Demian A. Schane
Thomas S. Waldo
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801-1145
Phone: (907) 586-2751
Fax: (907) 463-5891
dschane@earthjustice.org

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SOUTHEAST ALASKA CONSERVATION COUNCIL, SIERRA CLUB, and LYNN CANAL CONSERVATION, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES ARMY CORPS OF ENGINEERS; COLONEL TIMOTHY J. GALLAGHER, in his official capacity as District Engineer; LARRY L. REEDER, in his official capacity as Chief of the Regulatory Branch; DOMINIC IZZO, in his official capacity as Principal Deputy Assistant Secretary of the Army (Civil Works); and UNITED STATES FOREST SERVICE, <br><br> Defendants. | Case No. J05-0012 CV (JKS) |

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
**(5 U.S.C. §§ 702, 706(2)(A); 33 U.S.C. §§ 1311, 1316, 1342, 1344;**
**16 U.S.C. §§ 528-31, 551, 1600-14)**

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)

## INTRODUCTION

1. This action challenges the final decision of Defendant United States Army Corps of Engineers (Corps) to issue a section 404 permit under the Clean Water Act, 33 U.S.C. § 1344, for the disposal of 4.5 million tons of mine waste into a lake in connection with the Kensington Gold Project. It also challenges the final decision of the United States Forest Service approving the mining company's plan of operations and a second Corps' section 404 permit for the construction a marine terminal facility at Cascade Point, both of which depend on the Kensington section 404 permit.

2. The Kensington Gold Project is a proposed gold mine located near Juneau, Alaska. Coeur Alaska, Inc., a wholly-owned subsidiary of Coeur D'Alene Mines Corporation, seeks to develop the mine. As part of the proposal, Coeur Alaska intends to discharge, on average, 210,000 gallons per day of untreated, processed mine waste (mine tailings) into a freshwater lake, Lower Slate Lake, through a 3.5-mile pipeline. Ultimately, these discharges will deposit 4.5 million tons of mine tailings in the lake.

3. On June 15, 2005, the Corps signed the section 404 permit authorizing this discharge on the ground that the processed mine waste constitutes "fill material." On November 22, 2005, the Corps suspended the permit to re-evaluate its decision. On March 29, 2006, the Corps reinstated the identical permit.

4. Lower Slake Lake is a sub-alpine lake with a surface area of approximately 20 acres. It is situated on public lands within the Tongass National Forest on a relatively flat, south-facing terrace in the middle portion of the East Fork Slate Creek watershed. Slate Creek contains a variety of fish species, including coho, pink and chum salmon, Dolly Varden char, and cutthroat trout. Lower Slate Lake is surrounded by steep coniferous forested lands and rare and important

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                    -2-

lacustrine and palustrine emergent wetlands. Lower Slate Lake supports fish populations, including about 1,000 Dolly Varden char. There is no historical mine-related disturbance in the Slate Creek watershed.

5. Lower Slate Lake (elevation 650 feet) is connected to Slate Creek, which feeds into Berners Bay approximately 2 miles downstream. Berners Bay is one of Southeast Alaska's exceptional resources. Situated along the east side of Lynn Canal, Berners Bay provides outstanding biological resources and recreational opportunities for boaters, fishers, hunters, and wildlife viewers. The bay and the rivers that feed into it provide spawning and rearing habitat for runs of eulachon; sockeye, coho, pink, and chum salmon; steelhead and cutthroat trout; and Dolly Varden char. Every spring, eulachon gather in the tens of millions and make a spawning run up the bay's tributaries. The run draws an abundant array of species that come to the bay to feed on the eulachon. Hundreds of Steller sea lions, harbor seals, bald eagles, and sea gulls, among other wildlife, have been observed descending on the bay in search of food during the eulachon run.

6. Plaintiffs are organizations whose members use Lower Slate Lake and Berners Bay for recreation, fishing, camping, photography, wildlife viewing, and other activities. These organizations seek declaratory and injunctive relief preventing Defendants from allowing harm to the lake and the bay, and thereby to their members, pending compliance with the law.

**JURISDICTION, RIGHT OF ACTION, AND VENUE**

7. This court has jurisdiction pursuant to 28 U.S.C. § 1331 and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-02. Judicial review is available under the Administrative Procedure Act. 5 U.S.C. §§ 701-06.

