DECLARATION OF JOE KAHKLEN

JOE KAHKLEN declares under penalty of perjury as follows:

1.  My name is Joe Kahklen. I reside at 800 F Street, Unit D6, Juneau, Alaska, 99801. I am the Chairman of the Board of Directors of Goldbelt, Incorporated ("Goldbelt"). I am making this declaration in support of the Motion of Goldbelt to intervene as a defendant in this litigation.

2.  I am a Tlingit Indian. The name Tlingit translates roughly to "the real people." My traditional name is Kokeesh, my moiety is Raven, and my clan is Dog Salmon. I was the first CEO and President of Goldbelt when it was formed in 1974, and I have been active in corporate affairs ever since.

3.  Berners Bay and surrounding lands, including Cascade Point and the lands on which the Kensington Gold Project will be developed are within the aboriginal territory of the Auk Kwaan Tlingit, whose descendants are the modern day shareholders of Goldbelt.

4.  Berners Bay is an important subsistence hunting and fishing area for Juneau Tlingit. Goldbelt would not be a party to any development that significantly impacted use of the area for subsistence activities. Goldbelt and its shareholders have participated in the process of assessing the environmental impacts of the Kensington project - including the impacts of constructing the Cascade Point dock and

transporting mine workers across Berners Bay. Goldbelt and Coeur have agreed to extraordinary mitigation measures to insure that the resources of Berners Bay will not be harmed. Significantly, the plaintiffs do not challenge the adequacy of the Supplemental Environmental Impact Statement, which concluded that with the mitigation required by the Forest Service's decision, the impacts of the project on Berners Bay will be minimal.

5.   In the years since first contact with non-Native cultures, Tlingit lands, including Berners Bay, were encroached upon and wrongfully appropriated by individuals in populated areas, such as Juneau, and by the United States government for inclusion in the Tongass National Forest. The Tlingit received partial compensation for the loss of their lands as a result of a judgment issued by the United States Claims Court in 1968.

6.   In 1971, Congress further addressed the issue of Alaska Native land claims by enacting the Alaska Native Claims Settlement Act ("ANCSA"), which granted some 45 million acres of land and $1 billion as compensation for the extinguishment of Native aboriginal title. In order to receive benefits under ANCSA, Alaska Natives were required to organize as corporations under Alaska law. Land entitlements were organized primarily around traditional village sites, with

village corporations receiving surface estate and regional corporations the subsurface estate. Because the territory of Tlingit in the Juneau area had been subsumed into the City and Borough of Juneau, however, Tlingit in the Juneau area (along with three other communities) were incorporated under a separate section of ANCSA into so-called "urban corporations," with the right to select 23,040 acres of land in reasonable proximity to their municipalities. Congress expected that these lands would be selected for their economic potential, which, in Southeast Alaska at the time meant timber.

    7. In 1974, the Juneau area Tlingit organized Goldbelt Incorporated, which currently has more than 3,000 shareholders. In due course the Secretary of the Interior made withdrawals of land for selection by Goldbelt, including lands on Admiralty Island within the Admiralty Island National Monument. Environmental groups, including the Sierra Club (which is a plaintiff in this litigation) immediately brought suit challenging the legality of the Admiralty Island withdrawals. To avoid the delay and expense of that litigation, in 1979 Goldbelt agreed to exchange its Admiralty Island selections for less sensitive lands on the mainland, including approximately 1,000 acres of land on and around Cascade Point on the south shore of Berners Bay.

8. The Berners Bay lands, which have high values because of their easy access from the Juneau road system, are critical to the economic future of Goldbelt and its shareholders. In recognition of this fact, the City and Borough of Juneau has designated portions of Goldbelt's lands near Cascade Point as a "new growth area," and Goldbelt, at great expense, has developed a phased plan for development of the area, beginning with dock facilities at Cascade Point. A dock at this location would have substantial value as a ferry terminus to northern Lynn Canal and the communities of Haines and Skagway, as a service site for fishing vessels, and as an embarkation point for whale watching and other tourism activities, in addition to servicing the Kensington Mine.

