Demian A. Schane
Thomas S. Waldo
EARTHJUSTICE
325 Fourth Street
Juneau, Alaska 99801
Ph: 907-586-2751
Fax: 907-463-5891
Email: dschane@earthjustice.org

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SOUTHEAST ALASKA CONSERVATION COUNCIL, SIERRA CLUB, and LYNN CANAL CONSERVATION,<br><br>    Plaintiffs,<br><br>    v.<br><br>UNITED STATES ARMY CORPS OF ENGINEERS; COLONEL TIMOTHY J. GALLAGHER, in his official capacity as District Engineer; LARRY L. REEDER, in his official capacity as Chief of the Regulatory Branch; DOMINIC IZZO, in his official capacity as Principal Deputy Assistant Secretary of the Army (Civil Works); and UNITED STATES FOREST SERVICE,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No. J05-0012 CV (JKS)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFFS' OPENING BRIEF ON COUNT I**

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................3

    I.      HISTORY OF THE PROPOSED KENSINGTON MINE:  1989 - PRESENT. ...................................................................................................3

    II.     DESCRIPTION OF THE PROPOSED KENSINGTON MINE PROJECT. ......................................................................................................7

    III.    STATUTORY FRAMEWORK. ................................................................12

    IV.    REGULATORY FRAMEWORK. ..............................................................17

          A.   New Source Standards of Performance for Gold Mines. ................17

          B.   Definition of "Fill Material." .........................................................20

ARGUMENT .....................................................................................................................26

    I.      THE CORPS' PERMIT VIOLATES SECTION 306(E) OF THE CLEAN WATER ACT. ..............................................................................28

    II.     THE CORPS' SECTION 404 PERMIT IS INCONSISTENT WITH ITS REGULATIONS. .................................................................................30

    III.    THE REGAS MEMORANDUM ON WHICH THE CORPS RELIED IS ARBITRARY AND NOT IN ACCORDANCE WITH LAW ..........................35

    IV.    IF THE INTERPRETATION CONTAINED IN THE REGAS MEMORANDUM IS CORRECT, THE "FILL MATERIAL" REGULATIONS ARE UNLAWFUL. .................................................................40

    V.     THE FOREST SERVICE'S ROD AND APPROVAL OF THE PLAN OF OPERATIONS, AND THE CORPS' SECTION 404 PERMIT FOR THE CONSTRUCTION OF A MARINE TERMINAL FACILITY AT CASCADE POINT, ARE ARBITRARY AND NOT IN ACCORDANCE WITH LAW. ......................................................................40

    VI.    THE COURT SHOULD VACATE THE SECTION 404 PERMITS AND THE FOREST SERVICE'S ROD AND APPROVAL OF THE PLAN OF OPERATIONS, AND GRANT A PERMANENT INJUNCTION. ..........................................................................................41

CONCLUSION ..................................................................................................................47

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)          i

Pursuant to the Court's Order of April 7, 2006 (Docket No. 37), Plaintiffs Southeast Alaska Conservation Council, Sierra Club, and Lynn Canal Conservation submit this opening brief on Count I.  Plaintiffs seek declaratory and injunctive relief.  A proposed order is attached.

INTRODUCTION

This case challenges the unprecedented decision by the Army Corps of Engineers (Corps) to issue a permit to a mining company allowing the discharge of chemically processed wastewater (called "mine tailings") directly into a lake.  These discharges will not be subject to the pollution control technologies required for other gold mines and will kill all fish and nearly all aquatic life in the lake for at least the life of the mine.  The Corps issued the permit to Coeur Alaska, Inc., in connection with its proposed Kensington mine, near Juneau, Alaska.

In 1972, Congress passed the Clean Water Act in response to the practice of using lakes, rivers, and streams as dumping sites for industrial wastes.  Pursuant to the Act, the Environmental Protection Agency (EPA) promulgated a regulation in 1982, known as a standard of performance, that prohibits gold mines from discharging their tailings into navigable waters.  Since 1982, every new gold mine in the United States has been required to comply with this standard.  In 2005, however, the Corps issued the Kensington mine a permit, pursuant to section 404 of the Clean Water Act, to discharge 210,000 gallons of tailings per day as "fill material" directly into a lake.  There is nothing distinctive about the Kensington mine that justifies treating it differently from similar mines, which are prohibited from discharging tailings into waters.

The Corps' permit violates the Clean Water Act.  The Act requires all "new sources" to comply with the standards of performance that EPA promulgates for those sources.  33 U.S.C. § 1316(e).  The relevant standard of performance here, for froth-flotation gold mills, generally

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                    1

prohibits the discharge of process wastewater, which includes tailings slurry, into United States waters. 40 C.F.R. § 440.104(b)(1). The standard is based on EPA's conclusion, in 1982, that the technology existed for gold mills using a froth-flotation process to recycle completely their process wastewater without discharging into navigable waters. Since the proposed discharges from the Kensington mine into the lake do not comply with the standard, the Corps' permit circumvents the Clean Water Act's requirement that all new sources comply with the standards of performance promulgated for those sources.

The Forest Service issued a Record of Decision (ROD) and approved the plan of operations for the proposed Kensington mine, and the ROD and plan rely on the Corps' Kensington mine permit. The Corps also issued a section 404 permit to Goldbelt, Inc. for the construction of a marine terminal facility at Cascade Point from which Coeur Alaska will shuttle its mine workers to and from Juneau. That permit, by its express terms, is dependent on the proposed mining operations. Since the ROD, plan of operations for Kensington mine, and section 404 permit for Cascade Point depend on an unlawful permit, they are arbitrary and not in accordance with law.

Plaintiffs will suffer irreparable harm if the Kensington mine is allowed to proceed under the proposed plan of operations. Specifically, Coeur Alaska's section 404 permit authorizes it, among other things, to discharge 210,000 gallons per day of toxic mine waste, the tailings slurry, via a 3.5-mile pipeline directly from its gold mill into Lower Slate Lake. The discharges will ultimately deposit about 4.5 million tons of solids into the lake, a fish-bearing waterbody that lies in an undeveloped terrace 650 feet above sea level and drains two miles through Slate Creek into Berners Bay, one of the most ecologically rich areas of Southeast Alaska. The discharges are

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                2

expected to kill all aquatic life in the lake, including the resident population of Dolly Varden

char, for at least the mine's 10- to 15-year life.  Mining operations will also substantially increase

vessel traffic and industrial noise in Berners Bay.  The Court should therefore vacate the section

404 permits, ROD and plan of operations, and enjoin the Corps and Forest Service from allowing

any activities authorized by the vacated permits, ROD, and plan of operations.  There are no

other legal remedies that will avoid causing irreparable harm to Plaintiffs.  Preventing the

agencies from authorizing activities under the unlawful permits and plan of operations is

essential to upholding the very purpose of the Clean Water Act – to protect the integrity of the

nation's waters.

BACKGROUND

I.     HISTORY OF THE PROPOSED KENSINGTON MINE:  1989 - PRESENT.

       The proposed Kensington mine is located on national forest lands and patented mining

claim lands within the Tongass National Forest near Juneau, Alaska.  It is south of Lion's Head

Mountain and situated between Berners Bay to the east and Lynn Canal to the west.  *See* Pl. Ex.

1 at 8 (2004 FSEIS, Figure 1-2 at 1-6).

       Coeur Alaska, a wholly-owned subsidiary of Coeur d'Alene Mines Corporation, first

proposed developing the mine in 1989.  54 Fed. Reg. 43,189 (Oct. 23, 1989).  At that time, the

proposal was a joint venture between Coeur Alaska and Echo Bay Exploration, Inc.  To analyze

its environmental effects, the Forest Service prepared an environmental impact statement and

released a record of decision (1992 ROD).  *See* Pl. Ex. 6 (1992 ROD).

       In the 1992 ROD, the Forest Service selected Alternative F.  *Id*. at 3 (1992 ROD at 3).

This alternative located operations within the Sweeney Creek and Sherman Creek drainages,

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                    3

both of which feed into Lynn Canal. Coeur Alaska had proposed to construct a dam in Sherman Creek and dispose up to 20 million tons of mine tailings, the waste byproduct of the gold ore extraction process, into the impounded waters. Pl. Ex. 5 at 7 (1992 FEIS at 2-15). During operations, Coeur Alaska would have provided on-site housing for employees. *Id*. at 6 (1992 FEIS at 2-2).

Because of water quality concerns, EPA and the Corps did not issue their respective permits for the mine. *See* Pl. Ex. 11 at 6 (EPA Technical Assistance Report at v). Coeur Alaska never proceeded with the plan of operations outlined in the 1992 ROD. In October 1995, after buying out Echo Bay Exploration's interests, Coeur Alaska amended its plan of operations and re-applied for permission from the Forest Service to develop the mine. Pl. Ex. 3 at 3 (1997 FSEIS at 1-3).

The amended plan of operations involved two principal changes from the 1992 proposed alternative. First, instead of damming Sherman Creek and disposing its tailings in the resulting impoundment, Coeur Alaska proposed to construct a "dry tailings facility" in an area between Sweeny and Sherman Creeks. *Id*. Essentially, Coeur Alaska proposed to construct a berm and drainage structures around the area and place the tailings within the enclosure. *Id*. at 5, 6 (1997 FSEIS at 2-5, 2-6). After operations ended, Coeur Alaska would have covered the area with till and growth media to support revegetation. *Id*. at 9 (1997 FSEIS at 2-22). Second, Coeur Alaska decided not to use cyanide in the on-site ore extraction process. Instead, it would send the ore concentrate off-site for cyanide processing. Pl. Ex. 4 at 5 (1997 ROD at 4).

In connection with the amended plan of operations, the Forest Service prepared a supplemental environmental impact statement (1997 FSEIS) and issued a new record of decision

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)          4

(1997 ROD).  *See* 62 Fed. Reg. 8,012 (Feb. 21, 1997); 62 Fed. Reg. 43,730 (Aug. 15, 1997).

The Forest Service adopted Coeur Alaska's modified proposal, Alternative D, in the 1997 ROD.

Pl. Ex. 4 at 5 (1997 ROD at 4).

      On January 28, 1998, the Corps issued Coeur Alaska a permit pursuant to section 404 of

the Clean Water Act to construct the dry tailings facility based on Alternative D in the 1997

ROD.  *See* Pl. Ex. 10 at 7 (1998 Corps ROD at 22).  On April 14, 1998, EPA issued Coeur

Alaska a National Pollutant Discharge Elimination System (NPDES) permit pursuant to section

402.  *See* Pl. Ex. 8 (1998 NPDES Permit).  Neither permit was appealed or challenged in court.

Coeur Alaska, however, did not proceed with the construction of the mine.  Instead, Coeur

Alaska proceeded to investigate other, less expensive ways to develop the mine.

      In November 2001, Coeur Alaska submitted another amended plan of operations to the

Forest Service, which is at issue here.  This proposal involved substantial changes from the

previous plans of operations.  First, instead of using the dry tailings method, Coeur Alaska

proposed to dispose of its mine tailings directly into a freshwater sub-alpine lake, Lower Slate

Lake.  Pl. Ex. 1 at 6 (2004 FSEIS at 1-4).  These discharges are expected to kill all fish in the

lake.  *Id*. at 41 (2004 FSEIS at 4-38).  Second, Coeur Alaska proposed to extract only higher-

grade ore, resulting in the need to process a smaller amount of rock.  Instead of mining at a rate

of 4,000 tons per day, Coeur Alaska proposed to mine at a rate of 2,000 tons per day.  *Id*. at 17

(2004 FSEIS at 2-19).  Under the proposal, Coeur Alaska would produce 7.5 million tons of

tailings (instead of 26 million tons).  *Id*.  Finally, instead of providing on-site employee housing,

Coeur Alaska proposed to shuttle its mine workers across Berners Bay every day between new

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                    5

marine terminals to be built at Cascade Point and Slate Creek Cove.  *Id*. at 23 (2004 FSEIS at 2-35).

