water must be recycled. This alternative would also include diversion channels to direct the flow from Mid-Lake East Fork Slate Creek and overland runoff from undisturbed areas around the TSF. The diversions would require a dam on Upper Slate Lake to maintain water levels in the diversion sufficient to reach the spillway at the TSF dam. The diversion would discharge to a spillway at the top of the TSF dam. The purpose of the diversion would be to minimize the volume of fresh water in contact with the tailings. The remaining project components, including the production rate of 2,000 tons per day of ore and the access tunnel, would be the same as those under Alternative B.

### 2.2.5 *Alternative D: TSF Water Treatment and Pipeline Diversion*

Alternative D includes a modified TSF design. A dam would be constructed in Mid-Lake East Fork Slate Creek, and it would gravity-feed a diversion pipeline. TSF water would be pumped to a reverse osmosis treatment system. The treatment plant effluent would discharge into the diversion pipeline, which would flow to East Fork Slate Creek below the TSF dam. Once tailings disposal was complete, the tailings would be capped with native material unless the operator can demonstrate that uncovered tailings would not cause toxicity throughout Lower Slate Lake after closure. The remaining components would be same as those of Alternative B.

## 2.3    PROJECT COMPONENTS STUDIED IN DETAIL

### 2.3.1   *Project Location/Duration*

Figure 2-1 shows the location of project facilities, which would be built on National Forest System lands as well as private land (dark shading). Under Alternative A, the facilities would be contained within watersheds draining to Lynn Canal. The process area would be near the Kensington 850-foot portal and would consist of the mill, warehouse buildings, maintenance shop, administrative offices, and laboratory. The personnel camp would be near the wastewater treatment plant, downslope of the process area. Under Alternatives B, C, and D, portions of the operation (waste rock disposal and wastewater treatment of the mine drainage) would remain within the Sherman Creek drainage; however, facilities would also be built in the Johnson Creek and Slate Creek drainages, within the Berners Bay watershed. Under Alternatives B, C, and D, the facilities mentioned above would be moved to an area above the historic Jualin Mine (Figure 2-5) consisting mostly of patented mining claims (private land). The personnel camp would be eliminated.

Under Alternative A, the active life of the project would be at least 12 years based on the existing reserve, following a 2-year construction period. Alternative A1 would have an active life of 10 years following a 2-year construction period. Mining operations lasting 10 years are projected under Alternatives B, C, and D, following an 18-month construction period.

### 2.3.2   *Mining Methods*

The proposed mining methods are similar to those presented in the 1997 Approved Plan of Operations. The following discussion provides a brief summary of mining methods based on details provided in the 1992 FEIS. The reader is referred to pages 2-5 through 2-7 of that document for additional details.

Under Alternatives A and A1, the ore body would be accessed by the existing tunnel at the Kensington 850 portal. Under Alternatives B, C, and D, the Jualin tunnel would be used as the primary access for workers and materials into the mine, as well as ore haulage between the mine and mill. The Jualin tunnel would be 18 feet wide by 15 feet high to accommodate 40-ton haul trucks. On the Jualin side, the portal would be near the mill at an elevation of 1,050 feet. From the portal, it

Case 1:05-cv-00012-JKS    Document 41-5    Filed 04/07/2006    Page 2 of 11

would slope downward at a grade of 1.5 percent for 5,000 feet toward the existing Kensington tunnel, which it would intersect at an elevation of 932 feet. The tunnel would be driven from both sides to reduce the duration of the pre-production development period and to eliminate the need for a ventilation raise to the surface. The estimated schedule for completing the tunnel is about 150 days.

The Kensington ore body consists of a dense pattern of quartz veins and veinlets that extend from the surface to a depth of approximately 3,000 feet. The ore zone averages approximately 60 feet wide but ranges in width from 22 feet to more than 165 feet. The ore body is irregular in shape and erratic in the distribution of gold content. Coeur selected a mining method called the long-hole, open-stope technique on the basis of a number of factors, such as the spatial and physical characteristics of the deposit, economics, and environmental considerations.

