

United States
Department of
Agriculture

**Forest Service**

Tongass
National
Forest
R10-MB-500a





# Kensington Gold Project

## Final
## Supplemental Environmental Impact Statement

*Volume 1: Sections 1–10*

**Lead Agency**
USDA Forest Service, Tongass National Forest



**Cooperating Agencies**
US Environmental Protection Agency, Region 10
US Army Corps of Engineers, Alaska District
Alaska Department of Natural Resources



US Army Corps
of Engineers
Alaska District



**Prepared by**
Tetra Tech, Inc.
143 Union Boulevard
Suite 1010
Lakewood, CO 80228

**December 2004**

Record of Decision

# Record of Decision

USDA FOREST SERVICE

Kensington Gold Project

Juneau Ranger District
Tongass National Forest

## Decision to be made

This Record of Decision documents my selection of an alternative that will be used to amend the 1997 Plan of Operations for the Kensington Gold Project. My decision is based on the analysis and evaluations in the 2004 Final Supplemental Environmental Impact Statement (FSEIS) as well as information incorporated by reference from the 1997 FSEIS and ROD and the 1992 FEIS and ROD.

While the 2004 FSEIS considers and discloses all direct, indirect and cumulative impacts related to this project, regardless of land ownership or jurisdiction, my decision addresses only those project components subject to my authority over National Forest System lands. Other Federal and State agencies and the City and Borough of Juneau have authority to issue specific permits on National Forest System lands and elsewhere. In particular, both the Environmental Protection Agency and the U.S. Army Corps of Engineers have yet to exercise their permitting authority over this project and have indicated their intent to issue separate Records of Decision based on this FSEIS. The State of Alaska will also rely on much of this analysis to approve activities on state lands and issue applicable permits. Implementation of my decision to select an alternative is subject to the completion of those necessary permit processes by the other federal, state, and local authorities.

As part of this decision I will also consider recommendations from an interagency team to modify three small Old Growth Habitat reserves located in the project area.

## Background

The Kensington Gold Project is an underground gold mine located approximately 45 miles north-northwest of Juneau, Alaska. The recent history of the Kensington Gold Project began in 1990 when the Kensington Venture (a joint venture between Coeur Alaska, Inc. [Coeur] and Echo Bay Exploration) submitted plans to the Forest Service to

develop the Kensington mine. The Forest Service completed the *Kensington Gold Project Final Environmental Impact Statement* (1992 FEIS) and Record of Decision (ROD) in 1992 to consider and disclose environmental impacts that could arise from the project. Alternative F, Water Treatment – Option1 was selected as the basis for a plan of operations which was subsequently approved by the Forest Service in July 1992. Alternative F consisted of underground mining, ore processing using cyanide vat leaching, tailings impoundment in Sherman Creek, marine discharge of process wastewater and various support facilities including liquefied petroleum gas for power generation.

In 1995, prior to obtaining all necessary permits, the joint venture was dissolved and Coeur became the sole stakeholder in the property. Coeur submitted an Amended Plan of Operations to the Forest Service in September 1995.

In June 1996 Coeur revised the 1995 Amended Plan of Operations in response to issues raised during scoping and at meetings with state and federal agencies. The 1996 Amended Plan of Operations was analyzed in the *Kensington Gold Project Final Supplemental Environmental Impact Statement* (1997 SEIS) and a ROD signed in August 1997 in which Alternative D (the No Action Alternative in the current SEIS) was selected. Major project changes approved as part of Alternative D in the 1997 decision included off-site shipment of concentrate rather than on-site cyanide leaching, elimination of the slurry disposal dam in Sherman Creek in favor of a dry tailings disposal facility and use of diesel fuel rather than liquefied petroleum gas for power generation. The Forest Service approved an amended plan of operations, consistent with the selected alternative, on May 28, 1998. Coeur obtained all permits necessary for construction from federal, state, and local authorities.

