

United States
Department of
Agriculture

Forest Service

Tongass
National
Forest
R10-MB-343



# KENSINGTON GOLD PROJECT

# FINAL SUPPLEMENTAL ENVIRONMENTAL IMPACT STATEMENT

## VOLUME I



Cooperating
Agencies





# Kensington Gold Project
# Final Supplemental
# Environmental Impact Statement

VOLUME I

United States Department of Agriculture
Forest Service
Tongass National Forest

August 1997



This document is printed on recycled paper.

This Final SEIS discusses the changes recommended in the TAR.

During summer 1995, Coeur Alaska became the sole operator of the Kensington Gold Project. In October 1995, the operator submitted an Amended Plan of Operations for the Kensington Gold Project. The primary modifications include 1) enhanced treatment of tailings effluent with discharge to Sherman Creek, 2) stabilization and backfilling of cyanidation tailings solids, 3) use of diesel generators for onsite power generation, 4) construction of avalanche control structures, and 5) relocation of the laydown and helicopter pad facilities. On October 16, 1995, the Forest Service published an initial Notice of Intent to prepare an SEIS for the proposed changes to the Kensington Gold Project. Public scoping meetings were held in October 1995.

In response to issues raised during the scoping process and meetings with Federal, State, and local agencies and other interested parties, the operator submitted a Revised Plan of Operations to the Forest Service in June 1996 (i.e., 1996 Revised Plan of Operations). On July 22, 1996, the Forest Service published a new SEIS Notice of Intent for the 1996 Revised Plan of Operations. The 1996 Revised Plan of Operations includes:

- Offsite processing of flotation concentrate (no onsite cyanidation)
- Construction of a dry tailings facility (DTF) between Sweeny and Sherman Creeks
- Backfill of at least 25 percent of flotation tailings.

All aspects of the operator's proposed operations as they affect National Forest surface resources are subject to a Plan of Operations (36 CFR 228) and Council on Environmental Quality (CEQ) regulations (40 CFR 1500). The SEIS must analyze the direct, indirect, and cumulative impacts associated with the proposed changes to the Plan of Operations. Based on this analysis, the Forest Service may approve the 1996 Revised Plan of Operations or require the operator to modify its proposal.

The 1992 FEIS analyzed the effects of developing the Kensington Gold Project. This Final SEIS only analyzes the effects of the 1996 Revised Plan of Operations.

**Purpose and Need**

The purpose of and need for the Proposed Action is to reduce potential impacts from a mixing zone in marine waters; increase assurance of meeting water quality standards; minimize the potential impacts to Ophir, Ivanhoe, and Sherman Creeks; reduce operational and maintenance requirements; minimize reclamation and long-term closure liabilities; and increase the economic efficiency of the mine.

## 1.1 PROPOSED ACTION

Modifications to the 1992 Approved Plan of Operations include offsite processing of flotation concentrate and dry tailings disposal at approximately Site B identified in the 1992 FEIS. Flotation concentrate would be placed in sealed containers and transported offsite for final processing. At least 25 percent of the flotation tailings would be paste backfilled. The remaining

tailings would be managed in the DTF. Mine drainage would undergo precipitation and filtration and be combined with process area runoff in a sediment pond. The sediment pond would discharge to upper Sherman Creek. The DTF would be designed to limit infiltration into the tailings. Waste rock and coarse and fine till would be used in DTF construction. All waste rock generated by the mine would either be used in DTF and process area foundation/bench construction or be backfilled. Till would be obtained from a 27-acre borrow area northwest of the process area. DTF seepage and runoff would be collected in a sediment pond and discharged to Camp Creek. Diesel fuel would be used for power generation. The locations of the helicopter pad, marine terminal, laydown area, and personnel camp are modified from the 1992 Approved Plan of Operations.

## 1.2 RESPONSIBLE OFFICIAL AND DECISION TO BE MADE

The Forest Supervisor for the Chatham Area of the Tongass National Forest is the responsible official for those portions of the project within the jurisdiction of the Forest Service and will document his decision in a Record of Decision based on the analysis presented in this Final SEIS. The responsible official may make the following decisions:

- Select the No Action Alternative
- Select an action alternative without modification
- Select an alternative that combines project components of more than one alternative
- Select an action alternative and require additional mitigation measures.

