

**USDA**

United States
Department of
Agriculture

**Forest Service**

Tongass
National
Forest
R10-MB-343



# KENSINGTON GOLD PROJECT

# FINAL SUPPLEMENTAL ENVIRONMENTAL IMPACT STATEMENT

## VOLUME I



Cooperating
Agencies





RECORD OF DECISION

FINAL SUPPLEMENTAL ENVIRONMENTAL IMPACT STATEMENT
KENSINGTON GOLD PROJECT

USDA Forest Service
Tongass National Forest - Chatham Area
Juneau Ranger District

**DECISION TO BE MADE**

This Record of Decision documents my selection of the alternative that will be used to revise the 1992 Plan of Operations for the Kensington Gold Project. This decision is based upon the analysis and evaluations in the Final Supplemental Environmental Impact Statement as well as information incorporated by reference from the 1992 FEIS and ROD.

**ALTERNATIVES CONSIDERED IN DETAIL**

Four alternatives were evaluated, including the No Action Alternative. This range of alternatives addressed the major issues associated with this project. The three action alternatives differed from each other in the type and location of various project components.

The alternatives are summarized as follows:

Alternative A - No Action - As a result of this alternative, the Forest Service would not approve the proposed 1996 revisions to the 1992 Plan of Operations. The No Action Alternative consists of Alternative F as identified in the 1992 FEIS and selected by the Forest Supervisor in the 1992 ROD and modified to address requirements identified by the Environmental Protection Agency during their 1994 review of the NPDES permit application.

| | |
|---|---|
| **Ore processing** | Underground crushing, surface grinding, flotation, and cyanidation with the final product being gold bars. |
| **Waste Rock** | Stored in a 15-acre stockpile at the mill site, about 50 percent used in tailings embankment, road, and foundation construction. |
| **Tailings Management** | Disposal in an impoundment in Sherman Creek, no backfill. |
| **Diversions** | Diversions of Ophir and Sherman Creeks designed for 100-year, 24-hour storm event. |
| **Mine Drainage and Mill Effluent** | Discharge to tailings impoundment, then piped to marine discharge point 1/2 mile off shore in Lynn Canal north of Point Sherman, treatment by enhanced settling in impoundment. |

| | |
|---|---|
| Employee Transportation | Helicopter from Juneau Airport. |
| supply Transportation | Barge to Comet Beach facility. |
| Power Supply | 2 LPG generators at the mill site, one LPG generator at Comet Beach. |
| Employee Housing | Onsite personnel camp south of Sherman Creek. |
| Borrow Area | Sand and gravel quarries near the process area (130 acres) within impoundment drainage. |
| Reclamation | Restore to previous use, wildlife habitat and recreation, remove structures, regrade and revegetate, route streams over tailings impoundment. |

**Alternative B - Proposed Action** - This alternative consists of the operator's proposal to modify the 1992 Plan of Operations and differs from Alternative A in the following:

| | |
|---|---|
| Ore processing | Underground crushing, surface grinding and flotation, offsite transport of flotation concentrate for further processing. |
| Waste rock | Temporary 15-acre pile at mine portal, all waste rock used in DTF construction and backfill. |
| Tailings Management | Placement of dry tailings in the dry tailings facility (DTF), engineered drainage system, paste backfill minimum of 25 percent of all tailings, tailings trucked to DTF. 60-foot wide haul road from mill to DTF. |
| Diversions | Diversion above the DTF, Ophir Creek diversion around the mill site, both designed for 100-year, 24-hour storm event. |
| Mine Drainage and Mill Effluent | Mill effluent recycled; mine drainage discharged to Sherman Creek after treatment by enhanced settling in ponds, and precipitation/filtration; runoff/leachate from DTF discharged to Camp Creek. |
| Stream Crossings | Bottomless arch conduits for crossing Upper Sherman Creek and Ivanhoe Creek. |
| Power Supply | 4 diesel generators at the mill site, one diesel generator at Comet Beach, diesel fuel trucked to the process area from the beach storage facility. |
| Employee Housing | Onsite personnel camp north of Sherman Creek. |

| | |
|---|---|
| Borrow Area | Sand and gravel quarries near the process area (16 acres total) , till borrow area (27 acres) west of the sand and gravel quarry. |
| Reclamation | Restore to previous use, wildlife habitat and recreation, remove structures, regrade and revegetate, maintain diversion above the DTF - increase to 500-year, 24-hour event capacity. |

