DAVID W. MÁRQUEZ, Attorney General
CAMERON M. LEONARD, Assistant Attorney General
RUTH HAMILTON HEESE, Assistant Attorney General
State of Alaska, Department of Law
P.O. Box 110300
Telephone:  (907) 451-2811
          or    (907) 465-3600
Facsimile:  (907) 465-6735
Juneau, Alaska 99811-0300


IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SOUTHEAST ALASKA CONSERVATION COUNCIL, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| UNITED STATES ARMY CORPS OF ENGINEERS, *et al.,* | ) ) ) |
| Defendants. | ) ) ) |

**DECLARATION OF EDMUND J. FOGELS
IN SUPPORT OF STATE OF ALASKA'S
MOTION TO INTERVENE**

Pursuant to 28 U.S.C. § 1746, I, Edmund J. Fogels, do declare as follows:

1.  I am the Acting Deputy Commissioner of the Alaska Department of Natural

    Resources ("the Department"), and I have served as Acting Deputy

    Commissioner for this Department since October, 2005.  Before that time,

    beginning November, 2002, I was the Large Mine Project Coordinator with the

    responsibility to coordinate state permitting of large mines in Alaska.

2.  I am familiar with the permitting and on-going operations of all major mines in

    this state, and I am also generally familiar with the permitting of any mine that

has come into production since the beginning of my tenure with the Department, in 1986.

3.  The Alaska Legislature has designated the Department as the lead agency for "all matters relating to the exploration, development, and management of mining," and has directed the Department to "coordinate all regulatory matters concerning mineral resource exploration, development, mining, and associated activities." *See* AS 27.05.010.

4.  In practice, the Department coordinates the permitting responsibilities of all state agencies that may be involved in the permitting and authorization of mines in this state, and also attempts to coordinate the regulatory involvement of federal and municipal entities to the extent possible. The Department assigns project leaders for each major mine project, and those designated project leaders typically coordinate through meetings and other forms of correspondence the interaction of the state agencies involved.

5.  I am familiar with the permitting of the Kensington Mine project by state and federal agencies, as I was the Department's Project Leader for this project.  I was responsible for coordinating all State agency permitting activities for this project. I was also responsible for ensuring State participation in the development of the Environmental Impact Statement for the project. I have personally participated in dozens of meetings and telephone conferences regarding the Kensington Mine project over the last few years.

6.  One legal issue that arose in the context of the Kensington Mine project involved the question of which section of the federal Clean Water Act (33 U.S.C. § 1341) applies to the discharge of mine tailings: Sec. 404 [which governs "dredge and fill" permits, and is administered by the U.S. Army Corps of Engineers (COE)], or Sec. 402 [which covers pollutant discharge, or National Pollutant Discharge Elimination System ("NPDES"), permits, and is administered by the U.S. Environmental Protection Agency (EPA)].

7.  During the winter and spring of 2004, I and other Department staff engaged in discussions with the COE, EPA, and other state agencies (most notably the Alaska Department of Environmental Conservation (ADEC)), over how the 2002 revision of the regulatory definition of "fill" under federal law, may have changed the way that the federal agencies should permit the disposal of mine tailings.

8.  Those discussions resulted in EPA's Office of Water issuing a memorandum dated May 17, 2004 , signed by Diane Regas, and often referred to informally as the "Regas memo."  That memorandum explained EPA's view on the correct approach for permitting the proposed discharge of mine tailings at the Kensington mine.  I viewed the Regas memo as important to the state, as its conclusion on how the disposal of mine tailings were to be permitted would affect not only how the state would permit the Kensington Mine, but also how we might permit other future mines.  I also recognized the importance of reaching a common understanding with EPA and the COE on how those two

agencies planned to permit the Kensington mine operations, as further described below.

9. The choice of a permitting strategy by the COE and EPA has a direct effect on the state's permitting of a mine project. Under Sec. 401 of the Clean Water Act (33 U.S.C. § 1341), the state must certify that a federal permit authorizing an activity that may result in a discharge to surface waters will comply with the state's water quality standards and other state laws. In Alaska, this role of certifying federal permits is undertaken by ADEC, under that agency's statutory authority, but the Department follows the certification process closely, since it is often a critical step in the state's authorization of a large mine project. Under ADEC's laws, the state's certification of a federal permit satisfies the legal requirement for a state permit for the same activity. *See* AS 46.03.110(e); 18 AAC 60.200(b).

10. For the Kensington project, ADEC certified both the COE's Sec. 404 permit for the disposal of mine tailings in the constructed tailings storage facility at Lower Slate Lake, and the EPA's Sec. 402 permit for the discharge of wastewater from the tailings storage facility into East Fork Slate Creek. ADEC, in consultation with the Department, placed several conditions on its certifications of both those permits. Both certifications explicitly recognized that they served as the state's authorization for the activities permitted by the COE and EPA respectively. In other words, the state's certifications served as the state's permits.

11. In my experience and professional opinion, the permitting of any large mine in Alaska requires both close coordination, and a common understanding of the legal requirements, between all federal and state agencies with jurisdiction over the proposed operations. Without this, evaluating the environmental issues associated with these large mines, and deciding on permitting issues would be st bast inefficient, and at worst impossible.

12. I am aware of the First Amended Complaint recently filed in this lawsuit, challenging the COE's Sec. 404 permit for the Kensington tailings storage facility at Lower Slate Lake, as well as other decisions associated with the mine project. Based on my experience, I think that the outcome of this lawsuit could affect not only the future of the Kensington mine itself, but could also impact how the federal and state agencies permit other mines in Alaska. Based on my experience, I believe that the outcome of the lawsuit could potentially eliminate the ability for most economically viable and environmentally appropriate mine designs to be permitted in Alaska. For that reason, I am very concerned that the state's interests be adequately represented in the lawsuit, by allowing the state to intervene in the suit at this early stage.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 7, 2006, at Anchorage, Alaska.

Edmund J. Fogels
Acting Deputy Commissioner
Alaska Department of Natural Resources