

United States
Department of
Agriculture

**Forest Service**

Tongass
National
Forest
R10-MB-159



# Kensington Gold Project

# FINAL ENVIRONMENTAL IMPACT STATEMENT

# VOLUME I



Cooperating Agencies



EPA



Prepared for the
Forest Service by:



Exhibit 5, page 1 of 7

# Kensington Gold Project

## Final Environmental Impact Statement
February, 1992

| | |
|---|---|
| Lead Federal Agency | USDA Forest Service<br>Tongass National Forest<br>Chatham Area |
| Responsible Official | Gary Morrison<br>Forest Supervisor |
| Cooperating Agencies | US Environmental Protection Agency<br>US Army Corps of Engineers |
| Contact | Roger Birk<br>Juneau Ranger District<br>8465 Old Dairy Road<br>Juneau, Alaska |



This Final Environmental Impact Statement is written in response to a proposal for an underground gold mine on the Tongass National Forest. The Forest Service will use this document to support a decision on a plan of operations under 36 CFR 228. The FEIS will also support decisions by the U.S. Army Corps of Engineers and The Environmental Protection Agency for permits under Sections 404 and 402 of the Clean Water Act. The proposal is to mine 4,000 tons of ore per day for a period of 12 years. Tailings would be disposed in a conventional tailings impoundment located in Sherman Creek basin. The site would be reclaimed after mining is complete. Approximately 340 people would be employed. There would be an onsite camp for workers who would commute to the site via helicopter.

Alternatives to the proposed action that were considered include: 1) not developing the project; 2) changing the location of several project features, 3) having employees commute to the site every day, 4) moving some of the project features to underground mine excavations, 5) disposing of the tailings in a dewatered tailings facility and 6) using different wastewater treatment strategies and different locations for project effluent discharge.

# INTRODUCTION

This Environmental Impact Statement (EIS) was prepared in order to consider an application for a Plan of Operations from the Kensington Venture to develop, construct, and operate a gold mine in accordance with the Kensington Venture's project description. The Kensington Venture is a joint venture between Coeur Alaska, Inc. (a subsidiary of Coeur d'Alene Mines Corporation) and Echo Bay Exploration, Inc. (a subsidiary of Echo Bay Mines Ltd.). The Kensington Venture will prepare and submit a Plan of Operations to the Forest Service following completion of a Final Environmental Impact Statement (FEIS).

This EIS was prepared by ACZ Inc. under the direction of the U.S. Department of Agriculture, Forest Service, Tongass National Forest (Forest Service) which is the lead agency responsible for preparation of the EIS. The U.S. Army Corps of Engineers and Environmental Protection Agency (EPA) are cooperating agencies to the Forest Service in preparation of this EIS (40 CFR 1501.6). Comments on the Draft Environmental Impact Statement (DEIS) were used by the Forest Service, the U.S. Army Corps of Engineers, and the EPA (Region 10) to complete the FEIS. The same comments will aid in the decision-making processes related to the issuance, or denial, of the permits required for the Kensington Gold Project.

All aspects of the Kensington Venture's proposed operations, as they affect National Forest surface resources, will be subject to a Plan of Operations (36 CFR 228) approved by the Forest Service. The Forest Service determined that approval would be a major federal action and that the proposed operation may significantly affect the human environment. Because of this determination, an EIS must be prepared to fulfill the requirements of the National Environmental Policy Act (NEPA) of 1969, the Forest Service regulations at (36 CFR 228), and the Council of Environmental Quality (CEQ) regulations (40 CFR 1500). The EIS must analyze the direct, indirect, and cumulative impacts associated with the proposed operation. Based on this analysis, the Forest Service response may be to approve or deny the Plan of Operations as proposed, or to require modification of the Plan.

# PURPOSE OF AND NEED FOR ACTION

The Kensington Venture proposes an underground gold mine, mill, and associated facilities known as the Kensington Gold Project. The project site is located on the west side of the Kakuhan Range adjacent to Lynn Canal, approximately 45 air miles north of Juneau and 35 air miles south of Haines, Alaska. (See Figure 1-1, General Location Map).



