

United States
Department of
Agriculture

**Forest Service**

Tongass
National
Forest
R10-MB-159



# Kensington Gold Project

# FINAL ENVIRONMENTAL IMPACT STATEMENT

# VOLUME I



Cooperating Agencies



EPA



Prepared for the Forest Service by:



RECORD OF DECISION
USDA FOREST SERVICE
Kensington Project
Final Environmental Impact Statement
Juneau Ranger District
Tongass National Forest - Chatham Area

DECISION TO BE MADE

This record documents my decision to select the alternative that will be used to develop the Plan of Operations for the Kensington Gold Project. This decision is based upon the analysis and evaluation in the Final Environmental Impact Statement.

ALTERNATIVES SELECTED FOR DETAILED EVALUATION

Six alternatives were evaluated, including the No Action Alternative. The range of alternatives addressed the major issues associated with this project. The five action alternatives differed from each other in the type and location of various project components.

The alternatives are summarized as follows:

Alternative A - No Action - As a result of this alternative, the Forest Service would not approve a Plan of Operations for the Kensington Project. This alternative precludes any mining and milling activities on National Forest System Lands at the project site under this proposal. Exploration activities would be allowed to continue, subject to applicable laws and regulations.

Alternative B - Applicant Proposal - This alternative consists of the project as proposed by the Kensington Venture in their Applicant Proposal, Appendix A of the Draft EIS.
- Ore crushing would be underground
- Ore grinding would be above ground.
- Generators would be located at mill site.
- Waste rock and borrow areas would be within Sherman Creek drainage.
- Tailings slurry would be disposed of in an impoundment in Sherman Creek drainage.
- Ophir and Sherman Creek (8,000 feet) would be diverted around the impoundment.
- The spillway for the Ophir and Sherman Creek diversion would be constructed of concrete.
- Water treatment methods would be alkaline chlorination and pond settling.
- Discharge of tailings pond effluent would be to marine waters north of Point Sherman.
- Employees would be transported from Juneau and stay at an on-site camp
- Supplies would be transported to a Comet Beach facility with no breakwater.
- 275 Acres of land would be disturbed.

<u>Alternative C - Berners Bay Access</u> - This alternative would differ from Alternative B as follows:
- Spillway would be constructed of riprap.
- Water treatment methods include dechlorination and enhanced pond settling.
- Employees and supplies would be transported to a terminal in Slate Creek Cove in Berners Bay. Employees would be transported to the site daily by ferry. An 8.5 mile road would be built from Slate Creek Cove to the project site. There would be only an emergency camp at the site.
- 392 Acres of land would be disturbed.

<u>Alternative D - Sweeny Creek Tailings Disposal</u> - This alternative would differ from Alternative B in the following items.
- Grinding would be located underground.
- Generators would be located near Comet Beach.
- Tailings disposal impoundment would be in Sweeny Creek drainage. This would require an additional 2 miles of tailings slurry line.
- Sweeny Creek (6,000 feet) would be diverted around impoundment.
- Water treatment methods would include dechlorination and enhanced pond settling.
- Employees would be transported by helicopter from Bridget or Yankee Cove area.
- 229 Acres of land would be disturbed.

<u>Alternative E - Dewatered Tailings Disposal</u> - This alternative differs from Alternative B as follows:
- Tailings would be dewatered and disposed at one of two locations within the Sherman Creek drainage, but outside the stream channels.
- No major stream diversions needed.
- No tailings impoundment or spillway needed.
- Water treatment methods would use hydrogen peroxide to destroy cyanide and would add dechlorination. Pond settling would be designed for dewatered tailings.
- 237 Acres of land would be disturbed.

<u>Alternative F</u> - This alternative was developed and analyzed in response to public comments on the DEIS and would differ from Alternative B as follows:
- Water treatment methods: three options have been assessed. All three options would add dechlorination and enhanced pond settling. In addition to this, the second option would filter total suspended solids (TSS) from the effluent below the tailings impoundment. The third option would dewater the CIL portion of the mill effluent. Effluent treatment methods include hydrogen peroxide cyanide destruction and chemical precipitation of the CIL mill effluent.
- Discharge to marine waters would be south of Point Sherman. The pipeline would be buried near the mean high tide line from the existing camp area to a point near Point Sherman.
- 277 Acres of land would be disturbed.

ENVIRONMENTALLY PREFERRED ALTERNATIVE

Alternative A, No Action, is the environmentally preferred alternative. The definition of environmentally preferred is the alternative which causes the least damage to the biological and physical environment, and which best protects, preserves, and enhances historic, cultural, and natural resources.


DESCRIPTION OF THE FOREST SERVICE PREFERRED ALTERNATIVE

The Forest Service preferred alternative will be used in the development of the Plan of Operations for the project.

