



**Department of the Army**

**Record of Decision**

US Army Corps
of Engineers
Alaska District

---

**Applicant:** Coeur Alaska, Incorporated
**Application Number:** 2-900592
**Waterway Number:** Lynn Canal 31


I. **Decision:** In light of the overall public interest, I have decided to issue a Department of the Army (DA) permit under Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. 403) and Section 404 of the Clean Water Act (33 U.S.C. 1344). The permit will be issued to Coeur Alaska, Incorporated, hereafter referred to as Coeur, to perform the following work:

   Develop the infrastructure to construct, operate, and reclaim the Kensington Gold Mine. The work will include placing fill into approximately 261 acres of jurisdictional wetlands and/or other waters of the United States. The proposed project involves the excavation of approximately 3,911,140 cubic yards of material from jurisdictional wetlands and/or other waters of the United States. There will be a total of 4,704,790 cubic yards of fill material deposited in jurisdictional wetlands and/or waters of the United States. The major surface components are listed below, and have been rounded to the nearest whole number.

   A. Mechanized land clearing, followed by the excavation of wetlands, and the placement of fill to construct the base, containment and drain structures for the Dry Tailings Storage Facility (DTF). The DTF is a permanent disposal and storage site for mill tailings, approximately 113 acres in wetlands.

   B. Mechanized land clearing followed by the excavation of wetlands, to expose the underlying gravels. The sand and gravel deposits will be removed and used as construction material, approximately 55 acres in wetlands.

   C. Mechanized land clearing, followed by the excavation of wetlands, and the placement of fill for building pads for the ore process area, batch plant and personnel camp, approximately 41 acres in wetlands. The diversion of Ophir Creek and Upper Sherman Creek will be constructed around the processing facilities. This component footprint is included within the disturbance for the process facility.

   D. Mechanized land clearing, followed by the excavation of wetlands, and the placement of fill to construct the dissemination area, mine water sedimentation ponds, storm water and sediment detention ponds, a sedimentation facility, topsoil stockpile areas, laydown area, fuel storage, and an explosives magazine, approximately 27 acres in wetlands.

to open weather. Stern buoys need to be added to the design. If fuel shipments are delayed by inclement weather it is important to have adequate mooring facilities for winter weather. Do not spend too much detail working on aesthetics and ignoring the needs of the miner and the crews on the barges serving the mine.

*Response to Whitestone Logging comments*: The marine barge-landing site has been designed to have the smallest footprint and still meet the objective of handling supplies for the mining operation. The Corps is not going to request a larger footprint and thus a larger impact. The fishing industry has been actively involved with the project design. Earlier proposals for the project included a breakwater for Comet Beach. The fishing and environmental communities were unhappy with the larger marine facility design. Coeur has proposed cessation of all fuel handling (loading and unloading) in the event seas are greater than three feet. The handling of fuel and supplies will be completed in a manner to prevent unnecessary environmental degradation. The Corps is also concerned with miner safety, and the ability to provide immediate care. Coeur will use helicopters for all immediate transportation needs. Injured workers requiring immediate care will be evacuated by helicopter. The helicopter will be able to fly in winds that will slow or negate boat travel. The Corps finds no compelling reason to require additional mooring facilities or marine facility design changes. If the USGC requires additional buoys or placement the Corps can modify the DA permit. The facility is safe as currently designed.

