

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION 10
1200 Sixth Avenue
Seattle, WA 98101**

Reply To
Attn Of: OWW-130

DEC - 1 2004

Forrest Cole
Forest Supervisor
648 Mission Street
Federal Building
Ketchikan, AK 99901-6591

RE: EPA's Environmentally Preferable and Preferred Alternatives
Kensington Gold Project

Dear Mr. Cole:

At the request of the Forest Service, EPA, a cooperating agency in the NEPA process for the Kensington Gold Project, is submitting our designation of an environmentally preferable alternative, and a preferred alternative, for inclusion in the Final Supplemental Environmental Impact Statement (FSEIS). It is EPA's understanding that the Forest Service intends to finalize the FSEIS on December 10, 2004, with publication of the document in the Federal Register on December 17, 2004.

Our selections of an environmentally preferable alternative and a preferred alternative, as outlined below and explained in the enclosures, are based on the current record, without the benefit of either a completed ESA analysis in conjunction with NOAA Fisheries addressing potential impacts to the herring population and marine mammals in Berners Bay, or a completed Clean Water Act (CWA) § 404(b)(1) analysis from the U.S. Army Corps of Engineers evaluating the least environmentally damaging practicable alternative. EPA's preference would be to incorporate those analyses, when they are performed, into the selection of environmentally preferable and preferred alternatives.

Based on current information and the collective analysis performed during the inter-agency meeting in Juneau on October 15, 2004, we conclude that Alternative A would have less adverse environmental impacts than Alternatives B, C or D. Alternative A is the only alternative that will avoid the habitat loss in Lower Slate Lake during mine operations, and the uncertainty in terms of the Lake's long term recovery. It is also the only alternative that avoids the significant impacts to sensitive habitat and resources in Berner's Bay that would result from Alternatives B, C and D.[1] In addition, if the project were to expand beyond the current proposal to mine only the smaller high-grade ore body, which is reasonably foreseeable, then

---

[1] While we understand that there are some ongoing discussions among various state and federal agencies about possible measures to mitigate the ecological impacts on Berner's Bay, it is not yet clear what those measures will be because both the Alaska Department of Natural Resources and NOAA Fisheries have proposed measures, but no consensus has been reached as to which of the proposed measures will be implemented.

Alternative A's dry tailings facility would have the capacity to store the additional tailings material with far less additional impacts than would result from future mine expansion under the other alternatives. For these reasons, Alternative A is the environmentally preferable alternative.

Alternative A is also EPA's preferred alternative, because in addition to being environmentally preferable, it appears to be a practicable and feasible alternative. The dry tailings facility proposed under Alternative A is a standard industry technology in use at other mines in Alaska. In June 1996, when the applicant submitted a revised plan of operations, gold prices were at approximately $390 an ounce. In 1998, Alternative A, in the form proposed by the applicant, was fully permitted by all the relevant federal and state agencies, which involved a finding by the U.S. Army Corps of Engineers that Alternative A was practicable. Gold prices are at approximately $450 an ounce today, which is approximately 50% higher than they were in 1998.

The enclosed analyses, which factor into the evaluation our CWA § 402 and 404 statutory authorities and our Clean Air Act § 309 review authority, explain our rationale in more detail.

EPA requests that our preferences, justification, and the enclosed analyses of the environmentally preferable and preferred alternatives be included in the FSEIS to meet our NEPA compliance requirements and for purposes of public disclosure. Also, pursuant to paragraph C.8 of the Memorandum of Agreement (MOU) executed on July 29, 2003, EPA requests an opportunity to review the environmentally preferable and preferred alternatives discussion in the FSEIS prior to publication. If the Forest Service decides not to include our analyses in the FSEIS, then we request a written response with an explanation of your reasoning, as provided in the MOU (¶ C.4).

EPA appreciates all the hard work and dedication of the agencies and staff toward this project. Please feel free to contact me at (206) 553-7151 if you have any questions or would like to discuss this letter. If you would like to arrange a meeting, please have your staff contact Hanh Gold of my staff at (206) 553-0171.

