U.S. Department of the Interior

93d Congress } 
1st Session }    **COMMITTEE PRINT**    1 9 JUL 1979

# A LEGISLATIVE HISTORY OF THE WATER POLLUTION CONTROL ACT AMENDMENTS OF 1972

TOGETHER WITH

## A SECTION-BY-SECTION INDEX

PREPARED BY THE

### ENVIRONMENTAL POLICY DIVISION

OF THE

### CONGRESSIONAL RESEARCH SERVICE

OF THE

### LIBRARY OF CONGRESS

———

## VOLUME 1

———



### JANUARY 1973

———

### SERIAL NO. 93–1

———

Printed for the use of the Committee on Public Works

———

U.S. GOVERNMENT PRINTING OFFICE

87-313 O            WASHINGTON : 1973

For sale by the Superintendent of Documents, U.S. Government Printing Office
Washington, D.C. 20402

**Exhibit 17, page 1 of 30**

# CONTENTS

## VOLUME I

|  | Page |
|---|---|
| Chapter I: Public Law 92–500, the Federal Water Pollution Control Act Amendments of 1972 | 1 |
| Chapter II: The Veto: Message and debates: |  |
| House debate | 95 |
| Senate debate | 115 |
| Veto message | 137 |
| Letters from Senator Edmund S. Muskie and William D. Ruckelshaus urging approval | 141 |
| Chapter III: Conference report and debates: |  |
| Senate consideration of the conference report | 161 |
| House consideration of the conference report | 225 |
| Conference report | 281 |
| Chapter IV: H.R. 11896 together with debate and report: |  |
| House debate: |  |
| March 27, 1972 | 343 |
| March 28, 1972 | 507 |
| March 29, 1972 | 610 |
| Report | 753 |
| H.R. 11896 | 893 |

Note: The section-by-section index may be found on p. 1729, volume II.

(v)

| 92D CONGRESS<br>2d Session | } | SENATE | { | REPORT<br>No. 92–1236 |

# FEDERAL WATER POLLUTION CONTROL ACT AMENDMENTS OF 1972

SEPTEMBER 28, 1972.—Ordered to be printed

Mr. MUSKIE, from the committee of conference, submitted the following

## CONFERENCE REPORT

[To accompany S. 2770]

(281)

Exhibit 17, page 3 of 30

Before issuing such a permit, the Administrator is required to establish guidelines, within 180 days after enactment of the Act, on the effect of disposal of pollutants on human health and welfare, on marine life, and on recreational and economic values, as well as guidelines for determining the persistence of the pollutant and other possible locations for its disposal.

### House amendment

Section 403 is essentially the same as the Senate bill except that prior to the promulgation of guidelines during the 180-day period after the date of enactment of the Act the Administrator can issue permits for these discharges while the Senate bill does not permit permits to be issued during this period prior to the issuance of such guidelines.

### Conference substitute

This is the same as the Senate bill and the House amendment, except that subsection (a) is amended to authorize, prior to the promulgation of guidelines, a permit to be issued under section 402 if the Administrator determines it to be in the public interest.

#### PERMITS FOR DREDGED OR FILL MATERIAL

### Senate bill

Section 402(m) of the Senate bill provided a procedure for the issuance of permits for the discharge of dredged spoil.

### House amendment

Section 404 establishes a separate permit program for the discharge of dredged or fill material into the navigable waters. This program would be administered by the Secretary of the Army, acting through the Chief of Engineers. A determination is required that the discharge would not unreasonably degrade or endanger human health, welfare, or amenities or the marine environment, ecological systems, or economic potentialities.

### Conference substitute

Section 404 of the conference substitute is a substitute for that provision in the House amendment.

Subsection (a) authorizes the Secretary of the Army, acting through the Chief of Engineers, to issue permits, after notice and opportunity for public hearings, for the discharge of dredged or fill material into the navigable waters at specified disposal sites.

Subsection (b) provides that, subject to subsection (c), each such disposal site shall be specified for each such permit by the Secretary of the Army (1) through the application of guidelines developed by the Administrator, in conjunction with the Secretary of the Army, which guidelines shall be based on criteria comparable to that applicable to the territorial seas, the contiguous zone in the ocean under section 403(c), and (2) whenever these guidelines alone would prohibit specification of a site, through the application additionally of the economic impact of the site on navigation and anchorage.

