| 92D CONGRESS 1st Session | SENATE | REPORT No. 92-414 |
|---|---|---|

# FEDERAL WATER POLLUTION CONTROL ACT AMENDMENTS OF 1971

## REPORT

OF THE

## COMMITTEE ON PUBLIC WORKS UNITED STATES SENATE

TOGETHER WITH

## SUPPLEMENTAL VIEWS

TO ACCOMPANY

## S. 2770



OCTOBER 28, 1971.—Ordered to be printed

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1971

87-313 O - 73 - Vol. 2 -- 21

# CONTENTS

|  | Page |
|---|---|
| General Statement | 1 |
| Discussion of intent | 11 |
| Title I—Research and related programs: | |
|     Declaration of policy | 11 |
|     Comprehensive program for water pollution control | 12 |
|     Interstate cooperation and uniform laws | 13 |
|     Research, investigations, training and information | 13 |
|     Research and demonstration programs | 16 |
|     State programs | 18 |
|     Mine water pollution control demonstrations | 20 |
|     Pollution control in Great Lakes | 21 |
|     Training grants and contracts | 21 |
|     Training program allocations | 22 |
|     Scholarships | 22 |
|     Training program authorization | 22 |
|     Alaska village demonstration projects | 22 |
|     Pollution control in Lake Tahoe | 22 |
| Title II—Grants for construction of treatment works: | |
|     Purpose | 23 |
|     Federal Share | 25 |
|     Plans, specifications, and estimates | 26 |
|     Grant conditions | 26 |
|     Grant allocations | 30 |
|     Reimbursement | 31 |
|     Grant authorizations | 34 |
|     Disbursement | 35 |
|     Waste treatment mangement | 36 |
|     Definitions | 40 |
| Title III—Standards and enforcement: | |
|     Effluent limitations | 41 |
|     Water quality related effluent limitations | 46 |
|     Aquaculture | 48 |
|     Information and Guidelines | 49 |
|     Water quality inventory | 55 |
|     National standards of performance | 57 |
|     Toxic and pretreatment effluent standards | 60 |
|     Inspection, monitoring, and entry | 63 |
|     Federal enforcement | 63 |
|     International pollution abatement | 65 |
|     Oil and hazardous substance liability | 65 |
|     Marine sanitation devices | 67 |
|     Federal facilities pollution control | 67 |
|     Clean lakes | 68 |
| Title IV—Permits and licenses: | |
|     Certification | 69 |
|     National pollutant discharge elimination system | 69 |
|     Ocean discharge criteria | 74 |

(III)

Discussion of intent—Continued

Title V—General provisions: Page
  Administration....................................................... 75
  General definitions.................................................. 75
  Water pollution control advisory board............................... 78
  Emergency powers.................................................... 78
  Citizens suits...................................................... 79
  Appearance.......................................................... 82
  Employee protection................................................. 82
  Federal procurement................................................. 83
  Administrative procedure and judicial review........................ 84
  State authority..................................................... 85
  Other affected authority............................................ 86
  Separability........................................................ 86
  Labor standards..................................................... 86
  Effluent standards and water quality information advisory
    committee........................................................ 86
  Reports to Congress................................................. 87
  General authorizations.............................................. 87
  Short title......................................................... 88

Miscellaneous Provisions:
  Oversight study..................................................... 88
  Diked disposal areas................................................ 88
  International agreements............................................ 89

Rollcall votes during committee consideration.......................... 91
Estimates of costs..................................................... 93
Committee views........................................................ 95
Supplemental views..................................................... 97
Changes in existing law made by the bill as reported................... 109
Appendixes............................................................. 111

NOTE

The titles and sections of the Committee bill are closely related and, taken together, provide a structure for the management of what is now called "waterborne waste". The key elements of that structure, developed by the Committee through intensive reexamination of the problems presented, appear near the beginning of each title—particularly in Sections 101, 201, 209, 301, and 402.

The bill is longer than most reported by the Committee—188 pages. It is suggested that not only those who are seeking the Committee bill for the first time, but all who wish to understand the framework it proposes for the management of waste and achievement of water quality, may find it convenient and helpful to first review the following sections: Section 101 (Declaration of Policy); Section 201 (Title II, Purpose); Section 209 (Regional Management); Sections 301 and 302 (Effluent Limitations); and Section 402 (Permit System). Those sections are the heart of the bill, on two dozen pages.

