47 FR 25682-01                                                    Page 15
47 FR 25682-01, 1982 WL 132502 (F.R.)
**(Cite as: 47 FR 25682)**


Antimony


  Antimony is recovered both from ore and as a byproduct of silver and lead
concentrates.    Antimony is located in ores in Idaho and Montana.    However, only
one operating mine/mill now produces antimony as a primary product.    The ore is
mined underground and concentrated using the froth flotation process. The mine has
no known discharge because it is above the water table.    The mill wastewater flows
to an impoundment and is then retained.

  Other mine/mills and smelters recover byproduct antimony.    Thirty to fifty
percent of domestic production of antimony (724 metric tons in 1977) in recent
years has been recovered as a byproduct of lead smelting.

  In reviewing BAT, EPA established a separate subcategory for antimony ores,
reserving effluent limitations reserved until the Agency gathers additional data on
the waste water discharges of this single existing facility.


Titanium


  Four facilities in the United States produce titanium concentrates.    One
operation extracts titanium from lode ore desposits.    Three operations dredge
sands to recover titanium minerals (ilmenite).    The lode ore operation is in New
York, one sand dredging operation is in New Jersey and the remaining facilities are
in Florida.    In 1979, severe price competition from Australian titanium-producing
operations forced three other sand dredging operations to close.

  The titanium sand dredging mines are now processing over 27 million metric tons of
ore per year.    From this ore, the mills produce approximately 500,000 metric tons
per year of mineral concentrate.

  The mine that extracts ilmenite from lode ore treats wastewater by settling.    The
mill associated with this mine uses pH adjustment, settling, and recycle to treat
wastewaters, with seasonal discharge to a river.    Usually the discharge period
lasts approximately three weeks per year.    At the sand dredging facilities,
multiple settling ponds are used before discharge.    Dredge pond water is recycled
for reuse, with excess water entering the multiple settling pond system Wastewater
treatment removes suspended solids primarily.

  In reviewing BAT for the titanium ore subcategory, EPA found the following
pollutants for control:  nickel zinc, iron, and TSS. (See Section VIII of this
preamble for a discussion of pollutant parameter selection.)


III. Scope of This Rulemaking and Summary of Methodology


  The proposed regulation is an expansion of water pollution control requirements
for the ore mining and dressing industry.    From 1973 through 1976, EPA emphasized
the achievement of limitations based on application of best practicable technology
(BPT) by July 1, 1977.    In general, this technology level represented the average
of the best existing performances of well-known technologies for control of

Copr. ©  2004 West. No Claim to Orig. U.S. Govt. Works.

47 FR 25682-01
47 FR 25682-01, 1982 WL 132502 (F.R.)
(Cite as: 47 FR 25682)
Page 16

familiar (i.e., "classical") pollutants.  In this industry, many metal pollutants that Congress subsequently designated as toxic were also regulated under BPT.

 In this rulemaking, EPA has sought to ensure the achievement, by July 1, 1984, of limitations based on application of the best available technology economically achievable (BAT).  In general, this technology level represents the best economically achievable performance in any industry category or subcategory. Moreover, as a result of the Clean Water Act of 1977, the emphasis of EPA's program has shifted from control of "classical" pollutants to the control of toxic substances.

 In the 1977 legislation, Congress recognized that it was dealing with areas of scientific uncertainty when it declared the 65 "priority" pollutants and classes of pollutants "toxic" under section 307(a) of the Act. The "priority" pollutants have been relatively unknown outside the scientific community, and those engaged in wastewater sampling and control have had little experience dealing with these pollutants.  Additionally, these pollutants can often appear and can have toxic effects at concentrations that severely tax current analytical techniques.  Even though Congress was aware of the state-of-the-art difficulties and expense of toxics control and detection, it directed EPA to act quickly and decisively to detect, measure, and regulate these substances.

 EPA's implementation of the Act is described in this section and succeeding sections of this notice.  Initially, because in many cases no public or private agency had done so, EPA, its laboratories, and consultants had to develop analytical methods for toxic pollutant detection and measurement (see section IV of this notice).  EPA then gathered technical and economic data about the industry, which are also summarized in Section IV. A number of steps were involved in arriving at the proposed limitations.

