

47 FR 54598-01                                                                                                     Page 1
47 FR 54598-01, 1982 WL 154788 (F.R.)
(Cite as: 47 FR 54598)

RULES and REGULATIONS

ENVIRONMENTAL PROTECTION AGENCY

40 CFR Part 440

[WH-FRL 2232-1]

Ore Mining and Dressing Point Source Category Effluent Limitations Guidelines
and New Source Performance Standards

Friday, December 3, 1982

\*54598 AGENCY: Environmental Protection Agency (EPA).

ACTION: Final rule.

SUMMARY: This regulation limits the discharge of pollutants into navigable waters of the United States from exisitng and new sources in the ore mining and dressing industry. The Clean Water Act and a Consent Decree require EPA to issue this regulation.

The purpose of this regulation is to establish "best available technology" limitations (BAT) and "new source performance standards" (NSPS) for direct dischargers. Pretreatment standards for both existing and new sources are not being issued since no known indirect dischargers exist nor are any known to be planned. Effluent limitations for "best conventional technology" (BCT) are reserved pending application of the new BCT cost methodology.

DATES: In accordance with 40 CFR 100.01 (45 FR 26048), this regulation will be considered issued for purposes of judicial review at 1:00 P.M. Eastern time on December 17, 1982. It will become effective January 17, 1983 publication date, except § 440.104(b)(2)(ii) which contains information collection requirements which are under review at OMB.

Under Section 509(b)(1) of the Clean Water Act, any petition for judicial review of this regulation must be filed in the United States Court of Appeals within 90 days after the regulation is considered issued for purposes of judicial review. Under Section 509(b)(2) of the Clean Water Act, the regulation may not be challenged later in civil or criminal proceedings brought by EPA to enforce its requirements.

ADDRESS. Technical information may be obtained from Mr. B. Matthew Jarrett, at the address listed below, or by calling (202) 382-7164. The economic information may be obtained from Mr. John Kukulka, Office of Analysis and Evaluation (WH-586), Environmental Protection Agency, 401 M Street SW., Washington, D.C. 20460, or by calling (202) 382-5388.

On December 24, 1982, copies of the development document and the NSPS economic analysis will be available for public review in EPA's Public Information Reference Unit, Room 2404 (Rear) (EPA Library), 401 M Street SW., Washington, D.C. On

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

47 FR 54598-01                                                            Page 2
47 FR 54598-01, 1982 WL 154788 (F.R.)
**(Cite as: 47 FR 54598)**

February 7, 1983, the complete Record, including the Agency's responses to comments on the proposed regulation will be available for review at the Public Information Reference Unit. The EPA information regulation (40 CFR Part 2) allows the Agency to charge a reasonable fee for copying. Copies of the development document and the economic analysis may also be obtained from the National Technical Information Service, Springfield, Virginia 22161 (703) 487-6000. A notice will be published in the Federal Register announcing the availability of these documents from NTIS. (This should occur within 60 days of today's date.)

SUPPLEMENTARY INFORMATION:

