to the requirements of this regulation only pertains to a single and complete project, and would not encompass cumulative discharges of dredged or fill material, each less than 500 cubic yards, in a large number of projects which comprise and are associated with a complete plan of development. The term "commenced" as used in this paragraph is satisfied if there has been some discharge of dredged or fill material at a specified disposal site or the entering into a written contract to do such before the date of the regulation. The "grandfathering" of these activities does not avoid the legal requirement to comply with the State water quality certification requirements of section 401 of the FWPCA or to furnish a coastal zone management certification, however.

*Paragraph (e)(2)(iv):* This paragraph permits, (without the need for the processing of a individual permit application through the procedures in the regulation), minor bulkheads and fills that are constructed in waters other than navigable waters of the United States provided they are less than 500 feet in length, constructed for property protection, and involve the discharge of less than an average of one cubic yard per running foot. However, while these types of discharges are permitted through the regulation, conditions have also been imposed that must be met before the discharge can occur (including the need to obtain a water quality certification and furnish a coastal zone management certification). In addition, the District Engineer can still exercise jurisdiction over these activities in those cases where he determines that the discharge will have a significant impact on the environment.

We believe that this administrative mechanism of authorizing this type of activity through the regulation is essential in order to make this program manageable from a manpower and resources point of view, and still protect the aquatic environment. In addition, it serves as a mechanism to alleviate the administrative burdens which are encountered in the normal processing of individual permits. To this end, we intend to rely heavily on the general public to bring to the attention of the District Engineer those minor bulkhead and fill activities which, while falling within the protection of this paragraph, should be regulated on a case by case basis.

*Paragraph (e)(4):* Activities of Federal agencies that involve the discharge of dredged material or of fill material into navigable waters are not exempt from the provisions of this regulation. Activities of the Corps of Engineers involving such discharges are reviewed and regulated pursuant to the policies and procedures expressed in Title 33 of the Code of Federal Regulations, Part 209.145.

*Paragraph (f)(3):* We believe there is considerable merit in having the States become directly involved in the decision-making process to the maximum extent possible under the law. Indeed, many states already have ongoing permit programs which address many, and, in some cases all, of the concerns which are addressed in the Corps decision-making process. Three ways will be used to involve the States in this decision-making process. We have embodied these three mechanisms in an effort to make the program manageable and publicly acceptable, and in response to the overwhelming number of comments which supported the basic concept.

First, since each discharge of dredged or fill material into a navigable water is, in effect, the discharge of a pollutant into the water, a State water quality certification is required under section 401 of the FWPCA before that discharge can be lawfully undertaken. Provision has therefore been made in the opening paragraph of this section to indicate this legal requirement. Thus, any State may cause the denial of a section 404 permit if it chooses to deny a water quality certification. Similar situations also exist in those states with approved coastal zone management plans. An individual in states with such plans must also certify that his activity will comply with the approved plan. On the other hand, where the state does not have such a certification program or delays the processing of its certification, we will still begin to process the section 404 permit. In absence of a timely response from the State, the section 404 permit will be processed to a conclusion.

Second, we are mindful that many states have existing permit programs to regulate the same types of activities that will be regulated through section 404 of the FWPCA by the Corps of Engineers. To the extent possible, it is our desire to support the state in its decision. Thus, where a state denies a permit, the Corps will not issue a section 404 permit. On the other hand, if a state issues a permit, the Corps would not deny its permit unless there are overriding national factors of the public interest which dictate such action. We believe that this type of situation can be kept to a minimum provided the State's permit program has built into it the policies, procedures, goals, requirements, and objectives embodied in the Corps permit program and the national legislation which molded and supports it. This would include, for example, the concerns and requirements of the National Environmental Policy Act, the Fish and Wildlife Coordination Act, the Endangered Species Act, the Coastal Zone Management Act, and the FWPCA. In view of this objective, a section 404 permit will generally be issued following a favorable State determination unless overriding national factors of the public interest are revealed during the final processing of the section 404 permit application and provided the concerns, policies, goals, and requirements expressed in the above cited statutes, the Corps policies, and the guidelines have been addressed. In those States without any type of permit program to regulate the types of activities envisioned by section 404, we believe that the objectives expressed in this subparagraph should give them guidance in the formulation of their respective programs should they choose to do so.

