37122

## RULES AND REGULATIONS

**Title 33—Navigation and Navigable Waters**

**CHAPTER II—CORPS OF ENGINEERS, DEPARTMENT OF THE ARMY**

Regulatory Programs of the Corps of Engineers

**AGENCY:** U.S. Army Corps of Engineers, DoD.

**ACTION:** Final rules.

**SUMMARY:** We are revising and reorganizing all regulations governing the permit programs of the Corps of Engineers. The new format is designed to make the policies and procedures more understandable to a person desiring to perform work in the waters of the United States. The Section 404 program (discharging dredged or fill material into the water) is being revised to clarify many terms and to provide for the issuance of nationwide permits. The new regulations should enable a person to get a quicker decision on his application. In the case of nationwide permits, no application at all is required.

**EFFECTIVE DATE:** July 19, 1977.

**FOR FURTHER INFORMATION CONTACT:**

Mr. Curtis Clark or Mr. Bernie Goode, Regulatory Functions Branch, phone: 202–693–5070 or Mr. William Hedeman, Chief Counsels Office, phone: 202–693–6169.

**SUPPLEMENTARY INFORMATION:** Because of the rapidly changing nature of the Corps' regulatory programs, we have prefaced this supplementary information with a historical background discussion.

### HISTORICAL BACKGROUND

The Department of the Army, acting through the Corps of Engineers, is responsible for administering various Federal laws that regulate certain types of activities in specific waters in the United States and the oceans. The authorities for these regulatory programs are based primarily on various sections of the River and Harbor Act of 1899 (33 U.S.C. 401 et seq.), Section 404 of the Federal Water Pollution Control Act Amendments of 1972 (33 U.S.C. 1344) and Section 103 of the Marine Protection, Research and Sanctuaries Act of 1972 (33 U.S.C. 1413). Each of these laws will be discussed in further detail below.

#### THE RIVER AND HARBOR ACT OF 1899

Until recently, the regulatory programs of the Corps of Engineers were administered only pursuant to various sections in the River and Harbor Act of 1899. These include: Section 9 (33 U.S.C. 401); Section 10 (33 U.S.C. 403); Section 11 (33 U.S.C. 404); and Section 13 (33 U.S.C. 407).

Section 9 requires a permit from the Corps of Engineers to construct any dam or dike in a navigable water of the United States. The consent of Congress is also required if the navigable water is interstate, and the consent of the appropriate state legislature is required if the water is intrastate. Bridges and causeways con-

structed in navigable waters of the United States also require permits under Section 9, but the authority to issue these permits was transferred to the U.S. Coast Guard in 1966 when the Department of Transportation was created.

Section 10 identifies other types of structures or work in or affecting navigable waters of the United States that are prohibited unless permitted by the Corps of Engineers. However, unlike Section 9, the consent of Congress or a state legislature is not required. Section 10 requires permits from the Corps for structures in navigable waters such as piers, breakwaters, bulkheads, revetments, power transmission lines, and aids to navigation. It also requires permits for various types of work performed in navigable waters, including dredging and stream channelization, excavation and filling. In addition, any work that is performed outside the limits of a navigable water which affects its navigable capacity may also require a Section 10 permit.

The 1899 Act was enacted to protect navigation and the navigable capacity of the nation's waters. Section 11 focuses on this basic concern by allowing the Secretary of the Army to establish harbor lines landward of which piers, wharves, bulkheads, and other structures or work could be built or performed without a Corps permit. However, as will be noted below, these harborlines now serve only as guides to defining the offshore limits of these activities from the standpoint of their impact on navigation. They can no longer be relied upon as a substitute for the requirement to obtain a permit under the 1899 Act.

Violation of the provisions and requirements of Section 9, 10, or 11 of the 1899 Act can result in criminal prosecution. Section 12 specifies criminal fines that range between $500 and $2,500 per day of violation and/or imprisonment, either or both of which may be imposed upon conviction. In addition, Section 12 also provides for injunctive relief that may be sought by the United States to respond to violations of these Sections, including the restoration of the area to its original condition. See *U.S.* v. *Moretti*, 478 F. 2d 418 (5th Cir. 1975).

Until 1968, the Corps administered the 1899 Act regulatory program only to protect navigation and the navigable capacity of the nation's waters. The permit requirements of the Act were limited in their application to waters that were presently used as highways for the transportation of interstate or foreign commerce.

On December 18, 1968, the Department of the Army revised its policy with respect to the review of permit applications under Sections 9 and 10 of the 1899 Act. It published in the FEDERAL REGISTER a list of additional factors besides navigation that would be considered in the review of these applications. These included: fish and wildlife; conservation; pollution; aesthetics; ecology; and the general public interest (33 CFR 209.120.)

The 1968 change in policy identified this new type of review as a "public interest review." It was adopted in re-

sponse to a growing national concern for environmental values as they related to our nation's water resources and in response to related Federal legislation, such as the Fish and Wildlife Coordination Act (16 U.S.C. 661 et seq.), that required the consideration of some of these concerns in Federal decision-making. Enactment of the National Environmental Policy Act on January 1, 1970 (42 U.S.C. 4331 et seq.) gave further support to this change in policy.

