Regulatory Branch
Special Actions Section
2-890243

JUN 18 1991

J. David Dorris
U.S. Department of the Interior
Bureau of Land Management
Alaska State Office (980)
222 W. 7th Ave., #13
Anchorage, Alaska 99513-7599

Dear Mr. Dorris:

    This is in regard to your letter dated May 1, 1991, requesting clarification and additional information on issues related to our Section 404 of the Clean Water Act evaluation and the Section 404(b)(1) Guidelines compliance review necessary to complete the Environmental Impact Statement. This request concerns Department of the Army permit application No. 2-890243, Gastineau Channel 420, by the Echo Bay Exploration, Inc. to discharge a total of approximately 1,242,270 cubic yards of dredged or fill material in waters of the U.S. near Juneau, Alaska.

    We will discuss the issues in the order they were presented in your letter:

    1. We have received the supplemental information submitted by Kilborn Engineering Pacific, Inc., entitled "Surface Facility Evaluation Using Corps of Engineers 404(b)(1) Guidelines" (actually they are the EPA's Guidelines). This submittal provides sufficient discussion of the surface facility to meet the needs our Section 404(b)(1) Guidelines alternatives evaluation. Any remaining questions we may have with regard to the surface facility components appear to be of lesser import; such as: (Could the shop, office and dry be combined into one three-story building?).

    2. The main focus of the Corps review for this project will be its compliance with the Section 404(b)(1) Guidelines.

        a. The decision whether to issue a permit will be based on an evaluation of the probable impacts including cumulative impacts of the proposed activity and its intended use on the public interest. Evaluation of the probable impacts which the proposed activity may have on the public interest requires a careful weighing of all those factors which become relevant in each particular case. The benefits which reasonably may be expected to accrue from the proposal must be balanced against its

reasonably foreseeable detriments. The decision whether to authorize a proposal, and if so the conditions under which it will be allowed to occur, are therefore determined by the outcome of the general balancing process. That decision should reflect the national concern for both protection and utilization of important resources. All factors which may be relevant to the proposal must be considered including the cumulative effects thereof. Among those are conservation, economics, aesthetics, general environmental concerns, wetlands, cultural values, fish and wildlife values, flood hazards, flood plain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership, and, in general, the needs and welfare of the people. For activities involving 404 discharges, a permit will be denied if the discharge that would be authorized by such permit would not comply with the Environmental Protection Agency's 404(b)(1) guidelines. Subject to the preceding sentence and any other applicable guidelines or criteria (see Sections 320.2 and 320.3), a permit will be granted unless the District Engineer determines that it would be contrary to the public interest.

    b. The Corps has neither the special expertise or jurisdiction by law to evaluate the impacts of the tailings discharge. This is particularly important in light of 40 CFR 1501.6(b)(3); "Each cooperating agency shall assume on request of the lead agency responsibility for developing information and preparing environmental analyses including portions of the environmental impact statement concerning which the cooperating agency has special expertise". Even if we were amenable to taking on the assessment of the impacts of the 402 tailings discharge (which we are not) the Corps does not have the requisite expertise readily available for developing information and preparing environmental analyses for the impacts of the 402 discharge. We maintain that the analysis of impacts directly and indirectly resulting from the 402 discharge is within the primary charge and purview of the EPA. Until such time as the 402 program is transferred to the Corps of Engineers, we will continue to maintain that view. Also we maintain our view, irrespective of EPA's convoluted logic to the contrary, that waters behind and upstream of the dam are waters of the U.S., until such time as they are polluted to the point of becoming a pollutant themselves. Therefore, we recommend that BLM, as lead agency in the NEPA process, make a specific request of EPA as to the impacts resulting from the discharge of tailings into the impoundment area.

    3. The Memorandum of Agreement (MOA) between the Assistant Administrators for External Affairs and Water, U.S. Environmental Protection Agency and the Assistant Secretary of the Army for Civil Works concerning the regulation of discharges of solid waste under the Clean Water Act, dated January 17, 1986, became effective April 29, 1986. We offer the following rationale as to why the Corps does not consider the regulation of the tailings disposal in the impoundment to be within its authority. The Corps reviews applications for DA permits to authorize the

-3-

discharge of dredged or fill material into waters of the United States pursuant to Section 404 of the Clean Water Act (as stated in our regulations at 33 CFR 323.1). The tailings do not meet the Corps' definition of fill material. The term fill material means any material used for the primary purpose of replacing an aquatic area with dry land or changing the bottom elevation of any waterbody. The term does not include any pollutant discharged into the water primarily to dispose of waste, as that activity is regulated under Section 402 of the CWA (33 CFR 323.2(e)). Per the MOA, a pollutant will normally be considered by EPA and the Corps to be subject to Section 402 if it is a discharge in liquid, semi-liquid, or suspended form or if it is a discharge of solid material of a homogeneous nature normally associated with single industry wastes, and from a fixed conveyance, or if trucked, from a single site and set of known processes. These materials include placer mining wastes, phosphate mining wastes, titanium mining wastes, sand and gravel wastes, fly ash, and drilling muds.

