The Coast Guard certifies under 5 U.S.C. 605(b) that this proposed rule would not have a significant economic impact on a substantial number of small entities because this rule removes an obsolete safety zone.

**Assistance for Small Entities**

Under section 213(a) of the Small Business Regulatory Enforcement Fairness Act of 1996 (Public Law 104–121), we offer to assist small entities in understanding the rule so that they could better evaluate its effects on them and participate in the rulemaking process. Small entities may contact the person listed under **FOR FURTHER INFORMATION CONTACT** for assistance in understanding and participating in this rulemaking. We also have a point of contact for commenting on actions by employees of the Coast Guard. Small business may send comments on the actions of Federal employees who enforce, or otherwise determine compliance with Federal regulations to the Small Business and Agriculture Regulatory Fairness Boards. The Ombudsman evaluates these actions annually and rates each agency's responsiveness to small business. If you wish to comment on actions by employees of the Coast Guard, call 1–888-REG-FAIR (1–888–734–3247).

**Collection of Information**

This rule calls for no new collection of information under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501–3520).

**Federalism**

A rule has implications for federalism under Executive Order 13132, Federalism, if it has a substantial direct effect on State or local governments and would either preempt State law or impose a substantial direct cost of compliance on them. We have analyzed this rule under that Order and have determined that it does not have implications for federalism.

**Unfunded Mandates Reform Act**

The Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531–1538) requires Federal agencies to assess the effects of their discretionary regulatory actions. In particular, the Act addresses actions that may result in the expenditure by a State, local, or tribal government, in the aggregate, or by the private sector of $100,000,000 or more in any one year. Though this rule will not result in such an expenditure, we do discuss the effects of this rule elsewhere in this preamble.

**Taking of Private Property**

This rule will not effect a taking of private property or otherwise have taking implications under Executive Order 12630, Governmental Actions and Interference with Constitutionally Protected Property Rights.

**Civil Justice Reform**

This rule meets applicable standards in sections 3(a) and 3(b)(2) of Executive Order 12988, Civil Justice Reform, to minimize litigation, eliminate ambiguity, and reduce burden.

**Protection of Children**

We have analyzed this rule under Executive Order 13045, Protection of Children from Environmental Health Risks and Safety Risks. This rule is not an economically significant rule and does not concern an environmental risk to health or safety that may disproportionately affect children.

**Environment**

The Coast Guard has considered the environmental impact of this proposed rule and concluded that, under figure 2–1, paragraph 34(g), of Commandant Instruction M16475.lC, this proposed rule is categorically excluded from further environmental documentation.

**Indian Tribal Governments**

This rule does not have tribal implications under Executive Order 13175, Consultation and Coordination with Indian Tribal Governments, because it does not have a substantial direct effect on one or more Indian tribes, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes.

**Energy Effects**

We have analyzed this proposed rule under Executive Order 13211, Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use. We have determined that it is not a "significant energy action" under that order because it is not a "significant regulatory action" under Executive Order 12866 and is not likely to have a significant adverse effect on the supply, distribution, or use of energy. It has not been designated by the Administrator of the Office of Information and Regulatory Affairs as a significant energy action.

Therefore, it does not require a Statement of Energy Effects under Executive Order 13211.

**List of Subjects in 33 CFR Part 165**

Harbors, Marine safety, Navigation (water), Reporting and recordkeeping requirements, Security measures, Waterways.

For the reasons discussed in the preamble, the Coast Guard amends 33 CFR part 165 as follows:

**PART 165— REGULATED NAVIGATION AREAS AND LIMITED ACCESS AREAS**

1. The authority for part 165 continues to read as follows:

**Authority:** 33 U.S.C. 1231; 50 U.S.C. 191, 33 CFR 1.05–1(g), 6.04–1, 6.04–6, 160.5; 49 CFR 1.46.

**§ 165.T07–002   [Removed]**

2. Section 165.T07–002 is removed.

Dated: April 18, 2002.

J.A. Servidio,
*Commander, U.S. Coast Guard, Captain of the Port.*

[FR Doc. 02–11619 Filed 5–8–02; 8:45 am]

**BILLING CODE 4910–15–U**

---

**DEPARTMENT OF DEFENSE**

**Department of the Army, Corps of Engineers**

**33 CFR Part 323**

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 232**

**[FRL 7209–2]**

**Final Revisions to the Clean Water Act Regulatory Definitions of "Fill Material" and "Discharge of Fill Material"**

**AGENCIES:** U.S. Army Corps of Engineers, Department of the Army, DoD; and Environmental Protection Agency.

**ACTION:** Final rule.

**SUMMARY:** The U.S. Army Corps of Engineers (Corps) and the Environmental Protection Agency (EPA) are promulgating a final rule to reconcile our Clean Water Act (CWA) section 404 regulations defining the term "fill material" and to amend our definitions of "discharge of fill material." Today's final rule completes the rulemaking process initiated by the April 20, 2000, proposal in which we jointly proposed to amend our respective regulations so that both agencies would have identical definitions of these key terms. The proposal was intended to clarify the Section 404 regulatory framework and

**Exhibit 27, page 1 of 15**

**31130**    **Federal Register** / Vol. 67, No. 90 / Thursday, May 9, 2002 / Rules and Regulations

generally to be consistent with existing regulatory practice. Today's final rule satisfies those goals.

