**31136** Federal Register / Vol. 67, No. 90 / Thursday, May 9, 2002 / Rules and Regulations

that we can improve the effective implementation of the program by placing greater emphasis on coordination among the Federal agencies and with relevant State and Tribal programs. There are numerous examples of where the agencies can effectively work together and with other State, Tribal and Federal programs in the review of proposed projects that involve a section 404 discharge to jointly develop information that is relevant and reliable. Projects involving discharges to waters of the U.S. are often subject to review under other Federal and State permit programs, including the RCRA, the Surface Mining Control and Reclamation Act (SMCRA), the Coastal Zone Management Act (CZMA), CWA Section 402 NPDES, and others. Examples where closer coordination may be beneficial include the review of proposed solid waste landfills under the CWA and RCRA, proposed highway projects under the CWA and NEPA, proposed mining projects under the CWA and SMCRA, and proposed coastal restoration projects under the CWA and CZMA.

As EPA and the Corps implement today's rule, we will be placing even greater emphasis on effective coordination with other relevant State, Tribal and Federal programs and, consistent with our legal responsibilities, on reliance, as appropriate, on the information developed and conclusions reached by other agencies to support the decisions required under these programs and ours. We are confident that this coordination will serve to make the implementation of today's rule and, more broadly, the CWA section 404 program, more effective, consistent and environmentally protective.

Some comments expressed concern that an effects-based approach to the definition of "fill material" would result in a duplication of effort among Federal programs and an increased workload for the Corps. We believe that more effective coordination among the State, Tribal and Federal agencies and appropriate reliance on the analyses of other agencies will help significantly to address these concerns.

First, it is important to note that EPA and Corps regulations encourage coordination and allow for appropriate reliance on relevant information and analyses developed under other programs to help satisfy section 404 program requirements. In the most effective circumstances, the Corps is able to coordinate with other relevant State, Tribal and Federal agencies before and during project review to identify the most efficient and effective role for each agency and ensure mutual reliance on information and analyses, particularly where that reliance is consistent with individual agency expertise and experience. For example, for many years, subject to advice from EPA, the Corps has relied on State determinations regarding water quality matters, as those State determinations are reflected in State CWA section 401 water quality certifications (see 33 CFR 320.4(d)). Such Corps reliance on State water quality determinations will continue for discharges associated with activities such as mining and solid waste landfills. In regulating discharges associated with mining, close coordination with the State, Tribal and Federal entities responsible for implementation of SMCRA, CWA section 401 and section 402 will enable the Corps to take advantage of the specialized expertise of the agencies as the Corps completes the section 404 review. Such coordination also helps to reduce the costs associated with project reviews, promotes consistent and predictable decision-making, and ultimately ensures the most effective protection for human health and the environment. EPA and the Corps anticipate that Corps District offices will rely on State/Federal site selection under SMCRA regarding the siting of coal mining related discharges to the extent allowed under current law and regulations. Similarly, the Corps will make full use of State RCRA information regarding the siting, design and construction of solid waste landfills, and will defer to those State decisions to the extent allowed by current law and regulation.

Both agencies recognize, however, that the Corps is ultimately responsible under the CWA for making the required determinations that support each permit decision based on the Corps' independent evaluation of the record. The Corps itself determines the extent of deference to information generated from other programs including, for example, site selection under SMCRA and RCRA, that is appropriate on a case-by-case basis. Ultimately the Corps is relying on, rather than relinquishing to, these other sources of information as a record is developed and the Corps makes the determinations required by the Section 404 regulatory program. For example, the Corps will make full use of State site selection decisions under SMCRA (*e.g.*, coal slurry impoundments) and RCRA (*e.g.*, solid waste landfills), but the Corps will independently review those decisions and the State processes that generated them, to ensure that any Corps permit decision for a discharge site will fully comply with NEPA, the section 404(b)(1) Guidelines, and other relevant legal requirements. The Corps and EPA believe that effective coordination with other State and Federal agencies and the information they develop will help the Corps continue to make more timely, consistent and environmentally protective permit decisions.

*D. The Final Rule and the Resource Investments Decision*

In *Resource Investments Inc* v. *Corps*, 151 F.3d 1162 (9th Cir. 1998), the Ninth Circuit held that the Corps lacked the authority to regulate a solid waste landfill in waters of the U.S. The court found that: (1) Neither the solid waste itself nor the liner consisting of layers of gravel and low-permeability soil constituted "fill material" under Corps regulations; and (2) because of the potential for inconsistent results if landfills were regulated under both section 404 of the CWA and Subtitle D of RCRA, requiring these facilities to be subject solely to RCRA would "harmonize" the statutes.

We discussed this decision in the preamble to the proposed rule as an example of some of the confusion engendered by the "primary purpose" test. The court found in *RII* that the liner was not fill material because its primary purpose was not to replace an aquatic area with dry land or change the bottom elevation of a waterbody, "but rather to serve as a leak detection and collection system." 151 F.3d at 1168. We explained in the proposal that fills typically serve some other purpose than just creating dry land or raising a water's bottom elevation and that, if the court's reasoning were taken to its logical conclusion, many traditional fills in waters of the U.S. would not be subject to section 404.

Some commenters objected to our proposal not to follow the decision in *RII* in this rulemaking. They criticized the proposal as an improper attempt to "override" or "overrule" the Ninth Circuit's decision, particularly within the Ninth Circuit where the decision is binding. They also argued that the proposed rule failed to address the potential for duplication and inconsistency in decision-making by State and Federal agencies identified in *RII*.

In our view, these comments raise two distinct issues. The first is whether we should follow the *RII* decision outside the Ninth Circuit and cease regulating discharges associated with the construction of solid waste landfills under section 404. The second issue is whether *RII* precludes us from

Exhibit 27, page 8 of 15

regulating discharges associated with construction of solid waste landfill structures within the Ninth Circuit, even after today's rule. We address each of these issues in turn.

