DELIVERED JUN 2 4 2002

**RESPONSE TO COMMENTS DOCUMENT FOR FINAL RULE AMENDING THE ENVIRONMENTAL PROTECTION AGENCY'S AND U.S. ARMY CORPS OF ENGINEERS' CLEAN WATER ACT SECTION 404 DEFINITIONS OF "FILL MATERIAL" AND "DISCHARGE OF FILL MATERIAL"**

**May 3, 2002**

**Exhibit 28, page 1 of 21**

# TABLE OF CONTENTS

A.  Introduction ........................................................................................ 1

B.  Background ......................................................................................... 1

    A.  April 2000 Proposal ..................................................................... 1
    B.  The May 2002 Final Rule ............................................................. 2

C.  Summary of and Responses to Comments on the April 2000 Proposal ........ 2

    A.  Overall Summary ........................................................................ 2
    B.  Purpose and Need for Proposed Rule Change .............................. 3
        1.  Conforming Corps and EPA Definitions ........................... 4
        2.  Eliminating Primary Purpose Test ................................... 6
        3.  Eliminating Waste Exclusion .......................................... 7
    C.  Legality of Proposal .................................................................... 10
        1.  Consistency with CWA and Regulatory Framework ........... 11
        2.  Consistency with the *Bragg* decision and effect on litigation ............... 16
        3.  Consistency with the case of *Resources Investment Inc. v Corps* ........... 17
        4.  Consistency of Proposal with Past Policy, 1986 Solid Waste MOA, and Other Agency Documents ................................................ 25
    D.  CWA regulation of activities related to mining practices ............... 34
    E.  Environmental Effects of Proposal ............................................... 35
    F.  Unsuitable Fill Material ............................................................... 38
    G.  NEPA Comments ......................................................................... 40
    H.  Federalism ................................................................................. 42
    I.  Economic Effects of Proposal ....................................................... 43
    J.  Suggested Alternatives or clarifications ....................................... 44
        1.  Issue Guidance or revise MOA instead of modifying the rule ............... 44
        2.  Eliminate primary purpose but retain waste exclusion ..................... 45
        3.  Clarify or delete effluent limitations guidelines ............................. 46
        4.  Explain effect on treatment of RCRA landfills ............................... 46
        5.  Modify reference to coal mining overburden in the definition of "discharge of fill material" ............................................... 47
        6.  Expand the unsuitable fill category to supplement the waste exclusion . 47
        7.  Miscellaneous Suggestions and comments ................................. 48
            a. Combine piling regulation in same section as new fill definition   48
            b. Create additional exemptions to compensate for the expansion in Corps jurisdiction ........................................................ 48
            c.  Effect on existing permits ............................................... 48
            d.  Effect of rule on treatment of stormwater .......................... 49
            e.  Clarify when conversions, diversions, and waste treatment systems

can be used to avoid jurisdiction ...................................................... 49

f.  Private appropriation of public waters ..................................... 50

g  Consistency between definitions of discharge of dredged material and discharge of fill ................................................................... 50

**RESPONSE TO COMMENTS DOCUMENT FOR FINAL RULE AMENDING THE ENVIRONMENTAL PROTECTION AGENCY'S AND U.S. ARMY CORPS OF ENGINEERS' CLEAN WATER ACT SECTION 404 DEFINITIONS OF "FILL MATERIAL" AND "DISCHARGE OF FILL MATERIAL"[1]**

**May 3, 2002**

**I.     Introduction**

This Response to Comments Document was prepared as part of the joint rulemaking process in which the Environmental Protection Agency (EPA) and the U.S. Army Corps of Engineers (Corps) issued a final rule amending their respective Clean Water Act (CWA) section 404 regulatory definitions of "fill material" and "discharge of fill material." This rulemaking process was initiated on April 20, 2000. The comment period for the proposal closed on July 19, 2000, after a 60-day comment period had been extended for an additional 30 days. The agencies received over 17,200 comments on the proposal, including several hundred comments that were received after the close of the comment period, but were nevertheless considered. This document summarizes the major issues raised in the public comments and the agencies responses. This document is part of the Administrative Record supporting the agencies' final rule.

