itself does not define or dictate what constitutes "fill material," leaving it to the discretion of the agencies to define that term. As explained in the proposed rule preamble (65 FR 21294 - 21295) and the preamble to the final rule, use of a primary purpose test and differing Corps and EPA definitions of fill material has resulted in regulatory uncertainties and confusion. Today's rule is intended to avoid such problems, and is well with the agencies' authority and discretion to adopt.

### 3. Eliminating Waste Exclusion

Regarding comments received concerning the proposed rule's elimination of the waste exclusion, the majority of commenters were opposed to omitting the current waste exclusion language from the proposed definition of fill material. One commenter stated, "elimination of the waste exclusion would give the Corps new authority to allow the disposal of refuse directly into the nation's waters, . . . and is an outrageous attempt to circumvent the letter and spirit of the Clean Water Act." Furthermore, prohibiting the disposal of waste "in the nation's waters under Section 404 is mandated by the letter, purpose, goals, and Congressional intent embodied in the Clean Water Act." Another commenter noted elimination of the waste exclusion is contrary to the "fundamental goal of the Clean Water Act: to eliminate the discharge of pollutants into the waters of the United States in order to preserve the physical, chemical and biological integrity of the nation's waters."

We agree that the goals of the CWA include the elimination of the discharge of pollutants, but do not agree that today's rule is inconsistent with those goals or with any actual requirements of the Act. First, today's rule does not authorize or permit the discharge of solid waste to waters of the U.S. As provided for by section 301 of the CWA, discharges to waters of the U.S. continue to be prohibited unless a permit under the Act authorizing the discharge is issued. Rather, the rulemaking being undertaken clarifies which permitting regime (section 404 or section 402) would be applicable. Moreover, as explained in the preamble to the proposed rule (65 FR 21293 - 21294), the section 404 program is specifically designed to regulate material that fills waters of the U.S. or changes their bottom elevation, and the 404(b)(1) Guidelines provide for the evaluation of alternatives to avoid or minimize the discharge of fill material. We also note, that in response to comments received, today's final rule modifies the proposal so as to exclude from the definition of fill material trash or garbage.

Several commenters suggest that the proposed elimination of the waste exclusion serves to "endorse the practice of mountaintop removal mining." Another expressed concern that removal of the "prohibition on use of fill that is discharged primarily to dispose of waste" would "greatly increase the universe of Section 404 regulated activities involving waste disposal."

Section 404 regulates the discharge of dredged or fill material to waters of the U.S., whereas the primary statute governing mountaintop removal mining is the Surface Mining Control and Reclamation Act (SMCRA). Rather than somehow "endorsing" that practice, today's rule ensures regulatory clarity and consistency by clarifying which CWA regulatory

9

regime governs discharges of material that has the effect of fill, and does so in a way that is consistent with EPA's long-standing definition. While today's rule clarifies that mining related discharges with the effect of fill, such as overburden, are subject to section 404, no such discharge may actually take place except as authorized by a 404 permit. In addition, mountaintop mining activities are also subject to SMCRA permitting requirements before they may occur. We also do not believe today's rule will greatly increase the universe of waste disposal activities regulated by section 404 as today's rule is generally consistent with existing practice as well as reflecting the effects-based approach in EPA's long-standing definition. Finally, as noted above, today's final rule does specifically exclude from the definition of fill material trash, garbage or similar materials unless such materials are to be used to create a structure or infrastructure in waters of the U.S.

Another commenter was supportive of the clarification made by the Corps and EPA. Specifically, the commenter noted that, to the mining industry, the term "waste" refers to leftover rock and dirt that is impacted by coal mining activities, and should be regulated under section 404 of the CWA. As stated previously, we believe that in determining whether a discharge is subject to section 404 or section 402, it is important to provide for application of the regulatory regime best suited to control the potential impacts. These materials both have the effect of fill and are geological materials similar to many other types of fill material; we thus agree it is appropriate that they be regulated under section 404.

