RECORD OF DECISION                                            POA-1990-592-M



Alaska District

REVISED
DEPARTMENT OF THE ARMY

RECORD OF DECISON
&
PERMIT EVALUATION



---

**APPLICANT:**        COEUR ALASKA, INCORPORATED and Goldbelt, Incorporated
**APPLICATION NO.:**  POA-1990-592-M and POA-1997-245-N
**WATERWAY:**         Lynn Canal and Berners Bay

This document constitutes the United States (U.S.) Department of the Army, Corps of Engineers' (Corps) Record of Decision (ROD), compliance determination according to the National Environmental Policy Act (NEPA), the U.S. Environmental Protection Agency's (USEPA) Section 404(b)(1) Guidelines[1] (Guidelines), and the public interest review for Coeur Alaska, Incorporated, (hereafter referred to as "Coeur"), proposed Kensington Gold Project.

The U.S. Forest Service (USFS) initiated the NEPA process to identify and analyze alternatives to the amended Mining Plan of Operation submitted to the USFS for the operation of the Kensington Gold Mine. The USFS was the lead Federal agency for the project, and the Corps was a cooperating agency to the Environmental Impact Statement (EIS) published in February 1992, and to the Supplemental EIS (SEIS) dated August 1997. The Corps has been a cooperating agency on and throughout the current Final SEIS (FSEIS) process, which was completed in December 2004, when the USFS published the FSEIS and the USFS' ROD. Alternative D is the USFS's preferred alternative and has been adopted by Coeur.[2] The Corps authorized Alternative D, to two different permittees in separate permits (e.g., to Coeur for the Kensington Gold Project and to Goldbelt, Incorporated (hereafter referred to as "Goldbelt") for the Cascade Point marine facility).

The aforementioned documents[3] included a complete project impact analysis and review of the direct, secondary, cumulative, and reasonably foreseeable impacts of the project as well as pertinent alternatives. These analyses have also resulted in minor changes to the proposed activities.

I have independently reviewed and evaluated the information in the EIS, the DSEIS and the FSEIS, in accordance with 40 CFR 1506.3 and 33 CFR 230.21, and have found them to be accurate assessments, and therefore appropriate for the purposes of the public interest review and alternatives analysis required by 33 CFR 320.4(b)(4) and 40 CFR 230.10. The Corps hereby adopts the FSEIS for the Kensington Gold Project, and those parts of the Kensington Gold Project EIS and SEIS not changed by the FSEIS.

---

[1] 40 CFR 230

[2] The applicant had originally applied for Alternative B (described in Section VI, later in this ROD). Alternative D was not in the Draft of the FSEIS, hereafter referred to as the DSEIS, but originated later as a result of comments received from Federal, State and local agencies, as well as the land manager (USFS), with respect to the DSEIS.

[3] These documents are all available at the USFS, 8465 Old Dairy Road, Juneau, AK 99801. A copy of each was incorporated into the case file.

1

RECORD OF DECISION                                    POA-1990-592-M

I. **DECISION**: I have decided, in light of the overall public interest, to issue two Corps permits pursuant to Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. 403), and pursuant to Section 404 of the Clean Water Act (CWA) (33 U.S.C. 1344) (10/404 permit). One permit will be issued to Coeur to authorize the discharge of processed mine tailings into Lower Slate Lake, and the discharge of fill materials into waters of the U.S. to construct a marine dock facility at Slate Creek Cove in accordance with the attached drawings (Attachment E), Alternative D in the FSEIS and this ROD.

The second permit will be issued to Goldbelt for the Cascade Point Docking Facility. See Plans of Goldbelt, attachment A.

The Corps' ROD is based upon information contained in the EIS, DSEIS, the FSEIS and the USFS's ROD, the stated views of Federal, State, local agencies, the interested public, current national policy and applicable laws and regulations. This decision has been made in conformance with the USEPA memorandum, entitled, "Clean Water Act Regulation of Mine Tailings", dated May 17, 2004. The possible consequences of all alternatives, including the USFS's preferred alternative, have been evaluated in terms of environmental effects, social well-being, and the public interest. All factors[4] which may be relevant to my decision were considered, including the cumulative effects thereof. These factors included, but were not limited to conservation, economics, aesthetics, general environmental concerns, wetlands, cultural values, fish and wildlife values, flood hazards, flood plain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, mineral needs, consideration of property ownership, and in general, the needs and welfare of the people.

Turbidity, total suspended solids (TSS), aluminum, and chromium are the principal components and elements of concern within the tailing storage facility (impoundment). The tailings deposited into the impoundment will have been processed to remove sulfides and the contained gold. The ore will be crushed and ground, with the sulfides and gold mineralization removed by a floatation circuit. This would leave trace concentrations of metals bearing sulfides, metal oxides, metal sulfates, and carbonate salts. Up to 40% of the tailings will be placed back underground in a wetted cement mixture. No cyanide or arsenic will be added to the ore as a reagent to recover gold. In fact, the gold concentrate will be shipped offsite for final recovery. The water in the impoundment will not be directly discharged into any receiving water. The water from the tailings storage facility will be pumped by pipeline to a water treatment facility before discharge to the East Fork of Slate Creek. To ensure water quality standards for the project are met, all water from the impoundment will have to go to and through a water treatment plant during operation. The discharge from the water treatment plant is subject to an NPDES permit. To ensure that the tailings are reclaimed in accordance with approved plans, the USFS and ADNR will hold reclamation bonds on the operation to ensure that all reclamation standards are met. See Section XI, Subpart G.

Attachments to Record of Decision:

A.  Plans of Goldbelt

---

[4] These and other factors, which were addressed in the DSEIS and FSEIS, Chapters 3 (Affected Environment) and 4 (Environmental Consequences), which adequately addressed the environmental and public interest factors. No new factors have been identified as a result of this review.

