David C. Crosby
David C. Crosby, P.C.
5280 Thane Road
Juneau, AK 99801-7717
Telephone: (907) 586-6262
Facsimile: (907) 586-5959
E-mail: crosbylaw@gci.net

Attorney for Intervenor-Defendant
Goldbelt, Incorporated

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA AT JUNEAU

| | |
|---|---|
| SOUTHEAST ALASKA CONSERVATION COUNCIL, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES ARMY CORPS OF ENGINEERS; et al., <br><br> Defendants, and <br><br> COEUR ALASKA, INC., a Delaware Corporation; STATE OF ALASKA, and GOLDBELT INCORPORATED, <br><br> Defendants-Intervenors. | Case No. J05-0012 CV (JKS) |

INTERVENOR-DEFENDANT GOLDBELT'S MEMORANDUM
IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

I.  INTRODUCTION

The permits issued to Coeur Alaska, Inc. ("Coeur") for construction and operation of the Kensington Gold Mine are the result of more than two decades of environmental studies and administrative reviews by federal, state and local agencies. The bottom line of this protracted and expensive process is that the permitted mine configuration -- which includes storage of mine tailings in Lower Slate Lake -- is not only the environmentally preferable method of operation,[1] but the only one that is practicable.[2]

Plaintiffs have challenged the permit issued to Coeur by the United States Army Corps of Engineers ("the Corps") for construction and operation of the Lower Slate Lake tailings storage facility ("TSF"). Because the tailings storage facility is critical to operation of the mine, plaintiffs argue that the entire Plan of Operations must fall if the Corps permit for the

---

[1] Revised Department of the Army Record of Decision & Permit Evaluation, Coeur Alaska, Inc. and Goldbelt, Inc., POA -1990-592-M and POA-1997-245-N (March 29, 2006) ("Kensington USACOE Record"), Exhibit A1 at 21, 53, ER Vol. 1, Tab 2, pp. 24, 55-56.

**Citations are to the electronic record ("ER") by [PDF] volume, tab number, and Record page.**

[2] Kensington USACOE Record, Exhibit A1 at 21-22, ER Vol. 1, Tab 2, pp. 24-25, 55-56.

2

TSF is set aside. And since the purpose of the permit issued by the Corps for construction of a marine terminal on lands owned by Goldbelt, Inc. ("Goldbelt") is for transportation of mine workers from the end of the Juneau road system at Cascade Point across Berners Bay to the mine site, plaintiffs insist that the Court should set aside Goldbelt's permit, as well. Plaintiffs have not asserted any additional legal basis for setting aside Goldbelt's Cascade Point marine terminal permit

Thus, plaintiffs' challenge to Goldbelt's permit hinges entirely on the success of their efforts to set aside Coeur's permit to construct and operate the Lower Slate Lake tailings storage facility and the Plan of Operations.[3] The briefs of the federal defendants, Coeur and the State of Alaska clearly set out the reasons why the permitted storage of tailings in Lower Slate Lake is environmentally sound and consistent with the Clean Water Act. Goldbelt will limit its briefing to (1) plaintiffs unsupported assertion that construction of a marine terminal at Cascade Point and ferrying of mine workers from there to the mine site would have adverse impacts on Berners Bay, and (2) the economic and other public interest factors that weigh against granting equitable injunctive relief to plaintiffs.

---

[3]   Both permits were issued pursuant to Section 404 of the Clean Water Act, 33 U.S.C. § 1344.

II.  BACKGROUND

All northern Southeast Alaska, including Berners Bay, at one time belonged to the Tlingit Indians -- taken from them in flagrant disregard of their aboriginal rights by non-Native settlers and the United States government. By the time Congress addressed this historic injustice in the Alaska Native Claims Settlement Act ("ANCSA") in 1971, 43 U.S.C. § § 1601, et seq., the Tlingit were a dispossessed "minority" in their own land. In the meantime, Juneau had become a prosperous, thriving government center. Many members of the new, non-Native majority quickly became more concerned with preserving their privileged access to undeveloped federal lands than fairness to Juneau's original inhabitants.

