RECORD OF DECISION                                    POA-1990-592-M





**REVISED
DEPARTMENT OF THE ARMY

RECORD OF DECISON
&
PERMIT EVALUATION**

**APPLICANT:**        COEUR ALASKA, INCORPORATED and Goldbelt, Incorporated
**APPLICATION NO.:**  POA-1990-592-M and POA-1997-245-N
**WATERWAY:**         Lynn Canal and Berners Bay

This document constitutes the United States (U.S.) Department of the Army, Corps of Engineers' (Corps) Record of Decision (ROD), compliance determination according to the National Environmental Policy Act (NEPA), the U.S. Environmental Protection Agency's (USEPA) Section 404(b)(1) Guidelines[1] (Guidelines), and the public interest review for Coeur Alaska, Incorporated, (hereafter referred to as "Coeur"), proposed Kensington Gold Project.

The U.S. Forest Service (USFS) initiated the NEPA process to identify and analyze alternatives to the amended Mining Plan of Operation submitted to the USFS for the operation of the Kensington Gold Mine. The USFS was the lead Federal agency for the project, and the Corps was a cooperating agency to the Environmental Impact Statement (EIS) published in February 1992, and to the Supplemental EIS (SEIS) dated August 1997. The Corps has been a cooperating agency on and throughout the current Final SEIS (FSEIS) process, which was completed in December 2004, when the USFS published the FSEIS and the USFS' ROD. Alternative D is the USFS's preferred alternative and has been adopted by Coeur.[2] The Corps authorized Alternative D, to two different permittees in separate permits (e.g., to Coeur for the Kensington Gold Project and to Goldbelt, Incorporated (hereafter referred to as "Goldbelt") for the Cascade Point marine facility).

The aforementioned documents[3] included a complete project impact analysis and review of the direct, secondary, cumulative, and reasonably foreseeable impacts of the project as well as pertinent alternatives. These analyses have also resulted in minor changes to the proposed activities.

I have independently reviewed and evaluated the information in the EIS, the DSEIS and the FSEIS, in accordance with 40 CFR 1506.3 and 33 CFR 230.21, and have found them to be accurate assessments, and therefore appropriate for the purposes of the public interest review and alternatives analysis required by 33 CFR 320.4(b)(4) and 40 CFR 230.10. The Corps hereby adopts the FSEIS for the Kensington Gold Project, and those parts of the Kensington Gold Project EIS and SEIS not changed by the FSEIS.

---

[1] 40 CFR 230

[2] The applicant had originally applied for Alternative B (described in Section VI, later in this ROD). Alternative D was not in the Draft of the FSEIS, hereafter referred to as the DSEIS, but originated later as a result of comments received from Federal, State and local agencies, as well as the land manager (USFS), with respect to the DSEIS.

[3] These documents are all available at the USFS, 8465 Old Dairy Road, Juneau, AK 99801. A copy of each was incorporated into the case file.

000004

RECORD OF DECISION												POA-1990-592-M

(Acres)
**NET LOSS (Acres)**				164   108.2   124   144   3.44   3.44   3.44
After Reclamation

See Section VI, above, for a detailed description of each alternative.

In Alternatives A through A3, the filling of the Dry Tailings Facility area would all result in the permanent conversion of wetlands to uplands. Further as explained in Section VI above and Section VIII below, these alternatives are not practicable. Permanent loss of these wetlands is an adverse environmental impact. In Alternatives B, C, and D, construction of the Wet Tailings Storage Facility would result in the conversion of wetlands to a deepwater habitat (due to the rising water level), the edges or shallow portions of which will eventually become emergent wetlands/vegetated shallows.

These conversions of one type of water of the U.S. to another are not a significant permanent adverse impact to the aquatic environment, and the temporal losses discussed above would not result in significant permanent adverse impacts to the aquatic environment. Our evaluation places special emphasis on the persistence and permanence of the effects described in this ROD and the FSEIS [see 40 CFR 230.10(c)]. The permanent loss of wetland functions and values in the Alternative A variants is more damaging and outweighs the temporary losses to the lake and its associated functions and values.

See Section XI, Subpart E, below, for a further discussion of the information provided in the acreage calculations. The Corps concludes that Alternative D is the least environmentally damaging practicable alternative because the impacts to the aquatic ecosystem are less harmful than the impacts of the Alternative A variants, which include permanent wetland losses, and it incorporates a water treatment system to ensure water quality is met.

