Department of Army, Corps of Engineers

Alaska District

Section 404(b)(1) Evaluation
and
Public Interest Review

Cascade Point Docking Facility
POA-1997-245-N

## I.  INTRODUCTION

Goldbelt, Incorporated (Goldbelt) has requested authorization for the discharge of dredged and/or fill material in waters of the United States (U.S.) under Section (§) 404 of the Clean Water Act (CWA), and for work in, on, over or under navigable waters of the U.S. under §10 of the Rivers and Harbors Act (RHA) of 1899, for construction of a docking facility to improve access to their property located at Echo Cove/Cascade Point.  The evaluation requirements of Section 404 CWA are within the guidelines developed by the Administrator of the EPA in conjunction with the Secretary of the Army, published in 40 Code of Federal Regulations (CFR), Part 230, and referred to as the Section 404 (b)(1) Guidelines[1] (Guidelines).  This Section 404(b)(1) evaluation and public interest review addresses the potential impacts of the discharge of dredged and/or fill material into waters of the U.S. by Goldbelt. This document will be attached to, and become a part of, the Corps Record of Decision for the Kensington Mine and Cascade Point projects.

The proposed project and its related impacts were described in the U.S. Forest Service's (USFS) Cascade Point Final Environmental Impact Statement (FEIS), dated March 10, 1998, which was for an access road and a marine terminal docking facility to be constructed on USFS and Goldbelt property, and later in the Corps' combined decision document/environmental assessment (EA), dated June 12, 1998.  The project and its related environmental impacts, was again discussed in the Draft Supplemental Environmental Impact Statement (DSEIS) for the Coeur Alaska, Incorporated, (Coeur) Kensington Gold Project[2].  This DSEIS was prepared by Tetra Tech, Incorporated, for the USFS, January 23, 2004, and described Cascade Point as one of several potential destination docking facilities for the transport (ferry shuttles) of the Kensington mining personnel, and it was discussed more recently in the Final Supplemental Environmental Impact Statement (FSEIS), dated December 2004, for the Kensington Gold Project.  These above referenced documents[3] included a complete project impact analysis and review of the direct, secondary, and cumulative, impacts of the project, as well as pertinent alternatives.  The previous Corps decision documents are at Attachment F of the ROD, and the relevant portions of the 1998 Cascade

---

[1] 40 CFR 230

[2] POA-1990-592-M, Kensington Gold Mine Project

[3] The USFS' EIS, DEIS and the FSEIS are all available at the USFS, 8465 Old Dairy Road, Juneau, AK 99801. A copy of each was referenced, and incorporated into the case file. These as well as the other referenced documents are available for viewing at the Corps of Engineers, Suite 106, 8800 Glacier Highway, Juneau, Alaska 99801.

000185

Point EIS, relied upon in those decision documents, are incorporated by reference except to the extent modified or supplemented in this document.  Goldbelt and Coeur Alaska have each submitted documentation pertaining to the proposed marine docking facility's site within Berners Bay[4], and portions of these documents are used by the Corps for this assessment document and are in the record.

All relevant factors, including the cumulative effects thereof, were considered (see the 2004 FSEIS, Chapters 3 and 4, and Attachment F to the ROD).  These factors include, but were not limited to, conservation, economics, aesthetics, general environmental concerns, wetlands, cultural values, fish & wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, mineral needs, consideration of property ownership, and in general, the needs and welfare of the people.

## II.  PROPOSED PROJECT

A description of the proposed work was published in the Corps public notice, dated June 21, 2004, with a 45-day comment period commensurate with the comment period of the Kensington Project's DEIS, and was later extended at the request of various Federal resource agencies to August 20, 2004.  A separate public notice for the Kensington Gold Project ran concurrent with this notice.  The proposed project would require the placement of a structure; dredging and the discharge of dredged and fill material into waters and navigable waters of the U.S. in conjunction with the construction of a docking facility at Cascade Point.  Approximately 23,000 cubic yards of material would be dredged from within an approximate 70,000 square foot area (1.6 acres) below the High Tide Line (HTL).  All dredging would occur from a barge. Dredged material would be stockpiled, segregated, transported and placed in the breakwater with the use of a large shovel mounted on a barge.  The fill material from the upland source would be clean gravel and rock, free from petroleum products.  Approximately 6,000 cubic yards would originate from an upland quarry site.  This would make a total approximately 29,000 cubic yards of fill material (dredged and quarry material) which would be discharged below the HTL to construct the breakwater, and would measure approximately 125-foot wide by 425-foot long (1.3 acres).  A moorage structure consisting of approximately 20 pilings, supporting a 120-foot long rigid dock, an 80-foot long gangway, and a 100-foot long float would be constructed.

## III.  PURPOSE

The purpose of the project would be to provide safe moorage during all tidal stages (deep-water access) for a miner's ferry shuttle within the Berners Bay area.  The selection of either Cascade Point and/or Echo Cove in the DSEIS and the FSEIS as potential destination docking facilities for vessels leaving the proposed Slate Creek Cove marine docking facility was a result of suggestions and comments generated during the scoping development of the initial DSEIS process: various alternative destination port sites were submitted for review and comment during scoping meetings.  It was noted that these two sites

[4] Coeur Alaska's Slate Creek Cove docking facility and Goldbelt's Cascade Point docking facility.

2

000186

were within Berners Bay, south of and in close proximity to the
proposed Slate Creek Cove marine docking facility.

## IV.  BACKGROUND

The Cascade Point FEIS, dated March 10, 1998, notes on pages 1-4 and 4-
21 that construction of other Cascade Point facilities, would proceed
as dictated by market conditions.  The Cascade Point dock would be
dependent on the construction of the road and a log transfer facility,
which implies an associated timber sale.  In other words, there must be
an economic driving force for construction of the Cascade Point dock to
proceed.  The multi-purpose intent for Cascade Point docking facility
reflects the original Echo Cove Master Plan, which was developed by
Goldbelt, in March of 1996.  That plan described the various purposes
to which Goldbelt's properties and adjacent marine waters located at
Cascade Point would be put:

"Goldbelt's immediate goals for Echo Cove property center on Cascade
Point.  The primary reasons for Cascade Point development include good
buildable land, gradients allowing road access to water, and acceptable
depths for docking.

Goldbelt identified four primary goals for near-term development at
Cascade Point.  These include the following:

    A.  High speed ferry service to Haines and Skagway, including travel
    related opportunities such as docking facility and restaurant.
    B.  Tourism opportunities, including boat excursions.
    C.  Fish industry support, including dock, hauling, ice.
    D.  Possible housing and support for future mining.

As a proposed New Growth Area, the planning materials developed for
Cascade Point are required to be fairly specific, and show possible
growth scenarios well into the future.  The following planning goals
were identified to guide development at Cascade Point, and became the
starting point for planning and design efforts:

    1.  Extend the road to Cascade Point utilizing the most logical
    route, and create a versatile dock structure at the end of the
    road which could accommodate various uses.
    2.  Lay out the framework of a small community at Cascade Point
    that works with limited near-term development, and also works
    well over time as the community grows.
    3.  Plan the community so that the long-term environmental
    quality of the Echo Cove setting is not significantly altered,
    and that minimal negative consequences of development are felt at
    other portions of the Echo Cove area."[5]

Goldbelt stated in their earlier Corps permit applications for the
Cascade Point dock, and for an access road, that the Cascade Point
marine facility had been proposed to support small tour boat
operations, commercial fishing, equipment and material on and off
loading, a passenger ferry service, and cargo barge loading.

---

[5] Echo Cove Master Plan, pages 1.5 to 1.6.

3

000187

The USFS' Cascade Point Access Road FEIS[6] stated, on page 1-4, that:

"Construction of the access road is expected to begin immediately upon receipt of all necessary permits and easements. As stated in the Echo Cove Master Plan (MRV, 1996), Phase One of the development at Cascade Point would be the initial dock development including a log transfer facility which would proceed concurrently with road construction. Development of other facilities at Cascade Point would proceed as dictated by market conditions and acquiring needed permits, but is anticipated to begin soon after construction of the access road. Planned public facilities, as discussed in the Echo Cove Master·Plan second phase of proposed development, consist of a lodge, high speed ferry facility, commercial fishery support, small grocery store, service station, maintenance garage, and small utilities building."

Goldbelt's more recent Corps permit application for the Cascade Point marine dock changed the wording of the dock's purpose, as originally stated in the master plan, to include a change of support for the Kensington Mine (rather than the Jualin Mine).

The Conditional Use Permit (CUP) issued by the City and Borough of Juneau, Alaska,[7] recognized Goldbelt's long-range goals for Cascade Point:

"Goldbelt has indicated that the docking facility could provide a location for the Lynn Canal gillnet fleet to offload fish and could be used to stage tourist day excursions. Goldbelt has also spoken to officials at the Alaska Marine Highway System about possible use of the location as a ferry docking facility. Support for tourism, fisheries and the ferry system are elements of Goldbelt's long-term conceptual development plans for marine docking facility operations at this location, but are not subject to this application. This report analyzes the project as a ferry dock for transportation of workers to the Kensington Mine."[8,9]

The above documentation and a subsequent follow-up letter, dated November 9, 2005, from Goldbelt and addressed to the Corps, continued to place a strong emphasis on the multiplicity of purpose for Goldbelt's Cascade Point dock:

"The purpose of this letter is to clarify once and for all that: (1) it has always been Goldbelt's intent in applying for permits to construct and use the Cascade Point marine docking facility for multiple purposes; (2) Goldbelt has never proposed a single use facility, nor has it ever been their intent to so limit its use to only mine shuttle purposes; (3) Goldbelt regards any restrictions on use of the docking facility as temporary and will seek to have them lifted to permit other uses of the facility." The letter expanded on this theme, by stating

[6] Published by the USFS on March 10, 1998.

[7] CUP was issued October 6, 2004.

[8] See page 3 (Background). Also see pages 4 (Project Design, second paragraph, and 8 (Traffic, second paragraph).

[9] Condition 5 of the CUP, stated in part "...No additional facilities or improvements other than those identified in the application and analyzed in this report, may be constructed on the site unless a modification of this permit, or a new permit, is obtained first."

4

000188

that: "…the record before the Corps clearly reflects that Goldbelt has long sought to build a marine facility at Cascade Point as the cornerstone of its Master Plan for development of uplands conveyed to Goldbelt pursuant to the Alaska Native Claims Settlement Act.  These plans have been developed independently of Coeur's Plan of Operations for the Kensington Mine.  Providing shuttle service to the Kensington represents only the first of what Goldbelt hopes and believes will be multiple business opportunities for use of the Cascade Point dock."

