DECLARATION OF JOE KAHKLEN

JOE KAHKLEN declares under penalty of perjury as follows:

1.    My name is Joe Kahklen.  I reside at 800 F Street, Unit D6, Juneau, Alaska, 99801.  I am the Chairman of the Board of Directors of Goldbelt, Incorporated ("Goldbelt").  I am making this declaration in support of the Motion of Goldbelt to intervene as a defendant in this litigation.

2.    I am a Tlingit Indian.  The name Tlingit translates roughly to "the real people."  My traditional name is Kokeesh, my moiety is Raven, and my clan is Dog Salmon.  I was the first CEO and President of Goldbelt when it was formed in 1974, and I have been active in corporate affairs ever since.

3.    Berners Bay and surrounding lands, including Cascade Point and the lands on which the Kensington Gold Project will be developed are within the aboriginal territory of the Auk Kwaan Tlingit, whose descendants are the modern day shareholders of Goldbelt.

4.    Berners Bay is an important subsistence hunting and fishing area for Juneau Tlingit.  Goldbelt would not be a party to any development that significantly impacted use of the area for subsistence activities.  Goldbelt and its shareholders have participated in the process of assessing the environmental impacts of the Kensington project - including the impacts of constructing the Cascade Point dock and

B

1    / 7

transporting mine workers across Berners Bay.  Goldbelt and

Coeur have agreed to extraordinary mitigation measures to

insure that the resources of Berners Bay will not be harmed.

Significantly, the plaintiffs do not challenge the adequacy of

the Supplemental Environmental Impact Statement, which

concluded that with the mitigation required by the Forest

Service's decision, the impacts of the project on Berners Bay

will be minimal.

    5.    In the years since first contact with non-Native

cultures, Tlingit lands, including Berners Bay, were

encroached upon and wrongfully appropriated by individuals in

populated areas, such as Juneau, and by the United States

government for inclusion in the Tongass National Forest.  The

Tlingit received partial compensation for the loss of their

lands as a result of a judgment issued by the United States

Claims Court in 1968.

    6.    In 1971, Congress further addressed the issue of

Alaska Native land claims by enacting the Alaska Native Claims

Settlement Act ("ANCSA"), which granted some 45 million acres

of land and $1 billion as compensation for the extinguishment

of Native aboriginal title.  In order to receive benefits

under ANCSA, Alaska Natives were required to organize as

corporations under Alaska law.  Land entitlements were

organized primarily around traditional village sites, with

village corporations receiving surface estate and regional
corporations the subsurface estate.  Because the territory of
Tlingit in the Juneau area had been subsumed into the City and
Borough of Juneau, however, Tlingit in the Juneau area (along
with three other communities) were incorporated under a
separate section of ANCSA into so-called "urban corporations,"
with the right to select 23,040 acres of land in reasonable
proximity to their municipalities.  Congress expected that
these lands would be selected for their economic potential,
which, in Southeast Alaska at the time meant timber.

        7.    In 1974, the Juneau area Tlingit organized Goldbelt
Incorporated, which currently has more than 3,000
shareholders.  In due course the Secretary of the Interior
made withdrawals of land for selection by Goldbelt, including
lands on Admiralty Island within the Admiralty Island National
Monument.  Environmental groups, including the Sierra Club
(which is a plaintiff in this litigation) immediately brought
suit challenging the legality of the Admiralty Island
withdrawals.  To avoid the delay and expense of that
litigation, in 1979 Goldbelt agreed to exchange its Admiralty
Island selections for less sensitive lands on the mainland,
including approximately 1,000 acres of land on and around
Cascade Point on the south shore of Berners Bay.

ß
3    17

8.    The Berners Bay lands, which have high values
because of their easy access from the Juneau road system, are
critical to the economic future of Goldbelt and its
shareholders.  In recognition of this fact, the City and
Borough of Juneau has designated portions of Goldbelt's lands
near Cascade Point as a "new growth area," and Goldbelt, at
great expense, has developed a phased plan for development of
the area, beginning with dock facilities at Cascade Point.  A
dock at this location would have substantial value as a ferry
terminus to northern Lynn Canal and the communities of Haines
and Skagway, as a service site for fishing vessels, and as an
embarkation point for whale watching and other tourism
activities, in addition to servicing the Kensington Mine.

