# MEMORANDUM

**CITY/BOROUGH OF JUNEAU**
155 South Seward Street, Juneau, Alaska 99801

**DATE:**  August 24, 2004

**TO:**  Planning Commission

**FROM:**  Peter Freer, Planning Supervisor
Community Development Department

**FILE NO:**  MIN2004-00003

**PROPOSAL:**  An Allowable Use Permit for an underground mine located approximately 45 miles northwest of Juneau near Berners Bay.

## GENERAL INFORMATION

Applicant:  Coeur Alaska, Inc.

Property Owners:  U.S. Forest Service; Coeur, Inc.; Hyak Mining; Dr. B.D. Fremming; State of Alaska

Property Address:  Juneau Office
Coeur Alaska, Inc.
3031 Clinton Drive, Suite 202
Juneau, AK. 99801

Legal Description:  U.S. Mineral Surveys 37A, 37B, 38A, 38B, 39, 40A, 40B, 41, 42, 43, 44, 45, 46, 47A, 47B, 48, 49, 50A, 50B, 51, 52A, 52B, 53, 54A, 54B, 55, 56, 57, 58, 59, 60, 61, 578, 261, 264, 265, 266, 676 and 1496; ADL 107152 (state tide and submerged lands within Section 1, T36S, R36E, and Section 32, T37S, R63E, CRM)

Parcel Code Number:  <u>Coeur Alaska fee simple and/or leasehold interest</u>

3M000BB00040, 3M000BB00041, 3M000BB00050, 3M000BB00060

<u>Private Mining Claims</u>

3M000BB00070, 3M000BB00090, 3M000BB00110, 3M000BB00120

Site Size:

| | |
|---|---|
| U.S. Forest Service | 157 acres |
| Coeur, Inc. | 764 acres |
| Hyak Mining | 228 acres |
| Dr. B.D. Fremming | 115 acres |
| State of Alaska | 6 |
| TOTAL | 1,264 acres |



**CITY/BOROUGH OF JUNEAU**
★ ALASKA'S CAPITAL CITY

Exhibit 1 to Freer Declaration
Page 1 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 2 of 60

| | |
|---|---|
| Zoning: | Rural Reserve |
| Utilities: | No public utilities |
| Access: | Air and water access |
| Existing Land Use: | Rural open space; historic mining operations; small mining camp; mining claims |

Surrounding Land Use:  North  -  Coast Range
South  -  Berners Bay; Lynn canal
East  -  Lace/Antler/Gilkey Rivers; Coast Range
West  -  Lynn Canal; Chilkat Range

**LIST OF ATTACHMENTS**

| | |
|---|---|
| Attachment A | Vicinity and Location Map |
| Attachment B | Project Area Map |
| Attachment C | General Layout of Facilities |
| Attachment D | Ordinance 2003-27am |
| Attachment E | Helicopter Flight Path |
| Attachment F | Avalanche Paths In Johnson Creek Basin |
| Attachment G | Slate Creek Cove Marine Terminal |
| Sub-attachment G-1 | Cross Sections 1-1' and 2-2' |
| Sub-attachment G-2 | Cross Section 3-3' |
| Attachment H | Location of Project Wetlands |
| Attachment I | Lower Slate Lake (existing condition/after reclamation) |

<u>**PROJECT DESCRIPTION**</u>

The Kensington Gold Project is located approximately 45 air miles north of Juneau and 35 air miles south of Haines, Alaska (see Attachment A for a Vicinity and Location Map of the project). The mine site is within the City and Borough of Juneau and the Tongass National Forest. In November 2001, Coeur Alaska, Inc. (Coeur) submitted an amendment to its approved 1998 Plan of Operations to the Forest Service. The amendment modifies site access, replaces an onsite personnel camp with a commute, relocates the mill site and eliminates the dry tailings facility in favor of placing the tailings into Lower Slate Lake.  Through these project optimization activities, Coeur estimated in a January 6, 2004 presentation to the U.S. Forest Service, that the project's operating costs would be approximately $195 per ounce of gold, and capital development costs would range between $75 and $125 million.

Exhibit 1 to Freer Declaration
Page 2 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 3 of 60

The proposed mine will produce approximately 2,000 tons of ore per day and 400 tons of development rock per day over an estimated 10 years. Coeur's preferred project, Alternative B in the Supplemental Draft EIS, is forecast to have an accelerated construction schedule of 16 months compared to 22 months for Alternative 'A'. The project will employ a peak workforce of 325 at the end of the first year of construction and is expected to average 228 workers over the first year and 98 workers over the last four months of construction. The 225 full-time employees will be required to operate the mine and processing facilities.

Coeur Alaska, Inc, the operator, currently maintains a wastewater treatment plant, including settling ponds located near the 850-foot portal in the vicinity of the historic Kensington Mine site. The settling ponds treat mine drainage. A waste rock pile resulting from exploration activities is located in the same vicinity. A small personnel camp at Comet Beach houses workers conducting maintenance activities at the site. The camp includes a small, permitted sewage treatment plant that discharges to Lynn Canal. The mine received all state and federal permits required to construct and operate the mine following publication of the 1997 Kensington Gold Project Final Supplemental Environmental Impact Statement and issuance of the Record of Decision, but did not begin construction or operations under these permits.

Coeur is submitting this application for Alternative 'B' as identified in the Supplemental Draft Environmental Impact Statement. This alternative is identified in the SDEIS as having a ten-year lifetime based on 1.1 million ounces of recoverable reserves. A resource of up to 5 million ounces may exist, and as the mine is developed, additional recoverable reserves can be expected to be identified. For example, the previously approved project (Alternative 'A' below) was based on 1.9 million ounces of recoverable reserves. The project is believed to have excellent exploration potential and the life of the mine may extend beyond the ten-year period authorized under federal permits. Coeur officials have stated that the mine may have a 15-year life. The CBJ's other large, underground mine, Greens Creek, has had its lifetime extended considerably as additional recoverable reserves have been identified.

The tailings disposal facility proposed for the Kensington project will accommodate a 10-year mine life. The development of additional reserves that extend the life of the mine beyond 10 years will require the project to undergo environmental review under NEPA for additional tailings storage capacity. For mines that are in operation, CBJ §49.65.155 (b) states that if a "change to the mining operations will require preparation of a new or supplemental environmental impact statement…..the [allowable use] permit shall be amended, unless summary approval of the change is granted pursuant to (b) (2) of this section." The section, CBJ 49.65.155 (b) (2), establishes the standard of review for a summary approval, and provides the Director with the authority to make a summary approval determination.

Thus, if mine life is extended and a new or supplemental EIS is required for additional tailings storage capacity or other changes in operation, a new Allowable Use Permit may or may not be required depending on whether the requirements for summary approval are met.

Exhibit 1 to Freer Declaration
Page 3 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 4 of 60

Each of the alternatives in the Supplemental Draft is summarized below.

**Project Alternatives**

Project alternatives in the Draft Supplemental EIS, including Alternative 'B', are described briefly below. The U.S. Forest Service, the Lead Agency for the DSEIS, will identify its Preferred Alternative when a Record of Decision for the project is issued in November of 2004. See Attachment A for a summary of impacts by alternative.

**Alternative A: No Action**. The "no action" alternative in the current EIS is the project that was approved for development in 1997. Supplies, including fuel, would be delivered to a marine terminal on Comet Beach (on Lynn Canal). Workers would be housed at the mine site and transported back to Juneau by helicopter. Tailings would be de-watered and placed in a DTF (dry tailings facility) designed to hold 20 million tons of tailings. The production rate is forecast at 4,000 tons of ore per day and 400 tons of waste rock per day. All mine facilities are located on the Lynn Canal side of Lions Head Mountain in the Ophir, Ivanhoe and Sherman Creek drainages, and occupy 268.6 acres of land. The DTF occupies 113.4 acres; the borrow sites occupy 54.7 acres; the processing area occupies 34.2 acres; and the access roads occupy 22.8 acres. Together, these sites comprise 84 percent of the total disturbed area. Long-term loss of wetlands is forecast at 164 acres.

**Alternative A1: Reduced Mining Rate/Smaller Dry Tailings Facility**. This is the same as Alternative 'A', but at the lower production level of 2,000 tons of ore per day. The DTF would be approximately 65 percent smaller than that proposed under Alternative 'A'. The reduced mining rate presented under Alternative 'A1' would produce very limited amounts of waste rock. Reduction in the size of the DTF and borrow areas would reduce the total disturbed area by 81.5 acres from Alternative A, from 268.6 to 187.1 acres. Other aspects of Alternative 'A1', including transportation of employees and materials, would be the same as those described under Alternative 'A'. The life of the operation would be reduced to 10 years following two years of construction. Long-term loss of wetlands is forecast at 124 acres.

**Alternative B: Proposed Action**. The proposed action differs significantly from the approved 1997 project. Milling and processing operations will be moved from the Sherman Creek drainage to a location near the old Jualin Mine in the Johnson Creek Drainage. Workers will not be housed at the mine site, but will commute to a new marine terminal proposed at Cascade Point, then travel by vessel to a marine terminal at Slate Creek Cove. All freight, fuel and other materials bound for the mine will be delivered to the Slate Creek Cover terminal and trucked up a five-mile haul road to the mine site. Tailings will be disposed in a tailings storage facility (TSF) in Lower Slate Lake. Water from the TSF will be recycled for use in the mill circuit. Approximately 1.9 million ounces of gold reserves have been identified, and approximately 1.1 million

Exhibit 1 to Freer Declaration
Page 4 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 5 of 60

ounces would be recovered, as ore with a higher average gold concentration is mined. The production rate is anticipated to be 2,000 tons of ore per day over a 10-year mine life. This alternative disturbs 195.5 acres of land. Long-term loss of forested wetlands is approximately 51 acres. Successful restoration of Lower Slate Lake would expand aquatic habitat.

**Alternative C: Dock Location and Design/Stream Diversion**. This alternative relocates the Cascade Point marine terminal to a location inside Echo Cove and diverts water from Upper Slate Lake in open channel diversions around the TSF in Lower Slate Lake, to minimize the volume of fresh water in contact with the tailings. The landing craft ramp at Slate Creek Cove, included in Alternative B, is eliminated in this alternative.

**Potential Alternative "D"**: This possible alternative was not discussed in the DSEIS, but because it has been discussed as an alternative for the Final SEIS, it is included here. Alternative D would be the same as Alternative B except for changes to the operation of the Tailings Storage Facility (TSF). Under this alternative, a cofferdam would be built below Upper Slate Lake to capture the flow of Mid-Lake East Fork Slate Creek and divert it around the TSF. This diversion would entail a 20-inch pipeline through which water would flow to the TSF spillway and be discharged into East Fork Slate Creek below the impoundment. Water to be discharged from the TSF would first pass through a water treatment plant before being discharged to East Fork Slate Creek. The extent of disturbance would be more than that described for Alternative B and less than described for Alternative C because the open channel diversions would not be required.


## BACKGROUND

Historically, development and ore production occurred at the Kensington mine site from 1897 through 1938. Recoverable gold reserves were discovered at the nearby Jualin Claim in 1895, and the mine operated intermittently between 1896 to 1928. Together, both mines produced 40,513 ounces of gold from 75,208 tons of ore.

The Kensington Gold Project now encompasses and includes both the Kensington and Jualin prospects. The Kensington Gold Project is located on federal land overseen by the U.S. Forest Service (USFS), on State of Alaska tidelands, and on private patented mining claims.

The Kensington Venture, a joint venture between Coeur and Echo Bay Exploration Inc, initially proposed to develop the Kensington Gold Project. Their proposal, submitted to the Forest Service in 1990, would have used underground techniques to recover the ore, processed the ore onsite using flotation and cyanidation circuits, and disposed of the tailings in a tailings impoundment built in the Sherman Creek drainage. The impoundment would have been sized to contain 30 million tons of tailings. The proposal included discharging wastewater to Lynn Canal

Exhibit 1 to Freer Declaration
Page 5 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 6 of 60

following treatment and shuttling employees to the mine site using helicopters. The operation would have used liquefied petroleum gas (LPG) to fuel on-site generators. Deliveries of supplies and shipment of gold offsite would have been done from a marine terminal developed at Comet Beach in Lynn Canal. The Kensington Venture never obtained all permits necessary to build the mine and in 1995, Coeur became the sole stakeholder in the property.  Draft and Final Environmental Impact Statements were prepared for the project.

Coeur then submitted a revised Plan of Operations to the Forest Service in September 1995. Coeur's 1995 Plan of Operations included the same mining and tailings disposal scenario but proposed enhanced treatment of the tailings wastewater and a discharge to Sherman Creek rather than Lynn Canal. The proposal also included back-filling the cyanidation tailings and shifting the fuel source from LPG to diesel. The Forest Service published a Notice of Intent to prepare a Supplemental Environmental Impact Statement for the proposed changes, and scoping meetings were held in October 1995 to solicit comments on the project from the public.  In response to the scoping process and meetings with federal, state and local agencies, Coeur again revised their Plan of Operations and resubmitted it to the Forest Service in June 1996. The 1996 plan called for the elimination of onsite cyanidation in favor of shipping flotation concentrate.

In August 1997, the Forest Service approved a revised Plan of Operation for the Kensington Gold Project. The modified plan called for offsite processing of concentrates; placement of tailings in a dry tailings facility (25% to be placed back underground); use of diesel fuel for power generation; and tailings slurry being piped to a de-watering plant, with reclaimed water returned for reuse.  Draft and Final Environmental Impact Statements were prepared for the project, and a Record of Decision was issued.  The project received a Large Mine Permit from the CBJ.

The current project is the result of optimization studies by the applicant to lower the overall costs and footprint of the mine, concentrate on recovery of the most valuable reserves and improve its economic feasibility and potential profitability.


## ANALYSIS

## PROJECT SITE

The project is located on U.S. Forest Service land, State of Alaska tidelands and private mining claims below Lions Head Mountain in the Johnson Creek drainage above Berners Bay (see Attachment B, Project Area Map).  The project site encompasses approximately 1,125.54 acres and includes marine facilities at Slate Creek Cove, a 5.1-mile haul road from Slate Creek Cove through the site of the present Jualin mining claim to a mill and associated mine facilities above the Jualin claim in the Johnson Creek Basin.  Marine facilities are proposed to be constructed on land owned by Goldbelt, Inc. at Cascade Point, near the Echo Cove end of Berners Bay, where workers will board a boat for the daily trip to the mine site.

Exhibit 1 to Freer Declaration
Page 6 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 7 of 60

## PROJECT DESIGN

The Kensington mine will be operated as an underground mine utilizing Lower Slate Lake for tailings disposal.  A five–mile road connects the mining and milling facilities to tidewater marine terminal facilities at Slate Creek Cove.  This is a substantially re-designed project from the one that sought a City and Borough of Juneau Large Mine Permit in 1997.  The significant changes between the project permitted in 1997 and the proposed project are:

- Workers will commute by bus and boat from town and will not reside in a camp at the mine.
- Marine terminal facilities will be constructed within Berners Bay at Slate Creek Cove and Cascade Point, rather than in Lynn Canal at Comet Beach.
- The mill will be located in the Johnson Creek drainage in the vicinity of the Jualin claim, and not in the Sherman/Ophir Creek drainages.
- Tailings will be disposed into Lower Slate Lake in the Slate Creek drainage and not into a dry tailings facility in the Sherman/Ophir Creek drainages.
- An adit will be driven from the Jualin side, where the mill will be located, to connect with the Kensington adit.

Coeur seeks the change in mine operation plans to reduce capital construction costs, lower long-term operating expenses and reduce the footprint of mine development by approximately 136 acres (Coeur presentation, January 6, 2004).  The operation is scaled to mine a smaller portion of the ore body containing a higher average gold concentration than that proposed under previous iterations (Kensington SDEIS, January of 2004).   Mine life is estimated at 10 years to recover approximately 1.1 million ounces of gold.  Coeur has identified recoverable reserves of 1.7 million ounces of gold and has indicated an exploration potential of up to 5 million ounces of gold.  Gold recovery greater than the currently planned 1.1 million ounces will require the future development of additional tailings storage capacity (see Attachment C, General Layout of Facilities).

CBJ Regulation of Large Mines Located in the Rural Mining District. CBJ §49.65.115 [c] (see Attachment D, Ordinance 2003-27am), provides that a mine located in the Rural Mining District that will undergo environmental review by federal and state agencies shall be permitted as an Allowable Use pursuant to CBJ 49.15.320. This code section authorizes the Planning Commission to impose conditions (1)—(8) of CBJ §49.15.320, as well as several additional conditions particular to large mines in the Rural Mining District.  The code permits the Commission to impose additional conditions addressing traffic, lighting, safety, noise, dust, visual screening, surface subsidence, avalanches, landslides, and erosion.  This project must also be reviewed for consistency with the Juneau Coastal Management Program, CBJ §49.70.900 et. seq.

Each of the above-listed subjects is discussed in this staff report, with recommended conditions listed by subject following each discussion.  In many of these areas, CBJ shares regulatory

Exhibit 1 to Freer Declaration
Page 7 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 8 of 60

authority with the federal and state governments.  When an area is regulated by federal and/or state law, the report gives an overview of federal and state permitting processes and regulatory decisions.


## TRAFFIC

Ground traffic will be generated on the haul road as trucks haul ore concentrate to tidewater and freight to the mine, and on Glacier Highway as mine workers are bussed daily to the marine terminal at Cascade Point.  Marine traffic will be generated within Berners Bay as freight and workers are delivered to and from the Slate Creek Cove marine terminal.  Air traffic will be generated as construction workers are transported by helicopter between the Juneau airport and the personnel camp at Comet Beach.  Future construction of the Juneau Access Road could bring road transportation to Kensington during its operations.

