DAVID W. MÁRQUEZ, Attorney General
CAMERON M. LEONARD, Assistant Attorney General
State of Alaska, Department of Law
100 Cushman Street, Suite 400
Fairbanks, AK  99701
Telephone:  (907) 451-2811
Facsimile:  (907) 451-2985
Cam_leonard@law.state.ak.us
RUTH HAMILTON HEESE, Assistant Attorney General
State of Alaska, Department of Law
P.O. Box 110300
Juneau, Alaska 99811-0300
Telephone: (907) 465-3600
Facsimile:  (907) 465-6735
ruth_hamilton_heese @law.state.ak.us

ATTORNEYS FOR INTERVENOR DEFENDANT STATE OF ALASKA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SOUTHEAST ALASKA CONSERVATION COUNCIL, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| UNITED STATES ARMY CORPS OF ENGINEERS; et al., | ) ) ) Case No: J05-0012 CV (JKS) |
| Defendants. | ) ) ) |
| v. | ) ) |
| COUER ALASKA, INC., et al., | ) ) |
| Intervenor Defendants | ) ) |

**STATE OF ALASKA'S OPPOSITION**

**TO  PLAINTIFFS' OPENING BRIEF ON COUNT I**

The State of Alaska has intervened in this important case not simply to defend the Kensington Mine Project. The Complaint brought by the plaintiffs Southeast Alaska Conservation Council et al. (SEACC) challenges an established system for the permitting of mine tailings disposal under the Clean Water Act. Because the challenged system is used routinely for large mines in Alaska, there is more at stake in this lawsuit than the future of the Kensington mine itself. Fortunately for the mining industry and for the state, SEACC's challenge lacks merit, and the legal analysis that leads to that conclusion is straight-forward.

## I. INTRODUCTION

### A. The State's Role

The State of Alaska has been an active participant in the permitting of the Kensington Mine project. Staff from three state resource agencies[1], in consultation with the Department of Law, worked closely with the federal agencies and with the project proponent, Coeur Alaska, Inc. (Coeur), throughout the lengthy NEPA review and permitting process. The State also worked with the U.S. Army Corps of Engineers (COE) and the U.S. Environmental Protection Agency (EPA) in developing their permitting strategy for the mine, as set out in the "Regas memo." State regulators were involved in every major design refinement that resulted from the extensive project review process. State agencies issued also several permits necessary for mine

---

[1] The state's three resource agencies are: the Department of Natural Resources, the Department of Environmental Conservation, and the Department of Fish and Game. AS 37.10.058(9).

development[2]. The State considers itself a full partner with the COE, EPA, and the U.S. Forest Service (USFS) in the authorization of this mine project.  The State has intervened in this lawsuit to assist the COE, USFS and Coeur in defending the project.

This mine project, unlike several others in the state, is located on federal land, so the federal government, rather than the state, acts as land manager. And because the State has yet to assume primacy from the federal government over the two major permitting programs applicable to the project (discussed in section II-B, below), it was the COE and EPA who issued the pivotal Clean Water Act Sec. 402 and Sec. 404 permits (33 U.S.C. §§ 1342 and 1344, respectively) needed to implement the project. Nevertheless, the state has a critical role in the issuance of those two federal permits, by virtue of Sec. 401 of the Clean Water Act (CWA), 33 U.S.C. § 1341.  That law creates a process known as certification, whereby the state must certify that activities proposed to be permitted by a federal agency will comply with state law, including state water quality standards. Those standards are the state's regulatory limits on the amounts of pollutants that may be introduced into state waters without impairing the waters' designated uses.[3]

    **B. The Kensington Certifications**

---

[2] The state permits include: tideland leases, road construction permits, fish passage permits, and water rights authorizations.  AR 872. The state discharge permits are discussed *infra* at 3.

[3] Alaska's water quality standards are codified at 18 AAC 70.

