John C. Berghoff, Jr., ILBA# 0181528
Michael P. Rissman, ILBA# 6194350
Mayer, Brown, Rowe & Maw LLP
71 South Wacker Drive
Chicago, IL  60606
Phone: (312) 782-0600/Fax: (312) 701-7711
jberghoff@mayerbrownrowe.com
mrissman@mayerbrownrowe.com

Eric B. Fjelstad, ABA# 9505020
Robert A. Maynard, ABA# 8610093
Perkins Coie LLP
1029 West Third Avenue, Suite 300
Anchorage, AK 99501
Phone: (907) 279-8561/Fax: (907) 276-3108
efjelstad@perkinscoie.com
rmaynard@perkinscoie.com

Attorneys for Defendant-Intervenor Coeur Alaska, Inc.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| SOUTHEAST ALASKA CONSERVATION COUNCIL, et al., | ) ) ) | Case No. J05-0012 CV (JKS) |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| UNITED STATES ARMY CORPS OF ENGINEERS; et al. | ) ) ) | |
| Defendants. | ) ) | |
| and | ) ) | |
| COEUR ALASKA, INC., et al., | ) ) | |
| Defendant-Intervenors. | ) ) | |

## COEUR ALASKA, INC.'S BRIEF IN OPPOSITION
## TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

OVERVIEW ............................................................................................................. 1

FACTUAL STATEMENT ...................................................................................... 3

ARGUMENT ........................................................................................................... 16

    I. The Corps' Section 404 Permit for the Discharge of Mine Tailings Is Expressly Authorized by the Clean Water Act and the Regulatory Definition of Fill Material ... 16

        A.   Under the Clean Water Act, the Section 404 Program and  the Section 402 Program are Separate and Distinct......................................................... 16

        B.   The Tailings Discharge in this Case Clearly Falls Under the Section 404 Program Because It Is a Discharge of "Fill Material"....................................................... 18

        C.   Regulation of Mine Tailings as Fill Material is Consistent With Historical Practices and the Clean Water Act's Goals ......................................... 20

    II. Plaintiffs' Attempt to Circumvent the Governing Statutory and Regulatory Provisions Is Unavailing and Counterproductive. .......................................................... 22

        A.   Standards of Performance Adopted Under Section 306 Do Not Apply in the Section 404 Program......................................................................... 22

            1.   The text and structure of the CWA are clear. ................................. 22
            2.   The Corps and EPA are entitled to substantial deference .............................. 25

        B.   The Regulations Do Not Exclude Mine Tailings From the Definition of "Fill Material" ......................................................................... 27

            1.   The unambiguous text of the regulatory definitions is dispositive ................ 27
            2.   The definitions of "fill material" and "discharge of fill material" are plain and unambiguous ..................................................................... 28
            3.   The preamble to the final joint agency rule and other regulatory history confirm that "any" mine tailings are "fill material"........................................ 28

         C.   Plaintiffs' Proposed Interpretation Would Weaken the CWA's  Protections....... 34

    III. Plaintiffs Are Not Entitled to Any Relief ................................................. 35

CONCLUSION.................................................................................................... 40

## OVERVIEW

The Kensington Project is the result of years of study, planning, review, and refinement. It is a model for the responsible use of resources. The Project retrieves the valuable minerals of Southeast Alaska while providing economic stimulus to people in need of it and long-term enhancement of the environment of the area. The United States Army Corps of Engineers ("Corps"), United States Environmental Protection Agency ("EPA"), United States Forest Service ("Forest Service"), Alaska Department of Environmental Conservation, and Alaska Department of Natural Resources all reviewed and approved Coeur Alaska's plan to reinvigorate the Kensington gold mine. Indeed, the Corps took a second look, reaffirming its permit. By their approval of this Project, the agencies also affirmed the efficacy of two decades of interpretation of Clean Water Act law and regulations as applied to mine tailings used as "fill material," under Section 404.

For the next ten years, the Kensington Project will mine substantial quantities of gold-containing rock and crush it to smaller sizes appropriate for processing. The processing will employ a simple waterbased flotation system, without chemicals such as cyanide or mercury. When complete, the gold-bearing material will be taken off-site for processing. The remaining, water-soaked material ("tailings") is too great in quantity to be shipped any long distances. So, instead of placing the tailings into and permanently destroying neighboring wetlands, Coeur Alaska received approval to divert a portion of this waste rock to the bottom of nearby Lower Slate Lake. When complete, this will leave a larger, improved Lower Slate Lake, providing better fish habitat. When complete, this Project will leave a more economically viable Southeast Alaska. When complete, this Project will leave scarcely any environmental sign that it was ever there.

Under the Clean Water Act, the Corps issues Section 404 permits for discharges of "fill material" under EPA oversight.  EPA issues Section 402 permits for discharges of material other than fill.  The two programs are distinct, and Congress designated the Corps and EPA as the gatekeepers in determining which program applies to any given discharge.  The key issue in this case—the "gate"—is whether EPA and the Corps reasonably concluded that the discharge of tailings constitutes the discharge of "fill material."

The Plaintiffs' position rests on a number of mistaken factual and legal premises.  First, Plaintiffs give no credence to the fact that Congress designated the Corps and EPA as the agencies responsible for making the Clean Water Act work on the ground.  Congress left to the Corps and EPA the task of defining "fill material" and for making policy decisions to harmonize the Section 402 and 404 programs, and the agencies' decision in doing so is entitled to substantial deference.   Second, Plaintiffs argue that standards unique to the Section 402 program—namely, the Section 306 standards—should determine whether, in fact, the 402 program applies as a threshold matter to a given discharge.  This argument puts the cart before the horse insofar as Section 306 is applicable to a given discharge if, and only if, that discharge is first subject to regulation under a Section 402 permit.  In this case, EPA and the Corps have reasonably determined that Section 404—not Section 402—applies to the discharge of tailings into Lower Slate Lake.  Third, Plaintiffs argue that EPA and the Corps have misconstrued their own recent regulations, and in the process Plaintiffs ignore the plain language of the regulation and the substantial body of case law holding that an agency's reasonable interpretation of its own regulations is entitled to the highest level of deference.  Last, Plaintiffs' position assumes that the tailings disposal option selected by the agencies is less environmentally preferable than other options.  Plaintiffs ignore the fact that regulation under the Section 404 program provides as

much or more—not less—protection than regulation under a Section 402 permit, and that the ecology of Lower Slate Lake will ultimately be improved by the operations permitted by the agencies.[1]  Plaintiffs' challenge completely fails to meet their steep burden, as the Corps' action here was not arbitrary or capricious but was well-reasoned and fully in accordance with law.

The integrity of the Clean Water Act is undermined by Plaintiffs' misreading of the law, which discards over two decades of Congressional, EPA, and Corps interpretation, analysis, and synthesis.  Permit after permit has been appropriately approved under the Section 404 program, as has the Kensington permit.  The federal and state agencies involved in the Kensington Project all recognized that Coeur Alaska appropriately sought a permit under the Section 404 program. Applying the precedents and principles of that program to Kensington, the permit was approved. We ask this Court to affirm that approval and, in so doing, affirm the fundamental integrity of the Clean Water Act.

## FACTUAL STATEMENT

Historic Kensington and Jualin Mine Areas

The Kensington Project is in an area of historic mining activity in Southeast Alaska.  This underground mine lies beneath the western slopes of Lion's Head Mountain, approximately 45 miles north of Juneau.  The mine is at the location of the historic Kensington mine, which operated from 1897 to 1938.  Coeur Ex. 3 at 12 (FSEIS at 3-101).  The mill is located on the eastern side of the mountain—called the "Jualin" side for the historic Juneau/Alaska/Indiana

---

[1]    Plaintiffs, who objected to all plans for Kensington, have never supported a Southeast Alaska mining project.  U.S. Senate, Hearing Before the Subcommittee on Public Lands and Forests of the Committee on Energy and Natural Resources (March 10, 2004) at 32 (testimony of Buck Lindekugel, Conservation Director, Southeast Alaska Conservation Council) (attached as Coeur Ex. 4).

mine and mill that operated there beginning in approximately 1896.  *See id.*  The following is a

photograph of the pre-1919 Julian mine site:



Jualin Mine Looking Northwest – Lions Head Mountain in the background (Pre-1919)

    The Kensington Project mill and some other facilities are on privately owned patented

mining claim land.  Other components of the Project—including Lower Slate Lake—are on a

section of the Tongass National Forest that the Forest Service has specifically designated for

mining.  Coeur Ex. 3 at 11 (FSEIS at 3-71) (Land Use Designation for Project area is Modified

Landscape with a Minerals overlay).  The designation "acknowledges the previous gold mining

activities in the area" and "provides management prescriptions for current or proposed mining

activities."  *Id.*  One of the Forest Service's goals in so designating this area is "[t]o encourage

the prospecting, exploration, development, mining, and processing of locatable minerals . . . ." Coeur Ex. 6 at 2 (Tongass Land Management Plan at 3-148).

