Westlaw.

47 FR 54598-01                                                                Page 1
47 FR 54598-01, 1982 WL 154788 (F.R.)
**(Cite as: 47 FR 54598)**


RULES and REGULATIONS

ENVIRONMENTAL PROTECTION AGENCY

40 CFR Part 440

[WH-FRL 2232-1]

Ore Mining and Dressing Point Source Category Effluent Limitations Guidelines
                    and New Source Performance Standards

Friday, December 3, 1982

**\*54598** AGENCY: Environmental Protection Agency (EPA).

ACTION: Final rule.

SUMMARY: This regulation limits the discharge of pollutants into navigable waters of
the United States from exisitng and new sources in the ore mining and dressing
industry.  The Clean Water Act and a Consent Decree require EPA to issue this
regulation.

 The purpose of this regulation is to establish "best available technology"
limitations (BAT) and "new source performance standards" (NSPS) for direct
dischargers.  Pretreatment standards for both existing and new sources are not
being issued since no known indirect dischargers exist nor are any known to be
planned.  Effluent limitations for "best conventional technology" (BCT) are
reserved pending application of the new BCT cost methodology.

DATES: In accordance with 40 CFR 100.01 (45 FR 26048), this regulation will be
considered issued for purposes of judicial review at 1:00 P.M. Eastern time on
December 17, 1982.  It will become effective January 17, 1983 publication date,
except § 440.104(b)(2)(ii) which contains information collection requirements which
are under review at OMB.

  Under Section 509(b)(1) of the Clean Water Act, any petition for judicial review
of this regulation must be filed in the United States Court of Appeals within 90
days after the regulation is considered issued for purposes of judicial review.
Under Section 509(b)(2) of the Clean Water Act, the regulation may not be challenged
later in civil or criminal proceedings brought by EPA to enforce its requirements.

ADDRESS. Technical information may be obtained from Mr. B. Matthew Jarrett, at the
address listed below, or by calling (202) 382-7164.  The economic information may
be obtained from Mr. John Kukulka, Office of Analysis and Evaluation (WH-586),
Environmental Protection Agency, 401 M Street SW., Washington, D.C. 20460, or by
calling (202) 382-5388.

  On December 24, 1982, copies of the development document and the NSPS economic
analysis will be available for public review in EPA's Public Information Reference
Unit, Room 2404 (Rear) (EPA Library), 401 M Street SW., Washington, D.C. On February
7, 1983, the complete Record, including the Agency's responses to comments on the
proposed regulation will be available for review at the Public Information Reference
Unit. The EPA information regulation (40 CFR Part 2) allows the Agency to charge a
reasonable fee for copying.  Copies of the development document and the economic
analysis may also be obtained from the National Technical Information Service,
Springfield, Virginia 22161 (703) 487-6000.  A notice will be published in the
Federal Register announcing the availability of these documents from NTIS. (This

         ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

```
47 FR 54598-01                                                       Page 16
47 FR 54598-01, 1982 WL 154788 (F.R.)
(Cite as: 47 FR 54598)
```

regulation if the amount and toxicity of each pollutant in the discharge does not justify developing national requirements in accordance with the schedule contained in the agreement.  EPA is excluding the mill subpart in the Uranium, Radium and Vanadium subcategory from development of BAT regulations **\*54606** because there is only one existing discharger and development of national regulations are not warranted for this single plant.  EPA is excluding the Nickel subcategory, the Vanadium subcategory (mined alone and not as a byproduct) and, the Antimony subcategory from development of BAT and NSPS because there is only one known discharger in each of these subcategories and no new sources are expected.  EPA is excluding the Platinum subcategory from development of NSPS because the one identified new source must use an entirely different treatment system than what was identified as best demonstrated technology and EPA lacks data on the system.  EPA is differing regulations of the gold placer mine subpart of the Copper, Lead, Zinc, Gold, Silver, and Molybdenum subcategory until it completes data gathering efforts for this subpart.

Paragraph 8(b) of the Settlement Agreement allows the Administrator to exclude from regulation pretreatment standards for all point sources within a point source category.  Pretreatment standards for both existing and new sources in this point source category are not justified because no indirect dischargers exist nor are any known to be planned.

IX. Best Management Practices

Section 304(e) of the Clean Water Act gives the Administrator authority to prescribe "best management practices" (BMPs).  BMPs are not addressed in this regulation.

