Case 1:05-cv-00012-JKS   Document 71-3   Filed 05/05/2006   Page 1 of 15

The Coast Guard certifies under 5 U.S.C. 605(b) that this proposed rule would not have a significant economic impact on a substantial number of small entities because this rule removes an obsolete safety zone.

**Assistance for Small Entities**

Under section 213(a) of the Small Business Regulatory Enforcement Fairness Act of 1996 (Public Law 104–121), we offer to assist small entities in understanding the rule so that they could better evaluate its effects on them and participate in the rulemaking process. Small entities may contact the person listed under **FOR FURTHER INFORMATION CONTACT** for assistance in understanding and participating in this rulemaking. We also have a point of contact for commenting on actions by employees of the Coast Guard. Small business may send comments on the actions of Federal employees who enforce, or otherwise determine compliance with Federal regulations to the Small Business and Agriculture Regulatory Fairness Boards. The Ombudsman evaluates these actions annually and rates each agency's responsiveness to small business. If you wish to comment on actions by employees of the Coast Guard, call 1–888-REG-FAIR (1–888–734–3247).

**Collection of Information**

This rule calls for no new collection of information under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501–3520).

**Federalism**

A rule has implications for federalism under Executive Order 13132, Federalism, if it has a substantial direct effect on State or local governments and would either preempt State law or impose a substantial direct cost of compliance on them. We have analyzed this rule under that Order and have determined that it does not have implications for federalism.

**Unfunded Mandates Reform Act**

The Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531–1538) requires Federal agencies to assess the effects of their discretionary regulatory actions. In particular, the Act addresses actions that may result in the expenditure by a State, local, or tribal government, in the aggregate, or by the private sector of $100,000,000 or more in any one year. Though this rule will not result in such an expenditure, we do discuss the effects of this rule elsewhere in this preamble.

**Taking of Private Property**

This rule will not effect a taking of private property or otherwise have taking implications under Executive Order 12630, Governmental Actions and Interference with Constitutionally Protected Property Rights.

**Civil Justice Reform**

This rule meets applicable standards in sections 3(a) and 3(b)(2) of Executive Order 12988, Civil Justice Reform, to minimize litigation, eliminate ambiguity, and reduce burden.

**Protection of Children**

We have analyzed this rule under Executive Order 13045, Protection of Children from Environmental Health Risks and Safety Risks. This rule is not an economically significant rule and does not concern an environmental risk to health or safety that may disproportionately affect children.

**Environment**

The Coast Guard has considered the environmental impact of this proposed rule and concluded that, under figure 2–1, paragraph 34(g), of Commandant Instruction M16475.lC, this proposed rule is categorically excluded from further environmental documentation.

**Indian Tribal Governments**

This rule does not have tribal implications under Executive Order 13175, Consultation and Coordination with Indian Tribal Governments, because it does not have a substantial direct effect on one or more Indian tribes, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes.

**Energy Effects**

We have analyzed this proposed rule under Executive Order 13211, Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use. We have determined that it is not a "significant energy action" under that order because it is not a "significant regulatory action" under Executive Order 12866 and is not likely to have a significant adverse effect on the supply, distribution, or use of energy. It has not been designated by the Administrator of the Office of Information and Regulatory Affairs as a significant energy action. Therefore, it does not require a Statement of Energy Effects under Executive Order 13211.

**List of Subjects in 33 CFR Part 165**

Harbors, Marine safety, Navigation (water), Reporting and recordkeeping requirements, Security measures, Waterways.

For the reasons discussed in the preamble, the Coast Guard amends 33 CFR part 165 as follows:

**PART 165— REGULATED NAVIGATION AREAS AND LIMITED ACCESS AREAS**

1. The authority for part 165 continues to read as follows:

**Authority:** 33 U.S.C. 1231; 50 U.S.C. 191, 33 CFR 1.05–1(g), 6.04–1, 6.04–6, 160.5; 49 CFR 1.46.

**§ 165.T07–002   [Removed]**

2. Section 165.T07–002 is removed.

Dated: April 18, 2002.

**J.A. Servidio,**
*Commander, U.S. Coast Guard, Captain of the Port.*
[FR Doc. 02–11619 Filed 5–8–02; 8:45 am]
**BILLING CODE 4910–15–U**

---

**DEPARTMENT OF DEFENSE**

**Department of the Army, Corps of Engineers**

**33 CFR Part 323**

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 232**

[FRL 7209–2]

**Final Revisions to the Clean Water Act Regulatory Definitions of "Fill Material" and "Discharge of Fill Material"**

**AGENCIES:** U.S. Army Corps of Engineers, Department of the Army, DoD; and Environmental Protection Agency.

**ACTION:** Final rule.

**SUMMARY:** The U.S. Army Corps of Engineers (Corps) and the Environmental Protection Agency (EPA) are promulgating a final rule to reconcile our Clean Water Act (CWA) section 404 regulations defining the term "fill material" and to amend our definitions of "discharge of fill material." Today's final rule completes the rulemaking process initiated by the April 20, 2000, proposal in which we jointly proposed to amend our respective regulations so that both agencies would have identical definitions of these key terms. The proposal was intended to clarify the Section 404 regulatory framework and

generally to be consistent with existing regulatory practice. Today's final rule satisfies those goals.

Today's final rule defines ''fill material'' in both the Corps' and EPA's regulations as material placed in waters of the U.S. where the material has the effect of either replacing any portion of a water of the United States with dry land or changing the bottom elevation of any portion of a water. The examples of ''fill material'' identified in today's rule include rock, sand, soil, clay, plastics, construction debris, wood chips, overburden from mining or other excavation activities, and materials used to create any structure or infrastructure in waters of the U.S. This rule retains the effects-based approach of the April 2000 proposal and reflects the approach in EPA's longstanding regulations. Today's final rule, however, includes an explicit exclusion from the definition of ''fill material'' for trash or garbage.

Today's final rule also includes several clarifying changes to the term ''discharge of fill material.'' Specifically, the term ''infrastructure'' has been added in several places following the term ''structure'' to further define the situations where the placement of fill material is considered a ''discharge of fill material.'' In addition, the phrases ''placement of fill material for construction or maintenance of any liner, berm, or other infrastructure associated with solid waste landfills'' and ''placement of overburden, slurry, or tailings or similar mining-related materials'' have been added to the definition of ''discharge of fill material'' to provide further clarification of the types of activities regulated under section 404.

As indicated in the proposal, as a general matter, this final rule will not modify existing regulatory practice. Today's final rule, which establishes uniform language for the Corps' and EPA's definitions of ''fill material'' and ''discharge of fill material,'' will enhance the agencies' ability to protect aquatic resources by ensuring more consistent and effective implementation of CWA requirements.

**EFFECTIVE DATE:** June 10, 2002.

**FOR FURTHER INFORMATION CONTACT:** For information on today's rule, contact either Mr. Thaddeus J. Rugiel, U.S. Army Corps of Engineers, ATTN CECW– OR, 441 ''G'' Street, NW., Washington, DC 20314–1000, phone: (202) 761–4595, e-mail address: *thaddeus.j.rugiel@hq02.usace.army.mil,* or Ms. Brenda Mallory, U.S. Environmental Protection Agency, EPA West, Office of Wetlands, Oceans and Watersheds (4502T), 1200 Pennsylvania Avenue, NW., Washington, DC 20460, phone: (202) 566–1368, e-mail address: *mallory.brenda@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

**I. Background**

*A. Potentially Regulated Entities*

Persons or entities that discharge material to waters of the U.S. that has the effect of replacing any portion of a water of the U.S. with dry land or changing the bottom elevation of any portion of a water of the U.S. could be regulated by today's rule. The CWA generally prohibits the discharge of pollutants into waters of the U.S. without a permit issued by EPA, or a State or Tribe approved by EPA under section 402 of the Act, or, in the case of dredged or fill material, by the Corps or an approved State or Tribe under section 404 of the Act. Today's final rule addresses the CWA section 404 program's definitions of ''fill material'' and ''discharge of fill material,'' which are important for determining whether a particular discharge is subject to regulation under CWA section 404. Today's final rule reconciles EPA's and the Corps' differing definitions of ''fill material'' and provides further clarification for the regulated public on what constitutes a ''discharge of fill material.'' Examples of entities potentially regulated include:

| Category | Examples of potentially regulated entities |
|---|---|
| State/Tribal governments or instrumentalities. | State/Tribal agencies or instrumentalities that discharge material that has the effect of replacing any portion of a water of the U.S. with dry land or changing the bottom elevation of a water of the U.S. |
| Local governments or instrumentalities. | Local governments or instrumentalities that discharge material that has the effect of replacing any portion of a water of the U.S. with dry land or changing the bottom elevation of a water of the U.S. |
| Federal government agencies or instrumentalities. | Federal government agencies or instrumentalities that discharge material that has the effect of replacing any portion of a water of the U.S. with dry land or changing the bottom elevation of a water of the U.S. |
| Industrial, commercial, or agricultural entities. | Industrial, commercial, or agricultural entities that discharge material that has the effect of replacing any portion of a water of the U.S. with dry land or changing the bottom elevation of a water of the U.S. |
| Land developers and landowners. | Land developers and landowners that discharge material that has the effect of replacing any portion of a water of the U.S. with dry land or changing the bottom elevation of a water of the U.S. |

This table is not intended to be exhaustive, but rather provides a guide for readers regarding entities that are likely to be regulated by this action. This table lists the types of entities that we are now aware of that could potentially be regulated by this action. Other types of entities not listed in the table also could be regulated. To determine whether your organization or its activities are regulated by this action, you should carefully examine the applicability criteria in sections 230.2 of Title 40 and 323.2 of Title 33 of the Code of Federal Regulations, as well as the preamble discussion in Section II of today's final rule. If you have questions regarding the applicability of this action to a particular entity, consult the persons listed in the preceding section entitled **FOR FURTHER INFORMATION CONTACT.**

*B. Summary of Regulatory History Leading to Final Rule and Related Litigation*

The CWA governs the ''discharge'' of ''pollutants'' into ''navigable waters,'' which are defined as ''waters of the United States.'' Specifically, Section 301 of the CWA generally prohibits the discharge of pollutants into waters of the U.S., except in accordance with the requirements of one of the two permitting programs established under the CWA: Section 404, which regulates the discharge of dredged or fill material, or sction 402, which regulates all other pollutants under the National Pollutant Discharge Elimination System (NPDES) program. Section 404 is primarily administered by the Corps, or States/Tribes that have assumed the program pursuant to section 404(g), with input and oversight by EPA. In contrast, Section 402 and the remainder of the CWA are administered by EPA or approved States or Tribes. The CWA defines the term ''pollutant'' to include

materials such as rock, sand, and cellar dirt that often serve as ''fill material.'' The CWA, however, does not define the terms ''fill material'' and ''discharge of fill material,'' leaving it to the agencies to adopt definitions consistent with the statutory framework of the CWA.

