

**USDA**

United States
Department of
Agriculture

**Forest Service**

Tongass
National
Forest
R10-MB-500a





# Kensington Gold Project

## Final
## Supplemental Environmental Impact Statement

*Volume 1: Sections 1–10*

**Lead Agency**

USDA Forest Service, Tongass National Forest

**Cooperating Agencies**

US Environmental Protection Agency, Region 10

US Army Corps of Engineers, Alaska District

Alaska Department of Natural Resources



United States
Environmental Protection
Agency



**US Army Corps
of Engineers**
Alaska District



**Prepared by**
Tetra Tech, Inc.
143 Union Boulevard
Suite 1010
Lakewood, CO 80228

**December 2004**

Exhibit 3, page 1

# SECTION 2.0
# DESCRIPTION OF PROPOSED ACTION AND OTHER ALTERNATIVES

This section describes the alternatives that form the basis for evaluating the current proposal for the Kensington Gold Project. Evaluating a reasonable range of alternatives ensures that significant impacts are avoided or mitigated to the extent possible. Various project components were evaluated as part of the alternatives analysis under the previous National Environmental Policy Act (NEPA) actions associated with the Kensington Gold Project. Alternatives in this Final Supplemental Environmental Impact Statement (SEIS) target project components that are different from those previously proposed and that could address the significant issues identified during the scoping process.

The alternatives evaluated in this Final SEIS focus primarily on employee housing, transportation of personnel and material to and from the site, tailings disposal and management, and the location of wastewater discharges. Since publication of the 1992 Final Environmental Impact Statement (FEIS) and the 1997 SEIS, the operator has continued to collect baseline data on hydrology, water quality, aquatic life, and other key environmental resources in the vicinity of the Kensington Gold Project site. These data, as well as data collected by the U.S. Fish and Wildlife Service (USFWS), have been used to evaluate the feasible project alternatives and mitigation measures.

The following discussions explain the development of alternatives, present a brief description of each alternative, and describe individual project components, including tailings disposal, water management, and transportation. Section 2 closes with a description of mitigation and monitoring, a tabular comparison of impacts, by alternative, on the various resource areas discussed in greater detail in sections 3 and 4, and identification of the Forest Service's environmentally preferable alternative.

---

### ALTERNATIVES FOR THE KENSINGTON GOLD PROJECT

**Alternative A (No Action):** 1997 SEIS Alternative D: Dry tailings facility (DTF) with engineered berm; wastewater discharged to Sherman Creek and DTF drainage to Camp Creek; employee transportation by helicopter; personnel camp.

**Alternative A1 (Reduced Mining Rate DTF):** Similar to Alternative A with smaller production rate and smaller DTF.

**Alternative B (Proposed Action):** Wet tailings storage facility (TSF) in Lower Slate Lake; TSF wastewater discharged to Slate Creek and mine water discharged to Sherman Creek; employee transport by daily crew shuttle boat between marine terminals at Cascade Point and Slate Creek Cove; no personnel camp.

**Alternative C (TSF Diversion/Modified Dock):** Same as Alternative B except diversions to route Mid-Lake East Fork Slate Creek and overland flow around the TSF; employee transport by daily crew shuttle boat between marine terminals at Slate Creek Cove and Echo Cove; minimized subtidal footprint of the Slate Creek Cove marine terminal.

**Alternative D (Modified TSF Design):** Same as Alternative B except that Mid-Lake East Fork Slate Creek is diverted around the TSF via a pipeline, TSF water is treated by reverse osmosis prior to discharge into diversion pipeline, and a cover is installed over the tailings.

## 2.1    ISSUES AND ALTERNATIVE DEVELOPMENT

The formulation of alternatives to the Proposed Action is one of the most important components of the NEPA process. Significant issues identified during the scoping process drive the formulation of

Exhibit 3, page 2

water must be recycled. This alternative would also include diversion channels to direct the flow from Mid-Lake East Fork Slate Creek and overland runoff from undisturbed areas around the TSF. The diversions would require a dam on Upper Slate Lake to maintain water levels in the diversion sufficient to reach the spillway at the TSF dam. The diversion would discharge to a spillway at the top of the TSF dam. The purpose of the diversion would be to minimize the volume of fresh water in contact with the tailings. The remaining project components, including the production rate of 2,000 tons per day of ore and the access tunnel, would be the same as those under Alternative B.

### 2.2.5    *Alternative D: TSF Water Treatment and Pipeline Diversion*

Alternative D includes a modified TSF design. A dam would be constructed in Mid-Lake East Fork Slate Creek, and it would gravity-feed a diversion pipeline. TSF water would be pumped to a reverse osmosis treatment system. The treatment plant effluent would discharge into the diversion pipeline, which would flow to East Fork Slate Creek below the TSF dam. Once tailings disposal was complete, the tailings would be capped with native material unless the operator can demonstrate that uncovered tailings would not cause toxicity throughout Lower Slate Lake after closure. The remaining components would be same as those of Alternative B.

### 2.3    *PROJECT COMPONENTS STUDIED IN DETAIL*

### 2.3.1    *Project Location/Duration*

Figure 2-1 shows the location of project facilities, which would be built on National Forest System lands as well as private land (dark shading). Under Alternative A, the facilities would be contained within watersheds draining to Lynn Canal. The process area would be near the Kensington 850-foot portal and would consist of the mill, warehouse buildings, maintenance shop, administrative offices, and laboratory. The personnel camp would be near the wastewater treatment plant, downslope of the process area. Under Alternatives B, C, and D, portions of the operation (waste rock disposal and wastewater treatment of the mine drainage) would remain within the Sherman Creek drainage; however, facilities would also be built in the Johnson Creek and Slate Creek drainages, within the Berners Bay watershed. Under Alternatives B, C, and D, the facilities mentioned above would be moved to an area above the historic Jualin Mine (Figure 2-5) consisting mostly of patented mining claims (private land). The personnel camp would be eliminated.

Under Alternative A, the active life of the project would be at least 12 years based on the existing reserve, following a 2-year construction period. Alternative A1 would have an active life of 10 years following a 2-year construction period. Mining operations lasting 10 years are projected under Alternatives B, C, and D, following an 18-month construction period.

### 2.3.2    *Mining Methods*

The proposed mining methods are similar to those presented in the 1997 Approved Plan of Operations. The following discussion provides a brief summary of mining methods based on details provided in the 1992 FEIS. The reader is referred to pages 2-5 through 2-7 of that document for additional details.

Under Alternatives A and A1, the ore body would be accessed by the existing tunnel at the Kensington 850 portal. Under Alternatives B, C, and D, the Jualin tunnel would be used as the primary access for workers and materials into the mine, as well as ore haulage between the mine and mill. The Jualin tunnel would be 18 feet wide by 15 feet high to accommodate 40-ton haul trucks. On the Jualin side, the portal would be near the mill at an elevation of 1,050 feet. From the portal, it

Exhibit 3, page 3

would slope downward at a grade of 1.5 percent for 5,000 feet toward the existing Kensington tunnel, which it would intersect at an elevation of 932 feet. The tunnel would be driven from both sides to reduce the duration of the pre-production development period and to eliminate the need for a ventilation raise to the surface. The estimated schedule for completing the tunnel is about 150 days.

The Kensington ore body consists of a dense pattern of quartz veins and veinlets that extend from the surface to a depth of approximately 3,000 feet. The ore zone averages approximately 60 feet wide but ranges in width from 22 feet to more than 165 feet. The ore body is irregular in shape and erratic in the distribution of gold content. Coeur selected a mining method called the long-hole, open-stope technique on the basis of a number of factors, such as the spatial and physical characteristics of the deposit, economics, and environmental considerations.

The long-hole, open-stope technique is employed in situations where ore occurs in wide and steeply dipping vein deposits. Mining would progress throughout the ore body as dictated by mine design, stope size, backfilling sequence, and other key elements that maximize extraction of the mineral resource. The long-hole, open-stope method allows for flexibility in handling irregular ore body widths and allows efficient removal of ore. It also allows safe working conditions while using a minimal workforce. Figures 2-13 and 2-14 depict the extent of the mine workings under Alternatives A1, B, C, and D in relation to the ground surface and surface water drainages, respectively.

The operation under all the alternatives would mine the Kensington ore body. Alternative A proposes to process ore at a rate of 4,000 tons per day (tpd) and produce approximately 26 million tons of tailings over the life of the mine. The DTF would be sized to hold a maximum of 20 million tons, and 25 percent of the tailings would be backfilled. Under Alternatives A1, B, C, and D, a smaller portion of the same ore body would be mined at a rate of 2,000 tpd. The 2,000-tpd operation would target smaller quantities of higher-grade ore (ore with a higher gold content) than the operation proposed under Alternative A. Operations under Alternative A1, B, C, or D would produce a total of 7.5 million tons of tailings over the life of the mine: 4.5 million tons (60 percent) would be disposed of in the TSF (or the DTF in the case of Alternative A1), and 3 million tons (40 percent) would be backfilled.

