RECORD OF DECISION                                    POA-1990-592-M



Alaska District



**REVISED**
**DEPARTMENT OF THE ARMY**

**RECORD OF DECISON**
**&**
**PERMIT EVALUATION**

---

**APPLICANT:**        COEUR ALASKA, INCORPORATED and Goldbelt, Incorporated
**APPLICATION NO.:**  POA-1990-592-M and POA-1997-245-N
**WATERWAY:**         Lynn Canal and Berners Bay

This document constitutes the United States (U.S.) Department of the Army, Corps of Engineers' (Corps) Record of Decision (ROD), compliance determination according to the National Environmental Policy Act (NEPA), the U.S. Environmental Protection Agency's (USEPA) Section 404(b)(1) Guidelines[1] (Guidelines), and the public interest review for Coeur Alaska, Incorporated, (hereafter referred to as "Coeur"), proposed Kensington Gold Project.

The U.S. Forest Service (USFS) initiated the NEPA process to identify and analyze alternatives to the amended Mining Plan of Operation submitted to the USFS for the operation of the Kensington Gold Mine. The USFS was the lead Federal agency for the project, and the Corps was a cooperating agency to the Environmental Impact Statement (EIS) published in February 1992, and to the Supplemental EIS (SEIS) dated August 1997. The Corps has been a cooperating agency on and throughout the current Final SEIS (FSEIS) process, which was completed in December 2004, when the USFS published the FSEIS and the USFS' ROD. Alternative D is the USFS's preferred alternative and has been adopted by Coeur.[2] The Corps authorized Alternative D, to two different permittees in separate permits (e.g., to Coeur for the Kensington Gold Project and to Goldbelt, Incorporated (hereafter referred to as "Goldbelt") for the Cascade Point marine facility).

The aforementioned documents[3] included a complete project impact analysis and review of the direct, secondary, cumulative, and reasonably foreseeable impacts of the project as well as pertinent alternatives. These analyses have also resulted in minor changes to the proposed activities.

I have independently reviewed and evaluated the information in the EIS, the DSEIS and the FSEIS, in accordance with 40 CFR 1506.3 and 33 CFR 230.21, and have found them to be accurate assessments, and therefore appropriate for the purposes of the public interest review and alternatives analysis required by 33 CFR 320.4(b)(4) and 40 CFR 230.10. The Corps hereby adopts the FSEIS for the Kensington Gold Project, and those parts of the Kensington Gold Project EIS and SEIS not changed by the FSEIS.

---

[1] 40 CFR 230

[2] The applicant had originally applied for Alternative B (described in Section VI, later in this ROD). Alternative D was not in the Draft of the FSEIS, hereafter referred to as the DSEIS, but originated later as a result of comments received from Federal, State and local agencies, as well as the land manager (USFS), with respect to the DSEIS.

[3] These documents are all available at the USFS, 8465 Old Dairy Road, Juneau, AK 99801. A copy of each was incorporated into the case file.

1

000004

Exhibit 11, page 1

RECORD OF DECISION                                POA-1990-592-M

I. **DECISION**:  I have decided, in light of the overall public interest, to issue two Corps permits pursuant to Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. 403), and pursuant to Section 404 of the Clean Water Act (CWA) (33 U.S.C. 1344) (10/404 permit).  One permit will be issued to Coeur to authorize the discharge of processed mine tailings into Lower Slate Lake, and the discharge of fill materials into waters of the U.S. to construct a marine dock facility at Slate Creek Cove in accordance with the attached drawings (Attachment E), Alternative D in the FSEIS and this ROD.

The second permit will be issued to Goldbelt for the Cascade Point Docking Facility.  See Plans of Goldbelt, attachment A.

The Corps' ROD is based upon information contained in the EIS, DSEIS, the FSEIS and the USFS's ROD, the stated views of Federal, State, local agencies, the interested public, current national policy and applicable laws and regulations.  This decision has been made in conformance with the USEPA memorandum, entitled, "Clean Water Act Regulation of Mine Tailings", dated May 17, 2004.  The possible consequences of all alternatives, including the USFS's preferred alternative, have been evaluated in terms of environmental effects, social well-being, and the public interest.  All factors[4] which may be relevant to my decision were considered, including the cumulative effects thereof.  These factors included, but were not limited to conservation, economics, aesthetics, general environmental concerns, wetlands, cultural values, fish and wildlife values, flood hazards, flood plain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, mineral needs, consideration of property ownership, and in general, the needs and welfare of the people.

Turbidity, total suspended solids (TSS), aluminum, and chromium are the principal components and elements of concern within the tailing storage facility (impoundment).  The tailings deposited into the impoundment will have been processed to remove sulfides and the contained gold.  The ore will be crushed and ground, with the sulfides and gold mineralization removed by a floatation circuit.  This would leave trace concentrations of metals bearing sulfides, metal oxides, metal sulfates, and carbonate salts.  Up to 40% of the tailings will be placed back underground in a wetted cement mixture.  No cyanide or arsenic will be added to the ore as a reagent to recover gold.  In fact, the gold concentrate will be shipped offsite for final recovery.  The water in the impoundment will not be directly discharged into any receiving water.  The water from the tailings storage facility will be pumped by pipeline to a water treatment facility before discharge to the East Fork of Slate Creek.  To ensure water quality standards for the project are met, all water from the impoundment will have to go to and through a water treatment plant during operation.  The discharge from the water treatment plant is subject to an NPDES permit.  To ensure that the tailings are reclaimed in accordance with approved plans, the USFS and ADNR will hold reclamation bonds on the operation to ensure that all reclamation standards are met.  See Section XI, Subpart G.

Attachments to Record of Decision:

A.  Plans of Goldbelt

---

[4] These and other factors, which were addressed in the DSEIS and FSEIS, Chapters 3 (Affected Environment) and 4 (Environmental Consequences), which adequately addressed the environmental and public interest factors.  No new factors have been identified as a result of this review.

000005

Exhibit 11, page 2

RECORD OF DECISION                                   POA-1990-592-M

    B.  Kensington Mine Section 404(b)(1) analysis.
    C.  List of Reference Documents
    D.  Revised Special Conditions for Coeur permit
    E.  Revised permit application tables and drawings, Coeur
    F.  Signed Department of the Army Permit Evaluation and Decision Documents
       for Coldbelt, Incorporated:  (1) POA-1997-245-2 (Cascade Point Dock), and
       (2) POA-1997-245-M (Road from Echo Cove to Cascade Point),
    G.  The Section 404(b)(1) Analysis and Public Interest Review for
       POA-1997-245-N (Cascade Point Dock)

The documents listed in Attachment C were submitted to the Corps by the
applicant and by various Federal and State agencies as supporting documents,
and specified documents or portions of the listed documents have been
incorporated into this ROD by reference.

II.  **PROPOSED PROJECT**:  The location and description of the proposed work was
described in the Corps public notice, dated June 21, 2004.  The 45-day
comment period, originally commensurate with the comment period of the DSEIS,
was later extended at the request of various Federal resource agencies to
August 20, 2004.

Coeur's proposal is to mine gold from subsurface mineral deposits located
within the Tongass National Forest on Federal and private patented lands,
just north of Berners Bay, Alaska.

Coeur proposed[5] in June 2, 2004 in a revised application to place structures,
and to discharge an approximate total of 5,451,700 cubic yards (cy) of fill
material into an approximate total of 91.7 acres of waters of the U.S.,
including wetlands, in conjunction with the construction of the following new
mine facilities and associated infrastructure:

| Proposed Facilities | Acres of US Waters To Be Impacted | Proposed Fill Volume (cy) |
|---|---|---|
| Process Area | 5.3 | 88,000 |
| Tailing Dam | 1.4 | 145,000 |
| Access Road | 12.0 | 26,000 |
| Laydown Area | 5.0 | 4,800 |
| Waste Rock Disposal | 4.8 | 311,000 |
| Borrow Areas | 4.2 | 0 |
| Mine Tailings | 45.5 | 4,800,000 |
| Tails Placement Facilities | 8.9 | 15,000 |
| Topsoil Stockpile | 1.0 | 33,000 |
| Slate Creek Terminal | 3.6 | 28,900 |
| TOTAL | 91.7 | 5,451,700 |

These activities included the discharge of fill material in waters of the
U.S., and the placement of several structures (floats, docks and piles) in
navigable waters of the U.S., in conjunction with the construction of a
marine dock facility in Slate Creek Cove.

The individual components of the proposed work included the following
activities:  (1) the construction of building pads for milling facilities,
administrative, and support facilities; (2) construction of a tailings dam;
(3) construct fill pads associated with the tailings pipeline, access roads,

---

[5] The location and description of the proposed work was described in the Corps public notice, dated June 21, 2004.

3

RECORD OF DECISION                                    POA-1990-592-M

a discharge pipe, and a pump-back sump (located at the toe of the proposed dam); (4) construction of a waste rock disposal site; (5) construction of abutments for the main access road, which would run from Slate Creek Cove to the process area, plus fills associated with the construction of various bridges (abutments, etc.); (6) construction of a staging and laydown area, as well as an infiltration gallery in Johnson Creek; (7) approximately 4,800,000 cy (or 4.5 million tons) of fill material would be discharged into approximately 45.5 acres of waters of the U.S.; (8) material and topsoil stockpiles for use in concurrent and closure reclamation activities; (9) construction of 2-foot high berms encircling settling and storage ponds; and, (10) construction of a marine dock facility in Slate Creek Cove. Galvanized metal piling would be used to anchor various floating components of the dock facility.

Coeur did not include the Cascade Point docking facility in their Department of the Army (DA) permit application. The Cascade Point docking facility application was submitted separately by Goldbelt, Incorporated, and previously evaluated as an independent activity by the Corps in our decision document for that project. This ROD now analyzes Cascade Point as a component of the Kensington Gold Project. Two different permit decisions are being made; one for the Kensington Mine Project, and another for a docking facility at Cascade Point. We re-examined our previous conclusion that the Cascade Point facility was a separate and independent project. Based on a review of all available information including, but not limited to, the FSEIS, Goldbelt's submissions, and the City & Borough of Juneau's Conditional Use permit, we determine that, without the Kensington Mine, the Cascade Point facility would not be constructed in the foreseeable future. Although we recognize that Goldbelt intends the dock to be used for other purposes in the future, such plans are insufficient for us to evaluate it as an independent activity. We therefore conclude that a destination docking facility at Cascade Point is a component of the Kensington Mine project. It is analyzed in the FSEIS, this ROD, and in attachments F (as modified by attachment G) and G (both incorporated into this ROD).

The applicant originally applied for Alternative B, as reflected in the Corps public notice, stating that approximately 5,451,700 cubic yards of fill material would be discharged into 91.7 acres of waters of the U.S., including wetlands. The applicant later adopted the USFS's preferred Alternative D, with the volumes and acreages described in Section VI below, prior to publication of the FSEIS.

III. **PURPOSE AND NEED FOR ACTION**: The basic purpose is to develop a working, profitable gold mine for the Jualin/Kensington ore body. This will be accomplished by extracting the gold ore and reducing it by removal and disposal of non-marketable components, and by transporting the gold concentrate to market. There are several transportation links and construction activities implicit in the overall mining operation.

The overall mine operation project would need the following components: (1) building pads for milling facilities, administrative and support facilities; (2) tailings disposal facilities; (3) fill pads associated with pipelines; (4) a waste rock disposal site; (5) access roads and bridge abutments; (6) staging and laydown areas; (7) an infiltration gallery; (8) material and topsoil stockpiles; (9) two marine dock facilities; and (10) berms to encircle settling and storage ponds.

4

000007

Exhibit 11, page 4

RECORD OF DECISION                              POA-1990-592-M

Coeur's need is to relocate[6] the major mine components from the Kensington Mine site adjacent to Lynn Canal, to the Jualin Mine site location in the Johnson Creek watershed (approximately two miles to the southeast across a southern ridge extension of Lion's Head Mountain), and at Slate Cove, on the northwest side of Berners Bay. This action would allow Coeur to transport ore from the mine directly[7] to a mill on the Jualin side of the peninsula for processing, from where the processed tailings material slurry would then be piped by gravity feed directly to the alpine lake disposal site (Lower Slate Lake). Coeur needs to establish a marine dock facility in Slate Creek Cove for the transport of mine personnel safely to another destination port and move gold concentrate efficiently and reliably off the mine site.

IV.   **SCOPE OF ANALYSIS [33 CFR 325, Appendix B, 7(b)]**:   When an applicant proposes to conduct a specific activity (e.g., the actions proposed by Coeur in the Corps' public notice, dated June 21, 2004), requiring authorization from the DA, and it is merely one component of a larger project (e.g., an ongoing mining operation), the District Engineer (DE) shall establish the scope of the ROD and/or permit evaluation assessment to address the impacts of the specific activity requiring Corps authorization and those portions of the entire project over which the DE has sufficient control and responsibility to warrant Federal review. Sufficient control and responsibility is considered to exist for portions of the project beyond the Corps' jurisdiction where the Federal involvement is sufficient to turn an essentially private action into a Federal action. These are situations where the environmental consequences of the larger project are essentially products of the Corps' permit action. (See 33 CFR 325 Appendix B, Paragraph 7.b.)

