RECORD OF DECISION                                    POA-1990-592-M

preservative that contains pentachlorophenol. Creosote and
pentachlorophenol are toxic to juvenile fish in marine waters.

*CORPS RESPONSE TO USFWS: Current practices regarding creosote treated wood have
been that creosote may not be used on structures in <u>fresh</u> waters. In fresh and marine
waters, any preservative on wooden structures must be applied by pressure injection using a
method that prevents leaching, based on the 1997 Best Management Practices for the Use of
Treated Wood in Aquatic Environments, by the Western Wood Preserves Institute. The use
of creosote treated wood in marine waters is in compliance with uses approved by the U.S.
Environmental Protection Agency. The question of creosote use in waters and navigable
waters of the U.S. is addressed by the ADEC and the USEPA. In addition, this subject was
discussed in the <u>Berners Bay Transportation Policy and Mitigation and Best Management
Practices Plan</u>, prepared by Coeur (2005), See SOP #12 of Goal #5. The Plan has been
incorporated into, and is a part of the Final Plan Of Operations for the Kensington Gold
Project, dated May 2005, Appendix 4-C', and is enforceable by the USFS. The USFS' Final
Plan of Operations has been incorporated as a condition of the Corps permit. Also, note
that ADEC's Water Quality Certification condition #7 was imposed to control the use of
creosote, and as a result of the Corps incorporating ADEC's Certification into the Corps
permit, this, will be an enforceable condition by both ADEC and the Corps.*

**Suggested Condition 9.** Although piling-supported structures will
allow continued use of the project site by many vertebrates and
fish, much of the existing plant life is likely to be shaded and
thereby lost. We recommend using metal grating as a top surface,
rather than planking minimizes this loss, as this results in
greater light transmission to aquatic plants. Light penetration is
needed to maintain inter-tidal habitat beneath structures such as
walkways, catwalks, and gangways.

*CORPS RESPONSE TO USFWS: The following special condition will be incorporated into the
Corps permit:*

\*    *Permittee shall use metal grating, rather than planking, as a top surface of structures
that extend over waters of the United States, such as docks, catwalks, and gangways.*

     *Rationale: This provides light penetration to maintain intertidal habitat beneath
structures such as walkways, catwalks, and gangways.*

**Suggested Condition 10.** No portion of the new float may ground at
any tidal stage. This is necessary to protect water quality and
aquatic habitat by minimizing disturbance and introduction of
suspended sediment, petroleum products, and toxic substances into
the cove and outside waters.

*CORPS RESPONSE TO USFWS: The following special condition will be incorporated into
the Corps permit:*

\*    *No portion of any floating structure may ground at any tidal stage.*

     *Rationale: This would protect water quality and aquatic habitat by minimizing
disturbance.*

000038

RECORD OF DECISION                            POA-1990-592-M

**Suggested Condition 11.** Geographic Response Strategies (GRS) to protect sensitive coastal environments along the planned service routes have also been identified. These map-based strategies display where sensitive areas are located and where to place oil spill protection resources. We recommend that the GRS be included in the development of a Route Operational Manual (ROM) to minimize or reduce impacts from potential oil spills on seabirds, marine mammals, fish, and the respective important coastal environments of each. Information on the GRS locations is available on the Southeast Alaska GRS website: www.stin.ak.us/dec/spar/perp/grs/se/home.

*CORPS RESPONSE TO USFWS: The Corps regulations at 33 CFR 325.4(a)(2) and (b) for conditioning of permits [paraphrasing] state that special conditions can be added at the applicant's request or to clarify the permit application and that the Corps can take into account an enforceable agreement between the applicant and another party concerned with the resource, which would achieve the desired objective. The permittee stated their agreement to the USFWS's request in a letter to the Corps, dated November 10, 2004. The protection of sensitive coastal environments specific to the routing of shuttle vessels transiting Berners Bay is addressed in the* <u>Berners Bay Transportation Policy and</u> <u>Mitigation and Best Management Practices Plan</u>*, prepared by Coeur (2005) Goal #5, SOP #1. The Plan has been incorporated into, and is a part of the Final Plan of Operations for the Kensington Gold Project, dated May 2005, Appendix 4-C, and is enforceable by the USFS. The USFS's Final Plan of Operations has been incorporated as a condition of the Corps permit.*

**Suggested Condition 12.** Hunting, trapping, and fishing in the project area by construction personnel during construction of the project shall be prohibited by the employer as a condition of employment. Employment termination shall be among the penalties for violation of this ban.

*CORPS RESPONSE TO USFWS: The Corps has not extended its control and responsibility to cover hunting, trapping, and fishing in the project area, and, therefore, the Corps permit will not be conditioned accordingly. Under the Coeur's lease agreement for the Jualin Mine site, Coeur employees are not permitted to engage in these activities. However, the permittee stated their agreement to this request in a letter to the Corps, dated November 10, 2004. This request was been incorporated into, and is a part of the Final Plan of Operations for the Kensington Gold Project, dated May 2005, Appendix 4-C, and is enforceable by the USFS.*

**Suggested Condition 13.** An off-site mitigation package, acceptable to the Juneau Fish and Wildlife Field Office (JFWFO) and other resource agencies, will be developed before construction begins on activities authorized under this permit. The development of an interest-bearing escrow account to mitigate for fish, wildlife, and water quality impacts associated with construction and operation of the project could be a component of a mitigation package. The funds in the account would be made available to a resource agency council (council) composed of JFWFO, National Marine Fisheries Service, Tongass National Forest, Alaska Department of Fish and Game, and the Alaska Department of Natural Resource representatives. The council would determine the type, cost, and location of mitigation projects. The escrow amount and accumulated

000039

interest would remain in escrow for the term of the project, unless jointly determined by the council and the applicant that the account may be closed. The account would be used by the council to implement fish and wildlife mitigation and enhancement. None of the monies would be used for council members' salaries or travel costs. The applicant would be notified before any funds are withdrawn from the account and shall have the right to audit expenditures to ensure compliance with its purpose. This escrow account would be readily available for mitigation projects, if there are unforeseen events that impact fish and wildlife resources as a result of the project that cannot otherwise be mitigated by making a change in project operations.

*CORPS RESPONSE TO USFWS. The applicant has minimized and avoided fill impacts to special aquatic sites, and to other waters of the United States. 33 CFR 320.4(r) states that "All compensatory mitigation will be for significant resource losses which are specifically identifiable, reasonably likely to occur, and or importance to the human or aquatic environment." In this area of Southeast Alaska, the permanent loss of 3.44 acres of forested wetlands would not result in a significant loss of aquatic resource, though it is identifiable and very likely to occur. See the Corps Response to the USEPA's recommended condition number 12, above. Therefore, no additional off-site mitigation package is required for this permit action.*

**NATIONAL MARINE FISHERIES SERVICE [NMFS].**

Comment dated August 3, 2004. The NMFS stated that the project was likely to adversely affect Essential Fish Habitat (EFH) within Berners Bay and have the potential to harm Stellar sea lions and humpback whales, and "Berners Bay is an aquatic resource of national importance and these proposed projects may pose unacceptable adverse effects to these resources." The NMFS requested a two-week extension to review both the Corps public notice as well as the USFS' DSEIS.

Comment dated August 19, 2004. See Coeur's Response #18, Attachment C. The NMFS stated in the comment letter concerns similar to those listed in the USFWS' letter, dated August 3, 2004, and went on to request that the Corps prepare an EFH assessment, and initiate informal consultation pursuant to the Endangered Species Act. The NMFS also recommended 16 special conditions to be appended to the Corps permit.

*CORPS RESPONSE TO NMFS: The USFS' FSEIS included, as Appendix B, an Essential Fish Habitat (EFH) Assessment, which included, as an appendix, the Berners Bay Transportation Policy and Mitigation and Best Management Practices Plan, prepared by Coeur (2005). Both the Plan and the recommendations in the EFH Assessment are enforceable by the USFS. The USFS' Final Plan of Operations has been incorporated as a condition of the Corps permit. The Corps has adopted, and incorporated by reference the USFS' Essential Fish Habitat Assessment. Also, the Corps and the USFS initiated joint informal and formal consultation pursuant to the Endangered Species Act (see below for a discussion of the process).*

16 Recommendations by NMFS.

000040

RECORD OF DECISION                                    POA-1990-592-M

**Suggested Condition 1.**  In-stream activities will be limited to work windows recommended by the Alaska Department of Fish and Game and the Department of Natural Resources (ADNR).  Work windows are necessary to protect migrating juvenile salmonids, rearing salmonid smolts, and other fish.

*CORPS RESPONSE TO NMFS:  See the Corps Response to the USEPA's recommended condition number 10, above.*

**Suggested Condition 2.**  Conduct the installation of steel piles with a vibratory hammer.  Under those conditions where impact hammers are required for reasons of seismic stability or substrate type, we recommend that the piles be driven as deep as possible with a vibratory hammer prior to the use of the impact hammer.  The impact hammer should be used at a time of year when larval and juvenile stages of fish species are not present.  In-water work may occur during work windows recommended by appropriated resource agencies.  This stipulation is necessary to protect migrating juvenile salmonids, rearing salmonid smolts, spawning and rearing herring.

*CORPS RESPONSE TO NMFS:  The following special condition will be incorporated into the Corps permit:*

* *All steel piles shall be driven using a vibratory hammer.  Under those conditions where impact hammers are required for reasons of seismic stability or substrate type, the piles shall be driven as deep as possible with a vibratory hammer prior to the use of the impact hammer.  The impact hammer shall be used at a time of year when larval and juvenile stages of fish species are not present: this will be coordinated with the Alaska Department of Natural Resources, Habitat.*

**Suggested Condition 3.**  Drive piles when the current is reduced (i.e., centered on slack current) to minimize the number of fish exposed to adverse levels of underwater sound.

*CORPS RESPONSE TO NMFS:  The following special condition will be incorporated into the Corps permit:*

* *All piles shall be driven when the current is reduced (i.e., centered on slack current) to minimize the number of fish exposed to adverse levels of underwater sound.*

**Suggested Condition 4.**  Use a block of wood between the impact hammer and the pilings or use a bubble curtain to attenuate the sound.

*CORPS RESPONSE TO NMFS:  The following special condition will be incorporated into the Corps permit:*

* *Permittee shall either use a block of wood between the impact hammer and the pilings, and/or use a bubble curtain to attenuate the sound.*

**Suggested Condition 5.**  Reasonable precautions and controls must be used to prevent incidental and accidental discharge of petroleum products.

38

RECORD OF DECISION                           POA-1990-592-M

*CORPS RESPONSE TO NMFS: The following special condition has been incorporated into the Corps permit:*

* *Permittee shall use all reasonable precautions and controls to prevent incidental and accidental discharge of petroleum products.*

**Suggested Condition 6.** Material such as sorbent pads must be available on-site, and must be used to contain and clean up any petroleum product spilled as a result of construction activities and operation.

*CORPS RESPONSE TO NMFS: The following special condition will be incorporated into the Corps Permit:*

* *Material such as sorbent pads must be available on-site whenever construction activities are locally current, and shall be used to contain and clean up any petroleum product spilled as a result of construction activities and operation.*

**Suggested Condition 7.** The discharge of fill material in the sub-tidal areas would be detrimental to marine fish rearing habitat and potentially could result in the declines of fish populations in Slate Creek Cove. We recommend that the size of the fill material footprint be restricted to minimize adverse environmental impacts to the Slate Creek Cove and Berners Bay ecosystem. Discharging fill materials at low tides reduces the impacts of sedimentation on the marine ecosystem.

