

Thursday,
April 20, 2000

Part V

# Department of Defense

Department of the Army, Corps of Engineers

33 CFR Part 323

# Environmental Protection Agency

40 CFR Part 232
Proposed Revisions to the Clean Water Act Regulatory Definitions of "Fill Material" and "Discharge of Fill Material"; Proposed Rule

Exhibit 21, page 1

**DEPARTMENT OF DEFENSE**

**Department of the Army, Corps of Engineers**

**33 CFR Part 323**

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 232**

**[FRL–6582–8]**

**Proposed Revisions to the Clean Water Act Regulatory Definitions of ''Fill Material'' and ''Discharge of Fill Material''**

**AGENCIES:** U.S. Army Corps of Engineers, Department of the Army, DOD; and Environmental Protection Agency.

**ACTION:** Proposed rule.

**SUMMARY:** The Department of the Army (Army) and the Environmental Protection Agency (EPA) today are jointly proposing to revise their Clean Water Act (CWA) regulations defining the term ''fill material.'' At present, the Army and EPA definitions of ''fill material'' differ from each other, and this has resulted in regulatory uncertainty and confusion. The existing Army definition defines ''fill material'' as any material used for the primary purpose of replacing an aquatic area with dry land or of changing the bottom elevation of a water body, and specifically excludes from that definition any material discharged into the water primarily to dispose of waste, as that activity is regulated under section 402 of the Clean Water Act. The existing EPA definition defines ''fill material'' as any pollutant which replaces a portion of the waters of the U.S. with dry land or which changes the bottom elevation of such waters, regardless of the purpose of the discharge. Today's proposal would amend both the Army and EPA definitions of ''fill material'' to provide a single definition of that term, and thus ensure proper, consistent, and more effective regulation under the CWA of materials that have the effect of replacing any portion of a water of the U.S. States with dry land or of changing the bottom elevation of any portion of a water of the U.S. Today's proposal also would make a change to the definition of the term ''discharge of fill material'' in order to provide further clarification of this issue.

**DATES:** Written comments must be submitted by June 19, 2000.

**ADDRESSES:** Send written comments on the proposed rule to the Office of the Chief of Engineers, ATTN CECW–OR, 20 Massachusetts Avenue, Washington, DC 20314–1000.

We request that commenters submit any references cited in their comments. We also request that commenters submit an original and 2 copies of their written comments and enclosures. Commenters that want receipt of their comments acknowledged should include a self-addressed, stamped envelope. All written comments must be postmarked or delivered by hand. No facsimiles (faxes) will be accepted.

A copy of the supporting documents for this proposed rule is available for review in Room 6225 at the U.S. Army Corps of Engineers' Pulaski Building, located at 20 Massachusetts Avenue, Washington, DC 20314–1000. For access to docket materials, call (202) 761–0199 between 9 a.m. and 3:30 p.m. for an appointment. Comments received on the proposed rule will also be available for examination in Corps District or Division offices.

**FOR FURTHER INFORMATION CONTACT:** For information on the proposed rule, contact either Mr. Thaddeus Rugiel, U.S. Army Corps of Engineers, ATTN CECW–OR, 20 Massachusetts Avenue, Washington, DC 20314–1000, phone: (202) 761—0199, e-mail: Thaddeus.J.Rugiel@ HQ02.USACE.ARMY.MIL, or Mr. John Lishman, U.S. Environmental Protection Agency, Office of Wetlands, Oceans and Watersheds (4502F), Ariel Rios Building, 1200 Pennsylvania Avenue NW, Washington, DC 20460, phone: (202) 260–9180, e-mail: lishman.john@ epa.gov.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

*A. Plain Language*

In compliance with President Clinton's June 1, 1998, Executive Memorandum on Plain Language in government writing, this preamble is written using plain language. Thus, the use of ''we'' in this action refers to EPA and the U.S. Army Corps of Engineers (Corps), and the use of ''you'' refers to the reader.

*B. Potentially Regulated Entities*

Persons or entities that discharge material to waters of the U.S. that has the effect of replacing any portion of a water of the U.S. with dry land or changing the bottom elevation of any portion of a water of the U.S. could be regulated by today's proposed rule. The CWA generally prohibits the discharge of pollutants into waters of the U.S. without a permit issued by EPA or a State approved by EPA under section 402 of the Act or, in the case of dredged or fill material, by the Corps or an approved State under section 404 of the Act. Today's proposal addresses the CWA section 404 program's definitions of ''fill material'' and ''discharge of fill material,'' which are important for determining whether a particular discharge is subject to regulation under CWA section 404. In developing today's proposal to reconcile the agencies differing definitions, we have carefully considered our current regulatory practice and the terms of a 1986 Memorandum of Agreement Between the Assistant Administrators for External Affairs and Water, U.S. Environmental Protection Agency, and the Assistant Secretary of the Army for Civil Works Concerning Regulation of Discharges of Solid Waste Under the Clean Water Act (''1986 Solid Waste MOA''). The 1986 Solid Waste MOA sets out a number of factors to help determine whether material is subject to the CWA under section 404 or 402. Today's proposal does not alter current practice, but rather is intended to clarify what constitutes ''fill material'' subject to CWA section 404. Examples of entities potentially regulated include:

| Category | Examples of potentially affected entities |
|---|---|
| State/Tribal governments or instrumentalities | State/Tribal agencies or instrumentalities that discharge material that has the effect of replacing any portion of a water of the U.S. with dry land or changing the bottom elevation of a water of the U.S. |
| Local governments or instrumentalities | Local governments or instrumentalities that discharge material that has the effect of replacing any portion of a water of the U.S. with dry land or changing the bottom elevation of a water of the U.S. |
| Federal government agencies or instrumentalities | Federal government agencies or instrumentalities that discharge material that has the effect of replacing any portion of a water of the U.S. with dry land or changing the bottom elevation of a water of the U.S. |

| Category | Examples of potentially affected entities |
|---|---|
| Industrial, commercial, or agricultural entities ........ | Industrial, commercial, or agricultural entities that discharge material that has the effect of replacing any portion of a water of the U.S. with dry land or changing the bottom elevation of a water of the U.S. |
| Land developers and landowners .......................... | Land developers and landowners that discharge material that has the effect of replacing any portion of a water of the U.S. with dry land or changing the bottom elevation of a water of the U.S. |

