**RESPONSE TO COMMENTS DOCUMENT FOR FINAL RULE AMENDING THE ENVIRONMENTAL PROTECTION AGENCY'S AND U.S. ARMY CORPS OF ENGINEERS' CLEAN WATER ACT SECTION 404 DEFINITIONS OF "FILL MATERIAL" AND "DISCHARGE OF FILL MATERIAL"**

**May 3, 2002**

# TABLE OF CONTENTS

3.  Introduction ............................................................................................... 1

4.  Background ............................................................................................... 1

    A.  April 2000 Proposal ......................................................................... 1
    B.  The May 2002 Final Rule ................................................................ 2

5.  Summary of and Responses to Comments on the April 2000 Proposal ............... 2

    A.  Overall Summary ............................................................................. 2
    B.  Purpose and Need for Proposed Rule Change ................................. 3
        1.  Conforming Corps and EPA Definitions .............................. 4
        2.  Eliminating Primary Purpose Test ...................................... 6
        3.  Eliminating Waste Exclusion .............................................. 7
    C.  Legality of Proposal ........................................................................ 10
        1.  Consistency with CWA and Regulatory Framework ............ 11
        2.  Consistency with the *Bragg* decision and effect on litigation .............. 16
        3.  Consistency with the case of *Resources Investment Inc. v Corps* ........... 17
        4.  Consistency of Proposal with Past Policy, 1986 Solid Waste MOA, and
            Other Agency Documents ................................................... 25
    D.  CWA regulation of activities related to mining practices ................. 34
    E.  Environmental Effects of Proposal .................................................. 35
    F.  Unsuitable Fill Material .................................................................. 38
    G.  NEPA Comments ............................................................................ 40
    H.  Federalism ...................................................................................... 42
    I.  Economic Effects of Proposal .......................................................... 43
    J.  Suggested Alternatives or clarifications .......................................... 44
        1.  Issue Guidance or revise MOA instead of modifying the rule .............. 44
        2.  Eliminate primary purpose but retain waste exclusion .............. 45
        3.  Clarify or delete effluent limitations guidelines ...................... 46
        4.  Explain effect on treatment of RCRA landfills ....................... 46
        5.  Modify reference to coal mining overburden in the definition of
            "discharge of fill material" ................................................ 47
        6.  Expand the unsuitable fill category to supplement the waste exclusion . 47
        7.  Miscellaneous Suggestions and comments ............................ 48
            a.  Combine piling regulation in same section as new fill definition   48
            b.  Create additional exemptions to compensate for the expansion in
                Corps jurisdiction ..................................................... 48
            c.  Effect on existing permits .......................................... 48
            d.  Effect of rule on treatment of stormwater ..................... 49
            e.  Clarify when conversions, diversions, and waste treatment systems

can be used to avoid jurisdiction .................................................... 49

f. Private appropriation of public waters ..................................... 50

g Consistency between definitions of discharge of dredged material and discharge of fill ................................................................ 50

Exhibit 26, page 3

**RESPONSE TO COMMENTS DOCUMENT FOR FINAL RULE AMENDING THE ENVIRONMENTAL PROTECTION AGENCY'S AND U.S. ARMY CORPS OF ENGINEERS' CLEAN WATER ACT SECTION 404 DEFINITIONS OF "FILL MATERIAL" AND "DISCHARGE OF FILL MATERIAL"[1]**

**May 3, 2002**

1.      Introduction

        This Response to Comments Document was prepared as part of the joint rulemaking process in which the Environmental Protection Agency (EPA) and the U.S. Army Corps of Engineers (Corps) issued a final rule amending their respective Clean Water Act (CWA) section 404 regulatory definitions of "fill material" and "discharge of fill material." This rulemaking process was initiated on April 20, 2000. The comment period for the proposal closed on July 19, 2000, after a 60-day comment period had been extended for an additional 30 days. The agencies received over 17,200 comments on the proposal, including several hundred comments that were received after the close of the comment period, but were nevertheless considered. This document summarizes the major issues raised in the public comments and the agencies responses. This document is part of the Administrative Record supporting the agencies' final rule.

2.      Background

        A.   April 2000 Proposal

        In April 2000, the agencies proposed revisions to their respective definitions of "fill material" and "discharge of fill material," adopting a single effects-based definition for fill material and making conforming changes to the latter term. From 1977 until the issuance of the rule developed in this process, EPA and the Corps have had different definitions of the term "fill material." The Corps defined "fill material" based on the purpose of the activity. Its definition of "fill material" adopted in 1977 read as follows: "The term 'fill material' means any material used *for the primary purpose* of replacing an aquatic area with dry land or of changing the bottom elevation of an [sic] water body. The term does not include any pollutant discharged into the water primarily to dispose of waste, *as that activity is regulated under section 402 of the Clean Water Act.*" 33 CFR 323.2(e)(2001)(emphasis added).

        In contrast, the EPA regulations at 40 CFR 232.2 defined "fill material" as "any 'pollutant' which replaces portions of the 'waters of the United States' with dry land or which changes the bottom elevation of a water body *for any purpose*" (emphasis added). EPA's definition focused on the effect of the material (an effects-based test), rather than the purpose of the discharge in determining whether it would be regulated by section 404 or section 402.

        The April 2000 proposed rule defined "fill material" as material that has the effect of

---

        [1] Hereinafter referred to as " the Response to Comments Document."

replacing any portion of a water of the U.S. with dry land, or changing the bottom elevation of any portion of a water of the U.S. The proposal removed from the Corps' definition the "primary purpose" test and the provision excluding pollutants discharged into water primarily to dispose of waste. The April proposal also would have excluded from the definition discharges subject to an EPA proposed or promulgated effluent limitation guideline or standard under CWA sections 301, 304, 306, or discharges covered under a NPDES permit under CWA section 402. Finally, the April proposal solicited comments on the idea of the agencies creating an "unsuitable fill" category in the regulations that would identify materials that the Corps District Engineer could determine were not appropriate as fill material and, consequently, refuse to process an application seeking authorization to discharge such material.

### B.  The May 2002 Final Rule

The final rule retains the "effects-based" approach of the proposal, defining "fill material" in both the Corps' and EPA's regulations as material placed in waters of the United States where the material has the effect of either replacing any portion of a water of the United States with dry land or changing the bottom elevation of any portion of a water. The examples of "fill material" identified in the rule include rock, sand, soil, clay, plastics, construction debris, wood chips, overburden from mining or other excavation activities, and materials used to create any structure or infrastructure in waters of the U.S. The final rule also includes an explicit exclusion from the definition of "fill material" for trash or garbage.

Today's final rule also includes several changes to the term "discharge of fill material." Most significantly, the term now includes the phrases "placement of fill material for construction or maintenance of any liner, berm, or other infrastructure associated with solid waste landfills" and "placement of overburden, slurry, or tailings or similar mining-related materials." These phrases have been added to the definition of "discharge of fill material" to provide further clarification of the types of activities that will be regulated.

This final rule was developed after considering the comments provided on the April proposal.

### 3.    Summary of and Responses to Comments on the April 2000 Proposal

#### A.  Overall Summary

We received over 17,200 comments on the proposed rule, including several hundred late comments, most of which consisted of identical or substantially identical e-mails, letters, and postcards opposing the rule. (In April 2002, an additional several thousand letters and e-mails were sent opposing the adoption of a rule similar to the proposal.) Approximately 500 of the original comments consisted of more individualized letters, with a mixture of those comments supporting and opposing the rule. The comments of environmental groups and the various form letters were strongly opposed to the proposal, in particular, the elimination of the waste exclusion

Exhibit 26, page 5

and the discussion in the preamble regarding treatment of unsuitable fill material.  Except for several landfill representatives, comments from the regulated community generally supported the proposal, in particular, the fact that the rule would create uniform definitions of "fill material" for the Corps' and EPA's rules and maintain regulation of certain discharges under section 404 as opposed to section 402 of the CWA.  While the above characterization reflects the general framework for the proponents and opponents of the rule, both raised a number of specific issues that are identified and discussed below.

Because of the nature of the comments (e.g., many identical or substantially identical), we were able to categorize the comments by issue.  We then summarized the comments addressing each issue and developed a response to the issue.  Those summaries and responses are provided below.  This document is organized by category, with the first part of the document (sections III. A - I) addressing issues raised about the proposal and the latter part of the document (section III J) reflecting alternative approaches or clarifications to the proposed rule that were recommended.

## B.  Purpose and Need for Proposed Rule Change

The comments received regarding the purpose and need for the proposed rule change reflect both support and opposition to the proposal.  A significant number of those commenting support the agencies' effort to make consistent the Corps' and EPA's regulatory definition of "fill material," as well as their elimination of the primary purpose test in favor of an effects-based definition.  However, many commenters expressed opposition to the proposed elimination of the waste exclusion from the definition of "fill material," and specifically asked that the "placement of coal mining overburden" not be added to those activities that can be authorized by the Corps as a "discharge of fill material."  Many stated that the proposed rulemaking would "result in an unconscionable weakening of the Clean Water Act" by allowing the Corps to permit the deposition of waste into waters of the United States.

