We do believe that the agencies should continue to look for improvement in Section 404 program implementation related to valley fills and have undertaken a number of measures to that end. These include an April 1999 Memorandum of Understanding between the Office of Surface Mining, the Fish and Wildlife Service, EPA, the Corps, and the State of West Virginia that describes discharges that the signatory agencies believe generally should have only a minimal effect on waters of the U.S., development of technical models to help minimize the size of proposed coal overburden discharges, and initiation of development of a comprehensive EIS to assess current federal and state authorities for regulating coal mining discharges in Appalachia and what measures may be necessary to ensure protection of human health and the environment. A draft of that EIS is anticipated to be available for public comment on August 2002. In addition, Nationwide Permit 21 was revised and reissued on January 15, 2002, with improvements to its mitigation provisions and a requirement not only for pre-construction notification to the Corps but also written authorization from the Corps before the project can proceed. See discussion of Nationwide Permit 21 at 67 FR 2038- 2043.

Another comment took issue with the proposal's preamble language (65 FR 21294) that explained it was problematic for the Corps to make subjective determinations about the primary purpose of a prospective discharge. The comment suggested this difficulty would be eliminated if the regulations made it clear that the Corps and EPA (and not the project applicant) are to make an independent determination.

We do not agree that the difficulties described in the preamble can be resolved by simply having us make an independent determination of the primary purpose of a prospective discharge. First, we believe it preferable to apply the regulatory regime that is best fitted to address the effects of the particular discharge, rather than assigning regulatory responsibility on the basis of project purpose. For discharges with the effect of fill, as explained above, we believe the appropriate regulatory regime is Section 404. Moreover, an independent determination by the agencies would not resolve difficulties arising under the primary purpose test. For example, in *RII* (discussed in the proposal's preamble at 65 FR 21294), the Corps determined that a discharge of fill material was involved, as the primary purpose of the discharge associated with construction of the landfill was to replace waters of the U.S. with dry land or alter the bottom elevation. The Court however interpreted the primary purpose test on its own to come to a different conclusion, finding the liner was not fill material because its primary purpose was not to replace an aquatic area with dry land or change the bottom elevation of a waterbody, "but rather to serve as a leak detection and collection system." 151 F.3d at 1168.

A number of comments were received questioning the consistency of the proposed rule with the 1986 "Memorandum of Agreement Between the Assistant Administrators for External Affairs and Water U.S. Environmental Protection Agency and the Assistant Secretary of the Army for Civil Works Concerning Regulation of Discharges of Solid Waste Under the Clean Water Act"("1986 MOA") and related agency documents.

Some of these commenters generally pointed to the 1986 MOA and the "primary purpose

28

test" in the Corps definition of fill material as presenting a strong argument that materials are prohibited under the Section 404 program when they are "pollutants" being discharged into a water of the US "primarily to dispose of waste," and thus should be regulated under Section 402 of the Act by EPA as a point source discharge.

The 1986 MOA is intended to provide guidance to the Corps and EPA on how to determine the applicability of Section 404 or 402 to solid waste discharges in light of the differing EPA and Corps definitions of fill material. Because it is only guidance, it cannot and does not establish legally binding requirements, nor is it prescriptive in nature. It provides factors to be considered when making the determination of which permitting regime to apply, but does not direct or instruct how the factors are to be considered or balanced to reach a conclusion. In fact, it explicitly recognizes that there will be cases where application of the factors it contains will not provide a clear answer, or the agencies may disagree as to which permit regime should be applied. 1986 MOA, Section C. 1 and 2. As explained in the proposed rule preamble (65 FR 21297), and will be addressed further below, we believe the approach being taken in reconciling the regulations is generally consistent with the 1986 MOA.

With regard to the Corps regulations defining fill material, those regulations provide in part:

> The term "fill material" means any material used for the primary purpose of replacing an aquatic area with dry land or of changing the bottom elevation of an waterbody. The term does not include any pollutant discharged into the water primarily to dispose of waste, <u>as that activity is regulated under Section 402 of the Clean Water Act</u>. 33 CFR 323.2(e) (2001) (emphasis added)

Under EPA's long standing definition of what constitutes fill material (and thus <u>not</u> subject to Section 402 (see CWA Section 402(a)(1)), fill material is defined as material that has the effect of fill, without regard to the purpose of the discharge. We thus do not agree that under the differing EPA and Corps regulations it is simply clear by referring to the Corps regulations alone that pollutants discharged to dispose of waste are not subject to Section 404; rather, the contents of <u>both</u> regulations need to be taken into account. Moreover, as noted in the prosed rule's preamble (65 FR 21295) the Corps has historically regulated valley fills under Section 404.

Some of the comments pointed to specific language in the 1986 MOA as indicating that mine waste was properly the subject of Section 402 and not Section 404. Several of these commenters cited Section B.5. of the 1986 MOA. That provision states:

> "On the other hand, in the situation in paragraph B.3, a pollutant (other than dredged material) will normally be considered by EPA and the Corps to be subject to Section 402 if it is discharged in liquid, semi-liquid, or suspended form or if it is a discharge of solid material of a homogeneous nature normally associated with single industry wastes, and from a fixed conveyance, or if trucked, from a single

29

site and set of known processes. These materials include placer mining wastes, phosphate mining wastes, titanium mining wastes, phosphate mining wastes, titanium mining wastes, sand and gravel wastes, fly ash, and drilling muds. As appropriate, EPA and the Corps will identify additional such materials."

These commenters saw the proposed rule as a repudiation of that provision. Some of these comments further pointed to a cover memorandum from Lawrence Jensen, then-Assistant Administrator of the Office of Water, to Regional Administrators transmitting the 1986 MOA which stated wastes of a homogenous nature normally associated with a single industry and discharged from a fixed conveyance, or if trucked from a single site such as fly ash, are subject to the Section 402 program.

As explained previously, under today's rule, we will continue, consistent with our long-standing practice, to rely on the existence of effluent limitation guidelines or standards or an NPDES permit to inform the determination of how a particular discharge is regulated under the Act. If a specific discharge is regulated under Section 402, it would not also be regulated under Section 404, and vice versa. As explained in the proposed rule's preamble (65 FR 21296), many of the discharges referred to in Section B.5. of the 1986 MOA are subject to effluent guidelines and NPDES permitting, and today's rule would not alter that existing scheme. Moreover, when Section B.5. of the 1986 MOA was adopted, the EPA regulations defining fill material, like today's rule, defined fill material as material that has the effect of replacing waters of the U.S. with dry land or changing the bottom elevation. We thus do not agree that today's rule is inconsistent with or repudiates that 1986 MOA provision.

One of the commenters further indicated that the 1986 MOA outlined four factors for determining whether a specific waste was properly regulated under Section 404 or Section 402, stating that each factor, if it applied to the material at issue, meant that the material should be regulated under Section 404. The commenter concluded that three of the four factors listed in the 1986 MOA (Sections B.4.a, b, and d) weighed in favor of overburden being regulated by EPA under Section 402, with only one factor (Section B.4.c) weighing in favor of Section 404.

We do not agree that only one factor in Section B.4 of the 1986 MOA weighs in favor of regulating overburden under Section 402 as the commenter asserts. With regard to the comment's suggestion that Sections B.4.a, b, and d weigh in favor of overburden being regulated under Section 402, we note that Section B.4.d refers to heterogenous discharges of the type "normally associated with sanitary landfills," and thus appears inapplicable in the case of overburden rather than affirmatively indicating it is subject to Section 402. With regard to Section B.4.b., overburden consists of rock and dirt and thus is similar in nature to materials generated by construction-type activities, such as road cuts that generate waste rock and dirt. The 1986 MOA does not specify how to weigh and balance the various factors it contains, and as noted above, Section C of the 1986 MOA explicitly recognizes this and calls for inter-agency discussions when the factors specified in the MOA do not resolve the issue.