**8.** Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e).

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                -3-

## PLAINTIFFS

9.  Southeast Alaska Conservation Council (SEACC) is a nonprofit organization of eighteen volunteer conservation groups in fourteen communities across the Southeast Alaska panhandle, from Yakutat to Ketchikan, and over 2000 individual members, the majority of whom live in Alaska.  SEACC advocates the conservation and wise long-term management of the scenic, wilderness, fish, wildlife, recreation, subsistence and other natural resources and values of Southeast Alaska.  SEACC's organizational members include Lynn Canal Conservation and the Juneau Group of the Sierra Club.

10.  Sierra Club is a national grassroots conservation organization with about 767,000 members, including about 1,800 Alaska residents, who are inspired by nature.  They explore, enjoy, and protect the wild places of the earth including the Berners Bay area of the Tongass National Forest.  They practice and promote the responsible use of the earth's ecosystems and resources.  For over a hundred years they have sought to educate and enlist humanity to protect and restore the quality of the natural and human environment.  Sierra Club members reside in nearly every community of Southeast Alaska, from Yakutat to Ketchikan.

11.  Lynn Canal Conservation, Inc. is a non-profit, volunteer grassroots conservation organization founded in 1971, based in Haines, Alaska.  It has approximately 150 members, all of whom reside in Southeast Alaska.  Lynn Canal Conservation works to protect the environment of the Lynn Canal area, including the Berners Bay area.

12.  Plaintiffs participated actively in the administrative processes leading up to the various approvals for the Kensington Gold Project.  Plaintiffs submitted comments on draft permits, proposed actions, and draft, final, and supplemental EISs for the project.  Plaintiffs exhausted the administrative remedies for the decision challenged in this Complaint.

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                -4-

13.     Members of plaintiff organizations reside near, visit, or otherwise use and enjoy areas that will be affected by the Kensington mine project, including Berners Bay and Lower Slate Lake.  In particular, members of plaintiff organizations use these areas for swimming, fishing, hunting, wildlife viewing, photography and education, and aesthetic and spiritual enjoyment.  Plaintiffs and their members derive recreational, aesthetic, and conservation benefits and enjoyment from these areas.  The construction and operation of the proposed gold mine will directly and irreparably injure these interests.

## DEFENDANTS

14.     Defendant United States Army Corps of Engineers is an agency of the United States.  It is charged, among other things, with issuing permits for the discharge of dredged or fill material under section 404 of the Clean Water Act.  The Corps issued the section 404 permits challenged here.

15.     Defendant Colonel Timothy J. Gallagher is the District Engineer for the Alaska District office of the United States Army Corps of Engineers in Anchorage, Alaska.  The District office is responsible for issuing permits for the discharges of dredged or fill material in Alaska under section 404 of the Clean Water Act.  Defendant Gallagher signed the Corps' Revised Record of Decision, the section 404 permits challenged here, and the letters reinstating those permits.

16.     Defendant Larry L. Reeder is the Chief of the Regulatory Branch in the Alaska District office of the United States Army Corps of Engineers in Anchorage, Alaska.  He is responsible for issuing permits for the discharge of dredged or fill material in Alaska under section 404 of the Clean Water Act, and he signed the section 404 permits challenged here.

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                -5-

17. Defendant Dominic Izzo is the Principal Deputy Assistant Secretary of the Army (Civil Works). On May 2, 2002, he signed the Corps' new regulations covering the definitions of "fill material" and "discharge of fill material" on which the Corps relied in issuing the Kensington permit challenged here.

18. The full name of Defendant United States Forest Service is United States Department of Agriculture, Forest Service. It is an agency of the Department of Agriculture entrusted with the administration of the national forests, including the Tongass National Forest. It regulates mining claimants' use of national forest lands, and it approved the plan of operations for the Kensington gold mine, including the use of Lower Slate Lake for the disposal of mine tailings, within the Tongass National Forest.

## FACTS

19. This project dates back to 1989 when Coeur Alaska first proposed the development of the Kensington mine. Coeur Alaska made that proposal as a joint venture with Echo Bay Exploration, Inc.