9. Having, in effect, forced Goldbelt off of Admiralty Island and into Berners Bay and Cascade Point in particular, the same environmental groups, lead by the plaintiffs in this litigation, have bitterly opposed every effort of Goldbelt to realize any economic benefit from its Berners Bay lands. In 1998, these group successfully opposed Goldbelt's application for a dredge and fill permit to construct a dock at Cascade Point. The Corps of Engineers' decision was based in part on a finding that there was no demonstrated public or economic need for a dock at that time. That requirement is presently satisfied by the inclusion of the Cascade Point marine

terminal in the Kensington Gold Project Plan of Operations and the need to ferry workers to the mine site.

10. In 1999, SEACC and the Sierra Club appealed a Forest Service decision authorizing construction of a right-of-way to allow administrative access to Goldbelt's lands at Cascade Point.

11. The marine terminal cannot be constructed without a conditional use permit ("CUP") from the City and Borough of Juneau ("CBJ"). SEACC strenuously opposed Goldbelt's application for a CUP. When it became clear that a permit would be granted, SEACC succeeded in having the CBJ Planning Commission and Assembly insert a condition in the CUP that the dock could be used <u>solely</u> to transport workers via a single ferry to the Kensington mine site. So conditioned, the CUP was granted on October 15, 2004.

12. In 2003, Goldbelt once again applied for a dredge and fill permit to construct a dock at Cascade Point to serve as a marine terminal for transporting workers to the mine site. Although the 404 permit application was in the name of Goldbelt as the property owner, the dock is an integral part of the Kensington Gold Project Plan of Operations. The environmental impacts of the dock were considered in the Supplemental Environmental Impact Statement prepared for the Plan of Operations and associated federal permits. On

July 15, 2005, the Corps issued a 404 permit for the Cascade Point marine terminal. The Corps has advised Goldbelt, however, that use of the dock for any purpose other than mine worker ferry operations, as required in Goldbelt's CUP from CBJ, may require re-noticing and amendment of the Corps' permit. Goldbelt has expended considerable time, effort and resources in pursuing a permit for a marine terminal at Cascade Point in reliance on Coeur's plans for the Kensington Mine.

13. As a consequence of SEACC's opposition, Goldbelt's proposed Cascade Point dock is a dedicated facility that is only viable if the mine goes into operation. If SEACC, the Sierra Club and Lynn Canal Conservation succeed in invalidating the Plan of Operations and blocking construction of the Kensington Mine, the practical and legal effect will be to block construction of the Cascade Point dock, as well. A recent Op-Ed piece by a representative of plaintiff Lynn Canal Conservation (Attachment A) makes it clear that stopping the commute of mine personnel between Cascade Point and Slate Creek Cove is a principal, if indirect, aim of the litigation. SEACC has formally requested the Corps of Engineers to reconsider and deny Goldbelt's 404 permit for Cascade Point on the ground that the dock is dedicated to mine service (thanks to their efforts) and Coeur could transport workers from

another site (Yankee Cove) not owned by Goldbelt. Attachment B.

14.  In all its proposals for development of the Kensington mine, Coeur Alaska has shown sensitivity to the needs of the Native Community.  In 1996, Coeur entered into an agreement with a consortium of Southeast Alaska Native organizations, including Goldbelt that, among other provisions, gives a bidding preference to members of the coalition in contracts for construction and servicing the mine.  Because Goldbelt is the Native Corporation in closest proximity to the Kensington mine, in 2000, Goldbelt and Coeur entered into a separate agreement contemplating leases of land (including the Cascade Point dock site) and future contracting consideration, including contracting for worker transportation and ferry service across Berners Bay for commuting Coeur employees.  Coeur's Plan of Operations, under challenge in this litigation, is premised on use of Cascade Point and ferry service provided by Goldbelt.  Thus, the litigation threatens a direct an immediate economic impact to Goldbelt.

15.  Coeur has also made commitments for local and Native training and hire.  Unemployment and underemployment among Goldbelt shareholders is significantly higher than for non-Natives.  Many of the jobs that are available to Goldbelt shareholders are in the seasonal tourism industry, where wages

7

are low and fringe benefits are not customary. The Kensington mine represents the most promising new source of meaningful, well paying jobs with benefits for our shareholders.