To analyze this latest proposal, the Forest Service prepared another supplemental environmental impact statement (2004 FSEIS), and it released a third record of decision (2004 ROD).  *See* 69 Fed. Reg. 3,340 (Jan. 23, 2004); 69 Fed. Reg. 76,942 (Dec. 23, 2004).  Plaintiffs appealed the 2004 ROD to the Forest Service's Regional Forester, and he rejected their appeals.

On June 17, 2005, the Corps signed the section 404 permit for the daily discharges of mine tailings.  *See* Pl. Ex. 9 (2005 Corps Permit).  On June 28, 2005, EPA signed the NPDES permit for the project.  *See* Pl. Ex. 8 (2005 NPDES Permit).  On July 15, 2005, the Corps signed the section 404 permit for the construction of a marine terminal at Cascade Point.[1]  *See* Pl. Ex. 37 (2005 Cascade Point Permit).

In July 2005, Coeur Alaska began some work on the project, upgrading an existing road from Slate Creek Cove to its patented mining claim lands and constructing facilities on those lands.  Between May and September 2005, Coeur Alaska and Plaintiff Southeast Alaska Conservation Council held confidential negotiations to try to resolve this dispute without litigation.  Pl. Ex. 30 at 3 (Lindekugal Decl. at ¶ 6).  They were unable to reach an agreement.  On September 12, 2005, Plaintiffs filed the Complaint.

Shortly after Plaintiffs filed the Complaint, the Corps moved for a voluntary remand of the case, because the Corps decided to suspend both section 404 permits and re-assess its decision.  *See* Docket No. 16.  On November 14, 2005, the Court remanded the permits back to

---

[1] Since Goldbelt, Inc. owns the lands at Cascade Point, it applied for and received the section 404 permit for the construction of the marine terminal facility.

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                    6

the Corps.  Docket No. 20.  On March 29, 2006, the Corps reinstated the permits.  *See* Pl. Exs.
38, 40 (Coeur Alaska Reinstatement Letter, Goldbelt Reinstatement Letter).  The Corps also
issued a revised Record of Decision explaining its rationale for reinstating the original permits.
*See* Pl. Ex. 39 (2006 Corps Revised ROD).  The Corps did not make any changes to the terms
and conditions of the section 404 permit for the discharges of mine tailings.  *See* Pl. Ex. 38
(Coeur Alaska Reinstatement Letter).  The Corps slightly modified the section 404 permit for the
marine terminal facility at Cascade Point to make clear that the sole purpose of the facility is to
provide a ferry shuttle service for the Kensington mine.  *See* Pl. Ex. 40 (Goldbelt Reinstatement
Letter).  *See also* Pl. Ex. 39 at 4 (2006 Corps Revised ROD at 4) (concluding that the Cascade
Point facility is an interdependent project since, "without the Kensington Mine, the Cascade
Point facility would not be constructed in the foreseeable future").  On April 4, 2006, Plaintiffs
moved to reopen the case.  Docket No. 26.  At the same time, they filed their First Amended
Complaint in light of the Corps' revised Record of Decision.  *See* Docket No. 28.

II.      DESCRIPTION OF THE PROPOSED KENSINGTON MINE PROJECT.

Under the selected alternative in the 2004 ROD, Alternative D, Coeur Alaska will
develop an underground mine.  Pl. Ex. 1 at 16-17 (2004 FSEIS at 2-18 to 2-19).  Coeur Alaska
intends to construct a mill and related processing facilities on patented lands near the Jualin mine
site.[2]  *See id.* at 13, 14 (2004 FSEIS at 2-5, 2-9).  After extracting the orebody, Coeur Alaska will
haul it from the mining area to the processing facilities, where it will go through a variety of
steps:  crushing, grinding, flotation, thickening, and filtration.  *Id.* at 18 (2004 FSEIS at 2-21).

_____

[2] The Jualin mine site is on the Berners Bay side of the project area.  *See* Pl. Ex. 1 at 8 (2004
FSEIS, Figure 1-2 at 1-6).

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                    7

After the first two steps, crushing the ore into small pieces and grinding it to even smaller particles, the finely ground ore will undergo a flotation process which involves separating gold minerals from the orebody in a froth flotation. *Id*. at 19 (2004 FSEIS at 2-22). During this process, a variety of chemicals — generically referred to as conditioners, frothers, surfactants, and scale inhibitors — will be added to the ore. *Id*. Air will then be introduced into the process, producing bubbles which attach to the gold-bearing materials. The bubbles rise to the top, bringing the gold-bearing materials with them and forming a froth layer which is skimmed and removed. *Id*.

This process generates a substantial amount of waste. On average, Coeur Alaska will process 2,000 tons of ore per day. Pl. Ex. 1 at 17 (2004 FSEIS at 2-19); Pl. Ex. 12 at 12 (Report on Water Quality Modeling at 8). Of that amount, only 5% (100 tons) contains the economically valuable gold minerals. *Id*. The rest constitutes the waste byproduct of the froth-flotation process, referred to as tailings.[3] Coeur Alaska intends to discharge most of this waste byproduct (1,444 tons per day) via a 3.5-mile pipeline directly into Lower Slate Lake. *Id*.; Pl. Ex. 1 at 21 (2004 FSEIS at 2-25).[4] By volume, it will discharge 210,000 gallons per day. Pl. Ex. 1 at 60-61 (2004 FSEIS, App. C at C-49 to C-50).

---

[3] Tailings are defined as the "noneconomic constituents of the ground ore material that remain after the valuable minerals have been removed from the raw materials." Pl. Ex. 1 at 55 (2004 FSEIS at 8-19). *See also id*. at 20 (2004 FSEIS at 2-23) ("Tailings are the material that remains in the flotation tanks once the gold-bearing material has been removed").

[4] The remainder, 456 tons of tailings per day, will be used as backfill, *i.e.*, mixed with cement and returned underground. Pl. Ex. 12 at 12 (Report on Water Quality Modeling at 8). There is a discrepancy in the record concerning the backfill rate. The 2004 FSEIS states that "[a]t least 40 percent of the tailings would be backfilled . . . ." Pl. Ex. 1 at 22 (2004 FSEIS at 2-28) (emphasis added). Coeur Alaska's plan of operations states that "up to 40% of the tailings" will be

(footnote continued…)

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                    8

Lower Slate Lake is the second of two lakes in East Fork Slate Creek, a tributary of Slate Creek which drains into Berners Bay. *Id*. at 30 (2004 FSEIS at 3-26). "There is no historical mine-related disturbance in the Slate Creek watershed." *Id*. at 29 (2004 FSEIS at 3-25). Lower Slate Lake has a surface area of 20 acres, is located about one mile upstream from the confluence of the east and west forks of Slate Creek, and is about two miles from Berners Bay. *See id*. at 8, 30 (2004 FSEIS at 1-6, 3-26). *See also* Pl. Ex. 30 at 5 (Alexakos Decl., Attachment A). The lake supports fish populations, including about 1,000 Dolly Varden char. Pl. Ex. 1 at 32 (2004 FSEIS at 3-28). Below the lake, in Slate Creek, there are populations of cutthroat trout, pink salmon, chum salmon, and coho salmon. *Id*. at 31 (2004 FSEIS at 3-27). Due to natural barriers, the salmon and trout do not reach the lake. *Id*.

To prepare Lower Slate Lake for the disposal of its mine tailings, Coeur Alaska will construct a 90-foot high and 500-foot long dam at the lake's outfall. *Id*. at 22 (2004 FSEIS at 2-28). Coeur Alaska will construct another dam between Upper and Lower Slate Lakes, in Mid-Lake East Fork Slate Creek, and build a pipeline diversion to direct water around the lake. *Id*. at 16, 22 (2004 FSEIS at 2-18, 2-28).

Analysis of the liquid part of the tailings, decant water, conducted in 1998 indicates that the tailings effluent contains concentrations of several metals, including aluminum, copper, lead,

_____

(…footnote continued)

backfilled. Pl. Ex. 13 at 14 (2005 Plan of Operations at 61) (emphasis added). Coeur Alaska's water quality report indicates that, on average, 456 out of the 1,900 tons of tailings, or about 25%, will be used for backfill. *See* Pl. Ex. 12 at 12 (Water Quality Modeling Report at 8).

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                    9

and mercury.[5]  *See* Pl. Ex. 1 at 27 (2004 FSEIS, Table 3-5 at 3-10).  The tailings effluent has a

pH over 10 (whereas the pH of East Fork Slate Creek is between 7.1 and 8.4).  *Id.* at 27, 28

(2004 FSEIS at 3-10, 3-20).  *See also id.* at 60. (2004 FSEIS, App. C at C-49) (the "decant water

has a pH of approximately 10, which is above the protective concentration pH range of

approximately 6-9 for aquatic life"); Pl. Ex. 39 at 10 (2006 Corps Revised ROD at 19) ("the pH

around the discharge pipe will be toxic to the aquatic environment").  It also has a high level of

total suspended solids — approximately 550,000 milligrams per liter (or about 55% solids).  *See*

Pl. Ex. 12 at 7, 19 (Report on Water Quality Modeling at 3, 24).  As a result, the daily discharge

of 210,000 gallons of tailings slurry is expected to kill all fish and nearly all other aquatic life

(macroinvertebrates, periphyton, and zooplankton) in the lake.  Pl. Ex. 1 at 41 (2004 FSEIS at 4-

38).  *See also* Pl. Ex. 39 at 15 (2006 Corps Revised ROD at 27) ("We agree that all fish and most

aquatic life would be lost during operation").

In order to predict whether aquatic life will be able to repopulate Lower Slate Lake after

mining operations cease, two toxicity tests on freshwater organisms were conducted, and

previous toxicity tests on marine organisms were analyzed.  Since Lower Slate Lake is a

freshwater lake, the tests on the freshwater organisms "are the most relevant to tailings disposal .

. . ."  Pl. Ex. 14 at 4 (Review of Toxicity Data at 3).

The tests on the freshwater organisms showed clear harm to biological productivity.  In

one test (on the freshwater amphipod *Hyalella azteca*), few organisms survived.  Pl. Ex. 1 at 44

---

[5] Table 3-5 contains two analyses:  1996 and 1998.  Plaintiffs refer to the 1998 analysis since
"more accurate analytical methods [were] used in 1998."  Pl. Ex. 1 at 27 (2004 FSEIS at 3-10).

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                    10

(2004 FSEIS at 4-41). In the other test, (on the freshwater midge *Chironomus tentans*), the organisms survived, though they exhibited a reduced rate of emergence from their eggs. *Id*. The FSEIS concluded that "toxicity tests show that the tailings might not provide suitable habitat for macroinvertebrates." *Id*. at 41-42 (2004 FSEIS at 4-38 to 4-39). In an attempt to mitigate the potential toxicity of the tailings in the lake sediments over the long-term, Coeur Alaska is required to install a cap over the tailings after mining operations cease, unless it can demonstrate that the tailings are not toxic. *See* Pl. Ex. 1 at 16 (2004 FSEIS at 2-18) ("Once tailings disposal was complete, the tailings would be capped with native material unless the operator can demonstrate that uncovered tailings would not cause toxicity throughout Lower Slate Lake after closure"). The administrative record does not contain analyses showing the efficacy of any proposed cap. However, even if effective, this potential mitigation measure does not address the impacts to the lake during the 10 to 15 years that the mine is operating.