The long-hole, open-stope technique is employed in situations where ore occurs in wide and steeply dipping vein deposits. Mining would progress throughout the ore body as dictated by mine design, stope size, backfilling sequence, and other key elements that maximize extraction of the mineral resource. The long-hole, open-stope method allows for flexibility in handling irregular ore body widths and allows efficient removal of ore. It also allows safe working conditions while using a minimal workforce. Figures 2-13 and 2-14 depict the extent of the mine workings under Alternatives A1, B, C, and D in relation to the ground surface and surface water drainages, respectively.

The operation under all the alternatives would mine the Kensington ore body. Alternative A proposes to process ore at a rate of 4,000 tons per day (tpd) and produce approximately 26 million tons of tailings over the life of the mine. The DTF would be sized to hold a maximum of 20 million tons, and 25 percent of the tailings would be backfilled. Under Alternatives A1, B, C, and D, a smaller portion of the same ore body would be mined at a rate of 2,000 tpd. The 2,000-tpd operation would target smaller quantities of higher-grade ore (ore with a higher gold content) than the operation proposed under Alternative A. Operations under Alternative A1, B, C, or D would produce a total of 7.5 million tons of tailings over the life of the mine: 4.5 million tons (60 percent) would be disposed of in the TSF (or the DTF in the case of Alternative A1), and 3 million tons (40 percent) would be backfilled.

### 2.3.3 Waste Rock Disposal

Waste rock is material encountered during the mining process that has a gold content less than that economically recoverable. During operations, waste rock would be hauled to the surface for storage, use, or disposal.

Under Alternative A, waste rock would be used as foundation, drainage, and berm material in construction of the DTF. A 15-acre temporary stockpile would be located near the mine opening for the first 3 to 4 years while the DTF was being developed. Once the DTF became active, the demand for waste rock would essentially equal production; that is, all waste rock would eventually be used in the DTF. Section 2.3.3 of the 1997 SEIS provides a more detailed discussion of waste rock management under Alternative A. Very little waste rock would be produced under Alternative A1.

Under Alternatives B, C, and D, most of the waste rock would be generated in the process of developing the access tunnel between the Kensington and Jualin portals. This tunnel would not be developed under Alternative A or A1. The waste rock would be hauled by truck to a 31.5-acre permanent disposal site near the Kensington 850-foot portal. There would also be capacity to store approximately 500,000 tons of waste rock on 4.8 acres in the vicinity of the process area at Jualin. Under all alternatives, waste rock could also be placed underground as part of the backfill process.



**FIGURE 2-14. UNDERGROUND MINE WORKINGS UNDER ALTERNATIVES A1, B, C, AND D IN RELATION TO SURFACE WATER DRAINAGES**

### 2.3.4 Ore Processing

Ore processing refers to the methods by which gold is separated from the surrounding material. The steps in ore processing would be nearly the same under all alternatives; the only difference would be the location of the processing facilities. Processing steps include crushing, grinding, flotation, thickening, and filtration. Under Alternatives A and A1, crushing would take place underground and all the other steps would be conducted in buildings. Under Alternatives B, C, and D, all steps would be done in buildings. Table 2-4 summarizes the chemicals and materials used in the milling process under each alternative.

The mill would be located at the Kensington process area under Alternatives A and A1 and at the Jualin process area under Alternatives B, C, and D. In each case, ore would be hauled from the active mining area and dumped down an ore chute. The material would then be sent through the primary

**Table 2-4**
**Chemical and Material Use**

| Milling Process | Reagent or Material | Container (Shipping and Storage) | Approximate Daily Use (tons) | |
|---|---|---|---|---|
| | | | Alternative A | Alternatives A1, B, C, and D |
| Grinding | Steel balls | 10-ton steel bins | 5–6 | 4–5 |
| Flotation | Potassium amyl xanthate | 50-gallon drum | 1 | 0.5 |
| | MIBC (frother) | 50-gallon drum | 0.4 | 0.2 |
| | Flocculant | 1-ton Flo-bin | 0.2 | 0.1 |
| | Polymer | 50-gallon drum | 0.02 | 0.01 |
| | Surfactant | 50-gallon drum | 0.04 | 0.02 |
| | Scale inhibitor | 50-gallon drum | 0.1 | 0.05 |
| | Lime* | 1,000-lb bags | 2 | 1 |