In 2001 Coeur submitted an amendment to the approved 1997 Plan of Operations for the stated purpose of improving efficiency and reducing the extent of surface disturbance of the approved project. The amended plan proposes a number of changes to the 1997 approved plan, including changing the location of the processing facilities from National Forest System lands in the Sherman Creek drainage to private lands in the Johnson Creek drainage near the historic Jualin Mine workings, tailings disposal in Lower Slate Lake, an access tunnel from the mill to the Kensington claims and a daily commute of workers via shuttle boat rather than on-site housing with helicopter access. The operation would also mine a smaller portion of the ore body containing a higher average gold concentration than proposed under previous plans. The amended plan calls for the construction of two marine terminals on state tidelands; one at Slate Creek Cove and one at Cascade Point, adjacent to lands owned by Goldbelt Incorporated (Goldbelt), an Alaska Native corporation. Goldbelt would own and operate the Cascade Point dock as well as the ferry service between the two marine facilities. See Chapters 1 and 2 of the FSEIS for a more detailed description of the proposed action and alternatives.

The Forest Service directed the preparation of this SEIS using a third-party contractor, Tetra Tech, Inc. The U.S. Environmental Protection Agency (USEPA), U.S. Army Corps of Engineers (USACE), and Alaska Department of Natural Resources (ADNR) participated as cooperating agencies with the Forest Service in preparing the SEIS.

## Record of Decision

The current SEIS was developed to evaluate proposed changes to the approved plan of operations which could effect National Forest System, State of Alaska, Goldbelt Native Corporation and private lands. Approval for components not on NFS lands will be accomplished through other state and federal agencies with jurisdiction. This SEIS is intended to supplement the 1997 SEIS and 1992 FEIS. According to requirements in the Council on Environmental Quality regulations for implementing NEPA (40 CFR Part 1500), this document analyzes and discloses the direct, indirect, and cumulative impacts associated with the proposed changes to the approved plan of operations.

## Decision

Based on the analysis and evaluation in the SEIS for the Kensington Gold Project, it is my decision to select Alternative D. In conjunction with this decision, I am also approving a non-significant Forest Plan amendment to enlarge three Old Growth Habitat reserves as recommended by an interagency review team and described in Appendix 1 to this ROD.

My decision is based upon the analysis and evaluation in this 2004 Final SEIS as well as information incorporated by reference from the 1997 SEIS and ROD and the 1992 EIS and ROD.

My selection of Alternative D, as described in the SEIS, approves modifications to the 1997 Approved Plan of Operations to include the following:

- A Tailings Storage Facility (TSF) will be located at Lower Slate Lake rather than a Dry Tailings Facility (DTF) near Comet Beach. The TSF will be sized to accommodate 4.5 million tons of tailings and will ultimately increase the size of Lower Slate Lake from 23 acres to 56 acres. East Fork Slate Creek will be dammed between Upper and Lower Slate Lakes and diverted by pipeline around the TSF. The construction and operation of a water treatment system for the TSF discharge is authorized as required to meet NPDES permit limits. All discharge waters are required to comply with conditions to be established in a National Pollution Discharge Elimination System (NPDES) permit administered by the USEPA.

- Surface processing of ore will be done at mill facilities located on patented (private) lands in the Johnson Creek drainage. A floatation process will be used to separate gold from tailings and gold concentrate will be shipped off-site for further processing. Tailings will be transported as slurry through a 3.5-mile long pipeline from the mill to the TSF at Lower Slate Lake. Approximately 40% of tailings will be backfilled into underground workings.

- The existing Kensington and Jualin Mine access roads will be upgraded to safely accommodate mine traffic. Two new bridges will be constructed on the Kensington access road and two existing bridges will be upgraded on the Jualin access road. A 3.5-mile pipeline access road and a 1-mile cutoff road will be constructed. All road construction on NFS land will be subject to Forest Service standards and guidelines utilizing Best Management Practices (BMPs).

- Dry Tailings Facility (DTF), personnel camp, and mooring facilities located at Comet Beach will be eliminated.

- A tunnel to connect the Kensington Mine with ore processing facilities on private land near the Jualin Mine in the Johnson Creek drainage will be built.

- A permanent waste rock disposal facility at a 31.5-acre site near the Kensington 850-foot portal and a 4.8-acre site near the Jualin Mine process area will be developed.

- Surface water diversions will be built above the Kensington Mine 850-foot portal and waste rock disposal area, the Jualin process area and mine portal, and the diversion pipeline around the TSF.

- A fresh water infiltration gallery will be constructed in Johnson Creek, subject to ADNR approval, and a 300,000 gallon tank will be built at the Jualin process area for fresh water. A water recycle pipeline will be constructed alongside the tailings slurry pipeline to return process water to the mill.