## 1.3 SCOPING AND PUBLIC INVOLVEMENT

As required by the National Environmental Policy Act (NEPA) (CEQ 1501.7), the Forest Service provided for an early and open process to determine the scope of issues to be addressed and to identify significant issues related to proposed modifications to the Kensington Gold Project.

As indicated previously, the Notice of Intent to prepare an SEIS for the 1996 Revised Plan of Operations was published in the *Federal Register* on July 22, 1996. The Forest Service had mailed approximately 360 scoping letters to the public on July 15, 1996. The letter described the proposed changes to the Plan of Operations and the SEIS process. The letter also announced that public scoping meetings would be held in Juneau, Alaska, on August 7, 1996, and in Haines, Alaska, on August 8, 1996. Advertisements were placed in the *Juneau Empire* newspaper on August 1, 4, and 6, 1996, and the *Chilkat Valley News* in Haines on August 1, 1996, announcing the public meetings.

The public meetings were held at Centennial Hall in Juneau on August 7, 1996, and at the City Council Chambers in Haines on August 8, 1996. Both meetings were open to the public and provided an opportunity for the public to learn about the project and the SEIS process from the Forest Service, EPA, and Corps of Engineers, as well as identify issues they wanted analyzed in

constructed in the Ophir Creek drainage. Upper Sherman Creek would be diverted through a culvert.

Reclamation would comprise restoring the site to its pre-mining land use of wildlife habitat and recreation. All buildings, structures, storage tanks, and roads would be removed from the site, except the tailings impoundment. All disturbed areas, including the tailings impoundment, would be regraded to blend with the natural topography to the maximum extent possible. These areas then would be covered with growth media and seeded. Upper Sherman Creek and South Fork Sherman Creek would be routed across the east end of the tailings impoundment into a pond adjacent to the Ophir Creek diversion. The pond would discharge to the Ophir Creek diversion, where the combined flows would fall through a spillway to lower Sherman Creek. All channels would be designed to carry the probable maximum flood.

### 2.2.2 Alternative B – Proposed Action

Alternative B represents the operator's formal proposal to modify the 1992 Plan of Operations. The modification was proposed to enhance the project's constructability, operability, reclamation, and long-term post-closure monitoring and maintenance, as well as to minimize potential impacts to water quality.

Alternative B involves offsite transport and processing of flotation concentrate, construction of the DTF, and backfilling of tailings. The flotation concentrate would contain the majority of the sulfide component of the ore. The concentrate would be dewatered, filtered, and loaded into specially designed, sealed marine transport containers. Barge shipments would occur weekly, weather permitting, to an existing offsite location for gold recovery operations.

Flotation tailings would be either backfilled in the mine or deposited in the DTF. At least 25 percent of the tailings would be backfilled using paste backfill techniques. The thickened tailings would be pumped to a paste backfill plant in the mine, combined with water and cement, and gravity fed into mined out areas. In addition, waste rock would be backfilled into selected areas within the mine.

Tailings to be deposited in the DTF would be dewatered and transported by truck to the DTF site (i.e., Site B identified in the 1992 FEIS). The DTF would be constructed in three stages or cells. Tailings would be placed in 28-foot high, uncompacted lifts or layers. Each lift would be covered with a 2-foot layer of till and waste rock. The outer slopes and top of the DTF would receive a final cover of till and growth media. Till would be obtained from a borrow area near the mill. Waste rock would be stored temporarily in a 15-acre pile at the 800-foot adit. All waste rock generated during the life of the mine is expected to be used in DTF and process area foundation construction or backfilled.

Mine drainage would undergo precipitation and filtration and then be combined with process area (46 acres) runoff in a settling pond. Discharge from the settling pond would be to upper Sherman Creek. Runoff and seepage from the DTF would be collected in a settling pond and discharged to Camp Creek. Wastewater from the milling process would be recycled. The DTF would require the diversion of a series of unnamed streams that terminate near Comet

Beach. Ophir Creek would be diverted away from the process area and around the sand and gravel borrow area.