<u>Alternative C</u> - This alternative is the same as Alternative B with the following exceptions:

| | |
|---|---|
| Mine Drainage and Mill Effluent | Marine discharge of mine drainage and DTF effluent to Lynn Canal.  Discharge of process area runoff to upper Sherman Creek, enhanced settling in ponds. |
| Power Supply | 4 diesel generators at the mill site, one diesel generator at Comet Beach, diesel fuel piped to the process area from the beach storage area. |

<u>Alternative D</u> - This alternative is the same as Alternative B with the following exceptions:

| | |
|---|---|
| Tailings Management | Placement of dry tailings in the DTF, engineered structural berm around three sides of the tailings pile, backfill 25 percent of tailings.  Tailings slurry piped from mill to DTF. |
| Stream Crossings | Bridges for crossing Sherman Creek, Upper Sherman Creek, and Ophir Creek. |

## ENVIRONMENTALLY PREFERRED ALTERNATIVE

Alternative D is the environmentally preferred alternative.  The environmentally preferred alternative is the one which causes the least damage to the biological and physical environment, and which best protects, preserves, and enhances historic, cultural and natural resources.

## DESCRIPTION OF THE FOREST SERVICE SELECTED ALTERNATIVE

The selected alternative will be used to revise the 1992 Plan of Operations for the Kensington Gold Project.

Based on the analysis and evaluation in the Final Supplemental Environmental Impact Statement for the Kensington Gold Project, and portions of the 1992 FEIS incorporated by reference, it is my decision to select Alternative D.

Approval of the wastewater discharge site is outside the authority of the Forest Service.  If EPA, through their permitting authority, were to approve marine discharge of wastewater, rather than freshwater discharge of wastewater as described in Alternative D, the Forest Service will approve the surface facilities required for marine discharge as outlined in Alternative C.

**Exhibit 4, page 4 of 12**

4

RATIONALE FOR **THE** DECISION

Alternative D differs from the other action alternatives in that it requires an engineered structural berm around three sides of the DTF, the tailings slurry is piped to the DTF from the mill rather than trucked, and bridges rather than bottomless arch conduits are used for crossing Upper Sherman Creek and Ivanhoe Creek.

I selected Alternative D because it best addresses issues identified during scoping and comments received concerning the DSEIS. While some alternatives better address individual issues, the Selected Alternative provides the best mix for addressing all the issues at an acceptable level.

Under Alternative D, as well as Alternatives B and C, the flotation concentrate would be shipped off-site for processing. This will provide several secondary benefits in terms of reducing potential environmental impacts. Off-site processing will eliminate the need for onsite use of cyanide and the risk of accidental cyanide release. It will also eliminate concerns regarding disposal of CIL tailings. With no CIL tailings production and new paste backfill techniques, the operator will be able to backfill a minimum of 25 percent of the tailings and reduce the volume of tailings disposed on the surface. Since cyanide destruction will no longer be required, the use of chlorine will be reduced to only what is required for domestic water treatment.

Dry tailings disposal, as described in Alternative D, will result in more visual impacts during the life of the mine than wet tailings disposal since the wet tailings impoundment would screen many of the facilities and revegetation of the impoundment face could begin immediately. Dry tailings disposal does, however, have a greater potential for successful reclamation and will require much less long term maintenance. It will eliminate the need to disturb a large section of Sherman Creek and reroute streams over reclaimed tailings. The use of a dry tailings facility will address many concerns regarding long term stability.

The operator has proposed to utilize diesel fuel for power generation, rather than LPG as approved in the 1992 ROD. Based on the information presented in the 1992 FEIS and this SEIS, I do not see a compelling reason to require one type of fuel over the other and, therefore, am approving the use of diesel fuel as requested. Both diesel fuel and LPG can easily meet air quality permit requirements. While the use of LPG would result in slightly lower emissions and slightly lower risk of spills, it would also require a separate, more elaborate and more visible storage facility. Since substantial amounts of diesel fuel will still be required for other aspects of the project, the use of LPG would not eliminate the need for diesel fuel transfer, transportation and storage at the site. There would be a slight increase in the risk of spills from increased diesel use but the diesel would be transported, handled, and stored according to an SPCC plan and State spill response requirements. Any impacts from spills would be limited by transfer timing restrictions, equipment design, and prompt spill response capability.

The approval and permitting of wastewater discharge under the Clean Water Act rests with EPA.  The analysis in the FSEIS indicates that wastewater discharge into freshwater, as described under Alternatives B and D, will meet all permit requirements of other agencies without the use of a mixing zone.  Utilization of a freshwater discharge site will address substantial controversy concerning the effects of a marine discharge, and associated mixing zone, on local commercial fisheries.