Figure 1-1, General Location Map

The mine would produce about 4,000 tons of ore and 400 tons of underground development waste rock per day for approximately 12 years. Expected gold production is about 200,000 ounces per year. The work force would be about 340 people during full production. Additional details on the Kensington Gold Project proposal can be found in Chapter 2 and in the DEIS (Appendix A, Applicant Proposal).

The purpose of and need for the proposed action is to develop and operate an underground gold mine within the Kensington Venture's claims boundary. The proposed project is consistent with the Mining Law of 1872 and its principal amendment of July 23, 1955.

Under the Mining Law of 1872 et seq. qualified prospectors may search for mineral deposits on public domain lands open to mineral entry.

Upon discovering a valuable mineral deposit, a prospector may locate a mining claim. A mining claimant is entitled to reasonable access to the claim for further prospecting, mining, or necessary related activities, subject to other laws and applicable regulations. Because the proposed operations would be located primarily on public lands in the Tongass National Forest, compliance with the guidelines described in the Tongass Land Management Plan (USFS, amended, 1986) in addition to development under U.S. Mining Laws is required. The project site occurs within an area designated as Land Use Designation (LUD) II in the Tongass Land Management Plan (TLMP). The TLMP states the following purpose for LUD II:

> "Areas allocated to LUD II are to be managed in a roadless state to retain their wildland character, but this would permit wildlife and fish habitat improvement and primitive recreation facility development."

Management implications for LUD II areas state that "Mineral development is subject to existing laws and regulations (USFS, amended, 1986).

U.S. Mining Laws and TLMP recognize the statutory right of mining claim holders to explore and/or develop mineral resources and encourage such activity consistent with the Mining and Mineral Policy Act and the Federal Land Policy and Management Act. These regulations require responsible federal agencies to review applicant's Plan of Operation to ensure that: 1) adequate provisions are included to minimize, where feasible, adverse environmental impacts on public land surface resources; 2) measures are included to provide for reclamation, where practicable; and 3) the proposed operation will comply with other applicable federal and State laws and regulations.

## RESPONSIBLE OFFICIAL AND DECISION TO BE MADE

The Forest Service is following a specific procedure that began with scoping and data collection and continues with analysis of data to evaluate alternatives. The results of these analyses are documented in this EIS and form the basis for the Forest Supervisor's decision on the project. The Forest Supervisor for the Chatham Area of the Tongass National Forest is the Responsible Official for this decision.

The responsible official may decide to:

- Adopt the No Action Alternative
- Adopt one of the action alternatives
- Adopt an alternative that combines features of more than one alternative
- Adopt one of the action alternatives with additional mitigation measures

The Record Of Decision (ROD) will result in an action on the Kensington Plan of Operations (permit application). The Forest Service will either approve, deny, or require that Kensington revise the Plan of Operations prior to approval.

## SCOPING AND PUBLIC INVOLVEMENT

As required by NEPA (CEQ 1501.7), the Forest Service has provided for an early and open process to determine the scope of issues to be addressed and to identify the significant issues related to the Kensington Gold Project.

The Forest Service accomplished this goal by holding agency and public scoping meetings, by forming an Interdisciplinary (ID) Team, preparing a Draft Scoping Document (dated April 23, 1990) and a Final Scoping Document (dated July 31, 1990). A DEIS was released June 1, 1991 for public comment.

### AGENCY SCOPING

On October 19, 1989, the Forest Service held an agency scoping meeting to discuss the Kensington Gold Project. Representatives from the Forest Service, EPA, U.S. Fish and Wildlife Service (USFWS), City and Borough of Juneau (CBJ), National Marine Fisheries Services (NMFS), Alaska Department of Natural Resources (ADNR), Alaska Department of Fish & Game (ADF&G), Alaska Department of Environmental Quality (ADEC), Alaska Division of Governmental Coordination (ADGC), and

# INTRODUCTION

On November 28, 1978 the Council on Environmental Quality issued the Final Regulations for Implementing NEPA (FR 55990, Col. 43, No. 230). In July 1978, the Forest Service issued Final Implementation Procedures for NEPA, which further define Forest Service procedures as related to NEPA. These regulations direct the Forest Service to apply uniform practices in developing a full range of reasonable alternatives for proposed developments on lands administered by the Forest Service, and impartially evaluate their effects on the environment.