Based on the analysis and evaluation in the Final Environmental Impact Statement for the Kensington Project, it is my decision to select Alternative F with water treatment Option 1.

The choice of Option 1 is based on the assessment that the water discharged from the impoundment area can meet water quality criteria found in the Draft National Pollutant Discharge Elimination System (NPDES) permit by dechlorinating the mill effluent and enhancing the settling of suspended solids in the tailings impoundment with a combination of flocculants, baffles, and other design methods. These methods are estimated to enhance settling of TSS by 75 percent, thereby substantially reducing the discharge of TSS and heavy metals to Lynn Canal. Additional effluent treatment measures such as those described in Alternative F, Options 2 and 3, may be implemented if the final NPDES permit, or ADEC mixing zone criteria require lower concentrations of TSS, cyanide, or metals in the tailings pond effluent discharge. If violations of the NPDES permit effluent standards occur, EPA may require additional treatment of the effluent.

Approval of the marine discharge site identified in the Preferred Alternative is outside the jurisdiction of the Forest Service. It is included as a recommended site since it represents the only practical option to address concerns expressed about conflicts with anchoring vessels and the perceived threat to the high value fishery north of Point Sherman. The Clean Water Act requires a Certification of Reasonable Assurance with the Clean Water Act from the Alaska Department of Environmental Conservation and a National Pollutant Discharge Elimination System permit from the Environmental Protection Agency before final criteria for marine effluent discharge can be determined.


RATIONALE FOR THE DECISION

Alternative F was selected because it best addresses the issues identified during scoping and comments received concerning the DEIS. While some alternatives might better address certain issues, the Preferred Alternative provides the best mix for addressing them at an acceptable level.

Under Alternative F, all ground disturbance on National Forest System lands will be confined to one drainage. Based on comments to the DEIS and additional technical analysis, including considerations for installation, operation, and safety, I have decided to authorize operation of ore grinding facilities above ground and to allow power generating facilities to be located at the mill site. This differs from the Preferred Alternative identified in the DEIS. Approval is contingent upon design and monitoring verification by the proponent that structures housing these facilities can be designed to reduce noise

produced in the structures to a level no higher than 79 dBA at a distance of 50 feet from the structures. By locating the generators at the mill, waste heat can be utilized for heating the camp and mine with associated reduction in fuel consumption and some reduction in risks associated with fuel handling and storage.

All facilities (the mine, mill, waste rock disposal, rock quarry areas, tailings disposal, camp and supply loading area) will be contained in Sherman Creek drainage. This minimizes the area of ground disturbed by roads and tailings pipelines. Locating the impoundment in Sherman Creek results in slightly larger tailings surface area.

Compared with dewatered tailings, disposal of the slurried tailings in an impoundment in Sherman Creek is more stable over the long-term because it is contained by a higher strength embankment. In the case that primary spill prevention and containment measures fail, the Sherman Creek impoundment will also serve as a secondary spill containment area, since the decant valve can be closed to prevent the release of spilled material to fresh or marine waters. The trade-off is that it creates the need for long-term maintenance of the spillway to route Sherman Creek over the tailings impoundment and into the natural channel. Dewatered tailings piles would be more visible from Lynn Canal. In addition, the operational success of drying, placement, and compaction to stabilize dewatered tailings piles is questionable due to the area's high precipitation.

Discharge water quality requirements for the project will be determined by the EPA through the final NPDES permit and by the Alaska Department of Environmental Conservation through their decision of whether or not to issue a permit for a mixing zone in the marine receiving waters. If ADEC permits this zone they will also determine the size to be used for administrative purposes and the location.

Water treatment in Alternative F includes dechlorination and enhanced pond settling because the wastewater analysis indicated that the tailings pond treatment proposed in the applicant's proposal (Alternative B) would require additional treatment to meet the water quality criteria in the Draft NPDES permit. These criteria apply to the effluent at the end of the outfall pipe. The analysis indicates that additional dilution would be required for some effluent constituents (TSS, copper, lead, and total cyanide) to meet marine receiving water criteria established by the State of Alaska. The FEIS describes the impacts to marine biota within this dilution or mixing zone and in the area where effluent sediments may be deposited. The analysis indicates that there would be no significant bioaccumulation, concentration, or persistence of the materials in the environment; that there would be no adverse impact on anadromous fish spawning or rearing habitat; and there would be no barrier formed to migratory species. No practicable effluent treatment methods are available to reduce concentrations of TSS, total cyanide, and metals in the effluent to levels that meet State of Alaska marine receiving water quality criteria without allowance for dilution in a mixing zone.

Locating the marine outfall in the area south of Point Sherman would reduce potential anchor fouling conflicts with the commercial fishing fleet when they anchor in the protected area off Comet Beach. It would also avoid mixing the tailings effluent in the waters which eddy in front of Comet Beach.