(b) *Lynn Canal Conservation (LCC)* in a letter dated October 28, 1997, expressed several concerns with the proposal. LCC requested that a structural berm be placed around the DTF. The design of the DTF did not account for the seismic activity in the area. There is a potential for the failure of the uncompacted tailings. LCC also expressed a concern that there is no impervious barrier between the tailings and the ground water. There is potential for water mixing and the likely hood of acid drainage. The sulfides in the tailings would cause the acid condition and heavy metals would contaminate the ground water. LCC expressed a concern that the barge landing facility would be inaccessible 40 percent of the time (Coeur data). Ultimately a critical item will be brought in and unloaded during poor weather. The potential for a disaster is likely. This is a very sensitive fishing area. LCC is concerned with fuel deliveries and the potential for spills in inclement weather. The facility as designed is inadequate for the weather in this location. This part of the facility should be denied. Consider the use of hydropower from Lace River or Goat Lake. The buoys need to be adequately anchored. Light duty anchors are not adequate. LCC further requests compensatory mitigation for the DTF site. Sawmill Creek or other sites in Juneau would be appropriate. Consider using fishery resource stream restoration in upper Lynn Canal. The loss of tidelands should also require compensatory mitigation. A public hearing is requested to address the impacts of granting the permit on the health and welfare of the residents of Upper Lynn Canal. The economies of fishing, tourism, and subsistence may be adversely impacted by this project.

*Response to Lynn Canal Conservation's comments*: This project has undergone intense public and agency scrutiny for eight years. There is an extensive record of meetings, workshops, and hearings held by CBJ, the USFS, EPA and the Corps. The public has been an integral part of the project review. The comments received by the Corps were both supportive and critical of the project. No additional supporting information was supplied in the public comments for the Corps to conclude new information would be provided at another hearing. Thus, the Corps determined that additional hearings were not necessary. The comments received from the review of DSEIS resulted in the project being modified. Because of agency and public concern the USFS required a structural berm in the DTF perimeter. The preferred alternative

Exhibit 10, page 2 of 7

selected by the USFS also required the tailings to be pumped to the DTF rather than be trucked. In addition, the USFS required Coeur to use bridges for the stream crossings on Sherman Creek, Upper Sherman Creek, and Ophir Creek. The impacts to aquatic resources were reduced by the use of bridges.

The USFS did not require off site mitigation or compensatory mitigation for the losses of Forest Service managed lands. The USFS required instead a comprehensive reclamation plan as part of the plan of operation for the project. The CBJ in their Large Mine permit decision for the project did not require off site mitigation or compensatory mitigation for the proposed project. The CBJ placed emphasis on the reclamation plan, monitoring plan, and bonding. The Corps is responsible to ensure any fill placed into the nation's wetlands adheres to national law and policy. There is currently a national goal for "no net loss" of wetlands as outlined in an agreement between the Corps of Engineers and EPA. This is a goal that is evaluated on a site by site basis. Wetlands in the area to be affected by the Kensington proposal were identified using the 1987 Federal Manual for Wetland Delineation. The impact to wetlands was completely evaluated in Chapter 4 of the FSEIS. The FSEIS did not find these wetlands to be of a singularly significant importance. For example the wetlands identified in Alternative A would include palustrine-forested wetlands that form a riparian corridor along Sherman Creek. These wetlands adjacent to Sherman Creek serve important sediment trapping and surface hydrologic control. These functions contribute to the riparian corridor and enhance the downstream fishery. The wetlands associated with Alternative D are palustrine scrub-shrub wetlands that are located off of the main channel of Sherman Creek. While these wetlands provided important functions of sediment trapping, and nutrient transformation they are associated with upland areas and are removed from Sherman Creek. These are wetlands that are typical and in abundance in Southeast Alaska. There would be the permanent loss of 107 acres at the DTF and 28 acres of wetlands at the process area. These wetland losses are not substantial when considered on a watershed and/or regional basis. The loss of wetland functions and values provided by these wetlands is not sufficient, in this watershed and region, to require compensatory mitigation beyond that provided in the reclamation plan.