Sincerely,

Michael F. Gearheard
Director
Office of Water and Watersheds

Enclosures

cc:     Ed Fogels, ADNR
        John Leeds, U.S. Army Corps of Engineers
        Aleria Jensen, NOAA Fisheries

**Kensington Gold Project**
**U.S. Environmental Protection Agency**
**Environmentally Preferable and Preferred Alternative Analyses**

## INTRODUCTION

This purpose of this analyses is to determine EPA's environmentally preferable and preferred alternatives for the Kensington Gold Project Supplemental Environmental Impact Statement (SEIS). The analyses are based on discussions among the U.S. Forest Service, the U.S. Army Corps of Engineers, NOAA Fisheries, the U.S. Fish and Wildlife Service, the Alaska Department of Natural Resources, and the Alaska Department of Environmental Conservation. EPA participated with those agencies in a collaborative process designed to achieve consensus on an environmentally preferable alternative, and thereafter a preferred alternative. As part of that process, the agencies identified various resources impacted by the alternatives identified in the Preliminary Final SEIS (PFSEIS, September 2004). The alternatives are summarized in Table 1. The agencies reached a general consensus, at staff level, on the degree of impact on each resource for each alternative, and also agreed on relative importance, or weighting, of each of the resource impacts (Table 2).

For the environmentally preferable analysis, EPA considered the list of affected resources described in Table 2. The three categories listed correspond to the resource impacts given maximum weight (called "maximum resource considerations"), those given medium weight ("medium resource considerations"), and those given minimum weight ("minimum resource considerations"). The specific resource considerations listed in each category correspond either to one resource impact that the agencies identified, or to a small group of closely related impacts.

For each resource consideration, the environmentally preferable alternative analysis below uses the degree of impact to which the agencies' staff agreed ("low," "moderate," "high," etc.).

# DESCRIPTION OF ALTERNATIVES

## Table 1 - Description of Alternatives

| Alternative | A | A1* | B (Proposed Alternative) | C | D |
|---|---|---|---|---|---|
| Alternative Description | 1998 permitted project | Same as A w/ reduced mining rate | Recycle process water; no treatment of TSF effluent | Same as B except with no recycle | Same as B except with treatment of TSF effluent by reverse osmosis and capping of the sediment post-operation |
| Tailings Disposal | DTF<br><br>20 million tons; 25% backfilled | DTF<br><br>4.5 million tons; 40% backfilled | Lower Slate Lake TSF<br><br>4.5 million tons; 40% backfilled | Lower Slate Lake TSF<br><br>4.5 million tons; 40% backfilled | Lower Slate Lake TSF<br><br>4.5 million tons; 40% backfilled |
| Diversion | Stormwater diversion around DTF | Stormwater diversion around DTF | No diversion | Ditch diversion around TSF- would require damming of Upper Slate Lake and raising water level 20 ft. to allow gravity flow | Pipeline diversion around TSF- would require dam in Mid-lake East Fork Slate Creek |
| Access/Marine Facilities | On-site housing; workers transported by helicopter (12 RT per week); marine terminal at Comet Beach | Same as A | No on-site housing; daily crew shuttle between marine terminals at Cascade Point and Slate Creek Cove (4 RT per day) | Same as B except daily crew shuttle service between Echo Cove and Slate Creek Cove; no landing craft ramp at Slate Creek Cove | Same as B |

* Alternative A1 was not evaluated in the environmentally preferable alternative analysis. Instead, mine expansion considerations and potential environmental impacts were incorporated into the evaluation of Alternatives B, C, and D.