Subsection (c) authorizes the Administrator to prohibit the specification (including the withdrawal of specification of any defined area as a disposal site) and he is authorized to deny or restrict the use of any defined area for specification as a disposal site (including

141

**Exhibit 17, page 4 of 30**

93d Congress }
1st Session  }    COMMITTEE PRINT    1 9 JUL 1979

# A LEGISLATIVE HISTORY OF THE WATER POLLUTION CONTROL ACT AMENDMENTS OF 1972

TOGETHER WITH

## A SECTION-BY-SECTION INDEX

PREPARED BY THE

### ENVIRONMENTAL POLICY DIVISION

OF THE

### CONGRESSIONAL RESEARCH SERVICE

OF THE

### LIBRARY OF CONGRESS

---

VOLUME 2

---



JANUARY 1973

---

SERIAL NO. 93-1

---

Printed for the use of the Committee on Public Works

---

U.S. GOVERNMENT PRINTING OFFICE

87-313 O    WASHINGTON : 1973

For sale by the Superintendent of Documents
U.S. Government Printing Office, Washington, D.C. 20402
Price $3.70 domestic postpaid or $3.25 GPO Bookstore
Stock Number 5270-01767

Exhibit 17, page 5 of 30

# CONTENTS

## VOLUME 2

Page

Chapter V: Administration testimony during hearings on H.R. 11896, Committee on Public Works, House of Representatives, December 7, 1972 _____ 1111

Chapter VI: S. 2770 together with debate and report:
    Senate debate_____ 1253
    Senate report_____ 1415
    S. 2770_____ 1534

Comparison of sections of Public Law 92–500, S. 2770, and prior existing law _____ 1725

Section-by-section index_____ 1729

(III)

## SENATE DEBATE ON S. 2770, NOVEMBER 2, 1971

Mr. MUSKIE. This country once was famous for its rivers. In songs and poems and stories, Americans gloried in the now-quiet, now-roaring reaches of the river waters. A vigorous people, following their rivers to the oceans and beyond, built along the riverbanks a strong and productive economy.

But today, the rivers of this country serve as little more than sewers to the seas. Wastes from cities and towns, from farms and forests, from mining and manufacturing, foul the streams, poison the estuaries, threaten the life of the ocean depths. The danger to health, the environmental damage, the economic loss can be anywhere.

Just a 10-minute walk from this Chamber, the Potomac River is a hazard to health. The Georgetown Gap in the District of Columbia's sewer pipelines allows 15 million gallons of raw sewage to pour into the river every day.

A Federal biologist, speaking of mercury, says he can find no chemical potentially worse for man. Mercury is toxic. It is cumulative. It is persistent. While the biologist speaks, a factory discharges into the Detroit River a daily dose of 10 to 20 pounds of mercury.

In a single day, 10 million fish die in a Florida bay. It is not the first fish kill in the bay, and it is known that wastes are dumped into its waters, but the cause of death is given as a lack of oxygen in the bay.

An oil spill releases more than 700 tons of fuel oil into the waters off the Massachusetts coast. Later, scientists using a dredge find that more than 90 percent of the organisms brought up from the bottom in the area of the spill are dead or dying.

In 1969, the Council on Environmental Quality reports, nearly a fourth of this country's shellfish crop could not be harvested. The men and women who make their living from the shellfish crop suffered an economic loss of more than $60 million.

Industries also suffer economic loss. The value of lead washed down the rivers into the oceans every year is estimated at nearly $600 million. The copper lost through discharge into the rivers, if reclaimed and reused, would be worth $5 billion a year.

Mr. President, these are only a sampling of the symptoms. The Committee on Public Works, after 2 years of study of the Federal water pollution control program, concludes that the national effort to abate and control water pollution is inadequate in every vital aspect.

Many of the Nation's navigable waters are severely polluted, and major waterways near the industrial and urban areas are unfit for any purpose;

Rivers are the primary sources of pollution of coastal waters and the oceans, and many lakes and confined waterways are aging rapidly under the impact of increased pollution;

(1253)

Rivers, lakes, and streams are being used to dispose of man's wastes rather than to support man's life and health; and

The use of any river, lake, stream, or ocean as a waste treatment system is unacceptable.