This suggestion for preliminary review of the framework of the bill does not imply that other sections are not important, and many will have profound impact and be of particular interest to those affected. Among these are: Sections 202–208 (Federal Share, Grant Conditions, Grant Allocations, Reimbursement, and Grant Authorization); Section 306 (Standards of Performance for new sources); Section 307 (Toxic and Pretreatment Effluent Standards); Section 309 (Federal Enforcement); Section 505 (Citizen Suits); Section 516 (General Authorizations); and among the definitions, those for the terms "pollutant", "pollution", "toxic pollutant", "discharge", 'treatment works", and "replacement" appearing in Sections 502 and 210.

(V)

Calendar No. 411

| 92d CONGRESS<br>1st Session | SENATE | REPORT<br>No. 92-414 |

# FEDERAL WATER POLLUTION CONTROL ACT AMENDMENTS OF 1971

OCTOBER 28, 1971.—Ordered to be printed

Mr. RANDOLPH, from the Committee on Public Works, submitted the following

## REPORT

together with

## SUPPLEMENTAL VIEWS

[To accompany S. 2770]

The Committee on Public Works, to which was referred the bill (S. 2770) Federal Water Pollution Control Act Amendments of 1971, having considered the same, reports favorably thereon without amendment and recommends that the bill do pass. An original bill (S. 2770) is reported in lieu of S. 523, S. 1012, S. 1013, S. 1014, S. 1017 and S. 1018 which were considered by the committee.

### GENERAL STATEMENT

#### HISTORY

For more than two decades, Federal legislation in the field of water pollution control has been keyed primarily to an important principle of public policy: The States shall lead the national effort to prevent, control and abate water pollution. As a corollary, the Federal role has been limited to support of, and assistance to, the States.

2

The 1948 legislation, for example, assigned powers for enforcement in water pollution control to Governors of the States. The Federal agencies were authorized only to support research in water pollution, projects in new technology, and limited loans to assist the financing of treatment plants.

Given these basic provisions, State and Federal efforts in water pollution control went forward with little legislative change for nearly 10 years. It was a period of transition. To most Americans, the problems of water pollution control appeared to be localized and moderate.

In 1956, the Congress approved the first major legislative changes in the water pollution control program. Federal grants were authorized to assist States in preparing plans for pollution control and to help localities in building treatment plants. The authority for research and technical assistance was increased and broadened. Measures for controlling pollution of interstate waters were tightened.

The 1956 legislation called for increased cooperation between the Federal government and the States to develop a broader national effort against water pollution. The Federal funding authorized, however, fell short of needs. Pressures of population and economic growth upon the natural resources, as evidenced by reports of previously unobserved forms and kinds of water pollution, continued to increase.

In 1965, the Congress approved a second set of major legislative decisions for the water pollution control program. For the purpose of this report, perhaps the most important among these decisions were the assignment of a new responsibility to the States, the continued use of a 1948 enforcement procedure, and the establishment of a new agency to administer the Federal portion of the program.

Each State was required by the 1965 Act to develop standards for water quality within its boundaries. These standards were to be applied to all interstate navigable waters flowing through the State; intrastate waters were not included. The State standards were to be submitted to the new Federal agency by July 1, 1967, for approval.

The 1948 enforcement procedure provided for conferences and negotiations between dischargers of pollutants and officials of the governments involved. The procedure also permitted judicial review of the abatement conference recommendations. Further, a court could order abatement only after a finding that compliance with the order was feasible.

The new agency established to administer the Federal portion of the program was originally known as the Federal Water Pollution Control Administration and was located in the Department of Health, Education, and Welfare. During the past five years, its authority has been transferred twice to other officials in the Executive branch: In May, 1966, to the Secretary of the Interior, and in December, 1970, to the Administrator of the Environmental Protection Agency.

The Congress moved again in 1966 to broaden and intensify the Federal support of State efforts in water pollution control. A five-year authorization totaling $3.4 billion for grants to assist the construction of waste treatment plants was provided. The authorization scheduled $150 million for fiscal year 1967 and increased steeply during the 5 years to $1.25 billion for fiscal year 1971.