 *25688 First, EPA studied the ore mining and dressing industry to determine whether differences in raw materials;  final products;  manufacturing processes; equipment, age, and size of plants, water usage;  wastewater constituents;  or other factors required the development of separate effluent limitations and standards for different subcategories and segments of the industry.  This study included identifying raw waste and treated effluent characteristics, including: the sources and volume of water used, the processes employed, the sources of pollutants and wastewater in the plant and the constituents of wastewater, including toxic pollutants.  EPA then identified the constituents of wastewaters that should be considered for effluent limitations guidelines and standards of performance.

 Next, EPA identified several distinct control and treatment technologies, including both in-plant and end-of-process technologies, that are in use or capable of being used in the ore mining and dressing industry.  The Agency compiled and analyzed historical and newly generated data on the effluent quality resulting from the application of these technologies.  The long-term performance, operations, limitations, and reliability of each treatment and control technology were also identified.  In addition, EPA considered the non-water quality environmental impacts of these technologies, including impacts on air quality, solid waste generation, water availability, and energy requirements.

 The Agency then estimated the costs of each control and treatment technology from unit cost curves developed by standard engineering analyses as applied to ore mining and dressing wastewater characteristics.  EPA derived unit process costs from representative plant characteristics (production and flow) applied to each

Copr. ©  2004 West. No Claim to Orig. U.S. Govt. Works.

47 FR 25682-01
47 FR 25682-01, 1982 WL 132502 (F.R.)
**(Cite as: 47 FR 25682)**

treatment process (i.e., secondary settling, pH adjustment and settling, granular-media filtration, etc.).    These unit process costs were added to yield total cost at each treatment level.    After confirming the reasonableness of this methodology by comparing EPA cost estimates with treatment systems supplied by the industry, the Agency evaluated the economic impacts of these costs. (Costs and economic impacts are discussed in detail under the various technology options and in section XVII of this preamble.)

1After considering these factors, EPA identified various control and treatment technologies as BAT and BADT (Best Available Demonstrated Technology).    The proposed regulation, however, does not require the installation of any particular technology or limit the choices of technologies that may be used in specific situations.    Rather, it requires achievement of effluent limitations that represent the proper design, construction, and operation of these or equivalent technologies.

The effluent limitations for ore mining and dressing BAT, BCT, and NSPS are expressed in concentrations (e.g., milligrams of pollutant per liter of wastewater) rather than loading per unit(s) of production (e.g., kg of pollutant per metric ton of product) because correlating units of production and wastewater discharged by mines and mills was not possible for this category.    The reasons are:

1kZ!...  EXT. 012 (PART 2, PROPOSED RULES)...14JN >80270 Saxon 6/10/82  89-999 F. 39A-42 8.0

(1) The quantity of mine water discharged varies considerably from mine to mine and is influenced by topography, climate, geology (affecting infiltration rates) and the continuous nature of water infiltration regardless of production rates. Mine water may be generated and required to be treated and discharged even if production is reduced or terminated.

(2) Consistent water use and loss relationships for ore mills could not be derived from facility to facility within a subcategory because of wide variations in application of specific processes.    The subtle differences in ore mineralogy and process development may require the use of differing amounts of water and process reagents but do not necessarily require different wastewater treatment technology(ies).

The Agency is not proposing pretreatment standards because it does not know of any existing facilities that discharge to POTWs or any that are planned.


IV. Data-Gathering Program


(A) Sampling and Analytical Methods


As Congress recognized in enacting the Clean Water Act of 1977, the state-of-the-art ability to monitor and detect toxic pollutants is limited.    Most toxic pollutants were relatively unknown until only a few years ago, and only on rare occasions has EPA regulated or has industry monitored or even developed methods to monitor these pollutants.    Section 304(h) of the Act, however, requires the Administrator to promulgate guidelines to establish test procedures for the analysis of toxic pollutants.    As a result, EPA scientists, including staff of the Environmental Research Laboratory in Athens, Georgia, and staff of the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Environmental Monitoring and Support Laboratory in Cincinnati, Ohio, conducted a literature search and initiated a laboratory program to develop analytical protocols.   The analytical techniques used in this rulemaking were developed concurrently with the development of general sampling and analytical protocols and were incorporated into the protocols ultimately adopted for the study of other industrial categories.   See Sampling and Analysis Procedures for Screening of Industrial Effluents for Priority Pollutants, revised April 1977.