Organization of this Notice

I. Legal Authority

II. Scope of This Rulemaking

  A. Overview

  B. Prior EPA Regulations

  C. Description of This Regulation

III. Summary of Legal Background

  A. The Clean Water Act

    1. Best Practicable Control Technology Currently Available (BPT)

    2. Best Available Technology Economically Achievable (BAT)

    3. Best Conventional Pollutant Control Technology (BCT)

    4. New Source Performance Standards (NSPS)

    5. Pretreatment Standards for Existing Sources (PSES) and Pretreatment Standards for New Sources (PSNS)

IV. Methodology and Data Gathering Efforts

V. Summary of Promulgated Regulation and Changes From Proposal

  A. Subcategorization

  B. Applicability

  C. Best Practicable Technology Limitations

  D. Best Available Technology Limitations

  E. Best Conventional Technology Limitations

  F. New Source Performance Standards

    1. Froth Flotation Mills

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

  2. Uranium Mills

  3. Storm Exemption

 G. General Provisions and Definitions

VI. Costs and Economic Impact

VII. Nonwater Quality Environmental Impacts

VIII. Pollutants and Subcategories Not Regulated

 A. Exclusion of Pollutants

 B. Exclusion of Subcategories

IX. Best Management Practices

X. Upset and Bypass Provisions

XI. Variances and Modifications

XII. Relationship to NPDES Permits

XIII. Public Participation

XIV. Small Business Administration (SBA) Financial Assistance

XV. List of Subjects in 40 CFR 440

XVI. Availability of Technical Assistance

XVII. OMB Review

Appendices

 A. Abbreviations, Acronyms, and Units Used in This Notice

 B. Toxic Organic Compounds Not Detected During Sampling

 C. Toxic Organic Compounds Detected at at Least One Facility But Always 10 ug/1 or Less

 D. Toxics Detected at Levels Too Small To Be Effectively Reduced by Technologies Known to the Administrator

 E. Toxic Organic Compounds Detected From a Small Number of Sources and Uniquely Related to These Sources

 F. Pollutants Effectively Controlled by the Technology Upon Which Other Effluent Limitations and Guidelines Are Based

 G. Pollutants Excluded by Subcategory and Subpart

 H. Subcategories Excluded From Development of BAT or NSPS

            © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

47 FR 54598-01                                                                    Page 4
47 FR 54598-01, 1982 WL 154788 (F.R.)
**(Cite as: 47 FR 54598)**

I. Legal Authority

   The regulations described in this notice are promulgated under authority of Sections 301, 304, 306, 307, 308, and 501 of the Clean Water Act (the Federal Water Pollution Control Act Amendments of 1972, 33 USC 1251 et seq., as amended by the Clean Water Act of 1977, P.L. 95-217) (the "Act"). These regulations are also promulgated in response to the Settlement Agreement in Natural Resources Defense Council, Inc., v. Train, 8 ERC 2120 (D.D.C. 1976), modified, 12 ERC 1833 (D.D.C. 1979).

II. Scope of This Rulemaking

   A. Overview. This regulation applies to facilities engaged in mining and processing of metal ores. The industry includes facilities which mine or process the ores of 23 separate metals and is segregated by the U.S. Bureau of the Census Standard Industrial Classification (SIC) into nine major codes: SIC 1011, Iron Ore; SIC 1021, Copper Ores; SIC 1031, Lead and Zinc Ores; SIC 1041, Gold Ores; SIC 1044, Silver Ores; SIC 1051, Aluminum Ore; SIC 1061, Ferroalloy Ores including Tungsten, Nickle, and Molybdenum; SIC 1092 Mercury Ores; SIC 1094 Uranium, Radium, and Vanadium Ores; and SIC 1099 Metal Ores, Not Elsewhere Classified including Titanium and Antimony.

   Over 500 active mining and over 150 milling operations are located in the United States and most are in remote areas.

   The industry includes facilities that mine ores to produce metallic products and all ore dressing and beneficiating operations at mills operated either in conjunction with a mine operation or at a separate location. A detailed overview of the ore mining industry can be found in the proposed regulation (47 FR 25682).

   *54599 B. Prior EPA Regulations. On November 6, 1975, EPA published interim final regulations establishing BPT requirements for existing sources in the ore mining and dressing industry (see 40 FR 51722). These regulations became effective upon publication. However, concurrent with their publication, EPA solicited public comments with a view to possible revisions. On the same date, EPA published proposed BAT, NSPS, and pretreatment standards for this industry (see 40 FR 51738). Comments were also solicited on these proposals.

   On May 24, 1976, as a result of the public comments received, EPA suspended certain portions of the interim final BPT regulations and solicited additional comments (see 41 FR 21191). EPA promulgated revised, final BPT regulations for the ore mining and dressing industry on July 11, 1978, (see 43 FR 29711, 40 CFR Part 440). On February 8, 1979, EPA published a clarification of the BPT regulations as they apply to storm runoff (see 44 FR 7953). On March 1, 1979, the Agency amended the final BPT regulations by deleting the requirements for cyanide applicable to froth flotation mills in the base and precious metals subcategory (see 44 FR 11546).

   On December 10, 1979, the United States Court of Appeals for the Tenth Circuit upheld the BPT regulations, rejecting challenges brought by five industrial petitioners. Kennecott Copper Corp. v. EPA, 612 F. 2d 1232 (10th Cir. 1979).

   The Agency withdrew the proposed BAT, NSPS, and pretreatment standards on March 19, 1981 (see 46 FR 17567). On June 14, 1982 the Agency proposed the BAT, BCT, and NSPS limitations and standards which are the subject of this rulemaking.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

47 FR 54598-01                                                                  Page 5
47 FR 54598-01, 1982 WL 154788 (F.R.)
**(Cite as: 47 FR 54598)**

  C. Description of This Regulation. As a result of the Clean Water Act of 1977, the emphasis of EPA's program has shifted from "classical" pollutants to the control of a list of toxic substances. Therefore, in this rulemaking, EPA efforts are primarily directed toward ensuring the achievement of limitations based upon the best available technology economically achievable (BAT) by July 1, 1984.