Finally, provision has been made in subparagraph (v) of this section to allow the District Engineer to enter into an agreement with those States having ongoing permit programs which would enable joint processing of the Department of the Army and the state permit application to an independent conclusion by each entity. This would include joint public notices, joint public hearings, and the joint development, review, and analysis of information which leads to the final decision on a permit application. We strongly encourage States to work with our District Engineers in this effort for we feel that this is a valuable mechanism to make this program manageable and publicly acceptable as well as a means to avoid unnecessary duplication of effort.

*Paragraph (i)(2)(ix):* We have also adopted a procedure, found in this paragraph, to process general permits for certain clearly described categories. A general permit once issued would preclude the need for any further permit for similar work and would prescribe conditions to be followed in the future performance of such work. We hope this mechanism will go far in making our entire regulatory program administratively manageable, and we will attempt to use the general permit for many categories in Phases II and III prior to the effective date of those phases. We intend to urge our District Engineers to utilize this mechanism as often as possible, and we request that those Federal agencies, organizations, and members of the public who review and comment on public notices for general permits do so in a spirit of cooperation, constructive criticism and suggestion.

During the next 90 days, comments addressing this interim final regulation should be submitted in writing to the Chief of Engineers, Forrestal Building, Washington, D.C. 20314, ATTN: DAEN-CWO-N.

It is hereby certified that the economic and inflationary impacts of this regulation have been carefully evaluated in accordance with OMB Circular A-107.

Dated: July 22, 1975.

ROBERT B. HUGHES,
*Colonel, Corps of Engineers, Assistant Chief, Construction-Operations, Directorate of Civil Works.*

§ 209.120 **Permits for activities in Navigable Waters or Ocean Waters.**

(a) *Purpose.* This regulation prescribes the policy, practice, and procedure to be followed by all Corps of Engineers installations and activities in connection with applications for permits authorizing structures and work in or affecting navigable waters of the United States, the discharge of dredged or fill material into navigable waters, and the transportation of dredged material for the purpose of dumping it into ocean waters.

(b) *Laws requiring authorization of structures or work.* (1) Section 9 of the

River and Harbor Act approved March 3, 1899 (30 Stat. 1151; 33 U.S.C. 401) prohibits the construction of any dam or dike across any navigable water of the United States in the absence of Congressional consent and approval of the plans by the Chief of Engineers and the Secretary of the Army. Where the navigable portions of the waterbody lie wholly within the limits of a single State, the structure may be built under authority of the legislature of that State, if the location and plans or any modification thereof, are approved by the Chief of Engineers and by the Secretary of the Army. The instrument of authorization is designated a permit. Section 9 also pertains to bridges and causeways but the authority of the Secretary of the Army and Chief of Engineers with respect to bridges and causeways was transferred to the Secretary of Transportation under the Department of Transportation Act on October 16, 1966 (80 Stat. 941; 49 U.S.C. 1165g(6)(A)).

(2) Section 10 of the River and Harbor Act approved March 3, 1899 (30 Stat. 1151; 33 U.S.C. 403) prohibits the unauthorized obstruction or alteration of any navigable water of the United States. The construction of any structure in or over any navigable water of the United States, the excavation from or depositing of material in such waters, or the accomplishment of any other work affecting the course, location, condition, or capacity of such waters are unlawful unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army. The instrument of authorization is designated a permit or letter of permission. The authority of the Secretary of the Army to prevent obstructions to navigation in the navigable waters of the United States was extended to artificial islands and fixed structures located on the outer continental shelf by section 4(f) of the Outer Continental Shelf Lands Act of 1953 (67 Stat. 463; 43 U.S.C. 1333(f)).