The "public interest review" received its first judicial test in the case of *Zabel* v. *Tabb*, 430 F. 2d 199 (5th Cir. 1970), cert. den. 401 U.S. 910 (1972) in which the Court upheld the denial by the Corps of a landfill permit for fish and wildlife reasons (and not reasons related to navigation). In reaching this decision, the Court reaffirmed the Department of the Army's position that it was "acting under a Congressional mandate to collaborate and consider all of these factors" when it reached that decision.

In further response to the adoption of this public interest review, the Department of the Army revised its harbor-line regulation (33 CFR 209.150) on May 27, 1970. This revision made it clear that permits were required for any work commenced landward of an established harborline after May 27, 1970, and that these permit applications would receive a full public interest review. Of course, navigation concerns in this public interest review will be guided, in large part, by the presence of established harborlines.

During 1972, the Corps of Engineers reviewed all judicial decisions in which the term "navigable waters of the United States" had been interpreted in order to identify all waters to which Sections 9 and 10 of the 1899 Act could be applied. This analysis was made in response to the Federal government's growing concern over the protection of the nation's water resources and the need to protect those resources through the full mandate of available Federal laws.

On September 9, 1972, the Corps of Engineers published an administrative definition of the term "navigable waters of the United States" in the FEDERAL REGISTER (subsequently codified as 33 CFR 209.260). This definition was intended for use in the Corps' administration of Sections 9 and 10 of the 1899 Act, and included the following: (1) all waters presently used to transport interstate or foreign commerce (see *Daniel Ball* v. *United States*, 77 U.S. 557 (1871)); (2) all waters used in the past to transport interstate of foreign commerce (see *Economy Light and Power Company* v. *United States*, 256 U.S. 113 (1921)); all waters susceptible to use in their ordinary condition or by reasonable improvement to transport interstate or foreign commerce (see *United States* v. *Appalachian Electric Power Co.*, 311 U.S. 377 (1940)); and all waters subject to the ebb and flow of the tide (see *United States* v. *Moretti*, *supra*). The landward limit of this jurisdiction for freshwater was established as the ordinary high water mark and the shore-

Exhibit 22, page 1 of 6

## RULES AND REGULATIONS

ward limit for tidal water was established as the mean high water mark (mean higher high water mark on the West Coast).

On April 4, 1974, the Corps of Engineers published final revisions to its permit regulation (33 CFR 209.120) (Proposed revisions were published for interim guidance on May 10, 1973). These revisions were made for the following reasons:

a. To incorporate new permit programs established under Section 404 of the FWPCA and Section 103 of the MPRSA (discussed in more detail below);

b. To incorporate the requirements of new Federal legislation related to the review of the Federal permit applications, including: other sections of the FWPCA and the MPRSA; the National Environmental Policy Act of 1969, and the Coastal Zone Management Act of 1972, as amended (16 U.S.C. 1451 et seq.).

c. To adopt additional factors of concern in the public interest review, in response to this related legislation, including, in addition to those previously announced, the following: economics, historic values, flood damage prevention, land use classification; recreation, water supply, and water quality.

d. To adopt criteria that would also be considered in the evaluation of each permit application including the desirability of using appropriate alternatives; the extent and permanence of the beneficial and/or detrimental effects of the proposed activity; and the cumulative effect of the activity when considered in relation to other activities in the same general area;

e. To adopt a wetlands policy that would protect wetlands within the Corps jurisdiction from unnecessary destruction; and

f. To implement procedures that insured compliance with these new statutory and policy review requirements.

As previously noted, regulations have been published throughout the past years to implement Sections 9, 10, 11, and 13 of the 1899 Act. These regulations have all been included in Part 209 of Title 33 of the Code of Federal Regulations as follows:

a. 209.120. Permits for Activities in Navigable Waters and Ocean Areas.

b. 209.125. Dams and Dikes Across Waterways.

c. 209.131. Permits for Discharges of Deposits into Navigable Waters.

d. 209.150. Harbor Lines.

e. 209.260. Definition of Navigable Waters of the United States.

### THE REFUSE ACT PERMIT PROGRAM

On April 7, 1971 the Corps of Engineers implemented the first nationwide program to regulate the discharge of pollutants into the nation's waters. Authority for this permit program was based on Section 13 of the River and Harbor Act of 1899 (33 U.S.C. 407), commonly referred to as "The Refuse Act," which prohibits the discharge of "refuse matter" into navigable waters of the United States or their tributaries, or onto the banks of such waters if the "refuse matter" is likely to be washed into a navigable water. Regulations to implement this permit program were published in 33 CFR 209.131. On December 24, 1971, the permit program was enjoined by the District Court for the District of Columbia in the case of *Kalur v. Resor*, 335 F. Supp. 1, (D.D.C. 1971).

The Refuse Act permit program remained suspended until October 18, 1972, when Congress enacted the FWPCA. Section 402 of the FWPCA established the National Pollutant Discharge Elimination System program, which subsumed the Refuse Act permit program. Section 402(a)(5) provides that no permits may be issued under Section 13 of the 1899 Act for discharges into waters of the United States after 18 October 1972. However, the Refuse Act prohibitions can only be lifted by the issuance of an NPDES permit, and the Refuse Act remains a viable Federal enforcement mechanism for the discharge of pollutants into these waters without such a permit.