We consider impounded waters to meet the definition of waters of the U.S. (33 CFR 328.3(a)(4) i.e., all impoundments of waters otherwise defined as waters of the United States). Consequently, as discussed above we do not consider the discharge of tailings to be a discharge of dredged or fill material subject to our jurisdiction even though they may occur within a water of the United States.

In the event that neither agency determines that the criteria for its permit program have been met, the Division Engineer and the Regional Administrator (RA) (or their designees) shall consult and determine which agency shall process the application in question.

4. It should be remembered that none of the following is to be construed as a change from our letter to the EPA dated April 22, 1991. In other words, if EPA decides the containment structure site is appropriate and that a containment structure is necessary; we will not second guess their decision. If this project were to be authorized as proposed, we would anticipate that the following mitigation measures would be required in order to balance the public interest:

    a. The dam would be operated as a flow-through structure until such time as a tailings discharge occurs, at that point in time the structure could then be operated as a tailings impoundment as a result of the discharge. Under this operating procedure, there would be no adverse impacts to wetlands or other aquatic resources resulting from the 404 discharge due to flooding of the impoundment, nor would there be adverse impacts to in-stream (downstream) flows on the native or anadromous fishery resulting from the 404 discharge until such time as closure of the structure occurs to contain the tailings. Consequently, the flow-through structure operation would mitigate for all impacts of the 404 discharge except for those which would occur directly within the footprint of the dam.

-4-

If it were within the Corps authority to regulate and assess the impacts resulting from the 402 discharge, we would anticipate that the following mitigation measures might be required in order to balance the public interest:

    a. The enhancement of another stream(s) to provide the potential for resident fishery improvement.

    b. The enhancement of other wetlands of lesser concern for the identified existing functions in Sheep Creek wetlands which would be lost as a result of the proposed project.

    c. Placement of the outfall at a location removed from the surface facility.

5. The Memorandum of Agreement between the U.S. Environmental Protection Agency and the Department of the Army concerning the determination of mitigation under the Clean Water Act Section 404(b)(1) Guidelines became effective February 7, 1990. This MOA is consistent with the President's goal of no overall net loss of wetlands and affirms the Corps existing policy of striving to avoid adverse impacts and offset unavoidable adverse impacts to aquatic resources. For clarification, the Corps does not have "no net loss" procedures; we have an agreement (which provides additional guidance) with EPA as to how we will implement the 404(b)(1) Guidelines, as stated at 40 CFR 230, to determine if mitigation is required (practicable and appropriate). If at this juncture compensatory mitigation is found to be practicable, appropriate and warranted, we would require compensatory mitigation. We do not anticipate, at this time, a need for compensatory mitigation due to impacts related to the proposed 404 discharge. However, we will need to complete the full public interest review process and give full consideration to all comments received before reaching our final conclusion on 404 compensatory mitigation.

6. The Corps considers Sheep Creek to be the preferred alternative for the reasons stated below. However, having said that we wish to point out that the selection of a tailings disposal site is not the Corps decision to make. If BLM as the Federal land manager determines that Federal property is the appropriate place to site a disposal operation, the Corps will not second guess that decision. If EPA determines that a tailings disposal operation is warranted and waters of the U.S. (Sheep Creek or any other alternative location) are the appropriate location, we will not second guess their decision.

    a. EPA has preemptively eliminated the marine discharge alternative which appears to be the least environmentally damaging alternative.

    b. The Sheep Creek Valley is the least pristine of the on-land alternatives identified to date.

Exhibit 25, page 4 of 5

-5-

    c. Disposal of the tailing/waste processing materials, of economic necessity, should occur on-site or within reasonable proximity to the mine site operations, and if containment is necessary, must be located in a suitable containment site (facility).

    Please contact me directly, if you have any questions, at the address above or telephone (907) 753-2712.

                              Sincerely,

                              SIGNED

                              Glen E. Justis
                              Southern Team Leader
                              Special Actions Section