Today's final rule defines "fill material" in both the Corps' and EPA's regulations as material placed in waters of the U.S. where the material has the effect of either replacing any portion of a water of the United States with dry land or changing the bottom elevation of any portion of a water. The examples of "fill material" identified in today's rule include rock, sand, soil, clay, plastics, construction debris, wood chips, overburden from mining or other excavation activities, and materials used to create any structure or infrastructure in waters of the U.S. This rule retains the effects-based approach of the April 2000 proposal and reflects the approach in EPA's longstanding regulations. Today's final rule, however, includes an explicit exclusion from the definition of "fill material" for trash or garbage.

Today's final rule also includes several clarifying changes to the term "discharge of fill material." Specifically, the term "infrastructure" has been added in several places following the term "structure" to further define the situations where the placement of fill material is considered a "discharge of fill material." In addition, the phrases "placement of fill material for construction or maintenance of any liner, berm, or other infrastructure associated with solid waste landfills" and "placement of overburden, slurry, or tailings or similar mining-related materials" have been added to the definition of "discharge of fill material" to provide further clarification of the types of activities regulated under section 404.

As indicated in the proposal, as a general matter, this final rule will not modify existing regulatory practice. Today's final rule, which establishes uniform language for the Corps' and EPA's definitions of "fill material" and "discharge of fill material," will enhance the agencies' ability to protect aquatic resources by ensuring more consistent and effective implementation of CWA requirements.

**EFFECTIVE DATE:** June 10, 2002.

**FOR FURTHER INFORMATION CONTACT:** For information on today's rule, contact either Mr. Thaddeus J. Rugiel, U.S. Army Corps of Engineers, ATTN CECW–OR, 441 "G" Street, NW., Washington, DC 20314–1000, phone: (202) 761–4595, e-mail address: *thaddeus.j.rugiel@hq02.usace.army.mil,* or Ms. Brenda Mallory, U.S. Environmental Protection Agency, EPA West, Office of Wetlands, Oceans and Watersheds (4502T), 1200 Pennsylvania

Avenue, NW., Washington, DC 20460, phone: (202) 566–1368, e-mail address: *mallory.brenda@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

**I. Background**

*A. Potentially Regulated Entities*

Persons or entities that discharge material to waters of the U.S. that has the effect of replacing any portion of a water of the U.S. with dry land or changing the bottom elevation of any portion of a water of the U.S. could be regulated by today's rule. The CWA generally governs the discharge of pollutants into waters of the U.S. without a permit issued by EPA, or a State or Tribe approved by EPA under section 402 of the Act, or, in the case of dredged or fill material, by the Corps or an approved State or Tribe under section 404 of the Act. Today's final rule addresses the CWA section 404 program's definitions of "fill material" and "discharge of fill material," which are important for determining whether a particular discharge is subject to regulation under CWA section 404. Today's final rule reconciles EPA's and the Corps' differing definitions of "fill material" and provides further clarification for the regulated public on what constitutes a "discharge of fill material." Examples of entities potentially regulated include:

| Category | Examples of potentially regulated entities |
|---|---|
| State/Tribal governments or instrumentalities. | State/Tribal agencies or instrumentalities that discharge material that has the effect of replacing any portion of a water of the U.S. with dry land or changing the bottom elevation of a water of the U.S. |
| Local governments or instrumentalities. | Local governments or instrumentalities that discharge material that has the effect of replacing any portion of a water of the U.S. with dry land or changing the bottom elevation of a water of the U.S. |
| Federal government agencies or instrumentalities. | Federal government agencies or instrumentalities that discharge material that has the effect of replacing any portion of a water of the U.S. with dry land or changing the bottom elevation of a water of the U.S. |

| Category | Examples of potentially regulated entities |
|---|---|
| Industrial, commercial, or agricultural entities. | Industrial, commercial, or agricultural entities that discharge material that has the effect of replacing any portion of a water of the U.S. with dry land or changing the bottom elevation of a water of the U.S. |
| Land developers and landowners. | Land developers and landowners that discharge material that has the effect of replacing any portion of a water of the U.S. with dry land or changing the bottom elevation of a water of the U.S. |

This table is not intended to be exhaustive, but rather provides a guide for readers regarding entities that are likely to be regulated by this action. This table lists the types of entities that we are now aware of that could potentially be regulated by this action. Other types of entities not listed in the table also could be regulated. To determine whether your organization or its activities are regulated by this action, you should carefully examine the applicability criteria in sections 230.2 of Title 40 and 323.2 of Title 33 of the Code of Federal Regulations, as well as the preamble discussion in Section II of today's final rule. If you have questions regarding the applicability of this action to a particular entity, consult the persons listed in the preceding section entitled **FOR FURTHER INFORMATION CONTACT.**