Regarding the first question, we note first that, after *RII* was decided, we chose not to acquiesce in the decision outside the Ninth Circuit. While we agreed that the solid waste disposal placed in a landfill is not fill material (and such waste continues to be excluded under today's rule), we believed that the court misapplied the primary purpose test in the Corps' regulations, and that the court's conclusion that RCRA supplanted CWA regulation was contrary to Congressional intent. See *Resource Investments Inc. et al.* v. *Corps,* No. 97–35934 (Government's Petition for Rehearing and Suggestion for Rehearing En Banc, September 30, 1998). Thus, after the court decided *RII,* the Corps has continued to issue section 404 permits for the construction of solid waste landfill infrastructures outside the Ninth Circuit.

After considering public comments, we continue to decline to follow *RII* outside the Ninth Circuit and have, therefore, maintained the approach in the proposed rule to the regulation of solid waste landfills. The revisions to the Corps' definition of fill material in today's rule address the basis for the court's holding that the landfill did not involve the discharge of fill material under section 404. For the reasons explained elsewhere in today's notice, we believe that an effects-based test is the appropriate means of evaluating whether a pollutant is "fill material" and should be regulated under section 404 as opposed to section 402 of the CWA. The placement of berms, liners and other infrastructure (such as roads) associated with construction of a solid waste landfill in waters of the U.S. has the effect of replacing water with dry land or raising the bottom elevation of a water. Therefore, under today's rule, they constitute fill material. Such discharges are indistinguishable from similar discharges associated with other construction activity, which the Corps has always regulated as fill under section 404. *See* 40 CFR 232.2; 33 CFR 323.2 (defining "discharge of fill material," to include "fill that is necessary for the construction of any structure in a water of the U.S.; the building of any structure or impoundment requiring rock, sand, dirt or other material for its construction; site-development fills for recreational, industrial, commercial, residential and other uses; causeways or road fills; * * *"). We have amended our definition of this term to include the "placement of fill material for construction or maintenance of any liner, berm, or other infrastructure associated with solid waste landfills." That amendment does not change substantively the prior definition, but merely adds solid waste landfills as an example to make clear that it constitutes a "discharge of fill material." Thus, under our new regulations, discharges associated with the creation of solid waste landfill structures clearly constitute "fill material."

To the extent some commenters asserted that revising our regulation was an improper attempt to "overrule" or "override" this holding in *RII,* we disagree. The court's analysis of the "fill material" in *RII* was based entirely on the Corps regulations as they existed at that time, and not upon the interpretation of the CWA itself. Moreover, the CWA does not define "fill material." Therefore, both the statute and the Ninth Circuit's decision leave us the discretion to adopt a reasonable definition consistent with the statutory scheme. We have explained elsewhere why we believe today's definition of fill is reasonable and appropriate under the CWA. To the extent today's rule has the practical effect of "overriding" this aspect of the court's decision in *RII,* that is neither remarkable nor inappropriate, since it is entirely proper for agencies to consider and, if appropriate, revise their regulations in light of judicial interpretation of them.

For purposes of deciding whether to apply the *RII* decision outside the Ninth Circuit, we have also evaluated the second basis for the court's decision— that regulation solely under Subtitle D of RCRA instead of section 404 would "harmonize" the statutes and avoid necessary duplication. We decline to follow that holding both on legal and policy grounds. First, we believe, notwithstanding *RII,* that eliminating the CWA permitting requirement on the grounds that an activity is regulated under RCRA is contrary to Congressional intent in both statutes. Second, we do not agree with the court that regulation under Subtitle D and section 404 would constitute unnecessary duplication, in light of the distinct purposes served by these authorities, the differing Federal roles under the two statutes, and our clarification in today's rulemaking of our intent to give all appropriate deference to State RCRA decision-making in the section 404 permitting process.

We first do not agree with the court's legal reasons for concluding that regulation under Subtitle D of RCRA supplants CWA regulation. The CWA prohibits the discharge of any pollutant into waters of the U.S. without a permit under the Act. *See* CWA section 301(a). Even though an activity associated with a discharge may be regulated under other Federal or State authorities, we believe there is not any basis to conclude that such regulation by itself makes section 301(a) of the Act inapplicable to a discharge of a pollutant into waters of the U.S. In effect, the court concluded that enactment of a regulatory scheme under Subtitle D of RCRA impliedly repealed the statutory permit requirement under the CWA. But "the intention of the legislature to repeal must be clear and manifest." *Radzanower* v. *Touche Ross & Co.,* 426 U.S. 148, 154 (1976), and the court must conclude that the two acts are in irreconcilable conflict or that the later act covers the whole subject of the earlier one and is clearly intended as a substitute. *Id.* The court in *RII* did not, and could not, make these findings.

In fact, Congress itself made precisely the opposite findings when it enacted RCRA. Section 1006(a) states:

Nothing in this chapter shall be construed to apply to (or to authorize any State, interstate, or local authority to regulate) any activity or substance which is subject to the [CWA] except to the extent such application (or regulation) is not inconsistent with the requirements of (the CWA).

This provision precludes regulation of solid waste landfills under Subtitle D in a manner inconsistent with the requirements of the CWA. In our view, it is plainly "inconsistent" with the requirements of the CWA to hold that regulation under RCRA eliminates CWA permitting requirement altogether.