**II.     Background**

**A.     April 2000 Proposal**

In April 2000, the agencies proposed revisions to their respective definitions of "fill material" and "discharge of fill material," adopting a single effects-based definition for fill material and making conforming changes to the latter term. From 1977 until the issuance of the rule developed in this process, EPA and the Corps have had different definitions of the term "fill material." The Corps defined "fill material" based on the purpose of the activity. Its definition of "fill material" adopted in 1977 read as follows: "The term 'fill material' means any material used *for the primary purpose* of replacing an aquatic area with dry land or of changing the bottom elevation of an [sic] water body. The term does not include any pollutant discharged into the water primarily to dispose of waste, *as that activity is regulated under section 402 of the Clean Water Act*." 33 CFR 323.2(e)(2001)(emphasis added).

In contrast, the EPA regulations at 40 CFR 232.2 defined "fill material" as "any 'pollutant' which replaces portions of the 'waters of the United States' with dry land or which changes the bottom elevation of a water body *for any purpose*" (emphasis added). EPA's definition focused on the effect of the material (an effects-based test), rather than the purpose of the discharge in determining whether it would be regulated by section 404 or section 402.

The April 2000 proposed rule defined "fill material" as material that has the effect of

---

[1] Hereinafter referred to as " the Response to Comments Document."

replacing any portion of a water of the U.S. with dry land, or changing the bottom elevation of any portion of a water of the U.S. The proposal removed from the Corps' definition the "primary purpose" test and the provision excluding pollutants discharged into water primarily to dispose of waste. The April proposal also would have excluded from the definition discharges subject to an EPA proposed or promulgated effluent limitation guideline or standard under CWA sections 301, 304, 306, or discharges covered under a NPDES permit under CWA section 402. Finally, the April proposal solicited comments on the idea of the agencies creating an "unsuitable fill" category in the regulations that would identify materials that the Corps District Engineer could determine were not appropriate as fill material and, consequently, refuse to process an application seeking authorization to discharge such material.

### B. The May 2002 Final Rule

The final rule retains the "effects-based" approach of the proposal, defining "fill material" in both the Corps' and EPA's regulations as material placed in waters of the United States where the material has the effect of either replacing any portion of a water of the United States with dry land or changing the bottom elevation of any portion of a water. The examples of "fill material" identified in the rule include rock, sand, soil, clay, plastics, construction debris, wood chips, overburden from mining or other excavation activities, and materials used to create any structure or infrastructure in waters of the U.S. The final rule also includes an explicit exclusion from the definition of "fill material" for trash or garbage.

Today's final rule also includes several changes to the term "discharge of fill material." Most significantly, the term now includes the phrases "placement of fill material for construction or maintenance of any liner, berm, or other infrastructure associated with solid waste landfills" and "placement of overburden, slurry, or tailings or similar mining-related materials." These phrases have been added to the definition of "discharge of fill material" to provide further clarification of the types of activities that will be regulated.

This final rule was developed after considering the comments provided on the April proposal.

### III.     Summary of and Responses to Comments on the April 2000 Proposal

### A.  Overall Summary

We received over 17,200 comments on the proposed rule, including several hundred late comments, most of which consisted of identical or substantially identical e-mails, letters, and postcards opposing the rule. (In April 2002, an additional several thousand letters and e-mails were sent opposing the adoption of a rule similar to the proposal.) Approximately 500 of the original comments consisted of more individualized letters, with a mixture of those comments supporting and opposing the rule. The comments of environmental groups and the various form letters were strongly opposed to the proposal, in particular, the elimination of the waste exclusion

2

and the discussion in the preamble regarding treatment of unsuitable fill material. Except for several landfill representatives, comments from the regulated community generally supported the proposal, in particular, the fact that the rule would create uniform definitions of "fill material" for the Corps' and EPA's rules and maintain regulation of certain discharges under section 404 as opposed to section 402 of the CWA. While the above characterization reflects the general framework for the proponents and opponents of the rule, both raised a number of specific issues that are identified and discussed below.

Because of the nature of the comments (e.g., many identical or substantially identical), we were able to categorize the comments by issue. We then summarized the comments addressing each issue and developed a response to the issue. Those summaries and responses are provided below. This document is organized by category, with the first part of the document (sections III. A - I) addressing issues raised about the proposal and the latter part of the document (section III J) reflecting alternative approaches or clarifications to the proposed rule that were recommended.

**B. Purpose and Need for Proposed Rule Change**

The comments received regarding the purpose and need for the proposed rule change reflect both support and opposition to the proposal.   A significant number of those commenting support the agencies' effort to make consistent the Corps' and EPA's regulatory definition of "fill material," as well as their elimination of the primary purpose test in favor of an effects-based definition. However, many commenters expressed opposition to the proposed elimination of the waste exclusion from the definition of "fill material," and specifically asked that the "placement of coal mining overburden" not be added to those activities that can be authorized by the Corps as a "discharge of fill material." Many stated that the proposed rulemaking would "result in an unconscionable weakening of the Clean Water Act" by allowing the Corps to permit the deposition of waste into waters of the United States.