### C. Legality of Proposal

#### 1. Consistency with CWA and Regulatory Framework

A number of comments addressed issues about the consistency of the proposal with the CWA, generally, and with the cases and regulatory requirements implementing the Act. Those opposing the proposal argued that it reflected a "major weakening of current law" and undermined the zero discharge goal of the Act. The opponents of the rule noted that the CWA was established to protect the physical, chemical, and biological integrity of the nation's waters from pollution emanating from point as well as non-point sources. Instead, says one comment, the proposal cripples the effectiveness of the Act. An industry opponent of the rule argued that the rule goes well beyond the Corps' jurisdiction over protecting wetlands and other rare and important waters, and now has the Corps asserting jurisdiction over vast areas of desert that have no connection to the Corps mandate. Those supporting the rule argued that the proposal is consistent with the CWA purposes and the regulatory framework for the Act. A supporter noted that it is clear that Congress did not intend to stop mining in this country when the CWA was enacted, which the comment says would be the outgrowth of some of the arguments alleging that the proposal violates the CWA.

The agencies do not agree that the proposal would have resulted in a major weakening of the CWA. In fact, as noted above, the purpose of this regulatory change is to improve the effectiveness of the program by increasing the clarity and consistency of program

10

implementation with the CWA. Today's final rule improves upon the proposal by specifically excluding trash or garbage from the definition of "fill material" and thereby ensuring that the public understands that such materials will generally not be permitted for disposal in waters. It is important to note that neither the proposal nor this final rule affects the scope of geographic jurisdiction. Thus, those comments concerning the scope of geographic jurisdiction are not germane to today's action.

Below we will address some the specific comments concerning the legality of the proposal and this final rule in light of existing regulations and case law.

a. *Section 402 versus section 404.* Numerous commenters noted that, although they agreed with the intent of subsection (e)(2) of the proposed rule (i.e., discharges covered by effluent limitation guidelines and discharges covered by a section 402 NPDES permit do not require a section 404 permit), the proposed language specifically excluding discharges subject to proposed or final effluent limitations guidelines or NPDES permits was ambiguous and confusing. One commenter, representing the mining industry, specifically was concerned that the exclusion, as worded, could inadvertently result in attempts by regulators in the field to have discharges excluded from section 404 coverage simply due to the presence of constituents in the material for which effluent limitation guidelines exist and would apply if such constituents were discharged in wastewater (e.g., mine drainage or process waste water). Overall, commenters requested clarification of the (e)(2) language, even if such clarification was made in the Preamble to the rule.

Based on the comments received, the agencies recognize the potential for the proposed language to cause confusion and believe such language is unnecessary for achieving the purposes of the rule. Accordingly, today's final rule deletes the exclusion for discharges covered by effluent limitation guidelines and standards or NPDES permits. The agencies, however, will continue to be guided by practices and past determinations about the applicability of effluent limitation guidelines or NPDES permits in deciding whether section 402 or 404 will govern specific discharges. If EPA has previously determined that a discharge is covered by an ELG, that determination is not altered by today's rule. Similarly, even though some discharges covered by section 402, such as suspended or setteable solids can have the effect, over time, of raising the bottom elevation of a water due to settling of waterborne pollutants, we do not consider such pollutants to be "fill material," and nothing in today's rule changes that view.

Some commenters noted that section 404 is better suited to address certain types of discharges because it deals with physically modifying or replacing waters, whereas 402 deals with the discharge of waterborne pollutants and the ability of the receiving waters to assimilate them. Others, however, maintained that, rather than justifying regulation under section 404, the inability of certain discharges to comply with section 402 requirements simply demonstrates that the CWA was intended to prohibit such discharges. Such comments also questioned the adequacy of Section 404 regulation of waste-type fills, due to inconsistent application of its alternatives analysis and compensatory mitigation requirements. The commenters asserted that

11

the proposed rule constitutes a "dramatic reversal of agency policy" that was not justified simply to eliminate inconsistencies between the Corps and EPA definitions.

Clearly, two regulatory programs were established by the CWA serving distinct objectives and goals. One limits discharges of pollutants in order to protect water quality of the receiving water (section 402 NPDES program). The other regulates dredged and fill activities that, among other things, may displace or change the elevation of receiving water -- often replacing it with dry land (section 404). Even though there are some water quality considerations included in the section 404(b)(1) guidelines, this is distinct from the water quality considerations and analysis of the assimilative capacity of receiving waters done as part of the section 402 review. In determining whether the section 402 versus section 404 permit will control specific discharges, the differing purposes of the two programs is an important consideration. Finally, as explained elsewhere and in the Federal Register notice of the final rule, today's rule reflects the approach in EPA's longstanding regulation and is generally consistent with past practice, so does not represent a radical departure for the agencies.