RECORD OF DECISION                                          POA-1990-592-M

B. Kensington Mine Section 404(b)(1) analysis.
C. List of Reference Documents
D. Revised Special Conditions for Coeur permit
E. Revised permit application tables and drawings, Coeur
F. Signed Department of the Army Permit Evaluation and Decision Documents for Goldbelt, Incorporated: (1) POA-1997-245-2 (Cascade Point Dock), and (2) POA-1997-245-M (Road from Echo Cove to Cascade Point),
G. The Section 404(b)(1) Analysis and Public Interest Review for POA-1997-245-N (Cascade Point Dock).

The documents listed in Attachment C were submitted to the Corps by the applicant and by various Federal and State agencies as supporting documents, and specified documents or portions of the listed documents have been incorporated into this ROD by reference.

II. **PROPOSED PROJECT**: The location and description of the proposed work was described in the Corps public notice, dated June 21, 2004. The 45-day comment period, originally commensurate with the comment period of the DSEIS, was later extended at the request of various Federal resource agencies to August 20, 2004.

Coeur's proposal is to mine gold from subsurface mineral deposits located within the Tongass National Forest on Federal and private patented lands, just north of Berners Bay, Alaska.

Coeur proposed[5] in June 2, 2004 in a revised application to place structures, and to discharge an approximate total of 5,451,700 cubic yards (cy) of fill material into an approximate total of 91.7 acres of waters of the U.S., including wetlands, in conjunction with the construction of the following new mine facilities and associated infrastructure:

| Proposed Facilities | Acres of US Waters To Be Impacted | Proposed Fill Volume (cy) |
|---|---|---|
| Process Area | 5.3 | 88,000 |
| Tailing Dam | 1.4 | 145,000 |
| Access Road | 12.0 | 26,000 |
| Laydown Area | 5.0 | 4,800 |
| Waste Rock Disposal | 4.8 | 311,000 |
| Borrow Areas | 4.2 | 0 |
| Mine Tailings | 45.5 | 4,800,000 |
| Tails Placement Facilities | 8.9 | 15,000 |
| Topsoil Stockpile | 1.0 | 33,000 |
| Slate Creek Terminal | 3.6 | 28,900 |
| TOTAL | 91.7 | 5,451,700 |

These activities included the discharge of fill material in waters of the U.S., and the placement of several structures (floats, docks and piles) in navigable waters of the U.S., in conjunction with the construction of a marine dock facility in Slate Creek Cove.

The individual components of the proposed work included the following activities: (1) the construction of building pads for milling facilities, administrative, and support facilities; (2) construction of a tailings dam; (3) construct fill pads associated with the tailings pipeline, access roads,

---
[5] The location and description of the proposed work was described in the Corps public notice, dated June 21, 2004.

3

RECORD OF DECISION                                          POA-1990-592-M

a discharge pipe, and a pump-back sump (located at the toe of the proposed dam); (4) construction of a waste rock disposal site; (5) construction of abutments for the main access road, which would run from Slate Creek Cove to the process area, plus fills associated with the construction of various bridges (abutments, etc.); (6) construction of a staging and laydown area, as well as an infiltration gallery in Johnson Creek; (7) approximately 4,800,000 cy (or 4.5 million tons) of fill material would be discharged into approximately 45.5 acres of waters of the U.S.; (8) material and topsoil stockpiles for use in concurrent and closure reclamation activities; (9) construction of 2-foot high berms encircling settling and storage ponds; and, (10) construction of a marine dock facility in Slate Creek Cove. Galvanized metal piling would be used to anchor various floating components of the dock facility.

Coeur did not include the Cascade Point docking facility in their Department of the Army (DA) permit application. The Cascade Point docking facility application was submitted separately by Goldbelt, Incorporated, and previously evaluated as an independent activity by the Corps in our decision document for that project. This ROD now analyzes Cascade Point as a component of the Kensington Gold Project. Two different permit decisions are being made; one for the Kensington Mine Project, and another for a docking facility at Cascade Point. We re-examined our previous conclusion that the Cascade Point facility was a separate and independent project. Based on a review of all available information including, but not limited to, the FSEIS, Goldbelt's submissions, and the City & Borough of Juneau's Conditional Use permit, we determine that, without the Kensington Mine, the Cascade Point facility would not be constructed in the foreseeable future. Although we recognize that Goldbelt intends the dock to be used for other purposes in the future, such plans are insufficient for us to evaluate it as an independent activity. We therefore conclude that a destination docking facility at Cascade Point is a component of the Kensington Mine project. It is analyzed in the FSEIS, this ROD, and in attachments F (as modified by attachment G) and G (both incorporated into this ROD).

The applicant originally applied for Alternative B, as reflected in the Corps public notice, stating that approximately 5,451,700 cubic yards of fill material would be discharged into 91.7 acres of waters of the U.S., including wetlands. The applicant later adopted the USFS's preferred Alternative D, with the volumes and acreages described in Section VI below, prior to publication of the FSEIS.

III. **PURPOSE AND NEED FOR ACTION**: The basic purpose is to develop a working, profitable gold mine for the Jualin/Kensington ore body. This will be accomplished by extracting the gold ore and reducing it by removal and disposal of non-marketable components, and by transporting the gold concentrate to market. There are several transportation links and construction activities implicit in the overall mining operation.

The overall mine operation project would need the following components: (1) building pads for milling facilities, administrative and support facilities; (2) tailings disposal facilities; (3) fill pads associated with pipelines; (4) a waste rock disposal site; (5) access roads and bridge abutments; (6) staging and laydown areas; (7) an infiltration gallery; (8) material and topsoil stockpiles; (9) two marine dock facilities; and (10) berms to encircle settling and storage ponds.

4

RECORD OF DECISION                                                POA-1990-592-M

Coeur's need is to relocate[6] the major mine components from the Kensington Mine site adjacent to Lynn Canal, to the Jualin Mine site location in the Johnson Creek watershed (approximately two miles to the southeast across a southern ridge extension of Lion's Head Mountain), and at Slate Cove, on the northwest side of Berners Bay. This action would allow Coeur to transport ore from the mine directly[7] to a mill on the Jualin side of the peninsula for processing, from where the processed tailings material slurry would then be piped by gravity feed directly to the alpine lake disposal site (Lower Slate Lake). Coeur needs to establish a marine dock facility in Slate Creek Cove for the transport of mine personnel safely to another destination port and move gold concentrate efficiently and reliably off the mine site.