Because most of the developable land in the immediate vicinity of Juneau was already spoken for, the Juneau Tlingits -- now organized as "Goldbelt, Inc.," under Section 14(h)(3) of ANCSA, 43 U.S.C. § 1613(h)(3) -- were forced to make their land selections elsewhere.[4] They chose Admiralty Island, portions of which had been withdrawn by the Secretary of the Interior for their benefit. The Sierra Club, one of the appellants here, promptly challenged the legality of the Admiralty Island withdrawals, alleging that logging or other development by Goldbelt would compromise

---

[4]    Declaration of Joe Kahklen, ("Kahklen decl."), Exhibit B ¶ 6

the national monument. To avoid the interminable delays and expense of litigation, Goldbelt agreed to a voluntary exchange of its selection rights on Admiralty Island for other, environmentally less sensitive, lands. Among these lands were those at Cascade Point in Berners Bay.[5]

The exchange agreement was enacted into law as Section 506(b) of the Alaska National Interest Lands Conservation Act, Pub.L. 96-487, 94 Stat. 2371, 2409 (December 2, 1980). The lands Congress ordered the Secretary to convey to Goldbelt were in lieu of Goldbelt's original ANCSA entitlement. Congress fully expected that these lands, given as compensation for extinguishment of the Tlingit's aboriginal title, should be used for economic development purposes.[6] See, e.g., City of Angoon v. Hodel, 803 F.2d 1016, 1019 (9th Cir.1986) cert. denied 484 U.S. 870 (1987), citing City of Angoon v. Marsh, 749 F.2d 1413, 1418 (9th Cir. 1985) ("It was 'inconceivable that Congress would have extinguished their aboriginal

---

[5]   Kahklen decl., Exhibit B ¶ 7.

[6]   Congress did not wish the benefits of the exchange to become mired in yet another round of environmental challenges to Goldbelt's new land selections. Accordingly, it exempted the conveyance of lands at Cascade Point to Goldbelt from the provisions of the National Environmental Policy Act ("NEPA"). ANILCA § 506(b), 94 Stat. 2409.

claims and insured their economic well being by forbidding the only real economic use of the lands [i.e., logging] so conveyed.'").

Notwithstanding Congress' intent that Goldbelt receive lands in Berners Bay for economic development purposes, or the fact that they chased Goldbelt off of Admiralty Island and into Berners Bay to begin with, the Sierra Club and other environmental groups continued to oppose every effort by Goldbelt to put their Berners Bay lands to productive use – or, indeed, even to have reasonable access to these lands for administrative purposes.[7]

The record reflects Goldbelt's consistent attempts to put its lands at Cascade Point to productive use. It also reflects the plaintiffs' equally persistent efforts to relegate the lands conveyed to Goldbelt by the United States for development purposes to the status of public lands and to maintain Berners Bay as a kayaking reserve for the privileged few.

For more than a decade, Goldbelt has had a master plan for development of its Cascade Point lands. The linchpin of that plan is a dock

---

[7]   In 1998, having successfully opposed Goldbelt's first attempt to permit a dock at Cascade Point, SEACC and the Sierra Club appealed a Forest Services right of way permit granting Goldbelt access to its Cascade Point lands for administrative purposes. That appeal was rejected, and in 2005 a gravel road was finally completed connecting Cascade Point to the Juneau Road system. Kahklen decl., Exhibit B ¶¶ 9,10.

at Cascade Point whose prospective uses include support of the Kensington mine, as well as additional ferry, tour boat, and fishing industry support activities.[8]

An effort to permit the dock in 1998 was opposed by SEACC and failed.[9] In 2003, Goldbelt applied to the City and Borough of Juneau for a permit to construct a multi-purpose dock. Because Goldbelt's immediate plans called for using the dock to ferry workers to the Kensington mine, however, the Juneau Planning Commission limited Goldbelt's permit to mine shuttle purposes.[10]

Goldbelt's application to the Corps for a section 404 permit to construct a marine terminal at Cascade Point likewise contemplated Kensington mine ferry shuttle and other prospective uses.[11] Because the initial use of the facility will be for mine shuttle purposes, the Corps of Engineers consolidated the environmental review of Goldbelt's dock

---

[8] Cascade Point 404(b)(1) Evaluation and Public Interest Review, (March 29, 2006) ("Cascade Point USACOE Record"), Exhibit A2 at 3, ER Vol. 1, Tab 2, p. 187.