### VIII.  PROJECT COST CALCULATIONS SUMMARY

We previously determined that the Alternative A variants were practicable alternatives. This was based on an assumption that since Alternative A had been permitted in 1998, it was still practicable to Coeur. We have re-examined that determination and, for the reasons explained below, now determine that neither Alternative A, nor any of its variants, is practicable.

The applicant submitted an "Alternative Material Disposal Sites Cost Analysis"[64] with an expense breakdown for each of the proposed preferred actions, as well as for each of the respective alternatives. This analysis, which included logistics, technology and cost considerations, demonstrated to the Corps that the applicant did not consider Alternative A to be a practicable alternative. Also, the Alaska Department of Natural Resources (ADNR) analyzed data provided by the applicant, and concluded[65], "Therefore, we do not consider Alternative A to be a 'practicable' or 'reasonable' alternative from the standpoint of cost or economics." The Corps reviewed and reevaluated the ADNR analysis documentation and other relevant

---

[64] Coeur Letter to the Corps, dated November 23, 2004.
[65] Letter dated December 1, 2004, from the State of Alaska's Department of Natural Resources, Office of Project Management and Permitting, and addressed to David Cox of the USFS.

000024

RECORD OF DECISION                                      POA-1990-592-M

information in the FSEIS, and information provided by the applicant, and now independently concludes that the previously authorized site is no longer practicable to the applicant due to unreasonable costs.

Coeur concluded in its October 2004 Practicability Analysis that, for technical reasons, a scaled-down DTF would need a minimum of 70 acres to accommodate tailings from the high-grade mining operation discussed in the FSEIS(see also Sec. VI above). We reviewed that document and now concur with that conclusion. Thus, Alternatives A1 and A2 are not practicable for technical/logistical reasons. Coeur also discussed in the Practicability Analysis the reasons why no Alternative A project was practicable based on cost. Coeur's 2004 economic calculations support its conclusion that neither Alternative A (negative 15.8% return) nor A1 (70 acre DTF, negative 9.4% return) would generate a return on the investment needed to build the project. Neither alternative would ever recover the capital investment. Coeur also explained that while 1997 economic studies projected a slightly positive return for Alternative A, 2004 studies resulted in the figures set forth above. In comparison, Alternative D would generate an 8.5% return and pay back capital costs in 8 years. Coeur concluded that Alternative D was the only scenario under which it would choose to build and operate Kensington. Based on our independent evaluation of the relevant information, we agree with Coeur's analysis.

In addition, the USFS stated in the FSEIS, that "the mining scenario under Alternative A1 [A2 in this ROD] could not be imposed on the company if the No Action Alternative was selected."[66] Based on the costs and similarities (location, logistics of material transport, construction and operation of the facility, etc.) of the alternative variants of Alternative A (Alternatives A1 through A3), these three variations are also not practicable for cost reasons. Costs for the various alternatives are summarized in the chart, below.

### Alternatives Costs Table[67]

|  | Initial DTF Construction Costs | Total DTF or Wet Tailings Annual Operating Costs | Additional DTF or Wet Tailings-related Construction Costs [1/] | Total Trans. Facilities Construction Cost | Total Worker Transportation Annual Operating Cost [2/] | Total Initial Construction and Year 1 Operating Cost |
|---|---|---|---|---|---|---|
| **DRY TAILINGS FACILITIES** | | | | | | |
| Alt. A (113 acres) | $21,907,000 | $15,534,400 | $34,104,000 | $12,537,000 | $5,296,000 | $89,378,400 |
| Alt. A1 (34.2 acres) | $13,390,000 | $7,570,100 | $34,104,000 | $12,537,000 | $5,296,000 | $72,897,100 |
| Alt. A2 (50 acres) (FSEIS A1) | $13,144,200 [3/] | $9,320,640 | $34,104,000 | $12,537,000 | $5,296,000 | $74,401,840 |
| Alt. A3 (70-acre) | $15,334,900 [4/] | $10,874,080 | $34,104,000 | $12,537,000 | $5,296,000 | $78,145,980 |
| **WET TAILINGS FACILITIES** | | | | | | |

---

[66] Section 2.2.2., page 2-17, Alternative A1: Reduced Mining Rate Dry Tailings Facility.
[67] Chart submitted by Coeur Alaska, February 17, 2006.

22

000025

uncertain contents of some of the comments, which resulted in uncertainty regarding in which category they should be grouped.

The comments addressed such topics as economics, safety, tourism, taxes, monitoring, subsistence, alternatives, transportation, aesthetics, pollution, site histories, wilderness determinations, fish and wildlife. These issues were addressed in the DSEIS and FSEIS, Chapters 3 (Affected Environment) and 4 (Environmental Consequences), as well as in this ROD, Section II.2.G. Responses, below.