However, Goldbelt also pointed out that:

"…the plaintiffs successfully lobbied……to require Goldbelt to seek additional or amended permits and/or environmental reviews before the marine docking facility may be used for anything other than mine shuttle services."  And "…although…Goldbelt is currently authorized to provide only mine shuttle operations from the Cascade Point marine docking facility, all of the permitting agencies recognize that Goldbelt will seek amendments to its permit in the future…".

Although we recognize that Goldbelt intends the dock to be for other purposes in the future, such plans are insufficient to persuade us to analyze the dock as an independent facility.  The FSEIS analyzed the direct, secondary, and cumulative effects of the Cascade Point dock as part of the Kensington Gold Project, and we are applying the Guidelines and public interest review of the docking facility in this attachment.

## V.   PUBLIC AND ENVIRONMENTAL FACTORS CONSIDERED

The original Corps environmental assessments prepared for the access road and dock projects, and for just the dock, as well as the documentation prepared by the USFS (see above discussion), has adequately addressed the pertinent environmental and public interest factors surrounding the current proposal and no new factors have been identified.  However, these factors have been expanded upon (based on new information, project designs and revised plans, etc.), and are discussed below.  The user of the guidelines must recognize the different levels of effort that should be associated with varying degrees of impact and require or prepare commensurate documentation. An essential part of the evaluation process involves conducting further evaluation of the guidelines only as needed.  40 230.6(b),(c)

## VI.   ALTERNATIVE ANALYSIS [33 CFR 320.4(b)(4), 40 CFR 230.10]

The Echo Cove Master Plan depicted the potential uses to which Goldbelt's upland properties and the adjacent marine waters might be put, and included roads, homes and businesses, as well as a marine docking facility.  The purpose of the proposed marine docking facility which was listed in the plan was to provide safe moorage of tour vessels during all tidal stages, and a moorage facility for up to two mine ferry shuttle vessels, which would provide personnel transport between Cascade Point and Kensington's marine docking facility at either Comet Beach or Slate Creek Cove, or both.  The proposed marine docking facility would be located immediately adjacent to the upland properties owned by Goldbelt.

000189

Goldbelt had previously applied for a marine docking facility with a causeway approximately 419 feet long at the same site, but the application was denied[10] for failure to satisfy the Guidelines: Goldbelt failed to demonstrate that there were no less-damaging (to the aquatic environment), practicable alternatives to their proposed facility.  The current proposal is for a pile-supported dock protected by a rubble-mound breakwater.

    A.  NO ACTION:  Denial of the Cascade Point dock application would cause Coeur to attempt another docking facility location or resort to alternatives with less practicable, more expensive, or more adverse environmental impacts; such as, helicopter transport, a resident camp, or more distant and less safe transit of Berners Bay. Denial of the proposed action at Cascade Point could cause Goldbelt to attempt placement of a marine docking facility at Echo Cove, which is the only other possible site remaining either on or in close proximity to Goldbelt's property.  However, this proposed action may result in greater opposition from resource agencies due to the presence of mudflats and eelgrass beds in the cove.  The mudflats and eelgrass beds are designated Special Aquatic Sites[11], requiring Federal protection.  The eelgrass beds are located at the head of Echo Cove:  one along a 500-meter swath at the northeastern edge of the cove, and the other along a 400-meter swath along the midsection of the eastern shore of the cove.  Construction of a docking facility in Echo Cove would result in the removal of a portion of these beds, by either dredging and/or fill activities. Also, Echo Cove has been documented for Dungeness Crab harvesting, both commercial and subsistence[12,13].

    Should both the Cascade Point site and the alternative Echo Cove site result in denials, Coeur and/or Goldbelt would be forced to use privately owned facilities outside of the immediate geographical area to access marine waters, either further south of Goldbelt's property, or north (e.g., Skagway or Haines).  Either of these options would result in a detriment to the development of the Goldbelt lands in the Berners Bay area.  Additionally, Coeur would also be required to find a transportation alternative.  See the Alternative Destinations discussion below.

    Goldbelt could access marine waters in Berners Bay without the need to obtain a Department of the Army authorization:  a pile-supported structure could be built extending seawards from the high tide line (HTL) to and stopping at the mean high water mark (MHWM). [14]  Such a structure, to be effective, would have to be immediately adjacent to deep water, unlike Cascade Point, and only shallow-draft vessels could moor at these docks, and only at the higher tides. Additionally, such a structure would be subjected to the bay's high-energy waves, rendering the venture hazardous to personnel and equipment.  Based on the analysis submitted by Goldbelt, this alternative would not be practicable.

---

[10] USACE Letter of Denial, dated June 25, 1998.
[11] 40 CFR 230
[12] USFS' FSEIS, Section 3.
[13] See Section 5, Subsistence, recreational or commercial fisheries, below.
[14] Limits of Section 10 waters.

6

B.  ALTERNATIVE PROJECT DESIGNS[15] [smaller, larger, different, etc.]:
Goldbelt had previously submitted[16] a design for a marine docking
facility at Cascade Point, and this included a fill of approximately
69,000 cubic yards [cy] for a 419-foot long causeway/dock/launching
ramp, but the application was denied[17] for failure to satisfy the
Guidelines:  Goldbelt failed to demonstrate that there were no less-
damaging (to the aquatic environment), practicable alternatives to
the proposed facility.

Goldbelt financed a study titled Design Wave Determination at
Cascade Point, Berners Bay[18] to aid in the redesign of a marine
docking facility adequate to meet Goldbelt's purpose and needs.
This study suggested that use of the dock alone would be limited to
calm-water periods, unless a wave-deflection device was incorporated
into the design, allowing for all-weather use.

A discussion of alternative designs for a marine docking facility
must address both the moorage facility (dock, piling(s), buoy(s),
etc.) as well as any protective structure (log boom, breakwater,
etc.).  The original moorage structure considered by Goldbelt was a
barge ramp without a breakwater or other protection from wind and/or
waves.

Goldbelt's current application included a discussion of alternative
designs:  (1) a reduced fill (29,000 cy) without the ramp; (2) an L-
shaped breakwater with approximately 120,000 cy of fill; (3) a
straight breakwater with wave barrier; (4) the Captive Barge
concept; (5) a pile-supported wave barrier; and (6) a retained fill
bulkhead.  These designs were examined by Peratovich, Nottingham &
Drage (PND), Incorporated (Applicant's submission, dated December 2,
2004, along with a Binder with 17 inclusive attachments), and
determined to be impracticable in light of the wave study, cost,
environmental issues, or all of the above.  We have evaluated this
study and concur with PND's determination.

The Corps considered several additional alternative designs and
these included (a) floating and non-floating breakwaters parallel
to, but without connection to the shoreline; (b) a breakwater
connected at its northern end to the shore; (c) a breakwater
connected at the southern end to the shore; and (d) a breakwater
connected to the shore at either the northern end or the southern
end, but with a breach included in either.  These, as well as
construction of a pile-supported dock versus a fill dock, are
evaluated here with regards to practicability and impacts on the
aquatic environment.  The open northern-end option would allow high-
water ocean events[19] (i.e., ocean swells, storm surges, etc.) to
enter the enclosed harbor resulting in damage to moored vessels and

---

[15] See US Forest Service's FSEIS, dated December 2004, Section 2.4.7 Alternative Locations or Designs
for the Cascade Point Marine Docking facility.

[16] Public Notice, dated January 30, 1998.

[17] Corps Letter of Denial, dated June 20, 1998

[18] See Referenced Documents at the end of the document.

[19] Design Wave Determination at Cascade Point, Berners Bay, Alaska.  Pacific International Engineering,
Edmonds, Washington.  (October 15, 1997)

000191

docking facilities.  A floating parallel breakwater would have
similar problems with high water events.  However, the breakwater
design with a connection at the northern terminus would appear to be
practicable, but such a structure would prevent salmon fry from
following the shoreline forcing them to follow the perimeter of the
breakwater and subjecting them to greater predation.  This design
would also result in a build-up of sediment/sand along its northern
face as a result of littoral drift.  None of these design variations
is practicable.

Finally, there is Goldbelt's current proposal, which is for a pile-
supported dock, to be protected by a rubble-mound breakwater, with a
breach in its northern face (see section D: Applicant's Preferred
Alternative, below).

C.  ALTERNATIVE DESTINATIONS.  The Corps concluded in the Kensington
ROD that the proposed Cascade Point dock facility, as a destination
dock for transiting mine personnel and equipment, would be the least
environmentally damaging practicable alternative destination docking
facility.  Refer to the Kensington ROD at Section VI., Subsection
(B) Discussion of Alternative Destinations.  This discussion
provides a comparison of potential destination docking facilities,
including transit distances and travel duration, during normal
weather periods.  The marine transportation chart in the Kensington
ROD indicates travel times between Slate Creek Cove and the moorage
facilities at Cascade Point, Echo Cove and Yankee Cove would be
similar.  If the Cascade Point facility were not available, the
Yankee Cove facility could be used by the mine crew shuttle, though
the marine transit would not be as safe due to the necessity of
traveling on Lynn Canal during the winter months and would at times
be unavailable for transport activities due to bad weather.  In
addition, there would be other adverse impacts to the aquatic
ecosystem associated with the increased travel time and distance and
the differences in travel routes.  The facility at Echo Cove, though
also in close proximity to Slate Creek Cove, would require
additional improvements (channel dredging and dock construction)
before it would be sufficiently safe and large enough for the
Kensington shuttle craft.  These improvements would also result in
increased adverse impacts to special aquatic sites.

A detailed analysis of impacts and alternatives (locations and
methods) associated with the Goldbelt's Cascade Point marine docking
facility, and inclusive of the Echo Cove port site alternative, can
be found in Attachment F (Department of the Army Permit Evaluation
and Decision Documents for POA-1997-245 [Dock], and POA-1997-245
[Road].

Echo Cove is a practicable alternative location to the proposed
discharge at Cascade Point.  Selection of the Echo Cove alternative
would require a complete redesign to include the relocation of the
existing facilities (boat launch ramp with associated parking) in
lower Echo Cove, though road access would require only a short
extension of the existing road by a few hundred yards.  Constructing
a marine docking facility at Echo Cove would require dredging of the
cove entrance to allow for deep draft vessels (ferries and tour
vessels) to access the facility.

8

000192

A comparison of the two alternative locations indicates that Cascade Point has a variety of intertidal and subtidal plant communities, but no Special Aquatic Site, and Echo Cove has mud flats and eelgrass beds (both Special Aquatic Sites) that would be adversely impacted. Therefore, Cascade Point site is the least damaging alternative.