9.    Having, in effect, forced Goldbelt off of Admiralty
Island and into Berners Bay and Cascade Point in particular,
the same environmental groups, lead by the plaintiffs in this
litigation, have bitterly opposed every effort of Goldbelt to
realize any economic benefit from its Berners Bay lands.  In
1998, these group successfully opposed Goldbelt's application
for a dredge and fill permit to construct a dock at Cascade
Point.  The Corps of Engineers' decision was based in part on
a finding that there was no demonstrated public or economic
need for a dock at that time.  That requirement is presently
satisfied by the inclusion of the Cascade Point marine

terminal in the Kensington Gold Project Plan of Operations and
the need to ferry workers to the mine site.

10.   In 1999, SEACC and the Sierra Club appealed a Forest
Service decision authorizing construction of a right-of-way to
allow administrative access to Goldbelt's lands at Cascade
Point.

11.   The marine terminal cannot be constructed without a
conditional use permit ("CUP") from the City and Borough of
Juneau ("CBJ").  SEACC strenuously opposed Goldbelt's
application for a CUP.  When it became clear that a permit
would be granted, SEACC succeeded in having the CBJ Planning
Commission and Assembly insert a condition in the CUP that the
dock could be used solely to transport workers via a single
ferry to the Kensington mine site.  So conditioned, the CUP
was granted on October 15, 2004.

12.   In 2003, Goldbelt once again applied for a dredge
and fill permit to construct a dock at Cascade Point to serve
as a marine terminal for transporting workers to the mine
site.  Although the 404 permit application was in the name of
Goldbelt as the property owner, the dock is an integral part
of the Kensington Gold Project Plan of Operations.  The
environmental impacts of the dock were considered in the
Supplemental Environmental Impact Statement prepared for the
Plan of Operations and associated federal permits.  On

5                    B
                  s   17

July 15, 2005, the Corps issued a 404 permit for the Cascade

Point marine terminal.  The Corps has advised Goldbelt,

however, that use of the dock for any purpose other than mine

worker ferry operations, as required in Goldbelt's CUP from

CBJ, may require re-noticing and amendment of the Corps'

permit.  Goldbelt has expended considerable time, effort and

resources in pursuing a permit for a marine terminal at

Cascade Point in reliance on Coeur's plans for the Kensington

Mine.

13.  As a consequence of SEACC's opposition, Goldbelt's

proposed Cascade Point dock is a dedicated facility that is

only viable if the mine goes into operation.  If SEACC, the

Sierra Club and Lynn Canal Conservation succeed in

invalidating the Plan of Operations and blocking construction

of the Kensington Mine, the practical and legal effect will be

to block construction of the Cascade Point dock, as well.  A

recent Op-Ed piece by a representative of plaintiff Lynn Canal

Conservation (Attachment A) makes it clear that stopping the

commute of mine personnel between Cascade Point and Slate

Creek Cove is a principal, if indirect, aim of the litigation.

SEACC has formally requested the Corps of Engineers to

reconsider and deny Goldbelt's 404 permit for Cascade Point on

the ground that the dock is dedicated to mine service (thanks

to their efforts) and Coeur could transport workers from

B
6   17

another site (Yankee Cove) not owned by Goldbelt.
Attachment B.

14.   In all its proposals for development of the
Kensington mine, Coeur Alaska has shown sensitivity to the
needs of the Native Community. In 1996, Coeur entered into an
agreement with a consortium of Southeast Alaska Native
organizations, including Goldbelt that, among other
provisions, gives a bidding preference to members of the
coalition in contracts for construction and servicing the
mine.  Because Goldbelt is the Native Corporation in closest
proximity to the Kensington mine, in 2000, Goldbelt and Coeur
entered into a separate agreement contemplating leases of land
(including the Cascade Point dock site) and future contracting
consideration, including contracting for worker transportation
and ferry service across Berners Bay for commuting Coeur
employees.  Coeur's Plan of Operations, under challenge in
this litigation, is premised on use of Cascade Point and ferry
service provided by Goldbelt.  Thus, the litigation threatens
a direct an immediate economic impact to Goldbelt.

15.   Coeur has also made commitments for local and Native
training and hire.  Unemployment and underemployment among
Goldbelt shareholders is significantly higher than for non-
Natives.  Many of the jobs that are available to Goldbelt
shareholders are in the seasonal tourism industry, where wages

are low and fringe benefits are not customary. The Kensington
mine represents the most promising new source of meaningful,
well paying jobs with benefits for our shareholders.