### Background

**Haul Road**.  A 5.1-mile haul road connects the marine terminal at Slate Creek Cove to the mill site near the old Jualin claim.  The road is designed as a one-lane road with pullouts every 1,500 feet to accommodate two-way traffic.  Radio communications between vehicles will be used to monitor and control traffic on the road.  Vehicles using the haul road will include tractor/trailer rigs, flatbeds, buses, carryalls, pick-ups, fuel trucks, fire fighting vehicles, an ambulance, forklifts, road graders, snowplows and other vehicles supporting mine operations.  The DSEIS indicates that approximately 5,350 vehicle round trips per year will be made on the haul road during mine operations.

The haul road is classified as an RS 2477 road.  Revised Statute (RS) 2477, contained in the 1866 federal Mining Law, was intended to facilitate settlement of the West by granting rights-of-ways on public lands.  RS 2477 was repealed in 1976, and existing claims, including the Kensington haul road, were "grandfathered."  To facilitate mine development, the Department of Natural Resources has issued a Draft Finding and Decision to close the road to public access. The stated purposes of the closure are:

1. To protect the public from safety hazards associated with mining activities;
2. To comply with Mine Safety and Health Administration requirements to control/limit public access to mining activities;
3. The frequent use of mining support vehicles along a one-way road, and;
4. The necessity to haul explosives, fuel and other hazardous materials along the route.

The Finding and Decision gives the mine operator the authority to restrict the public from using the right-of-way when that use would unduly interfere with mining operations, or create a public safety risk, except, the operator can grant permission for public access with specific times and methods of use.  If the operator wants to restrict the public from any access, a Public Access

Exhibit 1 to Freer Declaration
Page 8 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 9 of 60

Management Plan specifying how the use is to be restricted must be submitted to DNR for approval.

Materials expected to be routinely delivered via the haul road include:

| | |
|---|---|
| Ore Concentrate | 25 trips every 24 hours totaling 500 tons-per-day |
| Fuel | 25-34 5,000-gallon isotainers per week |
| Grinding Balls | 2 containers per week |
| Mill Reagents/Supplies | 3-4 containers per week |
| Mine Supplies | 3-4 containers per week |
| General Material | 3-4 containers per week |
| Employees | 4-5 trips per day |

**Worker/Commute Traffic**. Workers will commute by bus from an as-yet-undesignated location (most likely) in the Mendenhall Valley to the marine terminal at Cascade Point (the applicant has also discussed using existing, vacant parking). A catamaran ferry will transport workers from this location to the Slate Creek Cove marine terminal, where they will be bussed five miles to the mine site. The SDEIS forecasts a total of four bus trips per day to transport workers during the Monday-Friday work week, timed to meet ferry departures from Cascade Point at 5 AM, 3 PM, 6 PM, and 1 AM. On weekends, buses will operate to meet 5 AM and 6 PM departures from Cascade Point. A 78-foot catamaran with a top speed of 28 knots will transport workers between marine terminals, except when weather requires the use of a 47 to 60-foot deep V-hulled vessel with a top speed of 14 to 18 knots. The slower vessel holds fewer people and would make twice the number of trips as the faster catamaran.

**Marine Traffic**. Construction materials and fuel will be barged to Comet Beach until construction of terminal facilities at Slate Creek Cove is completed, approximately four months into the construction schedule. At that time supplies, including fuel, will be delivered to the Slate Creek Cove marine terminal. Four barge trips per week are anticipated during mine operations. Diesel fuel will be delivered to the site in 5,000-gallon isotainers conforming to ISO (international standards organization) standard 1496-3. Under this standard, the tank will be enclosed within a structural frame that isolates and protects the tank during handling. Approximately 25-34 isotainers will be delivered to the marine terminal each week to meet the estimated fuel consumption at the mine of 6.5 million gallons annually. Chemicals used for milling and other purposes and ore concentrate will also be moved through the Slate Creek Cove terminal.

Exhibit 1 to Freer Declaration
Page 9 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 10 of 60

Workers will be transported across Berners Bay by catamaran from Cascade Point to Slate Creek Cove between three and five times per day during mine operations. As stated above, the vessel is expected to be 78 feet in length with a passenger load of 140 and a top speed of 28 knots. A one-way trip between marine terminals is approximately 15 minutes under good weather and sea conditions. A deep V-hulled vessel would take approximately a half-hour or longer to make this passage depending on the severity of the weather.

**Helicopter Traffic**. Helicopter use will occur primarily during the construction phase of the project, as workers driving the tunnel between the Kensington and Jualin workings are shuttled between the Juneau airport and an interim camp at Comet Beach. According to the Supplemental Draft EIS, workers would be shuttled at a rate of 12 to 14 trips per month.

**Cascade Point Road/Juneau Access Road**. The U. S. Forest Service has completed an EIS for the Cascade Point Road, and issued a Record of Decision in 1998. The right-of-way for the two-and-a-half-mile road is largely similar to the Juneau Access Road right-of-way. Construction of the road is expected to begin in conjunction with planned construction of the Kensington Mine. Goldbelt could operate the road privately, or permit public use.

The current schedule for the Juneau Access Road EIS calls for a Draft Supplemental EIS in August of 2004, a Final Supplemental EIS in January of 2005, and a Record of Decision in the spring or early summer of 2005. Assuming that the project is funded and moves forward, construction of the first segment of the road, from Echo Cove to the Antler River, could begin in 2005. Geo-technical work could begin concurrently on bridge crossings of the Antler River (2,100 feet) and the Lace River (2,500 feet). Assuming the mine opens in 2006 and has a 10-year lifetime, it is possible, but by no means predictable, that the Juneau Access road could reach the mine during its operations.

<u>Analysis</u>

**Haul Road Traffic**. Traffic on the one-way mine haul road will be regulated by Coeur policy. The company states in the Allowable Use Permit application that it has a Federal Communications Commission permit for surface traffic communication. All vehicles traveling on the haul road will be radio equipped with an open channel similar to marine channel 16. All vehicles will be required to check on the open channel before transiting the haul road. This resembles the traffic safety protocol on the Greens Creek haul road, where vehicles are required to use a dedicated radio frequency to stay in constant contact with regard to location. Using Alaska Highway traffic safety data, the SDEIS has projected the statistical probability of one vehicle accident on the haul road over the life of the mine.

The SDEIS estimates it will take vehicles, on average, 15-20 minutes to travel the 5.1-mile distance between Slate Creek Cove and the mill complex, which translates into speeds averaging between 15 and 20 miles-per-hour.

Exhibit 1 to Freer Declaration
Page 10 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 11 of 60

**Worker/Commute Traffic**. Any increase in traffic volume on Glacier Highway directly associated with mine commuting will be negligible, as workers will transported to the Cascade Point marine terminal by bus, according to the applicant's submittal. Daily transport of workers to Cascade Point will require Glacier Highway to be plowed and maintained beyond the point at which it is currently maintained for safe vehicle use during the winter months. Currently, winter road maintenance ends at Eagle Beach Recreation Area (Mile 29), and will have to be extended to Cascade Point (Mile 42.5), to accommodate daily bus commutes. Winter maintenance of Glacier Highway is expected to lead to an increase in non-mine-related traffic, as local residents take advantage of winter travel and recreational opportunities in this area.

Traffic volume on Glacier Highway would increase, should the bus commute prove impractical or unpopular and mine workers chose instead to drive their own cars to Cascade Point or to make other informal carpooling arrangements. Glacier Highway can easily accommodate the potential increase in traffic that would result from mine workers driving their own cars, and from the induced traffic.

Department of Transportation data from 2001 shows a statewide rate of one accident per 315,000 driving miles (4,801 million driving miles/15,273 accidents). If an average of 200 vehicles (50 vehicles per shift/4 shifts per day) carrying mine workers make an average 70-mile daily round trip 365 days per year, then there is a statistical probability that up to sixteen vehicle accidents related to mine-generated traffic could occur annually. If commute distances are shorter, say a 40-mile round-trip, then eight or nine vehicle accidents related to mine-generated traffic can be projected to occur annually. The actual number of private vehicles that could be driven daily by mine workers is not known. The figures above are based on 50 workers per shift each driving their own vehicle, and probably represents a "worst case." No estimate is made for accident probability related to non-mine-related traffic since there is no reliable winter traffic count.

DOT records average daily traffic counts for many locations in the CBJ, including Mile 35 Glacier Highway, the closest location to Cascade Point at which traffic counts are made. In 2002, the last year for which complete figures are available, DOT vehicle counts showed an average daily count in both directions of 213 vehicles at this location. Because the highway is not maintained during winter months, and because this area sees heavy summertime recreational use, traffic volumes are presumed to be much less than the average during the winter months and correspondingly higher during the summer months. Should personal vehicles replace the proposed bus commute and recreational use expand due to maintained roads, the winter vehicle count can be expected to increase considerably over this level.

Bus and recreational traffic traveling to the end of Glacier Highway during the winter months will expand the area over which emergency services will be needed. Capital City Fire and Rescue has indicated that an ambulance from the Glacier Station, located at the Juneau Airport, would respond to vehicle accidents along this stretch of Glacier Highway. Ambulance response time from the Glacier Station to Cowee Creek, for example, is estimated to take 30 minutes assuming good weather and driving conditions. An engine from the Glacier or Auke Bay fire

Exhibit 1 to Freer Declaration
Page 11 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 12 of 60

stations would respond also, depending on staffing (the Lynn Canal fire station is not currently staffed, however, efforts are being made to restore staffing to the station). Drive time for an engine from the Lynn Canal Station to Cowee Creek is estimated to be approximately half that of Glacier Station response time. Response times are affected by numerous factors besides distance, including level of traffic, road conditions, weather, time of year and time of day. Capital City Fire and Rescue routinely responds to vehicle accidents throughout the roaded service area.

**Marine Traffic**. Marine traffic will consist of daily round trips for the mineworkers and weekly schedules of barge deliveries. A catamaran (or deep V-hull type vessel during inclement weather) will make four round trips per day transporting mine workers between marine terminals at Cascade Point and Slate Creek Cove. Barge traffic will access Slate Creek Cove by passing through the northwest corner of Berners Bay on a line from Lynn Canal to Slate Creek Cove. The principal impacts to users of Berners Bay from this marine traffic are expected to be noise, wakes, and an increased level of activity within the bay.

The Supplemental Draft EIS estimates maximum wake from the catamaran at 1.5 feet, diminishing to 8 inches within 300 to 500 feet from the sailing line. Estimated wake height is not provided for marine freight traffic; however, the SDEIS does state that commercial tugs and barges produce many more waves than a recreational-type vessel, and that the waves occur over a longer period of time.

The U.S. Coast Guard does not have the capability to patrol Berners Bay to provide onsite monitoring of potential conflicts between commercial and recreational vessel traffic. While vessel captains are presumed to be aware of, and prepared to follow, marine safety rules, and while the U.S. Coast Guard is required to investigate marine accidents and respond to complaints, some caution in the piloting of mine commute vessels could alleviate the potential for conflicts caused by wakes.

**Helicopter Traffic.** A helicopter produces 72 decibels of noise directly overhead at 2,000 feet. This is equivalent to a vacuum cleaner. This level drops to 62 decibels when 2,000 feet of horizontal separation is added to the 2,000 feet of vertical separation, or about the noise level of a sewing machine or typewriter. The FAA requires helicopters to fly at least 300 feet above ground level in residential areas, which has a decibel level of about 90, the same as a food blender. Helicopter flight paths and flight safety are administered by the FAA under CFR Title 14, which takes into account weather, cloud cover and other factors. The proposed flight path avoids the high-density residential neighborhoods of the East Mendenhall Valley by following Montana Creek to Windfall Lake then following Cowee Creek to Point Bridget State Park and up Lynn Canal to the construction camp near Comet Beach.

**Cascade Point Road/Juneau Access Route**. Construction of the bridge crossings and extension of the road to the Kensington mine is dependent on funding and other factors, and the timing for

Exhibit 1 to Freer Declaration
Page 12 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 13 of 60

actual construction is speculative until environmental review of the project is completed.  Still, it seems unlikely the road will be constructed as far as the Kensington mine site by 2006.

Road access to the mine site could prompt interest in mining support and other development at Cascade Point or at other locations beyond (for example) mile 25 Glacier Highway.  Speculation about future development patterns is outside the scope of this review, except to note that road access to the mine, together with mine workers commuting individually, could prompt residential development from 20 or 25-mile and beyond.

The Cascade Point area is identified in the Comprehensive Plan as a "New Growth Area," essentially a designation for a new community with a "full range of uses and densities."  A New Growth Area can be developed only after Assembly adoption of a Master Plan that inventories environmental and site conditions, proposes all public and private services and facilities, and provides for basic development standards.  A draft Master Plan was prepared for Cascade Point in 1996 but was not adopted by the CBJ Assembly.

The Rural Reserve zoning classification currently in effect for Cascade Point is limited in the uses and activities that are allowed, and does not support the "full range of uses and densities" envisioned for Cascade Point as a distinct community.  For example, housing in the Rural Reserve zone is limited to one unit per acre, while many commercial, professional and retail services are prohibited.  Future development of Cascade Point as a full-service support community will almost certainly require the adoption of a New Growth Area Master Plan.

### Findings

Haul road traffic will be controlled by the mining company and use of the haul road is proposed to be restricted to company vehicles with limited opportunity for public access.  Marine freight traffic is under the jurisdiction of the U.S. Coast Guard. The EPA requires the preparation of a Spill Prevention Control and Countermeasures Plan and a Facility Response Plan for the prevention and clean up of hydrocarbon spills. The approved Plan of Operations for the mine also identifies the need for a Facility Response Plan.  The use of double-walled isotainers for fuel shipment during mine operations provides a safeguard against the potential for spills.

Bus travel on Glacier Highway is expected to lead to greater winter use of the road, and may result in additional emergency calls.  At the present time, it seems reasonable to conclude that Goldbelt Corporation will construct the Cascade Point Road and related marine terminal facilities before the Juneau Access Road is constructed, and that workers will commute to the mine by catamaran.  If the bus commute is abandoned and workers drive individual vehicles to Cascade Point, the potential for accidents and related emergency response can be expected to increase.  If workers commute individually to the mine site on the Juneau Access road once it is completed, emergency response times for vehicle accidents will likely be extended beyond acceptable limits.  While speculative, this scenario could require the location of emergency

Exhibit 1 to Freer Declaration
Page 13 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 14 of 60

response capability at a location on the highway closer to the road terminus than the Glacier or Auke Bay stations, or the Lynn Canal station when it becomes staffed again.

The 1997 Draft EIS on Juneau access stated that, "staffing would have to be increased to patrol and provide emergency response for 30 miles of extended rural highway jurisdiction in order to maintain the existing level of service." This statement assumes service is provided to the northern boundary of the borough, approximately fifteen miles beyond the Kensington, but should nevertheless be considered illustrative of the potential need for additional emergency response capacity. Capital City Fire and Rescue is not currently budgeted for an ambulance at either the Auke Bay or Lynn Canal stations, and would need to further develop the volunteer EMS squad or expand paid staffing to accomplish this.

Catamaran traffic on the bay will occur year-around, during periods of both low and high recreational use. Catamaran activity will share the bay with recreational boaters, particularly smaller boats including skiffs and kayaks. Actual numbers of users is elusive; however, the U.S. Forest Service cabin located in the upper, eastern portion of Berners Bay logged 522 visitors over 165 nights in 2000. All of these visitors are believed to have traveled to the cabin by boat, although it is possible that a small percentage may have flown there. Anecdotal information in the Supplemental Draft EIS indicates that 60 – 65 boats (skiffs predominantly) use the bay on a high-use weekend, along with 5 – 10 groups of kayakers, with most of the use observed to take place along the mainland side of Berners Bay. A few guided trips take place in Berners Bay during the summer months, primarily kayak day trips.

The recommended helicopter flight path is contained in the 1992 EIS for the project. The path begins at the airport, goes up the Montana Creek drainage and over Windfall Lake, down the Cowee Creek drainage, across Berners Bay and along the coastline of Lynn Canal to the construction camp at Comet Beach. The flight path is predominantly over land for safety reasons, and will vary depending on weather conditions. Weather permitting, the helicopter would fly at 2,000 feet elevation, but in no case lower than a minimum elevation of 300 feet.

It appears unlikely that the Juneau Access Road will reach the Kensington mine site before operation of the mine is proposed to begin. It also appears unlikely that it will reach Cascade Point before Goldbelt Corporation initiates construction of the road extension to Cascade Point. It is possible, but speculative, that the Juneau Access road could reach the Kensington during the life of the mine and provide alternative access for workers. This could (again, speculatively) prompt demand for residential development and provision of city services "out the road," for example, at Echo Cove or Cascade Point.

## Recommendation

1. Speed limit signs that are provided by, or are comparable to, Alaska Department of Transportation speed limit signs, shall be posted in readily visible locations at the tidewater and millsite ends of the haul road.

Exhibit 1 to Freer Declaration
Page 14 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 15 of 60

2. Coeur shall state in the approved Plan of Operations that passenger and freight vessels must reduce speed and/or alter course to lessen the wake effect on other boat traffic in the bay, particularly non-motorized vessels.

3. Unless weather, safety procedures, emergencies, or Federal Aviation Administration requirements dictate otherwise, the mine operator shall operate helicopters at elevations and along the flight path that follows, in order to minimize noise levels on residential areas and recreational users of Berners Bay.