The Alaska Department of Environmental Conservation (DEC) certified that the activities to be permitted at the Kensington Mine project by EPA and the COE would comply with the state's water quality standards, if those activities were subject to certain conditions. DEC issued three separate certifications for: the COE's Sec. 404 permit for the Cascade Point Terminal (State's Ex. A); the COE's Sec. 404 permit for the Kensington mine project, including the tailings storage facility (TSF) (State's Ex. B; also found in COE's Administrative Record (AR) as Doc. #19); and EPA's Sec. 402 permit for the discharge from the TSF to East Fork Slate Creek (State's Ex. C)[4]. By certifying the federal permits, DEC also adopted them as the discharge permits required under state law. *See* AS 46.03.110(e); 18 AAC 60.200(b).

DEC's certifications impose conditions on the activities being permitted. Indeed, imposition of such conditions through the state certification is the whole point of Sec. 401. The certification process gives the state some control over whether and how federal agencies permit activities that could affect the quality of the state's waters. If the state does not certify the federal permit (or waive its right to certify), the federal agency cannot issue the permit. *See* CWA Sec. 401(a); 33 U.S.C. § 1341(a).

In its deliberations surrounding its certification of the COE's Sec. 404 permit for the mine, DEC's main concern was whether the tailings themselves would be toxic. Any tailings toxicity could have two unacceptable consequences: it could prevent

---

[4] Because SEACC's challenge to the COE's Sec. 404 permit for the Cascade Point dock is based solely on its challenge to the Sec. 404 permit for the mine (*see* SEACC Br. at 40-41), the State's brief will simply focus on the legality of the mine permit itself.

3.

the re-colonization of Lower Slate Lake after mine closure, and it could, if not properly managed, impair the water quality in East Fork Slate Creek, the receiving water for the discharge from the impoundment. In weighing these concerns, DEC looked carefully at the results of two kinds of tests: one to evaluate the potential of the tailings to generate acid, and the other to evaluate their toxicity. *See* AR at 876-78. DEC also hired a consultant to assist it in interpreting the toxicity test results. *See* AR, Doc. # 118. After a searching analysis, DEC's ultimate conclusion was that "the toxicity risks associated with the tailings will be low both during and after mining operations." *See* AR at 4745.

Nevertheless, DEC included conditions in its certification of the COE's Sec. 404 permit to guard against the potential of any future toxicity from the tailings. DEC required quarterly testing of the tailings, to monitor for any changes in tailings chemistry that could affect their toxicity. *See* State's Ex. B at 4 (cond. #8). DEC also stated that: "Capping of the tailings, addition of organics, or other state approved mitigation measures will be required at or after mine closure if water quality criteria[5] are not met in the impoundment, or if the tailings do not successfully re-colonize as determined by the state." *Id.* at 5 (cond. #15).

The CWA Sec. 402 permit, issued by EPA, regulates the discharge from the TSF into East Fork Slate Creek. That permit requires that effluent discharged

---

[5] The term "water quality criteria" refers to the narrative and numeric criteria set by DEC to protect designated uses of state waters. *See* 18 AAC 70.020(b). Those criteria are the central component of the Water Quality Standards in 18 AAC 70.

comply with the state's water quality criteria, even before any dilution in the creek. *See* State's Ex. C at 4-5 (discussion of "Outfall 002"). During the permitting process, questions arose about whether the effluent from the impoundment would comply with all criteria without some form of treatment. Given these questions, Coeur agreed to use a reverse osmosis treatment system, to ensure effluent quality. *See* Plaintiffs' Ex. 7 at 6 (discussion of Alt. D). Because the Sec. 402 permit already required compliance with the state's water quality criteria, DEC did not need to add any conditions to its certification of that permit. *See* State's Ex. C at 4-5.

To summarize: the federal permits, as certified by DEC acting for the State, assured both that aquatic life could successfully re-colonize the TSF after mine closure, and that the outflow from the TSF would meet the state's water quality standards, thus protecting the designated uses of downstream waters. This is hardly the toxic waste site that SEACC portrays. *See* Plaintiffs' Br. at 9-10.

## II. ARGUMENT

SEACC advances five arguments. But a single theme underlies all five. That theme is the proposition that the discharge of tailings is subject to federal new source performance standards applicable to the mining industry, found at 40 CFR § 440.104.