The Kensington Project surface facilities include a roadway for personnel access, rock crushing operations, mill facilities, and a pipeline for tailings transport. Figures showing the Kensington Project area and the general facilities arrangement are set forth at pages 13 and 14, *infra*. Coeur Ex. 9 (FSEIS Figure 1-2); Coeur Ex. 7 at 14 (Permit, Sheet 2 of 14).

<u>The Mine Tailings</u>

The milling process is a standard "froth flotation" method with no use of cyanide or mercury. Coeur Ex. 3 at 5 (FSEIS at 2-22). Trucks arriving at the mill with ore-bearing rock will offload their cargo into an ore chute to move the rock into a series of purely mechanical processes which break the rock down to a fine material, including crushing, grinding, vibrating, screening, and centrifuging. The slurry of finely ground rock is fed to a conditioning tank. Conditioners and frothers in the tank cause the mineralized part of the slurry to attach to air bubbles pumped into the tank. These mineral-bearing bubbles rise to the surface, forming a so-called "froth" on top of the flotation tank. This froth is skimmed off and collected as a concentrate. This small volume of material contains almost all the gold and other metals associated with the ore. Coeur Alaska then will ship this gold-bearing concentrate to an off-site processing facility. *Id*.

After the mineralized portion of the slurry is skimmed off, the remaining inert wet slurry rock material is taken from the flotation tank. This material is known as "tailings." At this stage, the tailings are very much like a wet absorbent sand; wet and silty because they are the waste rock material which has been crushed, screened and thoroughly soaked. Metals concentrations in the tailings are comparable to concentrations in nearby natural lake sediments.

*Id.* at 21 (FSEIS at C-31). Moreover, "[m]ost of the chemicals added to the system would stay in the flotation tanks or be removed with the flotation concentrate as opposed to being discharged with the tailings." *Id.* at 6 (FSEIS at 2-23).

Coeur Alaska will use about 40 percent of the tailings as backfill in the Kensington mine.[2] After years of study, review, planning, and revisions, Coeur Alaska has developed a plan for managing the remaining tailings that not only will leave no adverse environmental footprint, it will leave a better environment.

Tailings Deposit

Under Coeur Alaska's twice-approved plan, mine tailings will be carried from the mill site through a double-walled pipe to the bottom of nearby Lower Slate Lake. The pipe will be rotated from time to time to even out the lake bottom. The discharge will cause the lake bottom elevation to rise substantially. Coeur Ex. 11 at 10 (ROD at 10). The water will rise and the lake's surface will spread out. The lake's surface will rise to within a few feet of the top of a permanent dam that will be constructed for this Project. Coeur Ex. 3 at 25 (FSEIS at D-9).

To contain the tailings to the point of deposit, the Corps' permit requires Coeur Alaska to use "silt screens or other appropriate methods . . . to confine suspended particles and turbidity to a small area . . . , and include filter blankets and curtains to filter out suspended solids." Coeur Ex. 7 at 6 (Permit, Condition 17). In addition, Coeur Alaska will add non-toxic flocculants to the tailings to promote rapid settling. Coeur Ex. 8 at 5 (Corps Section 404(b)(1) Evaluation at 5).

---

[2]    Tailings are filled back into the mine to provide support and a solid working platform for continued mining operations. Coeur Ex. 3 at 7 (FSEIS at 2-28). Plaintiffs' brief queries the 40% figure. Plf. Brf. at 8 n.4. A 2003 water quality report anticipated that about 25% of tailings would be used for backfill. Subsequent optimization of the operating plan raised the anticipated backfill number to approximately 40%.

Lower Slate Lake is one of several lakes in the vicinity of the Jualin mill site. It sits about two miles back from Berners Bay, at an elevation of 650 feet. Slate Creek flows from Upper Slate Lake (elevation 740 feet) into Lower Slate Lake. Slate Creek then flows out of Lower Slate Lake, eventually flowing into Berners Bay two miles away at Slate Creek Cove. Coeur Ex. 9 (FSEIS Figure 1.2) (reproduced at p. 13, *infra*). The Slate Lakes are not visible from Berners Bay. Coeur Ex. 3 at 16 (FSEIS at 4-91).

Prior to recent construction, heavy underbrush and the absence of a road made it difficult to reach Lower Slate Lake. *Id.* at 17 (FSEIS at 4-94). And because of its inaccessibility and tiny fish population, the lake has scarcely any recreational use. Virtually all visits to the area of the lake have been in connection with the mining Project. The owner of the Jualin patented lands frequents the area and has "not once observed any recreational user at Slate Lakes." Coeur Ex. 10 at 1-2 (MacKinnon Decl. ¶¶ 5-7). Declarations submitted by Plaintiffs with their summary judgment brief only demonstrate the sparse use of the lake. Only four declarants have ever visited the lake, and then only five times over 70+ years of combined outdoor recreation in the region. *See* Plf. Exs. 30, 31, 32, 33, 42.

Fish do not visit the lake, either. A permanent natural fish barrier about a mile below the lake keeps salmon and other anadromous fish from the lake. Coeur Ex. 3 at 19 (FSEIS at C-12). This barrier will remain undisturbed by the Kensington Project.

The resident fish population in the lake is meager due to limited, poor habitat. The lake is not large, with a current surface area of approximately 23 acres. Surrounded by steep slopes, the lake bottoms quickly drop off to a depth of about 50 feet. The zone of emergent shoreline vegetation is "relatively small," about 3 to 4 acres. Coeur Ex. 3 at 9 (FSEIS at 3-26); Coeur Ex. 11 at 10 (ROD at 10). The center is too deep to receive enough sunlight to be ecologically

productive, leaving a dead zone in half the lake where the bottom-dwelling benthic invertebrate organisms cannot grow. Coeur Ex. 14 at 3 (KER 12/23/03 Memo at 3 [Table 1]). A figure showing the unproductive zone is reproduced at the top of page 15, infra. *Id*. at 5 (Figure 2).

Extensive fish studies prepared for the Kensington Project located only one species of game fish, Dolly Varden char, in the lake. Coeur Ex. 3 at 20 (FSEIS at C-15). The population is small, "likely due to very oligotrophic (nutrient-poor) conditions in the lake." *Id*. at 10 (FSEIS at 3-28). Estimates of the total population of Dolly Varden char range from 439 to 996. *Id.* Overall, based on field data and local and regional comparisons, "Lower Slate Lake and streams in the Slate Creek drainage offer limited fish habitat. This limited habitat is reflected in a non-diverse, sparsely populated, assemblage of small fish." Coeur Ex. 13 at 4 (KER and Earthworks Report at 8).

Effects of Tailings Discharge: Localized and Temporary

Coeur Alaska and the federal, state, and local agencies with jurisdiction have carefully studied how the discharge of tailings to Lower Slate Lake will affect the environment. They determined that any adverse effects from the tailings discharge will be localized and temporary.

The placement of tailings onto the lake bottom will reshape and enlarge the lake. The deep, unproductive zone at the center of the lake as it is currently configured will be filled in. After closure the lake will be about 30 feet deep at its deepest. Coeur Ex. 3 at 24 (FSEIS at D-9). Thus the area of lake bottom suitable as habitat for benthic invertebrate organisms will grow from about 11 acres currently to nearly five times that size. Coeur Ex. 14 at 3 (KER 12/23/03 Memo at 3 [Table 1]). A figure showing the expanded productive zone is reproduced at the bottom of p. 15, *infra*. *Id*. at 7 (KER Memo at 7 [Figure 4]).

Within "[one] year after closure, the [lake] will have a larger area of productive lake bottom than currently exists and there will then be no constraints to reestablishing populations of fish, plants, and wildlife that will meet or exceed the diversity and productivity of the existing Lower Slate Lake community."   Coeur Ex. 15 at 1 (KER 8/17/04 Memo at 1).   The Alaska Department of Environmental Conservation "looked closely at the characteristics of the tailings" and concluded that "[a] number of marine and freshwater tests show no toxic effects associated with the tailings."   Coeur Ex. 16 at 1 (ADEC 12/6/04 Letter to Corps at 1).[3]

With this extra protection secured, the Corps determined in its review that after reclamation, the lake "would be restored to the *equivalent habitat value* that existed prior to the project."   Coeur Ex. 8 at 3 (Corps Section 404(b)(1) Evaluation at 3) (emphasis added).   The Forest Service similarly concluded that the lake "can be restored to *at least equivalent* habitat and fish populations after closure."   Coeur Ex. 3 at 14 (FSEIS at 4-39) (emphasis added).   A study prepared on behalf of the Forest Service, EPA, and the Corps  concluded that in the long run, "[t]he higher productivity should eventually provide *better long-term conditions* for Dolly Varden char than the current conditions" in Lower Slate Lake.   *Id.* at 23 (FSEIS at C-70) (emphasis added).