X. Upset and Bypass Provisions

A recurring issue is whether industry guidelines should include provisions authorizing noncompliance with effluent limitations during periods of "upset" or "bypass." An upset, sometimes called an "excursion," is an unintentional noncompliance occurring for reasons beyond the reasonable control of the permittee.  It has been argued that an upset provision in EPA's effluent limitations is necessary because such upsets will inevitably occur even in properly operated control equipment.  Because technology-based limitations require only what technology can achieve, it is claimed that liability for such situations is improper.  When confronted with this issue, courts have disagreed on whether an explicit upset or excursion exemption is necessary, or whether upset or excursion incidents may be handled through EPA's exercise of enforcement discretion.  Compare Marathon Oil Co. v. EPA, 564 F. 2d 1253 (9th Cir. 1977) with Weyerhaeuser v. Costle, 590 F. 2d 1011 (D.C. Cir. 1978) and Corn Refiners Assn., et al. v. Costle, 594 F. 2d 1223 (8th Cir. 1979). [See also American Petroleum Institute v. EPA, 540 F. 2d 1023 (10th Cir. 1976); CPC International, Inc. v. Train, 540 F. 2d 1320 (8th Cir. 1976); FMC Corp. v. Train, 539 F. 2d 973 (4th Cir. 1976).]

An upset is an unintentional episode during which effluent limits are exceeded;  a bypass, however, is an act of intentional noncompliance during which waste treatment facilities are circumvented in emergency situations.  We have, in the past, included bypass provisions in NPDES permits.

We determined that both upset and bypass provisions should be included in NPDES permits and have promulgated Consolidated Permit Regulations that include upset and bypass provisions. [See 40 CFR 122.60, 45 FR 33290 (May 19, 1980).] The upset provision establishes an upset as an affirmative defense to prosecution for violation of technology-based effluent limitations.  The bypass provision authorizes bypassing to prevent loss of life, personal injury, or severe property damage.

The Agency has received several inquiries on the relationship between the general upset and bypass provisions set forth in the consolidated permit regulations and the storm exemption contained in the regulations for ore mining and dressing.  This relationship is discussed in Section V of this preamble.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

```
47 FR 54598-01                                                     Page 17
47 FR 54598-01, 1982 WL 154788 (F.R.)
```
**(Cite as: 47 FR 54598)**

XI. Variances and Modifications

  Upon the issuance of this regulation, the effluent limitations for the appropriate subcategory must be applied in all Federal and State NPDES permits thereafter issued to direct dischargers in the ore mining and dressing industry.   For the BPT effluent limitations promulgated on July 11, 1978, the only exception to the binding limitations is EPA's "fundamentally different factors" variance. [See E.I. du Pont de Nemours & Co. v. Train, 430 U.S. 112 (1977); Weyerhaeuser Co. v. Costle, supra.] This variance recognizes factors concerning a particular discharger that are fundamentally different from the factors considered in this rulemaking.   Although this variance clause was set forth in EPA's 1973-1976 industry regulations, it is now included in the NPDES regulations and will not be included in the ore mining and dressing industry BAT regulation. (See the NPDES regulations at 40 CFR Part 125, Subpart D.)

  The BAT limitations in this regulation are also subject to EPA's  "fundamentally different factors" variance.   BAT limitations for nonconventional pollutants are subject to modifications under Sections 301(c) and 301(g) of the Act. These statutory modifications do not apply to toxic or conventional pollutants.   To apply for these modifications a discharger must be in compliance with BPT. Because this rule will make BAT equal to BPT, EPA does not expect any applications for Section 301(c) or 301(g) modifications. [See 43 FR 40895 (September 13, 1978).] NSPS are not subject to EPA's "fundamentally different factors" variance or any statutory or regulatory modifications. (See E. I. du Pont de Nemours and Co v. Train, supra.)

XII. Relationship to NPDES Permits

  The BAT limitations and NSPS in this regulation will be applied to individual ore mines and mills through NPDES permits issued by EPA or approved state agencies, under Section 402 of the Act. As discussed in the preceding section of this preamble, these limitations must be applied in all Federal and State NPDES permits except to the extent that variances and modifications are expressly authorized. Other aspects of the interaction between these limitations and NPDES permits are discussed below.

  One issue that warrants consideration is the effect of this regulation on the powers of NPDES permit-issuing authorities.   The promulgation of this regulation does not restrict the power of any permitting authority to act in any manner consistent with law or these or any other EPA regulations, guidelines or policy. For example, even if this regulation does not control a particular pollutant, the permit-issuer may still limit such pollutant on a case-by-case basis when limitations are necessary to carry out the purposes of the Act. Where manufacturing practices or treatment circumstances warrant additional controls, such limitations may be technology-based in conformance with the legislative history of the Act. However, such limitations are subject to administrative and judicial review as part of the permit issuance process. In addition, to the extent that State water quality standards or other provisions of State or Federal law require limitation of pollutants not covered by this regulation (or require more stringent limitations on covered pollutants), such limitations must be applied by the permit-issuing authority.

  A second topic that warrants discussion is the operation of EPA's NPDES enforcement program, many aspects of which were considered in developing this regulation.   We emphasize that although the Clean Water Act is a strict liability statute, the initiation of enforcement proceedings by EPA is discretionary.   We have exercised **\*54607** and intend to exercise that discretion in a manner that recognizes and promotes good-faith compliance efforts.

XIII. Public Participation

  The Agency solicited public comment on the proposed rules published in the Federal Register on June 14, 1982, (47 FR 25682).   In addition, the Agency accepted public comment on the development document and economic analysis supporting the proposed

              ©   2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.