Prior to 1977, both the Corps and EPA had defined ''fill material'' as ''any pollutant used to create fill in the traditional sense of replacing an aquatic area with dry land or of changing the bottom elevation of a water body for any purpose. * * *'' 40 FR 31325 (July 25, 1975); 40 FR 41291 (September 5, 1975).

In 1977, the Corps amended its definition of ''fill material'' to add a ''primary purpose test,'' and specifically excluded from that definition material that was discharged primarily to dispose of waste. 42 FR 37130 (July 19, 1977). This change was adopted by the Corps because it recognized that some discharges of solid waste materials technically fit the definition of fill material; however, the Corps believed that such waste materials should not be subject to regulation under the CWA section 404 program. Specifically, the Corps' definition of ''fill material'' adopted in 1977 reads as follows:

(e) The term ''fill material'' means any material used *for the primary purpose* of replacing an aquatic area with dry land or of changing the bottom elevation of an [sic] water body. The term does not include any pollutant discharged into the water primarily to dispose of waste, *as that activity is regulated under section 402 of the Clean Water Act.''* 33 CFR 323.2(e) (2001)(emphasis added).

EPA did not amend its regulations to adopt a ''primary purpose test'' similar to that used by the Corps. Instead, the EPA regulations at 40 CFR 232.2 defined ''fill material'' as ''any 'pollutant' which replaces portions of the 'waters of the United States' with dry land or which changes the bottom elevation of a water body *for any purpose''* (emphasis added). EPA's definition focused on the effect of the material (an effects-based test), rather than the purpose of the discharge in determining whether it would be regulated by section 404 or section 402.

*C. April 2000 Proposal*

These differing definitions of ''fill material'' have resulted in some confusion for some members of the regulated community which has not promoted effective implementation of the CWA. *See* 65 FR at 21294. As a result, in April 2000, the agencies proposed revisions to their respective definitions of ''fill material'' and ''discharge of fill material,'' adopting a single effects-based definition similar to that in EPA's regulations. The April 2000 proposed rule defined ''fill material'' as material that has the effect of replacing any portion of a water of the U.S. with dry land, or changing the bottom elevation of any portion of a water of the U.S. The agencies believe that an effects-based definition is, as a general matter, the most effective approach for identifying discharges that are regulated as ''fill material'' under section 404. Thus, the proposal removed from the Corps' definition the ''primary purpose'' test and the provision excluding pollutants discharged into water primarily to dispose of waste.

The April 2000 proposal also would have excluded from the definition discharges subject to an EPA proposed or promulgated effluent limitation guideline or standard under CWA sections 301, 304, 306, or discharges covered under a NPDES permit under CWA section 402. Finally, the April 2000 proposal solicited comments on the idea of the agencies creating an ''unsuitable fill'' category in the regulations that would identify materials that the Corps District Engineer could determine were not appropriate as fill material and, consequently, refuse to process an application seeking authorization to discharge such material.

In the preamble for the April 2000 proposal, the agencies discussed the need to address the confusion created by the agencies' differing definitions. While in practice some Corps Districts and EPA Regions have developed consistent approaches for determining whether proposed activities would result in a discharge of fill material, national uniformity will ensure better environmental results. Moreover, two judicial decisions discussed in the April 2000 proposal, *Resource Investments Incorporated* v. *U.S. Army Corps of Engineers*, 151 F. 3d 1162 (9th Cir. 1998) (''*RII*'') and *Bragg* v. *Robertson*, (Civil Action No. 2:98–636, S.D. W. Va.), *vacated on other grounds*, 248 F. 3d 275 (4th Cir. 2001) (''*Bragg*''), indicate that the differing EPA and Corps definitions can result in judicial decisions that further confuse the regulatory context. *See* 65 FR at 21294–95. The clarification in the April 2000 proposal was intended to promote clearer understanding and application of our regulatory programs.

With respect to the term ''discharge of fill material,'' the April 2000 proposal also included several clarifying changes. Unlike the definition of ''fill material,'' EPA's and the Corps' then-existing regulations defining the term ''discharge of fill material'' were substantively identical. The proposed changes to the term were intended to provide further clarification of the issue. Specifically, the proposal provided for adding two phrases to the definition: (1) ''Placement of fill material for construction or maintenance of liners, berms, and other infrastructure associated with solid waste landfills; and (2) ''placement of coal mining overburden.''

As summarized in more detail in the U.S. Army Corps of Engineers' and Environmental Protection Agency's Response to Comments on the April 20, 2000, Proposed Rule Revising the Clean Water Act Regulatory Definitions of ''Fill Material'' and ''Discharge of Fill Material,'' dated May 3, 2002 (''Response to Comments''), we received a number of comments addressing these proposed changes. The comments and the above-referenced document are part of the administrative record for this rule and are available from either agency. *See* the section entitled **FOR FURTHER INFORMATION CONTACT**.

**II. Discussion of Final Rule**

*A. Overall Summary of Comments*

We received over 17,200 comments on the proposed rule, including several hundred late comments, most of which consisted of identical or substantially identical e-mails, letters, and postcards opposing the rule. (In April 2002, an additional several thousand letters and e-mails were sent opposing the adoption of a rule similar to the proposal.) Approximately 500 of the original comments consisted of more individualized letters, with a mixture of those comments supporting and opposing the rule. The comments of environmental groups and the various form letters were strongly opposed to the proposal, in particular, the elimination of the waste exclusion and the discussion in the preamble regarding treatment of unsuitable fill material. Except for several landfill representatives, comments from the regulated community generally supported the proposal, in particular, the fact that the rule would create uniform definitions of ''fill material'' for the Corps'' and EPA's rules and maintain regulation of certain discharges under section 404 as opposed to section 402 of the CWA. A detailed discussion of the issues raised in the comments and the agencies' responses can be found in the Response to Comments document.

The April 2000 proposal would have achieved four major outcomes and these were the focus of many of the comments. These outcomes were (1) Conforming the EPA and Corps definitions of ''fill material'' to one another; (2) adopting an effects-based

test, as opposed to the Corps' primary purpose test, for defining ''fill material;'' (3) eliminating the waste exclusion from the Corps'' regulation; and (4) soliciting comments on whether to develop a definition for ''unsuitable fill material.'' A summary of comments relating to these four issues and our responses are discussed in section II.B of this preamble, which describes today's final rule.

In addition, comments asserted the need for the agencies to prepare an environmental impact statement (EIS) in order to comply with the National Environmental Policy Act; and questioned the consistency of the April 2000 proposal with the CWA, existing judicial decisions, and agency guidance documents. These comments are addressed in this section of the preamble.

With respect to the need for an EIS, many of the comments opposing the adoption of the rule argued that an EIS should have been prepared, particularly to address the impacts of eliminating the waste exclusion. Supporters of an EIS rejected the notion that the issues will be addressed in the individual permit situations. First, they pointed out that many of the mining activities have historically been permitted under the nationwide permit program where truncated environmental review occurs and no individual NEPA analysis is undertaken. Second, they argued that the cumulative impacts often are not appropriately addressed in this context. As described in section III. J of this final preamble and in the Response to Comments document, the agencies have concluded that preparation of an EIS is not required for this rule pursuant to NEPA. While supporters of an EIS suggest that finalizing this rule will result in significant new discharges that previously would not have occurred, that is not the case. Although the rule will clarify the appropriate regulatory framework, we do not expect there to be any significant change in the nature and scope of discharges that will occur.

Finally, a number of comments asserted that the proposal should not be finalized because it violated the then-existing law ( *e.g.*, CWA, *Bragg*, and *RII*). Other comments argued that the proposal was consistent with the CWA and current regulatory practice. We do not agree that the proposal or today's final rule violate the CWA or any other law. Moreover, we believe that agencies have an obligation to take whatever steps may be necessary, including making revisions to their regulations, to ensure that their programs are appropriately implementing statutory mandates. As indicated, the Corps and EPA believe that the current inconsistency between their respective definitions of ''fill material'' is impeding the effective implementation of the section 404 program. Under those circumstances, we believe that a change in the regulatory language is justified and that by adopting the substance of EPA's longstanding definition, we are minimizing potential confusion and disruption to the program, while remaining consistent with the CWA. We agree with those comments that recognize the consistency of our action with the CWA and current practice. As described in more detail in the Response to Comments document and sections II. B and D of this preamble, today's final rule clarifies the governing regulatory framework in a manner consistent with the CWA and existing practice.

*B. Discussion of the Final Rule*

1. Definition of ''Fill Material''

Today's final rule modifies both the EPA's and Corps' existing definitions of ''fill material'' and has retained the effects-based approach set forth in the proposal. The final rule defines ''fill material'' as material placed in waters of the U.S. where the material has the effect of either replacing any portion of a water of the United States with dry land or changing the bottom elevation of any portion of a water. The examples of ''fill material'' identified in today's rule include rock, sand, soil, clay, plastics, construction debris, wood chips, overburden from mining or other excavation activities, and materials used to create any structure or infrastructure in waters of the U.S. The proposed rule only specifically identified rock, earth and sand as examples, but the preamble made it clear that these were merely illustrative. In addition, in the preamble to the proposal, we indicated that wood chips, coal mining overburden, and similar materials would also constitute ''fill material'' if they had the effect of fill. As a result of questions raised in the comments about the scope of the term ''fill material,'' we have included additional examples in the final rule, several of which were discussed in the proposed preamble. We believe that these additional examples will further clarify the rule.

Although today's final rule adopts a general effects-based approach for defining ''fill material,'' it specifically excludes trash or garbage. Today's final rule does not modify any other Section 404 jurisdictional terms or alter any procedures governing the individual or general permit processes for Section 404 authorizations, requirements under Section 402, or the governing permit programs. Following is a summary of the actions that the agencies have taken in response to public comments.

*a. Reconciling Agencies' Definitions*

The majority of the comments from both the environmental and industry perspectives addressing the issue of whether the agencies should have identical definitions expressed the general view that the agencies should have the same definitions for the key jurisdictional terms ''fill material'' and ''discharge of fill material.'' Many of the comments also noted that the differences between the Corps' and EPA's rules have historically caused confusion for the regulated community. Several asserted that despite differences in the regulatory language, some Corps Districts have been applying an effects-based test for some time. As described in the Response to Comments document, the agencies agree with those comments supporting the promulgation in both the Corps' and EPA's regulations of a uniform definition for the terms ''fill material'' and ''discharge of fill material.'' Today's final rule achieves this result.