### 2.3.3  Waste Rock Disposal

Waste rock is material encountered during the mining process that has a gold content less than that economically recoverable. During operations, waste rock would be hauled to the surface for storage, use, or disposal.

Under Alternative A, waste rock would be used as foundation, drainage, and berm material in construction of the DTF. A 15-acre temporary stockpile would be located near the mine opening for the first 3 to 4 years while the DTF was being developed. Once the DTF became active, the demand for waste rock would essentially equal production; that is, all waste rock would eventually be used in the DTF. Section 2.3.3 of the 1997 SEIS provides a more detailed discussion of waste rock management under Alternative A. Very little waste rock would be produced under Alternative A1.

Under Alternatives B, C, and D, most of the waste rock would be generated in the process of developing the access tunnel between the Kensington and Jualin portals. This tunnel would not be developed under Alternative A or A1. The waste rock would be hauled by truck to a 31.5-acre permanent disposal site near the Kensington 850-foot portal. There would also be capacity to store approximately 500,000 tons of waste rock on 4.8 acres in the vicinity of the process area at Jualin. Under all alternatives, waste rock could also be placed underground as part of the backfill process.

Exhibit 3, page 4

**Table 2-4**
**Chemical and Material Use**

| Milling Process | Reagent or Material | Container (Shipping and Storage) | Approximate Daily Use (tons) | |
|---|---|---|---|---|
| | | | Alternative A | Alternatives A1, B, C, and D |
| Grinding | Steel balls | 10-ton steel bins | 5–6 | 4–5 |
| Flotation | Potassium amyl xanthate | 50-gallon drum | 1 | 0.5 |
| | MIBC (frother) | 50-gallon drum | 0.4 | 0.2 |
| | Flocculant | 1-ton Flo-bin | 0.2 | 0.1 |
| | Polymer | 50-gallon drum | 0.02 | 0.01 |
| | Surfactant | 50-gallon drum | 0.04 | 0.02 |
| | Scale inhibitor | 50-gallon drum | 0.1 | 0.05 |
| | Lime* | 1,000-lb bags | 2 | 1 |

* Lime is also used in concentrate thickening.

crusher, which would reduce the size of the ore to less than 6 inches. The crushed ore would then be hauled by truck to the coarse ore stockpile at either the Kensington side (Alternatives A and A1) or Jualin side (Alternatives B, C, and D) of the operation. There, the ore would be fed into a hopper with a vibrating feeder and then onto a belt that would discharge into a semiautogenous grinding (SAG) mill.

The SAG mill would be set up in a closed circuit with a horizontal vibrating screen and a ball mill. Oversized material would be fed back into the SAG mill, while undersized material (minus 100 mesh) would be directed to hydrocyclones. Hydrocyclones use centrifugal force to separate coarse material from fine material. The heavy material (underflow) from the cyclones would be directed to a gravity concentrator used to recover coarse gold. Lighter materials from the cyclones would be fed back to the cyclone circuits, eventually overflowing from the cyclones to a conditioning tank feeding the flotation circuit.

The flotation process would involve separating the gold from the barren material in a froth flotation. A slurry would be fed from the cyclones to the conditioning tank, where conditioners (e.g., potassium amyl xanthate) and frothing agents would be added. These materials would cause the sulfide and telluride minerals (both gold-bearing) in the slurry to attach to air bubbles once air was pumped through the system. The bubbles containing the mineralized portion of the slurry, including the gold, would form a froth on top of the flotation tank. The gold-bearing froth would then be skimmed off and collected. This "concentrate" would flow through additional flotation tanks to further concentrate the gold. The flotation process would separate approximately 93 to 96 percent of the non-gold material from the ore fed into the system, leaving 160 to 280 tons (under Alternative A) or 80 to 140 tons (under Alternatives A1, B, C, and D) of flotation concentrate per day. Most of the chemicals added to the system would stay in the flotation tanks or be removed with the flotation concentrate as opposed to being discharged with the tailings. Most of the metals associated with the ore body would be removed from the system with the gold concentrate.

Following the final flotation, the concentrate would be dewatered before being placed into specialized 8-foot by 8-foot by 20-foot sealed marine transport containers for shipment to an existing, off-site processing facility outside Southeast Alaska. Under Alternative A the average production would be approximately 1,400 tons (40 containers) of concentrate per week. The production level would average approximately 700 tons (20 containers) of concentrate per week under Alternatives A1, B, C, and D.

Exhibit 3, page 5

### 2.3.5    Tailings Disposal

Tailings are the material that remains in the flotation tanks once the gold-bearing material has been removed. This Final SEIS evaluates two methods of tailings disposal. Under Alternatives A and A1, tailings would be placed in the DTF. Alternatives B, C, and D would employ wet (underwater or subaqueous) tailings disposal methods in the TSF constructed in Lower Slate Lake. Under all the alternatives, the operator would backfill some of the tailings to permit the maximum extraction of the resource and provide structural stability within the mine. Under Alternative A, the operator would backfill at least 25 percent of the tailings generated. Under Alternatives A1, B, C, and D, the operator proposes to, backfill at least 40 percent of the tailings generated over the life of the operation.

#### Dry Tailings Disposal

The following discussion is taken from Section 2.3.6 (pages 2-20 through 2-22) of the 1997 SEIS. Additional detail on the DTF can be found in that document. Under Alternatives A and A1, the DTF would be constructed using methods similar to the construction of landfills. The slurry would be thickened to approximately 55 percent solids. The thickened slurry would be moved from the mill to the DTF through an 8,000-foot, gravity-fed pipeline. The pipeline would be built within the footprint of the haul road for most of its length. The pipeline would be approximately 14 inches in diameter with a 20-inch casing for spill containment. At the DTF the tailings would be dewatered, using plate filters (or the design equivalent), to a moisture content of 5 to 18 percent. The filter cake would then be loaded into trucks and placed in the DTF.

The DTF would be constructed in a series of three stages or cells. Before placement of the first lift of each cell, a series of foundation drains would be installed to form the base. The drains would be laid out in a herringbone pattern and consist of gravel wrapped in geotextile material. A minimum of 2 feet of waste rock or development rock would be placed over the drains. Each cell would consist of five to seven lifts, each 28 feet high. Tailings would be placed (unconsolidated) into the 28-foot lifts followed by 1 foot of compacted, low-permeability fine till and 1 foot of waste rock to provide a cover and working surface. Stockpiles of waste rock to be used in DTF construction would be placed within the footprint of the next cell. The final cover for the facility would consist of 6 to 8 feet of coarse and fine till. The underlying fine till layer would serve as a capillary break, and the overlying coarse till would promote infiltration and drainage. Growth media would be placed on the coarse till to support revegetation.

To ensure that tailings placed into the DTF did not contain excess moisture, there would be no temporary storage at the process area or the dewatering area. Tailings would be placed directly into the DTF or backfilled. The operation would generally expose less than 5 acres of tailings to direct precipitation at any one time (before concurrent covering and revegetation), as illustrated in Figure 2-15.

An engineered structural berm would be constructed around the north, south, and west sides of each cell to increase the stability of the facility. The berm would be constructed of waste rock, compacted tailings, or other suitable material. The berm would extend to a height of approximately 100 feet along the west slope and 50 feet along the north and south slopes. Under Alternative A, the DTF, including the berm, would ultimately cover 113 acres and have a capacity of 20 million tons of tailings. Under Alternative A1, the DTF would cover approximately 40 acres and be able to store 4.5 million tons of tailings.

Exhibit 3, page 6

Under Alternative D, Mid-Lake East Fork Slate Creek would be diverted around the TSF by a pipeline. Up to 1,300 gpm of water would be pumped from a clear portion of the TSF. Approximately 100 gpm of this flow would be recycled to the mill, while up to 1,200 gpm would flow into a reverse osmosis treatment system for additional solids and metals removal. The reverse osmosis system would involve high-pressure flow through a permeable membrane, where high-quality water would be separated from remaining impurities. A schematic of the reverse osmosis system is included as Figure 2-18. The impurities would be concentrated in a "brine" solution, which would be returned to the TSF. The ratio of high-quality water to brine is typically about 80 percent to 20 percent; for example, at the treatment plant's design capacity of 1,200 gpm, about 960 gpm of high-quality water would be produced along with 240 gpm of brine. Overall, the volume of brine produced would vary between 100 and 240 gpm. The high-quality water would be discharged to the diversion pipeline, which would flow via a spillway to East Fork Slate Creek below the TSF.

### Backfilling

Backfilling tailings to mined-out areas underground would provide structural support of the underground workings and allow removal of more of the gold ore. It would also reduce the volume of tailings placed into an aboveground disposal unit (DTF or TSF). Backfilling is proposed under all the alternatives.