For this proposal, works initially identified as requiring Corps authorization are limited to the placement of structures, and the discharge of dredged or fill material into waters and navigable waters of the U.S.

However, the DE is considered to have control and responsibility for portions of the project beyond the limits of Corps jurisdiction where the Federal involvement is sufficient to turn an essentially private action into a federal action. These are cases where the environmental consequences are essentially products of the Corps permit action. Typical factors to be considered in determining whether sufficient control and responsibility exists include (1) whether or not the regulated activity is 'merely a link' in a corridor type project; (2) whether adjacent uplands in the immediate vicinity of the regulated activity affected the locations and configuration of the regulated activity; (3) the extent to which the entire project will be within the Corps jurisdiction; and (4) the extent of cumulative Federal control and responsibility.

Combined Federal controls are influenced by the fact that the work would be conducted in part on Federally administered lands (Tongass National Forest-USFS), and in part on State of Alaska administered lands (Alaska Tidelands-marine dock facility); the water leaving the impoundment behind the dam is subject to the (USEPA) regulations (i.e., subject to the USEPA's authorization to discharge under the National Pollutant Discharge Elimination System (NPDES Permit); and other Federal laws (e.g., Endangered Species Act,

---

[6] The locations of certain structures, as yet not constructed, were referenced in the previous Corps authorization. The current proposal would relocate these structures on 'paper' to new locations.

[7] The 'high-grade' ore body that would be mined is located on the eastern side of Lions Head Mountain. Thus, locating the mill on the eastern side would shorten the distance from ore body to portal to mill.

000008

Exhibit 11, page 5

RECORD OF DECISION                                    POA-1990-592-M

Fish and Wildlife Coordination Act, the National Historic Preservation Act, the Marine Mammal Protection Act, the Coastal Zone Management Act, etc.).

There are alternatives available to the applicant, that would allow various activities of the Kensington Gold Project to function without the need for Corps authorization, e.g. use of uplands[8,9]. Additionally, logistics, technological or economic concerns, and/or other Federal or State regulatory findings could affect the practicability of some of the listed alternatives.

The scope of analysis for this action includes not only the impacts, alternatives, and project benefits resulting from the primary proposed actions (two marine docking facilities and a mine tailings disposal site) as identified above, but also the infrastructural items, e.g., the road system, pipelines, and material stockpile sites. Other project-related impacts not within the scope or a product of Corps authorization have been summarized and identified in the direct, secondary and cumulative impact analysis sections of the FSEIS.[10]

V.   **BACKGROUND**:  In July of 1992, the USFS approved a Plan of Operations (POO) for the Kensington Gold Project.  The POO called for underground mining; ore processing with on-site cyanidation; a tailings impoundment; marine discharge of process wastewater; and various support facilities, including the use of liquefied petroleum gas for power generation.  Comet Beach was the proposed landing site for all supplies and fuel.  A man camp was proposed for the workers.  The Corps evaluated a DA permit application for the creation of an impoundment in Sherman Creek Valley, and the disposal of mine tailings behind that dam.  The Corps completed a public notice, public meetings, public hearings on this proposal, but never issued a DA permit for that facility.

In August 1997, the USFS approved a revised POO for the Kensington Gold Project.  The modified plan called for off-site processing of a floatation derived gold concentrate; placement of tailings in a dry tailings facility accessed through a pipeline, with 25% of tailings to be paste (wetted cement mixture) backfilled in the underground workings; diesel fuel would be used for power generation; and the tailing slurry would be piped to a dewatering plant and the reclaimed water returned for reuse.  Comet Beach was the proposed landing site for supplies and fuel.  A camp was proposed for the workers.  The Corps of Engineers received a DA permit application for this new facility design.  The Corps completed a public notice, public meetings, and public hearings on this proposal.  After a thorough evaluation of the project the Corps of Engineers issued a permit for the dry tailings facility and the support infrastructure.

Between the times the 1997 FSEIS evaluated the Kensington Mine Project and the revised Kensington Mine Project proposal in 2001, Coeur gained control of the Jualin Mine site and this changed the land status and gold resource calculations which resulted in a need to modify the Plan of Operation.  The previous POO sited all of the mining and milling operations on west side of Lion's Heads Mountain ridge with access and support facilities located at Comet Beach on Lynn Canal.  In the 2004 FSEIS, this scenario is represented by all "A" Alternatives.  The 2001 revised POO resulted in the siting of the

---

[8] FSEIS, Section 2.2, Overview of Project Alternatives.
[9] ROD, Section VI. Alternatives, below.
[10] See FSEIS, Section 4.21, Cumulative Effects.

000009

Exhibit 11, page 6

RECORD OF DECISION                                POA-1990-592-M

marine dock facility, the mill, access road, and wet tailings storage facility on the east side of Lion's Heads Mountain ridge. Except for the eventual connection by indirect tunneling for air flow purposes, support of waste rock disposal resulting from adit development (tunneling), and water treatment facilities located on the west side, no alternatives were contemplated or considered for a split operation, e.g. a mill operation on one side of the ridge and tailings disposal on the other. Comet Beach would still be used for support of the west side developments.

In November 2001, Coeur submitted an amendment to its approved 1998 Plan of Operations to the USFS. The amendment modified site access and eliminated the dry tailings facility in favor of placing the tailings into an impoundment in Lower Slate Lake. With the elimination of the dry tailings facility (113 acres in size), two gravel borrow areas (totaling 43 acres), which were located underneath wetlands, were also eliminated. The ore would go through a floatation circuit and the concentrate would be shipped offsite for processing. The proposal included 40% of the tailings being placed underground as a paste backfill. The mine site now includes both the Kensington and Jualin sites. Access to the mine site would be from the Jualin side, and include a marine dock facility in Slate Creek Cove off of Berners Bay. A daily commute for the mine workers was proposed, and the man camp eliminated from the proposal. In December of 2004, the USFS finalized the Supplemental Environmental Impact Statement and issued their Record of Decision for the modified Kensington project. The DA has been a cooperating agency on the SEIS for this project and this ROD constitutes the Corps decision on the latest mine project design proposal.

VI.   **ALTERNATIVES CONSIDERED**:

For the reasons discussed below, the Corps has concluded that alternative D with the inclusion of the water treatment plant and water diversion is the least environmentally damaging practicable alternative. The No Action Alternative (listed as Alternative A in the FSEIS) is not environmentally preferable for the reasons discussed in Section VII below. Since Alternative D has the least environmental impact, it is the environmentally preferable alternative. This section discusses two categories of alternatives. The first category is alternatives for a tailings facility with related components. The second is alternative docking destinations.

Determination of the Corps' Jurisdiction. The USFS conducted wetland and vegetation mapping of the Alternative A lands (located in the Sherman Creek and Sweeney Creek watersheds) and published the results in the 1992 EIS[11], for the Kensington Gold Project. The USFS' mapping method was the procedure outlined in the 1989 Federal Manual for Delineating Jurisdictional Wetlands. However, "Since that time, the 1992 Energy and Water Development Appropriations Act mandated the use of the 1987 Corps of Engineers Wetlands Delineation Manual for wetland delineations instead of the Federal Manual for Delineating Jurisdictional Wetlands (Federal Interagency Committee for Wetland Delineation, 1989). The Corps of Engineers has reevaluated the August 1990 wetland delineation performed for the Kensington Project, and as a result has determined that the wetland determinations would remain the same based on the 1987 manual."[12] The Corps conducted an onsite field visit on August 6, 1996, to verify the wetland delineation prior to giving approval.[13]

_____

[11] FEIS, Chapter 3, Vegetation, pages 3-45 through 3-48.
[12] FEIS, Chapter 3, Vegetation, pages 3-45 through 3-48.
[13] See Corps' Memorandum dated August 12, 1996, file number POA-1990-592-D.

000010

Exhibit 11, page 7

RECORD OF DECISION                               POA-1990-592-M

Wetland and vegetation mapping of the currently proposed project areas (Johnson Creek and Slate Creek watersheds) was conducted using several methods.[14] Initially, wetland maps from the U.S. Fish & Wildlife Service's National Wetland Inventory were used to provide some preliminary mapping. Boundary mapping was performed by the USFS using aerial photograph interpretation, using mapping codes from Cowardin's Classification of Wetlands and Deepwater Habitats of the United States.[15] The USFS contracted with ABR, Incorporated, to conduct more extensive wetland mapping and a functional analysis of the project area. All mapping was verified on the ground using the three-parameter approach as described in the Corps of Engineers Wetlands Delineation Manual (1987), and this preliminary wetland determination[16] was submitted to the Corps for approval. Prior to giving final approval, personnel from the Corps' Juneau Field Office conducted an onsite visit to verify the wetland delineation in the project areas[17].

Thus, the project area for Alternative A, and the project area for the Alternatives B through D were each delineated and mapped using the 1987 Corps of Engineers Wetlands Delineation Manual. This ensured consistency in the Corps' jurisdictional determination process as well as in the alternatives analysis in this ROD.

*No Action Alternative*: Includes both the Comet Beach marine dock facility and the Dry Stack disposal site.

This is the original action which was authorized by the Corps in 1998. It is identified as Alternative A in the DSEIS, and in the 1997 SEIS. This alternative includes the project description found in the USFS Draft of the 1998 SEIS (Alternatives B and D) for the project, as well as in the Corps permit, dated May 6, 1998. A Corps ROD was issued for this alternative on January 28, 1998, and placed into the permit file. It is also considered the "No Action Alternative" in the 2004 FSEIS.

This project included the following: the discharge of fill material onto approximately 113 acres of forested and scrub-shrub wetlands (special aquatic site)[18] for the construction and capping of a Dry Tailings Facility; the discharge of fill material into an additional 155.1 acres of waters of the United States (U.S.); the mechanical land clearing of 259 wetland acres[19]; underground mining; processing by conventional flotation; and tailings management using a Dry Tailings Facility with at least 25% of the processed material being put underground as backfill. The project would require two stream crossings and two major creek diversions. A 252-person work camp would be located at the mine site, and weekly transport of mine personnel would be by helicopter from the airport in Juneau. All fuel, supplies, chemicals and consumables would be barged to Comet Beach. Final reclamation would restore approximately 104.1 acres back to wetlands, and would involve the permanent conversion of approximately 164 acres

---

[14] FSEIS, Chapter 3, Section 3.12.3 Wetlands, beginning on page 3-66.

[15] See Item 19, Attachment C, References.

[16] Preliminary Jurisdictional Determination, Delineation, and Functional Assessment of Wetlands, Juslin Mine Project, Alaska, prepared by ABR, Incorporated-Environmental Research & Services. October 2000.

[17] See Corps' letter dated March 29, 2004, file number POA-1990-592-N.

[18] See 40 CFR: 230.3, Definitions, and 230.40 to 45, Potential Impacts to Special Aquatic Sites.

[19] The acreage for the mechanical land clearing activities is not cumulative to the acreages associated with fill activities.

000011

Exhibit 11, page 8

RECORD OF DECISION                                    POA-1990-592-M

of forested wetlands to uplands by capping and revegetating the Dry Tailings Facility, removal of all structures except the diversions and large sediment retention structures, and long-term care and maintenance of the Dry Tailings Facility and related water management systems.

| | |
|---|---|
| Total Wetlands Impacted | = 269.1 Acres |
| Dry Tailings Facility Wetlands Filled | = 113.0 Acres |
| Total Waters of the U.S. to be Reclaimed | = 304.1 Acres |
| Net Loss of Waters of the U.S. | = 164 Acres[20] |

*Subsection (A): Discussion of Tailings Facility Alternatives.*

1.  Dry Tailings Facility Alternatives:

Three variations[21] of Alternative A are described in this subsection. These would each result from the high-grade mining process of gold ore (from the same ore body), which potentially results in a reduced Dry Tailings Facility (DTF) footprint. This is because mining only the higher grades of ore results in less total ore processed, and less tailings generated. Additionally, for each variant, mine personnel would live on-site, and would be periodically transported to and from the mine site by helicopter. All of the activities authorized under Alternative A would remain the same for each variant: only the size of the proposed DTF would change. The fill footprint pertinent to the DTF and the net loss for each variant was calculated by a different party (see footnotes) and the results presented below. Please note that Alternative A2 below is the same as Alternative A1 in the 2004 FSEIS. For clarity in this ROD, the numerical change (from A1 to A2) was made so that the increasing numbered DTF alternatives reflected increasing impacts to waters of the U.S. We examine an expanded number of DTF alternatives in this ROD to ensure that all reasonable, potentially practicable DTF variants are analyzed.