*CORPS RESPONSE TO NMFS: The applicant has resubmitted the revised design for the Slate Creek Cove marine dock facility, which reflects the lack of the originally requested ramp, thus reducing fill material impacts to the marine inter-tidal waters and navigable waters. The following special condition has been incorporated into the Corps permit:*

* *The discharge of fill material and/or dredged fill material into marine waters shall only occur during low-water periods (i.e., low tide).*

**Suggested Condition 8.** Wooden surfaces of the structures that come into contact with the water shall not be painted or otherwise surface-treated with creosote and may not be treated with a preservative that contains pentachlorophenol. Creosote and pentachlorophenol are toxic to juvenile fish in marine waters.

*CORPS RESPONSE TO NMFS: The following special condition has been incorporated into the Corps permit:*

* *Wooden surfaces of the structures that come into contact with the water shall not be painted or otherwise surface-treated with creosote and may not be treated with a preservative that contains pentachlorophenol. Creosote and pentachlorophenol are toxic to juvenile fish in marine waters.*

*Current practices regarding creosote treated wood have been that creosote may not be used on structures in fresh waters. In fresh and marine waters, any preservative on wooden structures must be applied by pressure injection using a method that prevents*

39

RECORD OF DECISION                                    POA-1990-592-M

*leaching, based on the 1997 Best Management Practices for the Use of Treated Wood in Aquatic Environments, by the Western Wood Preserves Institute. The use of creosote treated wood in marine waters is in compliance with uses approved by the U.S. Environmental Protection Agency. In addition, this subject was in the Berners Bay Transportation Policy and Mitigation and Best Management Practices Plan, prepared by Coeur (2005), Goal #5, SOP #12. The Plan has been incorporated into, and is a part of the Final Plan Of Operations for the Kensington Gold Project, dated May 2005, Appendix 4-C, and is enforceable by the USFS. The USFS' Final Plan of Operations has been incorporated as a condition of the Corps permit. Also, note that ADEC's Water Quality Certification condition #7 was imposed to control the use of creosote, and as a result of the Corps incorporating ADEC's Water Quality Certification into the Corps permit, this, will be an enforceable condition by both ADEC and the Corps.*

**Suggested Condition 9.** Although piling-supported structures will allow continued use of the project site by many vertebrates and fish, much of the existing plant life is likely to be shaded and thereby lost. We recommend using metal grating as a top surface, rather than planking minimizes this loss, as this results in greater light transmission to aquatic plants. Light penetration is needed to maintain inter-tidal habitat beneath structures such as walkways, catwalks, and gangways.

*CORPS RESPONSE TO NMFS: The following special condition will be incorporated into the Corps permit:*

- *Although piling-supported structures will allow continued use of the project sites by many vertebrates and fish, much of the existing plant life is likely to be shaded and thereby lost. Therefore, in order to minimize this loss, the permittee shall use metal grating, rather than planking, as a top surface of structures that extend over waters of the United States, such as docks, catwalks, and gangways.*

**Suggested Condition 10.** No portion of the new float may ground at any tidal stage. This is necessary to protect water quality and aquatic habitat by minimizing disturbance and introduction of suspended sediment, petroleum products, and toxic substances into the cove and outside waters.

*CORPS RESPONSE TO NMFS: The following special condition will be incorporated into the Corps permit:*

- *No portion of any floating structure may ground at any tidal stage. This is necessary to protect water quality and aquatic habitat by minimizing disturbance and introduction of suspended sediments, petroleum products, and toxic substances into the cove and outside waters.*

**Suggested Condition 11.** Geographic Response Strategies (GRS) to protect sensitive coastal environments along the planned service routes have also been identified. These map-based strategies display where sensitive areas are located and where to place oil spill protection resources. We recommend that the GRS be included in the development of a Route Operational Manual (ROM) to minimize or reduce impacts from potential oil spills on seabirds, marine mammals, fish, and the respective important coastal environments of

000043

Exhibit 11, page 40

each.  Information on the GRS locations is available on the
Southeast Alaska GRS website:
www.sttc.ak.us/dec/spar/perp/grs/se/home.

*CORPS RESPONSE TO NMFS:  The Corps regulations at 33 CFR 325.4(a)(2) and (b) for
conditioning of permits [paraphrasing] state that special conditions can be added at the
applicant's request or to clarify the permit application and that the Corps can take into
account an enforceable agreement between the applicant and another party concerned with
the resource, which would achieve the desired objective. The permittee stated their
agreement to this request in a letter to the Corps, dated November 10, 2004. The protection
of sensitive coastal environments specific to the routing of shuttle vessels transiting Berners
Bay is addressed in the Berners Bay Transportation Policy and Mitigation and Best
Management Practices Plan, prepared by Coeur (2005)Goal #5, SOP #1. The Plan has
been incorporated into, and is a part of the Final Plan Of Operations for the Kensington
Gold Project, dated May 2005, Appendix 4-C, and is enforceable by the USFS. The USFS's
Final Plan of Operations has been incorporated as a condition of the Corps permit.*

**Suggested Condition 12.**  An off-site mitigation package, acceptable
to the Juneau Fish and Wildlife Field Office (JFWFO) and other
resource agencies, will be developed before construction begins on
activities authorized under this permit.  The development of an
interest-bearing escrow account to mitigate for fish, wildlife, and
water quality impacts associated with construction and operation of
the project could be a component of a mitigation package.  The
funds in the account would be made available to a resource agency
council (council) composed of JFWFO, National Marine Fisheries
Service, Tongass National Forest, Alaska Department of Fish and
Game, and the Alaska Department of Natural Resource
representatives.  The council would determine the type, cost, and
location of mitigation projects.  The escrow amount and accumulated
interest would remain in escrow for the term of the project, unless
jointly determined by the council and the applicant that the
account may be closed.  The account would be used by the council to
implement fish and wildlife mitigation and enhancement.  None of
the monies would be used for council members' salaries or travel
costs.  The applicant would be notified before any funds are
withdrawn from the account and shall have the right to audit
expenditures to ensure compliance with its purpose.  This escrow
account would be readily available for mitigation projects, if
there are unforeseen events that impact fish and wildlife resources
as a result of the project that cannot otherwise be mitigated by
making a change in project operations.

*CORPS RESPONSE TO NMFS:   The applicant has minimized and avoided fill material
impacts to special aquatic sites, and to other waters of the United States. 33 CFR 320.4(r)
states that "All compensatory mitigation will be for significant resource losses which are
specifically identifiable, reasonably likely to occur, and or importance to the human or
aquatic environment." In this area of Southeast Alaska, the permanent loss of 3.44 acres of
forested wetlands would not constitute a significant loss of aquatic resource, though it is
identifiable and very likely to occur. See the Corps Response to the USEPA's recommended
condition number 12, above.*

**ENDANGERED SPECIES ACT (ESA) CONSULTATION PROCESS.**

000044

RECORD OF DECISION                                    POA-1990-592-M

The Corps initiated[78] informal consultation pursuant to Section 7 of the ESA, with the NMFS, and later, jointly with the USFS, requested[79] formal consultation along with the submission of a jointly prepared Biological Assessment/Biological Evaluation (BABE) stating that the Corps and the USFS had each determined that the Kensington and the Goldbelt projects were not likely to affect threatened and endangered species (humpback whale and Stellar sea lions) within the project area [Berners Bay].

Comment dated December 3, 2004. NMFS acknowledged receipt of the joint request for formal consultation pursuant to Section 7 of the ESA, stating that they had reviewed the BABE, but disagreed with our conclusions. The letter went on to discuss several factors which NMFS felt were of importance: regularity of shuttle transit of the bay, vessel speed, construction of a dock at Cascade Point (Goldbelt application) and at Slate Creek Cove, and the usage of these facilities by members of the public. NMFS recommended looking for an alternative site to the Cascade Point site, and suggested the suspension of vessel traffic within Berners Bay at pre-selected dates and times. NMFS stated in the letter "during formal consultation, Federal action agencies may not make any irreversible or irretrievable commitment of resources that limits future options. This practice insures that agency actions do not preclude the formulation or implementation of reasonable and prudent alternatives that avoid jeopardizing the continued existence of T&E species or destroying or modifying their critical habitats."

Comment dated March 18, 2005. NMFS completed the Biological Opinion, within which it stated that "...the revised Plan of Operations for the Kensington Gold Project, as proposed, is not likely to jeopardize the continued existence of these listed species in the wild, or destroy or adversely modify designated critical habitat found in proximity to the action area." The Opinion also included 16 Conservation Recommendations, as well as maintaining the original recommendation for denial, and these are addressed as follows:

**Denial Recommendation.** The NMFS' stated, on page 128 of the Biological Opinion, NMFS' continued recommendation that Coeur seek an alternative to the Cascade Point facility, preferably located outside of Berners Bay. Consequently, the NMFS recommended denial.

*CORPS RESPONSE TO NMFS, ESA: The Corps has concluded that the permitted marine docking facility at Cascade Point is the least environmentally damaging practicable alternative destination for the Kensington Gold Project.[80] This conclusion is addressed in Attachment G. Also, see the discussion on Alternative Destinations, Section VI, above. Denial of the Corps' permit application is not warranted, as is explained throughout this ROD.*

Biological Opinion Recommendations.

---

[78] June 21, 2004.
[79] November 16, 2004.
[80] See Section VI, Alternative Destinations, above.

42

RECORD OF DECISION                              POA-1990-592-M

**Recommendation 1.** "Any crew shuttle transits across Berners Bay during the eulachon run and herring spawning periods of April and May should be suspended. NMFS recommends use of other transportation routes during this time to minimize adverse effects to listed species and their prey base." Also, "...that Coeur limit disturbance from vessel noise, lights, and other sources that may discourage herring from utilizing spawning habitat in the vicinity of Cascade Point."

*CORPS RESPONSE TO NMFS, ESA:   The issues pertaining to the eulachon and herring spawning periods in Berners Bay are addressed in the Berners Bay Transportation Policy and Mitigation and Best Management Practices Plan, prepared by Coeur (2005), Goal #5, SOP #3. The Plan has been incorporated into, and is a part of the Final Plan Of Operations for the Kensington Gold Project, dated May 2005, Appendix 4-C, and is enforceable by the USFS. The USFS's Final Plan of Operations has been incorporated as a condition of the Corps permit.*

**Recommendation 2.** "Fueling of vessels at the Cascade Point marine dock facility should be prohibited from the time pre-spawning aggregations of herring are observed around the dock facility until herring eggs have hatched."

*CORPS RESPONSE TO NMFS, ESA: The fueling of shuttle vessels transiting Berners Bay is addressed in the Berners Bay Transportation Policy and Mitigation and Best Management Practices Plan, prepared by Coeur (2005), Goal #5, SOP #3 and SOP#6. The Plan has been incorporated into, and is a part of the Final Plan Of Operations for the Kensington Gold Project, dated May 2005, Appendix 4-C, and is enforceable by the USFS. The USFS's Final Plan of Operations has been incorporated as a condition of the Corps permit.*

**Recommendation 3.** "Dock facilities should serve only the Kensington Gold Project and public or other private uses should be entirely restricted in order to protect and avoid additional cumulative impacts to marine mammal populations in Berners Bay."