This table is not intended to be exhaustive, but rather provides a guide for readers regarding entities that are likely to be regulated by this action. This table lists the types of entities that we are now aware of that could potentially be regulated by this action. Other types of entities not listed in the table could also be regulated. To determine whether your organization or its activities are regulated by this action, you should carefully examine the applicability criteria in § 230.2 of Title 40 of the Code of Federal Regulations, as well as the preamble discussion in section II of today's proposal. If you have questions regarding the applicability of this action to a particular entity, consult the persons listed in the preceding **FOR FURTHER INFORMATION CONTACT** section.

*C. Overview of Clean Water Act*

The CWA is the primary federal statute addressing the discharge of pollutants to waters of the U.S. Section 301(a) of the CWA generally prohibits such discharges except as may be authorized by a permit issued under the Act. Two different permitting regimes are created by the Act: (1) section 404 permits, primarily administered by the Corps, addressing the discharge of dredged or fill material, and (2) section 402 permits (commonly referred to as National Pollutant Discharge Elimination System, or ''NPDES'' permits), administered by EPA and the States, which address the discharge of all other pollutants. The CWA defines the term ''pollutant'' to include materials such as rock, sand, and cellar dirt that often serve as ''fill material.'' The CWA, however, does not define the term ''fill material,'' leaving it to the agencies to adopt a definition consistent with the statutory language and scheme. Providing a clear and consistent definition for the term ''fill material'' under the CWA is important in determining whether a proposed discharge of a pollutant is subject to regulation under section 404 or section 402.

In keeping with the fundamental difference in the nature and effect of the discharge that each program was intended by Congress to address, sections 404 and 402 employ different approaches to regulating the discharges to which they apply. The section 402 program is focused on (although not limited to) discharges such as wastewater discharges from industrial operations and sewage treatment plants, stormwater and the like. See, e.g., CWA sections 304 (b) and (d) and 402(p). Pollutant discharges are controlled under the section 402 program principally through the imposition of effluent limitations, which are restrictions on the ''quantities, rates, and concentrations of chemical, physical, biological and other constituents which are discharged from point sources into navigable waters'' (CWA section 502(11)). Section 402 permits must include effluent limitations that reflect treatment with available pollution control technology, and any more stringent limitations necessary to meet water quality standards for the receiving water (CWA section 301(b)). There are no statutory or regulatory provisions under the section 402 program designed to address discharges that convert waters of the U.S. to dry land. Moreover, the section 402 permitting process does not require an evaluation of alternatives to a proposed discharge or mitigation for unavoidable impacts.

The section 404 permitting program differs from the section 402 program in several fundamental respects. First, section 404 focuses exclusively on two materials: dredged material and fill material. The term ''fill material'' clearly contemplates material that fills in a water body, and thereby converts it to dry land or changes the bottom elevation. Fill material differs fundamentally from the types of pollutants covered by section 402 because the principal environmental concern is the loss of a portion of the water body itself. For this reason, the section 404 permitting process focuses on different considerations than the section 402 permitting program. Section 404(b) of the CWA directs the Corps to apply Guidelines promulgated under section 404(b)(1) of the CWA, which in turn must be based on criteria comparable to the criteria contained in section 403(c) of the CWA. Among other things, those criteria expressly require consideration of ''other possible locations and methods of disposal'' and ''land-based alternatives.''

The section 404(b)(1) Guidelines do provide for consideration of the effects of chemical contaminants on water quality in a number of ways, specifically requiring compliance with applicable State water quality standards (40 CFR 230.10(b)(1)), toxic effluent limits or standards established under CWA section 307 (40 CFR 230.10(b)(2)), and appropriate use of chemical and biological testing to evaluate contaminant effects (40 CFR 230.11(d) and (e); 230.60). However, because section 404 was intended by Congress to provide a vehicle for regulating materials whose effects include the physical conversion of waters to non-waters or other physical alterations of aquatic habitat, the section 404(b)(1) Guidelines go beyond such a water quality based approach to require numerous additional considerations before a section 404 permit may be issued. These include careful consideration of the effects of the discharge on the aquatic ecosystem as a whole, as well as evaluation of alternatives to the discharge and measures to minimize and compensate for unavoidable adverse effects.

Under the section 404(b)(1) Guidelines, discharges having significant adverse effects on aquatic ecosystems are not allowable (40 CFR 230.10(c) (2) and (3)). As a result, the Guidelines require evaluation of the effects of discharges on the aquatic ecosystem (40 CFR 230.11(e)), including cumulative impacts and secondary effects (40 CFR 230.11(g) and (h)). The Guidelines also set forth specific provisions for considering impacts on the aquatic ecosystem, including effects on aquatic organisms in the food web and other wildlife (40 CFR part 230, subpart D). In addition, the Guidelines do not allow discharges that would have significant adverse effects on human health, recreation, aesthetic, and economic values (40 CFR 230.10(c) (1) and (4)). The Guidelines set forth specific provisions for considering such impacts (40 CFR part 230, subpart F).