One commenter remarked that "the impetus for this proposed rule is the continued regulation of valley fills by the Corps, and not improved implementation of the Clean Water Act."  Additionally, changes regarding the permitting of solid waste landfills could more appropriately be made through agency guidance or through "supplementing the 1986 MOA with clarifying terms."

One commenter was generally opposed to the proposed rule changes arguing that "they would serve as an unbelievable capitulation to coal companies" and would result in a weakening of existing clean water laws.  Another stated that "instead of re-writing the rules to allow more fills and other discharges into the nation's waters," the Corps and EPA should strive to "uphold their Section 404 responsibilities in compliance with Clean Water Act goals."

Several commenters stated that the "proposed broadening of the Corps' jurisdiction is unwarranted," and concerns were expressed regarding the effect of the proposed rulemaking on

3

the regulation of discharges from the on-board processing of sand and gravel by instream dredging operations, and on hard rock mining activities.

In light of the comments we received on the proposed rulemaking, we remain convinced of the fundamental need to reconcile the differing definitions of "fill material" in our regulations. We disagree with the assertion that the reconciliation of the definitions by adopting EPA's 25-year old effects-based approach somehow would weaken the CWA either by allowing waste disposal in waters or broadening jurisdiction. The fact that we have essentially implemented the EPA-based approach since 1977 discredits the notion that this rulemaking now results in a change from past practice and allows impermissible waste disposal. Moreover, the suggestion that this rulemaking now provides a legal basis for previously illegal activities is not the case– no discharges that were previously prohibited are now authorized as a result of this rulemaking.

It is important to note, however, that we do agree with the sentiments expressed by many commenters opposed to the rule that the agencies need to do a more comprehensive job at implementing existing provisions of CWA section 404 as they pertain to the review and conditioning of permits for certain discharges, including those that result from mining activities. Guidance from Corps headquarters in 2000 and changes to Nationwide general permit 21 in 2002 are concrete actions that have been taken recently to improve implementation. The agencies also concur that additional environmental improvements under the CWA and under the Surface Mining Control and Reclamation Act should be evaluated, and we remain committed to completing the programmatic Environmental Impact Statement on Mountaintop Mining and Valley Fills to facilitate such reviews.

A majority of those commenting on the purpose and need for the rulemaking, whether or not they supported specific aspects of the proposal, supported the basic objective of unifying the definitions. As a matter of good government and reducing regulatory uncertainty, we agree that our definitions should be identical. We also believe that, for a single definition, maintaining EPA's long-standing effects-based approach, in lieu of one based on purpose, is preferable because it provides a more objective and predictable approach for ensuring that section 404, the regulatory regime best suited for controlling discharges with the effect of fill, is used. Likewise, elimination of the so-called "waste exclusion" from the Corps' definition is preferable as it is generally consistent with current agency practice and it does not expand the types of discharges that will be covered under the CWA section 404 program. Specific discussions of the purpose and need for the rule are provided below and organized under subheadings dealing with conforming the regulatory definitions, eliminating the primary purpose test, and eliminating the waste exclusion.

## 1.  Conforming Corps and EPA Definitions

Regarding comments received concerning conforming Corps and EPA definitions through the proposed rulemaking, the majority of commenters were in support of making consistent the Corps' and EPA's regulatory definition of "fill material." One commenter stated,

4

"it clears up longstanding confusion arising from the differing definitions of the two agencies, and therefore simplifies and clarifies the regulatory schemes and compliance obligations." Another noted that eliminating the current discrepancy between the EPA and Corps definitions of "fill material" will "improve the clarity and consistency of the Section 404 regulations, and will avoid the need for litigation predicated on the differences in the existing rules." Furthermore, another commenter states the current lack of consistency "has created the potential that, for certain kinds of discharges, there was no regulatory program pursuant to which authorization could be obtained."

One commenter "agrees that regulatory consistency among federal agencies implementing the CWA is a good thing when done for the right reasons. However, a proposal to change the definitions, now purportedly to rectify misinterpretations by federal courts, does not make sense." The commenter cites several additional fill-related court cases that have not warranted a change in the regulations. Additionally, the commenter states, as proposed, "by regulating some types of mining wastes under the 402 program and others under the 404 program, they belie their claim that this proposal will retain current practice and resolve regulatory differences."

Although one commenter agreed that "appropriate clarifications will avoid the confusion and problems associated with the past differences in the definitions," the agencies have continually acted in a manner more consistent with the "effects" test than the Corps' "primary purpose" test. Another commenter states, " a unified definition will help eliminate confusion. Unfortunately, we believe the proposed definition, although similar to the current EPA definition, is difficult to interpret and apply to activities." On commenter speaks to the "regulatory uncertainty" caused by having inconsistent definitions of "fill material" by stating that there is "nothing uncertain about the current regulatory scheme" as it applies to the practice of valley fills. In keeping with the regulatory agencies' efforts to provide consistency, one commenter suggests that "the two agencies develop an identical list of every known type of fill material."

In light of the comments we received on the proposed rulemaking, we affirm our position that conforming the regulations by adopting a single definition is necessary and desirable. Importantly, as a matter of good government, we believe that a uniform definition will eliminate any uncertainty and confusion that may have been bred by different definitions applying to the same regulatory program. The final rule achieves this objective.

Specifically, in response to the commenter that disputed whether the proposed changes would resolve regulated community and court misinterpretations, we disagree. Although regulatory action is not the automatic result of relevant court decisions or confusion on the part of the regulated public, it is an appropriate response in the present situation. Not only had confusion on the part of the regulated community occurred, it was manifest in several court actions. In addition, these court actions did not impact one type of activity, but at least two—those of landfill construction and those of certain mining discharges. Moreover, the agencies had issued guidance to address the confusion in the regulated community, but issues continued to be raised. Given the significance of the issues and the less than successful attempts to resolve them

5

short by guidance, a rulemaking to clarify the issue was warranted. While we can certainly not guarantee that every future issue is put to rest with the final rulemaking, the extensive nature of the comments received by the public has greatly assisted the agencies in addressing a wide variety of the final rule's implications.

In response to the specific comment regarding the suggestion that we develop a list of every known type of fill material, we conclude that this exercise would not be practicable. A number of examples of materials generally included and not included are provided in the final rule language and/or are discussed in the preamble. We note that the use of certain examples in the final rulemaking was a result of public comment to increase clarity. However, it is unlikely that a list of every known fill material could be generated, given the variety of materials that are or could be discharged. We are satisfied that the expanded discussion in the final rule language itself and the preamble is informative and representative, without being unwieldy.

## 2. Eliminating Primary Purpose Test

An overview of the comments received regarding the proposed elimination of the primary purpose test from the definition of "fill material" reveals both support and opposition. A significant number of those commenting supported the replacement of the Corps' "primary purpose test" with an effects-based definition.

One commenter noted the change to an effects-based test "will finally close an infamous loophole that has allowed wetlands to be filled as long as the permit applicant could point to a "primary purpose" other than fill (e.g., solid waste landfill or temporary road construction)." Another commenter stated, "removal of the primary purpose test and replacing it with the effects test will promote greater clarity and consistency in the regulatory approach for wetlands protection." They further stated that currently some discharges occur without permit authorization under either section 402 or section 404 of the CWA, a violation of section301, as a result of the failure to regulate these fills because of the primary purpose test.

As discussed in the preamble to the proposed rule (65 FR 21,294-21,295), we agree that use of a "primary purpose test" to define fill material has caused confusion and engendered litigation, problems which can be substantially reduced or avoided by use of a more objective effects-based test. With regard to comments on unpermitted discharges being a violation of section301, this comment is outside the scope of the rule, which addresses the issues of how to define "fill material."

In contrast, another commenter asserted a "purpose-based test can be enforced fairly and in the public interest" particularly with regard to waste regulation. Also noted was the "inherent subjectivity of the wood chips example" discussed in the Public Notice. The commenter suggested that potential abuses in interpretation of a purpose-based test could be addressed through "consideration of the economics of the proposed commercial activity (particularly the costs of alternatives available to meet the intended purpose)." Another commenter also

6

challenged concerns about the subjective nature of the determinations performed by the Corps in applying the primary purpose test. The commenter stated the Corps "is quite capable (evidenced by the fact that it has been doing it for years) to determine if the primary purpose is to get rid of waste or to construct a fill."

We do not agree that use of a primary purpose test is preferable to use of an effects-based test for a number of reasons. Our practical experience with use of a primary purpose test is that it does result in uncertainty and confusion, as for example, in the *RII* case. Although, as the commenter suggested, the Corps is capable of evaluating project purpose, such an evaluation nonetheless is subjective, does not ensure use of the most appropriate permitting regime, and as evidenced by *RII* is subject to a differing interpretation by the court. We believe that in assigning a discharge to section 404 versus section 402 permitting, it is important to apply the regulatory regime that is in fact best-equipped to consider and control the impacts of the potential discharge. Because section 404 and its implementing regulations are specifically designed to address discharges that fill waters of the U.S., we believe that it should apply to discharges that have such an effect, rather than looking to the primary purpose of the discharge. Although we agree that today's final rule does not eliminate all subjectivity (as in the wood chip example given above), use of an effects-based test does substantially improve clarity and objectivity compared to the subjective nature of a primary purpose test. With regard to the comment suggesting use of an economics-based approach to implement a purpose-based test, this would still assign discharges to section 404 versus section 402 on the basis of the purpose of the discharge, rather than on the basis of which regime is best-equipped to control the potential impacts. In addition, while use of an economics based approach could perhaps reduce some of the subjectivity associated with a purpose-based test, it does not do so to the degree that an effects-based test accomplishes, would require development of economic yardsticks which themselves would be subject to subjectivity, and would unnecessarily add a further degree of analytical complexity and information needs to the permitting process. We thus do not agree with comments favoring use or retention of a purpose-based test.