30

Other comments questioned the status of the 1986 MOA, indicating that it was intended to provide only interim section 404 jurisdiction and pointing to language in Section E.2. as indicating it expired when EPA's RCRA Subtitle D regulations were published in 1991. Some of these comments pointed to the *RII* decision as supporting that view. One of these comments focused on issues related to the applicability of Section 404 to solid waste landfills, asserting that the discussion in the proposed rule preamble of the 1986 MOA between EPA and the Corps regarding the "temporary" assertion of jurisdiction over landfills by the Corps was inaccurate and misleading. This commenter further indicated that in a case asserting a temporary regulatory taking of a landfill by the Corps of Engineers, both former and existing Corps officials have testified under oath that the MOA was intended to impose interim jurisdiction only until the states took over their solid waste responsibilities under RCRA Subtitle D. The commenter concluded that it was simply untrue that the Corps' "consistent intent" has been to regulate solid waste landfills.

We note that by its very title the 1986 MOA concerns "regulation of discharges of solid waste" (emphasis added), not the broader question of Section 404 jurisdiction over other landfill activities, such as their construction or maintenance. It thus does not have a bearing on Section 404 jurisdiction over discharges of material used to create landfill infrastructure such as berms, liners, and the like, which under both of the differing Corps and EPA definitions are fill material. Further, Section A.5 of the 1986 MOA describes the basis of the agreement, indicating the MOA addresses "the uncertainty as to whether Section 402 of the Act or Section 404 is intended to regulate discharges of solid waste materials into waters of the United States for the purpose of disposal of waste . . ." (emphasis added). Because it addresses only solid waste discharges, we do not agree that the 1986 MOA reflects an intent to assert "interim jurisdiction over solid waste landfills by the Corps."

Moreover, in the preamble to the rule adopting the primary purpose test and waste exclusion, the Corps specifically recognized that jurisdiction under that regulation still remained for creation of landfill infrastructure:

"During the two years of experience with the Section 404 program, several industrial and municipal discharges of solid waste materials have been brought to our attention which technically fit within our definition of "fill material" but which were intended to be regulated under the NPDES [CWA § 402 permit] program. * * *

The Corps and [EPA] feel that the initial decision relating to this type of discharge should be through the NPDES program. We have, therefore, modified our definition of fill material to exclude those pollutants that are discharged into water primarily to dispose of waste. We will process Section 404 permits for these types of activities to the extent that a levee or other type of containment structure must be placed in the water as part of the overall disposal plan."

Exhibit 26, page 34

42 F.R. 37,122, 37,129 (July 19, 1977) (emphasis added).

Similarly, the proposed rule was intended to recognize as a discharge of fill material "placement of material for construction or maintenance of . . . infrastructure associated with solid waste landfills" (65 FR 21300). It would not have asserted Section 404 jurisdiction over actual solid waste going into the landfill cells, and as noted elsewhere, today's rule has been modified to specifically exclude disposal of trash garbage and the like from being fill material. In addition, as explained Section II C. of today's preamble, in implementing Section 404, the Corps will emphasize effective coordination with other relevant programs such as RCRA, and consistent with its legal responsibilities, rely as appropriate, on the information developed and conclusions reached by other agencies to support the decisions required under that program. Readers are also referred to the previous discussion in today's preamble for issues related to the applicability of Section 404 to landfills and the <u>Resource Investment</u> case.

With regard to the status of the 1986 Solid Waste MOA, we also do not agree that it has expired. Section 5.E.2. of the 1986 MOA provides it may be extended by mutual agreement, and both EPA (58 FR 9337) and the Corps (May 17, 1993, memorandum from John Studt, Chief, Regulatory Branch, U.S. Army Corps of Engineers) have indicated the MOA remains in effect.

One commenter stated that the 1986 MOA contains language that is potentially confusing and inconsistent with the proposed rule and the accompanying preamble and recommended that while they believed the 1986 MOA contains some provisions worth maintaining, it also contains others that should be reworked consistent with the proposed rule and current permitting practices. This commenter pointed to Section B.4.d of the 1986 MOA as providing that a discharge will normally be considered to meet the definition of "fill material" if heterogeneous in nature and of the type normally associated with sanitary landfill discharges, whereas in the preamble to the proposed rule, the agencies proposed to adopt a definition of "unsuitable" fill material that would include in most instances "heterogeneous solid waste," thereby excluding from the Section 404 permit program materials that would satisfy the language in Section B.4.d of the 1986 MOA. This commenter also pointed to Section B.5 of the 1986 MOA (which addresses "solid material of a homogeneous nature normally associated with single industry wastes") as resulting in confusion and inconsistent positions for materials generated by hard rock mining.

We agree that in many respects the 1986 MOA did not fully resolve issues associated with the discharge of solid waste. This is not surprising as it was developed under a regulatory framework involving differing definitions of fill material, and as guidance, could not depart from those regulations or establish mandatory or prescriptive criteria. Following promulgation of today's rule which results in a single and consistent definition of fill material, we will be revisiting the 1986 MOA to determine if it is still necessary, and if so, what modifications might be appropriate.

One commenter opposing the proposed rule requested that if it nonetheless is issued, language in Section B.6. of the 1986 MOA be retained, which provides for a State determination

32

to be provided prior to application processing that the proposed discharge will comply with applicable provisions of State law, including applicable water quality standards. The commenter indicated this was necessary in order to keep Corps districts from becoming immersed in disputes over siting of wasting facilities.

We will take this comment into account in reviewing the 1986 MOA. We also note that Section 401 of the CWA itself requires any applicant for a Federal license or permit to conduct any activity that may result in a discharge of a pollutant into waters of the U.S. to obtain a certification from the State as to compliance with applicable provisions of State law, including applicable water quality standards. With regard to Section 404 permits, the Corps has in place regulations addressing the nature and timing of such 401 certifications. See e.g., 33 CFR Part 320.

One commenter provided lengthy historical information asserting that the proposed rule's preamble description of how the differing definition of "fill material" came into being incorrectly ascribing this divergence to actions by the Corps. We appreciate submission of this information, but note that the preamble language in question (65 FR 21294) was intended only as brief background chronology, not to explain how the definitions came to differ.

Other comments pointed to a March 19,1984, letter from William R. Gianelli, then Assistant Secretary of the Army for Civil Works, to William Rucklelshaus, then Administrator of EPA, which was cited in the RII case at 151 F.3d 1169. These comments pointed to language in that Department of Army letter stating:

"This follows up on discussions our agencies have had over the years about the proper way to regulate garbage disposal and other waste disposal in waters of the United States.

EPA has many solid waste responsibilities under its RCRA programs and has developed expertise in that area. Army has very limited expertise. Hence we would have to establish duplicative expertise which may well result in policies and technical decisions which differ from those of EPA. It would not be in the best interest of Government for EPA to work with the States under RCRA under one policy and Army to operate under a 404 permit program for garbage disposal on a different basis. It is logical to identify regulations of garbage disposal with EPA's current and historic mission. It strains reason to have the Army Corps of Engineers, with its primary military and navigation missions, to lead this garbage disposal regulation."

They commenters believed that letter indicates that while EPA has many solid waste responsibilities under its RCRA programs and has developed expertise in that area, the Corps has very limited expertise.