20. On June 1, 1991, the Forest Service released a draft environmental impact statement (DEIS) for the project. On January 29, 1992, the Forest Service released the final environmental impact statement (FEIS) and signed the Record of Decision (ROD).

21. At that time, Coeur Alaska claimed that the Kensington gold ore reserves included approximately 2,000,000 ounces of gold. Accordingly, the Forest Service's 1992 ROD authorized Coeur Alaska to mine approximately 200,000 ounces of gold per year for 10-12 years.

22. Under the 1992 plan, Coeur Alaska would have produced 26 million tons of mine tailings, 25% of which would have been backfilled. The rest of the mine tailings would have been disposed of in Sherman Creek, a creek that feeds into Lynn Canal.

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                                -6-

23.     Coeur Alaska intended to construct a dam in Sherman Creek in order to create a "waste disposal facility" for its mine tailings, which would have had the capacity to store 30 million tons of tailings.

24.     Coeur Alaska, however, did not receive any permits from the Corps or the United States Environmental Protection Agency (EPA).  EPA believed the Corps should regulate the construction of the dam and, in so doing, consider the impacts of both the dam and the disposal of the mine tailings.  The Corps believed that it lacked both the expertise and jurisdiction to regulate the discharge of mine tailings into a waterway.  Neither the Corps nor EPA contemplated regulating the mine tailings as "fill material."

25.     Corps Headquarters and EPA Headquarters met to resolve their disagreement.  According to the resulting EPA guidance, the Corps would issue a section 404 permit for the construction of a dam in Sherman Creek.  After the installation of the dam, the impounded waters would no longer be considered jurisdictional "waters of the United States" under the Clean Water Act and, as a result, neither agency would regulate the direct discharges of pollutants into the impounded waters.  Instead, the Corps would consider the impacts from the disposal of the mine tailings in connection with its analysis in issuing the section 404 permit for the dam.  EPA would regulate discharges from the impounded area into the creek below the dam pursuant to section 402 of the Clean Water Act.

26.     Despite this guidance, neither the Corps nor EPA issued a permit for the project.

27.     In 1995, Coeur Alaska bought out Echo Bay Exploration's interest in the Kensington Gold Project and became the sole operator.

28.     In 1996, Coeur Alaska submitted a revised, amended plan of operations.  In this version, Coeur Alaska made two significant changes.  First, it would not use on-site cyanidation

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                    -7-

but would send the ore concentrate off-site for final processing. Second, Coeur Alaska proposed to dispose its mine tailings by thickening them to approximately 55% solids and then discharging them in a wetland area between Sweeny and Sherman Creeks. The agencies referred to this proposal as a "dry tailings facility."

29.     Under the 1996 Amended Plan of Operations, Coeur Alaska would provide on-site, temporary housing for its employees during the life of the mine.

30.     On February 18, 1997, the Forest Service released a draft supplemental environmental impact statement (DSEIS). On August 1, 1997, the Forest Service issued a final supplemental environmental impact statement (FSEIS) and ROD for the 1996 Amended Plan of Operations.

31.     On January 28, 1998, the Corps issued Coeur Alaska a permit pursuant to section 404 of the Clean Water Act for the construction of the dry tailings facility. On April 14, 1998, EPA issued Coeur Alaska a permit pursuant to section 402 to discharge runoff and leachate from the facility.

32.     Despite having received its permit approvals, Coeur Alaska decided not to proceed with the project but, instead, reviewed other ways to cut project costs.

33.     In November 2001, Coeur Alaska submitted another amended plan of operations to the Forest Service. Once again, Coeur Alaska substantially modified its proposal. Coeur Alaska proposed to mine a much smaller, higher-grade ore body than it would have done under its 1996 Amended Plan of Operations. It would produce about 100,000 ounces of gold per year for 10 years instead of about 200,000 ounces of gold per year for 10 years.

34.     Coeur Alaska would produce 7.5 million tons of mine tailings, instead of 26 million tons. Coeur Alaska proposed to backfill up to 40% of its tailings (3 million tons) and

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                        -8-

discharge the remaining 4.5 million tons into Lower Slate Lake, a freshwater alpine lake that feeds into Slate Creek.