16. To summarize, the pending litigation is just the latest in a consistent series of actions by the plaintiffs designed to prevent any and all development of Goldbelt's lands at Berners Bay. Their efforts to derail the Kensington Mine, if successful, will not only kill Goldbelt's dock at Cascade Point, but also will deliver a crushing blow to the hopes of Goldbelt and its shareholders to benefit from the economic prosperity that the mine would bring to the community of Juneau.

17. Because of its historical roots in Berners Bay and its involvement in the permitting process, Goldbelt is in a position to provide the court with information that may not be available to other parties. Paragraph 83 of the complaint, for example, contains misleading information concerning the importance of Cascade Point as a herring spawning area. Dive surveys performed by Goldbelt and provided to the Corps of Engineers demonstrate that the small amount of herring spawning habitat that will be impacted is marginal. The Alaska Department of Fish and Game reports that Cascade Point is used infrequently for spawning. Because of the importance of the mine to Goldbelt and its shareholders, Goldbelt is also

8

in a unique position to provide the Court with information concerning balancing of the equities.

18. No other party can adequately represent Goldbelt's interests in this litigation. The primary interest of the federal agencies and the State of Alaska is in defending the permitting process. They will not be harmed if the mine is enjoined. Coeur's principal interest is in opening and operating the mine. Transportation and housing of employees are subsidiary issues. The plaintiffs have argued that transportation and housing could be accommodated in several ways that would not require a marine terminal at Cascade Point -- such as transportation by helicopter(Alternative A, or the "no action" Alternative favored by plaintiffs) or use of the permitted dock facility at Yankee Cove outside Berners Bay on Lynn Canal. These alternatives are more costly, less effective to the purposes of the Plan of Operations, and involve significantly higher safety risks. Nevertheless, at some point, one of these alternatives might seem to Coeur preferable to the costs and uncertainty of protracted litigation.

DATED this 12 day of Oct, 2005, at Juneau, Alaska.

Joe Kahklen

A:KahklenDecl.Coeur9
As of 10/4/2005

ATTACHMENT A



Click here to return to the original story

## My Turn: Kensington mine is a threat to Berners Bay fish habitat

The Sept. 16 "My Turn" column explains how the Corps of Engineers violated the federal Clean Water Act by permitting the Kensington Mine to dump 4.5 million tons of tailings into Lower Slate Lake above Berners Bay. The article provides a rational explanation of why conservationists have taken the violation to court.

Another disturbing aspect of the mine operation that is not the focus of litigation is its potentially serious and irreversible harm to fish resources in Berners Bay and Lynn Canal. The largely undisturbed bay and its tributary rivers support five species of salmon, Dungeness and tanner crab, halibut and cod. The bay provides the last significant herring spawning and rearing habitat in lower Lynn Canal.

Incremental, cumulative mine-related impacts are expected to permanently degrade the nearshore ecosystem upon which all aquatic life in Berners Bay depends. Shoreline facilities and increased vessel traffic are expected to disrupt migration patterns and alter current patterns that determine predator-prey distribution, spawning habitat, immature fish survival and critical freshwater-salinity gradients. Slow and chronic releases of hydrocarbons are expected to disrupt fish reproduction.

These impacts would extend far beyond Berners Bay because commercially important fish and their prey move freely between the bay, the rest of Lynn Canal and Icy Strait. These populations support the region's commercial gillnet, seine, and troll fishermen, as well as sport and subsistence users.

Studies in the 1980s indicate that Lynn Canal's east shore is a critical migration corridor for juvenile salmon migrating from the rich spawning grounds in northern Lynn Canal. Juveniles stay close to shore to feed and avoid predation. Some fish follow the beach around Point St. Mary into Berners Bay. It is well documented that Chilkat River coho smolt migrate to sea, then overwinter in Berners River and leave the following spring.

Berners Bay herring and eulachon are important to juvenile salmon. Juvenile salmon migration coincides with the hatching of herring, and fish prey in general comprise 30 to 75 percent of their diet.