Other than the addition of flocculants and polymers to enhance settling, Coeur Alaska will not apply any pollution control technology to its discharges of tailings slurry before the slurry enters Lower Slate Lake. The daily discharges of 210,000 gallons of tailings slurry will exceed the lake's capacity, and Coeur Alaska intends to recycle some lake water for use in mill operations and discharge some lake water into the stream below the lake. For the discharges into the stream below, Coeur Alaska apparently intends to apply pollution control technology to remove contaminants, and EPA has issued Coeur Alaska a National Pollutant Discharge Elimination System permit pursuant to section 402 of the Clean Water Act on the assumption that such technology will be applied to those discharges. *See* Pl. Ex. 1 at 22 (2004 FSEIS at 2-28) (describing "reverse osmosis system" for treating discharges from the lake). This treatment,

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                  11

which focuses only on the overflow discharges from the lake into the stream below, will not address the discharges of tailings slurry from the mill into the lake.

III.    STATUTORY FRAMEWORK.

The purpose of the Clean Water Act "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To fulfill this purpose, the Clean Water Act aims to eliminate completely the discharge of all pollutants into navigable waters by 1985 and, as an interim goal, to make waters suitable for fish, shellfish, wildlife, and recreation by 1983. 33 U.S.C. § 1251(a)(1), (2).

The Clean Water Act marked a dramatic shift from the previous federal water pollution control program, which Congress deemed "'inadequate in every vital aspect.'" *Envtl. Prot. Agency v. Cal. ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 203 (1976) (quoting S. Rep. No. 92-414, at 7 (1971), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3674). One of Congress's principal concerns was the use of waterways for waste disposal:

-- Rivers, lakes, and streams are being used to dispose of man's wastes rather than to support man's life and health; and

-- <u>The use of any river, lake, stream or ocean as a waste treatment system is unacceptable</u>.

S. Rep. No. 92-414, at 7 (1971) (emphasis added), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3674 , *and in* 2 Comm. on Public Works, 93rd Cong., A Legislative History of the Water Pollution Control Act Amendments of 1972, at 1425 (1973) (attached as Pl. Ex. 17 at 25).

The previous federal program failed because it focused on the levels of pollution in a waterbody and not on the causes of such pollution. Congress therefore changed its approach to pollution control, imposing technology-based limitations on the direct discharges of pollution into waters. *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 11

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                    12

(1981); *Cal. ex rel. State Water Res. Control Bd.*, 426 U.S. at 204.  The Act "relies primarily on a permit program for the achievement of effluent limitations--restrictions on the quantity of pollutants that may be discharged into the nation's waters--to attain its goals."  *Natural Res. Def. Council, Inc. v. Train*, 510 F.2d 692, 695 (D.C. Cir. 1975).  Under the statutory scheme, EPA is charged with developing technology-based standards and making them increasingly strict over time, with the intent that the technology will ultimately reach a point where there will be no discharges of pollution into the nation's waters.  *See Natural Res. Def. Council, Inc. v. Costle*, 568 F.2d 1369, 1371 (D.C. Cir. 1977) (the Act's goal to eliminate all pollution "is to be achieved through the enforcement of the strict timetables and technology-based effluent limitations established by the Act").

The central provision, or "fundamental premise," of the Clean Water Act is section 301(a) which provides that "the discharge of any pollutant by any person shall be unlawful," except as in compliance with enumerated sections of the Act.[6]  *Natural Res. Def. Council, Inc. v. Envtl. Prot. Agency*, 822 F.2d 104, 109 (D.C. Cir. 1987); 33 U.S.C. § 1311(a).  The enumerated sections relevant here are sections 301, 306, 402, and 404.  33 U.S.C. §§ 1311, 1316, 1342, and 1344.

---

[6] The term "pollutant" is defined broadly to mean "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water."  33 U.S.C. § 1362(6).

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                13

Section 301(b) calls for a two-phase implementation of effluent limitations for existing point sources.[7] *See* 33 U.S.C. § 1311(b).  Effluent limitations are "any restriction established by a state or [EPA] on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance."  33 U.S.C. § 1362(11).  By July 1, 1977, the effluent limitations shall require the application of "the best practicable control technology currently available."  33 U.S.C. § 1311(b)(1)(A).  Over time, the effluent limitations become increasingly stringent.  By March 31, 1989, the limitations require the application of the best available technology economically achievable.  *Id.* § 1311(b)(2).  *See Chem. Mfrs. Ass'n v. Natural Res. Def. Council, Inc.*, 470 U.S. 116, 118 (1985); *E.I. du Pont de Nemours & Co. v. Train,* 430 U.S. 112, 121 (1977).  Once EPA promulgates these effluent limitations, they "shall be applied to all point sources of discharge of pollutants in accordance with the provisions of" the Act.  33 U.S.C. § 1311(e).

Section 306 calls for the implementation of even more stringent effluent limitations — standards of performance — for "new sources," which Congress defined as "any source, the construction of which is commenced after the publication of proposed regulations prescribing a standard of performance . . . ."[8]  33 U.S.C. § 1316(a)(2).  Section 306(b) directs EPA to

---

[7] "The term 'point source' means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).

[8] "The term 'source' means any building, structure, facility, or installation from which there is or may be the discharge of pollutants."  33 U.S.C. § 1316(a)(3).

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                14

promulgate a list of categories of sources and, for new sources within each category, regulations establishing national standards of performance. *Id.* § 1316(b)(1). The standards of performance must reflect "the greatest degree of effluent reduction which [EPA] determines to be achievable through the application of the best available demonstrated control technology . . . ." *Id.* § 1316(a)(1). Congress directed EPA to consider, where practicable, "a standard permitting no discharge of pollutants." *Id. See also Natural Res. Def. Council, Inc. v. United States Envtl. Prot. Agency*, 822 F.2d 104, 123 (D.C. Cir. 1987) ("In setting new source standards, EPA is statutorily required to give serious consideration to a standard permitting *no* discharge of pollutants.")

Congress further provided that, once the standards of performance are established, "it shall be unlawful for any owner or operator of any new source to operate such source in violation of any standard of performance applicable to such source." 33 U.S.C. § 1316(e). Congress thus "intended these regulations to be absolute prohibitions. . . . [T]here is no statutory provision for variances, and a variance provision would be inappropriate in a standard that was intended to insure national uniformity and 'maximum feasible control of new sources.'" *E.I. du Pont de Nemours & Co. v. Train,* 430 U.S. 112, 138 (1977) (quoting S. Rep. No. 92-414, at 58 (1971), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3724, *and in* 2 Comm. on Public Works, 93rd Cong., A Legislative History of the Water Pollution Control Act Amendments of 1972, at 1476 (1973)). *See also Riverkeeper, Inc. v. United States Envtl. Prot. Agency*, 358 F.3d 174, 192 (2nd Cir. 2004) (explaining that the "legislative history of [section 306] suggests that Congress made a deliberate choice not to allow variances for new sources").

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                    15

Section 402 created the National Pollutant Discharge Elimination System (NPDES) permit program, which is "is central to the enforcement of the" Act. *Natural Res. Def. Council, Inc. v. Costle*, 568 F.2d 1369, 1374 (D.C. Cir. 1977). Through this program, EPA applies effluent limitations and standards of performance to dischargers of pollutants. *Id*. NPDES "permits contain specific terms and conditions, as well as numerical discharge limits, which govern the activities of pollutant dischargers. Through the Clean Water Act, Congress has directed the EPA to incorporate into the permits increasingly stringent technology-based effluent limitations." *Rybachek v. United States Envtl. Prot. Agency*, 904 F.2d 1276, 1283 (9th Cir. 1990).

Section 404 established a separate permit program for the Corps to oversee. Whereas section 402 focuses on the discharge of all pollutants from industrial processes and sources, section 404 focuses on the discharge of a particular type of pollutant: dredged or fill material. *See* 33 U.S.C. § 1362(6) (defining pollutant to include dredged spoil, rock, and sand). Section 404(a) of the Act provides that the Corps "may issue permits, after notice and opportunity for public hearings[,] for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a). Section 404(b) provides that the selection of disposal sites shall be made pursuant to guidelines promulgated by EPA in conjunction with the Corps. 33 U.S.C. § 1344(b). *See* 40 C.F.R. part 230. Section 404(c) provides EPA with veto authority over section 404 permits issued by the Corps. 33 U.S.C. § 1344(c).

The dual permitting structure of sections 402 and 404 reflects Congress's view that discharges of dredged or fill material did not pose the same threats to water quality as discharges of industrial and municipal wastes. In the initial draft of the bill, EPA would have regulated the

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                    16

discharges of all pollutants, including dredged spoil.  *See* S. Conf. Rep. No. 92-1236 at 141

(1972), *reprinted in* 1972 U.S.C.C.A.N. 3776, 3818, *and in* 1 Comm. on Public Works, 93rd

Cong., A Legislative History of the Water Pollution Control Act Amendments of 1972, at 324

(1973) (attached as Pl. Ex. 17 at 4).  The sponsor of the amendment allowing the Corps, instead

of EPA, to issue permits for discharges of dredged or fill material stated:

> The disposal of dredged material does not involve the introduction of new
> pollutants; it merely moves the material from one location to another. If polluted
> discharges from municipal and industrial sources are controlled as required by
> this bill, the disposal of dredged material in open water presents no significant
> problem.

117 Cong. Rec. 38797, 38853 (Nov. 2, 1971) (remarks of Senator Ellender), *reprinted in* 2

Comm. on Public Works, 93rd Cong., A Legislative History of the Water Pollution Control Act

Amendments of 1972, at 1386 (1973) (attached as Pl. Ex. 17 at 10).  Congress thus carved out a

particular role for the Corps to fulfill, leaving EPA in charge of regulating municipal and

industrial wastes, the more serious sources of pollution.

IV.    REGULATORY FRAMEWORK.

    A.    New Source Standards of Performance for Gold Mines.

    Pursuant to section 306(b) of the Clean Water Act, 33 U.S.C. § 1316(b), EPA has

promulgated regulations establishing effluent limitations and standards of performance for a

variety of point source categories.  *See* 40 C.F.R. parts 405-471.  In 1982, EPA promulgated such

regulations for the ore mining and dressing category.  *See* 47 Fed. Reg. 25,682 (June 14, 1982)

(proposed) (attached as Pl. Ex. 18); 47 Fed. Reg. 54,598 (Dec. 3, 1982) (final) (attached as Pl.

Ex. 19).  Within this category, EPA established several subcategories, including one that covers

ore mining for copper, lead, zinc, gold, and molybdenum.  *See* 40 C.F.R. § 440.100 – 440.104.

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                17

For gold mills that use a froth-flotation process, such as the proposed Kensington mine,

EPA promulgated a zero discharge limitation on all mills constructed after June 14, 1982.[9]  The

regulations provide:

> Except as provided in paragraph (b)[(2)] of this section, there shall be no
> discharge of process wastewater to navigable waters from mills that use the froth-
> flotation process alone, or in conjunction with other processes, for the
> beneficiation of copper, lead, zinc, gold, silver, or molybdenum ores or any
> combination of these ores.

40 C.F.R. § 440.104(b)(1).[10]  "Process wastewater" includes mine tailings.  *See* Pl. Ex. 7 at 3

(EPA Record of Decision at 3) (the new source performance standards for gold mills using froth

flotation "prohibit the discharge of process water (including mine tailings)"); 40 C.F.R. §

401.11(q) ("The term *process waste water* means any water which, during manufacturing or

processing, comes into direct contact with or results from the production or use of any raw

material, intermediate product, finished product, by-product, or waste product"); 47 Fed. Reg.