* Lime is also used in concentrate thickening.

crusher, which would reduce the size of the ore to less than 6 inches. The crushed ore would then be hauled by truck to the coarse ore stockpile at either the Kensington side (Alternatives A and A1) or Jualin side (Alternatives B, C, and D) of the operation. There, the ore would be fed into a hopper with a vibrating feeder and then onto a belt that would discharge into a semiautogenous grinding (SAG) mill.

The SAG mill would be set up in a closed circuit with a horizontal vibrating screen and a ball mill. Oversized material would be fed back into the SAG mill, while undersized material (minus 100 mesh) would be directed to hydrocyclones. Hydrocyclones use centrifugal force to separate coarse material from fine material. The heavy material (underflow) from the cyclones would be directed to a gravity concentrator used to recover coarse gold. Lighter materials from the cyclones would be fed back to the cyclone circuits, eventually overflowing from the cyclones to a conditioning tank feeding the flotation circuit.

The flotation process would involve separating the gold from the barren material in a froth flotation. A slurry would be fed from the cyclones to the conditioning tank, where conditioners (e.g., potassium amyl xanthate) and frothing agents would be added. These materials would cause the sulfide and telluride minerals (both gold-bearing) in the slurry to attach to air bubbles once air was pumped through the system. The bubbles containing the mineralized portion of the slurry, including the gold, would form a froth on top of the flotation tank. The gold-bearing froth would then be skimmed off and collected. This "concentrate" would flow through additional flotation tanks to further concentrate the gold. The flotation process would separate approximately 93 to 96 percent of the non-gold material from the ore fed into the system, leaving 160 to 280 tons (under Alternative A) or 80 to 140 tons (under Alternatives A1, B, C, and D) of flotation concentrate per day. Most of the chemicals added to the system would stay in the flotation tanks or be removed with the flotation concentrate as opposed to being discharged with the tailings. Most of the metals associated with the ore body would be removed from the system with the gold concentrate.

Following the final flotation, the concentrate would be dewatered before being placed into specialized 8-foot by 8-foot by 20-foot sealed marine transport containers for shipment to an existing, off-site processing facility outside Southeast Alaska. Under Alternative A the average production would be approximately 1,400 tons (40 containers) of concentrate per week. The production level would average approximately 700 tons (20 containers) of concentrate per week under Alternatives A1, B, C, and D.

### 2.3.5 Tailings Disposal

Tailings are the material that remains in the flotation tanks once the gold-bearing material has been removed. This Final SEIS evaluates two methods of tailings disposal. Under Alternatives A and A1, tailings would be placed in the DTF. Alternatives B, C, and D would employ wet (underwater or subaqueous) tailings disposal methods in the TSF constructed in Lower Slate Lake. Under all the alternatives, the operator would backfill some of the tailings to permit the maximum extraction of the resource and provide structural stability within the mine. Under Alternative A, the operator would backfill at least 25 percent of the tailings generated. Under Alternatives A1, B, C, and D, the operator proposes to, backfill at least 40 percent of the tailings generated over the life of the operation.

**Dry Tailings Disposal**

The following discussion is taken from Section 2.3.6 (pages 2-20 through 2-22) of the 1997 SEIS. Additional detail on the DTF can be found in that document. Under Alternatives A and A1, the DTF would be constructed using methods similar to the construction of landfills. The slurry would be thickened to approximately 55 percent solids. The thickened slurry would be moved from the mill to the DTF through an 8,000-foot, gravity-fed pipeline. The pipeline would be built within the footprint of the haul road for most of its length. The pipeline would be approximately 14 inches in diameter with a 20-inch casing for spill containment. At the DTF the tailings would be dewatered, using plate filters (or the design equivalent), to a moisture content of 5 to 18 percent. The filter cake would then be loaded into trucks and placed in the DTF.