- Diesel fuel delivery, transport, and storage using 6,500 gallon isotainers. Isotainers will be placed in the laydown area at Slate Creek Cove, near power generation facilities, and at equipment fueling areas. All isotainers will be stored in HDPE-lined and bermed storage areas.

- The development of two new sand and gravel borrow areas, as well as the continued use of two existing borrow areas, disturbing approximately 7.1 acres will provide construction materials.

Included in the Selected Alternative is my decision to adopt the mitigation and monitoring measures identified in the 2004 SEIS as described in section 2.5 that are within the authority of the Forest Service. This includes mitigation measures for safety, and the protection of the environment. My decision is also premised upon other permitting agencies adopting the mitigation and monitoring measures identified in the SEIS that are within their authority. In the event that the other mitigation and monitoring measures are not adopted, I will review this decision to determine whether any changes are needed.

The legal framework applicable to authorizing a large mine requires permits from different federal agencies, each of which must engage in consultation under Section 7 of the Endangered Species Act before the project may proceed. In particular, the mine operator must receive a permit under Section 404 of the Clean Water Act from the U.S. Army Corps of Engineers before construction or operation of marine terminals in Berners Bay. The USACE (and the Forest Service) initiated formal consultation under Section 7 and the USACE will not issue any permit for the marine terminals until consultation is completed. The USACE retains full discretionary authority to deny or condition the terminal permits in response to a biological opinion or the identification of reasonable and prudent alternatives. Therefore, my decision on the plan of operations does not constitute an irretrievable or irreversible commitment of resources foreclosing any

## Record of Decision

reasonable and prudent alternatives with regard to the marine terminals that might be found necessary to avoid jeopardy to an endangered or threatened species.

In addition to a Section 404 permit, the operator must receive Tidelands Leases (Alaska Department of Natural Resources) for construction and operation of marine terminals. Operation of crew transport ferries across Berners Bay and barge traffic is subject to National Marine Fisheries Service (NMFS), U.S. Coast Guard, and Alaska Department of Environmental Conservation regulation. The City and Borough of Juneau (CBJ) has issued an Allowable Use Permit to Coeur for mining operations and Slate Creek Cove marine facility operation. Goldbelt has received a CBJ Conditional Use Permit for operations at Cascade Point.

### Rationale for the Decision

In making my decision, I considered the many concerns raised during the analysis of this project, as well as those raised during the preparation of earlier NEPA documents related to the Kensington Mine. I took into account competing interests and values of the public and included mitigation measures, where possible, to avoid or minimize undesirable effects. All alternatives considered in detail are consistent with Forest Plan standards and guidelines designed to protect resources within the project area. I have carefully reviewed relevant information documented in the SEIS, discussions between cooperating agencies, and mitigation measures applicable to the project. Chapter 2 of the SEIS contains a detailed summary of the effects of each alternative both in tabular and narrative form. Based on that review, I believe that the actions described in Alternative D will be permitted by the other regulatory agencies.

I have also considered input from USEPA in their December 1, 2004, memo (SEIS – Appendix K) identifying their Environmentally Preferred Alternative (Alternative A) and Preferred Alternative (Alternative. A). USEPA stated that their input was provided without the benefit of a completed practicability evaluation by the USACE or a completed Biological Opinion from NMFS.

I am confident those analyses, when completed, will provide information leading to reasonable environmental mitigation measures for project components subject to the regulatory authority of the cooperating agencies.

I have also considered the advice of the State of Alaska in its memo December 1, 2004 (SEIS – Appendix K) to me regarding environmentally preferable and preferred alternatives. The State identified both Alternatives A and D as environmentally preferable and Alternative D as its preferred alternative. The State of Alaska is confident that mitigation measures identified in the FSEIS, the conditional and allowable use permits issued by the CBJ, agreed to by Coeur in its transportation plan, and those identified in the BA/BE submitted to NMFS on November 17, 2004, will all serve to reduce impacts to minimal levels for resources under the jurisdiction of the State of Alaska, herring in particular. The State of Alaska will be including a number of those mitigation measures in its Tidelands leases for marine facilities and Alaska Coastal Zone consistency review. I agree with the comment and analysis provided by the State.