The personnel camp (5.7 acres) would be located directly west and adjacent to the process area, farther removed from the main access road than under Alternative A. Haul road stream crossings on upper Sherman Creek and Ivanhoe Creek would be constructed using long-span low-profile bottomless arch conduits. Diesel fuel would be transported by barge to the site and trucked to the generators at the mill site.

Reclamation would consist of restoring the site to its pre-mining land use of wildlife habitat and recreation. All buildings, structures, and storage tanks would be removed from the site. All disturbed areas, including roads, would be regraded to blend with the natural topography and seeded to the maximum extent possible. The borrow pits would be graded to support the development of wetlands. The settling ponds would be retained as open water. The original channel of Ophir Creek would be restored. The diversion channels around the DTF would remain in place and be redesigned to carry a 500-year, 24-hour storm event. The DTF would undergo concurrent reclamation as cells were developed. This would reduce the extent of disturbance in the project area over the life of the project. Appendix C presents relevant sections of the reclamation plan that were submitted as part of the Proposed Action.

### 2.2.3 Alternative C – Marine Discharge

Alternative C is similar to Alternative B, except that mine drainage and DTF effluent would be discharged to Lynn Canal, and diesel fuel would be transported from Comet Beach to the process area via a double-walled steel pipeline. Mine drainage would not receive treatment beyond underground settling. Mine drainage would be piped from the process area toward Lynn Canal and be combined with effluent from the DTF settling pond prior to discharge. The operator would need to have an NPDES permit and apply for a mixing zone from the State of Alaska to comply with NPDES permit limits. The effluent pipeline would extend 300 feet into Lynn Canal from Comet Beach. The discharge would be through a diffuser located 30 feet below the low-tide level. Process area runoff would be collected in a settling pond and discharged to upper Sherman Creek. Diesel fuel would be transported by an above-ground, double-walled steel pipeline that would generally parallel the road from Comet Beach to the process area. Reclamation would be similar to Alternative B.

### 2.2.4 Alternative D – Modified DTF Design

Alternative D is similar to Alternative B, except that the DTF design would be modified. Under Alternative D, the most significant modification is construction of an engineered structural berm around the exterior shell of the DTF. The berm could be constructed of waste rock, tailings, and/or other appropriate material. Alternative D also includes an above-ground tailings slurry pipeline and dewatering facility at the DTF. Reclaimed water would be pumped back to the mill. Under this alternative, bridges would be constructed for haul road stream crossings on upper Sherman Creek and Ivanhoe Creek. Reclamation would be similar to Alternative B.

**Tailings Dewatering and Management**

Under Alternatives B through D, flotation tailings would be thickened to approximately 55-percent solids. Under Alternatives B and C, the thickener overflow would discharge to the mill water tank, and underflow would be pumped to two filter feed tanks at the mill site. Plate filters (or design equivalent) would dewater the flotation tailings to filter cake with 15- to 18-percent moisture content (dry weight). The filtrate would be recycled completely as process water. The filter cake would be transferred to covered trucks within the covered loading area and transported to the DTF for placement. The operator would construct a 60-foot wide haul road from the process area to the DTF to meet Mine Safety and Health Administration (MSHA) requirements.

Alternative D includes an 8,000-foot tailings slurry pipeline from the mill to a dewatering facility located near the DTF. Tailings would flow from the thickeners to an agitative tank and then by gravity through the pipeline. The pipeline would parallel the access/haul road in a 10-foot wide right-of-way (see Figure 2-4, presented previously). The tank would have an 8-hour maximum holding capacity. The tailings pipeline would be 14-inch HDPE with a 20-inch casing for spill containment. Flow sensors would be used to detect any blockages or breaks, and an automatic shutdown mechanism would activate as necessary. The dewatering facility would have the same configuration as under Alternatives B and C. The dewatered tailings would be conveyed to a covered transfer area prior to loading into trucks from which the tailings would be placed in the DTF. Reclaimed water would be piped back to the mill through a steel or HDPE pipeline parallel to the slurry pipeline for recycling. Construction of the pipelines would eliminate the 80 haulage trips per day for tailings. The haul road specifications under Alternative D would be the same as for Alternatives B and C, because waste rock and till borrow material would be transported to the DTF site.