Alternative D requires construction of a structural berm around three sides of the dry tailings facility to minimize the risk of pile failure.  This type of berm is based on proven technology and has a high probability of being effective.  The operator will monitor tailings saturation and performance, allowing for further fine tuning of the DTF without fear of failure.  Implementation of Alternative D minimizes the risk of tailings pile failure and allows the operator the flexibility to manage tailings disposal under a variety of climatic conditions.  If the operator can demonstrate through monitoring and evaluation that tailings can be placed to a level of stability acceptable to the Forest Service, I will consider modifications to the berm design in the future.

The use of bridges under Alternative D instead of bottomless arch conduits at several haul road stream crossings will reduce the potential for stream channelization, erosion of bed materials, and channel downcutting.  This will reduce the potential for degradation of aquatic habitat at these road crossings during operations and improve the potential for stream rehabilitation during reclamation of the road and mill site.

Because of reduced truck traffic, the use of a slurry line in Alternative D will reduce fugitive dust emissions when compared to truck transport of tailings in Alternatives B and C.  The potential for a slurry spill as a result of pipeline rupture is minimized because of the use of double-walled pipe with check valves and pressure sensors.

Considerable concern was expressed during the preparation of this document about potential cumulative effects of the the Kensington Gold Project in conjunction with several other proposed or potential projects in the Berners Bay area.  The FSEIS includes an expanded discussion addressing this concern. The alternative which I have selected results in very little direct or indirect effect to Berners Bay and has no direct relationship to any other projects except the proposed Juneau Access Road.  Although no relationship exists at this time, I recognize the possibility that it could exist at some unspecified future date if changes to the project, such as development of the Jualin Mine, use of hydropower from Lace River, or changes to employee housing and transportation were proposed.  These changes would require additional environmental analysis prior to approval.

PUBLIC INVOLVEMENT

A Notice of Intent to prepare a supplemental environmental impact statement was printed in the Federal Register on July 22, 1996.  Public scoping meetings were held in Juneau on August 7, and in Haines on August 8, 1996.  The Draft SEIS was sent to the public in February 1997 with Notice of Availability published in the Federal Register on February 21, 1997.  On March 6, 1997 members of the Interdisciplinary Teams from the Forest Service and our third party contractor, SAIC, were available at the Juneau Ranger District to answer questions from the public.  Public hearings on the Draft SEIS were held in

Juneau on March 25, and in Haines on March 26, 1997. More than 50 comment
letters on the Draft SEIS were received from the public.

All meetings were announced on local radio stations and in local newspapers in
both communities. In addition, newspapers in Juneau and Haines printed many
articles on the proposed Kensington Gold Project.
The following significant issues were identified for consideration in the SEIS.

Assurances should be given that the discharges under a National Pollutant
Discharge Elimination System (NPDES) permit must meet water quality
standards. Concerns were raised that the wastewater discharges permitted
through the NPDES process meet water quality standards.

The potential for and effects of failure of the DTF should be considered.
The risks, liability, and contingencies, as well as environmental effects,
of a DTF failure should be discussed.

The visual effects on tourism, especially cruise ships and ferries, of the
proposed changes should be minimized. Concerns were expressed that the
visual impacts of the DTF, road, borrow pits, temporary camp, fugitive
dust, and diesel emissions from power generation could negatively affect
tourism.

Use of diesel fuel instead of liquified petroleum gas (LPG) for power
generation may result in increased air emissions. There is concern that
burning diesel fuel, as well as other project modifications, would increase
emissions of air pollutants, including carbon dioxide.

The impacts from spills caused by transporting, storing, and handling
additional diesel fuel could affect water quality, fisheries, and other
resources. The increase in transportation, handling, and use of diesel
fuel for power generation could increase the potential for spills.


MITIGATION, MONITORING, AND RECLAMATION

The FSEIS, Chapter 2, Mitigation and Monitoring lists the mitigation measures
required as part of Alternative D that are designed to ensure that all
practicable means have been adopted and will be implemented to avoid or
minimize potential environmental impacts from the selected alternative during
construction, operation, and project reclamation. These mitigation measures
have been used successfully in other projects with similar types of
activities. As a result, they are considered effective and are made part of
this decision. Mitigation and monitoring plans will be submitted by the mine
operator as part of the revised Plan of Operations. Mine construction may not
begin until the Plan of Operations is approved.

Environmental monitoring programs that meet the requirements of the Forest
Service, EPA, ADEC and other agencies will be implemented. These programs will
be designed to determine compliance of the project with the Plan of Operations,
other Federal, State and local permits, and to validate the projected effects
of the project's construction, operation, reclamation and post-closure
conditions. Impacts that result in violations of regulatory stipulations will
require alterations of project operations or additional mitigation actions.