This chapter describes the process used to develop and compare the Kensington Gold Project Applicant Proposal (*Appendix A, DEIS*) and five project alternatives, including the No Action Alternative.

The discussion of alternatives is the foundation of the EIS process (40 CFR 1502.14). There must be a reasonable array of alternatives to achieve the purpose for which an EIS is prepared.

Studies of metallurgical processing options and other project related tradeoffs were implemented by the Kensington Venture. This provided data related to process optimization, waste treatment needs, environmental safeguards and potential mitigation measures. This information was made available to the Forest Service early in the NEPA process.

Site visits were made to the project area by representatives of the Forest Service, other involved agencies, and the general public. These site visits provided individuals with a familiarity of the project area and additional insight regarding the variety of feasible component options.

## COMPONENTS, OPTIONS, AND ALTERNATIVES

Components are separate elements which, joined together, form the complete project alternatives. This chapter provides descriptions of project components, including options to these components. The discussions of all proposed options, or combination of options, include those eliminated from further consideration and the reasoning for early elimination.

There are a number of separate operational components that must be linked to develop complete project alternatives for the Kensington Gold Project. For environmental analysis purposes, the overall mining and processing operation was segregated into major project components. These include:

- Mining methods
- Waste rock disposal
- Ore processing
- Wastewater treatment
- Tailings disposal
- Housing and other surface facilities and locations
- Access and transportation (supplies, work force)

Each of these components is analyzed in a similar fashion for all project alternatives. The selection of feasible component options for further consideration provides the basis for a compilation of a reasonable range of alternatives to the Applicant Proposal.

Geographic location, topography, extent of mineralization, and land ownership in the project area restrict certain options for each of the project components. For example, the location and extent of mineralization dictate the mine area.

The formulation of alternatives to the proposed project is significant in the NEPA process. Through the alternative development process, the agency can alter or lessen the magnitude of the potential effects of the proposed project on local environmental conditions.

A screening process was used to identify options or alternatives for the Kensington Gold Project. Although a number of options were formulated, many were screened from further consideration when they could not reasonably meet the proposal objectives or address the issues, particularly with respect to the avoidance or reduction of adverse

environmental impacts. The following alternatives were assembled from the options that survived the screening process.

- **Alternative A - No Action Alternative** - This alternative, required by NEPA, stops project development but allows continuation of mineral exploration. It provides a baseline against which action alternatives are compared.

- **Alternative B - Applicant Proposal** - This alternative locates tailings disposal in the Sherman Creek drainage. Project access for supplies would occur at a Comet Beach marine terminal facility. Helicopters would be used to transport employees. Onsite housing would be provided for employees. Crushing would be underground; grinding and milling would be above ground. The Ophir Creek diversion channel spillway into Sherman Creek below the dam would be concrete lined.

- **Alternative C - Berner Bay Access** - This alternative provides project access for employees and supplies from a marine terminal facility in Berners Bay at Slate Creek Cove. An 8.5 mile access road from Slate Creek Cove to the mine site in the Sherman Creek drainage would be constructed. No employee housing would be provided onsite. Enhanced settling would be used for wastewater treatment. The remaining facilities and tailings disposal are identical to Alternative B. The Ophir Creek diversion channel spillway would be riprap lined.

- **Alternative D - Sweeny Creek Tailings** - This alternative is identical to Alternative B except tailings would be pumped to a disposal impoundment in Sweeny Creek. Project access would be as Alternative B except that helicopters would fly from a base near Yankee Cove when transporting employees to the site. Grinding would be contained underground along with the crushing facilities. Diverted stream flows would be returned to Sweeny Creek below the dam via a riprapped lined channel. Enhanced settling would be used for wastewater treatment.

- **Alternative E - Dewatered Tailings** - This alternative is similar to Alternative B except that tailings disposal would be by the dewatered tailings method. A storage building would be required for temporary storage of tailings during wet weather when tailings could not be handled properly. Additional processing facilities for mechanical and thermal drying of tailings would be required to permit proper handling and placement. Hydrogen peroxide would be used for cyanide destruction.

- **Alternative F - Enhanced Effluent Treatment** - This alternative is similar to Alternative B, with two significant exceptions; the marine discharge line is routed along an alignment to the south of Point Sherman and there is additional treatment for effluent water.