Helicopter flights from the airport would utilize existing facilities at the Juneau airport and minimize impacts to recreation activities near the end of the Juneau road system.

On the recommendation of specialists in dam construction and safety, including the U.S. Army Corps of Engineers, I am withdrawing my earlier preference that the Sherman Creek spillway channel be constructed of large riprap. The channel will be constructed of concrete and designed for minimum long term maintenance. Long term bonding will be developed to assure that funds are available for long term maintenance.

Alternative B concentrates development and potential impacts in one drainage but does not provide for water treatment, dechlorination, or reducing potential conflicts associated with marine discharge north of Point Sherman.

Alternative C minimizes conflicts with marine traffic in Lynn Canal by locating the marine terminal in Slate Creek Cove but spreads the impacts over several drainages including the popular recreation area of Berners Bay. By increasing the handling of fuel and chemicals, it increases the potential for spills.

Alternative D spreads the disturbance to two drainages. A tailings slurry pipeline would be necessary to transport tailings to the Sweeny Creek tailings impoundment, increasing surface disturbance and the potential for a spill. Locating electrical generators near Comet Beach rather than at the mill site would result in the loss of the waste heat which would otherwise be used for heating the camp and underground facilities. Underground grinding would increase construction and operational costs without providing benefits. Information developed in response to comments on the DEIS indicate that noise levels associated with both the generators and grinding facilities can be reduced, through design and orientation of the facilities, to levels which will not result in increased wildlife disturbance.

Alternative E would eliminate the need to construct a dam and dispose of mill tailings directly in Sherman Creek but would require construction of a very large structure to store up to ten days of tailings during wet weather. Alternative E would create the most noise impacts to mountain goats because of truck/offloading activity. This alternative is also the most visible from Lynn Canal. Dewatering the tailings would require a third generator, increasing fuel consumption and handling. Dewatering of tailings has never been attempted on this scale in this climate, and it can be considered an unproven technology.

The General Mining Law states that mining claims on Federal lands are "free and open to exploration and purchase." Similarly, the Organic Act of June 4, 1897 states: "Nor shall anything herein prohibit any person from entering upon such national forests for all proper and lawful purposes, including that of prospecting, locating, and developing the minerals resources thereof; provided that such persons comply with the rules and regulations covering such national forests." The Mining and Mineral Policy Act and the Federal Land Policy and Management Act require responsible federal agencies to review an applicant's plan of operations to ensure that: 1) adequate provisions are included to minimize, where feasible, adverse environmental impacts on public land surface resources; 2) measures are included to provide for reclamation, where practicable; and 3) the proposed operation would comply with other applicable federal and state laws and regulations. The applicable authority for finalization and approval of the Plan of Operations is 36 CFR 228. The Kensington Project is located within lands designated as LUD II in the Tongass Land Management Plan, as amended, which allow for mineral development subject to existing laws.

PUBLIC INVOLVEMENT

A Notice of Intent was filed in the Federal Register on October 23, 1989. Public involvement began on October 19, 1989 with an agency scoping meeting attended by Federal, State, and local agencies. Public scoping meetings were held in Juneau on December 13, 1989 and in Haines on January 9, 1990. Out of this effort, a Draft Scoping Document identifying issues and concerns was sent to the public in May, 1990 for their review and comment. After receiving public comment, a Final Scoping Document was sent to the public in August, 1990.

The Draft EIS was sent to the public in June, 1990 for a 90 day comment period. Public hearings were held in Juneau on July 11 and in Haines on July 18. Included in the meetings were question and answer sessions with the Forest Service and ACZ Interdisciplinary Teams. The Juneau meeting was held in cooperation with the City and Borough of Juneau, who also participated in both the question and answer session and the hearing. Approximately 150 people attended the Juneau meeting with 30 people testifying. In Haines approximately 80 people attended with 34 people testifying. Since water quality was one of the most important issues associated with this project, water quality workshops were held August 8 in Haines and August 9 in Juneau with 15 and 25 people, respectively, attending the workshops. The workshops were held during the day with EPA's NPDES hearings held during the evening.

All meetings were announced on local TV and radio stations and in local newspapers in both communities. In addition, the Juneau and Haines newspapers have printed many articles on the proposed Kensington Mine. Presentations regarding the project have also been made to local organizations by the Forest Service.

One hundred and twenty-one comment letters were received on the DEIS and used to develop the FEIS.


MITIGATION, MONITORING, AND RECLAMATION

The FEIS identifies mitigation measures that are designed to ensure that all practicable means have been adopted to avoid or minimize potential environmental impacts from the selected alternative during the construction and operation of the Kensington Project. Chapter 2, Management, Mitigation, and Monitoring lists the mitigation measures common to all alternatives and the mitigation measures specific to Alternative B, which also apply to Alternative F. These mitigation measures are considered to be effective, and are made a part of this decision. They have been successfully used in other projects with similar types of activities. Mitigation and monitoring plans will be submitted as part of the detailed Plan of Operations.