Table 4-27 of the FSEIS identifies the total projected wetland losses by alternative. There are several differences on the acres shown in the FSEIS and those in the Corps public notice. Table 2.2 in the September 29, 1997, public notice is correct. The Corps public notice is the correct representation of the acreage to be disturbed and the reclaimed acre objectives. Table 2.2 in the Corps public notice of September 29, 1997 is a conservative estimate of the acres that can be reclaimed to wetlands and to open waters. Table 2.2 includes reclaiming the areas adjacent to uplands as wetlands. The DTF has a footprint of 113 acres of which 107 acres will remain uplands. The process facility is a 34-acre pad of which 28 acres will remain upland, and 5.5 acres will be returned to wetlands and open water. The FSEIS identified all gravel pits as being reclaimed to open water. In reality, Coeur believes that fifteen acres of pits can be reclaimed to open waters, and that thirty-five acres can be reclaimed to wetlands. This difference is based on Coeur refining the computer aided drawings and design after the USFS ROD was published. At the completion of the project there would be 135 acres of uplands, 15 acres of open water, 111 acres of wetlands, and 2.1 acres of intertidal land (all numbers rounded up). The Corps has jurisdiction on approximately 261 project acres of which 259 are wetlands. The reclaimed upland areas would support the development of a Sitka spruce forest, a habitat not well represented on site. The reclamation plan, sets site specific post-mining objectives and goals for each of the surface-disturbing component within the project area. Reclamation will include removal of all structures, regrading of all surface disturbances, application of topsoil to the regraded areas, replanting of the disturbed areas, and reestablishing all drainage

ways.  The reclamation plan includes seed mixes for the wet areas and for the uplands including soil treatments such as fertilizer and mulch.  There are specific criteria to measure success and bond release.  The material sites, mine water ponds, sedimentation ponds, diversions, and storm water ponds will be left as open waters of the United States.  These ponds will be designed and graded to encourage fringe wetland habitat.  The fringes will be seeded with the wet seed mix.  There will be approximately 15 acres of open water left at the conclusion of the project.  The FSEIS found that while there would be wetland habitat lost directly by this action there would be upland and aquatic habitat provided following reclamation that would increase habitat diversity.  The USFWS and the NMFS traveled to the site to look for further on site mitigation projects.  Neither agency had any further suggestions for mitigation.  No Federal agency requested further mitigation for the project.  The decision to require compensatory mitigation rests with the Corps of Engineers.  The Corps has considered the site-specific conditions, and the total impact from the project. Additional compensatory mitigation beyond the reclamation plan proposed by Coeur is not required for the wetland losses.

   The USFS modified the mine plan to include a structural berm.  The plans published in the Corps public notice of September 29, 1997, for the DTF included a structural berm.

   There was a concern about the potential to generate acid drainage (ARD) from the DTF and or the mine drainage.  The EPA studied this issue in detail.  This was a topic of the EPA TAR and earlier public review.  A tremendous amount of rock characterization was completed on both the waste rock and the mine drainage water.  The EPA concluded there was little risk of an ARD problem.  The FSEIS addressed the potential for ARD from the DTF.  The FSEIS concluded that since the sulfides are removed from the waste there is little risk of an ARD problem.  The EPA issued a draft 402 permit for the DTF water discharge.  The ADEC regulates the placement of solid waste (the tailings) in disposal/storage sites like the DTF through their solid waste permit.  The Corps does not regulate the placement of tailings.  The construction of the DTF base using waste rock, glacial till and sand and gravel will not create an ARD risk.

   (c)  **Mr. Bruce Baker representing the Kensington Coalition**, in a letter of October 28, 1997, expressed several concerns with the proposal.  The Coalition was concerned that the Corps was allowing a total of 135.3 acres of wetlands related to the DTF and to the process area to be converted to an upland without requiring mitigation or compensation for the losses.  There are valid reasons for not returning these areas to wetlands, however the Corps should provide compensation for the loss of this acreage.  The national policy is "no net loss".  Offsite compensatory mitigation would make up for some of the loss.  Stream restoration would be one way to offset some of the loss.  There are several streams in Juneau and Haines that were originally salmon habitat and today are degraded or the habitat destroyed by urban development.  In Haines, Sawmill Creek is an example.  In Juneau, there are a number of available streams.  Discussions with the Juneau Wetlands Board would provide useful information.  Compensation of this nature would have significant social, environmental, and economic benefits for both Haines and Juneau.  A public hearing is requested to discuss why the Corps is not requiring compensation for the loss of half of the wetlands in the Kensington project site.