DTF - drystack tailings facility
TSF - tailings storage facility
RT - round trip
CFS - cubic foot per second
gpm - gallons per minute

# ENVIRONMENTALLY PREFERABLE ALTERNATIVE ANALYSIS

## Table 2 - Environmentally Preferable Alternative Evaluation by Resource

| RESOURCE | Alt. A | Alt. B | Alt. C | Alt. D | WEIGHTING |
|---|---|---|---|---|---|
| Air | X | X | X | X | |
| **Geotechnical** | | | | | |
| Probability of tailings disposal facility failure | Low | Low | Low | Low | Minimum |
| Consequence of tailings disposal facility failure | Low and short-term | High and mid- to long-term | High and mid- to long-term | High and mid- to long-term | Minimum |
| **Surface Water Hydrology** | | | | | |
| Instream flow | Meets instream flow requirements | Does not always meet instream flow requirements | Meets instream flow requirements | Meets instream flow requirements | |
| Potential sediment production | X | X | X | X | |
| **Surface Water Quality (Fresh Water)** | | | | | |
| Effluent quality | Meets NPDES permit limits | Does not meet NPDES permit limits | Does not meet NPDES permit limits | Meets NPDES permit limits | Maximum |
| Fuel spill probability | Low | Lower | Lower | Lower | Minimum |
| Fuel spill volume | High | Low | Low | Low | Minimum |
| Fuel spill consequence | High | High | High | High | Minimum |
| **Groundwater Hydrology** | X | X | X | X | |
| **Groundwater Quality** | X | X | X | X | |
| **Aquatic Resources (Freshwater)** | | | | | |
| Short-term habitat loss | Low | High | Highest | High | Medium |
| Long-term habitat loss | None | Low (Moderate)* | Low (Moderate)* | Very Low (Moderate)* | Medium |
| Dolly Varden char loss | 100-200 | 1000 (2,380) | 1000 (2,380) | 1000 (2,380) | Minimum (Medium) |
| **Marine Resources** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Herring habitat loss short-term | None | High | Low | High | Maximum |
| Herring habitat loss long-term | None | High | Low | High | Maximum |
| Marine mammals | Very Low | High | Moderate | High | Maximum |
| Birds | Low | High/ Seasonal | High/ Seasonal | High/ Seasonal | Maximum |
| Spill probability | Moderate | Low | Low | Low | Maximum |
| Spill volume | High [880 gallons] | Low [20 gallons] | Low [20 gallons] | Low [20 gallons] | Maximum |
| Spill consequences | Low | High | Moderate | High | Maximum |
| **Wildlife** | Mountain goats - Moderate; Others-Low | Low (Geese-Moderate) | Low (Geese-Moderate) | Low (Geese-Moderate) | Minimum |
| **Acres of Disturbance/% Watershed** | 268 acres/ 3.0% | 195 acres/ 2.1% | 215 acres/ 2.2% | 197 acres/ 2.1% | |
| **Vegetation (Productive old growth [POG]/% POG)** | 135 acres/ 1.6% | 140 acres/ 1.7% | 149 acres/ 1.8% | 142 acres/ 1.7% | |
| **Wetlands** | | | | | |
| Wetlands - On land (acres/type)** | 265.8 [mostly forested, no palustrine emergent] | 90.9 [9.6 palustrine emergent; 20 lacustrine] | 111.3 [15 palustrine emergent; 20 lacustrine] | 92.8 [9.8 palustrine emergent; 20 lacustrine] | Maximum |
| Wetlands - Marine (acres) | 2.3 | 33.3 | 38.2 | 33.5 | Minimum |
| **Visual (short-term)** | High | Low-Moderate | Low-Moderate | Low-Moderate | Medium |
| **Visual (long-term)** | Low | Low-Moderate | Low-Moderate | Low-Moderate | Medium |
| **Recreation*** | Low-Moderate | Moderate | High | Moderate | Medium |
| **Cultural Resources** | X | X | X | X | |

( ) = cumulative impacts from mine expansion
X = no impacts of consequence
* Small risk of restoration failure
** Table 4-22 of PFSEIS
*** There was some disagreement among the agencies as to whether recreation should be considered in the evaluation of the environmentally preferable alternative.