The committee believes the country should move now to restore and maintain the natural chemical, physical, and biological integrity of the Nation's waters. To achieve this objective, the committee recommends that the following be adopted as national policy [**Section 101**]:

The discharge of pollutants into the navigable waters be eliminated by 1985;

An interim goal of water quality be achieved by 1981 to provide for the propagation of fish, shellfish, and wildlife, and for recreation in and on the water;

The discharge of toxic pollutants in toxic amounts be prohibited;

Federal grant assistance be provided to any community which constructs a waste treatment facility which is consistent with the program set forth by the Congress;

A major research and demonstration effort be initiated to find the technological methods necessary to eliminate waste discharges; and

Regional waste management treatment programs be developed and implemented to assure adequate control of all sources of pollution in each State.

The legislation recommended by the committee proposes a major change in the enforcement mechanism—from water quality standards to effluent limits—of the Federal water pollution control program.

Under the 1965 act, water quality standards were to be set as the control mechanism. States were to decide the uses of water to be protected, the kinds and amounts of pollutants to be permitted, the degree of pollution abatement to be required, the time to be allowed a polluter for abatement.

The water quality standards program is limited in its success. After 5 years, many States do not have approved standards. Officials are still working to establish relationships between pollutants and water uses. Time schedules for abatement are slipping away because of failure to enforce, lack of effluent controls, and disputes over Federal-State standards.

The committee recommends the change to effluent limits as the best available mechanism to control water pollution. With effluent limits, the Administrator can require the best control technology: He need not search for a precise link between pollution and water quality.

With this recommendation, the committee intends no criticism of the States in which water quality standards are approved nor of the State officials whose programs are superior in many respects to the Federal water pollution control program.

To the contrary, it is the committee's intent to restore the balance of Federal-State effort in the program as contemplated by the 1965 and 1966 acts. The committee is particularly concerned that there shall be a balanced effort in the discharge permit system initiated under section 13 of the 1899 Refuse Act.

*NOTE.—References in the text in this chapter are to S. 2770 as reported (see pp. 1534–1723).

1255

The permits system establishes a direct link between the Federal Government and each source of discharge into the navigable waters. But the permit system exists independently from the Federal-State program set up by the 1965 act: The dual controls are incomplete and contribute to uncertainty among all concerned.

The permit system, as restated by this legislation, prohibits the discharge of pollutants into the navigable waters. The Federal Administrator is responsible for control of any discharges of pollutants; he must move against the polluters.

The legislation will restore Federal-State balance to the permit system. Those States whose own programs are superior will be allowed to administer the permit system.

The most inspiring defense of the procedures set forth in the bill appears in a University of Pennsylvania law review article by Prof. William H. Rodgers, Jr., of the University of Washington, in which he states:

EPA can exercise a preventive authority it has never before enjoyed. There will be no more prerequisites to action that pollution in one state must cause health hazards in another. No more obligations to prove that the fish kill near the chemical plant actually was caused by the suspected culprit. No more useless two million dollar studies proving that sulfite waste liquor harms oysters. . . . Instead, EPA, acting with the approval of the corps, can specify necessary studies, treatment, and monitoring precautions as a condition to the permit. It can insist upon the non-degradation and best-technology principles now virtually ignored. It can in short, reclaim much of the authority it has been denied under the Federal Water Pollution Control Act.

### HISTORY

Let me now review briefly how the committee arrived at the recommendations contained in this legislation. As Senators know, Federal legislation in the field of water pollution control has been keyed primarily to an important principle of public policy: the States shall lead the national effort to prevent, control, and abate water pollution. As a corollary, the Federal role has been limited to support of, and assistance to, the States.

Given these basic provisions, State and Federal efforts in water pollution control went forward with little legislative changes for nearly 10 years after 1948. It was a period of transition. To most Americans, the problems of water pollution control appeared to be localized and moderate.

In 1956, the Congress approved the first major legislative changes in the water pollution control program. Federal grants were authorized to assist States in preparing plans for pollution control and to help localities in building treatment plants. The authority for research and technical assistance was increased and broadened. Measures for controlling pollution of interstate waters were tightened.