Last year, the Congress confronted several specific problems in water pollution control. The 1970 amendments added to the basic law

new sections on liability for cleaning up of oil discharges, discharge of hazardous substances, discharge of sewage from vessels, demonstration projects for cleaning up pollution in the Great Lakes, acid mine drainage, regulation of Federal activities affecting water quality, and manpower training for water pollution control.

### 1970 HEARINGS

During April, May, and June of 1970, the Subcommittee on Air and Water Pollution devoted 14 days of public hearings to 18 Senate bills concerning water pollution abatement and control. Among the bills were four introduced for the Administration to amend the law concerning construction grants, standard setting, and enforcement. (The Committee is separately reporting the fourth Administration bill, establishing an Environmental Financing Authority.) The Subcommittee's extremely busy schedule with the Clean Air Act of 1970 and the Resource Recovery Act of 1970 did not permit it to develop a water pollution control bill for action by the Committee on Public Works.

The 1970 water pollution hearings and the Committee's work with the Clean Air and Resource Recovery Acts contributed greatly, however, to the Committee's approach to the pending legislation in this first session of the 92nd Congress. As the Committee observed in its summary of 1969 and 1970 legislative activities:

> The Committee's experience with the early legislation, and the experience of other branches of government, suggested the need for environmental planning on a broader scale. During the 91st Congress, the Committee continued to press for control of existing sources of pollution, and it began to work toward an environmental policy in which the rights to, and responsibility for, use of the air, water, and land resources would be more precisely defined.
> The Committee's goal is a policy for adequate management of all forms of environmental pollution and for effective protection of the environment. A policy for air pollution only, a policy for water pollution only, a policy for solid waste disposal only, will not suffice. A broad policy and a coordinated effort are imperative.

In particular, the Committee became increasingly concerned during 1970 with the effects of pollution upon public health. In its report on the Clean Air Amendments of 1970, the Committee said in part:

> The legislation reported by the Committee is the result of deep concern for protection of the health of the American people. Air pollution is not only an aesthetic nuisance. The Committee's concern with direct adverse effects upon public health has increased since the publication of air quality documents for five major pollutants (oxides of sulfur, particulates, carbon monoxide, hydrocarbons, and oxidants). These documents indicate that the air pollution problem is more severe, more pervasive, and growing at a more rapid rate than was generally believed.

The final sentence of the quotation could be applied with equal accuracy to the information developed by the 1971 hearings on the pending water pollution control legislation.

## 1971 HEARINGS

The oversight portion of the 1971 hearings was conducted by the Subcommittee on Air and Water Pollution on February 4, 8, and 9. Among the witnesses were the Administrator of the Environmental Protection Agency and members of his staff; the Mayors of Detroit, Michigan, and Atlanta, Georgia, and representatives of the National League of Cities and United States Conference of Mayors.

The Subcommittee's Washington hearings on 15 Senate bills were held March 15–19 and March 22–24. Among these bills were four introduced for the Administration which were similar to those considered during the 1970 water pollution control hearings.

In addition, the Subcommittee held field hearings March 26 at Rehoboth Beach, Delaware, on the problems of ocean dumping; April 2 at Kansas City, Missouri, on the problems associated with agricultural runoff; and April 5 at New Orleans, Louisiana, on the problems associated with petrochemical wastes and deep well disposal of such wastes.

Further, the Subcommittee's Panel on Science and Technology held hearings May 13 and 14 on the technology of waste water treatment and related issues.

## ADEQUACY OF STANDARDS

The setting of water quality standards for interstate navigable waters, as indicated above, is the keystone of the present program for control of water pollution. The standards are intended to function in two ways:

1. As a measure of performance, the standards are expected to establish the maximum level of pollution allowable in interstate waters.

2. The standards also are intended to provide an avenue of legal action against polluters. If the wastes discharged by polluters reduce water quality below the standards, actions may be begun against the polluters.

The task of setting water quality standards, assigned to the States by the 1965 legislation, is lagging. More than 4 years after the deadline for submission of standards, only a little more than half of the States have fully approved standards. Of the 54 jurisdictions covered by the water pollution control program—the figure includes the 50 States, the District of Columbia, Guam, Puerto Rico, and the Virgin Islands—only 27 have fully approved standards. However, on their own motion, 44 States have also adopted intrastate water quality standards, in most cases quite similar to their standards for interstate waters.