Because section 304(h) methods were available for most toxic metals, pesticides, cyanide and phenolics (4AAP), the analytical effort focused on developing methods for sampling and analyses of organic toxic pollutants.   The three basic analytical approaches considered by EPA are infrared spectroscopy (IS), gas chromatography (GC) with multiple detectors, and gas chromatography/mass spectrometry (GC/MS). Evaluation of these alternatives led the Agency to propose analytical techniques for 113 toxic organic pollutants (see 44 FR 69464, December 3, 1979, amended 44 FR 75028, December 18, 1979) based on:   (1) GC with selected detectors, or high-performance liquid chromatography (HPLC), depending on the particular pollutant and (2) GC/MS.    In selecting among these alternatives, EPA considered their sensitivity, laboratory availability, costs, applicability to diverse waste streams from numerous industries, and capability for implementation within the statutory and court-ordered time constraints of EPA's program.    The rationale for selecting the proposed analytical protocols may be found in 44 FR 69464 (December 3, 1979).

In EPA's judgment, the test procedures used in this rulemaking represent the best state-of-the-art methods for toxic pollutant analyses available when this study was begun, As state-of-the-art technology progresses, future rulemaking will be initiated to evaluate, and if necessary, incorporate these changes.

Before analyzing ore mining and dressing wastewater, EPA defined specific toxic pollutants for the analyses.   The list of 65 pollutants and classes of pollutants potentially includes thousands of specific pollutants, and the expendure of resources in government and private laboratories would be overwhelming if analyses were attempted for all these pollutants.    Therefore, to make the task more manageable, EPA selected 129 specific toxic pollutants for study in this *25689 rulemaking and other industry rulemakings.

In general, EPA collected four types of samples from each sampling point:   (1) a 9.6 liter, 24-hour composite sample used to analyze metals, pesticides, PCBs, asbestos, organic compounds, and the classical parameters;   (2) a 1-liter, 24- hour composite sample used to analyze total cyanide;   (3) a 0.47-liter, 24-hour composite sample to analyze total phenols (4AAP);   and (4) two 125-ml grab samples to analyze volatile organic compounds by the "purge and trap" method.

EPA analyzed for toxic pollutants according to groups of chemicals and associated analytical schemes.   Organic toxic pollutants included volatile (purgeable), base-neutral and acid (extractable) pollutants, and pesticides. Inorganic toxic pollutants included toxic metals, cyanide, and asbestos (chrysotile and total asbestiform fibers).

The primary method used in screening and verification of the volatile, base-neutral, and acid organics was gas chromatography with confirmation and quantification on all samples by mass spectrometry (GC/MS).   Phenolics (total) were analyzed by the 4-aminoantipyrine (4AAP) method.   GC was employed for analysis of pesticides with limited MS confirmation.   The Agency analyzed the toxic metals by atomic adsorption spectrometry (AAS), with flame or graphite furnace atomization following appropriate digestion of the sample.   Samples were

Copr. ©  2004 West. No Claim to Orig. U.S. Govt. Works.

47 FR 25682-01                                                    Page 19
47 FR 25682-01, 1982 WL 132502 (F.R.)
(Cite as: 47 FR 25682)

analyzed for total cyanide by a colorimetric method, with sulfide previously
removed by distillation.   Asbestos was analyzed by transmission electron
microscopy and fiber presence reported as chrysotile and total fiber counts.   EPA
analysed for seven other parameters including: pH, temperature, TSS, VSS, COD,
TOC, iron, aluminum, and radium 226 (total and dissolved).