  The BPT effluent limitations are included as part of this regulation for the convenience of the reader. Since there are no substantive changes in the BPT effluent limitations as sustained by the 10th Circuit, the BPT effluent limitations are not subject to further judicial review.

  BAT limitations are established for seven subcategories in the ore mining and dressing point source category. The BAT effluent limitations are being promulgated as they were proposed on June 14, 1982 (47 FR 25682). The technology basis for BAT is discussed in the proposed regulation and is discussed in greater detail in the development document supporting the proposed regulation and in the development document supporting this final regulation.

  BCT effluent limitations are not being promulgated in this rulemaking. As discussed further in Section V, Changes from Proposal, BCT for this point source category is instead being included as part of the proposed regulation on the new BCT cost methodology. (47 FR 49176, October 29, 1982).

  NSPS are established for seven subcategories. A NSPS for froth flotation mills extracting copper, lead, zinc, gold, silver, or molybdenum was proposed as zero discharge, but the standard is being amended to allow for a bleed in the mill circuit. Also, the upset and bypass storm provision for new sources requiring zero discharge is being changed and made identical to the provision for existing sources. All other standards of performance and general provisions are established essentially as proposed. This is discussed further in Section V, Changes from Proposal.

  Finally, this regulation does not establish pretreatment standards because, as discussed in the proposed regulation, the Agency knows of no existing facilities which discharge to publicly owned treatment works and does not expect that any new sources will do so.

III. Summary of Legal Background

  A. The Clean Water Act. The Federal Water Pollution Control Act Amendments of 1972 established a comprehensive program to "restore and maintain the chemical, physical and biological integrity of the Nation's waters" (Section 101(a)). To implement the Act, EPA was required to issue effluent limitations guidelines, pretreatment standards and new source performance standards for industrial dischargers.

  The Act included a timeable for issuing these standards. However, EPA was unable to meet many of the deadlines and, as a result, in 1976, it was sued by several environmental groups. In settling this lawsuit, EPA and the plaintiffs executed a court-approved "Settlement Agreement." This Agreement required EPA to develop a program and adhere to a schedule in promulgating effluent limitations guidelines and pretreatment standards for 65 "priority" pollutants and classes of pollutants, for 21 major industries. [See Natural Resources Defense Council, Inc. v. Train, 8 ERC 2120 (D.D.C. 1976), modified, 12 ERC 1833 (D.D.C. 1979)].

  Many of the basic elements of this Settlement Agreement were incorporated into the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Clean Air Water Act of 1977 ("the Act"). Like the Settlement Agreement, the Act stressed control of the 65 classes of toxic pollutants. In addition, to strengthen the toxic control program, Section 304(e) of the Act authorizes the Administrator to prescribe "best management practices" (BMP) to prevent the release of toxic and hazardous pollutants from plant site runoff, spillage or leaks, sludge or waste disposal and drainage from raw material storage associated with, or ancillary to, the manufacturing of treatment process.

Under the Act, the EPA program is to set a number of different kinds of effluent limitations. These are discussed in detail in the proposed regulation and development document. The following is a brief summary:

1. Best Practicable Control Technology Currently Available (BPT). BPT limitations generally are based on the average of the best existing performance at plants of various sizes, ages and unit processes within the industry or subcategory. In establishing BPT limitations, we consider the total control of applying the technology in relation to the effluent reduction derived, the age of equipment and facilities involved, the process employed, the engineering aspects of the control technologies, process changes and the nonwater-quality environmental impacts (including energy requirements). We balance the total cost of applying the technology against the effluent reduction.

2. Best Available Technology Economically Achievable (BAT). BAT limitations, in general, represent the best existing performance in the industrial subcategory or category. The Act establishes BAT as the principal national means of controlling the direct discharge of toxic and nonconventional pollutants to navigable waters. In arriving at BAT, the Agency considers the age of the equipment and facilities involved, the process employed, the engineering aspects of the control technologies, process changes, the cost of achieving such effluent reduction and nonwater-quality environmental impacts. The Administrator retains considerable discretion in assigning the weight to be accorded these factors.

3. Best Conventional Pollutant Control Technology (BCT). The 1977 Amendments added Section 301(b)(2)(E) to the Act establishing "best *54600 conventional pollutant control technology" (BCT) for discharges of conventional pollutants from existing industrial point sources. Conventional pollutants are those defined in Section 304(a)(4) [biological oxygen demanding pollutants (e.g., BOD5) total suspended solids (TSS), fecal coliform and pH] and any additional pollutants defined by the Administrator as "conventional," i.e., oil and grease. (See 44 FR 44551: July 30, 1979.)