(3) Section 11 of the River and Harbor Act approved March 3, 1899 (30 Stat. 1151; 33 U.S.C. 404) authorizes the Secretary of the Army to establish harbor lines channelward of which no piers, wharves, bulkheads, or other works may be extended or deposits made without approval of the Secretary of the Army. Regulations (ER 1145-2-304) have been promulgated relative to this authority and published at § 209.150. By policy stated in those regulations effective May 27, 1970, harbor lines are guidelines only for defining the offshore limits of structures and fills insofar as they impact on navigation interests. Except as provided in paragraph (e)(1) of this section below, permits for work shoreward of those lines must be obtained in accordance with section 10 of the same Act, cited above.

(4) Section 13 of the River and Harbor Act approved March 3, 1899 (30 Stat. 1152; 33 U.S.C. 407) provides that the Secretary of the Army, whenever the Chief of Engineers determines that anchorage and navigation will not be injured thereby, may permit the discharge of refuse into navigable waters. In the absence of a permit, such discharge of refuse is prohibited. While the prohibition of this section, known as the Refuse Act, is still in effect, the permit authority of the Secretary of the Army has been superseded by the permit authority provided the Administrator, Environmental Protection Agency, under sections 402 and 405 of the Federal Water Pollution Control Act (PL 92-500, 86 Stat. 816, 33 U.S.C. 1342 and 1345).

(5) Section 14 of the River and Harbor Act approved March 3, 1899 (30 Stat. 1152; 33 U.S.C. 408) provides that the Secretary of the Army on the recommendation of the Chief of Engineers may grant permission for the temporary occupation or use of any sea wall, bulkhead, jetty, dike, levee, wharf, pier, or other work built by the United States. This permission will be granted by an appropriate real estate instrument in accordance with existing real estate regulations.

(6) Section 1 of the River and Harbor Act of June 13, 1902 (32 Stat. 371; 33 U.S.C. 565) allows any persons or corporations desiring to improve any navigable river at their own expense and risk to do so upon the approval of the plans and specifications by the Secretary of the Army and the Chief of Engineers. Improvements constructed under this authority, which are primarily in Federal project areas, remain subject to the control and supervision of the Secretary of the Army and the Chief of Engineers. The instrument of authorization is designated a permit.

(7) Section 404 of the Federal Water Pollution Control Act (PL 92-500, 86 Stat. 816, 33 U.S.C. 1344) authorizes the Secretary of the Army, acting through the Chief of Engineers, to issue permits, after notice and opportunity for public hearings, for the discharge of dredged or fill material into the navigable waters at specified disposal sites. The selection of disposal sites will be in accordance with guidelines developed by the Administrator of the Environmental Protection Agency (EPA) in conjunction with the Secretary of the Army. Furthermore, the Administrator can prohibit or restrict the use of any defined area as a disposal site whenever he determines, after notice and opportunity for public hearings, that the discharge of such materials into such areas will have an unacceptable adverse effect on municipal water supplies, shell fish beds and fishery areas, wildlife or recreational areas.

(8) Section 103 of the Marine Protection, Research and Sanctuaries Act of 1972 (PL 92-532, 86 Stat. 1052, 33 U.S.C. 1413) authorizes the Secretary of the Army to issue permits, after notice and opportunity for public hearings, for the transportation of dredged material for the purpose of dumping it in ocean waters. However, similar to the EPA Administrator's limiting authority cited in paragraph (b)(7) of this section, the Administrator can prevent the issuance of a permit under this authority if he finds that the dumping of the material will result in an unacceptable adverse impact on municipal water supplies, shellfish beds, wildlife, fisheries or recreational areas.