### SECTION 404 OF THE FWPCA

On October 18, 1972, Congress enacted the Federal Water Pollution Control Act Amendments of 1972 with the announced purpose of restoring and maintaining the chemical, physical, and biological integrity of the Nation's waters. The FWPCA established a number of goals, requirements, prohibitions, and programs to achieve this purpose, and addressed the problems of water pollution by using many different approaches. The Amendments provide Federal financial assistance for major research and demonstration projects and the construction of publicly owned waste treatment works. They also provide programs to deal with various sources and types of pollution, including toxic, oil, and hazardous substances. Section 208 of the Act provides for the development and implementation of areawide waste treatment management planning processes to control all sources of pollution.

Section 301 of the FWPCA prohibits the discharge of pollutants from discernible conveyances (defined as "point sources") into "navigable waters", defined in the FWPCA as "the waters of the United States, including the territorial seas"), unless the discharge is in compliance with Section 402 or 404 of the Act. As noted above, Section 402 establishes the National Pollutant Discharge Elimination System to regulate discharges of pollutants into the Nation's waters. The NPDES permit program is administered by the Administrator of the Environmental Protection Agency, and provides an opportunity for the Administrator to transfer this responsibility to those States that have the authority and capability to assume responsibility for the administration of the NPDES program.

Section 404 of the FWPCA establishes a permit program, administered by the Secretary of the Army, acting through the Chief of Engineers, to regulate the discharge, into the waters of the United States, of dredged material and of those pollutants that comprise fill material. Applications for Section 404 permits are evaluated by using guidelines developed by the Administrator of EPA, in conjunction with the Secretary of the Army (See 40 CFR 230). The Chief of Engineers can make a decision to issue a permit that is inconsistent with those guidelines if the interests of navigation require. Section 404(c) gives the Administrator, EPA, further authority, subject to certain procedures, to restrict or prohibit the discharge of any dredged or fill material that may cause an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas.

Violation of the prohibition specified in Section 301 of the FWPCA against discharging pollutants into the waters of the United States without a required permit under Section 402 or 404, or permit conditions, or of other requirements of the FWPCA, can result in civil fines of not more than $10,000 per day of violation, criminal fines of up to $50,000 per day of violation, imprisonment, and/or injunctive relief, including restoration of the area to its original condition. The exact provisions for Federal enforcement of the FWPCA are established in Section 309, (33 U.S.C. 1319).

As part of the revisions to its April 3, 1974 permit regulation, the Department of the Army published regulations to implement the Section 404 permit program. These regulations limited the Section 404 permit program to the same waters that were being regulated under the River and Harbor Act of 1899: waters that are subject to the ebb and flow of the tide shoreward to their mean high water mark (mean higher water mark on the West Coast) and/or waters that are presently used, were used in the past, or are susceptible to use to transport interstate or foreign commerce.

The Natural Resources Defense Council and the National Wildlife Federation challenged this limitation on the jurisdiction of Section 404 as being inconsistent with the intent of Congress to regulate "all waters" of the United States," as expressed in the FWPCA's definition of "navigable" waters." Concern was expressed over the need to regulate the entire aquatic system, including all of the wetlands that are part of it, rather than only those aquatic areas that are arbitrarily distinguished by the presence of an ordinary or mean high water mark. (A major portion of the coastal wetlands are above the mean high water mark and were outside the permit review requirements of Section 404 by this interpretation.) Concern was expressed over the need to regulate the many tributary streams that feed into the tidal and commercially navigable waters (all of which were subject to regulation under the Refuse Act and NPDES programs) since the destruction and/or degradation of the physical, chemical, and biological integrity of each of these waters is threatened by the unregulated discharge of dredged or fill material. And concern was expressed for the many

Exhibit 22, page 2 of 6

37124

**RULES AND REGULATIONS**

other waters, including lakes, isolated wetlands, and potholes whose degradation, destruction, and disappearance continues to increase at alarming rates.

On March 27, 1975, the District Court for the District of Columbia ordered the revocation and rescission of that part of the Department of the Army's regulation "which limits the permit (Section 404) jurisdiction of the Corps by definition or otherwise to other than the waters of the United States." The Court further ordered publication of proposed regulations within 15 days (later amended to 40 days) which clearly recognized the full regulatory mandate of the FWPCA with respect to Section 404 and final regulations within 30 days of the date of the order (later amended to 80 days). *NRDC* v. *Callaway*, 392 F. Supp. 685 (D.D.C. 1975).

Responding to this court order, the Corps published four alternative proposed regulations in the FEDERAL REGISTER for comment on May 6, 1975. Over 4,500 comments were received in response to these proposed regulations. Many of these comments assisted the Corps in developing an administrative definition of "navigable waters" that was consistent with the intent and objectives of the FWPCA, and also in developing a program that was responsive to many of the concerns raised by the comments.

On July 25, 1975, the Corps of Engineers published an interim final regulation in the FEDERAL REGISTER. The interim final regulation essentially melded revisions to the Section 404 program into the previously published April 3, 1974 regulation. It included administrative definitions of "navigable waters", "dredged material", and "fill material", and procedural mechanisms to avoid unnecessary duplicative review in those states that have permit programs similar to Section 404.