*B. Summary of Regulatory History Leading to Final Rule and Related Litigation*

The CWA governs the "discharge" of "pollutants" into "navigable waters," which are defined as "waters of the United States." Specifically, Section 301 of the CWA generally prohibits the discharge of pollutants to waters of the U.S., except in accordance with the requirements of one of the two permitting programs established under the CWA: Section 404, which regulates the discharge of dredged or fill material, or sction 402, which regulates all other pollutants under the National Pollutant Discharge Elimination System (NPDES) program. Section 404 is primarily administered by the Corps, or States/Tribes that have assumed the program pursuant to section 404(g), with input and oversight by EPA. In contrast, Section 402 and the remainder of the CWA are administered by EPA or approved States or Tribes. The CWA defines the term "pollutant" to include

materials such as rock, sand, and cellar dirt that often serve as "fill material." The CWA, however, does not define the terms "fill material" and "discharge of fill material," leaving it to the agencies to adopt definitions consistent with the statutory framework of the CWA.

Prior to 1977, both the Corps and EPA had defined "fill material" as "any pollutant used to create fill in the traditional sense of replacing an aquatic area with dry land or of changing the bottom elevation of a water body for any purpose. * * *" 40 FR 31325 (July 25, 1975); 40 FR 41291 (September 5, 1975).

In 1977, the Corps amended its definition of "fill material" to add a "primary purpose test," and specifically excluded from that definition material that was discharged primarily to dispose of waste. 42 FR 37130 (July 19, 1977). This change was adopted by the Corps because it recognized that some discharges of solid waste materials technically fit the definition of fill material; however, the Corps believed that such waste materials should not be subject to regulation under the CWA section 404 program. Specifically, the Corps' definition of "fill material" adopted in 1977 reads as follows:

(e) The term "fill material" means any material used *for the primary purpose* of replacing an aquatic area with dry land or of changing the bottom elevation of an [sic] water body. The term does not include any pollutant discharged into the water primarily to dispose of waste, *as that activity is regulated under section 402 of the Clean Water Act.*" 33 CFR 323.2(e) (2001)(emphasis added).

EPA did not amend its regulations to adopt a "primary purpose test" similar to that used by the Corps. Instead, the EPA regulations at 40 CFR 232.2 defined "fill material" as "any 'pollutant' which replaces portions of the 'waters of the United States' with dry land or which changes the bottom elevation of a water body *for any purpose*" (emphasis added). EPA's definition focused on the effect of the material (an effects-based test), rather than the purpose of the discharge in determining whether it would be regulated by section 404 or section 402.

*C. April 2000 Proposal*

These differing definitions of "fill material" have resulted in some confusion for some members of the regulated community which has not promoted effective implementation of the CWA. *See* 65 FR at 21294. As a result, in April 2000, the agencies proposed revisions to their respective definitions of "fill material" and "discharge of fill material," adopting a single effects-based definition similar to

that in EPA's regulations. The April 2000 proposed rule defined "fill material" as material that has the effect of replacing any portion of a water of the U.S. with dry land, or changing the bottom elevation of any portion of a water of the U.S. The agencies believe that an effects-based definition is, as a general matter, the most effective approach for identifying discharges that are regulated as "fill material" under section 404. Thus, the proposal removed from the Corps'' definition the "primary purpose" test and the provision excluding pollutants discharged into water primarily to dispose of waste.

The April 2000 proposal also would have excluded from the definition discharges subject to an EPA proposed or promulgated effluent limitation guideline or standard under CWA sections 301, 304, 306, or discharges covered under a NPDES permit under CWA section 402. Finally, the April 2000 proposal solicited comments on the idea of the agencies creating an "unsuitable fill" category in the regulations that would identify materials that the Corps District Engineer could determine were not appropriate as fill material and, consequently, refuse to process an application seeking authorization to discharge such material.

In the preamble for the April 2000 proposal, the agencies discussed the need to address the confusion created by the agencies' differing definitions. While in practice some Corps Districts and EPA Regions have developed consistent approaches for determining whether proposed activities would result in a discharge of fill material, national uniformity will ensure better environmental results. Moreover, two judicial decisions discussed in the April 2000 proposal, *Resource Investments Incorporated v. U.S. Army Corps of Engineers*, 151 F. 3d 1162 (9th Cir. 1998) ("*RII*") and *Bragg* v. *Robertson*, (Civil Action No. 2:98–636, S.D. W. Va.), *vacated on other grounds*, 248 F. 3d 275 (4th Cir. 2001) ("*Bragg*"), indicate that the differing EPA and Corps definitions can result in judicial decisions that further confuse the regulatory context. *See* 65 FR at 21294–95. The clarification in the April 2000 proposal was intended to promote clearer understanding and application of our regulatory programs.