Instead, the court relied upon certain Corps regulations, statements by Corps officials and a 1986 interagency MOA. The court first stated that applying section 404 to solid waste landfills was "unreasonable" because there would be "potentially inconsistent results" where both the State and the Corps were applying the same criteria in regulating solid waste landfills. 151 F.3d at 1169. The court held that this "regulatory overlap is inconsistent with Corps regulations stating that "the Corps believes that State and Federal regulatory programs should complement rather than duplicate one another.'" 33 CFR 320.1(a)(5). In addition, the court cited statements by the Corps in a 1984 letter to EPA stating that EPA was in a better position than the Corps to regulate solid waste landfills. Finally, the court cited the 1986 MOA between the Corps and EPA.

However, none of these "authorities" purport to modify the statutory

permitting requirements of the CWA, nor could they. The Corps' regulation cited by the court is simply a statement of the Corps' policy objective of working in concert with State regulatory programs, an important and continuing Corps objective that was discussed previously. The Corps' letter and the MOA reflected our efforts to manage our programs in light of our differing definitions of fill material, but did not speak to the CWA statutory permitting requirement. The court also misconstrued the 1986 MOA entered into by EPA and the Corps as indicating we intended to make the regulation of solid waste facilities within "the sole purview of the EPA and affected states" after EPA promulgated certain Subtitle D regulations. 151 F.3d at 1169. In fact, we stated,

> EPA and Army agree that consideration given to the control of discharges of solid waste both in waters of the United States and upland should take into account the results of studies being implemented under the 1984 Hazardous and Solid Waste Amendments (HSWA) to the Resource Conservation and Recovery Act (RCRA), signed into law on November 8, 1984. . . .
>
> Unless extended by mutual agreement, the agreement will expire at such time as EPA has accomplished specified steps in its implementation of RCRA, at which time the results of the study of the adequacy of the existing Subtitle D criteria and proposed revisions to the Subtitle D criteria for solid waste disposal facilities, including those that may receive hazardous household wastes and small quantity generator waste, will be known. In addition, data resulting from actions under the interim agreement can be considered at that time.

It should be noted that this MOA is about the regulation of solid waste disposal, not about the construction of infrastructure, including solid waste landfill infrastructure, that involves discharges of fill material to waters of the U.S. We did not address in the MOA how solid waste landfills would be regulated after EPA completed its study and certain RCRA regulations, but said only that these developments would "be taken into account" as we decided how to address these discharges in the future. Thus, in addition to the inability of the agencies as a legal matter to modify the CWA statutory permitting requirement through an MOA, we expressly reserved any judgment about the appropriate regulatory approach to be taken after certain actions were taken under RCRA. The court appears to have assumed that the MOA expired after we completed the specified steps under RCRA, and that regulatory authority over solid waste landfills thereafter became the sole purview of RCRA. In fact, the MOA did not expire, and it has continued to provide the framework for regulation of solid waste landfills under section 404 of the CWA. See Memorandum of John F. Studt, U.S. Army Corps of Engineers, May 17, 1993 (stating "the subject MOA remains effective in its entirety until further notice" and noting that this position was coordinated with EPA).

We conclude, therefore, that it would be contrary to the language and intent of both the CWA and RCRA to conclude that RCRA subtitle D supplants the CWA permitting requirement for discharges into waters of the U.S. associated with the construction of solid waste landfills. The different Federal roles in the permitting schemes in these statutes supports this conclusion. Subtitle D provides that each State will "adopt and implement a permit program or other system of prior approval and conditions" to assure that each solid waste management facility within the State "will comply" with criteria established by EPA for the siting, design, construction, operation and closure of solid waste landfills. RCRA section 4005(c)(1)(B). States are required to submit permit programs for EPA to review and EPA is required to "determine whether each State has developed an adequate program" to ensure compliance with EPA's Subtitle D regulations. RCRA section 4005(c)(1)(B) and (C). However, RCRA does not grant to EPA authority to issue permits for solid waste landfills, review State permitting decisions or enforce Subtitle D requirements in States with approved programs. The court in *RII* appeared to misunderstand EPA's authorities under Subtitle D of RCRA when it stated that EPA would be the permitting authority in the absence of an approved State program. *See* 151 F.3d 1169 ("we hold that when a proposed project affecting a wetlands area is a solid waste landfill, the *EPA* (or the approved State program) . . . will have the permit authority under RCRA.") (Emphasis added); 151 F.3d at 1167 ("RCRA gives the EPA authority to issue permits for the disposal of solid waste, but allows states to substitute their own permit programs for the Federal program if the State program is approved by EPA."). While this authority exists with regard to disposal of hazardous waste under Subtitle C of RCRA, EPA does not have this authority with regard to disposal of non-hazardous solid waste under Subtitle D.

In contrast, the CWA requires either a Federal permit for discharges of pollutants into waters of the U.S., or issuance of a permit by a State/Tribe with an approved program, subject to EPA's authority to object to a permit where EPA finds it fails to meet the guidelines and requirements of the CWA. CWA sections 402(d); 404(j). EPA also has authority under the CWA to enforce conditions in Federal or State permits under the Act. CWA section 309.

These contrasting statutory schemes support the conclusion that eliminating CWA authority over discharges of fill material associated with construction of solid waste landfills would mean a significant departure from the statutory structure created by Congress in the CWA, a scheme which Congress expressly sought to preserve when it adopted RCRA. *See* RCRA section 1006(a). This does not mean that we view the Federal role as one of second-guessing every decision made by State regulatory authorities under RCRA. To the contrary, both RCRA and the CWA reflect a strong presumption in favor of State-administered regulatory programs. As discussed elsewhere, we intend to rely on State decision-making under RCRA to the extent allowed under current law and regulations. However, we believe that eliminating a Federal role entirely on these matters is neither appropriate nor consistent with Congressional intent under RCRA or the CWA.