One commenter remarked that "the impetus for this proposed rule is the continued regulation of valley fills by the Corps, and not improved implementation of the Clean Water Act." Additionally, changes regarding the permitting of solid waste landfills could more appropriately be made through agency guidance or through "supplementing the 1986 MOA with clarifying terms."

One commenter was generally opposed to the proposed rule changes arguing that "they would serve as an unbelievable capitulation to coal companies" and would result in a weakening of existing clean water laws. Another stated that "instead of re-writing the rules to allow more fills and other discharges into the nation's waters," the Corps and EPA should strive to "uphold their Section 404 responsibilities in compliance with Clean Water Act goals."

Several commenters stated that the "proposed broadening of the Corps' jurisdiction is

**Exhibit 28, page 6 of 21**

unwarranted," and concerns were expressed regarding the effect of the proposed rulemaking on the regulation of discharges from the on-board processing of sand and gravel by instream dredging operations, and on hard rock mining activities.

In light of the comments we received on the proposed rulemaking, we remain convinced of the fundamental need to reconcile the differing definitions of "fill material" in our regulations. We disagree with the assertion that the reconciliation of the definitions by adopting EPA's 25-year old effects–based approach somehow would weaken the CWA either by allowing waste disposal in waters or broadening jurisdiction. The fact that we have essentially implemented the EPA-based approach since 1977 discredits the notion that this rulemaking now results in a change from past practice and allows impermissible waste disposal. Moreover, the suggestion that this rulemaking now provides a legal basis for previously illegal activities is not the case– no discharges that were previously prohibited are now authorized as a result of this rulemaking.

It is important to note, however, that we do agree with the sentiments expressed by many commenters opposed to the rule that the agencies need to do a more comprehensive job at implementing existing provisions of CWA section 404 as they pertain to the review and conditioning of permits for certain discharges, including those that result from mining activities. Guidance from Corps headquarters in 2000 and changes to Nationwide general permit 21 in 2002 are concrete actions that have been taken recently to improve implementation. The agencies also concur that additional environmental improvements under the CWA and under the Surface Mining Control and Reclamation Act should be evaluated, and we remain committed to completing the programmatic Environmental Impact Statement on Mountaintop Mining and Valley Fills to facilitate such reviews.

A majority of those commenting on the purpose and need for the rulemaking, whether or not they supported specific aspects of the proposal, supported the basic objective of unifying the definitions. As a matter of good government and reducing regulatory uncertainty, we agree that our definitions should be identical. We also believe that, for a single definition, maintaining EPA's long-standing effects-based approach, in lieu of one based on purpose, is preferable because it provides a more objective and predictable approach for ensuring that section 404, the regulatory regime best suited for controlling discharges with the effect of fill, is used. Likewise, elimination of the so-called "waste exclusion" from the Corps' definition is preferable as it is generally consistent with current agency practice and it does not expand the types of discharges that will be covered under the CWA section 404 program. Specific discussions of the purpose and need for the rule are provided below and organized under subheadings dealing with conforming the regulatory definitions, eliminating the primary purpose test, and eliminating the waste exclusion.

## 1. Conforming Corps and EPA Definitions

Regarding comments received concerning conforming Corps and EPA definitions through the proposed rulemaking, the majority of commenters were in support of making

consistent the Corps' and EPA's regulatory definition of "fill material." One commenter stated, "it clears up longstanding confusion arising from the differing definitions of the two agencies, and therefore simplifies and clarifies the regulatory schemes and compliance obligations." Another noted that eliminating the current discrepancy between the EPA and Corps definitions of "fill material" will "improve the clarity and consistency of the Section 404 regulations, and will avoid the need for litigation predicated on the differences in the existing rules." Furthermore, another commenter states the current lack of consistency "has created the potential that, for certain kinds of discharges, there was no regulatory program pursuant to which authorization could be obtained."

One commenter "agrees that regulatory consistency among federal agencies implementing the CWA is a good thing when done for the right reasons. However, a proposal to change the definitions, now purportedly to rectify misinterpretations by federal courts, does not make sense." The commenter cites several additional fill-related court cases that have not warranted a change in the regulations. Additionally, the commenter states, as proposed, "by regulating some types of mining wastes under the 402 program and others under the 404 program, they belie their claim that this proposal will retain current practice and resolve regulatory differences."