Some commenters also noted that the proposed rule language and preamble discussion created some confusion about whether mine overburden and mine tailings are both subject to section 404 regulation as opposed to section 402. Today's final rule clarifies that any material that has the effect of fill is regulated under section 404 and further that the placement of "overburden, slurry, or tailings or similar mining-related materials" is considered a discharge of fill material. Nevertheless, if EPA has previously determined that certain materials are subject to an ELG under specific circumstances, then that determination remains valid. Moreover, NPDES permits issued pursuant to section 402 are intended to regulate process water and provide effluent limits that are protective of receiving water quality. This distinction provides the framework for today's rule.

b. *Operation of Water Quality Standards, anti-degradation policies and 404(b)(1) Guidelines*. Two comments raised issues concerning compliance of the proposal with water quality standards and the section 404(b)(1) Guidelines, each arguing opposing conclusions. One comment noted that the Guidelines prohibited discharges that would cause or contribute to violations of water quality standards or that caused or contributed to significant degradation of the waters. This comment noted that while some provisions of the Guidelines contemplated a balancing approach, the above referenced provisions did not. They simply prohibited such actions. Moreover, the comment argued that compliance with both prohibitions was required. In addition, the comment concluded that "filling in waters for the purpose of waste disposal undeniably violates water quality standards and anti-degradation regulations," and as such, is prohibited by the section 404(b)(1) Guidelines. The second comment cited to EPA's Water Quality Standards Handbook and, specifically, to the discussion of the Anti-degradation policy to reject the concept that "the anti-degradation policy necessarily prohibits filling operations by virtue of altering the use of the stream segment filled." This comment noted that the Handbook observes that compliance with the CWA anti-degradation policy is achieved through the application of the 404(b)(1) Guidelines, and further that any other construction of the anti-

12

technology and water quality based standards. These considerations were explained in detail in the proposed rule preamble (65 FR 21293 -21294), and we believe amply support a conclusion that application of Section 404 to regulate materials with the effect of fill is reasonable and environmentally protective.

We do believe that the agencies should continue to look for improvement in Section 404 program implementation related to valley fills and have undertaken a number of measures to that end. These include an April 1999 Memorandum of Understanding between the Office of Surface Mining, the Fish and Wildlife Service, EPA, the Corps, and the State of West Virginia that describes discharges that the signatory agencies believe generally should have only a minimal effect on waters of the U.S., development of technical models to help minimize the size of proposed coal overburden discharges, and initiation of development of a comprehensive EIS to assess current federal and state authorities for regulating coal mining discharges in Appalachia and what measures may be necessary to ensure protection of human health and the environment. A draft of that EIS is anticipated to be available for public comment on August 2002. In addition, Nationwide Permit 21 was revised and reissued on January 15, 2002, with improvements to its mitigation provisions and a requirement not only for pre-construction notification to the Corps but also written authorization from the Corps before the project can proceed. See discussion of Nationwide Permit 21 at 67 FR 2038- 2043.

Another comment took issue with the proposal's preamble language (65 FR 21294) that explained it was problematic for the Corps to make subjective determinations about the primary purpose of a prospective discharge. The comment suggested this difficulty would be eliminated if the regulations made it clear that the Corps and EPA (and not the project applicant) are to make an independent determination.

We do not agree that the difficulties described in the preamble can be resolved by simply having us make an independent determination of the primary purpose of a prospective discharge. First, we believe it preferable to apply the regulatory regime that is best fitted to address the effects of the particular discharge, rather than assigning regulatory responsibility on the basis of project purpose. For discharges with the effect of fill, as explained above, we believe the appropriate regulatory regime is Section 404. Moreover, an independent determination by the agencies would not resolve difficulties arising under the primary purpose test. For example, in *RII* (discussed in the proposal's preamble at 65 FR 21294), the Corps determined that a discharge of fill material was involved, as the primary purpose of the discharge associated with construction of the landfill was to replace waters of the U.S. with dry land or alter the bottom elevation. The Court however interpreted the primary purpose test on its own to come to a different conclusion, finding the liner was not fill material because its primary purpose was not to replace an aquatic area with dry land or change the bottom elevation of a waterbody, "but rather to serve as a leak detection and collection system." 151 F.3d at 1168.