IV. **SCOPE OF ANALYSIS [33 CFR 325, Appendix B, 7(b)]**: When an applicant proposes to conduct a specific activity (e.g., the actions proposed by Coeur in the Corps' public notice, dated June 21, 2004), requiring authorization from the DA, and it is merely one component of a larger project (e.g., an ongoing mining operation), the District Engineer (DE) shall establish the scope of the ROD and/or permit evaluation assessment to address the impacts of the specific activity requiring Corps authorization and those portions of the entire project over which the DE has sufficient control and responsibility to warrant Federal review. Sufficient control and responsibility is considered to exist for portions of the project beyond the Corps' jurisdiction where the Federal involvement is sufficient to turn an essentially private action into a Federal action. These are situations where the environmental consequences of the larger project are essentially products of the Corps' permit action. (See 33 CFR 325 Appendix B, Paragraph 7.b.)

For this proposal, works initially identified as requiring Corps authorization are limited to the placement of structures, and the discharge of dredged or fill material into waters and navigable waters of the U.S.

However, the DE is considered to have control and responsibility for portions of the project beyond the limits of Corps jurisdiction where the Federal involvement is sufficient to turn an essentially private action into a federal action. These are cases where the environmental consequences are essentially products of the Corps permit action. Typical factors to be considered in determining whether sufficient control and responsibility exists include (1) whether or not the regulated activity is 'merely a link' in a corridor type project; (2) whether adjacent uplands in the immediate vicinity of the regulated activity affected the locations and configuration of the regulated activity; (3) the extent to which the entire project will be within the Corps jurisdiction; and (4) the extent of cumulative Federal control and responsibility.

Combined Federal controls are influenced by the fact that the work would be conducted in part on Federally administered lands (Tongass National Forest-USFS), and in part on State of Alaska administered lands (Alaska Tidelands-marine dock facility); the water leaving the impoundment behind the dam is subject to the (USEPA) regulations (i.e., subject to the USEPA's authorization to discharge under the National Pollutant Discharge Elimination System (NPDES Permit); and other Federal laws (e.g., Endangered Species Act,

---

[6] The locations of certain structures, as yet not constructed, were referenced in the previous Corps authorization. The current proposal would relocate these structures on 'paper' to new locations.
[7] The 'high-grade' ore body that would be mined is located on the eastern side of Lions Head Mountain. Thus, locating the mill on the eastern side would shorten the distance from ore body to portal to mill.

RECORD OF DECISION                                          POA-1990-592-M

Fish and Wildlife Coordination Act, the National Historic Preservation Act, the Marine Mammal Protection Act, the Coastal Zone Management Act, etc.).

There are alternatives available to the applicant, that would allow various activities of the Kensington Gold Project to function without the need for Corps authorization, e.g. use of uplands[8,9]. Additionally, logistics, technological or economic concerns, and/or other Federal or State regulatory findings could affect the practicability of some of the listed alternatives.

The scope of analysis for this action includes not only the impacts, alternatives, and project benefits resulting from the primary proposed actions (two marine docking facilities and a mine tailings disposal site) as identified above, but also the infrastructural items, e.g., the road system, pipelines, and material stockpile sites. Other project-related impacts not within the scope or a product of Corps authorization have been summarized and identified in the direct, secondary and cumulative impact analysis sections of the FSEIS.[10]

**V.   BACKGROUND**:  In July of 1992, the USFS approved a Plan of Operations (POO) for the Kensington Gold Project. The POO called for underground mining; ore processing with on-site cyanidation; a tailings impoundment; marine discharge of process wastewater; and various support facilities, including the use of liquefied petroleum gas for power generation. Comet Beach was the proposed landing site for all supplies and fuel. A man camp was proposed for the workers. The Corps evaluated a DA permit application for the creation of an impoundment in Sherman Creek Valley, and the disposal of mine tailings behind that dam. The Corps completed a public notice, public meetings, public hearings on this proposal, but never issued a DA permit for that facility.

In August 1997, the USFS approved a revised POO for the Kensington Gold Project. The modified plan called for off-site processing of a floatation derived gold concentrate; placement of tailings in a dry tailings facility accessed through a pipeline, with 25% of tailings to be paste (wetted cement mixture) backfilled in the underground workings; diesel fuel would be used for power generation; and the tailing slurry would be piped to a dewatering plant and the reclaimed water returned for reuse. Comet Beach was the proposed landing site for supplies and fuel. A camp was proposed for the workers. The Corps of Engineers received a DA permit application for this new facility design. The Corps completed a public notice, public meetings, and public hearings on this proposal. After a thorough evaluation of the project the Corps of Engineers issued a permit for the dry tailings facility and the support infrastructure.

Between the times the 1997 FSEIS evaluated the Kensington Mine Project and the revised Kensington Mine Project proposal in 2001, Coeur gained control of the Jualin Mine site and this changed the land status and gold resource calculations which resulted in a need to modify the Plan of Operation. The previous POO sited all of the mining and milling operations on west side of Lion's Heads Mountain ridge with access and support facilities located at Comet Beach on Lynn Canal. In the 2004 FSEIS, this scenario is represented by all "A" Alternatives. The 2001 revised POO resulted in the siting of the

---

[8] FSEIS, Section 2.2, Overview of Project Alternatives.
[9] ROD, Section VI. Alternatives, below.
[10] See FSEIS, Section 4.21, Cumulative Effects.

6

RECORD OF DECISION                                    POA-1990-592-M

marine dock facility, the mill, access road, and wet tailings storage facility on the east side of Lion's Heads Mountain ridge. Except for the eventual connection by indirect tunneling for air flow purposes, support of waste rock disposal resulting from adit development (tunneling), and water treatment facilities located on the west side, no alternatives were contemplated or considered for a split operation, e.g. a mill operation on one side of the ridge and tailings disposal on the other. Comet Beach would still be used for support of the west side developments.