[9] Cascade Point USACOE Record, Exhibit A2 at 7, ER Vol. 1, Tab 2, p. 191; Kahklen decl., Exhibit B ¶ 9.

[10] Cascade Point USACOE Record, Exhibit A2 at 4, ER Vol. 1, Tab 2, p. 188 (referencing Juneau conditional use permit).

[11] Cascade Point USACOE Record, Exhibit A2 at 2, 4-5, ER Vol. 1, Tab 2, pp. 186-189.

application with Coeur's application for a dock, tailings facility and other mine development.  The Corps ultimately concluded that without the Kensington mine, the Cascade Point dock would not be constructed in the foreseeable future, and limited the purpose of the dock project authorized by the Corps permit to a mine ferry shuttle.[12]

The Kensington Gold Project Supplemental Environmental Impact Statement (December 2004) ("SEIS")[13] carefully considered all potential impacts associated with construction and operation of the Cascade Point marine terminal.[14]  In addition, an Essential Fish Habitat study was prepared,[15] and both the Forest Service and the Corps engaged in lengthy formal consultations with the National Marine Fisheries Service, which resulted in a Biological Opinion and a finding that the dock would not jeopardize the continued existence or recovery of endangered humpback

---

[12]   Cascade Point USACOE Record, Exhibit A2 at 5, ER Vol. 1, Tab 2, p. 189.

[13]   Relevant portions are excerpted in Exhibit A3, ER Vol. 8, Tab 107.

[14]   See, e.g., Exhibit A3, SEIS Vol. 1, Sections 3.10 and 4.10, ER Vol. 8, Tab 107, pp. 3461, et seq., 3582 et seq.

[15]   SEIS Vol. 2, Appendix B, Exhibit A4, ER Vol. 9, Tab 108, pp. 3876, et seq.

whales or threatened Steller's sea lions in Berners Bay.[16] The State of Alaska certified that the dock will not violate Alaska water quality standards,[17] and also found that the facility will be consistent with Alaska's Coastal Zone Management Act.[18] Plaintiffs have not challenged either the adequacy or the findings of <u>any</u> of these governmental reviews of the Cascade Point marine terminal.

In addition to the foregoing, the Corps of Engineers conducted its own Section 404(b)(1) Evaluation and Public Interest Review. After summarizing the exhaustive environmental studies, the numerous mitigating conditions imposed on construction and operation of the dock, and after responding to agency and public comments, the Corps found that construction of the marine terminal will not adversely impact:

    (a) fish, shellfish, wildlife and/or special aquatic sites;

    (b) life stages of aquatic life and/or wildlife;

---

[16] Cascade Point USACOE Record, Exhibit A2 at 18-25, ER Vol. 1, Tab 2, pp. 202-209 (discussing conditions proposed by NMFS).

[17] Cascade Point USACOE Record, Exhibit A2 at 31-33, ER Vol. 1, Tab 2, pp. 215-217 (discussing conditions of Alaska Certificate of Reasonable Assurance incorporated into permit).

[18] Final Consistency Response – Concurrence, Exhibit A5, ER Vol. 1, Tab 2, pp. 174-183.

(c) diversity, productivity, and stability of aquatic life and other wildlife; or

(d) recreational, aesthetic, and/or economic values.

Cascade Point USACOE Record, Exhibit A2 at 32-33, ER Vol. 1, Tab 2, pp. 216-217.

Neither the adequacy of the Corps' analysis nor any of its findings has been challenged by the plaintiffs.