G. **RESPONSES.**

Comments from the Federal and State agencies, if not addressed above (IX.2.A-F), as well as comments from the public (individuals and organizations), whether to the public notice or the public hearing, were arranged into distinct categories and addressed below:

COMMENTS ON ALTERNATIVES.

Compliance with the Section 404 (b)(1) guidelines requires that a proposed discharge of dredged or fill material into waters and navigable waters of the United States, should contain all appropriate and practicable steps to minimize potential impacts of the discharge on the aquatic ecosystem, and it should represent the least environmentally damaging practicable alternative. If the proposed activity does not require access or proximity to or siting within a special aquatic site (i.e., wetlands, mudflats, etc.), less damaging practicable alternatives that do not involve a "special aquatic site" are presumed to be available[92], unless clearly demonstrated otherwise.

An alternative is practicable if it is available and capable of being performed after taking into consideration cost, existing technology, and logistics in light of the overall project purpose. Practicable alternatives include, but are not limited to (a) activities which do not involve a discharge of dredged or fill material into waters (including wetlands) of the United States (U.S.); and (b) discharges of dredged or fill material into waters of the U.S. at other locations and resulting in less impact.

It is the applicant's responsibility to demonstrate that there are no practicable alternatives that would be less damaging to the aquatic environment than the applicant's preferred alternative. The Corps had earlier requested that the applicant demonstrate that either there are no available practicable alternatives to the proposed actions, or that there were no less damaging [to the aquatic environment], practicable alternatives available that would fulfill the applicant's purpose. That information has been received, evaluated, and currently resides in the case file[93].

The Corps concludes that the construction of a marine dock facility at Slate Creek Cove is practicable and would be the least

---

[92] See 40 CFR 230.10(a)(3).
[93] See Sections VII and VIII, above.

RECORD OF DECISION                                    POA-1990-592-M

environmentally damaging practicable alternative[94]. In addition, the Corps also concludes that the discharge of fill material into Lower Slate Lake[94], as well as the discharges of fill material associated with the construction of the road and pipeline, the dam, the building support pads, the material storage facilities, and the water treatment facility are each practicable and the least environmentally damaging practicable alternative. These conclusions are based largely on the fact that all of the fill structures listed here, with the exception of the earthen dam and the water treatment facility, would be reclaimed at mine closure back to a water of the U.S. The water treatment facility would eventually be inundated (covered) by the rising waters of Lower Slate Lake.

COMMENTS ON DAM SAFETY.

Coeur's initial dam design was evaluated by the State of Alaska's Department of Natural Resources, Division of Mining, Land and Water, Dam Safety and Construction Unit, with respect to Coeur's application for a <u>Certificate of Approval to Construct a Dam</u>. The reviewing Unit assigned the proposed structure a Class II (significant) hazard potential.[95] Additionally, several recommendations were provided to Coeur, as well as a request for additional information to be provided by the applicant, prior to continuing with the certification process.

COMMENTS ON TIMING RESTRICTIONS.

The following timing restrictions were recommended by the Alaska Department of Natural Resources-Habitat and will be incorporated into the Corps permit as permit conditions:

*   *No in-water work shall occur in Berners Bay between March 15 through June 30, to protect juvenile salmonids, herring and eulachon.*

*   *No in-water work shall occur in Johnson Creek from May 1 through October 1, to direct construction to low-flow periods.*

COMMENTS ON "INSUFFICIENT PROJECT COVERAGE BY THE PUBLIC NOTICE TO ALLOW READERS TO PROPERLY ASSESS A PROJECT AND ITS IMPACTS ON THE ENVIRONMENT."

33 CFR 325.1(d)(1), Content of a permit application. This Federal Regulation[96] states that the Department of the Army permit application must include a complete description of the proposed activity including necessary drawings, sketches, or plans sufficient for public notice (detailed engineering plans and specifications are not required); the location, purpose and need for the proposed activity; scheduling of the activity; the names and addresses of adjoining property owners; the location and dimensions of adjacent structures; and a list of authorizations required by other federal, interstate, state, or local agencies for

---

[94] See the 404(b)(1) Evaluation.
[95] Letter from the Dam Safety and Construction Unit to Coeur Alaska, dated January 22, 2004.
[96] 33 CFR 325.1(d)(1) Content of a permit application; and 33 CFR 325.3(a) Public Notice.

53