D.  GOLDBELT'S PREFERRED ALTERNATIVE.  Goldbelt redesigned the proposed Cascade Point marine docking facility as a result of concerns raised by the Corps and other agencies during Goldbelt's initial submittal of an application for a road and a marine docking facility. After a re-evaluation of available alternatives, as well as new information, Goldbelt submitted a revised application for a pile-supported moorage facility partially enclosed by a rubble-mound breakwater.  The breakwater would be connected to the shoreline on the northern end incorporating a breach between it and the shoreline.  The revised design, substantially reduced in size and design from the original application, was described in the Corps public notice, for public review and comments.  Goldbelt's new alternative design, properly conditioned, represents a less environmentally damaging, practicable alternative (compared to other alternatives) when logistics, cost and existing technology are considered.

**VII.  PHYSICAL AND/OR CHEMICAL CHARACTERISTICS AND ANTICIPATED CHANGES:** See the original Corps Environmental Assessment, dated June 17, 1998.

CURRENTS, CIRCULATION OR DRAINAGE PATTERNS: plus sediment sources and transport:  The project site is subject to the ebb and flow of the tides, as well as to the wind.  No discernable current, other than tidal, has been detected in Berners Bay.  Littoral drift caused by both wind and wave action may result in the accretion of sediment (i.e., sand and/or silt) around the proposed breakwater.  It would be expected that the breach proposed by Goldbelt might eventually become filled with sediment, if not cleaned out on a periodic basis.  Therefore, if this alternative were authorized, a special condition requiring the removal of accumulated sediment (sand and/or silt) from the breach would be incorporated into the Corps permit.

SUSPENDED PARTICULATES, TURBIDITY:  During dredging and construction of the breakwater, the discharge of rock fill may result in a temporary increase in turbidity in the area surrounding the project, as a result of fines mixed with the rock.  Some sediment may settle over nearby kelps and fucus, but the twice daily tidal flushes and proper conditioning of the permit would reduce these impacts.

WATER QUALITY [TEMPERATURE, SALINITY PATTERNS AND OTHER PARAMETERS]:  Certification of compliance with applicable effluent limitations and water quality standards required under provisions of Section 401 of the Clean Water Act will be considered conclusive with respect to water quality considerations unless the Regional Administrator, U.S. Environmental Protection Agency [USEPA], advises of other water quality aspects for Corps consideration (33 CFR 320.4(d).

9

**000193**

STORM, WAVE AND EROSION BUFFERS:  The breakwater would provide a
buffer between high water events in Berners Bay and the interior
of the partially enclosed harbor, providing a measure of
protection to the vessel(s) moored to the dock facility.

**VIII.  BIOLOGICAL CHARACTERISTICS AND ANTICIPATED CHANGES:**  See the
original Corps Environmental Assessment, dated June 17, 1998.

SPECIAL AQUATIC SITES [WETLANDS, MUDFLATS, CORAL REEFS, POOL AND
RIFFLE AREAS, EELGRASS BEDS, VEGETATED SHALLOWS, SANCTUARIES AND
REFUGES, AS DEFINED IN 40 CFR 230.40-45]:  There are no
identified special aquatic sites at Cascade Point.

HABITAT FOR FISH AND OTHER AQUATIC ORGANISMS:  The project area
consists primarily of scattered rock on a sand and gravel
substrate, with an exposed shoreline above the HTL.  The subtidal
habitat has been documented as having highly productive
communities of Laminaria, Alaria and Macrocystis, Desmarestia, as
well as other kelps.  Alaria spp. grows mostly in the mid-low
intertidal zone, and fucus dominates the low intertidal zone.
Laminaria saccararina occurs in the low intertidal to subtidal
zone.  Both Alaria and Laminararia plants provide enhanced
spawning habitat for herring.  The project, if authorized, would
replace the existing kelp and fucus communities with rock, which
in turn would be susceptible (and available) to natural
colonization by marine plant species, such as Fucus gardneri,
Alaria marginata and/or other marine plant species currently
existing along the shoreline in the bay.

ENDANGERED OR THREATENED SPECIES:  In accordance with a request
from the NMFS, the Corps initiated informal consultation in
accordance with the Endangered Species Act (ESA), with the
eventual result of the Corps' submittal (jointly with the USFS)
of a Biological Assessment/Biological Evaluation (BABE).
Eventually, both the Corps and the USFS entered into Formal
Consultation with the NMFS pursuant to the ESA.  See below for a
discussion and results of the consultation process.

ESSENTIAL FISH HABITAT:  The proposed work has been evaluated for
possible effects to Essential Fish Habitat (EFH) and coordinated
with the National Marine Fisheries Service (NMFS) pursuant to the
Magnuson Stevens Fishery Conservation and Management Act of 1996
(MSFCMA).  The USFS prepared and submitted an EFH Assessment to
the NMFS and included a copy in the 2004 FSEIS, Appendix B.  This
Assessment is applicable to the proposed marine docking facility
at Cascade Point (Goldbelt) as well as the Slate Creek Cove
(Kensington), and has been adopted by the Corps.

**IX.  HUMAN USE CHARACTERISTICS AND ANTICIPATED CHANGES:**  See the
Corps Environmental Assessment, dated June 17, 1998 (Road and
Docking facility Application).

SUBSISTENCE, RECREATIONAL OR COMMERCIAL FISHERIES:  The Alaska
Department of Fish and Game (ADF&G) recorded the following
numbers of crab pots from aerial photos of Echo Cove, taken just
inside the spit:

10

000194

```
2000 = 60 pots                 2002 = 29 pots
2001 = 50 pots                 2003 = 50 pots
```

The majority of these pots had tags, indicating they were
commercial. Due to the size of the area utilized and the large
number of pots, the conclusion by ADF&G is that the area is
sustaining a large population of commercial quality crabs.
Should the Cascade Point location be authorized, this fishery
would not be impacted. However, relocating the docking facility
to Echo Cove may adversely impact this fishery.

AESTHETICS OF THE AQUATIC ECOSYSTEM: Since aesthetic values are
dependent upon the subjective interpretation of the observer,
positive, negative, or no effect impacts would be expected. The
work would not conform to the existing aesthetic settings, which
consists of an undeveloped coastline.

TRAFFIC AND/OR TRANSPORTATION PATTERNS: A Corps permit was
issued to Goldbelt, on March 5, 2003, authorizing construction of
a road from the now current end-of-road in lower Echo Cove, to
continue north to Cascade Point. This road would allow Goldbelt,
and their members, to access the Goldbelt properties. It is
anticipated that this road, upon completion of construction
activities, would be transferred to the State of Alaska, to
become a State road. Road construction was nearing completion by
December 2005. Completion of the road construction would provide
the necessary access to facilitate dock construction.

NAVIGATION: The United States Coast Guard (USCG) has been
notified, by virtue of the Corps public notice, of the proposed
work and has not identified any conflicts with marine navigation
traffic. Provided that the marine pilots using the facilities
operate within the standard rules for navigation regulating
vessel operations, adverse impacts are not likely to occur.
However, the new structure would require proper lighting in
accordance with USCG regulations, and a special condition would
be appended to the Corps permit to reflect this.

SAFETY: All construction activities must comply with the State
of Alaska's safety regulations.

HISTORIC PROPERTIES [SECTION 301(5) NATIONAL HISTORIC
PRESERVATION ACT]: The latest published version of the Alaska
Heritage Resources Survey [AHRS] has been consulted for the
presence or absence of historic properties, including those
listed in or eligible for inclusion in the National Register of
Historic Places. This work site is not a registered or eligible
property. Consultation of the AHRS constitutes the extent of
cultural resource investigations by the District Engineer at this
time, and he is otherwise unaware of the presence of any other
such resources. This application was coordinated with the State
Historic Preservation Officer [SHPO], via publication of the
Public Notice. The SHPO did not express to the Corps any
concerns they may have regarding presently unknown archaeological
or historical data that may be lost or destroyed by work under
the requested permit.

11

000195

LAND USE CLASSIFICATION: The surface estate (land above the mean high water (MHWM) mark was conveyed via a Public Land Order to Goldbelt, Incorporated, as a requirement of the Alaska Native Claims Settlement Act. Currently, the land below the mean high water (MHW) line is considered by the State of Alaska to be the property of the State, and the use of it by Goldbelt requires a Tidelands Lease to be obtained from the Alaska Department of Natural Resources. Additionally, the project site is within the City and Borough of Juneau (CBJ), and CBJ has issued a Conditional Use Permit for the docking facility.

ECONOMICS:

PROPERTY VALUES: Anticipated increase with completion of the marine facility.

TAX REVENUES: Increase.

EMPLOYMENT: Temporary increase in a few positions, terminating upon completion of construction activities.


X.     **SUMMARY OF SECONDARY AND CUMULATIVE IMPACTS:**

Known secondary impacts of this proposal include an increase in the volumes of both commercial and private navigation within Berners Bay; a temporary increase in turbidity in waters immediately adjacent to the project site during project construction; adverse impacts to water quality caused by discharges and fuel spills from vessels using the facility; elevated noise levels during project construction and normal operation of the facility; adverse impacts on air quality caused by fuel emissions from equipment used to construct the facilities, as well as from vessels using the facility. These impacts, while adverse, would be relatively minor. See the 2004 FSEIS, Attachment F, and the cumulative impact analysis in the 1998 Cascade Point EIS.

XI.   **FINDINGS**

OTHER AUTHORIZATIONS:

A. Certificate of Reasonable Assurance [Alaska Department of Environmental Conservation (ADEC)]:

Date: May 6, 2005   [X] Issued   [] Denied   [] Waived
Special Conditions: [X] Yes   [] No

Pursuant to 33 CFR 320.4(d), the certification of compliance with applicable effluent limitations and water quality standards required under the provisions of Section 401 of the Clean Water Act are considered conclusive with respect to water quality considerations unless the Regional Administrator, U.S. Environmental Protection Agency, advises of other water quality aspects to be taken into consideration. This certificate will be attached to and become part of the Corps permit.

000196

B.  Coastal Zone Management Consistency Determination:

Date: April 27, 2005    [X] Concurred    [] Non-Concurrence
Conditions for concurrence:  [] Yes   [X] No (If yes, see
attachment).

C.  State and/or local authorizations (if issued):  Alaska
Department of Natural Resources Tidelands Permit has been issued.