16. To summarize, the pending litigation is just the
latest in a consistent series of actions by the plaintiffs
designed to prevent any and all development of Goldbelt's
lands at Berners Bay. Their efforts to derail the Kensington
Mine, if successful, will not only kill Goldbelt's dock at
Cascade Point, but also will deliver a crushing blow to the
hopes of Goldbelt and its shareholders to benefit from the
economic prosperity that the mine would bring to the community
of Juneau.

17. Because of its historical roots in Berners Bay and
its involvement in the permitting process, Goldbelt is in a
position to provide the court with information that may not be
available to other parties. Paragraph 83 of the complaint,
for example, contains misleading information concerning the
importance of Cascade Point as a herring spawning area. Dive
surveys performed by Goldbelt and provided to the Corps of
Engineers demonstrate that the small amount of herring
spawning habitat that will be impacted is marginal. The
Alaska Department of Fish and Game reports that Cascade Point
is used infrequently for spawning. Because of the importance
of the mine to Goldbelt and its shareholders, Goldbelt is also

in a unique position to provide the Court with information concerning balancing of the equities.

18.    No other party can adequately represent Goldbelt's interests in this litigation.  The primary interest of the federal agencies and the State of Alaska is in defending the permitting process.  They will not be harmed if the mine is enjoined.  Coeur's principal interest is in opening and operating the mine.  Transportation and housing of employees are subsidiary issues.  The plaintiffs have argued that transportation and housing could be accommodated in several ways that would not require a marine terminal at Cascade Point -- such as transportation by helicopter(Alternative A, or the "no action" Alternative favored by plaintiffs) or use of the permitted dock facility at Yankee Cove outside Berners Bay on Lynn Canal.  These alternatives are more costly, less effective to the purposes of the Plan of Operations, and involve significantly higher safety risks.  Nevertheless, at some point, one of these alternatives might seem to Coeur preferable to the costs and uncertainty of protracted litigation.

DATED this /2 day of ____, 2005, at Juneau, Alaska.

Joe Kahklen

A:KahklenDecl.Coeur9
As of 10/4/2005

9

B
9    17

ATTACHMENT A

B
ı o          ı 7



Click here to return to the original story

# My Turn: Kensington mine is a threat to Berners Bay fish habitat

The Sept. 16 "My Turn" column explains how the Corps of Engineers violated the federal Clean Water Act by permitting the Kensington Mine to dump 4.5 million tons of tailings into Lower Slate Lake above Berners Bay. The article provides a rational explanation of why conservationists have taken the violation to court.

Another disturbing aspect of the mine operation that is not the focus of litigation is its potentially serious and irreversible harm to fish resources in Berners Bay and Lynn Canal. The largely undisturbed bay and its tributary rivers support five species of salmon, Dungeness and tanner crab, halibut and cod. The bay provides the last significant herring spawning and rearing habitat in lower Lynn Canal.

Incremental, cumulative mine-related impacts are expected to permanently degrade the nearshore ecosystem upon which all aquatic life in Berners Bay depends. Shoreline facilities and increased vessel traffic are expected to disrupt migration patterns and alter current patterns that determine predator-prey distribution, spawning habitat, immature fish survival and critical freshwater-salinity gradients. Slow and chronic releases of hydrocarbons are expected to disrupt fish reproduction.

These impacts would extend far beyond Berners Bay because commercially important fish and their prey move freely between the bay, the rest of Lynn Canal and Icy Strait. These populations support the region's commercial gillnet, seine, and troll fishermen, as well as sport and subsistence users.

Studies in the 1980s indicate that Lynn Canal's east shore is a critical migration corridor for juvenile salmon migrating from the rich spawning grounds in northern Lynn Canal. Juveniles stay close to shore to feed and avoid predation. Some fish follow the beach around Point St. Mary into Berners Bay. It is well documented that Chilkat River coho smolt migrate to sea, then overwinter in Berners River and leave the following spring.

Berners Bay herring and eulachon are important to juvenile salmon. Juvenile salmon migration coincides with the hatching of herring, and fish prey in general comprise 30 to 75 percent of their diet.