   - The minimum flight elevation shall be 1,000 feet above ground level. The highest practicable elevation shall be maintained, preferably at least 2,000 feet above mean sea level.
   - The flight path shall be: from the Juneau Airport, head west while immediately climbing to FAA-directed or highest practicable altitude, cross the Mendenhall River, turn north to Montana Creek and proceed northwest following the creek drainage, on past Windfall Lake toward the mouth of Cowee Creek, north across Berners Bay, and then along the coastline of Lynn Canal to Comet Beach.


## PARKING AND CIRCULATION

### Background

The applicant proposes to provide bus transportation for workers from a location in the Mendenhall Valley to the Cascade Point marine terminal. The "park-and-ride" lot is a component of the overall project, but is not a part of the Allowable Use Permit application, and will be applied for at a later date as an allowable use or a conditional use as necessary. The applicant has stated it is their desire to locate the facility near their Juneau offices at Vintage Office Park, but has also discussed using existing, vacant parking if available. The park-and-ride lot may, or may not, require a land use permit, depending whether a new site is developed or an existing site is used.

### Analysis

The commute option, which is Coeur's preferred alternative, will require the location of a 'park-and-ride' type of facility where commuting workers will park their vehicles and board buses for the drive to Cascade Point. The prospective location and actual size of this facility is not identified in the Draft Supplemental EIS or in the applicant's Allowable Use Permit application for the mine, and will be permitted under a separate application as necessary. Consequently, potential impacts related to zoning, location, hours of operation, surrounding land use, and so on, are not addressed in this report.

Exhibit 1 to Freer Declaration
Page 15 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 16 of 60

Buses will shuttle between the 'park-and-ride' site and Cascade Point four times per day to meet Cascade Point ferry departures scheduled at 5 AM, 3 PM, 6 PM and 1 AM on weekdays and 5 AM and 6 PM on weekends. For purposes of analysis it is assumed there will be 50 workers commuting per shift, so that at any given time there could be 100 vehicles in the lot; 50 for those departing, and 50 for those returning. With code requirements for stall size and aisle width, the facility could require an acre of land if an existing site is not available. The number of vehicle arrivals and bus departures between midnight and 6 AM indicates the facility should be located away from residential neighborhoods, and in a location that has easy or quick access to Glacier Highway.

Automobile parking lots not related to a principle use on the lot are identified in the Table of Permissible Uses as Use 10.100. Use 10.100 is a Conditional Use in the Light Commercial zoning district, an outright use in the Industrial zoning district and an Allowable Use in the General Commercial, Mixed-Use and Mixed-Use 2 zoning districts. Property in all of these zoning classifications exists within a one-mile radius of the Coeur offices; however, no analysis of property availability has been completed.

## Findings

A bus commute benefits the applicant and the CBJ. For the applicant, a bus commute organizes workers for the trip and assures that workers are brought to Cascade Point for scheduled departures. It allows a "head count" for each shift. For the CBJ, it means a reduction in daily traffic furthest from emergency responders and a lowered probability of accidents requiring emergency medical response.

The park-and-ride facility will be instrumental in managing the number of vehicle trips on Glacier Highway, especially during the winter months, when the potential for accidents is expected to be higher and emergency response times may be slower. Impacts related to the location, scale and operation of a park-and-ride facility will be addressed at the time an application for the facility is submitted.

## Recommendation

1. The applicant shall develop and operate a bus commute for mine workers for the life of the project. This requirement may be waived only upon modification of this permit. A fully-operational bus commute system, which includes both a bus commute and a park-and-ride as described in conditions 2 and 3 below, must be in place before any Occupancy Permit is issued to the applicant or the Allowable Use Permit will be revoked.

2. The park-and-ride facility must be located between Mile 6and Mile 12 of Glacier Highway, and must be designed and sized to support daily bus transportation to and from Cascade Point for all mining shifts and all mine workers per shift. The park-and-ride facility must provide enough parking spaces for two shifts of workers, or 100 vehicles.

Exhibit 1 to Freer Declaration
Page 16 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 17 of 60

3. The bus commute shall consist of round-trip bus transportation from a park-and-ride facility to the Cascade Point Terminal and back. The busses shall be operated daily, 365 days per year, and shall be operated so as to provide transportation to and from each work shift. The busses shall have sufficient capacity to transport all mineworkers scheduled for each work shift.

4. The applicant shall institute a company policy that its employees utilize the bus commute on a daily basis.

## EXTERIOR LIGHTING

### Background

Exterior lighting will be used at all mining and mining support facilities to support year-around, 24-hour-a-day operations. This includes the marine terminal facilities at Cascade Point and Slate Creek Cove, the vessels used to transport workers across Berners Bay and the mine and mill facilities in the Johnson Creek drainage. Lighting is an essential safety element of mining operations.

### Analysis

The mine will operate 24 hours a day, 365 days a year, and the millsite and associated facilities will be lighted as needed during operations. These facilities are several miles from tidewater, at approximately 700 feet in elevation, and buffered by standing timber. The Supplemental Draft EIS, in the section on Visual Resources, states that "lighting from the mine site, process area and tailings facility would not be visible from Berners Bay due to the topography."

Exterior lighting at the marine facilities at Slate Creek Cove will be easily visible after dark, and especially during the winter months, when lighting must be employed for a majority of the day. The heaviest recreational use of Berners Bay is expected to occur during daylight hours in the summer, when lighting is least likely to be needed. Overnight and winter users of Berners Bay will unavoidably encounter lighting at the marine terminals. According to the SDEIS, again in the section on Visual Resources, "marine facilities would be lighted only while boats are approaching or being loaded or unloaded."

Coast Guard regulations prescribe the use of running lights by boats during darkness or periods of reduced visibility. Again, according to the Supplemental Draft EIS, "the lights are intended to be seen by other boats, and not to light up the surroundings, and thus are not extremely bright or large lights." The Coast Guard is reviewing the marine terminal facilities at Slate Creek Cove and Cascade Point, and may require the placement of Aids to Navigation at one or both marine terminal facilities. These would be strobe-type lights, directed toward the terminal approaches that would flash at either 4 or 6-second intervals.

Exhibit 1 to Freer Declaration
Page 17 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 18 of 60

## Findings

Because of topography and extensive standing timber, lighting at the mine and mill site is not expected to have any noticeable effect on users of Berners Bay. Lighting at the Slate Creek Cove marine terminal will have unavoidable visual effects, particularly during the winter months and at other times of the year when vessels load and unload after daylight hours. The heaviest recreational use of the bay is expected to occur during the summer months, primarily during daylight hours, when terminal lighting is least likely to be used. The use of running lights on vessels in the bay is a basic marine safety requirement.

## Recommendation

1.  Lighting at the marine terminals shall be used only during loading and off-loading of workers and materials, or when the terminals are otherwise in use, and applicant shall use an appropriate low-intensity lighting system to implement this condition.

2.  Lighting must, to the extent that safety is not compromised, be directed downward, and remain within the perimeter of the site

3.  Lighting must be of a type that provides for adequate illumination without unnecessary glare. The applicant shall install a low-level lighting system, subject to Department approval, that provides for onsite safety while minimizing or eliminating offsite glare.

4.  Lighting required by the Coast Guard as Aids to Navigation is exempt from these recommendations.


## SIGNS

## Background

Signage is not one of the 10 areas identified for conditions in the revised mining ordinance, but is a topic usually addressed in an Allowable Use Permit report. In this report, it is relevant only for the planned park-and-ride lot and the mine haul road.

Signage for the project will not be directional or interpretive signing for the general public, but safety and informational signage for mine workers. Signage requirements at the mine, millsite, processing area and related areas are established by state and federal law and industry practice and should not be subject to CBJ review. Signage at the proposed park-and-ride lot must comply with CBJ requirements.

Exhibit 1 to Freer Declaration
Page 18 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 19 of 60

## Analysis

The CBJ Land Use Code, in §49.45.130 (a), requires all signs to have a permit issued by the Community Development Department unless a specific exception or exemption is listed in the land use code.  These exceptions are essentially for temporary signs and do not identify signs having industrial uses or applications.  The purpose of the sign ordinance is to "maintain and enhance the aesthetic environment and the City and Borough's ability to attract tourists and sources of economic development, to assure the business community quality signs to adequately identify and market their businesses, and to protect and promote the public health, safety and welfare."

Signage used at the mine will have specific safety, informational and instructional content directed to a specific group of people, that is, mine workers and visitors, and not the general public. Sign size, design, placement, and content are closely related to mine safety and the fulfillment of safety requirements and industry operating practices, and are not conducive to local approval.  Signage on the haul road, such as speed limit signs, curve arrows, and other traffic/directional signage, should comply with Alaska Department of Transportation sign standards.  Signage may be necessary at the park-and-ride site, however, this will be considered under a separate application.

## Findings

The CBJ sign code, while applicable to the project, is largely irrelevant, because safety and regulatory requirements for signage at the mine will determine sign size, placement and other factors.   CBJ sign review is relevant to related proposals that will be reviewed under separate applications, including the Cascade Point marine terminal and the planned park-and-ride/bus commute facility.

## Recommendation

1.  Speed limit signs and other signs managing traffic on the haul road shall comply with appropriate Alaska Department of Transportation standards for highway signage.

2.  Signage at the park-and-ride facility must comply with standards in CBJ 49.45.

## SAFETY

## Background

Safety covers many aspects of mine construction and operation, crossing over into topics such as traffic, avalanches and noise.  To avoid redundant discussions, this section focuses on worker and mine site safety.

Exhibit 1 to Freer Declaration
Page 19 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 20 of 60

**Worker Safety**. Worker safety is addressed by the Mine Safety and Health Administration (MSHA) under the Federal Mine Safety and Health Act of 1977 (Mine Act) and their authority in federal regulation at 30 CFR Parts 1-199, and by the Safety Reference Manual adopted by Coeur Alaska, Inc in 1988.

## Analysis

Safety at mine facilities and workings concerns the health and physical safety of mine workers and visitors. The Mine Act covers all mine operators and miners throughout the United States. The Mine Act requires that the Mine Safety and Health Administration (MSHA) inspect all mines each year. All underground mines are to receive at least four inspections annually; all surface operations are to be inspected at least twice annually. MSHA is specifically prohibited from giving advance notice of an inspection, and it is specifically authorized to enter mine property without a warrant.

The Mine Act requires or authorizes additional inspections and investigations to ensure safe and healthy work environments for miners. Additionally, MSHA must investigate all fatal accidents and miners' complaints of discrimination based upon the exercise of their rights under the Mine Act.

To promote compliance with the provisions of the Act and its safety and health standards, all violations found during inspections and investigations must be cited. All violations are subject to civil penalties, and all violations must be corrected within the time frames established by MSHA.

MSHA's regulations also establish requirements for immediate notification of accidents, injuries and illnesses; for training programs that meet the statutory requirements of the Mine Act; and for obtaining approval for certain equipment used in gassy underground mines. Mine operators must notify MSHA when they open or close a mine.

Coeur Alaska, Inc. adopted a Safety and Health Reference Manual in May of 1998 and submitted it as part of the Company's Allowable Use Permit application, providing policies, standards and procedures in a variety of areas including:

1. generic safety rules
2. statutory health and safety requirements
3. substance abuse
4. Mine Safety and Health Administration required training
5. first aid
6. accident reporting
7. accident investigation
8. hazardous materials handling
9. personal protective equipment

Exhibit 1 to Freer Declaration
Page 20 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 21 of 60

    10.  fire protection
    11.  electrical safety
    12.  lock out
    13.  underground  evacuation
    14.  surface evacuation
    15.  confined space entry
    16.  spill prevention

Each of these topics is addressed by specific and prescriptive requirements that are straightforward to interpret.  These include equipment specifications, hazardous and dangerous materials signage, emergency procedures, storage and handling requirements and treatment of flammable and combustible liquids among others.

The Manual also delineates responsibilities for disaster events at the mine.  For example, underground rescue in case of fire, cave-in or other emergency would first be the responsibility of trained workers at the mine site, then would be requested from two other main sources: Kennecott Greens Creek Mine and the Central Mine Rescue Unit in Osburn, Idaho.  Capital City Fire and Rescue (CCFR) would not be expected to perform underground rescue activities.

Capital City Fire and Rescue has routinely responded by helicopter to emergency medical requests outside the borough in locations such as Skagway, Hoonah, Gustavus and Glacier Bay, and would respond similarly to call-outs at the Kensington mine.  Helicopter charter costs are borne by the person served, so would not occur at CBJ expense.  CCFR would provide emergency medical services including stabilization and preparation of accident victims for medivac to Bartlett Regional Hospital and overall coordination of emergency services efforts.

## Findings

Neither the City and Borough of Juneau, nor the State of Alaska Department of Labor administer mine safety programs.  This area is solely the responsibility of the MSHA and the mining company, which has an approved safety reference manual.  Capital City Fire and Rescue can respond to medical emergencies and coordinate overall emergency medical response to the mine site but would not perform underground rescue.

## Recommendation

No recommendations.

Exhibit 1 to Freer Declaration
Page 21 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 22 of 60

**NOISE**

<u>Background</u>

Development and operations will generate noise in a variety of ways.  During mine construction, noise will be generated by blasting, construction equipment, helicopter flights, barge traffic and haul road traffic during mine construction.  As the project transitions from construction to operations, the noise sources will be vessel traffic in Berners Bay, loading and off-loading at the Slate Creek Cove marine terminal facility and haul road traffic.  Noise from milling and processing operations is not expected to be discernable from Berners Bay.

The following listing of decibel levels is meant to provide a context in which noise levels are more understandable.

|  |  |
|---|---|
| Normal Breathing | 10dB |
| Whispering | 25dB |
| Normal Conversation | 60dB |
| Automobile | 70dB |
| Noisy Restaurant | 80dB |
| Screaming Child | 90dB |
| Subway Train | 100dB |
| Helicopter | 105dB |
| Thunder | 120dB |
| Jackhammer | 130dB |
| Jet Engine | 140dB |

Continued exposure to noise above 85 decibels will, over time, cause hearing loss. According to the National Institute for Occupational Safety and Health (NIOSH), the maximum exposure time before a person's hearing is endangered at 85 dB is 8 hours.  The decibel scale is logarithmic, which means that a mere 3 dB increase represents a doubling of sound intensity. A four-hour dose of sound at 88 dB is roughly the same as an eight-hour dose at 85 dB. At 110 dB, the recommended maximum exposure time is only about a minute and a half. If you must be exposed to sound above 85 dB for an extended period of time, it is recommended that you use some form of hearing protection

<u>Analysis</u>

**Construction-Related Noise.** Workers will be transported to Comet Beach by helicopter during the 16 months of mine construction.  It is estimated that a total of 12 to 14 helicopter trips per month will take place between the Juneau Airport and Comet Beach during the construction period, following a flight path described previously in the section on Traffic.  As mentioned in that section, a helicopter produces 72 decibels of noise directly overhead at 2,000 feet, equivalent to a vacuum cleaner.  This level drops to 62 decibels when 2,000 feet of horizontal separation is added to the 2,000 feet of vertical separation, creating a noise level equivalent to a

Exhibit 1 to Freer Declaration
Page 22 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 23 of 60

sewing machine or typewriter. The FAA requires a minimum height of 300 feet above residential areas, which would produce noise roughly equivalent to a power mower.

Blasting will occur in building the tunnel between the Kensington 850-foot portal and the Jualin mine adit, in the development of rock quarries in the Johnson Creek drainage and near Slate Creek Cove, and for the production of road base and road fill material for the haul road. Blasting is expected to be the loudest source of noise during the construction phase. According to the Supplemental Draft EIS, blasting would not occur more than once a day in connection with road development efforts.

Barge loading and off-loading will also be a significant source of noise, during both the construction and operations phases. Barge arrivals are anticipated on a weekly basis, delivering freight and fuel and back-hauling ore concentrate, with the noise originating from equipment used to haul material back-and-forth between the barge and the freight staging area. Tug and barge operations will generate only negligible noise, however, barge unloading is expected to produce noise at 89 decibels measured at a 50-foot distance, approximately the equivalent of shop tools or a food blender. At the Forest Service cabin approximately three miles distant on the east shore of the bay, the decibel level drops to 39.5, or the level of a quiet residence or neighborhood.

**Production-Related Noise.** Noise in the underground workings can be very loud but should create no off-site effects. Milling is noisy as well, but takes place indoors in a structure that is proposed to be sound-proofed at construction. Mine and mill-related noise should have almost no effect on recreational users of the Bay. Noise encountered on an ongoing basis will be from daily catamaran trips during mine operations and freight unloading at Slate Creek Cove during both construction and operations.

According to the SDEIS, the catamaran will generate approximately 80 dBA of noise, measured in the middle of the bow at full power. This is the equivalent of standing next to a dishwasher or a garbage disposal, or being in a noisy office. At 1,000 feet distance, the decibel level drops to approximately 53.1 dBA's, approximately a conversational level. The SDEIS states that noise levels are "barely noticeable at a distance of approximately 200 to 300 yards" from the vessel. Four round trips per day, at 30 minutes per round trip, will create two hours of running time per day in half-hour increments. If the forecasted schedule remains accurate (see Traffic above), these will occur at 5-5:30 AM, 3-3:30 PM, 6-6:30 PM and 1-1:30 AM.

**Noise Effects**. The noise effects of the project will be most apparent in upper Berners Bay from both construction and operations activities. During construction, noise will be generated by blasting, generator use, helicopter flights and freight and material hauling. During operations, catamaran trips will be added to the mix of noise, but construction blasting will be completed and helicopter flights will be reduced substantially.