### A. The Core Legal Issue

One of the new source performance standards for the mining industry is a general prohibition on the discharge of process wastewater, subject only to two narrow exceptions: for net annual precipitation, and as necessary to correct any treatment interference caused by a build-up of contaminants in the recycle water at the mill facility. *See* 40 CFR § 440.104(b). SEACC argues that this general prohibition applies to the discharge of the tailings slurry into the proposed Kensington TSF.

The State does not dispute either that the Kensington Mine project falls within the mining industry sub-category, or that the performance standards referenced by SEACC may apply to the project. But the State strongly disagrees with SEACC's assertion that they apply to the discharge of the tailings into the TSF. Mine tailings are now included within the revised definition of the term "discharge of fill material," and therefore the discharge of those tailings is subject to a CWA Sec. 404 permit from the COE. *See* pp. 10-13, *infra*. New source performance standards, like other promulgated effluent guidelines, are applied through CWA Sec. 402 permits issued by EPA, not through the COE's Sec. 404 permits. Indeed, CWA Sec. 402(a)(1), 33 U.S.C. § 1342(a)(1), which requires that Sec. 402 permits comply with CWA Sec. 306, 33 U.S.C. § 1316, specifically exempts Sec. 404 permits from that requirement.

Thus, the core legal issue posed by this lawsuit is whether the discharge of tailings into the TSF at Kensington is governed by CWA Sec. 404, as "fill," or by CWA Sec. 402, which incorporates the new source performance standards for this mine industry. Given the literal language of the 2002 rule-making, the answer is refreshingly

simple: such tails are indeed fill material. That means they need a 404 permit, and not a 402 permit.[6]

### B. The 2002 Federal Rule-Making

This case, of course, is over whether the tailings slurry proposed for discharge into the TSF should or should not be permitted as "fill material," under a Sec. 404 permit issued by COE. Under the revised regulations, the proposed tailings slurry expressly qualifies as fill. As revised in 2002, the phrase "discharge of fill material" now includes: "placement of overburden, slurry, or tailings or similar mining-related materials." *See* 33 CFR § 323(f) (COE's definition); 40 CFR § 232.2 (EPA's definition). On the face of the current law, the status of tailings as fill seems quite clear.

But SEACC argues that somehow EPA and the COE did not mean what they said in their 2002 rule-making, and that mine tailings from this industry should not be regulated as "fill." Ignoring the literal language of the revised rule, SEACC relies instead on select passages from the rule's preamble. *See* SEACC Br. at 24-25. To understand and resolve this issue requires a detailed review of the May 2002 rule-making, including its preamble.

The important portion of the preamble is at 67 Fed. Reg. 31,135 (*see* SEACC's Ex. 27 at 7). Notably, EPA chose to delete from the final rule a provision that

---

[6] By way of historical background, the State attaches the 1986 MOA between COE and EPA, as well as the "Wilcher memo", as State's Exs. D & E. The analysis of these documents was made obsolete by the 2002 rule-making, but they address some of SEACC's arguments.

7.

would have excluded from the term "fill" discharges covered by established effluent guidelines. *Id.,* first column. SEACC explains this significant deletion away in a footnote, minimizing its significance. *See* SEACC' Br. at 25 n.12. They fail to mention a comment from the mining industry, which had opposed the proposed exclusion because:

> it could inadvertently result in attempts by regulators in the field to have discharges excluded from section 404 coverage simply due to the presence of constituents in the material for which effluent limitation guidelines exist and would apply if such constituents were discharged in wastewater (e.g. mine drainage or <u>process waste water</u>).

Plaintiffs' Ex. 28, p 14 (emphasis added). Ironically, even though EPA and the COE deleted the proposed exclusion based on such concerns, SEACC through this lawsuit now seeks to achieve the same result the miners feared: exclusion of tailings from Sec. 404 coverage simply because they contain some process wastewater.

That result would clearly be contrary to EPA and the COE's intent in revising their respective definitions in 2002. The most compelling statement of their intent on how to regulate mine tailings is the following quote from the rule's preamble: "The language in today's final rule will clarify that <u>any mining-related material that has the effect of fill when discharged will be regulated as 'fill material</u>.'" 67 Fed. Reg. 31,135; Plaintiffs' Ex. 27 at 7, 3rd column (emphasis added). Indeed, it is hard to imagine how EPA and the COE could have stated their intent any more clearly.