Naturally, with the burying of bottom-dwelling organisms which serve as fish food, "there is significant uncertainty whether the [lake] would support a fish population during operations."   *Id.*   For purposes of evaluating the Project, the Corps in its 404(b)(1) analyses

---

[3]    The Department specifically addressed the laboratory test singled out in Plaintiffs' brief in which invertebrate growth did not occur at rates seen in other laboratory and real-world tests. It concluded that the "one test result" with "undiluted residual milling reagents" was not indicative of what would occur at Kensington because of the "substantial dilution of residual milling reagents in the disposal facility during actual operations."   Coeur Ex. 16 at 2 (ADEC 12/6/04 Letter to Corps at 2).

therefore assumed that the loss of habitat would kill the entire fish population during the operation of the tailings discharge facility.

Notably, the assumed loss of fish will not be due to any metals or chemicals in the tailings. While Plaintiffs' summary judgment brief (and indeed just about their every filing) repeatedly uses the word "toxic," the extensive studies required for the regulatory process established that the "toxicity risks associated with the tailings will be low both during and after mining operations." Coeur Ex. 16 at 1 (ADEC 12/6/04 Letter at 1); Coeur Ex. 11 at 27 (ROD at 27) ("Tests upon the tailings have conclusively shown that the tailings will not generate an acid discharge or result in a metals leachate being generated.").[4]

The Project presents no risk to the aquatic environment outside Lower Slate Lake. Coeur Alaska will use a pipeline to divert the creek that currently feeds Lower Slate Lake. Coeur Ex. 3 at 7 (FSEIS at 2-28). Thus, water from Upper Slate Lake that would have emptied into Lower Slate Lake will travel directly into Slate Creek at a point below Lower Slate Lake in a bypass. *Id*. With a new dam blocking the only drainage point from Lower Slate Lake into Slate Creek, Coeur Alaska will pump water from Lower Slate Lake into a state-of-the-art water treatment system. *Id*. High-quality treated water will flow from the treatment system into the diversion pipeline leading from Upper Slate Lake into Slate Creek, in accordance with a permit issued by the EPA under the Section 402 program. *Id*. These measures will prevent any untreated Lower Slate Lake water from reaching Slate Creek or points downstream. EPA will regulate the discharge of water *from* Lower Slate Lake *into* Slate Creek through the Section 402 permit.

---

[4]    Similarly, while Plaintiffs note that there will be high pH at the immediate point of discharge (due to the addition of lime), it is important to recognize that the high pH "will dissipate very rapidly." Coeur Ex. 11 at 19 (ROD at 19). "[G]iven the avoidance mechanisms used by fish, these conditions would not be likely to affect fish in the [lake] during operations." Coeur Ex. 3 at 22 (FSEIS at C-68). Bottom-dwellers will be adversely affected "primarily from being covered with tailings and from" the suspended solids. Coeur Ex. 11 at 19 (ROD at 19).

Reclamation

"[A]fter project closure the lake's aquatic ecosystem structure and functions would be restored and expanded."  Coeur Ex. 8 at 3 (Corps Section 404(b)(1) Evaluation at 3).  Indeed, once the placement of tailings is complete, the lake's water quality will be consistent with background levels.  Coeur Ex. 18 at 12 (Coeur Alaska Section 404(b)(1) Evaluation at 8). Within one year of closure, macroinvertebrates needed to support restored fish populations will recolonize the lake from submerged natural sediment at the lake's perimeter.  *Id.* at 12-13, 24 (Coeur Alaska Section 404(b)(1) Evaluation at 8-9, 20).  Coeur Alaska will introduce wild fish populations back into the lake.  Coeur Alaska, the Forest Service, and the State will monitor the abundance and diversity of fish, invertebrates, and other microorganisms until a self-sustaining community is established.  *Id.* at 13 (Coeur Alaska Section 404(b)(1) Evaluation at 9).

Coeur Alaska will also reclaim the process areas surrounding the lake and throughout the overall Project site.  When it closes the Kensington mine and mill, Coeur Alaska will decommission and remove its facilities, including buildings, storage tanks, roads, stream crossings, and piers, decking, and pilings from the Slate Creek Cove marine terminal.  Coeur Ex. 19 at 7 (Reclamation and Closure Plan at 3).  "Upon project closure," the Corps concluded, "aesthetic values would be restored."  Coeur Ex. 8 at 7 (Corps Section 404(b)(1) Evaluation at 7).  To ensure compliance with its Reclamation and Closure Plan, Coeur Alaska has posted a reclamation bond.  The company expects to complete site reclamation and closure within two years after mining is completed.  Coeur Ex. 19 at 5 (Reclamation and Closure Plan at 1).  Long-term maintenance and monitoring of the tailings is fully bonded.  *Id.* at 8 (Reclamation and Closure Plan at 4).

Alternatives

As part of its review of Coeur Alaska's permit application, the Corps undertook an analysis of alternatives to the discharge of tailings into Lower Slate Lake. This analysis is required by the Clean Water Act, as spelled out in regulations promulgated by EPA. For the Kensington Project, the only so-called "alternative" to Lower Slate Lake would be to pile the tailings in a wetland area, resulting in the permanent loss of more than 100 acres of wetlands and creating a mountain of tailings. Coeur Ex. 11 at 9-10 (ROD at 9-10) "From a national perspective, the degradation or destruction of special aquatic sites, such as filling operations in wetlands, is considered to be among the most severe environmental impacts covered by [the Section 404(b)(1) Guidelines.]" 40 C.F.R. § 230.1(d).[5] The Corps determined that discharging to Lower Slate Lake is the "least environmentally damaging practicable alternative." Coeur Ex. 11 at 21 (ROD at 21).[6]

---

[5] Since the 1980s, the Corps and EPA have been the agencies at the forefront of implementing the Congressional and Presidential policy goal of "no overall net loss" of wetlands. *See, e.g.*, 33 U.S.C. § 2317(a)(1); 55 Fed. Reg. 9,210, 9,210-11 (Mar. 12, 1990) (attached as Coeur Ex. 22).

[6] The Corps concluded that discharge to Lower Slate Lake was less damaging than discharge to the wetlands. It also concluded that the plan involving discharge to wetlands was not practicable and was less operationally safe. Coeur Ex. 11 at 9, 17-18 (ROD at 9, 17-18).



Source: U.S. Geological Survey, 1985

**FIGURE 1-2. SPECIFIC PROJECT AREA**

Exhibit 9, page 1



Exhibit 7, page 14



Exhibit 14, page 5

Figure 2. Zones of benthic productivity in Lower Slate Lake superimposed on a topographic map with the outline of the proposed final water level of the tailings impoundment.



Exhibit 14, page 7

Figure 4. Zones of benthic productivity in the Lower Slate Lake tailings impoundment after recolonization of tailings.

**ARGUMENT**

I.    **THE CORPS' SECTION 404 PERMIT FOR THE DISCHARGE OF MINE TAILINGS IS EXPRESSLY AUTHORIZED BY THE CLEAN WATER ACT AND THE REGULATORY DEFINITION OF FILL MATERIAL.**

The issue before the Court is whether the Corps' decision to permit the discharge of the Kensington mine tailings as "fill material" under Section 404 of the Clean Water Act ("CWA" or "Act") is unlawful. The Court may not set aside the Corps' determination unless that decision is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." Administrative Procedure Act, 5 U.S.C. § 706(2)(A); *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 384 F.3d 1163, 1170 (9th Cir. 2004).[7]

A.    **Under the Clean Water Act, the Section 404 Program and the Section 402 Program are Separate and Distinct.**

Under the Clean Water Act, two distinct permitting regimes exist to regulate discharges into waters of the United States. The Section 404 program regulates discharges of "dredged or fill material." CWA § 404(a); 33 U.S.C. § 1344(a). This program is administered by the Corps, as the designee of the Secretary of the Army. *See id.* Permits issued under this program are called Section 404 permits or "dredge and fill" permits. Other discharges are regulated by the EPA under the Section 402 program. CWA § 402; 33 U.S.C. § 1342. Permits issued by EPA under the Section 402 program are called National Pollutant Discharge Elimination System (or NPDES) permits. For this Court's convenience, the following diagram is provided:

---

[7]    Pursuant to Local Rule 16.3(c)(2), this brief shall be deemed to be a cross-motion for summary judgment.



Clean Water Act Discharge Permit Programs

The Section 404 and Section 402 permit programs are mutually exclusive.  The CWA expressly provides that discharges covered by Section 404 are not subject to Section 402.  *See* 33 U.S.C. § 1342(a)(1) (stating that EPA may issue permits under Section 402 "[e]xcept as provided in" Section 404).  A party that obtains a Section 404 permit does not also obtain a Section 402 permit for the same discharge.  *See id.*; *see also* 40 C.F.R. § 122.3 ("The following discharges do not require NPDES permits: . . . Discharges of dredged or fill material into waters of the United States that are regulated under section 404 of the CWA."); *Greenfield Mills, Inc. v.*

*Macklin*, 361 F.3d 934, 946 n.14 (7th Cir. 2004) (noting that a party whose activity is governed by Section 404 "is not . . . subject to the [Section 402] permitting requirements").