*b. Effects-Based Test*

Most of the comments supported the proposed rule's use of an effects-based test similar to EPA's longstanding definition for defining ''fill material'' and the elimination of the ''primary purpose'' test from the Corps regulations. Those disagreeing with such an approach gave a variety of reasons including, the lack of any demonstrated justification that eliminating the primary purpose test from the Corps' regulation was necessary; the existence of similar purpose tests in other statutes involving waste materials as well as in the Section 404(b)(1) Guidelines as demonstrating that such tests need not be unwieldy; the existence of alternative ways of addressing the issues of concern without resorting to this rule change; and concerns about the inappropriate expansion of section 404 jurisdiction. As will be explained, the agencies are not persuaded by these arguments.

First, we believe that the objective standard created by the effects-based test will yield more consistent results in determining what is ''fill material'' and will provide greater certainty in the implementation of the program. We believe that these benefits provide sufficient justification for today's rule change. In addition, although similar ''purpose'' tests may be used under other statutes and even under the section 404 program, this does not

negate the difficulties we have faced in applying the primary purpose test, as well as some confusion that has resulted from the use of the subjective primary purpose test in the section 404 jurisdictional context. An objective, effects-based standard also helps ensure that discharges with similar environmental effects will be treated in a similar manner under the regulatory program. The subjective, purpose-based standard led in some cases to inconsistent treatment of similar discharges, a result which hampers effective implementation of the statute.

Moreover, we believe there is an important distinction between the use of a purpose test here, where it determines the basic jurisdiction of the section 404 versus the section 402 program, and its use in the other contexts, such as in the evaluation of whether alternatives to a discharge of dredged material are "practicable" within the meaning of the section 404(b)(1) Guidelines. See 40 CFR 230.10(a)(2). The use of project purpose in the latter case is appropriate because it would make no sense to consider an alternative "practicable" if it did not satisfy the basic or overall purpose of the project proposed by the applicant. The definition of fill material, on the other hand, determines which legal requirements must be met for a discharge to be authorized under the statute. In that circumstance, we believe it is important to use an objective, effects-based test that ensures consistent treatment of like discharges, and prevents uncertainty for the regulated community as to what regulatory program applies to particular discharges. Moreover, we disagree that alternatives other than a rulemaking could have adequately addressed the agencies' concerns since the facial differences in our regulations could only be completely reconciled by revising the rules. In addition, the agencies previously had attempted to clarify their interpretation of the rules in a 1986 Memorandum of Agreement (MOA). Nevertheless, issues persisted.

Finally, we disagree that the rule causes an inappropriate expansion of section 404 jurisdiction. The CWA does not limit section 404 jurisdiction over fill material to materials meeting the primary purpose test. The "primary purpose test" is a regulatory definition and within the agencies province to modify as long as the modification is consistent with the CWA. In sum, as described in the Response to Comments document, the final rule, just as the proposal, adopts an effects-based approach to defining fill material. We believe the clarity and consistency created by the agencies relying on a more objective test for defining these key jurisdictional terms will result in more effective regulation under the CWA.

### c. Elimination of Waste Exclusion

Many comments opposed the proposal to eliminate the waste exclusion from the Corps' regulation. Some of these comments recommended that, in addition to the effects-based test, the agencies should include a general exclusion from the definition of "fill material" for any discharge of "waste." These comments asserted that such an approach provides the advantages of EPA's effects-based approach while more effectively implementing the Corps' exclusion of waste material from regulation under section 404. Some of the comments argued that the proposed rule's deletion of the waste exclusion language from the Corps' regulations violates the CWA. According to these comments, while waste material can permissibly be covered by section 404 when it is placed in waters for a beneficial purpose, the CWA categorically prohibits authorizing such discharges under section 404 when their purpose is waste disposal. These comments pointed to the decisions in *RII* and *Bragg* to argue that all waste material is outside the scope of section 404.

These comments do not object to, nor claim that the CWA prohibits, issuance of a section 404 permit for waste material discharged into waters of the U.S. under all circumstances. Where waste is discharged for a purpose other than waste disposal (e.g., to create fast land for development), these comments acknowledged that the Corps' issuance of a section 404 permit in accordance with the section 404(b)(1) Guidelines adequately protects the environment and is consistent with the CWA. On this point, we agree. However, where the identical material—with identical environmental effects—is discharged into waters for purposes of waste disposal, the comments contend that issuance of a section 404 permit in accordance with the Guidelines would neither protect the environment nor be allowed by the CWA. Here, we disagree.

Simply because a material is disposed of for purposes of waste disposal does not, in our view, justify excluding it categorically from the definition of fill. Some waste (e.g., mine overburden) consists of material such as soil, rock and earth, that is similar to "traditional" fill material used for purposes of creating fast land for development. In addition, other kinds of waste having the effect of fill (e.g., certain other mining wastes) can, unlike trash or garbage, be indistinguishable either upon discharge or over time from structures created for purposes of creating fast land. Given the similarities of some discharges of waste to "traditional" fill, we believe that a categorical exclusion for waste would be over-broad. Instead, where a waste has the effect of fill, we believe that regulation under the section 404 program is appropriate.

This does not mean, however, that today's rule opens up waters of the U.S. to be filled for any waste disposal purposes. As explained previously, today's rule is generally consistent with current agency practice and so it does not expand the types of discharges that will be covered under section 404. The section 404(b)(1) Guidelines provide for a demonstration that there are no less damaging alternatives to the discharge, and that all appropriate and practicable steps have been taken to avoid, minimize and compensate for any effects on the waters. We recognize that, some fill material may exhibit characteristics, such as chemical contamination, which may be of environmental concern in certain circumstances. This is true under either a primary purpose or effects based definition of fill material. The section 404 permitting process, however, is expressly designed to address the entire range of environmental concerns arising from discharges of dredged or fill material. See 40 CFR Part 230, subparts C–G (containing comprehensive provisions for addressing physical, chemical and biological impacts of discharges).

The 404(b)(1) guidelines provide a comprehensive means of evaluating whether any discharge of fill material, regardless of its purpose, is environmentally acceptable and therefore may be discharged in accordance with the CWA. Where the practicable alternatives test has been satisfied and all practicable steps have been taken both to minimize effects on the aquatic environment and to compensate for the loss of aquatic functions and values, we believe the section 404 permitting process is adequate to ensure protection of the aquatic ecosystem for any pollutant that fills waters. There is no environmental basis for contending that the sufficiency of the permitting process to protect waters of the U.S. depends on the purpose of the discharge.

The position reflected in some of the comments appears to be based on the contention that Congress did not intend for waste disposal to be a permissible purpose of discharging pollutants into waters of the U.S. While we agree that

Congress wanted to prevent utilization of waters as unlicensed dumping grounds for waste material, the Act as a whole is focused primarily on discharges of waste material, as shown by the Act's definition of pollutant, which includes solid waste, sewage, garbage, discarded equipment, industrial, municipal and agricultural waste. *See* CWA section 502(6). While the elimination of all discharges is an important goal of the Act (*see* CWA section 101(a)(1)), the Act seeks to meet that goal not by banning discharges of waste outright, but by imposing carefully tailored restrictions on discharges of pollutants based on factors such as the impact of the discharge on the receiving water, availability of treatment technologies, cost, and the availability of alternatives to the discharge. *See, e.g.*, CWA sections 301(b), 304(b) (requiring discharges to meet technology-based effluent limitations guidelines and standards); section 306(a)(1) (defining new source performance standard to include no discharge of pollutants "where practicable"); section 301(b)(1)(C) (requiring dischargers to comply with any more stringent limitations necessary to meet water quality standards); sections 404(b)(1) and 403(c)(1)(F) (requiring that 404(b)(1) Guidelines be based on section 403(c) criteria, which include consideration of "other possible locations" of disposal).

Nor do we think that there is any indication that Congress intended to exclude discharges for purposes of waste disposal entirely from coverage under section 404. For example, section 404 applies to "dredged material" (referred to as dredged "spoil" in the definition of pollutant in section 502(6)), which is typically discharged not for any beneficial purpose, but as a waste product from a dredging operation. Moreover, section 404(a) authorizes the Corps to issue permits for discharges of dredged or fill material at specified "disposal" sites. Congress' use of the word "disposal" supports the reasonableness of our view that regulating waste material having the effect of fill under section 404 is consistent with the Act.

We also disagree with the interpretation of some of the comments on the *RII* and *Bragg* decisions as mandating that the Corps retain the current exclusion of waste disposal in the definition of fill material. We note first that the decision of the district court in *Bragg* has been vacated by the Fourth Circuit on 11th amendment grounds. *Bragg* v. *Robertson*, 72 F. Supp. 2d 642 (S.D. W. Va. 1999), *rev'd*, 248 F. 3d 275 (4th Cir. 2001). In any event, both *Bragg* and *RII* applied the Corps' then-existing definition of fill material to conclude that certain discharges were not covered by section 404. Nothing in those decisions suggests that the Act itself precluded the regulation of waste materials with the effect of fill under section 404. See section II. D. of this preamble for further discussion of the *RII* decision. While we agree that trash or garbage generally should be excluded from the definition of fill material (for the reasons explained in section II.B.1d of this preamble), we do not agree that an exclusion for all waste is appropriate and have not included such a provision in today's rule. These issues are discussed in section II.B.1d of the preamble and are addressed more fully in the Response to Comments document.

*d. Trash or Garbage*

The agencies have added an exclusion for trash or garbage to the definition of "fill material" for several reasons. First, the preamble to the proposed rule and many of the comments recognized that trash or garbage, such as debris, junk cars, used tires, discarded kitchen appliances, and similar materials, are not appropriately used, as a general matter, for fill material in waters of the U.S. In particular, we agree that the discharge of trash or garbage often results in adverse environmental impacts to waters of the U.S. by creating physical obstructions that alter the natural hydrology of waters and may cause physical hazards as well as other environmental effects. We also agree that these impacts are generally avoidable because there are alternative clean and safe forms of fill material that can be used to accomplish project objectives and because there are widely available landfills and other approved facilities for disposal of trash or garbage.