Under Alternative A, the operator would transport at least 25 percent of the tailings to a paste backfill plant at the 2,050-foot level of the mine. In the plant, tailings would be mixed with water and cement to form a paste, which would then be directed to open stopes (excavations) within the mine. The paste would be thick and heavy, making pumping expensive in terms of the cost of equipment. Therefore, the use of paste backfill would be limited to the areas that could be accessed by gravity flow from the backfill plant. The backfilled areas would allow the removal of additional ore that would otherwise need to be left in place to provide structural support.

Backfilling under Alternatives A1, B, C, and D would not involve creating a paste but instead would consist of pumping the coarse fraction of the tailings through an HDPE pipe from the cyclones to working areas that need backfill. On the surface, the backfill pipeline would run from the mill to the mine within a containment ditch. Because the ditch would be sized to contain the volume of tailings within the pipeline, it would provide secondary containment in the event of a pipeline failure. A decant line to pump water from the backfill area back to the processing circuit would parallel the backfill pipeline. Depending on the size and use of the area (stope) to be backfilled, cement might be mixed with the upper few inches of backfilled tailings to provide a stable working surface. At least 40 percent of the tailings would be backfilled under Alternatives A1, B, C, and D.

### 2.3.6    TSF Dam Construction

The TSF would be formed in part by the natural lake basin at Lower Slate Lake and a dam constructed at the outlet of the lake. The dam would be a concrete-faced rockfill dam constructed in two phases. During operations, the dam of the TSF would be 90 feet tall and approximately 500 feet long. The TSF would be sized to accommodate 4.5 million tons of tailings. Figure 2-19 shows the TSF dam. The phased approach to constructing the dam would allow tailings disposal to begin once the first stage of the dam was completed. The second stage would be built while mining operations and tailings disposal were active, likely 4 to 5 years into the process.

# SECTION 3.0
# AFFECTED ENVIRONMENT

## 3.1    INTRODUCTION

Section 3.0 describes the baseline condition for the area affected by any of the alternatives. The extent of the area analyzed and discussed in this Final SEIS is the same as that described in the 1992 FEIS, which included alternatives or project components located in the Slate, Johnson, and Sherman creek drainages. For clarification purposes, the term *project area* is defined as the specific area within which all surface disturbance and development activities would occur. The term *study area* is defined as the larger peripheral zone around the project area within which most potential direct or indirect effects on a specific resource are likely to occur. The project area, therefore, is consistent across all resources within an alternative, whereas the study area is variable from one resource to the next.

The 1992 FEIS provided a description of the affected environment with a project area that encompassed both the Kensington and Jualin areas. Section 3.0 of the 1997 SEIS referred to Section 3.0 of the 1992 FEIS extensively, supplementing discussions only where new information was available. This document summarizes resource information presented in both the 1992 FEIS and 1997 SEIS and includes new data that have become available since those documents were completed. The discussions of individual resources identify the new or revised information.

Although Section 3.0 describes the resources in the project area individually, it is important to recognize the complexity of relationships among the various resources that as a group form the local ecosystem. The relatively undisturbed nature of many places in Southeast Alaska, including the project area, reinforces the interconnectivity and interdependence of these resources. Old-growth forests provide habitat for species such as marbled murrelets, bald eagles, marten, and deer. The forests stabilize the soil, preventing the accumulation of sediment in the streams and rivers. Water bodies such as Slate and Spectacle lakes support waterfowl and fish. Adjacent emergent and shrub wetlands provide habitat to migratory birds and moose.

Berners Bay supports a diverse range of sensitive habitats for birds, fish, and wildlife. The silt and sand deposited by the glacially fed Lace and Antler river systems form an extensive intertidal mudflat at the head of the bay and estuary where the fresh waters combine with the marine waters of Berners Bay and Lynn Canal. The Berners, Lace, and Antler rivers and Johnson and Slate creeks all support anadromous fish populations including salmon and Dolly Varden char.

Eulachon gather in the waters of Berners Bay each spring before moving into the shallows of the Lace, Berners, and Antler rivers to spawn. While in the marine environment, these fish serve as an important food source for humpback whales and Steller sea lions at a critical time prior to pupping. As the eulachon move into the freshwater tributaries to spawn, they are pursued by the sea lions and by harbor seals and also preyed upon by numerous species of birds. The annual eulachon run ultimately draws hundreds of sea lions and tens of thousands of birds to Berners Bay. A similar scene is repeated as bears and birds feed on salmon returning to rivers and streams, including Slate, Johnson, and Sherman creeks. These events are further tied to human uses, including recreation and fishing, the value of which is difficult to quantify in terms of economics.

Exhibit 3, page 8

### Sherman Creek Drainage

The Sherman Creek drainage consists of four upper tributaries, Ivanhoe and Ophir creeks to the northeast and Upper Sherman and South Fork Sherman creeks to the southeast (Figure 3-2). All tributaries converge into a single stream channel approximately 1 mile from its confluence with Lynn Canal at Comet Beach. The average annual flow in Sherman Creek at the mouth is 43 cfs. Upper Sherman Creek currently receives the discharge of treated mine water at the NPDES-permitted outfall from the settling ponds (outfall 001). A permanent barrier to upstream fish migration in the form of a falls occurs approximately 1,200 feet from the stream's confluence with Lynn Canal.

Six small stream systems, including Camp Creek, which would receive the DTF discharge, are in or near the terrace area basin (Konopacky, 1996b). Flows in all the identified channels are low and range from 0.002 cfs to 0.01 cfs.

### Slate Creek Drainage

The Slate Creek drainage is composed of two tributaries, West Fork Slate Creek and East Fork Slate Creek. Slate Creek drains into Slate Creek Cove on Berners Bay with a mean annual flow of 34 cfs (Forest Service, 1992). A barrier to upstream anadromous fish movement in East Fork Slate Creek is located immediately upstream of the confluence between the two forks.

Upper Slate Lake and Lower Slate Lake are within the East Fork Slate Creek drainage, approximately 4 miles southeast of the historic Jualin mine site. Lower Slate Lake receives outflow from Upper Slate Lake via split channels. It discharges to East Fork Slate Creek from its southern end. The two lakes are further discussed below.

### Lower Slate Lake

Lower Slate Lake is approximately 1 mile upstream of the confluence of the east and west forks of Slate Creek. The lake has a surface area of 20 acres, and it is approximately 1,600 feet long with an average width of 600 feet (Buell, 1989). It should be noted that Mid-Lake East Fork Slate Creek, a tributary to Lower Slate Lake, has a split channel prior to entering Lower Slate Lake. Some of the literature has considered this split two channels.

Much of Lower Slate Lake is surrounded by steeply sloping, wet coniferous forest with some deciduous understory. Bogs are present along the northern lake edge and near the lake outlet. The shoreline is 4,127 feet in length and not irregular. The bottom of the littoral zone varies between silt and clay with intermittent areas of gravel and beds of submerged and emergent vegetation. The littoral zone is relatively small (3.9 acres); the lake slopes quickly to a deep point of 51 feet near the center. Light penetration is poor in the lake due to coloring from dissolved organic compounds (Kline, 2003a).

### Upper Slate Lake

Upper Slate Lake is 1,600 feet upstream of Lower Slate Lake. The split channels of Mid-Lake East Fork Slate Creek connect the two lakes. The lake has a surface area of approximately 12 acres and is approximately 1,200 feet long, with an average width of 430 feet and a maximum depth of 43 feet. Upper Slate Lake has five inlets, but only the two largest (Upper East Fork Slate Creek and South Creek) provide fish habitat during the summer months (Romey Environmental and Martin Environmental, 1998).

**Table 3-15**
**Freshwater and Anadramous Fish Species and Their Locations**

| Common Name | Scientific Name | Drainage Area[a] | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Sherman Creek | | Slate Creek | | Slate Lakes | | Johnson Creek | |
| | | A | B | A | B | U | L | A | B |
| Dolly Varden char | *Salvelinus malma* | X | X | X | X | X | X | X | X |
| Pink salmon | *Oncorhynchus gorbuscha* | | X | | X | | | | X |
| Chum salmon | *Oncorhynchus keta* | | X | | X | | | | X |
| Cutthroat trout | *Oncorhynchus clarki* | | X | | X | | | | X |
| Coho salmon | *Oncorhynchus kisutch* | | X | | X | | | | X |
| Prickly sculpin | *Cottus asper* | | X | | X | | | | X |
| Three-spine stickleback | *Gasterosteus aculeatus* | | | X | X | X | X | X | X |

[a] All three drainages have fish barriers in their lower reaches. The A and B columns represent presence above (A) or below (B) the fish passage barrier. Two lakes are present in the Slate Creek drainage and are identified as Upper (U) and Lower (L).
Sources: Biostat, 1998; Buell, 1989; Kline, 2001, 2003a, 2003b; and Konopacky, 1992, 1995.

there is the potential for one-way migration. Fish below a permanent barrier would not be able to migrate upstream; however, fish within any portion of the system could move downstream through the barriers.