Coeur has stated that none of the DTFs, as described for Alternative A or its variants (A1, A2 and A3), were practicable.[22,23,24] Coeur found that using the high-grade process described in the FSEIS would require a minimum size DTF of 70 acres. The Alternative A1 and A2 DTF sizes were incorrectly calculated by Coeur's consultant and by the USFS. We reviewed Coeur's submission on this issue and agree with it. Consequently, Alternatives A1 and A2 are not practicable from a technical/logistical standpoint, since the DTFs in those alternatives are inadequately sized to hold the amount of tailings generated by a high-grade mining process. Coeur also determined that Alternatives A and A3 were not practicable from a cost and economics standpoint, and stated it could not, and would not, construct and operate the Kensington mine project under any Alternative A variant. We reviewed Coeur's submission on this issue and also agree with it, for the reasons described in more detail in Section VIII of this ROD.

Alternative A1[22]:  This action would result in converting approximately 109.2 acres of waters of the U.S. permanently to uplands.

---

[20] See FSEIS, Summary Table on page S-13, Wetlands.
[21] The three variations of Alternative A were all based on the same mining technique, and the same method of constructing the Dry Tailings Facility. However, the volume of mine waste to be disposed of above ground would differ under each alternative, depending upon the calculation.
[22] Acreages were computed by Knight-Piesold's Preliminary Design of Scaled Down Dry Tailings Facility (Alternative A1), dated June 24, 2004.

9

000012

RECORD OF DECISION                                    POA-1990-592-M

```
Total Waters Impacted                             = 171.2 Acres
Dry Tailings Facility Wetlands Filled             =  34.2 Acres
Impacted Waters Restored to Waters of the U.S.    =  63.0 Acres
Net Loss of Waters of the U.S.                    = 108.2 Acres
```

Alternative A2[23]:  This action would result in converting approximately 124 acres of waters of the U.S. permanently to uplands.

```
Total Waters Impacted                             = 187 Acres
Dry Tailings Facility Wetlands Filled             =  50 Acres
Impacted Waters Restored to Waters of the U.S.    =  63 Acres
Net Loss of Waters of the U.S.                    = 124 Acres
```

Alternative A3[24]:  This action would result in converting approximately 144 acres of waters of the U.S. permanently to uplands.

```
Total Waters Impacted                             = 207.0 Acres
Dry Tailings Facility Wetlands Filled             =  70.0 Acres
Impacted Waters Restored to Waters of the U.S.    =  63.0 Acres
Net Loss of Waters of the U.S.                    = 144.0 Acres
```

2.   *Wet Tailings Storage.*

Alternatives B, C and D, which are briefly described below, are discussed in detail in the 2004 FSEIS.[25],[26]  The existing Lower Slate Lake measures up to approximately 23 acres in area (approximately 3 acres of emergent wetlands along the lake fringe and approximately 20 acres of deep-water habitat), and approximately 51 feet deep, would be filled with tailings to the now-current ordinary high water mark (OHWM), and would, by mine closure, measure approximately 62 acres in size and up to approximately 33 feet deep, thus a net area increase of 269%.  The increased lake area would then consist of approximately 47 acres of deepwater habitat and approximately 15 acres of aquatic shallow-water habitat[27], which would likely convert by natural, or artificial[28], means to a shallow water emergent wetland/vegetated shallows (special aquatic site).  During the mining process, approximately 39 acres of adjacent scrub-shrub and forested wetlands would be covered by the rising lake waters.  The marine docking facility in Slate Creek Cove would be constructed.  The milling facility would be constructed in the Johnson Creek watershed.  A destination dock facility would be constructed for transportation of personnel.  The proposed Cascade Point facility would require the placement of approximately 1.3 acres of fill into marine waters for a breakwater, the impacts of which are analyzed in Attachment G.

---

[23] Acreages were computed and published by the FSEIS.

[24] Acreages were computed by Coeur Alaska, Incorporated, and are contained in Kensington Gold Project, Corps of Engineers 404(B) (1) Practicability Analysis, dated October 2004.

[24] DSEIS and FSEIS, Section 2.2, Overview of Project Alternatives.  Also, Table of Summary of Potential Impacts of Each Alternative by Resource (Pages S-8 through S-17).

[25] FSEIS, Table 4-24, page 4-82, Acres of wetlands affected under each alternative from construction through operations.

[26] Acreage is based on the area of the new lake that would be equal or less than nine feet deep..

[27] The Kensington Gold Mine Project's Mining Plan of Operations contains a Reclamation Appendix, which includes a lake restoration plan.  This plan is not complete, and won't be until project closure, at which time the Federal and State resource agencies will convene to determine the best method of restoring Lower Slate Lake. Restoration will include capping of the mine tailings at the lake bottom.

000013

Exhibit 11, page 10

RECORD OF DECISION                                    POA-1990-592-M

An approved reclamation plan was not available for inclusion in the DSEIS or the 2004 FSEIS. The Final Kensington Gold Project' Mining Plan of Operations, with Reclamation Plan, dated May 2005, outlines the reclamation process applicable to Alternative D. The same reclamation plan would be applicable to Alternatives B and C, as well. The applicant has provided a reclamation plan which addresses all impacted waters of the U.S. applicable to this project proposal. This information has been incorporated into Alternatives B, C, and D, below.

Primary differences between alternatives B, C, and D, are indicated in the following table:

| ALTERNATIVES | B | C | D |
|---|---|---|---|
| Recycling of water from Lower Slate Lake back to Mill | X | | |
| Slate Creek Cove Terminal with Barge Landing Ramp | X | | |
| Cascade Point as a Destination | X | | |
| Echo Cove as a Destination | | X | X |
| Small Diversion Dam in Upper Slate Lake with Diversion Pipeline | | X | |
| Slate Creek Cove with no Barge Landing Ramp | | X | X |
| Tailings Cover in Lower Slate Lake | | X | X |
| Small Diversion Dam in Mid-Lake East Fork Slate Creek with Diversion Pipeline | | | X |
| Water Treatment Plant (Reverse Osmosis) | | | X |

Alternative B: Applicant's original preferred plan[29]. This alternative would also include a means (pipeline sitting on the ground surface) of recycling water from the Wet Tailings Storage Facility back to the mill. Total potential waters disturbed during mine operations would be approximately 97.2 acres, including Cascade Point. Reclamation at Kensington would restore all impacted waters of the U.S. back to a water of the U.S., with the exception of approximately 3.44 acres. In addition, 1.3 acres of fill would remain in marine waters at Cascade Point (included in total waters impacted, but not in net loss below).

Total Waters Impacted                    ≈ 97.20 Acres
Impacted Waters restored to Waters of the U.S. ≈ 93.76 Acres
Net Loss of Waters of the U.S.           ≈  3.44 Acres

Alternative C: Similar to Alternative B above, plus the use of a diversion pipeline[30] which would intercept Slate Creek just below Upper Slate Lake but above the mid-point between Upper and Lower Slate Lake, and divert the creek waters around Lower Slate Lake, and back into Slate Creek at a point below the dam; and elimination of the barge ramp from the Slate Creek Cove marine docking facility design. This alternative does not include a recycle circuit pipeline of lake water as described in Alternative B, above. The 2004 FSEIS stated that a marine docking facility constructed in Echo Cove would be a likely destination. Total potential waters disturbed during project operations would be approximately 118.4 acres. Reclamation would restore all impacted waters of the U.S. back to a water of the U.S., with the exception of approximately 3.44 acres.

[29] Corps' Public Notice, dated June 21, 2004.
[30] The pipeline would sit on the ground surface and not in a ditch.

11

RECORD OF DECISION                                    POA-1990-592-M

Total Waters Impacted                          = 118.40 Acres
Impacted Waters restored to Waters of the U.S. = 114.96 Acres
Net Loss of Waters of the U.S.                 =   3.44 Acres

Alternative D:[31]  This alternative was not listed in the DSEIS, but was
developed as a result of concerns and issues raised after publication
of the DSEIS.  It was also the USFS's preferred alternative in the 2004
FSEIS and it has been adopted by Coeur.  It is similar to Alternative C
above, with the addition of the piped[32] removal of Wet Tailings Storage
Facility waters from Lower Slate Lake to a reverse osmosis treatment
facility adjacent to the Wet Tailings Storage Facility.  Impounded
waters would be pumped out of the lake to the treatment facility and
then piped away to where it would empty in Slate Creek at a point below
the dam.[33]  The FSEIS stated that a marine terminal constructed at
Cascade Point would be the destination commuter point.  Additionally,
capping of lake bottom sediments would be required unless the operator
can demonstrate that the tailings would not cause contaminant release
after closure.[34]  Total acres of U.S. waters that would be impacted are
98.6 acres, including Cascade Point.  Reclamation at Kensington would
restore all impacted waters of the U.S. back to a water of the U.S.,
with the exception of approximately 3.44 acres.  In addition, 1.3 acres
of fill would remain in marine waters at Cascade Point (included in
total waters impacted, but not in net loss below).

Total Waters Impacted                          = 98.6 Acres
Impacted Waters restored to Waters of the U.S. = 95.16 Acres
Net Loss of Waters of the U.S.                 =  3.44 Acres

*Subsection (B) Discussion of Alternative Destinations.*  This section analyzes
alternative commuting destination docks for Alternatives B, C, and D.  All the
Alternative A variants require an on-site personnel camp due to facility
location for those alternatives.  Such a camp has potential transportation
problems, as well as impracticable costs, as described further in this
section and in Section VIII of this ROD.  If a commuting dock is not
constructed and operated (for any alternative), personnel must be transported
to a camp either by helicopter or by vessel from existing port facilities.
Traveling by vessel from existing port facilities exposes the trip to risk of
unavailability due to weather, as explained below.  Personnel would either
wait or attempt to travel by helicopter, exposing them to further safety
risks in bad weather.  A camp also requires the storage and transportation of
much larger amounts of fuel.  The risks of unavailability and safety concerns
make a personnel camp not practicable from a logistics standpoint.

---

[31] Prior to the authorization of this action, the Corps had determined that the net loss for Alternatives B, C, and D
would be 7.74 acres.  However, shortly after permit issuance the applicant's contractors began ground work and
made changes to the plans.  One change was to relocate the proposed Jualin Development Rock Storage Area, which
comprised 4.3 acres of waters of the U.S., northwards to an upland area.  This reduced the anticipated net loss of
waters of the U.S. to 3.44 acres.  This and other changes were coordinated with the Corps to ensure compliance with
the Clean Water Act.  All of the acreages provided hereafter will reflect the reduction of impact to U.S. Waters to
3.44 acres.
[32] The referenced pipe, as well as the pipe leaving the treatment facility, would sit on the ground, as compared to
being located in a ditch.
[33] The use of the reverse osmosis treatment facility is necessary to satisfy a requirement in the USEPA NPDES
permit.
[34] FSEIS, Summary, Page S-5, 3rd Paragraph.

000015

Exhibit 11, page 12

RECORD OF DECISION                                    POA-1990-592-M

See the Marine Transportation Chart below:  (The travel times in the chart are for one way travel and were calculated from the Brotherhood Bridge over the Mendenhall River in Juneau to the mill site.  This time calculation does not include approximately one hour to "suit-up" (dress and gather up equipment in preparation for going underground) going to a dry locker room area and then to the mine and vice versa.)  This is a comparison of potential destination docking facilities to include transit distances and travel duration, during normal weather periods.  It is apparent from the chart that travel times between Slate Creek Cove and the moorage facilities at Cascade Point, Echo Cove and Yankee Cove would be similar.  If the Cascade Point facility were not available, the Yankee Cove facility could be used by the mine crew shuttle, though the marine transit would not be as safe due to the necessity of traveling on Lynn Canal during the winter months and would at times be unavailable for transport activities due to bad weather.  In addition, there would be other adverse impacts to the aquatic ecosystem associated with the increased travel time and distance and the differences in travel routes.  The facility at Echo Cove, though also in close proximity to Slate Creek Cove, would require additional improvements (channel dredging and dock construction) before it would be sufficiently safe and large enough for the Kensington shuttle craft.  These improvements would also result in increased adverse impacts to the environment (see discussion below).

The Corps has concluded for the reasons listed below that the proposed Cascade Point dock facility, as a destination dock for transiting mine personnel and equipment, would be the least environmentally damaging practicable alternative destination docking facility.