*CORPS RESPONSE TO NMFS, ESA:   It is anticipated that the property owner may restrict the use of the facility from public and private use due to insurance liability issues. The City & Borough of Juneau Conditional Use Permit restricts use of the dock to mine shuttle operations. However, it should be recognized that the structure would provide a safe haven in the event of a storm event, and its use at that time or in similar circumstances should not be restricted.*

**Recommendation 4.** "Construction should not occur between March 15 and June 30 to minimize potential noise impacts to marine mammals." And, "NMFS recommends that near-water construction occur during winter months when fewer marine mammals are present."

*CORPS RESPONSE TO NMFS, ESA: The following special condition will be incorporated into the Corps permit:*

* *No in-water work shall occur in Berners Bay between March 15 through June 30, to protect juvenile salmonids, herring, eulachon, and marine mammals.*

**Recommendation 5.** "NMFS recommends the use of appropriate in-water noise control measures (e.g., mufflers, bubble curtains) or other

43

RECORD OF DECISION                          POA-1990-592-M

technology for construction equipment and activities to minimize the effects of construction noise. NMFS also recommends the use of the additional noise reduction measures described in the BA/BE (e.g., instituting speed limits, controlling helicopter altitudes, implementing flight path requirements, refraining from compression braking on haul roads from the Slate Creek Dock to the mining site)."

*CORPS RESPONSE TO NMFS, ESA:   See Corps Response NMFS, ESA to Recommendation number 6, below. The placement of structures into waters of the U.S., and the control of helicopter and/or vessel or vehicle operations, to include route selection, vessel fueling, flight altitudes, speed limits, etc., as well as in-water noise control measures are addressed in the Berners Bay Transportation Policy and Mitigation and Best Management Practices Plan, prepared by Coeur (2005), Goal #5, SOP #11 and SOP#12. The Plan has been incorporated into, and is a part of the Final Plan Of Operations for the Kensington Gold Project, dated May 2005, Appendix 4-C, and is enforceable by the USFS. The USFS's Final Plan of Operations has been incorporated as a condition of the Corps permit. The operational control for vehicle speeds, braking procedures, and noise, as well as other noise sources, including blasting are controlled through the USFS Plan of Operation.*

**Recommendation 6.**  "In-water construction should occur outside of appropriate timing windows that protect out migrating juvenile salmonids, and spawning and rearing marine forage fish." And, "...we also recommend using vibratory hammers whenever and wherever practicable except for the final few minutes needed to proof piles when an impact hammer must be used."

*CORPS RESPONSE TO NMFS, ESA:   The following special conditions will be incorporated into the Corps permit:*

*   *All steel piles shall be driven using a vibratory hammer. Under those conditions where impact hammers are required for reasons of seismic stability or substrate type, the piles shall be driven as deep as possible with a vibratory hammer prior to the use of the impact hammer. The impact hammer shall be used at a time of year when larval and juvenile stages of fish species are not present; this will be coordinated with the Alaska Department of Natural Resources, Habitat Division.*

*   *All piles shall be driven when the current is reduced (i.e., centered on slack current) to minimize the number of fish exposed to adverse levels of underwater sound.*

*   *Permittee shall either use a block of wood between the impact hammer and the pilings, and/or use a bubble curtain to attenuate the sound.*

**Recommendation 7.**  "As included in the SEIS' Best Management Practices, NMFS recommends the use of silt curtains or other methods to prevent sedimentation of coastal habitat areas from construction activities."

*CORPS RESPONSE TO NMFS, ESA:   The following special condition will be incorporated into the Corps permit:*

44

RECORD OF DECISION                                      POA-1990-592-M

> \*   *Silt screens or other appropriate methods shall be used to confine suspended particles and turbidity to a small area where settling can occur in Lower Slate Lake (see 40 CFR 230.73[c]), and include filter blankets and curtains to filter out suspended solids.*

**Recommendation 8.**  "A marine biologist should monitor construction activities' effects on marine mammal behavior to ensure that impacts on marine mammals will be minimal. Monitoring results should be submitted to NMFS and USFS annually to determine if protection requirements have been met."

*CORPS RESPONSE TO NMFS, ESA:  The presence of a marine biologist or any other trained observer, as well as the monitoring of construction activities are addressed in the Berners Bay Transportation Policy and Mitigation and Best Management Practices Plan, prepared by Coeur (2005), Goal #5, SOP #4 and SOP #7. The Plan has been incorporated into, and is a part of the Final Plan Of Operations for the Kensington Gold Project, dated May 2005, Appendix 4-C, and is enforceable by the USFS. The USFS's Final Plan of Operations has been incorporated as a condition of the Corps permit.*

**Recommendation 9.**  "Vessel traffic should be minimized after dark, especially during spring eulachon/herring runs when Stellar sea lions and humpback whales are most likely to be foraging near the surface and along the route of the crew shuttle, increasing the likelihood of disturbance to both predators and prey from vessel noise and presence."

*CORPS RESPONSE TO NMFS, ESA:  Timing of vessels transiting Berners Bay is addressed in the Berners Bay Transportation Policy and Mitigation and Best Management Practices Plan, prepared by Coeur (2005), Goal #5, SOP #7. The Plan has been incorporated into, and is a part of the Final Plan Of Operations for the Kensington Gold Project, dated May 2005, Appendix 4-C, and is enforceable by the USFS. The USFS's Final Plan of Operations has been incorporated as a condition of the Corps permit.*

**Recommendation 10.**  "Vessels should be operated year-round at speeds not exceeding 13 knots."

*CORPS RESPONSE TO NMFS, ESA:  The control of the speed of vessels transiting Berners Bay is addressed in the Berners Bay Transportation Policy and Mitigation and Best Management Practices Plan, prepared by Coeur (2005), Goal #5, SOP #5. The Plan has been incorporated into, and is a part of the Final Plan Of Operations for the Kensington Gold Project, dated May 2005, Appendix 4-C, and is enforceable by the USFS. The USFS's Final Plan of Operations has been incorporated as a condition of the Corps permit.*

**Recommendation 11.**  "Quieting techniques should be adapted to vessels associated with the Kensington Gold Project, particularly the crew shuttle, to minimize noise disturbance to listed species and their prey in the action area."

*CORPS RESPONSE TO NMFS, ESA: See the response to NMFS, ESA Recommendation number 5, above.*

**Recommendation 12.**  "As the proposed action increases vessel traffic in an area where disturbance and collision risk have been minimal in the past, NMFS recommends that vessel-operating procedures be monitored and evaluated to determine if they are

000048

Exhibit 11, page 45

RECORD OF DECISION                                    POA-1990-592-M

effective at protecting sea lions and whales in the waters of
Berners Bay."

*CORPS RESPONSE TO NMFS, ESA:   Monitoring of the operation of vessels transiting
Berners Bay is addressed in the <u>Berners Bay Transportation Policy and Mitigation and Best
Management Practices Plan</u>, prepared by Coeur (2005), Goal #5, SOP #4 and SOP #7  The
Plan has been incorporated into, and is a part of the Final Plan Of Operations for the
Kensington Gold Project, dated May 2005, Appendix 4-C, and is enforceable by the USFS.
The USFS's Final Plan of Operations has been incorporated as a condition of the Corps
permit.*

**Recommendation 13.**   "NMFS recommends that a marine mammal observer
monitor crew shuttle operations during the entire year, beyond
simply the April/May time period, to ensure that impacts on marine
mammals are minimized and properly mitigated.  Monitoring results
should be submitted to NMFS and USFS annually to determine if
protection requirements have been met."

*CORPS RESPONSE TO NMFS, ESA:   The presence of a trained observer on or monitoring of
vessels transiting Berners Bay is addressed in the <u>Berners Bay Transportation Policy and
Mitigation and Best Management Practices Plan</u>, prepared by Coeur (2005), Goal #5, SOP
#4 and SOP #7. The Plan has been incorporated into, and is a part of the Final Plan Of
Operations for the Kensington Gold Project, dated May 2005, Appendix 4-C. and is
enforceable by the USFS. The USFS's Final Plan of Operations has been incorporated as a
condition of the Corps permit.*

**Recommendation 14.**   "NMFS recommends that USFS and ACOE [Corps]
should complete the spill prevention, control, and containment plan
for approval by NMFS and other relevant agencies that addresses the
potential for catastrophic spill (i.e., in the event that a 6,500
diesel fuel isotainer was to leak or rupture during transport,
loading, or offloading)."

*CORPS RESPONSE TO NMFS, ESA:   In July 2002, the USEPA amended the Oil Pollution
Prevention regulation at Title 40 of the Code of Federal Regulations, Part 112, (40 CFR
112). The regulation incorporated revisions proposed in 1991, 1993, and 1997. Subparts A
through C of the Oil Pollution Prevention regulation are often referred to as the "SPCC
rule" because they describe the requirements for certain facilities to prepare. amend and
implement Spill Prevention, Control and Countermeasure (SPCC) Plans.*

*The regulation requires that all regulated facilities have a fully prepared and implemented
Spill Prevention, Control, and Countermeasure, or SPCC Plan.  A licensed professional
engineer must certify the SPCC Plan.  Facilities must implement the Plan, including
carrying out the spill prevention and control measures established for the type of facility or
operations, such as measures for containing a spill (e.g., berms).  In the event that a facility
cannot implement containment measures, the facility must demonstrate that secondary
containment is impracticable; conduct periodic integrity and leak testing of bulk containers
and associated valves and piping; develop and incorporate a strong spill contingency plan
into the SPCC Plan; and provide a written commitment of manpower, equipment, and
materials required to quickly remove any quantity of oil discharged that may be harmful.  In
addition, facility owners or operators must conduct employee training on the contents of the
SPCC Plan.  Facilities that become operational between August 17. 2002 and August 18.
2006 must prepare and implement an SPCC Plan by August 18, 2006. Facilities that*

46

**000049**

Exhibit 11. page 46

RECORD OF DECISION                              POA-1990-592-M

*become operational after August 18, 2006, must prepare and implement a Plan before beginning operations.*

*Therefore, since preparation and implementation of a SPCC plan is the responsibility of the facility operator (Coeur), it is not necessary for the Corps permit to carry this condition independently. The Corps will supply an advisory on the Corps permit transmittal letter to the applicant.*

**Recommendation 15.** "...NMFS recommends that monitoring be directed toward adaptive management. We further recommend that our agency and other natural resource agencies be able to independently review collected data to assess impacts. If impacts are detected from project activities, USFS and ACOE should consult with NMFS to determine how to adjust the action effectively."

*CORPS RESPONSE TO NMFS, ESA:   The Corps will conduct normal monitoring of permit compliance in the project area, but will not be actively conducting any additional requested monitoring studies in the project area. Second, it is understood that most if not all of the proposed actions associated with the Kensington Gold Project will result in impacts, whether to the physical, social and/or biological environment, and these have been extensively discussed in the FSEIS, along with the means to mitigate for them. Also, several Federal and State resource agencies will be conducting monitoring activities at the project site and within Berners Bay. If adverse impacts different than those already discussed and mitigated for are detected, the Corps will coordinate corrective efforts with all appropriate Federal, State and local resource agencies.*

**Recommendation 16.** "...NMFS recommends that Coeur support such research efforts in the action area throughout the course of the Kensington Gold Project, and use best available technology to design any breakwater structure so that the probability of recreating productive herring spawning habitat is maximized."