In addition to providing for careful assessment of the overall effects of the discharge on aquatic ecosystems and other amenities, the Guidelines do not

allow a discharge if there are practicable alternatives with less adverse effects on the aquatic ecosystem (40 CFR 230.10(a)). The Guidelines further require that if a discharge is allowed, appropriate and practicable steps must be taken to minimize potential adverse effects to the aquatic ecosystem and mitigate for unavoidable impacts (40 CFR 230.10(d)). They also identify a range of such potential measures for consideration in the permitting process (40 CFR part 230, subpart H). The Guidelines also provide for mitigation to compensate for unavoidable adverse effects. See, February 1990 Memorandum of Agreement Between the Environmental Protection Agency and the Department of the Army Concerning the Determination of Mitigation Under the Clean Water Act section 404(b)(1) Guidelines.

*D. Discussion of the Existing Corps and EPA Definitions of Fill Material*

Prior to 1977, both the Corps and EPA had defined ''fill material'' as ''any pollutant used to create fill in the traditional sense of replacing an aquatic area with dry land or of changing the bottom elevation of a water body for any purpose. * * *'' 40 FR 31325 (July 25, 1975); 40 FR 41291 (September 5, 1975).

In 1977, the Corps amended its definition of ''fill material'' to add a ''primary purpose test,'' and specifically excluded from that definition material that was discharged primarily to dispose of waste. 42 FR 37130 (July 19, 1977). This change was adopted by the Corps because it recognized that some discharges of solid waste materials technically fit the definition of fill material; however, the Corps believed that such waste materials should not be subject to regulation under the CWA section 404 program. Specifically, the Corps' definition of ''fill material,'' unchanged since 1977, currently reads as follows:

(e) The term ''fill material'' means any material used *for the primary purpose* of replacing an aquatic area with dry land or of changing the bottom elevation of an [sic] water body. The term does not include any pollutant discharged into the water primarily to dispose of waste, *as that activity is regulated under section 402 of the Clean Water Act.*'' 33 CFR 323.2(e) (emphasis added).

EPA did not amend its regulations to adopt a ''primary purpose test'' similar to that used by the Corps. Instead, the EPA regulations at 40 CFR 232.2 currently define ''fill material'' as ''any 'pollutant' which replaces portions of the 'waters of the United States'' with dry land or which changes the bottom elevation of a water body *for any purpose*'' (emphasis added). EPA's definition focuses on the effect of the material, rather than allowing the purpose of the discharge to affect whether it would be regulated by section 404 or section 402.

*E. Problems and Issues With the Existing Definitions*

These differing definitions of the term ''fill material'' have resulted in inconsistencies which impede the fair and effective implementation of the CWA in a number of ways. For example, in the case of the Corps definition, use of a ''primary purpose test'' appears to require the Corps to make a subjective determination about the primary purpose of a prospective discharge. This subjective determination becomes even more problematic to make where the proposed discharge has multiple purposes. The ''primary purpose test'' also allows any prospective discharger or project proponent to seek to affect which regulatory regime would apply by simply asserting a purported purpose. This definition also lends itself to the possible exclusion of materials that are most commonly used for the very purpose of raising the elevation of an area (i.e., of filling a water of the U.S.) if the materials are a waste product of some other activity.

The confusion caused by the ''primary purpose test'' has also engendered extensive litigation. We are concerned that if the inconsistencies and ambiguities in the regulatory definitions of ''fill material'' are not corrected, further litigation would arise and future court decisions could reduce the ability of the CWA section 404 program to protect the quality of the aquatic environment, and the overall public interest.

The court decision that most clearly illustrates the serious problems caused by the ''primary purpose test'' is the Ninth Circuit Court of Appeals decision in *Resource Investments Incorporated* v. *U.S. Army Corps of Engineers,* 151 F.3d 1162 (9th Cir. 1998) (the RII case). This case involved a CWA section 404 permit application for a solid waste landfill proposed to be built in waters of the U.S. located in the State of Washington. The Corps' Seattle District Engineer denied the section 404 permit, on the grounds that a solid waste landfill at that location could contaminate an important ''sole source'' aquifer, and on the grounds that environmentally safer practicable alternatives were available to handle the region's solid waste. When the permit applicant sued, the District Court upheld the Corps' permit denial, but the Ninth Circuit Court of Appeals reversed, on a number of grounds.

One of the Ninth Circuit's conclusions in the RII decision was that the ''primary purpose'' test in the Corps' definition of the term ''fill material'' meant that the Corps could not require a CWA section 404 permit for pollutants that the applicant proposed to discharge into waters of the U.S. relating to his proposed landfill. Based on the Corps' definition of fill material, the Ninth Circuit stated that no section 404 permit was needed for the solid waste that would be disposed of in the proposed landfill. Moreover, the Ninth Circuit also determined that the layers of gravel, low permeability soil, and synthetic liner that would underlie the solid waste landfill did not constitute fill material. The Court reasoned that the ''primary purpose'' of these materials (*e.g.,* soil and gravel) to be placed in the waters of the U.S. to underlie the landfill was not ''changing the bottom elevation of a water body'' or ''replacing an aquatic area with dry land.'' Rather, the court found that its primary purpose was the installation of a leak detection and collection system for that landfill. The court did not address the material that would be used to construct roads and berms that were part of the project.

The Ninth Circuit's decision in the RII case illustrates the inherent problems in the ''primary purpose'' test. In RII, the litigant was successful in excluding from regulation under the CWA section 404 traditional fill material, by alleging an alternative primary purpose. Typically fill serves some purpose other than just creating dry land or changing a water body's bottom elevation. Thus, if this approach to interpreting the Corps' ''primary purpose test'' were to be taken to its extreme conclusion, the unreasonable end result could be that almost any traditional fill material proposed to be placed in waters of the U.S. does not need a section 404 permit. Such an interpretation would be clearly contrary to the intent of Congress expressed in the plain words of CWA sections 404 and 301, which require that any ''fill material'' to be placed in any water of the U.S. must be legally authorized by a permit under CWA section 404.