One commenter supporting the proposed change to an effects-based definition of fill stated it should not be up to the Corps District Engineers' discretion "to define what constitutes fill, or what constitutes effects." It was further suggested that, based on the CWA section 404 (b)(1) Guidelines, "the Corps and EPA should determine at the national level what structures, works and activities have the effect of fill."

We do not agree with these comments. Implementation of an effects-based test is best left to the permitting authority (e.g., for section 404, the District Engineer), as they are in the best position to know local conditions and ascertain a discharge's effects. In addition, by adopting a single consistent effects-based test, today's rule provides the permitting authority with an objective means for assessing the applicability of section 404 and helps ensure consistency between the Corps and EPA in determining what constitutes "fill material." With regard to the suggestion that a national level determination should be made as to what activities or works have the effect of fill, it is not feasible to come up with a comprehensive or exhaustive list, and use of

7

Exhibit 26, page 10

an effects-based test instead both improves clarity while still being sufficiently broad to encompass the full range of materials that should be treated as "fill material." We also note that as described in the preamble to today's rule, additional examples of "fill material" and the "discharge of fill material" have been added to the final rule.

One commenter indicated that "while an 'environmental effects' test may be appropriate to the definition of 'fill material' in the Section 402 program, it is not necessarily similarly appropriate to the definition of 'fill material' in the Section 404 program, even if it provides some benefit or clarity," and went on to state there are situations in which a broad "environmental effects" trigger is inappropriate for bringing about Section 404 regulation. The commenter also asserted an environmental effects rationale was, found to exceed the Corps authority when the court invalidated "the Tulloch Rule regulating all excavation activities, including those that were merely removal activities with only incidental fallback."

We believe that a single and consistent definition of the term "fill material" is necessary to provide consistency and certainty in implementation of the CWA. Use of separate approaches to define that term under sections 404 and 402 result in uncertainties and potential regulatory gaps in which material does not clearly fall within one program or the other. Matters related to the "Tulloch Rule" (which defines the term "discharge of dredged material" and "incidental fallback") are fully discussed in that rule's preamble ( 66 FR 4550) and are outside the scope of this rule. Moreover, today's rule does not use an effects-based test to determine if a discharge occurs, but rather to determine when a given discharge falls into the category of "fill material" subject to section 404. We also note that unlike the Tulloch Rule, which implicates questions of when an addition of a pollutant occurs in the context of dredging and excavation activities, the effects-based test adopted in today's definition of "fill material" addresses additions of material to waters of the U.S. to such a degree and amount that it creates dry land or raises the bottom elevation.

Another commenter suggested eliminating the primary purpose test will increase Corps workload. They were concerned the proposed change would elicit an expansion of the Corps' "jurisdiction on certain kinds of fill material...and would slow the permit approval process further." We expect that because today's rule is generally consistent with existing practice it will not have substantial effects on Corps workload or engender permit delays. In addition, unlike the proposal, today's final rule is more limited in scope as it contains an express exclusion from the definition of fill for trash and garbage.

Another commenter expressed concern that elimination of the "primary purpose" test in favor of an effects-based definition of fill would cause circumvention of the CWA by allowing polluters to "pass off waste material as fill," particularly with regard to coal mining activities. We do not agree that today's rule would "cause circumvention of the Clean Water Act." The Act itself does not define or dictate what constitutes "fill material," leaving it to the discretion of the agencies to define that term. As explained in the proposed rule preamble (65 FR 21294 - 21295)

8

and the preamble to the final rule, use of a primary purpose test and differing Corps and EPA definitions of fill material has resulted in regulatory uncertainties and confusion. Today's rule is intended to avoid such problems, and is well with the agencies' authority and discretion to adopt.

### 3. Eliminating Waste Exclusion

Regarding comments received concerning the proposed rule's elimination of the waste exclusion, the majority of commenters were opposed to omitting the current waste exclusion language from the proposed definition of fill material. One commenter stated, "elimination of the waste exclusion would give the Corps new authority to allow the disposal of refuse directly into the nation's waters, . . . and is an outrageous attempt to circumvent the letter and spirit of the Clean Water Act." Furthermore, prohibiting the disposal of waste "in the nation's waters under Section 404 is mandated by the letter, purpose, goals, and Congressional intent embodied in the Clean Water Act." Another commenter noted elimination of the waste exclusion is contrary to the "fundamental goal of the Clean Water Act: to eliminate the discharge of pollutants into the waters of the United States in order to preserve the physical, chemical and biological integrity of the nation's waters."

We agree that the goals of the CWA include the elimination of the discharge of pollutants, but do not agree that today's rule is inconsistent with those goals or with any actual requirements of the Act. First, today's rule does not authorize or permit the discharge of solid waste to waters of the U.S. As provided for by section 301 of the CWA, discharges to waters of the U.S. continue to be prohibited unless a permit under the Act authorizing the discharge is issued. Rather, the rulemaking being undertaken clarifies which permitting regime (section 404 or section 402) would be applicable. Moreover, as explained in the preamble to the proposed rule (65 FR 21293 - 21294), the section 404 program is specifically designed to regulate material that fills waters of the U.S. or changes their bottom elevation, and the 404(b)(1) Guidelines provide for the evaluation of alternatives to avoid or minimize the discharge of fill material. We also note, that in response to comments received, today's final rule modifies the proposal so as to exclude from the definition of fill material trash or garbage.

Several commenters suggest that the proposed elimination of the waste exclusion serves to "endorse the practice of mountaintop removal mining." Another expressed concern that removal of the "prohibition on use of fill that is discharged primarily to dispose of waste" would "greatly increase the universe of Section 404 regulated activities involving waste disposal."

Section 404 regulates the discharge of dredged or fill material to waters of the U.S., whereas the primary statute governing mountaintop removal mining is the Surface Mining Control and Reclamation Act (SMCRA). Rather than somehow "endorsing" that practice, today's rule ensures regulatory clarity and consistency by clarifying which CWA regulatory regime governs discharges of material that has the effect of fill, and does so in a way that is consistent with EPA's long-standing definition. While today's rule clarifies that mining related discharges

9

with the effect of fill, such as overburden, are subject to section 404, no such discharge may actually take place except as authorized by a 404 permit. In addition, mountaintop mining activities are also subject to SMCRA permitting requirements before they may occur. We also do not believe today's rule will greatly increase the universe of waste disposal activities regulated by section 404 as today's rule is generally consistent with existing practice as well as reflecting the effects-based approach in EPA's long-standing definition. Finally, as noted above, today's final rule does specifically exclude from the definition of fill material trash, garbage or similar materials unless such materials are to be used to create a structure or infrastructure in waters of the U.S.

Another commenter was supportive of the clarification made by the Corps and EPA. Specifically, the commenter noted that, to the mining industry, the term "waste" refers to leftover rock and dirt that is impacted by coal mining activities, and should be regulated under section 404 of the CWA. As stated previously, we believe that in determining whether a discharge is subject to section 404 or section 402, it is important to provide for application of the regulatory regime best suited to control the potential impacts. These materials both have the effect of fill and are geological materials similar to many other types of fill material; we thus agree it is appropriate that they be regulated under section 404.

**C. Legality of Proposal**

**1. Consistency with CWA and Regulatory Framework**

A number of comments addressed issues about the consistency of the proposal with the CWA, generally, and with the cases and regulatory requirements implementing the Act. Those opposing the proposal argued that it reflected a "major weakening of current law" and undermined the zero discharge goal of the Act. The opponents of the rule noted that the CWA was established to protect the physical, chemical, and biological integrity of the nation's waters from pollution emanating from point as well as non-point sources. Instead, says one comment, the proposal cripples the effectiveness of the Act. An industry opponent of the rule argued that the rule goes well beyond the Corps' jurisdiction over protecting wetlands and other rare and important waters, and now has the Corps asserting jurisdiction over vast areas of desert that have no connection to the Corps mandate. Those supporting the rule argued that the proposal is consistent with the CWA purposes and the regulatory framework for the Act. A supporter noted that it is clear that Congress did not intend to stop mining in this country when the CWA was enacted, which the comment says would be the outgrowth of some of the arguments alleging that the proposal violates the CWA.

The agencies do not agree that the proposal would have resulted in a major weakening of the CWA. In fact, as noted above, the purpose of this regulatory change is to improve the effectiveness of the program by increasing the clarity and consistency of program implementation with the CWA. Today's final rule improves upon the proposal by specifically excluding trash or garbage from the definition of "fill material" and thereby ensuring that the public understands

10

that such materials will generally not be permitted for disposal in waters.  It is important to note that neither the proposal nor this final rule affects the scope of geographic jurisdiction.  Thus, those comments concerning the scope of geographic jurisdiction are not germane to today's action.