The letter in question addresses the "proper way to regulate garbage disposal." As

33

explained elsewhere in today's preamble, we have modified the proposal in today's rule to generally exclude trash or garbage from the definition of "fill material." We thus believe today's rule to be consistent with the referenced letter. We also note that since 1984, through its dredged material management program, the Corps has gained considerable expertise with regard to disposal of geological materials and sediments dredged from waters of the U.S . See for example, Inland Testing Manual. EPA/USACE, 1998. Evaluation of Dredged Material Proposed for Discharge into Waters of the U.S. – Testing Manual. EPA-823-B-98-004, Washington, DC. Moreover, as explained in the preamble to the proposed rule (65 FR 21296), where discharges of solid waste subject to Section 404 also result in the discharge of effluent to waters of the U.S., the effluent discharge would require a Section 402 permit and thus be subject to applicable technology and water quality based standards under that program.

### D.   CWA regulation of activities related to mining practices

Some commenters generally agreed with the language relating to mining activities and by-products provided in the definition of "discharge of fill materials." One commenter indicated that the addition of examples served to "clarify Section 404's applicability to solid waste landfills and placement of coal mine overburden." Many of these commenters wrote in to explain the practical realities associated with certain types of mining activities. They agreed that utilizing Section 404 authority is the only reasonable approach under which mining activities can be permitted. A result other than that proposed by the rule, commenters said, "could deal a crippling blow" to the mining industry. One commenter did, however, voice concerns over the current Corps practice of permitting "valley fills" under the authority of Section 404 and thus disagreed with the inclusion of mining activities at all in the definition of "discharge of fill material."

Commenters had concerns though with the identification of only one particular mining activity (coal mining) and one particular by-product of mining activities (overburden). They suggested that the "singling out" of coal mining overburden may leave the impression that other mining activities and their related by-products are not intended to fall within this definition, leaving to question if mining activities, other than the coal industry, fall into Section 404 regulation. Some commenters further suggested that the rule draws an "arbitrary distinction" among types of mining by the specific inclusion of coal mining overburden as an example of fill in the language of the rule. These commenters stated that the specific inclusion of coal mining related materials may result in differing treatment under the regulations of other forms of mining overburden. This, commenters suggest, will create significant uncertainty in other sectors of the mining community.

**Under the CWA, the regulatory programs of the Corps and the EPA are concerned with "discharges" into waters of the United States and their related effects. In general,** Section 404 discharges into waters of the United States that are associated with mining activities primarily fall into two broad categories: the discharge of overburden materials, and the discharge of mining by-products such as those resulting from mining beneficiation or the processing of mined materials. Overburden materials typically consist of the same kinds of rock and soil materials that are typically utilized for construction fills which, when discharged into waters of the

34

Exhibit 26, page 37

United States, have traditionally been regulated by the Corps under section 404 of the CWA. In contrast, the mining by-products may have a slightly different physical form from the traditional rock and soil used as fill material, but it can have the same effect on the aquatic environment as those materials. Where the discharge of both types of materials into waters of the United States will result either in a change in the bottom elevation, or in the replacement of the waters with dry land, both materials clearly qualify as "fill material" under this rule, and their discharge into waters of the United States will be regulated by the Corps under section 404 of the Act.

However, the scope of the Corps' review of such discharges normally will encompass the direct, indirect, and cumulative effects on waters of the United States. Under Section 404, the agencies may not evaluate or control mining activities that are otherwise not regulated under the CWA.. **The CWA does not regulate mining activities, per se. However, as indicated, some activities that are associated with mining do involve discharges of materials into waters of the United States.**

**In the so-called 'valley fill' situations, coal mining interests under certain circumstances have no practicable alternative to placing the rock and soil overburden, slurry, tailings and similar materials from mining operations into valley areas that most typically contain streams and wetlands. Mining activities, other than coal mining, are sometimes faced with similar situations. Both the Corps and the EPA agree that the placement of these materials in areas that qualify as waters of the United States must be regulated, but not absolutely prohibited, under section 404 of the CWA. While some Corps Districts have been regulating mining discharges in the manner the agencies believe appropriate, today's rule will clarify the agencies' position for all regulators and members of the public and result in uniform application of these important requirements.**

**Accordingly, we disagree with those comments that urge us to maintain the confusion created by the Corps and EPA having different definitions for the term "fill material" with the purpose being to curtail all mountaintop mining and other similar mining practices. We believe that the appropriate application of these key jurisdictional terms and of the Section 404 permit requirements, in the context of specific requests for authorization, can result in the authorization of activities that are consistent with the CWA requirements. It is not within the purview of the Corps' and EPA's authority to address alleged problems associated with mining practices that go beyond those associated with discharges into waters of the U.S.**

E.   Environmental Effects of Proposal

Many commenters opposed to the rule expressed concern that it would have broad and far-reaching environmental effects, characterizing it as allowing the use of waters of the U.S. as dumping grounds for excess mine overburden and other solid wastes, and asserting that the rule would result in a dramatic increase in such dumping  These commenters contended that mountaintop removal coal mining and the use and size of valley fills associated with this practice,

Exhibit 26, page 38

in particular, would increase, referencing the fourfold increase in affected areas in West Virginia over the past twenty years as an example. Many commenters asserted that the proposed rule would result in a backsliding from improvements in water quality gained through the CWA and SMCRA.

We believe that the preamble to the rule addresses these concerns at length. In sum, we disagree that today's rule would have any significant effect on the environment, including encouraging mountaintop mining activities. Today's rule is consistent with EPA's longstanding definition of fill and the current practice of regulating valley fills under section 404. Today's final rule simply brings improved consistency and clarity into the regulations. This improvement will lead to more effective implementation of the CWA, thereby strengthening environmental protection. The rule should not be misread as opening U.S. waters to uncontrolled waste; analysis under the guidelines and appropriate mitigation provide the most appropriate framework for assessing and responding to proposed impacts.

A number of comments also detailed past, present, and possible future ecological effects of mountaintop mining coal removal, and other mining practices which involve fill material. For example, the comments stated that more than 300,000 acres of hardwood forests in West Virginia have been destroyed by the practice of mountain top mining. Many noted that the forests of Appalachia are among the most productive and diverse in North America, that they are vitally important to migratory birds, and that many species are unique to Appalachia. Many commenters referred to affected areas as being among the richest temperate freshwater ecosystems in the world. Others discussed the various effects to underlying streams and surrounding areas, including impacts on air quality, stream hydrology, temperature, runoff, aquifer recharge, and the aquatic and terrestrial life (including impacts on threatened and endangered species) that depend on the affected streams and neighboring habitats. Others discussed the pollution in immediate and downstream areas, such as acid and toxic mine drainage, as well as possible effects of other polluting waste, noting that contamination has rendered many streams lifeless. Some commenters noted that negative effects would extend downstream all the way to coastal wetlands and estuaries.

Comments also provided information on current conditions of natural resources as evidence of the already degraded environment, noting that 750 miles of streams have been filled in West Virginia, and that 12,000 miles of streams in the U.S. have been contaminated from mine overburden, many of which have not yet been reclaimed. Two commenters noted that the Coal River in West Virginia has been named as one of the country's most endangered rivers for the past two years due to mountaintop removal coal mining, and expressed concern about the cumulative impacts of future valley fills creating new waste streams into already degraded rivers. Another commenter found discrepancy between the legal practice of mountaintop removal coal mining and the illegal use of dynamite for fishing of coral reef fish in marine environments. Many expressed concern about the extent and permanence of effects on the environment, such as changes in landscape, contour, and habitat, effects on downstream water quality when headwaters, streams and wetlands are removed from the watershed or carry contaminated waste, and the future

36

cumulative impacts to rivers and watersheds in impacted areas. Furthermore, they argued that mining companies have not taken responsibility to restore and rehabilitate land and waters affected in the past, and that EPA and the Corps have failed to require such measures.