35.     Specifically, Coeur Alaska proposed to construct a 90-foot tall by 500-foot long dam below the lake to enlarge it and then discharge the tailings via a 3.5-mile pipeline from its milling facility directly into the lake.

36.     Under the 2001 Amended Plan of Operations, Coeur Alaska will not provide on-site employee housing. Instead, it will transport its employees via ferry. To do this, Coeur Alaska will construct marine terminals at Cascade Point and Slate Creek Cove, and the shuttle vessel will make three to five round-trips per day during the week and three round-trips per day during weekends.

37.     On January 23, 2004, the Forest Service released another DSEIS. On December 23, 2004, the Forest Service released a FSEIS and a third ROD. In the 2004 FSEIS, Alternative A, the no-action alternative, is the approved alternative from the 1997 FSEIS, *i.e.*, using the "dry tailings facility" and providing on-site employee housing. Alternative A1 is similar to Alternative A except that it involves mining under the reduced rate of Coeur Alaska's current proposal and therefore results in fewer impacts. Alternative D, the alternative selected in the 2004 FSEIS, involves mining at the reduced rate, discharging the processed waste or tailings into Lower Slate Lake, and shuttling the mine workers back and forth every day between Cascade Point and Slate Creek Cove.

38.     At the time the Forest Service released the 2004 DSEIS, EPA and the Corps were discussing how they would regulate the disposal of the mine tailings. They considered following the procedure that they had outlined in 1992, *i.e.*, redefining the lake as a "waste treatment facility" and not regulating the direct discharge of tailings into Lower Slate Lake. They also

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                    -9-

considered for the first time labeling the mine tailings "fill material" based on rule changes, promulgated by the Corps and EPA in 2002, that amended the definitions of "fill material" and "discharge of fill material." Under that approach, the Corps would regulate the direct discharge of mine tailings at the end of the pipe into the lake.

39. In May 2004, the agencies decided that the mine tailings should be deemed "fill material," and the Corps would regulate Coeur Alaska's discharge of the processed mine waste from the milling facility into Lower Slate Lake pursuant to section 404 of the Clean Water Act. EPA would regulate the discharges from Lower Slate Lake into waters below the lake pursuant to section 402 of the Act.

40. On June 17, 2005, the Corps signed the section 404 permit allowing Coeur Alaska to discharge its mine tailings into Lower Slate Lake.

41. On June 29, 2005, EPA issued a section 402 permit to Coeur Alaska for the discharges from Lower Slate Lake into the East Fork of Slate Creek Cove.

42. On July 15, 2005, the Corps issued a section 404 permit to Goldbelt, Inc., the owner of lands at Cascade Point, for the construction of a marine terminal facility there. The sole purpose of this facility is to provide a shuttle service for the Kensington mine.

43. Plaintiffs filed their initial Complaint on September 12, 2005. Shortly thereafter, the Corps decided to suspend both section 404 permits and re-evaluate its decision. On November 29, 2005, the Corps formally suspended the permits. On March 29, 2006, the Corps rendered a revised Record of Decision and reinstated the original permits. Coeur Alaska's section 404 permit for the disposal of mine tailings remained the same. The Corps slightly modified the section 404 permit for the Cascade Point marine facility to make clear that the permit is dependent on the proposed plan of operations for the Kensington mine.

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                    -10-

44.    Pursuant to its section 404 permit, Coeur Alaska proposes to discharge, on average, 210,000 gallons of mine tailings per day into Lower Slate Lake, totaling about 4.5 million tons over 10 years. The tailings discharge into the lake is projected to have a concentration of about 550,000 milligrams per liter of total suspended solids and pH between 10 and 11.

45.    The tailings discharges will likely kill all fish and invertebrates in Lower Slate Lake.

46.    Coeur Alaska and Defendants have not established that fish and other aquatic life will be able to re-populate Lower Slate Lake after Coeur Alaska stops discharging its mine waste into the lake. Coeur Alaska conducted two freshwater sediment toxicity tests on freshwater benthic invertebrates using samples of tailings generated from Kensington ore. One of those tests revealed a statistically significant drop in survival rate for the test organism. In other words, the tailings killed the organism.

47.    Coeur Alaska failed to preserve any more samples of tailings to conduct further habitability tests on freshwater organisms.