In 2004, an Alaska Department of Fish and Game biologist stated that the Lynn Canal herring stock collapsed in 1982 and has not recovered. He said that overfishing and Auke Bay habitat degradation are thought to be the main contributing factors. Developing a mine-related marine facility at Cascade Point is likely to impact herring. Continued encroachment on shoreline spawning habitat could collapse the area's herring resource and the amount of food available to Lynn Canal juvenile salmon.

Immature kings feed throughout Lynn Canal and depend on herring and eulachon. Herring and eulachon also feed mature kings and cohos moving through Icy Strait toward the many spawning rivers and streams in Lynn Canal. Adult king, coho, chum and pink salmon returning to spawn in northern Lynn Canal feed on aquatic resources produced in Berners Bay. Berners River coho smolt produce adults caught in the Chilkat River. The bay's plankton-rich water feeds migrating sockeye salmon.

Commercial gillnetting in Lynn Canal also depends on summer chum returning to hatchery release sites at Amalga and Boat harbors. Primary fishing for summer chum lies between the latitude of Little Island and Point Bridget, the southern point of Berners Bay. Sockeye destined for Berners Bay migrate through this area when chum are harvested.

ADF&G must manage all salmon fisheries to ensure wild salmon escapement in numbers sufficient to sustain them. The bay is the first estuarine environment juvenile sockeye encounter. If industrial development in the bay negatively impacts wild sockeye, ADF&G may need to close the lower Lynn Canal summer chum fishery to protect it. Closure would affect fishermen, nonprofits that produce chum, and processors who buy gillnetted chum and sockeye.

ADF&G may also need to limit commercial trolling to protect Berners Bay coho from overharvest. Coho depend on a healthy estuary and the fish prey it produces. A collapse of herring and eulachon runs could dramatically impact coho.

Agencies can speculate that the Kensington Mine will not impact Lynn Canal fisheries; however, events commonly unfold differently than government and industry people hope. Consequences for complex biological systems like Berners Bay-Lynn Canal can be serious and irreversible. To risk sustainable Lynn Canal fisheries for short-term economic returns from the Kensington Mine would be irresponsible.

• Bruce Baker is a natural resource consultant, conservationist and retired deputy director of the Alaska Department of Fish and Game's Habitat Division.
Click here to return to story:
http://www.juneauempire.com/stories/092905/opi_20050929004.shtml



# Southeast Alaska Conservation Council

SEACC 419 6th Street, Suite 200, Juneau, AK 99801
(907) 586-6942 phone • (907) 463-3312 fax
www.seacc.org • info@seacc.org

RECEIVED

AUG 0 8 2005

CENPA - CO - FI - E - JFO
Alaska District Corps of Engineers

August 5, 2005

John Leeds
U.S. Army Corps of Engineers
Regulatory Branch
8800 Glacier Highway, Suite 106B
Juneau, AK 99801

RE:   Use of Cascade Point under ACOE Permit POA 1997-245-N

Dear Mr. Leeds:

As you are aware, the Southeast Alaska Conservation Council (SEACC) has been actively engaged in the public review of Goldbelt Inc.'s permit application for development of a marine terminal at Cascade Point. We have reviewed the Record of Actions that you provided SEACC via email on August 4, 2005, and it is unclear whether the Army Corps of Engineers has seen the enclosed letter. The letter is from David D. Goade, Executive Vice President of Goldbelt, Inc. to Kaja Brix of the Protected Resource Division, NMFS Alaska Region, dated December 20, 2004.

In the letter, Mr. Goade clearly indicates that "[t]here are no possible future developments involving the terminal that are 'reasonably certain to occur'" in addition to mine support. Goade letter at 1. Because "Goldbelt has no present plan or intention to use the dock for any other purpose" than shuttling mine workers (*id.*), the purpose Goldbelt envisions for the marine terminal is far narrower than that characterized in the Corps' Decision Document for the permit. For this reason, the Corps should re-open its alternatives analysis with due consideration of the newly-constructed facilities at Yankee Cove, which can fulfill the sole purpose of this project (shuttling mine workers).