25,682, 25,685 (June 14, 1982) ("Mill process wastewater is characterized by very high

suspended solids levels . . ., high metals levels, and process reagents such as cyanide").

---

[9] *See* 40 C.F.R. § 401.11(e) (new source is defined as any "building structure, facility or
installation . . . the construction of which is commenced after the publication of proposed
regulations prescribing a standard of performance under section 306 of the Act . . .").

[10] The exceptions contained in paragraph (b)(2) do not apply to the discharges of tailings slurry
from the mill into Lower Slate Lake.  The exceptions allow discharges from a tailings storage
facility where net precipitation into the facility exceeds net evaporation, in which case the
difference between the two can be discharged, and where there is a buildup of contaminants in
the water recycled from the tailings storage facility that significantly interferes with the ore
recovery process, in which case a discharge can occur to correct the interference problem.  *See*
40 C.F.R. § 440.104(b)(2).  In this case, EPA applied these exceptions to allow Coeur Alaska to
discharge, after treatment, some of the contaminated lakewater into the stream below.  *See supra*
pp. 11-12.

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                    18

In developing this zero discharge limitation, "EPA studied the ore mining and dressing industry . . . ," identified "control and treatment technologies, including both in-plant and end-of-process technologies, that are in use or capable of being used . . . ," and "estimated the costs of each control and treatment technology . . . ." 47 Fed. Reg. 25,682, 25,688 (June 14, 1982). With respect to gold mining, EPA found that "[m]ost of the nine active gold milling operations in the United States use the cyanidation process to recover gold, but some flotation, concentration, and amalgamation processes are also used. For the most part, spent leach solutions used to beneficiate ore are recycled, resulting in zero discharge of mill wastewater." *Id*. at 25,686. EPA therefore proposed that new source gold mills "that use froth flotation achieve zero discharge of process wastewater." *Id*. at 25,697.

Pursuant to congressional guidance, EPA found that a zero discharge standard for mills using froth flotation was practicable. EPA explained that its decision was "based on the fact that 46 out of 90 existing facilities for which [EPA had] data achieve zero discharge through total recycle and evaporation of process wastewater." 47 Fed. Reg. 54,598, 54,602 (Dec. 3, 1982). Mining operations avoided discharging process wastewater into navigable waters by discharging into "a settling pond for suspended solids and metals removal" and routing the treated water "back to the mill for reuse in the beneficiating process." 47 Fed. Reg. 25,682, 25,692 (June 14, 1982).

Industry commenters had "contended that in rainy or mountainous areas, the costs of constructing the tailings impoundment necessary to achieve zero discharge and the costs of transporting recycle water back to the mill could be prohibitive." 47 Fed. Red. 54,598, 54,602 (Dec. 3 1982). EPA rejected this argument, finding that "[m]ills currently achieving zero

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                19

discharge are located in areas ranging from flat to extremely steep and mountainous. . . .

Similarly, although the majority of mills achieving zero discharge are located in dry areas, 15 are

located in relatively wet areas." *Id.* Further, EPA explained that it added the exception for the

discharge of excess net precipitation to address this issue. *Id.*[11]

B. Definition of "Fill Material."

Several years before EPA promulgated the new source performance standards for the

mining industry, EPA and the Corps promulgated regulations for the discharge of "fill material"

pursuant to section 404 of the Clean Water Act. In 1975, the Corps adopted interim final

regulations which defined fill material to mean "any pollutant used to create fill in the traditional

sense of replacing an aquatic area with dry land or of changing the bottom elevation of a water

body for any purpose." *See* 40 Fed. Reg. 31,320, 31,325 (July 25, 1975) (attached as Pl. Ex. 20).

Later that year, EPA adopted the identical definition. *See* 40 Fed. Reg. 41,292, 41,298 (Sept. 5,

1975) (attached as Pl. Ex. 21).

Two years later, the Corps revised its regulations. The Corps explained that "[s]everal

comments and two years of experience have revealed the need to make certain changes to" the

definitions pertaining to dredged and fill material. 42 Fed. Reg. 37,122, 37,130 (July 19, 1977)

(attached as Pl. Ex. 22). According to the Corps:

During the two years of experience with the Section 404 program, several
industrial and municipal discharges of solid waste materials have been brought to
our attention which technically fit within our definition of "fill material" but

---

[11] Industry members filed a lawsuit against a zero discharge limitation contained in prior, related
regulations, and the Tenth Circuit ruled in EPA's favor. *See Kennecott Copper Corp. v. Envtl.
Prot. Agency*, 612 F.2d 1232, 1244 (10th Cir. 1979) ("As th[e] recycle method has been
demonstrated to be feasible, it appears that zero discharge of process waste water is not
unreasonable").

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                              20

which were intended to be regulated under the NPDES program.  These include the disposal of waste materials such as sludge, garbage, trash, and debris in water. In some cases involving the disposal of these types of material in water, the final result may be a land-fill even though the primary purpose of the discharge is waste disposal.

> The Corps and the Environmental Protection Agency feel that the initial decision relating to this type of discharge should be through the NPDES program. We have, therefore, modified our definition of fill material to exclude those pollutants that are discharged into water primarily to dispose of waste.  We will process Section 404 permits for these types of activities to the extent that a levee or other type of containment structure must be placed in the water as part of the overall disposal plan.

*Id*.  The regulations that the Corps promulgated in 1977 provided:

> The term "fill material" means any material used for the primary purpose of replacing an aquatic area with dry land or of changing the bottom elevation of a waterbody.  The term does not include any pollutant discharged into the water primarily to dispose of waste, as that activity is regulated under Section 402 of the Federal Water Pollution Control Act Amendments of 1972.

*Id*. at 37,145.

EPA did not promulgate the Corps' 1977 definition of fill material.  While the Corps adopted the primary purpose standard quoted above for determining whether a proposed discharge constituted fill material, EPA amended its regulations in 1980 and adopted an effects-based standard.  EPA defined fill material to mean "any 'pollutant' which replaces portions of the 'waters of the United States' with dry land or which changes the bottom elevation of a water body for any purpose."  45 Fed. Reg. 33,290, 33,421 (May 19, 1980) (attached as Pl. Ex. 23).

EPA's effects-based test created an overlap:  many industrial wastes covered by effluent limitations and regulated by EPA under section 402 contain solids that have the effect of changing the bottom elevation of a water body.  EPA, however, did not intend to exempt these wastes from the effluent limitations by allowing them to be discharged as "fill material" pursuant

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                21

to a section 404 permit.  For example, EPA continued to promulgate regulations limiting discharges of industrial pollutants with high concentrations of solids regardless of whether they could change the bottom elevation of a waterbody.  *See*, *e.g.*, 46 Fed. Reg. 8,260, 8,292 (Jan. 26, 1981) (regulating discharges of suspended solids from log washing processes in connection with the timber products industry).  Indeed, EPA promulgated the standard of performance for new froth-flotation gold mills after it adopted its effects-based test for "fill material."  *See* 47 Fed. Reg. 54,598 (Dec. 3, 1982).

EPA and the Corps made this understanding explicit in a 1986 Memorandum of Agreement (1986 MOA) intended to reconcile the agencies' different definitions of "fill material."  *See* 51 Fed. Reg. 8,871 (Mar. 14, 1986).  The agreement identified factors the agencies would consider in determining whether a discharge of solid waste meets the definition of "fill material."  *See id*. at 8,872.  The agreement then provided:

> 5. [A] pollutant (other than dredged material) will normally be considered by EPA and the Corps to be subject to section 402 if it is a discharge in liquid, semi-liquid, or suspended form or if it is a discharge of solid material of a homogeneous nature normally associated with single industry wastes, and from a fixed conveyance, or if trucked, from a single site and set of known processes. These materials include placer mining wastes, phosphate mining wastes, titanium mining wastes, sand and gravel wastes, fly ash, and drilling muds. As appropriate, EPA and the Corps will identify additional such materials.

*Id*.

Under this MOA, the Corps previously determined that it did not have jurisdiction to regulate tailings discharges like those associated with the 1989 Kensington mine proposal:

> The Corps has taken the position that the dam itself and some fill for supporting facilities is under Corps jurisdiction and requires Corps authorization.  The tailings behind the dam, however, are a waste product of the mining operation and are not under our jurisdiction according to the 1986 Memorandum of Agreement with EPA and our own regulations [33 C.F.R. 323.2(e)].

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                    22

Pl . Ex. 24 at 1-2 (Memorandum from J. Pierce, Corps, to C. Reinke of 04/14/1992 at 1-2).  *See also* Pl. Ex. 25 at 2 (Letter from G. Justis, Corps, to J. Dorris, BLM, of 06/18/1991 at 2) (the Corps "has neither the special expertise [n]or jurisdiction by law to evaluate the impacts of the tailings discharge").

Similarly, in the Corps' 1998 Record of Decision issuing Coeur Alaska the section 404 permit for its previous plan of operations, the Corps maintained that it lacked authority to regulate the discharge of tailings from the Kensington mine:  "The [Alaska Department of Environmental Conservation] regulates the placement of solid waste (the tailings) in disposal/storage sites like the [dry tailings facility (DTF)] through their solid waste permit.  The Corps does not regulate the placement of tailings."  Pl. Ex. 10 at 4 (1998 Corps ROD at 13).  *See also id*. at 5 (1998 Corps ROD at 20) ("The Corps does not regulate the disposal of mine tailings. The DTF is a disposal and containment site, much like a sanitary landfill in function").

In 2002, the Corps and EPA harmonized their different definitions of "fill material" in a way that was consistent with their established regulatory practice.  The agencies amended their definitions, making them identical and generally following EPA's approach with an effect-based test.  The regulations now provide:

> (e)(1) Except as specified in paragraph (e)(3) of this section, the term fill material means material placed in waters of the United States where the material has the effect of:
>
>> (i) Replacing any portion of a water of the United States with dry land; or
>>
>> (ii) Changing the bottom elevation of any portion of a water of the United States.
>
> (2) Examples of such fill material include, but are not limited to: rock, sand, soil, clay, plastics, construction debris, wood chips, overburden from mining or other

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                    23

excavation activities, and materials used to create any structure or infrastructure in the waters of the United States.

(3) The term fill material does not include trash or garbage.

33 C.F.R. § 323.2 (Corps' regulations); 40 C.F.R. § 232.2 (EPA's regulations).

In jointly adopting this new definition, the agencies stated that they did not intend to change their long-standing practice under which EPA regulated discharges of pollutants for which EPA had promulgated effluent limitations and standards of performance:

> [W]e emphasize that today's rule generally is intended to maintain our existing approach to regulating pollutants under either section 402 or 404 of the CWA. Effluent limitation guidelines and new source performance standards ("effluent guidelines") promulgated under section 304 and 306 of the CWA establish limitations and standards for specified wastestreams from industrial categories, and those limitations and standards are incorporated into permits issued under section 402 of the Act. EPA has never sought to regulate fill material under effluent guidelines. Rather, effluent guidelines restrict discharges of pollutants from identified wastestreams based upon the pollutant reduction capabilities of available treatment technologies. Recognizing that some discharges (such as suspended or settleable solids) can have the associated effect, over time, of raising the bottom elevation of a water due to settling of waterborne pollutants, we do not consider such pollutants to be "fill material," and nothing in today's rule changes that view. <u>Nor does today's rule change any determination we have made regarding discharges that are subject to an effluent limitation guideline and standards, which will continue to be regulated under section 402 of the CWA.</u> Similarly, this rule does not alter the manner in which water quality standards currently apply under the section 402 or the section 404 programs.