The DTF would be constructed in a series of three stages or cells. Before placement of the first lift of each cell, a series of foundation drains would be installed to form the base. The drains would be laid out in a herringbone pattern and consist of gravel wrapped in geotextile material. A minimum of 2 feet of waste rock or development rock would be placed over the drains. Each cell would consist of five to seven lifts, each 28 feet high. Tailings would be placed (unconsolidated) into the 28-foot lifts followed by 1 foot of compacted, low-permeability fine till and 1 foot of waste rock to provide a cover and working surface. Stockpiles of waste rock to be used in DTF construction would be placed within the footprint of the next cell. The final cover for the facility would consist of 6 to 8 feet of coarse and fine till. The underlying fine till layer would serve as a capillary break, and the overlying coarse till would promote infiltration and drainage. Growth media would be placed on the coarse till to support revegetation.

To ensure that tailings placed into the DTF did not contain excess moisture, there would be no temporary storage at the process area or the dewatering area. Tailings would be placed directly into the DTF or backfilled. The operation would generally expose less than 5 acres of tailings to direct precipitation at any one time (before concurrent covering and revegetation), as illustrated in Figure 2-15.

An engineered structural berm would be constructed around the north, south, and west sides of each cell to increase the stability of the facility. The berm would be constructed of waste rock, compacted tailings, or other suitable material. The berm would extend to a height of approximately 100 feet along the west slope and 50 feet along the north and south slopes. Under Alternative A, the DTF, including the berm, would ultimately cover 113 acres and have a capacity of 20 million tons of tailings. Under Alternative A1, the DTF would cover approximately 40 acres and be able to store 4.5 million tons of tailings.

*Subaqueous Tailings Disposal*

Under Alternatives B, C, and D, tailings would flow by gravity as a slurry from the mill facility located on private land near the Jualin Mine portal to the TSF at Lower Slate Lake through a 3.5-mile pipeline (Figures 2-5 and 2-6). The pipeline would be double-walled, high-density polyethylene (HDPE), approximately 6 inches in diameter. Flow sensors with automatic shutdown mechanisms would be used to detect any blockages or breaks in the system.

Before the slurry left the mill, a polymer and flocculant would be added to agglomerate the small particles and enhance settling once the tailings were deposited into the TSF. The polymers and flocculants are not toxic and would have no effect on water quality beyond their capability to improve the efficiency of settling out fine material. The tailings slurry would be discharged into the TSF through perforations in a portion of the tailings delivery pipeline submerged in the TSF.

A portion of the perforated segment of the pipeline would always be above the bottom of the TSF, allowing the tailings to flow freely from the pipe. The perforations would be very large in comparison to the size of the tailings particles to prevent the tailings from clogging the pipeline. Valves would be placed in the delivery pipeline to allow for maintenance or relocation of the tailings discharge point (perforated pipe). The tailings pipeline would be moved periodically to ensure equal distribution of the tailings.

Under Alternative B, water from the slurry transport of tailings and natural inflow from the drainage basin would maintain a relatively consistent lake volume and thus provide water cover for the tailings. The tailings would be deposited to a final elevation of 704 feet with a constant cover of at least 9 feet of water. Figures 2-16 and 2-17 provide an overview of biological activity in Lower Slate Lake before and after mining operations. The maximum depth of the tailings at closure would be approximately 120 feet. The operational details of the facility at the initial dam construction stage (705 feet) have yet to be determined. Water would be recycled from the TSF for reuse in the process facilities at an average rate of 100 gallons per minute (gpm).

Under Alternative C, all natural inflows from the channel between the two lakes (Mid-Lake East Fork Slate Creek; see Figure 3-3) and the drainage areas surrounding the TSF would be diverted around the TSF. In this case, natural flows would be captured in diversion ditches, carried around the north and east shores of the TSF, and discharged to a drop structure constructed at the TSF dam spillway. Water from the TSF would not be recycled under Alternative C.