**Record of Decision**

As noted above, other agencies have the final decision in authorizing the type of transportation system to be used to access National Forest System lands. The FSEIS does, however, attempt to predict likely effects to non-National Forest resources based on anticipated activities and both mandatory and anticipated mitigation. Based on this analysis and current mitigation requirements it appears that the effects to wildlife, fish, and recreational resources in Berners Bay are minimal. It is also possible that additional permit conditions could be imposed under both the USCOE permit and the State of Alaska tidelands lease that would further reduce impacts. Given this conclusion, and the level of concern regarding the effects of helicopter transport on wildlife and recreation expressed during the 1992 and 1997 analyses, both helicopter and vessel transport result in low to moderate effects on various resources, including the recreational setting. As a result transportation related effects are not a deciding factor in my selection of Alternative D.

Alternative D provides the best combination of components to minimize ground disturbance, reduce impacts to wetlands, provide safe and efficient transportation of workers, and reduce on-site fuel storage with the related risk of fuel spills within the framework of existing laws, regulations, and policies while meeting the stated purpose and need.

The Forest Service generally encourages use of private land for construction of privately owned facilities and roads where possible. Alternative A has the greatest impact on NFS lands in terms of surface disturbance (248 acres) whereas alternatives B, C, and D put more of the disturbance onto privately held lands, and impact less acreage of NFS lands (157 acres, 177 acres, and 159 acres respectively for alternatives B, C, and D).

The EPA has indicated that both Alternative A and Alternative B could be permitted under an NPDES permit pursuant to the Clean Water Act. Without additional water treatment, neither Alternative B nor Alternative C could meet expected NPDES permit conditions at all times and, therefore, could not discharge to Slate Creek under all conditions. Alternative C also does not include process water recycling which the EPA has indicated will be required by the NPDES permit (40 CFR 440.104(b)). The open channel diversion of East Fork Slate Creek around the TSF in Alternative C would provide the same minimum in-stream flows to Slate Creek as Alternative D, but would result in more ground disturbance and be more difficult to maintain than the pipeline diversion in Alternative D. Modifying either alternative to address these concerns would make them similar to Alternative D.

Alternative D disturbs approximately 197 acres, of which 96 acres are wetlands, while Alternative A (No Action) disturbs 268 acres, all of which are wetlands. Although the total disturbed wetland acreage is low for all alternatives, Alternative D does reduce wetland disturbance by 171 acres compared to the previously approved plan and virtually all of the wetlands affected by Alternative D will be reclaimed following closure. Approximately 164 acres of wetlands lost to the TSF under Alternative A would not be regained.

Under Alternative D, water treatment and tailings capping offer reasonable assurances that water quality downstream of the TSF will be protected. Reclamation of the TSF, post

## Record of Decision

closure, will recreate habitat lost during operations and restore a viable fish population comparable to pre-operational conditions.

Both the DTF under Alternative A and the TSF under Alternative D pose a minor threat due to the potential for design failure. Any tailings facility approved will be required to be built to high standards. Construction of the TSF dam will require certification from the Alaska State Dam Officer and bonding for maintenance in perpetuity.

Alternative D provides for safer handling of fuels compared to Alternative A. The risk of diesel spills is reduced under Alternative D by requiring all diesel fuel to be delivered, transported, and stored in isotainers rather than pumped from a fuel barge at Comet Beach as under Alternative A. Since fuel storage facilities under all alternatives would be within approved containment the effects of a spill at those facilities would be minimal should one occur.

Slate Creek Cove offers more reliable and safer conditions for marine traffic. This reduces the need to store excess fuels, chemicals, and materials onsite as a contingency for weather delays.

Construction of 4.5 miles of road, common to alternatives B, C, D, results in a minimal change to the character of Roadless Area 301. Roads not required for future monitoring and maintenance will be reclaimed following mine closure and revegetated with native plant species.

The 122-acre DTF under Alternative A would be highly visible from Lynn Canal, the only Visual Priority Travel Route (VPTR) impacted by project components on NFS lands. Figure 4-1 in the SEIS provides a visual simulation of this effect. By eliminating this component, my decision reduces visual impacts along the VPTR.