**Dry Tailings Facility Operation**

Under Alternatives B through D, dry tailings would be placed in the DTF. The overall footprint of the DTF under Alternatives B and C would be about 104 acres. The DTF would be constructed in stages (i.e., cells)—cell 1 (33 acres), cell 2 (40 acres), and cell 3 (41 acres). Each cell would have 5 to 7 lifts of tailings. Under Alternative D, construction of an engineered structural berm could increase the area of disturbance by up to 18 acres.

Under Alternatives B through D, the operating scenario for the DTF involves construction of an initial drainage system following clearing, stripping, and stockpiling of surficial materials. As shown in Figure 2-8, the drainage system would be herringbone design with drains spaced at about 100-foot intervals. The drains would be filled with gravel from the construction of the terminal area at Comet Beach. The gravel would be wrapped in geotextile materials to ensure integrity. Prior to initial tailings placement, a minimum of 2 feet of development rock would be placed over the foundation drains. Any areas of the ground that were unsuitable for direct waste rock placement would be covered with geofabric prior to rock placement. Tailings then would be placed in uncompacted lifts approximately 28 feet high. Placement would occur across the entire width of the cell, advancing in an easterly direction. Tailings would not be stored




**Figure 2-8**
**Dry Tailings Development Sequence**
**(Source: Modified from SRK, 1996b)**

temporarily at the process area or DTF beyond the limited surge capacity in the dewatering system and transfer areas. Therefore, tailings would be either placed directly in the DTF or backfilled (see below) at all times under all weather conditions. Each DTF lift would be covered with a 2-foot layer comprising 1 foot of compacted low permeability fine till material (a barrier) and 1 foot of waste rock to provide immediate cover and a working surface. The waste rock stockpile for each cell would be located in the footprint of the next cell to be constructed. Figure 2-8 shows the development sequence of the DTF, and Figure 2-9 provides typical cross sections and cover details.

As sections of each lift were filled completely, the exposed tailings on the surface of the cell would be covered immediately by the till and waste rock layers, thereby minimizing exposure to precipitation and infiltration. Generally, the tailings area exposed to direct precipitation would be less than 5 acres. Tailings seepage and runoff from the active areas of the cells, as well as runoff from reclaimed areas, would be directed to the DTF settling pond prior to discharge. The pond would be about 350 feet × 150 feet × 14 feet in depth, with a capacity of about 13 acre-feet. The pond would be sized to handle drainage for the entire DTF area of disturbance. As the tailings were placed in each lift, a compacted tailings shell would be constructed around the perimeter of each lift. The thickness of this shell would vary from 35 feet at the base of each cell to 12 feet at the top of each cell. The compacted shell primarily would provide a working surface for capping and reclamation of the outer surfaces of the DTF.

Under Alternatives B through D, the outer slopes and top of the DTF would receive a final cover. The final cover would comprise 6 to 8 feet of fine and coarse till. The underlying fine till layer would serve as a hydraulic barrier, while the overlying coarse till layer would be a drainage layer for infiltration. Growth media would be placed over the coarse till to support revegetation.

Specific operational procedures, quality assurance/quality control requirements, and monitoring plans would be incorporated into the DTF design and final Plan of Operations. Instrumentation, including thermistors, piezometers, and lysimeters, would be used to monitor water levels and potential saturation, which affect geotechnical stability. If monitoring data indicated that widespread saturation were occurring, Alternatives B and C would include a contingency to construct an engineered structural berm around three sides of the DTF using waste rock, compacted tailings, or other suitable material.

Alternative D consists of a modified DTF design similar to Alternatives B and C, with the same infrastructure, construction, operation, and closure as specified in the 1996 Revised Plan of Operations. As mentioned previously, Alternative D would require the construction of an engineered structural berm around the north, south, and west sides of all cells. It would be constructed concurrent with the initial tailings lifts of each cell. The berm might be constructed of impacted tailings, waste rock, or other suitable material. The footprint of the berm of all cells, shown in Figure 2-4, presented previously, could increase the total area disturbed by up to 18 acres. Figure 2-10 provides a cross section at the west toe of the berm. The berm as currently designed would extend to a height of about 100 feet along the west slope and about 50 feet on the north and south slopes.