A summary of monitoring activities, including the various authorities and the
responsible parties, are identified in Table 2-3 of the FSEIS. For resources

under the authority of the FS, details of the the monitoring programs will be approved as part of the Plan of Operations. For resources under the regulatoryauthority of other agencies, the details of monitoring will be provided as required in that agency's permits.

## ALASKA COASTAL MANAGEMENT PLAN

The State of Alaska sets standards and criteria for consistency determinations with the Alaska Coastal Management Plan. While Federal lands are excluded from the coastal zone, Section 307(c) (2) of the Coastal Zone Management Act states, "Any Federal agency which shall undertake any development project in the coastal zone of the state shall insure that the project is, to the maximum extent practicable, consistent with the approved management program. "

The ACMP regulations in 6 AAC 85.020 require that each district coastal program develop goals and policies related to coastal management. These policies must be consistent with ACMP standards at 6 AAC 80. For the CBJ, these policies are established in the Juneau Comprehensive Plan, Part Two, Coastal Management Program (JCMP), effective on November 20, 1986. The following sections describe how the selected alternative, Alternative D, for the Kensington Gold Project is consistent with the specific enforceable policies in the JCMP. Only the JCMP sections that apply to the Kensington Gold Project are discussed.

### Coastal Development (JCMP, Section 2)

The Comet Beach dock facilities are identified as coastal development. The construction and use of these facilities have been determined to be necessary and consistent with JCMP standards because: (1) this is a water-dependant use, (2) it is the only feasible and prudent location, and (3) the facilities would be constructed in a manner that is consistent with 33 CFR Parts 320-322 and minimizes adverse impacts on physical shore features, visual resources, fish habitat and passage, and navigation.

### Geophysical Hazards (JCMP, Section 3)

The north sand and gravel borrow area and the Ophir Creek diversion are located in an area with landslide and snow avalanche potential. There is not a significant risk to human health or physical property at these sites. The Ophir Creek diversion will be removed at closure and the natural drainage restored. As discussed in Section 4.4 of the FSEIS, BMPs will be used during construction and operation to minimize erosion and the site will be revegetated at closure. The DTF design is based on withstanding the maximum credible earthquake. With the engineered structural berm and ongoing monitoring program, the potential for failure that could affect surrounding resources or endanger human health is minimal. This is consistent with JCMP standards.

### Transportation and Utilities (JCMP, Section 6)

The transportation system for the selected alternative, except in accessing dock facilities, has been sited inland from beaches. Mitigation measures have been included to minimize road visibility from the beach. There are no stream crossings in the anadromous fishery in Lower Sherman Creek. Two crossings in Upper Sherman Creek and one in Ivanhoe Creek will be constructed with bridges to ensure fish passage and avoid impacts on fish habitat. In-stream construction will be avoided during critical stages for aquatic life. The project is consistent with JCMP requirements for transportation.

8

Mining and Mineral Processing

The enforceable policies of this section generally require consistency with other sections of JCMP.

Subsistence (JCMP, Section 10)

The FSEIS and 1992 FEIS have shown that there is little or no subsistence use of the Point Sherman area.  Under the selected alternative, there will be no impacts on subsistence fishing opportunities.  This is consistent with the JCMP standards to recognize and assure subsistence opportunities.

Habitat (JCMP, Section 11)

The Comet Beach dock facility will require dredging of approximately 2.3 acres.  This will result in a localized disturbance of cobble beach habitat. The potential for significant effects on the overall availability of marine habitat and sport, commercial, and subsistence fishing opportunities is negligible.  Wetlands are found throughout the site.  None of the wetlands are unique and all losses, except at the DTF, will be temporary.  Loss of wetlands associated with the DTF will not impact important habitat.  All discharges from the site will meet human health and aquatic life water quality standards at the discharge points.  Under the selected alternative, effects on stream flows and habitat in Sherman Creek will be minimized.  Minimum instream flows established by ADF&G will have to be met and natural drainages will be restored at closure.  This is consistent with JCMP standards.

Air, Land, and Water Quality (Section 12)

Under the selected alternative, the air emissions and water discharges from the project would comply with all applicable State air and water quality standards.  The project is also consistent with all applicable land use designations.  The site would be completely reclaimed and revegetated at closure.

Conclusion

In this analysis, the Forest Service has determined that the selected Alternative meets the JCMP standards to the maximum extent practicable. In addition, all feasible and prudent steps to maximize conformance with the JCMP have been taken.