Alternatives C, D and E were developed to address issues identified in scoping. Alternative F was developed in response to public comments and concerns expressed during the DEIS comment period. A summary of the issues and how they are addressed in each action alternative is presented in *Table 2-1, Development of Alternatives in Response to Issues*.

**MITIGATION AND MANAGEMENT**

Mitigation and environmental management guidelines as well as monitoring and control measures need to ensure that the final actions conform to all other applicable laws relating to the Forest Service activities. The intent of these constraints, guidelines, and mitigation measures is to ensure that adverse environmental impacts are avoided or minimized during construction, operation, and closure of the project.

Following completion of the NEPA process, the Kensington Venture would submit a Plan of Operations to the Forest Service. The plan would provide final engineering and detailed prescriptive mitigation measures, including a final reclamation and closure plan for the selected alternative.

lead. Lime precipitation alone is not as effective (50± percent) for the removal of nickel or arsenic.

Removal effectiveness for some metals is dependent on their respective oxidation states. Because the treatment facility cannot directly control the influent conditions, the effectiveness of the metals removal process could be affected. If metals removal at Kensington were required, pilot testing would be necessary to verify the performance of chemical precipitation.

**TAILINGS DISPOSAL**

Tailings are the finely ground, sand and silt-like waste rock material which are the by-product of milling (ore processing). Tailings consist of rejects from the flotation circuit and leach residue from the cyanide destruction circuit.

At present, the Applicant is estimating at least a 20 million ton ore reserve. Ongoing preliminary design is being conducted to accommodate up to 30 million tons of tailings at the alternative tailings disposal sites. The probability of delineating an ore reserve of 20 million tons is high based on the existing defined reserve. As all ore mined becomes tailings after processing, sufficient tailings disposal areas are required for the expected recoverable ore body. Following is a discussion of the tailings options identified for the Kensington Project.

**Conventional (Wet) Tailings Disposal**

Tailings would be transported as a slurry to a disposal site. Water used in the process would be recycled to the extent possible, depending on the season and the amount of precipitation falling on the tailings pond.

The Applicant proposes to pump tailings from the mill to the tailings impoundment using an 8 inch diameter slurry pipeline. The tailings slurry would contain approximately 29 percent solids by weight. Once solids settle out from process water in the tailings pond, process water would be available for recycling. Process water and precipitation would be returned to the mill by a barge-mounted pump located in the center area of the tailings pond. Slurry and return water pipelines would be constructed utilizing flexible pipe resistant to corrosion and abrasion.

Tailings would be discharged around the perimeter of the active tailings areas to form a beach using a managed thin-layer deposition technique. This method of deposition allows coarser materials to settle out close to the embankment, while fines are transported to the center portions of the impoundment for settling.

Composite tailings samples produced as a result of bench scale and bulk metallurgical testing of the ore have been subject to corrosive, reactivity, and EP toxicity tests. These tests show that the tailings material does not contain any anomalous or deleterious concentrations of heavy metals or other materials characterized by these tests. The tailings would not be classified as hazardous waste under current RCRA regulations. Excess water accumulated in the tailings impoundment as a result of net precipitation buildup would be discharged to Lynn Canal via a marine outfall in accordance with an EPA administered NPDES Permit. Locational options for conventional disposal would include the Sherman Creek and Sweeny Creek sites with nearshore and deep water marine outfall locations incorporated as options for both alternatives.

**Sherman Creek.** The Kensington Venture has proposed an onshore tailings disposal facility in Sherman Creek downstream of the confluence with Ophir Creek. Initially, a starter dam would be constructed from both underground development rock and rock material obtained from a surface borrow area within the impoundment area.

Review of the dam design would be conducted by the Forest Service and the City and Borough of Juneau. The final design approval would be provided by the Alaska Department of Natural Resources dam safety engineer.

The starter dam would be located and constructed across a constricted section of Sherman Creek. The dam would begin at a toe elevation of approximately 410 feet Mean Sea Level (MSL) and extend to an intermediate crest elevation of approximately 570 feet MSL giving an initial dam height of 160 feet. (*See Figure 2-5, Sherman Creek Tailings Disposal Detail*). The volume of embankment material is estimated at 989,000 cubic yards. This initial