Monitoring will determine compliance of the project with the Plan of Operations and validate projected environmental effects of the project. Much of the on-site monitoring will be financed by the operating company and conducted cooperatively with the Forest Service based on monitoring plans approved as part of the Plan of Operations. The Forest Service will be responsible for approving the monitoring plans dealing with the upland portions of this project. Standards for monitoring of tailings effluent and marine water will be approved by EPA and ADEC as part of their permits. Chapter 2 contains monitoring measures common to all action alternatives and monitoring measures specific to Alternative F. These monitoring measures are made part of this decision and will guide development of the Plan of Operations.

The purpose of reclamation is to return the disturbed areas to a stabilized and productive condition and protect long-term land and water resources. Chapter 2 of the FEIS lists the reclamation measures that will be used to develop the reclamation plan that will be part of the Plan of Operations. These measures are also part of this decision.


TONGASS LAND MANAGEMENT PLAN, AS AMENDED

Alternative F is consistent with the Tongass Land Management Plan, as amended. The site is located in Management Areas 19C and 20C which have been assigned Land Use Designation (LUD) II. The emphasis for management in this area is for major activity to be oriented toward maintaining the land in a wild and roadless condition, except for authorized uses. Mining is an authorized use.


ANILCA SECTION 810, SUBSISTENCE EVALUATION AND FINDING

As required by Section 810 of ANILCA, the effect of this project on subsistence has been evaluated in terms of, a) subsistence uses and needs, b) availability of other lands, c) other alternatives. Alternative F does not present a significant possibility of significantly restricting subsistence uses. Therefore, it is my determination that this decision will not cause a significant restriction of subsistence uses or resources.


COASTAL ZONE MANAGEMENT ACT OF 1972, AS AMENDED

The Coastal Zone Management Act requires the Forest Service, when conducting or authorizing activities or undertaking development directly affecting the coastal zone, to insure that the activities or development be consistent with the approved Alaska Coastal Management Program to the maximum extent practicable. I have determined that selection of Alternative F is consistent with the Alaska Coastal Management Program to the maximum extent practicable.


ENDANGERED SPECIES ACT OF 1973

No Federally listed threatened or endangered species will be affected by Alternative F.

NATIONAL HISTORIC PRESERVATION ACT OF 1966

The Forest Service program for compliance with the National Historic Preservation Act includes locating, inventorying and nominating all cultural sites that may be directly or indirectly affected by Alternative F. No known cultural resources occur in the project area.

FLOODPLAINS, WETLANDS, AND DECISION IMPLEMENTATION

Alternative F involves floodplains and wetlands. Implementation of this decision may occur no sooner than 30 days from the date of publication of the notice of availability of the FEIS in the Federal Register.

IMPLEMENTATION DATE:

Implementation of decisions made by the CHATHAM AREA FOREST SUPERVISOR, which are subject to appeal pursuant to 36 CFR Part 217, normally may not occur for 7 calendar days following publication of legal notice of the decision in the Juneau Empire newspaper, published in Juneau, Alaska. Because this decision involves floodplains and wetlands, implementation of this decision may occur no sooner than 30 days from the date of publication of the notice of this decision.

RIGHT TO APPEAL OR ADMINISTRATIVE REVIEW

This decision is subject to administrative review (appeal) pursuant to 36 CFR Part 217. A written notice of appeal, in duplicate must be filed with the Reviewing Officer:

> MICHAEL A. BARTON
> Regional Forester
> Forest Service, USDA
> Federal Building
> P.O. Box 21628
> Juneau, AK   99802-1628

The Notice of Appeal must be filed within 45 days of publication of notice of this decision in the Juneau Empire.

In accordance with 36 CFR Section 217.9, it is the responsibility of those who appeal a decision to provide the Reviewing Officer sufficient evidence and argument to show why the decision by the lower level officer should be changed or reversed. At a minimum, the written notice of appeal filed must:

1. State that the document is a Notice of Appeal filed pursuant to 36 CFR Part 217.

2. List the name, address, and telephone number of appellant;

3. Identify the decision about which the requestor objects;

4. Identify the document in which the decision is contained, by title and subject, date of the decision, and name and title of the Deciding Officer.

5. Identify specifically that portion of the decision document to which the requestor objects;

6. State the reasons for objection, including issues of fact, law, regulation, or policy and, if applicable, specifically how the decision violates the law, regulation, or policy; and

7. Identify the specific change(s) in the decision that the appellant seeks.


_____
GARY A. MORRISON
Forest Supervisor

1/29/92
Date