   **Response to Mr. Bruce Baker's comments**:  See response to Lynn Canal Conservation comments for discussion on compensatory mitigation and the need for a Corps public hearing.  It is important to note that the Federal agencies (EPA, USFWS, and NMFS) had no additional recommendations for mitigation for this project.  Sherman Creek will not be negatively impacted by the proposal.  The riparian vegetation will be preserved.  The anadromous

Exhibit 10, page 4 of 7

*SUBPART F - POTENTIAL EFFECTS ON HUMAN USE CHARACTERISTICS*

Human use characteristics that will be affected by the proposed project include water supplies, fisheries, water-related recreation, aesthetics, and recreation areas. Pertinent information about potential impacts of the proposed work on human use characteristics is found in Chapter four of the FSEIS. Anticipated impacts, both beneficial and detrimental, range from relatively minor impacts to water-related recreation to moderate long term impacts to aesthetics.

*SUBPART G - EVALUATION AND TESTING*

The potential for encountering hazardous wastes or materials that will lead to contamination is discussed in Chapter four of the FSEIS. The gravel and glacial till that will be used for construction in this project is natural in-place material. There is little chance of contamination from this material. In addition, the EPA completed extensive waste characterization analysis on the mine rock. The SEIS evaluated the potential for the waste and the DTF to become an acid rock discharge (ARD) or generating system. The analysis looked at both the mine water discharge and the DTF. The analysis concluded there was little risk in an ARD event. The Corps does not regulate the disposal of mine tailings. The DTF is a disposal and containment site, much like a sanitary landfill in function. The DTF would permanently store approximately 11,722,506 cubic yards of mine tailings. The State, USFS, CBJ, and EPA have all reviewed the DTF design. In addition, the use of cyanide has been eliminated from the project. Based on this analysis, the likelihood of contaminated materials being discharged under Corps jurisdiction is remote. Therefore, the discharge of materials meets the testing exclusion criteria.

*SUBPART H - ACTIONS TO MINIMIZE ADVERSE EFFECTS*

Actions proposed to minimize potential adverse effects for each alternative are discussed in Chapter two of the FSEIS. The plan incorporates numerous changes to avoid and minimize impacts to the aquatic resources. Coeur has agreed to construct the project in conformance with Alternative D of the FSEIS, August 1997, and as identified in the USFS ROD. Mitigation was incorporated into Coeur's plan submitted to the Corps. Coeur agreed to install bridges instead of conduits for the three stream crossings in the mine haul road. Coeur added an engineered berm into the DTF to ensure long-term pile stability. Coeur included wetland reconstruction and open water creation as part of their reclamation plan. The reclamation plan includes recontouring, topsoil application and reseeding as part of plan that proposes these activities concurrent with mining. As an example the DTF would be built in cells. The filled or completed cell would be reclaimed as the construction of the new cell commences. The unreclaimed surface acreage exposed to storm events would thus be minimized. The operator's mine plan will result in at least 25% of all mill tailings being placed back under ground to reduce surface disturbance. Coeur designed water treatment facilities to release mine water and surface water to the environment, while meeting appropriate standards. Relocating facilities and eliminating the tailings impoundment has minimized the impacts to Sherman Creek. The USFS and CBJ will hold a performance bond to ensure reclamation and site rehabilitation. The USFS will monitor the operation for compliance with the USFS plan of operation and for compliance with a set of BMPs for mine construction and operation. The relevant BMPs were listed in Appendix D of the FSEIS. The ADEC and CBJ will also monitor air, surface condition, and water quality. Up front planning, and the EIS and SEIS analysis have minimized project impacts.