4

**Alternatives B vs. D**

While Alternative B is nearly identical to Alternative D, Alternative B cannot be the environmentally preferable alternative because the differences between the two alternatives all favor D over B. Three main considerations lead to this conclusion. First, D would meet NPDES requirements and B would not, because of B's lack of wastewater treatment. B also lacks a diversion, which would increase the volume of wastewater being discharged. Second, B would not always meet in-stream flow requirements for Slate Creek because of the lack of the diversion (which is a feature of D). Third, D would better ensure long-term protection of habitat and water quality of Lower Slate Lake because of the tailings cap. Alternative B has no environmental advantages over D and is eliminated from further analysis.

**Alternatives A vs. C**

<u>Maximum Resource Considerations</u>:

Effluent quality considerations favor Alternative A because its effluent would meet NPDES requirements, while effluent quality from Alternative C would not.

Setting aside fuel spills, marine resource considerations all favor A as well, taking into account herring habitat loss (none for A, low for C), marine mammal impacts (very low for A, medium for C), and impacts on birds (low for A, seasonally high for C).

Marine fuel spills involve a tradeoff. Alternative A has a higher spill probability and volume, but a lower impact due to less sensitive receiving environment in Lynn Canal as compared to Berner's Bay. In EPA's view, this consideration favors A because while it is reasonable to expect that over the life of the mine, there may be more spills under alternative A than C, the total number of spills would likely be small or zero in either case, but the impacts would be more significant under Alternative C. This seems to favor Alternative A from this standpoint.

Freshwater wetlands impacts also involve a tradeoff. Alternative A would impact over twice as many acres of wetlands overall (265.8 acres for A compared to 111.3 acres for C), but most are forested or scrub-shrub wetlands. While C affects fewer acres overall, it would affect 20 acres of lacustrine wetland and 15 acres of palustrine emergent wetlands (compared to none for A). EPA believes that forested wetlands are far more plentiful, and of far less ecological value at this location, than lacustrine and palustrine emergent wetlands, which are rare and ecologically important at this location. For that reason, EPA believes that this consideration favors Alternative A from an environmental perspective, though EPA recognizes that this consideration involves tradeoffs between the two alternatives.

In weighing these considerations against one another, the NPDES problems seem to

weigh heavily against C, and the marine considerations other than spills also strongly favor A. The marine spills considerations involve tradeoffs and do not seem to cut strongly either way; on balance we believe they favor A, but less strongly than the prior two considerations. The fresh water wetlands considerations also involve tradeoffs. While one could make a case for C based on the numbers of acres impacted, we believe the consideration of the type of wetlands impacted by the options makes it a much closer question, tilting in favor of A in our opinion but less decisively than the first two considerations. Overall, all of these factors either strongly favor A, or are closer calls that one could argue either way but which we believe favor A as well.

Medium Resource Considerations:

Impacts to fresh water aquatic resources all favor A over C. This includes short term habitat loss, long-term habitat loss,[1] and Dolly Varden char loss (100-200 fish for A, 1000-2380 fish for C[2]).

Visual impacts involve a tradeoff. Short-term impacts favor C because the dry stack facility would not be vegetated in the short-term, while long term impacts favor A due to revegetation of the tailings facility post-operation. The marine terminals in Berner's Bay (Echo Cove and Slate Creek Cove) would be permanently visible. Overall, long-term impacts seem more significant because they will be essentially permanent rather than temporary.

Recreation impacts favor A. There is some disagreement as to whether this is an environmental consideration, but from EPA's perspective, the 404 (b)(1) guidelines require consideration of affects on water-related recreation and aesthetics. Recreation and visual impacts are getting at largely the same considerations, and both should be taken into account in determining the environmentally preferred alternative. We note that recreation was one of the three main issues identified during the public NEPA scoping process.

Overall, these factors either clearly favor A (fresh water resources) or involved tradeoffs that weakly favor A but we recognize could be argued either way. Whatever the conclusion regarding the visual and recreational impacts, it appears to EPA that on balance these factors favor A, given the clear advantages in the area of fresh water aquatic resources.