In 1965, the Congress approved a second set of major legislative decisions for the water pollution control program. For the purpose of the pending legislation, perhaps the most important among these decisions were the assignment of a new responsibility to the States, the continued use of a 1948 enforcement procedure, and the establishment of a new agency to administer the Federal portion of the program.

**Exhibit 17, page 9 of 30**

1386

NOT VOTING—8

| Goldwater | Metcalf | Taft |
|-----------|---------|------|
| Gurney | Mundt | Thurmond |
| Inouye | Scott | |

So Mr. Boggs' amendment was rejected.

Mr. ELLENDER. Mr. President, I send an amendment to the desk and ask for its immediate consideration.

The PRESIDING OFFICER. The amendment will be stated.

The assistant legislative clerk read as follows:

At page 161, between lines 7 and 8 add new section:
"Sec. 404. (a) The Secretary of the Army may issue permits, after notice and opportunity for public hearing, for the discharge of dredged materials into the navigable waters at specified disposal sites.

(b) In identifying disposal sites for the purposes of subsection (a), the Secretary shall apply the criteria established pursuant to subsection(c)(1) of section 403 together with an evaluation of the impact of such sites on navigation and anchorage. In applying such criteria, the Secretary in cooperation with the Administrator, shall determine those sites which would not adversely affect shellfish beds, fisheries (including spawning and breeding areas) or recreation areas."

Mr. ELLENDER. Mr. President, this is a very simple amendment, and should not take long to explain.

It simply retains the authority of the Secretary of the Army to issue permits for the disposal of dredged materials. This is essential since the Secretary of the Army is responsible for maintaining and improving the navigable waters of the United States.

One of the main deficiencies of this bill is that it treats dredged materials the same as industrial waste, sewage, sludge, or refuse introduced into a river system, lake estuary or ocean. The disposal of dredged material does not involve the introduction of new pollutants; it merely moves the material from one location to another. If polluted discharges from municipal and industrial sources are controlled as required by this bill, the disposal of dredged material in open water presents no significant problem.

There is no competent evidence to show that there is any increase in pollution or permanent effect on the marine environment in and adjacent to open water disposal areas resulting from typical dredged materials. Studies conducted by the Government show that there is no measurable effect.

The River and Harbor Act of 1970 authorized the construction of diked disposal areas for those Great Lakes harbors which are heavily polluted, and authorized a study of the characteristics of dredged spoil, and alternate methods of its disposal, including the effect of such disposal on water quality. The Public Works Appropriations Act for fiscal year 1972 included $30 million to initiate construction of the diked disposal areas for some 30 Great Lakes harbors. The authorized study of the characteristics of the spoil material has not been completed, and it would be unreasonable to place unjustified restrictions on the disposal of such materials.

The bill under consideration extends the authority of the corps to construct similar diked disposal areas in other parts of the country where found necessary.

The amendment which I propose requires that the Secretary of the Army apply the criteria established pursuant to **subsection (c)** of **section 403**, together with an evaluation of the impact of such sites on navigation and anchorage. It further requires that, in applying such criteria, the Secretary in cooperation with the Administrator shall determine those sites which would not adversely affect shellfish beds, fisheries—including spawning and breeding areas—or recreation areas.

The principal difference is that the permit authority remains with the Secretary of the Army who has the responsibility for maintaining and improving the navigable waters of the United States rather than placing this responsibility on the Administrator. As I have just pointed out, the Secretary must follow the same criteria as the Administrator. The bill, as reported, would in effect give the Environmental Protection Agency a veto power over the spoil disposal areas required for construction and maintenance of all navigation projects. The Secretary of the Army will not be obligated to require strict compliance with the effluent requirements established by the Environmental Protection Agency in issuing permits. The strict adherence to the published standards would result in 90 percent of the ports and harbors of the United States being closed, until such time as land disposal areas are provided. This would create a catastrophical situation with respect to our foreign and domestic commerce.

Perhaps the most significant effect of applying standards for the discharge of effluents as it relates to moving spoil material from one place in the waterway to another, without the interjection of new pollutants, is the effect these arbitrary and unsupported standards will have on the benefit-to-cost ratio of navigation projects.