The States have first responsibility for enforcement of their standards. When approved by the Environmental Protection Agency, however, the standards for interstate navigable waters become Federal-State standards.

A critical delay of enforcement for interstate water quality results from the water quality standards structure just described. The EPA Administrator may begin action to abate pollution only when:

1. Water quality of interstate waters is reduced below the established standards;
2. Pollution originating in one State is endangering the health or welfare of persons in another State downstream; or
3. The Governor of the State in which the pollution is originating consents to the proposed action.

### ADEQUACY OF ENFORCEMENT

The continued use of the 1948 abatement procedure also contributes to delay. The record shows an almost total lack of enforcement. Under this procedure, only one case has reached the courts in more than two decades.

In that case, involving a Midwestern city, more than four years elapsed between initial conference and consent decree. The city later constructed a sewage treatment plant. Within 2 years, the plant was treating only half of the city's sewage. Five million tons of raw sewage were being dumped into the river each day.

Continued use of the 1948 abatement procedure, and the almost total lack of enforcement, encourage governing bodies and officials to search for other, more direct avenues of action against water polluters and water pollution.

One such approach which has been focused on is the use of section 13 of the 1899 Refuse Act, which declares a prohibition over the discharge of any matter into the navigable waters.

While the permit program created in late 1970 under the Refuse Act by the Administrator seeks to establish this direct approach, it is weak in two important respects: It is being applied only to industrial polluters, and authority is divided between two Federal agencies.

Experience with the permit system during the past 10 months suggests that the machinery used to date may be as cumbersome as the 1948 abatement procedure. Estimates of the number of permit applications to be received run as high as 300,000; estimates of the time required to process the applications run as long as four years.

### ADEQUACY OF FUNDING

The lack of adequate funding of grants to assist States and localities in constructing sewage treatment plants is causing critical problems.

Of the $3.4 billion authorized for this purpose by the 1966 legislation, only $2.2 billion was appropriated. The backlog of projects eligible for Federal payments has reached a total of nearly $2 billion.

As more States and localities move to take part in the construction program, the need for increased Federal spending is rising rapidly.

Five years ago, the Committee estimated that more than $20 billion worth of sewage treatment plants would have to be built before 1972 in order to serve the population expected in 1980.

Estimates received by the Commission from the National League of Cities—United States Conference of Mayors during its hearings last

year place the total national need for the next five years at more than $30 billion. The figure covers only needs already identified by local officials.

In addition to these demands for increased Federal funding, there is another problem connected with the construction grant program. A 1969 report of the General Accounting Office raises a critical question concerning the use of Federal funds.

Based on a study of eight States, the GAO report discloses that more than $80 million of $1 billion in Federal grants awarded to those States through 1968 was used to help build about 400 municipal treatment plants. The report states, however, that the plants were designed to treat primarily the wastes of industries located within or near the municipal boundaries.

As the size of the Federal grant program and the costs of construction increase, this kind of indirect payment to industrial users of joint treatment plants also will increase.

## ADEQUACY OF INFORMATION

The Federal water pollution control program suffers from a lack of information concerning dischargers, amounts and kinds of pollution, abatement measures taken, and compliance.

The present water pollution control law allows the EPA Administrator, after an enforcement conference, to require the filing of reports by polluting industries and municipalities. The reports are to include data on discharges and actions taken to abate pollution. However, two provisions of law prevent the Administrator from obtaining adequate information. Polluters are allowed to omit from their reports any information they believe to involve trade secrets or secret processes. And the Administrator has no legal right of entry so that he may check the polluters' operations.

The situation is not so damaging as it might be, since many State programs give their officials the right to enter and inspect plants for compliance with State discharge permits.

The 1969 report of the General Accounting Office, referred to earlier, suggests how much vital information is not available to Federal enforcement officials. The GAO investigated files of State permits on 80 industrial plants discharging wastes into a 170-mile reach of the Mississippi River. The files included information on the amount of wastes being discharged by only 52 of the 80 plants.

It should be noted that one of the most important aspects of the Administration's 1899 Refuse Act permit program has been the accumulation for the first time of detailed information on the character of industrial pollution discharges.

## ADEQUACY OF RESEARCH

The Federal water pollution control program also suffers from a lack of adequate research and demonstration beyond the traditional methods used in municipal treatment plants.