The high costs, time-consuming nature of analysis, and limited laboratory
capability for toxic pollutant analyses posed considerable difficulties to EPA. The
cost of each wastewater analysis for organic toxic pollutants ranges between $650
and $1,700, excluding sampling costs (based on quotations recently obtained from a
number of analytical laboratories).   Even with unlimited resources, however, time
and laboratory capability would have posed additional constraints.   Efficiency is
improving, but when this study was initiated, a well-trained technician using the
most sophisticated equipment could perform only one complete organic analysis in an
eight-hour workday.   Moreover, when this rulemaking study began only about 15
commercial laboratories in the United States could perform these analyses.   Today,
EPA knows of over 50 commercial laboratories that can perform these analyses, and
the number is increasing as the demand increases.

In planning data generation for this rulemaking, EPA considered requiring
dischargers to monitor and analyze toxic pollutants under section 308 of the Act.
The Agency did not use this authority, however, because it was reluctant to
increase the cost to the industry and because it desired to keep direct control
over sample analyses in view of the developmental nature of the methodology and the
need for close quality control.   In addition, EPA believed that the slow pace and
limited laboratory capability for toxic pollutant analysis would have hampered
mandatory sampling and analysis.   Although EPA believes that available data
support these regulations, it would have preferred a larger data base for some of
the toxic pollutants and will continue to seek additional data.   EPA will
periodically review these regulations, as required by the Act, and make any
revisions supported by new data.

(B) Data Gathering Efforts

Data gathering for the ore mining and dressing industry included an extensive
collection of information:

 (1) Screening and verification sampling and analysis programs

 (2) Engineering cost site visits

 (3) Supporting data from EPA regional offices

 (4) Treatability studies

 (5) Industry self-monitoring sampling

 (6) BPT data base

 (7) Placer study

 (8) Titanium sand dredges study

 (9) Uranium study

              Copr. ©  2004 West. No Claim to Orig. U.S. Govt. Works.

settling is most effective when existing conditions are not ideal in the primary settling ponds.  It provides additional residence time in the treatment system and affords additional removal of suspended solids and associated heavy metals.  At least 17 facilities practice secondary or mutliple pond treatment.

Coagulation/Flocculation

 In coagulation and flocculation, chemical coagulants act to destabilize colloidal solids, causing them to gather together in a floc and settle.  The primary purpose of chemical coagulation or flocculant addition to wastewater is to increase the size of settling particles by forming flocs of individual particles that act as a single large particle, which settles faster than individual particles.  These chemicals typically are added upstream of sedimentation ponds, *25692 clarifiers, or filter units.  This practice has demonstrated improved metals removal due to the formation of flocs, which appear to be effective in adsorbing and absorbing fine metal hydroxide precipitates (particles) formed either naturally or by pH adjustment using lime.

 Over ten facilities in the industry now practice this type of treatment.

pH Adjustment and Settling

 Adjustment of pH, usually with lime, changes the solubility of many dissolved metals, causing them to precipitate as a solid.  These precipitated metals are then removed with other solids through settling.  This technology is commonly used in the industry and is the basis for BPT in most subcategories.  It is considered again because the process can be applied or optimized with the potential for significantly improved metals removal in some subcategories. For example, a treatment system operated at a pH of 7 can often improve dissloved metals removal by increasing the pH to 9 while maintaining the same settling time.

Granular Media Filtration

 Filtration is accomplished by passing water through a physically restrictive medium (such as sand), thereby entrapping suspended particulate matter. Filtration systems are usually located downstream of primary settling ponds and work best when applied to waste streams having TSS loads of 50 mg/l or less. Filtration can be used to remove a wide range of suspended particle sizes. Next to gravity sedimentation (unaided settling), granular-media filtration is the most widely used process for the separation of solids from wastewater. Ultimate clarification of the filtered water is a function of particle size, filter medium porosity, filter loading rate, frequency of backwash, and other variables.  This technology has been demonstrated in both industrial and municipal applications and is cost-effective in relation to other technologies when reductions to 10 mg/l TSS are required.  During periods of steady operation of properly sized and designed units, granular media filters have consistently demonstrated the ability to achieve proposed limitations for TSS and metals.  Reduction of metals is a function of the metals contained in the solids (particles of ores, waste rock, tailings, and solids formed during lime precipitation of dissolved metals).