BCT is not an additional limitation but replaces BAT for the control of conventional pollutants. In addition to other factors specified in section 304(b)(4)(B), the Act requires that BCT limitations be assessed in light of a two part "cost-reasonableness" test. <u>American Paper Institute v. EPA, 660 F. 2d 954 (4th Cir. 1981)</u>. The first test compares the cost for private industry to reduce its conventional pollutants with the cost of publicly owned treatment works (POTWs) for similar levels of reduction in their discharge of these pollutants. The second test examines the cost-effectiveness of additional industrial treatment beyond BPT. EPA must find that limitations are "reasonable" under both tests before establishing them as BCT. In no case may BCT be less stringent than BPT.

EPA published its methodology for carrying out the BCT analysis on August 29, 1979 (44 FR 50732). In the case mentioned above, the Court of Appeals ordered EPA to correct data errors underlying EPA's calculation of the first test, and to apply the second cost test. (EPA had argued that a second cost test was not required.)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

  EPA recently proposed a new methodology on October 29, 1982 and simultaneously proposed BCT limitations for ore mining and dressing. (47 FR 49176).

  4. New Source Performance Standards (NSPS). NSPS are based on the best available demonstrated technology. New plants have the opportunity to install the best and most efficient production processess and wastewater treatment technologies.

  5. Pretreatment Standards for Existing Sources (PSES), and Pretreatment Standards for New Sources (PSNS). Pretreatment standards (PSES and PSNS) are designed to control the discharge of pollutants into publicly owned treatment works. Pretreatment standards were not proposed for the ore mining and dressing category since no known indirect dischargers exist nor are any known to be planned. Ore mines are located in rural areas, generally far from a POTW. EPA expects that the cost of pumping mine and mill wastewater to a POTW would be prohibitive in most cases, and on-site treatment is more cost effective in virtually every instance.

  IV. Methodology and Data Gathering Efforts.

  The methodology and data gathering efforts used in developing the proposed regulation were discussed in the preamble to the proposal, 47 FR 25682 (June 14, 1982). In summary, before publishing the proposed regulation the Agency conducted a data collection, analytical screening, and analytical verification program for the ore mining and dressing industry. This program stressed the acquisition of data on the presence and treatability of the 65 toxic pollutants and classes of toxic pollutants discussed previously. The 65 toxic pollutants and classes of pollutants potentially include thousands of specific pollutants. EPA selected 129 specific toxic pollutants for study in this rulemaking and other industry rulemakings. (Analytical methods are discussed in Sampling and Analysis Procedures for Screening of Industrial Effluents for Priority Pollutants (U.S. E.P.A., April 1977)). Based on the results of that program, EPA identified several distinct treatment technologies, including both end-of-pipe and in-plant technologies, that are or can be used to treat ore mining and dressing industry wastewaters.

  For each of these technologies, the Agency (i) compiled and analyzed historical and newly-generated data on effluent quality, (ii) identified its reliabilities and constraints, (iii) considered the nonwater quality impacts (including impacts on air quality, solid waste generation and energy requirements), and (iv) estimated the costs and economic impacts of applying it as a treatment and control system. Costs and economic impacts of the technology options considered are discussed in detail in two separate documents, The Economic Impact Analysis of Promulgated New Source Performance Standards for the Ore Mining and Dressing Industry and The Economic Impact Analysis of Promulgated BAT Effluent Limitations and Standards for the Ore Mining and Dressing Industry. A more complete description of the Agency's study methodology, data gathering efforts and analytical procedures supporting the regulation can be found in the Final Development Document for Effluent Limitations Guidelines and New Source Performance Standards for the Ore Mining and Dressing Point Source Category (U.S. EPA, November 1982).

  V. Summary of Promulgated Regulation and Changes From Proposal

  The final regulation does not change the proposed BAT regulations but does change the standards for new sources. The changes are the result of the Agency's consideration of public comments provided in response to the proposal and further evaluation of the information upon which the proposal was based.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A. Subcategorization. The proposed subcategorization scheme was similar to the subcategorization scheme found in the 1978 BPT regulations. That scheme subcategorizes the industry primarily on the basis of ore type. Each subcategory is further subdivided on the basis of whether the discharge is from a mine or a mill and, in some cases, according to the type of beneficiation process employed. In these final regulations the Agency is retaining the proposed subcategorization scheme with a few modifications resulting from comments received on the proposed regulation.