(9) The New York Harbor Act of June 29, 1888, as amended (33 U.S.C. 441 et seq.) provides for the issuance of permits by the Supervisors of the New York, Baltimore, and Hampton Roads Harbors for the transportation upon and/or discharge in those harbors of a variety of materials including dredgings, sludge and acid. The District Engineers of New York, Baltimore and Norfolk have been designated the Supervisors of these harbors, respectively. However, section 511(b) of the Federal Water Pollution Control Act (PL 92-500, 86 Stat. 816) provides that the discharge of these materials into navigable waters shall be regulated pursuant to that Act and not the New York Harbor Act except as to the effect on navigation and anchorage. In addition, section 106(a) of the Marine Protection, Research and Sanctuaries Act of 1972 (PL 92-532, 86 Stat. 1052) provides that all permits for discharges in ocean waters shall only be issued in accordance with the Act after April 23, 1973. Therefore, the supervisors of these three harbors will no longer issue permits under the authority of the New York Harbor Act, as amended, for transportation and/or discharge of these materials.

(c) *Related Legislation.* (1) Section 401 of the Federal Water Pollution Control Act (PL 92-500; 86 Stat. 816, 33 U.S.C. 1411) requires any applicant for a Federal license or permit to conduct any activity which may result in a discharge into navigable waters to obtain a certification from the State in which the discharge originates or will originate, or, if appropriate, from the interstate water pollution control agency having jurisdiction over the navigable waters at the point where the discharge originates or will originate, that the discharge will comply with the applicable effluent limitations and water quality standards. A certification obtained for the construction of any facility must also pertain to the subsequent operation of the facility.

(2) Section 307(c)(3) of the Coastal Zone Management Act of 1972 (PL 92-583, 86 Stat. 1280, 16 U.S.C. 1456(c)(3)) requires any applicant for a Federal license or permit to conduct an activity affecting land or water uses in the State's coastal zone to furnish a certification that the proposed activity will comply with the State's coastal zone management program. Generally, no permit will be issued until the State has concurred with the applicant's certification. This provision becomes effective upon approval by the Secretary of Commerce of the State's coastal zone management program.

(3) Section 302 of the Marine Protection, Research, and Sanctuaries Act of 1972 (Pub. L. 92-532, 86 Stat. 1052, 16 U.S.C. 1432) authorizes the Secretary of Commerce, after consultation with other interested Federal agencies and with the approval of the President, to designate as marine sanctuaries those areas of the ocean waters or of the Great Lakes and their connecting waters or of other coastal waters which he determines necessary for the purpose of preserving or

restoring such areas for their conservation, recreational, ecological, or esthetic values. After designating such an area, the Secretary of Commerce shall issue regulations to control any activities within the area. Activities in the sanctuary authorized under other authorities are valid only if the Secretary of Commerce certifies that the activities are consistent with the purposes of Title III of the Act and can be carried out within the regulations for the sanctuary.

(4) The National Environmental Policy Act of 1969 (42 U.S.C. 4321–4347) declares the national policy to encourage a productive and enjoyable harmony between man and his environment. Section 102 of that Act directs that "to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this Act, and (2) all agencies of the Federal Government shall * * * insure that presently unquantified environmental amenities and values may be given appropriate consideration in decision making along with economic and technical considerations * * *." See also paragraph (l)(1) of this section on environmental statements.

(5) The Fish and Wildlife Act of 1956 (16 U.S.C. 742a, et seq.), the Migratory Marine Game-Fish Act (16 U.S.C. 760c–760g) and the Fish and Wildlife Coordination Act (16 U.S.C. 661–666c) and other acts express the concern of Congress with the quality of the aquatic environment as it affects the conservation, improvement and enjoyment of fish and wildlife resources. Reorganization Plan No. 4 of 1970 transferred certain functions, including certain fish and wildlife-water resources coordination responsibilities, from the Secretary of the Interior to the Secretary of Commerce. Under the Fish and Wildlife Coordination Act and Reorganization Plan No. 4, any Federal Agency which proposes to control or modify any body of water must first consult with the United States Fish and Wildlife Service, the National Marine Fisheries Service, as appropriate, and with the head of the appropriate State agency exercising administration over the wildlife resources of the affected State.