The interim final regulation administratively defined the term "navigable waters" to include: coastal waters, wetlands, mudflats, swamps, and similar areas; freshwater lakes, rivers, and streams that are used, were used in the past, or are susceptible to use to transport interstate commerce including all tributaries to these waters; interstate waters; certain specified intrastate waters, the pollution of which would affect interstate commerce; and freshwater wetlands, including marshes, shallows, swamps, and similar areas that are contiguous or adjacent to the above described lakes, rivers, and streams, and that are periodically inundated and normally characterized by the prevalence of vegetation that requires saturated soil conditions for growth and reproduction.

The regulation also specified that permits would not be required for discharges beyond the "headwaters" of a river or stream unless the interests of water quality required assertion of jurisdiction above the headwaters. "Headwaters" was defined as "the point on the stream above which the flow is normally less than 5 cubic feet per second."

Any material that is excavated or dredged from a water of the United States and reintroduced into a water of

the United States is considered to be the "discharge of dredged material" for purposes of Section 404.

"Fill material" was defined to include the following activities: the creation of fastlands, elevations of land beneath waters or the United States, or impoundments; the building of any structure or impoundment requiring rock, sand, dirt, or other pollutants for its construction; site-development fills; causeway or road-fills; dams and dikes; artificial islands; property protection and/or reclamation devices such as riprap, groins, and breakwaters; beach nourishment; levees; and backfill for various structures and utility lines.

The regulation also identified certain types of activities that were excluded from the program because they do not involve the discharge of dredged or fill material into water. Plowing, seeding, cultivating, and harvesting for the production of food, fiber, and forest products were included in this list of excluded activities. Also excluded from the program was material placed for maintenance and emergency reconstruction of existing fills.

The July 25 regulation adopted a phase-in schedule to implement the permit requirements of Section 404 for discharges in the above defined waters, and also included authority for District Engineers to issue general permits for those discharges that cause only a minor individual and cumulative impact to the environment. Phase I began immediately upon publication of the regulation, and included all waters subject to the ebb and flow of the tide and/or waters that are, were, or are susceptible to use for commercial navigation purposes (waters already being regulated by the Corps) plus all adjacent wetlands to these waters (thus eliminating the artificial ordinary high water and mean high water mark distinctions). Phase II became effective on September 1, 1976 (originally scheduled for July 1, 1976, but postponed for 60 days by Presidential action), and included primary tributaries to the Phase I waters and lakes greater than five acres in surface area, plus wetlands adjacent to these waters. Phase III, requiring permits for discharges of dredged or fill material into all waters of the United States, became effective on July 1, 1977. Discharges that occur in a particular waterbody before a scheduled phase-in date are permitted by the regulation, subject to six specified conditions. Also permitted by the regulation are certain minor discharges, again subject to the same conditions.

Various policies and procedures were also included in this regulation to allow joint review and processing of applications for Section 404 permits in those states with programs similar to Section 404.

On September 5, 1975, EPA published interim final guidelines to be used in the evaluation of proposed discharges of dredged or fill material. These interim guidelines are published in 40 CFR Part 230.

A number of courts have had occasion to consider whether particular waters, including wetlands, are "waters of the

United States" within the scope of the FWPCA. The first case to address whether wetlands beyond the mean high water mark of traditional navigable waters of the United States were subject to the FWPCA was *United States* vs. *Holland*, 373 F. Supp. 665, (M.D. Fla., 1974) in which the Court held:

> The court is of the opinion that the mean high waterline is no limit to Federal authority under the FWPCA. While the line remains a valid demarcation for other purposes, it has no rational connection to the aquatic ecosystems which the FWPCA is intended to protect. Congress has wisely determined that Federal authority over water pollution properly rests on the commerce clause and not on past interpretations of an act designed to protect navigation. And the commerce clause gives Congress ample authority to reach activities above the mean high water line that pollute the waters of the United States.

Other Courts have pursued the same theme, and often use the Holland rationale to support their position. These include the following: *United States* v. *Ashland Oil and Transportation Co.*, 504 F2d 1317 (6th Cir. 1974), involving discharges of oil into a tertiary tributary to a navigable water of the United States; *United States* v. *P.F.Z. Properties, Inc.*, 393 F. Supp. 1370, 1381 (D.D.C. 1975) and *Leslie Salt* v. *Froehlke*, 403 F. Supp. 1292, 1295-1297 (N.D. Cal. 1974)—each involving discharges of dredged or fill material into navigable waters of the United States; *Conservation Council of North Carolina* v. *Costanzo*, 398 F. Supp. 653, 673 (E.D. N.C.: 1975); *United States* v. *Smith*, 7 ERC 1936, 1938–1939 (E.D. Va., 1975); *United States* v. *Golden Acres, Inc.*, No. 76-0023-CIV-4, slip opinion p. 5-6 (E.D. N.C., Jan. 13, 1977); *United States* v. *Riverside Bayview Homes, Inc.*, Civil Action No. 77-70041 (E.D. Mich., Feb. 24, 1977)—all involving discharges into wetlands adjacent to navigable waters of the United States or a primary tributary thereof in which the wetland area is located above the mean high tide line or ordinary high water mark but is still periodically inundated and covered with aquatic vegetation; and *United States* v. *Byrd and Elder*, ERC 1275 (N.D. Ind., August 13, 1976) involving the discharge of fill material into a natural freshwater lake.