With respect to the term "discharge of fill material," the April 2000 proposal also included several clarifying changes. Unlike the definition of "fill material," EPA's and the Corps" then-existing regulations defining the term "discharge of fill material" were substantively identical. The proposed changes to the term were intended to provide further

clarification of the issue. Specifically, the proposal provided for adding two phrases to the definition: (1) "Placement of fill material for construction or maintenance of liners, berms, and other infrastructure associated with solid waste landfills; and (2) "placement of coal mining overburden."

As summarized in more detail in the U.S. Army Corps of Engineers' and Environmental Protection Agency's Response to Comments on the April 20, 2000, Proposed Rule Revising the Clean Water Act Regulatory Definitions of "Fill Material" and "Discharge of Fill Material," dated May 3, 2002 ("Response to Comments"), we received a number of comments addressing these proposed changes. The comments and the above-referenced document are part of the administrative record for this rule and are available from either agency. *See* the section entitled **FOR FURTHER INFORMATION CONTACT**.

**II. Discussion of Final Rule**

*A. Overall Summary of Comments*

We received over 17,200 comments on the proposed rule, including several hundred late comments, most of which consisted of identical or substantially identical e-mails, letters, and postcards opposing the rule. (In April 2002, an additional several thousand letters and e-mails were sent opposing the adoption of a rule similar to the proposal.) Approximately 500 of the original comments consisted of more individualized letters, with a mixture of those comments supporting and opposing the rule. The comments of environmental groups and the various form letters were strongly opposed to the proposal, in particular, the elimination of the waste exclusion and the discussion in the preamble regarding treatment of unsuitable fill material. Except for several landfill representatives, comments from the regulated community generally supported the proposal, in particular, the fact that the rule would create uniform definitions of "fill material" for the Corps" and EPA's rules and maintain regulation of certain discharges under section 404 as opposed to section 402 of the CWA. A detailed discussion of the issues raised in the comments and the agencies' responses can be found in the Response to Comments document.

The April 2000 proposal would have achieved four major outcomes and these were the focus of many of the comments. These outcomes were (1) Conforming the EPA and Corps definitions of "fill material" to one another; (2) adopting an effects-based

test, as opposed to the Corps' primary purpose test, for defining "fill material;" (3) eliminating the waste exclusion from the Corps'' regulation; and (4) soliciting comments on whether to develop a definition for "unsuitable fill material." A summary of comments relating to these four issues and our responses are discussed in section II.B of this preamble, which describes today's final rule.

In addition, comments asserted the need for the agencies to prepare an environmental impact statement (EIS) in order to comply with the National Environmental Policy Act; and questioned the consistency of the April 2000 proposal with the CWA, existing judicial decisions, and agency guidance documents. These comments are addressed in this section of the preamble.

With respect to the need for an EIS, many of the comments opposing the adoption of the rule argued that an EIS should have been prepared, particularly to address the impacts of eliminating the waste exclusion. Supporters of an EIS rejected the notion that the issues will be addressed in the individual permit situations. First, they pointed out that many of the mining activities have historically been permitted under the nationwide permit program where truncated environmental review occurs and no individual NEPA analysis is undertaken. Second, they argued that the cumulative impacts often are not appropriately addressed in this context. As described in section III. J of this final preamble and in the Response to Comments document, the agencies have concluded that preparation of an EIS is not required for this rule pursuant to NEPA. While supporters of an EIS suggest that finalizing this rule will result in significant new discharges that previously would not have occurred, that is not the case. Although the rule will clarify the appropriate regulatory framework, we do not expect there to be any significant change in the nature and scope of discharges that will occur.

Finally, a number of comments asserted that the proposal should not be finalized because it violated the then-existing law ( *e.g.*, CWA, *Bragg*, and *RII*). Other comments argued that the proposal was consistent with the CWA and current regulatory practice. We do not agree that the proposal or today's final rule violate the CWA or any other law. Moreover, we believe that agencies have an obligation to take whatever steps may be necessary, including making revisions to their regulations, to ensure that their programs are appropriately implementing statutory mandates. As indicated, the Corps and

EPA believe that the current inconsistency between their respective definitions of "fill material" is impeding the effective implementation of the section 404 program. Under those circumstances, we believe that a change in the regulatory language is justified and that by adopting the substance of EPA's longstanding definition, we are minimizing potential confusion and disruption to the program, while remaining consistent with the CWA. We agree with those comments that recognize the consistency of our action with the CWA and current practice. As described in more detail in the Response to Comments document and sections II. B and D of this preamble, today's final rule clarifies the governing regulatory framework in a manner consistent with the CWA and existing practice.