Thus, we decline to follow the decision in *RII* outside the Ninth Circuit because we conclude there is not an adequate legal basis on which to conclude that discharges of pollutants associated with solid waste landfills no longer need to be authorized by a CWA permit solely because the project receives a permit under Subtitle D of RCRA.

We nonetheless share the basic policy perspective expressed by the court in *RII* about the need to avoid unnecessary duplication and potential inconsistent application of regulatory programs under the CWA and RCRA. In fact, RCRA expressly vests EPA with the responsibility to "integrate all provisions of (RCRA) for purposes of administration and enforcement and (to) avoid duplication, to the maximum extent practicable, with the appropriate provisions of the * * * (CWA). * * * Such integration shall be effected only to the extent that it can be done in a manner consistent with the goals and policies of this chapter and the CWA. * * *" RCRA section 1006(b). EPA has sought such integration first by promulgating location restrictions for landfills that are consistent with the criteria for issuance of section 404 permits. See 40 CFR 258.12; 230.10. Among other requirements, a landfill may not be located in wetlands unless it is demonstrated to the State that there

Case 1:05-cv-00012-JKS   Document 46-3   Filed 04/07/2006   Page 4 of 8

are not less environmentally damaging practicable alternatives, the facility will not cause significant degradation of wetlands, and that appropriate and practicable steps have been taken to mitigate the loss of wetlands from the facility. However, EPA never purported to substitute Subtitle D regulation for the CWA permitting requirement, a result that would violate both section 1006(a) and (b). Instead, the Subtitle D RCRA regulations make clear that owners or operators of municipal solid waste landfills "must comply with any other applicable Federal rules, laws, regulations, or other requirements." 40 CFR 258.3. At the time EPA promulgated this regulation, the agency expressly noted that such requirements include those arising under the CWA. See 56 FR 51042 (October 9, 1991).

We do not believe, however, that the Subtitle D and section 404 programs are redundant. Rather, each program has a distinct focus. The State RCRA permitting process addresses a much broader range of issues, including technical operating and design criteria, ground water monitoring, corrective action, closure and post-closure care and financial assurances. In contrast, the section 404 process is focused exclusively on the impacts of discharges of dredged or fill material on the aquatic ecosystem, and ways of ensuring that those impacts are avoided, minimized and compensated. Because of the Corps' expertise in protecting aquatic ecosystems, we have found that State RCRA permitting agencies often incorporate by reference the requirements of section 404 permits. (For example, the State RCRA permit for the RII landfill required the applicant to implement the wetlands and mitigation plan to be approved by the Corps through the 404 permit process.) We believe that, in these and other ways, State and Federal permitting authorities can create efficiencies by relying on each other's expertise in making regulatory decisions.

We intend to make additional efforts to avoid unnecessary duplication in the Federal and State permitting process. As explained in section II. C of this final preamble, we intend that the Corps will rely on decisions by the State RCRA authority about the siting, design and construction of solid waste landfills in waters of the U.S. to the extent allowed by law and regulations. Appropriate deference to State decision-making will help avoid duplication, while still ensuring that the Corps fulfills its responsibilities to authorize discharges of fill material associated with solid waste landfills in accordance with CWA requirements.

This does not mean that, in every single case, State and Federal decision-makers will agree on whether a particular project or configuration is environmentally acceptable. Nevertheless, instances of disagreement have been rare. We intend to further enhance our efforts to ensure effective coordination between State and Federal officials. However, we do not agree with the court in RII that the only way to avoid unnecessary duplication is to eliminate the CWA permitting requirement altogether.

We next address commenters' assertions that the decision in RII continues to preclude us from regulating solid waste landfills under section 404 within the Ninth Circuit. These comments also argue that, given the "statutory" basis for the court's decision, we cannot change the result in the Ninth Circuit through this rulemaking.

As noted in this preamble, the court construed administrative materials of the Corps and EPA as supporting the conclusion that the agencies did not intend to regulate solid waste landfills under section 404 of the CWA. In light of this agency intent, the court concluded that subjecting landfills to regulation solely under RCRA would "harmonize" the statutes and "give effect to each [statute] while preserving their sense and purpose." 151 F.3d at 1169. The court found that this harmonization "is consistent with the sense of the CWA that discharges of solid waste materials are beyond the scope of section 404 . . . and avoids unnecessary duplication of Federal and State efforts in the area of wetlands protection." Id.

We again emphasize the distinction between "discharges of solid waste material," as referenced by the court and discharges of fill material associated with the construction of infrastructure. In this rulemaking, we have clarified that discharges having the effect of raising the bottom elevation of a water or replacing water with dry land, including fill used to create landfills such as liners, berms and other infrastructure associated with solid waste landfills are discharges of fill material subject to the section 404 program. Therefore, we have altered the landscape as understood by the court in RII (i.e., that these facilities were entirely outside the intended purview of section 404). We do not agree with commenters who argued that there was a "statutory" basis to the court's decision in the sense that the holding of the decision turned on an interpretation of Congressional intent in the CWA or RCRA. The court did not cite any provision of the CWA or RCRA to support its conclusions. Rather, the court derived the "sense and purpose" of the CWA based on agency regulations, guidance and correspondence. By clarifying the scope of section 404 authorities in this rulemaking, we have altered the "sense and purpose" of the CWA underlying the court's conclusion that regulation solely under RCRA would "harmonize" the statutes. Because the premises before the court have changed, we do not view the court's decision as continuing to bar the regulation under section 404 of discharges associated with solid waste landfills within the Ninth Circuit. At a minimum, today's rule calls into question the continuing vitality of the court's reasoning and conclusions and, should a case be brought within the Ninth Circuit challenging our authority to regulate solid waste landfills, we would ask the court to address the question anew in light of the clarification of our authorities in today's rule.