Although one commenter agreed that "appropriate clarifications will avoid the confusion and problems associated with the past differences in the definitions," the agencies have continually acted in a manner more consistent with the "effects" test than the Corps' "primary purpose" test. Another commenter states, " a unified definition will help eliminate confusion. Unfortunately, we believe the proposed definition, although similar to the current EPA definition, is difficult to interpret and apply to activities." On commenter speaks to the "regulatory uncertainty" caused by having inconsistent definitions of "fill material" by stating that there is "nothing uncertain about the current regulatory scheme" as it applies to the practice of valley fills. In keeping with the regulatory agencies' efforts to provide consistency, one commenter suggests that "the two agencies develop an identical list of every known type of fill material."

In light of the comments we received on the proposed rulemaking, we affirm our position that conforming the regulations by adopting a single definition is necessary and desirable. Importantly, as a matter of good government, we believe that a uniform definition will eliminate any uncertainty and confusion that may have been bred by different definitions applying to the same regulatory program. The final rule achieves this objective.

Specifically, in response to the commenter that disputed whether the proposed changes would resolve regulated community and court misinterpretations, we disagree. Although regulatory action is not the automatic result of relevant court decisions or confusion on the part of the regulated public, it is an appropriate response in the present situation. Not only had confusion on the part of the regulated community occurred, it was manifest in several court actions. In addition, these court actions did not impact one type of activity, but at least two—

those of landfill construction and those of certain mining discharges. Moreover, the agencies had issued guidance to address the confusion in the regulated community, but issues continued to be raised. Given the significance of the issues and the less than successful attempts to resolve them short by guidance, a rulemaking to clarify the issue was warranted. While we can certainly not guarantee that every future issue is put to rest with the final rulemaking, the extensive nature of the comments received by the public has greatly assisted the agencies in addressing a wide variety of the final rule's implications.

In response to the specific comment regarding the suggestion that we develop a list of every known type of fill material, we conclude that this exercise would not be practicable. A number of examples of materials generally included and not included are provided in the final rule language and/or are discussed in the preamble. We note that the use of certain examples in the final rulemaking was a result of public comment to increase clarity. However, it is unlikely that a list of every known fill material could be generated, given the variety of materials that are or could be discharged. We are satisfied that the expanded discussion in the final rule language itself and the preamble is informative and representative, without being unwieldy.

## 2. Eliminating Primary Purpose Test

An overview of the comments received regarding the proposed elimination of the primary purpose test from the definition of "fill material" reveals both support and opposition. A significant number of those commenting supported the replacement of the Corps' "primary purpose test" with an effects-based definition.

One commenter noted the change to an effects-based test "will finally close an infamous loophole that has allowed wetlands to be filled as long as the permit applicant could point to a "primary purpose" other than fill (e.g., solid waste landfill or temporary road construction)." Another commenter stated, "removal of the primary purpose test and replacing it with the effects test will promote greater clarity and consistency in the regulatory approach for wetlands protection." They further stated that currently some discharges occur without permit authorization under either section 402 or section 404 of the CWA, a violation of section 301, as a result of the failure to regulate these fills because of the primary purpose test.

As discussed in the preamble to the proposed rule (65 FR 21,294-21,295), we agree that use of a "primary purpose test" to define fill material has caused confusion and engendered litigation, problems which can be substantially reduced or avoided by use of a more objective effects-based test. With regard to comments on unpermitted discharges being a violation of section 301, this comment is outside the scope of the rule, which addresses the issues of how to define "fill material."

In contrast, another commenter asserted a "purpose-based test can be enforced fairly and in the public interest" particularly with regard to waste regulation. Also noted was the "inherent subjectivity of the wood chips example" discussed in the Public Notice. The commenter

6

suggested that potential abuses in interpretation of a purpose-based test could be addressed through "consideration of the economics of the proposed commercial activity (particularly the costs of alternatives available to meet the intended purpose)." Another commenter also challenged concerns about the subjective nature of the determinations performed by the Corps in applying the primary purpose test. The commenter stated the Corps "is quite capable (evidenced by the fact that it has been doing it for years) to determine if the primary purpose is to get rid of waste or to construct a fill."