A number of comments were received questioning the consistency of the proposed rule with the 1986 "Memorandum of Agreement Between the Assistant Administrators for External

Affairs and Water U.S. Environmental Protection Agency and the Assistant Secretary of the Army for Civil Works Concerning Regulation of Discharges of Solid Waste Under the Clean Water Act"("1986 MOA") and related agency documents.

Some of these commenters generally pointed to the 1986 MOA and the "primary purpose test" in the Corps definition of fill material as presenting a strong argument that materials are prohibited under the Section 404 program when they are "pollutants" being discharged into a water of the US "primarily to dispose of waste," and thus should be regulated under Section 402 of the Act by EPA as a point source discharge.

The 1986 MOA is intended to provide guidance to the Corps and EPA on how to determine the applicability of Section 404 or 402 to solid waste discharges in light of the differing EPA and Corps definitions of fill material. Because it is only guidance, it cannot and does not establish legally binding requirements, nor is it prescriptive in nature. It provides factors to be considered when making the determination of which permitting regime to apply, but does not direct or instruct how the factors are to be considered or balanced to reach a conclusion. In fact, it explicitly recognizes that there will be cases where application of the factors it contains will not provide a clear answer, or the agencies may disagree as to which permit regime should be applied. 1986 MOA, Section C. 1 and 2. As explained in the proposed rule preamble (65 FR 21297), and will be addressed further below, we believe the approach being taken in reconciling the regulations is generally consistent with the 1986 MOA.

With regard to the Corps regulations defining fill material, those regulations provide in part:

> The term "fill material" means any material used for the primary purpose of replacing an aquatic area with dry land or of changing the bottom elevation of an waterbody. The term does not include any pollutant discharged into the water primarily to dispose of waste, <u>as that activity is regulated under Section 402 of the Clean Water Act</u>. 33 CFR 323.2(e) (2001) (emphasis added)

Under EPA's long standing definition of what constitutes fill material (and thus <u>not</u> subject to Section 402 (see CWA Section 402(a)(1)), fill material is defined as material that has the effect of fill, without regard to the purpose of the discharge. We thus do not agree that under the differing EPA and Corps regulations it is simply clear by referring to the Corps regulations alone that pollutants discharged to dispose of waste are not subject to Section 404; rather, the contents of <u>both</u> regulations need to be taken into account. Moreover, as noted in the prosed rule's preamble (65 FR 21295) the Corps has historically regulated valley fills under Section 404.

Some of the comments pointed to specific language in the 1986 MOA as indicating that mine waste was properly the subject of Section 402 and not Section 404. Several of these commenters cited Section B.5. of the 1986 MOA. That provision states:

29

"On the other hand, in the situation in paragraph B.3, a pollutant (other than dredged material) will normally be considered by EPA and the Corps to be subject to Section 402 if it is discharged in liquid, semi-liquid, or suspended form or if it is a discharge of solid material of a homogeneous nature normally associated with single industry wastes, and from a fixed conveyance, or if trucked, from a single site and set of known processes. These materials include placer mining wastes, phosphate mining wastes, titanium mining wastes, phosphate mining wastes, titanium mining wastes, sand and gravel wastes, fly ash, and drilling muds. As appropriate, EPA and the Corps will identify additional such materials."

These commenters saw the proposed rule as a repudiation of that provision. Some of these comments further pointed to a cover memorandum from Lawrence Jensen, then-Assistant Administrator of the Office of Water, to Regional Administrators transmitting the 1986 MOA which stated wastes of a homogenous nature normally associated with a single industry and discharged from a fixed conveyance, or if trucked from a single site such as fly ash, are subject to the Section 402 program.

As explained previously, under today's rule, we will continue, consistent with our long-standing practice, to rely on the existence of effluent limitation guidelines or standards or an NPDES permit to inform the determination of how a particular discharge is regulated under the Act. If a specific discharge is regulated under Section 402, it would not also be regulated under Section 404, and vice versa. As explained in the proposed rule's preamble (65 FR 21296), many of the discharges referred to in Section B.5. of the 1986 MOA are subject to effluent guidelines and NPDES permitting, and today's rule would not alter that existing scheme. Moreover, when Section B.5. of the 1986 MOA was adopted, the EPA regulations defining fill material, like today's rule, defined fill material as material that has the effect of replacing waters of the U.S. with dry land or changing the bottom elevation. We thus do not agree that today's rule is inconsistent with or repudiates that 1986 MOA provision.