In November 2001, Coeur submitted an amendment to its approved 1998 Plan of Operations to the USFS. The amendment modified site access and eliminated the dry tailings facility in favor of placing the tailings into an impoundment in Lower Slate Lake. With the elimination of the dry tailings facility (113 acres in size), two gravel borrow areas (totaling 43 acres), which were located underneath wetlands, were also eliminated. The ore would go through a floatation circuit and the concentrate would be shipped offsite for processing. The proposal included 40% of the tailings being placed underground as a paste backfill. The mine site now includes both the Kensington and Jualin sites. Access to the mine site would be from the Jualin side, and include a marine dock facility in Slate Creek Cove off of Berners Bay. A daily commute for the mine workers was proposed, and the man camp eliminated from the proposal. In December of 2004, the USFS finalized the Supplemental Environmental Impact Statement and issued their Record of Decision for the modified Kensington project. The DA has been a cooperating agency on the SEIS for this project and this ROD constitutes the Corps decision on the latest mine project design proposal.

VI. **ALTERNATIVES CONSIDERED**:

For the reasons discussed below, the Corps has concluded that alternative D with the inclusion of the water treatment plant and water diversion is the least environmentally damaging practicable alternative. The No Action Alternative (listed as Alternative A in the FSEIS) is not environmentally preferable for the reasons discussed in Section VII below. Since Alternative D has the least environmental impact, it is the environmentally preferable alternative. This section discusses two categories of alternatives. The first category is alternatives for a tailings facility with related components. The second is alternative docking destinations.

Determination of the Corps' Jurisdiction. The USFS conducted wetland and vegetation mapping of the Alternative A lands (located in the Sherman Creek and Sweeney Creek watersheds) and published the results in the 1992 EIS[11], for the Kensington Gold Project. The USFS' mapping method was the procedure outlined in the 1989 Federal Manual for Delineating Jurisdictional Wetlands. However, "Since that time, the 1992 Energy and Water Development Appropriations Act mandated the use of the 1987 Corps of Engineers Wetlands Delineation Manual for wetland delineations instead of the Federal Manual for Delineating Jurisdictional Wetlands (Federal Interagency Committee for Wetland Delineation, 1989). The Corps of Engineers has reevaluated the August 1990 wetland delineation performed for the Kensington Project, and as a result has determined that the wetland determinations would remain the same based on the 1987 manual."[12] The Corps conducted an onsite field visit on August 6, 1996, to verify the wetland delineation prior to giving approval.[13]

---

[11] FEIS, Chapter 3, Vegetation, pages 3-45 through 3-48.
[12] FEIS, Chapter 3, Vegetation, pages 3-45 through 3-48.
[13] See Corps' Memorandum dated August 12, 1996, file number POA-1990-592-D.

RECORD OF DECISION                                POA-1990-592-M

safety problems, which is an unacceptable risk to workers. Also, see Section VIII of this ROD for a discussion of cost issues.

Conclusion. The Corps has considered the potential alternative destinations listed above and concluded that the proposed Cascade Point docking facility is the least environmentally damaging practicable alternative destination docking facility. Three docking facilities were considered reasonable in terms of proximity to the Slate Creek Cove dock. The Corps has determined Cascade Point, Echo Cove, and Yankee Cove to be reasonable alternative destination docking facilities in terms of proximity, because they are close enough to the north end of Berners Bay to allow for daily commuting. The other sites discussed above are more distant and would not allow for daily commuting. This is because more than a three-hour commute results in more than a 14 hour workday for the miners, and is unsafe. Reference the memorandum to the file, entitled, "Coeur Miner's Work Day", dated February 14, 2006. Use of the more distant docking facilities would therefore require construction of a residential camp near the mine site, at greater expense and environmental impact.[49] The more distant docking facilities are not practicable destinations and were not carried forward for further review. Use of Yankee Cove would result in more exposure to rough seas in Lynn Canal. The Lynn Canal route (outside Berners Bay) would be dangerous and unavailable for worker transport over extended winter periods. For this reason, the Corps does not consider Yankee Cove a practicable destination port. Therefore, Cascade Point and Echo Cove are the only remaining destinations that are practicable. Of these two practicable alternative destinations, Cascade Point is the least environmentally damaging, and thus is the environmentally preferable alternative. The environmental impacts of each are described above.[50]

VII. **ANALYSIS OF THE LEAST ENVIRONMENTALLY DAMAGING**[51] **PRACTICABLE ALTERNATIVE**[52]

Permanent Losses.[53] All variants of the Dry Tailings Facility would result in the permanent loss of 34 to 113 acres of aquatic habitat (special aquatic site), which consists of forested and scrub-shrub wetlands. The wetland functional values of the Dry Tailings Facility were determined to be medium for wildlife habitat, production export and flood flow alteration, and low for riparian support. Placement of fill material into this area would reduce these wetland functions to zero. Upon final reclamation, the Dry Tailings Facility might regain some habitat value, but no wetland functions. This would not be expected to occur in the short term.

The functional value at the Dry Tailings Facility site as well as at the site of the connecting road system would cease immediately with the initial mechanical land clearing operations. The continued presence of humans and

---

[49] Kensington Gold Project, Corps of Engineers 404(B)(1) Practicability Analysis, Prepared by Coeur, October 2004.
[50] See Attachments B (Section 404(b)(1) Analysis), and G. Also, see Section XI, later in this ROD.
[51] The majority of the wetlands to be impacted would be heavily forested, with some scrub-shrub mix. Other wetlands (Wet Tailings Storage Facility) would be lake oriented (e.g., lacustrine emergent). This was discussed in the FSEIS, and summarized in the Summary of Potential Impacts of Each Alternative, under the headings of Resources, and impacts (by function and value).
[52] See 404(b) (1) Evaluation.
[53] FSEIS, Chapter 3, Section 3.12.3, and Chapter 4, Section 4.12.3.

17

RECORD OF DECISION								POA-1990-592-M

equipment would ensure that the project site was devoid of all habitat values, or 'zero-function'.[54] Once all fill material has been discharged, and after reclamation activities have been completed, and the area has been deserted by humans, other functions (e.g., wildlife habitat) would develop over time. These would be functions specific to an upland, non-forested habitat, and the conversion of wetlands to uplands would be permanent.