III. THERE IS NO SUPPORT IN THE RECORD FOR PLAINTIFFS' CLAIMS THAT THE ENVIRONMENT OF BERNERS BAY WILL BE HARMED IF THE CASCADE POINT DOCK IS CONSTRUCTED FOR MINE SHUTTLE PURPOSES

On page 44 of their brief, plaintiffs quote several passages from the SEIS regarding the ecological values of Berners Bay, which no one would generally dispute. But aside from a vague reference to "disruption of marine mammals and fish," they have not indicated what harm -- irreparable or otherwise -- will result from construction of a dock at Cascade Point or 3-5 daily shuttle trips across the mouth of Berners Bay in an area where substantial private and commercial marine activity already occurs without identifiable adverse consequences.

Plaintiffs cite the SEIS for their conclusory assertion that vessel traffic and noise will disrupt marine mammals and fish. In fact, the SEIS generally

10

states only that the terminal and shuttle operations <u>could</u> have impacts, not that they <u>will</u> have impacts.[19] More importantly, plaintiffs do not inform the Court that the SEIS concludes that the numerous mitigating conditions imposed on the project by various federal, state and local permitting authorities will minimize even these hypothetical intrusions. For example:

> In Summary, the project operations <u>could</u> cause effects on individual marine mammals due to noise and/or physical disturbance. As documented in the BA/BE [Biological Assessment/Biological Evaluation, SEIS Vol. 2, Appendix J], the mitigation measures expected to be included in federal, state, and local permits will minimize these effects and no adverse impacts are predicted.

Exhibit A3, SEIS Vol. 1 at 4-54, ER Vol. 8, Tab 107, p. 3591 (emphasis added).

Objections to construction of the dock focused on the supposed impacts to herring spawning habitat. Although area herring stocks have been depressed in recent years, there is no evidence to link declines to the lack of spawning habitat along the largely undeveloped shores of Northern Lynn Canal.[20] Plaintiffs further misrepresent the record when they state at

---

[19] SEIS, Exhibit A3, Section 4.10, ER Vol. 8, Tab 107, p. 3582, <u>et seq</u>.

[20] Exhibit A3, SEIS Vol. 1 at 3-45, ER Vol. 8, Tab 107, p. 3472 (reasons for decline "unclear," listing over fishing and several other factors as possible causes).

11

page 44 of their brief that "Cascade Point is one of the most frequent [herring] spawning habitat locations in the bay." In fact, the record establishes that Cascade Point is only marginal herring spawning habitat. Spawning occurred there only twice in the eleven years preceding the SEIS. SEIS Vol. 2, Appendix J, Biological Assessment/Biological Evaluation ("BA/BE"), Appendix E thereto, "Lynn Canal Pacific Herring Stock, Table E-1.[21] The marine terminal would affect approximately 350 feet of shoreline habitat on the periphery of a ten-mile stretch of the eastern shore of Berners Bay used for herring spawning in the last 30 years -- or about 6/10 of a percent of the area historically used for spawning.[22]

Numerous conditions were added by the Corps and other environmental agencies to avoid disruption of herring spawning, from a prohibition of in water construction during herring spawning season[23] to restrictions on fueling and operations if herring are observed spawning in proximity to the dock.[24] These conditions mitigate the already low

---

[21]   Exhibit A6, ER Vol. 9, Tab 108, Appendix J, p. 4289.

[22]   Exhibit A3, SEIS Vol. 1 at 4-57, ER Vol. 8, Tab 107, p. 3594.

[23]   Cascade Point USACOE Record, Exhibit A2 at 35, special condition 15, ER Vol. 1, Tab 2, p. 219.

[24]   Cascade Point USACOE Record, Exhibit A2 at 27 citing City and Borough of Juneau Conditional Use Permit condition 17, ER Vol. 1, Tab 2, p. 211.

probability that construction of the dock might impact the Berners Bay herring stock.