D.  ADEC Certificate of Reasonable Assurance for the NPDES
Permit:  This certificate applies to discharges of wastewater from
three outfall structures:  Outfall 001 [Sherman Creek], Outfall 002
[effluent from the Wet Tailings Storage Facility (Lower Slate Lake)
to Slate Creek], and Outfall 003 [domestic wastewater to Lynn
Canal].  ADEC issued this Certificate on June 17, 2005.

E.   City and Borough of Juneau: A Conditional Use Permit was
issued for the Goldbelt marine docking facility but it only applies
to the transport of Kensington Mine workers.  See III.2.A.(2)(iii),
below.

A complete application was received on July 21, 2003.  A public
notice describing the project was issued on June 21, 2004, and sent
to all interested parties [see mailing list] including appropriate
Federal and State agencies.  Public Hearings were held by the U.S.
Environmental Protection Agency (USEPA) in accordance with the
National Pollutant Discharge Elimination System (NPDES) regulations.
The public hearings were held on July 26, 2004, in Juneau, Alaska,
and on July 27, 2004, in Haines, Alaska (see case file).  A public
hearing was held on July 26, 2004, with respect for this proposal as
well as for the proposed Kensington Gold project.  All pertinent
comments received on this proposed action have been reviewed and are
summarized below.

SUMMARY OF COMMENTS RECEIVED

A.  FEDERAL AGENCIES

U.S. Environmental Protection Agency [USEPA]:

Comment dated August 2, 2004.  The USEPA requested a two-week
extension to the public notice comment period.

Comment dated August 20, 2004.  The USEPA submitted one comment
letter, with three attachments, applicable to the Goldbelt's
proposed marine docking facility at Cascade Point and to proposed
changes to the Kensington Mine Plan of Operations.  The USEPA
recommended 12 special conditions to be appended to the Corps
permit, if authorized, applicable to the Kensington Mine project
and the Goldbelt proposal.  Only the following listed conditions
applied to the Goldbelt proposal:

#8.  The 404 permit should authorize the Echo Cove marine docking
facility instead of the Cascade Point marine docking facility.

Corps Response to USEPA: See Section VI Alternative Analysis,
above.

000197

#10.  The 404 permit should include timing restrictions for the construction of the marine docking facilities to avoid impacts to fish and marine mammals, especially during the eulachon run in late April and early May.

Corps Response to USEPA:  The following special condition will be incorporated into the Corps permit, if authorized:

*  No in-water construction work shall occur in Berners Bay between March 15 through June 30, to protect juvenile salmonids, herring, eulachon, and marine mammals.

#11. The 404 permit should include restrictions on timing of ferry, and ferry routing during the eulachon run in late April and early May.

Corps response to USEPA:  The timing and routing of the Kensington mine shuttle vessels transiting Berners Bay are addressed in the Berners Bay Transportation Policy and Mitigation and Best Management Practices Plan, prepared by Coeur Alaska (2005).  See Goal #5, SOP #7 of the Plan.  The Plan has been incorporated into, and is a part of the Final Plan of Operations for the Kensington Gold Project, dated May 2005, Appendix 4-C, and is enforceable by the USFS.  The USFS's Final Plan of Operations has been incorporated as a condition of the Kensington Mine permit.

#12. The 404 permit should include appropriate compensatory mitigation for unavoidable impacts.

Corps Response to USEPA:  Goldbelt has minimized and avoided impacts to the aquatic habitat (see Alternative Analysis section, above).  Construction of the breakwater would result in filling approximately 1.3 acres of waters and navigable waters of the United States with rock.  The breakwater may be redesigned by Goldbelt specifically to provide surface area for colonization by various marine plants (fucus and/or kelps) and various fauna (e.g., invertebrates, and small fish).  It is anticipated that the multi-textured makeup of the rock fill would provide habitat and protection for both prey and predator species.  The result of the discharge would be a conversion of a relatively flat vegetated habitat to a rocky habitat, with a habitat similar to that which exists further up the tidal gradient.

33 CFR 320.4(g)(17)(2) states that "All compensatory mitigation will be for significant resource losses which are specifically identifiable, reasonably likely to occur, and or of importance to the human or aquatic environment."  The impact on 2.9 acres of ocean bottom (dredge and fill operations) is not significant and is minor in the context of Berners Bay, to the aquatic environment, though it is identifiable and very likely to occur.

Therefore, compensatory mitigation for the discharge of fill and the dredging of the 2.8 acres of U.S. waters will not be required.

14

000198

U.S. Fish and Wildlife Service [USFWS]:

Comment dated August 3, 2004. See the Corps response to these
issues, in the responses to comments by category, below. The
USFWS stated that the Corps public notice lacked information
needed to assess the effects of the proposed project on fish and
wildlife resources.

The USFWS addressed Goldbelt's master plan with respect to the
land area around Cascade Point and expressed concern for
potential impacts to the local fish and wildlife species, many of
which were listed in their comment letter. The use of the area's
marine waters by Pacific herring was documented along with
anticipated impacts associated with the proposed marine docking
facility as well as the industrialization of the Goldbelt
property that the USFWS expected as an immediate result.

The USFWS went on to suggest that there were less environmentally
damaging alternatives to the action, and recommended denial of
the Corps permit referencing Part IV, 3(a) of the Memorandum of
Agreement (MOA) between the Corps and the Department of the
Interior. Though the USFWS stated that the proposed "project may
have substantial and unacceptable impacts on aquatic resources of
national importance", a specific resource was not identified.
The USFWS did not follow up with a 3(b) objection letter.

National Marine Fisheries Service [NMFS]:

Comment dated August 3, 2004. The NMFS requested a two-week
extension to the public notice review period. They stated that
this project, along with the Kensington Mine project, was likely
to adversely affect Essential Fish Habitat within Berners Bay.
They also recommended Alternative C, in the USFS DSEIS, for a
marine docking facility at Echo Cove to minimize adverse effects
to Essential Fish Habitat (EFH) especially to spawning Pacific
herring and eulachon, and noted that the Corps public notice
appeared to select Alternative B.

Comment dated August 19, 2004. See the Corps response to the
issues mentioned immediately below, in response to comments by
category of this document.

The NMFS disagreed with the Corps' findings of no adverse impacts
to either threatened or endangered species, or to their critical
habitat, and went on to request that the Corps prepare an EFH
assessment, and begin consultation pursuant to Section 7 of the
Endangered Species Act (ESA).

NMFS' concerns included water quality impacts associated with
certain petroleum products, with emphasis on polycyclic aromatic
hydrocarbons (PAHs), which would reportedly originate from
gasoline and diesel fueling operations and vehicle parking. A
secondary concern was the Corps' lack of sufficient information
in their public notice to allow "adequate analysis of a federal
action that may significantly affect the environment." The NMFS
recommended in the USFS' Draft SEIS that the Cascade Point marine
docking facility not be selected "due to loss and degradation of

000199

Pacific herring spawning habitat that would result from the
intertidal fill necessary for construction and the adverse
effects to spawning, incubating and rearing larval herring that
would be expected from acute and chronic inputs of hydrocarbons
associated with boat operations and fueling at the Cascade Dock
site."

Stressing the 'potential reality' of Goldbelt's master plan for
the area, and "The proposed project is part of a series of
interrelated activities planned by Goldbelt that in conjunction
with reasonably foreseen development of homes and businesses,
daily commuter ferry service, mining and road building..." the
NMFS requested that a comprehensive environmental impact
statement be prepared to address the cumulative impact of these
'foreseeable' actions on fish and wildlife resources.

Further, NMFS recommended denial of the permit referencing Part
IV, 3(a) of the MOA between the Corps and the Department of
Commerce.

Denial Recommendation. The NMFS' stated, on page 128 of the
Biological Opinion, NMFS' continued recommendation that Coeur
seek an alternative to the Cascade Point facility, preferably
located outside of Berners Bay. Consequently, the NMFS
recommended denial.

Corps response to NMFS, ESA: Denial of the Corps' permit
application is not warranted, as is explained in this analysis
and throughout the Kensington ROD, specifically see the
discussion on Alternative Destinations, Section VI.

NMFS Recommendation #1: NMFS requests that the Corps prepare an
Essential Fish Habitat (EFH) Assessment in accordance with the
requirements of 50 CFR 600.920(e).

Corps Response to NMFS: The USFS prepared and submitted an EFH
Assessment to the NMFS and included a copy in their Final
Supplemental Environmental Impact Statement, Appendix B. This
Assessment was applicable to both the proposed marine docking
facility at Cascade Point (Applicant) and the proposed docking
facility at Slate Creek Cove (Kensington). Subsequently, the
Corps has adopted it as its own.

NMFS Recommendation 2#: NMFS recommended that Goldbelt
"...submit an application that did not require permanent fill and
minimized construction within the intertidal areas of Berners
Bay."

Corps Response to NMFS: Goldbelt had applied earlier for a
marine docking facility (causeway approximately 419 feet long) at
the same site as the current proposal, but the application was
denied (Corps Letter of Denial, dated June 20, 1998) for failure
to satisfy the Section 404(b)(1) Guidelines, that is, failure to
demonstrate that there were no less-damaging (to the aquatic
environment), practicable alternatives to the proposed facility.

16

**000200**

Goldbelt has since financed a study (Design Wave Determination at Cascade Point, Berners Bay, Alaska, by Pacific International Engineering, Edmonds, Washington, October 15, 1997) to aid in their design of a marine docking facility adequate to meet their needs, and yet satisfy the Guidelines. This resulted in the current proposal, which is for a pile-supported structure protected by a rubble-mound breakwater.

Goldbelt's current alternative design, if properly conditioned, represents the least environmentally damaging, practicable alternative, when logistics, cost and existing technology are considered.

Also, see Section VI Alternatives, above.

NMFS Recommendation #3: The NMFS stated that the Public Notice lacked specific information needed to assess the effects of the proposed project on listed species and EFH.

Corps Response to NMFS: The Federal Regulations [33 CFR 325.1(d)(1) Content of a permit application; and 33 CFR 325.3(a) Public Notice] states that the Department of the Army permit application must include a complete description of the proposed activity including necessary drawings, sketches, or plans sufficient for public notice (detailed engineering plans and specifications are not required); the location, purpose and need for the proposed activity; scheduling of the activity; the names and addresses of adjoining property owners; the location and dimensions of adjacent structures; and a list of authorizations required by other federal, interstate, state, or local agencies for the work, including all approvals received or denials already made. (2) All activities that Goldbelt plans to undertake which are reasonably related to the same project (emphasis added) and for which a Department of the Army permit would be required should be included in the same permit application.