In 2004, an Alaska Department of Fish and Game biologist stated that the Lynn Canal herring stock collapsed in 1982 and has not recovered. He said that overfishing and Auke Bay habitat degradation are thought to be the main contributing factors. Developing a mine-related marine facility at Cascade Point is likely to impact herring. Continued encroachment on shoreline spawning habitat could collapse the area's herring resource and the amount of food available to Lynn Canal juvenile salmon.

Immature kings feed throughout Lynn Canal and depend on herring and eulachon. Herring and eulachon also feed mature kings and cohos moving through Icy Strait toward the many spawning rivers and streams in Lynn Canal. Adult king, coho, chum and pink salmon returning to spawn in northern Lynn Canal feed on aquatic resources produced in Berners Bay. Berners River coho smolt produce adults caught in the Chilkat River. The bay's plankton-rich water feeds migrating sockeye salmon.

Commercial gillnetting in Lynn Canal also depends on summer chum returning to hatchery release sites at Amalga and Boat harbors. Primary fishing for summer chum lies between the latitude of Little Island and Point Bridget, the southern point of Berners Bay. Sockeye destined for Berners Bay migrate through this area when chum are harvested.

ADF&G must manage all salmon fisheries to ensure wild salmon escapement in numbers sufficient to sustain them. The bay is the first estuarine environment juvenile sockeye encounter. If industrial development in the bay negatively impacts wild sockeye, ADF&G may need to close the lower Lynn Canal summer chum fishery to protect it. Closure would affect fishermen, nonprofits that produce chum, and processors who buy gillnetted chum and sockeye.

ADF&G may also need to limit commercial trolling to protect Berners Bay coho from overharvest. Coho depend on a healthy estuary and the fish prey it produces. A collapse of herring and eulachon runs could dramatically impact coho.

Agencies can speculate that the Kensington Mine will not impact Lynn Canal fisheries; however, events commonly unfold differently than government and industry people hope. Consequences for complex biological systems like Berners Bay-Lynn Canal can be serious and irreversible. To risk sustainable Lynn Canal fisheries for short-term economic returns from the Kensington Mine would be irresponsible.

• Bruce Baker is a natural resource consultant, conservationist and retired deputy director of the Alaska Department of Fish and Game's Habitat Division.
Click here to return to story:
http://www.juneauempire.com/stories/092905/opi_20050929004.shtml



# Southeast Alaska Conservation Council

SEACC  419 6th Street, Suite 200, Juneau, AK 99801
(907) 586-6942 phone • (907) 463-3312 fax
www.seacc.org • info@seacc.org

## RECEIVED

### AUG 0 8 2005

CENPA - CO - FI - E - JFO
Alaska District Corps of Engineers

August 5, 2005

John Leeds
U.S. Army Corps of Engineers
Regulatory Branch
8800 Glacier Highway, Suite 106B
Juneau, AK 99801

RE:     Use of Cascade Point under ACOE Permit POA 1997-245-N

Dear Mr. Leeds:

As you are aware, the Southeast Alaska Conservation Council (SEACC) has been actively engaged in the public review of Goldbelt Inc.'s permit application for development of a marine terminal at Cascade Point. We have reviewed the Record of Actions that you provided SEACC via email on August 4, 2005, and it is unclear whether the Army Corps of Engineers has seen the enclosed letter. The letter is from David D. Goade, Executive Vice President of Goldbelt, Inc. to Kaja Brix of the Protected Resource Division, NMFS Alaska Region, dated December 20, 2004.

In the letter, Mr. Goade clearly indicates that "[t]here are no possible future developments involving the terminal that are 'reasonably certain to occur'" in addition to mine support. Goade letter at 1. Because "Goldbelt has no present plan or intention to use the dock for any other purpose" than shuttling mine workers (*id.*), the purpose Goldbelt envisions for the marine terminal is far narrower than that characterized in the Corps' Decision Document for the permit. For this reason, the Corps should re-open its alternatives analysis with due consideration of the newly-constructed facilities at Yankee Cove, which can fulfill the sole purpose of this project (shuttling mine workers).