Exhibit 1 to Freer Declaration
Page 23 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 24 of 60

The Table below is derived from information in the Draft Supplemental EIS regarding the noise impacts of Alternative B.  To place the noise levels in context, a quiet office is 45 decibels, a refrigerator is approximately 68 decibels, a food processor is approximately 90 decibels and a chainsaw operating at high RPMs is approximately 115 decibels.  Distances to the Forest Service cabin and Cove Point are measured from Slate Creek Cove.

**TABLE 2**

| Noise Source | dBA @ 50 Ft | USFS Cabin (2.84 miles) | Cove Point (1.04 miles) |
|---|---|---|---|
| 3,500 kW generator | 75 | 25.5 | 34.2 |
| Barge Unloading | 89 | 39.5 | 48.2 |
| Blasting | 125 | 75.5 | 84.2 |
| Helicopter | 102 | 52.0 | 62.0 |
| Catamaran | 80 | 30.5 | 39.2 |
| Haul Truck | 94 | 44.5 | 53.2 |
| Mill Process Building | 72 | N/A | N/A |

## Findings

Noise impacts will be unavoidable because of the nature of the activity and sources.  Ore and freight hauling, ore crushing, freight loading and off-loading, and vessel and helicopter traffic will unavoidably produce noise.  Some mitigation can occur through regulating helicopter flight paths and flight altitudes, through sound-proofing of the mill and processing buildings, and through forbidding the use of "jake" brakes or compression brakes on trucks using the haul road. Catamaran activity represents a new and ongoing increase in commercial vessel traffic in the bay, and will have noticeable noise effects, but is not forecast to produce noise at harmful levels (see Table 2 above).  Mine operations depend on huge transfers of freight one way, and ore concentrate the other. These transfers are reliant on haulage and large machinery.  The remote location of the activity also requires access by boat and helicopter

## Recommendation

1.  Company policy should forbid the use of "jake" brakes, or compression braking, on trucks transiting the haul road to Slate Creek Cove.

2.  Only rubber-tired machinery should be used to load and offload freight at the Slate Creek Cove marine terminal.

3.  (see the Traffic section for a condition on helicopter flights)

Exhibit 1 to Freer Declaration
Page 24 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 25 of 60

**DUST**

## Background

This section examines dust and particulate matter and does not address chemical pollution associated with diesel power generation or milling operations. Dust and particulate emissions will be produced during mine construction from ground disturbance, diesel generators, slash burning and vehicle travel between Slate Creek Cove and the mill site. During mine operation, dust and particulate emissions will be produced from above-ground ore crushing, the waste rock storage pile, sand and gravel quarries, diesel generators and bus and freight traffic on the haul road. Sub-aqueous tailings disposal will essentially eliminate tailings as a source of windblown dust.

## Analysis

The Draft Supplemental EIS estimates that Alternative B will produce approximately 9 tons of particulate matter during the construction phase. This will occur primarily in the Johnson Creek drainage and along the haul road to Slate Creek Cove. The 2004 DSEIS estimates the discharge of 80.2 tons of particulate matter annually during operations, 29.8 tons from stack sources such as diesel plants and 50.4 tons as fugitive emissions from the waste rock pile, sand and gravel quarries and travel on the haul road. In the 1997 Plan of Operations, most particulate emissions, approximately 94%, could be attributed to road dust and windblown dust from the dry tailings facility. Stack sources represent a higher proportion of forecasted particulate emissions in this version of the project as milling and processing will occur aboveground. Particulate emissions and 'fugitive' dust are regulated by DEC, however, CBJ may also impose conditions for dust control as a conventional municipal power.

Coeur is required to obtain a DEC Air Quality Control Permit to Operate for the proposed project. Coeur obtained Air Quality Control Permit to Operate #9511 AA007 in 1996, for the plan of operations identified in the 2004 SDEIS as Alternative 'A'. The company is now applying for a 2004 air quality permit.

In addition to potential air quality permit conditions that will apply, the applicant has adopted a series of best management practices (BMP'S) in August of 1998, to control erosion and sedimentation, including minimizing the potential sources of sediment from the outset. Some of these practices, specifically the practices aimed at sediment source reduction, will also act to mitigate dust and particulate emissions. Identified as Surface Stabilization BMPs, these include:

**Dust Control**: Watering, mulching or other means to prevent soil loss as dust.
**Mulching**: Protecting and insulating soil to minimize transport and promote vegetative growth.
**Seeding**: Stabilizing the soil by inducing vegetative growth.
**Road Surfaces**: Watering the roads, millsite, stockpiles, borrow areas and crusher areas to minimize dust transport.

Exhibit 1 to Freer Declaration
Page 25 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 26 of 60

The <u>Amended Plan of Operations for the Kensington Gold Project</u>, adopted by Coeur in November, 2001, states in Section 4.6, Air Quality, that "fugitive dust will be controlled by the use of water, chemical suppressants, or other means when necessary and appropriate. Controls will address both surface and underground sources as appropriate.

## Findings

The 1997 staff report on Coeur's Large Mine Permit application indicated that road dust would account for 76% of all dust emissions from the project, with the dry tailings facility contributing another 18%. In this iteration of the project, the dry tailings facility is replaced by tailings storage in a lake, where fugitive dust will not present a problem. The mill is located aboveground rather than underground, and consequently will contribute more significantly to forecasted emissions (37% of total), subject to regulation by the DEC. The haul road, waste rock pile and sand and gravel pits will contribute approximately 63% of the forecasted particulate load.

## Recommendation

1.  The speed limit on the haul road shall be posted at 20 miles-per-hour to minimize the amount of airborne dust.

2.  The haul road shall be watered or treated with approved dust suppressants no later than any third consecutive day of dry weather, then watered or treated with approved dust suppressants as needed thereafter until the next rainfall.

3.  The waste rock storage pile and the borrow areas shall be watered or treated with approved dust suppressants no later than any third consecutive day of dry weather, then watered or treated with approved dust suppressants as needed thereafter until the next rainfall.

## VISUAL SCREENING

## Background

The U.S. Forest Service provides standards for managing visual resources on National Forest lands through the Visual Management System (VMS). The intent of the VMS is to incorporate the overall character of the existing landscape, the expectations and numbers of viewers, the duration of views, distance, and perceptual variables into a system for managing visual resources. Management goals, referred to as Visual Quality Objectives, or VQOs, are then established in the Forest Plan. The Forest Plan assigns each area of the Tongass a LUD, or Land Use Designation, and the management activities within each LUD must be consistent with applicable Visual Quality Objectives. Several VQOs exist within Berners Bay.

Exhibit 1 to Freer Declaration
Page 26 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 27 of 60

The Table below provides a summary of Visual Quality Objectives.

| Visual Quality Objective | Description | Schedule |
|---|---|---|
| Retention | Design activities so they are not Visually evident to the casual observer | Within 6 months of project completion |
| Partial Retention | Design activities to be subordinate to the landscape character of the area | Within 1 year of project completion |
| Modification | Activities may dominate the character-istic landscape, but they must have visual characteristics similar to those of natural occurrences within the surrounding area or character type. | Within 1 year in the fore-ground and w/I 5 years in the middle ground and background zones follow-ing project completion |
| Max. Modification | Activities may dominate the charac-teristic landscape, but when viewed as background, they should appear to be a natural occurrence. | N/A |

## Analysis

The Slate Creek Cove marine terminal and the southern portion of the haul road are located within an Old Growth LUD, which requires that activities conform to the retention VQOs at all distance zones. Activities are to be designed so as not to be visually evident to the casual observer. Exceptions for small areas of nonconforming developments, such as transportation and mining developments, may be considered on a case-by-case basis. The Forest Plan requires the use of designs and materials that are compatible with forms, colors, and textures found in the characteristic landscape. For example, color contrasts will be reduced by painting the facility a neutral, non-reflective color that has been approved by the Forest Service; still, it is not expected that the Slate Creek Cove terminal will meet the VQO during mine operations. The facilities are proposed to be removed and the beach area reclaimed after mining is completed, which would allow the Retention VQO to be met over the long term.

The Cascade Point marine terminal will be more visible from the southern portions of the bay, including Echo Cove and Point Bridget. The facility would not need to meet a Forest Service VQO, as it is located on private property. The facility is anticipated to create a strong contrast with the surrounding shoreline, particularly in terms of color and texture. The fill required for the breakwater will create a large, rectilinear form in contrast with the adjacent shoreline. The vessel used to transport workers will remain at Cascade Point while not in service, adding to the visibility of this location.

The LUD for the area where the mill and processing facilities will be located on the Jualin side is classified as modified landscape with Minerals Overlay. The Modified Landscape classification

Exhibit 1 to Freer Declaration
Page 27 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 28 of 60

is intended to provide a sustained yield of timber and a mix of resource activities while minimizing the visibility of developments in the foreground and providing a spectrum of recreation opportunities consistent with resource activities. The Modified Landscape classification acknowledges the previous gold mining activities in the area, whereas the Minerals Overlay provides management prescriptions for current or proposed mining activities, with the intent that the LUD will revert back to a Modified Landscape once mining is completed. According to the Supplemental Draft EIS, the U.S. Forest Service cabin "may have a view of the top of the mill building and adjacent development rock and topsoil stockpiles. At six miles away, however, the visibility of these facilities may be obscured by distance."

The LUD for the 850 portal and development waste rock storage area on the Kensington side of the development are in a Modified Landscape LUD and must conform to the Modification VQO because of their proximity to the Lynn Canal ferry and cruise ship routes. The visual impacts at this location will be reduced from the prior operating plan since the dry tailings facility is no longer proposed for this location. The absence of this facility, at 113 acres, will reduce the visual impact of development, but this area may not meet a Modified VOQ during mine operations.

The tailings storage facility at Lower Slate Lake is in a Maximum Modification VQO, as it is not expected to be visible from selected locations in the bay, referred to as Visual Priority Travel Routes (VTPRs) and Use Areas (UAs), the most frequently traveled and used areas of the Berners Bay. A earthen and concrete impoundment approximately 90 feet in height will be constructed at the outlet of Lower Slate Lake to accommodate the tailings; however, standing timber between the impoundment and Berners Bay should largely screen the impoundment from observation from the Bay.

### Findings

The system of visual classification used by the Forest Service provides for an organized, rational approach to classifying visual resources and the impacts to those resources caused by human activity. They also establish a basis for future reclamation efforts, to restore visual resource values that have been compromised during mine operations.

The marine terminals will be the most visible feature of mining activity. The mill and processing facilities will be less visible under this alternative than under the prior alternative, since they are moved from a location that is highly visible from Lynn Canal to a location that is not visible at all from Lynn Canal, and only marginally visible from Berners Bay. Remaining facilities on the Kensington side-- the Kensington portal, the development waste rock storage area, and the access road from Comet Beach to the portal--will remain visible from Lynn Canal.

### Recommendation

1. Retain the values of the Modified Landscape VQO in the materials and colors used in construction of the Slate Creek Cove marine terminal.

Exhibit 1 to Freer Declaration
Page 28 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 29 of 60

2. Minimize tree clearing at the mine and mill complex and along the haul road. Maintain as large a buffer of standing timber as possible between the haul road, mill and processing area and Berners Bay.

3. Use earth tone colors and finishes on the exterior of the mill and processing buildings.

**SURFACE SUBSIDENCE**

**Background**

The Kensington ore body consists of a dense pattern of quartz veins and veinlets that extend from the surface to a depth of approximately 3,000 feet. The ore zone averages approximately 60 feet in width, ranging in width from 22 feet to 165 feet. The ore body is irregularly shaped with scattered, varying distribution of gold. For a variety of reasons, including the spatial and physical characteristics of the ore body, economic, and environmental considerations, Coeur proposes using a mining method called the long-hole, open stoping technique.

**Analysis**

The 2004 Draft Supplemental EIS discusses the long-hole, open-stoping method, and also refers to the to the 1997 approved Plan of Operations and the 1992 Final EIS for additional detail.

The long-hole, open-stoping technique is used in situations where ore occurs in wide and steeply dipping vein deposits. Mining progresses throughout the ore body as dictated by mine design, stope size, back-filling sequence, and other key elements that maximize extraction of the mineral resource. The long-hole, open-stope method allows for flexibility in handling irregular ore widths and allows efficient removal of ore. It also allows safe working conditions while using a minimal workforce.

Under Alternative 'B', Coeur proposes to backfill at least 40% of the tailings generated over the life of the operation. Backfilling tailings to mined-out areas underground would provide structural support of the underground workings and allow for removal of more of the resource. Backfilling consists of pumping the coarse tailings through a high-density polyurethane (HDPE) pipe to working areas within the mine needing backfill, including the addition of cement with the upper few inches of back-filled tailings to provide a stable working surface. Waste rock could also be placed underground as part of the backfill plan.

Along with back-filled tailings and waste rock, the long-term stability of the mine workings will also be provided by leaving a crown pillar at least 150 feet thick between mined out areas within the mine and the surface of the ground above. According to the 1992 FEIS, subsidence at the surface is not expected due to the bulking effect of the broken rock in the mine and the minimum 150-foot crown pillar left to ensure stability. The bulking effect occurs as rock 'caves' within a

Exhibit 1 to Freer Declaration
Page 29 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 30 of 60

stope, or mined-out area.  Caved rock takes up more volume than in-place rock.  With sufficient rock between the stope and the ground surface –the crown pillar--the caved rock will eventually fill the mined-out space and support the remaining rock walls and ceiling.  Variations of stope mining techniques, including post pillar cut and fill and bench techniques, may be used depending on ore zones identified during mining and exploration.

## Findings

The mining method proposed now is the same method proposed and approved in 1997. The use of additional mining techniques could result in changes to crown pillar design criteria, invoking concerns over stability and subsidence potential.

## Recommendation

1.  The company must maintain a 150-foot crown pillar to assure stability and prevent surface subsidence.

2.  The employment of mining techniques that modify the 150-foot crown pillar must be pre-approved in the Plan of Operations and be shown to have no increased potential for contributing to surface subsidence.

## AVALANCHES and LANDSLIDES

## Background

Several active avalanche chutes were identified in the Ophir Creek drainage in the 1997 EIS on the mine.  In particular, the Ophir Creek diversion and avalanche catch basins could be subject to avalanches within the Ophir Creek drainage.  The Kensington mine portal could be subject to avalanche hazards originating on the face of Horrible Hill directly above the portal.  The Draft Supplemental EIS identifies the appropriately named Snowslide Gulch as the only area on the Jualin side of the operation where an avalanche could impact mine operations.  In particular, the pipeline carrying tailings slurry from the processing area to Lower Slate Lake, as well as the access road to Lower Slate Lake, pass across the avalanche chute.  In mapped materials provided as part of Coeur's application, other slide areas are shown within the Johnson Creek drainage; however, the mapped slide paths do not reach mine facilities or improvements (see Attachment E for slide paths in Johnson Creek basin).

## Analysis

The 1997 preferred alternative for the Kensington mine located the mill and other improvements within the Ophir Creek and Sherman Creek drainages.  The Kensington portal was the primary access to the mine, while a dry tailings facility was located in the Sherman/Ophir Creek drainages.  To protect the tailings impoundment, a creek diversion structure and debris

Exhibit 1 to Freer Declaration
Page 30 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 31 of 60

flow/avalanche catch basins were proposed to be constructed upstream, within the avalanche footprint of the drainage, to divert water flow around the tailings storage area.

The main access to the mine will now be via the Jualin portal in the Johnson Creek drainage, and tailings are proposed to be disposed into Lower Slate Lake. The Kensington portal will remain open for emergency access, and development waste rock will continue to be stockpiled below the portal. To a certain extent, mitigation for avalanche danger shifts from the Lynn Canal, or Kensington side, of the operation to the Johnson Creek watershed, or Jualin side of the operation, where most mill facilities and improvements will be located. The availability of the Kensington portal for emergency access remains important, however, and the portal should be protected from blockage.

The location of mine improvements in Snowslide Gulch within the Johnson Creek drainage poses issues for both worker safety and environmental protection. Specifically, the tailings slurry pipeline to Lower Slate Lake and the access road to Lower Slate Lake cross approximately 1,700 feet of mapped avalanche path in Snowslide Gulch. Mapping provided by the applicant shows that the tailings pipeline is buried for a distance of approximately 400 feet in the deepest 'V' section of the gulch.

The tailings access road is being constructed for installation of the tailings pipeline and the applicant has stated that the road will not be in use during the avalanche season. If there is no travel on the access road during the avalanche season, the need for avalanche forecasting and response is reduced. If, at some point during mine operations, travel on the tailings access road becomes regular or routine, the need for avalanche forecasting and response is heightened.

Informal communication with the Southeast Alaska Avalanche Center indicates the importance of planning, training, preparation and readiness to minimize the exposure to avalanche danger. No incidence of slide events in Snowslide Gulch is available, but anecdotally it is described as an active location.

According to the SDEIS, precipitation, including snow, increases significantly from sea level to the top of Lions Head Mountain at 5,500 feet. Based on long-term precipitation data for Eldred Rock approximately six miles away, the closest weather station certified by the National Weather Service, the average annual precipitation at 5,000 feet is calculated to be 200 inches. Despite this being a calculation, and while actual precipitation (and snowfall) could be greater or smaller in a given year, it illustrates the potential for snow build-up at the higher elevations.

**<u>Findings</u>**

Steep slopes with high snow accumulations in the upper elevations indicate the high probability of avalanches. A report prepared in 1994 by Doug Fesler and Jill Fredston of the Alaska Mountain Safety Center identified the high probability of an avalanche within the Ophir Creek drainage, which descends almost 5,000 vertical feet, near both the Kensington mine portal and

Exhibit 1 to Freer Declaration
Page 31 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 32 of 60

development waste rock disposal site. The same report indicated the possibility of avalanches from Horrible Hill above the Kensington portal. Relocation of the tailings storage area to Lower Slate Lake and the fact that diversion and catchment work on Ophir Creek does not have to be constructed under the currently preferred alternative alleviates, but does not eliminate, concern over avalanche safety in this area of mine development.