8.

Against this clear and concise statement, which SEACC does not even acknowledge, they offer one that is longer, more vague, and at best, ambiguous. *See* SEACC Br. at 24. While EPA and the COE did say that the new rule was generally intended to maintain their existing approach, that observation certainly doesn't require application of new source performance standards to the discharge of mine tailings. As explained in Section II-D, even prior to the 2002 federal rule-making, the existing practice by the federal and state agencies was to regulate the placement of mine tailings with Sec. 404 permits.

SEACC also relies on the federal agencies' recognition that some discharges can have the effect, over time, of raising the bottom elevation of a water body, without being considered to be fill. *See* SEACC Br. at 24, 31, 38. Presumably SEACC offers this quote to suggest that EPA and the COE had mine tailings in mind when they wrote it. Quite the opposite is true. The only fair reading of this passage, when read with care and in context, is that the agencies are referring not to mine tailings (which, being half solid, raise bottom elevations rather quickly), but rather to a wastewater discharge with much lower solids content, resulting in a slower, incremental effect on bottom elevations. That is certainly how EPA and the COE interpreted this very passage, when they discussed it in the 2004 Regas memo. *See* SEACC's Ex. 29 at 3. It is the only reading that fits.

The fact of the matter is that EPA and the COE meant just what they said in plain and simple terms: under the revised definitions, mine tailings like those at the

9.

Kensington mine project are to be regulated as "fill material," under a Sec. 404 permit issued by the COE. The new source performance standards, in contrast, would apply to any subsequent discharge from a tailings impoundment, in this case from the Kensington TSF, that may be permitted by EPA under Sec. 402. The Regas memo, which laid out just that approach, correctly interpreted and applied the revised definitions. Contrary to SEACC's arguments (*see* SEACC Br. at 33-34), there is nothing new or unusual about this approach. In fact, this is how the federal and state agencies have been permitting large metals mines in Alaska for many years, as further described below.

### C. Comparison With Other Alaskan Mines

Kensington is not the first large mine permitted in this state. There have been several, each of which received its permits and authorizations after the coordinated efforts of federal and state regulators. At each of the large metals mines in the state (Red Dog, Pogo, Greens Creek, and the Ft. Knox/True North mine complex), the placement of the tailings was permitted by the COE under CWA Sec. 404, just as was done at Kensington. *See* State's Ex. F (Declaration from Edmund J. Fogels, the Acting Deputy Commissioner, Alaska Department of Natural Resources) In each case where a discharge from the tailings storage facility was anticipated[7], that discharge was permitted by EPA under Sec. 402, again, just as at Kensington.

---

[7] Because the Ft. Knox/True North mine was designed to be a "zero discharge" facility, it did not require a Sec. 402 permit from EPA.

Indeed, contrary to SEACC's attempt to characterize Kensington's Sec. 404 permit (or the Regas memo) as a departure from past practice, to accept SEACC's premise – that Sec. 402, with its effluent guidelines, applies to the discharge of the tailings into the impoundment – would be a dramatic change from what has occurred elsewhere. Moreover, it would simply not work. The volume of tailings required for placement could not possibly comply with the new source performance standards described above, which prohibit any discharge of process wastewater subject to two narrow exceptions. The only way to sensibly apply the dual permit scheme is how EPA and the COE have done it at Kensington: to regulate tailings as fill under a Sec. 404 permit, and to regulate any discharge from the impoundment as a point source discharge subject to a Sec. 402 permit with its effluent guidelines requirements.

### D.  Permitting Tailings as "Fill" Does Not Reduce Environmental Protection

Permitting tailings disposal under Sec. 404 does not mean that there are no rules to protect the environment. The rules are simply different from those that apply to Sec. 402 permits. All disposal sites permitted under Sec. 404 are selected under a set of regulatory guidelines, jointly developed by EPA and the COE. CWA Sec. 404(b)(1); 33 U.S.C. § 1344(b)(1). These are commonly referred to as the "404(b)(1) Guidelines," and are codified at 40 C.F.R. Part 230. While a detailed exposition of the Guidelines is beyond the scope of this brief, a few highlights deserve mention.