The two permit programs follow completely separate regulatory regimes.  The Section 404 program is administered by the Corps under regulations promulgated in 33 C.F.R. parts 320 through 331 and 40 C.F.R. parts 230 through 233.  EPA administers the Section 402 program under its regulations set forth at 40 C.F.R. parts 122 through 125.  The Corps and EPA have long recognized this division of authority created by the CWA.  *See, e.g.*, 51 Fed. Reg. 8,871, 8,872 (Mar. 13, 1986) (attached as Coeur Ex. 20).

Thus, the definitions of "dredged material" and "fill material" serve as the dividing line between the two different permitting programs.  (For purposes of the present lawsuit, "dredged material" does not come into play, and therefore for simplicity this brief focuses on "fill material.")  The decision of whether a discharge is regulated under the Section 404 program versus the Section 402 program depends exclusively on whether it is a discharge of "fill material."

### B. The Tailings Discharge in this Case Clearly Falls Under the Section 404 Program Because It Is a Discharge of "Fill Material."

The discharge of mine tailings to Lower Slate Lake unquestionably is the "discharge of fill material."  The Clean Water Act does not define "discharge of fill material."  Therefore, this task has fallen to the Corps and the EPA by regulation and practice.  In 2002, the two agencies jointly adopted a regulation defining the terms "fill material" and "discharge of fill material."  33 C.F.R. § 323.2(e) & (f) (Corps regulation); 40 C.F.R. § 232.2 (identical EPA regulation).  That regulation remains in force and is applicable to Coeur Alaska's permit evaluation.

The plain text of the regulation unambiguously defines the proposed placement of Coeur Alaska's mine tailings as the "discharge of fill material."  And since the tailings are fill material,

the Corps' decision to evaluate the permit application under the Section 404 program was obviously correct.  There is no need to look further.  Even Plaintiffs do not dispute that Coeur Alaska's mine tailings are "fill material" under the regulation's plain text.  (Instead, Plaintiffs try to confuse the clear path of analysis by arguing that the definition does not mean what it says; we discuss this below in Section II.)

The regulation defines "fill material" to include any material that "has the effect of . . . [c]hanging the bottom elevation of any portion of a water of the United States."  33 C.F.R. § 323.2(e)(1)(ii).  This is precisely the effect that the Kensington tailings will have on Lower Slate Lake.  The regulation reads:

> (1)    Except as specified in paragraph (e)(3) of this section, the term "fill material" means material placed in waters of the United States where the material has the effect of:
>
>    (i)    Replacing any portion of a water of the United States with dry land; or
>
>    (ii)   Changing the bottom elevation of any portion of a water of the United States.
>
> (2)    Examples of such fill material include, but are not limited to: rock, sand, soil, clay, plastics, construction debris, wood chips, overburden from mining or other excavation activities, and materials used to create any structure or infrastructure in the waters of the United States.
>
> (3)    The term fill material does not include trash or garbage.

*Id.* § 323.2(e).  Coeur Alaska's discharge of mine tailings thus squarely fits within the definition.

The examples provided by the regulation confirm this plain-text reading.  The regulation specifically states that the definition of "discharge of fill material" includes "the placement of overburden, slurry, or tailings or similar mining-related materials."  *Id.* § 323.2(f).  If that were not proof enough, the regulation also explains that "[e]xamples of such fill material include, but are not limited to: rock, sand, soil, clay . . . [and] overburden from mining or other excavation

activities. . . .” 33 C.F.R. § 323.2(e)(2). Mine tailings include rock and are also the result of mining activities. Thus, mine tailings are precisely the sort of material the agencies were considering in promulgating the definition of “fill material.”

### C.    Regulation of Mine Tailings as Fill Material is Consistent With Historical Practices and the Clean Water Act’s Goals.

It makes perfect sense to have the Corps regulate the discharge of the Kensington mine tailings under the Section 404 program. When it enacted the Clean Water Act, “Congress gave the Corps the responsibility of regulating the discharge of dredged or fill material into navigable waters in recognition of the Corps’ historical role under section 10 of the Rivers and Harbors Act of 1899 as the permitting agency for dredge and fill activities in the nation’s navigable waters. . . .” *Res. Invs., Inc. v. U.S. Army Corps of Eng’rs*, 151 F.3d 1162, 1166 (9th Cir. 1998). As both the Corps and EPA have recognized, “the principal environmental concern” with the discharge of fill material “is the loss of a portion of the water body itself.” 65 Fed. Reg. 21,292, 21,293 (April 20, 2000) (attached as Coeur Ex. 21). This is the Corps’ well-established area of authority and expertise, from regulating the construction of dams to the filling of wetlands.

As is discussed above, the principal environmental consideration with the discharge of tailings to Lower Slate Lake will be the physical loss of a portion of the water body. Short-term losses in aquatic habitat will result from covering the lake bottom rather than from impacts to water quality. Long-term effects on the lake—improved habitat due to its larger size and shallower depth—also result from changes to the shape of the water body. Impacts will be localized to the lake itself, and will not affect the ecosystem upstream or downstream of the lake. These are the types of impacts that the Corps has evaluated for many decades. They are best evaluated in the Section 404 program, as part of the Corps’ consideration of “the entire range of environmental concerns arising from the discharge of dredged or fill material.” 67 Fed. Reg.

31,129, 31,133 (May 9, 2002) (attached as Coeur Ex. 2).  The Section 402 program is not designed to evaluate these impacts.  *See* 65 Fed. Reg. at 21,293 ("There are no statutory or regulatory provisions under the section 402 program designed to address discharges that convert waters of the U.S. to dry land.").

While the Corps has special expertise with respect to the loss of a portion of the water body, it considers all environmental effects in its case-by-case analysis under the Section 404(b)(1) Guidelines.  *See* 33 U.S.C. § 1344(b)(1); 40 C.F.R. pts. 230-232.  Before issuing a Section 404 permit for the discharge of fill material, the Corps undertakes a complete evaluation of the environmental impacts of a fill.  "The Section 404 permitting process . . . is expressly designed to address the entire range of environmental concerns arising from the discharge of dredged or fill material."  67 Fed. Reg. at 31,133.  In accordance with CWA Section 404(b), the Corps implements a set of mandatory environmental regulations promulgated by EPA.  The Guidelines mandate that the Corps undertake "careful consideration of the effects of the discharge on the aquatic ecosystems as a whole, as well as evaluation of alternatives to the discharge and measures to minimize and compensate for unavoidable adverse effects."  65 Fed. Reg. at 21,293.  Under the guidelines, "discharges having significant adverse effects on aquatic ecosystems are not allowable."  *Id.* (citing 40 C.F.R. § 230.10(c)(2) & (3)).  The Corps therefore analyzes each permit on a case-by-case basis, as it did for the Kensington Project.

A second level of environmental protection is provided by Section 401 of the CWA, 33 U.S.C. § 1341, which requires Section 404 permit applicants to obtain a certification that the discharge of fill material will comply with state water quality standards.  33 U.S.C. § 1341(a)(2).  The State of Alaska issued that certification for the Kensington Project.  Coeur Ex. 17 (ADEC Section 401 Certification).

Third, although a discharge of fill material is governed by the Section 404 program—not the Section 402 program—EPA retains authority to veto the Corps' issuance of Section 404 permits, which EPA did not deem necessary here.  33 U.S.C. § 1344(c).

Regulation of the Kensington mine tailings under Section 404 promotes the goals of the Clean Water Act.  The elaborate Section 404 permitting process allows and compels the selection of the least environmentally "damaging" "practicable alternative[]."  40 C.F.R. § 230.5(c).  That is exactly what was permitted for the Kensington Project.

## II.    PLAINTIFFS' ATTEMPT TO CIRCUMVENT THE GOVERNING STATUTORY AND REGULATORY PROVISIONS IS UNAVAILING AND COUNTERPRODUCTIVE.

### A.    Standards of Performance Adopted Under Section 306 Do Not Apply in the Section 404 Program.

Plaintiffs wrongly contend that where EPA has promulgated a "standard of performance" under Section 306 of the CWA, the Corps may not issue a permit under Section 404 of the Act.  Consequently, Plaintiffs argue, the Corps is prohibited from defining and regulating mine tailings as "fill material."  Plf. Brf. at 28-30.  Plaintiffs' argument is contrary to the unambiguous text and structure of the CWA.  And, to the extent there is any ambiguity in the CWA, a court must defer to the interpretation and implementation of the CWA by the Corps and EPA, the agencies invested by Congress with the power and responsibility to implement and enforce the statute.

### 1.    The text and structure of the CWA are clear.

Plaintiffs' statutory argument ignores the language and the structure of the CWA.    As is discussed above, the threshold question is to determine which permitting program applies.  This is determined by whether the discharge is of fill material.  <u>If the discharge is of fill material, then the Section 404 program applies.</u>  Standards of performance issued under Section 306 come into play in the Section 402 program.  Under the language of the CWA, they are not applicable to the Section 404 program.