Accordingly, a party may not obtain a section 404 permit to dispose of trash or garbage in regulated waters. Because the discharge of any pollutant into jurisdictional waters is prohibited under CWA section 301 except in accordance with a permit issued under sections 404 or 402, section 402 would govern such discharges. For many of the reasons identified in this preamble, such as the physical obstruction and hazards that such materials would create in waters of the U.S., we would emphasize that trash or garbage are unlikely to be eligible to receive a permit under the section 402 regulatory program. We also note that where such materials are placed in waters of the U.S. without a permit, EPA or an approved State/Tribal agency with permitting authority, remains the lead enforcement agency. Today's rule does not affect the application of section 402 of the CWA to discharges of pollutants other than fill material that may be associated with such things as solid waste landfill structures and mine impoundments. Where such structures release pollutants into waters of the U.S., a permit under section 402 of the CWA is required that will ensure protection of any downstream waters, including compliance with State water quality standards.

While the agencies have generally excluded materials characterized as trash or garbage from the definition of "fill material," we agree that there are very specific circumstances where certain types of material that might otherwise be considered trash or garbage may be appropriate for use in a particular project to create a structure or infrastructure in waters of the U.S. In such situations, this material would be regulated as fill material. Such material would have to be suitably cleaned up and not include constituents that would cause significant environmental degradation. An example would be where recycled porcelain fixtures are cleaned and placed in waters of the U.S. to create environmentally beneficial artificial reefs. Such material would not be considered trash or garbage and thus would not be subject to the exclusion. The agencies believe that this is appropriate, and even environmentally beneficial, in situations where (1) the otherwise excluded materials are being placed in waters of the U.S. in a manner consistent with traditional uses of fill material to create a structure or infrastructure, (2) the material's characteristics are suitable to the project purpose, and (3) the review under section 404 can effectively ensure that the material will not cause or contribute to significant environmental degradation.

We also note that as stated in the preamble to the proposal, it is important to draw a clear distinction between solid waste discharged directly into waters of the U.S. and sanitary solid waste landfills. With respect to solid waste landfills, the liners, berms, and other infrastructure that are constructed of fill materials in waters of the U.S. are regulated under section 404 of the CWA. In the case of a landfill that has received a section 404 permit for the placement of berms, dikes, liners and similar activities needed to construct the facility, the subsequent disposal of solid waste into the landfill, while subject to regulation under the RCRA, would not be subject to regulation under the CWA because the constructed facility is not waters of the U.S. As with current

practice, discharges of leachate from landfills into waters of the U.S. would remain subject to CWA section 402. Today's final rule does not change this general regulatory framework for landfills. *See* section II D of this preamble for further discussion.

*e. Unsuitable Fill Material*

With respect to developing a potential definition of ''unsuitable fill material,'' there was almost unanimous opposition to the unsuitable fill concept as discussed in the preamble. Some comments viewed it as an inadequate substitute for the elimination of the waste exclusion. Others argued that having an unsuitable fill provision would be a good idea but that it would need to be much broader and to specifically include mining-related wastes. These commenters also objected to leaving the question of whether something was ''unsuitable fill material'' to the discretion of the District Engineer. Some comments expressed concern that the definition of unsuitable fill material focused on materials that have a potential to leach or that have toxic constituents in toxic amounts. They argued that the definition could result in prohibiting activities that with appropriate permit terms and conditions potentially are allowable under section 404. They also argued that such issues should be addressed in the context of the permitting process and should not result in the permit application being rejected. As described in the Response to Comments document, the agencies have not included an unsuitable fill category in the final rule but, as discussed, the final rule does narrow the scope of ''fill material'' by excluding trash or garbage.

*f. Effluent Guideline Limitations and 402 Permits*

In addition to the changes already discussed in this preamble, today's final rule also deletes the exclusion contained in the proposal for discharges covered by effluent limitation guidelines or standards or NPDES permits. Several of the comments raised concerns that the exclusion included in the proposed definition for discharges covered by proposed or existing effluent limitation guidelines or standards or NPDES permits was vague and would result in uncertainty with respect to the regulation of certain discharges. Other comments stated that it was inappropriate for rule language to allow reliance on proposed effluent limitation guidelines or standards before they are promulgated as a final rule. In addition, including the language in the actual rule could raise questions as to whether the reference to effluent guidelines was meant to refer only to those in existence at the time today's rule was promulgated or whether the reference was prospective.

In light of the concerns and confusion associated with the proposed provision, we have decided to delete it from the rule. However, although we have removed the language in question from the rule itself, we emphasize that today's rule generally is intended to maintain our existing approach to regulating pollutants under either section 402 or 404 of the CWA. Effluent limitation guidelines and new source performance standards (''effluent guidelines'') promulgated under section 304 and 306 of the CWA establish limitations and standards for specified wastestreams from industrial categories, and those limitations and standards are incorporated into permits issued under section 402 of the Act. EPA has never sought to regulate fill material under effluent guidelines. Rather, effluent guidelines restrict discharges of pollutants from identified wastestreams based upon the pollutant reduction capabilities of available treatment technologies. Recognizing that some discharges (such as suspended or settleable solids) can have the associated effect, over time, of raising the bottom elevation of a water due to settling of waterborne pollutants, we do not consider such pollutants to be ''fill material,'' and nothing in today's rule changes that view. Nor does today's rule change any determination we have made regarding discharges that are subject to an effluent limitation guideline and standards, which will continue to be regulated under section 402 of the CWA. Similarly, this rule does not alter the manner in which water quality standards currently apply under the section 402 or the section 404 programs.

2. Definition of ''Discharge of Fill Material''

Most of the comments addressing ''discharge of fill material'' supported the inclusion of items related to solid waste landfills, although several asserted that the regulation of discharges associated with solid waste landfills was inconsistent with the court's decision in *Resource Investments Inc.* v. *U.S. Army Corps of Engineers,* 151 F.3d 1162 (9th Cir. 1998). See detailed discussion in section II. D of this final preamble. With respect to the placement of coal mining overburden, two diametrically opposed views were reflected in the comments. Many of the comments argued that coal overburden was ''waste'' material and that allowing such discharges was a violation of the CWA. In contrast, other comments argued that focusing on ''coal mining overburden'' was confusing, because it created the impression that the overburden or similar materials from other mining processes may not be regulated as ''discharges of fill material.''

Today's final rule responds to the comments in the following ways. First, the agencies continue to agree with those comments that supported including the placement of material associated with construction and maintenance of solid waste landfills and related facilities in the discharge of fill material. For the reasons discussed in section II. D of this final preamble and in the Response to Comments document, we do not agree that we are precluded by the *RII* decision from issuing a rule that defines ''fill material'' or the ''discharge of fill material'' as encompassing discharges associated with the construction of solid waste landfill infrastructures. Second, the agencies have modified the ''placement of coal mining overburden'' to read ''placement of overburden, slurry, or tailings or similar mining-related materials.'' The language in today's final rule will clarify that any mining-related material that has the effect of fill when discharged will be regulated as ''fill material.'' We made this clarification because it was clear from the comments that some were reading the examples we identified as an exclusive list. The general intent of this rule is to cover materials that have the effect of fill, not simply to focus on any one industrial activity. We believe that the additional mining related examples will address the confusion reflected in the comments. Finally, as discussed in section II.B.1.c of this preamble, we do not agree that the CWA contains a blanket prohibition precluding discharges of ''waste'' materials in to waters of the U.S. Instead, the Act establishes the framework for regulating discharges into waters and we believe the section 404 program is the most appropriate vehicle for regulating overburden and other mining-related materials. Several other minor changes, editorial in nature, have also been made in today's final rule.

*C. Appropriate Reliance on the Environmental Reviews Conducted by Other Federal or State Programs*

As indicated, today's rule is designed to improve the effective implementation of the section 404 program by having the Corps and EPA adopt a single, uniform definition for these key jurisdictional terms. We also believe

that we can improve the effective implementation of the program by placing greater emphasis on coordination among the Federal agencies and with relevant State and Tribal programs. There are numerous examples of where the agencies can effectively work together and with other State, Tribal and Federal programs in the review of proposed projects that involve a section 404 discharge to jointly develop information that is relevant and reliable. Projects involving discharges to waters of the U.S. are often subject to review under other Federal and State permit programs, including the RCRA, the Surface Mining Control and Reclamation Act (SMCRA), the Coastal Zone Management Act (CZMA), CWA Section 402 NPDES, and others. Examples where closer coordination may be beneficial include the review of proposed solid waste landfills under the CWA and RCRA, proposed highway projects under the CWA and NEPA, proposed mining projects under the CWA and SMCRA, and proposed coastal restoration projects under the CWA and CZMA.

As EPA and the Corps implement today's rule, we will be placing even greater emphasis on effective coordination with other relevant State, Tribal and Federal programs and, consistent with our legal responsibilities, on reliance, as appropriate, on the information developed and conclusions reached by other agencies to support the decisions required under these programs and ours. We are confident that this coordination will serve to make the implementation of today's rule and, more broadly, the CWA section 404 program, more effective, consistent and environmentally protective.

Some comments expressed concern that an effects-based approach to the definition of "fill material" would result in a duplication of effort among Federal programs and an increased workload for the Corps. We believe that more effective coordination among the State, Tribal and Federal agencies and appropriate reliance on the analyses of other agencies will help significantly to address these concerns.

First, it is important to note that EPA and Corps regulations encourage coordination and allow for appropriate reliance on relevant information and analyses developed under other programs to help satisfy section 404 program requirements. In the most effective circumstances, the Corps is able to coordinate with other relevant State, Tribal and Federal agencies before and during project review to identify the most efficient and effective role for each agency and ensure mutual reliance on information and analyses, particularly where that reliance is consistent with individual agency expertise and experience. For example, for many years, subject to advice from EPA, the Corps has relied on State determinations regarding water quality matters, as those State determinations are reflected in State CWA section 401 water quality certifications (see 33 CFR 320.4(d)). Such Corps reliance on State water quality determinations will continue for discharges associated with activities such as mining and solid waste landfills. In regulating discharges associated with mining, close coordination with the State, Tribal and Federal entities responsible for implementation of SMCRA, CWA section 401 and section 402 will enable the Corps to take advantage of the specialized expertise of the agencies as the Corps completes the section 404 review. Such coordination also helps to reduce the costs associated with project reviews, promotes consistent and predictable decision-making, and ultimately ensures the most effective protection for human health and the environment. EPA and the Corps anticipate that Corps District offices will rely on State/Federal site selection under SMCRA regarding the siting of coal mining related discharges to the extent allowed under current law and regulations. Similarly, the Corps will make full use of State RCRA information regarding the siting, design and construction of solid waste landfills, and will defer to those State decisions to the extent allowed by current law and regulation.