Dolly Varden char, cutthroat trout, prickly scuplin, chum salmon, pink salmon, and juvenile coho salmon have been captured in Lower Johnson Creek. Dolly Varden char have also been captured on Upper Johnson Creek above the barrier falls. No surveys for three-spine sticklebacks have been performed in Johnson Creek, but based on observations in Slate Creek, they are assumed to be present. The Dolly Varden char in Lower Johnson Creek are larger (up to 16 inches) than those in the upper stream (up to 13 inches) or those in Slate Creek, and they probably represent an anadromous population (Konopacky, 1996d). Sport fish are present throughout the project area, but there has been no documented use for sportfishing (see Section 3.13, Land Use and Recreation).

Dolly Varden char and three-spine stickleback have been captured in the stream above the fish passage barrier near the confluence of the east and west forks of Slate Creek. Several estimates of the population of Dolly Varden char in Lower Slate Lake have been made. Buell (1989) set gill nets and captured two fish. The conclusion was that the population was small, likely due to very oligotrophic (nutrient-poor) conditions in the lake. Another estimate of 439 fish (range of 162 to 716) was reported based on an acoustic survey conducted in 1994 (Konopacky 1995). This estimate, however, has been questioned due to the lack of success in catching fish in the deeper portion of the lake and the limited existence of a benthic macroinvertebrate food supply (Kline, 2001). Kline (2001) was unable to successfully capture Dolly Varden char in Lower Slate Lake using hoop nets, although 12 fish were captured using rod and reel techniques. Based on capture-tag-recapture survey, Kline (2003c) estimated the Dolly Varden char population at 996. By comparison, 1,378 Dolly Varden char were found in Upper Slate Lake in 2003. The density is more than 50 percent higher than that in Lower Slate Lake (Kline, 2003d). There is a limited population (estimated at 85 fish in 1994, 23 in 2001) of Dolly Varden char in East Fork Slate Creek below Lower Slate Lake (Kline, 2001; Konopacky, 1995). The population is thought to be

3-28

Sherman, Slate, and Johnson creeks, as well as those that surround Slate and Spectacle lakes. The scrub-shrub and forested wetlands in the terrace area provide this function to a lesser extent through the intermittent streams that drain the area.

*Wildlife habitat* includes supporting food webs, providing cover, and enhancing connectivity between upland areas. Depending on size and structure, wetlands may support a wide variety of species, including birds, deer, bear, and furbearers. Most of the wetlands in the study area provide a relatively high level of this function. The highest levels are provided by wetlands diverse in form and surrounded by old-growth forests, such as those around Slate and Spectacle lakes. Wetlands in the vicinity of existing disturbances—the waste rock storage and settling ponds at Kensington and the camp near the Jualin Mine—provide this wildlife function to a lesser degree because of occasional human activity.

*Fish habitat* applies to those wetlands that provide direct or indirect support to fish and fisheries. This function typically applies to streams, rivers, and open water, including saltwater wetlands. Forested wetlands in the vicinity of Upper and Lower Slate lakes, the scrub-shrub and emergent wetlands around Spectacle Lake, and forested wetlands along Sherman and Johnson creeks support fish habitat. The aquatic bed and lacustrine wetland areas in Upper and Lower Slate lakes, respectively, support populations of three-spined stickleback and Dolly Varden char, as well as benthic communities.

## 3.13    LAND USE AND RECREATION

### 3.13.1    Land Use and Recreation Resource Management

The Forest Plan provides prescriptions, standards, and guidelines for managing land use and recreation resources in the study area (Forest Service, 1997b). As discussed previously, the Forest Plan establishes land use designations (LUDs) for each part of the forest, and each LUD has specific prescriptions for managing recreation and other resources. The LUD for the area containing the Kensington and Jualin mines is Modified Landscape (ML) with a Minerals overlay. The ML prescription is intended to provide a sustained yield of timber and a mix of resource activities while minimizing the visibility of developments in the foreground and providing a spectrum of recreation opportunities consistent with resource activities. The ML prescription acknowledges the previous gold mining activities in the area, whereas the Minerals overlay provides management prescriptions for current or proposed mining activities, with the intent that the LUD will revert back to ML once mining is completed.

The only project facilities outside the ML designation are the Slate Creek Cove marine terminal and approximately 2.5 miles of the main access road to the historic Jualin Mine. This area is designated Old-Growth Habitat (OGH). The Old Growth Habitat LUD was established as part of a forest-wide strategy to maintain viable wildlife populations. The conservation strategy includes a system of large, medium, and small OGH and a set of standards and guidelines designed to preserve the integrity of the old-growth ecosystem. There are three small OGH within the project area. The Forest Plan allows for adjustment of the reserves' boundaries based on site-specific information. The additional information developed during the Kensington SEIS process is being used to adjust the boundaries of these small OGH LUDs to better conform to the standards and guidelines established by the Forest Plan. If the Forest Service accepts the proposed boundary modification, the marine terminal and access road will be entirely within the ML LUD (see Appendix F).

(Vancouver, 1984). A few years later what would become the Russian American Company moved its headquarters to Sitka, on the Pacific side of Baranof Island, but the company's direct contact with mainland Natives like the Chilkat and Auke Tlingit was limited (Arndt et al., 1987). Historical records of Lynn Canal and Berners Bay are scarce until after 1867, which begins Alaska's American Period. In 1878 a Northwest Trading Company post was established at Chilkoot Inlet near the beginning of an old Tlingit trail into the interior, followed in 1881 by a Presbyterian mission built close by, forming a settlement that together became known as Haines (Orth, 1967). Alaska's third salmon cannery (preceded in 1878 by facilities at Klawock and old Sitka) was the Chilkat Packing Company built at Chilkat Inlet in 1882, followed the subsequent year by the Northwest Trading Company's cannery at Pyramid Harbor on Chilkat Inlet, followed yet again in 1889 by construction of the Chilkat Canning Company at Chilkat Village (MacDonald, 1951). The commercial economy grew considerably when the Klondike and other interior Alaskan and Yukon gold rushes were accessed from the Lynn Canal settlements of Haines, Dyea, and Skagway, but that was almost 10 years later, in 1898.

Juneau's history, in contrast, centered around mining during the 1880s and 1890s, and no canneries were built until later, at Auke Bay in 1916 and Juneau in 1918 (MacDonald, 1951). By then the Juneau area had for decades been part of a major mining district known as the Juneau Gold Belt, containing almost 200 documented prospects and 5 historically important mines worthy of separate discussion by Redman et al. (1991). Within 2 years of the original 1880 Juneau gold discoveries, numerous prospects and claims had been staked nearby, and development had begun on the enormously successful and long-lived (1880 to 1944) Alaska Juneau Mine, and the Treadwell Mine (1882 to 1917) across Gastineau Channel at Douglas (Orth, 1967; Redman et al., 1991). A third mine of the five singled out by Redman et al. (1991) is the Herbert Glacier Prospect, 5 miles north of Auke Bay. The last two of the five mines—the Jualin Mine and the Kensington Mine—are particularly pertinent to the Kensington Gold Project.

In 1895, on the north side of Berners Bay beneath the peak known since 1867 as Lions Head (Orth, 1967), prospectors discovered gold-bearing quartz veins that would become the Jualin Mine (Brooks, 1916). Production began the following year under Mellon and Herbert Hoggatt, with brother Wilford becoming mine superintendent and postmaster in 1899. Wilford Hoggatt left the mine job in 1906 to assume the office of Alaska's Territorial Governor (Roppel, 1972). Facilities built during the early years of operation included a corduroy road from Berners Bay to the "Lower Camp" mine up Johnson Creek, boarding house, bunkhouse, office, warehouse, and blacksmith shop (Brooks, 1916). Higher-elevation workings known as the "Upper Camp" were developed by Belgian investors in 1912 after several years of low or no production, involving construction of a wharf, tramway, bunkhouse, flume, pipeline, and new pump systems, and installation of the first semi-diesel generators in Alaska (Redman, 1991). Even higher than the Upper Camp was the 10-stamp Indiana mill (Mobley, 1988). But overall production was good only from 1915 to 1917, and soon after the Jualin Mill burned down. When the last gold was produced in 1928, the cumulative total production of 37,913 ounces of gold and 12,640 ounces of silver amounted to $791,754 worth of metal (Redman et al., 1991).