## Marine Transportation Chart
(Does not include helicopter travel)

| Destination Docking facilities | Distance[35] | | Travel time[35] | | |
|---|---|---|---|---|---|
| | To Shuttle[36] | Terminal to Terminal | To Shuttle[37] | Terminal to Terminal | One Way Travel Time[38] |
| Amalga Harbor | 14.71 miles | 23.82 miles | 20 minutes | 1 hr. 15 minutes | 1 hr. 45 minutes |
| Auke Bay | NA | 36.07 miles | NA | 2 hr. 08 minutes | 2 hr. 08 minutes |
| Cascade Point[39] | 32.92 miles | 5.60 miles | 45 minutes | 15-20 minutes | 1 hr. 15 minutes |
| Echo Cove | 30.12 miles | 7.87 miles | 40-45 minutes | 28 minutes | 1 hr. 23 minutes |
| Haines City Dock | NA | 46.44 miles | NA | 2 hr. 05 minutes | 2 hr. 05 minutes |
| Skagway City Dock | NA | 59.78 miles | NA | 3 hr. 33 minutes | 3 hr. 33 minutes |
| Tee Harbor | 8.38 miles | 27.92 miles | 12 minutes | 1 hr. 39 minutes | 1 hr. 51 minutes |
| Yankee Cove | 23.38 miles | 16.10 miles | 30 minutes | 57 minutes | 1 hr. 27 minutes |

Note that the assumption is that the Slate Creek Cove Marine Terminal would be used for all personnel transport on the Kensington end of the trip.  Also, using the approximate travel time of 20 minutes to travel by vessel the

---

[35] Distances, Travel Times and Speeds are approximates.  All calculations are based on one-way as opposed to round-trip.
[36] Distance from personnel collection center (park and ride in either Haines or Skagway, or from the Brotherhood Bridge in Juneau) to shuttle dock.  However, if the destination dock is in close proximity to the city center where parking is readily available, then the distance is not applicable (NA).
[37] Vehicle travel time based on speed limited to 45 mph.
[38] Total includes the 10 minute ride from the marine terminal to the mine and mill.
[39] Travel time data was taken from Kensington Gold Project, Corps of Engineers 404(B)(1) Practicability Analysis, prepared by Coeur Alaska, Inc., October 2004.

000016

Exhibit 11, page 13

RECORD OF DECISION                                    POA-1990-592-M

approximate 5.6 nautical miles between Slate Creek Cove and Cascade Point, the travel times for the other destination docking facilities was calculated.

Goldbelt's Cascade Point Dock Alternative Site[40]:  Cascade Point is located on the eastern shore of Berners Bay, approximately 5.6 miles south by southeast of Slate Creek Cove, and located in the southeastern area of the bay.  Travel time would require approximately two hours and thirty minutes, from the bridge to the mill site and back.

Goldbelt Incorporated (Goldbelt), owner of the uplands surrounding Cascade Point, was the applicant[41], and eventual permittee, for a marine docking facility to be located at Cascade Point.  Goldbelt's application was for a Corps' permit to dredge, place structures, and discharge fill material into waters and navigable waters of the U.S. in conjunction with the construction of a marine docking facility.  The Corps permit was issued July 15, 2005.  Goldbelt's stated purpose for the marine docking facility was to (1) provide deep-water access between the Goldbelt property and marine waters, and (2) to provide a source of income for the Native Corporation and its stockholders.  These purposes would be satisfied by providing safe moorage for tour vessels (long-term) and the Kensington miners' ferry shuttles (near-term) during all tidal stages, within the Berners Bay area[42].  This multi-purpose intent for the Cascade Point marine docking facility reflected the original Echo Cove Master Plan, developed by Goldbelt, Incorporated, and published in March of 1996.

Echo Cove Alternative Dock Site[40]:  Echo Cove is located south by southeast of Cascade Point and is the only other potential destination site remaining within Berners Bay.  It is approximately 7.8 nautical miles from Slate Creek Cove, and round trip travel would require approximately two hours and forty-six minutes, from the bridge to the mill site and back.

The sea bottom of Echo Cove consists primarily of mud and sand flats, likely resulting from glacial outwashes.  There is some evidence of continual, but minor, accretion of fine materials at or near the entrance to the cove, and the removal of such would require periodic dredging of the cove entrance.  There are several intermixed mud and sand flats located on a 500-meter swath at the northeastern edge of the cove, and along a 400-meter swath along the midsection of the eastern shore of the cove.  There are eelgrass beds located at the head of Echo Cove[43]:  one along a 500-meter swath at the northeastern edge of the cove, and the other along a 400-meter swath along the midsection of the eastern shore of the cove.  Construction of a docking facility in Echo Cove would result in the removal of a portion of these beds, by either dredging and/or fill activities.  Vegetated shallows (eelgrass beds) and mud flats are defined[44] as special aquatic sites.  Also, Echo Cove is a site for Dungeness crab harvesting, both commercial and subsistence.[45,46]

---

[40] FSEIS, Section 2.3.18, Marine Terminals.
[41] Complete application received July 21, 2003.
[42] Echo Cove Master Plan, Goldbelt, Inc. (March 1996).
[43] Mapped Vegetation & Substrate, prepared by Darcie Neff, September 24, 2004.
[44] 40 CFR Part 230, Section 404(b)(1) Guidelines for Specification of Disposal Sites for Dredged or Fill Material, Subpart E. Potential Impacts on Special Aquatic Sites. Subpart 230.42 (Mud flats), and 230.41 (Vegetated Shallows-Eelgrass).
[45] FSEIS, Section 3.
[46] See Attachment G, POA-1997-245-N.

14

RECORD OF DECISION                              POA-1990-592-M

Selection of the Echo Cove as a destination port would require a complete redesign of the existing boat launching facility, to include the relocation of the existing facilities (boat launch ramp with associated parking) in lower Echo Cove, though road access would require only a short extension of the existing road by a few hundred yards. Constructing a marine docking facility at Echo Cove would also require dredging of the cove entrance to allow for deep draft vessels to access the facility.

FSEIS Designation of Cascade Point versus Echo Cove as a Destination: The discussion of either Cascade Point and/or Echo Cove in the FSEIS as potential destination docking facilities for vessels leaving the proposed Slate Creek Cove marine docking facility was a result of suggestions and comments generated during the scoping development of the initial DSEIS process: various alternative destination port sites were submitted to the cooperating agencies for review and comment during scoping meetings. It was noted that these two sites were within Berners Bay, south of and in close proximity to the proposed Slate Creek Cove marine docking facility. The preparers of the Draft SEIS, and the FSEIS determined that the majority of the skilled and unskilled work force for the Kensington Mine would likely be hired in the City and Borough of Juneau (CBJ), since the Kensington project site is within CBJ.

Construction of a marine docking facility at either Cascade Point or at the Echo Cove site was compared using a cost breakdown analysis, with the result that both alternatives would cost approximately the same to construct and operate. An ecological comparison of the two alternative locations indicated that Cascade Point has no Special Aquatic Site, whereas Echo Cove has mud flats and eelgrass beds (both Special Aquatic Sites) that would be adversely impacted. Therefore, of these two sites, Cascade Point site would be the least environmentally damaging practicable alternative.[47]

A detailed analysis of impacts and alternatives (locations and methods) associated with the proposed Goldbelt Incorporated's Cascade Point marine docking facility, and inclusive of the Echo Cove port site alternative, can be found in Attachment F (Department of the Army Permit Evaluation and Decision Documents for POA-1997-245 [Dock] and POA-1997-245 [Road], and in Attachment G.

Yankee Cove Alternative Dock Site: The Yankee Cove dock facility, owned by the Yankee Cove Development Company, consists of a bulkhead with a barge landing and a 20-foot by 80-foot timber dock. The Yankee Cove Development Company currently has a Corps permit application (file number POA-1986-106-O) pending for a protective marine breakwater with a proposed footprint of 0.3 acres located on a gravel bar area (not a special aquatic site). Yankee Cove is located at the mouth of Bessie Creek, which has an anadromous fish run. The facility is approximately 16.1 nautical miles from Slate Creek Cove, and the round trip travel time would require approximately two hours and fifty-four minutes from the bridge to the mill site and back. As extrapolated from the Comet Beach analysis, travel to Yankee Cove would require transit in Lynn Canal during the winter. This would expose the crew shuttle to the high wind and (14-foot) waves experienced in Lynn Canal. This route would be unavailable over extended

---

[47] 40 CFR Part 230, Section 404(b)(1) Guidelines for Specification of Disposal Sites for Dredged or Fill Material, Subpart E, Potential Impacts on Special Aquatic Sites. Subpart 230.42 (Mud flats), and 230.43 (Vegetated Shallows-Eelgrass).

000018

RECORD OF DECISION                          POA-1990-592-M

winter periods.[48] The route outside Berners Bay would be more dangerous and there would be other adverse impacts to the aquatic ecosystem. There would be unscheduled periods of time lasting for unknown lengths when mine workers would not be available to run the mill and/or mine. This would create an unacceptable operational circumstance for the company.

The following destination docking facilities were determined to be not practicable due to required travel times and exposure to unsafe boating conditions, as indicated below:

Amalga Harbor:  This harbor facility is approximately 24 nautical miles from Slate Creek Cove, requiring approximately three hours and thirty minutes round trip travel time from the bridge to the mill site and back. The harbor, which is used almost exclusively by small recreational craft, has a narrow entrance channel and a floating pile-supported dock. These factors alone would make the facility unacceptable and unsafe for use by the larger crew shuttle as envisioned by Coeur. Use of this harbor would require transit in Lynn Canal and Berners Bay, as well as road travel from Juneau. This marine travel would incur the same safety and environmental issues as traveling to Yankee Cove.

Auke Bay:  Auke Bay is approximately 36 nautical miles from Slate Creek Cove, requiring approximately four hours and sixteen minutes to travel round trip by boat. Auke Bay currently handles the State ferry vessels, as well as the Greens Creek Mine's crew shuttle, and would be able to accommodate the Kensington shuttle craft.

Skagway:  The City of Skagway and its docks are approximately 60 nautical miles by boat from Slate Creek Cove, requiring approximately seven hours and six minutes to travel round trip by boat. The Skagway facility also handles the State ferry vessels, and would be able to accommodate the Kensington shuttle craft.

Haines:  The City of Haines is approximately 46 nautical miles from Slate Creek Cove, requiring approximately four hours and ten minutes to travel round trip by boat. The Haines dock facilities currently handles the State ferry vessels, and would be able to accommodate the Kensington shuttle craft.

Helicopter Travel.  Travel by helicopter remains an alternative to marine travel. However, according to Coeur[49]:

"Helicopter transport of mine worker personnel, as permitted under the Alternative A Dry Tailings Facility alternative, present two levels of risk: 1) weather and 2) safety. Limited daylight during winter months requires additional helicopter(s) to be added in order to transport over a shorter time period. Overtime costs can also be significant when considering standby personnel, in the event of weather delays."

Helicopter travel requires twice-daily trips of a large fleet of craft to handle the large number of expected mine workers. The Corps has concluded that this method of transporting mine workers to and from the mine site would not be a practicable alternative, from the standpoint of logistics and safety. In addition to delays, bad weather creates potential flight

---

[48] Kensington Gold Project, Corps of Engineers 404(b)(1) Practicability Analysis, dated October 2004, page 26."

000019

Exhibit 11, page 16

RECORD OF DECISION                                      POA-1990-592-M

safety problems, which is an unacceptable risk to workers.  Also, see
Section VIII of this ROD for a discussion of cost issues.

Conclusion.  The Corps has considered the potential alternative
destinations listed above and concluded that the proposed Cascade Point
docking facility is the least environmentally damaging practicable
alternative destination docking facility.  Three docking facilities were
considered reasonable in terms of proximity to the Slate Creek Cove dock.
The Corps has determined Cascade Point, Echo Cove, and Yankee Cove to be
reasonable alternative destination docking facilities in terms of
proximity, because they are close enough to the north end of Berners Bay
to allow for daily commuting.  The other sites discussed above are more
distant and would not allow for daily commuting.  This is because more
than a three-hour commute results in more than a 14 hour workday for the
miners, and is unsafe.  Reference the memorandum to the file, entitled,
"Coeur Miner's Work Day", dated February 14, 2006.  Use of the more
distant docking facilities would therefore require construction of a
residential camp near the mine site, at greater expense and environmental
impact.[49]  The more distant docking facilities are not practicable
destinations and were not carried forward for further review.  Use of
Yankee Cove would result in more exposure to rough seas in Lynn Canal.
The Lynn Canal route (outside Berners Bay) would be dangerous and
unavailable for worker transport over extended winter periods.  For this
reason, the Corps does not consider Yankee Cove a practicable destination
port.  Therefore, Cascade Point and Echo Cove are the only remaining
destinations that are practicable.  Of these two practicable alternative
destinations, Cascade Point is the least environmentally damaging, and
thus is the environmentally preferable alternative.  The environmental
impacts of each are described above.[50]

VII.  **ANALYSIS OF THE LEAST ENVIRONMENTALLY DAMAGING[51] PRACTICABLE
      ALTERNATIVE[52]**

Permanent Losses.[53]  All variants of the Dry Tailings Facility would result in
the permanent loss of 34 to 113 acres of aquatic habitat (special aquatic
site), which consists of forested and scrub-shrub wetlands.  The wetland
functional values of the Dry Tailings Facility were determined to be medium
for wildlife habitat, production export and flood flow alteration, and low
for riparian support.  Placement of fill material into this area would reduce
these wetland functions to zero.  Upon final reclamation, the Dry Tailings
Facility might regain some habitat value, but no wetland functions.  This
would not be expected to occur in the short term.