*CORPS RESPONSE TO NMFS, ESA:   The current breakwater design has been submitted and published in the Corps public notice for public review and has not generated any negative responses with respect to its habitat potential (e.g., herring, kelps and fucus, bivalves, echinoderms, crustaceans, etc.).*

C.   **STATE:**  Alaska Department of Natural Resources.

**Comment dated April 7, 2004, addressed to the USFS, specific to the DSEIS.** "The largest wetlands loss in Alternative A is from the Dry Tailings Facility, which would result in a permanent loss of over 100 acres of Palustrine forest and Palustrine scrub-shrub wetlands.[81]"

D.   **CITY AND BOROUGH OF JUNEAU**

The City and Borough of Juneau (CBJ) issued[82] an "Allowable use permit for gold mining development and production within the Rural Mining District at Berners Bay" to Kensington, with several conditions. The following conditions are of particular interest to the Corps, and will be modified and appended to the permit:

---

[81] ADNR letter dated April 7, 2004.
[82] September 13, 2004.

47

RECORD OF DECISION                          POA-1990-592-M

**Condition 19.** Minimize tree clearing at the mine and mill complex and along the haul road. Maintain as large a buffer of standing timber as possible between the haul road, mill and processing area at Berners Bay.

*CORPS RESPONSE TO CBJ: The following special condition will be incorporated into the Corps permit:*

* *Permittee shall minimize tree clearing at the mine and mill complex and along the haul road, and shall maintain as large a buffer of standing timber as practicable between the haul road, the mill and the processing area at Berners Bay.*

**Condition 29.** Coeur shall identify methods in the approved Plan of Operations for the employment of best management practices that allow for quick action to be taken where erosion is imminent or under way.

*CORPS RESPONSE TO CBJ: The following special condition will be incorporated into the Corps permit:*

* *Permittee shall identify methods in the approved Plan of Operations and implement the best management practices that allow for quick action to be taken where erosion is imminent or under way.*

**Condition 31.** Reclaim disturbed areas on steep slopes and avoid disturbing steep slopes during inclement weather.

*CORPS RESPONSE TO CBJ:   The following special condition will be incorporated into the Corps permit:*

* *Permittee shall reclaim impacted areas on steep slopes and shall avoid disturbing steep slopes during inclement weather.*

**Condition 34.** Fill in wetlands shall be avoided and minimized to the greatest extent practicable.

*CORPS RESPONSE TO CBJ: The following special condition will be incorporated into the Corps permit:*

* *No fill material or construction materials shall be stockpiled, temporarily or permanently, on adjacent wetlands or waters outside the approved footprint.*

E.   **ORGANIZATIONS and COMPANIES**

Southeast Alaska Conservation Council [SEACC]. SEACC commented[83] that the Corps' public notice was premature since the USFS had not yet approved any modifications to the Plan of Operations for the Kensington Mine. They also contended that the Corps had not entered into consultation pursuant to the Endangered Species Act

---

[83] SEACC Letter, dated August 5, 2004, with attachments.

000051

Exhibit 11, page 48

RECORD OF DECISION                                        POA-1990-592-M

(ESA)[84], nor had the Corps adequately considered the cumulative impacts of all of the projects currently under consideration for the Berners Bay area.[85]

In a letter, SEACC addressed the proposed discharge of processed mining tailings into Lower Slate Lake, stating that "There are specific effluent limitations for that discharge and, if the Corps attempts to issue a 404 permit for those pollutants, it will be circumventing the entire 402 program and the will of Congress." SEACC went on to argue that "Even if a Section 404 Permit Were Appropriate, It would violate the 404(b)(1) Guidelines."[86] Another argument by SEACC was that the proposed [permit] action would violate State Water Quality[87] Standards.  SEACC also suggested that the discharge into the lake would violate State law.

SEACC commented on the proposed Slate Creek Cove marine dock facility and discussed the availability of practicable alternatives[88] [to the proposed barge ramp], and the use of the Comet Beach site as a location alternative, as well as impacts to the inter- and sub-tidal habitats.

*CORPS RESPONSE TO SEACC:  SEACC's comment letter was received August 6, 2004, in response to the Corps' public notice, when the Corps had yet to initiate consultation pursuant to the Endangered Species Act, and conduct an in-depth alternative analysis. The DSEIS was out for comment at the same time the Corps' notice was published. The Corps and the USFS have completed informal and formal consultation pursuant to the Endangered Species Act, prepared a response pertinent to issues on Essential Fish Habitat, and were intricately involved with discussions with Federal, State and local resource agencies addressing these and other issues. The following SEACC Comments were premature or reflected a misinterpretation of Corps policy:*

*a. The Corps does not automatically initiate the Endangered Species Act consultation process prior to publication of a public notice;*
*b. Issuance (or denial) of a Corps permit is not dependent on the USFS's approval of a Mine Operating Plan;*
*c. The Corps conducted its own alternative analysis, using the alternatives' analysis in the FSEIS, the alternatives and information supplied by Coeur, and relevant information generated during the Corps' public review process;*
*d. Not all of the project components of alternatives A, A1, B and C, are subject to the Corps' regulatory authority, nor would the Corps issue a permit for all of the project components in "Alternative B" or in "Alternative A", as examples.*

**Issue:**  "The ACOE cannot permit the proposed construction of marine facilities at Cascade Point because this project is not in the public interest."

*CORPS RESPONSE TO SEACC:   The construction of the Cascade Point docking facility is in the public's interest.    See the discussions in Sections I (Decision), Section VI (Alternatives*

---

[84]. See IX.2.B, Endangered Species Consultation Process, above.
[85]. See the FSEIS, Chapter 4.21, Cumulative Effects.
[86]. See 404(b)(1) evaluation.
[87]. See IX.1.A, the Alaska Department of Environmental Conservation's Water Quality Certification, above.
[88]. See VII, Analysis of the Least Environmentally Damaging Practicable Alternative, above.

49

000052

RECORD OF DECISION                                POA-1990-592-M

*Considered), X (General Evaluation) in this ROD, and in the FSEIS in Sections 4.10 (Aquatic Resources: Marine), and Section 4.21.17 (Transportation), and Attachments F and G.*

**Issue:** "The ACOE cannot rely upon the Forest Service's 1998 Draft Biological Assessment/Evaluation."

*CORPS RESPONSE TO SEACC:   The Corps did not rely on this document. See the discussions in Section IX.2.B, NMFS' Endangered Species Act (ESA) Consultation Process, in this ROD.*

**Issue:** "SEACC seeks clarification relating to where fueling of the worker transport ferries actually will occur."

*CORPS RESPONSE TO SEACC:   Fuel storage, fueling activities and fuel spillage are addressed in the Berners Bay Transportation Policy and Mitigation and Best Management Practices Plan, prepared by Coeur (2005), Goal #3, and Goal #4, SOPs #6, #7, #10 and #13. The Plan has been incorporated into, and is a part of the Final Plan Of Operations for the Kensington Gold Project, dated May 2005, Appendix 4-C, and is enforceable by the USFS. The USFS's Final Plan of Operations has been incorporated as a condition of the Corps permit.*

**Issue:** "As noted above, one reason this proposal is not in the public's interest is the adverse effect that construction and use of this industrial port facility on preserving and maintaining one of the few remaining intact herring spawning area in the greater Lynn Canal region. Numerous studies conducted in the past 5 years have suggested a deleterious effect of hydrocarbons on herring."

*CORPS RESPONSE TO SEACC:   See the Corps' responses in Section IX.2.B, National Marine Fisheries Service (EFH), and to the Biological Opinion Recommendations, both in this ROD; also, see the Berners Bay Transportation Policy and Mitigation and Best Management Practices Plan, prepared by Coeur (2005), Goal #3, and Goal #5, SOP #7. The Plan has been incorporated into, and is a part of the Final Plan Of Operations for the Kensington Gold Project, dated May 2005, Appendix 4-C, and is enforceable by the USFS. The USFS's Final Plan of Operations has been incorporated as a condition of the Corps permit.*

**Issue:** "The Corps cannot lawfully issue a section 404 permit for the disposal of mining waste into Lower Slate Lake."

*CORPS RESPONSE TO SEACC:   This action is consistent with current law and regulation[89].*

**Issue:** "Even if a Section 404 permit were appropriate, it would violate the 404(b)(1) Guidelines."

*CORPS RESPONSE TO SEACC:   The Corps has completed a review of the 404 (b)(1) guidelines and the project complies with the guidelines. See the discussions in Sections VI (Alternatives*

---

[89] See, e.g. Federal Register Vol. 67, No 90, pages 31129-31143 (May 9 2002), 40 §CFR 232 and 33 §CFR 323, Final Revisions to the Clean Water Act Regulatory Definitions of "Fill Material" and "Discharge of Fill Material", and Diane Regas Memo, United States Environmental Protection Agency, Clean Water Act Regulation of Mine Tailings, May 17 2004.

000053

Exhibit 11, page 50

RECORD OF DECISION                                POA-1990-592-M

*Considered), Section VII (Analysis of the Least Environmentally Damaging Practicable Alternative), and Section XI Subpart B(Compliance with the Guidelines) in this ROD.*

**Issue:**  "Dumping Mine Tailings into Lower Slate Lake will Violate State Law."

*CORPS RESPONSE TO SEACC:    The State of Alaska Department of Environmental Conservation has issued a Certificate of Reasonable Assurance, dated May 6, 2005, with 15 conditions. Conditions on this Certification are listed on Attachment D of the ROD.*

**Issue:**  "The applicant has not demonstrated that no practicable alternatives to the proposed action exist, that the project will result in no significant degradation, or that adequate mitigation will be undertaken to minimize adverse environmental effects of the dumping of mine tailings into Lower Slate Lake."

*CORPS RESPONSE TO SEACC:   We disagree with this comment. See the discussions in Sections VI (Alternatives Considered), Section VII (Analysis of the Least Environmentally Damaging Practicable Alternative), and Section VIII (Project Cost Calculation Summary), in this ROD, as well as in the 404(b)(1) Evaluation.*

Lynn Canal Conservation, Inc. (LCC)[90].  The LCC stated[91] opposition to the proposed changes to the Kensington Mine Project.  This included "harm to public interest natural resources; failure to adequately address cumulative (past, present and future) impacts; and piece-mealing of the mine-related activities, excluding potential impacts that might result if mining were to be extended for a greater period:"…a federal member of the agency panel said that this expanded mine development would only be considered by the agencies if and when Coeur submits additional permit applications for that purpose.  That is precisely the sort of piece-mealing that violates the intent of NEPA provisions…"  LCC also contends that the Corps permit, if authorized, would authorize the applicant to construct an industrial port facility in Slate Creek Cove, and authorize Goldbelt, Incorporated, to construct a similar facility at Cascade Point.  LCC also stated opposition to "federal approval of the disposal of processed mining waste into waters of the United States."

These issues were addressed in the DSEIS and FSEIS, Chapters 3 (Affected Environment) and 4 (Environmental Consequences), as well as in this ROD, Section IX.2.G.  Responses, below.

F.  **INDIVIDUALS (See Responses in Section G, below)**

Approximately 342 individuals, private companies, and other organizations responded to the proposed action.  A number of these were in direct response to the USEPA's NPDES related Public Hearing held on July 26, 2004, in Juneau, Alaska, and on July 27, 2004, in Haines, Alaska, while the rest were in response to the Corps Public Notice.  The comments, sometimes more than 1 per comment letter, have approximate totals of 223 for, 67 against, and another 52 unclear.  The 'approximate totals' is due to the illegibility and

---

[90] See Section IX.2.G. Responses.
[91] LCC Email, dated August 5, 2004

000054

Exhibit 11, page 51

RECORD OF DECISION                          POA-1990-592-M

uncertain contents of some of the comments, which resulted in
uncertainty regarding in which category they should be grouped.