These problems can be avoided by focusing on the effect of the material to be discharged rather than the purpose. For example, in the decision of the Fifth Circuit Court of Appeals in *Avoyelles Sportsmens League* v. *Marsh,* 715 F. 2d. 897 (5th Cir. 1983), the Court effectively interpreted the ''primary purpose test'' as an ''effects based'' definition of ''fill material.'' In the words of the Fifth Circuit:

* * * the burying of the unburned material, as well as the discing, had the *effect* of filling in the sloughs on the tract and leveling the land. The landowners insist that any leveling was ''incidental'' to their clearing activities and therefore, the material was not deposited for the ''primary purpose'' of changing the character of the land. The district court found, however, that there had been significant leveling * * * Certainly, the activities were designed to ''replace the aquatic area with dry land.'' Accordingly, we hold that the district court correctly concluded that the landowners were discharging ''fill material'' into the wetlands. (Id. At 924–925; emphasis added).

Thus, in the Avoyelles decision the Fifth Circuit essentially held that if the effect of material discharged into waters of the U.S. is fill, then that material properly is treated as fill material needing a CWA section 404 permit.

Other litigation which reflects the confusion caused by the ambiguities of the ''primary purpose test'' originated in the District Court for the Southern District of West Virginia (*Bragg* v. *Robertson,* (Civil Action No. 2:98–636, S. D. W. Va.)) and currently is the subject of an appeal to the U.S. Court of Appeals for the Fourth Circuit. The Bragg case involves the discharge of large volumes of rock, sand, and earth (*i.e.,* surface mining overburden) into waters in West Virginia as part of the process of ''mountaintop removal'' surface coal mining. The Corps has historically regulated this type of discharge, commonly known as ''valley fills,'' under CWA section 404 general and individual permits (permits under the Surface Mining Control and Reclamation Act (SMCRA) are also required). Among several claims in Bragg was the assertion that this rock and soil overburden should be regulated under CWA section 402. On December 23, 1998, a settlement agreement was reached among the federal defendants, West Virginia Department of Environmental Protection and the plaintiffs to resolve all claims against the federal defendants. Under the settlement agreement, the plaintiffs agreed not to challenge Corps' authority to regulate as ''fill material'' under CWA Section 404 various types of material (e.g., rock, sand, and earth) generated by the coal mining industry in West Virginia and placed in waters of the U.S. On June 17, 1999, the District Court approved the agreement, finding that the agreement ''accords with the law and is fair, reasonable and faithful to the objectives of SMCRA and CWA.'' 54 F.Supp.2d 653, 665 (S.D.W.Va. 1999). However, an October 1999 Memorandum Opinion and Order by the District Court addressing claims against the West Virginia Department of Environmental Protection under SMCRA contains obiter dicta, based upon the Corps' primary purpose test, indicating that the Corps lacked authority to regulate under CWA section 404 the placement into waters of the U.S. of rock, sand, and earth overburden from coal surface mining operations, because the ''primary purpose'' of the discharge was waste disposal.

In contrast to the use of a ''primary purpose test,'' the EPA regulations currently define ''fill material'' as ''* * * any 'pollutant' which replaces portions of the 'waters of the United States' with dry land or which changes the bottom elevation of a water body for any purpose'' (emphasis added). This approach, which focuses on whether the material would have the effect of replacing portions of waters of the U.S. with dry land, or of changing the bottom elevation of such waters, is less ambiguous and subjective than use of a ''primary purpose test.'' However, we believe that this definition needs clarification, because, read literally, it could subject to regulation under CWA section 404 certain pollutants that have been, are being, and should be regulated by the technology and water quality based standards used in the section 402 program. For example, industrial waste or sewage may contain suspended solids which ultimately will settle to the bottom following discharge. Although this would not replace waters with dry land, this could have effects on the water body's bottom elevation. Where such pollutants are covered by proposed or final effluent limitations guidelines and standards under section 301, 304, or 306 of the CWA or the discharge is covered by a NPDES permit issued under section 402 of the CWA, the proposed rule would exclude the discharge from the definition of fill.

II. Discussion of Proposed Rule

In order to ensure a clear, effective, and consistent regulatory approach, the Corps and EPA today are proposing identical definitions of the term ''fill material.'' In particular, we believe that regardless of the purpose of a prospective discharge, the definition of ''fill material'' should cover material that has the effect of fill.

Accordingly, today's proposal would amend both the Corps' definition of ''fill material'' at 33 CFR 323.2(e) and the EPA's definition at 40 CFR 232.2 to provide that ''fill material'' means material that has the effect of replacing any portion of a water of the U.S. with dry land, or changing the bottom elevation of any portion of a water of the U.S. At the same time, it would specifically exclude from the definition of fill material discharges subject to EPA proposed or promulgated effluent limitation guidelines and standards under CWA sections 301, 304, and 306, or discharges covered by a NPDES permit issued under CWA section 402.

In the revised definition of ''fill material'' we have included examples of certain types of material that often constitute fill. We wish to emphasize that these are illustrative clarifying examples and are not intended to be an exhaustive list. As today's rule formally adopts the effects test, it also is important that we clarify our intent with respect to certain materials not specifically listed within the definition. The materials include wood chips, coal mining overburden, certain forms of solid waste, and material used to construct solid waste landfills.

With respect to ''wood chips,'' when this material is scattered as a result of the normal use of wood cutting equipment such as chainsaws, bush hogs, and similar equipment, the wood chips would not have the effect of fill, and thus would not be covered by CWA section 404 under today's proposal. However, some operators of heavy mechanized equipment place or stockpile wood chips in wetlands to use as temporary road material, equipment pads, or surfacing to facilitate operation of equipment such as trucks, backhoes, and excavation equipment. In addition, in some cases the regular operation of chipping equipment can result in stockpiling or mounding of chips in waters of the U.S. In situations such as these, because of their quantity or distribution, the woodchips have the effect of fill and would be subject to regulation under CWA section 404.