Below we will address some the specific comments concerning the legality of the proposal and this final rule in light of existing regulations and case law.

a. *Section 402 versus section 404*.  Numerous commenters noted that, although they agreed with the intent of subsection (e)(2) of the proposed rule (i.e., discharges covered by effluent limitation guidelines and discharges covered by a section 402 NPDES permit do not require a section 404 permit), the proposed language specifically excluding discharges subject to proposed or final effluent limitations guidelines or NPDES permits was ambiguous and confusing.  One commenter, representing the mining industry, specifically was concerned that the exclusion, as worded, could inadvertently result in attempts by regulators in the field to have discharges excluded from section 404 coverage simply due to the presence of constituents in the material for which effluent limitation guidelines exist and would apply if such constituents were discharged in wastewater (e.g., mine drainage or process waste water).  Overall, commenters requested clarification of the (e)(2) language, even if such clarification was made in the Preamble to the rule.

Based on the comments received, the agencies recognize the potential for the proposed language to cause confusion and believe such language is unnecessary for achieving the purposes of the rule.  Accordingly, today's final rule deletes the exclusion for discharges covered by effluent limitation guidelines and standards or NPDES permits.  The agencies, however, will continue to be guided by practices and past determinations about the applicability of effluent limitation guidelines or NPDES permits in deciding whether section 402 or 404 will govern specific discharges.  If EPA has previously determined that a discharge is covered by an ELG, that determination is not altered by today's rule.  Similarly, even though some discharges covered by section 402, such as suspended or setteable solids can have the effect, over time, of raising the bottom elevation of a water due to settling of waterborne pollutants, we do not consider such pollutants to be "fill material," and nothing in today's rule changes that view.

Some commenters noted that section 404 is better suited to address certain types of discharges because it deals with physically modifying or replacing waters, whereas 402 deals with the discharge of waterborne pollutants and the ability of the receiving waters to assimilate them.  Others, however, maintained that, rather than justifying regulation under section 404, the inability of certain discharges to comply with section 402 requirements simply demonstrates that the CWA was intended to prohibit such discharges.  Such comments also questioned the adequacy of Section 404 regulation of waste-type fills, due to inconsistent application of its alternatives analysis and compensatory mitigation requirements.  The commenters asserted that the proposed rule constitutes a "dramatic reversal of agency policy" that was not justified simply to eliminate inconsistencies between the Corps and EPA definitions.

11

Clearly, two regulatory programs were established by the CWA serving distinct objectives and goals. One limits discharges of pollutants in order to protect water quality of the receiving water (section 402 NPDES program). The other regulates dredged and fill activities that, among other things, may displace or change the elevation of receiving water -- often replacing it with dry land (section 404). Even though there are some water quality considerations included in the section 404(b)(1) guidelines, this is distinct from the water quality considerations and analysis of the assimilative capacity of receiving waters done as part of the section 402 review. In determining whether the section 402 versus section 404 permit will control specific discharges, the differing purposes of the two programs is an important consideration. Finally, as explained elsewhere and in the Federal Register notice of the final rule, today's rule reflects the approach in EPA's longstanding regulation and is generally consistent with past practice, so does not represent a radical departure for the agencies.

Some commenters also noted that the proposed rule language and preamble discussion created some confusion about whether mine overburden and mine tailings are both subject to section 404 regulation as opposed to section 402. Today's final rule clarifies that any material that has the effect of fill is regulated under section 404 and further that the placement of "overburden, slurry, or tailings or similar mining-related materials" is considered a discharge of fill material. Nevertheless, if EPA has previously determined that certain materials are subject to an ELG under specific circumstances, then that determination remains valid. Moreover, NPDES permits issued pursuant to section 402 are intended to regulate process water and provide effluent limits that are protective of receiving water quality. This distinction provides the framework for today's rule.

  *b. Operation of Water Quality Standards, anti-degradation policies and 404(b)(1) Guidelines.* Two comments raised issues concerning compliance of the proposal with water quality standards and the section 404(b)(1) Guidelines, each arguing opposing conclusions. One comment noted that the Guidelines prohibited discharges that would cause or contribute to violations of water quality standards or that caused or contributed to significant degradation of the waters. This comment noted that while some provisions of the Guidelines contemplated a balancing approach, the above referenced provisions did not. They simply prohibited such actions. Moreover, the comment argued that compliance with both prohibitions was required. In addition, the comment concluded that "filling in waters for the purpose of waste disposal undeniably violates water quality standards and anti-degradation regulations," and as such, is prohibited by the section 404(b)(1) Guidelines. The second comment cited to EPA's Water Quality Standards Handbook and, specifically, to the discussion of the Anti-degradation policy to reject the concept that "the anti-degradation policy necessarily prohibits filling operations by virtue of altering the use of the stream segment filled." This comment noted that the Handbook observes that compliance with the CWA anti-degradation policy is achieved through the application of the 404(b)(1) Guidelines, and further that any other construction of the anti-degradation policy would effectively eviscerate section 404 of the CWA. This comment also takes exception to the notion that all use of streams for waste assimilation is prohibited. Instead

12

this comment claimed that the prohibition is against the use of streams as open sewers to the exclusion of other beneficial uses. The comment argued that theses issues are likewise resolved by the application of the 404(b)(1) Guidelines.

One commenter stated that the proposed rule will violate the CWA anti-degradation policy and state water quality standards by allowing discharges that destroy existing uses of water bodies or that fail to comply with water quality standards. Another commenter stated that the anti-degradation policy prohibits filling operations, generally; while other commenters noted that such an interpretation would be inconsistent with the intent of the CWA which expressly contemplates filling activities under section 404. Moreover, many commenters stated that any discharge of fill material in waters of the U.S. for purposes of waste disposal is prohibited by the CWA. In addition, some commenters added that such waste material discharges conflict with Federal and State water quality standards which prohibit the use waters of the U.S. for waste assimilation purposes (40 CFR 131.10(a)). Finally, one commenter noted that the current Corps definition of fill material excludes waste material and thus is regulated under section 402 of the CWA which would prohibit such a discharge.

Questions of whether water quality standards have been violated or the significant degradation standard has been surpassed are decided on a case specific basis, and not simply on the basis of whether the definition of fill material has been met. The assessment of the impacts in a specific case is critical. We do not agree with the broad statements that this rule violates the CWA anti-degradation policies or water quality standards. First, this rule defines a jurisdictional term that simply determines whether a permit under section 402 or 404 must be obtained for a discharge into waters of the U.S.; it does not authorize any specific activities. The issue of whether the anti-degradation policy or water quality standards will be violated in a specific case will have to be determined on the facts. Thus, we do not believe there is any basis to conclude that simply defining certain waste materials as 'fill material' is prohibited under the CWA as a matter of law.

Moreover, while these commenters suggest that the only filling prohibited by the Act is for purposes of waste disposal, in fact, their reading of the anti-degradation policy would effectively prohibit the discharge of any fill material in waters of the U.S. for any purpose, as several other comments noted. The commenters assert that, because the act of filling a water eliminates a portion of waters, it fails to comply with the requirement of EPA's anti-degradation policy to maintain and protect existing uses. If this were a correct reading of EPA's regulation and the Act, all fills in waters of the U.S. would be prohibited, because filling a water has the same effect of eliminating some portion of it regardless of whether the purpose is waste disposal or some other purpose. As indicated in several of the comments, this result, however, would effectively eliminate section 404 from the statute. We believe that, by establishing a program under section 404 for authorizing discharges of fill material into waters of the U.S., Congress sanctioned the filling or elimination of waters where it can be done in an environmentally acceptable manner, i.e., where consistent with the 404(b)(1) Guidelines. Therefore, we do not believe that these commenters' reading of the statute can be squared with section 404 itself.

13

In contrast to commenters' strained reading, EPA's longstanding interpretation of the Act and EPA's regulations is consistent with Congressional intent. In 1985, EPA articulated its view that the anti-degradation policy is satisfied in the context of discharges subject to section 404 where a discharge complies with the requirement in the section 404(b)(1) guidelines that it not result in significant degradation of waters of the U.S. **See Questions and Answers on Antidegradation** (1985); **Water Quality Standards Handbook: Second Edition, August 1994. (While the guidance refers specifically to wetlands, its reasoning applies equally to discharges of fill material in any water of the U.S.).** This interpretation does not, like the commenters,' effectively read section 404 out of the Act as it relates to fill material. This reading also reasonably squares EPA's anti-degradation policy with the specific environmental criteria applicable to discharges of dredged or fill material that Congress directed to be followed in section 404.