We maintain that by improving consistency and clarity, today's rule increases regulatory effectiveness. Furthermore, many of the wide range of impacts detailed in the comments are not within the jurisdiction of the Corps and EPA. The Office of Surface Mining (OSM) has authority to address concerns such as stream hydrology, water quality, acid and toxic mine drainage, landscape contour, the restoration and rehabilitation of affected areas, and the use of explosives in relation to mining under the SMCRA §515 (b). OSM sets specific environmental protection performance standards under SMCRA, which addresses the environmental concerns voiced in comments. While improvements in the regulation of mining practices is worthy of attention, this rule is not the vehicle for addressing the range of issues identified in the comments.

Numerous commenters maintain that this rule will have direct effects on human health, and were particularly concerned about the contamination of drinking water. Several comments stated that drinking water sources in some coalfield communities are no longer reliable, forcing communities to either pay for systematic purification or to purchase purified drinking water. One commenter indicated that many families cannot afford to pay for clean drinking water. Part of EPA's mission is to ensure safe drinking water, and under the Safe Drinking Water Act, EPA has the authority to set drinking water standards to control the level of contaminants in the nations's drinking water and to regulate publicly-or-privately-owned drinking water systems which serve 25 people or more. EPA does not regulate private wells that supply water to fewer than 25 people, or private drinking water supplies from streams or cisterns, but works closely with our State, Tribal, and local partners to prevent contamination of drinking water supplies at the source.

Many commenters from the affected communities discussed other impacts from mountaintop removal coal mining, such as increased flooding, damage to the structural integrity of homes and other buildings, dust, noise, and vibration from blasting. Some contended that families have been uprooted due to unfavorable living conditions, sometimes leaving homes or communities that have existed for many generations, resulting in the loss of cultural heritage in Appalachia. In addition, many commenters mentioned the adverse impacts on aesthetics, historic sites, water recreation and tourism. We appreciate these concerns, and again stress that OSM has authority over many of these impacts, and in particular that explosives are used only in accordance with State and Federal laws and regulations (SMCRA §515(b)(15)). Moreover, OSM must ensure blasts do not damage property outside the permit area.

Other comments viewed the proposed rule as a weakening of federal protection. One commenter argued that the proposed rule would make it impossible to comply with wetland rehabilitation and recovery mandates, TMDLs, and the Clean Water Action Plan. Another comment argued that the proposed rule contradicts the <u>Report to Congress: Waste from the Combustion of Fossil Fuels</u>, in which EPA held that coal combustion waste in mined lands were strongly acidic. Today's rule represents a coordination of efforts aimed at minimizing confusion

and inefficiency in the evaluation and development of mitigation for proposed projects, and thus works towards the goals of the Clean Water Action Plan. Anti-degradation policies provide for the protection of existing uses in waters and the level of water quality necessary to protect those uses. EPA interprets 40 CFR 131.12(a)(1) of the anti-degradation policy to be satisfied with regard to fills in wetlands if the discharge does not result in "significant degradation" to the aquatic ecosystem as defined in the Section 404(b)(1) Guidelines. Furthermore, it is still the case that coal combustion wastes are regulated under RCRA Subtitle D (Federal Register 40 CFR Part 261). We believe that today's rule is consistent with current federal laws and regulations.

We maintain that by improving consistency and clarity, today's rule increases regulatory certainty but will not have any significant effect on the environment, and will not cause the other effects of concern related to mountaintop mining operations. While specific proposals to undertake mountaintop mining and discharge fill material into waters of the U.S. will have environmental and other effects, today's rule does not authorize or otherwise address those effects, which are, however, addressed in the context of the section 404 and SMCRA permitting processes. Therefore, nothing in this rule is inconsistent with environmental protection principles under various aspects of the CWA or with EPA's regulatory determination relating to fossil fuel combustion wastes under RCRA, which was solely concerned with whether regulation of those wastes under subtitle C of RCRA was warranted. Furthermore, many of the wide range of impacts detailed in the comments are not within the jurisdiction of the Corps and EPA. The OSM has authority to address concerns such as stream hydrology, water quality, acid and toxic mine drainage, landscape contour, the restoration and rehabilitation of affected areas, and the use of explosives in relation to mining under SMCRA §515(b). OSM sets specific environmental protection performance standards under SMCRA, which reflects the environmental concerns voiced in comments.

## F. Unsuitable Fill Material

Many commenters raised concerns over the proposal's discussion of including an "unsuitable fill material" provision in the Corps' regulations that would seemingly have replaced the waste exclusion currently defined by the Corps' regulations. They indicated that the proposed definition of unsuitable fill was "too weak and vague" to adequately replace the waste exclusion as currently embodied in the Corps regulations. Commenters cited to the preamble language indicating that "unsuitable" materials could include those that have the potential to leach contaminants. They identified this as overly broad and indicated that it provided little guidance as to what materials may be considered "unsuitable" and therefore not permitable. Commenters suggested that this would add new uncertainty into the regulatory process and was contrary to EPA's and the Corps' stated intent not to alter current permitting practices. Similarly, one commenter noted that the April 2000 preamble discussion of homogeneity and heterogeneity as a determining factor for the suitability of fill material was confusing , particularly because both terms are used to describe materials that would not permitted under section 404. Specifically, the

38

commenter was seeking clarification as to whether the proposed rule intended to exclude from section 404 only those entrained solids contained in water discharged pursuant to section 402, rather than any waste materials that may contribute contaminants to water.

In contrast, some commenters indicated that the definition, while useful in addition to the waste exclusion, was not broad enough to capture some discharges that they deemed also unsuitable as fill material. These commenters also generally argued that the appropriate place for this provision would be in the rule itself, as opposed to the preamble where it appeared in the April 2000 proposal.

Some commenters suggested that the agencies' comparison of unsuitable fill in the April proposal to the existing general condition addressing unsuitable fill which is applicable to all nationwide permits was inappropriate. These commenters stated that the general condition should not be use as a basis of support for widespread use elsewhere under section 404 as it is not justified due to the significant differences between individual permits and nationwide permits. Commenters further suggested that the concept of unsuitable fill is already adequately addressed by the Section 404(b)(1) Guidelines and related evaluation, thus the process for review of individual permits should remain as it stands now.

As it pertains to granting the Corps District Engineer discretionary authority to refuse to process a section 404 permit application, commenters raised concerns that this would exceed the Agency's authority under the CWA. This, one commenter stated, undermines the "statutory scheme which contemplates reasoned decision making after notice and opportunity for a public hearing." One commenter indicated that this would "inject uncertainty into the process" and could lead to inconsistencies amongst the Corps Districts throughout the country. Commenters also indicated that the nature of the material should not be the only factor considered when making a determination to review a permit application or render a decision under section 404, as is suggested by the preamble discussion. Questions were also raised as to an applicant's right to appeal, either administratively or judicially, under the proposed scheme. Commenters indicated that the probability of numerous judicial appeals of decisions under this provision would seriously undercut the Agencies' purported reasoning for the suggested revision, conservation of limited Corps resources.