## COUNT I

### (Clean Water Act)

48.    Plaintiffs repeat and incorporate by reference the allegations of the preceding paragraphs.

49.    The purpose of the Clean Water Act is "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                            -11-

50.     To further these goals, section 301(a) of the Clean Water Act prohibits "the discharge of any pollutant by any person" unless done in compliance with the Act, such as pursuant to a permit issued under section 402 or 404.  33 U.S.C. § 1311(a).

51.     Section 402 of the Act established the National Pollutant Elimination Discharge System (NPDES) permit program.  33 U.S.C. § 1342.  These permits contain specific terms and conditions, as well as numerical discharge limits, which govern the activities of pollutant dischargers.

52.     Congress directed EPA to promulgate effluent limitations for point source discharges of pollutants.  33 U.S.C. § 1311(b).  Congress also directed EPA to identify categories of point sources and promulgate national standards of performance for new sources within each category.  33 U.S.C. § 1316(b)(1).

53.     An effluent limitation "means any restriction established by a State or [EPA] on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, . . . including schedules of compliance."  33 U.S.C. § 1362(11).  A standard of performance is "a standard for the control of the discharge of pollutants which reflects the greatest degree of effluent reduction which [EPA] determines to be achievable through application of the best available demonstrated control technology, processes, operating methods, or other alternatives, including, where practicable, a standard permitting no discharge of pollutants."  33 U.S.C. § 1316(a)(1).  Since standards of performance reduce or eliminate quantities, rates, or concentrations of pollutants, they constitute effluent limitations.

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                           -12-

54. Section 404 of the Clean Water Act authorizes the Corps to issue permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a).

55. Between 1977 and 2002, EPA and the Corps had different definitions for "fill material" and similar definitions for "discharge of fill material." In 2002, the agencies promulgated new regulations amending those definitions and making them identical. Under the new regulations, "fill material means material placed in waters of the United States where the material has the effect of: (i) Replacing any portion of a water of the United States with dry land; or (ii) Changing the bottom elevation of any portion of a water of the United States." 33 C.F.R. § 323.2(e)(1).

56. In enacting this regulation, however, the Corps made clear that it was not changing existing regulatory practice. Under the agencies' long-standing practice, point source discharges for which EPA had promulgated effluent limitations are not "fill material." Instead, those discharges are subject to regulation under section 402 and must comply with EPA's effluent limitations at the end of the pipe.

57. On December 3, 1982, EPA promulgated national standards of performance for new gold mines with mills that use a froth-flotation process to separate the gold minerals from the rock. 47 Fed. Reg. 54,598 (Dec. 3, 1982).

58. The standard of performance for mines proposed after 1982 prohibits the discharge of process wastewater to navigable waters except where net precipitation exceeds net evaporation, in which case the difference between the two can be discharged, and where there is a buildup of contaminants that significantly interferes with the ore recovery process, in which case a discharge can occur to correct the interference problem. 40 C.F.R. § 440.104(b).

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                    -13-

59. The milling process for the Kensington gold mine will use a froth-flotation process for the beneficiation of gold.

60. Coeur Alaska constitutes a "person" under the Act. 33 U.S.C. § 1362(5).

61. The mine tailings generated by the milling process in this project constitute a "pollutant" under the Act, which includes industrial waste. 33 U.S.C. § 1362(6).

62. The 3.5-mile pipeline leading from the milling facility to Lower Slate Lake is a discernible, confined and discrete conveyance and therefore a "point source" under the Act. 33 U.S.C. § 1362(14).

63. Lower Slate Lake constitutes "navigable waters" under the Act. 33 U.S.C. § 1362(7).

64. Coeur Alaska's proposed daily discharges of 210,000 gallons of mine tailings thus constitutes a point source discharge of pollutants. Those discharges are subject to the national standard of performance that EPA promulgated in 1982 for discharges from froth-flotation gold mills at the end of the pipe into Lower Slate Lake. 40 C.F.R. § 440.104.

65. Congress directed that the effluent limitations established by EPA "shall be applied to all point sources of discharge of pollutants in accordance with the provisions of" the Act. 33 U.S.C. § 1311(e).