ALASKA SOCIETY OF AMERICAN FOREST DWELLERS, Point Baker • ALASKANS FOR JUNEAU • CHICHAGOF CONSERVATION COUNCIL, Tenakee
• FRIENDS OF BERNERS BAY, Juneau • FRIENDS OF GLACIER BAY, Gustavus • JUNEAU AUDUBON SOCIETY • JUNEAU GROUP SIERRA CLUB • LOWER CHATHAM
CONSERVATION SOCIETY, Port Alexander • LYNN CANAL CONSERVATION, Haines • NARROWS CONSERVATION COALITION, Petersburg • LISIANSKI INLET RESOURCE
COUNCIL, Pelican • PRINCE OF WALES CONSERVATION LEAGUE, Craig • SITKA CONSERVATION SOCIETY • TONGASS CONSERVATION SOCIETY, Ketchikan • TAKU
CONSERVATION SOCIETY, Juneau • WRANGELL RESOURCE COUNCIL • YAKUTAT RESOURCE CONSERVATION COUNCIL

*printed on recycled paper*

Thank you for your attention to this request.

Sincerely,

*Buck Lindekugel*
Buck Lindekugel
Conservation Director / Staff Attorney

Enclosure: Goade, Goldbelt Inc. letter to Brix, NMFS, dated December 20, 2005

CC:   Larry L. Reeder, Chief, Regulatory Branch
      Timothy J. Gallagher, Colonel, Corps of Engineers

ATTACHMENT B



**Goldbelt**
9097 Glacier Hwy. Suite 200, Juneau, Alaska 99801 (907) 790-4990 Fax (907) 790-4999

December 20, 2004

Kaja Brix
NMFS Alaska Region
Protected Resource Division
P.O. Box 21668
709 West 9th Street
Juneau, AK 99802

Re: Kensington Gold Project ESA § 7 Consultation

Dear Ms. Brix:

I have reviewed the draft minutes of the December 15, 2004, ESA Section 7 Consultation meeting. I am writing to respond to the third bulleted point under section III, regarding Goldbelt's future plans for the Cascade Point marine terminal. There are no possible future developments involving the terminal that are "reasonably certain to occur," as contemplated by your Consultation Handbook, page 4-30.

As you know, the City and Borough of Juneau has issued a Conditional Use Permit that restricts Goldbelt's use of the terminal to a single shuttle ferry to accommodate workers at the Kensington mine. Quite apart from this legal restraint, Goldbelt has no present plan or intention to use the dock for any other purpose.

The Corps of Engineers asked Goldbelt to describe any uses to which the dock could be put, without regard to present zoning or permit restrictions. It is conceivable that a dock in that location could be used in the future for ecotourism cruises, services for commercial fishermen, or even (with some modifications) as a ferry terminal to serve northern Lynn Canal. Goldbelt has no current commitments or business plans for any of these options, however.

By way of further explanation, until last year Goldbelt owned and operated a fleet of 10 day and over night tour vessels. Last year, however, Goldbelt sold all but one of its operational vessels, which is home ported in Ketchikan. Goldbelt does have a lease back agreement on a single vessel that is dedicated to Tracy Arm tours. Thus, Goldbelt management has made a conscious decision to retrench its tourism operations and has absolutely no plans at the present time to expand those operations, at Cascade Point or elsewhere.

Services to the commercial fishing industry are purely speculative. Goldbelt has no commitments or plans with respect to such operations.

Kaja Brix
Section 7 Consultation
Page 2

The State of Alaska is considering a Juneau access alternative that would involve ferry service to Lynn Canal out of a Cascade Point location. If that alternative is selected (which seems unlikely), it would require significant modifications to the current dock proposal (which is designed to accommodate small, shallow draft vessels). Any such modifications would require additional dredge and fill permits from the United States Army Corps of Engineers, which, of course, would necessitate further Section 7 consultations. I understand that any future "federal actions" unrelated to the present proposal and that would require their own Section 7 consultation are not considered in your cumulative effects analysis. Consultation Handbook, page 4-30.

Because of the restrictions imposed by the CBJ Conditional Use Permit, and Goldbelt's complete absence of any specific plans for use of the Cascade Point marine terminal beyond servicing the Kensington Mine in accordance with that permit, I can assure you that no other use of the dock is "reasonably certain to occur" in the foreseeable future.

If you have any other questions, please give me a call.

Sincerely,
GOLDBELT, INC.


David D. Goade
Executive Vice President