67 Fed. Reg. 31,129, 31,135 (May 9, 2002) (emphasis added) (attached as Pl. Ex. 27).  In their Response to Comments, the Corps and EPA reiterated this view.  *See* Pl. Ex. 28 at 18 (2002 EPA/Corps Response to Comments at 30) ("under today's rule, we will continue, consistent with our long-standing practice, to rely on the existence of effluent limitation guidelines or standards or an NPDES permit to inform the determination of how a particular discharge is regulated under the Act.  If a specific discharge is regulated under Section 402, it would not also be regulated

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                    24

under Section 404, and vice versa").[12]  *See also id*. at 14 (2002 EPA/Corps Response to

Comments at 11).

In May 2004, however, during the environmental impact statement process for the

Kensington mine proposal, the agencies prepared an informal memorandum that departed from

this position.  Notwithstanding EPA's standard of performance for new gold froth-flotation mills,

the Corps and EPA concluded that the tailings slurry generated by the proposed Kensington

froth-flotation mill would be deemed "fill material" and could be discharged directly into Lower

Slate Lake pursuant to a section 404 permit issued by the Corps, without complying with the

standard of performance established for these kinds of discharges.  *See* Pl. Ex. 29 at 2 (Regas

Memorandum at 2).  Relying on this informal memorandum, the Corps issued the section 404

permit.[13]

---

[12]  When the Corps and EPA first proposed the amended regulations, they included an explicit
exception from the definition of "fill material" for discharges covered by effluent limitations and
standards of performance. *See* 65 Fed. Reg. 21,292, 21,299 (April 20, 2000) (attached as Pl. Ex.
26).  The exception was intended to maintain "their current practice" and was "consistent with
paragraph B.5 of the 1986 Solid Waste MOA."  *Id*. at 21,297.  The agencies removed the explicit
exception from the final rule because commenters expressed concern that the exception was
"vague and would result in uncertainty . . . as to whether the reference to effluent guidelines was
meant to refer only to those in existence at the time today's rule was promulgated or whether the
reference was prospective."  67 Fed. Reg. 31,129, 31,135 (May 9, 2002).  As explained above,
the agencies did not intend to modify their long-standing regulatory practice.

[13]  The Regas Memorandum also concludes that, after the tailings settle in the lake and the lake
water dilutes the liquid portion of the tailings slurry, EPA will regulate any discharges from the
lake into the creek below under section 402 of the Act.  Pl. Ex. 29 at 2 (Regas Memorandum at
2).  Plaintiffs do not challenge the EPA permit.

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                    25

ARGUMENT

Under the Administrative Procedure Act, "federal courts have the authority to 'hold unlawful and set aside' agency actions which are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Res. Ltd. v. Robertson*, 35 F.3d 1300, 1304 (9th Cir. 1994) (quoting 5 U.S.C. § 706(2)(A)). The Corps' section 404 permit for the discharge of Kensington mine tailings violates the Clean Water Act. The Act clearly provides that all new sources must comply with the standards of performance that EPA has promulgated for those sources. 33 U.S.C. § 1316(e). The Corps' permit authorizes discharges of tailings from the Kensington's froth-flotation mill directly into Lower Slate Lake. In doing so, it allows the mill to avoid compliance with the applicable standard of performance. The permit thus does not comply with the Act.

In addition, the Corps' permit is inconsistent with the Corps' and EPA's "fill material" regulations. In 2002, when the agencies enacted the regulations, they explained that, where EPA had promulgated effluent limitations or standards of performance, EPA would regulate the discharge under section 402 of the Act.

The agencies' informal interpretation (contained in the 2004 Regas Memorandum) on which the Corps relied for issuing the section 404 permit is inconsistent with the Act and the agencies' intent at the time they promulgated the 2002 regulations. The interpretation would also produce absurd results, enforcing the zero discharge limitation for froth-flotation gold mills only where the impacts from the discharge are less severe. It is therefore arbitrary and not in accordance with law.

If the agencies' informal guidance correctly interprets their regulations, those regulations are unlawful since they are inconsistent with the Act. The language of the Act is clear. All new

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                    26

sources must comply with the relevant standards of performance.  The agencies' interpretation, however, allows the Kensington mill facility to avoid complying with the standard of performance for froth-flotation gold mills.

The Forest Service's ROD and approval of the plan of operations, and the Corps' section 404 permit for the construction of the Cascade Point marine terminal facility are premised on the unlawful section 404 permit for the Kensington mine.  They are therefore arbitrary and not in accordance with law.

The Court should vacate the section 404 permits, the Forest Service's ROD and approval of the plan of operations, and enjoin the Corps and Forest Service from allowing any activities authorized by the vacated permits, ROD, and plan of operations.  The authorized activities will cause permanent and irreparable harm to Plaintiffs, and there are no legal remedies available to Plaintiffs.

Plaintiffs are local and national conservation organizations, each with a mission to advocate for protection of natural resources and clean water.  *See* Pl. Exs. 34-36 (Organizational Declarations).  Plaintiffs' members live in Juneau, Haines, and other parts of Southeast Alaska.  These individuals use and enjoy the Berners Bay area, including Lower Slate Lake.  *See* Pl. Exs. 30-33, 42 (Member Declarations).  Plaintiffs have standing to bring this action because they will suffer injuries in fact, those injuries are traceable to Defendants' actions, and they would be redressed by a favorable decision of this Court setting aside Defendants' arbitrary and unlawful actions.  *See Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-84 (2000).

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                     27

I.       THE CORPS' PERMIT VIOLATES SECTION 306(e) OF THE CLEAN WATER ACT.

It is axiomatic that "every permit must comply with the standards articulated by the Clean Water Act." *Envtl. Def. Ctr., Inc. v. United States Envtl. Prot. Agency*, 344 F.3d 832, 855 n.32 (9th Cir. 2003), *cert. denied*, 541 U.S. 1085 (2004). The Clean Water Act prohibits "the discharge of any pollutant by any person" unless done in compliance with the Act, including sections 301, 306, 402 and 404. 33 U.S.C. § 1311(a). The term "discharge of any pollutant" means "any addition of any pollutant to navigable waters from any point source." *Id.* § 1362(12)(A).

Without a permit, Coeur Alaska's proposed daily discharge of 210,000 gallons of tailings slurry from the Kensington mill facility into Lower Slate Lake would violate section 301(a), 33 U.S.C. § 1311(a). Coeur Alaska is a "person" under the Act. *See* 33 U.S.C. § 1362(5). The slurry is industrial waste and therefore a pollutant. *See id.* § 1362(6); *N. Plains Res. Council v. Fid. Exploration & Dev. Co.*, 325 F.3d 1155, 1160-61 (9th Cir. 2003) (holding "industrial waste" includes coal bed methane process water). The proposed 3.5-mile pipeline from the Kensington mill facility to Lower Slate Lake is a point source. *See* 33 U.S.C. § 1362(14). Finally, Lower Slate Lake constitutes "navigable waters." *See id.* § 1362(7); *Rybachek v. United States Envtl. Prot. Agency*, 904 F.2d 1276, 1285 (9th Cir. 1990) ("Congress views broadly the words 'navigable waters'").

The principal dispute is whether the Corps can issue a permit pursuant to section 404, 33 U.S.C. § 1344, authorizing the direct discharge of tailings slurry from the proposed Kensington mill facility into a lake, when that permit violates the standard of performance for that type of facility. On this issue, the Act is clear. Under section 301(a), 33 U.S.C. § 1311(a), every discharge of pollutants must comply with the enumerated sections of the Act, which includes

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                    28

section 306(e), 33 U.S.C. § 1316(e).  Under section 306(e), where EPA has promulgated

standards of performance for new sources, such as the proposed Kensington mill facility, the Act

prohibits the operation of that source unless it complies with the performance standards:

> After the effective date of standards of performance promulgated under this
> section, it shall be unlawful for any owner or operator of any new source to
> operate such source in violation of any standard of performance applicable to such
> source.

33 U.S.C. § 1316(e).[14]  *See also* 33 U.S.C. § 1311(e) ("Effluent limitations established pursuant

to this section or section 1312 of this title shall be applied to all point sources of discharge of

pollutants in accordance with the provisions of this chapter").  The proposed Kensington mill

facility must therefore comply with the relevant standard of performance, and the Corps cannot

escape this requirement by authorizing discharges from the facility pursuant to section 404.

There are no exceptions to the blanket prohibition of section 306(e).  *See E.I. du Pont de*

*Nemours & Co. v. Train,* 430 U.S. 112, 138 (1977) (these standards are "absolute prohibitions").

*See also Chevron, U.S.A. v. Natural Res. Def. Council,* 467 U.S. 837, 842-43 (1984) ("If the

intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must

give effect to the unambiguously expressed intent of Congress"); *League of Wilderness*

*Defenders/Blue Mountains Biodiversity Project v. Forsgren*, 309 F.3d 1181, 1186 (9th Cir. 2002)

(same).

EPA promulgated the standard of performance for gold mills that use a froth-flotation

process in 1982.  *See supra* pp. 17-20.  The standards prohibit mills constructed after 1982, such

---

[14] The Kensington mill facility is a "source" since it is a building, structure, and/or a facility from
which there will be a discharge of pollutants.  *See* 33 U.S.C. § 1316(a)(3).  It is also clearly a
"new source," since it was not in existence in 1982.  *See id*. § 1316(a)(2).

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                29

as the proposed Kensington mill, from discharging any process wastewater into waters of the

United States with limited exceptions, such as for excess precipitation.  40 C.F.R. §

440.104(b)(1).  EPA promulgated that standard pursuant to congressional guidance to consider,

where practicable, a zero discharge limitation.  33 U.S.C. § 1316(a)(1).  In determining that a

zero discharge limitation was practicable, EPA concluded that the best available demonstrated

control technology consisted of the complete recycling of process wastewater.  *See* 47 Fed. Reg.

54,598, 54,602 (Dec. 3, 1982).  EPA even heard concerns from the mining industry about the

difficulties of complying with the zero discharge limitation in wet climates and mountainous

regions and, as a result, EPA created the limited exception for excess precipitation.  *See id.*

     For these reasons, the Corps' section 404 permit is inconsistent with section 306(e) of the

Clean Water Act, 33 U.S.C. § 1316(e).[15]  It also contravenes the Act's goal of maintaining the

chemical, physical, and biological integrity of the nation's waters, 33 U.S.C. § 1251(a), and with

Congress's purpose of ending the use of waterways for waste disposal, S. Rep. No. 92-414, at 7

(1971), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3674.

II.     THE CORPS' SECTION 404 PERMIT IS INCONSISTENT WITH ITS
        REGULATIONS.

     The section 404 permit is also inconsistent with the Corps' own regulations.  There are

two regulations that, on their face, could apply to the proposed tailings discharges:  EPA's

regulations implementing new source performance standards for gold mining mills that use a

froth-flotation process, 40 C.F.R. § 440.104, and the Corps' and EPA's regulations concerning

---

[15] Similarly, since the standard of performance for froth-flotation gold mills is a zero discharge limitation, EPA could not, consistent with the Act, issue a section 402 permit that allows Coeur Alaska to discharge the tailings slurry directly from the mill facility into the lake.

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                    30

the definition of "fill material." 33 C.F.R. § 323.2; 40 C.F.R. § 232.2. The agencies, however, resolved any potential uncertainty when they promulgated the "fill material" regulations in 2002, explaining that discharges like the one from the Kensington mill are not "fill material" and that EPA would regulate them under section 402 of the Clean Water Act. The Corps' permit therefore does not comply with its regulations.