Under Alternative B, a drop-structure spillway would be installed at the east abutment of the dam to direct discharge from the TSF to East Fork Slate Creek. An energy dissipater at the bottom of the spillway would allow the water to flow into East Fork Slate Creek without affecting the downstream velocity in the creek. Operationally, water would be pumped from a clear portion of the pond, away from the tailings discharge, to the spillway inlet for discharge. The operator would manage the TSF so that the water is maintained at a steady level. This approach would maintain flow-through conditions so that releases from the TSF would be roughly equivalent to the natural inflow to the lake from natural sources. Under Alternative C, the discharge from the TSF would be pumped to the diversion channel, where it would combine with the natural flows in the diversion channel before flowing into East Fork Slate Creek below the embankment. Upon completion of mining operations, the lake ecosystem would be reestablished at its new level and flows would passively discharge through the permanent embankment spillway.

Under Alternative D, Mid-Lake East Fork Slate Creek would be diverted around the TSF by a pipeline. Up to 1,300 gpm of water would be pumped from a clear portion of the TSF. Approximately 100 gpm of this flow would be recycled to the mill, while up to 1,200 gpm would flow into a reverse osmosis treatment system for additional solids and metals removal. The reverse osmosis system would involve high-pressure flow through a permeable membrane, where high-quality water would be separated from remaining impurities. A schematic of the reverse osmosis system is included as Figure 2-18. The impurities would be concentrated in a "brine" solution, which would be returned to the TSF. The ratio of high-quality water to brine is typically about 80 percent to 20 percent; for example, at the treatment plant's design capacity of 1,200 gpm, about 960 gpm of high-quality water would be produced along with 240 gpm of brine. Overall, the volume of brine produced would vary between 100 and 240 gpm. The high-quality water would be discharged to the diversion pipeline, which would flow via a spillway to East Fork Slate Creek below the TSF.

*Backfilling*

Backfilling tailings to mined-out areas underground would provide structural support of the underground workings and allow removal of more of the gold ore. It would also reduce the volume of tailings placed into an aboveground disposal unit (DTF or TSF). Backfilling is proposed under all the alternatives.

Under Alternative A, the operator would transport at least 25 percent of the tailings to a paste backfill plant at the 2,050-foot level of the mine. In the plant, tailings would be mixed with water and cement to form a paste, which would then be directed to open stopes (excavations) within the mine. The paste would be thick and heavy, making pumping expensive in terms of the cost of equipment. Therefore, the use of paste backfill would be limited to the areas that could be accessed by gravity flow from the backfill plant. The backfilled areas would allow the removal of additional ore that would otherwise need to be left in place to provide structural support.

Backfilling under Alternatives A1, B, C, and D would not involve creating a paste but instead would consist of pumping the coarse fraction of the tailings through an HDPE pipe from the cyclones to working areas that need backfill. On the surface, the backfill pipeline would run from the mill to the mine within a containment ditch. Because the ditch would be sized to contain the volume of tailings within the pipeline, it would provide secondary containment in the event of a pipeline failure. A decant line to pump water from the backfill area back to the processing circuit would parallel the backfill pipeline. Depending on the size and use of the area (stope) to be backfilled, cement might be mixed with the upper few inches of backfilled tailings to provide a stable working surface. At least 40 percent of the tailings would be backfilled under Alternatives A1, B, C, and D.

### 2.3.6 TSF Dam Construction

The TSF would be formed in part by the natural lake basin at Lower Slate Lake and a dam constructed at the outlet of the lake. The dam would be a concrete-faced rockfill dam constructed in two phases. During operations, the dam of the TSF would be 90 feet tall and approximately 500 feet long. The TSF would be sized to accommodate 4.5 million tons of tailings. Figure 2-19 shows the TSF dam. The phased approach to constructing the dam would allow tailings disposal to begin once the first stage of the dam was completed. The second stage would be built while mining operations and tailings disposal were active, likely 4 to 5 years into the process.