I recognize the high recreational value of Berners Bay to users. Berners Bay is an outstanding resource that provides unique opportunities for wildlife and landscape viewing. Portions of the operations will be visible from the Forest Service Berners Bay Cabin, Echo Cove, and Point Bridget. Impacts to users of Berners Bay are related to marine facilities at Cascade Point/Echo Cove and Slate Creek Cove and the vessel traffic between them. Although these project components are outside of National Forest System lands, the impacts related to them have been evaluated in the SEIS and are considered in my decision. The Forest Service will work, to the extent practicable, with the other Federal, State, and local agencies, as well as with the operator to minimize these impacts. I believe recreational values will be maintained with the mitigation measures considered in the SEIS. I also recognize that there may be some forest users that find even these minimal impacts to be unacceptable.

### Alternatives Considered in Detail

Four alternatives were considered in detail, including the No Action Alternative. This range of alternatives addressed the major issues associated with this project. The three action alternatives differed from each other in the type and location of various project

**Record of Decision**

components. The alternatives are summarized below. Table 2-5 in the FSEIS compares alternatives by key project components.

**Alternative A – No Action** – As a result of this alternative, the Forest Service would not approve proposed changes to the 1997 Approved Plan of Operations. This alternative includes underground crushing of ore with aboveground grinding and flotation. Flotation concentrate would be shipped to a processing facility off-site. Employees would be housed on-site and transported by helicopter for weekly rotations. Supplies, including fuel, would be delivered to a marine terminal on Comet Beach. Tailings would be dewatered before being placed in a dry tailings facility (DTF) facing Lynn Canal. The DTF would have the design capacity to hold 20 million tons of tailings and would include an engineered berm around each cell of the facility. The production rate would be 4,000 tons of ore per day and 400 tons of waste rock per day. The waste rock would be used in the construction of the DTF. Road and DTF construction would require the development of sand, gravel, and till borrow areas.

**Alternative A1: Reduced Mining Rate, DTF** – Alternative A1 illustrates the impacts that might occur if the No Action Alternative were selected and the operator chose to mine the same ore volumes proposed in the action alternatives. Alternative A1 reflects a mining plan similar to that described for Alternative A but uses a mining rate and tailings production levels consistent with the Proposed Action (2,000 tons per day and 7.5 million tons total, respectively). *The effects of Alternative A1 were included in the FSEIS for comparison purposes only. The Forest Service does not regulate mining rate or target ore body.*

Alternative A1 would result in 4.5 million tons of tailings being placed in the DTF, assuming 40 percent of the tailings would be backfilled. The DTF would be approximately 65 percent smaller than it would be under Alternative A. The reduced mining rate presented under Alternative A1 would produce very limited amounts of waste rock for DTF construction. For this reason, the impact analysis assumes the same number of acres of sand and gravel borrow areas would be required as under Alternative A, although the coarse and fine till borrow area would be reduced in size. Other aspects of Alternative A1, including transportation of employees and materials, would remain the same as those described under Alternative A. The life of the operation would be reduced to ten years following two years of construction.

**Alternative B: Proposed Action** – Alternative B reflects a number of changes to the mine plan compared with the No Action Alternative, including constructing a tailings storage facility (TSF) in Lower Slate Lake, relocating milling operations to the Johnson Creek drainage, and eliminating the personnel camp. The operation would mine a smaller amount of ore with a higher average gold concentration compared with that proposed under Alternative A. Alternative B would include the development of a tunnel connecting the existing Kensington Mine to the process area located near the Jualin Mine in the Johnson Creek drainage. Access to the site would be from marine terminals built in Slate Creek Cove and at Cascade Point. Crew shuttle boats would transport employees daily to and from the project site. The TSF would be sized to accommodate the disposal of 4.5 million tons of tailings. Borrow areas would need to be developed for construction of the TSF dam and roads. The production rate would be approximately 2,000 tons of ore per

# Record of Decision

day. This alternative includes recycling water from the TSF to the mill circuit. Alternative B would require upgrading the 5-mile-long access road from Slate Creek Cove and constructing a 3.5-mile pipeline access road and a 1-mile cutoff road connecting the other two roads.

**Alternative C: Dock Location and Design/Diversion**- Alternative C would eliminate the dock at Cascade point and instead include a dock in Echo Cove, approximately 0.75 mile north of the existing Echo Cove boat ramp. Also, the landing craft ramp at the Slate Creek Cove marine terminal would be eliminated, minimizing the amount of fill placed in the intertidal zone. Alternative C does not include recycling process water from the TSF and the mill circuit. This alternative would include diversion channels to direct the flow from Mid-Lake East Fork Slate Creek and overland runoff from undisturbed areas around the TSF. The diversion would discharge to a spillway at the top of the TSF dam. The diversions would require a dam on Upper Slate Lake to maintain water levels sufficient to reach the spillway at the TSF dam. The purpose of the diversion would be to minimize the volume of fresh water in contact with the tailings. The remaining project components, including the production rate of 2,000 tons per day of ore and the access tunnel, would be the same as those under Alternative B.