9

**FINDINGS REQUIRED BY OTHER LAWS**

<u>Tongass Land and Resource Management Plan</u>

This decision is consistent with the 1997 Tongass Land and Resource Management Plan. The site is located in an area designated as Modified Landscape with a Minerals Prescription. The emphasis for management in this area is encouragement of minerals development in an environmentally sensitive manner and limited to the area necessary for efficient, economic, and orderly development. The long-term goal is reclamation consistent with a Modified Landscape designation.

<u>ANILCA Section 810, Subsistence Evaluation and Finding</u>

The effects of this project have been evaluated to determine potential effects on subsistence opportunities and resources. There is no documented or reported subsistence use that would be restricted as a result of this decision. The potential competition caused by population increases in Juneau could be controlled by regulations pertaining to Federal lands, which would reduce the season and/or bag limit by non-rural residents.

<u>Coastal Zone Management Act of 1972, as amended</u>

The Coastal Zone Management Act requires the Forest Service, when conducting or authorizing activities or undertaking development directly affecting the coastal zone, to insure that the activities or development be consistent with the approved Alaska Coastal Management Program to the maximum extent practicable. I have determined that the proposed activities are consistent with the Alaska Coastal Management Program to the maximum extent practicable.

<u>Endangered Species Act of 1973</u>

A biological evaluation has been completed for this action which documents that no Federally listed threatened or endangered species will be affected by this decision.

<u>National Historic Preservation Act of 1966</u>

The Forest Service program for compliance with the National Historic Preservation Act includes locating, inventorying and nominating all cultural sites that may be directly or indirectly affected by scheduled activities. This activity has been reviewed by a qualified archeologist and a determination made that no known cultural resources will be impacted by this action.

<u>Floodplain Management (E.O. 11988)</u>

This activity is located within floodplains as defined by Executive Order 11988. This action has been designed to minimize potential harm to or within the floodplains.

**Exhibit 4, page 10 of 12**

Protection of Wetlands (E.O. 11990)

This activity is located within wetlands as defined in Executive Order 11990. I have determined that (1) that there is no practicable alternative to such construction, and (2) that the selected alternative includes all practicable measures to minimize harm to wetlands which may result from such use.

Recreational Fisheries (E.O. 12962)

Based on the analyses for water quality and fisheries and pursuant to Executive Order 12962, I have determined that there will be no significant effect to recreational fisheries.

Environmental Justice (E.O. 12898)

I have determined that in accordance with Executive Order 12898 this project does not have disproportionately high and adverse human health or environmental effects on minority populations and low-income populations.


**IMPLEMENTATION DATE:**

Implementation of decisions made by the Chatham Area Forest Supervisor, which are subject to appeal pursuant to 36 CFR part 215, may occur on, but not before, 5 business from the close of the appeal filing period.  The appeal filing period closes 45 days after publication of legal notice of this decision in the Juneau Empire newspaper, published in Juneau, Alaska.


**RIGHT TO APPEAL OR ADMINISTRATIVE REVIEW**

This decision is subject to administrative review (appeal) pursuant to 36 CFR Part 215.  A written notice of appeal must be filed with the Appeal Deciding Officer:

Phil Janik, Regional Forester
Regional Office
P.O. Box 21628
Juneau, Alaska 99802-1628

The Notice of Appeal must be filed within 45 days of publication of notice of this decision in the Juneau Empire.

In accordance with 36 CFR Section 215.14, it is the responsibility of those who appeal a decision to provide the Appeal Deciding Officer sufficient evidence and rationale to show why the Responsible Official's decision should be remanded or reversed.  The written notice of appeal filed must meet the following requirements:

1. State that the document is a Notice of Appeal filed pursuant to 36 CFR part 215.
2. List the name, address, and telephone number of appellant;
3. Identify the decision document by title and subject, date of the decision, and name and title of the Responsible Official;
4. Identify the specific change(s) in the decision that the appellant seeks or portion of the decision to which the appellant objects;
5. State how the Responsible Official's decision fails to consider comments previously provided, either before or during the cement period specified in 36 CFR 215.6 and, if applicable, how the appellant believes the decision violates law, regulation, or policy and, if applicable, specifically how the decision violates the law, regulation, or policy.

**CONTACT PERSON**

Roger Birk
Juneau Ranger District
8465 Old Dairy Road
Juneau, Alaska    99801
907-586-8800

_____        _8/1/97_____
GARY A. MORRISON                                    Date
Chatham Area Forest Supervisor