To ensure the aquatic resources are protected the following special conditions will be incorporated into the Department of the Army permit:

1. The clearing limit for each mine component shall be clearly identified in the field prior to excavation, clearing and construction. The fill limit boundaries shall be located prior to fill placement. Permanent survey markers shall be placed and monumented so an observer can delineate the clearing and fill limits while walking on the ground at the site.

2. Coeur Alaska, Incorporated must install and maintain, at their expense, any safety lights and signals prescribed by the U.S. Coast Guard (USCG) through regulations or otherwise, on the authorized facilities. The USCG can be reached at the following address and telephone number: Commander (oan) 17th Coast Guard District, Post Office Box 25517, Juneau, Alaska 99802-5517, telephone (907) 463-2254.

3. Coeur Alaska, Incorporated shall be responsible to obtain and comply with all appropriate State and Federal Statutes for oil storage and transfer. An oil storage facility shall be subject to the provisions of a plan of operation approved by the USGC and an Oil Spill Contingency Plan approved by the Alaska Department of Environmental Conservation.

4. Coeur Alaska, Incorporated shall provide an annual progress report to the Corps on project status. This report shall summarize the acres disturbed and reclaimed under the Corps' jurisdiction. The disturbance shall reference the twenty project parcels as shown in Table 2.1 of the permit. The report will be due yearly on or before February 15.

5. Failure to comply with permit conditions may be grounds to modify, suspend or revoke the Department of Army permit.

In accordance with 33 U.S.C. 1341(d), all conditions on the Alaska Department of Environmental Conservation certification, if any, will be incorporated as part of the DA permit.


**VI. Compliance with Environmental Requirements**: The issuance of a permit for the proposed project is in compliance with applicable environmental requirements. The development of the EIS and FSEIS was accomplished in accordance with the National Environmental Policy Act of 1969, as amended. Recommendations of the USFWS prepared pursuant to the Fish and Wildlife Coordination Act of 1958, as amended, have been fully considered in the permit decision. Coordination with the USFWS and NMFS pursuant to Section 7 of the Endangered Species Act of 1973, as amended, have been completed. A DA permit will not be issued until the State issues a Section 401 Water Quality Certification or waiver and a CZM concurrence or presumed concurrence. Coordination with the State Historical Preservation Officer was conducted pursuant to the National Historic Preservation Act of 1966, as amended. An evaluation of the discharge of dredge or fill material as required by Section 404(b)(1) of the Clean Water Act, 40 CFR 230 was completed. The discharge complies with the guidelines, with the inclusion of the appropriate and practicable conditions listed above to minimize pollution and the adverse effects to the affected ecosystem. I find that issuance of a permit as described above is in conformance with these guidelines.


**VII. Section 176(c) of the Clean Air Act General Conformity Rule Review**: The proposed project has been analyzed for conformity applicability pursuant to regulations implementing Section 176(c) of the Clean Air Act. Air quality

Exhibit 10, page 6 of 7

impacts were fully addressed in the EIS and the FSEIS. This project was issued an air quality emissions permit by the ADEC. This action has been coordinated with ADEC and EPA. Any later indirect emissions are generally not within the Corps continuing program responsibility and cannot be practicably controlled by the Corps.

VIII. **Determination**: I find that the issuance of the DA permit, as described by regulations published in 33 CFR Parts 320 through 330, with the scope of work as described in this document, and in accordance with the drawings attached to the public notice dated September 29, 1997 is based on a thorough analysis and evaluation of the various factors enumerated above. There are no practicable alternatives available to Coeur that will achieve the purposes for which the work is being conducted; the proposed work is deemed to comply with established state and local laws, regulations, and codes; the issuance of this permit is consistent with national policy, statutes, and administrative directives; and on balance, issuance of a DA permit to Coeur for the proposed work is not contrary to the public interest. I have determined that the DA permit will be issued if the State issues a Section 401 Water Quality Certification or waiver and a CZM concurrence, or presumed concurrence.

Prepared and Approved by:    Date:  28 January 1998    *[signature]*
Victor O. Ross
Project Manager
South Section
Regulatory Branch