Minimum Resource Considerations:

The impacts of a tailings disposal facility failure are more adverse for Alternative C than A. In both cases, the probability of failure is low, but for Alternative A the consequences are low

---

[1] The impact is low based on the proposed mine size in alternative C, but medium taking into account cumulative impacts from reasonably foreseeable mine expansion.

[2] 1000 fish lost as currently proposed, 2380 lost based on cumulative impacts from mine expansion.

and short term, whereas for Alternative C they are high and mid- to long-term.

The risks of a freshwater fuel spill favor Alternative C over Alternative A because the spill risk is lower for C, and the volume that would be spilled is much lower for C than A, though the consequences of a spill are comparable for the two alternatives.

Wildlife concerns favor Alternative C over A (moderate versus low), but only because C assumes a smaller mine than A assumed. If, for Alternative C, we take into account the cumulative impacts of continuing to develop the mine to its originally proposed size, as is assumed for Alternative A, then the wildlife impacts are comparable.

Marine wetlands considerations favor Alternative A because it would disturb only 2.3 acres, versus 38.2 acres for Alternative C.

Overall, these factors do not strongly favor either alternative. Two of the factors (tailings facility failure and marine wetlands impacts) favor A, one (freshwater fuel spills) favors C, and the remaining factor (wildlife impacts) either favors C or is a wash. All of these factors are of relatively minimum significance, and since they do not all favor the same alternative, they do not seem to affect the analysis based on the more heavily weighted factors.

Conclusion:

All of the maximum or medium environmental considerations favor Alternative A over Alternative C or are neutral. The only consideration favoring C over a is the risk from freshwater fuel spills, a minimum factor, which is balanced by other minimum factors favoring Alternative A. Overall, Alternative A is environmentally preferable to Alternative C.

**Alternatives A vs. D**

Maximum Resource Considerations:

Both alternatives would meet NPDES requirements, so effluent quality does not favor either alternative.

Marine resource impacts excluding fuel spills all favor A over D even more strongly than they favor A over C (as discussed above). Alternative D involves higher herring habitat loss than Alternative C, compared to no impacts for Alternative A. Marine mammal impacts are very low for A, but are medium for C and significantly higher still for D. Impacts on birds are seasonally high for D (as they are for C), and very low for A. Overall, adverse effects on marine resources are much higher for Alternative D than they are for Alternative A.

Fuel spills are more likely, and also likely to involve larger volumes, under Alternative A as compared to Alternative D. However, the environmental consequences would be much

7

greater under D than A because of the sensitivity of the ecosystem in Berner's Bay compared to Lynn Canal. This is similar to the comparison of Alternatives A and C, except that the ecological sensitivity is even higher for Alternative D than C because even within Berner's Bay, Cascade Point is a much more ecologically sensitive area than Echo Cove. Because spill likelihood is relatively low under either alternative, but the consequences much more severe under Alternative D, EPA believes that the risk of fuel spills favors Alternative A over D from an environmental standpoint.

Regarding impacts to fresh water wetlands, the comparison between Alternatives A and D is similar to that discussed above for A and C, except that Alternative D impacts slightly fewer forested wetlands, and about 2/3 the number of palustrine emergent wetlands (9.8 acres for D, compared to 15 acres for C). For the same reasons discussed above for A vs. C, EPA believes that the 9.8 acres of palustrine emergent wetlands affected by Alternative D (compared to none for Alternative A) outweigh in ecological significance the fact that Alternative A impacts more forested wetlands than Alternative D (265.8 acres for A compared to 92.8 acres for D). Therefore, this consideration favors Alternative A from an environmental standpoint.

Overall, the marine impacts strongly favor Alternative A over D, while fresh water wetlands impacts weakly favor A and the effluent quality is neutral. These considerations as a group therefore favor Alternative A.