We all recognize the need to protect our environment, but it is also necessary that we maintain a healthy economy. This is inherent in the declaration of policy in the Environmental Protection Act of 1970 which states:

The Congress . . . , declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all *practicable* means and measures, including financial and technical assistance in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which *man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.*

For these reasons, I urge support of my amendment.

As I have said, the only authority granted here is to give the Secretary of the Army the right to make these determinations, but using the same criteria as provided for in the bill.

Mr. MUSKIE. Mr. President, one of the most difficult challenges that has faced the Subcommittee on Air and Water Pollution for the past 8 to 10 years has been an effective way of making the Federal Government comply with environmental requirements in the same way that the Federal Government asks citizens to comply. At every turn we have taken, we have found an excuse as to why the Federal Government should have a lesser or different standard of performance or compliance from that of a private citizen. This has been true of defense installations, of dredging, and of many other activities. There is always a

**Exhibit 17, page 11 of 30**

reason why the Federal Government should not do what is required of other citizens.

**Title IV,** which is involved in Senator Ellender's amendment, is addressed to this problem. **Section 401,** the certification section, is the applicable section. What this section does is this: This section, largely taken from present law, requires that any applicant for a Federal license or permit provide the licensing agency with a certification from the State in which the discharge occurs that any such discharge will comply with **section 301 and 302,** which are the environmental control sections.

Is that an unreasonable requirement? All we ask is that activities that threaten to pollute the environment be subjected to the examination of the environmental improvement agency of the State for an evaluation and a recommendation before the Federal license or permit be granted.

What Senator Ellender's amendment would do would be to exempt dredging. There is no question that the Secretary of the Army should retain authority to permit dredging operations for the purpose of navigable water and channel maintenance. It is a mission-oriented agency, and this is its mission. We do not undertake to turn that mission over to anybody else, and that specific activity should not be interfered with by the Environmental Protection Agency.

But, conversely, spoil disposal should be subject to EPA regulations. Spoil disposal is a pollutant. Any person who wished to dump polluted dredge spoil into navigable waters would be required, under this section, to get a permit from EPA or the State, just as would be required of other discharges.

The question of spoil disposal is one of cause, as is the question of pollution control in general. There is no question that the technology of alternative disposal of dredge spoil exists. The land disposal techniques advocated in **title II** as a result of the Corps of Engineers studies are available for disposition of dredge spoil.

So, what **section 401 would require is that the pollution potential** of the proposed dredge spoil be evaluated by EPA and that the environmental impact of disposing of dredge spoil in particular locations or sites, as recommended by the Corps of Engineers, be evaluated by EPA. If we eliminate those two checks by the only agency we have to evaluate environmental damage and make dredgers exempt, as no one else is under this bill, from this kind of monitoring and supervision, it means releasing them from all control.

The Corps of Engineers, a mission-oriented agency, is not equipped to evaluate the environmental impact of these dredging activities. It is equipped to form judgments on what is needed for navigation. This bill does not take that judgment-making authority from it. The amendment would shift the environmental evaluation authority from EPA to the Corps of Engineers, and the committee is against it. The committee considered this and rejected it. The committee position is "no," and I urge the Senate to vote "no" on this amendment.

Mr. STENNIS. Mr. President, as I understand the Senator from Louisiana, all he proposes by his amendment is to treat with dredge material, which has a very definite meaning, as I understand it; and his statement says that studies conducted by the Government show that

**Exhibit 17, page 12 of 30**

there is no measurable effect by what are really dredge materials with reference to pollution. This would have to meet the same requirement, anyway, under his amendment, any project, as is set up for the standards to be used by environmental agencies. It that not correct?

Mr. Muskie. No, not as I read it. Let me read the amendment:

The Secretary of the Army may issue permits, after notice and opportunity for public hearing, for the discharge of dredged materials into the navigable waters at specified disposal sites.

That is the Secretary of the Army. That is not the Administrator of the EPA. So that is different. "In identifying disposal sites for the purpose of **subsection (a),** the Secretary"—Not the Administrator of EPA, but the Secretary—

Shall apply the criteria established pursuant to **subsection (c)(1) of section 403** ...

In other words, the Secretary shall make the environmental judgments that under the bill are entrusted to the Administrator of EPA.

Mr. Stennis. But they are the same standards that are being applied under the Senator's amendment and the bill.