In primary treatment of sewage, between 30 to 50 percent of organic pollution is removed. With secondary treatment, between 50 and 90 percent is removed.

7

Neither of the traditional methods, then, can be completely satisfactory, and both have significant disadvantages. Primary and secondary treatment, for example, requires large capital expenditures and the use of extensive land areas.

The sludge remaining from secondary treatment can create special problems. Some localities burn sludge, thus contributing to air pollution. Other localities use sludge for landfill. Still others dump sludge into the oceans where it is hazardous to sea life.

The reliance of the Federal program upon primary and secondary treatment continues, although the program's efforts in research and demonstration is now more than 10 years old. The annual budget for research by the water quality office of the Environmental Protection Agency amounts to less than $50 million.

### COMMITTEE FINDINGS

From its two-year study of the Federal water pollution control program, the Committee concludes that the national effort to abate and control water pollution has been inadequate in every vital aspect:

—Many of the Nation's navigable waters are severely polluted, and major waterways near the industrial and urban areas are unfit for most purposes;
—Rivers are the primary sources of pollution of coastal waters and the oceans, and many lakes and confined waterways are aging rapidly under the impact of increased pollution;
—Rivers, lakes, and streams are being used to dispose of man's wastes rather than to support man's life and health; and
—The use of any river, lake, stream or ocean as a waste treatment system is unacceptable.

The Committee believes the restoration of the natural chemical, physical, and biological integrity of the Nation's waters is essential. To achieve this objective, the Committee recommends that the following be adopted as national policy:

—The discharge of pollutants into the navigable waters be eliminated by 1985;
—An interim goal of water quality be achieved by 1981 to provide for the protection and propagation of fish, shellfish, and wildlife, and for recreation in and on the water;
—The discharge of toxic pollutants in toxic amounts be prohibited;
—Federal grant assistance be provided to any community which constructs a waste treatment facility which is consistent with the program set forth by the Congress;
—Regional waste management treatment programs be developed and implemented to assure adequate control of all sources of pollution in each State; and
—A major research and demonstration effort be initiated to find the technological methods necessary to eliminate waste discharges.

### THE LEGISLATION

The legislation recommended by the Committee proposes a major change in the enforcement mechanism of the Federal water pollution control program from water quality standards to effluent limits.

8

Under the 1965 Act, water quality standards were to be set as the control mechanism. States were to decide the uses of water to be protected, the kinds and amounts of pollutants to be permitted, the degree of pollution abatement to be required, the time to be allowed a polluter for abatement.

The water quality standards program is limited in its success. After five years, many States do not have approved standards. Officials are still working to establish relationships between pollutants and water uses. Time schedules for abatement are slipping away because of failure to enforce, lack of effluent controls, and disputes over Federal-State standards.

The Committee adopted this substantial change because of the great difficulty associated with establishing reliable and enforceable precise effluent limitations on the basis of a given stream quality. Water quality standards, in addition to their deficiencies in relying on the assimilative capacity of receiving waters, often cannot be translated into effluent limitations—defendable in court tests, because of the imprecision of models for water quality and the effects of effluents in most waters.

Under this Act the basis of pollution prevention and elimination will be the application of effluent limitations. Water quality will be a measure of program effectiveness and performance, not a means of elimination and enforcement.

The Committee recommends the change to effluent limits as the best available mechanism to control water pollution. With effluent limits, the Administrator can require the best control technology; he need not search for a precise link between pollution and water quality.

It is the Committee's intent to restore the balance of Federal-State effort in the program as contemplated by the 1965 and 1966 Acts. The Committee is particularly concerned that there should be a balanced effort in the discharge permit system initiated under section 13 of the 1899 Refuse Act.

The permit system establishes a direct link between the Federal government and each industrial source of discharge into the navigable waters. This permit system is independent of the Federal-State program set up by the 1965 Act which contributes to uncertainty among all concerned.

The permit system, as restated by this legislation, prohibits the discharge of pollutants into the navigable waters.

The legislation will restore Federal-State balance to the permit system. Talents and capacities of those States whose own programs are superior are to be called upon to administer the permit system within their boundaries. The Administrator is to suspend his activity, insofar as the permit system is concerned, in these States.

In order to carry out the objective of this legislation, a two-phase program for applying effluent limits is created; the first based on best practicable technology, the second based on best available technology.