Copr. ©  2004 West. No Claim to Orig. U.S. Govt. Works.

Clarifiers

Clarifiers are large tanks that have systems to direct and segregate solids.  The design of these devices provides for concentration and removal of suspended and settleable solids in one effluent stream and a clarified liquid in the other. Clarified waters with extremely low solids contents may be produced through proper design and application.  Settled solids from clarifiers are removed periodically or continuously for either disposal or recovery of contained values.  The use of clarifiers improves treatment efficiency, reduces the area needed for tailing ponds, and facilitates the reuse or recycle of water in the milling operation.  The use of flocculants to enhance the performance of clarifiers is common practice. In this industry, clarifiers have their greatest use when the additional space for more settling ponds is not available or topography precludes construction of ponds.


Complete Recycle

Raw wastewater discharged from a typical ore mill is usually routed to a settling pond for suspended solids and metals removal.  In complete recycle, all treated water is routed back to the mill for reuse in the beneficiating process. Facilities that use recycle are often in arid regions because of the scarcity of available water.  Many facilities both in arid and humid regions recycle at least a portion of their process wastewater.

Complete recycle of mine drainage is generally not a viable option.  Except for small amounts of water used in dust control, cooling, drilling fluids, and transport fluids for sluicing tailings back to the mine, water is not widely used in mines.  In some cases, mine drainage is used by the mill as process water in beneficiation.  However, the volume of mine drainage may exceed the mill's requirement for process water, making complete reuse unachievable.

(2) Cyanide Removal.

Three technologies, alkaline chlorination, ozonation, and hydrogen peroxide oxidation were considered to convert cyanide into the nontoxic gases carbon dioxide ($CO_2$) and nitrogen ($N_2$). These technologies do not remove toxic metals. Cyanide appears in wastewater as the result of two processes used in the ore mining and dressing industry:  (1) the cyanidation leach process used primarily for gold recovery and (2) the froth flotation process in which cyanide componds are used as selective reagents.   Under BPT, wastewater from the cyanide leach process for gold was subject to no discharge.  The cyanide limits for the froth flotation mills under the base and precious metals ores were later withdrawn because of an inadequate data base.  Raw wastewater from froth flotation mills typically contains some total cyanide, but the highest treated effluent level measured was less than 0.4 mg/l.  A few mines in the industry practice hydraulic backfilling of mines with tailings from froth flotation process, and in these cases, cyanide is found in the mine drainage in concentrations less than those found in the mill discharge.

Specific technology for destruction of cyanide is not used at most domestic mine/mill operations that use cyanide.  Such technology is generally not necessary because in-process controls and retention of wastewater in tailing ponds have reduced cyanide concentrations to less than detectable.  The mechanism of cyanide

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

47 FR 25682-01                                                    Page 27
47 FR 25682-01, 1982 WL 132502 (F.R.)
**(Cite as: 47 FR 25682)**

decomposition within a tailing pond is throught to involve photo-decomposition by
ultraviolet light, aeration, and biological oxidation.

  Some domestic and foreign mine/mill operations have investigated and implemented
specific technologies for cyanide oxidation.  The technologies most applicable to
mine/mill wastewater are discussed below.


Alkaline Chlorination


  In alkaline chlorination, free cyanide (CN) is oxidized to cyanate (CNO-), then to
carbon dioxide ($CO_2$) and free nitrogen ($N_2$). One facility in the industry now
has an alkaline chlorination system in operation as a standby treatment if an
emergency discharge should occur (mill treatment system is no discharge).  A major
mill has installed a full-scale system (2000 gpm). Several other facilities are
performing treatability studies to determine the applicability and economics of
operation of this technology.

  The process uses free chlorine or sodium hypochlorite at a pH above 10.  Reagent
dosage, contact time, and the number of stages must be suited to the wastewater in
question.   Optimization of this process is best done using pilot-scale testing.
Advantages to the use of alkaline chlorination include relatively low reagent
costs, applicability of automatic process control, and experience with its use in
other industries (e.g., electroplating).