The 1978 BPT regulations contained a Ferroalloy Ores subcategory that addressed discharges from facilities mining or milling chromium, cobalt, columbium, tantalum, manganese, molybdenum, nickel, tungsten, and vanadium (recovered alone, rather than as a by-product of uranium mining or milling). The BPT regulations also contained a Base and Precious Metal Ores subcategory that addressed the discharges from facilities mining or milling copper, lead, zinc, gold, or silver. Prior to proposing the BAT and NSPS regulations, EPA found that the wastewater discharges from molybdenum mines and mills were more like the discharges from facilities in the Base and Precious Metals Ores subcategory than the discharges from the Ferroalloy subcategory. Consequently the proposed BAT and NSPS regulations placed molybdenum mines and mills into the Base and Precious metals subcategory, which was renamed the Copper, Lead, Zinc, Gold, Silver, Platinum and Molybdenum Ores subcategory. The proposal also eliminated the Ferroalloy subcategory and replaced it with the Nickle Ores subcategory, the Tungsten Ores subcategory, and the Vanadium Ores subcategory (recovered alone, not as a by-product of uranium mining and milling). For clarification, however, the proposal retained the old subcategorization scheme for the BPT limitations.

From the comments received, it is apparent that retention of the old BPT subcategorization scheme for the BPT *54601 limitations has only confused, rather than clarified matters. The commenters suggested that, to eliminate this confusion, the Agency should use an identical subcategorization scheme for all the limitations and standards. Accordingly, in this final regulation, the Agency is eliminating a separate subcategorization scheme for the BPT limitations, and is, instead, using the same scheme for all the BPT, BAT, and NSPS limitations. This change is solely for the purpose of clarification and will not alter in any way the actual numerical limitations which apply to facilities covered by the BPT regulations.

One additional modification to the subcategorization scheme is being made. The Agency is taking platinum ore out of the new Copper, Lead, Zinc, Gold, Silver, and Molybdenum Ores subcategory and establishing a new subcategory for these mines and mills. The Agency received comments that a new platinum mine and mill is being considered that will be substantially different than the existing mines and mills upon which the Agency based best demonstrated technology. The Agency is, therefore, establishing a new subcategory addressing platinum ore mines and mills and is reserving the new source performance standard.

B. Applicability. As discussed in the proposal, the Ore Mining and Dressing effluent guidelines limitations and standards are applicable to facilities discharging wastewater from ore mining and milling operations. They do not, however, provide a complete basis for calculating the limitations of operations known as "complex facilities," which combine wastestreams from processes such as refining and smelting with ore mining and milling wastestreams and then treat this combined stream before discharge. Each facility will be given effluent limitations that are derived from the BAT mine and mill guidelines and the smelter and refining guidelines and other applicable guidelines.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Agency received voluminous comments from developers of a molybdenum mine and mill in southeastern Alaska. The developers argued that the mill differs substantially from the existing molybdenum mills upon which the Agency based the proposed NSPS. Specifically, they argue that precipitation is greater than at other facilities and that the terrain is unusually steep, necessitating the construction of a dam much larger than tailings impoundments at existing facilities. They further argue that since the mine and mill are located in the environmentally sensitive Misty Fjords National Monument, construction of a massive tailings impoundment may result in greater long term environmental degradation than at existing facilities. In a related vein, they point out that the mine and mill are being developed in accordance with the dictates of the Alaska National Interest Lands Conservation Act (ANILC), which requires an intensive study of the overall environmental impact of the mine and mill before construction begins. Finally, they note that the mine and mill are in an earthquake area, and that construction of a large tailings dam raises concerns for safety of the population below the dam.

The Agency disagrees with the commenter's assertions that the proposed molybdenum mine and mill differ significantly in topography and climate from existing mines and mills. Nevertheless, given the possibility that compliance with the zero discharge NSPS would result in substantial non-water quality environmental impacts, and given the fact these impacts are being subjected to an intense environmental scrutiny, the Agency believes it would be premature to subject the mine and mill to regulation at this time, before the environmental review process is fully completed.