(6) The Federal Power Act of 1920 (41 Stat. 1063; 16 U.S.C. 791a et seq.), as amended, authorizes the Federal Power Commission (FPC) to issue licenses for the construction, operation and maintaining of dams, water conduits, reservoirs, power houses, transmission lines, and other physical structures of a power project. However, where such structures will affect the navigable capacity of any navigable waters of the United States (as defined in 16 U.S.C. 796), the plans for the dam or other physical structures affecting navigation must be approved by the Chief of Engineers and the Secretary of the Army. In such cases, the interests of navigation should normally be protected by a recommendation to the FPC for the inclusion of appropriate provisions in the FPC license rather than the issuance of a separate Department of the Army permit under 33 U.S.C. 401 et seq. As to any other activities in navigable waters not constituting construction, operation and maintenance of physical structures licensed by the FPC under the Federal Power Act of 1920, as amended; the provisions of 33 U.S.C. 401 et seq. remain fully applicable. In all cases involving the discharge of dredged or fill material into navigable waters or the transportation of dredged material for the purpose of dumping in ocean waters, Department of the Army permits under section 404 of the Federal Water Pollution Control Act, or under section 103 of the Marine Protection, Research and Sanctuaries Act of 1972 will be required.

(7) The National Historic Preservation Act of 1966 (80 Stat. 915, 16 U.S.C. 470) created the Advisory Council on Historic Preservation to advise the President and Congress on matters involving historic preservation. In performing its function the Council is authorized to review and comment upon activities licensed by the Federal Government which will have an effect upon properties listed in the National Register of Historic Places.

(8) The Interstate Land Sales Full Disclosure Act (15 U.S.C. 1701 et seq.) prohibits any developer or agent from selling or leasing any lot in a subdivision unless the purchaser is furnished in advance a printed property report including information which the Secretary of Housing and Urban Development may, by rules or regulations, require for the protection of purchasers. In the event the lot in question is in a wetlands area, the report is required by Housing and Urban Development regulation to state that no permit has been granted by the Corps of Engineers for the development under Section 10 of the River Harbor Act of 1899.

(9) The Water Resources Planning Act (42 U.S.C. 1962 et seq.) provides for the possible establishment upon request of the Water Resources Council or a State of river basin water and related land resources commissions. Each such commission shall coordinate Federal, State, interstate, local and nongovernmental plans for the development of water and related land resources in its area, river basin, or group of river basins. In the event the proposed Corps of Engineers permits to non-governmental developers or other agencies under section 10 of the River and Harbor Act of 1899 and section 404 of the Federal Water Pollution Control Act may affect the plans of such river basin commissions, the permits will be coordinated with the appropriate concerned river basin commissions. The same is true of Corps of Engineers authorizations to private persons or corporations to improve navigable rivers at their own expense under section 1 of the River and Harbor Act of 1902.

(d) Definitions. For the purpose of issuing or denying authorizations under this regulation.

(1) "Navigable waters of the United States." The term, "navigable waters of the United States," is administratively defined to mean waters that have been used in the past, are now used, or are susceptible to use as a means to transport interstate commerce landward to their ordinary high water mark and up to the head of navigation as determined by the Chief of Engineers, and also waters that are subject to the ebb and flow of the tide shoreward to their mean high water mark (mean higher high water mark on the Pacific Coast). See 33 CFR 209.260 (ER 1165–2–302) for a more definitive explanation of this term.

(2) "Navigable waters". (i) The term, "navigable waters," as used herein for purposes of Section 404 of the Federal Water Pollution Control Act, is administratively defined to mean waters of the United States including the territorial seas with respect to the disposal of fill material and excluding the territorial seas with respect to the disposal of dredged material and shall include the following waters:

(a) Coastal waters that are navigable waters of the United States subject to the ebb and flow of the tide, shoreward to their mean high water mark (mean higher high water mark on the Pacific coast);

(b) All coastal wetlands, mudflats, swamps, and similar areas that are contiguous or adjacent to other navigable waters. "Coastal wetlands" includes marshes and shallows and means those areas periodically inundated by saline or brackish waters and that are normally characterized by the prevalence of salt or brackish water vegetation capable of growth and reproduction;