SECTION 103 OF THE MARINE PROTECTION, RESEARCH AND SANCTUARIES ACT OF 1972

Five days after enactment of the FWPCA, Congress enacted the Marine Protection, Research and Sanctuaries Act of 1972 (33 U.S.C. 1413). This Act, commonly referred to as the "Ocean Dumping Act", has many provisions that resemble the approach taken by the FWPCA to regulate activities that can pollute or otherwise adversely affect the ocean waters.

Section 102 of the Act vests authority in the Administrator, EPA, to issue permits, after notice and opportunity for public hearing, for the transportation from the United States of material that is intended to be dumped in ocean waters. "Material" is defined in the Act to include most liquid, solid, or suspended solid substances. Before issuing a permit,

**Exhibit 22, page 3 of 6**

# RULES AND REGULATIONS

rate definitions will assist in alleviating the confusion expressed over the broad definition of "lake" as cited in the 1975 regulation.

At the suggestion of EPA, we have defined "natural lake" as "a natural depression fed by one or more streams and from which a stream may flow, that occurs due to the widening or natural blockage of a river or stream, or that occurs in an isolated natural depression that is not part of a surface river or stream." We believe that this definition reflects the three types of situations in which a natural lake may exist.

We have defined the term "impoundment" as a "standing body of open water created by artificially blocking or restricting the flow of a river, stream, or tidal area." Responding to several suggestions, we have clarified what is not included in the term "impoundment" by stating that it does not include artificial lakes or ponds created by excavating and/or diking dry land to collect and retain water for such purposes as stock watering, irrigation, settling basins, cooling, or rice growing.

Unlike the 1975 definition, no size limitation has been placed on the definitions of "natural lake" or "impoundment". Instead, we are permitting, today, through the issuance of nationwide permits, discharges of dredged or fill material into natural lakes, including their adjacent wetlands, that are less than 10 acres in surface area and that are either fed or drained by a river or stream above the headwaters, or isolated and not a part of a tributary system to navigable waters of the United States or interstate waters. Discharges into natural lakes below the headwaters and isolated natural lakes greater than ten acres will require individual or general permits to satisfy the requirements of Section 301 of the FWPCA. We are also issuing today a nationwide permit for discharges of dredged or fill material into non-tidal rivers, streams and their impoundments including adjacent wetlands that are located above the headwaters. (Again, discharges into impoundments below the headwaters of a river or stream will require an individual or general permit.) We refer you to our discussion of nationwide permits, below, for further details on this action.

We believe that the inclusion of adjacent wetlands as part of the 10 acre measurement of those natural lakes that are included in this definition will alleviate many concerns raised over how and when this measurement must occur. Since our definition of "wetlands" requires aquatic vegetation, we anticipate that the lake's measurement normally can be made on the basis of the presence of this vegetation, which generally remains fixed throughout the year, even if the water levels in the lake fluctuate.

*Dredged and Fill Material.* The 1975 regulation provided definitions of "dredged material", "discharge of dredged material", "fill material", and "discharge of fill material". Several comments and two years of experience have revealed the need to make certain changes to these definitions.

To respond to many misunderstandings over activities that require Section 404 permits, the 1975 regulation stated, in the definitions of "dredged material" and "fill material" that "material resulting from normal farming, silviculture, and ranching activities, such as plowing, cultivating, seeding, and harvesting for the production of food, fiber, and forest products" was not included. We intended, by this statement, to make it clear that activities such as plowing, seeding, harvesting, cultivating and any other activity by any industry that do not involve discharges of dredged or fill material cannot be included in the program. However, many interpreted this language as an exclusion of all practices by the farming and forestry industry including those that do involve discharges of dredged or fill material into water. The FWPCA does not allow us to make such an exemption or exclusion for any industry. (See *NRDC vs. Train,* 366 F. Supp. 1393 (D.D.C., 1975.) We have, however, clarified our intent by stating at the end of our definitions of "discharge of dredged material" and "discharge of fill material" that plowing, seeding, cultivating and harvesting for the production of food, fiber, and forest products is not included in the Section 404 program.

The 1975 definition of "fill material" also excluded "material placed for the purpose of maintenance, including emergency reconstruction of recently damaged parts, of currently serviceable structures such as dikes, dams, levees, groins, riprap, breakwaters, causeways, and bridge abutments or approaches, and transportation structures." Since maintenance and emergency reconstruction of these types of fill often involve discharges into water, we do not have authority to exclude these activities from the permit requirements of the FWPCA. We have, therefore, eliminated this exclusion from our definition of "fill material". At the same time, we are issuing, today, a nationwide permit for discharges of dredged or fill material that involve maintenance and emergency reconstruction of existing fills. The nationwide permit contains basic common sense conditions and management practices which, if followed, will achieve the objectives of the FWPCA. Of course, if the maintenance or emergency reconstruction does not involve a discharge in water, no permit is required.

During the two years of experience with the Section 404 program, several industrial and municipal discharges of solid waste materials have been brought to our attention which technically fit within our definition of "fill material" but which were intended to be regulated under the NPDES program. These include the disposal of waste materials such as sludge, garbage, trash, and debris in water. In some cases involving the disposal of these types of material in water, the final result may be a land-fill even though the primary purpose of the discharge is waste disposal.