*B. Discussion of the Final Rule*

1. Definition of "Fill Material"

Today's final rule modifies both the EPA's and Corps' existing definitions of "fill material" and has retained the effects-based approach set forth in the proposal. The final rule defines "fill material" as material placed in waters of the U.S. where the material has the effect of either replacing any portion of a water of the United States with dry land or changing the bottom elevation of any portion of a water. The examples of "fill material" identified in today's rule include rock, sand, soil, clay, plastics, construction debris, wood chips, overburden from mining or other excavation activities, and materials used to create any structure or infrastructure in waters of the U.S. The proposed rule only specifically identified rock, earth and sand as examples, but the preamble made it clear that these were merely illustrative. In addition, in the preamble to the proposal, we indicated that wood chips, coal mining overburden, and similar materials would also constitute "fill material" if they had the effect of fill. As a result of questions raised in the comments about the scope of the term "fill material," we have included additional examples in the final rule, several of which were discussed in the proposed preamble. We believe that these additional examples will further clarify the rule.

Although today's final rule adopts a general effects-based approach for defining "fill material," it specifically excludes trash or garbage. Today's final rule does not modify any other Section 404 jurisdictional terms or alter any procedures governing the individual or general permit processes for Section 404 authorizations, requirements under

Section 402, or the governing permit programs. Following is a summary of the actions that the agencies have taken in response to public comments.

*a. Reconciling Agencies' Definitions*

The majority of the comments from both the environmental and industry perspectives addressing the issue of whether the agencies should have identical definitions expressed the general view that the agencies should have the same definitions for the key jurisdictional terms "fill material" and "discharge of fill material." Many of the comments also noted that the differences between the Corps' and EPA's rules have historically caused confusion for the regulated community. Several asserted that despite differences in the regulatory language, some Corps Districts have been applying an effects-based test for some time. As described in the Response to Comments document, the agencies agree with those comments supporting the promulgation in both the Corps' and EPA's regulations of a uniform definition for the terms "fill material" and "discharge of fill material." Today's final rule achieves this result.

*b. Effects-Based Test*

Most of the comments supported the proposed rule's use of an effects-based test similar to EPA's longstanding definition for defining "fill material" and the elimination of the "primary purpose" test from the Corps regulations. Those disagreeing with such an approach gave a variety of reasons including, the lack of any demonstrated justification that eliminating the primary purpose test from the Corps' regulation was necessary; the existence of similar purpose tests in other statutes involving waste materials as well as in the Section 404(b)(1) Guidelines as demonstrating that such tests need not be unwieldy; the existence of alternative ways of addressing the issues of concern without resorting to this rule change; and concerns about the inappropriate expansion of section 404 jurisdiction. As will be explained, the agencies are not persuaded by these arguments.

First, we believe that the objective standard created by the effects-based test will yield more consistent results in determining what is "fill material" and will provide greater certainty in the implementation of the program. We believe that these benefits provide sufficient justification for today's rule change. In addition, although similar "purpose" tests may be used under other statutes and even under the section 404 program, this does not

negate the difficulties we have faced in applying the primary purpose test, as well as some confusion that has resulted from the use of the subjective primary purpose test in the section 404 jurisdictional context. An objective, effects-based standard also helps ensure that discharges with similar environmental effects will be treated in a similar manner under the regulatory program. The subjective, purpose-based standard led in some cases to inconsistent treatment of similar discharges, a result which hampers effective implementation of the statute.

Moreover, we believe there is an important distinction between the use of a purpose test here, where it determines the basic jurisdiction of the section 404 versus the section 402 program, and its use in the other contexts, such as in the evaluation of whether alternatives to a discharge of dredged material are "practicable" within the meaning of the section 404(b)(1) Guidelines. See 40 CFR 230.10(a)(2). The use of project purpose in the latter case is appropriate because it would make no sense to consider an alternative "practicable" if it did not satisfy the basic or overall purpose of the project proposed by the applicant. The definition of fill material, on the other hand, determines which legal requirements must be met for a discharge to be authorized under the statute. In that circumstance, we believe it is important to use an objective, effects-based test that ensures consistent treatment of like discharges, and prevents uncertainty for the regulated community as to what regulatory program applies to particular discharges. Moreover, we disagree that alternatives other than a rulemaking could have adequately addressed the agencies' concerns since the facial differences in our regulations could only be completely reconciled by revising the rules. In addition, the agencies previously had attempted to clarify their interpretation of the rules in a 1986 Memorandum of Agreement (MOA). Nevertheless, issues persisted.

Finally, we disagree that the rule causes an inappropriate expansion of section 404 jurisdiction. The CWA does not limit section 404 jurisdiction over fill material to materials meeting the primary purpose test. The "primary purpose test" is a regulatory definition and within the agencies province to modify as long as the modification is consistent with the CWA. In sum, as described in the Response to Comments document, the final rule, just as the proposal, adopts an effects-based approach to defining fill material. We believe the clarity and consistency created by the agencies relying on a more objective test for defining these key jurisdictional terms will result in more effective regulation under the CWA.