### III. Administrative Requirements

#### A. Plain Language

In compliance with the principle in Executive Order 12866 regarding plain language, this preamble is written using plain language. Thus, the use of "we" in this notice refers to EPA and the Corps, and the use of "you" refers to the reader. We have also used active voice, short sentences, and common every day terms except for necessary technical terms.

#### B. Paperwork Reduction Act

This action does not impose any new information collection burden under the provisions of the Paperwork Production Act, 44 U.S.C. 3501 et seq. This rule merely reconciles EPA and Corps CWA section 404 regulations defining the term "fill material" and amends our definitions of "discharge of fill material." Thus, this action is not subject to the Paperwork Reduction Act.

Burden means the total time, effort, or financial resources expended by persons to generate, maintain, retain, or disclose or provide information to or for a Federal agency. This includes the time needed to review instructions; develop, acquire, install, and utilize technology and systems for the purposes of collecting, validating, and verifying information, processing and maintaining information, and disclosing and providing information; adjust the existing ways to comply with any previously applicable instructions and requirements; train personnel to be able to respond to a collection of

**31140**  Federal Register / Vol. 67, No. 90 / Thursday, May 9, 2002 / Rules and Regulations

information; search data sources; complete and review the collection of information; and transmit or otherwise disclose the information.

An Agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. The OMB control numbers for EPA's regulations are displayed in 40 CFR part 9 and 48 CFR chapter 15. For the CWA section regulatory 404 program, the current OMB approval number for information requirements is maintained by the Corps of Engineers (OMB approval number 0710–0003, expires December 31, 2004).

### C. Executive Order 12866

Under Executive Order 12866 (58 FR 51735, October 4, 1993), EPA and the Corps must determine whether the regulatory action is "significant" and therefore subject to review by the Office of Management and Budget (OMB) and the requirements of the Executive Order. The Order defines "significant regulatory action" as one that is likely to result in a rule that may:

(1) Have an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or Tribal governments or communities;

(2) Create a serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(3) Materially alter the budgetary impact of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(4) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive Order.

Pursuant to the terms of Executive Order 12866, it has been determined that this rule is a "significant regulatory action" in light of the provisions of paragraph (4) above. As such, this action was submitted to OMB for review. Changes made in response to OMB suggestions or recommendations will be documented in the public record.

### D. Executive Order 13132

Executive Order 13132, entitled "Federalism" (64 FR 43255, August 10, 1999), requires EPA and the Corps to develop an accountable process to ensure "meaningful and timely input by State and local officials in the development of regulatory policies that have Federalism implications." "Policies that have Federalism implications" is defined in the Executive Order to include regulations that have "substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government."

This final rule does not have Federalism implications. It will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government, as specified in Executive Order 13132. Currently, under the CWA, any discharge of pollutants into waters of the U.S. requires a permit under either section 402 or 404 of the CWA. Today's rule conforms our two regulatory definitions of "fill material" and thereby clarifies whether a particular discharge is subject to regulation under section 402 or Section 404. It is generally consistent with current agency practice and does not impose new substantive requirements. Within California, Oregon, Washington, Idaho, Wyoming, Nevada, Arizona, Hawaii, Guam, and the Northern Mariana Islands, after today's rule, the Corps will again be issuing Section 404 permits for the construction of solid waste landfills in waters of the U.S., which the Corps had ceased doing after the decision in *RII* (the decision did not affect the permitting requirement outside these states). *See* section II. D. of this preamble. However, resuming the issuance of section 404 permits for construction of solid waste landfills in waters of the U.S. in these areas does not have Federalism implications. None of the States within the Ninth Circuit will incur administrative costs as a result of today's rule, because none currently administer the section 404 program and, in any event, the administrative costs of permitting solid waste landfills are minimal in the context of the overall section 404 permitting program. In addition, this change does not impose any additional substantive obligations on State or local governments seeking to construct solid waste landfills in waters of the U.S. since Subtitle D of RCRA currently requires such facilities to meet comparable conditions for receiving a section 404 permit. *See* section II. D of this preamble. Finally, we do not believe that requiring any State or local governments seeking to construct solid waste landfills in waters of the U.S. to undergo the Section 404 permitting process itself will have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Thus, Executive Order 13132 does not apply to this rule.

### E. Regulatory Flexibility Act (RFA), as Amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), 5 U.S.C. 601 et seq.

The RFA generally requires an agency to prepare a regulatory flexibility analysis of any rule subject to notice-and-comment rulemaking requirements under the Administrative Procedure Act or any other statute unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. Small entities include small businesses, small organizations and small governmental jurisdictions.

For purposes of assessing the impacts of today's rule on small entities, a small entity is defined as : (1) A small business based on SBA size standards; (2) a small governmental jurisdiction that is a government of a city, county, town, school district, or special district with a population of less than 50,000; and (3) a small organization that is any not-for-profit enterprise which is independently owned and operated and is not dominant in its field.

After considering the economic impacts of today's final rule on small entities, we certify that this action will not have a significant economic impact on a substantial number of small entities. Currently, under the CWA, any discharge of pollutants into waters of the U.S. requires a permit under either section 402 or 404 of the CWA. Today's rule conforms our two regulatory definitions of "fill material" and thereby clarifies whether a particular discharge is subject to regulation under section 402 or section 404. Today's rule is generally consistent with current agency practice, does not impose new substantive requirements and therefore would not have a significant economic impact on a substantial number of small entities.