We do not agree that use of a primary purpose test is preferable to use of an effects-based test for a number of reasons. Our practical experience with use of a primary purpose test is that it does result in uncertainty and confusion, as for example, in the *RII* case. Although, as the commenter suggested, the Corps is capable of evaluating project purpose, such an evaluation nonetheless is subjective, does not ensure use of the most appropriate permitting regime, and as evidenced by *RII* is subject to a differing interpretation by the court. We believe that in assigning a discharge to section 404 versus section 402 permitting, it is important to apply the regulatory regime that is in fact best-equipped to consider and control the impacts of the potential discharge. Because section 404 and its implementing regulations are specifically designed to address discharges that fill waters of the U.S., we believe that it should apply to discharges that have such an effect, rather than looking to the primary purpose of the discharge. Although we agree that today's final rule does not eliminate all subjectivity (as in the wood chip example given above), use of an effects-based test does substantially improve clarity and objectivity compared to the subjective nature of a primary purpose test. With regard to the comment suggesting use of an economics-based approach to implement a purpose-based test, this would still assign discharges to section 404 versus section 402 on the basis of the purpose of the discharge, rather than on the basis of which regime is best-equipped to control the potential impacts. In addition, while use of an economics based approach could perhaps reduce some of the subjectivity associated with a purpose-based test, it does not do so to the degree that an effects-based test accomplishes, would require development of economic yardsticks which themselves would be subject to subjectivity, and would unnecessarily add a further degree of analytical complexity and information needs to the permitting process. We thus do not agree with comments favoring use or retention of a purpose-based test.

One commenter supporting the proposed change to an effects-based definition of fill stated it should not be up to the Corps District Engineers' discretion "to define what constitutes fill, or what constitutes effects." It was further suggested that, based on the CWA section 404 (b)(1) Guidelines, "the Corps and EPA should determine at the national level what structures, works and activities have the effect of fill."

We do not agree with these comments. Implementation of an effects-based test is best left to the permitting authority (e.g., for section 404, the District Engineer), as they are in the best position to know local conditions and ascertain a discharge's effects. In addition, by adopting a single consistent effects-based test, today's rule provides the permitting authority with an objective means for assessing the applicability of section 404 and helps ensure consistency

between the Corps and EPA in determining what constitutes "fill material." With regard to the suggestion that a national level determination should be made as to what activities or works have the effect of fill, it is not feasible to come up with a comprehensive or exhaustive list, and use of an effects-based test instead both improves clarity while still being sufficiently broad to encompass the full range of materials that should be treated as "fill material." We also note that as described in the preamble to today's rule, additional examples of "fill material" and the "discharge of fill material" have been added to the final rule.

One commenter indicated that "while an 'environmental effects' test may be appropriate to the definition of 'fill material' in the Section 402 program, it is not necessarily similarly appropriate to the definition of 'fill material' in the Section 404 program, even if it provides some benefit or clarity," and went on to state there are situations in which a broad "environmental effects" trigger is inappropriate for bringing about Section 404 regulation. The commenter also asserted an environmental effects rationale was found to exceed the Corps authority when the court invalidated "the Tulloch Rule regulating all excavation activities, including those that were merely removal activities with only incidental fallback."

We believe that a single and consistent definition of the term "fill material" is necessary to provide consistency and certainty in implementation of the CWA. Use of separate approaches to define that term under sections 404 and 402 result in uncertainties and potential regulatory gaps in which material does not clearly fall within one program or the other. Matters related to the "Tulloch Rule" (which defines the term "discharge of dredged material" and "incidental fallback") are fully discussed in that rule's preamble ( 66 FR 4550) and are outside the scope of this rule. Moreover, today's rule does not use an effects-based test to determine if a discharge occurs, but rather to determine when a given discharge falls into the category of "fill material" subject to section 404. We also note that unlike the Tulloch Rule, which implicates questions of when an addition of a pollutant occurs in the context of dredging and excavation activities, the effects-based test adopted in today's definition of "fill material" addresses additions of material to waters of the U.S. to such a degree and amount that it creates dry land or raises the bottom elevation.

Another commenter suggested eliminating the primary purpose test will increase Corps workload. They were concerned the proposed change would elicit an expansion of the Corps' "jurisdiction on certain kinds of fill material...and would slow the permit approval process further." We expect that because today's rule is generally consistent with existing practice it will not have substantial effects on Corps workload or engender permit delays. In addition, unlike the proposal, today's final rule is more limited in scope as it contains an express exclusion from the definition of fill for trash and garbage.

Another commenter expressed concern that elimination of the "primary purpose" test in favor of an effects-based definition of fill would cause circumvention of the CWA by allowing polluters to "pass off waste material as fill," particularly with regard to coal mining activities. We do not agree that today's rule would "cause circumvention of the Clean Water Act." The Act

8