One of the commenters further indicated that the 1986 MOA outlined four factors for determining whether a specific waste was properly regulated under Section 404 or Section 402, stating that each factor, if it applied to the material at issue, meant that the material should be regulated under Section 404. The commenter concluded that three of the four factors listed in the 1986 MOA (Sections B.4.a, b, and d) weighed in favor of overburden being regulated by EPA under Section 402, with only one factor (Section B.4.c) weighing in favor of Section 404.

We do not agree that only one factor in Section B.4 of the 1986 MOA weighs in favor of regulating overburden under Section 402 as the commenter asserts. With regard to the comment's suggestion that Sections B.4.a, b, and d weigh in favor of overburden being regulated under Section 402, we note that Section B.4.d refers to heterogenous discharges of the type "normally associated with sanitary landfills," and thus appears inapplicable in the case of overburden rather than affirmatively indicating it is subject to Section 402. With regard to

30

Section B.4.b., overburden consists of rock and dirt and thus is similar in nature to materials generated by construction-type activities, such as road cuts that generate waste rock and dirt. The 1986 MOA does not specify how to weigh and balance the various factors it contains, and as noted above, Section C of the 1986 MOA explicitly recognizes this and calls for inter-agency discussions when the factors specified in the MOA do not resolve the issue.

Other comments questioned the status of the 1986 MOA, indicating that it was intended to provide only interim section 404 jurisdiction and pointing to language in Section E.2. as indicating it expired when EPA's RCRA Subtitle D regulations were published in 1991. Some of these comments pointed to the *RII* decision as supporting that view. One of these comments focused on issues related to the applicability of Section 404 to solid waste landfills, asserting that the discussion in the proposed rule preamble of the 1986 MOA between EPA and the Corps regarding the "temporary" assertion of jurisdiction over landfills by the Corps was inaccurate and misleading. This commenter further indicated that in a case asserting a temporary regulatory taking of a landfill by the Corps of Engineers, both former and existing Corps officials have testified under oath that the MOA was intended to impose interim jurisdiction only until the states took over their solid waste responsibilities under RCRA Subtitle D. The commenter concluded that it was simply untrue that the Corps' "consistent intent" has been to regulate solid waste landfills.

We note that by its very title the1986 MOA concerns "regulation of discharges of solid waste" (emphasis added), not the broader question of Section 404 jurisdiction over other landfill activities, such as their construction or maintenance. It thus does not have a bearing on Section 404 jurisdiction over discharges of material used to create landfill infrastructure such as berms, liners, and the like, which under both of the differing Corps and EPA definitions are fill material. Further, Section A.5 of the 1986 MOA describes the basis of the agreement, indicating the MOA addresses "the uncertainty as to whether Section 402 of the Act or Section 404 is intended to regulate discharges of solid waste materials into waters of the United States for the purpose of disposal of waste . . ." (emphasis added). Because it addresses only solid waste discharges, we do not agree that the1986 MOA reflects an intent to assert "interim jurisdiction over solid waste landfills by the Corps."

Moreover, in the preamble to the rule adopting the primary purpose test and waste exclusion, the Corps specifically recognized that jurisdiction under that regulation still remained for creation of landfill infrastructure:

> "During the two years of experience with the Section 404 program, several industrial and municipal discharges of solid waste materials have been brought to our attention which technically fit within our definition of "fill material" but which were intended to be regulated under the NPDES [CWA § 402 permit] program. * * *
>
> The Corps and [EPA] feel that the initial decision relating to this type of discharge should

31

be through the NPDES program. We have, therefore, modified our definition of fill material to exclude those pollutants that are discharged into water primarily to dispose of waste. <u>We will process Section 404 permits for these types of activities to the extent that a levee or other type of containment structure must be placed in the water as part of the overall disposal plan</u>."