Under Alternatives A through A-3, additional waters, including wetlands, would not be reclaimed for all other project component areas. Some permanent loss (up to approximately 70 acres) would remain in addition to the DTF. These areas have similar functions and values to the DTF area, with some higher value areas near Sherman creek.

Construction of the Wet Tailings Storage Facility would result in the permanent loss of 3.44 acres of aquatic habitat (within the footprint of the dam). This includes high value wildlife habitat.

The docking facility at Cascade Point will require permanent filling of approximately 1.3 acres of marine waters. This location has a rocky sand and gravel substrate with some fucus and kelp plant communities. It provides some herring spawning habitat. Some recolonization of this plant life is expected after placement of fill. The loss of this area is small in the context of Berners Bay and is considered a minimal loss of functions and values.

Temporary losses: The FSEIS stated that "For the purposes of this analysis, it is expected that all fish and most other aquatic life (such as macroinvertebrates, periphyton, and zooplankton) in Lower Slate Lake would be lost during operations as a result of this action. Some individuals might survive, but marginal food sources and the lack of suitable habitat as the lake elevation rises appear to be the major limiting factors."[55] Functional habitat values in the Wet Tailings Storage Facility area include high values for wildlife habitat (located primarily along the lake edge), and moderate values for fish habitat, and low values for carbon/detrital export, with low to moderate values for sediment/shoreline stabilization and nutrient cycling.[56,16] The inundation of adjacent forested and scrub-shrub wetlands by the rising lake waters would reduce the wildlife habitat values of those wetlands. There will be a conversion of one aquatic habitat type (wetland) for another (open water).

Lower Slate Lake will be used as the settling pond and disposal site for the tailings generated from the mill. The mill will crush, grind, and float the sulfides out of the material. The sulfides contain the gold and will be processed off site. There will be no cyanide or arsenic added to the milling circuit. The tailings have been analyzed for the ability to generate acid drainage, and to develop metals that could become mobile. The tests described in the FSEIS App. C have shown that the tailings will not be a generator of acid or heavy metals. The tests were performed on both the tailings and the tailings decant water. The components of the tailings decant water that were identified as contaminants include aluminum, chromium,

---

[54] Zero-function is defined here as having no vegetation or water sources present, and having only bare ground and therefore providing no habitat functions such as food sources, cover from predation, nesting sites, etc., all of which is supportive of wildlife and/or fish populations.
[55] See FSEIS, Section 4.9.3, page 4-38, Integrity of Freshwater Habitat.
[56] FSEIS, Sections 3.9 (Aquatic Resources: Freshwater), 3.11 (Wildlife), and 4.9.3 (Effects Common to Alternatives B, C, and D), and 4.11 (Wildlife).

RECORD OF DECISION                                          POA-1990-592-M

pH, and Total Suspended Solids.  The tests have concluded that the pH around the discharge pipe will be toxic to the aquatic environment.  This will dissipate very rapidly.  The TSS will be harmful to the fish in the immediate area of the discharge.  The suspended solids will be discharged to the lower depth portion of the lake.  The aluminum levels from the tailings decant water will rapidly decrease to natural levels as the pH is neutralized.  Aluminum will pose a low risk to aquatic life.  This is because the aluminum concentrates in the tailings is less than that in the lake sediment and the decant water levels are similar to existing concentrations in the lake.  The chromium would be in a reduced form, and because of sub-aqueous disposal and the low oxygen conditions, would not be oxidized to a more toxic form.  There would be a low potential for chromium to be a risk to aquatic life.  Impacts to the aquatic community from physical stress are a greater risk than increased chemical concentrations.  Aquatic life will die primarily from being covered with tailings and from the TSS.

The lake will recover over time.  The tailings will be placed at a depth to prevent remobilization after closure from wave action.  The tailings will be under water and out of the energy of wind driven waves.  Post closure water concentrations of chromium and aluminum would pose a minimal risk to aquatic life.  Capping of the tailings will assist in re-establishing lake bottom habitat.  It is expected that the lake eventually will provide at least equivalent productivity as the current conditions of Lower Slate Lake.  The reclamation of the lake will result in more emergent wetlands/vegetated shallows with moderate values for fish habitat, nutrient recycling, carbon/detrital export and sediment/toxicant retention, and high values for wildlife habitat.  This functioning emergent wetland/vegetated shallows lake complex, including 15 acres of emergent wetland/vegetated shallows as part of a 62 acre lake, is more valuable to the aquatic ecosystem than a permanently filled wetland (DTF) that has lost all aquatic functions and values.

The Federal and State resource agencies have conditioned the respective permits to require habitat and mortality monitoring activities in the Wet Tailings Storage Facility.  Collected information would be used to determine the effects of the discharge of tailings on the lake habitat.  The surface of the lake waters should rise, by project closure, to its maximum height above the lake's original surface, and the lake waters would eventually inundate approximately 39 acres of adjacent forested and scrub-shrub wetland habitats[57], converting these to a deepwater habitat.  This would constitute a conversion of one type of water of the U.S. to another: converting adjacent forested and/or scrub-shrub wetlands to non-vegetated waters.  These non-vegetated waters would convert, by either natural or artificial[58] means (active lake restoration), to emergent wetlands/vegetated shallows (special aquatic sites).  The anticipated end result would be a lake of approximately 62 acres in area (47 acres of deepwater habitat and 15 acres of emergent wetlands/vegetated shallows along the fringe).  This conversion process would continue during and after the life of the project.  The lake and its emergent fringe wetlands/vegetated shallows would provide potential fish habitat after final lake restoration had been completed and would include food sources,

---

[57] The applicant intends to clear these land areas mechanically prior to inundation of the lake waters. Otherwise, the vegetation would inhibit movement of the raft carrying the slurry line, and preventing an even deposition of material onto the lake bottom.

[58] The Kensington Gold Project's Mining Plan of Operations contains a Reclamation Appendix, which includes the Lake Restoration Plan. The DA recognizes that this Restoration Plan is a conceptual plan, and that future revisions will be evaluated and approved as appropriate. Capping of the mine tailings in the impoundment is required by ADEC. The final reclamation plan will assure that the latest methods are used to maximize success.