Objections to mine worker ferry operations across the mouth of Berners Bay focused on the supposed disruption of marine mammals, and in particular humpback whales and Steller sea lions. Following formal consultation with the Forest Service and the Corps, the National Marine Fisheries Service issued a Biological Opinion concluding that construction of the Cascade Point dock and operation of the shuttle service will not jeopardize the continued existence or recovery of either species. Although the opinion expressed some concern about possible effects of mine shuttle operations on individual animals,[25] the record reflects that numerous privately owned vessels already operate in the area during the spring and summer periods when marine mammals are most likely to be present in substantial numbers.[26] Current boating use in Berners Bay includes

---

[25]   NMFS recommended a number of conservation measures to reduce the likelihood of adverse impacts on individual animals. Most of these recommendations were adopted by the Corps. See Cascade Point USACOE Record, Exhibit A2 at 18-25, ER Vol. 1, Tab 2, pp. 202-209.

[26]   Endangered Species Act – Section 7 Consultation, Biological Opinion (March 2005), Exhibit A7 at 74-75, ER Vol. 6, Tab 37, pp. 2571-2573.

motorboats, airboats, and jet-skis, as well as kayaks and other non-motorized craft.[27]

Indeed, the Audubon Society, which is a member of plaintiff SEACC, conducts guided boat tours of Berners Bay during the peak period when marine mammals are most likely to be in the Bay.[28] Because these boats, and the numerous "eco-tour" operators that have sprung up in recent years, operate out of existing docks, their activities are totally unregulated. The goal of these commercial operators is actively to <u>seek</u> out close encounters with marine mammals. In sharp contrast, Goldbelt's mine shuttle vessels will be required to <u>avoid</u> encounters with marine mammals. As a result of conditions adopted during the permitting processes, these vessels will carry a NMFS approved observer to assist in route planning, and to take other

---

[27]   FSEIS Vol. 1 at 3-77 to 3-79, ER Vol. 8, Tab 107, pp. 3504-3506.

[28]   The presence of marine mammals in Berners Bay correlates strongly with the spring eulachon run and, to a lesser extent, herring spawning. These events take place over a two to three week period between mid-March and early June. Exhibit A3, SEIS Vol. 1 3-42 through 3-45 (timing of eulachon and herring runs); Exhibit A3, 4-52 to 4-53 (noting that the presence of marine mammals correlates to spring runs), ER Vol. 8, Tab 107, pp. 3469-3472, 3589-3590.

The Juneau Empire on April 23, 2006, reported that the Audubon Society had chartered a boat the preceding week for a Berners Bay wildlife tour, and planned two trips for May 6, 2006. Exhibit C. These dates are timed to coincide with the peak eulachon run that attracts sea lions and other marine mammals to Berners Bay.

measures to avoid disrupting marine mammals.[29]  In short, SEACC's suggestion that Goldbelt's 3-5 daily shuttle trips across Berners Bay will significantly disrupt marine mammals is not only far fetched, but hypocritical.

To summarize, insofar as plaintiffs' request for injunctive relief is premised on their assertions of harm to Berners Bay wildlife and other resources, those conclusory assertions are not supported by any citations to the record.  The record is to the contrary.

IV. ENJOINING THE MINE AND GOLDBELT'S MARINE TERMINAL WOULD NOT BE IN THE PUBLIC INTEREST

The SEIS characterizes the Juneau economy as "stagnant" (3-89) with higher levels of employment in 2004 than in 1997.  The Kensington Mine would bring up to 325 construction and 225 operating jobs.  These jobs would pay approximately twice the existing per capita income in

---

[29] Coeur Alaska Kensington Gold Mine Berners Bay Transportation Policy and Mitigation and Best Management Practices Plan (September 2004) ("Transportation Plan"), Exh. A8 at p.7-8, ER Vol. 6, Tab 23, pp. 2211-2212.  The Transportation Plan is incorporated into the Plan of Operations, which is incorporated into the Kensington 404 permit.  Cascade Point USACOE Record, Exhibit A2 at 23, ER Vol. 1, Tab 2, p. 207.  The Transportation Plan contains numerous additional measures to minimize impacts of the Cascade Point dock, shuttle ferry, and other mine operations on Berners Bay resources and uses.

Juneau (3-92; 4-109 through 4-114), and would generate up to twice as many indirect and induced jobs. 4-113.