Public Notices are not required to provide the type of information the NMFS was requesting, that is, species specific information needed to assess the effects of the proposed project on those listed species and on EFH. However, the notice was published concurrent with the USFS' Draft SEIS, which did provide this environmental background information on this project and on the Kensington project; an assessment of anticipated impacts; and a completed EFH assessment.

NMFS Recommendation #4: NMFS recommended that "...a comprehensive environmental impact statement should be completed to evaluate the cumulative effects of such actions on fish and wildlife resources."

Corps Response to NMFS: Please refer to the USFS FSEIS, Chapter 4.0, Section 4.21, Cumulative Effects, for a discussion of environmental effects associated with the various existing and proposed structures for the Berners Bay area.

17

000201

See also the original Corps' Combined Permit Evaluation and
Decision Document, dated June 12, 1998, Section F, Cumulative
Impacts.

NMFS Recommendation #5:  NMFS stated in their letter that the
proposed project "...may affect endangered humpback whales,
threatened Stellar sea lions which are protected from harm under
the ESA, and may harm other marine mammals what are afforded
protection from harm under the Marine Mammal Protection Act."
NMFS requested that the Corps begin consultation with NMFS
pursuant to Section 7 of the Endangered Species Act (ESA),
stating that the original Biological Opinion prepared by the
Corps for the original permit application by Goldbelt was
outdated and should be revised with new information specific to
Berners Bay.

Corps Response to NMFS:  The Corps initiated informal
consultation on June 21, 2004, pursuant to Section 7 of the ESA,
with the NMFS, and later, jointly with the USFS on November 16,
2004, requested formal consultation by submitting a Biological
Assessment/Biological Evaluation (BABE) stating that both
agencies had jointly determined that the project was not likely
to adversely affect threatened and endangered species (humpback
whale and Stellar sea lions) within the project area.

The NMFS acknowledged receipt of the joint request for formal
consultation pursuant to Section 7 of the ESA, stating that they
had reviewed the BABE, and disagreed with the conclusion.
However, on March 18, 2005, the NMFS completed their Biological
Opinion, and recommended denial of the Cascade Point project and
included 16 Conservation Recommendations.  These are addressed
below.

Comment dated September 13, 2004.  The NMFS referenced their
earlier comments of August 19, 2004, reiterating that the Corps
should prepare an EFH assessment and initiate consultation under
the ESA.  The NMFS again recommended denial of the permit
referencing Part IV, 3(b) of the MOA between the Corps and the
Department of Commerce.

Corps Response to NMFS:  See the Corps response to the NMFS'
Recommendations #1 and #5, Comment dated August 19, 2004, above.

National Marine Fisheries Service, Protected Resources Division,
Endangered Species Act (ESA) Consultation Process:

The Corps initiated informal consultation pursuant to Section 7
of the ESA, with the NMFS, and later, jointly with the USFS,
formal consultation and submitted a Biological
Assessment/Biological Evaluation (BABE) stating that both
agencies had determined that the project was not likely to
adversely affect threatened and endangered species (humpback
whale and Stellar sea lions) within the project area.

Comment dated December 3, 2004.  The NMFS acknowledged receipt of
the joint request for formal consultation pursuant to Section 7
of the ESA, stating that they had reviewed the BABE, and

18

000202

disagreed with the conclusion of the Corps and the USFS. The letter went on to discuss several factors which NMFS felt were of importance: regularity of shuttle transit of the bay, vessel speed, construction of a dock at Cascade Point (Goldbelt application) and at Slate Creek Cove (Kensington application), and the usage of these facilities by members of the public. NMFS recommended looking for an alternative site to the Cascade Point site, and suggested the suspension of vessel traffic within Berners Bay at pre-selected dates and times. NMFS stated in their letter "during formal consultation, Federal action agencies may not make any irreversible or irretrievable commitment of resources that limits future options. This practice insures that agency actions do not preclude the formulation or implementation of reasonable and prudent alternatives that avoid jeopardizing the continued existence of T&E species or destroying or modifying their critical habitats."

Comment dated March 18, 2005. The NMFS completed their Biological Opinion (BO) and also included 16 Conservation Recommendations, which are addressed below.

   The BO concluded with the following:

   (a) "...the proposed action is not likely to jeopardize the continued existence of the western population of Steller sea lions."
   (b) "...the proposed action is not likely to jeopardize the continued existence of the eastern population of Steller sea lions."
   (c) "...the proposed action is not likely to jeopardize the continued existence of the Central North Pacific population of humpback whales."

However, the BO also concluded that individual Steller sea lions and individual humpback whales in the project area might be adversely affected, since the project site would be located within the known or historic range of these mammals.

The referenced "proposed action" stated in the BO is the work associated with the Plan of Operations (POO) for the Kensington Gold Mine project. The POO addresses the use of Cascade Point as a marine docking facility only as a mine crew shuttle embarkation/debarkation point, and to be used for no other stated purpose. For this reason, the BO did not address other uses to which the marine docking facility might be put to in the future, such as tourism, commercial transport, log transfer facility, personal usage, etc. See Consideration of Comments, National Marine Fisheries Service, below.

Denial Recommendation. The NMFS stated, on page 128 of their BO, their continued recommendation that Goldbelt seek an alternative location to the Cascade Point facility, preferably outside of Berners Bay.

Corps Response to ESA: The Corps has determined that the current proposal is the least environmentally damaging, practicable alternative. See Section VI Alternative Analysis, above.

000203

Recommendation #1. "Any crew shuttle transits across Berners Bay during the eulachon run and herring spawning periods of April and May should be suspended. NMFS recommends use of other transportation routes during this time to minimize adverse effects listed species and their prey base." Also, "...that Coeur limit disturbance from vessel noise, lights, and other sources that may discourage herring from utilizing spawning habitat in the vicinity of Cascade Point."

Corps Response to ESA: The timing and routing of the Kensington mine shuttle vessels transiting Berners Bay are addressed in the Berners Bay Transportation Policy and Mitigation and Best Management Practices Plan, prepared by Coeur Alaska (2005). See Goal #5 of the Plan. The Plan has been incorporated into, and is a part of the Final Plan Of Operations for the Kensington Gold Project, dated May 2005, Appendix 4-C, and is enforceable by the USFS. The USFS's Final Plan of Operations has been incorporated as a condition of the Kensington Mine permit.

Recommendation #2. "Fueling of vessels at the Cascade Point marine docking facility should be prohibited from the time pre-spawning aggregations of herring are observed around the dock facility until herring eggs have hatched."

Corps Response to ESA: The U.S. Forest Service's Mining Plan of Operations addressed fueling of vessels at this facility for the Kensington Gold Mine Project. Also, the state's Submerged Lands Permit carries conditions pertinent to the storage of fuel as well as fueling operations at Cascade Point. Vessel fueling of the Kensington mine shuttle at the Cascade Point marine facility is addressed in the Berners Bay Transportation Policy and Mitigation and Best Management Practices Plan, prepared by Coeur Alaska (2005). See Goal #5 of the Plan. The Plan has been incorporated into, and is a part of the Final Plan of Operations for the Kensington Gold Project, dated May 2005, Appendix 4-C, and is enforceable by the USFS. The USFS's Final Plan of Operations has been incorporated as a condition of the Kensington Mine permit.

Recommendation #3. "Dock facilities should serve only the Kensington Gold Project and public or other private uses should be entirely restricted in order to protect and avoid additional cumulative impacts to marine mammal populations in Berners Bay."

Corps Response to ESA: The City & Borough of Juneau Conditional Use Permit restricts use of the dock to Kensington Mine Shuttle operations. It should be recognized that the structure, if constructed, would provide a safe haven in the event of a storm event, and its use at that time or under similar circumstances by members of the public should not be restricted.

Recommendation #4. "Construction should not occur between March 15 and June 30 to minimize potential noise impacts to marine mammals." And, "NMFS recommends that near-water construction occur during winter months when fewer marine mammals are present."

20

Corps Response to ESA:  The following special condition will be
incorporated into the Corps permit, if authorized:

  *No in-water construction work shall occur in Berners Bay
  between March 15 through June 30, to protect juvenile
  salmonids, herring, eulachon, and marine mammals.

Recommendation #5.  "NMFS recommends the use of appropriate in-
water noise control measures (e.g., mufflers, bubble curtains) or
other technology for construction equipment and activities to
minimize the effects of construction noise.  NMFS also recommends
the use of the additional noise reduction measures described in
the BA/BE (e.g., instituting speed limits, controlling helicopter
altitudes, implementing flight path requirements, refraining from
compression braking on haul roads from the Slate Creek Dock to
the mining site).

Corps Response to ESA:  See Corps Response to Recommendation
number 6, below.  The placement of structures into waters of the
U.S. and the control of helicopter and/or vessel operations, to
include route selection, vessel fueling, flight altitudes, speed
limits, as well as in-water noise control measures are addressed
in the Berners Bay Transportation Policy and Mitigation and Best
Management Practices Plan, prepared by Coeur (2005), Goal #5 SOP
#11 and SOP #12.  The Plan has been incorporated into, and is a
part of the Final Plan of Operations for the Kensington Gold
Project, dated May 2005, Appendix 4-C, and is enforceable by the
USFS.  The USFS's Final Plan of Operations has been incorporated
as a condition of the Corps permit.  The operational control for
vehicle speeds, braking procedures, and noise, as well as other
noise sources, including blasting are controlled through the USFS
Plan of Operation.

Recommendation #6.  "In-water construction should occur outside
of appropriate timing windows that protect most migrating juvenile
salmonids, and spawning and rearing marine forage fish."  And,
"...we also recommend using vibratory hammers whenever and
wherever practicable except for the final few minutes needed to
proof piles when an impact hammer must be used."

Corps Response to ESA:  The following special conditions will be
incorporated into the Corps permit, if authorized:

  *All steel piles shall be driven using a vibratory hammer.
  Under those conditions where impact hammers are required for
  reasons of seismic stability or substrate type, the piles
  shall be driven as deep as possible with a vibratory hammer
  prior to the use of the impact hammer.  The impact hammer
  shall be used at a time of year when larval and juvenile
  stages of fish species are not present:  this will be
  coordinated with the Alaska Department of Natural Resources,
  Habitat.

  *All piles shall be driven when the current is reduced (i.e.,
  centered on slack current) to minimize the number of fish
  exposed to adverse levels of underwater sound.

21

*Permittee shall either use a block of wood between the impact hammer and the pilings, and/or use a bubble curtain to attenuate the sound.