13

13     17

ALASKA SOCIETY OF AMERICAN FOREST DWELLERS, Point Baker • ALASKANS FOR JUNEAU • CHICHAGOF CONSERVATION COUNCIL, Tenakee • FRIENDS OF BERNERS BAY, Juneau • FRIENDS OF GLACIER BAY, Gustavus • JUNEAU AUDUBON SOCIETY • JUNEAU GROUP SIERRA CLUB • LOWER CHATHAM CONSERVATION SOCIETY, Port Alexander • LYNN CANAL CONSERVATION, Haines • NARROWS CONSERVATION COALITION, Petersburg • LISIANSKI INLET RESOURCE COUNCIL, Pelican • PRINCE OF WALES CONSERVATION LEAGUE, Craig • SITKA CONSERVATION SOCIETY • TONGASS CONSERVATION SOCIETY, Ketchikan • TAKU CONSERVATION SOCIETY, Juneau • WRANGELL RESOURCE COUNCIL • YAKUTAT RESOURCE CONSERVATION COUNCIL

*printed on recycled paper*

Thank you for your attention to this request.

Sincerely,

Buck Lindekugel
Conservation Director / Staff Attorney


Enclosure: Goade, Goldbelt Inc. letter to Brix, NMFS, dated December 20, 2005


CC:    Larry L. Reeder, Chief, Regulatory Branch
       Timothy J. Gallagher, Colonel, Corps of Engineers

B
15    17

ATTACHMENT B



**Goldbelt**

9097 Glacier Hwy. Suite 200. Juneau. Alaska 99801 (907) 790-4990 Fax (907) 790-4999

December 20, 2004

Kaja Brix
NMFS Alaska Region
Protected Resource Division
P.O. Box 21668
709 West 9th Street
Juneau, AK 99802

Re:    Kensington Gold Project ESA § 7 Consultation

Dear Ms. Brix:

I have reviewed the draft minutes of the December 15, 2004, ESA Section 7 Consultation
meeting. I am writing to respond to the third bulleted point under section III, regarding
Goldbelt's future plans for the Cascade Point marine terminal. There are no possible
future developments involving the terminal that are "reasonably certain to occur," as
contemplated by your Consultation Handbook, page 4-30.

As you know, the City and Borough of Juneau has issued a Conditional Use Permit that
restricts Goldbelt's use of the terminal to a single shuttle ferry to accommodate workers
at the Kensington mine. Quite apart from this legal restraint, Goldbelt has no present
plan or intention to use the dock for any other purpose.

The Corps of Engineers asked Goldbelt to describe any uses to which the dock could be
put, without regard to present zoning or permit restrictions. It is conceivable that a dock
in that location could be used in the future for ecotourism cruises, services for
commercial fishermen, or even (with some modifications) as a ferry terminal to serve
northern Lynn Canal. Goldbelt has no current commitments or business plans for any of
these options, however.

By way of further explanation, until last year Goldbelt owned and operated a fleet of 10
day and over night tour vessels. Last year, however, Goldbelt sold all but one of its
operational vessels, which is home ported in Ketchikan. Goldbelt does have a lease back
agreement on a single vessel that is dedicated to Tracy Arm tours. Thus, Goldbelt
management has made a conscious decision to retrench its tourism operations and has
absolutely no plans at the present time to expand those operations, at Cascade Point or
elsewhere.

Services to the commercial fishing industry are purely speculative. Goldbelt has no
commitments or plans with respect to such operations.

VB
16        17

Kaja Brix
Section 7 Consultation
Page 2

The State of Alaska is considering a Juneau access alternative that would involve ferry service to Lynn Canal out of a Cascade Point location. If that alternative is selected (which seems unlikely), it would require significant modifications to the current dock proposal (which is designed to accommodate small, shallow draft vessels). Any such modifications would require additional dredge and fill permits from the United States Army Corps of Engineers, which, of course, would necessitate further Section 7 consultations. I understand that any future "federal actions" unrelated to the present proposal and that would require their own Section 7 consultation are not considered in your cumulative effects analysis. Consultation Handbook, page 4-30.

Because of the restrictions imposed by the CBJ Conditional Use Permit, and Goldbelt's complete absence of any specific plans for use of the Cascade Point marine terminal beyond servicing the Kensington Mine in accordance with that permit, I can assure you that no other use of the dock is "reasonably certain to occur" in the foreseeable future.

If you have any other questions, please give me a call.

Sincerely,
GOLDBELT, INC.


David D. Goade
Executive Vice President

EXHIBIT    B
Page    17    of    17