Likewise, avalanche chutes have been identified in the Johnson Creek drainage. One of these chutes, the aptly-named Snowslide Gulch, has a mapped run-out length that crosses the tailings pipeline and tailings access road and extends an additional 1,600 feet downhill. Other avalanche chutes are shown within the Johnson Creek drainage, but the mapped run-out lengths do not reach mine and/or mill facilities.

### Recommendation

1. The tailings pipeline must be buried for the entire the mapped area of the Snowslide Gulch avalanche path. Burial must be at a depth and length that will assure the integrity of the pipeline to withstand a 100-year avalanche event.

2. **If the tailings access road remains open for use during the November to May avalanche season**, then the applicant shall be required to prepare a Snow Safety Plan that includes, at a minimum, the following:

   a. avalanche search and rescue training for on-site employees;
   b. travel protocol on the tailings access road;
   c. placement of probes, beacons and shovels in all vehicles crossing Snowslide Gulch;
   d. radio checks for all travel across Snowslide Gulch;
   e. a system for daily and/or weekly avalanche forecasting;
   f. designation of an on-site avalanche expert;
   g. other practices and procedures that assure worker safety and rapid response to
     avalanche events.

   The plan shall be prepared by an organization such as the Southeast Alaska Avalanche Center, or another comparably qualified organization.

3. **If the tailings access road remains closed for use during the avalanche season**, then the applicant shall be required to incorporate avalanche awareness training into the required 40 hour Mine Safety and Health Administrative (MSHA) training class that is given to every new miner hired for the project. The applicant is required to consult with the Southeast Alaska Avalanche Center, or a comparably qualified organization, in developing avalanche awareness training. Specific attention shall be given to the avalanche hazard posed at Snowslide Gulch.

4. Snow removal equipment must be staged on the mill side of the tailings pond access road, and must be in a ready-to-operate condition in the event the tailings pipeline is damaged.

Exhibit 1 to Freer Declaration
Page 32 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 33 of 60

This equipment must be available to clear the access road of avalanche debris just as quickly as it is declared safe to do so in consultation with a qualified individual or organization such as the Southeast Alaska Avalanche Center. This consultation shall occur immediately following an avalanche event.

5.  If the tailings access road is available for use during the avalanche season, signage must be placed warning all drivers of avalanche danger on the road. The road must be closed during periods of high avalanche risk as determined by mine officials in consultation with the Southeast Alaska Avalanche Center or comparably qualified organization or individual. This consultation shall occur on a daily basis during the November-May avalanche season.

6.  A snow shed shall be constructed over the Kensington portal to shed snow away from the portal and prevent the portal from being covered by snow and impeding escape from the mine.


**EROSION**

**Background**

Most potential for erosion will occur during construction as ground is cleared and graded for roads, buildings and other facilities. The Supplemental Draft EIS states that 195.5 acres of grounds will be disturbed from construction through operations, including 92 acres of wetlands and 80.6 acres of old growth forest. Approximately 113 acres will consist of disturbed soils, creating potential for runoff and sediment loading in Johnson Creek and Slate Creek. Many of the facilities and roads will be constructed on slopes in excess of 30%, where the potential for erosion and runoff will be the greatest. Two stormwater diversion ditches will be constructed around the mill complex to contain a 100-year, 24-hour precipitation event.

**Analysis**

Control of erosion and sedimentation will be managed through the requirements of the National Pollution Discharge Elimination System (NPDES) permit from the EPA, which requires the identification of Best Management Practices (BMP) for runoff from developed areas; from the Stormwater Pollution Prevention Plan required by the DEC; and from MBPS identified in the Forest Service-approved Plan of Operations.

The applicant's amended Plan of Operations dated November of 2001, identifies numerous MBPs that will be employed during construction and operations. These are practices that will be followed generically; following them are practices more specifically targeted to borrow pits, bridges and culverts and roads.

1.  Vegetation will be removed only from those areas necessary to meet project requirements (ie, minimize disturbance).

Exhibit 1 to Freer Declaration
Page 33 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 34 of 60

2. Excessive clearing will be avoided in areas adjacent to stream channels. Final design plans will specifically show distances from the edge of clearing to perennial streams. Explanations will be provided to the U.S. Forest Service for any clearing within 100 feet of the high water line of a perennial stream.
3. Salvageable timber will be utilized on-site for mine development, construction of other facilities, or used as practicable in accordance with Forest Service regulations.
4. Fill slopes adjacent to streams will be re-vegetated, as practicable.
5. Designated embankment slopes will be graded and re-vegetated to prevent erosion, as practicable.
6. Runoff from roads, buildings, and other structures will be handled through common sediment control measures, including sediment traps, straw bale barriers, settling ponds, berms, sediment filter fabric, and other means.
7. Unnecessary off-road vehicle travel will be avoided.
8. Precipitation falling on construction areas will be collected in temporary infiltration basins or sediment sumps to remove sediment.
9. Interim, concurrent, and final reclamation will be performed as described in the Final Reclamation Plan and will be implemented during the project life at closure.
10. To the extent possible, drainage patterns will be maintained to protect water quality and to support aquatic populations and habitat.

**Borrow Pits**. Borrow pits and quarries will be developed to minimize soil erosion from cut slopes and exposed surfaces during construction. Interim drainage stabilization within the borrow sites will include the use of silt fences, straw bale barriers and/or slash windrows. Discharge of storm water from borrow pits will also be addressed through the NPDES permit.

**Bridges and Culverts**. Bridge construction must comply with Alaska Statutes Title 41 requirements for work in anadromous streams, including the timing of construction to avoid habitat impacts (see the analysis under Habitat). Other practices will include stream bank armoring/riprapping, and installing adequately sized culverts to accommodate flow.

**Roads**. Roads will be designed and constructed or upgraded to minimize the concentration of runoff on road surfaces and cut-and-fill slopes associated with the road footprint. Culvert inlets and outlets will be properly armored, and culverts will be installed and periodically cleaned to ensure that they maintain their conveyance capacity. Roadside ditches will be sized and armored as necessary to control erosion and transport runoff to culverts. Eroded material from road surfaces will be controlled by the use of sediment traps, silt fences, straw bales, water bars or diversion ditches and berms.

Road maintenance will be conducted to minimize surface water rutting, slope failures, sidecasting of road surface armor material, and blockage of drainage facilities. Protective road surface armor material will be selectively applied to roads to minimize erosion. Snow removal will be conducted to protect the road surface and prevent undercutting of cut slopes. Snow berms will be placed on the outside edge of the road and in such a manner as to prevent channeling of snowmelt runoff.

Exhibit 1 to Freer Declaration
Page 34 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 35 of 60

Following permanent construction, roads will be stabilized by one or more of the following techniques:

1. Re-seed during the first planting season following construction.
2. Selectively rip-rap steep slopes, as necessary, where stormwater runoff could concentrate.
3. Pre-strip and replace soil.
4. Fertilize, as necessary, to provide appropriate nutrients for vegetation.
5. Install retaining walls where necessary.

## Findings

The EPA NPDES permit will require the establishment of best management practices to assure that runoff from developed areas meets federal Clean Water Act standards. The existing approved Plan of Operations contains MBPs that specifically address erosion and sedimentation The continuing employment of best management practices provides for day-to-day and even moment-to-moment capability to control erosion and sedimentation.

## Recommendation

1. Coeur shall identify methods in the approved Plan of Operations for the employment of best management practices that allows for quick action to be taken where erosion is imminent or under way.
2. Provide worker training in the employment of best management practices, including both techniques (how MBPs are employed) and protocols (when and where MBPs are employed).
3. Reclaim disturbed areas on steep slopes and avoid disturbing steep slopes during inclement weather.
4. Construct all storm water diversion ditches to accommodate a 100-year, 24-hour precipitation event.

## JUNEAU COASTAL MANAGEMENT PROGRAM

Numerous enforceable policies of the Juneau Coastal Management Program, CBJ §49.70.900 et. seq., apply to this project. In particular, the policies under Coastal Development apply to the marine terminal facility at Slate Creek Cove, and the policies under Habitat apply to for disturbances to wetlands and water bodies. Each pertinent policy is listed below with an accompanying discussion.

Coastal Development

The coastal development policies of the JCMP apply to the development of a marine terminal facility at Slate Creek Cove. Goldbelt Corporation will apply separately for a Conditional Use

Exhibit 1 to Freer Declaration
Page 35 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 36 of 60

Permit to construct marine terminal facilities at Cascade Point. Structural components of marine terminal development at Slate Creek Cove include:

- clean gravel fill approach
- 30 by 210 foot landing craft ramp
- 40 by 60 foot heavy duty platform
- 12 by 110 light duty dock
- 6 by 80 foot gangway
- 12 by 100 foot removable float
- 24 by 120-foot transfer bridge with a mechanical hoist and lifting frame on pile-supported dolphins
- breasting pierhead with 5 breasting/mooring dolphins

Approximately 28,900 cubic yards of fill material will be used to construct the approach to the terminal, most of it below the high tide line of 21.5 feet. Coeur's Tidelands Lease application to the Department of Natural Resources states the fill will cover 41,100 square feet of surface area, of which 31,800 square feet are below Mean High Water, 9,800 square feet are between the Mean High Tide and the High Tide Line, and 2,500 square feet are above the High Tide Line.

See Attachments G, G-1 and G-2 for engineering illustrations of the terminal facilities.

1. *§49.70.905(1). To the extent feasible and prudent, coastal development shall be designed and operated to prevent adverse impact upon beaches and other physical shore features in the coastal zone.*

   The marine terminal is located at the tidewater terminus of a five-mile haul road leading to the mine and mill complex in the Johnson Creek Basin, thus is limited in location even if some re-routing of the haul road could be considered. Construction of the terminal will directly impact approximately 41,000 square feet of upland, inter-tidal and sub-tidal habitat with the placement of fill.

   The Slate Creek Cove Marine Terminal Development Plan submitted by Coeur to the Department of Natural Resources as part of its application for a tidelands lease, states that the facilities have been designed to minimize the amount of excavation and construction in the inter-tidal and upland beach areas. The design incorporates mooring dolphins for barges, which are then accessed with a transfer bridge with a mechanical hoist from the heavy-duty platform located on the fill approach. The outreaching platform and bridge reduce the amount of fill needed in the inter-tidal zone, while still providing access for the deep water mooring for supply barges during different tide levels. This design also eliminates the need for excavations in the inter-tidal zone.

   Thus, by minimizing disturbance in the inter-tidal zone, **the policy is met**.

Exhibit 1 to Freer Declaration
Page 36 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 37 of 60

2. **§49.70.905(5).** *Shoreline industrial developments, ports, harbors and marinas shall be sited, designed, constructed and operated such that:*

(A)    *lawful navigation is not impaired;*

The Chief of Port Operations of the 17th Coast Guard District in Juneau has reviewed the plans and specifications for the Slate Creek Cove marine terminal and determined that the terminal does not impair lawful navigation.

Thus, lawful navigation is not impaired by the siting, design, construction or planned operation of the facility.

(B)    *facilities for proper handling of sewage, refuse, fuel and waste oil are provided;*

Diesel fuel is proposed to be off-loaded at Slate Creek Cove in 5,000 gallon isotainers (see the Transportation discussion). According to the 2004 Supplemental Draft EIS, these tank containers are designed for multi-modal transportation and conform to requirements established by the International Standards Organization (ISO). Coeur proposes using ISO standard 1496-3, in which the tank is enclosed within a structural frame designed to isolate the shell of the tank if it is dropped or involved in a roll-over accident during handling, transport and storage. The tanks are designed for stacking and can be loaded onto flatbed trailers by crane or forklift.

Utilities for the marine terminal will include lighting and electrical power systems only, powered by a diesel generator. No water, sewer, or other utilities are anticipated at the terminal. The applicant has stated that portable toilets will likely be located in the laydown area, where the haul road meets the marine terminal approach. Coeur's Tidelands Lease application indicates that trash containers will be provided on shore at the marine terminal, and that waste receptacles will be placed on the dock, secured to prevent accidental spills into the water.

For the project overall, bear-proof dumpsters would be placed at centralized locations throughout the site, including the marine terminal and process area. The dumpsters would be constructed from two bins, one for combustible waste and the other for non-combustible waste. Combustible waste would be collected daily and disposed of in a fenced, bear-proof incinerator. Ash from the incinerator would be placed underground in dry portions of the mine. Noncombustible waste would be disposed of on private land in a manner consistent with Alaska Department of Environmental Conservation requirements. Used oil would be collected and burned to provide heat in an approved used-oil heater, or removed from the site by an approved used oil contractor. Coeur has also stated in July 19, 2004 correspondence with the Department that waste management services are available in Juneau, and offsite disposal may be utilized if warranted.

Exhibit 1 to Freer Declaration
Page 37 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 38 of 60

Thus, facilities for proper handling of sewage, refuse, fuel and waste oil are provided and **the policy is met**.

> *(C)   all feasible steps are taken to prevent water pollution by incorporating best management practices; and*

Numerous, generic Best Management Practices have been identified in Coeur's Tidelands Lease application, both for construction and operation of the marine terminal.  These are illustrative of the measures that can be expected to be taken, and include:

### During construction

- Hydraulic equipment used on barges will use vegetable oil or another biodegradable fluid rather than petroleum-based oils.
- Refueling of construction equipment will be conducted on shore, with the exception of refueling barges.
- Fuel transfers will incorporate level sensors, drip pans, and other precautionary measures, as appropriate.
- Oil spill response equipment will be readily available to respond to and/or to contain any spills.  Spill response equipment will include absorbent materials, containment booms, and appropriate personal protective equipment.  Personnel that are trained in responding to spills will be at the scene during all operations that could result in a spill.
- Spills into coastal waters will be reported to the appropriate agency immediately.  Oil absorbent booms/socks will be placed around the spill sheen to contain it and absorb it as much as possible.

### Operations

- Waste receptacles would be placed on the dock and secured to prevent accidental spillage into the water.
- Propylene glycol-based antifreeze would be used in place of ethylene glycol if possible because of its lower toxicity.
- An oil spill response plan would be developed for the terminal facility.
- Adequate spill response equipment would be easily accessible and in a clearly marked location.  Phone numbers and directions on reporting spills would also be clearly posted in the same location.
- Used spill response equipment would be properly disposed of.
- Biological cleaners, which eat and digest petroleum pollutants, would be used to ensure complete remediation of a spill, when appropriate.
- Prior to discharging bilge water, it would be inspected to ensure that no oil or fuel has been spilled into the bilge.  The bilge water would not be discharged f it has a sheen, or if it contains solvents, detergents or other additives.
- An oil/water separator would be installed in the bilge and in the bilge water pump discharge line and maintained regularly.

Exhibit 1 to Freer Declaration
Page 38 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 39 of 60

- Coeur would recommend that oil-absorbing materials be used in bilge areas of boats that have inboard engines.
- Non-alkaline, biodegradable bilge cleaners would be used.

In addition to these MBPs proposed in the Tidelands Lease application, Coeur also has an adopted Best Management Practices Plan prepared in 1998 by Carson Dorn, Inc. While written for a different mining plan than the plan now under consideration, the kinds of practices that are identified remain applicable and can be suitably adapted for Alternative 'B'.

Coeur must prepare a Stormwater Pollution Prevention Plan (SWPPP) to prevent and control erosion and associated sedimentation of water bodies; a Spill Prevention Control and Countermeasure Plan to prevent spills from reaching waters of the U.S; and a Facilities Response Plan for remediation of hazardous materials spills into fresh or marine waters. The SWPPP will be prepared as part of the applicant's National Pollution Discharge Elimination System (NPDES) permit application. The Facilities Response Plan and SPCC plan are also required by the U.S. Coast Guard and by the EPA under Section 311 of the Clean Water Act. These plans must be certified by a registered engineer.

Thus, the policy is met by incorporating best management practices and by having plans and procedures in place to prevent water pollution through sedimentation or release of hydrocarbons.

*(D)    adequate access and utility access are available or can be provided.*

Access to the site is, and will continue to be, by water. No water or wastewater utilities are proposed to be located at the marine terminal facility. Portable toilets will be located at the nearby laydown area. The terminal will provide marine and overland access to the mine for the movement of workers, and for freight, ore concentrate and other commodities. The portable toilets will be cleaned regularly and the waste disposed of in a DEC-approved manner.

*§49.70.905(7). To the extent feasible and prudent, ports, harbors and docks shall be installed in waters that have adequate natural flushing capacities. If solid fill must be used, it shall be located and constructed to maintain water circulation in the harbor.*

A review of the Planning Record for the Kensington project has not revealed a study or discussion of the flushing characteristics of Slate Creek Cove, nor was this identified as an issue during public and agency scoping of the project. The location of the marine terminal facilities near the entrance to Slate Creek Cove, where it is widest, and where marine facilities would be expected to have the least effect on the hydrology of the cove.

Exhibit 1 to Freer Declaration
Page 39 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 40 of 60

The development plan for the Slate Creek Cove terminal prepared by Coeur in February, 2004, states that the terminal facilities have been designed to minimize the amount of excavation and construction in the inter-tidal and beach areas. Fill material will extend from just above the high tide line, to approximately the 10-foot contour below the high tide line, covering approximately 38,600 square feet, or 9/10ths of an acre, of inter-tidal and submerged land. The rest of the terminal facility improvements, which extend approximately to the 40-foot contour line below high tide, are supported on galvanized steel piles that should not pose a barrier to water movement.