The Guidelines are "intended to be consistent with and to implement" the policies of the Clean Water Act itself. 40 C.F.R. § 230.1(b). Contrary to SEACC's arguments, a decision to permit the discharge of mine tailings as fill material does not defeat or frustrate the goals of the Clean Water Act. Permitting the placement of fill, done under the mandatory methodology of the 404(b)(1) Guidelines, will be consistent with the goals and purposes of the Act.

The Guidelines include four major restrictions on discharges seeking authorization under Sec. 404:

1. there must be no practicable alternative to the proposed discharge that would have less adverse impact on the aquatic ecosystem;

2. the discharge can't violate water quality standards or toxic effluent standards, or jeopardize protected species;

3. the discharge can't cause or contribute to significant degradation of the waters of the U.S.; and

4. appropriate and practicable steps must be taken to minimize potential adverse impacts of the discharge on the aquatic ecosystem.

40 C.F.R. § 230.10(a) – (d).

Finally, EPA has a veto power over COE's decision, made under the 404(b)(1) Guidelines, to allow a discharge of fill. CWA Sec. 404(c); 33 U.S.C. § 1344(c); *see James City County v. EPA*, 955 F.2d 254, 257 (4th Cir. 1992).

In short, the Guidelines require that the COE carefully consider the environmental effects of any disposal it is considering permitting, and select the

12.

alternative with the least adverse impact. If EPA objects to the COE's decision, it can veto it. In this case, the federal and state agencies worked diligently and responsibly to select the project alternative with the least environmental impact. The agencies followed the law, and the resulting mine design is sound.

### E.  Injunctive Relief is Not Warranted in this Case

SEACC asks the Court to vacate the COE's Section 404 permits and the Forest Service's Record of Decision (ROD) and approval of the Kensington Plan of Operations, and to grant SEACC a permanent injunction prohibiting the activities authorized under the agencies' various approvals. SEACC Br. at 41-47. In order to get a permanent injunction, the moving party must first prove that it will suffer irreparable injury and that the balance of hardships tip sharply in its favor. *Hells Canyon Preservation Council v. Jacoby*, 9 F. Supp.2d 1216, 1245 (D. Or. 1998). The moving party must also show actual success on the merits, not just the mere likelihood of success. *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 546 n. 12 (1987).

Because the permits issued by COE for the mine and the dock facility are lawful, the State expects that the Court will never reach the issue of whether to grant SEACC the injunctive relief that it seeks. If the Court does rule for SEACC on the merits, the State requests the opportunity to address the appropriateness and the scope of a permanent injunction at that time. However, in case the Court does not provide such an opportunity, the State offers the following arguments now.

SEACC has failed to show that it will suffer continuing, irreparable injury from the permitted activities. The FSEIS and related environmental reviews and studies underpinning the decision to issue a Sec. 404 permit for the TSF -- the key agency action challenged by SEACC, upon which all of their other challenges and alleged injuries hinge -- describe relatively short-term and minor environmental impacts as a consequence of tailings disposal at the TSF. *See, generally,* AR 3538-3691 (effects analysis of Alt. D).

The COE, in its 2006 Revised ROD, concluded that "the proposed discharge of tailings into Lower Slate Lake would not constitute a significant adverse environmental consequence." AR at 61-64. *See also* AR 63-64. As noted earlier in this brief, "the toxicity risks associated with the tailings will be low both during and after mining operations." AR 4745. Water discharging from the TSF to downstream receiving waters is expected to meet applicable water quality standards. AR 65. In fact, once mining operations cease and reclamation is carried out, Lower Slate Lake is expected to provide a greater area of habitat suitable for wildlife, benthic organisms, and fish. AR 13, 68, 3620-22. Thus, SEACC will suffer no permanent, irreparable injury.

If the court finds for SEACC on the merits, and further finds that a continuing, irreparable injury will occur, a permanent injunction should not automatically issue. The court must still weigh the relative harms to the parties and

14.

consider the public interest in determining whether to issue an injunction. *Amoco*, 480 U.S. at 545-46.