The language of Section 402 and Section 404 determines whether standards under Section 306 are applicable. With respect to discharges regulated in the Section 402 program, the CWA expressly requires that EPA consider standards promulgated under Section 306. Section 402 authorizes EPA to issue a discharge permit "upon condition that such discharge will meet . . . all applicable requirements under" Section 306 and other specified sections. 33 U.S.C. § 1342(a)(1). Section 404 contains no similar requirement that the Corps consider Section 306 standards when issuing permits for the discharge of fill material. *Compare* CWA § 402(a)(1), 33 U.S.C. § 1342(a)(1) *with* CWA § 404(a), 33 U.S.C. § 1344(a). If Congress had wanted Section 306 standards to apply to permit decisions under Section 404, it would have used the same language in Section 404 that it used in Section 402. *See Hernandez v. Ashcroft*, 345 F.3d 824, 834-35 (9th Cir. 2003) ("It is a basic principle of statutory construction that 'where Congress includes particular language in one section of the statute but omits it in another section of the same Act, . . . Congress acts intentionally and purposely in the disparate inclusion or exclusion.'") (quoting *Andreiu v. Ashcroft*, 253 F.3d 477, 480 (9th Cir. 2001) (en banc)); *see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987).

The Ninth Circuit addressed an almost identical situation in *Defenders of Wildlife v. Browner*, 191 F.3d 1159 (9th Cir. 1999). The question in that case was whether Section 301 effluent guidelines apply to discharges of municipal stormwater. The court answered this question by comparing the provisions, set forth in separate subsections of Section 402, for *permitting* of industrial and municipal stormwater discharges. "As is apparent," the court stated, "Congress expressly required *industrial* storm-water discharges to comply with the requirements of 33 U.S.C. § 1311 [Section 301 of the CWA]. *See* 33 U.S.C. § 1342(p)(3)(A) ('Permits for discharges associated with industrial activity *shall meet all applicable provisions of* this section

and *section 1311* of this title.') (emphasis added [by court])." *Defenders*, 191 F.3d at 1164. By contrast, "Congress chose not to include a similar provision for municipal storm-sewer discharges." *Id*. at 1165 (citing 33 U.S.C. § 1342(p)(3)(B)(iii), which specifies requirements for municipal storm sewer discharge permits).

The Ninth Circuit held that the difference is dispositive. Applying the "familiar and logical principle" that Congress is presumed to act intentionally where it "includes particular language in one section of a statute but omits it in another section of the same Act," the court "conclude[d] that Congress' choice to require industrial storm-water discharges to comply with [Section 301], but not to include the same requirement for municipal discharges, **must be given effect.**" *Id.* at 1165 (emphasis added). In the present case, Congress' choice to require Section 402 permits to incorporate Section 306 requirements, but not to include the same requirement for discharges of fill material, must be given effect.

Plaintiffs do not address the clear distinction between the text of Sections 404 and 402. Instead, they cite to Section 306(e), which states that persons may not operate a source in violation of any standard of performance "applicable to such source." Plf. Brf. at 29 (quoting 33 U.S.C. § 1316(e)). But this provision merely begs the question of when is a Section 306 standard "applicable" under the Act. The provisions of the Act which answer this question are the permitting sections, Sections 404 and 402.

While the language of the statute is dispositive, it is noteworthy that EPA has consistently confirmed that Section 306 standards of performance apply only in the Section 402 program. When EPA adopted the standards of performance for ore mining, it said that they "will be applied to individual ore mines and mills through NPDES permits issued by EPA or approved state agencies, under Section 402 of the Act." 47 Fed. Reg. 54,598, 54,606 (Dec. 3, 1982)

(attached as Coeur Ex. 1).[8]  More recently, it reiterated that it "has never sought to regulate fill material under effluent guidelines [such as standards of performance]."   67 Fed. Reg. at 31,135. EPA has not adopted standards of performance applicable to discharges of fill material.  It could not do so consistently with the CWA.

### 2.    The Corps and EPA are entitled to substantial deference.

Even if there were ambiguity as to the interpretation of the Clean Water Act (and there is not), it is well settled that this Court should defer to the Corps' and EPA's reasonable interpretation of the statute.  When reviewing an agency's statutory interpretation, courts employ the familiar two-step process articulated in *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984). At the first step, courts must decide "whether Congress has directly spoken to the precise question at issue." *Id*. at 842.  "If the intent of Congress is clear, that is the end of the matter." *Id*.  But "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843.  If the agency defines a term in a way that is reasonable in light of the legislature's revealed design, then the agency's interpretation is entitled to "controlling weight."  *Id*. at 844; *see also Fairhurst v. Hagener*, 422 F.3d 1146, 1150 (9th Cir. 2005) ("[A]n agency's construction of a statute it is charged with enforcing is normally entitled to deference if it is reasonable and not in conflict with the expressed intent of Congress.").

To qualify as reasonable under *Chevron*, this interpretation does not need to be the best reading of a statute. *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 744-45 (1996).  Nor does it

---

[8]    The standard of performance for froth-flotation gold mills obviously applies only to the discharge of wastewater effluent, not to the discharge of tailings.  The standard for froth-flotation mills is zero discharge because the EPA concluded that process wastewater could be recycled back into the mill.  Tailings (over 7 million tons for this project) cannot be recycled back into the mill.

need to be the interpretation the Court would adopt were it writing on a clean slate.  *Chevron*, 467 U.S. at 843 n.11; *Arkansas v. Oklahoma*, 503 U.S. 91, 114 (1992) (stating "it is not our role, or that of the Court of Appeals, to decide which policy choice is the better one, for it is clear that Congress has entrusted such decisions to the [regulatory agency]").  Moreover, the agencies' interpretation need not be the only reasonable one to withstand scrutiny.  *Am. Mining Cong. v. EPA*, 965 F.2d 759, 764 (9th Cir. 1992) ("If EPA's interpretation of the CWA is reasonable, we must defer to the agency's interpretation even if the agency could also have reached another reasonable interpretation. . . ."); *see also Chem. Mfrs. Ass'n v. NRDC*, 470 U.S. 116, 134 (1985) (stating, in deferring to EPA's interpretation of Clean Water Act, "we do not sit to judge the relative wisdom of competing statutory interpretations"); *Alaska v. Lyng*, 797 F.2d 1479, 1481 (9th Cir. 1986).  The only question is whether the Corps' and EPA's interpretation is so wholly unsupported by reason that it "exceeds the bounds of the permissible."  *Barnhart v. Walton*, 535 U.S. 212, 218 (2002).

When the Corps and EPA adopted the definition of "fill material" to include mine tailings having the effect of fill, and when they applied that definition to the Kensington tailings, the agencies reasonably interpreted the CWA.  As is discussed above, the Corps' and EPA's determination that elements of the Section 402 program such as Section 306 standards of performance do not belong in the Section 404 program is a plainly reasonable interpretation of the statute, if not compelled.  The courts have recognized that the CWA is a complex statute and that the agencies administering it are entitled to "considerable deference in the interpretive process of making the regulatory machinery work."  *NRDC v. EPA*, 859 F.2d 156, 202 (D.C. Cir. 1988).  The Corps' and EPA's reasoned decision to regulate mine tailings as "fill material" under the Section 404 program is entitled to such deference.

**B.      The Regulations Do Not Exclude Mine Tailings From the Definition of "Fill Material."**

Plaintiffs argue that the Section 404 permit issued to Coeur Alaska is inconsistent with the definition of "fill material" set forth in the Corps' and EPA's joint regulation.  Plf. Brf. at 30-34.  According to Plaintiffs, the Corps and EPA intended that mine tailings "like the ones from the Kensington mill" are not fill material but instead are to be regulated by EPA under the Section 402 program.  Plf. Brf. at 31.

Nowhere in their argument do Plaintiffs actually discuss the text of the regulatory definition.  Instead, Plaintiffs base their argument exclusively on snippets from the rulemaking history.  Their interpretation is contrary to the text of the regulation, contrary to established canons of regulatory interpretation, contrary to the regulatory history, and contrary to the position of the very agencies who promulgated the regulation.

**1.      The unambiguous text of the regulatory definitions is dispositive.**

It is axiomatic that where a regulation is unambiguous, the text of the regulation governs its interpretation.  "A regulation should be construed to give effect to the natural and plain meaning of its words."  *Crown Pacific v. Occupational Safety & Health Review Comm'n*, 197 F.3d 1036, 1038 (9th Cir. 1999) (citation omitted).  The "language in the preamble of a regulation is not controlling over the language of the regulation itself."  *Entergy Servs., Inc. v. FERC*, 375 F.3d 1204, 1209 (D.C. Cir. 2004) (citation omitted); s*ee also Burns v. Barnhart*, 312 F.3d 113, 125 (3d Cir. 2002) ("[W]e cannot ignore the plain wording of the regulation.").