Both agencies recognize, however, that the Corps is ultimately responsible under the CWA for making the required determinations that support each permit decision based on the Corps' independent evaluation of the record. The Corps itself determines the extent of deference to information generated from other programs including, for example, site selection under SMCRA and RCRA, that is appropriate on a case-by-case basis. Ultimately the Corps is relying on, rather than relinquishing to, these other sources of information as a record is developed and the Corps makes the determinations required by the Section 404 regulatory program. For example, the Corps will make full use of State site selection decisions under SMCRA (*e.g.,* coal slurry impoundments) and RCRA (*e.g.,* solid waste landfills), but the Corps will independently review those decisions and the State processes that generated them, to ensure that any Corps permit decision for a discharge site will fully comply with NEPA, the section 404(b)(1) Guidelines, and other relevant legal requirements. The Corps and EPA believe that effective coordination with other State and Federal agencies and the information they develop will help the Corps continue to make more timely, consistent and environmentally protective permit decisions.

*D. The Final Rule and the Resource Investments Decision*

In *Resource Investments Inc* v. *Corps,* 151 F.3d 1162 (9th Cir. 1998), the Ninth Circuit held that the Corps lacked the authority to regulate a solid waste landfill in waters of the U.S. The court found that: (1) Neither the solid waste itself nor the liner consisting of layers of gravel and low-permeability soil constituted "fill material" under Corps regulations; and (2) because of the potential for inconsistent results if landfills were regulated under both section 404 of the CWA and Subtitle D of RCRA, requiring these facilities to be subject solely to RCRA would "harmonize" the statutes.

We discussed this decision in the preamble to the proposed rule as an example of some of the confusion engendered by the "primary purpose" test. The court found in *RII* that the liner was not fill material because its primary purpose was not to replace an aquatic area with dry land or change the bottom elevation of a waterbody, "but rather to serve as a leak detection and collection system." 151 F.3d at 1168. We explained in the proposal that fills typically serve some other purpose than just creating dry land or raising a water's bottom elevation and that, if the court's reasoning were taken to its logical conclusion, many traditional fills in waters of the U.S. would not be subject to section 404.

Some commenters objected to our proposal not to follow the decision in *RII* in this rulemaking. They criticized the proposal as an improper attempt to "override" or "overrule" the Ninth Circuit's decision, particularly within the Ninth Circuit where the decision is binding. They also argued that the proposed rule failed to address the potential for duplication and inconsistency in decision-making by State and Federal agencies identified in *RII.*

In our view, these comments raise two distinct issues. The first is whether we should follow the *RII* decision outside the Ninth Circuit and cease regulating discharges associated with the construction of solid waste landfills under section 404. The second issue is whether *RII* precludes us from

regulating discharges associated with construction of solid waste landfill structures within the Ninth Circuit, even after today's rule. We address each of these issues in turn.

Regarding the first question, we note first that, after *RII* was decided, we chose not to acquiesce in the decision outside the Ninth Circuit. While we agreed that the solid waste disposal placed in a landfill is not fill material (and such waste continues to be excluded under today's rule), we believed that the court misapplied the primary purpose test in the Corps' regulations, and that the court's conclusion that RCRA supplanted CWA regulation was contrary to Congressional intent. See *Resource Investments Inc. et al.* v. *Corps,* No. 97–35934 (Government's Petition for Rehearing and Suggestion for Rehearing En Banc, September 30, 1998). Thus, after the court decided *RII,* the Corps has continued to issue section 404 permits for the construction of solid waste landfill infrastructures outside the Ninth Circuit.

After considering public comments, we continue to decline to follow *RII* outside the Ninth Circuit and have, therefore, maintained the approach in the proposed rule to the regulation of solid waste landfills. The revisions to the Corps' definition of fill material in today's rule address the basis for the court's holding that the landfill did not involve the discharge of fill material under section 404. For the reasons explained elsewhere in today's notice, we believe that an effects-based test is the appropriate means of evaluating whether a pollutant is "fill material" and should be regulated under section 404 as opposed to section 402 of the CWA. The placement of berms, liners and other infrastructure (such as roads) associated with construction of a solid waste landfill in waters of the U.S. has the effect of replacing water with dry land or raising the bottom elevation of a water. Therefore, under today's rule, they constitute fill material. Such discharges are indistinguishable from similar discharges associated with other construction activity, which the Corps has always regulated as fill under section 404. *See* 40 CFR 232.2; 33 CFR 323.2 (defining "discharge of fill material," to include "fill that is necessary for the construction of any structure in a water of the U.S.; the building of any structure or impoundment requiring rock, sand, dirt or other material for its construction; site-development fills for recreational, industrial, commercial, residential and other uses; causeways or road fills; * * *"). We have amended our definition of this term to include the "placement of fill material for construction or maintenance of any liner, berm, or other infrastructure associated with solid waste landfills." That amendment does not change substantively the prior definition, but merely adds solid waste landfills as an example to make clear that it constitutes a "discharge of fill material." Thus, under our new regulations, discharges associated with the creation of solid waste landfill structures clearly constitute "fill material."

To the extent some commenters asserted that revising our regulation was an improper attempt to "overrule" or "override" this holding in *RII,* we disagree. The court's analysis of the "fill material" in *RII* was based entirely on the Corps regulations as they existed at that time, and not upon the interpretation of the CWA itself. Moreover, the CWA does not define "fill material." Therefore, both the statute and the Ninth Circuit's decision leave us the discretion to adopt a reasonable definition consistent with the statutory scheme. We have explained elsewhere why we believe today's definition of fill is reasonable and appropriate under the CWA. To the extent today's rule has the practical effect of "overriding" this aspect of the court's decision in *RII,* that is neither remarkable nor inappropriate, since it is entirely proper for agencies to consider and, if appropriate, revise their regulations in light of judicial interpretation of them.

For purposes of deciding whether to apply the *RII* decision outside the Ninth Circuit, we have also evaluated the second basis for the court's decision—that regulation solely under Subtitle D of RCRA instead of section 404 would "harmonize" the statutes and avoid necessary duplication. We decline to follow that holding both on legal and policy grounds. First, we believe, notwithstanding *RII,* that eliminating the CWA permitting requirement on the grounds that an activity is regulated under RCRA is contrary to Congressional intent in both statutes. Second, we do not agree with the court that regulation under Subtitle D and section 404 would constitute unnecessary duplication, in light of the distinct purposes served by these authorities, the differing Federal roles under the two statutes, and our clarification in today's rulemaking of our intent to give all appropriate deference to State RCRA decision-making in the section 404 permitting process.

We first do not agree with the court's legal reasons for concluding that regulation under Subtitle D of RCRA supplants CWA regulation. The CWA prohibits the discharge of any pollutant into waters of the U.S. without a permit under the Act. *See* CWA section 301(a). Even though an activity associated with a discharge may be regulated under other Federal or State authorities, we believe there is not any basis to conclude that such regulation by itself makes section 301(a) of the Act inapplicable to a discharge of a pollutant into waters of the U.S. In effect, the court concluded that enactment of a regulatory scheme under Subtitle D of RCRA impliedly repealed the statutory permit requirement under the CWA. But "the intention of the legislature to repeal must be clear and manifest." *Radzanower* v. *Touche Ross & Co.,* 426 U.S. 148, 154 (1976), and the court must conclude that the two acts are in irreconcilable conflict or that the later act covers the whole subject of the earlier one and is clearly intended as a substitute. *Id.* The court in *RII* did not, and could not, make these findings.

In fact, Congress itself made precisely the opposite findings when it enacted RCRA. Section 1006(a) states:

Nothing in this chapter shall be construed to apply to (or to authorize any State, interstate, or local authority to regulate) any activity or substance which is subject to the [CWA] except to the extent such application (or regulation) is not inconsistent with the requirements of (the CWA).

This provision precludes regulation of solid waste landfills under Subtitle D in a manner inconsistent with the requirements of the CWA. In our view, it is plainly "inconsistent" with the requirements of the CWA to hold that regulation under RCRA eliminates CWA permitting requirement altogether.

Instead, the court relied upon certain Corps regulations, statements by Corps officials and a 1986 interagency MOA. The court first stated that applying section 404 to solid waste landfills was "unreasonable" because there would be "potentially inconsistent results" where both the State and the Corps were applying the same criteria in regulating solid waste landfills. 151 F.3d at 1169. The court held that this "regulatory overlap is inconsistent with Corps regulations stating that "the Corps believes that State and Federal regulatory programs should complement rather than duplicate one another.'" 33 CFR 320.1(a)(5). In addition, the court cited statements by the Corps in a 1984 letter to EPA stating that EPA was in a better position than the Corps to regulate solid waste landfills. Finally, the court cited the 1986 MOA between the Corps and EPA.

However, none of these "authorities" purport to modify the statutory

permitting requirements of the CWA, nor could they. The Corps' regulation cited by the court is simply a statement of the Corps' policy objective of working in concert with State regulatory programs, an important and continuing Corps objective that was discussed previously. The Corps' letter and the MOA reflected our efforts to manage our programs in light of our differing definitions of fill material, but did not speak to the CWA statutory permitting requirement. The court also misconstrued the 1986 MOA entered into by EPA and the Corps as indicating we intended to make the regulation of solid waste facilities within ''the sole purview of the EPA and affected states'' after EPA promulgated certain Subtitle D regulations. 151 F.3d at 1169. In fact, we stated,

> EPA and Army agree that consideration given to the control of discharges of solid waste both in waters of the United States and upland should take into account the results of studies being implemented under the 1984 Hazardous and Solid Waste Amendments (HSWA) to the Resource Conservation and Recovery Act (RCRA), signed into law on November 8, 1984. . . .
>
> Unless extended by mutual agreement, the agreement will expire at such time as EPA has accomplished specified steps in its implementation of RCRA, at which time the results of the study of the adequacy of the existing Subtitle D criteria and proposed revisions to the Subtitle D criteria for solid waste disposal facilities, including those that may receive hazardous household wastes and small quantity generator waste, will be known. In addition, data resulting from actions under the interim agreement can be considered at that time.