Quartz veins in the Jualin Diorite exposed on the Lynn Canal side of Lions Head were first explored in 1887 as the Bear Mine (Redman et al., 1991). The nearby Comet Mine saw significant development in 1892, and during the next 8 years construction of a 2.5-mile railroad, 6,000-foot tram line, and 40-stamp mill allowed production of 22,485 ounces of gold worth $444,057 (Redman et al., 1991). The Bear Mine was connected by tram to the Comet Mill in 1895, and in 1895 rich veins at a higher elevation, called the Kensington Mine, were connected by tram line to the top of the Bear Mine tram line (Redman et al., 1991). All three claims—the

3-101

# SECTION 4.0
# ENVIRONMENTAL CONSEQUENCES

## 4.1    INTRODUCTION

This section presents the results of the analysis of potential impacts from the four alternatives considered in this Final SEIS. The discussions focus on how each alternative would affect each of the resources described in Section 3. The extent to which the different resources are discussed is based on the comments made during the scoping process and the significant issues identified during scoping. As discussed in the introduction to Chapter 3, the relationships and connectivity among the individual resources are difficult to quantify although their importance cannot be overlooked. The reader should keep in mind that although the following discussion presents impacts in terms of individual resources, the impacts on some resources, particularly in terms of habitat or food sources, could produce more wide-ranging effects. This section identifies these linkages to the extent practicable.

This section discusses the direct, indirect, and cumulative impacts, as well as irreversible and irretrievable commitment of resources, for each alternative. The direct and indirect impacts are addressed within the discussions of individual resources; cumulative effects are also described by resource, but in a separate section.

The discussions that follow are organized to present the impacts of each alternative on each resource without a great deal of redundancy where effects would be common to all or most alternatives. Therefore, each section briefly explains the important aspects of the individual resource, identifies the indicators used to compare alternatives, and discusses the potential impacts. The discussions of potential impacts are structured so that impacts common to all alternatives are presented first. In cases where impacts are common to Alternatives B, C, and D, the discussions of Alternatives A and A1 are presented first, followed by a discussion of impacts common to Alternatives B, C, and D, followed by a discussion of impacts unique to Alternatives B, C, and D.

## 4.2    AIR QUALITY

This section discusses the potential impacts of atmospheric emissions from the five project alternatives on air quality and visibility. The air pollutant sources and activities associated with each alternative are explained, and the expected air pollutant emission rates are examined. The potential environmental impacts caused by each alternative are discussed and compared with state and federal standards. The indicator for this resource is the amount of emissions.

### 4.2.1    Effects of Alternatives A and A1

The potential impacts from air pollutant emissions associated with Alternatives A and A1 are discussed for both construction activity and production activity.

#### Construction

The potential impacts on air quality during the construction phase of the project are expected to be low and mitigated in part by the frequent precipitation in the area. Emissions from construction operations would be short-term and limited to confined areas. Construction-related emissions would result from temporary use of diesel generators, slash burning, and fugitive dust from construction of the process area and dry tailings facility (DTF). Particulate emissions due to construction-related

Exhibit 3, page 13

not provide suitable habitat for macroinvertebrates. Over the long term, as natural materials redeposit throughout the lake, the larger shallow/productive areas should increase the available habitat (and corresponding fish and macroinvertebrate populations). In the proposed reclamation plan, after mine closure the lake would have at least an equivalent area of plant and shallow water macroinvertebrate habitat that is not covered by tailings. It is therefore assumed that post-closure habitat should be adequate to support a macroinvertebrate population at least comparable to the pre-mining population.

The work completed to date demonstrates that the TSF can be restored to at least equivalent habitat and fish populations after closure. The operational monitoring described in Section 2 would be used to further refine and optimize the reclamation plan. These data would be reviewed by the Forest Service and ADNR, which would approve and oversee implementation of the final reclamation plan. As required by the ADNR Title 41 permit, downstream fish passage would have to be provided at closure from Upper Slate Lake through Lower Slate Creek to East Fork Slate Creek below the lakes. Upstream fish passage would not be restored from East Fork Slate Creek below Lower Slate Lake to Lower Slate Lake.

The existing Jualin access road would be maintained as the primary access to the mine under Alternatives B, C, and D. The road would be upgraded as needed to suit construction and operational requirements and extended from Jualin to the proposed mine portal using appropriate Forest Service BMPs. This road has two stream crossings over Johnson Creek. Existing bridges would be upgraded. Construction would be consistent with Forest Service standards and guidelines (TRAN214), including the use of erosion control and stabilization measures. The installation or improvement of the bridges would also be done under ADNR Title 41 permits that would address impacts on fish habitat.

### Water Withdrawal

Under Alternatives B, C, and D an infiltration gallery is proposed for installation in Johnson Creek near Jualin. The infiltration gallery would consist of a perforated pipe placed in gravel adjacent to the stream. Water would flow from a pipe into a sump and then be pumped into a 300,000-gallon freshwater tank. Water withdrawal would require approximately 0.3 cfs under Alternatives B and D and 0.52 cfs under Alternative C from Johnson Creek. These withdrawals would follow instream flow requirements developed by ADF&G and authorized under a water right issued by ADNR. Adherence to the requirements should minimize adverse effects associated with flow reductions. Withdrawals could be restricted during periods of critical flow.

Some short-term impacts on the stream channel would likely occur during installation of the infiltration gallery in Johnson Creek. BMPs should minimize these impacts, but the loss of macroinvertebrates and other aquatic insects would likely occur. As previously indicated, macroinvertebrate species would likely recolonize any areas affected by stream crossings. No studies are available on the presence of fish in this portion of Johnson Creek (Kline, 2003a). If fish are present, the installation of the infiltration gallery would likely have little direct impact on them, and downstream impacts from sediment deposition would probably not occur because sediment would be quickly flushed from the system.

### Water Quality

*Stream Discharges.* Under Alternatives B, C, and D, surface water collected from the Kensington waste rock disposal area would be diverted into the sediment ponds (Figure 2-4) and ultimately discharged to Sherman Creek. This discharge would need to meet water quality-based discharge

Helicopter activity would occur only 12 to 14 times per month during construction and would include flights from Juneau to the site. This is not a large increase in helicopter activity over what currently occurs (up to 200 flights daily in the summer in Lynn Canal) in the region, so wildlife disturbance would be slight relative to background conditions. Offloading of supplies at Slate Creek Cove would occur about four times per week and would include some sharp noise (metal on metal). This noise might cause some brief startle reactions in wildlife (mammals, birds) near the pier, but the noise would dissipate generally to normal voice level less than 1 mile from the site (see Section 4.18), causing limited potential for disturbance.

Shuttle boat traffic would occur three to five times daily between Slate Creek Cove and Cascade Point or Echo Cove. Noise levels equal to normal voice level would not be exceeded within a mile of the route. The relatively low noise levels of the shuttle and brief periods of shuttle passing are likely to cause slight disturbance of birds that are very near the boat. Vehicle traffic on the road from the terminal at Slate Creek Cove to the mine might increase, to some unknown extent, avoidance of this region by brown bear. However, the presence of the road might have a greater effect than noise on such avoidance.

Increased noise levels expected during the Kensington Gold Project construction, operation, and reclamation would result in direct, short-term impacts on wildlife in proximity to the project's footprints. Wildlife avoidance due to noise would result in the displacement of individuals into areas where noise levels are lower. Because operation of the project would occur year-around, noise disturbance could affect both resident species (e.g., northern goshawk, black bear, bald eagle) and those occupying the area seasonally (e.g., various neotropical migrant birds). The predicted extent of noise impacts on wildlife, as described above, is based on the implementation of Alternative B, C, or D. Noise levels are expected to exceed ambient levels and adversely affect wildlife over approximately one-half of the project area (based on blasting during construction) (see Section 4.18, Noise). The noise levels would range from 125 dBA for blasting near the borrow pits attenuating to 84.2 dBA near Cove Point, to 72 dBA at the milling process building, and to below ambient levels at Cove Point (see Section 4.18, Noise). Noise from underground blasting would be quieter than that for any surface blasting, and therefore the potential for disturbance to wildlife would be less or none.

### 4.11.3  Summary

The potential direct effects of the Kensington Gold Project on wildlife vary substantially between species groups and alternatives. Species groups discussed include marine mammals, marine birds, terrestrial mammals, and terrestrial birds. Direct and indirect effects, which vary by alternative, include loss of habitat, disturbance during construction activities and mine operations, mortality from vehicle or vessel collisions, habitat fragmentation, interior forest patch size reductions, nest predation, and increased human disturbance.

Alternatives A and A1 would not involve the construction of marine facilities or associated boat service within Berners Bay, and therefore no impacts on marine mammals and marine birds that use the bay would occur. Marine mammals might be present in the vicinity of Comet Beach, but they are not known to congregate in the area. Minor habitat impacts are expected for management indicator species and other species of concern. For species associated with higher-volume, coarse-canopy forests, such as northern goshawk, marbled murrelet, and Townsend's warbler, impacts on their habitat are expected to be small. Less than 3 acres of high-volume old-growth forest would be affected under Alternatives A and A1, and less than 1 percent of the total productive old-growth forest would be removed (Table 4-14). A total of 135 acres and 104 acres of productive forest would be affected under Alternatives A and A1, respectively. Helicopter flights (up to three flights per day, 5 days per week) to transport personnel might displace goats in the upper Sherman Creek watershed;

minutes to cross the bay from Lynn Canal and would remain at Slate Creek Cove for several hours—long enough to load or unload. Project-related helicopter traffic would be limited to occasional trips to transport emergency supplies or personnel.