The functional value at the Dry Tailings Facility site as well as at the site
of the connecting road system would cease immediately with the initial
mechanical land clearing operations.  The continued presence of humans and

---

[49] Kensington Gold Project, Corps of Engineers 404(B)(1) Practicability Analysis, Prepared by Coeur, October 2004.

[50] See Attachments B (Section 404(b)(1) Analysis), and G.  Also, see Section XI, later in this ROD.

[51] The majority of the wetlands to be impacted would be heavily forested, with some scrub-shrub mix.  Other wetlands (Wet Tailings Storage Facility) would be lake oriented (e.g., lacustrine emergent.  This was discussed in the FSEIS, and summarized in the Summary of Potential Impacts of Each Alternative, under the headings of Resources, and impacts (by function and value).

[52] See 404(b) (1) Evaluation.

[53] FSEIS, Chapter 3, Section 3.12.3, and Chapter 4, Section 4.12.3.

000020

Exhibit 11, page 17

RECORD OF DECISION                                POA-1990-592-M

equipment would ensure that the project site was devoid of all habitat values, or 'zero-function'.[54] Once all fill material has been discharged, and after reclamation activities have been completed, and the area has been deserted by humans, other functions (e.g., wildlife habitat) would develop over time. These would be functions specific to an upland, non-forested habitat, and the conversion of wetlands to uplands would be permanent.

Under Alternatives A through A-3, additional waters, including wetlands, would not be reclaimed for all other project component areas. Some permanent loss (up to approximately 70 acres) would remain in addition to the DTF. These areas have similar functions and values to the DTF area, with some higher value areas near Sherman Creek.

Construction of the Wet Tailings Storage Facility would result in the permanent loss of 3.44 acres of aquatic habitat (within the footprint of the dam). This includes high value wildlife habitat.

The docking facility at Cascade Point will require permanent filling of approximately 1.3 acres of marine waters. This location has a rocky sand and gravel substrate with some fucus and kelp plant communities. It provides some herring spawning habitat. Some recolonization of this plant life is expected after placement of fill. The loss of this area is small in the context of Berners Bay and is considered a minimal loss of functions and values.

Temporary losses: The FSEIS stated that "For the purposes of this analysis, it is expected that all fish and most other aquatic life (such as macroinvertebrates, periphyton, and zooplankton) in Lower Slate Lake would be lost during operations as a result of this action. Some individuals might survive, but marginal food sources and the lack of suitable habitat as the lake elevation rises appear to be the major limiting factors."[55] Functional habitat values in the Wet Tailings Storage Facility area include high values for wildlife habitat (located primarily along the lake edge), and moderate values for fish habitat, and low values for carbon/detrital export, with low to moderate values for sediment/shoreline stabilization and nutrient cycling.[56] The inundation of adjacent forested and scrub-shrub wetlands by the rising lake waters would reduce the wildlife habitat values of those wetlands. There will be a conversion of one aquatic habitat type (wetland) for another (open water).

Lower Slate Lake will be used as the settling pond and disposal site for the tailings generated from the mill. The mill will crush, grind, and float the sulfides out of the material. The sulfides contain the gold and will be processed off site. There will be no cyanide or arsenic added to the milling circuit. The tailings have been analyzed for the ability to generate acid drainage, and to develop metals that could become mobile. The tests described in the FSEIS App. C have shown that the tailings will not be a generator of acid or heavy metals. The tests were performed on both the tailings and the tailings decant water. The components of the tailings decant water that were identified as contaminants include aluminum, chromium,

---

[54] Zero-function is defined here as having no vegetation or water sources present, and having only bare ground and therefore providing no habitat functions such as food sources, cover from predation, nesting sites, etc., all of which is supportive of wildlife and/or fish populations.

[55] See FSEIS, Section 4.9.3, page 4-38, Integrity of Freshwater Habitat.

[56] FSEIS, Sections 3.9 (Aquatic Resources: Freshwater), 3.11 (Wildlife), and 4.9.3 (Effects Common to Alternatives B, C, and D), and 4.11 (Wildlife).

000021

Exhibit 11, page 18

RECORD OF DECISION                                          POA-1990-592-M

pH, and Total Suspended Solids. The tests have concluded that the pH around the discharge pipe will be toxic to the aquatic environment. This will dissipate very rapidly. The TSS will be harmful to the fish in the immediate area of the discharge. The suspended solids will be discharged to the lower depth portion of the lake. The aluminum levels from the tailings decant water will rapidly decrease to natural levels as the pH is neutralized. Aluminum will pose a low risk to aquatic life. This is because the aluminum concentrates in the tailings is less than that in the lake sediment and the decant water levels are similar to existing concentrations in the lake. The chromium would be in a reduced form, and because of sub-aqueous disposal and the low oxygen conditions, would not be oxidized to a more toxic form. There would be a low potential for chromium to be a risk to aquatic life. Impacts to the aquatic community from physical stress are a greater risk than increased chemical concentrations. Aquatic life will die primarily from being covered with tailings and from the TSS.

The lake will recover over time. The tailings will be placed at a depth to prevent remobilization after closure from wave action. The tailings will be under water and out of the energy of wind driven waves. Post closure water concentrations of chromium and aluminum would pose a minimal risk to aquatic life. Capping of the tailings will assist in re-establishing lake bottom habitat. It is expected that the lake eventually will provide at least equivalent productivity as the current conditions of Lower Slate Lake. The reclamation of the lake will result in more emergent wetlands/vegetated shallows with moderate values for fish habitat, nutrient recycling, carbon/detrital export and sediment/toxicant retention, and high values for wildlife habitat. This functioning emergent wetland/vegetated shallows lake complex, including 15 acres of emergent wetland/vegetated shallows as part of a 62 acre lake, is more valuable to the aquatic ecosystem than a permanently filled wetland (DTF) that has lost all aquatic functions and values.

The Federal and State resource agencies have conditioned the respective permits to require habitat and mortality monitoring activities in the Wet Tailings Storage Facility. Collected information would be used to determine the effects of the discharge of tailings on the lake habitat. The surface of the lake waters should rise, by project closure, to its maximum height above the lake's original surface, and the lake waters would eventually inundate approximately 39 acres of adjacent forested and scrub-shrub wetland habitats[57], converting these to a deepwater habitat. This would constitute a conversion of one type of water of the U.S. to another: converting adjacent forested and/or scrub-shrub wetlands to non-vegetated waters. These non-vegetated waters would convert, by either natural or artificial[58] means (active lake restoration), to emergent wetlands/vegetated shallows (special aquatic sites). The anticipated end result would be a lake of approximately 62 acres in area (47 acres of deepwater habitat and 15 acres of emergent wetlands/vegetated shallows along the fringe). This conversion process would continue during and after the life of the project. The lake and its emergent fringe wetlands/vegetated shallows would provide potential fish habitat after final lake restoration had been completed and would include food sources,

---

[57] The applicant intends to clear these land areas mechanically prior to inundation of the lake waters. Otherwise, the vegetation would inhibit movement of the raft carrying the slurry line, and preventing an even deposition of material onto the lake bottom.

[58] The Kensington Gold Project's Mining Plan of Operations contains a Reclamation Appendix, which includes the Lake Restoration Plan. The DA recognizes that this Restoration Plan is a conceptual plan, and that future revisions will be evaluated and approved as appropriate. Capping of the mine tailings in the impoundment is required by ADEC. The final reclamation plan will assure that the latest methods are used to maximize success.

000022

Exhibit 11, page 19

RECORD OF DECISION                                POA-1990-592-M

protection from predation, nesting capabilities, etc., whereas the lake's open waters would provide an open space for fish and other motile organisms.[59] The FSEIS concluded that after closure Lower Slate Lake could be restored to at least equivalent aquatic habitat.

For all alternatives, wetlands on which other project components (e.g., connecting roadways, borrow sites, building and material storage fill pads, etc.) will be located, all have high values for wildlife habitat, and carbon/detrital export, with moderate values for sediment and/or nutrient cycling.[60] The temporary discharge of fill into the forested and scrub-shrub wetlands for the construction and operations of these structures would result in reduced wildlife habitat values during the life of the project. However, at project closure (and completion of all required reclamation) there will be moderate to high (when fully recovered) functions for wildlife habitat in these reclaimed areas.

The proposed marine docking facility at Slate Creek Cove has low to moderate fish habitat values. The placement of structures (e.g., piles and floats) and the discharge of fill into the intertidal waters for construction of an abutment for a docking facility would result in short term increases in suspended sediments in the water in the areas adjacent to the work activities. However, because the nearshore sediments are primarily coarse materials and cobbles, these materials would settle rapidly to the bottom, thus decreasing the magnitude and duration of the suspended sediment concentrations. In addition, the site is subject to the ebb and flow of the tide, and therefore, this added component of the marine tidal system would ensure that the subtidal and intertidal habitat values of the Cove would not be adversely impacted.[61] Reclamation of the site would result in removing all structures, and excavating the majority of the fill from below the High Tide Line, and flattening the rest to form a rocky subtidal substrate, all in conformance with the reclamation plan.

**Least Environmentally Damaging Practicable Alternative Acreage Calculations.[62]** (Note: The numbers below do not fully reflect the Reclamation and Closure Plan for the Kensington Gold Project, since the Reclamation Plan is a conceptual plan, and future revisions will be evaluated and approved by the Corps as appropriate.)

Based on information provided in the FSEIS, the application form and other documentation in the Corps' case files, and in the referenced documents (Attachment C), and calculating the acreages of impact[63] to waters of the U.S. by project closure, Alternatives B, C, and D have the least permanent impacts (3.44 acres) to the aquatic environment over the anticipated life of the project. This conclusion remains the same when adding the impacts of the 1.3 acres of fill material for the Cascade Point breakwater for Alternatives B and D (not included in the net loss column below).

## ALTERNATIVES

| | A | A1 | A2 | A3 | B | C | D |
|---|---|---|---|---|---|---|---|
| Initial Impact To Waters of the U.S. | 268.1 | 171.2 | 187 | 207 | 97.2 | 118.4 | 98.6 |

[59] FSEIS, Sections 4.9 (Aquatic Resources: Freshwater) and 4.9.3 (Effects Common to Alternatives B, C, and D)
[60] See FSEIS, Sections 3.9 (Aquatic Resources: Freshwater) and 3.11 (Wildlife).
[61] FSEIS, Section 4.10.3, Effects of Alternatives B, C, and D (Aquatic Resources: Marine).
[62] Data taken from the FSEIS.
[63] See Least Damaging Acreage Calculations.

000023

Exhibit 11, page 20

RECORD OF DECISION                    POA-1990-592-M

| (Acres) NET LOSS (Acres) After Reclamation | 164 | 108.2 | 124 | 144 | 3.44 | 3.44 | 3.44 |
|---|---|---|---|---|---|---|---|

See Section VI, above, for a detailed description of each alternative.

In Alternatives A through A3, the filling of the Dry Tailings Facility area would all result in the permanent conversion of wetlands to uplands. Further as explained in Section VI above and Section VIII below, these alternatives are not practicable. Permanent loss of these wetlands is an adverse environmental impact. In Alternatives B, C, and D, construction of the Wet Tailings Storage Facility would result in the conversion of wetlands to a deepwater habitat (due to the rising water level), the edges or shallow portions of which will eventually become emergent wetlands/vegetated shallows.

These conversions of one type of water of the U.S. to another are not a significant permanent adverse impact to the aquatic environment, and the temporal losses discussed above would not result in significant permanent adverse impacts to the aquatic environment. Our evaluation places special emphasis on the persistence and permanence of the effects described in this ROD and the FSEIS [see 40 CFR 230.10(c)]. The permanent loss of wetland functions and values in the Alternative A variants is more damaging and outweighs the temporary losses to the lake and its associated functions and values.

See Section XI, Subpart E, below, for a further discussion of the information provided in the acreage calculations. The Corps concludes that Alternative D is the least environmentally damaging practicable alternative because the impacts to the aquatic ecosystem are less harmful than the impacts of the Alternative A variants, which include permanent wetland losses, and it incorporates a water treatment system to ensure water quality is met.

## VIII.  PROJECT COST CALCULATIONS SUMMARY

We previously determined that the Alternative A variants were practicable alternatives. This was based on an assumption that since Alternative A had been permitted in 1998, it was still practicable to Coeur. We have re-examined that determination and, for the reasons explained below, now determine that neither Alternative A, nor any of its variants, is practicable.