The comments addressed such topics as economics, safety, tourism,
taxes, monitoring, subsistence, alternatives, transportation,
aesthetics, pollution, site histories, wilderness determinations,
fish and wildlife. These issues were addressed in the DSEIS and
FSEIS, Chapters 3 (Affected Environment) and 4 (Environmental
Consequences), as well as in this ROD, Section II.2.C. Responses,
below.

C.  **RESPONSES.**

Comments from the Federal and State agencies, if not addressed
above (IX.2.A-F), as well as comments from the public (individuals
and organizations), whether to the public notice or the public
hearing, were arranged into distinct categories and addressed
below:

COMMENTS ON ALTERNATIVES.

Compliance with the Section 404 (b)(1) guidelines requires that a
proposed discharge of dredged or fill material into waters and
navigable waters of the United States, should contain all
appropriate and practicable steps to minimize potential impacts of
the discharge on the aquatic ecosystem, and it should represent the
least environmentally damaging practicable alternative. If the
proposed activity does not require access or proximity to or siting
within a special aquatic site (i.e., wetlands, mudflats, etc.),
less damaging practicable alternatives that do not involve a
"special aquatic site" are presumed to be available[92], unless
clearly demonstrated otherwise.

An alternative is practicable if it is available and capable of
being performed after taking into consideration cost, existing
technology, and logistics in light of the overall project purpose.
Practicable alternatives include, but are not limited to (a)
activities which do not involve a discharge of dredged or fill
material into waters (including wetlands) of the United States
(U.S.); and (b) discharges of dredged or fill material into waters
of the U.S. at other locations and resulting in less impact.

It is the applicant's responsibility to demonstrate that there are
no practicable alternatives that would be less damaging to the
aquatic environment than the applicant's preferred alternative.
The Corps had earlier requested that the applicant demonstrate that
either there are no available practicable alternatives to the
proposed actions, or that there were no less damaging [to the
aquatic environment], practicable alternatives available that would
fulfill the applicant's purpose. That information has been
received, evaluated, and currently resides in the case file[93].

The Corps concludes that the construction of a marine dock facility
at Slate Creek Cove is practicable and would be the least

---

[92] See 40 CFR 230.10(a)(3).
[93] See Sections VII and VIII, above.

52

RECORD OF DECISION                                POA-1990-592-M

environmentally damaging practicable alternative[64]. In addition, the Corps also concludes that the discharge of fill material into Lower Slate Lake[65], as well as the discharges of fill material associated with the construction of the road and pipeline, the dam, the building support pads, the material storage facilities, and the water treatment facility are each practicable and the least environmentally damaging practicable alternative. These conclusions are based largely on the fact that all of the fill structures listed here, with the exception of the earthen dam and the water treatment facility, would be reclaimed at mine closure back to a water of the U.S. The water treatment facility would eventually be inundated (covered) by the rising waters of Lower Slate Lake.

COMMENTS ON DAM SAFETY.

Coeur's initial dam design was evaluated by the State of Alaska's Department of Natural Resources, Division of Mining, Land and Water, Dam Safety and Construction Unit, with respect to Coeur's application for a Certificate of Approval to Construct a Dam. The reviewing Unit assigned the proposed structure a Class II (significant) hazard potential.[65] Additionally, several recommendations were provided to Coeur, as well as a request for additional information to be provided by the applicant, prior to continuing with the certification process.

COMMENTS ON TIMING RESTRICTIONS.

The following timing restrictions were recommended by the Alaska Department of Natural Resources-Habitat and will be incorporated into the Corps permit as permit conditions:

* *No in-water work shall occur in Berners Bay between March 15 through June 30, to protect juvenile salmonids, herring and eulachon.*

* *No in-water work shall occur in Johnson Creek from May 1 through October 1, to direct construction to low-flow periods.*

COMMENTS ON "INSUFFICIENT PROJECT COVERAGE BY THE PUBLIC NOTICE TO ALLOW READERS TO PROPERLY ASSESS A PROJECT AND ITS IMPACTS ON THE ENVIRONMENT."

33 CFR 325.1(d)(1), Content of a permit application. This Federal Regulation[66] states that the Department of the Army permit application must include a complete description of the proposed activity including necessary drawings, sketches, or plans sufficient for public notice (detailed engineering plans and specifications are not required); the location, purpose and need for the proposed activity; scheduling of the activity; the names and addresses of adjoining property owners; the location and dimensions of adjacent structures; and a list of authorizations required by other federal, interstate, state, or local agencies for

---

[64] See the 404(b)(1) Evaluation.

[65] Letter from the Dam Safety and Construction Unit to Coeur Alaska, dated January 22, 2004.

[66] 33 CFR 325.1(d)(1) Content of a permit application; and 33 CFR 325.3(a) Public Notice.

000056

Exhibit 11, page 53

RECORD OF DECISION                          POA-1990-592-M

the work, including all approvals received or denials already made.
See Section 325.3 for information required to be in public notices
(below).  (2) All activities which the applicant plans to undertake
which are reasonably related to the same project (emphasis added)
and for which a Department of the Army permit would be required
should be included in the same permit application.

The public notice is the primary method of advising all interested
parties of the proposed activity for which a permit is sought and
of soliciting comments and information necessary to evaluate the
probable impact on the public interest.  The notice must,
therefore, include sufficient information to give a clear
understanding of the nature and magnitude of the activity to
generate meaningful comment.

The public notice, which was published shortly after publication of
the DSEIS, was for the applicant's preferred Alternative C.  The
applicant later adopted Alternative D, which was a reduction in
overall footprint in waters of the U.S., and although Alternative D
was not mentioned in the DSEIS, it was addressed in the FSEIS.
Both the DSEIS and the FSEIS provided information applicable to the
applicant's revised alternative selection, and addressed such
elements as alternatives, baseline information, and discussion of
anticipated impacts.

COMMENTS ON ESSENTIAL FISH HABITAT (EFH).

The Corps has adopted the EFH Assessment, which was prepared by the
USFS concurrently with the preparation of the FSEIS, and a copy is
included as an attachment to the USFS's FSEIS[97].

X.    **General Evaluation [33 CFR 320.4(a)]:  Public Interest Review**

    1.  **The relative extent of the public and private need for the proposed
        work.**  The mining activity would stimulate local cash flow, broaden
        the CBJ's tax base and provide for local job opportunities.  In
        addition, there is a need for more reliable all-weather
        transportation in Berners Bay with greater worker safety; improved
        project access which would result in reduced fuel storage and
        material inventories; and the reduction of the permanent loss of
        aquatic acreage.

        The private need for the discharges of fill material and
        construction of structures in waters of the U.S. would be the
        logistic requirement of clearing, excavating and stockpiling of
        overburden to accommodate the mining operation and provide docking
        facilities for worker transportation.  It would also allow the
        applicant to realize a profit for the applicant's business
        investment.

    2.  **The practicability of using reasonable alternative locations and/or
        methods to accomplish the objective of the proposed structure or
        work.**  The alternatives that the Corps has decided to authorize by
        permit are the environmentally preferable alternatives and the

---

[97] FSEIS, Volume 2, Appendix B, Essential Fish Habitat Analysis.

000057

Exhibit 11, page 54

RECORD OF DECISION                                    POA-1990-592-M

least environmentally damaging practicable alternatives, as
explained elsewhere in this document (e.g., see Section VI,
Alternatives Considered, above). There are no reasonable or
practicable alternative methods and/or locations that would
accomplish the purposes of the proposed action and which would be
less environmentally damaging than the alternatives that the Corps
is permitting. The applicant has already reduced and or redesigned
the project to minimize impacts on the aquatic system. There are
no less environmentally damaging, practicable alternatives
available to Coeur that will achieve the purposes for which the
work[98] is being proposed. See Section VII. (Least Environmentally
Damaging Alternative Analysis), and Section VIII. (Project Cost
Calculations Summary), above.

3.   **The extent and permanence of the beneficial and/or detrimental
     effects that the proposed structures or work may have on the public
     and private uses which the area is suited."[99]** The major permanent
     benefits that would be derived from the proposed project would be
     the financial returns from the applicant's investment, and the
     contribution to the local and State economies. Company
     shareholders would benefit from the profits generated.

     Though the proposed work would alter approximately 98.6 acres of
     waters of the U.S., including up to 78.4 acres of wetlands, up to
     20 acres of deep water habitat, and 0.2 acres of marine habitat,
     only 3.44 acres of waters of the U.S. would be permanently
     converted to uplands, plus 1.3 acres at Cascade Point.

XI.  **Evaluation of the Discharge of Dredge and Fill Material in Accordance
     with 404(b)(1) Guidelines [restrictions on discharge, 40 CFR 230.10]:**

SUBPART A - <u>GENERAL</u>

"Dredged or fill material should not be discharged into the aquatic
ecosystem, unless it can be demonstrated that such a discharge will not have
an unacceptable adverse impact either individually or in combination with
known and/or probable impacts of other activities affecting the ecosystem of
concern."

"The guidelines have been developed by the Administrator for the USEPA in
conjunction with the Secretary of the Army acting through the Chief of
Engineers under Section 404(b)(1) of the Clean Water Act. The Guidelines are
applicable to the specification of disposal sites for discharges of dredged
or fill material into waters of the U.S."[100]

The following steps are outlined in the Guidelines, and are conducted in the
evaluation and selection process of a proposed discharge site:

---

[98] The discharge of processed mine tailings into Lower Slate Lake, and the discharge of fill materials into waters and
navigable waters of the U.S. to construct a marine terminal at Slate Creek Cove, as well as the discharge of fill
materials into wetlands for the purposes of constructing roadways, a slurry pipeline, building and material storage
pads, borrow sites, etc.
[99] FSEIS, Section 4, primarily Chapters 4.13 (Land Use and Recreation), 4.14 (Visual Resources), 4.15
(Socioeconomics), 4.19 (Transportation), and 4.20 (Subsistence).
[100] 33 U.S.C. 1344.

000058

Exhibit 11, page 55

RECORD OF DECISION                                    POA-1990-592-M

(a) Review the restrictions on discharges; the measures to minimize adverse impacts; and any required factual determinations;
(b) Examine practicable alternatives to the proposed discharge(s);
(c) Delineate the proposed discharge site;
(d) Evaluate the physical and chemical components of the discharge site, to include the substrate and receiving waters;
(e) Identify and evaluate any special or critical characteristics of the proposed discharge site;
(f) Review available Factual Determinations to determine whether the information is sufficient to provide the required documentation or to perform pre-testing evaluation, or if additional information is necessary;
(g) Evaluate the material to be discharged to determine possibility of chemical contamination or physical incompatibility;
(h) Conduct the appropriate tests if there is a reasonable probability of chemical contamination;
(i) Identify appropriate and practicable changes to the project to minimize environmental impacts by the proposed discharge; and
(j) Make and document Factual Determinations and Findings of Compliance.

SUBPART B - COMPLIANCE WITH THE GUIDELINES

The Corps conducted a 404(b)(1) analysis for the Cascade Point docking facility for Goldbelt in Attachment G.