With regard to proposed discharges of coal mining overburden, we believe that the placement of such material into waters of the U.S. has the effect of fill and therefore, should be regulated under CWA section 404. This approach is consistent with existing practice and the existing EPA definition of the term ''fill material.'' In Appalachia in particular, such discharges typically result in the placement of rock and other material in the heads of valleys, with a sedimentation pond located downstream of this ''valley fill.'' This has required authorization under CWA section 404 for the discharges of fill material into waters of the U.S., including the overburden and coal refuse, as well as the berms, or dams, associated with the sedimentation ponds. The effect of these discharges is to replace portions of a water body with dry land. Therefore, today's proposal makes clear that such material is to be regulated under CWA section 404. Also,

today's proposal recognizes that discharges from coal mining activities that are covered by a proposed or final EPA effluent guideline (See e.g., 40 CFR part 434) are not fill material and would remain subject to regulation under CWA section 402. Thus, the effluent discharged into waters of the U.S. from sedimentation ponds currently is regulated under CWA section 402, and would continue to be so regulated under today's proposal. This result would also be true for other types of activities that involve various discharges, some of which are subject to regulation under CWA section 404 and others of which are subject to regulation under section 402.

In proposing today's rule, it is the intent of the Corps and EPA to ensure that all activities involving discharge of pollutants into the waters of the U.S. associated with coal mining be regulated effectively to ensure protection of the aquatic environment. Consistent with the terms of the 1998 Bragg settlement agreement a Memorandum of Understanding (MOU) to coordinate coal mining permit evaluations in the state was entered into by the Office of Surface Mining, the Fish and Wildlife Service, EPA, the Corps, and the State of West Virginia. Completed in April 1999, the MOU describes those discharges that the agencies believe generally should have only a minimal effect on waters of the U.S. and thus could be eligible for general permit authorization by the Corps. Prior to that MOU, agency practice had allowed the authorization of some discharges that probably should have received individual permit review. In addition, the MOU initiated coordination procedures between CWA and Surface Mining Control and Reclamation Act permit reviews that also has resulted in the development of technical models for minimizing the size of proposed coal discharges. The settlement agreement included the initiation of a comprehensive Environmental Impact Statement (EIS) as well. The EIS is scheduled to be completed in December 2000 and will assess current federal and state authorities for regulating coal mining discharges in Appalachia and what measures may be necessary to ensure protection of human health and the environment. A draft EIS will be issued this summer for public comment.

With respect to solid waste, it is important at the outset to draw a clear distinction between solid waste discharged directly into waters of the U.S. and sanitary solid waste landfills (the latter is discussed further below). Under today's proposed rule, many forms of solid waste (including heterogeneous solid waste such as garbage) could fall within the definition of "fill material" if such waste were to be placed directly into waters of the U.S. This is because most forms of solid waste, if discharged into a water body, would have the effect of changing the bottom elevation of a portion of an aquatic area, or replacing a portion of the aquatic area with dry land.

Under today's proposal, the only exception would be for those discharges covered by proposed or final effluent limitation guidelines and standards under sections 301, 304, or section 306 of the CWA or an NPDES permit issued under section 402 of the CWA. Generally, under these provisions of the CWA, EPA regulates solid waste materials that are of a homogeneous nature normally resulting from a single-industry site or set of known processes. For example, such wastes as identified in 40 CFR part 440, subpart M (placer mining), 40 CFR part 436, subpart R (phosphate mining), 40 CFR part 440, subpart E (titanium mining), 40 CFR part 436, subpart C (sand and gravel mining), 40 CFR part 423 (steam electric power generation), and 40 CFR part 435 (oil and gas extraction). We welcome comment on all aspects of today's proposal, and especially solicit comment on whether the proposal's reference to discharges "covered by proposed or final effluent limitations guidelines and standards under sections 301, 304 or section 306 of the Clean Water Act * * * or discharges covered by an NPDES permit" fully encompasses the range of discharges properly subject to section 402 of the Act.

Notwithstanding the fact that the definition of fill could include many forms of solid waste, you should not infer from this fact that either the Corps or the EPA believes that solid waste (e.g., trash, debris, automobiles) is an appropriate or legitimate form of fill material for which CWA section 404 permits should be or will be granted. In fact, the opposite is true. As a general matter, we do not expect that CWA section 404 authorizations should be, or are likely to be, granted for proposals to discharge of fill material consisting of such solid waste into any water of the U.S.

In this regard, for many years the Corps has advised the regulated public that, as a general rule, such solid waste is not an acceptable form of fill material for which CWA section 404 permits can be issued. For example, all Corps Nationwide General Permits are subject to General Condition Number 3, which reads as follows:

3. *Suitable material.* No discharge of dredged or fill material may consist of unsuitable material (e.g., trash, debris, car bodies, etc.) and material discharged must be free from toxic pollutants in toxic amounts (see section 307 of the Clean Water Act.) (56 FR 59146, Nov. 22, 1991)

In the most recent revision of the nationwide general permit conditions, the list of "unsuitable" forms of fill material has been expanded to include "asphalt." (See 65 FR Page 12896, March 9, 2000).

This general condition reflects the policy that the waters of the U.S. should not be polluted by discharges of solid waste, which is generally not a suitable or appropriate form of "fill material," for a variety of reasons. For example, many forms of solid waste, such as heterogeneous solid waste, junked automobiles, discarded appliances, or chemically processed solid waste (e.g., heap leach piles) often contain pollutants (including toxic pollutants) that could, over time, leach into and contaminate both the surface waters and ground water. Consequently, as a general rule, members of the public should not seek CWA section 404 authorization for the discharge of such solid waste directly into the waters of the U.S., because there is no likelihood that section 404 permits would be granted.