We also believe that commenters are incorrect that defining fill material to include certain waste material somehow violates EPA's water quality standards regulations related to designation of uses by states under section 303(c) of the Act. 40 C.F.R. 131.10(a) states: "In no case shall a State adopt waste transport or waste assimilation as a designated use for any waters of the U.S." This regulation is consistent with section 303(c)(2)(A) of the Act, in which Congress directed states to designate appropriate uses of their waters, "taking into account their use and value for public water supplies, propagation of fish and wildlife, recreational purposes and agricultural, industrial and other purposes, and also taking into consideration their use and value for navigation." EPA promulgated the language cited above because it believed that Congress intended that states designate uses under section 303(c) to ensure the protection of their beneficial uses, including those listed in section 303(c). Once a state designates a use for a water, the state is also required to adopt numeric or narrative criteria to ensure the protection of those uses. EPA prohibited designating waters for waste assimilation or transport because of concern that such designation would be incompatible with the beneficial uses that Congress sought to encourage states to protect through their water quality standards.

Nothing in EPA's regulation, however, has any bearing on whether a particular discharge is classified as fill material subject to section 404 of the Act, or another pollutant subject to section 402. Instead, EPA's regulation only limits <u>states</u>' discretion in adopting designated uses <u>pursuant to section 303(c)</u>, which are submitted to EPA for approval under that provision. If a state were to adopt waste transport or assimilation as a designated use, then, under EPA's regulation, EPA would be required to disapprove that designated use and, if the State failed to adopt an appropriate use, promulgate an appropriate federal use designation.

Commenters' reading of section 131.10(a) takes the provision entirely out of context, for they appear to read it to mean that no discharges may be authorized that would effectively allow transport or assimilation of wastes in waters of the U.S. That was never EPA's intent in adopting 131.10(a), nor could it have been. For example, under section 402 of the Act, EPA and authorized states issue permits for discharges of pollutants into waters of the U.S., in many or

14

most cases for discharges of waste. The permitting authority evaluates, among other things, the effect of the "transportation" and "assimilation" of those wastes on the receiving water, and whether the discharge would comply with designated uses and applicable water quality criteria. Merely because waste is being transported or assimilated into the water does not, however, mean that the discharge violates 131.10(a). If it did, no pollutants could be discharged under the Act at all, a result contradicted by the existence of the Act's permitting schemes. Similarly, under section 404, discharges of waste material such as dredged spoil may be authorized even though the material is being assimilated into a water. Again, the permitting authority evaluates whether the waste discharge complies with water quality standards, but the mere fact that waste is being transported and assimilated into the water does not implicate 131.10(a).

Commenters may believe, in part relying upon the decision in *Bragg v. Robertson*, 72 F. Supp. 2d 642 (S.D. W. Va. 1999), rev'd, 248 F. 3d 275 (4th Cir. 2001), that fill material is different in that it may, in certain circumstances, bury portions of streams, in which case the waste material may be so large that it occupies or "assimilates" the entire portion of the stream. Again, EPA's water quality standards regulation merely limits states' discretion in designating uses under section 303, and EPA never intended that this provision directly apply to limit the authority of EPA, the Corps or states in making permitting decisions under sections 402 or 404 of the Act. Even if that provision were somehow directly relevant to the permitting context, commenters' reading cannot be squared with section 404 itself which, as discussed above, expressly contemplates that parties may receive authorization to "fill" waters of the U.S. subject to the Act's environmental safeguards. Fills by definition occupy a portion of a water of the U.S., and in many cases convert the water to dry land. Obviously, where that occurs, a designated use may no longer be met in that portion of the water body. Again, if the commenters' reading of 131.10(a) were adopted, no fills could be authorized in waters of the U.S., a result directly contradicted by the existence of the section 404 permitting program for fill material. As for the concern of some commenters that some fills, such as certain valley fills, are so large that they would eliminate entire portions of streams, that does not change the inapplicability of section 131.10(a) to the permitting process, or the implication of the commenters' reading for undermining the existence of the 404 permitting program. The size of the valley fill is, however, very relevant to the section 404 permitting process in determining whether a particular discharge may be allowed, for the permitting authority must determine that the discharage would not cause significant degradation of waters of the U.S., and that all appropriate and practicable steps have been taken to avoid, minimize and compensate for the effects of the discharge.

The final rule recognizes that the term "fill material" does not include trash or garbage. If a party discharges material into waters of the U.S. that does not meet the final definition of "fill material," this is a prohibited discharge under CWA section 301 except in accordance with a permit issued under the NPDES program. Several commenters correctly noted that because discharges of this nature would not generally meet state water quality standards designed to protect and maintain the integrity of the nation's waters, the discharge is unlikely to be permitted by the section 402 program.

15

One commenter noted that currently, the Corps and EPA provide different definitions of the term "fill material." This an appropriate reading of current Corps regulations and illustrates why the Corps and EPA are issuing this rule today. The confusion caused by the differing regulatory definitions needed to be resolved. By establishing a single definition of "fill material," today's rule will ensure proper, consistent and more effective regulation under the CWA and reduce the uncertainty within the regulated community of whether section 404 or section 402 requirements apply to their proposed operations.

## 2. Consistency with the *Bragg* decision and effect on litigation

Several commenters argued that EPA and the Corps should not be trying to "circumvent" the decision by the District Court in *Bragg v. Robertson*, which stated that coal mine overburden is waste material that, under Corps regulations, is subject to regulation under section 402 of the CWA, not section 404. One commenter also contended that we should not finalize a rule while the appeal of the *Bragg* decision before the 4th Circuit is pending. Two commenters asserted that the *Bragg* court ruled that the Corps did not have jurisdiction over the discharge of mining waste into waters of the U.S., and several argued that the *Bragg* ruling found such fills to be in violation of the CWA.


This final rule is not designed to circumvent any judicial decisions. Rather, as explained in the proposal, several recent court decisions have concluded that, that despite EPA's longstanding definition of fill material and the Corps' longstanding regulatory practice, regulating certain discharges under section 404 of the CWA was inconsistent with the definition of fill in the Corps' regulations. We believe these decisions reflect the uncertainty caused by differing regulatory definitions of fill material, which we are resolving today. Rather than "circumventing" those decisions, today's rule will ensure that, in the future, the courts have clear regulatory guidance as to how fill material is regulated under the CWA.

Moreover, while those judicial decisions turned on the Corps' regulatory definition of "fill material," they did not address the scope of our authority to revise our regulations in a reasonable manner consistent with statutory mandates. Therefore, while today's rule clarifies the definition of fill material in response to these courts' interpretation of our prior regulations, those decisions do not constrain our authority to adopt today's rule.

As for the status of the *Bragg* case, the Fourth Circuit Court of Appeals has reversed the decision of the District Court and held the claims remaining in that case were barred by the 11th amendment of the U.S. Constitution. Therefore, the opinion of the District Court, including dicta addressing the definition of fill material under the CWA, has been vacated. On January 23, 2002, the U.S. Supreme Court denied the plaintiffs' petition for Certiorai. In any case, the Fourth Circuit noted that its decision did not affect the District Court's approval of the settlement of the claims in the case against the Federal defendants which, consistent with today's rule, provided for

16

the regulation of coal mine overburden under section 404 of the CWA.

Some commenters reacted to our discussion in the preamble of the proposed rule of the settlement of the *Bragg* litigation, and our discussion of the steps that federal agencies are taking to ensure that adequate environmental controls are placed on valley fills resulting from coal mining operations in West Virginia. The comments included one voicing concern that the proposed rule provided no confirmation that, subsequent to the *Bragg* MOU, the Corps would provide more extensive review of proposed valley fills. Our intent in describing that effort was to highlight that modifying the definitions of fill material in the manner we proposed was consistent with our current practice of regulating valley fills pursuant to section 404 of the CWA. We discussed our current activities regarding coal mine disposal practices in Appalachia to provide background for the public on those activities. However, the manner in which we regulate such fills, as well as any other particular fill activity, is not within the scope of this rulemaking, as the sole issue here is how fill material is defined. The environmental controls placed on any particular activity will be addressed through the section 404 permitting process, not any elements of today's rule.

To the extent commenters are contending that the manner in which we have regulated valley fills demonstrates that such fills should not be regulated under section 404, we disagree. For all the reasons we have stated, we believe that the appropriate test for whether a pollutant is regulated under section 404 as "fill" is whether it has the effect of fill (regardless of its purpose), because under those circumstances the section 404 program is particularly well suited to address the environmental impacts of the discharge.

### 3. Consistency with the case of *Resources Investment Inc. v Corps*

One commenter characterized the proposed rule as alleviating the jurisdictional uncertainties that arise from the "primary purpose" test, and in the commenter's opinion, were the basis for the Ninth Circuit Court of Appeals' decision in *Resource Investments Incorporated v. U.S. Army Corps of Engineers* (*RII*), 151 F.3d 1162 (9th Cir. 1998). Other commenters, however, contend that the government's application of the *RII* decision in its stated rationale for the proposal ignores an additional holding in *RII*. 151 F.3d 1162 (9th Cir. 1998). Commenters characterized the proposed rule as an attempt to "override" or "overrule" the Ninth Circuit's binding decision upon the government and asserted that any effort to change the result in *RII*, by redefining "fill material," would be improper. Moreover, commenters asserted that to issue the rule, as proposed, would be inconsistent with the concept that federal agencies are required to apply federal law as interpreted by the federal courts in the relevant Circuit. They then argued that the narrow scope of the *RII* decision does not support the government's concerns that an "unreasonable end result" may occur should the definition of "fill material" be left as it is. In addition, commenters asserted that to revise the definition of "fill material," as proposed, would be duplicative, as applied to solid waste landfills. One commenter framed this argument as having "profound federalism implications," asserting that, under the revised definition of fill

17

material, both state RCRA-approved programs and Federal 404 authority to permit landfill activities will apply, creating a situation where potentially inconsistent wetland-impact determinations could result. This too, commenters indicated, is inconsistent with the holding in *RII*. Commenters also suggested that the proposed rule is an improper means of resolving disagreements between the federal agencies and the courts.