The agencies have not included an unsuitable fill category in the final rule but, as discussed in the preamble, the final rule does narrow the scope of "fill material" by excluding trash or garbage. **Since neither the Corps nor the EPA intended the proposed rule to imply that materials such as trash or garbage were suitable materials for placement in waters of the United States as fill, the preamble to the April 20, 2000 proposed rule alluded to a prospective administrative protocol under which Corps District Engineers could refuse to process a permit application if it was determined that the material proposed for discharge into waters of the U.S. was unsuitable as fill. After a review of the comments received on this proposal, the Corps concluded that, without specific criteria for determining what constituted such 'unsuitable' materials, these determinations by District Engineers could be**

39

inconsistent and thereby confusing to the regulated public. Therefore, the Corps and the EPA have abandoned further consideration of including an unsuitable fill category in the final rule.

However, the agencies have added an exclusion for trash or garbage to the definition of "fill material." There are several reasons, for this exclusion. First, the preamble to the proposed rule and many of the comments recognized that certain forms of traditional solid waste material such as garbage, trash, debris, junk cars, used tires, discarded kitchen appliances, and similar materials are not appropriately used, as a general matter, for fill material in waters of the U.S. We agree that the discharge of such materials often results in adverse environmental impacts to waters of the U.S. by creating physical obstructions that alter the natural hydrology of waters and may cause physical hazards and other environmental effects. We also agree that these impacts are generally avoidable because there are alternative clean and safe forms of fill material that can be used to accomplish project objectives and because there are widely available landfills and other approved facilities to receive these kinds of materials for disposal. Yet, the agencies also recognize that there are very specific circumstances where the placement of such materials in waters of the U.S. is associated with an appropriate project and would be consistent with their regulation as "fill material" under CWA section 404. As such, the final rule does not include an unsuitable fill category but does include an exclusion for trash or garbage.

### G. NEPA Comments

*EA/EIS compliance.* Commenters disagree with the Corps' assessment that no Environmental Impact Statement (EIS) was needed to evaluate the potential impacts of this rule to the human and aquatic environment. One commenter indicated that the conclusion reached to not prepare an EIS was arbitrary and capricious. Commenters argue that the rule will have significant environmental consequences and this information must be made available to the public through the NEPA process. They added that this information should have been provided prior to issuance of the proposed rule.

Moreover, commenters disagree that environmental documentation during the permitting phase is sufficient. Commenters noted that this approach is flawed, as many mining discharges are permitted under the nationwide permit program which does not require individual environmental review. The potential impacts, one commenter suggested, are "staggering" given that, according to statistics, the Corps grants most permit requests.

While supporters of an EIS suggest that finalizing this rule will result in significant new discharges that previously would not have occurred, the Agencies maintain that this is not the case. The rule seeks only to clarify the appropriate regulatory framework and thus we do not expect there to be any significant change in the nature and scope of discharges that will occur. As was indicated in the April 20, 2000, Federal Register notice of the proposed rule, the Corps

40

has prepared an environmental assessment of the final rule. This assessment concludes that the adoption of the final rule reconciles the Corps and EPA definitions of the term "fill material" by adopting an effects-based definition, and by excluding materials such as trash and garbage, in most circumstances. The Corps' environmental assessment indicates that the adoption of this rule will minimize the confusion that was previously caused by the differing Corps and EPA definitions of "fill material." The environmental assessment concludes that the adoption of this rule simply clarifies agency roles and responsibilities under the CWA. As such, it facilitates the proper regulation of prospective discharges into waters of the United States, as intended by the Act. The Corps' environmental assessment ultimately concludes that, since the adoption of this rule will not significantly effect the quality of the human environment, the preparation and coordination of an EIS is not required. The EA, included in the administrative record for this rule, explains further the rationale for the Corps' conclusion.

Nonetheless, we appreciate the commenters concerns as they pertain to the implementation of nationwide permit 21. The Corps will be proposing regional conditions to nationwide 21 in the Appalachian states to help reduce the environmental impacts resulting from authorized discharges under this permit.

*Ongoing Programmatic EIS.* In general, commenters stated concerns that the proposal to clarify the definition of "fill material" is being improperly initiated prior to the completion of an EIS assessing the environmental effects of mountaintop mining operations to waters of the United States and to fish and wildlife resources, within which, the proposed rule may be identified in the analysis as one alternative. One comment characterized the action as "ill-timed" and "aimed at providing an answer before the Draft EIS is issued." Another comment indicated that moving forward with the rule prior to the issuance of a Record of Decision on the EIS is not permissible under the CEQ regulations. Commenters also expressed concern over the impact the proposed rule may have on the adequacy and completion of the EIS, as well as its potential for adverse environmental impacts.

We do not agree that this proposal is being initiated improperly prior to the completion of this EIS. The defined action of the EIS is to

...consider developing agency policies, guidance, and coordinated agency decision-making processes to minimize, to the maximum extent practicable, the adverse environmental effects to waters of the United States and to fish and wildlife resources from mountaintop mining operations, and to environmental resources that could be affected by the size and location of fill material in valley fill sites.

The EIS presumes that the materials deposited as a result of practices associated with mountaintop mining will continue to be regulated as fill material by the Corps. It is believed that the actions undertaken as part of the EIS process, aimed, in part, at analyzing the permitting

41

Exhibit 26, page 44

process, will complement the implementation of the proposed rule by providing additional recommendations on improved coordination on permitting decisions as well as further evaluation of agency policies and practices with a view towards implementing additional regulatory improvements.

Furthermore, finalization of this rule should not await the completion of the Draft EIS. The Draft EIS is currently scheduled to be released in the Fall of 2002, followed by a 45 day comment period. Delays in the completion of the EIS have resulted from the time needed to secure adequate funding to initiate field studies, the desire to study the environmental effects of mountaintop mining operations over a series of seasons, and difficulties arising from the economic analysis being conducted by West Virginia University. Confusion amongst the regulated community currently exists in the day to day operations of the program in the field. This rule seeks to address that confusion by providing a uniform definition and should not be delayed by an EIS that already assumes this to be standard practice.

### H. Federalism

Two commenters expressed concern that, contrary to the preamble, the proposed rule did have profound federalism implications, and that omitting a discussion of these implications was a violation of Executive Order 13132, which requires meaningful input from state and local officials when a proposed rule has substantial direct effects on the distribution of power and responsibilities among various levels of government. They argued that by attempting to assert section 404 jurisdiction over State-permitted RCRA landfills, the proposal would result in the Corps potentially contradicting and "vetoing" land use and landfill siting decisions specifically left or delegated to the States and local government authorities. One of these commenters also expressed the view that, by requiring a federal "public interest" decision on the use of land in addition to a state decision, the Corps would be injecting itself into the area of land use, which is an area of regulation traditionally and intentionally left by Congress and the U.S. Constitution to state and local authorities.

One of the commenters also viewed the Ninth Circuit's decision in RII as ruling that Corps jurisdiction over solid waste landfill was prohibited because of federalism implications, pointing to RII as holding that jurisdiction was "unreasonable" because it was "duplicative," because it could lead to inconsistent decisions between State and federal agencies applying the same standards, and because the Corps' own regulations provided that state and federal wetland programs "should complement rather than duplicate one another." 151 F.3d at 1169. The commenters stated that changing the definition of "fill material" to include landfill structures would reintroduce the very duplication and inconsistent state and federal regulation that the Ninth Circuit held impermissible under RCRA and the CWA. At a minimum, the commenter argued, these federalism implications must be acknowledged, and state and local input sought, as the Executive Order requires.

42

In response, we refer you to section III. C.2 for a discussion of the *RII* case. Moreover, we note that Executive Order 13132, entitled "Federalism" (64 FR 43255, August 10, 1999), requires us to develop an accountable process to ensure "meaningful and timely input by State and local officials in the development of regulatory policies that have federalism implications." "Policies that have federalism implications" is defined in the Executive Order to include regulations that have "substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government." We continue to believe for the reasons explained in the preamble to the final rule that today's rule does not have such substantial direct effects, and thus does not have Federalism implications.