66. Congress also provided that "it shall be unlawful for any owner or operator of any new source to operate such source in violation of any standard of performance applicable to such source." 33 U.S.C. § 1316(e).

67. Although EPA has promulgated a national standard of performance for the proposed discharge from Coeur Alaska's milling facility, neither EPA nor the Corps is going to apply that standard to the discharge of pollutants at the end of the pipe.

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                    -14-

68. Instead, the Corps has authorized the direct point source discharge of processed mine waste into Lower Slate Lake pursuant to section 404 of the Act on the ground that such waste is "fill material."

69. When the Corps and EPA implemented their new regulations defining "fill material" and the "discharge of fill material," 33 C.F.R. § 323.2, they stated that pollutants for which EPA has promulgated effluent limitations do not constitute "fill material" even if their discharge has the effect of fill.

70. Therefore, the Corps' attempt to regulate the point source discharge of pollutants for which EPA has promulgated effluent limitations circumvents the purpose of the Clean Water Act, violates the requirements of sections 301(e) and 306(e), 33 U.S.C. §§ 1311(e) & 1316(e), violates the Corps' and EPA's respective regulations, and is inconsistent the Corps' and EPA's long-standing regulatory practice.

71. The Corps' decision to issue a section 404 permit for the discharges of processed mine waste from the milling facility directly into Lower Slate Lake is therefore arbitrary, capricious, and not in accordance with law.

72. To the extent that the regulations defining "fill material" and the "discharge of fill material," 33 C.F.R. § 323.2, are interpreted to authorize the proposed discharges of processed mine waste from the milling facility directly into Lower Slate Lake, the regulations and the section 404 permit issued under them are inconsistent with the Clean Water Act and therefore arbitrary, capricious, and not in accordance with law.

73. The Forest Service is directed to manage the various resources of the national forests, including watersheds and fish, for multiple use in a manner that best meets the needs of

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                    -15-

the American people and will not impair the productivity of the land. 16 U.S.C. §§ 528-31, 551, 1600-14.

74. The plan of operations the Forest Service approved for the Kensington mine includes the discharge of processed mine waste directly into Lower Slate Lake, contrary to the Clean Water Act. The Forest Service's approval is therefore arbitrary, capricious, and not in accordance with law.

75. The Corps' section 404 permit for the construction of a marine terminal facility at Cascade Point is intended solely to facilitate the operations at Kensington mine and is dependent on the proposed plan of operations. The Corps' decision to reinstate this permit, as modified, is therefore arbitrary, capricious, and not in accordance with the law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

1. Enter a declaratory judgment that the Corps' section 404 permit for the discharge of processed mine waste for which EPA has promulgated effluent limitations is inconsistent with the Clean Water Act and unlawful;

2. Enter a declaratory judgment that the plan of operations approved by the Forest Service is inconsistent with the Clean Water Act and unlawful;

3. Enter a declaratory judgment that the Corps' section 404 permit for the construction of a marine terminal facility at Cascade Point is inconsistent with the Clean Water Act and unlawful;

4. Set aside the section 404 permit the Corps issued to Coeur Alaska for the discharge of mine tailings into Lower Slate Lake, the Forest Service's plan of operations, and the section 404

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                -16-

permit the Corps issued to Goldbelt, Inc. for the construction of a marine terminal facility at Cascade Point;

     5.   Enter appropriate injunctive relief;

     6.   Award plaintiffs the costs of this action, including reasonable attorneys' fees; and

     7.   Grant such other relief as this Court deems just and proper.

Respectfully submitted this 4th day of April 2006,

    /s/ Demian A. Schane

Demian A. Schane (ABA# 0403007)
Thomas S. Waldo (ABA# 9007047)
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
Ph: 907-586-2751
Fax: 907-463-5891
Email: dschane@earthjustice.org

Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I, Demian Schane, certify that on April 4, 2006, a true and correct copy of FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF was served electronically to Mark Nitczynski. A courtesy copy was also sent via e-mail to Lawrence L. Hartig, John C. Berghoff, Jr., David C. Crosby, Cameron M. Leonard, Ruth Hamilton Heese, and Jim Ustasiewski.

/s/ Demian A. Schane
Demian A. Schane

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)    -17-