"It is a familiar rule of administrative law that an agency must abide by its own regulations." *Fort Stewart Sch. v. Fed. Labor Relations Auth.*, 495 U.S. 641, 654 (1990). When the Corps and EPA jointly promulgated their amended definitions of "fill material" in 2002, they explicitly stated that the regulations were consistent with their long-standing practice under which "discharges that are subject to an effluent limitation guideline and standards . . . will continue to be regulated under section 402 of the [Clean Water Act]." 67 Fed. Reg. 31,129, 31,135 (May 9, 2002). These pollutants, even though they may raise the bottom elevation of a waterbody over time, are "not consider[ed] . . . to be 'fill material.'" *Id. See supra* pp. 24-25.

The Corps and EPA thus made clear in the preamble to their new "fill material" regulations that the regulations do not apply to discharges for which there are effluent limitations or standards of performance. Courts have relied on such "contemporaneous explanation[s] of the regulation published through notice and comment rule making in the Federal Register" to discern an agency's intent. *League of Wilderness Defenders/Blue Mountains Biodiversity Project*, 309 F.3d at 1190. *See also Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 715-16 (1985) (holding that clear agency statement in Federal Register at time of promulgation was "dispositive" of the agency's intent). Consequently, the Corps' regulations do not allow it to authorize the proposed discharges from the Kensington mill into Lower Slate Lake pursuant to

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                    31

section 404 since there are standards of performance for those kinds of discharges. *See* 40 C.F.R. § 440.104.

The Fourth Circuit in *Kentuckians for the Commonwealth, Inc. v. Rivenburgh*, 317 F.3d 425 (4th Cir. 2003), recognized this existing regulatory practice between the Corps and EPA. In that case, the plaintiffs challenged a section 404 permit issued by the Corps under its 1977 fill material regulations for the discharge of "overburden" from mountain-top removal coal mining, referred to as "valley fills," into streams.[16] *Id*. at 431. Unlike the discharge of process wastewater from froth-flotation gold mills, the discharge of overburden from mountain-top removal coal mining is not subject to any effluent limitation or standard of performance. Upholding the Corps' permit, the Fourth Circuit concluded that the permit was consistent with the Corps' prior practice, which excluded from the definition of "fill material" any pollutant for which EPA had promulgated effluent limitations or standards of performance. *See id*. at 448 ("we conclude that the Corps' interpretation of 'fill material' as used in § 404 of the Clean Water Act to mean all material that displaces water or changes the bottom elevation of a water body except for 'waste' -- meaning garbage, sewage, and <u>effluent that could be regulated by ongoing effluent limitations as described in § 402</u> -- is a permissible construction of § 404") (emphasis added). *See also id*. at 445 (when the Corps issued the section 404 permit challenged in the case, "it continued to operate with an understanding that it was authorized to regulate discharges of fill, even for waste, unless the fill amounted to effluent that could be subjected to effluent limitations"). *Cf. Trustees for Alaska v. Envtl. Prot. Agency*, 749 F.2d 549, 558 (9th Cir. 1984)

---

[16] "'Overburden' is the soil and rock that overlies a coal seam, and overburden that is excavated and removed is 'spoil.'" *Kentuckians for the Commonwealth, Inc.*, 317 F.3d at 430.

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                    32

(holding that discharges from placer gold mining operations are subject to regulation under section 402 of the Clean Water Act on the ground that "when mining activities release pollutants from a discernible conveyance, they are subject to NPDES regulation, as are all point sources"); *United States v. Earth Sciences, Inc.*, 599 F.2d 368, 371-73 (10th Cir. 1979) (discharges from cyanide heap leach gold mining operations are subject to regulation under section 402, 33 U.S.C. § 1342); *Reserve Mining Co. v. Envtl. Prot. Agency*, 514 F.2d 492, 530 (8th Cir. 1975) (discharge of taconite mine tailings into Lake Superior are subject to regulation under section 407 of the Refuse Act, which was superseded by section 402 of the Clean Water Act, *see* 33 U.S.C. 1342(a)(5)).

Furthermore, when the EPA and the Corps enacted the 2002 rule changes concerning the definition of "fill material," they made clear that the new rule did not broaden the Corps' jurisdiction under section 404.  For example, in response to a comment that the new definition of "fill material" would allow previously-illegal waste disposal in waters or broaden the Corps' jurisdiction, the agencies stated:

> The fact that we have essentially implemented the EPA-based approach since 1977 discredits the notion that this rulemaking now results in a change from past practice and allows impermissible waste disposal.  Moreover, the suggestion that this rulemaking now provides a legal basis for previously illegal activities is not the case – no discharges that were previously prohibited are now authorized as a result of this rulemaking.

Pl. Ex. 28 at 7 (2002 EPA/Corps Response to Comments at 4).

The direct discharge of the tailings slurry from the proposed Kensington mine into waters of the United States was "previously prohibited."  The standard of performance in effect since 1982 is unambiguous, clearly applies to the Kensington mine, and clearly prohibits the discharge of gold mine tailings into navigable waters.  *See* 40 C.F.R. § 440.104(b)(1).  Throughout the

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                    33

regulatory history of the Kensington mine, until 2004, the Corps stated expressly that it lacked

the jurisdiction and expertise to regulate the discharge of mine tailings as "fill material" under

section 404 of the Clean Water Act.  *See supra* pp. 22-23.  The Corps' 1998 Record of Decision

on the section 404 permit for the construction of the dry tailings facility even stated that the

"Corps does not regulate the placement of tailings."  Pl. Ex. 10 at 4 (1998 Corps ROD at 13).

The Corps' current section 404 permit for the proposed Kensington mine thus expands the

Corps' jurisdiction, contrary to the Corps' and EPA's statements of their intent in 2002.

In sum, the Corps' permit violates section 306(e) of the Clean Water Act, 33 U.S.C. §

1316(e), because it authorizes a point source discharge from a froth-flotation gold mill without

complying with the standard of performance that EPA promulgated for those kinds of mills.  The

Corps' permit is also inconsistent with the Corps' regulations concerning the definition of fill

material.  Those regulations, which maintain the Corps' and EPA's long-standing practice, do

not give the Corps the authority to regulate the discharge of pollutants for which EPA has

promulgated effluent limitations or standards of performance.[17]

---

[17] Even if the Corps could regulate discharges of pollutants for which EPA has promulgated
effluent limitations or standards of performance, the permit would still have to comply with
those limitations or standards.  Congress provided that all discharges of pollutants are illegal
unless they comply with various sections of the Act, including section 306.  33 U.S.C. § 1311(a).
Section 306 requires all new sources to comply with the standards of performance that EPA
promulgates.  33 U.S.C. § 1316(e).  The Corps' permit for the proposed Kensington mine,
however, does not comply with the standards of performance for froth-flotation gold mills.  *See*
*supra* pp. 28-30.

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)          34

III.   THE REGAS MEMORANDUM ON WHICH THE CORPS RELIED IS ARBITRARY
       AND NOT IN ACCORDANCE WITH LAW.

In spite of the Clean Water Act's clear language requiring all new sources to comply with applicable standards of performance and the agencies' long-standing practice and express statements concerning their respective roles under sections 402 and 404, the Corps issued a section 404 permit to Coeur Alaska that disregards all three.  In doing so, the Corps relied on an informal memorandum (the Regas Memorandum) that EPA issued on May 17, 2004 in coordination with the Corps.  *See* Pl. Ex. 29 (Regas Memorandum).  The agencies prepared this memorandum during the environmental impact statement process for the Kensington mine.  The memorandum purports to interpret the agencies' new "fill material" regulations and concludes that the Corps can regulate, under section 404 of the Act, the direct discharge of 210,000 gallons per day of tailings slurry from the Kensington mill into Lower Slate Lake, without complying with the applicable standard of performance.  *Id*. at 2 (Regas Memorandum at 2).

The Regas Memorandum is inconsistent with the Clean Water Act, inconsistent with the agencies' stated interpretation at the time they adopted the 2002 regulations, and arbitrary.  The memorandum states:

> We believe that the text of the [2002] rule makes clear that mine tailings placed into impounded waters of the U.S., as proposed by the Kensington mine project, are regulated under section 404 of the CWA as a discharge of fill material, and that effluent discharged from the impoundment to a downstream water, such as Slate Creek is covered by section 402.  Mine tailings placed into the proposed impoundment will have the immediate effect of filling the areas of water into which they are discharged and therefore fall within the scope of section 404.  As a result, the regulatory regime applicable to discharges under section 402, including effluent limitations guidelines and standards, such as those applicable to gold ore mining . . ., do not apply to the placement of tailings into the proposed impoundment. . . .  This result is confirmed by the preamble to the [2002] rule which explained the dividing line between section 402 discharges and section 404 discharges by noting that EPA would continue to regulate under section 402 "discharges (such as suspended or settleable solids) [that] can have the associated effect, over time, of raising the bottom elevation of a water due to settling of

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                35

waterborne pollutants." 67 Fed. Reg. 31135. Here, the effluent discharged from the impoundment into Slate Creek will contain pollutants in the form of suspended and settleable solids, materials that will have, at most, an incidental filling effect. The addition of those pollutants to the Creek from this impoundment associated with an industrial operation would therefore be subject to regulation under section 402.

Pl.. Ex. 29 at 2-3 (Regas Memorandum at 2-3).

Courts will give substantial deference to an agency's interpretation of its own regulation, unless: (1) the interpretation is inconsistent with the statute, *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 600 (2004); *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Forsgren*, 309 F.3d 1181, 1183 (9th Cir. 2002); (2) the agency's interpretation conflicts with the agency's intent at the time it promulgated the regulation, *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994); *Alaska Trojan P'ship v. Gutierrez*, 425 F.3d 620, 631 (9th Cir. 2005); or (3) the interpretation is plainly erroneous or inconsistent with the regulation, *Thomas Jefferson Univ.*, 512 U.S. at 512.

The Regas Memorandum is not entitled to deference. It is inconsistent with section 306(e) of the Clean Water Act. *See supra* pp. 28-30. Under that section, all new sources, without exception, must comply with the standards of performance that EPA promulgates for each particular type of source. EPA has promulgated such a standard for froth-flotation gold mills, and it contains a zero discharge requirement. The Regas Memorandum, however, interprets the Corps' 2002 regulations in such way as to allow the Kensington mill facility to discharge 210,000 gallons of process wastewater (tailings slurry) per day directly into Lower Slate Lake. It thus does not comply with the zero discharge standard as required by section 306(e) of the Act. *See League of Wilderness Defenders/Blue Mountains Biodiversity Project*,

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                36

309 F.3d at 1190 ("An agency simply may not interpret a regulation in a way that contravenes a statute").

The Regas Memorandum is also not entitled to deference because it is inconsistent with the Corps' and EPA's intent at the time they promulgated the 2002 regulations.  When they proposed and finalized the regulations, they stated explicitly that discharges subject to effluent limitations and standards of performance "will continue to be regulated under section 402 of the Clean Water Act.  67 Fed. Reg. 31,129, 31,135 (May 9, 2002).  *See supra* pp. 24-25.  The Regas Memorandum completely ignores this clear statement.  The memorandum thus "provide[s] no rebuttal to the contemporaneous explanation of the regulation published through notice and comment rule making in the Federal Register."  *League of Wilderness Defenders/Blue Mountains Biodiversity Project*, 309 F.3d at 1190.  An agency's clear statement in the Federal Register is "dispositive" of the agency's intent at the time it adopted the rule.  *See Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 715-16 (1985).  *See also I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 447 n.30 (1987) ("An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view") (quoting *Watt v. Alaska,* 451 U.S. 259, 273 (1981)); *Lal v. I.N.S.*, 255 F.3d 998, 1007 (9th Cir. 2001) (same).  Moreover, since the Regas Memorandum is not a rule issued pursuant to notice-and-comment rulemaking, it could be entitled, at most, to limited deference.  *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (interpretations not subject to the rigors of formal notice-and-comment rulemaking, such as those contained in agency guidelines and opinion letters, are merely entitled to "some deference" or "respect" and

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                    37

"only to the extent that those interpretations have the power to persuade") (punctuation and citations omitted).