Under Alternatives B, C, and D, some interim on-site housing would be provided during the construction phase, primarily for workers driving the tunnel between Kensington and Jualin and completing mine development work. Up to 160 of these workers (80 at a time) would be housed at the camp at Comet Beach. These workers would be shuttled by helicopter at a rate of 12 to 14 trips per month. The helicopter landing pad would be on private land in the vicinity of the process area. Temporary workers building the marine terminal at Slate Creek Cove would likely be housed in a self-contained work camp on a barge during the brief construction period. Once the Slate Creek Cove facility was built, up to an additional 325 workers would shuttle back and forth daily to the site by boat for construction of the TSF and process area. After operations began, there would be no employee housing on-site.

Operations under Alternatives B, C, and D would include transporting employees to the site in a crew shuttle boat that would run five round trips daily between Slate Creek Cove and Cascade Point on weekdays and three round trips on weekends. During the eulachon spawning period each spring, the operator would reduce shuttle traffic to no more than two to three trips per day as well as minimize barge traffic at Slate Creek Cove. Under Alternative C, the same crew shuttle boat would be used to transport workers, but the dock would be located within Echo Cove, approximately 0.75 mile north of the existing boat ramp. The number of trips would be the same as that under Alternatives B and D, but some flexibility in the schedules would be needed to allow for low tides when shuttle boat operations could be precluded. As required by the City and Borough of Juneau's (CBJ) Allowable Use Permit, the operator must provide bus transportation for employees from an as-yet-undesignated location in the Mendenhall Valley to Cascade Point. This permit further requires the operator to establish a corporate policy requiring employees to use only bus transportation.

### 2.3.12 Power Supply

Under Alternatives A and A1, the operator would employ four 3.33-megawatt (MW) diesel generators to provide power to the process area. A 275-kilowatt (kW) "containerized" unit would be located near Comet Beach. Underground lines would be used to supply power from the process area to the DTF to drive the plate filters used to dewater the tailings.

Alternatives B, C, and D would operate three 3.33-MW diesel generators in the Jualin process area. A power line would be constructed along the tailings pipeline route to the TSF, and it would provide power to the discharge pumps and the reverse osmosis system under Alternative D. The reverse osmosis system would require about 180 kW of additional power on an annual basis compared to Alternative B. A 275-kW generator would be located at the Slate Creek Cove marine terminal. An additional 275-kW generator would be located at the TSF as a backup power supply.

A selective catalytic reduction system or similar best available technology would be included in the design for the diesel generators, as required by the Alaska Department of Environmental Conservation (ADEC) air quality permit. The power supplies would be operated and emission sources controlled according to ADEC's air quality permit requirements.

### 2.3.13 Fuel Use and Storage

Under all alternatives, diesel, aviation fuel, and gasoline would be stored on-site within secondary containment. The secondary containment would consist of concrete-lined, bermed areas or double-walled tanks. Diesel would be used as fuel for the vehicles, mobile equipment, and generators. Aviation fuel for helicopters would be available in small quantities. Gasoline would be limited to use

would occur on the Jualin side of the site at Slate Creek Cove. Personnel handling these materials would be trained and certified. Personnel transporting the materials would be trained in emergency procedures and would carry emergency response plans during transport.

### 2.3.15 Nonprocess Waste Disposal

Nonprocess waste disposal would be similar for all the alternatives. The only difference would be the placement of the receptacles and the location of the incinerator (Alternatives A and A1, Kensington side; Alternatives B, C, and D, Jualin side). Bear-proof dumpsters would be placed at centralized locations throughout the site, including the marine terminal and process area. The dumpsters would be constructed with two bins, one for combustible waste and the other for noncombustible waste. Combustible waste would be collected daily and disposed of in a fenced, bear-proof incinerator. Ash from the incinerator would be placed underground in dry portions of the mine. Noncombustible waste would be disposed of on private land in a manner consistent with ADEC requirements. Used oil would be collected and burned to provide heat in approved used oil heaters or removed from the site by an approved used oil contractor. Construction and demolition waste would be salvaged as appropriate, and some would be managed in privately owned portions of the mine workings in accordance with ADEC's solid waste management requirements.