**Alternative D: Modified TSF Design and Water Treatment**- Alternative D was developed to address comments received and concerns about the TSF effluent meeting NPDES permit limitations intended to protect downstream water quality in East Fork Slate Creek below the TSF. Alternative D includes a dam in Mid-Lake East Fork Slate Creek that would gravity feed a pipeline diversion around the TSF. Water would be pumped from the TSF to a reverse osmosis treatment system that would remove solids and metals to ensure compliance with permit limits. The treatment system would discharge to the diversion pipeline. Alternative D also requires the tailings placed in Lower Slate Lake to be capped if the operator cannot demonstrate that the tailings are re-colonized by plant and shallow-water macro invertebrates at least comparable to pre-mining conditions. The remaining project components would be same as those under Alternative B. Alternative D, the selected alternative, is described in more detail above.

## Environmentally Preferable Alternative

Environmentally Preferable Alternative(s) is (are) the alternative(s) that cause the least damage to the biological and physical environment and which best protect, preserve, and enhance historic, cultural, and natural resources.

I have identified Alternatives A and D as the environmentally preferable alternatives. While both alternatives include environmental impacts ranging from short to long term, each are protective of water and air quality standards. Each has different environmentally negative and positive aspects that, when compared, make the two alternatives different but near equal with respect to overall impact to the environment. I have reviewed input from the USEPA and the ADNR in reaching my determination. The written conclusions and rationale from both agencies are provided in Appendix K to the SEIS. While the Forest Service and ADNR appear to be in agreement about the relative effects of the

**Record of Decision**

alternatives on the environment, the USEPA differs in its relative weighing of project effects. Several interagency working meetings were held to attempt to reach consensus regarding the environmentally preferable alternative but, contrary to the USEPA's view, no group consensus was reached.

Comparing numerical differences of similar effects between alternatives (i.e. acres) provides one means of differentiating between the alternatives but is limited to easily measurable effects. Weighing the actual importance of an impact on one resource against a different impact on another resource is a much more difficult undertaking. For example; weighing the extremely low risk of a catastrophic event in one alternative against the certainty of a very small impact in a different alternative results in a very subjective ranking of one alternative against another. In the end, in my opinion, a meaningful difference between Alternatives A and D was not apparent based on the resource values affected, nor the degree to which those values would be affected. Chapter 2 of the SEIS contains a detailed summary of the effects of each alternative both in tabular and narrative form. Chapter 4 of the SEIS contains a detailed discussion of those effects.

## Alternatives Eliminated from Detailed Analysis

There were a number of alternatives and project components studied in the 1992 FEIS and 1997 SEIS including submarine tailings disposal, marine discharge of wastewater, and wet tailings disposal in the Sherman Creek drainage, among others. Those discussions are not repeated here. This FSEIS discusses a number of additional alternatives and components including disposal of tailings in Upper Slate Lake, use of tailings in the construction of the Juneau Access Road, helicopter access during eulachon and herring runs, and Cascade Point to Comet Beach crew shuttle access among others. Each is briefly discussed and reasons for not considering the alternative or project component in detail are listed.

## Mitigation, Monitoring, and Reclamation

The FSEIS, Chapter 2, Mitigation and Monitoring list the mitigations measures required as part of alternative D that are designed to avoid or minimize potential environmental impacts during construction, operation, and project reclamation. A summary of mitigation measures and a summary of monitoring measures, including various authorities and the responsible parties, are identified in Table 2-6 and 2-7 of the FSEIS respectively. These mitigation measures have been used successfully in other projects with similar types of activities. As a result, they are considered effective and are made part of this decision. The mine operator will be required, as part of the amended plan of operations, to submit mitigation and monitoring plans. Mine construction may not begin until the Forest Service approves the plan of operations.