Medium Resource Considerations:

Impacts to fresh water aquatic resources all favor A over D, for the same reasons that they favor A over C, as discussed above, but less strongly since the impacts from D are slightly less than those from C. Short term habitat loss is less for D than C, but still greater than A. Long-term habitat loss is lower for D than C, but there is none under Alternative A. Dolly Varden char loss is the same for D as it is for C (1000-2380 fish[3]), compared to 100-200 fish for A.

Visual impacts are the same for Alternatives C and D, so the discussion above applies. Short-term impacts favor D, while long term impacts favor A. Overall, long-term impacts seem more significant because they will be essentially permanent rather than temporary.

Recreation impacts favor A over D, but less strongly than they favor A over C.

Overall, these considerations each favor A over D or are neutral.

Minimum Resource Considerations:

All of the considerations in this category are identical for Alternatives C and D, except

---

[3] 1000 fish lost as currently proposed, 2380 lost based on cumulative impacts from mine expansion.

for marine wetlands impacts. Marine wetlands impacts are nearly the same for Alternatives C and D, however (38.2 acres affected versus 33.5 acres), and for both alternatives are significantly greater than the impacts for Alternative A (2.3 acres impacted). For these factors, therefore, the comparison between Alternatives A and D is essentially the same as it is for Alternatives A and C, and for the reasons discussed above, these factors do not strongly favor either alternative, and do not change the analysis from the more significant considerations discussed previously.

Conclusion:

As for the comparison between Alternatives A and D, all of the maximum or medium environmental considerations favor Alternative A over Alternative D or are neutral. The only consideration favoring D over A is the risk from freshwater fuel spills, a minimum factor, which is balanced by other minimum factors favoring Alternative A. Overall, Alternative A is environmentally preferable to Alternative D.

**Alternatives A vs. CD Composite**

Alternatives B, C and D each contain environmental advantages and disadvantages compared to one another that could just as easily be recombined into a new composite alternative that contains the environmental advantages of each. There is no reason that the advantages of these to alternatives cannot be combined; they were distributed among those two alternatives simply for ease of analysis. To be specific, a composite alternative could involve NPDES treatment (as provided in Alternative D, but not B or C), dock facilities in Echo Cove rather than Cascade Point (as in Alternative C, but not B or D), and sediment capping (as in Alternative D, but not B or C). For discussion purposes, this composite alternative will be referred to as "CD."

Maximum Resource Considerations:

Both Alternatives A and CD will meet NPDES requirements, so that consideration is neutral as between these alternatives.

Marine impacts other than fuel spills are the same as discussed in the comparison between Alternatives A and C, because CD incorporates the Echo Cove location as in Alternative C. As discussed above, this consideration favors Alternative A over CD.

Marine impacts from the risk of fuel spills are also as discussed in the comparison between Alternatives A and C, since CD takes its marine configuration from Alternative C. As discussed above, this consideration weakly favors Alternative A over CD.

Impacts to fresh water wetlands are as discussed above in the comparison between Alternatives A and D, since CD incorporates the wetlands-related configuration from Alternative D. For the reasons discussed above, this consideration favors Alternative A over CD.

Overall, these maximum considerations all either clearly favor A (non-spill marine impacts), or weakly favor A or are neutral.

Medium Resource Considerations:

Impacts to fresh water aquatic resources are as discussed above in the comparison between Alternatives A and D, since CD incorporates the fresh water-related configuration from Alternative D. For the reasons discussed above, this consideration favors Alternative A over D.

Visual impacts are the same for Alternatives C and D, so the visual impacts discussion in both of the above comparisons applies. Short-term impacts favor CD, while long term impacts favor A. Overall, long-term impacts seem more significant because they will be essentially permanent rather than temporary.

Recreation impacts of Alternative CD are the same as those for Alternative C, so the discussion of recreation impacts in the comparison between Alternatives A and C applies here. For the reasons explained above, recreation considerations favor Alternative A over CD. There is some disagreement as to whether recreation is an environmental consideration, but it seems to EPA staff that recreation and visual impacts are getting at largely the same considerations, and both should be taken into account in determining the environmentally preferred alternative. We note that recreation was one of the three main issues identified during the public NEPA scoping process.