Mr. Muskie. May I say to the Senator—and I will expand on the point—that we have found—and the hearings of our committee are replete with the evidence—that mission-oriented agencies whose mission is something other than concern for the environment simply do not adequately protect environmental values. That is not their mission. They would do a disservice to their mission if they would try to act as environmental protectors. The mission of the Corps of Engineers is to protect navigation. Its mission is not to protect the environment.

Mr. Stennis. In the beginning, the Senator used the words "making excuses."

Mr. Muskie. No—exemptions.

Mr. Stennis. I do not think there is anything about agencies making excuses for not doing this or that.

I found the Corps of Engineers to be as competent and capable an agency of the Government as I have ever run into and the job they do is excellent, truly outstanding. I am now chairman of the subcommittee that handles the public works appropriation bill, and I have been on the committee for 20 years, and thus I come in contact with the work of the corps nationwide. I know, if I am any judge of men—and I know them personally—that they are going all the way in doing the best they can under this new law. They are in sympathy with it. This amendment excepts this dredging. It does not touch the pollutants the Senator mentions, the pollutants, sludge, refuse, and so forth—

Mr. Muskie. Those pollutants are found in areas that are dredged. They form the bottom of the sludge. The Senator says the agencies are in sympathy with this legislation. They are, but they do not want to be under it. They do not want it to apply to them.

Mr. Stennis. We authorized $30 million this year for a Great Lakes project where they have all these pollutants; it is to provide dikes to control the pollutants. This is a program handled by the Engineers.

Mr. Muskie. I do not understand. Will the Senator please tell me why, of all the misoriented agencies subject to the 40 percent—this includes the AEC and every other agency—why the Corps of Engi-

neers only with respect to dredging should not be subject to what we are requiring of every other agency?

Mr. STENNIS. In order to get their job done. This project has got to stand by and wait and wait and wait for the application. The new agency has not been in operation very long. I do not charge them with wrongdoing but they need time to develop.

This is a real problem as to how far we are going in stopping all the many hundreds of projects that are in progress already or beginning to make progress, if we stop progress on the ports and harbors all over this country for a while, stop working on improving them, the economy will stagnate.

Mr. MUSKIE. Will the Senator refer me to that provision in the bill that stops these activities——

Mr. STENNIS. That is the practical effect of it.

Mr. MUSKIE. Will the Senator expand on that for me, as to what the practical effect will be?

Mr. STENNIS. Here is an illustration right here, this dike project for the Great Lakes, a project which impressed our subcommittee very much on which, unless there can be some "go" sign given, at least on a temporary basis, until the adjustments can be made and the matter can be clarified, will be stopped and we will be stopping them all over the country—absolutely.

Mr. MUSKIE. May I say to the Senator that if the Senator means what he has just been saying, then he should vote against the bill, because what we are talking about is subjecting every activity in the private and public sector in the kind of place he is insisting for this dredging, whether we are talking about papermills, chemical mills, oil refineries, cotton mills, textile mills—they are all subject to this kind of scrutiny, and every other Federal activity is. So I can understand if the Senator says it goes too far and he will vote against the bill. Why he should advocate this kind of control over every other activity in the public and private sector simply for the exemption of dredging, is beyond me.

Mr. STENNIS. I submit that I advocate a reasonable basis. I think, as a practical matter, that it is a necessary one. I appreciate all the fine work the Senator has done on this bill, but indignation is not enough just to get a bill passed——

Mr. MUSKIE. No, and it is not enough to support an amendment, either.

Mr. STENNIS. We have to have reasonable environmental protection and at the same time operate the economy of this country.

Mr. MATHIAS. **Section 209(b)(2)(C)(ii)** on page 63 requires an area-wide waste treatment plan to provide for the establishment of a program "to regulate the location, modification, and construction of any facilities . . . which may result in any discharge of pollutants." Would the certification procedures of **section 401** or the permits of **section 402** represent a sufficient program to regulate the location or construction of any facilities or would further procedures be required.

Mr. MUSKIE. It is intended that the requirements under **section 209** will not necessarily be satisfied by compliance with **section 401** and **section 402. Sections 401** and **402** provide for controls over discharge. **Section 209** anticipates controls over the location of facilities to com-