In Phase I, to be implemented by 1976, all industrial pollution sources must apply the best practicable technology. Communities will be required to have secondary treatment construction programs by June 30, 1974.

In Phase II, to be implemented by 1981, communities and industries will be required to apply, where the goal of no-discharge cannot be attained, the best available technology.

9

Until State programs are approved, the Administrator of the Environmental Protection Agency is authorized to regulate discharges of pollutants through the use of an expanded permit program. He also may ban the discharge of any toxic pollutant.

Progress toward the national goal is to be assisted through the following steps:

The legal base for use of Federal permits to regulate the discharge of pollutants is reinforced and improved.

The scope of the 1899 Refuse Act is broadened; the administrative capability is strengthened.

Where the Administrator can identify a direct link between a discharge source and water quality, the Administrator is authorized to tighten controls on the polluter.

Wherever attainable, an interim goal of water quality is to be achieved by 1981 providing for the protection and propagation of fish, shellfish, and wildlife, and for recreation in and on the water.

To assist States and localities, the bill proposes a 4-year program of Federal grants for construction of sewage treatment plants. The Federal matching funds total $14 billion through fiscal year 1975.

The minimum Federal grant is set at 60 percent of project cost. If a State contributes as much as 10 percent of project cost, the Federal grant is increased by a matching 10 percent. A locality's share thus becomes 20 percent of project cost.

The bill requires grantees to use the best practicable methods for waste treatment. After fiscal year 1974, all grantees must evaluate available methods for recycling and reclaiming wastes, including the use of confined and contained disposal of pollutants.

The bill requires Governors and local officials, in cooperation with the Administrator, to develop plans for areawide waste treatment management in areas with critical water pollution control problems. The plans are to be completed by July 1, 1974.

In addition to municipal and industrial wastes, the areawide plans are to include procedures to control agricultural runoff, surface and underground mine runoff, construction runoff, and disposal of pollutants on land or in excavations.

The bill also provides reimbursement for sewage treatment plants built without Federal assistance during earlier stages of the Federal program. Plants begun between fiscal year 1956 and fiscal year 1966 are eligible for grants equal to 30 percent of project cost. Plants begun after June 30, 1966 are eligible for grants equal to 50 percent of project cost. A total of $2.4 billion is authorized for this purpose.

A discretionary fund of $200 million is set aside for the Administrator's use where costs of regional sewage treatment plans may exceed State and local entitlement to the Federal grants. The fund is intended to assist such projects as the District of Columbia's Blue Plains plant, a major polluter of the Potomac River.

Grantees must adopt a system of user chargers to assure that each class of users will help to pay the costs of operation and maintenance, including replacement, of sewage treatment plants financed with Federal grants.

In this context, each industrial user of such facilities must agree by contract to pay back the portion of Federal share of construction

-JKS    Document 44-6    Filed 04/07/2006    Page 14 of 16
1428

10

cost allocable to the industrial user's wastes. These payments are to be received by the Administrator and deposited in the Federal Treasury.

The bill makes unlawful the dumping or disposal of any radiological, chemical or biological warfare agent, or high-level radioactive waste into the navigable waters.

Discharges into the territorial seas or discharges from ocean outfalls are subject to the regulations applicable to discharges into the domestic, navigable waters.

For new, point sources of discharge, the bill requires the Administrator to set uniform standards of performance. These standards must reflect the maximum reduction of pollutants possible through use of the best available control technology. Twenty-eight types of industry listed by the bill are to be covered by the performance standards. Each State may develop and submit to the Administrator a procedure for enforcing the performance standards for new, point sources located within the State.

The bill also requires the Administrator to conduct research into better methods of controlling pollutants from non-point sources such as agricultural runoff. A total of $10 million is set aside for the agricultural research.

Further, each State is required to adopt methods for control of pollution in fresh water lakes within the State. Restoration of water quality in these lakes is to be assisted by Federal funds.

The task of enforcing provisions of the bill is assigned to the Administrator. He is authorized to enforce permit violations immediately, or if a State fails to act within 30 days after receipt of a notice of violation, the Administrator may issue an order to comply or go to court against the violator.

Civil and criminal penalties are provided. A second conviction shall be punished by a fine of not more than $50,000 per day of violation, two years in prison, or both.