Ozonation


  In the ozonation process, the highly reactive ozone ($O_3$) molecules readily
liberate oxygen atoms, which then react with cyanide to form cyanate very rapidly.
Complete oxidation to $CO_2$ and $N_2$ occurs over a longer period of time (perhaps 30
minutes) with a higher concentration of ozone.   Cyanide oxidation to cyanate is
very rapid (10 to 15 minutes) at pH 9 to 12 and is **25693** practically instantaneous
if copper is present.

  Ozone also oxidizes other organic compounds if sufficient ozone and retention time
are provided.   However, the concentrations of compounds, such as phenol are
already very low and may be below the levels at which this treatment may be applied
economically.


Hydrogen Peroxide Oxidation


  This process uses hydrogen peroxide to oxidize cyanide.   In practice, a 30
percent solution is usually used at an alkaline pH with a copper catalyst.  A
patented process is also commercially available, which is capable of oxidizing
cyanide to cyanate.   This process has been successfully employed at one molybdenum
mining and milling facility to treat relatively low concentrations of cyanide and
reduce effluent levels to near detection limit.


In-Process Control of Cyanide

        Copr. ©  2004 West. No Claim to Orig. U.S. Govt. Works.

Conventional pollutants are those defined in Section 304(b)(4)--BOD, TSS, fecal
coliform, and pH--and any additional pollutants defined by the Adminsitrator as
"conventional." On July 30, 1978, EPA designated oil and grease as conventional
pollutants (see 44 FR 44501).

On July 28, 1981, the Fourth Circuit Court of Appeals remanded the regulations
establishing the "best conventional technology" (BCT) methodology and directed EPA
to conduct an additional cost-effectiveness test and to correct data errors.
American Paper Institute v. EPA, No. 79-1511.   While EPA Has not yet promulgated a
new BCT methodology, EPA is proposing BCT Limitations for the ore mining and
dressing industry.   These limits are identical to those for BPT. Since BPT is the
minimal level of control required by law, no possible reassessment of BCT pursuant
to the Court's remand could result in BCT limitations lower than those proposed
today.   Accordingly, there is no reason to wait until EPA revises the BCT
methodology before proposing these BCT limitations.


XI. New Source Performance Standards (NRSPS)


 The basis for new source performance standards (NSPS) under Section 306 of the Act
is the application of the best available demonstrated technology (BADT). New
facilities have the opportunity to implement the best and most efficient ore mining
and milling processes and wastewater technologies.   Accordingly, Congress directed
EPA to consider the best demonstrated process changes and end-of-pipe treatment
technologies capable of reducing pollution to the maximum extent feasible through a
standard of performance which includes, "where practicable, a standard permitting
no discharge of pollutants."


**25697 (A) NSPS Options**


 (1) Option 1:  Require achievement of performance standards in each subcategory
that are based on the same technology proposed for BAT.

 (2) Option 2:  Require standards that are based on a complete water recycle system
(no discharge of pollutants).


(B) NSPS Selection and Decision Criteria Subcategories and Subparts Under Option 1


 This proposed rulemaking requires that all facilities in the ore mining and
dressing industry achieve performance standards based on the same technology
proposed for BAT, except those facilities using froth flotation in the copper,
lead, zinc, gold, silver, platinum, and molybdenum subcategory and mills in the
uranium subcategory.   Option 1 has been selected for iron ore mills in the Mesabi
range;  copper, lead, zinc, silver, gold, platinum, and molybdenum mills that use
leaching to recover copper and the cyanidation process for the recovery of gold;
and mercury mills since BAT specifies zero discharge. Option 1 has also been
selected for iron ore mine drainage, iron ore mills, aluminum mine drainage,
copper, lead, zinc, gold, silver, platinum, and molybdenum mine drainage, titanium
mine drainage, dredges and mills, and mercury mine drainage.   The concentration
levels of toxic metals found in new sources in these subcategories and subparts are
expected to be similar to existing sources.   Since concentrations of some toxic

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

47 FR 25682-01
47 FR 25682-01, 1982 WL 132502 (F.R.)
(Cite as: 47 FR 25682)

metals were found at or near detection levels or at concentrations below the practical limits of additional technology, further reduction of these parameters would not be technically or economically justified.