Also, as the Agency stated in the preamble to the BPT regulations and in the proposed regulation for BAT and NSPS, under no circumstances will an owner or operator be required to violate applicable safety standards to meet the requirements of BPT, BAT, or NSPS. As discussed in these regulations, the Agency is confident that the national applicable effluent limitations guidelines and standards of performance do not pose a concern for the overall safety related to the water impoundments that may be required by the regulations. However, it would be premature to regulate this mine and mill before the potential for earthquake and avalanches in a deep mountain terrain has been completely evaluated by Federal and State agencies and others responsible for conducting a thorough study of the impacts of this proposed new mine and mill. Accordingly, the Agency is excluding this mine and mill from the regulations applicable to molybdenum mines and mills, thereby postponing consideration of the appropriate limitations for this facility until the permit proceedings.

The BPT limitations established a subpart for gold placer mines, but reserved effluent limitations because the Agency did not have sufficient technical or economic data. The proposal similarly reserved effluent limitations and standards for the gold placer mine subpart because the data generated prior to proposal were not sufficiently comprehensive.

EPA still has no data upon which to base an economic assessment of gold placer mines and does not have sufficient technical data to promulgate or propose limitations for gold placer mines. The Agency is, therefore, continuing to reserve the subpart for gold placer mines in the promulgated regulation.

C. Best Practicable Technology Limitations. The BPT limitations for the ore mining industry were promulgated in 1978, were completely upheld in the Courts, and are repeated in this regulation solely for clarity. EPA received a few comments which recommended that the Agency relax the current BPT regulations. These comments are

©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

47 FR 54598-01                                                              Page 10
47 FR 54598-01, 1982 WL 154788 (F.R.)
**(Cite as: 47 FR 54598)**

discussed in the response to public comments document.

D. Best Available Technology Limitations. EPA proposed BAT limitations equal to the BPT regulations currently applicable to this industry.

The rationale for setting BAT effluent limitations equivalent to BPT <u>effluent limitations is discussed in the proposal (47 FR 25682),</u> the development document supporting the proposed rule, and the development document supporting this final rule. In summary, the Agency established BAT equal to BPT either because BPT already specified zero discharge of process wastewater, or because application of candidate BAT did not reduce the level of the toxic or nonconventional pollutants, or because BPT removed a very high percentage of the relevant pollutants. Almost all the commenters agreed with EPA's decision to propose BAT equal to BPT. Accordingly, the Agency is finalizing the BAT limitations as proposed. The comments addressing the BAT limitation are discussed in the response to public comments document.

E. Best Conventional Technology Limitations. The Agency proposed BCT limitations equal to the BPT limitations for conventional pollutants. This was done even though the Agency had not established a new cost effectiveness test for conventional pollutant removal as directed by the Fourth Circuit Court of Appeals decision in American Paper Institute v. EPA, F. 2d (4th Cir. 1981). In the proposal the Agency reasoned that since BPT is the minimum level of control required by law, no possible reassessment of BCT pursuant to the Court's remand could result in BCT limitations for conventional pollutants less stringent than the BPT limitations.

*54602 A number of commenters took issue with the Agency's decision to propose BCT limitations in the absence of a new BCT methodology. The Agency agrees with these criticisms and has accordingly decided to withdraw the BCT limitations proposed on June 14, 1982. Instead, BCT Limitations for the ore mining and dressing point source category are being included as part of the proposed regulation on the new BCT methodology. This proposed regulation was published in the Federal Register on October 29, 1982. <u>(47 FR 49176).</u> Comments on the proposed BCT limitations must be submitted during the comment period for the BCT rulemaking.

F. New Source Performance Standards. EPA proposed new source performance standards (NSPS) equal to the BAT limitations for all elements of the ore mining and dressing industry with the exception of froth flotation mills in the copper, lead, zinc, gold, silver, platinum and molybdenum subcategory and the uranium mill subcategory. The Agency proposed NSPS requiring zero discharge for these latter two segments as discussed below.

1. Froth Flotation Mills. The proposed zero discharge requirement for new froth flotation mills was based on the fact that 46 out of 90 existing facilities for which we have data achieve zero discharge through total recycle and evaporation of process wastewater.

Industry commenters raised a number of objections to this proposal. First, they argued that most of the mills achieving zero discharge are in net evaporation areas with flat topography and that it was inappropriate to extrapolate from the treatment performance of mills in these areas to mills located in rainy or mountainous areas. They contended that in rainy or mountainous areas, the costs of constructing the tailings impoundment necessary to achieve zero discharge and the costs of transporting recycle water back to the mill could be prohibitive. They implied that this problem was greatly exacerbated by the proposed storm

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

47 FR 54598-01                                                             Page 11
47 FR 54598-01, 1982 WL 154788 (F.R.)
**(Cite as: 47 FR 54598)**

exemption for new sources, which granted relief to a facility only upon the occurrence of a ten year, twenty-four hour storm.