(c) Rivers, lakes, streams, and artificial water bodies that are navigable waters of the United States up to their headwaters and landward to their ordinary high water mark;

(d) All artificially created channels and canals used for recreational or other navigational purposes that are connected to other navigable waters, landward to their ordinary high water mark;

(e) All tributaries of navigable waters of the United States up to their headwaters and landward to their ordinary high water mark;

(f) Interstate waters landward to their ordinary high water mark and up to their headwaters;

(g) Intrastate lakes, rivers and streams landward to their ordinary high water mark and up to their headwaters that are utilized:

(1) By interstate travelers for water-related recreational purposes;

(2) For the removal of fish that are sold in interstate commerce;

(3) For industrial purposes by industries in interstate commerce; or

(4) In the production of agricultural commodities sold or transported in interstate commerce;

(h) Freshwater wetlands including marshes, shallows, swamps and, similar areas that are contiguous or adjacent to other navigable waters and that support freshwater vegetation. "Freshwater wetlands" means those areas that are periodically inundated and that are normally characterized by the prevalence of vegetation that requires saturated soil

conditions for growth and reproduction; and

(i) Those other waters which the District Engineer determines necessitate regulation for the protection of water quality as expressed in the guidelines (40 CFR 230). For example, in the case of intermittent rivers, streams, tributaries, and perched wetlands that are not contiguous or adjacent to navigable waters identified in paragraphs (a)–(h), a decision on jurisdiction shall be made by the District Engineer.

(ii) The following additional terms are defined as follows:

(a) *"Ordinary high water mark"* with respect to inland fresh water means the line on the shore established by analysis of all daily high waters. It is established as that point on the shore that is inundated 25% of the time and is derived by a flow-duration curve for the particular water body that is based on available water stage data. It may also be estimated by erosion or easily recognized characteristics such as shelving, change in the character of the soil, destruction of terrestrial vegetation or its inability to grow, the presence of litter and debris, or other appropriate means that consider the characteristics of the surrounding area;

(b) *"Mean high water mark"* with respect to ocean and coastal waters means the line on the shore established by the average of all high tides (all higher high tides on the Pacific Coast). It is established by survey based on available tidal data (preferably averaged over a period of 18.6 years because of the variations in tide). In the absence of such data, less precise methods to determine the mean high water mark may be used, such as physical markings or comparison of the area in question with an area having similar physical characteristics for which tidal data are already available;

(c) *"Lakes"* means natural bodies of water greater than five acres in surface area and all bodies of standing water created by the impounding of navigable waters identified in paragraphs (a)–(h), above. Stock watering ponds and settling basins that are not created by such impoundments are not included;

(d) *"Headwaters"* means the point on the stream above which the flow is normally less than 5 cubic feet per second; *provided, however,* the volume of flow, point and nonpoint source discharge characteristics of the watershed, and other factors that may impact on the water quality of waters of the United States will be considered in determining this upstream limit; and

(e) *"Primary tributaries"* means the main stems of tributaries directly connecting to navigable waters of the United States up to their headwaters and does not include any additional tributaries extending off of the main stems of these tributaries.

(3) *"Ocean waters"*. The term "ocean waters," as defined in the Marine Protection, Research, and Sanctuaries Act of 1972 (P.L. 92–532, 86 Stat. 1052), means those waters of the open seas lying seaward of the base line from which the territorial sea is measured, as provided for in the Convention on the Territorial Sea and the Contiguous Zone (15 UST 1606; TIAS 5639).

(4) *"Dredged material"*. The term "dredged material" means material that is excavated or dredged from navigable waters. The term does not include material resulting from normal farming, silvaculture, and ranching activities, such as plowing, cultivating, seeding, and harvesting, for production of food, fiber, and forest products.