The Corps and the Environmental Protection Agency feel that the initial decision relating to this type of discharge should be through the NPDES program. We have, therefore, modified our definition of fill material to exclude those pollutants that are discharged into water primarily to dispose of waste. We will process Section 404 permits for these types of activities to the extent that a levee or other type of containment structure must be placed in the water as part of the overall disposal plan. We will not, however, take any final action on the Section 404 permit application until a decision on the NPDES permit has been made (See 33 CFR 230.4(j)).

*Individual, general, and nationwide permits:* As we did in the regulation on our Section 10 program, we have included definitions of "individual", "general" and "nationwide" permits to distinguish between the three types of authorizations that will be used to satisfy the requirements of the FWPCA.

If a discharge requires an individual permit, an application must be made to the District Engineers following the procedures specified in 33 CFR Part 325 and the discharge cannot begin until and unless the permit is issued.

Before applying for an individual permit, however, a person needing a Section 404 permit should check to see whether the proposed discharge has already been permitted by a general permit, or a nationwide permit published in this regulation. District Engineers are issuing general permits for particular regions of the country that cover a wide variety of discharges that cause only minimal individual and cumulative adverse environmental impact. Nationwide permits apply throughout the country, and cover many types of minor activities. If a general or nationwide permit already covers your discharge, you should not have to get an individual permit to satisfy the requirements of the FWPCA.

## Nationwide Permits

On May 16, 1977 we published proposed nationwide permits in the FEDERAL REGISTER to authorize discharges of dredged or fill material into certain waters of the United States and also certain specific categories of discharges. We received 163 letters commenting on these nationwide permits, the majority of which supported the concept but suggested additions, modifications and/or deletions to the activities covered and/or the conditions imposed.

Today, we are issuing nationwide permits for discharges into most of the Category 4 waters, discussed above, (isolated natural lakes larger than 10 acres are not included) and for certain specific categories of discharges into other waters. These nationwide permits are being incorporated into § 323.4.

We wish to take this opportunity to express our appreciation to everyone who commented on these nationwide permits. The following is a discussion of the sub-

Exhibit 22, page 4 of 6

37144

## RULES AND REGULATIONS

**PART 323—PERMITS FOR DISCHARGES OF DREDGED OR FILL MATERIAL INTO WATERS OF THE UNITED STATES**

Sec.

| | |
|---|---|
| 323.1 | General. |
| 323.2 | Definitions. |
| 323.3 | Activities requiring permits. |
| 323.4 | Discharges permitted by this regulation. |
| 323.4-1 | Discharges prior to effective dates of phasing. |
| 323.4-2 | Discharges into certain waters of the United States. |
| 323.4-3 | Specific categories of discharges. |
| 323.4-4 | Discretionary authority to require individual or general permits. |
| 323.5 | Special policies and procedures. |

Appendix A—Delegation of authority.

AUTHORITY: 33 U.S.C. 1344.

### § 323.1 General.

This regulation prescribes, in addition to the general policies of 33 CFR 320.4 and procedures of 33 CFR Part 325, those special policies, practices, and procedures to be followed by the Corps of Engineers in connection with the review of applications for Department of the Army permits to authorize the discharge of dredged or fill material into waters of the United States pursuant to Section 404 of the Federal Water Pollution Control Act Amendments of 1972 (33 U.S.C. 1344) (hereinafter referred to as Section 404); See 33 CFR 320.2(g). Certain discharges of dredged or fill material into waters of the United States are also regulated under other authorities of the Department of the Army! These include dams and dikes in navigable waters of the United States pursuant to Section 9 of the River and Harbor Act of 1899 (33 U.S.C. 401; see 33 CFR 321) and structures or work in or affecting navigable waters of the United States pursuant to Section 10 of the River and Harbor Act of 1899 (33 U.S.C. 403; see 33 CFR 322). A Department of the Army permit will also be required under these additional authorities if they are applicable to activities involving discharges of dredged or fill material into waters of the United States. Applicants for Department of the Army permits under this Part should refer to the other cited authorities and implementing regulations for these additional permit requirements to determine whether they also are applicable to their proposed activities.

### § 323.2 Definitions.

For the purpose of this regulation, the following terms are defined:

(a) The term "waters of the United States" means:[1]

(1) The territorial seas with respect to the discharge of fill material. The transportation of dredged material by

vessel for the purpose of dumping in the oceans, including the territorial seas, at an ocean dump site approved under 40 CFR 228 is regulated by Section 103 of the Marine Protection, Research and Sanctuaries Act of 1972, as amended (33 USC 1413). See 33 CFR 324. Discharges of dredged or fill material into the territorial seas are regulated by Section 404.)[1]

(2) Coastal and inland waters, lakes, rivers, and streams that are navigable waters of the United States, including adjacent wetlands;

(3) Tributaries to navigable waters of the United States, including adjacent wetlands (manmade nontidal drainage and irrigation ditches excavated on dry land are not considered waters of the United States under this definition).