### c. Elimination of Waste Exclusion

Many comments opposed the proposal to eliminate the waste exclusion from the Corps' regulation. Some of these comments recommended that, in addition to the effects-based test, the agencies should include a general exclusion from the definition of "fill material" for any discharge of "waste." These comments asserted that such an approach provides the advantages of EPA's effects-based approach while more effectively implementing the Corps' exclusion of waste material from regulation under section 404. Some of the comments argued that the proposed rule's deletion of the waste exclusion language from the Corps regulations violates the CWA. According to these comments, while waste material can permissibly be covered by section 404 when it is placed in waters for a beneficial purpose, the CWA categorically prohibits authorizing such discharges under section 404 when their purpose is waste disposal. These comments pointed to the decisions in *RII* and *Bragg* to argue that all waste material is outside the scope of section 404.

These comments do not object to, nor claim that the CWA prohibits, issuance of a section 404 permit for waste material discharged into waters of the U.S. under all circumstances. Where waste is discharged for a purpose other than waste disposal (e.g., to create fast land for development), these comments acknowledged that the Corps' issuance of a section 404 permit in accordance with the section 404(b)(1) Guidelines adequately protects the environment and is consistent with the CWA. On this point, we agree. However, where the identical material—with identical environmental effects—is discharged into waters for purposes of waste disposal, the comments contend that issuance of a section 404 permit in accordance with the Guidelines would neither protect the environment nor be allowed by the CWA. Here, we disagree.

Simply because a material is disposed of for purposes of waste disposal does not, in our view, justify excluding it categorically from the definition of fill. Some waste (e.g., mine overburden) consists of material such as soil, rock and earth, that is similar to "traditional" fill material used for purposes of creating fast land for development. In addition, other kinds of waste having the effect of fill (e.g., certain other mining wastes) can, unlike trash or garbage, be indistinguishable either upon discharge or over time from structures created for purposes of creating fast land. Given the similarities of some discharges of waste to "traditional" fill, we believe that a categorical exclusion for waste would be over-broad. Instead, where a waste has the effect of fill, we believe that regulation under the section 404 program is appropriate.

This does not mean, however, that today's rule opens up waters of the U.S. to be filled for any waste disposal purposes. As explained previously, today's rule is generally consistent with current agency practice and so it does not expand the types of discharges that will be covered under section 404. The section 404(b)(1) Guidelines provide for a demonstration that there are no less damaging alternatives to the discharge, and that all appropriate and practicable steps have been taken to avoid, minimize and compensate for any effects on the waters. We recognize that, some fill material may exhibit characteristics, such as chemical contamination, which may be of environmental concern in certain circumstances. This is true under either a primary purpose or effects based definition of fill material. The section 404 permitting process, however, is expressly designed to address the entire range of environmental concerns arising from discharges of dredged or fill material. See 40 CFR Part 230, subparts C-G (containing comprehensive provisions for addressing physical, chemical and biological impacts of discharges).

The 404(b)(1) guidelines provide a comprehensive means of evaluating whether any discharge of fill material, regardless of its purpose, is environmentally acceptable and therefore may be discharged in accordance with the CWA. Where the practicable alternatives test has been satisfied and all practicable steps have been taken both to minimize effects on the aquatic environment and to compensate for the loss of aquatic functions and values, we believe the section 404 permitting process is adequate to ensure protection of the aquatic ecosystem for any pollutant that fills waters. There is no environmental basis for contending that the sufficiency of the permitting process to protect waters of the U.S. depends on the purpose of the discharge.

The position reflected in some of the comments appears to be based on the contention that Congress did not intend for waste disposal to be a permissible purpose of discharging pollutants into waters of the U.S. While we agree that

**Exhibit 27, page 5 of 15**

Congress wanted to prevent utilization of waters as unlicensed dumping grounds for waste material, the Act as a whole is focused primarily on discharges of waste material, as shown by the Act's definition of pollutant, which includes solid waste, sewage, garbage, discarded equipment, industrial, municipal and agricultural waste. *See* CWA section 502(6). While the elimination of all discharges is an important goal of the Act (*see* CWA section 101(a)(1)), the Act seeks to meet that goal not by banning discharges of waste outright, but by imposing carefully tailored restrictions on discharges of pollutants based on factors such as the impact of the discharge on the receiving water, availability of treatment technologies, cost, and the availability of alternatives to the discharge. *See, e.g.,* CWA sections 301(b), 304(b) (requiring discharges to meet technology-based effluent limitations guidelines and standards); section 306(a)(1) (defining new source performance standard to include no discharge of pollutants "where practicable"); section 301(b)(1)(C) (requiring dischargers to comply with any more stringent limitations necessary to meet water quality standards); sections 404(b)(1) and 403(c)(1)(F) (requiring that 404(b)(1) Guidelines be based on section 403(c) criteria, which include consideration of "other possible locations" of disposal).

Nor do we think that there is any indication that Congress intended to exclude discharges for purposes of waste disposal entirely from coverage under section 404. For example, section 404 applies to "dredged material" (referred to as dredged "spoil" in the definition of pollutant in section 502(6)), which is typically discharged not for any beneficial purpose, but as a waste product from a dredging operation. Moreover, section 404(a) authorizes the Corps to issue permits for discharges of dredged or fill material at specified "disposal" sites. Congress' use of the word "disposal" supports the reasonableness of our view that regulating waste material having the effect of fill under section 404 is consistent with the Act.