### F. Unfunded Mandates Reform Act

Title II of the Unfunded Mandates Reform Act of 1995 (UMRA), Public Law 104–4, establishes requirements for Federal agencies to assess the effects of their regulatory actions on State, local, and Tribal governments and the private sector. Under section 202 of the UMRA, the agencies generally must prepare a written statement, including a cost-benefit analysis, for proposed and final rules with "Federal mandates" that may result in expenditures to State, local,

and Tribal governments, in the aggregate, or to the private sector, of $100 million or more in any one year. Before promulgating an EPA or Corps rule for which a written statement is needed, section 205 of the UMRA generally requires the agencies to identify and consider a reasonable number of regulatory alternatives and adopt the least costly, most cost-effective or least burdensome alternative that achieves the objectives of the rule. The provisions of section 205 do not apply when they are inconsistent with applicable law. Moreover, section 205 allows EPA and the Corps to adopt an alternative other than the least costly, most cost-effective or least burdensome alternative if the Administrator and Secretary of the Army publish with the final rule an explanation why that alternative was not adopted. Before EPA or the Corps establishes any regulatory requirements that may significantly or uniquely affect small governments, including Tribal governments, they must have developed under section 203 of the UMRA a small government agency plan. The plan must provide for notifying potentially affected small governments, enabling officials of affected small governments to have meaningful and timely input in the development of EPA or Corps regulatory proposals with significant Federal intergovernmental mandates, and informing, educating, and advising small governments on compliance with the regulatory requirements.

We have determined that this rule does not contain a Federal mandate that may result in expenditures of $100 million or more for State, local, and Tribal governments, in the aggregate, or the private sector in any one year. Currently, under the CWA, any discharge of pollutants into waters of the U.S. requires a permit under either section 402 or 404 of the CWA. Today's rule conforms our two regulatory definitions of "fill material" and thereby clarifies whether a particular discharge is subject to regulation under section 402 or section 404. Today's rule is generally consistent with current agency practice, does not impose new substantive requirements and therefore does not contain a Federal mandate that may result in expenditures of $100 million or more for State, local, and Tribal governments, in the aggregate, or the private sector in any one year. Thus, today's rule is not subject to the requirements of sections 202 and 205 of the UMRA. For the same reasons, we have determined that this rule contains no regulatory requirements that might significantly or uniquely affect small governments. Thus today's rule is not subject to the requirements of section 203 of UMRA.

*G. National Technology Transfer and Advancement Act*

As noted in the proposed rule, Section 12(d) of the National Technology Transfer and Advancement Act of 1995 (the NTTAA), Public Law 104–113, section 12(d) (15 U.S.C. 272 note) directs us to use voluntary consensus standards in our regulatory activities unless to do so would be inconsistent with applicable law or otherwise impractical. Voluntary consensus standards are technical standards (*e.g.*, materials specifications, test methods, sampling procedures, and business practices) that are developed or adopted by voluntary consensus standards bodies. The NTTAA directs us to provide Congress, through OMB, explanations when we decide not to use available and applicable voluntary consensus standards.

This rule does not involve technical standards. Therefore, we did not consider the use of any voluntary consensus standards.

*H. Executive Order 13045*

Executive Order 13045: "Protection of Children from Environmental Health Risks and Safety Risks" (62 FR 19885, April 23, 1997) applies to any rule that: (1) Is determined to be "economically significant" as defined under Executive Order 12866, and (2) concerns an environmental health or safety risk that we have reason to believe may have a disproportionate effect on children. If the regulatory action meets both criteria, we must evaluate the environmental health or safety effects of the planned rule on children, and explain why the planned regulation is preferable to other potentially effective and reasonably feasible alternatives considered by us.

This final rule is not subject to the Executive Order because it is not economically significant as defined in Executive Order 12866. In addition, it does not concern an environmental or safety risk that we have reason to believe may have a disproportionate effect on children.

*I. Executive Order 13175*

Executive Order 13175, entitled "Consultation and Coordination with Indian Tribal Governments" (65 FR 67249, November 6, 2000), requires the agencies to develop an accountable process to ensure "meaningful and timely input by tribal officials in the development of regulatory policies that have tribal implications." "Policies that have tribal implications" is defined in the Executive Order to include regulations that have "substantial direct effects on one or more Indian tribes, on the relationship between the Federal government and the Indian tribes, or on the distribution of power and responsibilities between the Federal government and Indian tribes."

Today's rule does not have tribal implications. It will not have substantial direct effects on tribal governments, on the relationship between the Federal government and the Indian tribes, or on the distribution of power and responsibilities between the Federal government and Indian tribes, as specified in Executive Order 13175. Currently, under the CWA, any discharge of pollutants into waters of the U.S. requires a permit under either section 402 or 404 of the CWA. Today's rule conforms our two regulatory definitions of "fill material" and thereby clarifies whether a particular discharge is subject to regulation under section 402 or section 404. It is generally consistent with current agency practice and does not impose new substantive requirements. Within California, Oregon, Washington, Idaho, Wyoming, Nevada, Arizona, Hawaii, Guam, and the Northern Mariana Islands, after today's rule, the Corps will again be issuing Section 404 permits for the construction of solid waste landfills in waters of the U.S., which the Corps had ceased doing after the decision in *RII* (the decision did not affect the permitting requirement outside these states). *See* section II. D. of this preamble. However, resuming the issuance of section 404 permits for construction of solid waste landfills in waters of the U.S. in these areas does not have tribal implications. No tribes within the Ninth Circuit will incur administrative costs as a result of today's rule, because none currently administer the section 404 program and, in any event, the administrative costs of permitting solid waste landfills are minimal in the context of the overall section 404 permitting program. In addition, this change does not impose any additional substantive obligations on any Tribe seeking to construct solid waste landfills in waters of the U.S. since Subtitle D of RCRA currently requires such facilities to meet comparable conditions for receiving a section 404 permit. *See* section II.D. of this preamble. Finally, we do not believe that requiring any tribal government seeking to construct solid waste landfills in waters of the U.S. to undergo the Section 404 permitting process itself will have substantial direct effects on one or more Indian

**31142**  Federal Register / Vol. 67, No. 90 / Thursday, May 9, 2002 / Rules and Regulations

tribes, on the relationship between the Federal government and the Indian tribes, or on the distribution of power and responsibilities between the Federal government and Indian tribes. Thus, Executive Order 13175 does not apply to this rule.