42 F.R. 37,122, 37,129 (July 19, 1977) (emphasis added).

Similarly, the proposed rule was intended to recognize as a discharge of fill material "placement of material for construction or maintenance of . . . infrastructure associated with solid waste landfills" (65 FR 21300). It would not have asserted Section 404 jurisdiction over actual solid waste going into the landfill cells, and as noted elsewhere, today's rule has been modified to specifically exclude disposal of trash garbage and the like from being fill material. In addition, as explained Section II C. of today's preamble, in implementing Section 404, the Corps will emphasize effective coordination with other relevant programs such as RCRA, and consistent with its legal responsibilities, rely as appropriate, on the information developed and conclusions reached by other agencies to support the decisions required under that program. Readers are also referred to the previous discussion in today's preamble for issues related to the applicability of Section 404 to landfills and the <u>Resource Investment</u> case.

With regard to the status of the 1986 Solid Waste MOA, we also do not agree that it has expired. Section 5.E.2. of the 1986 MOA provides it may be extended by mutual agreement, and both EPA (58 FR 9337) and the Corps (May 17, 1993, memorandum from John Studt, Chief, Regulatory Branch, U.S. Army Corps of Engineers) have indicated the MOA remains in effect.

One commenter stated that the 1986 MOA contains language that is potentially confusing and inconsistent with the proposed rule and the accompanying preamble and recommended that while they believed the 1986 MOA contains some provisions worth maintaining, it also contains others that should be reworked consistent with the proposed rule and current permitting practices. This commenter pointed to Section B.4.d of the 1986 MOA as providing that a discharge will normally be considered to meet the definition of "fill material" if heterogeneous in nature and of the type normally associated with sanitary landfill discharges, whereas in the preamble to the proposed rule, the agencies proposed to adopt a definition of "unsuitable" fill material that would include in most instances "heterogeneous solid waste," thereby excluding from the Section 404 permit program materials that would satisfy the language in Section B.4.d of the 1986 MOA. This commenter also pointed to Section B.5 of the 1986 MOA (which addresses "solid material of a homogeneous nature normally associated with single industry wastes") as resulting in confusion and inconsistent positions for materials generated by hard rock mining.

We agree that in many respects the 1986 MOA did not fully resolve issues associated with the discharge of solid waste. This is not surprising as it was developed under a regulatory framework involving differing definitions of fill material, and as guidance, could not depart from those regulations or establish mandatory or prescriptive criteria. Following promulgation of

32

today's rule which results in a single and consistent definition of fill material, we will be revisiting the 1986 MOA to determine if it is still necessary, and if so, what modifications might be appropriate.

One commenter opposing the proposed rule requested that if it nonetheless is issued, language in Section B.6. of the 1986 MOA be retained, which provides for a State determination to be provided prior to application processing that the proposed discharge will comply with applicable provisions of State law, including applicable water quality standards. The commenter indicated this was necessary in order to keep Corps districts from becoming immersed in disputes over siting of wasting facilities.

We will take this comment into account in reviewing the 1986 MOA. We also note that Section 401 of the CWA itself requires any applicant for a Federal license or permit to conduct any activity that may result in a discharge of a pollutant into waters of the U.S. to obtain a certification from the State as to compliance with applicable provisions of State law, including applicable water quality standards. With regard to Section 404 permits, the Corps has in place regulations addressing the nature and timing of such 401 certifications. See e.g., 33 CFR Part 320.

One commenter provided lengthy historical information asserting that the proposed rule's preamble description of how the differing definition of "fill material" came into being incorrectly ascribing this divergence to actions by the Corps. We appreciate submission of this information, but note that the preamble language in question (65 FR 21294) was intended only as brief background chronology, not to explain how the definitions came to differ.

Other comments pointed to a March 19,1984, letter from William R. Gianelli, then Assistant Secretary of the Army for Civil Works, to William Rucklelshaus, then Administrator of EPA, which was cited in the RII case at 151 F.3d 1169. These comments pointed to language in that Department of Army letter stating:

> "This follows up on discussions our agencies have had over the years about the proper way to regulate garbage disposal and other waste disposal in waters of the United States.
>
> EPA has many solid waste responsibilities under its RCRA programs and has developed expertise in that area. Army has very limited expertise. Hence we would have to establish duplicative expertise which may well result in policies and technical decisions which differ from those of EPA. It would not be in the best interest of Government for EPA to work with the States under RCRA under one policy and Army to operate under a 404 permit program for garbage disposal on a different basis. It is logical to identify regulations of garbage disposal with EPA's current and historic mission. It strains reason to have the Army Corps of Engineers, with its primary military and navigation missions, to lead this garbage disposal regulation."