19

RECORD OF DECISION                                POA-1990-592-M

protection from predation, nesting capabilities, etc., whereas the lake's open waters would provide an open space for fish and other motile organisms.[59] The FSEIS concluded that after closure Lower Slate Lake could be restored to at least equivalent aquatic habitat.

For all alternatives, wetlands on which other project components (e.g., connecting roadways, borrow sites, building and material storage fill pads, etc.) will be located, all have high values for wildlife habitat, and carbon/detrital export, with moderate values for sediment and/or nutrient cycling.[60] The temporary discharge of fill into the forested and scrub-shrub wetlands for the construction and operations of these structures would result in reduced wildlife habitat values during the life of the project. However, at project closure (and completion of all required reclamation) there will be moderate to high (when fully recovered) functions for wildlife habitat in these reclaimed areas.

The proposed marine docking facility at Slate Creek Cove has low to moderate fish habitat values. The placement of structures (e.g., piles and floats) and the discharge of fill into the intertidal waters for construction of an abutment for a docking facility would result in short term increases in suspended sediments in the water in the areas adjacent to the work activities. However, because the nearshore sediments are primarily coarse materials and cobbles, these materials would settle rapidly to the bottom, thus decreasing the magnitude and duration of the suspended sediment concentrations. In addition, the site is subject to the ebb and flow of the tide, and therefore, this added component of the marine tidal system would ensure that the subtidal and intertidal habitat values of the Cove would not be adversely impacted.[61] Reclamation of the site would result in removing all structures, and excavating the majority of the fill from below the High Tide Line, and flattening the rest to form a rocky subtidal substrate, all in conformance with the reclamation plan.

**Least Environmentally Damaging Practicable Alternative Acreage Calculations.**[62]
(Note: The numbers below do not fully reflect the Reclamation and Closure Plan for the Kensington Gold Project, since the Reclamation Plan is a conceptual plan, and future revisions will be evaluated and approved by the Corps as appropriate.)

Based on information provided in the FSEIS, the application form and other documentation in the Corps' case files, and in the referenced documents (Attachment C), and calculating the acreages of impact[63] to waters of the U.S. by project closure, Alternatives B, C, and D have the least permanent impacts (3.44 acres) to the aquatic environment over the anticipated life of the project. This conclusion remains the same when adding the impacts of the 1.3 acres of fill material for the Cascade Point breakwater for Alternatives B and D (not included in the net loss column below).

|  | **ALTERNATIVES** | | | | | | |
|---|---|---|---|---|---|---|---|
|  | **A** | **A1** | **A2** | **A3** | **B** | **C** | **D** |
| Initial Impact To Waters of the U.S. | 268.1 | 171.2 | 187 | 207 | 97.2 | 118.4 | 98.6 |

---

[59] FSEIS, Sections 4.9 (Aquatic Resources: Freshwater) and 4.9.3 (Effects Common to Alternatives B, C, and D).
[60] See FSEIS, Sections 3.9 (Aquatic Resources: Freshwater) and 3.11 (Wildlife).
[61] FSEIS, Section 4.10.3, Effects of Alternatives B, C, and D (Aquatic Resources: Marine).
[62] Data taken from the FSEIS.
[63] See Least Damaging Acreage Calculations.

20

RECORD OF DECISION                                          POA-1990-592-M

(Acres)
**NET LOSS (Acres)**                    ·        164   108.2   124   144   3.44   3.44   3.44
After Reclamation

See Section VI, above, for a detailed description of each alternative.

In Alternatives A through A3, the filling of the Dry Tailings Facility area would all result in the permanent conversion of wetlands to uplands. Further as explained in Section VI above and Section VIII below, these alternatives are not practicable. Permanent loss of these wetlands is an adverse environmental impact. In Alternatives B, C, and D, construction of the Wet Tailings Storage Facility would result in the conversion of wetlands to a deepwater habitat (due to the rising water level), the edges or shallow portions of which will eventually become emergent wetlands/vegetated shallows.

These conversions of one type of water of the U.S. to another are not a significant permanent adverse impact to the aquatic environment, and the temporal losses discussed above would not result in significant permanent adverse impacts to the aquatic environment. Our evaluation places special emphasis on the persistence and permanence of the effects described in this ROD and the FSEIS [see 40 CFR 230.10(c)]. The permanent loss of wetland functions and values in the Alternative A variants is more damaging and outweighs the temporary losses to the lake and its associated functions and values.

See Section XI, Subpart E, below, for a further discussion of the information provided in the acreage calculations. The Corps concludes that Alternative D is the least environmentally damaging practicable alternative because the impacts to the aquatic ecosystem are less harmful than the impacts of the Alternative A variants, which include permanent wetland losses, and it incorporates a water treatment system to ensure water quality is met.

VIII.   **PROJECT COST CALCULATIONS SUMMARY**

We previously determined that the Alternative A variants were practicable alternatives. This was based on an assumption that since Alternative A had been permitted in 1998, it was still practicable to Coeur. We have re-examined that determination and, for the reasons explained below, now determine that neither Alternative A, nor any of its variants, is practicable.

The applicant submitted an "Alternative Material Disposal Sites Cost Analysis"[64] with an expense breakdown for each of the proposed preferred actions, as well as for each of the respective alternatives. This analysis, which included logistics, technology and cost considerations, demonstrated to the Corps that the applicant did not consider Alternative A to be a practicable alternative. Also, the Alaska Department of Natural Resources (ADNR) analyzed data provided by the applicant, and concluded[65], "Therefore, we do not consider Alternative A to be a 'practicable' or 'reasonable' alternative from the standpoint of cost or economics." The Corps reviewed and reevaluated the ADNR analysis documentation and other relevant

---

[64] Coeur Letter to the Corps, dated November 23, 2004.
[65] Letter dated December 1, 2004, from the State of Alaska's Department of Natural Resources, Office of Project Management and Permitting, and addressed to David Cox of the USFS.