As important as the Kensington Mine is to the overall well-being of Juneau, it is even more so to Goldbelt and its 3,000 shareholders.[30] For the first time, Goldbelt has some hope that the 25-year-old Congressional promise that it would receive lands in Berners Bay suitable for economic development may be fulfilled. Unemployment and underemployment among Goldbelt's shareholders is significantly higher than for non-Natives.[31] Coeur Alaska has shown sensitivity to the needs of the Native community. In addition to the contracting opportunities made available to Goldbelt, Coeur has made commitments for local and Native training and hire.[32] These opportunities will be lost to the Juneau Native community if the Kensington Mine is enjoined. In the words of Goldbelt's Chairman, Joe Kahklen:

> [Plaintiffs'] efforts to derail the Kensington Mine, if successful, will not only kill Goldbelt's dock at Cascade Point, but also will deliver a crushing blow to the hopes of Goldbelt and its shareholders to benefit

---

[30]   Kahklen decl., Exhibit B ¶ 8, 16.

[31]   Kahklen decl., Exhibit B ¶ 15.

[32]   Kahklen decl., Exhibit B ¶¶ 14, 15.

> from the economic prosperity that the mine would
> bring to the community of Juneau.

Kahklen decl., Exhibit B ¶ 16.

## IV. CONCLUSION

For the foregoing reasons, Goldbelt respectfully requests that the Court deny plaintiffs' motion for summary judgment and any injunction against Kensington Project activities.

DATED this 3rd day of May, 2006, at Juneau, Alaska.

Respectfully submitted,

DAVID C. CROSBY, P.C.

/s/ David C. Crosby
David C. Crosby
Alaska Bar No. 7106006

Attorney for Goldbelt, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on May 3, 2006, a copy of the following document was served electronically on:

Demian A. Schane
Thomas S. Waldo
Eric P. Jorgensen
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801

Mark A. Nitczynski
U.S. Department of Justice
Environmental Defense Section
999 18th Street, Suite 945
Denver, CO 80202-2449

John C. Berghoff, Jr.
Susan E. Brice
Michael P. Rissman
Mayer, Brown, Rowe & Maw LLP
71 S. Wacker Drive
Chicago, IL 60606-4637

Ruth Hamilton Heese
Assistant Attorney General
Department of Law
P.O. Box 110300
Juneau, AK 99811-0300

Cameron M. Leonard
Assistant Attorney General
Environmental Section
100 Cushman St., Suite 400
Fairbanks, AK 99701

/s/ David C. Crosby
David C. Crosby

Goldbelt Opposition II_5 1 2006.Goldbelt

List of Exhibits

Exhibit A: From the Administrative Record

    A1    Revised Department of the Army Record of Decision & Permit Evaluation, Coeur Alaska, Inc. and Goldbelt, Inc., POA-1990-592-M and POA-1997-245-N (March 29, 2006) ("Kensington USACOE Record") – excerpts only.

    A2    Department of the Army, Corps of Engineers, Alaska District, Section 404(b)(1) Evaluation and Public Interest Review, Cascade Point Docking Facility, POA-1997-245-N ("Cascade Point USACOE Record")

    A3    Kensington Gold Project Supplemental Environmental Impact Statement (December 2004) ("SEIS"), Volume 1, Sections 3.10 and 4.10 only.

    A4    Kensington Gold Project Supplemental Environmental Impact Statement (December 2004) ("SEIS"), Volume 2, Appendix B, Essential Fish Habitat Assessment.

    A5    Alaska Coastal Management Program Final Consistency Response – Concurrence (April 27, 2005)

    A6    Kensington Gold Project Supplemental Environmental Impact Statement (December 2004) ("SEIS"), Volume 2, Appendix J, Biological Assessment/Biological Evaluation, Appendix E: "Lynn Canal Herring Stock"

    A7    Endangered Species Act Section 7 Consultation – Biological Opinion (March 2005) – excerpts only

    A8    Coeur Alaska Kensington Gold Mine Berners Bay Transportation Policy and Mitigation and Best Management Practices Plan (September 2004)

Exhibit B: Declaration of Joe Kahklen

Exhibit C: "Animal Attractions," Juneau Empire, April 23, 2006