Recommendation #7. "As included in the USFS SEIS' Best Management Practices, NMFS recommends the use of silt curtains or other methods to prevent sedimentation of coastal habitat areas from construction activities."

Corps Response to ESA: The following special condition will be incorporated into the Corps permit, if authorized:

*Silt curtains or other appropriate methods shall be used to confine suspended particles and turbidity to a small area where settling can occur at the docking facility construction site (see 40 CFR 230.73[c]), and may include baffles to decrease turbulence and increase retention time or a filter blankets and curtains to filter out suspended solids.

Recommendation #8. "A marine biologist should monitor construction activities' effects on marine mammal behavior to ensure that impacts on marine mammals will be minimal. Monitoring results should be submitted to NMFS and USFS annually to determine if protection requirements have been met."

Corps Response to ESA: The request of having a marine biologist monitoring marine mammal behavior is addressed in the Berners Bay Transportation Policy and Mitigation and Best Management Practices Plan, prepared by Coeur (2005). See Goal #5 of the Plan. The Plan has been incorporated into, and is a part of the Final Plan of Operations for the Kensington Gold Project, dated May 2005, Appendix 4-C, and is enforceable by the USFS. The USFS's Final Plan of Operations has been incorporated as a condition of the Kensington Mine permit.

Recommendation #9. "Vessel traffic should be minimized after dark, especially during spring eulachon/herring runs when Stellar sea lions and humpback whales are most likely to be foraging near the surface and along the route of the crew shuttle, increasing the likelihood of disturbance to both predators and prey from vessel noise and presence."

Corps Response to ESA: The timing and routing of shuttle vessels transiting Berners Bay are addressed in the Berners Bay Transportation Policy and Mitigation and Best Management Practices Plan, prepared by Coeur Alaska (2005). See Goal #5 of the Plan. The Plan has been incorporated into, and is a part of the Final Plan of Operations for the Kensington Gold Project, dated May 2005, Appendix 4-C, and is enforceable by the USFS. The USFS's Final Plan of Operations has been incorporated as a condition of the Kensington Mine permit.

Recommendation #10. "Vessels should be operated year-round at speeds not exceeding 13 knots."

000206

Corps Response to ESA:  Vessel operations in Berners Bay are addressed in the Berners Bay Transportation Policy and Mitigation and Best Management Practices Plan, prepared by Coeur Alaska (2005).  See Goal #5 of the Plan.  The Plan has been incorporated into, and is a part of the Final Plan of Operations for the Kensington Gold Project, dated May 2005, Appendix 4-C, and is enforceable by the USFS.  The USFS's Final Plan of Operations has been incorporated as a condition of the Kensington Mine permit.

Recommendation 11.  "Quieting techniques should be adapted to vessels associated with the Kensington Gold Project, particularly the crew shuttle, to minimize noise disturbance to listed species and their prey in the action area."

Corps Response to ESA:  Quieting techniques is addressed in the Final Plan of Operations for the Kensington Gold Project, dated May 2005, Appendix 4-C, and is enforceable by the USFS.  The USFS's Final Plan of Operations has been incorporated as a condition of the Kensington Mine permit.  Also, see the Corps response to Recommendation 5, above.

Recommendation #12.  "As the proposed action increases vessel traffic in an area where disturbance and collision risk have been minimal in the past, NMFS recommends that vessel-operating procedures be monitored and evaluated to determine if they are effective at protecting sea lions and whales in the waters of Berners Bay."

Corps Response to ESA:  The monitoring of vessels' operations transiting Berners Bay is addressed in the Berners Bay Transportation Policy and Mitigation and Best Management Practices Plan, prepared by Coeur Alaska (2005).  See Goal #5 of the Plan.  The Plan has been incorporated into, and is a part of the Final Plan of Operations for the Kensington Gold Project, dated May 2005, Appendix 4-C, and is enforceable by the USFS. The USFS's Final Plan of Operations has been incorporated as a condition of the Kensington Mine permit.

Recommendation #13.  "NMFS recommends that a marine mammal observer monitor crew shuttle operations during the entire year, beyond simply the April/May time period, to ensure that impacts on marine mammals are minimized and properly mitigated. Monitoring results should be submitted to NMFS and USFS annually to determine if protection requirements have been met."

Corps Response to ESA:  The presence of a trained observer on or monitoring of vessels transiting Berners Bay is addressed in the Berners Bay Transportation Policy and Mitigation and Best Management Practices Plan, prepared by Coeur (2005), Goal #5, SOP #4 and SOP #7.  The Plan has been incorporated into, and is a part of the Final Plan of Operations for the Kensington Gold Project, dated May 2005, Appendix 4-C, and is enforceable by the USFS.  The USFS's Final Plan of Operations has been incorporated as a condition of the Kensington Mine permit.

Recommendation #14.  "NMFS recommends that USFS and ACOE [Corps] should complete the spill prevention, control, and containment

23

000207

plan for approval by NMFS and other relevant agencies that
addresses the potential for catastrophic spill (i.e., in the
event that a 6,500 diesel fuel isotainer was to leak or rupture
during transport, loading, or offloading)."

Corps Response to ESA:  EPA amended the Oil Pollution Prevention
regulation at Title 40 of the Code of Federal Regulations, Part
112, (40 CFR 112).  The regulation incorporated revisions
proposed in 1991, 1993, and 1997.  Subparts A through C of the
Oil Pollution Prevention regulation are often referred to as the
"SPCC rule" because it describes the requirements for certain
facilities to prepare, amend and implement Spill Prevention,
Control and Countermeasure (SPCC) Plans.

The regulation requires that all regulated facilities have a
fully prepared and implemented Spill Prevention, Control, and
Countermeasure, or SPCC Plan.  A licensed professional engineer
must certify the SPCC Plan.  Facilities must implement the Plan,
including carrying out the spill prevention and control measures
established for the type of facility or operations, such as
measures for containing a spill (e.g., berms).  In the event that
a facility cannot implement containment measures, the facility
must demonstrate that secondary containment is impracticable;
conduct periodic integrity and leak testing of bulk containers
and associated valves and piping; develop and incorporate a
strong spill contingency plan into the SPCC Plan; and provide a
written commitment of manpower, equipment, and materials required
to quickly remove any quantity of oil discharged that may be
harmful.  In addition, facility owners or operators must conduct
employee training on the contents of the SPCC Plan.  Facilities
that become operational between August 17, 2002 and August 18,
2006 must prepare and implement an SPCC Plan by August 18, 2006.
Facilities that become operational after August 18, 2006, must
prepare and implement a Plan before beginning operations.

Therefore, since preparation and implementation of a SPCC plan is
the responsibility of the facility operator (Coeur or Goldbelt),
with oversight provided by the USEPA, the Corps permit will not
carry this condition separately.  The Corps will supply an
advisory to the permittee.

Recommendation #15.  "...NMFS recommends that monitoring be
directed toward adaptive management.  We further recommend that
our agency and other natural resource agencies be able to
independently review collected data to assess impacts.  If
impacts are detected from project activities, USFS and ACOE
should consult with NMFS to determine how to adjust the action
effectively."

Corps Response to ESA:  The Corps will conduct normal monitoring
of permit compliance in the project area, but will not be
actively conducting any additional requested monitoring studies
in the project area.  Second, it is understood that most if not
all of the proposed actions associated with the Cascade Point
Marine Docking Facility would result in impacts, whether to the
physical, social and/or biological environment, and these have
been discussed in the FSEIS, along with the means to mitigate for

24

000208

them. Also, several Federal and State resource agencies will be
conducting monitoring activities at the project site and within
Berners Bay. If adverse impacts different than those already
discussed and mitigated for are detected, the Corps will
coordinate corrective efforts with all appropriate Federal, State
and local resource agencies.

Recommendation #16. "...NMFS recommends that Coeur support such
research efforts in the action area throughout the course of the
Kensington Gold Project, and use best available technology to
design any breakwater structure so that the probability of
recreating productive herring spawning habitat is maximized."

Corps Response to ESA: The current breakwater design for both
the Goldbelt and the Kensington projects have been submitted and
published in the Corps' public notices for public review and have
not generated any negative responses with respect to its habitat
potential (e.g., herring, kelps and fucus, bivalves, echinoderms,
crustaceans).

e. U.S. Coast Guard [USCG]: The USCG requested that Goldbelt
affix "a Flashing six second white light (FL 6s) on top of the
outermost portion of the rubble mound..." See Consideration of
Comments, below.

STATE AND LOCAL AGENCIES:

Alaska Department of Natural Resources, Habitat Division [ADNR-H]
did not comment to the Corps: ADNR-H was a cooperating agency to
the USFS' EIS, and commented directly to and coordinated with the
USFS, on issues pertaining to habitat concerns respective to both
the Kensington Gold Project and to Goldbelt's proposed marine
docking facility. This coordination resulted in conditioning of
the State of Alaska Tidelands permit and the State of Alaska
Habitat permits. Additionally, issues and/or concerns raised by
ADNR-H were also addressed in the USFS' FSEIS, Chapter 4.

Though the Alaska Department of Natural Resources, Division of
Parks and Outdoor Recreation, Office of History and Archaeology
[SHPO] did not comment to the Corps, and though SHPO did not
relate any issues pertaining to impacts to aquatic resources to
the Corps, SHPO related issues pertaining to Cascade Point were
addressed in Chapter 4 of the USFS' FSEIS.

The City and Borough of Juneau (CBJ) issued a Conditional Use
Permit to Goldbelt, Inc., with several conditions. The
conditions of special interest to the Corps are listed as
follows:

    #1. No vessel fueling is authorized to occur at this location
    except vessels used for transporting mineworkers to the Slate
    Creek Cover marine docking facility and craft necessary for
    facility operation and maintenance, including fuel spill
    responsibilities.

000209

#2.  No vessel maintenance is authorized at this location except routine maintenance activities required for daily vessel operations.

#3.  No on-site fuel storage is permitted in excess of one residential sized (550 gallon) aboveground tank as described in this report.

#4.  Expanded use of the facility may lead to the need for additional power generation, parking lot improvements, development of water supply, expanded on-site fuel storage, staging areas, improved sanitary services, upland facilities such as covered or enclosed structures, additional lighting and other improvements.  No additional facilities or improvements other than those identified in the application and analyzed in this report may be constructed on the site unless a modification of this permit, or a new permit, is obtained first.

#11.  As large a buffer of trees and natural vegetation as possible shall be left along the shoreline.

#13.  No in-water work shall occur at the project site between March 15 and June 15 to avoid impacts on spawning herring and other species.