The limited extent of fill materials in the fill and landing craft ramp, combined with the absence of a breakwater, results in limited impacts to the natural flushing capability of Slate Creek Cove. Thus, the policy is to protect adequate, natural flushing capability is met.

*§49.70.905(8). Excavation, shoreline alteration and disturbance of anadromous streams, tideflats and wetlands shall be minimized in the construction and operation of port, harbor, dock and industrial facilities.*

The development plan for the Slate Creek Cove terminal prepared by Coeur in February, 2004, states that the terminal facilities have been designed to minimize the amount of excavation and construction in the inter-tidal and beach areas. This has been accomplished by the design of the facility, which incorporates mooring dolphins for barges, which are then accessed with a transfer bridge with a mechanical hoist from the heavy-duty platform located on the fill approach. The outreaching platform and bridge reduce the amount of fill needed in the inter-tidal zone, while still providing access for the deep water mooring for supply barges during different tide levels. This design also eliminates the need for excavation in the inter-tidal zone. No anadromous streams are affected by marine terminal development. Thus, this policy is met.

Some upland wetlands will be filled at the laydown area at the top of the approach to the marine terminal facility. The laydown, or storage area, must be located adjacent to the marine terminal, as it will be used to store ore concentrate and other freight, materials and equipment that move across the dock. Loss of wetlands is addressed below in the JCMP Habitat discussion.

*§49.70.905(12). To the extent feasible and prudent, development shall not detract from the scenic qualities of the shorelines, shall be compatible with its surroundings and shall not significantly block scenic vistas.*

The Supplemental Draft EIS addresses the visual impacts of the project, including the marine terminal at Slate Creek Cove, in detail. The marine terminal will be the most visible element of the mine from Berners Bay. The discussion below is taken from the EIS.

"The Slate Creek Cove marine terminal and the southern portion of the main access road are located with the Old Growth Land Use Designation (LUD), which requires that activities conform to the Retention VQO at all distance zones (see Visual Screening earlier in this report).

Exhibit 1 to Freer Declaration
Page 40 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 41 of 60

Activities are to be designated so as not to be visually evident to the casual observer. Exceptions for small areas of non-conforming developments, such as transportation and mining developments, may be considered on a case-by-case basis. The Forest Plan requires the use of designs and materials that are compatible with forms, colors, and textures found in the characteristic environment."

The terminal would be evident to the casual observer, but may be considered an exception because it would be small in scale when viewed from much of Slate Creek Cove relative to the forested ridge behind it. The simulation [photo simulation in the Supplemental Draft EIS] indicates that the color of the docks and gravel fill would contrast with the surrounding landscape. This contrast would diminish over time as the portion of gravel below tide level becomes weathered and covered with mussels. Color contrasts would be reduced by painting the facility a neutral, non-reflective color as approved by the Forest Service. The facility's line and form would be more compatible with the landscape that its color, given the strong horizontals of the shoreline and the vertical tree pattern. The marine facilities would be removed and the beach area reclaimed after project completion, which would allow the VQO to be retained in the long term.

**Geophysical Hazards**

*§49.70.910(d). Industrial and resource extraction activities in high landslide or avalanche areas are prohibited unless it is determined that these activities will reduce the threat of landslides and avalanches on existing and potential development.*

Avalanche paths have been mapped on both the Kensington and Jualin sides of Lions Head Mountain. On the Kensington side, the Kensington portal is located in an avalanche path, while on the Jualin side, the tailings pipeline and tailings pipeline access road to Lower Slate Lake both cross an avalanche path in Snowslide Gulch.

There is existing development at the Jualin mining claim in the form of several small, wooden structures used for storing equipment and other small-scale mining support uses. This development, as well as most of the development that is proposed as part of this project, is outside of mapped avalanche paths. Mining facilities and activities will not reduce the threat of avalanches, but can be designed and constructed to safeguard mine personnel and operations. While some discretion exists in the actual "fit" of mine facilities and improvements, their location under all of the alternatives is closely tied to the location of the adit, or mine entrance, from which ore will be hauled.

Several factors can mitigate the avalanche hazard, including:

- The employment of engineered improvements such as snow sheds and buried pipelines;
- mine safety procedures that include ongoing avalanche monitoring during the avalanche "season" in the Spring and early Summer

Exhibit 1 to Freer Declaration
Page 41 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 42 of 60

- prevention of travel across avalanche routes during periods of high hazard;
- the fact that no unrelated or unanticipated development can occur within the mining area during the life of the mine
- access to the site will be will be restricted

See the discussion under Avalanches earlier in this report for recommended permit conditions. Thus, this policy is met because no other development besides mining development will occur in this location, and because conditions are identified to protect workers and facilities from avalanche hazards.

## Mining and Mineral Processing

*§49.70.940(a). Mining and mineral processing in coastal areas shall be regulated, designed, and conducted so as to be compatible with the standards in this article, adjacent uses and activities, statewide and national needs, and district programs.*

The applicant's proposal is undergoing review under the National Environmental Policy Act. A Supplemental Draft EIS has been prepared, a Final Supplemental EIS will be released in September, and a Forest Service Record of Decision is expected in November. NEPA is essentially a disclosure process that describes and analyzes the environmental effects of project alternatives. The preferred alternative must be compliant (or be made compliant) with numerous state and federal laws, the most significant of which for this project are listed below:

**EPA, National Pollution Discharge Elimination System Permit**. The most significant water quality permit. Establishes effluent limitations, toxicity testing and a Quality Assurance Plan; requires, and specifies, a Best Management Practices plan; establishes monitoring, recording and reporting requirements; and establishes compliance responsibilities.

**U.S. Army Corps of Engineers '404' Permit**. Allows the placement of fill into waters of the U.S. including forested wetlands and inter-tidal areas; establishes project-wide mitigation measures; establishes Best Management Practices and Reclamation Plan requirements; may require compensatory mitigation for wetlands loss.

**U.S. Forest Service-Approved Plan of Operations**. References all required permits and plans; provides a description of mine operations, facilities and procedures; identifies environmental mitigation measures, particularly for water quality; provides maps and figures for mine facilities and improvements.

**U.S. Army Corps of Engineers 'Section 10" Permit**. Allows the placement of structures (ie pilings in this case) in marine waters.

**Alaska DEC Air Quality Control Permit**. Establishes the requirements for compliance with Alaska air quality standards.

**Alaska DEC '404' Certification**. State certification of the U.S. Army Corps of Engineers 404 permit.

**Alaska DEC '401' Certification**. State certification of the Environmental Protection Agency NPDES permit.

Exhibit 1 to Freer Declaration
Page 42 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 43 of 60

**Tidelands Leases** for marine terminal facilities, Alaska DNR.
**Alaska Coastal Management Program** (ACMP), Alaska DNR, Office of Project Management and Permitting, ACMP consistency review.

Under the National Environmental Policy Act, (NEPA), the project must be designed, regulated and conducted in a manner that is compliant with state and federal environmental regulations, and with the specific provisions of numerous federal acts, plans and Executive Orders. Thus, the project is compatible with state and national needs because the mine will be permitted only if NEPA review shows that protections will be provided for public resources through the application of state and federal environmental laws. Likewise, the project can be construed as compatible with adjacent uses and activities to the extent that natural values are protected through water and air quality regulations, best management practices, permit stipulations and other plans such as a Stormwater Pollution Prevention Plan and Spill Prevention Countermeasures and Control Plan. Local, as opposed to state and/or national interests, are addressed in the CBJ Allowable Use Permit.

The mine is located in a remote area of the city and borough, with the closest developed area at the Echo Ranch Bible Camp, across Berners Bay at the entrance to Echo Cove, approximately six miles distant. The mine can be considered compatible with surrounding uses to the extent there is no urban development or other settlement in the vicinity, thus no potential for "urban-type" conflict with adjacent property owners. This is also evidenced by the conditions that are recommended for the project. They are conditions that are essentially meant to assure worker and public safety and are not the type of conditions that typically would address conflicts caused by conflicting or incompatible adjacent uses or activities.

The loss of biological productivity in Lower Slate Lake over the life of the mine, and the filling of approximately 50 acres of wetlands, renders the project inconsistent with several of the Habitat policies of the Juneau Coastal Management Program, as the discussion below will reveal. At the same time, the project has been evaluated under the provisions of CBJ 49.70.950 (d) (1), (2) and (3), and it has been determined that a significant public need exists for the project, that no feasible and prudent alternative exists that poses less impact, and that all feasible and prudent steps have been taken to minimize project impact. The determination of significant public need also responds to the provision of the mining policy above that addresses "compatibility with statewide and national needs."

**Habitat**

*49.70.950(c ) (3). Wetlands and tideflats shall be managed so as to ensure adequate water flow, nutrients, and oxygen levels, to avoid the adverse effects on natural drainage patterns, the destruction of important habitat, and the discharge of toxic substances.*
The project proposes to place approximately 5,451,700 cubic yards of fill in 91.7 acres of waters including forested and scrub wetlands, Lower Slate Lake, and marine waters. See Attachment H for Location of Wetlands.

Exhibit 1 to Freer Declaration
Page 43 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 44 of 60

Fill volumes and locations are:

| Proposed Facilities | Acres Impacted | Fill Volume |
|---|---|---|
| Process Area | 5.3 | 88,000 cy |
| Tailings Dam | 1.4 | 145,000 cy |
| Access Road | 12.0 | 26,000 cy |
| Laydown Area | 5.0 | 4,800 cy |
| Waste Rock Disposal | 4.8 | 311,000 cy |
| Borrow Areas | 4.2 | -0- |
| Mine Tailings | 45.5 | 4,800,000 cy |
| Tailings Placement Facilities | 8.9 | 15,000 cy |
| Topsoil Stockpile | 1.0 | 33,000 cy |
| Slate Creek Cove | 3.6 | 28,900 cy |
| | 91.7 | 5,451,700 cy |

Approximately one-half of the total acreage, or 41.8 acres, is scrub and forested wetlands, when the acreage for Lower Slate Lake and Slate Creek Cove are subtracted. The loss of wetlands acreage under the current proposal is significantly less than the forecasted loss of 268 acres of wetlands under the 1997 preferred alternative, much of which was associated with development of the Dry Tailings Facility.

The types of wetlands to be filled are represented in the Table below:

| Wetland Type | Acreage |
|---|---|
| Estuarine Rocky Intertidal Shoreline | 0.4 |
| Lacustrine | 20.0 |
| Palustrine Aquatic Plant Bed | 0.1 |
| Palustrine Emergent | 9.6 |
| Palustrine Scrub-Shrub | 0.5 |
| Palustrine Forest | 19.0 |
| Upland Forest (upland/wetland mix) | 2.9 |
| Disturbed (upland/wetland mix) | 39.2 |
| TOTAL | 91.7 |

The Supplemental draft EIS used the *Southeast Alaska Freshwater Wetland Assessment Method* (USACOE, 2000) to characterize wetlands functions within the Kensington project area. Wetlands within the project area were evaluated for:

**Floodflow Alteration**: the ability of a wetland to temporarily store water and reduce the magnitude of flood events.

**Groundwater Interchange**: discharge of groundwater to streams, springs and lakes, and recharge of groundwater supplies.

Exhibit 1 to Freer Declaration
Page 44 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 45 of 60

**Sediment/Toxicant Retention**: the capacity of a wetland to act as a "sink" for sediments and toxins.

**Sediment/Shoreline Stabilization**: the ability of a wetland to prevent erosion, including shoreline erosion.

**Nutrient Cycling**: a "pathway" for nitrogen, phosphorous, and organic material to break down and become available to the natural system.

**Carbon/Detrital Export**: movement of carbon and organic material from plants to other sources in the aquatic (and terrestrial) food web.

**Wildlife Habitat**: includes supporting food webs, providing cover and enhancing connectivity between upland areas.

**Fish Habitat**: applies to those wetlands that provide direct or indirect support to fish and fisheries.

Wetlands that will be affected by the project are not classified by value as wetlands are in the Juneau Wetlands Management Plan Atlas.  Instead, they are assessed according to function and type as presented above. Generally speaking, the wetlands in the project area rated low to moderate for groundwater interchange, shoreline stabilization, nutrient cycling and fish habitat, and moderate to high for floodflow alteration, carbon/detrital export, sediment/toxicant retention and wildlife habitat.  The discussion below is from the 2004 SDEIS and addresses the moderate to higher wetlands values.

**Floodflow Alteration.** most of the watercourses in the project area occur within steep-sided bedrock channels and have limited opportunity to store flood flows.  Wetlands around Spectacle Lake, which will not be impacted by the project, have the soils and topography to support floodflow alteration.  Wetlands in the terrace area also have the topography and soils to provide floodflow alteration but are not adjacent to a stream course, limiting the extent to which they actually perform this function.

**Carbon/Detrital Export**.  The wetlands with the greatest capacity for carbon export are those that occur adjacent to stream courses or water bodies –wetlands along Sherman, Slate and Johnson Creeks- as well as those that surround Slate and Spectacle lakes.  The scrub-shrub and forested wetlands areas in the terrace area provide this function to a lesser extent through the intermittent streams that drain the area.

**Sediment/Toxicant Retention**.  The scrub-shrub wetlands below the existing rock pile at Kensington and disturbed wetlands in the vicinity of the Jualin Mine would have the greatest opportunity to provide these functions.  Wetlands in the vicinity of Spectacle Lake and in the terrace area (a flat bench that exists between Sherman Creek to the north and Sweeney Creek to the south, the terrace area was the proposed site for the Dry Tailings Facility) also have the structure (relatively flat topography, deep organic soils, dense vegetation) to provide these functions, but less opportunity due to the lack of disturbance in the area.

Exhibit 1 to Freer Declaration
Page 45 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 46 of 60

**Wildlife Habitat**.  Most of the wetlands in the project area provide a relatively high level of this function, supporting species including birds, deer, bear and furbearers.  The highest levels are provided by wetlands diverse in form and surrounded by old-growth forests such as those around Slate Lake and Spectacle Lake.  Wetlands in the vicinity of the Jualin camp provide this function to a lesser degree due to occasional human contact.  Impacts to wildlife can be expected as Lower Slate Lake is used for tailings disposal over the life of the mine, but could be expected to repopulate this location after reclamation.

**This policy is not met**.  The policy is not met due to the direct loss of wetlands during and subsequent to mine operations.  Direct loss of these functions is expected for the life of the project as a result of the placement of fill in wetlands  The various types of forested wetlands are not proposed to be restored upon mine closure, but reclaimed as upland habitat.  Thus, approximately 70 acres of forested-type wetlands will be lost.  Coeur has prepared draft reclamation principles for the project that, if implemented, would lead to the restoration of some wetlands functions through slope and soil stabilization and through re-seeding with native species, re-colonization and natural plant succession.  The employment of best management practices enumerated in CBJ 49.70.1080 (b) (7) (A) through (H) is recommended as a condition to help assure sound wetlands management and protection during construction.

*§49.70.950(c) (7).  Rivers, lakes and streams shall be managed so as to protect natural vegetation, water quality, important fish or wildlife habitat and natural water flow.*

Lower Slate Lake will be converted from a biologically productive lake into a tailings storage facility for the life of the mine.  The Supplemental Draft EIS predicts that all fish and most other aquatic life in Lower Slate Lake would be lost for the period during which the lake is used for tailings storage.  The applicant proposes to restore Slate Lake to a biologically productive condition subsequent to mine closure and has described their concept for restoration of the lake in a paper entitled <u>Reclamation Principles,</u> submitted to the U.S. forest Service in June, 2004.  This paper states:

"Restoration of the aquatic community will be accomplished by a combination of passive processes and active measures.  Mid-Lake Slate Creek and Upper Slate Lake (via Mid-Lake Slate Creek) will supply benthic invertebrates, phytoplankton, and zooplankton.  Many early life stage aquatic invertebrate species will also be supplied by airborne dispersion of their adult stage.

Abundance and diversity of phytoplankton, zooplankton, benthic invertebrates, macrophytes, threespine sticklebacks, and Dolly Varden will be monitored in the TSF, beginning at closure and continuing until a self-sustaining community has become established.  Two surveys per year will be conducted for the first two years after closure, followed by one survey per year until restoration of the aquatic community is determined to be complete.  Corrective measures, such as replanting, restocking, substrate additions, or other habitat modifications, will be taken as necessary to accelerate recovery.  Studies

Exhibit 1 to Freer Declaration
Page 46 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 47 of 60

that will be conducted during operation will provide the necessary information to establish a schedule for reestablishment of the aquatic community in the TSF. Upper Slate Lake will serve as a model since it has been shown to support a more productive population of Dolly Varden than Lower Slate Lake. Use of Upper Slate Lake as a model should therefore assure that the objective of restoring a similar community is exceeded."

Johnson Creek is an anadromous water body as designated in Appendix 'B' of the Comprehensive Plan. The creek gathers water from Lions Head Mountain and adjacent ridges, and flows approximately 5.1 miles to Berners Bay. The creek exists in two segments: Lower Johnson Creek below, and Upper Johnson Creek above a barrier falls, that acts as a permanent barrier to upstream fish migration. Lower Johnson Creek supports runs of Pink, Coho and Chum salmon, as well as populations of Dolly Varden, Rainbow and Cutthroat trout. Upper Johnson Creek has a resident population of Dolly Varden char.