Contrary to SEACC's assertion, economic harms do weigh in the balance. *Hells Canyon Pres. Council*, 9 F. Supp.2d at 1245-46 (considered economic impacts that local community would suffer by enjoining road reconstruction work). In fact, potential significant economic harms formed part of the basis of the Supreme Court's denial of injunctive relief in *Amoco*. 480 U.S. at 544-45 (oil company's commitment of approximately $70 million dollars for oil exploration outweighed plaintiffs' claimed environmental injuries).

The Kensington mine in operation will have -- and is indeed currently providing during construction -- significant benefits for the public interest. AR 57-58 (COE's public interest review in revised ROD); 3645-46 (labor costs during construction estimated at $17.3 million); 3650-51 (annual wages during mine operation estimated at $15.1 million); 3654 (annual tax receipts to state and to Juneau estimated at $10.1 million). Mining is one of Alaska's major economic sectors. *See* Declaration of Richard Hughes, Docket #40, at ¶¶ 3, 4, 7, and 8.

Clearly, the socioeconomic harms to the State and its citizens would be extensive if an injunction were issued, in light of the loss of benefits that would otherwise be realized if the project goes forward. The harms to the State and consideration of the public interest in this case weigh against issuance of the requested injunction.

### III.  CONCLUSION

SEACC's Opening Brief makes a simple case unnecessarily complicated. The revised definitions contained in the 2002 rule-making, along with the preamble that explains them, resolve this case. Because Congress left it to the agencies to work out what qualifies as "fill material," subject to regulation under Sec. 404, the 2002 rule-making did not exceed those agencies' jurisdiction or otherwise violate the Clean Water Act.

Any suggestion by SEACC that the permitting agencies have not done their job responsibly is easily dispelled by a review of the administrative record, which reflects an extended and rigorous project review and evaluation. The resulting project design is well-conceived and will allow a major new mine to open in the Juneau vicinity, without sacrificing the environmental values that all stake-holders in this case appreciate.

SEACC has shown no legal error in the Sec. 404 permits for the Kensington Mine and the Cascade Point Marine Terminal. This Court should uphold those permits, and rule against SEACC on Count I of their Complaint.

DATED this 5th day of May, 2006

        Respectfully submitted

        DAVID W. MÁRQUEZ
        ATTORNEY GENERAL

By: s/CAMERON M. LEONARD  
Alaska Bar No.  8406036  
Assistant Attorney General  
State of Alaska, Department of Law  
100 Cushman Street, Suite 400  
Fairbanks, AK  99701  
Telephone: (907) 451-2811  
Facsimile: (907) 451-2985  
cam_leonard@law.state.ak.us  

By: s/ RUTH HAMILTON HEESE  
Alaska Bar No. 9406064  
Assistant Attorney General  
State of Alaska, Department of Law  
P.O. Box 110300  
Juneau, Alaska 99811-0300  
Telephone: (907) 465-3600  
Facsimile:  (907) 465-6735  
ruth_hamilton_heese @law.state.ak.us  

17.

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 5th day of May, 2006, a true and correct copy of the foregoing was served electronically on Demian A. Schane and Thomas S. Waldo (representing plaintiffs), Mark Nitczynski and Richard L. Pomeroy (representing federal defendants), John Berghoff (representing Coeur Alaska, Inc., intervenor defendant), David Crosby (representing Goldbelt, Inc., intervenor defendant). A courtesy copy was also sent by e-mail to Larry Hartig and Jim Ustasiewski.

By: s/Cameron M. Leonard
Cameron M. Leonard, ABA 8406036
100 Cushman Street, Suite 400
Fairbanks, AK  99701
Phone: (907) 451-2811
Fax: (907) 451-2985
cam_leonard@law.state.ak.us

STATE'S EXHIBIT LIST

  A. DEC's certification of COE permit for Cascade Point Marine Terminal, dated May 6, 2005.  4 pp.

  B. DEC's certification of COE permit for Kensington Mine, dated May 6, 2005.  5 pp.

  C. DEC's certification of EPA permit for Kensington Mine, dated June 17, 2005.  6 pp.

  D. Memorandum of Agreement between COE and EPA, dated February 14, 1986.  10 pp.

  E. Memorandum from Wilcher, EPA, dated October 2, 1992.  3 pp.

  F. Declaration on Edmund Fogels, dated April 27, 2006.  7 pp.