Plaintiffs cite to two cases for the unremarkable proposition that a court may consider regulatory history.  Plf Brf. at 31.  But in neither case did the regulatory history contradict the regulatory text.  *See Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 716 (1985) (Court says it would have reached the same conclusion "even in the absence of" the

agency's statement); *League of Wilderness Defenders v. Forsgren*, 309 F.3d 1181, 1189 (9th Cir. 2002) (noting that contemporaneous regulatory history is consistent with the court's interpretation of regulatory and statutory text).

Where the text of the regulation is clear, inquiry into the regulation's preamble or rulemaking history for the purpose of avoiding the text is inappropriate. *See United States v. Hagberg*, 207 F.3d 569, 574 (9th Cir. 2000) ("Where a statute or regulation is plain on its face . . . statements in legislative history do not sway our decision."). *See also Burns*, 312 F.3d at 125 ("Where the language of a regulation is plain and unambiguous, as it is here, further inquiry is not required."); *Albemarle Corp. v. Herman*, 221 F.3d 782, 786 (5th Cir. 2000) ("The preamble need be consulted, however, only when, unlike here, the regulation's plain language is ambiguous.").

### 2. The definitions of "fill material" and "discharge of fill material" are plain and unambiguous.

In the present case, there is absolutely no reason to resort to the regulatory history. The Kensington mine tailings will have the effect of changing the bottom elevation of the lake. They fit perfectly within the definition of "fill material." Moreover, "the placement of . . . tailings or similar mining-related materials" is the "discharge of fill material." 33 C.F.R. § 323.2(f). There is nothing in the regulations to interpret.

### 3. The preamble to the final joint agency rule and other regulatory history confirm that "any" mine tailings are "fill material."

Even though the unambiguous regulatory definitions make it inappropriate and unnecessary to dig into the regulatory history, the Corps' and EPA's statements indicate that they meant exactly what the regulations say. The Kensington mine tailings should be regulated as fill material.

Plaintiffs contend that the agencies indicated that they did not intend to change their existing (that is, pre-2002) practices. Plaintiffs further contend that the Corps would not have authorized the discharge of mine tailings to waters of the United States prior to 2002. Upon these two premises, Plaintiffs reach the conclusion that the agencies must not have intended the regulations to authorize the discharge of mine tailings as fill material. Plaintiffs' argument is wrong for a number of reasons.

Most directly, there is no need to draw inferences from the regulatory history about the agencies' intent with respect to mine tailings. The preamble to the final rule addresses the question directly: "***any*** mining-related material that has the effect of fill when discharged will be regulated as 'fill material.'" 67 Fed. Reg. at 31,135 (emphasis added).

Moreover, mines with tailings facilities located in "waters of the United States" are not new. In Alaska, given the overwhelming abundance of lakes, streams, ponds and wetlands, tailings facilities are usually, if not always, sited in waters subject to federal jurisdiction. Kensington is not, as Plaintiffs have suggested, a precedential expansion of the Corps' Section 404 regulatory program.

For example, the Red Dog Mine, a lead and zinc mine located approximately 82 miles northeast of Kotzebue, has a subaqueous tailings facility that is similar to that permitted at Kensington. In 1985, the Corps issued a Section 404 Permit for the placement of mine tailings into the south fork of Red Dog Creek and into adjacent wetlands. Coeur Ex. 23 (Red Dog Permit Record Excerpts). Although there is a Section 306 new source performance standard for wastewater discharges from lead and zinc mines, *see* 40 C.F.R. § 440.104, the Corps and EPA did not apply the standard to the discharge of the tailings.

The Fort Knox Mine, a gold mine located approximately fifteen miles northeast of Fairbanks, has a 1,147-acre subaqueous tailings impoundment sited in Fish Creek Valley. Construction of the tailings facility was authorized in 1994 under a Section 404 Permit. Coeur Ex. 24 (Fort Knox Permit Record Excerpts). The Fort Knox tailings facility involved the construction of two dams to create a tailings impoundment basin in Fish Creek and adjacent wetlands. Tailings are discharged into Fish Creek. As with the Kensington Project, the Corps and EPA did not apply any Section 306 new source performance standard to the tailings discharge.

The same permitting approach has been followed in other states in the Ninth Circuit. For example, the Smoky Canyon Mine, a phosphate mine located in Idaho, also has a similar tailings facility. In 1991, the Corps issued a Section 404 Permit for the construction of a dam for a tailings impoundment in Tygee Creek, and in 1997 the Corps issued a modified 404 Permit to expand the impoundment. Coeur Ex. 25 (Smoky Canyon Permit Record Excerpts). A tailings slurry is discharged to the waters behind the dam in Tygee Creek and into adjacent wetlands. Although there is a Section 306 new source performance standard for wastewater discharges from phosphate mines, *see* 40 C.F.R. § 436.185, the Corps and EPA did not apply the standard to the tailings discharge.

The Corps and EPA were aware of the existing practice of authorizing the placement of mine tailings into waters of the United States, and they stated that one purpose of issuing the regulations in 2002 was to clarify that such tailings should be regulated under the Section 404 program. They wrote:

> Both the Corps and the EPA agree that the placement of these materials [overburden, slurry, tailings, and similar materials from mining operations] in areas that qualify as waters of the United States <u>must be regulated, but not absolutely prohibited, under section 404</u> of the CWA. While some Corps

> Districts have been regulating mining discharges in the manner the agencies believe appropriate, today's rule will clarify the agencies' position for all regulators and members of the public and result in uniform application of these important requirements.

Coeur Ex. 26 at 38 (Response to Comments at 35) (emphasis added).  Thus, the regulatory history shows that the Corps and EPA intended to include mine tailings within the definition of fill material when their discharge will have the effect of fill.

Despite the fact that the Corps has been regulating discharges of mine tailings under Section 404 for years, Plaintiffs cite two memoranda issued by Corps personnel which they say proves the Corps' lack of such jurisdiction.  Plf. Brf. at 33-34.  Plaintiffs do not relate the full story, however, as these two memoranda were not the final word.  The two memoranda were authored in 1991 and 1992 by personnel in the Corps' Alaska District office.  They related to a project in which "[t]he applicant proposes to construct a 350-foot tall dam across Sheep Creek behind which some 84 million cubic yards of tailings will be discharged."  Plf. Ex. 24 at 1.  The 1992 memo, written by the District Commander, stated that there had been a "dispute" between the Corps district and the local EPA region "concerning agency jurisdiction . . . over the discharge of tailings (a waste product of the mining process) into waters of the United States." *Id.*  It "requests that the question be referred to the Washington level for resolution. . . ."  *Id.* at 3.

Washington responded.  In a memorandum dated September 10, 1992, Corps headquarters stated that "[i]t is agreed that the mining companies need a section 404 permit for the discharge of fill material to create the basin itself, and that a section 402 permit is needed for any discharges flowing out of the basin following treatment."  Coeur Ex. 27 at 1 (Studt Memo at 1).  Further, "the potential impacts of the discharge of mine tailings must be considered within the context of the section 404 permit evaluation."  *Id.* at 2 (Studt Memo at 2).  EPA headquarters issued a memorandum on October 2, 1992 that said the same thing.  Coeur Ex. 28 (Wilcher

Memo).[9]  The statements in the memoranda cited by Plaintiffs, superseded by headquarters' memorandum, have no weight.

Also of no consequence is the statement in the Corps' 1998 Record of Decision ("1998 ROD") for Kensington where it said that it "does not regulate the placement of tailings" into the dry tailings facility.  *See* Plf. Brf. at 23, 34.  The reason that the Corps would not regulate the placement of those tailings is that they would not be placed into waters of the United States.  The dry tailings facility was to be built in wetlands through the discharge of rock and other materials.  This discharge would convert the wetlands to dry land.  The tailings would then be placed on the dry land, and hence would not be subject to CWA jurisdiction.  *See* Coeur Ex. 29 at 1 (1998 ROD at 1); Coeur Ex. 30 at 2 (1997 FSEIS at 2-20).  This statement in the 1998 ROD simply does not support Plaintiffs' argument that the Corps believed it lacks jurisdiction to regulate the discharge of tailings into waters of the United States.

Plaintiffs also argue that the agencies could not have intended to define mine tailings as fill because, Plaintiffs assert, mine tailings are subject to effluent limitation guidelines and standards of performance.  This is a bootstrapping argument.  Whether the tailings are subject to effluent limitation guidelines or standards of performance depends upon whether they are fill material.  As is discussed above, the first step is to determine whether Section 404 or Section 402 applies.  Discharges of fill material are regulated under Section 404, and therefore are not subject to the effluent limitation guidelines and standards of performance of the Section 402 program.

The agencies do not share the Plaintiffs' view.  EPA has promulgated standards of performance for the Section 402 effluent discharges from most if not all mines.  *See* 40 C.F.R.

---

[9]    The memoranda concluded that once the dam was built, the impounded water behind the dam would no longer be a water of the United States, and therefore no permit from any agency was required for the placement of the tailings into the impounded waters.