It should be noted that this MOA is about the regulation of solid waste disposal, not about the construction of infrastructure, including solid waste landfill infrastructure, that involves discharges of fill material to waters of the U.S. We did not address in the MOA how solid waste landfills would be regulated after EPA completed its study and certain RCRA regulations, but said only that these developments would ''be taken into account'' as we decided how to address these discharges in the future. Thus, in addition to the inability of the agencies as a legal matter to modify the CWA statutory permitting requirement through an MOA, we expressly reserved any judgment about the appropriate regulatory approach to be taken after certain actions were taken under RCRA. The court appears to have assumed that the MOA expired after we completed the specified steps under RCRA, and that regulatory authority over solid waste landfills thereafter became the sole purview of RCRA. In fact, the MOA did not expire, and it has continued to provide the framework for regulation of solid waste landfills under section 404 of the CWA. See Memorandum of John F. Studt, U.S. Army Corps of Engineers, May 17, 1993 (stating ''the subject MOA remains effective in its entirety until further notice'' and noting that this position was coordinated with EPA).

We conclude, therefore, that it would be contrary to the language and intent of both the CWA and RCRA to conclude that RCRA subtitle D supplants the CWA permitting requirement for discharges into waters of the U.S. associated with the construction of solid waste landfills. The different Federal roles in the permitting schemes in these statutes supports this conclusion. Subtitle D provides that each State will ''adopt and implement a permit program or other system of prior approval and conditions'' to assure that each solid waste management facility within the State ''will comply'' with criteria established by EPA for the siting, design, construction, operation and closure of solid waste landfills. RCRA section 4005(c)(1)(B). States are required to submit permit programs for EPA to review and EPA is required to ''determine whether each State has developed an adequate program'' to ensure compliance with EPA's Subtitle D regulations. RCRA section 4005(c)(1)(B) and (C). However, RCRA does not grant to EPA authority to issue permits for solid waste landfills, review State permitting decisions or enforce Subtitle D requirements in States with approved programs. The court in *RII* appeared to misunderstand EPA's authorities under Subtitle D of RCRA when it stated that EPA would be the permitting authority in the absence of an approved State program. *See* 151 F.3d 1169 (''we hold that when a proposed project affecting a wetlands area is a solid waste landfill, the *EPA* (or the approved State program) . . . will have the permit authority under RCRA.'') (Emphasis added); 151 F.3d at 1167 (''RCRA gives the EPA authority to issue permits for the disposal of solid waste, but allows states to substitute their own permit programs for the Federal program if the State program is approved by EPA.''). While this authority exists with regard to disposal of hazardous waste under Subtitle C of RCRA, EPA does not have this authority with regard to disposal of non-hazardous solid waste under Subtitle D.

In contrast, the CWA requires either a Federal permit for discharges of pollutants into waters of the U.S., or issuance of a permit by a State/Tribe with an approved program, subject to EPA's authority to object to a permit where EPA finds it fails to meet the guidelines and requirements of the CWA. CWA sections 402(d); 404(j). EPA also has authority under the CWA to enforce conditions in Federal or State permits under the Act. CWA section 309.

These contrasting statutory schemes support the conclusion that eliminating CWA authority over discharges of fill material associated with construction of solid waste landfills would mean a significant departure from the statutory structure created by Congress in the CWA, a scheme which Congress expressly sought to preserve when it adopted RCRA. *See* RCRA section 1006(a). This does not mean that we view the Federal role as one of second-guessing every decision made by State regulatory authorities under RCRA. To the contrary, both RCRA and the CWA reflect a strong presumption in favor of State-administered regulatory programs. As discussed elsewhere, we intend to rely on State decision-making under RCRA to the extent allowed under current law and regulations. However, we believe that eliminating a Federal role entirely on these matters is neither appropriate nor consistent with Congressional intent under RCRA or the CWA.

Thus, we decline to follow the decision in *RII* outside the Ninth Circuit because we conclude there is not an adequate legal basis on which to conclude that discharges of pollutants associated with solid waste landfills no longer need to be authorized by a CWA permit solely because the project receives a permit under Subtitle D of RCRA.

We nonetheless share the basic policy perspective expressed by the court in *RII* about the need to avoid unnecessary duplication and potential inconsistent application of regulatory programs under the CWA and RCRA. In fact, RCRA expressly vests EPA with the responsibility to ''integrate all provisions of (RCRA) for purposes of administration and enforcement and (to) avoid duplication, to the maximum extent practicable, with the appropriate provisions of the * * * (CWA). * * * Such integration shall be effected only to the extent that it can be done in a manner consistent with the goals and policies of this chapter and the CWA. * * *'' RCRA section 1006(b). EPA has sought such integration first by promulgating location restrictions for landfills that are consistent with the criteria for issuance of section 404 permits. See 40 CFR 258.12; 230.10. Among other requirements, a landfill may not be located in wetlands unless it is demonstrated to the State that there

are not less environmentally damaging practicable alternatives, the facility will not cause significant degradation of wetlands, and that appropriate and practicable steps have been taken to mitigate the loss of wetlands from the facility. However, EPA never purported to substitute Subtitle D regulation for the CWA permitting requirement, a result that would violate both section 1006(a) and (b). Instead, the Subtitle D RCRA regulations make clear that owners or operators of municipal solid waste landfills "must comply with any other applicable Federal rules, laws, regulations, or other requirements." 40 CFR 258.3. At the time EPA promulgated this regulation, the agency expressly noted that such requirements include those arising under the CWA. *See* 56 FR 51042 (October 9, 1991).

We do not believe, however, that the Subtitle D and section 404 programs are redundant. Rather, each program has a distinct focus. The State RCRA permitting process addresses a much broader range of issues, including technical operating and design criteria, ground water monitoring, corrective action, closure and post-closure care and financial assurances. In contrast, the section 404 process is focused exclusively on the impacts of discharges of dredged or fill material on the aquatic ecosystem, and ways of ensuring that those impacts are avoided, minimized and compensated. Because of the Corps' expertise in protecting aquatic ecosystems, we have found that State RCRA permitting agencies often incorporate by reference the requirements of section 404 permits. (For example, the State RCRA permit for the *RII* landfill required the applicant to implement the wetlands and mitigation plan to be approved by the Corps through the 404 permit process.) We believe that, in these and other ways, State and Federal permitting authorities can create efficiencies by relying on each other's expertise in making regulatory decisions.

We intend to make additional efforts to avoid unnecessary duplication in the Federal and State permitting process. As explained in section II. C of this final preamble, we intend that the Corps will rely on decisions by the State RCRA authority about the siting, design and construction of solid waste landfills in waters of the U.S. to the extent allowed by law and regulations. Appropriate deference to State decision-making will help avoid duplication, while still ensuring that the Corps fulfills its responsibilities to authorize discharges of fill material associated with solid waste landfills in accordance with CWA requirements.

This does not mean that, in every single case, State and Federal decision-makers will agree on whether a particular project or configuration is environmentally acceptable. Nevertheless, instances of disagreement have been rare. We intend to further enhance our efforts to ensure effective coordination between State and Federal officials. However, we do not agree with the court in *RII* that the only way to avoid unnecessary duplication is to eliminate the CWA permitting requirement altogether.

We next address commenters' assertions that the decision in *RII* continues to preclude us from regulating solid waste landfills under section 404 within the Ninth Circuit. These comments also argue that, given the "statutory" basis for the court's decision, we cannot change the result in the Ninth Circuit through this rulemaking.

As noted in this preamble, the court construed administrative materials of the Corps and EPA as supporting the conclusion that the agencies did not intend to regulate solid waste landfills under section 404 of the CWA. In light of this agency intent, the court concluded that subjecting landfills to regulation solely under RCRA would "harmonize" the statutes and "give effect to each [statute] while preserving their sense and purpose." 151 F.3d at 1169. The court found that this harmonization "is consistent with the sense of the CWA that discharges of solid waste materials are beyond the scope of section 404 . . . and avoids unnecessary duplication of Federal and State efforts in the area of wetlands protection." *Id.*

We again emphasize the distinction between "discharges of solid waste material," as referenced by the court and discharges of fill material associated with the construction of infrastructure. In this rulemaking, we have clarified that discharges having the effect of raising the bottom elevation of a water or replacing water with dry land, including fill used to create landfills such as liners, berms and other infrastructure associated with solid waste landfills are discharges of fill material subject to the section 404 program. Therefore, we have altered the landscape as understood by the court in *RII* (i.e., that these facilities were entirely outside the intended purview of section 404). We do not agree with commenters who argued that there was a "statutory" basis to the court's decision in the sense that the holding of the decision turned on an interpretation of Congressional intent in the CWA or RCRA. The court did not cite any provision of the CWA or RCRA to support its conclusions. Rather, the court derived the "sense and purpose" of the CWA based on agency regulations, guidance and correspondence. By clarifying the scope of section 404 authorities in this rulemaking, we have altered the "sense and purpose" of the CWA underlying the court's conclusion that regulation solely under RCRA would "harmonize" the statutes. Because the premises before the court have changed, we do not view the court's decision as continuing to bar the regulation under section 404 of discharges associated with solid waste landfills within the Ninth Circuit. At a minimum, today's rule calls into question the continuing vitality of the court's reasoning and conclusions and, should a case be brought within the Ninth Circuit challenging our authority to regulate solid waste landfills, we would ask the court to address the question anew in light of the clarification of our authorities in today's rule.

### III. Administrative Requirements

#### A. Plain Language

In compliance with the principle in Executive Order 12866 regarding plain language, this preamble is written using plain language. Thus, the use of "we" in this notice refers to EPA and the Corps, and the use of "you" refers to the reader. We have also used active voice, short sentences, and common every day terms except for necessary technical terms.

#### B. Paperwork Reduction Act

This action does not impose any new information collection burden under the provisions of the Paperwork Production Act, 44 U.S.C. 3501 *et seq.* This rule merely reconciles EPA and Corps CWA section 404 regulations defining the term "fill material" and amends our definitions of "discharge of fill material." Thus, this action is not subject to the Paperwork Reduction Act.

Burden means the total time, effort, or financial resources expended by persons to generate, maintain, retain, or disclose or provide information to or for a Federal agency. This includes the time needed to review instructions; develop, acquire, install, and utilize technology and systems for the purposes of collecting, validating, and verifying information, processing and maintaining information, and disclosing and providing information; adjust the existing ways to comply with any previously applicable instructions and requirements; train personnel to be able to respond to a collection of

information; search data sources; complete and review the collection of information; and transmit or otherwise disclose the information.

An Agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. The OMB control numbers for EPA's regulations are displayed in 40 CFR part 9 and 48 CFR chapter 15. For the CWA section regulatory 404 program, the current OMB approval number for information requirements is maintained by the Corps of Engineers (OMB approval number 0710–0003, expires December 31, 2004).