The noise and activities from the crew shuttle and barge would affect recreational boaters and land-based recreation in the vicinity of Cascade Point and Slate Creek Cove. The shuttle would generate an estimated 80 A-weighted decibels (dBA) at the middle of the bow at full speed. As a comparison, the Forest Service uses an assumed background noise of 45 dBA for shoreline environments with calm sea and surf (Hart Crowser, 1997). Section 4.17 discusses the extent of noise impacts from the crew shuttle and other aspects of mining operations. Generally, people on motorboats that are underway would be unlikely to hear the shuttle even in close proximity. However, kayakers, beachcombers, and people in moored boats would be able to hear the crew shuttle boat, depending on their location, the location of the crew shuttle, and ambient conditions at the time (e.g., wind, waves, other boats). The crew shuttle crossings would generate less noise than the airboats that currently ply the bay. The general noise and activity generated as barges are unloaded or employees embark and disembark the crew shuttle at Slate Creek Cove would also affect boaters who moor or camp in the cove. The crew shuttle would slow down as it approaches the marine terminals, which would reduce the level of noise coming from it. Noise generated by the mine/mill site and vehicles using the access road is not expected to affect recreation, except for the few hunters and trappers who might travel through the project area.

The crew shuttle boat would travel at a maximum of 18 mph and the wakes from the crew shuttle would be larger than those generated by the skiffs that currently frequent the bay. A study of boat wake effects in the Upper Mississippi River showed recreational boats as having wakes of 3.2 inches, 6.3 inches, 9.5 inches, and 19.7 inches for pontoons, fishing boats, medium power boats, and large cruisers, respectively (Wilcox, no date). The barges would travel at slower speeds and have smaller wakes than the shuttle and thus would have less wake impact. Compared with the waves that regular users encounter in Berners Bay, the wakes are not expected to affect recreational users in the vicinity of the project area.

Visual impacts caused by the project could also affect the quality of the recreation experience. The only project features visible from Berners Bay would be the Slate Creek Cove marine terminal and a small portion of the pipeline access road, visible from the northern third of the bay. The area from which the access road could be seen consists mostly of the shallow waters near the mouth of the Berners and Antler rivers, but it also includes the Berners Bay Cabin. The road would be 6 miles away from the cabin and partially screened by trees and thus relatively difficult to detect. It might also be possible, depending on the weather and extent of tree cover, to see a very small part of the process area from the Berners Bay Cabin, limited to portions of the topsoil stockpile, waste rock storage area, and possibly the top of the mill building. See Section 4.14, Visual Resources, for a detailed discussion of visual impacts.

In addition, boaters could see the crew shuttle or an occasional barge cross the bay, depending on the time of day. These vessels would contrast with the smaller boats now used on the bay. The 3:00 p.m. and 6:00 p.m. shuttles on weekdays and the 6:00 p.m. shuttle on the weekend would be more likely to be seen by boaters, each trip lasting roughly 30 minutes. The 5:00 a.m. and 1:00 a.m. crew shuttle crossings might also affect boaters who moor or camp overnight on Berners Bay, particularly in Slate Creek Cove. The marine facility would be lighted only while boats are being loaded or unloaded. Marine facility lighting would affect mostly campers, overnight boaters, and those viewing the night sky; however, effects would be limited due to the long daylight hours during the recreation season. Lighting at the mine process area and TSF would not be visible to recreationists (see Section 4.14).

### 4.13.5 Summary

Alternatives A and A1 would have greater impacts on land use than Alternatives B, C, and D because they would disturb more land and the DTF would remain in place after project completion. The primary impact of Alternatives A and A1 on recreation would be the views of the DTF and mine process area from Lynn Canal during operation and the DTF after reclamation. Facilities associated with Alternatives A and A1 would be located within the ML LUD with a Minerals Overlay. This LUD allows resource activities to alter the ROS to Roaded Modified, which requires facilities to be visually subordinate from VPTRs. The facilities proposed for Alternative A would be compatible with this LUD, except the DTF, which would not be visually subordinate as seen from Lynn Canal. Alternatives A and A1 would thus not meet the ML LUD during operation but would meet it after reclamation.

Under Alternatives B, C, and D, the construction of the Slate Creek marine terminal would affect land use by interrupting recreational use of that portion of the shoreline. After project completion, mining facilities and the marine terminal would be removed and the area reclaimed, except the TSF, which would remain in place after project completion. The mine process facilities and TSF would be compatible with the Modified Landscape LUD and Minerals Overlay.

The impacts of Alternatives B, C, and D on recreation would be greater within the vicinity of Berners Bay and Slate Creek Cove than at the immediate mine site because of the larger number of people using the bay. Impacts on Berners Bay would result from the presence of regularly scheduled shuttle and barge traffic, which would alter the remote, pristine character of the bay. Recreationists would be able to see the Slate Creek and Cascade Point marine terminals, as well as several 30-minute crew shuttle trips per day and an estimated four barge trips per week.

Noise generated by the crew shuttles would be similar to that from the existing large power boats that use the bay but would be audible to people in smaller boats in close proximity to the shuttle boat. The shuttle would slow down when reaching the terminals, reducing noise impacts on those using Echo and Slate Creek coves. Lighting and noise during crew shuttle or barge offloading could also affect campers or boaters moored overnight. Crew shuttle wakes would be an estimated 18 inches, compared with 9.5 inches for a medium power boat, which would affect kayakers near the shuttle but would be similar in size to the wave heights that can occur naturally. Because much of the existing kayaking occurs in Echo Cove, Alternative C would have a greater impact on the kayakers that use the cove in terms of noise, wakes, and visual impacts.

The recreation impacts of the mine process area and TSF under Alternatives B, C, and D would be minimal relative to the Berners Bay impacts because much of the area is private property with relatively difficult access and thus is not used extensively for recreation. In addition, the Mining Overlay that applies to the mine process area and TSF site allows for changes to the recreational setting to a Roaded Modified ROS, allowing for more developed facilities and motorized uses than the existing Semi-primitive Non-motorized ROS. An approximate 1.5-mile stretch of the project access road is within the OGH LUD and is designated an SPNM ROS. The project-related truck and bus traffic along the road might conflict with this ROS. If the OGH boundaries were changed as proposed in Appendix F, the LUD would revert to ML, which would reduce this conflict because it would allow the ROS to be altered to Roaded Modified.

Exhibit 3, page 17

FINAL

# Ecological Risk Assessment of Aqueous Tailings Disposal at the Kensington Gold Mine

*Prepared for:*
**USDA Forest Service**
**Juneau Ranger District**
**Juneau, AK**

**U.S. Environmental Protection Agency, Region 10**
**Seattle, WA**

**U.S. Army Corps of Engineers**
**Alaska District**
**Juneau, AK**

*Prepared by:*
**Tetra Tech, Inc.**
**3801 Automation Way, Suite 100**
**Fort Collins, CO 80525**

**December 2004**

C-1

## 2.0    PROBLEM FORMULATION

This section presents the Problem Formulation step. As part of the Problem Formulation, a conceptual site model has been developed that identifies the physical stressors, the potential sources of COPECs, the fate and transport of the COPECs in the ecosystems at the site, and the receptors that are at potential risk has been developed. A substantial amount of site-specific and relevant area-wide information was available for use in developing the conceptual model. This conceptual model was used to establish a series of management goals, as well as the assessment endpoints that allow for the evaluation of these goals.

### 2.1    Ecological Resources

The Kensington Mine is in the temperate, or coastal, rain forest of southeastern Alaska. This area is known for its lush vegetation, which is largely dominated by a variety of conifer trees. Dominant tree species in the immediate area near the mine are western hemlock (*Tsuga heterophylla*), mountain hemlock (*Tsuga mertensiana*), and Sitka spruce (*Picea sitchensis*). Some common understory species are salmonberry (*Rubus spectabilis*), Alaska blueberry (*Vaccinium alaskaense*), and rusty menziesia (*Menziesia ferruginea*) (USFS, 1992). Other common vegetation types include muskeg, or peat bogs. Sphagnum moss is the dominant plant species, though muskeg areas also contain a wide variety of shrubs and forbs. The vegetation community surrounding LSL is similar to the vegetation community in the overall area, with the addition of stands of yellow cedar (*Chamaecyparis nootkatensis*; Streveler, 2002).