The applicant submitted an "Alternative Material Disposal Sites Cost Analysis"[64] with an expense breakdown for each of the proposed preferred actions, as well as for each of the respective alternatives. This analysis, which included logistics, technology and cost considerations, demonstrated to the Corps that the applicant did not consider Alternative A to be a practicable alternative. Also, the Alaska Department of Natural Resources (ADNR) analyzed data provided by the applicant, and concluded[65], "Therefore, we do not consider Alternative A to be a 'practicable' or 'reasonable' alternative from the standpoint of cost or economics." The Corps reviewed and reevaluated the ADNR analysis documentation and other relevant

---

[64] Coeur Letter to the Corps, dated November 23, 2004.
[65] Letter dated December 1, 2004, from the State of Alaska's Department of Natural Resources, Office of Project Management and Permitting, and addressed to David Cox of the USFS.

21

000024

Exhibit 11, page 21

RECORD OF DECISION                          POA-1990-592-M

information in the FSEIS, and information provided by the applicant, and now independently concludes that the previously authorized site is no longer practicable to the applicant due to unreasonable costs.

Coeur concluded in its October 2004 Practicability Analysis that, for technical reasons, a scaled-down DTF would need a minimum of 70 acres to accommodate tailings from the high-grade mining operation discussed in the FSEIS (see also Sec. VI above). We reviewed that document and now concur with that conclusion. Thus, Alternatives A1 and A2 are not practicable for technical/logistical reasons. Coeur also discussed in the Practicability Analysis the reasons why no Alternative A project was practicable based on cost. Coeur's 2004 economic calculations support its conclusion that neither Alternative A (negative 15.8% return) nor A1 (70 acre DTF, negative 9.4% return) would generate a return on the investment needed to build the project. Neither alternative would ever recover the capital investment. Coeur also explained that while 1997 economic studies projected a slightly positive return for Alternative A, 2004 studies resulted in the figures set forth above. In comparison, Alternative D would generate an 8.5% return and pay back capital costs in 8 years. Coeur concluded that Alternative D was the only scenario under which it would choose to build and operate Kensington. Based on our independent evaluation of the relevant information, we agree with Coeur's analysis.

In addition, the USFS stated in the FSEIS, that "the mining scenario under Alternative A1 [A2 in this ROD] could not be imposed on the company if the No Action Alternative was selected."[66] Based on the costs and similarities (location, logistics of material transport, construction and operation of the facility, etc.) of the alternative variants of Alternative A (Alternatives A1 through A3), these three variations are also not practicable for cost reasons. Costs for the various alternatives are summarized in the chart, below.

## Alternatives Costs Table[67]

| | Initial DTF Construction Costs | Total DTF or Wet Tailings Annual Operating Costs | Additional DTF or Wet Tailings-related Construction Costs [U] | Total Trans. Facilities Construction Cost | Total Worker Transportation Annual Operating Cost [V] | Total Initial Construction and Year 1 Operating Cost |
|---|---|---|---|---|---|---|
| **DRY TAILINGS FACILITIES** | | | | | | |
| Alt. A (113 acres) | $21,907,000 | $15,534,400 | $34,104,000 | $12,537,000 | $5,296,000 | $89,378,400 |
| Alt. A1 (34.2 acres) | $13,390,000 | $7,570,100 | $34,104,000 | $12,537,000 | $5,296,000 | $72,897,100 |
| Alt. A2 (50 acres) (FSEIS A1) | $13,144,200 | $9,320,640 | $34,104,000 | $12,537,000 | $5,296,000 | $74,401,840 |
| Alt. A3 (70-acre) | $15,334,900 | $10,874,080 | $34,104,000 | $12,537,000 | $5,296,000 | $78,145,980 |
| **WET TAILINGS FACILITIES** | | | | | | |

[66] Section 2.2.2., page 2-17, Alternative A1: Reduced Mining Rate Dry Tailings Facility.
[67] Chart submitted by Coeur Alaska, February 17, 2006.

000025

Exhibit 11, page 22

RECORD OF DECISION                                      POA-1990-592-M

| | | | | | |
|---|---|---|---|---|---|
| Alt. B (Coeur's Original Proposal) | $6,222,000 | $386,900 | $0 | $3,406,000 (SCC Dock) | $1,490,000 | $11,504,900 |
| Alt. C (Coffer Dam & Channel Diversions, Reclaim w/ Echo Cove Dock) | $9,512,000 | $386,900 | $2,790,000 (Reclaim) | $3,406,000 | $1,490,000 | $17,584,900 |
| Alt. D – Selected FSEIS (Reclaim & WTP) | $11,673,000 | $726,900 | $5,451,000 (Reclaim & WTP) | $3,406,000 | $1,490,000 | $22,746,900 |

**Notes:**

A) All costs presented herein are presented in 2004 dollars and are included in the existing Kensington Corps 404 Permit (POA-1990-592-M) Administrative Record. Costs for the Alternative A2 (A1 in FSEIS) are factored from Alternative A for the purposes of this analysis.

B) Life of Mine (LOM) total worker transportation operating costs for the dry tailings option are as follows. Alternatives A-A3 - $74.14M; LOM costs for Alternatives B, C & D=$20.9M.

C) Applicant's analysis shows 4000 TpD Dry Stack Facility does not meet water quality standards without a water treatment plant; these costs, however, are not included.

**Footnotes:**

1/ Additional major category construction costs directly related to Dry Stack Facility and tailings (fill) production include, but are not limited to: camp (required for Comet Beach alternatives), tailings filter plant, mobile hauling and stacking equipment, additional power generation for tailings filtering, additional fuel storage for Comet Beach dock facilities, and others (see Knight Piesold, 2004, Preliminary Design of Scaled Down Dry Tailings Facility, Sherman and Jualin sites included in October 2004 Practicability Analysis).

2/ Does not include additional transportation costs for helicopter transport during inclement weather at Comet Beach (see October 2004 Practicability Analysis, pg. 41); Applicant's analysis shows breakwater and facilities necessary to provide reliable, safe water access for fuel and consumables.

3/ Alternative A2 costs factored from Alternative A based on scaled-down tonnage (i.e. 4000 to 2000), as presented in FSEIS.

4/ Alternative 3 is from Practicability Analysis, October, 2004, pg. 28. It presents Coeur's factored analysis of a 70-acre scaled-down DTF located within the footprint of the previously permitted facility in 1998, at Sherman Creek. Similar costs are also evaluated in the Knight Piesold report: Kensington Gold Project – Preliminary Design of Scaled-Down Dry Tailings Facility (Alternative A1), June, 2004, previously submitted to Corps and included in the Practicability Analysis.

5/ Applicant's proposal did not contemplate recycle/reclaim system for tailings facility decant.

6/ Additional constructions costs related to coffer dam, East and West channel diversions, and reclaim/recycle system (see MWH, 2004, Aluminum & TSS Management for Kensington Mill Tailings Pond Discharge, included in October 2004 Practicability Analysis).

7/ Echo Cove dock construction costs less than Cascade Point dock; however, cost difference offset by requirement to dredge over 150,000 yd³ from the cove, and ongoing care and maintenance for same.

8/ Additional costs (operating and construction) are associated with requirement for advanced water treatment to remove naturally occurring background aluminum concentrations, and reclaim/recycle system (see Practicability Analysis, Appendix 19).

9/ Capping costs not included; not required by Corps (see Knight Piesold, 2004, Lower Slate Lake Tailings Capping Study, included in October 2004 Practicability Analysis, Appendix 18).

The proposed lake disposal alternatives (B, C and D) would each cost less to construct and operate over the short and the long term than the previously authorized Dry Tailings Facility, or a variation thereof. The applicant's analysis shows it would lose money on all displayed variations of Alternative A.

----------------------------

Comet Beach vs Slate Creek Cove Costs:

The project costs for each of the alternative marine docking facility sites were analyzed and are summarized below. As indicated, the required initial and operating expenses (construction, transport, operation and support) for the Slate Creek Cove dock facility and the Wet Tailings Storage Facility would be less costly and therefore economically and logistically practicable, in contrast to the authorized Comet Beach dock facility and the Dry Stack

000026

Exhibit 11, page 23

RECORD OF DECISION                                    POA-1990-592-M

Site (Dry Tailings Facility). Use of Comet Beach would substantially and unreasonably increase costs and therefore it is impracticable as a docking facility for the Kensington Mine north of Berner's Bay.

Marine Terminal        Construction
   Comet Beach       = $12,202,733.00
   Slate Creek Cove  = $ 3,405,996.00

The construction costs for the Comet Beach site included a breakwater, an approach fill and ramp (both below the HTL), and various piles, fenders, anchoring devices, lighting, etc. Although, these items were discussed in the 1997 FSEIS, they are not currently present at Comet Beach.

Comet Beach[68]: Comet Beach is affected by the larger wave action associated with northerly storms; significant exposure occurs from a 0-to-30-mile fetch down Lynn Canal from the north-northwest (302° to 325° from North). Wave exposure is evidenced by the composition of the beach large cobbles, boulders, and wave-deposited debris can be observed in the woods above the high tide line. Site engineering studies performed at Comet Beach indicated that significant armoring would be required for any fill material or structures placed below the high water mark. Comet Beach would be considered a semi-protected to semi-exposed site, based on maximum potential fetch window and wind direction. Point Sherman provides some protection to Comet Beach from waves generated by southeasterly storms.[68]

Traveling to and from Comet Beach, as an alternative to using Slate Creek Cove, to other destinations may result in shorter distances traveled, and correspondingly shorter travel times. However, selection of this site would require construction of a road through wetlands (special aquatic sites) to connect the mine and mill site, at the Jualin Mine site, to Comet Beach, as well as to other facilities not currently proposed. This possibility was further explored by Coeur at the Corps' request:

"A large breakwater was recommended for Comet Beach, if this route was selected. This would accommodate 8 round trips per 28-day period for marine vessel passenger service from Auke Bay, and fuel and supply shipments from Seattle. The cost of the breakwater was estimated at $12.54 million. This was based on the likelihood of extreme wave heights of 15 to 17 feet being experienced in Lynn Canal over extended winter periods. Marginal reliability was predicted for shuttle ferry transport with 10 foot waves at this location.

A second alternative involving marine access to Kensington by combination of Slate Creek Cove dock and 8.5 miles of new road construction to Comet Beach was also analyzed in the PN&D 1989 study, and dismissed in the 1992 EIS due to environmental and land ownership reasons. The EIS concluded that Lynn Canal access provided significant opportunity for delays during a 60-90 day "winter weather period".[69]

For the reasons stated above, Comet Beach is impracticable for logistical reasons, as well as for cost reasons.

---

[68] Kensington Gold Project, Corps of Engineers 404(B)(1) Practicability Analysis, prepared by Coeur Alaska, Inc. October 2004. Section 3.1.2. Lower risks of weather delays.
[69] Kensington Gold Project, Corps of Engineers 404(B)(1) Practicability Analysis, prepared by Coeur Alaska, Inc., October 2004. Pages 23-4.

000027

Exhibit 11, page 24

RECORD OF DECISION                                    POA-1990-592-M

Commuting Ferry vs. Personnel Camp

A daily commuting ferry as described in Section VI of this ROD eliminates the
need for an operational personnel camp. Coeur explained in its October 2004
Practicability Analysis that the annual cost to transport personnel to a camp
is $5.296 million, compared to $1.49 million for Berners Bay access.
Operating costs for a camp are estimated at more than $3 million annually.
Operating a camp also requires substantial on-site fuel transportation and
storage. It is our determination that Coeur's economic analysis supports the
conclusion that a personnel camp is not practicable for cost reasons.

## IX.    FINDINGS

1.    OTHER REQUIRED AUTHORIZATIONS:

   A.    The Alaska Department of Environmental Conservation (ADEC) has
         issued a Certificate of Reasonable Assurance, dated May 6, 2005,
         with 15 conditions. Conditions on this Certification are listed on
         Attachment D of the ROD.

         The Certificate also stated, with reference to the proposed
         disposal of processed mine tailings into an alpine lake, that "The
         Tailing Disposal Facility (TDF) proposed to be constructed in Slate
         Creek will be considered a 'disposal site' under federal law and
         policy (see 40 CFR § 230.3(i)), and is hereby authorized as a
         'treatment work' under State law (see AS 46.03.900(33)). Thus,
         State of Alaska water quality standards will not have to be met
         within that area. (8 AAC 70.010(c). Water discharged from the TDF
         shall meet NPDES permit limitations, and the receiving water, East
         Fork Slate Creek, must meet State water quality standards."

   B.    The Alaska Department of Natural Resources, Office of Project
         Management and Permitting, Alaska Coastal Management Program, has
         issued a Final Consistency Response (Concurrence), dated April 25,
         2005.