The actions proposed by Coeur for the Kensington Gold Project, file number POA-1990-592-M, would involve the discharge of fill material into special aquatic sites and into other waters of the U.S. in order to develop a material disposal site, a marine dock facility, and the infrastructure to operate an underground mine, e.g., roads, pipelines, utility corridors, borrow pits and material stockpiles, as well as several building pads. A brief description of the proposed project and alternatives considered is located at the beginning of this ROD and in greater detail in the FSEIS Summary, and in Section 2.0 of the FSEIS[101].

The applicant submitted a cost breakdown analysis[102] with respect to each of the two marine dock facility alternatives: Slate Creek Cove marine dock facility and Lower Slate Lake Wet Tailings Storage Facility, versus the Comet Beach marine dock facility and the Dry Tailings Facility. The applicant assumed for the Slate Creek Cove marine dock facility and the Lower Slate Lake disposal site that the majority of the respective support facilities, to include the processing mill, etc., would be constructed on uplands adjacent to the Jualin Mine (portal), which is located on the east side of the southern ridge of Lion's Head Mountain. The analysis, as well as the analysis provided by the ADNR[103], demonstrated that the proposed material disposal site in Lower Slate Lake and the proposed marine dock facility site at Slate Creek Cove were each practicable.[104]

The applicant demonstrated that there were no practicable alternatives to the proposed discharges (preferred alternative) that would accomplish the project's purpose and result in less impacts to waters of the U.S. Information in the FSEIS supported the applicant's conclusion.

---

[101] See FSEIS, dated December 2004, Summary, pages S-1 through S-17, and in Section 2.3.18 Marine Terminals.
[102] Coeur Alaska, two letters, dated November 19 and 23, 2004.
[103] ADNR letter addressed to the USFS, dated December 1, 2004.
[104] See VII. Analysis of the Least Environmentally Damaging Practicable Alternative, of this document.

56

000059

RECORD OF DECISION                                        POA-1990-592-M

After a detailed review of the applicant's submitted information, the Corps concludes that the construction of a marine dock facility at Slate Creek Cove is practicable and would be the least environmentally damaging practicable alternative for the transportation component of this project. In addition, the Corps also concludes that the discharge of fill material into Lower Slate Lake, as well as the discharges of fill material associated with the construction of the road and pipeline, the dam, the buildings support pads, the material storage facilities, and the water treatment facility are each practicable and the least environmentally damaging alternative.

**Disposal of Processed Mine Tailings.**  The original Corps permit[105] authorized the discharge of processed mine tailings into approximately 246 acres of forested and scrub-shrub wetlands, both of which are classified as special aquatic sites. By contrast, the applicant's preferred alternative would result in a discharge into Lower Slate Lake, a site defined partially as a deepwater habitat[106], with a narrow wetland band along its fringe. The lake is approximately 23 acres in size (20 acres deep-water habitat, and 3 acres fringe wetlands), and approximately 51 feet deep at its greatest depth.

The Guidelines state:  "Where the activity associated with a discharge which is proposed for a special aquatic site does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose (i.e., is not 'water dependent'), practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise. In addition, where a discharge is proposed for a special aquatic site, all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise." [107]  It has not been clearly demonstrated that the discharge of tailings into a special aquatic site (DTF) would be less damaging than the discharge of tailings into a non-special aquatic site (Lower Slate Lake). We conclude that the discharge into Lower Slate Lake is less damaging than the discharge of tailings into any of the Alternative A variants. In any event, the Alternative A variants are not practicable, for the reasons explained in Section VIII of this ROD.

The previously authorized Dry Tailings Facility would, by the end of the project and after reclamation had been completed, result in a permanent conversion of between 34 acres and 113 acres of waters of the U.S. to uplands, depending on which variant of Alternative A is selected.[108]  By comparison, the discharge of fill material into Lower Slate Lake would not convert any waters of the U.S. to uplands, even temporarily.  Rather, as the lake water level rises it would inundate approximately 39 acres of the adjacent forested and scrub-shrub wetlands, converting these into a deep water habitat.  This would be an eventual increase in area from the original 23 acres to a final 62 acres.

The Guidelines also state that "Except as provided under section 404(b)(2), no discharge or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States." And "Under these Guidelines, effects contributing to significant degradation

---

[105] Issued May 6, 1998.
[106] Classification of Wetlands and Deepwater Habitats of the United States. US Fish & Wildlife Service, FWS/OBS-79/31. December 1979. "Permanently flooded lands lying below the deepwater boundary of wetlands."
[107] 40 CFR Part 230.10(a)(3), Subpart B Compliance with the Guidelines.
[108] See Section VII, Least Environmentally Damaging Practicable Alternative Acreage Calculations' Chart.

000060

Exhibit 11, page 57

RECORD OF DECISION                                    POA-1990-592-M

considered individually or collectively, include: (1) Significantly adverse effects of the discharge of pollutants on human health or welfare, including but not limited to effects on municipal water supplies, plankton, fish, shellfish, wildlife, and special aquatic sites. (2) Significantly adverse effects of the discharge of pollutants on life stages of aquatic life and other wildlife dependent on aquatic ecosystems, including the transfer, concentration, and spread of pollutants or their byproducts outside of the disposal site through biological, physical, and chemical processes. (3) Significantly adverse effects of the discharge of pollutants on aquatic ecosystem diversity, productivity, and stability. Such effects may include, but are not limited to, loss of fish and wildlife habitat or loss of the capacity of a wetland to assimilate nutrients, purity water, or reduce wave energy; or (4) Significantly adverse effects of the discharge of pollutants on recreational, aesthetic, and economic values." The Guidelines go on to say that: "Except as provided in section 404(b)(2), no discharge of dredged or fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem. Subpart H identifies such possible steps." 40 CFR 230.10(c) also requires the Corps to place special emphasis on the persistence and permanence of the effects. Based in part on the actions listed in Subpart H below, which identifies those actions intended to minimize adverse effects to the aquatic ecosystem, the Corps concludes that the proposed discharge of tailings into Lower Slate Lake would not constitute a significant adverse environmental consequence.

[Note: See Subpart D, below, for additional information on Biological Characteristics.]

**Marine Terminal.** A number of alternative designs were considered by the Corps and by the applicant for a marine dock facility at Slate Creek Cove that would provide deep-water access and yet satisfy the Guidelines. These included (1) a reduced fill (10,475 cubic yards) without the ramp; (2) an all pile-supported structure; and (3) a retained fill bulkhead. These alternatives, as well as construction of a pile-supported dock versus a fill dock, have been evaluated in the FSEIS, and by the Corps, with regards to costs[109], and impacts to the aquatic environment. Additionally, there are no special aquatic sites within Slate Creek Cove[110] (below the HTL). The applicant's original design included a fill of approximately 10,000 cubic yards for a barge ramp. However, as a result of agency concerns, the ramp was removed and a new design has been submitted and incorporated into the proposal. The current design was determined by the Corps to be a practicable alternative that is least environmentally damaging to the aquatic ecosystem.

**Infrastructure.** The majority of building pads and the road system proposed in Alternative D would be constructed on uplands. The route for the slurry pipeline with its associated maintenance road, was designed to follow the topography of the ground contour to allow a gravity slurry feed into Lower Slate Lake, and to avoid crossing wetlands where possible. However, there are forested and scrub-shrub wetlands to the north of the lake, and a crossing of these wetlands could not be avoided.[111] The existing road connecting Slate Creek Cove and the Jualin Mine Site would be improved[112] but without the discharge of fill material into adjacent wetlands. Other

---

[109] See Section VIII of this ROD, above.
[110] See the FSEIS, Chapter 3, Section 3.10, Aquatic Resources: Marine.
[111] See Attachment E, Application Drawings. Sheet 5 of 14, dated April 2005.
[112] For example, grading, resurfacing and increasing height of fill, though this last would result in a narrower road.

000061

Exhibit 11, page 58

RECORD OF DECISION                                    POA-1990-592-M

infrastructure components[113] of the Kensington Gold Project either do not
require Corps authorization, they are existing, or they were authorized by a
previous Corps permit.

SUBPART C - POTENTIAL IMPACTS ON PHYSICAL AND CHEMICAL CHARACTERISTICS
           OF THE AQUATIC ECOSYSTEM

Applicable information about direct, indirect and cumulative environmental
impacts of the proposed project[114] and alternatives related to substrate,
suspended particulates/turbidity, water, current patterns and water
circulation, and normal water fluctuations, was discussed in Chapter 4.0 of
the FSEIS, which considered all of the resource values for the project.  The
individual affected resources are discussed in detail in Chapter 3.0 of the
FSEIS.  The USFS anticipates that adverse impacts to these characteristics
are expected to be relatively minor.  The Corps has evaluated this and other
available information[115] and concurs with the USFS.  There will be a temporary
conversion of approximately 36.6[116] acres of waters of the U.S., including
wetlands, to uplands; and all but 3.44 acres[117] would be reclaimed back to U.S.
waters, including wetlands.

Neither Lower Slate Lake nor the intertidal part of the Slate Creek Cove dock
facility would be converted to uplands.  The lake bottom would be covered
with fill material, but the lake would remain a lake.  Construction of the
dam would allow the lake to more than double in size to approximately 62
acres, inundating low adjacent forested and scrub-shrub wetland areas[118],
converting these to a mixture of deep-water habitat and emergent
wetlands/vegetated shallows over time.

Lower Slate Lake is approximately 51 feet deep with an emergent fringe.  The
lake bottom soils are primarily sandy silt, underlying organic mats.  During
the life of the project, the substrate would be covered by the mine tailings,
which consist of sand sized to very fine material.  No dredging or other
impacts to the substrate would occur.

With the dam and stream diversion(s) in place, the lake will experience
little stratification.  There will be no water currents, other than wind
driven surface disturbance.  The proposed discharge of tailings would not
impact the lake's water circulation.

The introduction of processed mine tailings into the lake waters would result
in an increase of total suspended solids (TSS)(turbidity) during mine
operation.  However, the permit was conditioned to require the use of silt
curtains to hang from the raft (from which the slurry pipeline would hang)
down to and surrounding the exit point of the slurry pipeline.  This permit
condition, plus the applicant's addition of flocculants to the slurry prior
to it leaving the mill, would reduce the TSS to a minimum.

---

[113] See Attachment E, Sheet 3A of 14, of the revised application drawings.
[114] The proposed project includes only those components as described in the Corps' public notice, dated June 21,
2004.  The alternatives discussed in the ROD are those that are specific to these project components.
[115] See Attachment C, List of Reference Documents.
[116] This is equal to the original 98.6 Acres minus the 23 Acre Lower Slate Lake minus the 39 Acres of wetlands
adjacent to Lower Slate Lake, and consist of the wetlands that would be temporarily filled to construct roads,
pipelines, building and structural pads, material stockpiles, staging areas, and material borrow sites.
[117] Certain wetlands and other waters of the U.S. covered by the embankment, or dam.
[118] These wetlands lying along the lake's margin would be mechanically land cleared prior to inundation by the lake
waters.