Where there is no reasonable prospect that a Corps District Engineer would grant a section 404 permit to discharge solid waste into a water body, it would be a waste of time for both the applicant and the Corps for the Corps to have to accept and process a permit application for such a proposed discharge. Thus, the Corps is considering including in its regulation a provision that would allow the District Engineer complete discretion to refuse to process any permit application to discharge fill material that the District Engineer determines to be "unsuitable fill material." This would allow Corps District offices to avoid expending limited resources processing applications for the direct discharge into waters of the U.S. of any form of solid waste where the District Engineer determines that there is no reasonable possibility for the granting of a section 404 permit.

To accomplish this purpose, the Corps could include within its regulations at 33 CFR 323.2 a definition for a new term, "unsuitable fill material." That proposed new definition would read generally as follows:

The term "unsuitable fill material" means any material proposed to be discharged into waters of the United States that would fall under the definition of "fill material," but

which the District Engineer determines to have physical or chemical characteristics that would make the material unsuitable for a proposed discharge into waters of the United States, so that there is no reasonable possibility that a section 404 permit can be granted for the proposed discharge of that particular material. For example the District Engineer may determine that fill material is unsuitable because of the potential for the leaching of contaminants from the fill material into ground waters or surface waters, or because the proposed fill material is too light or unstable to serve reliably for its intended purpose (e.g., bank stabilization or erosion control). In most circumstances, heterogeneous solid waste, discarded appliances, and automobile or truck bodies would qualify as unsuitable fill material. In addition, material containing toxic pollutants in toxic amounts (see section 307 of the Clean Water Act) is unsuitable fill material.

The Corps recognizes the fact that special and exceptional circumstances can arise whereby material generally deemed ''unsuitable'' for direct discharge into water bodies can be authorized for discharge, with little or no risk to the environment, or even to enhance environmental values. For example, over the years the Corps has authorized the creation of a number of artificial reefs from various types of discarded ''waste materials.'' Therefore, the new definition of ''unsuitable fill material'' would not reduce in any way the discretion of any District Engineer to authorize the discharge of any waste material for a beneficial purpose.

Accordingly, we request comment on adding a definition in the Corps regulations for the term ''unsuitable fill material,'' and on changing Corps regulations to grant the District Engineer authority to reject, without further processing, any permit application for ''fill material'' that the District Engineer determines to be ''unsuitable fill material.''

Unfortunately, it is well known that, upon occasion and from time to time, individuals illegally ''dump'' solid waste into wetlands and other aquatic areas, without having sought any sort of CWA authorization for those discharges. Such illegal discharges of solid waste present an enforcement problem under the CWA. The EPA will continue to serve as the lead enforcement agency regarding such unpermitted discharges of solid waste.

With respect to solid waste landfills, our intent has been, and continues to be, that liners, berms, and other infrastructure that are constructed of materials such as rock, sand, gravel, clay, soil, plastics, and other materials that have the effect of changing the elevation of waters of the U.S. should be regulated under section 404 of the CWA.

In the case of a landfill that has received an individual Department of the Army section 404 permit, the subsequent disposal of solid waste into the landfill, while subject to regulation under the Resource Conservation and Recovery Act (RCRA), would not be subject to regulation under the CWA. As with current practice, discharges of leachate from landfills into waters of the U.S. would remain subject to CWA section 402.

Our approach today is consistent with current practice and the 1986 Solid Waste MOA between the EPA and the Army that the agencies have continued to follow in implementing our current regulations. That MOA sets out a number of factors in paragraphs 4 and 5 to help determine whether material is subject to the CWA under 404 or 402, and today's proposal has been drafted to take into account factors similar to those in the 1986 Solid Waste MOA. In particular, the proposal's provision that material with the effect of fill would be subject to section 404 is similar to paragraph B.4.c of the 1986 Solid Waste MOA (providing that when the principal effect of the discharge is physical loss or modification of waters of the U.S., this is a factor indicating application of section 404). Similarly, proposed language excluding from coverage under section 404 material that is covered by proposed or promulgated EPA effluent guidelines or standards is consistent with paragraph B.5 of the 1986 Solid Waste MOA (providing that when discharges are in liquid, semi-liquid, or suspended form or the discharge is of homogeneous solid material, this is a factor indicating application of section 402). Additionally, as provided for in paragraph B.2 of the 1986 Solid Waste MOA, in cases of unpermitted discharges of solid waste into waters of the U.S., EPA will continue to serve as the lead enforcement agency.

Consistent with the above described revisions to the definition of ''fill material,'' we also are proposing to revise the definition of the term ''discharge of fill material'' to further clarify the issue of section 404 applicability with regard to materials used to construct solid waste landfills and placement of coal mining overburden. In particular, we believe placement of these materials in waters of the U.S. is properly subject to regulation under section 404 of the CWA. Accordingly, we are proposing a clarification to the regulations on this point by adding these placement activities to the list of examples set out in the regulations defining the ''discharge of fill material'' at 33 CFR 323.2(f) and 40 CFR 232.2.

### III. Administrative Requirements

*A. Paperwork Reduction Act*

This action does not impose any new information collection burden or alter or establish new record keeping or reporting requirements. Thus, this action is not subject to the Paperwork Reduction Act.

*B. Executive Order 12866*

Under Executive Order 12866 (58 FR 51735, October 4, 1993), we must determine whether the regulatory action is ''significant'' and therefore subject to review by the Office of Management and Budget (OMB) and the requirements of the Executive Order. The Order defines ''significant regulatory action'' as one that is likely to result in a rule that may:

(1) Have an annual effect on the economy of $100 million or more, or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or Tribal governments or communities;

(2) Create a serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(3) Materially alter the budgetary impact of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(4) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive Order.