In the Preamble to the final rule, the agencies addressed *RII* decision in detail, including responses to these comments. That discussion is set forth below.

In <u>Resource Investments Inc v. Corps</u>, 151 F.3d 1162 (9th Cir. 1998), the Ninth Circuit held that the Corps lacked the authority to regulate a solid waste landfill in waters of the U.S. The court found that: (1) neither the solid waste itself nor the liner consisting of layers of gravel and low-permeability soil constituted "fill material" under Corps regulations; and (2) because of the potential for inconsistent results if landfills were regulated under both section 404 of the CWA and Subtitle D of RCRA, requiring these facilities to be subject solely to RCRA would "harmonize" the statutes.

We discussed this decision in the preamble to the proposed rule as an example of some of the confusion engendered by the "primary purpose" test. The court found in <u>RII</u> that the liner was not fill material because its primary purpose was not to replace an aquatic area with dry land or change the bottom elevation of a waterbody, "but rather to serve as a leak detection and collection system." 151 F.3d at 1168. We explained in the proposal that fills typically serve some other purpose than just creating dry land or raising a water's bottom elevation and that, if the court's reasoning were taken to its logical conclusion, many traditional fills in waters of the U.S. would not be subject to section 404.

Some commenters objected to our proposal not to follow the decision in <u>RII</u> in this rulemaking. They criticized the proposal as an improper attempt to "override" or "overrule" the Ninth Circuit's decision, particularly within the Ninth Circuit where the decision is binding. They also argued that the proposed rule failed to address the potential for duplication and inconsistency in decision-making by State and Federal agencies identified in <u>RII</u>.

In our view, these comments raise two distinct issues. The first is whether we should follow the <u>RII</u> decision outside the Ninth Circuit and cease regulating discharges associated with the construction of solid waste landfills under section 404. The second issue is whether <u>RII</u> precludes us from regulating discharges associated with construction of solid waste landfill structures within the Ninth Circuit, even after today's rule. We address each of these issues in turn.

Regarding the first question, we note first that, after <u>RII</u> was decided, we chose not to acquiesce in the decision outside the Ninth Circuit. While we agreed that the solid waste disposal placed in a landfill is not fill material (and such waste continues to be excluded under today's rule), we believed that the court misapplied the primary purpose test in the Corps'

regulations, and that the court's conclusion that RCRA supplanted CWA regulation was contrary to Congressional intent. See Resource Investments Inc. et al. v. Corps, No. 97-35934 (Government's Petition for Rehearing and Suggestion for Rehearing En Banc, September 30, 1998). Thus, after the court decided RII, the Corps has continued to issue section 404 permits for the construction of solid waste landfill infrastructures outside the Ninth Circuit.

After considering public comments, we continue to decline to follow the RII outside the Ninth Circuit and have, therefore, maintained the approach in the proposed rule to the regulation of solid waste landfills. The revisions to the Corps' definition of fill material in today's rule address the basis for the court's holding that the landfill did not involve the discharge of fill material under section 404. For the reasons explained elsewhere in today's notice, we believe that an effects-based test is the appropriate means of evaluating whether a pollutant is "fill material" and should be regulated under section 404 as opposed to section 402 of the CWA. The placement of berms, liners and other infrastructure (such as roads) associated with construction of a solid waste landfill in waters of the U.S. has the effect of replacing water with dry land or raising the bottom elevation of a water. Therefore, under today's rule, they constitute fill material. Such discharges are indistinguishable from similar discharges associated with other construction activity, which the Corps has always regulated as fill under section 404. See 40 CFR 232.2; 33 CFR 323.2 (defining "discharge of fill material," to include "fill that is necessary for the construction of any structure in a water of the U.S.; the building of any structure or impoundment requiring rock, sand, dirt or other material for its construction; site-development fills for recreational, industrial, commercial, residential and other uses; causeways or road fills; . . ."). We have amended our definition of this term to include the "placement of fill material for construction or maintenance of any liner, berm, or other infrastructure associated with solid waste landfills." That amendment does not change substantively the prior definition, but merely adds solid waste landfills as an example to make clear that it constitutes a "discharge of fill material." Thus, under our new regulations, discharges associated with the creation of solid waste landfill structures clearly constitute "fill material."

To the extent some commenters asserted that revising our regulation was an improper attempt to "overrule" or "override" this holding in RII, we disagree. The court's analysis of the "fill material" in RII was based entirely on the Corps regulations as they existed at that time, and not upon the interpretation of the CWA itself. Moreover, the CWA does not define "fill material." Therefore, both the statute and the Ninth Circuit's decision leave us the discretion to adopt a reasonable definition consistent with the statutory scheme. We have explained elsewhere why we believe today's definition of fill is reasonable and appropriate under the CWA. To the extent today's rule has the practical effect of "overriding" this aspect of the court's decision in RII, that is neither remarkable nor inappropriate, since it is entirely proper for agencies to consider and, if appropriate, revise their regulations in light of judicial interpretation of them.

For purposes of deciding whether to apply the RII decision outside the Ninth Circuit, we have also evaluated the second basis for the court's decision -- that regulation solely under Subtitle D of RCRA instead of section 404 would "harmonize" the statutes and avoid necessary

duplication. We decline to follow that holding both on legal and policy grounds. First, we believe, notwithstanding RII, that eliminating the CWA permitting requirement on the grounds that an activity is regulated under RCRA is contrary to Congressional intent in both statutes. Second, we do not agree with the court that regulation under Subtitle D and section 404 would constitute unnecessary duplication, in light of the distinct purposes served by these authorities, the differing Federal roles under the two statutes, and our clarification in today's rulemaking of our intent to give all appropriate deference to State RCRA decision-making in the section 404 permitting process.

We first do not agree with the court's legal reasons for concluding that regulation under Subtitle D of RCRA supplants CWA regulation. The CWA prohibits the discharge of any pollutant into waters of the U.S. without a permit under the Act. See CWA section 301(a). Even though an activity associated with a discharge may be regulated under other Federal or State authorities, we believe there is not any basis to conclude that such regulation by itself makes section 301(a) of the Act inapplicable to a discharge of a pollutant into waters of the U.S. In effect, the court concluded that enactment of a regulatory scheme under Subtitle D of RCRA impliedly repealed the statutory permit requirement under the CWA. But "the intention of the legislature to repeal must be clear and manifest." Radzanower v. Touche Ross & Co., 426 U.S. 148, 154 (1976), and the court must conclude that the two acts are in irreconcilable conflict or that the later act covers the whole subject of the earlier one and is clearly intended as a substitute. Id. The court in RII did not, and could not, make these findings.

In fact, Congress itself made precisely the opposite findings when it enacted RCRA. Section 1006(a) states:

> Nothing in this chapter shall be construed to apply to (or to authorize any State, interstate, or local authority to regulate) any activity or substance which is subject to the [CWA] except to the extent such application (or regulation) is not inconsistent with the requirements of [the CWA].

This provision precludes regulation of solid waste landfills under Subtitle D in a manner inconsistent with the requirements of the CWA. In our view, it is plainly "inconsistent" with the requirements of the CWA to hold that regulation under RCRA eliminates CWA permitting requirement altogether.

Instead, the court relied upon certain Corps regulations, statements by Corps officials and a 1986 interagency MOA. The court first stated that applying section 404 to solid waste landfills was "unreasonable" because there would be "potentially inconsistent results" where both the State and the Corps were applying the same criteria in regulating solid waste landfills. 151 F.3d at 1169. The court held that this "regulatory overlap is inconsistent with Corps regulations stating that 'the Corps believes that state and federal regulatory programs should complement rather than duplicate one another.'" 33 CFR 320.1(a)(5). In addition, the court cited statements by the Corps in a 1984 letter to EPA stating that EPA was in a better position than the Corps to regulate solid waste landfills. Finally, the court cited the 1986 MOA between the Corps and EPA.

20

However, none of these "authorities" purport to modify the statutory permitting requirements of the CWA, nor could they. The Corps' regulation cited by the court is simply a statement of the Corps' policy objective of working in concert with State regulatory programs, an important and continuing Corps objective that was discussed previously. The Corps' letter and the MOA reflected our efforts to manage our programs in light of our differing definitions of fill material, but did not speak to the CWA statutory permitting requirement. The court also misconstrued the 1986 MOA entered into by EPA and the Corps as indicating we intended to make the regulation of solid waste facilities within "the sole purview of the EPA and affected states" after EPA promulgated certain Subtitle D regulations. 151 F.3d at 1169. In fact, we stated,

> EPA and Army agree that consideration given to the control of discharges of solid waste both in waters of the United States and upland should take into account the results of studies being implemented under the 1984 Hazardous and Solid Waste Amendments (HSWA) to the Resource Conservation and Recovery Act (RCRA), signed into law on November 8, 1984. . . .