One of the commenters raising federalism concerns further indicated these concerns were especially significant as "the Corps has asserted 404 jurisdiction over virtually every water body, drainage and erosional feature," including isolated waters used by migratory birds. This commenter believed that the current proposal would regulate all solid waste landfills that affect any waters of the U.S., constituting a "nearly total duplication" of state RCRA Subtitle D programs.

In response we note that the test for jurisdiction under section 404 is whether there is a discharge of dredged or fill material into waters of the U.S., not whether the landfill "affects" waters of the U.S. Second, since this comment was made, the US Supreme Court ruled on January 9, 2001, that CWA section 404 jurisdiction does not in fact extend to non-navigable intrastate waters based solely on their use by migratory birds. Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers, 531 U.S. 159 (2001). The agencies issued a joint legal memorandum on January 19, 2001, to that effect which is available on EPA's Website at http://www.epa.gov/owow/wetlands/swanccnav.html. Today's rule does not address the scope of geographic jurisdiction under the CWA.

## I. Economic Effects of Proposal

A number of commenters expressed concern about the economic effects of the proposal on the surrounding communities or State or local economies, including concerns that economic impacts associated with the proposal were not evaluated in depth. Some of these comments expressed concern that economic impacts on timbering and farming were not addressed, while others noted the potential for impacts to commercial and subsistence fisheries, even in coastal areas. Others expressed concern that the proposal would result in people having to buy drinking water because their well water has either dried up or has been contaminated by mountaintop removal mining. Still others expressed concern that allowing mining companies to place waste in streams would cause serious harm to future economic growth plans in Appalachia. These comments indicated tourism and recreation are important to future economic growth in Appalachia and are also dependent on a heathy environment and clean water.

43

A number of commenters expressed concerns that local communities would suffer the economic costs from a destroyed environment and would require federal taxpayers to pay billions in cleanup costs. These comments stated that although there is a federal trust fund to pay for cleaning up old coal sites, there is no money for cleaning up new damage that coal and hardrock mines would cause under the proposed rule. They asserted the Department of the Interior estimates cleaning AML sites in America will cost over $8 billion, with over half for clearing out clogged streams and cleaning up water to make it drinkable.

We do not believe today's rule will result in significant economic effects. Neither the proposal or today's rule has the effect of authorizing the placement of waste material in waters of the U.S. Rather, it clarifies which regulatory regime, section 402 or section 404, is applicable. In addition, it does so in a way that is consistent with the current approach of using section 404 to regulate discharges of coal mining overburden.

Other comments asserted that allowing placement of mine waste in waters of the U.S. supports coal production cost savings that are economically short-sighted, resulting in primarily short-term job growth, while sacrificing natural surroundings and future water quality. (Some noted that mining jobs have actually declined despite increases in coal production.) Others argued that, by making it easier and less expensive to mine coal, the proposed rule would be harmful by encouraging inefficient infrastructure development and unsustainable levels of consumption, thus ensuring quicker depletion of coal resources, while ultimately impeding a transition away from fossil fuels. Several comments viewed the proposal as a subsidy and one recommended the alternative of allowing market forces to set the price of coal within the current regulations.

These comments address issues related to national energy policy and the role of coal in energy production. Today's rule addresses matters related to the applicability of section 404, and issues related to the appropriate role of coal or other fossil fuels in national energy policy are outside the scope of today's rulemaking.

## J. Suggested Alternatives or clarifications

### 1. Issue Guidance or revise MOA instead of modifying the rule

Some of the comments criticized the agencies for not considering less drastic alternatives to the proposed rulemaking. One comment, in particular, suggested that the agencies could have satisfied the goal of eliminating the potential abuse of the primary purpose test without the dramatic adverse effects associated with eliminating the test itself and the waste exclusion. Some alternative approaches included issuing guidance indicating that the Corps, rather than the applicant, would establish the primary purpose test of a proposed project. Another suggested alternative was issuing guidance clarifying how placement of heterogeneous solid waste and landfill liners should be regulated under sections 402 or 404, and RCRA. The commenter suggested that such guidance ban the placement of those materials in wetlands, as has been done

44

in Kentucky. Another comment asserted that the proposal was inconsistent with the existing 1986 MOA and suggested that the agencies clarify the MOA as an alternative means of eliminating regulatory confusion.

The agencies do not agree that their goals for this rulemaking could be accomplished through the issuance of guidance. First, the issuance of guidance would not alter the fact that the two agencies responsible for administering the section 404 program have different definitions for the same key jurisdictional term. Conforming the agencies' regulations can only be corrected through a rulemaking. Second, the programmatic issues created by the courts' analyses in the *RII* and *Bragg* cases stem from the regulatory language in the Corps' regulations, which is not amenable to being resolved by guidance. Finally, the agencies do not agree that the proposed rule contradicts the existing MOA.

## 2. Eliminate primary purpose but retain waste exclusion

Another suggested example of a more limited approach to revising the definition of "fill material" was eliminating the primary purpose test but retaining the waste exclusion. One group noted that this approach still would allow the Corps to regulate the use of wood chips and landfill liners under Section 404, while preventing the dumping of waste. Elimination of the primary purpose test without retention of the waste exclusion, argued commenters, would impermissibly extend the scope of the Corps' authority to permit waste disposal, even with the revised definition of "unsuitable fill material," to which one commenter referred as vague, narrow and porous.

Another commenter, representing several environmental groups, asserted that applying a purpose-based waste exclusion would not create additional burdens for the Corps, because analysis of "overall project purpose" and "basic project purpose" is already required under the section 404(b)(1) Guidelines. In fact, the comment noted that the identification of project purpose was an essential part of the practicable alternatives analysis – the heart of the 404(b)(1) Guidelines. The comment noted that the Corps' experience, plus an ample body of judicial decisions providing guidance on project purpose should be sufficient for the Corps to determine when the purpose of an activity is waste disposal. This comment suggested that the Preamble discussion of the difficulty associated with applying the waste exclusion called into question the Corps' ability to implement the Section 404 requirements, in general.

This comment recommends that the Corps amend the regulation to make clear that the determination of whether the project's purpose is waste disposal would be made by the Corps and EPA, and not the project applicant and further that the determination would be based on an independent evaluation of the project.

The agencies do not agree that amending our proposal to retain the waste exclusion but eliminate the primary purpose test is a better approach to defining "fill material." First, we believe that a definition that primarily focuses on the effect of the material on the aquatic resource as opposed to its purpose better fulfills the purposes of the CWA. Retaining a purpose test focused on waste is confusing and would interfere with the overall benefit of the effects based

45

approach. Second, any similarity between the analysis that is required to implement the waste exclusion and the 404(b)(1) Guidelines does not address the fact that the program has experienced some confusion over how and when to apply the waste exclusion in the Corps' definition. Although only 2 cases were identified in the preamble, this issue has come up on numerous occasions in the context of the permit program. When it arises in the context of general permits, project-specific application of the 404(b)(1) Guidelines is not undertaken, contrary to the suggestion of the comment. We do not agree that the difficulties that have arisen suggest that the Corps is not able to properly implement the program.