The Regas Memorandum's reasoning is also internally contradictory and would lead to absurd results. It attempts to rationalize evasion of the performance standards on the ground that the discharge into Lower Slate Lake "will have the immediate effect of filling the areas of water . . . ." Pl. Ex. 29 at 2 (Regas Memorandum at 2). Yet, as the agencies recognize just a few sentences later, any discharge with suspended or settleable solids will have the effect of raising the bottom elevation of a water, and those discharges are covered by EPA section 402 permits. *See id*. at 3. The agencies appear to make a distinction between the Kensington discharges and other discharges with suspended or settleable solids based on the fact that the filling of Lower Slate Lake will happen more quickly, presumably because the volume of solids in the tailings slurry is exceptionally high. *See id*. at 2-3. There is, however, no basis for such a distinction in either the language of the rule or in the explanation the agencies provided at the time they promulgated the rule. Further, the Regas Memorandum contains no basis for determining when a discharge that includes suspended or settleable solids becomes so substantial that it should no longer be subject to applicable effluent limitations or performance standards. Were such a distinction possible, the result would be absurd: the most extreme discharges (such as 210,000 gallons per day of tailings slurry containing mostly solids) would be subject to the less strict regulation of a section 404 permit, while the less damaging discharges would be subject to the more strict regulation of a section 402 permit. This makes no sense and is contrary to the language and intent of the Clean Water Act.

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                    38

Finally, the Regas Memorandum relies on the definition of the "discharge of fill material," which includes the "'placement of overburden, slurry, tailings or similar mine-related materials.'"  Pl. Ex. 29 at 2 (Regas Memorandum at 2) (quoting 33 C.F.R. § 323.2(f)).  However, whether a particular discharge constitutes a "<u>discharge</u> of fill material" must first turn on whether the particular pollutant satisfies the definition of "fill material."  Here, the agencies have long agreed, as they stated explicitly when they promulgated the rule and as the Fourth Circuit recognized in *Kentuckians for the Commonwealth*, that pollutants for which EPA has promulgated effluent limitations or performance standards do not constitute "fill material."  Therefore, the discharge of the tailings slurry at issue in this case cannot constitute the "discharge of fill material."

If federal agencies cannot issue a permit consistent with the Clean Water Act allowing Coeur Alaska to proceed under its most recently modified plan of operations, they cannot simply circumvent the Act.  Instead, they must insist on a waste disposal method that complies with the Act, such as one that uses dry tailings disposal in uplands or settling ponds constructed outside of existing waters of the United States.  If EPA determines that there is a sound justification for doing so, it could revisit its 1982 conclusions and assess whether the new source performance standard remains appropriate for froth-flotation mining operations.  It is, however, difficult to imagine how EPA could justify a change in that standard since standards of performance are national standards, intended to apply uniformly to new sources throughout the United States and to serve as an action-forcing mechanism to achieve "the best available demonstrated control technology," 33 U.S.C. § 1316(a), and other mines have been operating successfully for years without discharging mine tailings directly into lakes, rivers, or streams.

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                    39

IV.   IF THE INTERPRETATION CONTAINED IN THE REGAS MEMORANDUM IS
      CORRECT, THE "FILL MATERIAL" REGULATIONS ARE UNLAWFUL.

To the extent that the Regas Memorandum correctly interprets the "fill material"

regulations, 33 C.F.R. § 323.2 & 40 C.F.R. § 232.2, those regulations are unlawful.  Because the

statute is clear, the agency "must give effect to the unambiguously expressed intent of

Congress."  *Chevron, U.S.A. v. Natural Res. Def. Council,* 467 U.S. 837, 842-43 (1984).  Section

306(e) prohibits the operation of sources that do not comply with the standards of performance

promulgated by EPA.  *See* 33 U.S.C. § 1316(e).  The Regas Memorandum interprets the "fill

material" regulations in such a way as to allow Coeur Alaska to operate its froth-flotation gold

mill facility without complying with the standard of performance for those mills.  Consequently,

if the Regas Memorandum correctly interprets the "fill material" regulations, those regulations

are unlawful since they would be inconsistent with the Act.

V.    THE FOREST SERVICE'S ROD AND APPROVAL OF THE PLAN OF
      OPERATIONS, AND THE CORPS' SECTION 404 PERMIT FOR THE
      CONSTRUCTION OF A MARINE TERMINAL FACILITY AT CASCADE POINT,
      ARE ARBITRARY AND NOT IN ACCORDANCE WITH LAW.

Because they are critically premised on the unlawful section 404 permit for the

Kensington mine, the Forest Service's ROD and approval of the plan of operations, and the

Corps' section 404 permit for the Cascade Point marine terminal facility, should be set aside and

remanded to the agency.  Under the "arbitrary and capricious" standard of review, an agency

must, among other things, "articulate a satisfactory explanation for its action…."  *Motor Vehicle

Mfrs. Ass'n of the United States v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).  The

agencies' explanations for the ROD, plan of operations, and Cascade Point facility permit are

premised on a mine of which a critical component is the discharge of mine tailings into Lower

Slate Lake.  *See* Pl. Ex. 13 at 10-13 (2005 Plan of Operations at 57-60) (describing tailings

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                    40

disposal); Pl. Ex. 2 at 4 (2004 ROD at 3).  The sole purpose of the Cascade Point facility "will be

to provide a miners ferry shuttle service within the Berners Bay area."  Pl. Ex. 40 (Goldbelt

Reinstatement Letter).  *See also* Pl. Ex. 39 at 4 (2006 Corps Revised ROD at 4) ("without the

Kensington Mine, the Cascade Point facility would not be constructed in the foreseeable

future").  For the reasons discussed above, the tailings disposal permit violates the Clean Water

Act.  Therefore, the agencies' rationales for the ROD, plan of operations, and Cascade Point

facility permit are no longer "satisfactory."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  They

should thus be "set aside" under the Administrative Procedure Act and remanded to the agencies.

5 U.S.C. § 706(2).

VI.     THE COURT SHOULD VACATE THE SECTION 404 PERMITS AND THE FOREST
         SERVICE'S ROD AND APPROVAL OF THE PLAN OF OPERATIONS, AND
         GRANT A PERMANENT INJUNCTION.

         Plaintiffs request that the Court vacate the section 404 permit for the discharges of mine

tailings into Lower Slate Lake, the Forest Service's ROD and approval of the plan of operations

for the Kensington mine, and the section 404 permit for the construction of a marine terminal

facility at Cascade Point.  Plaintiffs further request an injunction prohibiting Defendants from

allowing any activities authorized by the permits, ROD, and plan of operations, including cutting

trees, building roads, clearing shrubs, excavating wetlands, building dams or other structures,

and altering the natural water level of Lower Slate Lake or the natural flow of East Fork Slate

Creek.[18]  If Defendants, Coeur Alaska, and Goldbelt construct the mine and associated facilities,

---

[18] Since Coeur Alaska has stated it intends to begin immediately construction activities pursuant
to the reinstated section 404 permits, Plaintiffs may seek additional injunctive relief ordering
Defendants to restore disturbed areas depending on the nature of the activities that have been
completed by the time the Court resolves this case.

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                41

Plaintiffs will suffer irreparable harm.  There are no other remedies available to Plaintiffs.

Although Coeur Alaska and Goldbelt may suffer economic harm, this is not the type of unusual

circumstance that warrants the denial of an injunction.  The balance of harms therefore favors

Plaintiffs.  Finally, an injunction will advance the public interest.

The normal remedy under the Administrative Procedure Act for an unlawful agency

action is to "vacate the agency's action and remand to the agency to act in compliance with its

statutory obligations."  *Defenders of Wildlife v. United States Envtl. Prot. Agency*, 420 F.3d 946,

978 (9th Cir. 2005).  *See also Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir.

2001) (where a plaintiff "prevails on its APA claim, it is entitled to relief under that statute,

which normally will be a vacatur of the agency's order"); 5 U.S.C. § 706(2) (directing

"reviewing court" to "hold unlawful and set aside" arbitrary or unlawful agency action).  Since

the Corps' section 404 permit for the discharge of mine tailings into Lower Slate Lake is

inconsistent with the Clean Water Act, the Court should vacate it.  Similarly, since the Forest

Service's ROD and approval of the plan of operations for the Kensington mine and the Corps'

section 404 permit for the construction of a terminal at Cascade Point are premised on a mining

plan which depends on unlawful tailings disposal, the Court should vacate them as well.

"The requirements for the issuance of a permanent injunction are (1) the likelihood of

substantial and immediate irreparable injury, and (2) the inadequacy of remedies at law."  *G.C.*

*& K.B. Invs., Inc. v. Wilson*, 326 F.3d 1096, 1107 (9th Cir. 2003).  *Accord*, *LaDuke v. Nelson,*

762 F.2d 1318, 1330 (9th Cir.1985).  Unless Congress provides otherwise, courts should balance

the harms and consider the public interest.  *Amoco Prod. Co. v. Village of Gambell*, 480 U.S.

531, 542 (1987).  In cases involving environmental harm, courts should normally issue an

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                    42

injunction. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Id*. at 545. Courts will withhold or limit injunctions only in "unusual circumstances." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 738 n.18 (9th Cir. 2001) (quoting *Forest Conservation Council v. United States Forest Serv.*, 66 F.3d 1489, 1496 (9th Cir.1995)).

Without an injunction, Plaintiffs will suffer substantial and immediate irreparable harm. In order to prepare Lower Slate Lake for the disposal of 4.5 million tons of tailings, Coeur Alaska will log the trees around the lake and construct a dam, 90 feet high and 500 feet long, at the lake's outfall into Slate Creek. *Id*. at 22 (2004 FSEIS at 2-28). This dam is intended to block all flow from the lake, and its construction will require the filling of "4 acres of evergreen forested wetlands and 2 acres of emergent wetlands." *Id*. at 53 (2004 FSEIS at 4-83). These emergent wetlands "are rare and ecologically important at this location." Pl. Ex. 16 at 7 (EPA Comments on 2004 FSEIS at 5). The mining company will also cut off flow above the lake by constructing another dam between Upper and Lower Slate Lakes and diverting water around Lower Slate Lake. Pl. Ex. 1 at 16 (2004 FSEIS at 2-18). Once operations begin, Coeur Alaska will discharge 210,000 gallons of mine waste per day into the lake, killing all or nearly all aquatic life in the lake for at least the 10- to 15-year period that it operates. *Id*. at 41, 60-61 (2004 FSEIS at 4-38, C-49 to C-50).