### 2.3.16 Borrow Areas

Alternative A would require three sand and gravel borrow areas (16.5 acres) and a till borrow area (38.2 acres). Under Alternative A1, the sand and gravel borrow areas would be the same size while the till borrow area would be reduced to 20.1 acres. All of these areas would be on the Kensington side of the project area. Alternatives B, C, and D would require two new sand and gravel borrow areas, as well as the expansion of two existing borrow areas, which would disturb a total of approximately 7.1 acres. In each case, the material would be used for general fill, facility foundations, and other construction needs, including the DTF (Alternatives A and A1) and TSF embankment (Alternatives B, C, and D). The borrow areas would be developed as open pits and configured based on the type and quantity of material required. Under any of the alternatives, the borrow areas would be reclaimed at the end of mining operations. Reclamation would include grading the areas to blend with existing topography and, where practical, encouraging the development of wetland habitat.

### 2.3.17 Roads and Bridges

Roads are currently present from Comet Beach to the Kensington 850-foot portal and from Slate Creek Cove to the historic Jualin Mine site. Under Alternatives A and A1, the 2-mile road to the Kensington 850-foot portal would be upgraded to handle the increase in truck traffic moving fuel and supplies from Comet Beach to the process area and moving concentrate from the process area to Comet Beach. Haul trucks would be used to move waste rock and material from the borrow areas to the DTF. Two new bridges would be constructed, one over Ivanhoe Creek and one over Sherman Creek west of the process area. Two existing bridges, one over South Fork Sherman Creek and one over Sherman Creek south of the process area, would be upgraded. A culvert would be used to cross an unnamed, intermittent tributary to Sherman Creek about halfway between Comet Beach and the process area.

Under Alternatives B, C, and D, the 5-mile access road between Slate Creek Cove and the process area at Jualin would also be upgraded. The upgrade would consist of improving the surface of the road, reducing the grade in some segments, and adding turnouts every 1,500 feet. Two existing bridges crossing Johnson Creek would also be upgraded. The bridge upgrades would be completed

during periods of low flow to minimize the extent of construction activities within the creek. Construction would meet requirements outlined in a memorandum of understanding between the Forest Service and ADNR regarding activities in fish streams. A 3.5-mile pipeline access road between the process area and the TSF would be built, as would a 1-mile-long cutoff road between the pipeline access road and the main access road. The pipeline access road would be reinforced with a structural berm at the Snowslide Gulch crossing. Construction and upgrading of the roads and bridges under all alternatives, as well as the borrow sites on National Forest System lands, would be subject to Forest Service standards and guidelines.

The existing Jualin access road is subject to Revised Statute (RS) 2477, which means that it is a public right-of-way managed by ADNR with input from the landowners. ADNR would need to authorize any improvements to this road and might, for public safety, need to control public access during the life of mining.

### 2.3.18 Marine Terminals

Each alternative includes at least one marine terminal to access the site. Alternatives A and A1 would involve construction of a marine terminal at Comet Beach. Alternatives B, C, and D would require marine terminals at Slate Creek Cove and either Cascade Point or Echo Cove. The marine terminals in all cases would be built within state tidelands and require a tidelands lease from ADNR. The lands above the mean high tide line at Slate Creek Cove are National Forest System lands. The lands above the mean high tide line at Comet Beach, Cascade Point, and Echo Cove are all private property. The following subsections provide greater detail on each of the proposed facilities.

#### Comet Beach

The Comet Beach marine terminal would be exposed to the rough weather and high tides in Lynn Canal. A breakwater would not be feasible, and therefore deliveries of fuel and supplies would be limited to times when seas were less than 3 feet high. The facility would consist of a ramp constructed of precast concrete along a slope of approximately 10 percent (Figure 2-3). Barges would be accessed via a ramp and materials unloaded by forklift. Mooring dolphins would be used to stabilize barges during unloading. The 2.1-acre mooring area would require the removal of 75,000 cubic yards of material in dredging to a depth of 10 feet below mean lower low water (MLLW).