Environmental monitoring programs that meet the requirements of the Forest Service, USEPA, ACOE, ADNR, ADEC and other agencies will be implemented. These programs will be designed to determine compliance of the project with the plan of operations, other

## Record of Decision

federal, state and local permits, and to validate the projected effects of the project's construction, operation, reclamation, and post-closure conditions. Impacts that are likely to or do result in violations of regulatory stipulations will require alterations of project operations and/or additional mitigation actions.

Permits, Licenses and Certifications

To proceed with development of the Kensington Gold Project as approved in this ROD, various permits, licenses and certifications must be obtained from federal, state, and local agencies. The following permits must be obtained:

### USDA Forest Service

Approval of the amended plan of operations including posting of the approved reclamation bond.

### U.S. Army Corps of Engineers

Clean Water Act Section 404 Permits

Rivers and Harbors Act Section 10 Permits

### U.S. Environmental Protection Agency

Clean Water Act Section 402 - National Pollutant Discharge Elimination System Permit

Clean Air Act

### State of Alaska, Department of Environmental Conservation

Clean Water Act Section 401 Certification of the USACOE Section 404 permit
Clean Water Act Section 401 Certification of the USEPA Section 402 - NPDES permit
Air Quality Control Permit
Domestic wastewater system plan approval
Boat requirements (SPCCP and financial assurances)

### State of Alaska, Department of Natural Resources

Water rights authorizations
Tidelands leases for marine facilities
Alaska Coastal Zone consistency review
Certificate of Approval to Construct a Dam
Title 41 authorizations for fish passage and fish habitat
Right-of-way authorizations
Approval of the reclamation plan.

### City and Borough of Juneau

Allowable Use Permit for Gold Mine Development and Production within the Rural Mining District at Berners Bay. (Approved September 13, 2004)

Conditional Use Permit to allow development of a ferry dock and related access at Cascade Point. (Approved October 15, 2004)

**Record of Decision**

### Public Involvement

On September 13, 2002, the Forest Service published a Notice of Intent to prepare a Supplementary Environmental Impact Statement (SEIS) for the proposed project in the Federal Register (Vol. 67, No. 178, Page 58011-58012). Cooperating agencies as defined in 40 CFR, section 1501.6 are the U.S. Army Corps of Engineers, Environmental Protection Agency, and The State of Alaska. The National Marine Fisheries Service (NMFS) was invited to participate as a cooperating agency, but declined. A Memorandum of Understanding was executed that included the following State of Alaska agencies as participants in the development and review of the SEIS: Alaska Department of Natural Resources (ADNR), Alaska Department of Environmental Conservation (ADEC), and Alaska Department of Fish and Game (ADF&G). On the date of the Notice of Intent, the *Kensington Gold Project Amended Plan Of Operations; Supplemental Environmental Impact Statement; Scoping Document; USDA Forest Service, Juneau Ranger District; September 2002* was distributed to agencies, organizations, tribes, and persons who had previously expressed interest in minerals projects on the Tongass National Forest. Outreach was conducted with public service announcements in the Juneau Empire and by radio media.

On September 17, 2002 a scoping meeting/open house was held in Juneau, Alaska at Centennial Hall, and a second open house on September 19, 2002 in Haines, Alaska at the City Council chambers in City Hall. The open houses were designed to provide background information or technical assistance that the public or interested agencies might need before commenting. The scoping document was made available at these meetings. The formal comment period ended October 15, 2002.

The following significant issues were identified based on comments from the public, other agencies, federally recognized tribes, and non-governmental organizations.

1). Marine-related transportation will impact users of and resources within Berners Bay.

2). Construction and operation of the tailings disposal facility and other mine facilities will impact aquatic resources from Slate and Johnson Creeks to Slate Creek Cove and Berners Bay.

3). The Lower Slate Lake tailings storage facility, docks, access road, and other mine facilities will impact the scenic character of Berners Bay for recreationists.

To address these issues, the Forest Service developed alternatives to the Proposed Action, as described above.

A Notice of Availability of the Draft SEIS was published January 23, 2004 in the Federal Register (Vol. 69, No. 15, Page 3340-3341) and copies of the document distributed to interested and affected parties. A public meeting was held on February 24, 2004 at Centennial Hall in Juneau and on February 26, 2004 at the American Bald Eagle Foundation Building in Haines. The extended comment period for the Draft SEIS closed April 7, 2004. Based on comments to the Draft SEIS, Alternative D was developed. The only new component introduced in Alternative D was a reverse osmosis water treatment