Overall, these considerations each favor Alternative A over CD or are neutral.

Minimum Resource Considerations:

All of the considerations in this category are identical for Alternatives C and D, and therefore for CD as well, except for marine wetlands impacts. The marine wetlands impacts for CD are the same as for Alternative C. So all of the minimum resource considerations for Alternative CD are the same as for Alternative C, and the comparison of minimum resource considerations for Alternatives A and C applies here in the comparison between Alternatives A and CD. For the reasons discussed in the comparison between Alternatives A and C, these factors do not strongly favor either alternative, and since they do not all favor the same alternative, they do not seem to affect the analysis based on the more heavily weighted factors.

Conclusion:

All of the maximum or medium environmental considerations favor Alternative A over Alternative CD or are neutral. The only consideration favoring CD over A is the risk from freshwater fuel spills, a minimum factor, which is balanced by other minimum factors favoring Alternative A. Overall, Alternative A is environmentally preferable to Alternative CD.

**PREFERRED ALTERNATIVE ANALYSIS**

The Council on Environmental quality (CEQ) Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations defines the "agency's preferred alternative" as "the alternative which the agency believes would fulfill its statutory mission and responsibilities, giving consideration to economic, environmental, technical and other factors." EPA's "statutory mission and responsibilities" in this case include NPDES permitting under CWA § 402, and review of the Corps of Engineers' application of the CWA § 404(b)(1) guidelines to this project in the CWA § 404 permitting action.

The EPA's mission, generally, is primarily environmental protection. The Congressional declaration of the goals and policy underlying the CWA is set forth in CWA § 101, and its focus is entirely on the prevention of pollution and degradation, and the restoration, of the nation's waters. For example, the CWA § 101(a)(3) states, "It is the national policy that the discharge of toxic pollutants in toxic amounts be prohibited." The § 404(b)(1) guidelines, however, do incorporate the concept of the practicability of particular alternatives, in that they require the permitting under CWA § 404 only of the "least environmentally damaging *practicable* alternative" (emphasis added), also known as the LEDPA.

The project proponent, Coeur Alaska, has asserted that Alternative A is not *practicable*. In EPA's view, however, the information submitted to date is not adequate to establish that Alternative A is not a practicable alternative. In June 1996, when the applicant submitted a revised plan of operations, gold prices were at approximately $390 an ounce. In 1998, Alternative A, in the form proposed by the applicant, was fully permitted by all the relevant federal and state agencies (including EPA, the U.S. Army Corps of Engineers, USFS, ADNR, and ADEC), gold prices were around $300 an ounce. Gold prices are at approximately $450 an ounce today, which is approximately 50% higher than they were in 1998. Based on the current gold prices, we cannot conclude that Alternative A is not practicable.

In selecting an Environmentally Preferable Alternative, EPA concluded that Alternative A is the least environmentally damaging alternative. Since Alternative A, based on the current record, appears to be practicable, it appears to be the LEDPA as well, and therefore the only alternative that may be permitted under CWA § 404.

The 404 (b)(1) guidelines also prohibit significant degradation of waters of the U.S. The Corps of Engineers previously determined that Alternative A would not cause or contribute to significant degradation of waters of the U.S. when they permitted the project in 1998. While Alternative D attempts to address significant degradation of Lower Slate Lake by capping the tailings, it does not entirely avoid significant degradation because of the permanent loss of the natural Lower Slate Lake ecosystem. Alternative D is also inconsistent with the national policy mandated by the Clean Water Act to prohibit the discharge of toxic pollutants in toxic amounts.

Alternative A is EPA's Preferred Alternative because, based on the current record, it

11

appears that: (1) it is the environmentally preferable alternative, (2) it is the least environmentally damaging practicable alternative, (3) it is the only alternative that avoids significant degradation, and (4) it is the only alternative that is consistent with the national policy that prohibits the discharge of toxic pollutants in toxic amounts.