Under the bill, citizens themselves may go to United States District Courts against those who violate effluent standards or compliance orders. Citizens may also go to court against the Administrator for failure to carry out non-discretionary duties under the law.

57

the program. And, no one is under any illusion that that $12 billion investment in municipal waste treatment plants will implement existing water quality standards in many areas of the Nation, much less meet the goals of this Act.

The Committee recognizes that these figures may be conservative. It also notes that the Administration has estimated that the cost of removal of the final 1 percent of pollutants may exceed the cost of removing the initial 99 percent of pollutants. The Administration's estimate of the capital cost to achieve 100 percent pollution control for point sources is $94.5 billion.

The Committee also recognizes that even with application of a no-discharge standard where attainable at reasonable cost and, where not attainable, the best available technology, no better than 99 percent pollutant removal can be expected by 1981.

What the Congress must decide in 1976–1977, on the basis of the information provided by the inventory and evaluation required by this Section, is whether or not the additional levels of control required to completely eliminate pollutants are technically available, and if so, whether the ecological and water quality benefits to be derived worth the economic and social cost to be incurred. Having this information shortly after mid-decade will provide the Congress with a unique opportunity to make a mid-course correction in moving toward a 1985 goal. This policy evaluation is essential in order to balance the long-term program costs projected by this legislation with the Nation's priorities as they will be established in 1976–1977 and beyond.

SECTION 306—NATIONAL STANDARDS OF PERFORMANCE

**New sources of pollution in at least twenty-eight specified industries must be constructed to meet a standard that reflects the greatest degree of effluent reduction that can be achieved by use of the latest available control technology. If it is practicable, this could be a standard that permits no discharge of pollution. EPA must promulgate the best available technology standard for each industry. That technology must be followed by each plant which by modification becomes subject to the new source standards, unless the economic and social costs of achieving such a standard far exceeds the social and economic benefits. If that occurs, a lesser standard will be promulgated.**

**The Administrator may distinguish among classes and sizes of new sources. He may also delegate this authority to individual States if they develop procedures for setting and enforcing such standards.**

The Committee believes that this section, which is designed to assure that new stationary sources of water pollution are designed, built, equipped, and operated to minimize the discharge of pollutants, is among the most significant in the legislation.

Under the provisions of the bill, the standards of performance for new source of water pollution would require the achievement of the greatest degree of pollution reduction that can be achieved through the application of the best available effluent control technology and ultimately, to eliminate space. Such a maximum use of available means

to prevent and control water pollution is essential to the prevention of new pollution problems and the eventual attainment of the goal of no-discharge.

It should be noted that the Committee considered use of the phrase "latest available control technology," but rejected it in favor of "best available control technology."

The Committee agreed that, although used in the Clean Air Act, the term "latest" may not (as intended) be interpreted as the best. The Committee has substituted the word "best" in this bill to make clear its intention.

As used in this section, the term "available control technology" is intended to direct the Administrator to examine the degree of effluent reduction that has been or can be achieved through the application of technology which is available or normally can be made available. This does not mean that the technology must be in actual, routine use somewhere. Rather, it means that the technology must be available at a cost and at a time which the Administrator determines to be reasonable.

The implicit consideration of economic factors in determining whether technology is "available" should not affect the usefulness of this section. The overriding purpose of this section would be to prevent new water pollution problems, and toward that end, maximum feasible control of new sources, at the time of their construction, is considered by the Committee to be the most effective and, in the long run, the least expensive approach to pollution control.

This section requires that the Administrator, within 90 days following enactment of this Act, publish a list of categories of industrial groups for which he will establish standards of performance. The Committee has specified 28 industrial groups for which, at a minimum, the Administrator must establish national standards of performance:

    pulp and paper mills;
    paperboard, builders, paper and board mills;
    meat product and rendering processing;
    dairy product processing;
    grain mills;
    canned and preserved fruits and vegetables processing;
    canned and preserved seafood processing;
    sugar processing;
    textile mills;
    cement manufacturing;
    feedlots;
    electroplating;
    organic chemicals manufacturing;
    inorganic chemicals manufacturing;
    plastic and synthetic materials manufacturing;
    soap and detergent manufacturing;
    fertilizer manufacturing;
    petroleum refining;
    iron and steel manufacturing;
    nonferrous metals manufacturing;
    cotton ginning;
    phosphate manufacturing;