Subcategories and Subparts Under Option 2


  The Agency proposes that new source copper, lead, zinc, gold, silver, platinum, and molybdenum mills that use froth flotation achieve zero discharge of process wastewater.

  For this subpart, EPA considered zero discharge based on recycle for BAT, but rejected it because of the extensive retrofit required at some existing facilities, the cost of retrofitting, and the possible changes required in the process.  This concern does not apply to new sources.  Recycle, if required to achieve zero discharge, is a demonstrated technology and meets the definition of standard of performance permitting zero discharge of pollutants.  New sources have the option to recycle because the metallurgical processes can be adjusted and designed to recycle process wastewater before the actual construction of the new source. While reagent buildup has been mentioned by industry as a potential problem in extractive metallurgy, no evidence has been submitted to validate this assertion. The Agency will entertain any specific comments containing actual data which may validate the assertion.

  The Agency proposes that new source uranium mills achieve zero discharge of process wastewater.  For this subpart, EPA considered zero discharge for BAT based on total impoundment and evaporation or recycle and reuse of the mill process water or a combination of these technologies. Because the pollutants detected in the current discharge from this subpart are uniquely related to one point source, the single mill discharging, the uranium mill subpart is excluded from BAT (see section VIII of this preamble).

  However, the Agency believes that for new sources a standard of performance must be proposed.  Otherwise additional discharges (new sources) could occur that obviously would not be unique to one source.  New source mills are anticipated by the Agency and these mills can achieve zero discharge as indicated by the fact that 18 of 19 mills currently achieve no discharge.

  EPA estimates that the cost to implement zero discharge for new sources would approximate the cost to implement the technology identified as BPT for the two subparts, therefore, the zero discharge requirement should not impede construction of new facilities. (See section IX of the development document).


XII. Best Management Practices


  As described in sections I and II, section 304(e) of the Act authorizes the Administrator to publish regulations to control discharges of significant amounts of toxic pollutants under section 307 or hazardous substances under section 311 to avoid activities that the Administrator determines are associated with or ancillary to industrial manufacturing or treatment process.

  Section 402(a)(1) of the Act allows the Administrator to prescribe conditions in a permit determined necessary to carry out the provisions of the Act. BMPs are one

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

47 FR 25682-01                                                    Page 38
47 FR 25682-01, 1982 WL 132502 (F.R.)
(Cite as: 47 FR 25682)

such condition.   The discharges to be controlled by BMPs are plant site runoff,
spillage or leaks, sludge or waste disposal and drainage from raw material storage.

  EPA intends to develop BMPs that are (1) applicable to all industrial sites,  (2)
applicable to a designated industrial category, or (3) capable of guiding permit
authorities in establishing BMPs required by unique circumstances of a given plant.

  The ore mining and dressing industry has numerous problem areas, including storm
water runoff, groundwater infiltration, and seepage.   Section XIII of the
development document addresses possible BMP approaches and can guide the permitting
agency in developing case-by-case BMP requirements for NPDES permits.   The
following paragraphs contain a brief description of some possible BMP approaches.

  Minimizing the volume of water contaminated in a mine is desirable because the
mass of pollutants to be treated is less.   Diversion of water around a mine site
to prevent its contact with possible pollution-forming materials is an effective
and widely applied control technique.   For example, settling ponds should be
designed with adequate drainage and storm water diversion around the pond.

  Regarding or recontouring of some types of surface mines, and surface waste piles
can be used to modify surface runoff, decrease erosion, and prevent infiltration of
water into the mine area.

  Mine-sealing techniques are more frequently applied to inactive or abandoned
mines.   Internal sealing by placing barriers within an underground mine can be
used in an active mine.   However, this practice must be applied with caution.
The barriers must be carefully designed so as to prevent inundation of the working
areas.

  Most of the metal-ore mines examined in this report practice some measure of mine
drainage control, including regulated pumping of mine drainages and the use of mine
drainage as intake mill process water.   Use of mine water as makeup water in mill
circuits is a desirable management practice and is widely implemented in this
industry.