Second, they argued that EPA improperly assumed that new sources, unlike existing sources, would not experience extensive retrofit costs. They pointed out that the Agency's proposed definition of new source embraces both virgin or "greenfield" facilities and facilities constructed in conjunction with existing sources. These latter facilities, they stated, will incur substantial retrofit costs to achieve zero discharge.

Finally, they asserted that the Agency neglected to take into account the buildup of reagents and other contaminants in the recycle water of a total recycle system. They claimed that these contaminants would interfere with the froth flotation process and cause severe loss of product, necessitating either the addition of fresh make up water or the treatment of the recycle water. They added that treating the recycle water may not always prove to be an effective solution because of the buildup of contaminants from the treatment of the recycle water. They pointed out the Agency had not calculated the **costs** of **treating** the **recycle water** or building the bigger impoundment to hold and recycle the wastewater.

The Agency disagrees with the commenters' first criticism that EPA failed to adequately take into account topographical and climatic constraints in proposing a zero discharge requirement for new sources. Mills currently achieving zero discharge are located in areas ranging from flat to extremely steep and mountainous. Zero discharge is thus demonstrated for a wide spectrum of topographical constraints. Similarly, although the majority of mills achieving zero discharge are located in dry areas, 15 are located in relatively wet areas. Zero discharge is thus demonstrated for wet areas as well as dry areas. Moreover, the standards promulgated for new source froth flotation mills allow a discharge of wastewater equivalent to the net precipitation (precipitation less evaporation) subject to the discharge limitations for mine drainage, e.g. 440.104(2)(i). By permitting the discharge of excess rainwater and runoff, this provision substantially minimizes the effect of climate on a facility's ability to meet zero discharge.

An assumption of the commenters' arguments is that the zero discharge requirement imposes significantly greater costs than the BPT requirement under the same set of topographical, climatic and land availability constraints. Many commenters implied that constructing a tailings pond necessary to achieve zero discharge in mountainous or rainy areas would be much more expensive than constructing a similarly situated pond to meet BPT requirements. Although there might have been some merit to this argument under the Agency's proposed storm exemption for new sources, this is no longer the case. Now that the Agency has amended the proposed storm provision to make it identical to the provision for existing sources, the pond required to meet BPT requirements will be approximately the same size as the pond required to meet zero discharge. (See Development Document for further discussion).

One commenter, whose existing tailings pond is located several mills from the mill and several thousand feet below it, argued that, if this mill were a new source, the costs of recycling water to the mill to achieve zero discharge would prove much more expensive than meeting the BPT requirements. The Agency, however, considers such situations to be extremely rare. If a new source had to operate under similar constraints, the Agency would entertain a petition to modify the new source standard or create a new subcategory for this type of facility.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 19, page 11 of 13

47 FR 54598-01                                                                  Page 12
47 FR 54598-01, 1982 WL 154788 (F.R.)
**(Cite as: 47 FR 54598)**

With respect to industry commenters' second criticism, EPA agrees with their claim that there would be retrofit costs associated with meeting zero discharge where a new source is constructed at the site of an existing source. It is not clear, however, whether this problem is anything but theoretical. EPA specifically asked industry to provide it with examples of construction at the site of an existing source which might constitute a new source under EPA's proposed criteria for "new source" (45 FR 59343, September 9, 1980). After evaluating these examples, EPA has concluded that only one of the examples provided by industry would constitute a "new source" under the proposed criteria--and this example involved construction at a "green field" site. (These examples are specifically discussed in the Response to Comments document). Nevertheless, EPA has redone its economic analysis to embrace situations where construction at the site of an existing source would clearly create a new source (i.e. total replacement of a mill). EPA has concluded that in such situations, the costs of achieving zero discharge will not cause an adverse economic impact.