(5) *"Discharge of dredged material"*. The term "discharge of dredged material" means any addition of dredged material, in excess of one cubic yard when used in a single or incidental operation, into navigable waters. The term includes, without limitation, the addition of dredged material to a specified disposal site located in navigable waters and the runoff or overflow from a contained land or water disposal area. Discharges of pollutants into navigable waters resulting from the onshore subsequent processing of dredged material that is extracted for any commercial use (other than fill) are not included within this term and are subject to section 402 of the Federal Water Pollution Control Act even though the extraction of such material may require a permit from the Corps of Engineers under section 10 of the River and Harbor Act of 1899.

(6) *"Fill material."* The term "fill material" means any pollutant used to create fill in the traditional sense of replacing an aquatic area with dry land or of changing the bottom elevation of a water body for any purpose. "Fill material" does not include the following:

(i) Material resulting from normal farming, silvaculture, and ranching activities, such as plowing, cultivating, seeding, and harvesting, for the production of food, fiber, and forest products;

(ii) Material placed for the purpose of maintenance, including emergency reconstruction of recently damaged parts of currently serviceable structures such as dikes, dams, levees, groins, riprap, breakwaters, causeways, and bridge abutments or approaches, and transportation structures.

(iii) Additions to these categories of activities that are not "fill" will be considered periodically and these regulations amended accordingly.

(7) *"Discharge of fill material."* The term "discharge of fill material" means the addition of fill material into navigable waters for the purpose of creating fastlands, elevations of land beneath navigable waters, or for impoundments of water. The term generally includes, without limitation, the following activities: placement of fill that is necessary to the construction of any structure in a navigable water; the building of any structure or impoundment requiring rock, sand, dirt, or other pollutants for its construction; site-development fills for recreational, industrial, commercial, residential, and other uses; causeways or road fills; dams and dikes; artificial islands, property protection and/or reclamation devices such as riprap, groins, seawalls, breakwalls, and bulkheads and fills; beach nourishment; levees; sanitary landfills; fill for structures such as sewage treatment facilities, intake and outfall pipes associated with power plants, and subaqueous utility lines; and artificial reefs.

(8) *"Person"*. The term "person" means any individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, any interstate body, or any agency or instrumentality of the Federal Government, other than the Corps of Engineers (see 33 CFR 209.145 for procedures for Corps projects).

(9) *"Coastal zone."* The term "coastal zone" means the coastal waters and adjacent shorelands designated by a State as being included in its approved coastal zone management program under the Coastal Zone Management Act of 1972.

(e) *Activities Requiring Authorizations*. (1) Structures or work in navigable waters of the United States. Department of the Army authorizations are required under the River and Harbor Act of 1899 (See paragraph (b) of this section) for all structures or work in navigable waters of the United States except for bridges and causeways (see Appendix A), the placement of aids to navigation by the U.S. Coast Guard, structures constructed in artificial canals within principally residential developments where the canal has been connected to a navigable water of the United States (see paragraph (g)(11) below), and activities that were commenced or completed shoreward of established harbor lines before May 27, 1970 (see 33 CFR § 209.150) other than those activities involving the discharge of dredged or fill material in navigable waters after October 18, 1972.

(i) Structures or work are in the navigable waters of the United States if they are within limits defined in 33 CFR 209.260. Structures or work outside these limits are subject to the provisions of law cited in paragraph (b) of this section if those structures or work affect the course, location, or condition of the water body in such a manner as to significantly impact on the navigable capacity of the water body. A tunnel or other structure under a navigable water of the United States is considered to have a significant impact on the navigable capacity of the water body.

(ii) Structures or work licensed under the Federal Power Act of 1920 do not require Department of the Army authorizations under the River and Harbor Act of 1899 (see paragraphs (b) and (c) of this section); provided, however, that any part of such structures or work that involves the discharge of dredged or fill material into navigable waters or the transportation of dredged material for the purpose of dumping it into ocean waters will require Department of the Army authorization under Section 404 of the Federal Water Pollution Control Act and Section 103 of the Marine Protection, Research, and Sanctuaries Act, as appropriate.

(2) *Discharges of dredged material or of fill material into navigable waters.* (1)