(4) Interstate waters and their tributaries, including adjacent wetlands; and

(5) All other waters of the United States not identified in paragraphs (1)-(4) above, such as isolated wetlands and lakes, intermittent streams, prairie potholes, and other waters that are not part of a tributary system to interstate waters or to navigable waters of the United States, the degradation or destruction of which could affect interstate commerce.[2]

The landward limit of jurisdiction in tidal waters, in the absence of adjacent wetlands, shall be the high tide line and the landward limit of jurisdiction in all other waters, in the absence of adjacent

[2] In defining the jurisdiction of the FWPCA as the "waters of the United States," Congress, in the legislative history to the Act, specified that the term "be given the broadest constitutional interpretation unencumbered by agency determinations which would have been made or may be made for administrative purposes." The waters listed in paragraphs (a) (1)-4 fall within this mandate as discharges into those waterbodies may seriously affect water quality, navigation, and other Federal interests; however, it is also recognized that the Federal government would have the right to regulate the waters of the United States identified in paragraph (a) (5) under the broad Congressional mandate to fulfill the objective of the Act: "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters" (Section 101(a)). Paragraph (a) (5) incorporates all other waters of the United States that could be regulated under the Federal government's Constitutional powers to regulate and protect interstate commerce, including those for which the connection to interstate commerce may not be readily obvious or where the location or size of the waterbody generally may not require regulation through individual or general permits to achieve the objective of the Act. Discharges of dredged or fill material into waters of the United States identified in paragraphs (a) (1)-(4) will generally require individual or general permits unless those discharges occur beyond the headwaters of a river or stream or in natural lakes less than 10 acres in surface area. Discharges into these latter waters and into most of the waters identified in paragraph (a) (5) will be permitted by this regulation, subject to the provisions listed in paragraph 323.4-3(b) unless the District Engineer develops information, on a case-by-case basis, that the concern for the aquatic environment as expressed in the EPA Guidelines (40 CFR 230) require regulation through an individual or general permit. (See 323.4.)

wetlands, shall be the ordinary high water mark.

(b) The term "navigable waters of the United States" means those waters of the United States that are subject to the ebb and flow of the tide shoreward to the mean high water mark (mean higher high water mark on the Pacific coast) and/or are presently used, or have been and/or are susceptible to use in the past, or may be susceptible to use to transport interstate or foreign commerce. (See 33 CFR 329 for a more complete definition of this term)

(c) The term "wetlands" means those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs and similar areas.

(d) The term "adjacent" means bordering, contiguous, or neighboring. Wetlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like are "adjacent wetlands".

(e) The term "natural lake" means a standing body of open water that occurs in a natural depression fed by one or more streams and from which a stream more stream and from which a stream may flow, that occurs due to the widening of a natural blockage of a river or stream, or that occurs in an isolated natural depression that is not a part of a surface river or stream.

(f) The term "impoundment" means a standing body of open water created by artificially blocking or restricting the flow of a river, stream, or tidal area. As used in this regulation, the term does not include artificial lakes or ponds created by excavating and/or diking dry land to collect and retain water for such purposes as stock watering, irrigation, settling basins, cooling, or rice growing.

(g) The term "ordinary high water mark" means the line on the shore established by the fluctuations of water and indicated by physical characteristics such as a clear, natural line impressed on the bank; shelving; changes in the character of soil; destruction of terrestrial vegetation; the presence of litter and debris; or other appropriate means that consider the characteristics of the surrounding areas.

(h) The term "high tide line" means a line or mark left upon tide flats, beaches, or along shore objects that indicates the intersection of the land with the water's surface at the maximum height reached by a rising tide. The mark may be determined by a line of oil or scum along shore objects, a more or less continuous deposit of fine shell or debris on the foreshore or berm, other physical markings or characteristics, vegetation lines, tidal gages, or other suitable means that delineate the general height reached by a rising tide. The term includes spring high tides and other high tides that occur with periodic frequency, but does not include storm surges in which there is a departure from the normal or predicted reach of the tide due to the piling up of water against a coast

[1] The terminology used by the FWPCA is "navigable waters" which is defined in Section 502(7) of the Act as "waters of the United States including the territorial seas." For purposes of clarity, and to avoid confusion with other Corps of Engineers regulatory programs, the term "waters of the United States" is used throughout this regulation.

Exhibit 22, page 5 of 6

by strong winds such as those accompanying a hurricane or other intense storm.

(i) The term "headwaters" means the point on a non-tidal stream above which the average annual flow is less than five cubic feet per second. The District Engineer may estimate this point from available data by using the mean annual area precipitation, area drainage basin maps, and the average runoff coefficient, or by similar means.

(j) The term "primary tributaries" means the main stems of tributaries directly connecting to navigable waters of the United States up to their headwaters, and does not include any additional tributaries extending off of the "main stems of these tributaries.

(k) The term "dredged material" means material that is excavated or dredged from waters of the United States.

(l) The term "discharge of dredged material" means any addition of dredged material into the waters of the United States. The term includes, without limitation, the addition of dredged material to a specified disposal site located in waters of the United States and the runoff or overflow from a contained land or water disposal area. Discharges of pollutants into waters of the United States resulting from the onshore subsequent processing of dredged material that is extracted for any commercial use (other than fill) are not included within this term and are subject to Section 402 of the Federal Water Pollution Control Act even though the extraction and deposit of such material may require a permit from the Corps of Engineers. The term does not include plowing, cultivating, seeding and harvesting for the production of food, fiber, and forest products.

(m) The term "fill material" means any material used for the primary purpose of replacing an aquatic area with dry land or of changing the bottom elevation of a waterbody. The term does not include any pollutant discharged into the water primarily to dispose of waste, as that activity is regulated under Section 402 of the Federal Water Pollution Control Act Amendments of 1972.