We also disagree with the interpretation of some of the comments on the *RII* and *Bragg* decisions as mandating that the Corps retain the current exclusion of waste disposal in the definition of fill material. We note first that the decision of the district court in *Bragg* has been vacated by the Fourth Circuit on 11th amendment grounds. *Bragg v. Robertson,* 72 F. Supp. 2d 642 (S.D. W. Va. 1999), *rev'd,* 248 F. 3d 275 (4th Cir. 2001). In any

event, both *Bragg* and *RII* applied the Corps' then-existing definition of fill material to conclude that certain discharges were not covered by section 404. Nothing in those decisions suggests that the Act itself precluded the regulation of waste materials with the effect of fill under section 404. See section II. D. of this preamble for further discussion of the *RII* decision. While we agree that trash or garbage generally should be excluded from the definition of fill material (for the reasons explained in section II.B.1d of this preamble), we do not agree that an exclusion for all waste is appropriate and have not included such a provision in today's rule. These issues are discussed in section II.B.1d of the preamble and are addressed more fully in the Response to Comments document.

*d. Trash or Garbage*

The agencies have added an exclusion for trash or garbage to the definition of "fill material" for several reasons. First, the preamble to the proposed rule and many of the comments recognized that trash or garbage, such as debris, junk cars, used tires, discarded kitchen appliances, and similar materials, are not appropriately used, as a general matter, for fill material in waters of the U.S. In particular, we agree that the discharge of trash or garbage often results in adverse environmental impacts to waters of the U.S. by creating physical obstructions that alter the natural hydrology of waters and may cause physical hazards as well as other environmental effects. We also agree that these impacts are generally avoidable because there are alternative clean and safe forms of fill material that can be used to accomplish project objectives and because there are widely available landfills and other approved facilities for disposal of trash or garbage.

Accordingly, a party may not obtain a section 404 permit to dispose of trash or garbage in regulated waters. Because the discharge of any pollutant into jurisdictional waters is prohibited under CWA section 301 except in accordance with a permit issued under sections 404 or 402, section 402 would govern such discharges. For many of the reasons identified in this preamble, such as the physical obstruction and hazards that such materials would create in waters of the U.S., we would emphasize that trash or garbage are unlikely to be eligible to receive a permit under the section 402 regulatory program. We also note that where such materials are placed in waters of the U.S. without a permit, EPA or an approved State/Tribal agency with permitting authority, remains the lead

enforcement agency. Today's rule does not affect the application of section 402 of the CWA to discharges of pollutants other than fill material that may be associated with such things as solid waste landfill structures and mine impoundments. Where such structures release pollutants into waters of the U.S., a permit under section 402 of the CWA is required that will ensure protection of any downstream waters, including compliance with State water quality standards.

While the agencies have generally excluded materials characterized as trash or garbage from the definition of "fill material," we agree that there are very specific circumstances where certain types of material that might otherwise be considered trash or garbage may be appropriate for use in a particular project to create a structure or infrastructure in waters of the U.S. In such situations, this material would be regulated as fill material. Such material would have to be suitably cleaned up and not include constituents that would cause significant environmental degradation. An example would be where recycled porcelain fixtures are cleaned and placed in waters of the U.S. to create environmentally beneficial artificial reefs. Such material would not be considered trash or garbage and thus would not be subject to the exclusion. The agencies believe that this is appropriate, and even environmentally beneficial, in situations where (1) the otherwise excluded materials are being placed in waters of the U.S. in a manner consistent with traditional uses of fill material to create a structure or infrastructure, (2) the material's characteristics are suitable to the project purpose, and (3) the review under section 404 can effectively ensure that the material will not cause or contribute to significant environmental degradation.

We also note that as stated in the preamble to the proposal, it is important to draw a clear distinction between solid waste discharged directly into waters of the U.S. and sanitary solid waste landfills. With respect to solid waste landfills, the liners, berms, and other infrastructure that are constructed of fill materials in waters of the U.S. are regulated under section 404 of the CWA. In the case of a landfill that has received a section 404 permit for the placement of berms, dikes, liners and similar activities needed to construct the facility, the subsequent disposal of solid waste into the landfill, while subject to regulation under the RCRA, would not be subject to regulation under the CWA because the constructed facility is not waters of the U.S. As with current

**Exhibit 27, page 6 of 15**

practice, discharges of leachate from landfills into waters of the U.S. would remain subject to CWA section 402. Today's final rule does not change this general regulatory framework for landfills. *See* section II D of this preamble for further discussion.