*J. Environmental Documentation*

As required by the NEPA, the Corps prepares appropriate environmental documentation for its activities affecting the quality of the human environment. The Corps has prepared an environmental assessment (EA) of the final rule. The Corps' EA ultimately concludes that, since the adoption of this rule will not significantly affect the quality of the human environment, the preparation and coordination of an EIS is not required. The EA, included in the administrative record for today's rule, explains the rationale for the Corps' conclusion.

*K. Congressional Review Act*

The Congressional Review Act, 5 U.S.C. 801 *et seq.*, as added by the Small Business Regulatory Enforcement Fairness Act of 1996, generally provides that before a rule may take effect, the agency promulgating the rule must submit a rule report, which includes a copy of the rule, to each House of the Congress and to the Comptroller General of the United States. We will submit a report containing this rule and other required information to the U.S. Senate, the U.S. House of Representatives, and the Comptroller General of the United States prior to publication of the rule in the **Federal Register**. A major rule cannot take effect until 60 days after it is published in the **Federal Register**. This rule is not a "major rule" as defined by 5 U.S.C. section 804(2). This rule will be effective June 10, 2002.

*L. Executive Order 12898*

Executive Order 12898 requires that, to the greatest extent practicable and permitted by law, each Federal agency must make achieving environmental justice part of its mission. Executive Order 12898 provides that each Federal agency conduct its programs, policies, and activities that substantially affect human health or the environment in a manner that ensures that such programs, policies, and activities do not have the effect of excluding persons (including populations) from participation in, denying persons (including populations) the benefits of, or subjecting persons (including populations) to discrimination under such programs, policies, and activities because of their race, color, or national origin.

Today's rule is not expected to negatively impact any community, and therefore is not expected to cause any disproportionately high and adverse impacts to minority or low-income communities. Today's rule relates solely to whether a particular discharge is appropriately authorized under section 402 or section 404 of the Clean Water Act. Moreover, the proposed allocation of authority between these programs is generally consistent with existing agency practice.

*M. Executive Order 13211*

This rule is not a "significant energy action" as defined in Executive Order 13211, "Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use" (66 FR 28355 (May 22, 2001)) because it is not likely to have a significant adverse effect on the supply, distribution, or use of energy. Today's rule conforms our two regulatory definitions of "fill material" and thereby clarifies whether a particular discharge is subject to regulation under section 402 or section 404. Today's rule is generally consistent with current agency practice, does not impose new substantive requirements and therefore will not have a significant adverse effect on the supply, distribution, or use of energy.

**List of Subjects**

*33 CFR Part 323*

Water pollution control, Waterways.

*40 CFR Part 232*

Environmental protection, Intergovernmental relations, Water pollution control.

**Corps of Engineers**

*33 CFR Chapter II*

Accordingly, as set forth in the preamble 33 CFR part 323 is amended as set forth below:

**PART 323—[AMENDED]**

1. The authority citation for part 323 continues to read as follows:

Authority: 33 U.S.C. 1344.

2. Amend § 323.2 as follows:
a. Paragraph (e) is revised.
b. In paragraph (f), in the second sentence: add the words "or infrastructure" after the words "for the construction of any structure"; add the word ", infrastructure," after the words "building of any structure"; remove the words "residential, and" and add in their place the words "residential, or"; and add the words "placement of fill material for construction or maintenance of any liner, berm, or other infrastructure associated with solid waste landfills; placement of overburden, slurry, or tailings or similar mining-related materials;" after the words "utility lines;".

The revision reads as follows:

**§ 323.2  Definitions.**

\*      \*      \*      \*      \*

(e)(1) Except as specified in paragraph (e)(3) of this section, the term fill material means material placed in waters of the United States where the material has the effect of:

(i) Replacing any portion of a water of the United States with dry land; or

(ii) Changing the bottom elevation of any portion of a water of the United States.

(2) Examples of such fill material include, but are not limited to: rock, sand, soil, clay, plastics, construction debris, wood chips, overburden from mining or other excavation activities, and materials used to create any structure or infrastructure in the waters of the United States.

(3) The term fill material does not include trash or garbage.

\*      \*      \*      \*      \*

Dated: May 3, 2002.

**Dominic Izzo,**

*Principal Deputy Assistant Secretary of the Army (Civil Works), Department of the Army.*

**Environmental Protection Agency**

*40 CFR Chapter I*

Accordingly, as set forth in the preamble 40 CFR part 232 is amended as set forth below:

**PART 232—[AMENDED]**

1. The authority citation for part 232 continues to read as follows:

Authority: 33 U.S.C. 1344.

2. Amend § 232.2 as follows:
a. The definition of "Fill material" is revised.
b. In the definition of "Discharge of fill material", in paragraph (1): add the words "or infrastructure" after the words "for the construction of any structure"; add the word ", infrastructure," after the words "building of any structure"; remove the words "residential, and" and add in their place the words "residential, or"; and add the words "placement of fill material for construction or maintenance of any liner, berm, or other infrastructure associated with solid waste landfills; placement of overburden, slurry, or tailings or similar mining-related materials;" after the words "utility lines;".

The revision reads as follows:

**§ 232.2 Definitions.**

\* \* \* \* \*

*Fill material.* (1) Except as specified in paragraph (3) of this definition, the term fill material means material placed in waters of the United States where the material has the effect of:

(i) Replacing any portion of a water of the United States with dry land; or

(ii) Changing the bottom elevation of any portion of a water of the United States.