21

RECORD OF DECISION                                          POA-1990-592-M

Commuting Ferry vs. Personnel Camp

A daily commuting ferry as described in Section VI of this ROD eliminates the need for an operational personnel camp. Coeur explained in its October 2004 Practicability Analysis that the annual cost to transport personnel to a camp is $5.296 million, compared to $1.49 million for Berners Bay access. Operating costs for a camp are estimated at more than $3 million annually. Operating a camp also requires substantial on-site fuel transportation and storage. It is our determination that Coeur's economic analysis supports the conclusion that a personnel camp is not practicable for cost reasons.

IX. **FINDINGS**

1. OTHER REQUIRED AUTHORIZATIONS:

   A. The Alaska Department of Environmental Conservation (ADEC) has issued a Certificate of Reasonable Assurance, dated May 6, 2005, with 15 conditions. Conditions on this Certification are listed on Attachment D of the ROD.

      The Certificate also stated, with reference to the proposed disposal of processed mine tailings into an alpine lake, that "The Tailing Disposal Facility (TDF) proposed to be constructed in Slate Creek will be considered a 'disposal site' under federal law and policy (see 40 CFR § 230.3(i)), and is hereby authorized as a 'treatment work' under State law (see AS 46.03.900(33)). Thus, State of Alaska water quality standards will not have to be met within that area. 18 AAC 70.010(c). Water discharged from the TDF shall meet NPDES permit limitations, and the receiving water, East Fork Slate Creek, must meet State water quality standards."

   B. The Alaska Department of Natural Resources, Office of Project Management and Permitting, Alaska Coastal Management Program, has issued a Final Consistency Response (Concurrence), dated April 25, 2005.

   C. The USEPA, Region 10, has issued an Authorization to Discharge under the National Pollutant Discharge Elimination System (NPDES Permit), dated September 1, 2005.

   D. See Attachment G for Cascade Point Docking Facility findings.

2. COMMENTS RECEIVED:

   A. Coeur prepared several document summaries, each addressing comments received from Federal and State Agencies, to the Corps Public Notice, dated June 21, 2004, and to the Public Hearings, which were held by the USEPA in accordance with the USEPA's National Pollutant Discharge Elimination System (NPDES) regulations. The public hearings were held on July 26, 2004, in Juneau, Alaska, and on July 27, 2004, in Haines, Alaska (see case file).

   B. FEDERAL AGENCIES

      **US ENVIRONMENTAL PROTECTION AGENCY [USEPA].**

RECORD OF DECISION                                   POA-1990-592-M

Comment dated August 20, 2004. Also, see Coeur's Response #18 (Attachment C). USEPA's comment letter, with three attachments, pertained to Goldbelt's proposed marine terminal at Cascade Point[70], and to the proposed changes to the Kensington Mine's Plan of Operations, which includes a marine terminal at Slate Creek Cove and a discharge into Lower Slate Lake. The USEPA's comments respective to Coeur's project centered on the 404(b)(1) Guidelines, and after several pages of instructive discussion relative to 40 CFR 230.10, the USEPA "...rated Alternatives A and A1[71] as 'Lack of Objection' and Alternatives B and C as 'Environmental Objections'." The USEPA concluded the cover letter with a request "...to work collaboratively with you and the State to achieve a satisfactory outcome."

**USEPA ISSUE #1.** "...the wetlands analysis in the DSEIS is biased due to the lack of accurate and detailed wetlands mapping on the Kensington side of the project area. Therefore, there is insufficient information to make a reasonable judgment about the comparative effects of Alternatives A/A1 and Alternatives B/C on wetlands."

*CORPS RESPONSE TO USEPA: The wetlands were properly delineated in accordance with the 1987 Manual on both sides of Lion's Heads Mountain and thus there is adequate information to analyze the potential impacts upon wetlands. See the discussion in Section VI (Alternatives Considered) of this ROD.*

**USEPA ISSUE #2.** "With regard to the ecological risk of the tailings disposal options, the DTF [Dry Tailing Facility] (Alternatives A/A1) minimizes the exposure pathways by lining the dry stack cells, capping the dewatered tailings, treating DTF runoff in a storm water detention and sediment pond, and discharging a very small volume of treated water into a small creek devoid of fish. In contrast, the Lower Slate Lake tailings impoundment (Alternatives B/C) directly exposes the entire lake to the tailings, which have exhibited considerable toxicity (per the failed amphipod bioassay)."

*CORPS RESPONSE TO USEPA: Lower Slate Lake is the least environmentally damaging practicable alternative location for the tailings disposal. The tailings will be capped at the cessation of operation unless information is presented to the contrary. See ADEC condition #15. Testing of the tailings and water column of the impoundment will be completed quarterly to insure projected water quality modeling is accurate. See ADEC condition #8. In accordance with 33 U.S.C. 1341(d), all 401 conditions are incorporated into the Department of the Army permit.*
*See Section XI of this ROD, Subpart B, Evaluation and Testing, and Constraints.*

**USEPA ISSUE #3.** "Humpback whales are listed as an endangered species under the Endangered Species Act, and Steller sea lions are listed as a threatened species (although populations of both species appear to be increasing in Southeast Alaska."

---

[70] See Permit Application POA-1997-245-M
[71] Note that Alternative A1 here is the same as Alternative A2 in this ROD.

26

RECORD OF DECISION                                          POA-1990-592-M

*CORPS RESPONSE TO USEPA: See the discussion in Section IX.2.B. ENDANGERED SPECIES ACT (ESA) CONSULTATION PROCESS, in this ROD.*

**USEPA ISSUE #4.** "The DSEIS also documents the potential impacts that each alternative may have on recreation, including noise, wakes, lights, safety issues, and visual impacts."

*CORPS RESPONSE TO USEPA: See the FSEIS, Sections 4.13 (Land Use and Recreation), 4.14 (Visual Resources), 4.15 (Socioeconomics), 4.18 (Noise), and 4.21 (Cumulative Effects).*

**USEPA ISSUE #5.** "After the federal agencies published the DSEIS, but before EPA approved the draft NPDES permit, EPA determined that the proposed effluent limits for some of the above pollutants could not be made without additional treatment. The applicant then revised the NPDES permit application to include a reverse osmosis (RO) wastewater treatment system and a pipeline diversion of Upper Slate Lake flows around Lower Slate Lake."