Construction

a) The dredge barge shall have sideboards to contain dredge spoils.  If necessary, sideboards will be lined with a filter fabric to prevent mud from leaching through the joints between the barge deck and the sideboards and between individual members.

e) Oil spill response equipment will be readily available to respond to and/or to contain any oil spills.  Spill response equipment will include absorbent materials, containment booms, and appropriate personal protective equipment.  Personnel that are trained in responding to spills will be at the scene during all operations that could result in a spill.

f) Spills into coastal waters will be reported to the appropriate agency immediately.  Oil absorbent booms/socks will be placed around the spill sheen to contain it and absorb it as much as possible.

Vessel Fueling

h) All persons involved in the fuel transfer operations will be trained to follow the SOPs and in the consistent use of BMPs.

i) A spill response plan will be developed for the marine docking facility and all personnel will be trained accordingly.

000210

#15.  Coeur-Alaska will prepare and implement a Spill Response
Plan for Cascade Point as identified in their September 2004
Berners Bay Transportation Policy and Mitigation and Best
Management Practices Plan, as Standard Operating Procedure.

#13.  A draft plan will be circulated to Federal and state
agencies with responsibility for water quality and spill
prevention and response, and to the CBJ, for review.  Coeur
shall implement a final plan before docking facility
operations begin.

#17.  Fueling will take place at a U.S. Coast Guard approved
facility outside of Berners Bay between April 15 and May 15
each year when herring are observed spawning within 250 meters
of the marine docking facility.  The distances shall be
clearly marked on the shoreline.  A qualified observer whose
salary and expenses shall be reimbursed by Goldbelt will
determine the presence of spawning herring.

ORGANIZATIONS

Lynn Canal Conservation, Inc. [LCC].  See the Corps response to
these issues below.

The LCC stated their opposition to the proposed changes to the
Kensington Mine Project.  This included "harm to public interest
natural resources; failure to adequately address cumulative
(past, present and future) impacts; and piece-mealing of the
mine-related activities, excluding potential impacts that might
result if mining were to be extended for a greater period.  LCC
contended that the Corps' permit, if authorized, would authorize
Goldbelt to construct an industrial port facility in Slate Creek
Cove, and authorize Goldbelt, Inc., to construct a similar
facility at Cascade Point.  LCC also stated their opposition to
"Federal approval of the disposal of processed mining waste into
waters of the United States.

Southeast Alaska Conservation Council [SEACC].  See the Corps
response to these issues, below.

SEACC commented to the intention of Goldbelt to construct an
"industrial-sized moorage facility" at Cascade Point, and that
the Corps public notice was premature since the USFS had not yet
approved any modifications to the Plan of Operations for the
Kensington Mine.  They were also concerned that the Corps had not
entered into consultation pursuant to the Endangered Species Act
(ESA), nor had the Corps adequately considered the cumulative
impacts of all of the projects currently under consideration for
the Berners Bay area, to include the Corps authorized Goldbelt
road, and the proposed access road.  SEACC went on to request
that the Corps publish a second public notice to address the
proposed docking facility, the Cascade Point access road, and all
other structures on Goldbelt's master plan, to include all upland
structures.

SEACC also addressed the potential for Goldbelt to use the
facility at Yankee Cove as an alternative to constructing a

27

000211

docking facility at Cascade Point, and the need to include the
Yankee Cove site in the USFS' SEIS as an alternative to the use
of either Cascade Point or Echo Cove as a marine docking
facility.

SEACC went on to address the USFS Biological
Assessment/Biological Evaluation (BABE), stating that the Corps
should not depend on this document due to its inadequacies to
address environmental impacts of the Cascade Point site, and
recommended that the BABE be updated.  They were also concerned
with the impacts on the local environment by proposed fueling
activities at Cascade Point.

Corps response: SEACC's comment letter was received August 5,
2004, in response to the Corps' public notice, when the Corps had
yet to initiate consultation pursuant to the Endangered Species
Act, and conduct an in-depth alternative analysis.  The
Kensington DSEIS was out for comment at the same time the Corps'
notice was published.  The Corps and the USFS have completed
informal and formal consultation pursuant to the Endangered
Species Act, prepared a response pertinent to issues on Essential
Fish Habitat, and were intricately involved with discussions with
Federal, State and local resource agencies addressing  these and
other issues.  Additionally, SEACC also provided comments that
were based on errors, out-dated information or documents, or a
misunderstanding of the Federal environmental regulatory process.
Examples include, but are not limited to:

    a.  The Corps does not automatically initiate the Endangered
    Species Act consultation process prior to publication of a
    public notice;
    b.  Issuance (or denial) of a Corps permit is not dependent on
    the USFS's approval of a Mine Operating Plan for Coeur
    Alaska's Kensington Gold Project;
    c.  The Corps conducted its own alternatives analysis using
    the FSEIS and other appropriate information.
    d.  The proposed marine docking facility at Cascade Point was
    not part of Coeur Alaska's permit application.

Individuals: Approximately 342 individuals, private companies,
and other organizations responded to the proposed action.  A
number of these were in direct response to the USEPA's Public
Hearing, which was a requirement of the USEPA's National
Pollutant Discharge Elimination System regulations, and was held
in Juneau on July 26, 2004, and on July 27, 2004, in Haines,
Alaska,  while the rest were in response to the Corps; Public
Notice.  The comments, sometimes more than 1 per comment letter,
have approximate totals of 223 for, 67 against, and another 52 of
unclear.  The approximate numbers are due to the legibility and
uncertain contents of some of the comments, which resulted in
uncertainty of which category they should be grouped.

These comments addressed such topics as economics, safety,
tourism, taxes, monitoring, subsistence, alternatives,
transportation, aesthetics, pollution, site histories, wilderness
determinations, fish and wildlife.  These comments and/or issues
are addressed either in the USFS' FSEIS, Chapter 3 and 4, or in

000212

the response to comments by category section of this document, below.

B.    Evaluation: I have reviewed and evaluated, in light of the overall public interest, the documents and factors concerning this permit application as well as the stated views of other interested agencies and the concerned public.  In doing so, I have considered the possible consequences of this proposed work in accordance with regulations published in 33 CFR Part 320 to 330 and 40 CFR 230.  The following paragraphs include my evaluation of comments received and how the project complies with the above-cited regulations.

Consideration of comments:

National Marine Fisheries Service comments.  The Corps completed the review of the Goldbelt permit application, and on May 9, 2005, in accordance with the Memorandum of Agreement between the Department of the Commerce and the Department of the Army, the Corps informally contacted the NMFS with an informal Notice of Intent (NOI) to issue a Corps permit to Goldbelt.

The NMFS, in a follow-up letter dated May 31, 2005, responded respective to the ESA, and referencing their BO, reminding the Corps of the recommendations within that document.  The letter went on to state that, "The Biological Opinion also considered that no uses of the docking terminus other than a single shuttle ferry  to transport workers to and from the Kensington mine dock was reasonably certain to occur in the foreseeable future."

The letter also expressed concerns that the BO only addressed impacts associated with the use of Cascade Point as a marine docking facility for two ferry shuttles for the transport of Kensington Mine personnel, and had not addressed other 'potential' uses or purposes, to which the structure may be put in the future.

Corps Response to NMFS:  The CBJ conditional use permit restricted the use of Cascade Point to mine shuttle operations.  A change in this condition by CBJ will result in a review by the Corps, and consultation on ESA.

NMFS sent a letter dated May 31, 2005, and referencing their EFH concerns, included two recommendations for consideration. The Corps responded compensatory mitigation is not warranted for this action.  NMFS requested the Corps to require Goldbelt to "...incorporate design elements into the breakwater that can maximize the potential for colonization by desirable species of marine vegetation and the fish and invertebrate assemblages associated with the existing habitat at Cascade Point."  Should Goldbelt seek to modify the breakwater's design or content, they must apply for a modification to their Corps permit.

Responses by Category

29

000213

The comments by the Federal, State, local agencies, and the public which were not addressed above, or in the USFS' FSEIS, were arranged into distinct categories and addressed, as follows.

CONSTRUCTION TIMING RESTRICTIONS.  The following timing restrictions were recommended by the Alaska Department of Natural Resources-Habitat and will be incorporated into the Corps permit, if authorized:

   * No in-water construction work shall occur in Berners Bay between March 15 through June 30, to protect juvenile salmonids, herring, eulachon, and marine mammals.

   * No in-water construction work shall occur in Johnson Creek May 1 through October 1, in order to direct construction to low-flow periods.

INSUFFICIENT PROJECT COVERAGE BY THE PUBLIC NOTICE.  The Federal Regulations [33 CFR 325.1(d)(1) Content of a permit application; and 33 CFR 325.3(a) Public Notice] describe what the Public Notice must include as to appropriate information and drawings.  The notice is not designed to provide background geographical, sociological and/or ecological information sufficient to allow an assessment of impacts of the project on the human environment.  However, the notice in question was published concurrent with the USFS' Draft SEIS, which included an assessment of anticipated impacts, and a completed EFH assessment.  These documents provided background information on this project as well as on the Kensington Gold Mine project.  There was sufficient information to generate meaningful public comment.

MISCELLANEOUS CATEGORIES:

"The 404 permit should authorize the Echo Cove marine docking facility instead of the Cascade Point marine docking facility."

See Section Alternative Analysis, above.

"The 404 permit should include restrictions on timing, and on ferry routes during the eulachon run in late April and early May."

See response to ESA recommendation 1 above.

"The 404 permit should include appropriate compensatory mitigation for unavoidable impacts."

The design incorporates a breach in the breakwater to allow for near shore movement of fish.  It is anticipated that the breakwater may provide new substrate sufficient to compensate for lost habitat.  The impacts are not so substantial as to require compensatory mitigation.  Therefore, compensatory mitigation will not be required.

30

**000214**

Water quality impacts associated with certain petroleum products, with emphasis on polycyclic aromatic hydrocarbons (PAHs).

Potential contamination from PAH originating from creosote piling has been mitigated for by use of steel piling. See also responses to ESA recommendations 2 and 14 above.

"The proposed project is part of a series of interrelated activities planned by Goldbelt. .... in conjunction with reasonably foreseen development of homes and businesses, daily commuter ferry service, mining and road building...", NMFS requested a comprehensive environmental impact statement to address these 'foreseeable' actions and related impacts.

See the original Corps' Combined Permit Evaluation and Decision Document, dated June 12, 1998, Section F, Cumulative Impacts, and the 2004 FSEIS cumulative impact analysis.