A map submitted by the applicant shows a 100-foot, 'no development' buffer along either side of Johnson Creek from its origins upstream of the Jualin mine and mill complex to its discharge into Berners Bay. The only developments that are mapped within the 50-foot setback of Johnson Creek are two bridge crossings located in Upper Johnson Creek; one near the mill complex and the other approximately 4,500 feet downstream near the junction of a proposed access road to Lower Slate Lake. The new bridges are designed to be constructed without any in-stream work. However, in-stream work may be required if the existing bridge abutments need to be removed prior to construction of the new bridges. If in-stream work is required, the Office of Habitat Management and Permitting has recommended that the following MBPs be implemented to reduce the potential for the introduction of sedimentation and turbidity to the stream:

- Temporary sandbag dykes will be used to isolate the construction area from the streamflow, and the water pumped around the work area;
- Silt fencing will be installed surrounding the streambank to reduce silt loading directly
  into the stream;
- Minimal trafficking in the streambed to reduce displaced sediment; and
- Riprap armoring will be installed to reduce erosion, if streambank work is required.

Between bridge crossings, the haul road is located up to several hundred feet away from the creek. The haul road veers away from the creek about 1,000 feet from the proposed intersection with the tailings access road, and no project-related work is planned in-stream or adjacent to the biologically productive Lower Johnson Creek.

Construction-related disturbances will produce the potential for sedimentation that could affect habitat in Johnson Creek by reducing salmon egg survival and juvenile salmon over-wintering. Most of the construction activity will occur upstream of the biologically productive portion of

Exhibit 1 to Freer Declaration
Page 47 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 48 of 60

the creek, and MBPs will be employed to manage sedimentation and siltation (see the section on Erosion).

Slate Creek has been catalogued as being important for the migration, spawning and/or rearing of anadromous fish.  Anadromous fish use the creek from tidewater to a point at the confluence of the East and West Forks of Slate Creek, about one mile below the proposed impoundment on Lower Slate Lake, where a series of cataracts make upstream fish passage impossible.

Slate Creek will be affected in two ways: first, resident fish passage in the Slate Creek system could be inhibited, and second, Slate Creek below Lower Slate Lake will be the receiving water for discharges from Lower Slate Lake in its capacity as a Tailings Storage Facility.  The loss of biological productivity in Lower Slate Lake for the life of mine operations is a foregone conclusion.

According to the Supplemental Draft EIS, "although Lower Slate Lake supports a relatively small estimated population of Dolly Varden char, estimated at 1,000, these fish may be providing a viability link to fish populations in East Fork Slate Creek and locations further downstream. Lower Slate Lake is likely providing a route or connection for fish in Upper Slate Lake to move downstream through the Slate Creek system.  Tailings disposal and the construction of the dam would inhibit the passage of fish.  Under the requirement of the Department of Natural Resource's fish passage permit, Coeur must develop and implement a plan to ensure that fish are able to move around the TSF during operation and after closure."

Water discharged from Lower Slate Lake must meet federal Clean Water Act standards at the point of discharge.  The Kensington mine rock is not geo-chemically active, and is not acid-forming such as the sulfide rock from the Greens Creek mine. The Supplemental Draft EIS states in the section on geo-chemical effects that, "acid generation from the tailings would be unlikely…...this lack of acidification potential is partially attributed to the fact that sulfur, particularly sulfide, would partition to the flotation concentrate during processing.  The flotation concentrate would subsequently be moved off-site.  Column leach testing and analysis of tailings decant water indicate that leachate from the tailings would be of good quality with circum-neutral pH and low metal concentrations."  In effect, the tailings are forecasted to be benign, or neutral, and are not forecast to introduce pollutants or toxic materials into the lake.  In addition, the NPDES permit will require the discharge water to comply with permit limits established to protect water quality.

Another element of the EPA's NPDES permit is a requirement for biological testing and monitoring of aquatic resources, including anadromous species in Slate Creek.  Annual surveys of spawning salmon will be conducted to assess the size of the escapement.  Surveys will consist of weekly stream counts throughout the spawning season documenting the distribution of salmon within the surveyed area.  The quality of the spawning substrate will also be monitored to detect possible changes caused by potential introduction of fine sediments into lower Slate Creek.

Exhibit 1 to Freer Declaration
Page 48 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 49 of 60

**This policy is not met** due to the anticipated loss of biological productivity in Lower Slate Lake over the life of the mine. While Lower Slate Lake may become biologically productive upon reclamation, its natural values cannot be protected during mine operations. The habitat values of Lower Slate Creek and Johnson Creek can be protected through permit stipulations and best management practices.

*§49.70.950(d). Uses and activities in the coastal area which will not conform to the standards contained in subsections (b) and (c ) of this section may be allowed if the following standards are met:*

*(1) there is a significant public need for the proposed use or activity;*

The City and Borough of Juneau has established its support for numerous economic development initiatives including tourism, fish processing and mining. For example, the Assembly has identified 2004 goals for economic development with this strategy statement:

> Develop a vibrant and diversified Juneau economy by creating a support environment for business and government growth. This includes developing support infrastructure, helpful land and permitting policies, and selected marketing support for seafood, tourism, mining, the University, Alaska's capital, federal government and new businesses.

Ongoing goals under this strategy include promoting destination tourism (#7), supporting development of a UAF fisheries facility at Lena Point (#11) and supporting the Kensington mine project (#20).

The Assembly adopted Resolution #2257 on March 22, 2004, establishing a committee to develop a 50-year economic and employment diversification strategy for the CBJ. The resolution recognizes mining, among other industries, as a basic industry that "can increase employment and create new economies for economic sustainability."

The City and Borough has paid particular recent attention to the development of mining through the actions of the Planning Commission and the Assembly to promulgate revisions to the city and borough mining ordinance. Pertinent to the Kensington, 2003 revisions to the mining ordinance created a Rural Mining District, where large mines such as the Kensington can be permitted through the Allowable Use Permit process instead of under the more rigorous requirements of the Large Mine ordinance. While revised at the time the Kensington project was undergoing environmental review, the revised ordinance is applicable to any large mine that may seek a local permit within the Rural Mining District. Thus Assembly action to simplify permitting for mines in the Rural Mining District is viewed as supporting mining generally, and this project in particular, and establishing the importance of mining development for local economic development and diversification.
The Comprehensive Plan states in Policy 2.16:

Exhibit 1 to Freer Declaration
Page 49 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 50 of 60

*It is the policy of the CBJ to support the development of mineral resources in an environmentally sound manner, giving proper recognition to the unique values of this community.*

With revision of the mining ordinance, the CBJ has, in effect, placed the responsibility for assuring environmentally sound development in the hands of state and federal resource agencies, and focused its attention in areas typically under municipal authority.

The CBJ mining ordinance states as its purpose in CBJ §49.65.110 (a):

*To foster the development of a safe, healthy and environmentally sound mining industry while protecting the overall interests of public health, safety and the general welfare.....*

The Supplemental Draft EIS states, in the chapter on Socioeconomics, that long-term direct and indirect beneficial tax impacts would be expected from operation of the mine. The EIS material is not as detailed or as explicit as the information available in Reed Hansen Associates 1997 Socioeconomic Impact Analysis, but nevertheless indicates that tax earnings will exceed public service costs over the life of the mine.

The mine will employ approximately 225 workers over a projected 10-year life, with an annual direct payroll of $15,075,000, and is forecasted in the Supplemental Draft EIS to create as many as 499 indirect and induced jobs. This is at a time when, despite current high oil prices, there is long-term, downward pressure on the state budget and state government employment, affecting not only state government employment in Juneau, but also placing downward pressure on the city and borough budget. The addition of significant private employment, together with tax receipts that are forecast in the Supplemental Draft EIS to exceed mine-related city expenditures for public services and schools, also helps to establish public need for the project.

The project is forecast to create a demand for additional housing units in the community, however, unlike the 1997 approved project, when Coeur was under agreement with Goldbelt to construct 102 housing units, no agreement is in place for company provision of housing. Housing demand could highlight shortages in the short term, but is expected to result in additional residential construction that will expand the city's overall housing inventory.

In summary, CBJ believes that a significant public need exists for the Kensington gold project.

*(2) there is no feasible and prudent alternative to meet the public need for the proposed use or activity which would conform to the standards contained in subsections (b) and (c ) of this section; and*

Alternative 'B', the preferred alternative in the Supplemental Draft EIS, and the project alternative for which Coeur is seeking an Allowable Use Permit, impacts substantially fewer acres of wetlands than the previously-approved project.

Exhibit 1 to Freer Declaration
Page 50 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 51 of 60

Alternative 'B' results in the short-term loss of 92 acres of wetlands, in addition to areas previously permitted and already developed on Kensington, or Lynn Canal, side of the project. Approximately 50 acres of these wetlands –various forested wetlands- are proposed to be reclaimed as uplands upon closure of the mine. Lower Slate Lake will expand in size from 20 to 57 acres, and is proposed for reclamation as a biologically productive lake supporting a Dolly Varden trout population. While conjectural at this point, analysis of the proposed reclamation through the NEPA process, as well as testimony provided by Coeur representatives to the Wetlands Review Board, indicates that it is feasible and could succeed.

The previously-approved alternative, which is presented as Alternative 'A' in the 2004 Supplemental Draft EIS, would result in the short-term loss of 268 acres of wetlands, and the long-term loss of 164 acres of wetlands. Alternative A1, essentially a scaled-down version of Alternative A, would result in the short-term loss of 187 acres of wetlands, and the long-term loss of 124 acres of wetlands.

All of the alternatives in the Supplemental Draft EIS displace wetlands. The dry tailings storage areas in Alternative A and A-1 will remain as permanent disturbances, while the Lower Slate Lake tailings storage facility in Alternative B offers a seemingly realistic chance of restoration and enhancement of fish habitat. Thus, this alternative is superior to the others from the standpoint of reduced wetlands loss and improved opportunities for reclamation.

The location of the ore body, the kinds of facilities that are required to extract and process the ore, and the need for the facilities and the ore body to be nearby one another, will result in some unavoidable impacts under any alternative.

> *(3) all feasible and prudent steps to maximize conformance with the standards contained in subsections (b) and (c ) of this section will be taken.*

A large-scale, extractive activity such as mining cannot take place without adverse impacts on the environment, which, in the case of the Kensington project, means the permanent loss of some wetlands habitat and the conversion of a biologically productive lake into a tailings storage facility for the life of the mine. Still, with the conditions in this report, and the conditions and stipulations that are anticipated in state and federal permits, the habitat effects of the project can to some extent be mitigated.

The employment of Best Management Practices during both mine construction and operation, will prevent or help to slow surface erosion, and prevent sedimentation and turbidity in waters of the U.S. The EPA, the U.S. Army Corps of Engineers and the Forest Service Plan of Operations all identify, or establish a requirement, for the employment of MBPs. The effluent limitations, monitoring and enforcement provisions of the NPDES permit are meant to assure that Allowable Water Quality Standards are being met.

Exhibit 1 to Freer Declaration
Page 51 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 52 of 60

The U.S. Forest Service requires the preparation of a reclamation plan. A reclamation plan has not been finalized or approved at this time for the alternative for which Coeur is applying; that will not be required until after the Record of Decision is issued, and the project is finalized for permitting purposes.

Coeur has prepared reclamation principles for the current project, which offer guidance for the contents of an approved reclamation plan. The principles enumerated by Coeur are listed below.

- Stabilization and protection of surficial soil materials from wind and water erosion.
- Stabilization of steep slopes through re-contouring and leveling in order to provide rounded landforms and suitable growth media surfaces for native plant natural invasion and re-colonization.
- Establishment of long-term, self-sustaining vegetation communities through native re-seeding and promotion of natural invasion (re-colonization) and succession.
- Protection of surface and ground water quality.
- Protection of public health by reducing potential hazards typically associated with the mine and processing facilities.
- Establishment of fisheries and wildlife habitat and recreational resources.
- Alleviation or minimizing of long-term closure requirements, especially ongoing care and maintenance.

The reduced footprint of this alternative, in particular the reduction in long-term loss of wetlands, together with the employment of best management practices during construction and operations, the likelihood that Lower Slate Lake can be restored as productive habitat and the restoration and reclamation of disturbed areas following mine closure, indicates that the project is taking all feasible and prudent steps to attain compliance with the JCMP.

Conditions of the JCMP and recommendations from the Wetlands Review Board are listed below under **Conditions of Approval**.


**FINDINGS**

CBJ §49.15.320 (e), Decision, states that the Planning Commission shall consider the allowable use permit application and shall review the Community Development Director's recommendation with respect to:

1.  Whether the application is complete;

2.  Whether the requested permit is appropriate according to the Table of Permissible Uses;

3.  Whether the development as proposed will comply with the other requirements of this chapter; and,

Exhibit 1 to Freer Declaration
Page 52 of 73

Planning Commission
File No: MIN2004-00003
August 24, 2004
Page 53 of 60

4.    Whether conditions are necessary for approval[1].

The Commission shall approve the application and grant the permit unless it finds, by a preponderance of the evidence, that one or more of the criteria have not been met.  In either case the Commission shall adopt written findings setting forth the basis for its decision.

**Per CBJ §49.15.320 (e)(1 through 4), Decision, the director makes the following findings on the criteria for granting the requested allowable use approval:**

*1.    Is the application for the requested allowable use permit complete?*

> **Yes.**  The applicant has provided or referenced all of the information required by the Allowable Use Permit application.  The application submittal by the applicant, including the appropriate fees, substantially conforms to the requirements of CBJ Chapter 49.15.

*2.    Is the requested permit appropriate according to the Table of Permissible Uses?*

> **Yes.**  An allowable use permit is required according to the Table of Permissible Uses.  The permit is listed at CBJ §49.25.300 section 14.400.

*3.    Will the proposed development comply with the other requirements of this chapter?*

> **Yes**.  Staff has identified permit conditions that render the project compliant with the requirements of the land use code.

*4.    Are conditions necessary for approval of the requested allowable use permit?*

> **Yes**.  Staff has determined that the conditions that are listed below are necessary for the approval of the Allowable Use Permit.

## CONDITIONS OF APPROVAL

This section is in two parts: conditions based on the requirements of the revised large mining ordinance, 2003-27am, and conditions based on the Juneau Coastal Management Program.  Conditions based on 2003-27 am precede the JCMP conditions.

Conditions Based on 2003-27am

> **Traffic**

---

1      [1]CBJ §49.15.320 (f)(1 through 12), Conditions on Approval, lists a set of conditions that may be placed on the requested allowable use permit approval

Exhibit 1 to Freer Declaration
Page 53 of 73

Planning Commission
File No.: MIN2004-00003
August 24, 2004
Page 54 of 60

- Speed limit signs that are provided by, or comparable to, Alaska Department of Transportation speed limit signs, shall be posted in readily visible locations at the tidewater and millsite ends of the haul road.

- Coeur shall state in the approved Plan of Operations that passenger and freight vessels must reduce speed or alter course to lessen the wake effect on other boat traffic in the bay, particularly non-motorized vessels.

- Unless weather, safety procedures, emergencies, or Federal Aviation Administration requirements dictate otherwise, the mine operator shall operate helicopters at elevations and along the flight path that follows, in order to minimize noise levels on residential areas and recreational users of Berners Bay.

  a.  The minimum flight elevation shall be 1,000 feet above ground level.  The highest practicable elevation shall be maintained, preferably at least 2,000 feet above mean sea level.

  b.  The flight path shall be: from the Juneau Airport, head west while immediately climbing to FAA-directed or highest practicable altitude, cross the Mendenhall River, turn north to Montana Creek and proceed northwest following the creek drainage, on past Windfall Lake toward the mouth of Cowee Creek, north across Berners Bay, and then along the coastline of Lynn Canal to Comet Beach.

**Parking and Circulation**

- The applicant shall develop and operate a bus commute for mine workers for the life of the project.  This requirement may be waived only upon modification of this permit.  A fully-operational bus commute system, which includes both a bus commute and a park-and-ride as described in conditions 2 and 3 below,  must be in place before any Occupancy Permit is issued to the applicant or the Allowable Use Permit will be revoked.

- The park-and-ride facility must be located between Mile 6and Mile 12 of Glacier Highway, and must be designed and sized to support daily bus transportation to and from Cascade Point for all mining shifts and all mine workers per shift. The park-and-ride facility must provide enough parking spaces for two shifts of workers, or 100 vehicles.

- The bus commute shall consist of round-trip bus transportation from a park-and-ride facility to the Cascade Point Terminal and back. The busses shall be operated daily, 365 days per year, and shall be operated so as to provide transportation to and from each work shift.  The busses shall have sufficient capacity to transport all mine workers scheduled for each work shift.

Exhibit 1 to Freer Declaration
Page 54 of 73

Planning Commission
File No.: MIN2004-00003
August 24, 2004
Page 55 of 60

- The applicant shall institute a company policy that its employees utilize the bus commute on a daily basis.

**Lighting**

- Lighting at the marine terminals shall be used only during loading and off-loading of workers and materials, or when the terminals are otherwise in use, and applicant shall use an appropriate low-intensity lighting system to implement this condition.

- Lighting must, to the extent that safety is not compromised, be directed downward, and remain within the perimeter of the site.

- Lighting must be of a type that provides for adequate illumination without unnecessary glare.

- Lighting required as Aids to Navigation is exempt from these recommendations.

**Signage**

- Speed limit signs and other signs managing traffic on the haul road shall comply with appropriate Alaska Department of Transportation standards for highway signage.

- Signage at the park-and-ride facility shall comply with standards in CBJ 49.45.

**Noise**

- Company policy should forbid the use of "jake" brakes, or compression braking, on trucks transiting the haul road to Slate Creek Cove.

- Only rubber-tired machinery should be used to load and offload freight at the Slate Creek Cove marine terminal.

**Dust**

- The speed limit on the haul road shall be posted at 20 miles-per-hour to minimize the amount of airborne dust.

- The haul road shall be watered or treated with approved dust suppressants no later than any third consecutive day of dry weather, then watered or treated with approved dust suppressants thereafter as needed until the next rainfall.