Parts 434, 436, 440.  EPA and the Corps are intimately aware of these standards of performance. If these standards prevented mine tailings from being characterized as fill, then EPA and the Corps certainly would not have written that "any mining-related material that has the effect of fill when discharged will be regulated as 'fill material.'"  67 Fed. Reg. at 31,135.

The EPA and Corps recognized that some wastewater discharges "may contain suspended solids which ultimately will settle to the bottom following discharge."  65 Fed. Reg. at 21,295.  They did not want these discharges, traditionally permitted under Section 402, to be deemed "fill material" due to the incidental effect on bottom elevations of minor concentrations of suspended solids.  They wrote in the rule's preamble that the rule did not change how such discharges would be regulated:

> Recognizing that some discharges (such as suspended or settleable solids) can have the associated effect, over time, of raising the bottom elevation of a water due to settling of waterborne pollutants, we do not consider such pollutants to be "fill material," and nothing in today's rule changes that view.

67 Fed. Reg. at 31,135.  The discharge of the Kensington mine tailings, like other tailings, deposits large volumes of mostly solid material that affects the lake bottom directly and immediately.  This is very different in kind from a discharge of effluent with low concentrations of suspended solids which can have an associated effect over time on the bottom of a water body.

Plaintiffs argue that it is "contradictory" and "absurd" that "[t]he agencies appear to make a distinction between the Kensington discharges and other discharges with suspended or settleable solids based on the fact that the filling of Lower Slate Lake will happen more quickly, presumably because the volume of solids . . . is so high."  Plf. Brf. at 38.  Yet it is entirely appropriate for EPA and the Corps to decide that this is the type of distinction that makes a difference, and to continue to assign to the Corps the responsibility for regulating discharges of high volumes of solids like mine tailings.  This was clearly what they decided, as evidenced by

the text of the regulation, the preamble and other regulatory history, the Regas memorandum issued by the EPA in 2004 (discussed in Plaintiffs' brief at 35-39), and the agencies' permitting decision for the Kensington Project. "[T]he resolution among agencies of the line dividing their responsibilities is just the type of agency action to which the courts must defer." *Kentuckians for the Commonwealth, Inc. v. Rivenburgh*, 317 F.3d 425, 446 (4th Cir. 2003).

Judicial review of an agency's interpretation of its own regulation is "extremely deferential." *Alhambra Hosp. v. Thompson*, 259 F.3d 1071, 1074 (9th Cir. 2001). The agency's interpretation "must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Id.* (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)); *see also Auer v. Robbins*, 519 U.S. 452, 461 (1997). A court must defer to an agency's interpretation unless an "alternate reading is compelled by the regulation's plain language." *Alhambra Hosp.*, 259 F.3d at 1074 (citing *Thomas Jefferson Univ.*, 512 U.S. at 512). "This broad deference is all the more warranted when . . . the regulation concerns a complex and highly technical regulatory program." *Id.*

In the present case the Corps concluded that the discharge of tailings that will substantially raise the bottom elevation of Lower Slate Lake is the discharge of fill material. This conclusion is obviously a permissible conclusion, if not the only conclusion. After Plaintiffs commenced this lawsuit, the Corps took a second look at the permit and reaffirmed its conclusions, reinstating the permit. This history should magnify the deference afforded to the agency by this Court.

### C.    Plaintiffs' Proposed Interpretation Would Weaken the CWA's Protections.

The CWA's Section 404 program invests the Corps with the responsibility to ensure that the least damaging environmental practicable discharge is selected. 40 C.F.R. § 230.10(a). Plaintiffs' proposed approach would impede the Corps from fulfilling this objective of the CWA.

If this Court were to reinterpret the CWA or the Corps' regulations as Plaintiffs propose, then these tailings would need to be disposed on dry land, that is, other than in waters of the United States.  The Kensington mine is located in an area without suitable dry land for tailings disposal.  Thus, the only option would be to create uplands out of wetlands, and then put the tailings on top of the newly formed uplands.  This was the design of the dry tailings facility which was part of the earlier operations plan.  With this type of tailings discharge, the wetlands can never be restored.

Wetlands are a valuable resource, tightly regulated by the Corps to minimize adverse impacts.  The Corps considered and rejected an alternative to the Lower Slate Lake proposal, concluding that it would entail a substantial permanent loss of wetlands that would be unacceptably environmentally damaging.  Coeur Ex. 11 at 20-21 (ROD at 20-21).  The Corps should retain the flexibility to approve a plan like the Kensington plan, which allows the enhancement of the water bodies, rather than be forced into alternatives that permanently eliminate waters of the United States.

## III.  PLAINTIFFS ARE NOT ENTITLED TO ANY RELIEF.

Because Plaintiffs' legal claims fail on the merits, the Court must deny Plaintiffs any relief.  Plaintiffs' desperate attempt to shut down the Kensington Project is further evidenced by their request for injunctive relief, which request would fail under any circumstances.  In *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987), the Supreme Court reiterated "the fundamental principle that an injunction is an equitable remedy that does not issue as of course . . . and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law."  (Citation omitted.)  When considering whether to issue an injunction, a court must consider the nature of the claimed injury to the plaintiffs, including whether it is irreparable, and balance any such injury that an injunction may cause.  *Id; Alaska*

*Wilderness Recreation & Tourism Ass'n v. Morrison,* 67 F.3d 723, 732 (9th Cir. 1995).   In *Amoco Production*, the Supreme Court held that an injunction would be improper where alleged environmental injury arising from oil exploration was not probable and "on the other side of the balance of harms was the fact that the oil company petitioners had committed approximately $70 million to exploration . . . which they would have lost . . . had exploration been enjoined."  *Id.* at 545.

In addition to harm to the parties, the Court must also consider the impact on the public interest.  *Amoco Production*, 480 U.S. at 542; *Alaska Wilderness*, 67 F.3d at 732.  A wide variety of public interest impacts warrant consideration.   National security, economic, and environmental concerns are frequently cited as valid public interests in the context of injunctive relief.  *Pac. Aerospace & Elec., Inc. v. Taylor*, 295 F. Supp. 2d 1188, 1203 (E.D. Wash. 2003).  Accordingly, it is the court's province to protect not only the environment, but also the interests of the community.  Entire regions may be profoundly affected by an injunction which halts much needed economic development.  The Supreme Court recently emphasized that "there is no basis for exempting economic development from our traditionally broad understanding of public purpose."  *Kelo v. City of New London*, 125 S. Ct. 2655, 2665-66 (2005); *see also Alaska Wilderness*, 67 F.3d at 732 (harm to various Southeast Alaska industries to be considered in determining injunctive relief).

The balance of interests tips decidedly against an injunction at Kensington.  Environmentally sound mining is in the public interest.  "Congress declare[d] that it is the continuing policy of the Federal Government in the national interest to foster and encourage private enterprise in . . . the development of economically sound and stable domestic mining, minerals, metal and mineral reclamation industries. . . ." 30 U.S.C. § 21a.  The mine is in an area

of historic mining which the Forest Service has given a "Minerals" designation to "encourage . . . mining."  Coeur Ex. 6 at 2 (Tongass Land Management Plan at 3-148).

The Kensington Project will have enormous benefits to the people of Southeast Alaska. Coeur Alaska plans to spend many millions of dollars constructing the Kensington mine and associated works, anticipating the creation of 300-plus jobs during that construction, and 200-plus jobs while the mine is operating.  As stated in declarations filed in this case by the State of Alaska with their intervention papers, the City and Borough of Juneau stands to collect $2.4 million in property taxes and additional revenue in sales taxes.  In addition, the Project will add more than $6 million in licensing fees and corporate income taxes into the State of Alaska's coffers.  Coeur Ex. 32 at 4-7 (Hughes Decl. ¶¶ 7-9).  Coeur Alaska has worked extensively with Native Corporations to provide training and employment opportunities for their members.  The Project will provide good jobs at family-supporting wages that would otherwise be unavailable.

The harm to Coeur Alaska from enjoining the mine would be substantial and unwarranted.  Coeur Alaska's investment in the Kensington Project is nearly $200 million to date. Coeur Ex. 31 at 1 (Sabala Decl.).  As in *Amoco Production*, where an investment of $70 million warranted denial of an injunction, here too any balance of harms weighs against an injunction.

From a purely environmental perspective, there is <u>not</u> an automatic presumption that in every case where environmental injury is alleged an injunction is appropriate.  *Amoco Production*, 480 U.S. at 542; *The Lands Council v. Packard*, 391 F. Supp. 2d 869, 871-72  (D. Idaho 2005) ("[Environmental group] [p]laintiffs' interests are not the only interests involved in the management of public lands and this Court will not presume that Plaintiffs have satisfied their burden simply because of the environmental nature of the case.").  The Kensington Project

is beneficial.  Lower Slate Lake is a small, nutrient-poor lake with a small population of undersized fish.  At the end of the day there will be a more productive Lower Slate Lake, larger and with improved fish habitat.  The lake and entire Project area will be fully restored, as the agencies with jurisdiction concluded.  There will be no irreparable injury.