*C. Executive Order 12866*

Under Executive Order 12866 (58 FR 51735, October 4, 1993), EPA and the Corps must determine whether the regulatory action is ''significant'' and therefore subject to review by the Office of Management and Budget (OMB) and the requirements of the Executive Order. The Order defines ''significant regulatory action'' as one that is likely to result in a rule that may:

(1) Have an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or Tribal governments or communities;

(2) Create a serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(3) Materially alter the budgetary impact of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(4) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive Order.

Pursuant to the terms of Executive Order 12866, it has been determined that this rule is a ''significant regulatory action'' in light of the provisions of paragraph (4) above. As such, this action was submitted to OMB for review. Changes made in response to OMB suggestions or recommendations will be documented in the public record.

*D. Executive Order 13132*

Executive Order 13132, entitled ''Federalism'' (64 FR 43255, August 10, 1999), requires EPA and the Corps to develop an accountable process to ensure ''meaningful and timely input by State and local officials in the development of regulatory policies that have Federalism implications.'' ''Policies that have Federalism implications'' is defined in the Executive Order to include regulations that have ''substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government.''

This final rule does not have Federalism implications. It will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government, as specified in Executive Order 13132. Currently, under the CWA, any discharge of pollutants into waters of the U.S. requires a permit under either section 402 or 404 of the CWA. Today's rule conforms our two regulatory definitions of ''fill material'' and thereby clarifies whether a particular discharge is subject to regulation under section 402 or Section 404. It is generally consistent with current agency practice and does not impose new substantive requirements. Within California, Oregon, Washington, Idaho, Wyoming, Nevada, Arizona, Hawaii, Guam, and the Northern Mariana Islands, after today's rule, the Corps will again be issuing Section 404 permits for the construction of solid waste landfills in waters of the U.S., which the Corps had ceased doing after the decision in *RII* (the decision did not affect the permitting requirement outside these states). *See* section II. D. of this preamble. However, resuming the issuance of section 404 permits for construction of solid waste landfills in waters of the U.S. in these areas does not have Federalism implications. None of the States within the Ninth Circuit will incur administrative costs as a result of today's rule, because none currently administer the section 404 program and, in any event, the administrative costs of permitting solid waste landfills are minimal in the context of the overall section 404 permitting program. In addition, this change does not impose any additional substantive obligations on State or local governments seeking to construct solid waste landfills in waters of the U.S. since Subtitle D of RCRA currently requires such facilities to meet comparable conditions for receiving a section 404 permit. *See* section II. D of this preamble. Finally, we do not believe that requiring any State or local governments seeking to construct solid waste landfills in waters of the U.S. to undergo the Section 404 permitting process itself will have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Thus, Executive Order 13132 does not apply to this rule.

*E. Regulatory Flexibility Act (RFA), as Amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), 5 U.S.C. 601 et seq.*

The RFA generally requires an agency to prepare a regulatory flexibility analysis of any rule subject to notice-and-comment rulemaking requirements under the Administrative Procedure Act or any other statute unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. Small entities include small businesses, small organizations and small governmental jurisdictions.

For purposes of assessing the impacts of today's rule on small entities, a small entity is defined as : (1) A small business based on SBA size standards; (2) a small governmental jurisdiction that is a government of a city, county, town, school district, or special district with a population of less than 50,000; and (3) a small organization that is any not-for-profit enterprise which is independently owned and operated and is not dominant in its field.

After considering the economic impacts of today's final rule on small entities, we certify that this action will not have a significant economic impact on a substantial number of small entities. Currently, under the CWA, any discharge of pollutants into waters of the U.S. requires a permit under either section 402 or 404 of the CWA. Today's rule conforms our two regulatory definitions of ''fill material'' and thereby clarifies whether a particular discharge is subject to regulation under section 402 or section 404. Today's rule is generally consistent with current agency practice, does not impose new substantive requirements and therefore would not have a significant economic impact on a substantial number of small entities.

*F. Unfunded Mandates Reform Act*

Title II of the Unfunded Mandates Reform Act of 1995 (UMRA), Public Law 104–4, establishes requirements for Federal agencies to assess the effects of their regulatory actions on State, local, and Tribal governments and the private sector. Under section 202 of the UMRA, the agencies generally must prepare a written statement, including a cost-benefit analysis, for proposed and final rules with ''Federal mandates'' that may result in expenditures to State, local,

and Tribal governments, in the aggregate, or to the private sector, of $100 million or more in any one year. Before promulgating an EPA or Corps rule for which a written statement is needed, section 205 of the UMRA generally requires the agencies to identify and consider a reasonable number of regulatory alternatives and adopt the least costly, most cost-effective or least burdensome alternative that achieves the objectives of the rule. The provisions of section 205 do not apply when they are inconsistent with applicable law. Moreover, section 205 allows EPA and the Corps to adopt an alternative other than the least costly, most cost-effective or least burdensome alternative if the Administrator and Secretary of the Army publish with the final rule an explanation why that alternative was not adopted. Before EPA or the Corps establishes any regulatory requirements that may significantly or uniquely affect small governments, including Tribal governments, they must have developed under section 203 of the UMRA a small government agency plan. The plan must provide for notifying potentially affected small governments, enabling officials of affected small governments to have meaningful and timely input in the development of EPA or Corps regulatory proposals with significant Federal intergovernmental mandates, and informing, educating, and advising small governments on compliance with the regulatory requirements.

We have determined that this rule does not contain a Federal mandate that may result in expenditures of $100 million or more for State, local, and Tribal governments, in the aggregate, or the private sector in any one year. Currently, under the CWA, any discharge of pollutants into waters of the U.S. requires a permit under either section 402 or 404 of the CWA. Today's rule conforms our two regulatory definitions of ''fill material'' and thereby clarifies whether a particular discharge is subject to regulation under section 402 or section 404. Today's rule is generally consistent with current agency practice, does not impose new substantive requirements and therefore does not contain a Federal mandate that may result in expenditures of $100 million or more for State, local, and Tribal governments, in the aggregate, or the private sector in any one year. Thus, today's rule is not subject to the requirements of sections 202 and 205 of the UMRA. For the same reasons, we have determined that this rule contains no regulatory requirements that might significantly or uniquely affect small governments. Thus today's rule is not subject to the requirements of section 203 of UMRA.

*G. National Technology Transfer and Advancement Act*

As noted in the proposed rule, Section 12(d) of the National Technology Transfer and Advancement Act of 1995 (the NTTAA), Public Law 104–113, section 12(d) (15 U.S.C. 272 note) directs us to use voluntary consensus standards in our regulatory activities unless to do so would be inconsistent with applicable law or otherwise impractical. Voluntary consensus standards are technical standards (*e.g.,* materials specifications, test methods, sampling procedures, and business practices) that are developed or adopted by voluntary consensus standards bodies. The NTTAA directs us to provide Congress, through OMB, explanations when we decide not to use available and applicable voluntary consensus standards.

This rule does not involve technical standards. Therefore, we did not consider the use of any voluntary consensus standards.

*H. Executive Order 13045*

Executive Order 13045: ''Protection of Children from Environmental Health Risks and Safety Risks'' (62 FR 19885, April 23, 1997) applies to any rule that: (1) Is determined to be ''economically significant'' as defined under Executive Order 12866, and (2) concerns an environmental health or safety risk that we have reason to believe may have a disproportionate effect on children. If the regulatory action meets both criteria, we must evaluate the environmental health or safety effects of the planned rule on children, and explain why the planned regulation is preferable to other potentially effective and reasonably feasible alternatives considered by us.

This final rule is not subject to the Executive Order because it is not economically significant as defined in Executive Order 12866. In addition, it does not concern an environmental or safety risk that we have reason to believe may have a disproportionate effect on children.

*I. Executive Order 13175*

Executive Order 13175, entitled ''Consultation and Coordination with Indian Tribal Governments'' (65 FR 67249, November 6, 2000), requires the agencies to develop an accountable process to ensure ''meaningful and timely input by tribal officials in the development of regulatory policies that have tribal implications.'' ''Policies that have tribal implications'' is defined in the Executive Order to include regulations that have ''substantial direct effects on one or more Indian tribes, on the relationship between the Federal government and the Indian tribes, or on the distribution of power and responsibilities between the Federal government and Indian tribes.''

Today's rule does not have tribal implications. It will not have substantial direct effects on tribal governments, on the relationship between the Federal government and the Indian tribes, or on the distribution of power and responsibilities between the Federal government and Indian tribes, as specified in Executive Order 13175. Currently, under the CWA, any discharge of pollutants into waters of the U.S. requires a permit under either section 402 or 404 of the CWA. Today's rule conforms our two regulatory definitions of ''fill material'' and thereby clarifies whether a particular discharge is subject to regulation under section 402 or section 404. It is generally consistent with current agency practice and does not impose new substantive requirements. Within California, Oregon, Washington, Idaho, Wyoming, Nevada, Arizona, Hawaii, Guam, and the Northern Mariana Islands, after today's rule, the Corps will again be issuing Section 404 permits for the construction of solid waste landfills in waters of the U.S., which the Corps had ceased doing after the decision in *RII* (the decision did not affect the permitting requirement outside these states). *See* section II. D. of this preamble. However, resuming the issuance of section 404 permits for construction of solid waste landfills in waters of the U.S. in these areas does not have tribal implications. No tribes within the Ninth Circuit will incur administrative costs as a result of today's rule, because none currently administer the section 404 program and, in any event, the administrative costs of permitting solid waste landfills are minimal in the context of the overall section 404 permitting program. In addition, this change does not impose any additional substantive obligations on any Tribe seeking to construct solid waste landfills in waters of the U.S. since Subtitle D of RCRA currently requires such facilities to meet comparable conditions for receiving a section 404 permit. *See* section II.D. of this preamble. Finally, we do not believe that requiring any tribal government seeking to construct solid waste landfills in waters of the U.S. to undergo the Section 404 permitting process itself will have substantial direct effects on one or more Indian

tribes, on the relationship between the Federal government and the Indian tribes, or on the distribution of power and responsibilities between the Federal government and Indian tribes. Thus, Executive Order 13175 does not apply to this rule.

*J. Environmental Documentation*

As required by the NEPA, the Corps prepares appropriate environmental documentation for its activities affecting the quality of the human environment. The Corps has prepared an environmental assessment (EA) of the final rule. The Corps' EA ultimately concludes that, since the adoption of this rule will not significantly affect the quality of the human environment, the preparation and coordination of an EIS is not required. The EA, included in the administrative record for today's rule, explains the rationale for the Corps' conclusion.