The climate of the project area can best be described as West Coast marine, with temperature extremes moderated by Pacific Ocean currents and high annual precipitation totals resulting from the onshore movement of moist maritime air. Mean annual precipitation at the project area is estimated to be 1,458 millimeters (mm) (58.3 inches). Significant precipitation occurs in all months of the year, although the spring and early summer months are usually the driest and the fall months are usually the wettest. Creeks in the project area flow year-round; the lowest flows occur during the winter months of December to March, and the highest flows occur in the fall and spring.

LSL is approximately 4 miles southeast of the mine at an elevation of approximately 700 feet in the Slate Creek drainage basin. The Slate Creek drainage basin (Figure 2.1) is 839 hectares (ha) in size and has a mean annual flow of 0.95 cubic meters per second ($m^3$/sec) (Konopacky, 1995). USL and LSL are within the East Fork of Slate Creek. LSL is approximately 1.4 kilometers (km) upstream of the confluence of the East and West forks of Slate Creek and approximately 2.5 km upstream of Berners Bay. There is a permanent barrier to anadromous fish near the confluence of the West and East forks (Konopacky, 1995).

Exhibit 3, page 19

The bottom of LSL contains no large-scale topographic features and slopes to a single low area near the lake's center (Figure 1.5). LSL is bordered by steep terrain to its west, a moderate grade to the east, and nearly level terrain to the north and south. These generalities in the slopes of the riparian areas are reflected in the contours of the lake, with the most gradual bottom slope in the north end. At the high water mark, the transition between the littoral and riparian zones is abrupt, with no distinct shoreline habitat. The canopy and understory of the riparian zone vary between coniferous, deciduous, mixed, or absent, with no generalizable pattern. Submerged and partially submerged snags are common along the steep west shore. Streveler (2002) described the bottom substrate along the nearshore portions of the lake as alternating peaty and rocky. Kline (2001) reported that the deeper portions of littoral zone bottom were composed almost entirely of deep brown organic muck. Peaty substrates at the lake's margin support some sedge and grass species. The deeper "limnic zone" contained *Chara* alga, water lilies (*Nuphar polysepalum*), and pondweed (*Potamogeton natans*) (Streveler, 2002).

Rod/reel, gill net, hoop net, minnow trap, and electrofishing surveys in Upper and Lower Slate Lakes indicate that the headwaters resident Dolly Varden char (*Salvelinus malma*) is the only species of game fish present in LSL. Three-spine sticklebacks *(Gasterosteus aculeatus)* are also known to be present in the lake (Konopacky, 1995). Several estimates of the population of Dolly Varden char in LSL have been made. Buell (1989) set gill nets and captured two fish. The conclusion was that the population was small, likely because of the very oligotrophic conditions in the lake. An acoustic survey conducted in 1994 (Konopacky, 1995) estimated the number of fish to be 439 fish (range of 162–716). This estimate, however, has been questioned because of the lack of success in catching fish in the deeper part of the lake and the limited existence of a benthic macroinvertebrate food supply (Kline, 2001). Kline (2002) estimated a Dolly Varden char population of 996 (+/-292) fish in 2001 by using a mark-recapture survey. There is a limited population (estimated at 85 fish in 1994) of Dolly Varden char below LSL in East Fork Slate Creek (Konopacky, 1995). The population is thought to be small because of limited habitat. Dolly Varden char, sculpin (*Cottus* spp.), cutthroat trout (*Oncorhynchus clarki*), rainbow trout (*O. mykiss*), pink salmon (*O. gorbuscha*), and coho salmon (*O. kisutch*) occur in Slate Creek below the fish barrier (Buell, 1989; Kline, 2001; Konopacky, 1995). Dolly Varden char captured in the streams were four to nine times smaller on average, by weight, than those captured in the lakes, and those below the lower barrier falls were silver in color in contrast to the dark olive color of the Dolly Varden char above the falls and in the lakes (Kline, 2001). There is evidence that Dolly Varden char spawn along the shore of LSL. There is also evidence that Dolly Varden char migrate from USL to LSL (Kline, 2003a).

Exhibit 3, page 20

**FINAL**

**Table 3.2    Comparison of Tailings Chemistry with LSL Sediment and Risk-Based Criteria**

| Analyte | Unit | Tailings Analyses | | LSL Sediment Kline (2003b) | | Sediment Screening Values | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | MW (1996) USEPA 3051 | Rescan (2000) Aqua Regia | LSL-Shallow USEPA 3050 | LSL-Deep USEPA 3050 | MacDonald et al. (2000) | | CCME (2002) | | NOAA (1999) | | |
| | | | | | | TEC | PEC | ISQG | PEL | TEL | PEL | UET |
| Aluminum | mg/kg | | 16,300 | 17,530 | 22,567 | | | | | | | |
| Antimony | mg/kg | 3 | | 5.35 | 10.617 | | | | | | | 3 |
| Arsenic | mg/kg | 8 | 2 | 57 | 47.9 | 9.79 | 33.0 | 5.9 | 17 | 5.9 | 17 | 17 |
| Barium | mg/kg | 573 | 110 | 189 | 264 | | | | | | | |
| Beryllium | mg/kg | | <0.5 | 0.91 | 1.0 | | | | | | | |
| Cadmium | mg/kg | <0.1 | <0.5 | 2.07 | 1.56 | 0.99 | 4.98 | 0.6 | 3.5 | 0.596 | 3.53 | 3 |
| Chromium | mg/kg | 39 | 119 | 26.4 | 37.1 | 43.4 | 111 | 37.3 | 90 | 17.3 | 90 | 95 |
| Cobalt | mg/kg | 12 | 8 | 28.62 | 34.47 | | | | | | | |
| Copper | mg/kg | 30 | 14 | 50.12 | 65.43 | 31.6 | 149 | 35.7 | 197 | 35.7 | 197 | 86 |
| Iron | mg/kg | 31,000 | 31,100 | 29,217 | 41,167 | | | | | | | 40,000 |
| Lead | mg/kg | 25 | 4 | 7.2 | 9.05 | 35.8 | 128 | 35 | 91.3 | 35 | 91.3 | 127 |
| Manganese | mg/kg | 1,286 | 1,400 | 3,246 | 2,158 | | | | | | | 1,100 |
| Mercury | mg/kg | 0.058 | 0.01 | 0.15 | 0.174 | 0.18 | 1.06 | 0.17 | 0.49 | 0.174 | 0.486 | 0.56 |
| Molybdenum | mg/kg | 10 | 5 | 4.6 | 4.55 | | | | | | | |
| Nickel | mg/kg | 6 | 28 | 27.48 | 31.5 | 22.7 | 48.6 | | | 18 | 35.9 | 43 |
| Selenium | mg/kg | <1 | | 8.042 | 6.493 | | | | | | | |
| Silver | mg/kg | 0.01 | <0.2 | 0.615 | 0.973 | | | | | | | |
| Strontium | mg/kg | | 223 | 45.8 | 52.3 | | | | | | | 4.5 |
| Thallium | mg/kg | | <10 | 0.572 | 0.9 | | | | | | | |
| Vanadium | mg/kg | 65 | 65 | 67.4 | 96 | | | | | | | |
| Zinc | mg/kg | 55 | 52 | 204.8 | 203.5 | 121 | 459 | 123 | 315 | 123.1 | 315 | 520 |

In the shaded cells the tailings concentration exceeds the background LSL concentration. Boldface tailings values exceed a sediment screening value.
TEC = threshold effect concentration; PEC = probable effect concentration; ISQG = interim sediment quality guideline; PEL = probable effect level;
UET = upper effects threshold.

*Tetra Tech, Inc.*
*December 2004*

Exhibit 3, page 21

It is also important to note that, when possible, conservative assumptions of exposure and effects were used. This caution is seen, for example, in the use of the maximum detected concentrations for exposure, the assumption that the AUF = 1, and the selection of more conservative NOAEL and LOAEL values and higher transfer (BAF) factors. There is greater uncertainty in the aluminum NOAEL and LOAEL values for birds due to use of a single set of values for ring doves (Attachment A). Though there is greater uncertainty associated with these effects, the conservative selection of exposure factors should minimize the risk of underestimating potential risk to birds from aluminum.

Specific areas of additional uncertainty are (1) the limited data available for thallium concentrations in sediment and (2) unknown sedimentation rates in LSL. The available decant water data, however, suggest that thallium concentrations in the tailings and associated water are low, and therefore there is limited risk potential. The lack of data on sedimentation rates increases the uncertainty in projecting the time required for the tailings to be covered by natural sediments and thereby aid in the recovery of the macroinvertebrate community. Information in the literature (MEND, 1991) indicates that the deposition of sediment can be a very slow process. Although this might prolong the time frame required for colonization of the tailings, the availability of natural sediments in LSL should allow for sufficient macroinvertebrates to support fish in LSL.