   C.    The USEPA, Region 10, has issued an Authorization to Discharge
         under the National Pollutant Discharge Elimination System (NPDES
         Permit), dated September 1, 2005.

   D.    See Attachment G for Cascade Point Docking Facility findings.

2.    COMMENTS RECEIVED:

   A.    Coeur prepared several document summaries, each addressing comments
         received from Federal and State Agencies, to the Corps Public
         Notice, dated June 21, 2004, and to the Public Hearings, which were
         held by the USEPA in accordance with the USEPA's National Pollutant
         Discharge Elimination System (NPDES) regulations. The public
         hearings were held on July 26, 2004, in Juneau, Alaska, and on July
         27, 2004, in Haines, Alaska (see case file).

   B.    FEDERAL AGENCIES

         **US ENVIRONMENTAL PROTECTION AGENCY [USEPA].**

000028

Exhibit 11, page 25

Comment dated August 20, 2004.  Also, see Coeur's Response #18 (Attachment C).  USEPA's comment letter, with three attachments, pertained to Goldbelt's proposed marine terminal at Cascade Point[70], and to the proposed changes to the Kensington Mine's Plan of Operations, which includes a marine terminal at Slate Creek Cove and a discharge into Lower Slate Lake.  The USEPA's comments respective to Coeur's project centered on the 404(b)(1) Guidelines, and after several pages of instructive discussion relative to 40 CFR 230.10, the USEPA "...rated Alternatives A and A1"[71] as 'Lack of Objection' and Alternatives B and C as 'Environmental Objections'."  The USEPA concluded the cover letter with a request "...to work collaboratively with you and the State to achieve a satisfactory outcome."

**USEPA ISSUE #1.**  "...the wetlands analysis in the DSEIS is biased due to the lack of accurate and detailed wetlands mapping on the Kensington side of the project area.  Therefore, there is insufficient information to make a reasonable judgment about the comparative effects of Alternatives A/A1 and Alternatives B/C on wetlands."

*CORPS RESPONSE TO USEPA:  The wetlands were properly delineated in accordance with the 1987 Manual on both sides of Lion's Heads Mountain and thus there is adequate information to analyze the potential impacts upon wetlands.  See the discussion in Section VI (Alternatives Considered) of this ROD.*

**USEPA ISSUE #2.**  "With regard to the ecological risk of the tailings disposal options, the DTF [Dry Tailing Facility] (Alternatives A/A1) minimizes the exposure pathways by lining the dry stack cells, capping the dewatered tailings, treating DTF runoff in a storm water detention and sediment pond, and discharging a very small volume of treated water into a small creek devoid of fish.  In contrast, the Lower Slate Lake tailings impoundment (Alternatives B/C) directly exposes the entire lake to the tailings, which have exhibited considerable toxicity (per the failed amphipod bioassay)."

*CORPS RESPONSE TO USEPA:  Lower Slate Lake is the least environmentally damaging practicable alternative location for the tailings disposal.  The tailings will be capped at the cessation of operation unless information is presented to the contrary.  See ADEC condition #15.  Testing of the tailings and water column of the impoundment will be completed quarterly to insure projected water quality modeling is accurate.  See ADEC condition #8.  In accordance with 33 U.S.C. 1341(d), all 401 conditions are incorporated into the Department of the Army permit. See Section XI of this ROD, Subpart B, Evaluation and Testing, and Constraints.*

**USEPA ISSUE #3.**   "Humpback whales are listed as an endangered species under the Endangered Species Act, and Steller sea lions are listed as a threatened species (although populations of both species appear to be increasing in Southeast Alaska."

---

[70] See Permit Application POA-1997-245-M
[71] Note that Alternative A1 here is the same as Alternative A2 in this ROD.

26

000029

Exhibit 11, page 26

RECORD OF DECISION                              POA-1990-592-M

*CORPS RESPONSE TO USEPA: See the discussion in Section IX.2.B. ENDANGERED SPECIES ACT (ESA) CONSULTATION PROCESS, in this ROD.*

**USEPA ISSUE #4.** "The DSEIS also documents the potential impacts that each alternative may have on recreation, including noise, wakes, lights, safety issues, and visual impacts."

*CORPS RESPONSE TO USEPA: See the FSEIS, Sections 4.13 (Land Use and Recreation), 4.14 (Visual Resources), 4.15 (Socioeconomics), 4.18 (Noise), and 4.21 (Cumulative Effects).*

**USEPA ISSUE #5.** "After the federal agencies published the DSEIS, but before EPA approved the draft NPDES permit, EPA determined that the proposed effluent limits for some of the above pollutants could not be made without additional treatment. The applicant then revised the NPDES permit application to include a reverse osmosis (RO) wastewater treatment system and a pipeline diversion of Upper Slate Lake flows around Lower Slate Lake."

*CORPS RESPONSE TO USEPA: Coeur has agreed to construct a Reverse Osmosis, or water treatment facility, to aid in the removal of pollutants from water discharged from Lower Slate Lake, as well as construction of a pipeline diversion (of waters around the impoundment and downstream to the dam spillway). These components are part of Alternative D.*

**USEPA ISSUE #6.** "Due to the demonstrated toxicity of the tailings samples in the bioassay tests, and the limited application of other standard test on contaminant mobility and pathways, EPA believes that the tailings slurry is a carrier of contaminants (as defined in the Guidelines at 40 CFR 230.3)." (per the failed amphipod bioassay).

*CORPS RESPONSE TO USEPA: There is no conclusive test data showing that toxic substances in the tailings caused amphipod mortality. The poor survival of the amphipods in the test cell may be attributed to smothering, the nature of how the material was placed, or the floatation agent(s) used in the bulk sample. See FSEIS App. C and the discussion in Section VII above. Tests upon the tailings have conclusively shown that the tailings will not generate an acid discharge or result in a metals leachate being generated. We agree that all fish and most aquatic life would be lost during operation. (FSEIS 4.9.3). The FSEIS concluded that after closure Lower Slate Lake could be restored to at least equivalent aquatic habitat (see FSEIS 4.9.7). Capping of the impoundment tailings was added as a permit condition by ADEC to isolate any potential contaminants from the water column and to provide habitat for re-colonization in the storage facility. The State of Alaska issued a 401 Certificate of Reasonable Assurance for Alternative D. ADEC also stated that "the available information suggests that the toxicity risks associated with the tailings will be low during and after mining operations."[72] Conditions were incorporated by ADEC to ensure that no potential contaminants would leave the disposal site condition #15. ADEC included a requirement for testing of the material on a quarterly basis condition #8. In addition the Corps agrees to add the following condition to the permit #10. The waters and the discharged processed mine tailing sediments, located in Lower Slate Lake, shall be tested, at lake closure or just prior to cessation of discharges of mine wastes into Lower Slate Lake, in accordance with appropriate testing requirements (at the*

27

000030

RECORD OF DECISION                          POA-1990-592-M

*time of closure) for the presence of toxic materials and contaminants. The results shall be made available to the United States Army Corps of Engineers, Alaska District, Regulatory Branch, for dissemination to the appropriate State and Federal resource agencies. Also see the Corps response to Issue #2, above.*

The USEPA's primary concerns, as stated, centered on the potential impacts of the current impoundment proposal on the State of Alaska Water Quality Standards.

*CORPS RESPONSE TO THIS ISSUE: The Corps decision was reached in conformance with the permitting framework outlined in the USEPA memorandum, entitled, "Clean Water Act Regulation of Mine Tailings", dated May 17, 2004, and within the regulations found in 33 CFR Part 323, and 40 CFR Part 232, Final Revisions to the Clean Water Act Regulatory Definitions of "Fill Material" and the "Discharge of Fill Material". The Alaska Department of Environmental Conservation's Certificate of Reasonable Assurance (Section 401 Water Quality Certification) stated "The Tailing Disposal Facility (TDF) proposed to be constructed in Slate Creek will be considered a 'disposal site' under federal law and policy (see 40 CFR § 230.3(1)), and is hereby authorized as a 'treatment work' under State law (see AS 46.03.900(33)). Thus, State of Alaska water quality standards will not have to be met within that area. 18 AAC 70.010(c). Water discharged from the TDF shall meet NPDES permit limitations, and the receiving water, East Fork Slate Creek, must meet State water quality standards." For the reasons as set forth in Section VII above, and in the attached Section 404(b)(1) Analysis, Alternative D is the least environmentally damaging practical alternative compared to all alternatives including Alternative A or the variations of Alternative A (i.e., A1, A2 and A3).*

<u>Special Conditions Recommended by the USEPA.</u>

The USEPA recommended 12 special conditions. The substance of the USEPA's recommendations which were necessary to satisfy the public interest criteria, were edited and/or reworded and were incorporated into the Corps permit:

**Suggested Condition 1.** The 404 permit should require a post-closure lake restoration plan including: specific and measurable restoration objectives; specific restoration methods and techniques; a compliance schedule for implementing the plan; and a detailed monitoring and evaluation program to determine whether the specified methods are being implemented on schedule and whether they are effective in achieving the lake restoration objectives.

*CORPS RESPONSE TO USEPA: See response to Condition number 2, below; also, see Section XI, Subpart G, Constraints. This subject is discussed and contained in the Mining Plan of Operations' Reclamation Plan. The Plan has been incorporated into, and is a part of the Final Plan Of Operations for the Kensington Gold Project, dated May 2005, Appendix 4-C, and is enforceable by the USFS. The USFS's Final Plan of Operations has been incorporated as a condition of the Corps permit.*

**Suggested Condition 2.** The 404 permit should require engineered capping of the tailings disposal site in Lower Slate Lake with clean material [see 40 CFR 230.72(b)]. The purpose of capping the tailings is to confine and isolate the toxic material from the aquatic environment, provide a suitable substrate for benthic

000031

RECORD OF DECISION                          POA-1990-592-M

organisms and to minimize contact between the tailings and the lake water. The tailings cap should be designed to be of sufficient depth or composition to provide an adequate margin of safety. The sediment quality and particle size distribution of the fill material used to cap the tailings should be conducive to the timely attainment of the lake restoration objectives referred to above. The Final SEIS must consider the source and suitability of the cap material, the environmental impact of extracting the material from the source area and placing it in Lower Slate Lake, and the added cost of capping the tailings.

*CORPS RESPONSE TO USEPA: Capping has been required by, and written as a condition on the ADEC 401 Water Quality Certification as condition #15. Capping is also included in Coeur's Mining Plan of Operation. This subject is discussed in the Reclamation and Closure Plan, Appendix I. The following condition will be incorporated into the Corps permit:*

*   *Permittee shall comply with the terms and conditions of the most recently approved version of the Kensington Gold Project's "Final Plan of Operations", to include "Appendix I, Reclamation and Closure Plan", as approved by the U.S. Forest Service. All measures involving concurrent and end-of-project reclamation in all waters of the United States, including wetlands, shall become enforceable conditions of the Department of Army (DA) permit. The DA recognizes that the Reclamation Plan is a conceptual plan, and that future revisions will be evaluated and approved by the Corps as appropriate.*

**Suggested Condition 3.** The 404 permit should require diverting water from Upper Slate Lake around the Lower Slate Lake tailings disposal facility during mine operations. The purpose of the diversion is to enhance settling conditions and minimize contact between the high quality waters of Upper Slate Lake and the discharge of pollutants into Lower Slate Lake. This diversion should be done via a pipeline instead of a ditch. The intake should be located upstream of the impounded waters of Lower Slate Lake and the outfall should be located immediately downstream of the Lower Slate Lake dam. The Final SEIS should consider the environmental impact and added cost of the pipeline diversion.

*CORPS RESPONSE TO USEPA: Alternative D, selected by both the USFS and the applicant, incorporates the use of a pipeline (not a ditch) to divert upstream waters past the Wet Tailings Storage Facility. This has and will become part of the work description as stated in the Corps permit.*

**Suggested Condition 4.** The 404 permit should require an advanced wastewater treatment system, such as RO [Reverse Osmosis] (or an equivalent technology), to ensure that the proposed discharge complies with applicable Alaska water quality standards, including but not limited to turbidity (TSS, Total Suspended Solids), aluminum, iron and lead.

*CORPS RESPONSE TO USEPA: The applicant has agreed to construct a water treatment facility. The Alaska Department of Conservation (ADEC) wrote[72], in response to a question along*

---

[72] ADEC Letter, dated December 6, 2004, addressed to the Corps.