000062

Exhibit 11, page 59

RECORD OF DECISION                                POA-1990-592-M

A portion of the marine dock facility site below the High Tide Line (HTL) would be filled (approach fill material) but the fill material would be sloped from the HTL down to the sea floor, providing support for the fill structure above it. The portion of the fill structures located above the HTL, would be reclaimed back to wetlands. The area below the HTL would be returned to intertidal habitat.[119]

SUBPART D - POTENTIAL IMPACTS ON BIOLOGICAL CHARACTERISTICS OF THE
            AQUATIC ECOSYSTEM

Pertinent information about direct, indirect and cumulative impacts of the proposed project and all of the project's[120] components and alternatives related to threatened and endangered species, fish, aquatic organisms, and other wildlife is discussed in Chapter 4.0 of the FSEIS. Though the discharge of fill materials into waters of the U.S., including wetlands, in conjunction with the construction of the project's marine dock facility, tailings facility, pipelines, roads, utility corridors, borrow pits and material stockpiles and building pads, would result in a serious impact to all living organisms directly underneath the discharged material, adverse impacts to adjacent waters and wetlands, are expected to be minor. This would be due to the conditioning of the Corps permit to require the use of silt curtains, hay bales and other erosion prevention materials designed to prevent degradation of adjacent waters of the U.S., and uplands. The FSEIS discusses the potential for direct and indirect adverse effects on fish and wildlife habitat. The majority of these effects would result from the direct degradation of waters of the U.S. Approximately 3.44 acres would be permanently converted to uplands. There would be 47 acres of new deep-water habitat with 15 acres of fringe wetlands/vegetated shallows created by cessation of the operation. The applicant has prescribed reclamation[121] for each surface-disturbing component of the operation.

The discharge of the mine tailings into Lower Slate Lake would not result in significant permanent modifications to the lake's food web. There would be impacts to wildlife, such as waterfowl, deer, bear and various small mammals: conversion to open water, by inundation, of the special aquatic sites adjacent and to the north of the lake. The Corps has determined that this loss would not be significant. See Subpart H, Actions to Minimize Adverse Effects, below.

SUBPART E - POTENTIAL IMPACTS ON SPECIAL AQUATIC SITES

Special aquatic sites that would be affected by the proposed project are forested wetlands, scrub-shrub muskeg wetlands and emergent wetlands, all of which are typical in Southeast Alaska. The FSEIS identified a total of 98.6 wetland acres eliminated for Alternative D in the short term. However, the FSEIS did not provide any acreage numbers for the long-term loss, at project completion.[122,123]

---

[119] See the FSEIS, Chapter 3, Section 3.10, Aquatic Resources: Marine.
[120] The proposed project includes only those components as described in the Corps' public notice, dated June 21, 2004. The alternatives under discussion are those that are specific to these components.
[121] See the Kensington Mining Plan of Operation's Appendix 1, Reclamation Plan.
[122] See Section II. Analysis of the Least Environmentally Damaging Practicable Alternative, above.

60

000063

Exhibit 11, page 60

RECORD OF DECISION                                    PCA-1990-592-M

The acreages used in the FSEIS for Alternatives B, C, and D, were erroneous:
some of the acreage numbers used were taken from (a) previous Corps permitted
actions in the project area; (b) from misunderstandings by either the
applicant and or the USFS with respect to the applicant's proposed work;
and/or (3) was based on out-dated information, such as the previous Corps
public notice for the proposed work.  This misinformation would have resulted
in slightly inflated numbers.  Thus, the permit will reflect a different
acreage.  The difference between the FSEIS and the true values are minor and
inconsequential to the final Corps decision.

For example, though the Jualin to Slate Creek Cove access road component
already existed, and the applicant's intent was only to apply fill material
to the road surface and re-grade it, the applicant misunderstood and
responded to the Corps' information request with the statement that
approximately 26,000 cubic yards of fill material would be discharged into 12
acres of U.S. waters to construct the road.  This information was
subsequently published in the Corps public notice.  However, all of the
acreages of waters of the U.S. proposed to be impacted were correctly
identified prior to the writing of this ROD.[124]

Information about the functions and values associated with the area's
wetlands is discussed in Chapter 3.12.3, Soil, Vegetation, and Wetlands of
the FSEIS.  The impact upon wetlands is discussed in Chapter 4.12.3 of the
FSEIS.  The FSEIS recognizes that large portions of Southeast Alaska are
wetlands, and that the wetland types at this project site are not unique to
Southeast Alaska.  Impacts to the Sherman Creek and Ophir Creek drainages
were discussed in the 1997 SEIS.  Anticipated impacts to the Slate Creek and
Johnson Creek drainages would be minor.  The downstream fisheries of Slate
Creek would not be adversely impacted.  These wetland losses in this area of
Southeast Alaska are not substantial when evaluated on a watershed or
regional basis.

The initial discharge of fill material into approximately 23 acres of waters
of the U.S. (approximately 3 acres of emergent wetlands along the lake fringe
and approximately 20 acres of deep-water habitat) would fill Lower Slate Lake
to the current ordinary high water mark (OHWM).  An earthen embankment, or
dam, incorporated into the proposed plan, would be constructed at the lake
outlet, causing the lake waters to rise as the mine tailings discharged into
the lake.  It is anticipated that by project closure, the lake waters would
have risen to the maximum height, eventually inundating approximately 39
acres of adjacent forested and scrub-shrub wetland habitats[125], converting
these to a deepwater habitat.  This lake action would constitute a conversion
of one type of water of the U.S. to another:  converting forested and/or
scrub-shrub wetlands (special aquatic sites) to a mixture of open water and
emergent wetlands/vegetated shallows, which would convert by either natural

---

[123] The FSEIS was published prior to the applicant's final submittal of the Mining Plan of Operations (POO) to the USFS. The POO discusses reclamation with respect to intended loss and gains of U.S. waters, including wetlands, during concurrent and final reclamation.

[124] See Sheet 3A of Attachment E for a listing of all project components of Coeur's project, existing, permitted, and proposed.

[125] The applicant intends to mechanically land clear these areas prior to inundation of the lake waters. Otherwise, the vegetation would inhibit movement of the raft carrying the slurry line, and preventing an even deposition of material onto the lake bottom.

61

000064

Exhibit 11, page 61

RECORD OF DECISION                                    POA-1990-592-M

or artificial[126] means.  The anticipated end result would be a lake of approximately 62 acres in area (47 acres of deepwater habitat and 15 acres of emergent wetlands/vegetated shallows along the fringe), a 269% area increase.[127]

## SUBPART F - POTENTIAL IMPACTS ON HUMAN USE CHARACTERISTICS

Human use characteristics that will be affected by the proposed project include water supplies, fisheries, water-related recreation, aesthetics, and recreational areas.  Pertinent information about potential impacts of the proposed work on human use characteristics is found in Chapter 4.0 of the FSEIS.  Anticipated impacts, both beneficial and detrimental, ranged from relatively minor impacts to water-related recreation to moderate long term impacts to aesthetics.

## SUBPART G - EVALUATION AND TESTING

The potential for encountering hazardous wastes or materials that would lead to contamination of waters of the U.S. is discussed in the FSEIS, in Appendix A (Water Quality Analysis), and Appendix C (Ecological Risk Assessment of Aqueous Tailing Disposal at the Kensington Gold Mine).

The proposed discharge of fill material, including mine tailings into Lower Slate Lake would result in a Wet Tailings Storage Facility.  A factual determination of the impact of the discharge on the aquatic environment is required per 40 CFR 230.11, and its preparation[128] resulted in several characterizations of the discharged material (see below).

Previous Testing/Analysis.

• Tetra-Tech, a consultant company, addressed the potential for the processed ore material to become an acid rock discharge (ARD) or generating system, in the USFS' FSEIS[129].  "The 1997 FSEIS concluded that ore material does not pose a significant risk of acid rock drainage or metal release based on ore characterization studies."

• A sample of the mine water discharge was analyzed[130] for Cadmium, Copper, Lead, Mercury, pH, Total Suspended Solids, and Zinc, and the results documented in the FSEIS[131]: "Alternatives A, A1 and D would comply with all applicable water quality standards intended to protect downstream aquatic life.  Under Alternatives B and C, it is likely that additional metals and solids treatment would have to be added to meet discharge limits.  There is a potential for sediment-related impacts associated with construction and operation of mine facilities, in Sherman Creek under all alternatives and in Johnson and Slate creeks under Alternatives B, C, and D.  These impacts would be minimized or avoided by proper use of BMPs."

---

[126] The Kensington Gold Project's Mining Plan of Operations contains a Reclamation Appendix, which includes a lake restoration plan. The reclamation plan is a conceptual plan, and future revisions will be evaluated and approved by the Corps as appropriate. At project closure, the Federal and State resource agencies will convene to determine the best method based on the data collected to restore Lower Slate Lake.
[127] See the FSEIS, Chapter 3, Section 3.9, Aquatic Resources: Freshwater.
[128] See subpart C-F above.
[129] FSEIS, Section 3.3.2, Ore. page 3-6.
[130] FSEIS, Appendix A, Water Quality Analysis, 3.0, Acid Generation Potential, page A-39.
[131] FSEIS, Appendix A. Also, see Table 4-15, on page 4-31.

000065

RECORD OF DECISION                                    POA-1990-592-M

- Tetra-Tech characterized the geochemical properties of the expected tailings[132] using tests that had been performed on combined flotation (rougher) and carbon-in-leach tailings.  Under Alternative D, only rougher tailings would be produced at the mine.

- The tailing material, a slurry mix of processed ore and water, was tested for biological effects by the applicant, using habitability[133] tests with test organisms (amphipods Chironomus tentans and Hyalella azteca) though without following through with additional tests (e.g., tissue sample to reveal direct cause).  The C. tentans sample had slightly less egg production and "statistically significant reduced emergence", compared to the control, and the H. azteca sample had "statistically reduced survival".  These test results, though inconclusive, indicate that either the sediment or its suspension in the water column was lethal to these test freshwater organisms.  These results have led to ADEC conditioning their Water Quality Certificate of Reasonable Assurance to require further testing of the slurry and its impacts.  This condition is enforceable by the Corps.  If further testing shows there are contaminants at a level of concern, the Corps will consult with ADEC on appropriate measures to be taken.

Constraints.

Subpart G of the 404(b)(1) Guidelines, Evaluation and Testing, Part 230.60(d) states:  "Even if the section 230.60(b) evaluation (previous tests, the presence of polluting industries and information about the discharge or runoff into waters of the U.S., bioinventories, etc.) leads to the conclusion that there is a high probability that the material proposed for discharge is a carrier of contaminants, testing may not be necessary if constraints are available to reduce contamination to acceptable levels within the disposal site and to prevent contaminants from being transported beyond the boundaries of the disposal site, if such constraints are acceptable to the permitting authority and the Regional Administrator, and if the potential discharger is willing and able to implement such constraints."  Testing of the tailings and the tailings decant water was performed (FSEIS App. C) and will continue on a quarterly basis.  A National Pollutant Discharge Elimination System (NPDES) permit was issued by the USEPA on July 28, 2005, and effective September 1, 2005, for Fast Fork Slate Creek.  The NPDES permit was issued after the Corps issued a permit on June 15, 2005.

The following constraints are available and will be implemented to "reduce contamination to acceptable levels within the disposal site and to prevent contaminants from being transported beyond the boundaries of the disposal site".  These items are part of the terms of the permit (project work description), or are special conditions to the Corps permit, or both.

- An earthen dam would be located at the lake's outlet preventing all lake waters from exiting except during catastrophic, high water events;

---

[132] FSEIS, Section 3.3.4, Tailings, page 39.
[133] Results of Life-cycle Habitability Tests, submitted by AScI Corporation, Environmental Testing Laboratory. Also placed into Corps Case file August 24, 2004.