Pursuant to the terms of Executive Order 12866, it has been determined that this rule is a ''significant regulatory action.'' As such, this action was submitted to OMB for review. Changes made in response to OMB suggestions or recommendations will be documented in the public record.

*C. Executive Order 13132 (Federalism)*

Executive Order 13132, entitled ''Federalism'' (64 FR 43255, August 10, 1999), requires us to develop an accountable process to ensure ''meaningful and timely input by State and local officials in the development of regulatory policies that have federalism implications.'' ''Policies that have federalism implications'' is defined in the Executive Order to include regulations that have ''substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government.''

Under section 6 of Executive Order 13132, we may not issue a regulation

that has federalism implications, that imposes substantial direct compliance costs, and that is not required by statute, unless the Federal government provides the funds necessary to pay the direct compliance costs incurred by State and local governments, or we consult with State and local officials early in the process of developing the proposed regulation. We also may not issue a regulation that has federalism implications and that preempts State law, unless the Agency consults with State and local officials early in the process of developing the proposed regulation.

This proposed rule does not have federalism implications. It will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government, as specified in Executive Order 13132. Currently, under the CWA, any discharge of pollutants into waters of the U.S. requires a permit. Today's proposal relates solely to whether a particular discharge is appropriately authorized under section 402 or section 404 of the Act. Moreover, the proposed allocation of authority between these programs is consistent with existing agency practice. Thus, the requirements of section 6 of the Executive Order do not apply to this rule.

*D. Regulatory Flexibility Act (RFA) as Amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), 5 U.S.C. 601 et seq.*

The RFA generally requires an agency to prepare a regulatory flexibility analysis of any rule subject to notice and comment rulemaking requirements under the Administrative Procedure Act or any other statute unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. Small entities include small businesses, small organizations and small governmental jurisdictions.

The proposed rule does not impose any new requirements. Currently, under the CWA, any discharge of pollutants into waters of the U.S. requires a permit. Today's proposal relates solely to whether a particular discharge is appropriately authorized under section 402 or section 404 of the Act. Moreover, the proposed allocation of authority between these programs is consistent with existing agency practice. After considering the economic impacts of today's proposed rule on small entities, we certify that this action will not have a significant economic impact on a substantial number of small entities.

*E. Unfunded Mandates Reform Act*

Title II of the Unfunded Mandates Reform Act of 1995 (UMRA), Public Law 104–4, establishes requirements for Federal agencies to assess the effects of their regulatory actions on State, local, and Tribal governments and the private sector. Under section 202 of the UMRA, EPA generally must prepare a written statement, including a cost-benefit analysis, for proposed and final rules with "Federal mandates" that may result in expenditures to State, local, and Tribal governments, in the aggregate, or to the private sector, of $100 million or more in any one year. Before promulgating an EPA rule for which a written statement is needed, section 205 of the UMRA generally requires EPA to identify and consider a reasonable number of regulatory alternatives and adopt the least costly, most cost-effective or least burdensome alternative that achieves the objectives of the rule. The provisions of section 205 do not apply when they are inconsistent with applicable law. Moreover, section 205 allows EPA to adopt an alternative other than the least costly, most cost-effective or least burdensome alternative if the Administrator publishes with the final rule an explanation why that alternative was not adopted. Before EPA establishes any regulatory requirements that may significantly or uniquely affect small governments, including Tribal governments, it must have developed under section 203 of the UMRA a small government agency plan. The plan must provide for notifying potentially affected small governments, enabling officials of affected small governments to have meaningful and timely input in the development of EPA regulatory proposals with significant Federal intergovernmental mandates, and informing, educating, and advising small governments on compliance with the regulatory requirements.

We have determined that this rule does not contain a Federal mandate that may result in expenditures of $100 million or more for State, local, and Tribal governments, in the aggregate, or the private sector in any one year. The proposed rule does not impose any new requirements. Currently, under the CWA, any discharge of pollutants into waters of the U.S. requires a permit. Today's proposal relates solely to whether a particular discharge is appropriately authorized under section 402 or section 404 of the Act. Moreover, the proposed allocation of authority between these programs is consistent with existing agency practice. Thus, today's rule is not subject to the requirements of sections 202 and 205 of the UMRA. For the same reasons, we have determined that this rule contains no regulatory requirements that might significantly or uniquely affect small governments. Thus, today's rule is not subject to the requirements of section 203 of UMRA.

*F. National Technology Transfer and Advancement Act*

Section 12(d) of the National Technology Transfer and Advancement Act of 1995 (the NTTAA), Public Law 104–113, section 12(d) (15 U.S.C. 272 note), directs us to use voluntary consensus standards in our regulatory activities unless to do so would be inconsistent with applicable law or otherwise impractical. Voluntary consensus standards are technical standards (e.g., materials specifications, test methods, sampling procedures, and business practices etc.) that are adopted by one or more voluntary consensus standards bodies. The NTTAA directs us to provide Congress, through OMB, explanations when we decide not to use available and applicable voluntary consensus standards.

As part of a larger effort, EPA is undertaking a project to cross-reference existing voluntary consensus standards in testing, sampling, and analysis, with current and future EPA test methods. When completed, EPA will use this project to assist in identifying potentially applicable voluntary consensus standards that can then be evaluated for equivalency and applicability in determining compliance with future EPA regulations.

This proposed rulemaking does not involve technical standards. Therefore, we are not considering the use of any voluntary consensus standards. We welcome comments on this aspect of the proposed rulemaking and specifically, invite the public to identify any potentially applicable voluntary consensus standards and to explain why such standards should be used in this regulation.

*G. Executive Order 13045*

Executive Order 13045, entitled Protection of Children From Environmental Health Risks and Safety Risks (62 FR 19885, April 23, 1997), applies to any rule that we determine (1) is economically significant as defined under Executive Order 12866, and (2) concerns an environmental health or safety risk that we believe may have a disproportionate effect on children. If the regulatory action meets both criteria, we must evaluate the environmental

health or safety effects of the planned rule on children and explain why the planned regulation is preferable to other potentially effective and reasonably feasible alternatives that we considered.