> Unless extended by mutual agreement, the agreement will expire at such time as EPA has accomplished specified steps in its implementation of RCRA, at which time the results of the study of the adequacy of the existing Subtitle D criteria and proposed revisions to the Subtitle D criteria for solid waste disposal facilities, including those that may receive hazardous household wastes and small quantity generator waste, will be known. In addition, data resulting from actions under the interim agreement can be considered at that time.

**It should be noted that this MOA is about the regulation of solid waste disposal, not about the construction of infrastructure, including solid waste landfill infrastructure, that involves discharges of fill material to waters of the U.S. Further, we did not address in the MOA how solid waste landfills would be regulated after EPA completed its study and certain RCRA regulations, but said only that these developments would "be taken into account" as we decided how to address these discharges in the future. Thus, in addition to the inability of the agencies as a legal matter to modify the CWA statutory permitting requirement through an MOA, we expressly reserved any judgment about the appropriate regulatory approach to be taken after certain actions were taken under RCRA. Also, contrary to the court's conclusion, we have viewed the MOA as remaining in effect after EPA submitted its report to Congress and promulgated Subtitle D regulations in 1991. See Memorandum of John F. Studt, U.S. Army Corps of Engineers, May 17, 1993 (stating "the subject MOA remains effective in its entirety until further notice" and noting that this position was coordinated with EPA).**

We conclude, therefore, that it would be contrary to the language and intent of both the

21

CWA and RCRA to conclude that RCRA subtitle D supplants the CWA permitting requirement for discharges into waters of the United States associated with the construction of solid waste landfills. The different Federal roles in the permitting schemes in these statutes supports this conclusion. Subtitle D provides that each State will "adopt and implement a permit program or other system of prior approval and conditions" to assure that each solid waste management facility within the State "will comply" with criteria established by EPA for the siting, design, construction, operation and closure of solid waste landfills. RCRA section 4005(c)(1)(B). States are required to submit permit programs for EPA to review and EPA is required to "determine whether each State has developed an adequate program" to ensure compliance with EPA's Subtitle D regulations. RCRA section 4005(c)(1)(B) and (C). However, RCRA does not grant to EPA authority to issue permits for solid waste landfills, review State permitting decisions or enforce Subtitle D requirements in States with approved programs. The court in RII appeared to misunderstand EPA's authorities under Subtitle D of RCRA when it stated that EPA would be the permitting authority in the absence of an approved State program. See 151 F.3d 1169 ("we hold that when a proposed project affecting a wetlands area is a solid waste landfill, the EPA (or the approved state program) . . . will have the permit authority under RCRA.") (Emphasis added); 151 F.3d at 1167 ("RCRA gives the EPA authority to issue permits for the disposal of solid waste, but allows states to substitute their own permit programs for the federal program if the state program is approved by EPA."). While this authority exists with regard to disposal of hazardous waste under Subtitle C of RCRA, EPA does not have this authority with regard to disposal of non-hazardous solid waste under Subtitle D.

In contrast, the CWA requires either a Federal permit for discharges of pollutants into waters of the U.S., or issuance of a permit by a State/Tribe with an approved program, subject to EPA's authority to object to a permit where EPA finds it fails to meet the Guidelines and requirements of the CWA. CWA sections 402(d); 404(j). EPA also has authority under the CWA to enforce conditions in Federal or State permits under the Act. CWA section 309.

These contrasting statutory schemes support the conclusion that eliminating CWA authority over discharges of fill material associated with construction of solid waste landfills would mean a significant departure from the statutory structure created by Congress in the CWA, a scheme which Congress expressly sought to preserve when it adopted RCRA. See RCRA section 1006(a). This does not mean that we view the Federal role as one of second-guessing every decision made by State regulatory authorities under RCRA. To the contrary, both RCRA and the CWA reflect a strong presumption in favor of State-administered regulatory programs. As discussed elsewhere, we intend to rely on State decision-making under RCRA to the extent allowed under current law and regulations. However, we believe that eliminating a Federal role entirely on these matters is neither appropriate nor consistent with Congressional intent under RCRA or the CWA.

Thus, we decline to follow the decision in RII outside the Ninth Circuit because we conclude there is not an adequate legal basis on which to conclude that discharges of pollutants associated with solid waste landfills no longer need to be authorized by a CWA permit solely

22

because the project receives a permit under Subtitle D of RCRA.

We nonetheless share the basic policy perspective expressed by the court in RII about the need to avoid unnecessary duplication and potential inconsistent application of regulatory programs under the CWA and RCRA. In fact, RCRA expressly vests EPA with the responsibility to "integrate all provisions of [RCRA] for purposes of administration and enforcement and [to] avoid duplication, to the maximum extent practicable, with the appropriate provisions of the . . . [CWA] . . . . Such integration shall be effected only to the extent that it can be done in a manner consistent with the goals and policies of this chapter and the CWA. . . ." RCRA section 1006(b). EPA has sought such integration first by promulgating location restrictions for landfills that are consistent with the criteria for issuance of section 404 permits. See 40 CFR 258.12; 230.10. Among other requirements, a landfill may not be located in wetlands unless it is demonstrated to the State that there are not less environmentally damaging practicable alternatives, the facility will not cause significant degradation of wetlands, and that appropriate and practicable steps have been taken to mitigate the loss of wetlands from the facility. However, EPA never purported to substitute Subtitle D regulation for the CWA permitting requirement, a result that would violate both section 1006(a) and (b). Instead, the Subtitle D RCRA regulations make clear that owners or operators of municipal solid waste landfills "must comply with any other applicable Federal rules, laws, regulations, or other requirements." 40 CFR .258.3. At the time EPA promulgated this regulation, the agency expressly noted that such requirements include those arising under the CWA. See 56 FR 51042 (October 9, 1991).

We do not believe, however, that the Subtitle D and section 404 programs are redundant. Rather, each program has a distinct focus. The State RCRA permitting process addresses a much broader range of issues, including technical operating and design criteria, ground water monitoring, corrective action, closure and post-closure care and financial assurances. In contrast, the section 404 process is focused exclusively on the impacts of discharges of fill material on the aquatic ecosystem, and ways of ensuring that those impacts are avoided, minimized and compensated. Because of the Corps' expertise in protecting aquatic ecosystems, we have found that State RCRA permitting agencies often incorporate by reference the requirements of section 404 permits. (For example, the State RCRA permit for the RII landfill required the applicant to implement the wetlands and mitigation plan to be approved by the Corps through the 404 permit process.) We believe that, in these and other ways, State and federal permitting authorities can create efficiencies by relying on each other's expertise in making regulatory decisions.

We intend to make additional efforts to avoid unnecessary duplication in the Federal and State permitting process. As explained in section II. C of this final preamble, we intend that the Corps will rely on decisions by the State RCRA authority about the siting, design and construction of solid waste landfills in waters of the U.S. to the extent allowed by law and regulations. Appropriate deference to State decision-making will help avoid duplication, while still ensuring that the Corps fulfills its responsibilities to authorize discharges of fill material associated with solid waste landfills in accordance with CWA requirements.

23

Exhibit 26, page 26

This does not mean that, in every single case, State and Federal decision-makers will agree on whether a particular project or configuration is environmentally acceptable. Nevertheless, instances of disagreement have been rare. We intend to further enhance our efforts to ensure effective coordination between state and federal officials. However, we do not agree with the court in RII that the only way to avoid unnecessary duplication is to eliminate the CWA permitting requirement altogether.

We next address commenters' assertions that the decision in RII continues to preclude us from regulating solid waste landfills under section 404 within the Ninth Circuit. These comments also argue that, given the "statutory" basis for the court's decision, we cannot change the result in the Ninth Circuit through this rulemaking.

As noted above, the court construed administrative materials of the Corps and EPA as supporting the conclusion that the agencies did not intend to regulate solid waste landfills under section 404 of the CWA. In light of this agency intent, the court concluded that subjecting landfills to regulation solely under RCRA would "harmonize" the statutes and "give effect to each [statute] while preserving their sense and purpose." 151 F.3d at 1169. The court found that this harmonization "is consistent with the sense of the CWA that discharges of solid waste materials are beyond the scope of section 404 . . . and avoids unnecessary duplication of federal and state efforts in the area of wetlands protection." Id.

We again emphasize the distinction between "discharges of solid waste material," as referenced by the court and discharges of fill material associated with the construction of infrastructure. In this rulemaking, we have clarified that discharges having the effect of raising the bottom elevation of a water or replacing water with dry land, including fill used to create landfills such as liners, berms and other infrastructure associated with solid waste landfills are discharges of fill material subject to the section 404 program. Therefore, we have altered the landscape as understood by the court in RII (i.e., that these facilities were entirely outside the intended purview of section 404). We do not agree with commenters who argued that there was a "statutory" basis to the court's decision in the sense that the holding of the decision turned on an interpretation of Congressional intent in the CWA or RCRA. The court did not cite any provision of the CWA or RCRA to support its conclusions. Rather, the court derived the "sense and purpose" of the CWA based on agency regulations, guidance and correspondence. By clarifying the scope of section 404 authorities in this rulemaking, we have altered the "sense and purpose" of the CWA underlying the court's conclusion that regulation solely under RCRA would "harmonize" the statutes. Because the premises before the court have changed, we do not view the court's decision as continuing to bar the regulation under section 404 of discharges associated with solid waste landfills within the Ninth Circuit. At a minimum, today's rule calls into question the continuing vitality of the court's reasoning and conclusions and, should a case be brought within the Ninth Circuit challenging our authority to regulate solid waste landfills, we would ask the court to address the question anew in light of the clarification of our authorities in today's rule.