### 3. Clarify or delete effluent limitations guidelines

One commenter questioned the need for the proposed exclusion of materials covered by effluent limitation guidelines or NPDES permits, asserting that EPA has never had significant difficulties with the fact that its long-standing definition of fill material does not include such an exception. Several other commenters sought clarification of the discussion regarding the exclusion. Those commenters voiced concern that the discussion in the Preamble could be construed to exclude any and all materials from which subsequent runoff would be subject to effluent limitation guidelines, such as leach pads and tailings piles. Another commenter argued that the effluent limitation guidelines cited in the Preamble did not support the assertion that EPA generally regulates solid waste materials of a homogeneous nature, because the referenced effluent limitation guidelines apply to process wastewater or mine drainage, not solid materials. As such, the commenter found the reference confusing. A different commenter suggested that the exclusion based on effluent limitations include a specific effective date for such standards to be in place, to avoid a due process violation by excluding materials that are not currently covered or expected to be so within a reasonable time. An explanation has been provided earlier in this Preamble regarding materials not covered under section 404 permitting requirements. The determining factors do not include a distinction of either homogeneity or heterogeneity of the materials.

Although the (e)(2) language of the exclusion in the final rule has been clarified and ambiguous language referring to effluent limitation guidelines eliminated, EPA agrees that, where runoff constitutes stormwater, it would be covered under the section 402 program.. One commenter recommended that **the proposed (e)(2) exclusion language include not only discharges expressly authorized by an NPDES permit or covered by an effluent limitation guideline or standard, but also discharges associated with activities covered by a pollution prevention program implemented in connection with a facility's NPDES permit or as part of a facility's overall program for compliance with effluent limitations guidelines and standards. As discussed, we have modified the exclusionary language in the final rule to remove any ambiguity regarding its scope.**

### 4. Explain effect on treatment of RCRA landfills

46

Comments generally centered around the idea that the implementation of the proposed rule would add a layer of regulation to those activities already regulated under the Resource Conservation and Recovery Act (RCRA). One comment focused on the proposed rule's failure to provide, in explicit language, exceptions for those activities regulated under RCRA, as compared to that which was provided for Section 402 activities, while another recommended that the exclusion also apply to infrastructure associated with solid waste landfills. That same commenter asserted that the government incorrectly concluded that the rule does not have any economic impact which would require the Agency to develop a written economic statement. They maintained that part of the economic impact would be shouldered by the Corps as the implementation of the proposed rule would require the Corps to assess environmental impacts in an area not previously regulated by the Corps. These comments are fully addressed in the preamble to the final rule and in the discussion of the *RII* case.

**5. Modify reference to coal mining overburden in the definition of "discharge of fill material"**

A number of comments raised issues with respect to the proposal to include coal mining overburden in the definition of "discharge of fill material." Although one comment suggested that coal mining overburden and all other mining waste materials should be excluded from the definition of fill material, most of the comments argued that only referring to coal mining overburden was too narrow and misleading. They noted that this rule is intended to apply to coal mining as well as hard rock mining activities. These comments urged that the rationale behind the proposed rule as well as explicit statements in the April 2000 preamble that the agencies were not intending to change existing practice argued for broader language that more appropriately reflected the agencies' intentions. Suggested alternatives include "placement of coal mining overburden and coal refuse," "mining overburden and waste rock," " coal mining or other mining overburden," and "berms, or dams, associated with the sedimentation ponds." The thrust of these comments is that absent the inclusion of broader language in the rule, the implementation may continue to result in confusion and uncertainty for the regulated community. We have modified both the definition of "fill material" and "discharge of fill material" to make clear that this rule is not limited to coal mining. The definition of "fill material" includes "overburden from mining or other excavation activities;" the "discharge of fill material" includes "placement of overburden, slurry, or tailings or similar mining-related materials."

**6. Expand the unsuitable fill category to supplement the waste exclusion**

Several commenters suggested that the 'unsuitable fill' protocol described in the preamble to the proposed rule be expanded for use in other situations involving discharges into waters of the United States, such as waste disposal operations.

**As described, in the earlier section on unsuitable fill, the Corps and the EPA have abandoned further consideration the "unsuitable fill" protocol that was described in the preamble to the April 20, 2000 proposed rule. Instead, the final rule provides clearer more**

Exhibit 26, page 50

predictable guidance with respect to the types of materials that qualify as "fill material," and this has obviated the need for the "unsuitable fill" protocol. As such, there is no opportunity, and no need, to expand this category of prospective discharge materials.

7. Miscellaneous Suggestions and comments

a. Combine piling regulation in same section as new fill definition

Commenters requested that the definition of fill material and discharge of fill material clearly require the regulation of pilings and piling supported structures. One comment specifically referred to the regulation of "mothballed" ships used for entertainment. These comments expressed concern over the Corps' inconsistencies as they relate to the regulation of these discharges and objected to the removal of the reference to piling regulations. One commenter suggested the reorganization of the Corps regulations for easy reference to both the regulations pertaining to the definition of fill and pilings regulations.

The Agencies disagree that a specific reference to pilings and piling supported structures is necessary in the definition of fill material. The Corps' regulations indicate that "placement of pilings in waters of the United States constitutes a discharge of fill material and requires a Section 404 permit when such placement has or would have the effect of a discharge of fill material" (33 CFR 323.3(c)). However, this rulemaking is not a suitable forum for discussion regarding implementation of this regulation. The Corps does regard, as a matter of convenience and of logical consistency, the idea of combining these regulations as having significant merit. However, the final decision on implementing this suggestion will have to be deferred until such time as the Corps of Engineers publishes a consolidated version of its regulations. The Corps reserves the right to make all final decisions on the organization of regulations that it promulgates.

b. Create additional exemptions to compensate for the expansion in Corps jurisdiction

A few commenters suggested that one or more additional exemptions from regulation under section 404 of the CWA should be created in order to compensate for the expansion of jurisdiction that these commenters perceived would result from the adoption of the proposed rule.

We do not believe that either the rule proposed on April 20, 2000, or today's final rule constitutes an expansion of jurisdiction under the CWA. These rules simply sort the universe of prospective discharges into those that are regulated as "fill material," and those that are regulated as "all other pollutants" under the Act. Even if the adoption of a prospective rule arguably did represent some expansion of jurisdiction, we do not agree that additional exemptions should be created to compensate for that expansion. We believe that the criteria applied to any administrative interpretation of CWA requirements, jurisdiction,

48

and exemptions must relate exclusively to the intent of the law. As such, we believe that any consideration of the equity between the scope of CWA jurisdiction and those activities that are exempted is the exclusive province of the legislature.

### c. Effect on existing permits

Several commenters questioned the effect of this proposed rule on previously issued Corps of Engineers permits, and they expressed the concern that new criteria associated with the adoption of a revised definition of "fill material" would be imposed retroactively to previously authorized activities, in effect invalidating previously issued permits.

Today's rule only addresses the definition of fill material and the adoption of this rule will have no effect on existing permits.

### d. Effect of rule on treatment of stormwater

One commenter suggested that, in addition to subsection (e)(2) of the proposed rule (i.e., discharges covered by effluent limits and discharges covered by a section 402 NPDES permits do not require a section 404 permit), the definition should also explicitly exclude stormwater discharges that employ "approved best management practices in effect at the time of construction of the stormwater outfall," whether or not such discharges are covered under section 402 regulations. As discussed in earlier comment responses, two regulatory programs were established by the CWA serving distinct objectives and goals. Provided that construction activity mobilizes pollutants that impact the receiving water, this is activity that is subject to regulation under the section 402 NPDES program. This is clearly distinguishable from discharges of fill material that impacts a discernable disposal site by raising its bottom elevation or replacing waters of the U.S. with dry land subject to regulation under the section 404 program. However, any ambiguity caused by the language in the proposed rule regarding discharges subject to effluent guidelines or section 402 requirements has been removed by the deletion of this portion of the proposed rule's language.