To facilitate mining operations, Coeur Alaska intends to shuttle its workers between new marine terminals to be built at Cascade Point and Slate Creek Cove. The shuttle vessel is

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                43

expected to make five round-trips across Berners Bay per day during weekdays and three round-trips per day during weekends.[19]  Pl. Ex. 1 at 23 (2004 SFEIS at 2-35).  The Berners Bay watershed provides "spawning and rearing habitat for runs of eulachon, sockeye, coho, pink, and chum salmon; steelhead and cutthroat trout; and Dolly Varden char," and supports populations of humpback whales, Steller sea lions, and harbor seals. Pl. Ex. 41 at 7 (2005 NMFS BiOp at 17); Pl. Ex. 1 at 34-38 (2004 FSEIS at 3-37 to 3-41).  Cascade Point is one of the most frequent spawning habitat locations in the bay for the depressed Lynn Canal stock of Pacific herring, a keystone species which is an important nutritional resource for marine mammals, including endangered humpback whales and threatened and endangered Steller sea lions.  Pl. Ex. 41 at 8, 10 (2005 NMFS BiOp at 58, 60).  They are prey for pollock and salmon, which are prey for marine mammals.  *Id*. at 8 (2005 NMFS BiOp at 58).

Plaintiffs' members use and enjoy Berners Bay and the Lower Slate Lake area for the solitude they offer, their natural environments, and the bird and wildlife viewing opportunities that exist there.  *See* Pl. Exs. 30-33 (Member declarations).  Coeur Alaska's proposal will permanently alter the lake's natural condition – damming waters, changing water levels, logging trees, destroying vegetation, and killing aquatic life in the process.  In addition, the construction and operation of marine terminal facilities in Berners Bay will increase the vessel traffic and industrial noise, disrupting marine mammals and fish.  *See* Pl. Ex. 1 at 45-52 (2004 FSEIS at 4-53 to 4-60).  These activities and the use of the lake for the disposal of 4.5 million tons of mine waste will cause Plaintiffs' members irreparable harm warranting the issuance of an injunction.

---

[19] Coeur Alaska intends to reduce these vessel trips during the spring, when there is an ecologically important run of eulachon in Berners Bay.

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)          44

*See Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d at 737 ("When the 'proposed project

may significantly degrade some human environmental factor,' injunctive relief is appropriate")

(quoting *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 732 (9th Cir.

1995)).

      Moreover, the Corps' violation of the Clean Water Act is more than just a technical

violation.  It contravenes the very purpose of the Clean Water Act:  to protect the integrity of the

Nation's waters.  There are no legal means by which Coeur Alaska can proceed in the manner it

has proposed since, under the Clean Water Act and relevant new source performance standards,

the Kensington mill cannot discharge the tailings slurry directly into the lake.  *See* 33 U.S.C. §

1316(e); 40 C.F.R. § 440.104(b).  In circumstances similar to these, courts have issued injunctive

relief.  *See Int'l Union v. Amerace,* 740 F. Supp. 1072, 1086 (D.N.J.1990) (preliminary

injunction issued "to prevent ongoing violations of applicable federal and local discharge

standards," which "are at the heart of the Clean Water Act"); *United States v. City of Niagara

Falls*, 706 F. Supp. 1053, (W.D.N.Y. 1989) (injunctive relief furthers statutory purposes since

discharges of pollutants in violation of NPDES permit undermine "the substantive policies,

purposes, and objectives of the Clean Water Act"); *Friends of the Earth v. Hall*, 693 F. Supp.

904, 949 (W.D. Wash. 1988) (failure to issue injunction "would subject the Nation's waters to a

real and present danger of pollution," undermining the Clean Water Act).

      The balance of harms thus favors Plaintiffs.  Whereas Plaintiffs will suffer irreparable

harm without an injunction, Federal Defendants will suffer no harm if an injunction is issued.

Coeur Alaska and Goldbelt may incur economic harm, but such injuries are "generally not an

adequate basis for denying injunctive relief where plaintiffs show a sufficient likelihood of

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                    45

environmental injury." *Stein v. Barton*, 740 F. Supp. 743, 757 (D. Alaska 1990) (citing *People ex rel. Van de Kamp v. Marsh,* 687 F. Supp. 495, 501 (N.D.Cal.1988)). *See also Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 738 (9th Cir. 2001) (cruise ship company's "loss of anticipated revenues, however, does not outweigh the potential irreparable damage to the environment"); *Idaho Sporting Cong. v. Alexander*, 222 F.3d 562, 569 (9th Cir. 2000) (holding that the financial hardship to the Forest Service, intervenor-defendants, and local communities did not outweigh environmental harm from the logging of old-growth forests); *League of Wilderness Defenders v. Forsgren*, 184 F.Supp.2d 1058, 1071 (D.Or.2002) (in a case brought under National Environmental Policy Act (NEPA), court held that while "the record indicates that a preliminary injunction could present a financial hardship to the Forest Service, the intervenor, and the communities that support the intervenor, this possible financial hardship is outweighed by the potential environmental injury that could be caused in the absence of an injunction"); *Greenpeace Found. v. Mineta*, 122 F.Supp.2d 1123, 1138-39 (D. Hawai'i 2000) (in a NEPA case, court held that financial harm of two million dollars does not constitute "unusual circumstances" warranting the denial of preliminary injunction).

Finally, an injunction will advance the public interest. The Clean Water Act strives to "restore and maintain" the integrity of all waters of the United States. 33 U.S.C. § 1251(a). "It was a dramatic response to accelerating environmental degradation of rivers, lakes and streams in this country." *Natural Res. Def. Council, Inc. v. Costle*, 568 F.2d 1369, 1371 (D.C. Cir. 1977). Accordingly, an injunction preventing destructive activities pursuant to a permit that violates the Act ensures that the Act's purposes are maintained. *See Seattle Audubon Soc'y v. Evans*, 771 F. Supp. 1081, 1096 (W.D. Wash. 1991) (requiring federal agencies to act in

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                46

accordance with the law is "a public interest of the highest order"), *aff'd*, 952 F.2d 297 (9th Cir. 1991).

CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court enter a declaratory judgment holding that the section 404 permit for tailings disposal at the Kensington mine violates the Clean Water Act and that the Forest Service's ROD and approval of the plan of operations, and the Corps' section 404 permit for the Cascade Point marine terminal facility, are arbitrary and unlawful in their reliance on the unlawful Kensington tailings permit. Accordingly, the Court should vacate the two permits and the Forest Service's ROD and approval of the plan of operations. Further, the Court should enter an injunction enjoining Defendants from allowing any activities authorized by the vacated permits, ROD, and plan of operations, including cutting trees, building roads, clearing shrubs, excavating wetlands, building dams or other structures, and altering the natural water level of Lower Slate Lake or natural flow of East Fork Slate Creek.

Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                    47

Respectfully submitted this 7th day of April 2006,


  /s/ Demian A. Schane
Demian A. Schane (ABA# 0403007)
Thomas S. Waldo (ABA# 9007047)
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
Ph: 907-586-2751
Fax: 907-463-5891
Email: dschane@earthjustice.org

Attorneys for Plaintiffs


### CERTIFICATE OF SERVICE

I, Demian Schane, certify that on April 7, 2006, a true and correct copy of PLAINTIFFS' OPENING BRIEF ON COUNT I was served electronically to Mark A. Nitczynski, Richard L. Pomeroy, John C. Berghoff, Jr., and David C. Crosby.  A courtesy copy was also sent via e-mail to Lawrence L. Hartig, Cameron M. Leonard, Ruth Hamilton Heese, and Jim Ustasiewski.


  /s/ Demian A. Schane
Demian A. Schane


Southeast Alaska Conservation Council, et al. v.
U.S. Army Corps of Eng'rs, et al.
J05-0012 CV (JKS)                48

# LIST OF EXHIBITS

1        Kensington Gold Project:  2004 Final Supplemental Environmental Impact Statement:   (2004 FSEIS) [excerpt]

2        Kensington Gold Project:  2004 Record of Decision (2004 ROD)

3        Kensington Gold Project:  1997 Final Supplemental Environmental Impact Statement:  (1997 FSEIS) [excerpt]

4        Kensington Gold Project:  1997 Record of Decision (1997 ROD)

5        Kensington Gold Project:  1992 Final Environmental Impact Statement:  (1992 FEIS) [excerpt]

6        Kensington Gold Project:  1992 Record of Decision (1992 ROD)

7        EPA, 2005 Record of Decision for the Section 402 National Pollutant Discharge Elimination System Permit (EPA Record of Decision)

8        EPA, 2005 Section 402 National Pollutant Discharge Elimination System Permit (2005 NPDES Permit) [excerpt]

9        Corps of Army Engineers, 2005 Section 404 Permit (2005 Corps Permit) [excerpt]

10       Corps of Army Engineers, 1998 Record of Decision (1998 Corps ROD) [excerpt]

11       EPA, Technical Assistance Report for the U.S. Army Corps of Engineers, Oct. 2004 (EPA Technical Assistance Report) [excerpt]

12       Knight Piesold Consulting, Kensington Project, Report on Water Quality Modeling, February 7, 2003 (Report on Water Quality Modeling) [excerpt]

13       Coeur Alaska, Final Plan of Operations for the Kensington Gold Project, May 2005 (2005 Plan of Operations) [excerpt]

14       Ecology and Environment, Inc., Review of Data on Toxicity and Acid Rock Drainage Potential of Tailings at Kensington Mine, December 6, 2004 (Review of Toxicity Data)

15       EPA's Comments on Proposed Section 404 Permit for Kensington Mine, August 20, 2004 (EPA Comments on 404 Permit) [excerpt]

16       EPA's Comments on the 2004 FSEIS for the Kensington Gold Project, December 1, 2004 (EPA Comments on 2004 FSEIS)

17    Comm. on Public Works, 93rd Cong., A Legislative History of the Water Pollution Control Act Amendments of 1972 (1973) [excerpt]

18    47 Fed. Reg. 25,682 (June 14, 1982) [excerpt]

19    47 Fed. Reg. 54,598 (December 3, 1982) [excerpt]

20    40 Fed. Reg. 31,320 (July 25, 1975) [excerpt]

21    40 Fed. Reg. 41,292 (Sept. 5, 1975)

22    42 Fed. Reg. 37,122 (July 19, 1977) [excerpt]

23    45 Fed. Reg. 33,290 (May 19, 1980) [excerpt]

24    Memorandum from J. Pierce, Corps, to C. Reinke of 04/14/1992

25    Letter from G. Justis, Corps, to J. Dorris, Bureau of Land Management (BLM), of 06/18/1991

26    65 Fed. Reg. 21,292 (April 20, 2000)

27    67 Fed. Reg. 31,129 (May 9, 2002)

28    Response to Comments Document for Final Rule Amending EPA's and Corps' Clean Water Act Section 404 Definitions of "Fill Material," and "Discharge of Fill Material," May 3, 2002 (2002 EPA/Corps Response to Comments) [excerpt]

29    Memorandum from D. Regas, *et al.*, EPA, to R. Smith, EPA, of May 17, 2004 (Regas Memorandum)

30    Declaration of Irene Alexakos

31    Declaration of Eric Holle

32    Declaration of Richard Hellard

33    Declaration of Alan Micheal

34    Declaration of Robert E. Lindekugel

35    Declaration of Betsy Goll

36    Declaration of Scott Carey

37          Corps of Army Engineers, 2005 Cascade Point Permit (2005 Cascade Point Permit) [excerpt]

38          Letter from T. Gallagher, Corps, to T. Arnold, Coeur Alaska, of 03/29/06 (Coeur Alaska Reinstatement Letter)

39          Corps of Army Engineers, 2006 Revised Record of Decision (2006 Corps Revised Record of Decision) [excerpt]

40          Letter from T. Gallagher, Corps, to J. Droubay, Goldbelt, Inc., of 3/29/06 (Goldbelt Reinstatement Letter)

41          NMFS, Biological Opinion on the Kensington Gold Project, March 2005 (2005 NMFS BiOp) [excerpt]

42          Declaration of Gareth Hummel