#### Slate Creek Cove

The Slate Creek Cove marine terminal used under Alternative B, C, or D would consist of a ramp, a fixed dock (platform), a movable ramp, and a floating dock. No dredging would be required. Barges would be attached to pile-anchored mooring dolphins during the transfer of materials. Loading and unloading would be done using a roll-on/roll-off forklift transfer system. The floating dock would be used to allow personnel to move between the shuttle boat and the shore. Under Alternatives B and D, a landing craft ramp would be included in the design of the facility (Figure 2-7). The landing craft ramp and corresponding fill material would be eliminated under Alternative C (Figure 2-10). Under Alternatives B and D, approximately 29,000 cubic yards of fill material covering 3.6 acres would be placed in intertidal and subtidal habitats. Elimination of the landing craft ramp under Alternative C would eliminate approximately 10,000 cubic yards of fill in the intertidal zone. The landing craft ramp would not be the main method for offloading barges, but it would provide additional flexibility in loading and unloading operations. To access the barge, the movable ramp would be lowered from the fixed platform onto the deck of the barge.

**Exhibit 1, page 25 of 61**

copper, iron, manganese, vanadium, and zinc were detected in some samples, usually at or slightly above the detection limit. Only aluminum was detected above the applicable water quality criterion.

No evidence of acidic drainage or adverse impacts on the environment have been observed due to weathering of historical (up to 80 years old) waste rock piles present in the district (Geochemica Inc. and Kensington Venture, 1994). However, the geologic relationship between waste rock from historical operations and that from proposed future mining operations has not been defined. Runoff from the existing Kensington mine development rock pile has been collected, routed through sediment ponds, combined with mine drainage, and discharged via outfall 001. Discharge monitoring has shown consistently neutral pH.

### 3.3.4 Tailings

A significant amount of work has been performed to characterize the geochemical properties of the tailings. Most of this work, however, has been performed on combined flotation (rougher) and carbon-in-leach (CIL) tailings, which would have been produced by a process no longer being considered for the project. Under all alternatives, only rougher tailings would be produced at the mine.

Montgomery Watson (1996b) described the process by which pilot-scale ore processing was performed on a 3,000-pound composite ore sample to create rougher tailing samples, which were analyzed for geochemical characteristics. An abbreviated overview of the Montgomery Watson report is available in SAIC (1997). The composite ore sample was formulated by mine geologists and was considered representative of the ore produced over the life of the mine. The ore sample had a total sulfur content of 1.83 percent and a sulfide sulfur content of 1.74 percent (SAIC, 1997). The rougher tailing solids produced from the composite ore sample were subjected to ABA, column leach tests, and total metals analysis; the tailings decant water was analyzed for total metals and other parameters (SAIC, 1997).

Acid-base accounting tests showed the tailing solids to be net-neutralizing. As sulfide is removed from the tailings during processing, this material is more strongly neutralizing than waste rock produced during project operations (SRK, 1996b). Montgomery Watson (1996b) determined the total sulfur content to be 0.04 percent, corresponding to an NP:AP of 83, while SRK (1996b) measured a total sulfur content of 0.02 percent, corresponding to an NP:AP of 166. As is the case for ore and waste rock characterization, potential acidity was conservatively determined based on total sulfur, rather than sulfide sulfur, concentration.

Two subsamples of the rougher tailings were placed into columns and leached with five pore volumes of deionized water that was adjusted to pH 4.5 with hydrochloric acid (SRK, 1996b). Thirteen of the 22 analytes had total concentrations at or below their respective detection limits by the first or second pore volume. The majority of metals of concern, including cadmium, chromium, lead, mercury, and nickel, occurred in this group. The concentration of iron was relatively constant in the first four pore volumes, ranging from below detection to 0.06 mg/L. Iron was measured at 0.19 mg/L in the fifth pore volume. This concentration, however, was thought to be an anomaly due to laboratory error because of the non-detect value in the fourth pore volume and the fact that no other analyte concentrations increased in the fifth pore volume compared to the first pore volume (SAIC, 1997). Leachate pH remained near neutral throughout the test, ranging from 6.5 to 7.6. Sulfate was measured at 640 mg/L in the first pore volume, but it decreased to 50 mg/L by the second pore volume.