  In some situations, operators must prevent or control seepage of toxic substances
into groundwater supplies.   Prevention of seepage from impoundment systems can be
achieved by the use of liners.   Pond liners fall into two general categories:
natural (clay or treated clay) and synthetic (commonly polyvinyl chloride (PVC),
polyethylene (PE), chlorinated polyethylene (CPE), or Hypalon).   Other materials
that can be used as pond liners are compacted earth, waste tailings, concrete,
shotcrete, rock or brick.   See section VIII of the Development Document.


XIII. Variances and Modifications


  After the final regulations are promulgated, the effluent limitations must be
incorporated in all new or *25698 renewed NPDES permits issued to direct
dischargers in this industrial category, and also in those permits that have been
issued with a reopener clause.

  The BAT, BPT and BCT effluent limitations are subject to EPA's "fundamentally
different factors" variance.   See E. I. du Pont de Nemours and Co. v. Train, 430
U.S. 1112 (1977); EPA v. National Crushed Stone Association, 101 S. Ct. 295 (1980)
Weyerhaeuser Co. v. Costle, supra. This variance recognizes factors concerning a

        Copr. ©  2004 West. No Claim to Orig. U.S. Govt. Works.

particular discharger that are fundamentally different from the factors considered in this rulemaking.  Although this variance clause was set forth in EPA's 1973-1976 industry regulations, it will now be included only by reference in the ore mining and dressing and other industry regulations. (See 40 CFR 125.30-.32, for the text and explanation of the "fundamentally different factors" variance.)

In addition, BAT limitations for nonconventional pollutants are subject to modifications under sections 301(c) and 301(g) of the Act. These statutory modifications do not apply to toxic or conventional pollutants.  According to section 301(j)(1)(B), applications for these modifications must be filed within 270 days after promulgation of final effluent limitations guidelines. (See 43 FR 40859 September 13, 1978).

NSPS is not subject to modification through EPA's "fundamentally different factors" variance or any statutory or regulatory modifications. (See du Pont vs. Train, supra).

After reviewing MSHA and Army Corps of Engineers regulations, design guidelines, and holding discussions with representatives of the appropriate Federal regulatory agencies (Department of Labor, Department of Interior, Department of Defense), EPA is confident that the impoundment facilities needed to comply with the regulations proposed in this notice are reasonable, and that no additional danger will result from their implementation.  If evidence is submitted to the Agency that indicates that facilities would have to construct a structure which would violate safety standards set out by a State or Federal agency, EPA will consider granting a variance.  The Agency does not expect the construction of impoundment facilities would result in violation of State or Federal safety standards.  However, if an operation submits to the permitting authority evidence to the contrary, a variance from the national effluent limitations may be considered through the "fundamentally different factors" variance.  Under no circumstances will an owner or operator be required to violate applicable safety standards to meet these requirements.  If more than isolated instances occur, EPA will consider amending this regulation. However, the State and Federal authorities with whom EPA has consulted on this matter uniformly have concluded that safety issues should arise infrequently, if at all.


XIV. Upset and Bypass Provisions


An issue of recurrent concern has been whether industry guidelines should include provisions authorizing noncompliance with effluent limitations during periods of "upset" or "bypass." An upset, sometimes called an "excursion," is unintentional noncompliance occurring for reasons beyond the reasonable control of the permittee. Some argue that an upset provision in EPA's effluent limitations guidelines is necessary because such upsets will inevitably occur because of the limitations, even in properly operated control equipment. Because technology-based limitations require only what technology can achieve, some claim that liability for such situations is improper.  When confronted with this issue, courts have disagreed on the question of whether an explicit upset or excursion exemption is necessary, or whether upset or excursion incidents may be handled through EPA's exercise of enforcement discretion.

While an upset is an unintentional episode during which effluent limits are exceeded, a bypass is an act of intentional noncompliance during which waste treatment facilities are circumvented in emergency situations.  Bypass provisions

Copr. ©  2004 West. No Claim to Orig. U.S. Govt. Works.