EPA agrees with the commenters' third contention that we did not adequately consider the buildup of contaminants in the recycle water. Commenters have come forward with data demonstrating that the buildup of reagents and other contaminants can in fact interfere with the extractive process, causing severe loss of product. They have also demonstrated that treatment of the recycle water may not always be an economically viable option for dealing with this interference problem. Unfortunately, this interference is a complex phenomenon, which appears to be related to the characteristics of the ore at particular sites, making it impossible to carve out a subcategory of facilities afflicted with this problem. Accordingly, to *54603 accommodate the problem, the final NSPS contains a special "bleed" provision which will allow facilities to discharge wastewater (subject to the NSPS mine drainage standards) if they can demonstrate to the permitting authority that total recycle would cause a major interference in the extractive metallurgical process and that appropriate treatment of recycle water is not adequate to remedy this interference. This provision will allow such facilities to substitute some fresh water for recycle water as industry stated and their data indicated was necessary, thereby avoiding the losses associated with buildup of contaminants in the recycle water. Specification of the exact amounts of water discharged and the appropriate treatment of recycle water will, of course, be left to the permitting authority. The Agency has, however, evaluated the costs and economic impact of at least two forms of treatment of recycle water. The first is pH adjustment (lime addition) and settling. Assuming a 24-hour retention time and a 10 percent safety factor, the Agency has concluded that the costs of such treatment of recycle water would not be significant enough to deter investment for a new mill with a tailings pond used for primary settling. The Agency has further determined that additional treatment consisting of a mixed media filter would not constitute a barrier to entry for such mills. The development document and economic document supporting this regulation discuss in more detail the Agency's considerations in creating the bleed provision and what treatment was considered as appropriate treatment of recyle water.

2. Uranium Mills. The Agency proposed zero discharge for new uranium miles based on data demonstrating that 18 of 19 existing mills do not discharge wastewater. The single existing mill which discharges, recycles over 80 percent of the requirement for its intake water. Zero discharge for new uranium mills is based on recycle, evaporation, and a combination of recycle and evaporation.

Industry commented that our data represented mills in arid areas and that we did not consider new mills that may locate in areas of high rainfall. They also requested that flexibility should be allowed to accommodate changes in the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

47 FR 54598-01                                                                                            Page 13
47 FR 54598-01, 1982 WL 154788 (F.R.)
**(Cite as: 47 FR 54598)**

extractive processes currently used to recover uranium.   Finally they commented that we should allow an effluent discharge because such a discharge is considered a valuable commodity in water short areas.

The ability of uranium mills to achieve zero discharge is well demonstrated and is recognized by Federal and State regulating authorities dealing with the uranium industry.   It is true that existing uranium mills are located in arid areas.   However, we know of no plans for construction of new mills in non-arid areas, although some firms have conducted exploration in such areas.   Should any new mills locate in areas of high net precipitation, they can take advantage of the net precipitation provision and the storm exemption.   If, despite these provisions, a uranium mill locates in an area where it is impossible to achieve zero discharge the facility can petition the Agency to change NSPS or create a separate subcategory for that type of facility.

The Agency does not believe that it needs to provide any additional flexibility to accommodate changes in the extractive processes used to recover uranium.   Industry commenters failed to provide EPA with any information concerning new or different extractive processes.   Furthermore, the current regulations only apply to certain identified extractive processes and thus would not apply to processes unrelated to processes used today.

Nor does the Agency believe that the zero discharge requirement will adversely affect water conservation.   Even if there were a slight increase in water consumption attributable to compliance with zero discharge, that increase would not be significant when compared to the benefits derived from the use of recycle and evaporation systems.   Accordingly, the zero discharge requirement for new uranium mills is promulgated as proposed.

3. Storm Exemption. The Agency proposed a storm exemption for new sources subject to zero discharge which would allow a discharge of excess wastewater upon the occurrence of a 10-year 24-hour precipitation event.   Industry stated that the provision of the exemption imposed an impossible design requirement on them and should be changed to the requirement for existing sources.

After reviewing the industry comments, and data developed by the Agency, EPA has concluded that the industry comments are valid.   Conditioning the storm exemption on the actual occurrence of a 10-year, 24-hour storm is inappropriate because overflows can occur from facilities designed, maintained, and operated to handle a 10-year, 24-hour precipitation event as a result of recurring storms or excessive snowmelt even though no individual event were equivalent to a 10-year, 24-hour precipitation event.   The proposal would have required facilities to engage in the extremely difficult task of anticipating all such combinations of precipitation events.   Accordingly, we have modified the storm exemption for new sources subject to zero discharge so that it is identical to the exemption for existing sources.

The Agency received requests for further explanation of the considerations to be taken into account in the design and construction of a facility which may be granted relief under the storm exemption.   As a result of these requests we have made some clarifying changes in the language of the exemption.   The first change is designed to clarify the nature of the operator's responsibilities during an upset or bypass overflow event.   The storm exemption is designed to provide a limited exception to the requirements applicable to mines and mills under normal operating conditions.   It grants relief from excess discharges which occur during and immediately after any precipitation or snowmelt--the intensity of the event is not specified.   The storm exemption was not intended to grant the operator the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 19, page 13 of 13