(n) The term "discharge of fill material" means the addition of fill material into waters of the United States. The term generally includes, without limitation, the following activities: Placement of fill that is necessary to the construction of any structure in a water of the United States; the building of any structure or impoundment requiring rock, sand, dirt, or other material for its construction; site-development fills for recreational, industrial, commercial, residential, and other uses; causeways or

road fills; dams and dikes; artificial islands; property protection and/or reclamation devices such as riprap, groins, seawalls, breakwaters, and revetments; beach nourishment; levees; fill for structures such as sewage treatment facilities, intake and outfall pipes associated with power plants, and subaqueous utility lines; and artificial reefs. The term does not include plowing, cultivating, seeding and harvesting for the production of food, fiber, and forest products.

(o) The term "individual permit" means a Department of the Army authorization that is issued following a case-by-case evaluation of a specific project involving the proposed discharge(s) in accordance with the procedures of this regulation and 33 CFR 325 and a determination that the proposed discharge is in the public interest pursuant to 33 CFR Part 320.

(p) The term "general permit" means a Department of the Army authorization that is issued for a category or categories of discharges of dredged or fill material that are substantially similar in nature and that cause only minimal individual and cumulative adverse environmental impact. A general permit is issued following an evaluation of the proposed category of discharges in accordance with the procedures of this regulation (§ 323.3(c)), 33 CFR Part 325, and a determination that the proposed discharges will be in the public interest pursuant to 33 CFR Part 320.

(q) The term "nationwide permit" means a Department of the Army authorization that has been issued by this regulation in § 323.4 to permit certain discharges of dredged or fill material into waters of the United States throughout the Nation.

§ 323.3  Discharges requiring permits

(a) General. Department of the Army permits will be required for the discharge of dredged or fill material into waters of the United States. Certain discharges specified in §§ 323.4-1, 323.4-2 and 323.4-3 are permitted by this regulation. If a discharge of dredged or fill material is not permitted by this regulation, an individual or general Section 404 permit will be required for the discharge of dredged or fill material into waters of the United States in accordance with the following phased schedule:

(1) Before July 25, 1975, discharges into navigable waters of the United States.

(2) After July 25, 1975, discharges into navigable waters of the United States and adjacent wetlands.

(3) After September 1, 1976, discharges into navigable waters of the United States and their primary tributaries, including adjacent wetlands, and into natural lakes, greater than 5 acres in surface area. (See also § 323.4-2 for discharges that are permitted by this regulation.)

(4) After July 1, 1977, discharges into all waters of the United States. (See also § 323.4-2 for discharges that are permitted by this regulation.)

(b) Individual permits. Unless permitted by this regulation (§§ 323.4-1,

323.4-2 and 323.4-3), or authorized by general permits (§323.3(c)), the discharge of dredged or fill material into waters of the United States will require an individual Department of the Army permit issued in accordance with the policies in § 320.4 and procedures in 33 CFR Part 325.

(c) General permits. The District Engineer may, after compliance with the other procedures of 33 CFR Part 325, issue general permits for certain clearly described categories of structures or work, including discharges of dredged or fill material, requiring Department of the Army permits. After a general permit has been issued, individual activities falling within those categories will not require individual permit processing by the procedures of 33 CFR Part 325 unless the District Engineer determines, on a case-by-case basis, that the public interest requires individual review.

(1) District Engineers will include only those activities that are substantially similar in nature, that cause only minimal adverse environmental impact when performed separately, and that will have only a minimal adverse cumulative effect on the environment as categories which are candidates for general permits.

(2) The District Engineer shall include appropriate conditions as specified in Appendix G of 33 CFR Part 325 in each general permit and shall prescribe the following additional conditions:

(i) The maximum quantity of material that may be discharged and the maximum area that may be modified by a single or incidental operation (if applicable);

(ii) A description of the category or categories of activities included in the general permit; and

(iii) The type of water(s) into which the activity may occur;

(3) The District Engineer may require reporting procedures;

(4) A general permit may be revoked if it is determined that the effects of the activities authorized by it will have an adverse impact on the public interest provided the procedures of 33 CFR 325.7 are followed. Following revocation, applications for future activities in areas covered by the general permit shall be processed as applications for individual permits.

(d) Activities of Federal agencies. (1) Discharges of dredged or fill material into waters of the United States done by or on behalf of any Federal agency, or instrumentality other than the Corps of Engineers, are subject to the authorization procedures of this regulation. Agreement for construction or engineering services performed for other agencies by the Corps of Engineers does not constitute authorization under the regulation. Division and District Engineers will therefore advise Federal agencies and instrumentalities accordingly and cooperate to the fullest extent in the expeditious processing of their applications.

(2) The policy provisions set out in 33 CFR 320.4(j), relating to State or local authorizations, do not apply to discharges of dredged or fill material into

---

³ For streams that are dry during long periods of the year, District Engineers, after notifying the Regional Administrator of EPA, may establish the headwater point at that point on the stream where a flow of five cubic feet per second is equaled or exceeded 50 percent of the time. The District Engineer shall notify the Regional Administrator of his determination of these headwater points.

Exhibit 22, page 6 of 6