*e. Unsuitable Fill Material*

With respect to developing a potential definition of "unsuitable fill material," there was almost unanimous opposition to the unsuitable fill concept as discussed in the preamble. Some comments viewed it as an inadequate substitute for the elimination of the waste exclusion. Others argued that having an unsuitable fill provision would be a good idea but that it would need to be much broader and to specifically include mining-related wastes. These commenters also objected to leaving the question of whether something was "unsuitable fill material" to the discretion of the District Engineer. Some comments expressed concern that the definition of unsuitable fill material focused on materials that have a potential to leach or that have toxic constituents in toxic amounts. They argued that the definition could result in prohibiting activities that with appropriate permit terms and conditions potentially are allowable under section 404. They also argued that such issues should be addressed in the context of the permitting process and should not result in the permit application being rejected. As described in the Response to Comments document, the agencies have not included an unsuitable fill category in the final rule but, as discussed, the final rule does narrow the scope of "fill material" by excluding trash or garbage.

*f. Effluent Guideline Limitations and 402 Permits*

In addition to the changes already discussed in this preamble, today's final rule also deletes the exclusion contained in the proposal for discharges covered by effluent limitation guidelines or standards or NPDES permits. Several of the comments raised concerns that the exclusion included in the proposed definition for discharges covered by proposed or existing effluent limitation guidelines or standards or NPDES permits was vague and would result in uncertainty with respect to the regulation of certain discharges. Other comments stated that it was inappropriate for rule language to allow reliance on proposed effluent limitation guidelines or standards before they are promulgated as a final rule. In addition, including the language in the actual rule could raise questions as to whether the

reference to effluent guidelines was meant to refer only to those in existence at the time today's rule was promulgated or whether the reference was prospective.

In light of the concerns and confusion associated with the proposed provision, we have decided to delete it from the rule. However, although we have removed the language in question from the rule itself, we emphasize that today's rule generally is intended to maintain our existing approach to regulating pollutants under either section 402 or 404 of the CWA. Effluent limitation guidelines and new source performance standards ("effluent guidelines") promulgated under section 304 and 306 of the CWA establish limitations and standards for specified wastestreams from industrial categories, and those limitations and standards are incorporated into permits issued under section 402 of the Act. EPA has never sought to regulate fill material under effluent guidelines. Rather, effluent guidelines restrict discharges of pollutants from identified wastestreams based upon the pollutant reduction capabilities of available treatment technologies. Recognizing that some discharges (such as suspended or settleable solids) can have the associated effect, over time, of raising the bottom elevation of a water due to settling of waterborne pollutants, we do not consider such pollutants to be "fill material," and nothing in today's rule changes that view. Nor does today's rule change any determination we have made regarding discharges that are subject to an effluent limitation guideline and standards, which will continue to be regulated under section 402 of the CWA. Similarly, this rule does not alter the manner in which water quality standards currently apply under the section 402 or the section 404 programs.

2. Definition of "Discharge of Fill Material"

Most of the comments addressing "discharge of fill material" supported the inclusion of items related to solid waste landfills, although several asserted that the regulation of discharges associated with solid waste landfills was inconsistent with the court's decision in *Resource Investments Inc.* v. *U.S. Army Corps of Engineers*, 151 F.3d 1162 (9th Cir. 1998). See detailed discussion in section II. D of this final preamble. With respect to the placement of coal mining overburden, two diametrically opposed views were reflected in the comments. Many of the comments argued that coal overburden was "waste" material and

that allowing such discharges was a violation of the CWA. In contrast, other comments argued that focusing on "coal mining overburden" was confusing, because it created the impression that the overburden or similar materials from other mining processes may not be regulated as "discharges of fill material."

Today's final rule responds to the comments in the following ways. First, the agencies continue to agree with those comments that supported including the placement of material associated with construction and maintenance of solid waste landfills and related facilities in the discharge of fill material. For the reasons discussed in section II. D of this final preamble and in the Response to Comments document, we do not agree that we are precluded by the *RII* decision from issuing a rule that defines "fill material" or the "discharge of fill material" as encompassing discharges associated with the construction of solid waste landfill infrastructures. Second, the agencies have modified the "placement of coal mining overburden" to read "placement of overburden, slurry, or tailings or similar mining-related materials." The language in today's final rule will clarify that any mining-related material that has the effect of fill when discharged will be regulated as "fill material." We made this clarification because it was clear from the comments that some were reading the examples we identified as an exclusive list. The general intent of this rule is to cover materials that have the effect of fill, not simply to focus on any one industrial activity. We believe that the additional mining related examples will address the confusion reflected in the comments. Finally, as discussed in section II.B.1.c of this preamble, we do not agree that the CWA contains a blanket prohibition precluding discharges of "waste" materials in to waters of the U.S. Instead, the Act establishes the framework for regulating discharges into waters and we believe the section 404 program is the most appropriate vehicle for regulating overburden and other mining-related materials. Several other minor changes, editorial in nature, have also been made in today's final rule.

*C. Appropriate Reliance on the Environmental Reviews Conducted by Other Federal or State Programs*

As indicated, today's rule is designed to improve the effective implementation of the section 404 program by having the Corps and EPA adopt a single, uniform definition for these key jurisdictional terms. We also believe