(2) Examples of such fill material include, but are not limited to: rock, sand, soil, clay, plastics, construction debris, wood chips, overburden from mining or other excavation activities, and materials used to create any structure or infrastructure in the waters of the United States.

(3) The term fill material does not include trash or garbage.

\* \* \* \* \*

Dated: May 3, 2002.

**Christine Todd Whitman,**

*Administrator, Environmental Protection Agency.*

[FR Doc. 02–11547 Filed 5–8–02; 8:45 am]

**BILLING CODE 3710-92-P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Parts 52 and 81**

**[MT–001–0037a; FRL–7208–8]**

**Approval and Promulgation of Air Quality Implementation Plans; State of Montana; Great Falls Carbon Monoxide Redesignation to Attainment and Designation of Areas for Air Quality Planning Purposes**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Direct final rule.

**SUMMARY:** On February 9, 2001, the Governor of Montana submitted a request to redesignate the Great Falls "not classified" carbon monoxide (CO) nonattainment area to attainment for the CO National Ambient Air Quality Standard (NAAQS). The Governor also submitted a CO maintenance plan. In this action, EPA is approving the Great Falls CO redesignation request and the maintenance plan.

**DATES:** This direct final rule is effective on July 8, 2002, without further notice, unless EPA receives adverse comments by June 10, 2002. If adverse comment is received, EPA will publish a timely withdrawal of the direct final rule in the **Federal Register** and inform the public that the rule will not take effect.

**ADDRESSES:** Written comments may be mailed to:

Richard R. Long, Director, Air and Radiation Program, Mailcode 8P–AR, United States Environmental Protection Agency, Region VIII, 999 18th Street, Suite 300, Denver, Colorado 80202–2466.

Copies of the documents relevant to this action are available for public inspection during normal business hours at the following offices:

United States Environmental Protection Agency, Region VIII, Air and Radiation Program, 999 18th Street, Suite 300, Denver, Colorado 80202–2466; and, United States Environmental Protection Agency, Air and Radiation Docket and Information Center, 401 M Street, SW, Washington, DC 20460.

Copies of the State documents relevant to this action are available for public inspection at: Montana Air and Waste Management Bureau, Department of Environmental Quality, P.O. Box 200901, Helena, Montana, 59620–0901.

**FOR FURTHER INFORMATION CONTACT:** Tim Russ, Air and Radiation Program, Mailcode 8P–AR, United States Environmental Protection Agency, Region VIII, 999 18th Street, Suite 300, Denver, Colorado 80202–2466, Telephone number: (303) 312–6479.

**SUPPLEMENTARY INFORMATION:** Throughout this document wherever "we", "us", or "our" are used we mean the Environmental Protection Agency.

**I. What Is the Purpose of This Action?**

In this action, we are approving a change in the legal designation of the Great Falls area from nonattainment for CO to attainment and we're approving the maintenance plan that is designed to keep the area in attainment for CO for the next 10 years.

We originally designated the Great Falls area as nonattainment for CO under the provisions of the 1977 Clean Air Act (CAA) Amendments (see 43 FR 8962, March 3, 1978). On November 15, 1990, the Clean Air Act Amendments of 1990 were enacted (Pub. L. 101–549, 104 Stat. 2399, codified at 42 U.S.C. 7401–7671q). Under section 107(d)(1)(C) of the CAA, we designated the Great Falls area as nonattainment for CO because the area had been previously designated as nonattainment before November 15, 1990. The Great Falls area was classified as a "not classified" CO nonattainment area as the area had not violated the CO NAAQS in 1988 and 1989.[1]

---

[1] The EPA describes areas as "not classified" if they were designated nonattainment both prior to enactment and (pursuant to CAA section 107(d)(1)(C)) at enactment, and if the area did not violate the primary CO NAAQS in either year for the 2-year of 1988 through 1989. Refer to the "General Preamble for the Implementation of Title of the Clean Air Act Amendments of 1990", 57 FR 13498, April 16, 1992. See specifically 57 FR 13535, April 16, 1992.

Under the CAA, designations can be changed if sufficient data are available to warrant such changes and if certain other requirements are met. See CAA section 107(d)(3)(D). Section 107(d)(3)(E) of the CAA provides that the Administrator may not promulgate a redesignation of a nonattainment area to attainment unless:

(i) the Administrator determines that the area has attained the national ambient air quality standard;

(ii) the Administrator has fully approved the applicable implementation plan for the area under CAA section 110(k);

(iii) the Administrator determines that the improvement in air quality is due to permanent and enforceable reductions in emissions resulting from implementation of the applicable implementation plan and applicable Federal air pollutant control regulations and other permanent and enforceable reductions;

(iv) the Administrator has fully approved a maintenance plan for the area as meeting the requirements of CAA section 175A; and,

(v) the State containing such area has met all requirements applicable to the area under section 110 and part D of the CAA.

Before we can approve the redesignation request, we must decide that all applicable State Implementation Plan (SIP) elements have been fully approved. Approval of the applicable SIP elements may occur prior to final approval of the redesignation request or simultaneously with final approval of the redesignation request. We note there are no outstanding SIP elements necessary for the Great Falls redesignation.

**II. What Is the State's Process To Submit These Materials to EPA?**

Section 110(k) of the CAA sets out provisions governing our actions on submissions of revisions to a SIP. The CAA also requires States to observe certain procedural requirements in developing SIP revisions for submittal to EPA. Section 110(a)(2) of the CAA requires that each SIP revision be adopted after reasonable notice and public hearing. This must occur prior to the revision being submitted by a State to us.

The Montana Department of Environmental Quality (DEQ) held a public hearing on December 19, 2000,