*CORPS RESPONSE TO USEPA: Coeur has agreed to construct a Reverse Osmosis, or water treatment facility, to aid in the removal of pollutants from water discharged from Lower Slate Lake, as well as construction of a pipeline diversion (of waters around the impoundment and downstream to the dam spillway). These components are part of Alternative D.*

**USEPA ISSUE #6.** "Due to the demonstrated toxicity of the tailings samples in the bioassay tests, and the limited application of other standard test on contaminant mobility and pathways, EPA believes that the tailings slurry is a carrier of contaminants (as defined in the Guidelines at 40 CFR 230.3)." (per the failed amphipod bioassay).

*CORPS RESPONSE TO USEPA: There is no conclusive test data showing that toxic substances in the tailings caused amphipod mortality. The poor survival of the amphipods in the test cell may be attributed to smothering, the nature of how the material was placed, or the floatation agent(s) used in the bulk sample. See FSEIS App. C and the discussion in Section VII above. Tests upon the tailings have conclusively shown that the tailings will not generate an acid discharge or result in a metals leachate being generated. We agree that all fish and most aquatic life would be lost during operation. (FSEIS 4.9.3). The FSEIS concluded that after closure Lower Slate Lake could be restored to at least equivalent aquatic habitat (see FSEIS 4.9.7). Capping of the impoundment tailings was added as a permit condition by ADEC to isolate any potential contaminants from the water column and to provide habitat for re-colonization in the storage facility. The State of Alaska issued a 401 Certificate of Reasonable Assurance for Alternative D. ADEC also stated that "the available information suggests that the toxicity risks associated with the tailings will be low during and after mining operations."[72] Conditions were incorporated by ADEC to ensure that no potential contaminants would leave the disposal site condition #15. ADEC included a requirement for testing of the material on a quarterly basis condition #8. In addition the Corps agrees to add the following condition to the permit #10. The waters and the discharged processed mine tailing sediments, located in Lower Slate Lake, shall be tested, at lake closure or just prior to cessation of discharges of mine wastes into Lower Slate Lake, in accordance with appropriate testing requirements (at the*

27

RECORD OF DECISION                                          POA-1990-592-M

Mitigation also includes funding by Coeur for the monitoring activities in Berners Bay. These activities will be conducted by the NMFS and the Alaska Department of Fish and Game.

Coeur has, in part as mitigation for unavoidable impacts to waters of the U.S., and in part as a result of agreements reached during the Endangered Species consultation process with the USFS and Coeur, agreed to provide funding to the NMFS and to the Alaska Department of Fish and Game, with the intent that these agencies will conduct the following monitoring activities in Berners Bay:

- Hydrocarbon monitoring in water, sediment, and mussel tissue. This would be an annual program with a 6-year commitment of monitoring.

- Annual aerial surveys of herring spawning monitoring in Berners Bay. This is an annual commitment with up to 10 flights per year.

- A trained observer will conduct marine mammal and bird surveys during ferry commutes across Berners Bay during the eulachon run.

The Corps has considered each of the mitigation items listed above and has concluded that all of these taken as a group satisfy the requirement of mitigating for the unavoidable impacts of the project.

**XII. Compliance with Environmental Requirements:** The issuance of permits for the proposed project is in compliance with applicable environmental requirements. The development of the DSEIS and the FSEIS was accomplished in accordance with the National Environmental Policy Act of 1969, as amended. Recommendations of the USFWS prepared pursuant to the Fish and Wildlife Coordination Act of 1958, as amended, have been fully considered in the permit decision. Coordination with the NMFS pursuant to Section 7 of the Endangered Species Act of 1973, as amended, has been completed. The recommendations of the USEPA have been fully considered. An evaluation of the discharge of fill material and dredged fill material as required by Section 404(b)(1) of the Clean Water Act, 40 CFR 230, was completed and is attached to this document[137]. The discharge complies with the guidelines, with the inclusion of the appropriate and practicable conditions listed in Attachment D to minimize pollution and the adverse effects to the affected ecosystem. I find that issuance of permits as described above is in conformance with these guidelines. The Alaska Department of Natural Resources has issued a Coastal Zone Management Consistency Determination, and ADEC has issued a Certificate of Reasonable Assurance, with conditions. Both of these documents will be incorporated into and become part of the Corps permits.

**XIII. Section 176(c) of the Clean Air Act General Conformity Rule Review.** The proposed project has been analyzed for conformity applicability pursuant to regulations implementing Section 176(c) of the Clean Air Act. It has been shown that the activities proposed under this permit will not exceed *de minimis* levels of direct emissions of a criteria pollutant or its precursors and are exempted by 40 CFR Part 93.153. This no effect determination has been coordinated with the U.S. Environmental Protection Agency and the Alaska Department of Environmental Conservation. Any later indirect emissions are

---

[137] See Attachment B and G.

RECORD OF DECISION                                    POA-1990-592-M

generally not within the Corps continuing program responsibility and
generally cannot be practicably controlled by the Corps. For these reasons a
conformity determination is not required for this individual permit.

**XIV. Determination.** I find that the issuance of the Corps permits, as
described by regulations published in 33 CFR Parts 320 through 330, with the
scope of work as described in this document is based on a thorough analysis
and evaluation of all issues set forth in this ROD. There are no less
environmentally damaging, practicable alternatives available to the
applicants that will achieve the purposes for which the work is being
proposed; the proposed work is deemed to comply with established Federal,
State and local laws, regulations, and codes; the issuance of these permits
is consistent with National Policy, statutes, and administrative directives;
and on balance, issuance of Corps permits to Coeur and Goldbelt for the
proposed work is not contrary to the public interest. As explained in
Subpart H, above, all practicable means to avoid and/or minimize
environmental harm from the selected, permitted alternatives have been
adopted and required by terms and conditions of these permits.

29 Mar 2006
Date:                                    Timothy J. Gallagher
                                         Colonel, Corps of Engineers
                                         District Engineer