The following conditions were included in the Alaska Department of Environmental Conservation's (ADEC) Certificate of Reasonable Assurance:

1.  Petroleum spill response equipment and supplies shall be available at the marine docking facility to contain and clean up any fuel spills which may occur during the construction or operation phase.

2.  The wooden portions of the docking facility docking shall not be treated with a preservative containing pentachlorophenol and if treated with creosote, the creosote shall be applied via pressure treatment that inhibits leaching at a rate that causes a sheen to form on the water.

3.  Restroom and solid waste containment facilities shall be made available and maintained at the marine docking facility during the construction operation phases.

4.  The dredging activity and spoils barge shall be enclosed within a silt curtain during dredging and spoils dewatering activity.  If during dredging a silt plume is produced, dredging shall cease until the problem is resolved.  Runoff resulting from dewatering the spoils or storing the spoils on uplands shall be directed into the enclosed area.  The silt curtain shall extend a minimum of 20' below the surface at high tide.  The structure shall remain until the silts have settled from the enclosed waters.

5.  During breakwater construction, Goldbelt shall limit the introduction of silts into the marine waters.  This can be done by utilizing fill clean of all silts and organics or by enclosing and isolating the fill area prior to fill placement with a silt curtain or similar structure.  The silt curtain shall extend a minimum of 20' below the surface at high tide.  The structure shall remain until the silts have settled from the enclosed waters."

31

**000215**

(a)     Based on the discussion above, are
        there available, practicable
        alternatives having less adverse
        impact on the aquatic ecosystem and
        without other significant adverse
        environmental consequences that do          *
        not involve discharges into "waters
        of the U.S." or at other locations                    X
        within these waters?                        YES      NO

(b)     Based on above, if the project is
        in a special aquatic site and is
        not water dependent, has the
        applicant clearly demonstrated that                   *
        there are no practicable                    NA
        alternative sites available?                YES      NO

Alternative Test:

Special Restriction.   Will the discharge:

(a)     Violate state water quality                 *
        standards?
                                                              NO
                                                    YES

(b)     Violate toxic effluent standards            *
        [under Section 307] of the Clean
        Water Act?                                            X
                                                    YES      NO

(c)     Jeopardize endangered or                    *
        threatened species or their
        critical habitat?                                     X
                                                    YES      NO

(d)     Violate standards set by the                *
        Department of Commerce to
        protect marine sanctuaries?                           X
                                                    YES      NO

(e)     Evaluation of the information
        above, indicates that the                            *
        proposed discharge material         X
        meets the testing exclusion         YES      NO
        criteria for the following
        reasons:

                [x] Based on the above information,
                    the material is not a carrier of
                    contaminants.

        Other restrictions:  Will the discharge contribute to
        significant degradation of "waters of the U.S." through
        adverse impacts to:

32

000216

(a)  Human health or welfare, through          *
     pollution of municipal water
     supplies, fish, shellfish, wildlife        ___      X
     and/or special aquatic sites?              YES      NO

(b)  Life stages of aquatic life and/or        *
     wildlife?
                                                ___      X
                                                YES      NO

(c)  Diversity, productivity, and
     stability of the aquatic life and
     other wildlife?  Or wildlife              *
     habitat or loss of the capacity of
     wetlands to assimilate nutrients,          ___      X
     purify water or reduce wave energy?       YES      NO

(d)  Recreational, aesthetic, and/or           *
     economic values?
                                                         X
                                                ___      NO
                                                YES

     Actions to minimize potential adverse              *
     impacts [mitigation]?  Will all
     appropriate and practicable steps [40 CFR   X       ___
     230.70-77] be taken to minimize adverse    YES      NO
     impacts of the discharge on the aquatic
     ecosystem?

In accordance with 33 U.S.C. 1341(d), all conditions of ADEC's
Certification are incorporated as part of the DA permit.
Therefore, they are not listed as special conditions.  ADEC's
condition number 4 is required to meet the DA public interest
criteria.

The following special conditions would also be added to the DA
permit.  Several of the following conditions are similar to those
on the ADEC Certification and are being carried here because we
feel strongly that these conditions should be carried on the
Corps permit for the life of the project, whereas the conditions
on the ADEC certificate could be modified when the certificate is
renewed.

1.  The permittee understands and agrees that, if future
operations by the United States require the removal,
relocation, or other alteration, of the structure or work
herein authorized, or if, in the opinion of the Secretary of
the Army or his authorized representative, said structure or
work shall cause unreasonable obstruction to the free
navigation of the navigable waters, the permittee will be
required, upon due notice from the Corps of Engineers, to
remove, relocate, or alter the structural work or obstructions
caused thereby, without expense to the United States.  No
claim shall be made against the United States on account of
any such removal or alteration.

33

000217

2.  Any condition incorporated by reference into this permit by Special Condition or by General Condition 5, remains a condition of this permit unless expressly modified or deleted, in writing, by the District Engineer or his authorized representative.  The Department of the Army, however, will only enforce those conditions that are within it's authority to regulate, pursuant to Section 10 of the Rivers and Harbors Act 1899 (33 U.S.C. 403), and Section 404 of the Clean Water Act (33 U.S.C. 1344).

3.  The work limit for each component of the marine docking facility shall be clearly identified in the field prior to excavation, clearing and/or construction.  The fill limit boundaries shall be located and flagged prior to fill placement.  Permanent markers shall be placed and monumented so an observer can delineate the clearing and fill limits while walking on the ground at the site.

4.  The permittee shall ensure that all project contractors and all workers whose work is subject to this permit are advised of the permit's terms and conditions.

5.  No fill or construction materials will be stockpiled, temporarily or permanently, on adjacent wetlands or in marine waters outside the approved footprint.

6.  All surface disturbances below the High Tide Line (HTL) shall be confined to the project footprint to prevent unnecessary damage to adjacent waters.

7.  All steel piles shall be driven using a vibratory hammer. Under those conditions where impact hammers are required for reasons of seismic stability or substrate type, the piles shall be driven as deep as possible with a vibratory hammer prior to the use of the impact hammer.  The impact hammer shall be used at a time of year when larval and juvenile stages of fish species are not present.  Pile driving times shall be coordinated with the Alaska Department of Natural Resources, Habitat.

8.  All piles shall be driven when the current is reduced (i.e., centered on slack current) to minimize the number of fish exposed to adverse levels of underwater sound.

9.  Permittee shall use either a block of wood between the impact hammer and the pilings, and/or use a bubble curtain to attenuate the sound.

10.  Permittee shall install and maintain, at their expense, any safety lights and signals prescribed by the U.S. Coast Guard (USCG) through regulations or otherwise, on the authorized marine facilities.  The USCG can be reached at the following address and telephone number:  Commander (oan) 17th Coast Guard District, Post Office Box 25517, Juneau, Alaska 99802-5517, telephone (907) 463-2254.

000218

11.  The size of the fill footprint shall be restricted to minimize adverse environmental impacts to the Berners Bay ecosystem.  Fill in the sub-tidal areas would be detrimental to marine fish rearing habitat and potentially could result in the declines of fish populations in nearby waters.  Placing fill at low tides reduces the impacts of sedimentation on the marine ecosystem.

12.  Although piling-supported structures will allow continued use of the project sites by many vertebrates and fish, much of the existing plant life is likely to be shaded and thereby lost.  Therefore, in order to minimize this loss, the permittee shall use metal grating as a top surface, rather than planking, as this results in greater light transmission to aquatic plants.  Light penetration is needed to maintain intertidal habitat beneath structures such as walkways, catwalks, and gangways.

13.  No portion of any floating structure may ground at any tidal stage.  This is necessary to protect water quality and aquatic habitat by minimizing disturbance and introduction of suspended sediment, petroleum products, and toxic substances into the cove and outside waters.

14.  Wooden surfaces of the structures that come into contact with the water shall not be painted or otherwise surface-treated with creosote and may not be treated with a preservative that contains pentachlorophenol.  Creosote and pentachlorophenol are toxic to juvenile fish in marine waters.

15.  No in-water construction work shall occur in Berners Bay between March 15 through June 30.  This condition in necessary to protect juvenile salmonids, herring, eulachon and marine mammals.

16.  Silt curtains or other appropriate methods shall be used to confine suspended particles and turbidity to a small area where settling can occur (see 40 CFR 230.73[c]).  Other methods include: baffles to decrease turbulence and increase retention time; and filter blankets and curtains to filter out suspended solids.

17.  The placement of fill material into marine waters shall only occur during low-water periods.

18.  Your use of the permitted activity must not interfere with the public's right to free navigation on all navigable waters of the United States.

19.  No in-water construction work shall occur in Johnson Creek May 1 through October 1, in order to direct construction to low-flow periods.

20.  Permittee shall insure that all accumulated sediment is removed from the breakwater breach.

General Evaluation.  [33 CFR 320.4(a)].

35

The relative extent of the public and private need for the proposed work. The private need would be the logistical requirement of excavating material for an enclosed moorage facility and the discharge of fill material for a breakwater to protect the marine docking facility. Also, Goldbelt has a need to construct a marine docking facility with the expectation that it would provide a safe harbor for his vessels, as well as those of other users, during high water events, such as storms.

The project was not proposed nor designed to provide for public benefits. However, a public need does exist, and it is that of the market area to capture some of the personnel transport and [future] tourism business that is presently centered in Juneau.

The practicability of using reasonable alternative locations and/or methods to accomplish the objective of the proposed structure or work: A number of alternative designs and locations were considered for the proposed work. As a result of the concerns identified regarding the environmental impacts of the originally proposed work, Goldbelt redesigned the proposed facilities to appreciably reduce short and long term impacts to aquatic resources. The revised design was evaluated, and represents a reasonable and practicable alternative, as well as the least environmentally damaging.

The extent and permanence of the beneficial and/or detrimental effects that the proposed structures or work may have on the public and private uses which the area is suited: The major permanent benefit derived from the proposed facility would be the financial return from Goldbelt's investment, some of which would be injected into the local and state economies. Goldbelt's shareholders would benefit from the profits generated.

The proposed actions (fill and dredging) would permanently displace 1.3 acres of substrate at the breakwater and temporarily displace 1.6 acres of dredged substrate. Some of the loss is expected to be compensated for by the creation of aquatic surface area on the rubble-mound breakwater, as well as on the pilings supporting the proposed dock.

## XII.  DETERMINATION

The discharge complies with the guidelines, with the inclusion of the appropriate and practicable conditions listed above to minimize pollution or adverse effects to the affected ecosystem.

The issuance of a Department of Army Permit as prescribed in the Regulations in 33 CFR 320 to 321 and 40 CFR 230, is not contrary to the Public Interest.

000220