- The waste rock storage pile and the borrow areas shall be watered or treated with approved dust suppressants no later than any third consecutive day of dry weather, then watered or treated with approved dust suppressants thereafter as needed until the next rainfall.

Exhibit 1 to Freer Declaration
Page 55 of 73

Planning Commission
File No.: MIN2004-00003
August 24, 2004
Page 56 of 60

**Visual Screening**

- Retain the values of the Modified Landscape VQO in the materials and colors used in construction of the Slate Creek Cove marine terminal.

- Minimize tree clearing at the mine and mill complex and along the haul road. Maintain as large a buffer of standing timber as possible between the haul road, mill and processing area and Berners Bay.

- Use earth-tone colors and finishes on the exterior of the mill and processing buildings.

**Surface Subsidence**

- The company must maintain a 150-foot crown pillar to assure stability and prevent surface subsidence.

- The employment of mining techniques that modify the 150-foot crown pillar must be pre-approved in the Plan of Operations and be shown to have no increased potential for contributing to surface subsidence.

**Avalanches**

- The tailings pipeline must be buried for the entire the mapped area of the Snowslide Gulch avalanche path. Burial must be at a depth and length that will assure the integrity of the pipeline to withstand a 100-year avalanche event.

- **If the tailings access road remains open for use during the November to May avalanche season**, then the applicant shall be required to prepare a Snow Safety Plan that includes, at a minimum, the following:

  a. avalanche search and rescue training for on-site employees;
  b. travel protocol on the tailings access road;
  c. placement of probes, beacons and shovels in all vehicles crossing Snowslide Gulch;
  d. radio checks for all travel across Snowslide Gulch;
  e. a system for daily and/or weekly avalanche forecasting;
  f. designation of an on-site avalanche expert;
  g. other practices and procedures that assure worker safety and rapid response to avalanche events.

  The plan shall be prepared by an organization such as the Southeast Alaska Avalanche Center, or another comparably qualified organization.

- **If the tailings access road remains closed for use during the November to May avalanche season**, then the applicant shall be required to incorporate avalanche awareness training into the required 40 hour Mine Safety and Health Administrative

Exhibit 1 to Freer Declaration
Page 56 of 73

Planning Commission
File No.: MIN2004-00003
August 24, 2004
Page 57 of 60

(MSHA) training class that is given to every new miner hired for the project. The applicant is required to consult with the Southeast Alaska Avalanche Center, or a comparably qualified organization, in developing avalanche awareness training. Specific attention shall be given to the avalanche hazard posed at Snowslide Gulch.

- Snow removal equipment must be staged on the mill side of the tailings pond access road, and must be in a ready-to-operate condition in the event the tailings pipeline is damaged. This equipment must be available to clear the access road of avalanche debris just as quickly as it is declared safe to do so in consultation with a qualified individual or organization such

- If the tailings access road is available for use during the avalanche season, signage must be placed warning all drivers of avalanche danger on the road. The road must be closed during periods of high avalanche risk as determined by mine officials in consultation with the Southeast Alaska Avalanche Center or comparably qualified organization or individual. This consultation shall occur on a daily basis during the November-May avalanche season.

- A snow shed shall be constructed over the Kensington portal to shed snow away from the portal and prevent the portal from being covered by snow and impeding escape from the mine.

**Erosion**

- Coeur shall identify methods in the approved Plan of Operations for the employment of best management practices that allows for quick action to be taken where erosion is imminent or under way.

- Provide worker training in the employment of best management practices, including both techniques (how MBPs are employed) and protocols (when and where MBPs are employed).

- Reclaim disturbed areas on steep slopes and avoid disturbing steep slopes during inclement weather.

- Construct all storm water diversion ditches to accommodate a 100-year, 24-hour precipitation event.

JCMP Enforceable Conditions

- Preserved and pressure-treated wood shall not be used in the water, or have contact with the water, in the construction of the Slate Creek Cove marine terminal.
- Fill in wetlands shall be avoided and minimized to the greatest extent practicable.

Exhibit 1 to Freer Declaration
Page 57 of 73

Planning Commission
File No.: MIN2004-00003
August 24, 2004
Page 58 of 60

- The best management practices enumerated in CBJ §49.70.1080 (b) (7) (A) (B) (C) (D) (F) and (G) are incorporated as MBPs for the project.  These are:

  - There shall be no work in the stream bed or that would adversely impact the stream during egg incubation or out-migration of salmon smelts;
  - Filtration curtains shall be used to protect streams from turbidity due to adjacent soil disturbance activities;
  - Existing wetlands vegetation shall be stripped in mats and repositioned over regraded soils;
  - The amount of fill shall be restricted to the minimum amount necessary to achieve stated purposes;
  - All discharge material shall be free from toxic pollutants in toxic amounts as defined by state law, and;
  - Erosion at the construction site shall be controlled through re-vegetation and other appropriate means.  Exposed soils shall be re-vegetated within one year.

<u>Wetlands Review Board Review and Recommendations</u>

The Wetlands Review Board met on July 22 and July 29 to review and develop recommendations for the Kensington project.  Coeur technical staff attended both meetings, made presentations and responded to questions from board members on the wetlands and habitat impacts of the project. These recommendations fall under the Wetlands Review Board's advisory responsibility on projects that have wetlands and habitat impacts and are intended to inform the consistency review under the JCMP.  The fulfillment of these recommendations falls under the responsibilities of outside agencies and organizations such as the National Marine Fisheries Service, the EPA and the U.S. Forest Service.  To the extent these recommendations can be incorporated through the ACMP in permits issued by outside agencies, they will become binding.  Where a recommendation is not tied to an outside agency permit, the applicant is encouraged to work with appropriate agencies such as NMFS or the Forest Service to incorporate these recommendations into Plan of Operations.  The recommendations are made under the Habitat section of the JCMP in CBJ §49.70.950.

- Marine construction shall not occur in Slate Creek Cove during the spring concentration of forage fish.
- A strong monitoring and reporting program shall be instituted for water quality assessment in the Slate Lakes Basin and in Slate Creek Cove, with an emphasis on the fish population.
- Species in Slate Creek Cove shall be monitored for vessel impacts.  Measures shall be taken to reduce impacts to marine species, including reduction of vessel speed, vessel routing and timing of vessel arrivals and departures.  Coeur should incorporate provisions for marine mammal protection in the approved Plan of Operations or through an agreement with the National Marine Fisheries Service.
- Coeur shall sponsor a Berners Bay working group to coordinate activities and promote good communication among the operator, the agencies and the public.

Exhibit 1 to Freer Declaration
Page 58 of 73

Planning Commission
File No.: MIN2004-00003
August 24, 2004
Page 59 of 60

## BIBLIOGRAPHY

Supplemental Draft Environmental Impact Statement, Kensington Gold Project, January 3, 2004

Final Supplemental Environmental Impact Statement, Kensington Gold Project, August, 1997

Final Environmental Impact Statement, Kensington Gold Project, February, 1992

Amended Plan of Operations for the Kensington Gold Project, Coeur Alaska, Inc., November, 2001

Allowable Use Permit Application, Coeur Alaska, Inc., March, 2004

Safety Reference Manual, Coeur Alaska, Inc., May, 1998

Emergency Response Plan, Coeur Alaska, Inc., April, 1996

Public Notice of Application for Permit, Lynn Canal 31, U.S. Army Corps of Engineers, June, 2004

Application to the U.S. Army Corps of Engineers for Section 404 and Section 10 Permits, Lynn Canal 31, Coeur Alaska, Inc., June, 2004

Environmental and Economic Benefits of the Lower Slate Lake Proposal, Coeur Alaska, Inc., January, 2004

Best Practices Management Plan for the Kensington Gold Project, Carson Dorn, Inc., August 1998

Tidelands Lease Application to the Alaska Department of Natural Resources, Attachment A, Coeur Alaska Inc., June, 2004

Draft Fish Habitat Permit FH04-I-0083, Tailings Impoundment Dam, Alaska Department of Natural Resources, June, 2004

Draft Fish Habitat Permit FH04-I-0085, Bridge #1 Replacement on Upper Johnson Creek, Alaska Department of Natural Resources, June 2004

Fact Sheet, NPDES Permit # AK-005057-1Kensington Gold Project, U.S. Environmental Protection Agency, June, 2004

Draft Permit, NPDES Permit # AK-005057-1, Kensington Gold Project, U.S. Environmental Protection Agency, June, 2004

Draft Certificate of Reasonable Assurance, Lynn Canal 31 M, Kensington Mine, Alaska Department of Environmental Conservation, June, 2004

Exhibit 1 to Freer Declaration
Page 59 of 73

Planning Commission
File No.: MIN2004-00003
August 24, 2004
Page 60 of 60

Draft Finding and Decision, Jualin Mine Road, RST #4, Road Closure, Alaska Department of Natural Resources, June, 2004

Kensington Gold Project, Reclamation Principles, Coeur Alaska, Inc., June, 2004

Preliminary Snow Avalanche Hazard Evaluation of the Ophir Creek and Sherman Creek Mill and Portal Sites, Doug Fesler, Alaska Mountain Safety Center, 1987.

Kensington Mine Planning Record, 2002-2004, U.S. Forest Service, 2004

Air Quality Control Permit to Operate 9511-AA007 for the Kensington Gold Mine, Alaska Department of Environmental Conservation, 1997

Draft Environmental Impact Statement, Juneau Access Study, Alaska Department of Transportation and Public Facilities, 1997

Correspondence on Eagle Nest Location at Berners Bay, U.S. Fish and Wildlife Service, June 9, 2004

Memorandum from Coeur, Inc responding to inquiries from the CBJ Community Development Department, July 19, 2004

Coeur presentation to the Juneau Wetlands Review Board on wetlands impacts of the Kensington Mine Project, July 22 and July 29, 2004

Notice of Decision, CBJ Large Mine Permit, Kensington Gold, November, 1997

CBJ Large Mine Permit, November, 1997

Exhibit 1 to Freer Declaration
Page 60 of 73



**FIGURE 1-1. GENERAL PROJECT AREA (APPROXIMATELY 45 MILES NORTHWEST OF JUNEAU)**

Attachment A

Exhibit 1 to Freer Declaration
Page 61 of 73



Source: USGS, 1985

FIGURE 1-2. SPECIFIC PROJECT AREA

Attachment B

Exhibit 1 to Freer Declaration
Page 62 of 73



DEVELOPMENT ROCK STORAGE
850 LEVEL PORTAL
2050 LEVEL PORTAL

KENSINGTON CAMP

MINE/MILL COMPLEX

DEVELOPMENT ROCK STORAGE

1060 LEVEL PORTAL
NEW ACCESS ROAD EXTENSION

BRIDGE 2

EXISTING ACCESS ROAD
(TO BE UPGRADED)

PIPELINE BURIED AT
SNOWSLIDE GULCH

BRIDGE 1

TAILINGS PIPELINE
AND ACCESS
ROAD

ACCESS ROAD

Upper Slate Lake

Lower Slate Lake

TAILINGS EMBANKMENT

TURNOUTS
EVERY 1500'±
FROM PORT
TO MINE AREA

LYNN CANAL

Berners Bay

NORTH

SCALE IN FEET
0     2000     4000

SLATE CREEK COVE MARINE PORT

LAYDOWN AREA

LOCATION MAP

LYNN CANAL

PROJECT SITE

JUNEAU

Berners Bay

4 MILES

| | SHEET 2 OF 13 | DATE:  MAY 2004 |
|---|---|---|
| **RTR** Resource Management, Inc. | SCALE: AS SHOWN | DRAWN:  JASPER GEOGRAPHICS |
| | LOCATION: T.35S., R.62E., CITY & BOROUGH OF JUNEAU | |
| | **GENERAL FACILITIES ARRANGEMENT** SLATE CREEK COVE MARINE FACILITY BERNERS BAY, ALASKA | |

NOTE:
SLATE CREEK TAILINGS STORAGE FACILITY
BASED ON DESIGN PREPARED BY KNIGHT-
PIESOLD CONSULTING FOR COEUR ALASKA INC.

Attachment C

Exhibit 1 to Freer Declaration
Page 63 of 73

Presented by:  The Assembly
Introduced:    05/19/2003
Drafted by:    J.W. Hartle

## ORDINANCE OF THE CITY AND BOROUGH OF JUNEAU, ALASKA

### Serial No. 2003-27am

**An Ordinance Amending the CBJ Mining Ordinance to Adopt an Urban/Rural Mining District Map and Providing a Simpler Approval Process for Mines Located in the Rural Mining District and Subject to Federal and/or State Environmental Review.**

BE IT ENACTED BY THE ASSEMBLY OF THE CITY AND BOROUGH OF JUNEAU, ALASKA:

**Section 1.   Classification.** This ordinance is of a general and permanent nature and shall become a part of the City and Borough code.

**Section 2.   Amendment of Section.**  CBJ 49.65.115, General applicability, is amended by adding a new subsection to read:

**49.65.115 General applicability.**
   (c) There is adopted for the purpose of regulating exploration and mining activities within the City and Borough the Urban/Rural Mining District Map, dated June 19, 2003, attached as Exhibit A, depicting the Urban and Rural Mining Districts, as such may be amended from time to time by the assembly by ordinance.  Mines located in the Rural Mining District which will undergo environmental review by state agencies, federal agencies, or both, as determined by the Director, shall not be subject to chapter 49.65, and shall be permitted as allowable uses pursuant to CBJ 49.15.320.  With respect to mines in the rural mining district, the Planning Commission may impose conditions pursuant to CBJ 49.15.320(f)(1)-(8) and additional conditions relating to traffic, lighting, safety, noise, dust, visual screening, surface subsidence, avalanches, landslides, and erosion.

**Section 3.   Amendment of Section.**  CBJ 49.65.125(a), Small mine permits, financial warranties and procedures, is amended to read:

**49.65.125 Small mine permits, financial warranties and procedures.**
   (a)  Except as provided in CBJ 49.65.115(c), no new small mine shall commence mining operations after August 6, 1986, unless the operator shall have obtained a small mine permit pursuant to chapter 49.15, article III, as modified by this article. No small mine which is in operation on August 6, 1986, may remain in operation more than one year thereafter, unless the operator has submitted a permit application and the permit has not been denied.

///

//

Attachment D, page 1 of 3

Exhibit 1 to Freer Declaration
Page 64 of 73

**Section 4.  Amendment of Section.**  CBJ 49.65.130(a), Large mines, financial warranties and procedures, is amended to read:

**49.65.130 Large mines, financial warranties and procedures.**
   (a)  Except as provided in CBJ 49.65.115(c), no large mine shall commence mining operations after August 6, 1986, unless the operator has obtained a large mine permit pursuant to chapter 49.15, article III, as modified by this article.

**Section 5.  Amendment to Table of Permissible Uses.**  CBJ 49.25.300, Table of Permissible Uses, is amended as shown in Exhibit B attached.

**Section 6.  Effective Date.**  This ordinance shall be effective 30 days after its adoption.

Adopted this 16th day of June, 2003.

_Ken Koelsch_
Ken Koelsch, Deputy Mayor

Attest:

_Laurie J. Sica_
Laurie J. Sica, Clerk

Vote:    Aye - Koelsch; Powell; Anderson; Johnson; Ridgeway; Sanford
            Nay - Smith; Wheeler
            Abstained - Wanamaker

          Ord. 2003-27am

**Attachment D, page 2 of 3**

Exhibit 1 to Freer Declaration
Page 65 of 73



# Urban/Rural Mining District Map

Exhibit 1 to Freer Declaration
Page 66 of 73



Exhibit 1 to Freer Declaration
Page 67 of 73



**ALTERNATIVES B AND C JUALIN PROCESS AREA**

Attachment F

Exhibit 1 to Freer Declaration
Page 68 of 73



Attachment G

Exhibit 1 to Freer Declaration
Page 69 of 73



SECTION 1-1' THROUGH
REMOVABLE FLOAT
AND LIGHT DUTY DOCK

VICINTIY
MAP

ENTIRE AREA IS IN THE WATERS OF THE U.S.

1
NW

1'
SE

SECTION 2-2'
THROUGH
REMOVABLE
FLOAT

2
SW

2'
NE

DESIGN BY PERATROVICH, NOTTINGHAM & DRAGE, INC.

| SHEET 6 OF 13 | | DATE:  MAY 2004 |
|---|---|---|
| RTR | SCALE: AS SHOWN | DRAWN: JASPER GEOGRAPHICS |
| | LOCATION: T.35S., R.62E., CITY & BOROUGH OF JUNEAU | |
| CROSS-SECTIONS 1-1' & 2-2' | | |
| SLATE CREEK COVE MARINE FACILITY | | |
| BERNERS BAY, ALASKA | | |

Attachment G-1

Exhibit 1 to Freer Declaration
Page 70 of 73





**WATERS OF THE UNITED STATES**

- LAKES & PONDS
- STREAMS
- WETLANDS (PREVIOUS STUDY)
- WETLANDS (DEFINED BY ABR ENVIRONMENTAL RESEARCH & SERVICES 2000 WETLANDS SURVEY)

| SHEET 4 OF 13 | | DATE: MAY 2004 |
|---|---|---|
| RTR Resource Management, Inc. | SCALE: AS SHOWN | DRAWN: JASPER GEOGRAPHICS |
| | LOCATION: T.35S., R.62E., CITY & BOROUGH OF JUNEAU | |
| **WETLANDS LOCATIONS** | | |
| **SLATE CREEK COVE MARINE FACILITY** | | |
| BERNERS BAY, ALASKA | | |

**Attachment H**

Exhibit 1 to Freer Declaration
Page 72 of 73