If Plaintiffs' declarations are accepted at face value, their use of Lower Slate Lake is trivial.  Four declarants visited it on five occasions during 70 combined years of outdoor activities in the region.  Plf. Exs. 30, 31, 32, 33, 42.  Extrapolating these data suggests that only a handful of visits may be affected during the entire life of the Kensington Project.

Plaintiffs say they are concerned that there will be an additional burden on Berners Bay during the operation of the mining Project.  The discharge to Lower Slate Lake—two miles above the bay—will have no effect on the water quality or habitat in the bay, as any water flowing from the lake will receive state-of-the-art water treatment.  Instead, Plaintiffs say they are concerned that up to five mine shuttle ferry trips per day across the bay will affect its quietude.  But motorized craft and helicopters already use the bay.  Plf. Ex. 31 ¶ 14.  The Project will not use the "air boats" already operating in the bay that cause "the worst noise impacts." Plf. Ex. 32 ¶ 11.  The noise effect of the mine shuttles will be *de minimis*.  Further, as the agencies with jurisdiction have found, the additional traffic will not have substantial adverse effect on the wildlife or other resources in the bay.  Coeur Ex. 3 at 15 (FSEIS at 4-77).

The area around Berners Bay has seen mining and other related activities for the last century.  As the owner of the Jualin patented lands points out, "[t]hese activities have been ongoing for well over 100 years, almost continuously except for a period of 25 years between 1950 and the mid-1970s. . . . That some would still refer to the Berners Bay area as 'pristine'

simply illustrates the ability of nature to reclaim itself after man's temporary incursions." Coeur Ex. 10 at 2 (MacKinnon Decl. ¶¶ 9, 10).

The Kensington Project is lawful in all respects. It should not be enjoined. Plaintiffs' complaint should be dismissed with prejudice.

## <u>CONCLUSION</u>

For the foregoing reasons, Coeur Alaska respectfully requests that this Court enter judgment in favor of Defendants on Plaintiffs' First Amended Complaint.

DATED this 5th day of May, 2006.          Respectfully submitted,

MAYER, BROWN, ROWE & MAW LLP
Attorneys for Defendant-Intervenor
COEUR ALASKA, INC.

<u>/s/ John C. Berghoff, Jr.</u>
John C. Berghoff, Jr., ILBA# 0181528
Michael P. Rissman, ILBA# 6194350
71 South Wacker Drive
Chicago, IL  60606
Phone: (312) 782-0600
Fax: (312) 701-7711
jberghoff@mayerbrownrowe.com
mrissman@mayerbrownrowe.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 5th of May, 2006, a true and correct copy of the foregoing, along with accompanying documents, was served electronically on Demian A. Schane and Thomas S. Waldo (representing plaintiffs), Mark Nitczynski and Richard L. Pomeroy (representing federal defendants), Ruth Hamilton Heese and Cameron M. Leonard (representing defendant-intervenors), and David C. Crosby (representing defendant-intervenor Goldbelt, Inc.).  A courtesy copy was sent via email to Jim Ustasiewski.


<u>/s/ John C. Berghoff, Jr.</u>
John C. Berghoff, Jr.
Mayer, Brown, Rowe & Maw LLP
71 South Wacker Drive
Chicago, IL  60606
Phone: (312) 782-0600
Fax: (312) 701-7711
Email: jberghoff@mayerbrownrowe.com
ILBA# 0181528

## EXHIBIT LIST

**No.**

1       *Ore Mining and Dressing Point Source Category Effluent Limitations Guidelines and New Source Performance Standards*, 47 Fed. Reg. 54598 (Dec. 3, 1982) [excerpts]

2       *Final Rule, Clean Water Act Regulatory Definitions of "Fill Material" and "Discharge of Fill Material,"* 67 Fed. Reg. 31129 (May 9, 2002)

3       Kensington Gold Project, Final Supplemental Environmental Impact Statement (December 2004) ("FSEIS") [excerpts]

4       U.S. Senate, Hearing Before the Subcommittee on Public Lands and Forests of the Committee on Energy and Natural Resources (March 10, 2004) (testimony of Buck Lindekugel, Conservation Director, Southeast Alaska Conservation Council) [excerpt]

5       Hyak Mining Company's Comments on the Proposed Section 404 Permit for the Kensington Mine (July 26, 2004) ("Hyak Letter").

6       Tongass National Forest Land and Resource Management Plan (1997) [excerpt]

7       Department of the Army Permit for Coeur Alaska, Inc. (June 17, 2005) ("Permit")

8       Corps Section 404(b)(1) Guidelines Evaluation for the Kensington Gold Project

9       Figure 1-2, Kensington Gold Project Final SEIS

10      Declaration of E. Neil MacKinnon in Support of Coeur Alaska, Inc.'s Summary Judgment Response Brief ("MacKinnon Decl.")

11      Revised Department of the Army Record of Decision & Permit Evaluation (March 29, 2006) ("ROD")

12      Kline Environmental Research, LLC Technical Memorandum (August 23, 2004) ("KER 8/23/04 Memo")

13      Kensington Project Lower Slate Lake Tailings Impoundment: Habitat Creation and Mitigation Plan, prepared by Kline Environmental Research, LLC and Earthworks Technology, Inc. (July 14, 2003) ("KER and Earthworks Report") [excerpts]

14      Kline Environmental Research, LLC Memorandum (December 23, 2003) ("KER 12/23/03 Memo")

15          Kline Environmental Research, LLC Technical Memorandum (August 17, 2004) ("KER 8/17/04 Memo")

16          Alaska Department of Environmental Conservation Letter to the Corps (December 6, 2004) ("ADEC 12/6/04 Letter to Corps")

17          Alaska Department of Environmental Conservation Section 401 Certificate of Reasonable Assurance ("ADEC Section 401 Certification")

18          Coeur Alaska, Inc.'s Section 404(b)(1) Evaluation (November 17, 2004) ("Coeur Alaska Section 404(b)(1) Evaluation")

19          Reclamation and Closure Plan for the Kensington Gold Project (May 5, 2005) ("Reclamation and Closure Plan")

20          *Memorandum of Agreement on Solid Waste*, 51 Fed. Reg. 8,871 (March 14, 1986)

21          *Proposed Revisions to the Clean Water Act Regulatory Definitions of "Fill Material" and "Discharge of Fill Material";* 65 Fed. Reg. 21,292 (April 20, 2000)

22          *Notice of Correction of Memorandums of Agreement Regarding Clean Water Act Section 404(b)(1) Guidelines*, 55 Fed. Reg. 9,210 (Mar. 12, 1990)

23          Declaration of Don Rice; Department of the Army Permit for Red Dog Mine (January 12, 1984); ADEC Section 401 Certificate of Reasonable Assurance for Red Dog Mine (September 5, 1984) [excerpts]

24          Declaration of Don Rice; Department of the Army Permit for Fort Knox Mine (May 31, 1999); Department of the Army Permit Evaluation and Decision Document for the Red Dog Mine; Fort Knox Monitoring Plan (August 20, 1993) [excerpts]

25          Declaration of Catherine M. Harrison; Department of the Army Permit for Smoky Canyon Mine (February 26, 1991); Department of the Army Permit Evaluation and Decision Document for the Smoky Canyon Mine (February 7, 1991); Modification No. 1 to the Department of the Army Permit for the Smoky Canyon Mine (May 23, 1997); Department of the Army Permit Modification Evaluation and Decision Document for the Smoky Canyon Mine (May 12, 1997); Idaho Division of Environmental Quality Section 401 Certification for the Smoky Canyon Mine (December 4, 1996) [excerpts]

26          Response to Comments Document for Final Rule Amending the Environmental Protection Agency's and U.S. Army Corps of Engineers' Clean Water Act Section 404 Definitions of "Fill Material" and "Discharge of Fill Material" (May 3, 2002) ("Response to Comments")

27          Memorandum by John F. Studt, Chief, Regulatory Branch, Operations, Construction and Readiness Division, Directorate of Civil Works, U.S. Army Corps of Engineers (February 27, 1992) ("Studt Memo")

28          Memorandum by LaJuana S. Wilcher, Assistant Administrator, United States Environmental Protection Agency (October 2, 1992) ("Wilcher Memo")

29          Department of the Army Record of Decision for Section 404 Permit for Coeur Alaska, Inc. (January 28, 1998) ("1998 ROD") [excerpt]

30          Kensington Gold Project Final Supplemental Environmental Impact Statement (August 1997) ("1997 FSEIS") [excerpt]

31          Declaration of James A. Sabala in Support of Coeur Alaska, Inc.'s Summary Judgment Response Brief ("Sabala Decl.")

32          Declaration of Richard A. Hughes in Support of State of Alaska's Motion to Intervene (April 7, 2006) [copy]