*K. Congressional Review Act*

The Congressional Review Act, 5 U.S.C. 801 *et seq.*, as added by the Small Business Regulatory Enforcement Fairness Act of 1996, generally provides that before a rule may take effect, the agency promulgating the rule must submit a rule report, which includes a copy of the rule, to each House of the Congress and to the Comptroller General of the United States. We will submit a report containing this rule and other required information to the U.S. Senate, the U.S. House of Representatives, and the Comptroller General of the United States prior to publication of the rule in the **Federal Register**. A major rule cannot take effect until 60 days after it is published in the **Federal Register**. This rule is not a ''major rule'' as defined by 5 U.S.C. section 804(2). This rule will be effective June 10, 2002.

*L. Executive Order 12898*

Executive Order 12898 requires that, to the greatest extent practicable and permitted by law, each Federal agency must make achieving environmental justice part of its mission. Executive Order 12898 provides that each Federal agency conduct its programs, policies, and activities that substantially affect human health or the environment in a manner that ensures that such programs, policies, and activities do not have the effect of excluding persons (including populations) from participation in, denying persons (including populations) the benefits of, or subjecting persons (including populations) to discrimination under such programs, policies, and activities because of their race, color, or national origin.

Today's rule is not expected to negatively impact any community, and therefore is not expected to cause any disproportionately high and adverse impacts to minority or low-income communities. Today's rule relates solely to whether a particular discharge is appropriately authorized under section 402 or section 404 of the Clean Water Act. Moreover, the proposed allocation of authority between these programs is generally consistent with existing agency practice.

*M. Executive Order 13211*

This rule is not a ''significant energy action'' as defined in Executive Order 13211, ''Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use'' (66 FR 28355 (May 22, 2001)) because it is not likely to have a significant adverse effect on the supply, distribution, or use of energy. Today's rule conforms our two regulatory definitions of ''fill material'' and thereby clarifies whether a particular discharge is subject to regulation under section 402 or section 404. Today's rule is generally consistent with current agency practice, does not impose new substantive requirements and therefore will not have a significant adverse effect on the supply, distribution, or use of energy.

**List of Subjects**

*33 CFR Part 323*

Water pollution control, Waterways.

*40 CFR Part 232*

Environmental protection, Intergovernmental relations, Water pollution control.

**Corps of Engineers**

*33 CFR Chapter II*

Accordingly, as set forth in the preamble 33 CFR part 323 is amended as set forth below:

**PART 323—[AMENDED]**

1. The authority citation for part 323 continues to read as follows:

**Authority:** 33 U.S.C. 1344.

2. Amend § 323.2 as follows:
a. Paragraph (e) is revised.
b. In paragraph (f), in the second sentence: add the words ''or infrastructure'' after the words ''for the construction of any structure''; add the word '', infrastructure,'' after the words ''building of any structure''; remove the words ''residential, and'' and add in their place the words ''residential, or''; and add the words ''placement of fill material for construction or maintenance of any liner, berm, or other infrastructure associated with solid waste landfills; placement of overburden, slurry, or tailings or similar mining-related materials;'' after the words ''utility lines;''.

The revision reads as follows:

**§ 323.2  Definitions.**

\*   \*   \*   \*   \*

(e)(1) Except as specified in paragraph (e)(3) of this section, the term fill material means material placed in waters of the United States where the material has the effect of:

(i) Replacing any portion of a water of the United States with dry land; or

(ii) Changing the bottom elevation of any portion of a water of the United States.

(2) Examples of such fill material include, but are not limited to: rock, sand, soil, clay, plastics, construction debris, wood chips, overburden from mining or other excavation activities, and materials used to create any structure or infrastructure in the waters of the United States.

(3) The term fill material does not include trash or garbage.

\*   \*   \*   \*   \*

Dated: May 3, 2002.

**Dominic Izzo,**

*Principal Deputy Assistant Secretary of the Army (Civil Works), Department of the Army.*

**Environmental Protection Agency**

*40 CFR Chapter I*

Accordingly, as set forth in the preamble 40 CFR part 232 is amended as set forth below:

**PART 232—[AMENDED]**

1. The authority citation for part 232 continues to read as follows:

**Authority:** 33 U.S.C. 1344.

2. Amend § 232.2 as follows:
a. The definition of ''Fill material'' is revised.
b. In the definition of ''Discharge of fill material'', in paragraph (1): add the words ''or infrastructure'' after the words ''for the construction of any structure''; add the word '', infrastructure,'' after the words ''building of any structure''; remove the words ''residential, and'' and add in their place the words ''residential, or''; and add the words ''placement of fill material for construction or maintenance of any liner, berm, or other infrastructure associated with solid waste landfills; placement of overburden, slurry, or tailings or similar mining-related materials;'' after the words ''utility lines;''.

The revision reads as follows:

### § 232.2  Definitions.

* * * * *

*Fill material.* (1) Except as specified in paragraph (3) of this definition, the term fill material means material placed in waters of the United States where the material has the effect of:

(i) Replacing any portion of a water of the United States with dry land; or

(ii) Changing the bottom elevation of any portion of a water of the United States.

(2) Examples of such fill material include, but are not limited to: rock, sand, soil, clay, plastics, construction debris, wood chips, overburden from mining or other excavation activities, and materials used to create any structure or infrastructure in the waters of the United States.

(3) The term fill material does not include trash or garbage.

* * * * *

Dated: May 3, 2002.

**Christine Todd Whitman,**
*Administrator, Environmental Protection Agency.*

[FR Doc. 02–11547 Filed 5–8–02; 8:45 am]
**BILLING CODE 3710–92–P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Parts 52 and 81**

**[MT–001–0037a; FRL–7208–8]**

**Approval and Promulgation of Air Quality Implementation Plans; State of Montana; Great Falls Carbon Monoxide Redesignation to Attainment and Designation of Areas for Air Quality Planning Purposes**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Direct final rule.

**SUMMARY:** On February 9, 2001, the Governor of Montana submitted a request to redesignate the Great Falls ''not classified'' carbon monoxide (CO) nonattainment area to attainment for the CO National Ambient Air Quality Standard (NAAQS). The Governor also submitted a CO maintenance plan. In this action, EPA is approving the Great Falls CO redesignation request and the maintenance plan.

**DATES:** This direct final rule is effective on July 8, 2002, without further notice, unless EPA receives adverse comments by June 10, 2002. If adverse comment is received, EPA will publish a timely withdrawal of the direct final rule in the **Federal Register** and inform the public that the rule will not take effect.

**ADDRESSES:** Written comments may be mailed to:

Richard R. Long, Director, Air and Radiation Program, Mailcode 8P–AR, United States Environmental Protection Agency, Region VIII, 999 18th Street, Suite 300, Denver, Colorado 80202–2466.

Copies of the documents relevant to this action are available for public inspection during normal business hours at the following offices:

United States Environmental Protection Agency, Region VIII, Air and Radiation Program, 999 18th Street, Suite 300, Denver, Colorado 80202–2466; and, United States Environmental Protection Agency, Air and Radiation Docket and Information Center, 401 M Street, SW, Washington, DC 20460.

Copies of the State documents relevant to this action are available for public inspection at: Montana Air and Waste Management Bureau, Department of Environmental Quality, P.O. Box 200901, Helena, Montana, 59620–0901.

**FOR FURTHER INFORMATION CONTACT:** Tim Russ, Air and Radiation Program, Mailcode 8P–AR, United States Environmental Protection Agency, Region VIII, 999 18th Street, Suite 300, Denver, Colorado 80202–2466, Telephone number: (303) 312–6479.

**SUPPLEMENTARY INFORMATION:** Throughout this document wherever ''we'', ''us'', or ''our'' are used we mean the Environmental Protection Agency.

### I. What Is the Purpose of This Action?

In this action, we are approving a change in the legal designation of the Great Falls area from nonattainment for CO to attainment and we're approving the maintenance plan that is designed to keep the area in attainment for CO for the next 10 years.

We originally designated the Great Falls area as nonattainment for CO under the provisions of the 1977 Clean Air Act (CAA) Amendments (see 43 FR 8962, March 3, 1978). On November 15, 1990, the Clean Air Act Amendments of 1990 were enacted (Pub. L. 101–549, 104 Stat. 2399, codified at 42 U.S.C. 7401–7671q). Under section 107(d)(1)(C) of the CAA, we designated the Great Falls area as nonattainment for CO because the area had been previously designated as nonattainment before November 15, 1990. The Great Falls area was classified as a ''not classified'' CO nonattainment area as the area had not violated the CO NAAQS in 1988 and 1989.[1]

---

[1] The EPA describes areas as ''not classified'' if they were designated nonattainment both prior to enactment and (pursuant to CAA section 107(d)(1)(C) at enactment, and if the area did not violate the primary CO NAAQS in either year for the 2-year of 1988 through 1989. Refer to the ''General Preamble for the Implementation of Title of the Clean Air Act Amendments of 1990'', 57 FR 13498, April 16, 1992. See specifically 57 FR 13535, April 16, 1992.

---

Under the CAA, designations can be changed if sufficient data are available to warrant such changes and if certain other requirements are met. See CAA section 107(d)(3)(D). Section 107(d)(3)(E) of the CAA provides that the Administrator may not promulgate a redesignation of a nonattainment area to attainment unless:

(i) the Administrator determines that the area has attained the national ambient air quality standard;

(ii) the Administrator has fully approved the applicable implementation plan for the area under CAA section 110(k);

(iii) the Administrator determines that the improvement in air quality is due to permanent and enforceable reductions in emissions resulting from implementation of the applicable implementation plan and applicable Federal air pollutant control regulations and other permanent and enforceable reductions;

(iv) the Administrator has fully approved a maintenance plan for the area as meeting the requirements of CAA section 175A; and,

(v) the State containing such area has met all requirements applicable to the area under section 110 and part D of the CAA.

Before we can approve the redesignation request, we must decide that all applicable State Implementation Plan (SIP) elements have been fully approved. Approval of the applicable SIP elements may occur prior to final approval of the redesignation request or simultaneously with final approval of the redesignation request. We note there are no outstanding SIP elements necessary for the Great Falls redesignation.

### II. What Is the State's Process To Submit These Materials to EPA?

Section 110(k) of the CAA sets out provisions governing our actions on submissions of revisions to a SIP. The CAA also requires States to observe certain procedural requirements in developing SIP revisions for submittal to EPA. Section 110(a)(2) of the CAA requires that each SIP revision be adopted after reasonable notice and public hearing. This must occur prior to the revision being submitted by a State to us.

The Montana Department of Environmental Quality (DEQ) held a public hearing on December 19, 2000,