## 5.4    Conclusions

Overall, the projected risks to aquatic receptors from chemical stressors during operation of the TSF vary (Table 5.1). In the immediate vicinity of the tailings discharge into the TSF, the pH levels are expected to be toxic to aquatic life. The spatial area of toxic conditions would be limited, however, and given the avoidance mechanisms used by fish, these conditions would not be likely to affect fish in the TSF during operations. Because of geochemical interactions and intermixing with LSL water, the alkaline pH would be rapidly neutralized. Aluminum levels would then rapidly decrease to natural levels. Natural levels are, however, above the chronic criterion and could pose a risk. Chromium concentrations, even under the worst-case water scenario, would pose a low risk to aquatic life. In addition, post-closure water concentrations of aluminum and chromium would pose a low risk to aquatic life.

In general, there would be a low risk to terrestrial receptors from chemical COPECs. Though there would be some potential risk to individual terrestrial receptors through sediment ingestion, the placement of tailings in the deeper part of the TSF would essentially eliminate this route of exposure. Under the worst-case water (i.e., exposure to untreated tailings decant water), the greatest potential was calculated for

Exhibit 3, page 22

volume of water present and the water turnover in the lake. Overall, there is significant uncertainty whether the TSF would support a fish population during operations.

Upon closure of the TSF, water depths and substrate composition would stabilize, improving the conditions for plants and macroinvertebrates. As shown in Table 5.3, the area of native substrate for plants and benthic macroinvertebrates in the closed facility would be equivalent to that in the current lake (11.34 acres). It is also expected that at least some colonization of the shallower tailings would occur after closure and that conditions would improve in time so that the overall productivity of the closed facility could be higher than that currently present in LSL. The higher productivity should eventually provide better long-term conditions for Dolly Varden char than the current conditions in LSL, although data show this level of recovery could require more than 50 years.

## 5.5    Monitoring, Research, and Mitigation

This section briefly presents the research and monitoring program planned for the operational period and the post-closure period. Several aspects of the research and monitoring program are designed to provide a better understanding of the potential effects of operations and the ability of the TSF to be returned to a productive char fishery. These efforts are aimed at confirming that all permit requirements are met, as well as providing information to allow for effective management of tailings and the TSF. Primary aspects of the research and monitoring program are listed below:

<u>Research and Monitoring During Operation</u>
- Invertebrate and aquatic plant populations in LSL
- Oxygen/temperature profile monitoring in USL and Spectacle Lake
- Dolly Varden char spawning surveys in USL
- Experimental placement of spawning gravel in USL
- In situ wetland transplant trials in USL
- In situ benthic invertebrate recolonization experiments in USL
- Dolly Varden char population monitoring in impoundment (assumes fish are not removed and the primary objective is operation of the the treatment facility)
- Dolly Varden char tissue chemistry monitoring in impoundment (assumes fish are not removed and the primary objective is operation of the treatment facility)

<u>Research and Monitoring After Closure</u>
- Benthic invertebrate population surveys
- Benthic invertebrate metal content analysis
- Dolly Varden char population surveys
- Dolly Varden char spawning surveys
- Aquatic plant distribution surveys

*Tetra Tech, Inc.*
*December 2004*

## *Appendix D: Preliminary Reclamation Plan*

### 1.0    *INTRODUCTION*

### 1.1    *Overview*

The Kensington Gold Project is a proposed underground gold mine approximately 45 miles north of Juneau in Southeast Alaska (Figure Sheet 1 of 10). The project covers both private land managed by the Alaska Department of Natural Resources (ADNR) and public lands managed by the Forest Service. Coeur Alaska, Inc. (Coeur), a wholly owned subsidiary of Coeur d'Alene Mines Corporation, is the operator.

This appendix addresses conceptual reclamation principles that are required as part of the Plan of Operations. The final reclamation plan, with a comprehensive cost estimate, would be used for bonding purposes and must reflect the alternative chosen in the Record of Decision (ROD) on the Final Supplemental Environmental Impact Statement (SEIS). The plan would be an important element of the Final Plan of Operations. It would incorporate key reclamation, mitigation, and monitoring requirements, which are outgrowths of the Final SEIS; the ROD; and individual, applicable permits for the project.

The major components associated with the project are an underground mine, a mill site, a tailings disposal facility, borrow areas, an administrative office, a maintenance and generator facilities complex, and a marine dock facility. Ancillary facilities include the access road, topsoil stockpiles, diversion systems, wastewater facility, water supply, and other minor facilities.

The focus of the project is underground mining of a mesothermal gold deposit. The mine's life is estimated to be approximately 10 years, at a production rate of approximately 2,000 tons of ore and 400 tons of underground development rock (waste rock) per day. Ore reserves are estimated to be approximately 7.5 million tons.

The mine would be accessed through the existing 850 level lower portal and a newly defined portal on the Jualin side of the project (1,000 level portal in Figure Sheet 2 of 10). Mined ore would be hauled or conveyed to the process facilities adjacent to the Jualin Portal. Processing of the ore would consist of a flotation circuit producing a concentrate from the diorite host rock. The concentrate would contain the gold-bearing mineral calaverite or gold telluride ($AuTe_2$), native gold, pyrite, chalcopyrite, and other minerals, principally silicate. The concentrate comprises approximately 5 percent of the ore by weight and would be transported off-site for processing.

The flotation tailings would be slurried by gravity through a pipeline to the proposed tailings storage facility (TSF) at Lower Slate Lake (Figure Sheet 3 of 10). The bathymetry of the lake is conducive to the conventional slurried disposal of tailings behind an embankment, which allows for the reestablishment of the lake at closure.

Mining would occur 365 days per year; year-round processing would occur over the estimated 10-year life of the mine. Site closure and final reclamation are expected to take 2 years after cessation of all mining activities.

Based on applicable site reclamation requirements under 36 Code of Federal Regulations (CFR) Part 228 Subpart A, a Final Reclamation Plan was submitted to the Forest Service in January

Exhibit 3, page 24

The tailings would be deposited to a final elevation of approximately 704 feet with an assumed cover of approximately 9 feet; i.e., the lake would be at an elevation of 713 feet prior to implementation of the closure/reclamation plan. Coeur would initially ensure that all remaining tailings in the lake have settled (or been discharged). The plan then calls for the lake elevation to rise to a final elevation of 737 feet, which would be maintained by the spillway in the dam. Raising the lake to the final elevation would provide for inundation of an area of natural ground (uncovered by tailings) equivalent in size (approximately 11.3 acres) to the current productive zone within Lower Slate Lake. Based on the findings of the Ecological Risk Assessment, this "productive" zone would support initial reestablishment of macroinvertebrate populations as needed to support restored fish populations. As discussed in this Final SEIS, the settled tailings would not resuspend; i.e., the inundated natural area would not be affected by tailings. Airborne introduction and inflow from Upper Slate Lake would provide macroinvertebrate sources to Lower Slate Lake. Over an extended period, the tailings would be covered by natural materials entering the lake from Mid-Lake East Fork Slate Creek and should also support macroinvertebrate populations. This would be limited, however, by the depth of much of the lake (greater than 30 feet) at which macroinvertebrates have historically not been observed in Lower Slate Lake.

If the operational monitoring shows that exposed tailings will affect the ability of the lake to be restored to at least pre-mining aquatic conditions, Coeur could have to install a natural tailings cover of native glacial deposits, organic material, or imported alluvial material. The capping material would be stored adjacent to the TSF. At closure, the material would be mixed with tailings water and pumped to a floating barge equipped with a submerged diffuser. The slurry would then be distributed throughout the TSF by the diffuser and allowed to settle to the necessary cap thickness. The cover material is expected to be installed to a depth of 10 centimeters or more over the tailings. After installation of the cover, the final lake level would be established (with a spillway) at an elevation optimized for restoration of aquatic resources. Note that the final elevation would likely not be as high as the elevation without a tailings cover because there would be no need to inundate natural areas.

In contrast, operational monitoring may show that the tailings habitability would actually be better than predicted in the laboratory and/or can be enhanced by other modifications or additions to the reclamation plan. For example, organic material could be added either with or separately from the tailings. In such a case, it may not be necessary to inundate natural areas, and uncovered tailings would provide a large area of shallow water habitat for macroinvertebrates and plants.

Numbers of three-spine stickleback and Dolly Varden char that migrate out of Upper Slate Lake would be well understood before closure through the measures that would be taken to bypass the TSF during operation. This information would be used to determine whether passive restocking of the TSF after closure via natural downstream migration would result in a balanced reestablishment of fish along with their food source. It may be determined that restocking can be accelerated by trapping and relocating Upper Slate Lake fish, or that fish should be blocked from entering the TSF until a sufficient prey base is established. If the resource agencies prefer, any remaining physical barriers to upstream movement from the TSF to Upper Slate Lake would be removed.

The TSF would not contain any flooded timber and much of the riparian zone would be forested with the timber that currently exists along the ~737-foot contour. Disturbed areas would be planted to reestablish the existing woody and non-woody vegetation types. Studies would be