000032

Exhibit 11, page 29

RECORD OF DECISION                              POA-1990-592-M

*the same vein from the Corps, "...that available information suggests that the toxicity risks associated with the tailings will be low during and after mining operations." However, ADEC will "...require as a condition of our certification periodic testing of tailings characteristics." The current application is for a treatment facility, which includes the piping of treated lake waters past the dam and down to the lower Slate Creek below the dam. This concern is addressed by the USEPA, especially since the USEPA's Section 402 NPDES permit is designed to cover all waters of the U.S. that leave the impoundment (Wet Tailings Storage Facility). The applicant's plans include a fill pad for the support of a water treatment facility to be constructed adjacent to Lower Slate Lake. The Corps will not require a water treatment facility. The Corps will regulate the fill pad for the facility, which is proposed to be constructed in wetlands. At project closure, this facility and its supporting fill pad will be reclaimed back to a water of the U.S.*

**Suggested Condition 5.** The 404 permit should require using nontoxic chemical flocculants to enhance the deposition of suspended particles in the Lower Slate Lake disposal site [see CFR 230.71(d)]. The need for this requirement is supported by the Total Suspended Solids analysis on pages A-65 in Volume 2 of the DSEIS.

*CORPS RESPONSE TO USEPA: The Corps agrees. The following special condition will be incorporated into the Corps permit:*

* *A nontoxic chemical flocculent shall be added to the slurry to enhance the deposition of suspended particles in the Lower Slate Lake disposal site [see CFR 230.71(d)].*

**Suggested Condition 6.** The 404 permit should require using silt screens or other appropriate methods to confine suspended particles and turbidity to a small area where settling can occur in Lower Slate Lake (see 40 CFR 230.73[c]). Other methods include: baffles to decrease turbulence and increase retention time; a filter berm between the 404-discharge point and the 402-discharge point; and filter blankets and curtains to filter out suspended solids. The need for this requirement is supported by the Total Suspended Solids analysis on page A-63 in Volume 2 of the DSEIS.

*CORPS RESPONSE TO USEPA: The Corps agrees. The following special condition will be incorporated into the Corps permit:*

* *Silt screens or other appropriate methods shall be used to confine suspended particles and turbidity to a small area around the exit point of the slurry pipeline where settling can occur in Lower Slate Lake (see 40 CFR 230.73[c]), and include filter blankets and curtains to filter out suspended solids.*

**Suggested Condition 7.** The 404 permit should require designing water releases from Lower Slate Lake dam to accommodate the in-stream flow needs of downstream fish and wildlife (see 40 CFR 230.77[b]).

*CORPS RESPONSE TO USEPA: The Alaska Department of Natural Resources' (ADNR) Water Use Permit will require a minimum in-stream flow schedule. The in-stream flow requirements will also be required by reference in the ADNR Fish Habitat Permit In-*

000033

Exhibit 11, page 30

RECORD OF DECISION                                POA-1990-592-M

*stream flow requirements will be in effect during construction, operations and after project closeout.*

**Suggested Condition 8.** The 404 permit should authorize the Echo Cove marine dock facility instead of the Cascade Point marine dock facility.

*CORPS RESPONSE TO USEPA: This request is addressed in Attachment G.. Also, see the discussion on Alternative Destinations, Section V, above.*

**Suggested Condition 9.** The 404 permit should minimize the footprint of the Slate Creek Cove marine dock facility by eliminating the landing craft ramp.

*CORPS RESPONSE TO USEPA: The applicant has revised and resubmitted the revised design for the Slate Creek Cove marine dock facility, which reflects the deletion from the drawings of the landing craft ramp, thus reducing fill material impacts to the marine intertidal waters and navigable waters.*

**Suggested Condition 10.** The 404 permit should include timing restrictions for the construction of the marine dock facility to avoid impacts to fish and marine mammals, especially during the eulachon run in late April and early May.

*CORPS RESPONSE TO USEPA: The following two special conditions will be incorporated into the Corps permit:*

* *No in-water work shall occur in Berners Bay between March 15 through June 30, to protect juvenile salmonids, herring and eulachon.*

* *No in-water work shall occur in Johnson Creek from May 1 through October 1, to direct construction to low-flow periods.*

**Suggested Condition 11.** The 404 permit should include restrictions on timing, ferry routes during the eulachon run in late April and early May.

*CORPS RESPONSE TO USEPA: The timing and routing of shuttle vessels transiting Berners Bay are addressed in the* <u>Berners Bay Transportation Policy and Mitigation and Best Management Practices Plan</u>, *prepared by Coeur (2005). See Goal #5, SOP #7 of the Plan. The Plan has been incorporated into, and is a part of the Final Plan Of Operations for the Kensington Gold Project, dated May 2005, Appendix 4-C, and is enforceable by the USFS. The USFS's Final Plan of Operations has been incorporated as a condition of the Corps permit.*

**Suggested Condition 12.** The 404 permit should include appropriate compensatory mitigation for unavoidable impacts.

*CORPS RESPONSE TO USEPA: The applicant has demonstrated throughout each iteration of the NEPA process, a willingness to minimize, avoid, and reduce impacts to the aquatic environment to the maximum extent practicable. For example, the applicant revised*

31

000034

Exhibit 11, page 31

RECORD OF DECISION                                    POA-1990-592-M

*the application to adopt Alternative D[73], the proposed marine dock facility was redesigned to remove a proposed barge ramp and associated fill material; the slurry pipeline and road corridors have been redesigned to avoid wetlands to the greatest extent practicable; and a reclamation plan has been developed in a cooperative effort by the cooperating agencies and the applicant to prevent the permanent loss of wetlands.*

*Construction of the original DTF would, if constructed, have resulted in the permanent conversion of approximately 113 acres of forested and scrub-shrub wetlands to uplands. Reclamation of this site would have been performed by planting with grass and small shrubs. Also, this alternative would have resulted in a permanent loss totaling approximately 164 acres of filled wetlands, versus the approximate total permanent net loss of 3.44 acres of wetlands for the current proposal, Alternative D. The applicant has minimized and avoided fill impacts to special aquatic sites, and to other waters of the U.S.*

*The unavoidable impacts of alternative D would be the permanent loss of U.S. waters resulting from the discharge of fill material into 3.44 wetland acres to construct the embankment (dam). 33 CFR 320.4(r) states that "All compensatory mitigation will be for significant resource losses which are specifically identifiable, reasonably likely to occur, and of importance to the human or aquatic environment." In this area of Southeast Alaska, the permanent loss of 3.44 acres of forested wetlands would not constitute a significant loss of aquatic resources, though it is identifiable and will occur.*

*See the 1990 Memorandum of Agreement between the USEPA and the Department of the Army concerning the Determination of Mitigation under the Clean Water Act Section 404(b)(1) Guidelines, which states: "The determination of what level of mitigation constitutes 'appropriate' mitigation is based solely on the values and functions of the aquatic resource that will be impacted.....However, the level of mitigation determined to be appropriate and practicable under 40 CFR Section 230.10(d) may lead to individual permit decisions which do not fully meet this goal because the mitigation measures necessary to meet this goal are not feasible, not practicable, or would accomplish only inconsequential reductions in impacts. Consequently, it is recognized that "no net loss" of wetlands functions and values may not be achieved in each and every permit action." Guidance is also provided in the USEPA and USACE memorandum entitled, "Clarification of the Clean Water Act", dated January 24, 1992; and in the USEPA and USACE memorandum entitled, "Statements on the Mitigation Sequence and No Net Loss of Wetlands in Alaska", dated May 13, 1994.*

*Also, see Section XI, SUBPART H, below.*

*The Corps has concluded that additional compensatory mitigation, for the permanent conversion of 3.44 acres of U.S. waters to uplands, will not be required for this permit action.*

**U.S. FISH AND WILDLIFE SERVICE [USFWS].**

Comment, dated August 3, 2004.  See Coeur's Response #18[74], which addresses the USFWS issues.  The USFWS stated the concerns for habitat loss in various drainages (Sherman Creek and Johnson

---

[73] See Section VI, above for a comparison of alternatives.
[74] Listed on Attachment C.

32

000035

Exhibit 11, page 32

RECORD OF DECISION                                    POA-1990-592-M

Creek): the potential for dam failure[75] and the resulting impacts to the Lower Slate Creek drainage; and the anticipated total loss of Dolly Varden char habitat in Lower Slate Lake.  The USFWS was also concerned with the effects of pile-driving activities on fish, shellfish, and marine mammals.  The USFWS recommended that the applicant consider off-site mitigation to offset unavoidable impacts, and suggested the possible purchase and turning over of existing wetlands near the Mendenhall Wetlands State Game Refuge to a land trust such as the Southeast Alaska Land Trust.[76]  The USFWS addressed these concerns by recommending the following 13 special conditions[77]:

**Suggested Condition 1.**  In-stream activities will be limited to work windows recommended by the Alaska Department of Fish and Game and the Department of Natural Resources (ADNR).  Work windows are necessary to protect migrating juvenile salmonids, rearing salmonid smolts, and other fish.

*CORPS RESPONSE TO USFWS:  See the Corps Response to the USEPA's recommended condition number 10, above.*

**Suggested Condition 2.**  Conduct the installation of steel piles with a vibratory hammer.  Under those conditions where impact hammers are required for reasons of seismic stability or substrate type, we recommend that the piles be driven as deep as possible with a vibratory hammer prior to the use of the impact hammer.  The impact hammer should be used at a time of year when larval and juvenile stages of fish species are not present.  In-water work may occur during work windows recommended by appropriated resource agencies.  This stipulation is necessary to protect migrating juvenile salmonids, rearing salmonid smolts, spawning and rearing herring.

*CORPS RESPONSE TO USFWS:  The following special condition will be incorporated into the Corps permit:*

- *All steel piles shall be driven using a vibratory hammer.  Under those conditions where impact hammers are required for reasons of seismic stability or substrate type, the piles shall be driven as deep as possible with a vibratory hammer prior to the use of the impact hammer.  The impact hammer shall be used at a time of year when larval and juvenile stages of fish species are not present:  this will be coordinated with the Alaska Department of Natural Resources, Habitat.*

**Suggested Condition 3.**  Drive piles when the current is reduced (i.e., centered on slack current) to minimize the number of fish exposed to adverse levels of underwater sound.

*CORPS RESPONSE TO USFWS:  The following special condition will be incorporated into the Corps permit:*

---

[75] See IX.2.G, below

[76] The Southeast Land Trust neither accepts nor manage wetlands and/or uplands.  Also, see the response to Condition number 13, below.

[77] USFWS Letter, dated August 3, 2004, pages 5 through 7.

33

RECORD OF DECISION                                    POA-1990-592-M

*      *All piles shall be driven when the current is reduced (i.e., centered on slack current) to minimize the number of fish exposed to adverse levels of underwater sound.*

**Condition 4.** Use a block of wood between the impact hammer and the pilings or use a bubble curtain to attenuate the sound.

*CORPS RESPONSE TO USFWS: The following special condition will be incorporated into the Corps permit:*

*      *Permittee shall either use a block of wood between the impact hammer and the pilings, and/or use a bubble curtain to attenuate the sound.*

**Suggested Condition 5.** Reasonable precautions and controls must be used to prevent incidental and accidental discharge of petroleum products.

*CORPS RESPONSE TO USFWS: The potential for petroleum product spills is addressed in the <u>Berners Bay Transportation Policy and Mitigation and Best Management Practices Plan</u>, prepared by Coeur (2005), Goal #5, SOP #6 and #9. The Plan has been incorporated into, and is a part of the Final Plan Of Operations for the Kensington Gold Project, dated May 2005, Appendix 4-C, and is enforceable by the USFS. The USFS's Final Plan of Operations has been incorporated as a condition of the Corps permit. Additionally, this was addressed in ADEC's Water Quality Certification (see Condition # 6). This certification will become part of the Corps permit and as such will be enforceable by both the ADEC and the Corps.*

**Suggested Condition 6.** Material such as sorbent pads must be available on-site, and must be used to contain and clean up any petroleum product spilled as a result of construction activities and operation.

*CORPS RESPONSE TO USFWS: See Corps' response to USFWS Condition 5, above.*

**Suggested Condition 7.** Fill in the sub-tidal areas would be detrimental to marine fish rearing habitat and potentially could result in the declines of fish populations in Slate Creek Cove. We recommend that the size of the fill footprint be restricted to minimize adverse environmental impacts to the Slate Creek Cove and Berners Bay ecosystem. Placing fill at low tides reduces the impacts of sedimentation on the marine ecosystem.

*CORPS RESPONSE TO USFWS: The applicant's revised design for the Slate Creek Cove marine dock facility reflects the deletion of the originally requested ramp, thus reducing impacts related to the discharge of fill materials to the marine inter-tidal waters and navigable waters. The following special condition will be incorporated into the Corps permit:*

*      *The discharge of fill material and/or dredged fill material into marine waters shall only occur during low-water periods (i.e., low tide).*

**Suggested Condition 8.** Wooden surfaces of the structures that come into contact with the water shall not be painted or otherwise surface-treated with creosote and may not be treated with a

000037

Exhibit 11, page 34