63

RECORD OF DECISION                          POA-1990-592-M

- A National Pollutant Discharge Elimination System Permit (obtained from the USEPA) shall be required to control and/or treat any water and/or aqueous materials exiting the lake.

- A cofferdam will be constructed in East Fork Slate Creek, to capture and divert Upper Slate Lake waters and other waters via a pipeline past the Wet Tailings Storage Facility and into the East Fork Slate Creek segment located below the dam.  (This action will be required by condition to the Corps permit)

- Wet Tailings Storage Facility waters will be pumped to a reverse osmosis treatment facility and then into the diversion pipeline to exit into the East Fork Slate Creek below the dam.

- A catchment system will be located below the dam to collect water that manages to pass the dam, whether by ground percolation or overflow, and recycle it back into the Wet Tailings Storage Facility.

- Silt screens and other appropriate methods shall be used at the outlet of the slurry pipeline to confine suspended particles and turbidity to a small area where settling can occur in Lower Slate Lake (see 40 CFR 230.73[c]).  (This will be a condition to the Corps permit.)

- A part of the milling process involves the addition of a polymer and flocculants to the slurry before it leaves the mill.  These items would be non-toxic and would "improve the efficiency of settling out fine material", thus reducing turbidity.  [40 CFR 230.71(d)]  This will be a condition to the Corps permit.

- ADEC in the 401 Certification of Reasonable Assurance, and in accordance with 33 U.S.C. 1341(d), imposed conditions which are incorporated into the Department of the Army permit.  Condition #8 requires that the mine tailings shall be tested on a quarterly basis, in accordance with a monitoring plan approved by the department, to insure there are no significant deviations from the original tailings analysis which may affect monitoring, closure requirements, water quality, or any other permit condition.  Constituent levels that shall be measured include, but are not limited to, aluminum, ammonia, arsenic, cadmium, chromium, copper, iron, lead, mercury, nickel, nitrate, pH, selenium, silver, sulfate, total dissolved solids (TDS), zinc, meteoric water mobility, and acid base accounting.

- ADEC in the 401 Certification of Reasonable Assurance imposed Condition #14 that requires Coeur Alaska, Inc., to provide proof of financial responsibility in an amount and in form(s) acceptable to the Department, in accordance with AS 46.03.100(f) and 18 AAC 60.265.  If the financial assurances provided to other state and federal agencies are not sufficient to satisfy the Departments requirements, Coeur Alaska Inc. shall provide any additional financial assurances determined by the Department to be necessary.

- ADEC in the 401 Certification of Reasonable Assurance imposed Condition #15 that requires capping of the tailings, addition of organics, or other state approved mitigation measures to be required at or after mine closure

64

**000067**

Exhibit 11, page 64

RECORD OF DECISION                                POA-1990-592-M

if water quality criteria are not met in the impoundment, or if the
tailings do not successfully re-colonize as determined by the state.

Additionally, as discussed below, the Corps will require that the waters of
Lower Slate Lake and the discharged mine tailings deposited there be tested
at, or just prior to, cessation of discharges of the tailings into the lake.

The discharge of mine tailings into the Wet Tailings Storage Facility will be
limited, that is, pre-specified as to total volume, and when that limit is
reached the operation will be terminated, and the Wet Tailings Storage
Facility will be closed to further discharges of fill material. At that
point (or earlier), further testing will be required per Federal and State
permit conditioning[134] to reflect if either the water column and/or the
underlying lake bottom sediments are contaminated. Additionally, appropriate
options for containment[135] or decontamination of the lake will be explored via
the Reclamation and Closure Plan.[136] The applicant has demonstrated a
willingness and the ability to comply with these constraints (see 230.60(d)).

The FSEIS anticipates that Lower Slate Lake can be restored to at least
equivalent aquatic habitat and fish populations after closure. Additionally,
the Corps permit will carry the two conditions listed below to require
reclamation of those areas under Corps jurisdiction, as well as the full
restoration of the lake, and address testing of lake waters and bottom
sediments.

*Permittee shall comply with the terms and conditions of the most recently approved version of
the Kensington Gold Project's "Final Plan of Operations", to include "Appendix I, Reclamation
and Closure Plan", as approved by the U.S. Forest Service. All measures involving concurrent
and end-of-project reclamation in waters of the United States, including wetlands, shall become
enforceable conditions of the Department of Army (DA) permit. The DA recognizes that the
Reclamation Plan is a conceptual plan, and that future revisions will be evaluated and approved
by the Corps as appropriate.*

*The waters and the discharged processed mine tailing sediments, located in Lower Slate Lake
shall be tested at lake closure or just prior to cessation of discharges of mine tailings into Lower
Slate Lake, in accordance with appropriate testing requirements (at the time of closure) for the
presence of toxic materials and contaminants. The results shall be made available to the United
States Army Corps of Engineers, Alaska District, Regulatory Branch, for dissemination to the
appropriate State, Federal, and local resource agencies.*

SUBPART H - ACTIONS TO MINIMIZE ADVERSE EFFECTS

Actions proposed to minimize potential adverse effects for each available
Alternative are discussed in Chapter 2.5 of the FSEIS. The applicant's
proposed plan of work incorporated numerous changes to avoid and minimize
impacts to the aquatic resources:

---

[134] See Attachment D, ADEC's Certification condition #8 pertaining to quarterly testing of the sediments.
[135] See Attachment D, ADEC's Certification condition #15 pertaining to capping of the sediments.
[136] The USEPA's comment letter, dated August 20, 2004, recommended in their Special Condition number 2, a
preference for capping of the processed mine waste.

**000068**

Exhibit 11, page 65

RECORD OF DECISION                          POA-1990-592-M

- The project would be constructed in conformance with Alternative D of the FSEIS as identified in the USFS Record of Decision.

- Approximately 40% of all mill tailings will be placed back underground to reduce surface disturbance.

- Relocating the milling facilities and eliminating the Dry Tailings Facility from the Corps permit reduces the impacts to special aquatic sites.

- The USFS and ADNR hold performance bonds to ensure reclamation and site rehabilitation in accordance with the reclamation plan.

- The USFS will monitor the operation for compliance with the USFS Plan of Operations and for compliance with a set of Best Management Practices (BMP) for mine construction and operation.

- The ADEC and CBJ will each monitor air, surface condition, and water quality.

To ensure that the aquatic resources are protected, the special conditions listed in the original Corps permit will be incorporated, as appropriate, into a new list of special conditions to be appended to the Corps permit. See Attachment D.

As a result of pre-application coordination, the following mitigation will be incorporated into the project activities to reduce impacts to the aquatic environment, and Coeur has initiated the mitigation items as listed below.

- General construction-related Best Management Practices will be employed such as minimization of sediment transport from impacted areas prior to the construction of permanent facilities through sediment and erosion control devices and establishing a permanent vegetative cover;

- Natural drainages will be diverted around the process area and routed to Johnson Creek to maintain flow rates within the creek;

- Surface water will be diverted around the Wet Tailings Storage Facility in order to maintain flow rates in Slate Creek during mining operations;

- Mine process water will be recycled within the mine and discharged only after settling; and

- A Final Reclamation Plan will be developed and approved by resource agencies which will include returning the area to pre-project contours, permanently sealing of Coeur's Kensington mine portal (on the Jualin side of the Mountain), ensuring that Lower Slate Lake will be suitable for fish re-colonization, road culvert removal, and re-vegetation.

- Approximately 450 cy of appropriate fill materials will be discharged into approximately 8.5 acres of U.S. waters (wetlands) at the lake margin to provide enhanced spawning substrate for Dolly Varden char.  This action will occur at lake closure.

**000069**

Exhibit 11, page 66

RECORD OF DECISION                                    POA-1990-592-M

Mitigation also includes funding by Coeur for the monitoring activities in Berners Bay. These activities will be conducted by the NMFS and the Alaska Department of Fish and Game.

Coeur has, in part as mitigation for unavoidable impacts to waters of the U.S., and in part as a result of agreements reached during the Endangered Species consultation process with the USFS and Coeur, agreed to provide funding to the NMFS and to the Alaska Department of Fish and Game, with the intent that these agencies will conduct the following monitoring activities in Berners Bay:

* Hydrocarbon monitoring in water, sediment, and mussel tissue. This would be an annual program with a 6-year commitment of monitoring.

* Annual aerial surveys of herring spawning monitoring in Berners Bay. This is an annual commitment with up to 10 flights per year.

* A trained observer will conduct marine mammal and bird surveys during ferry commutes across Berners Bay during the eulachon run.

The Corps has considered each of the mitigation items listed above and has concluded that all of these taken as a group satisfy the requirement of mitigating for the unavoidable impacts of the project.

**XII. Compliance with Environmental Requirements:** The issuance of permits for the proposed project is in compliance with applicable environmental requirements. The development of the DSEIS and the FSEIS was accomplished in accordance with the National Environmental Policy Act of 1969, as amended. Recommendations of the USFWS prepared pursuant to the Fish and Wildlife Coordination Act of 1958, as amended, have been fully considered in the permit decision. Coordination with the NMFS pursuant to Section 7 of the Endangered Species Act of 1973, as amended, has been completed. The recommendations of the USEPA have been fully considered. An evaluation of the discharge of fill material and dredged fill material as required by Section 404(b)(1) of the Clean Water Act, 40 CFR 230, was completed and is attached to this document[137]. The discharge complies with the guidelines, with the inclusion of the appropriate and practicable conditions listed in Attachment D to minimize pollution and the adverse effects to the affected ecosystem. I find that issuance of permits as described above is in conformance with these guidelines. The Alaska Department of Natural Resources has issued a Coastal Zone Management Consistency Determination, and ADEC has issued a Certificate of Reasonable Assurance, with conditions. Both of these documents will be incorporated into and become part of the Corps permits.

**XIII. Section 176(c) of the Clean Air Act General Conformity Rule Review.** The proposed project has been analyzed for conformity applicability pursuant to regulations implementing Section 176(c) of the Clean Air Act. It has been shown that the activities proposed under this permit will not exceed *de minimis* levels of direct emissions of a criteria pollutant or its precursors and are exempted by 40 CFR Part 93.153. This no effect determination has been coordinated with the U.S. Environmental Protection Agency and the Alaska Department of Environmental Conservation. Any later indirect emissions are

---

[137] See Attachment B and G.

67

**000070**

RECORD OF DECISION                          POA-1990-592-M

generally not within the Corps continuing program responsibility and
generally cannot be practicably controlled by the Corps.  For these reasons a
conformity determination is not required for this individual permit.

**XIV. Determination.**  I find that the issuance of the Corps permits, as
described by regulations published in 33 CFR Parts 320 through 330, with the
scope of work as described in this document is based on a thorough analysis
and evaluation of all issues set forth in this ROD.  There are no less
environmentally damaging, practicable alternatives available to the
applicants that will achieve the purposes for which the work is being
proposed; the proposed work is deemed to comply with established Federal,
State and local laws, regulations, and codes; the issuance of these permits
is consistent with National Policy, statutes, and administrative directives;
and on balance, issuance of Corps permits to Coeur and Goldbelt for the
proposed work is not contrary to the public interest.  As explained in
Subpart H, above, all practicable means to avoid and/or minimize
environmental harm from the selected, permitted alternatives have been
adopted and required by terms and conditions of these permits.

29 Mar 2006
Date:

Timothy J. Gallagher
Colonel, Corps of Engineers
District Engineer

69

**000071**

Exhibit 11, page 68