This regulation is not subject to Executive Order 13045 because, as previously discussed, it does not constitute an economically significant regulatory action as defined by Executive Order 12866. Furthermore, it does not concern an environmental health or safety risk that we have reason to believe may have a disproportionate effect on children.

### H. Executive Order 13084

Under Executive Order 13084, we may not issue a regulation that is not required by statute, that significantly or uniquely affects the communities of Indian Tribal governments, and that imposes substantial direct compliance costs on those communities, unless the Federal government provides the funds necessary to pay the direct compliance cost incurred by the Tribal governments, or we consult with those governments. If we comply by consulting, Executive Order 13084 requires us to provide OMB, in a separately identified section of the preamble to the rule, a description of the extent of our prior consultation with representatives of affected Tribal governments, a summary of the nature of their concerns, and a statement supporting the need to issue the regulation. In addition, Executive Order 13084 requires us to develop an effective process permitting elected officials and other representatives of Indian Tribal governments ''to provide meaningful and timely input in the development of regulatory policies on matters that significantly or uniquely affect their communities.''

Today's rule does not significantly or uniquely affect the communities of Indian Tribal governments, nor does it impose significant compliance costs on them. Today's proposal relates solely to whether a particular discharge is appropriately authorized under section 402 or section 404 of the Clean Water Act. Moreover, the proposed allocation of authority between these programs is consistent with existing agency practice. Accordingly, the requirements of section 3(b) of Executive Order 13084 do not apply to this rule.

### I. Environmental Documentation

As required by the National Environmental Policy Act (NEPA), the Corps prepares appropriate environmental documentation for its activities affecting the quality of the human environment. The Corps has made a preliminary determination that today's proposed rule does not constitute a major Federal action significantly affecting the quality of the human environment, and thus does not require the preparation of an Environmental Impact Statement (EIS). Among the reasons for this conclusion is the fact that the Corps prepares appropriate NEPA documents, when required, covering specific permit situations. The implementation of the procedures prescribed in this proposed regulation would not authorize anyone (e.g., any landowner or permit applicant) to perform any work involving regulated activities in waters of the U.S. without first seeking and obtaining an appropriate permit authorization from the Corps. In addition, this proposed regulation merely revises and clarifies the Corps' and EPA's respective definitions of the terms ''fill material'' and ''discharge of fill material'' to allow more objective determinations, and is consistent with current practice. Accordingly, the Corps expects to prepare an environmental assessment (EA) for the rule.

### List of Subjects

*33 CFR Part 323*

Water pollution control, Waterways.

*40 CFR Part 232*

Environmental protection, Intergovernmental relations, Water pollution control.

### Corps of Engineers

*33 CFR Chapter II*

Accordingly, as set forth in the preamble 33 CFR part 323 is proposed to be amended as set forth below:

### PART 323—[AMENDED]

1. The authority citation for part 323 continues to read as follows:

**Authority:** 33 U.S.C. 1344.

2. Amend § 323.2 as follows:
   a. Paragraph (e) is revised.
   b. In paragraph (f), in the second sentence, add the words ''placement of *fill material* for construction or maintenance of liners, berms, and other infrastructure associated with solid waste landfills; placement of coal mining overburden;'', after the words ''utility lines;''.

The revision reads as follows:

### § 323.2  Definitions.

\*   \*   \*   \*   \*

(e)(1) Except as specified in paragraph (e)(2) of this section, the term *fill material* means material (including but not limited to rock, sand, and earth) that has the effect of:

(i) Replacing any portion of a water of the United States with dry land; or

(ii) Changing the bottom elevation of any portion of a water of the United States.

(2) The term *fill material* does not include discharges covered by proposed or final effluent limitations guidelines and standards under sections 301, 304 or section 306 of the Clean Water Act (see generally, 40 CFR part 401), or discharges covered by an NPDES permit issued under section 402 of the Clean Water Act.

\*   \*   \*   \*   \*

Dated: April 17, 2000.

**Joseph W. Westphal,**

*Assistant Secretary of the Army (Civil Works), Department of the Army.*

### Environmental Protection Agency

40 CFR Chapter I

Accordingly, as set forth in the preamble 40 CFR part 232 is proposed to be amended as set forth below:

**PART 232—[AMENDED]**

1. The authority citation for part 232 continues to read as follows:

**Authority:** 33 U.S.C. 1344.

2. Amend § 232.2 as follows:

a. The definition of "Fill material" is revised.

b. In the definition of "Discharge of fill material," in paragraph (1), add the words "placement of fill material for construction or maintenance of liners, berms, and other infrastructure associated with solid waste landfills; placement of coal mining overburden;", after the words "utility lines;".

The revision reads as follows;

**§ 232.2   Definitions.**

\*   \*   \*   \*   \*

*Fill material.* (1) Except as specified in paragraph (2) of this definition, the terms *fill material* means material (including but not limited to rock, sand, and earth) that has the effect of:

(i) Replacing any portion of water of the United States with dry land; or

(ii) Changing the bottom elevation of any portion of a water of the United States.

(2) The term *fill material* does not include discharges covered by proposed or final effluent limitations guidelines and standards under sections 301, 304 or section 306 of the Clean Water Act (see generally, 40 CFR part 401), or discharges covered by an NPDES permit issued under section 402 of the Clean Water Act.

\*   \*   \*   \*   \*

Dated: April 17, 2000.

**Carol M. Browner,**
*Administrator, Environmental Protection Agency.*
[FR Doc. 00–9940 Filed 4–19–00; 8:45 am]
**BILLING CODE 6560–50–P**