24

## 4. Consistency of Proposal with Past Policy, 1986 Solid Waste MOA, and Other Agency Documents

Some commenters questioned the adequacy of the agencies' basis for what they perceived as a change in policy. They viewed the elimination of the waste exclusion from the Corps' definition as representing an unexplained and drastic departure from existing regulations and agency policy. Other comments viewed the proposed rule as a drastic change in policy intended to avoid any more challenges to valley fills and coal mine waste disposal. They asserted that it was clear waste disposal is not allowable under the Corps' definition of fill material and that activities whose primary purpose is waste disposal are subject to Section 402, and not Section 404.

We do not agree that the proposal reflects a drastic change in policy. Rather, the rulemaking is intended to ensure a clear, effective, and consistent regulatory approach with regard to materials that have the effect of fill by providing a single consistent definition of the terms "fill material" and "discharge of fill material." The rule does this by embodying elements of both EPA's and the Corps' previous definition of fill material, while reconciling the differences between them. Commenters asserting a drastic policy shift point to the changes in the Corps' definition of fill material (33 CFR 323.2(e)(2001)). Today's rule (by use of an effects-based test to define fill material) reflects the existing approach already used under EPA's definition (40 CFR 232.2 (2001)), which has been in place since 1977. Moreover, the issue being addressed is not solely what materials should be subject to Section 404 permitting authority, but also the appropriate scope of Section 402 permitting. EPA is the agency assigned responsibility for administering Section 402, and under the existing EPA definition, material that has the effect of fill, regardless of the purpose of the discharge, is deemed fill material, and as such is not regulated under the Section 402 program. See, 33 USC 1342(a)(1). As was explained in the proposed rule's preamble, the rulemaking is intended to reconcile the differing Corps and EPA definitions in a manner consistent with the statutory scheme (see 65 FR 21293-21294) and that resolves regulatory uncertainties resulting from the differing definitions (see 65 FR 21294-21295).

Others expressed concern that the proposal would place the Corps, rather than EPA, in primary control of waste disposal in waters of the U.S., believing that the proposal would dramatically enlarge the range of Section 404 regulated activities involving waste disposal. They noted that the proposal not only would have eliminated the Corps' definition's "primary purpose" test (i.e., whether the material is used for the primary purpose of creating dry land or elevating the water body bottom), but also that definition's exclusion of pollutants primarily to dispose of waste.

Today's rule does not alter jurisdiction under the Section 402 program as it reflects an effects-based approach to defining fill material that is similar to that currently used by EPA. We thus do not agree it somehow alters responsibilities to make the Corps the primary agency in charge of waste disposal under the CWA. We also note that modifications have been made to the

25

proposal in response to comments received expressing concern over the proposal's elimination of the Corps definition's waste exclusion. In particular, today's rule has been modified to provide an explicit exclusion from the definition of "fill material" for trash, garbage or similar materials unless such materials are to be used to create a structure or infrastructure in waters of the U.S., such as a berm or artificial reef. That modification narrows the proposal's scope of what constitutes "fill material." Thus, even more so than the proposal, the rule adopted today does not reflect a policy change putting the Corps primarily in charge of waste disposal.

Another comment suggested inconsistency of the proposal with the statement in the proposed rule preamble that "waters of the U.S. should not be polluted by discharges of solid waste, which is generally not a suitable or appropriate form of 'fill material,' for a variety of reasons." (65 FR 1296). The commenter did note the preamble explained the proposed changes comport with existing practice, but asserted that existing practices violates the law. They claimed the rule was being changed to overturn part of the ruling in *Bragg* finding that issuance of 404 permits for the discharges at issue was illegal, in an attempt "to allow the destruction to continue."

We do not agree that the proposal or today's rule is inconsistent with the preamble statement. First, neither the proposal nor today's rule have the effect of authorizing or permitting the discharge of solid waste to waters of the U.S. As provided for by Section 301 of the CWA, discharges to waters of the U.S. remain prohibited unless a permit under either Section 404 or 402 authorizing the discharge is issued. Rather, the rulemaking being undertaken clarifies what regulatory regime (Section 404 or 402) would be applicable. Moreover, as explained in the preamble to the proposed rule (65 FR 21293 - 21294), because the Section 404 program is specifically designed to regulate material that fills waters of the U.S. or changes their bottom elevation, whereas Section 402 is primarily designed to regulate sewage and industrial effluents, we believe Section 404 is the environmentally preferable permitting regime to apply. In response to comments received, we also have modified the proposal in today's final rule to exclude from the definition of fill material trash, garbage or similar materials unless such materials are to be used to create a structure or infrastructure in waters of the U.S.

With regard to assertions that existing practices do not comport with the law and that the rule is motivated by an intent to overturn the *Bragg* decision, we note the *Bragg* court actually approved a settlement agreement resolving claims against the Federal defendants, under which overburden from valley fills would continue to be subject to Section 404, and determined that settlement agreement "accords with the law." See 54 F.Supp 653, 665. A subsequent October 1999 Memorandum Opinion and Order in the *Bragg* case (addressing SMCRA claims against the State defendants) contained language that does question the applicability of Section 404 to mining overburden in light of the Corps' regulations' primary purpose test. However, as explained in the proposed rule's preamble (65 FR 21295), that language was obiter dicta rather than a holding of the Court. Moreover, on April 25, 2001, that October 1999 Memorandum Opinion and Order was **vacated** by the U.S. Circuit Court of Appeals for the Fourth Circuit, which determined the underlying claims against the State defendants were barred by the 11th

26

Amendment of the U.S. Constitution. 248 F.3d 275 (4ᵗʰ Cir, 2001); **that Fourth Circuit decision left intact the 1998 settlement agreement. See 248 F.3d at 288, n.1 (noting District Court's approval of the settlement agreement).** We thus do not agree that existing practices do not comport with the law. See also, Avoyelles Sportsmens League v. Marsh, 715 F. 2d. 897, 924-925 (5th Cir. 1983) (endorsing use of an effects-based test for determining what constitutes fill material subject to Section 404). Finally, with regard to assertions that the proposal was somehow motivated by a desire to "overturn the *Bragg* decision" we further note that the proposed rule preamble explained in detail the various regulatory uncertainties and confusion arising from the differing Corps and EPA definitions of fill material and the environmental, legal, and programmatic reasons why there was a need to reconcile those differences. 65 FR 21294 - 21295.

Another commenter stated that the volume of a single stream fill can be as much as up to 250 million cubic yards with stream burials up to 2 miles long, and that from 1986 to 1998, at least 900 stream miles were filled with excess spoil and coal mining waste in Pennsylvania, Kentucky, West Virginia and Virginia. The commenter concluded from this that Section 404 permits are rarely denied and the 404(b)(1) protections that the proposed rule preamble refers to as sufficiently protective of the aquatic environment are not if a standard that allows no "significant effect" allows the complete burial of miles of streams. This commenter also noted that the proposal would have added "placement of coal mining overburden" to the definition of "discharge of fill material," and indicated this was contrary to West Virginia Coal Assn. v. Reilly, 728 F. Supp. 1276, 1281 (S.D.W.Va. 1989), and that the agencies had not clarified why amending the regulatory definitions makes more sense than refining the MOA's list of mining wastes already disposed of under Section 402, pursuant to EPA regulation. Another commenter also pointed to the definition of "discharge of fill material" in 33 CFR 323.2(f), noting that the examples listed in that definition are all constructive and do not include waste disposal.

While we agree that the length of streams filled by valley fills can be substantial, we do not agree that this leads to a conclusion that such fills or other such wastes would be better regulated under Section 402 rather than 404. With regard to West Virginia Coal Assn, that decision involved issues arising under the regulations existing at the time of the decision (i.e., with the differing Corps and EPA definitions)and the 1986 MOA that was based on those regulations ; it neither held or suggested that the regulations could not be changed or clarified so as to reconcile those differences. With regard to suggestions of further refining the MOA as to regulation of mining waste under Section 402 or application of Section 402 in lieu of Section 404, we note that Section 404 is better designed to address impacts associated with filling of waters of the U.S., as it provides for evaluation of impacts on aquatic ecosystems, consideration of practicable alternatives to avoid impacts, consideration of measures to minimize impacts, and mitigation of unavoidable impacts. In contrast, Section 402 primarily relies on use of end of pipe technology and water quality based standards. These considerations were explained in detail in the proposed rule preamble (65 FR 21293 -21294), and we believe amply support a conclusion that application of Section 404 to regulate materials with the effect of fill is reasonable and environmentally protective.

27