### e. Clarify when conversions, diversions, and waste treatment systems can be used to avoid jurisdiction

Several comments raised issues about practices described as "conversion" and "diversion" of waters of the U.S. One commenter described the first practice as converting waters into non-waters by impounding them for waste treatment, while the second practice involves diverting a stream out of its channel, such that the newly created dry area is no longer jurisdictional and not subject to CWA regulation. One industry comment explained that the practice of diverting ephemeral and intermittent streams has been used by his company. Facilities and materials of various types are then placed in the former streambeds without being subject to CWA regulation because they are no longer waters of the U.S.

49

Two comments from environmental organizations suggested that these practices violated the letter and spirit of the CWA and that it should be made clear that such methods could not be used to avoid CWA jurisdiction. One of these two comments explained that the practice of diversion essentially involves turning a live stream into a "sterile concrete or earthen channel devoid of most or all of the aquatic life that existed previously." As such, the comment asserts that the practice destroys the natural structure and function of the stream ecosystem, and thus violates the CWA mandate to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." Moreover, this comment asserts that the practice of diversion violates both the designated uses and the anti-degradation policy elements of the water quality standards. The commenter argued that removing waters from their stream banks is not consistent with maintaining the minimum standard that waters be fishable and swimmable, nor with the requirement that all existing designated uses must be maintained.

These comments are outside the scope of the rule since they address the scope of geographic jurisdiction under the CWA and other requirements, whereas today's rule simply defines fill material.

f. Private appropriation of public waters

Two commenters expressed the view that the rule improperly allowed the private appropriation of public waters, for disposal of mining overburden and other waste, and construction of in-stream sediment ponds. They stated these waters are held in public trust and are designated for beneficial uses, one of which is not be waste transport. They asserted that in-stream sediment ponds convert the stream segment upstream of the ponds into unauthorized "mixing zones" for treatment and dilution of mine-related pollutants and settling of sediment from contaminated stormwater runoff, in derogation of State and Federal water quality standards.

We do not believe today's rule improperly allows private appropriation of public waters. Section 404 of the CWA expressly authorizes issuance of permits to authorize placement of dredged or fill material and does not condition authority to issue such permits based upon whether the project proponent is a private entity. With regard to use of waters for waste transport and mixing zones, these involve issues related to implementation of State water quality standards under Section 303 of the CWA, and are outside the scope of this rule. We do note, however, that Section 404 permits are subject to certification by the State under Section 401 as to compliance with water quality standards, and if the State has such concerns it is free to deny 401 certification. Readers are also referred to the previous preamble discussion of anti-degradation issues for related issues.

g  Consistency between definitions of discharge of dredged material and discharge of fill material

Several commenters indicated that there was a need for the rule to reconcile any

50

inconsistencies between the definitions of "discharge of dredged material" and "discharge of fill material." One of these commenters requested additional examples be included in the list of examples of fill material at section 323.2 (e)( 1), to avoid any misunderstanding that other materials can also displace wetlands and waters. The commenter also expressed concern that the term "dry land" in section 323 .2(e)(1)(i) might connote a limited intent of regulated activities as there are some activities that can physically displace wetlands and waters but may not necessarily result in dry land. They expressed support for an interpretation of the term "changing the bottom elevation of any portion of a water" in section 323.2(e)(1)(ii) that would include redeposits from mechanized land clearing.

We do not believe such a clarification in the rule is necessary since, as the commenter notes, the definition of fill material in today's rule embraces material that changes the bottom elevation of any portion of a water of the US. We do note that where redeposits associated with landclearing have the effect of fill, courts have found that a discharge of fill material has occurred. See, Avoyelles, supra; Borden Ranch Partnership v. U.S. Army Corps of Engineers, 261 F. 3d 810 (9th Cir. 2001).

Two commenters believed the proposal was inconsistent with the CWA, as construed in recent case law, including National Mining Association v. U.S. Army Corps of Engineers, 145 F.3d 1399 (D.C. Cir. 1998) (NMA); one of them also asserted that it was inconsistent with United States v. Wilson, 133 F.3d 251 (4th Cir. 1997). One reason given for inconsistency with NMA was that the court clarified that the reference in section 404 of the CWA to "discharge of dredged or fill materials" necessarily referred to the "addition" of material to the waters, and that "because incidental fallback represents a net withdrawal, not an addition of material, it cannot be a discharge." 145 F.3d 1404 (emphasis added). The commenter thus reasoned that excavation of a landfill cell, followed by the addition of a required two-foot thick liner results in a "net withdrawal" not an addition of material. The commenter also asserted that the Corps does not have CWA jurisdiction over "excavation" in wetlands, noting that excavation is governed only by section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, which extends only to waters subject to the ebb and flow of the tide or used or potentially used in interstate transport. This commenter also pointed to the LRI landfill, noting that the landfill cells were excavated in areas that contained isolated wetlands, that no excavated materials were placed back in any wetland areas on the site, and thus, that the Corps had no jurisdiction over the activity. Moreover, the commenter asserted the liner and other landfill infrastructure subsequently placed in the excavated area did not constitute a "net addition" of material, and that, regardless, the discharge site was no longer a "wetland," as a result of activities not within the jurisdiction of the Corps. Finally, the commenter noted that the solid waste itself was not jurisdictional material, because it was excluded from the definition of the "fill material."

The NMA decision addressed what constitutes a discharge of dredged material, not fill material, and thus is not germane to today's rulemaking. In addition, that decision turned on the interpretation of "addition" under the CWA, an issue not addressed by this rulemaking. Issues related to what constitutes non-regulable incidental fallback under the NMA decision have been

51

addressed in a separate rulemaking addressing the definition of "discharge of dredged material." 66 FR 4550. Similarly, assertions by the commenter related to Rivers and Harbors Act jurisdiction and whether excavation activities alter wetlands so as to defeat CWA jurisdiction are also outside the scope of this rulemaking. Interested readers are referred to the relevant regulations at 33 CFR Part 329 with regard to Rivers and Harbors Act jurisdiction and to 33 CFR 328.3(b) and 40 CFR 230.3(t) with regard to what constitutes a "wetland." With regard to US v. Wilson, that decision addressed the scope of geographic jurisdiction of the CWA, and thus also is not germane to today's rulemaking which deals with the matters related to the definition of "fill material." Readers are referred to the preamble's previous discussion of Solid Waste Agency of Northern Cook County for additional information on CWA geographic jurisdiction and isolated wetlands.

Another commenter requested that we revise the definition of "discharge of fill material" to provide, consistent with the approach in the definition of "discharge of dredged material," that incidental or de minimis addition of fill material does not require authorization under Section 404. The commenter reasoned that under the previous "purpose-based" definition of "fill material," such a de minimis exception was unnecessary because, as a practical matter, a discharge for the purpose of filling a water of the US was not likely to be de minimis. The commenter noted that an effects-based definition would encompass even de minimis discharges, because they would have the effect of raising the bottom elevation, even if only slightly. Accordingly, the commenter recommended including the following sentence under the definition of "discharge of fill material:"

> "Section 404 authorization is not required for any incidental addition of fill material that does not have or would not have the effect of destroying or degrading an area of waters of the United States as defined in paragraphs (d)(4) and (d)(5) of this section."

The de minimis concept that has been applied by the agencies in the context of discharges of dredged material relates fundamentally to determining when an "addition" of a pollutant occurs in a water of the U.S. Because dredged material originates from waters of the U.S., the question of what is an addition is particularly relevant in that context. The agencies have never applied this concept in the context of fill material, those questions are outside the scope of the narrow, definitional issues proposed in this rulemaking, and we decline to address them in this final rule.

52