SUE ELLEN WOOLDRIDGE
United States Department of Justice
Environment and Natural Resources Division
Washington, D.C.
DEBORAH M. SMITH
Acting United States Attorney
Anchorage, Alaska
MARK A. NITCZYNSKI
U.S. Department of Justice
Environmental Defense Section
1961 Stout Street - 8th Floor
Denver, CO 80294
Phone: (303) 844-1498
Fax: (303) 844-1350
mark.nitczynski@usdoj.gov
RICHARD L. POMEROY
Assistant United States Attorney
District of Alaska
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9
Anchorage, Alaska 99513
Telephone: (907) 271-5071

Attorneys for Defendants United States
Army Corps of Engineers, et al.

## UNITED STATES DISTRICT COURT
## DISTRICT OF ALASKA

| | | |
|---|---|---|
| SOUTHEAST ALASKA CONSERVATION COUNCIL, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. J05-0012 CV (JKS) |
| UNITED STATES ARMY CORPS OF ENGINEERS, et al., | ) ) ) | |
| Defendants. | ) ) ) ) | |

### UNITED STATES' OPPOSITION TO PLAINTIFFS' OPENING BRIEF, AND MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON COUNT ONE OF FIRST AMENDED COMPLAINT

SEACC v. United States Army Corps of Engineers,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment

TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

   I.    STATUTORY AND REGULATORY BACKGROUND . . . . . . . . . . . . . . . . 2

        A.   The Permitting Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        B.   The "Fill Rule" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        C.   Regulatory Guidance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

   II.   FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        A.   History of the Kensington Mine Proposals . . . . . . . . . . . . . . . . . . . . . 10

        B.   Evaluation of Alternatives for the Current Proposal . . . . . . . . . . . . . 12

        C.   Tailings Disposal and Permitting for the Kensington
            Mine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

   I.    REGULATING THE DISCHARGES HERE UNDER
        CWA SECTION 404 IS CONSISTENT WITH THE
        CWA, APPLICABLE REGULATIONS AND AGENCY
        GUIDANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        A.   "Fill Material" Under CWA Section 404(a) is
            Undefined and Ambiguous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        B.   The Permit Decision is Consistent With the Fill
            Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        C.   The Permitting Decision is Consistent With
            Regulatory Guidance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

   II.   THE FILL RULE IS VALID . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
        A.   The Issue Before the Court is the Corps'
            Interpretation of its Regulations, Not the
            Guidance Set Forth in the The Regas Mem . . . . . . . . . . . . . . . . . . . . 22

        B.   The Fill Rule is Consistent With the Clean
            Water Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

<u>SEACC v. United States Army Corps of Engineers</u>,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment    i

       1.    The Definition of "Fill Material" is
           Consistent With the Statutory Term . . . . . . . . . . . . . . . . . . . . . 24

       2.    The Fill Rule is Consistent With the
           CWA Section 402 and 404 Programs . . . . . . . . . . . . . . . . . . . . 24

       3.    The Section 306(e) Prohibition Does
           Not Apply Here . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

III.    THE "DRY TAILINGS FACILITY" ALTERNATIVE
      INCLUDED THE PERMANENT LOSS OF NUMEROUS
      ACRES OF WETLANDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

IV.    PLAINTIFFS' REQUESTS FOR RELIEF SHOULD BE
      DENIED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

<u>SEACC v. United States Army Corps of Engineers</u>,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment    ii

INTRODUCTION AND SUMMARY OF ARGUMENT

The Federal Defendants hereby respond to Plaintiffs' Brief on Count 1 ("Plfs' Brf.") [Dkt. No. 41-1] and move for summary judgment on that count. This case presents an Administrative Procedure Act challenge to a permit issued by the United States Army Corps of Engineers ("Corps") to Coeur Alaska, Inc. under section 404 of the Clean Water Act ("CWA" or "Act"). In their First Amended Complaint, Plaintiffs include only "Count One," which alleges that the permit is unlawful because discharges of slurried tailings from Coeur Alaska's Kensington Mine should not be regulated under section 404, which regulates discharges of "fill material."

In sum, the Corps' decision to regulate the discharges at issue here under section 404 of the CWA was proper. The fundamental issue before the Court –  whether the discharges of tailings from the Kensington Mine must be regulated under CWA section 402 or, instead, are properly regulated as fill material under section 404 – was left unresolved by Congress when it passed the Act. Congress did not define the term "fill material," thus leaving it to the Corps and EPA, the agencies that administer the Act, to define which discharges would be regulated as discharges of fill material. The agencies clarified that issue in the May 9, 2002 "fill rule," in which EPA and the Corps clarified the regulatory terms "fill material" and "discharge of fill material." Those definitions expressly cover the discharges at issue here. The Corps' permitting decision also is entirely consistent with guidance issued by EPA after promulgation of the fill rule.

In addition, the application of the fill rule to the discharges at issue here is consistent with the CWA. The text of the Act and the stark differences between the section 402 and 404 permitting regimes clearly support the regulatory definitions adopted jointly by the Corps and EPA. Further, the Act makes it clear that the "new source performance standard" for process wastewater from froth-flotation mills at gold mines applies only to effluent discharges regulated

SEACC v. United States Army Corps of Engineers,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment     1

under section 402, not to the discharges of fill material regulated under section 404. Because the Corps properly determined that the discharges of fill material here should be regulated under section 404, the new source performance standard upon which Plaintiffs so heavily rely does not apply to those discharges.

Further, the Corps selected this alternative for the mining operations because it concluded that the alternative selected was the least environmentally damaging. The water leaving the lake impoundment will be treated before being discharged to the downstream creek, and the treated waters must meet the terms of a Clean Water Act section 402 permit as well as state water quality standards. The water quality of Slate Creek and Berners Bay will be protected, including during mine operations. After mine closure, Lower Slate Lake will be reclaimed and its functions will be restored, including, for example, as habitat for Dolly Varden. In contrast, the tailings disposal method under the lead alternative not selected by the Corps involved creation of a tailings disposal facility in wetlands - that is, waters of the United States that receive special protection as "special aquatic sites" - and those waters of the United States and their functions would have been completely, permanently lost if the Corps had selected that alternative.

BACKGROUND

I.     STATUTORY AND REGULATORY BACKGROUND.

A.     The Permitting Process.

The CWA, 33 U.S.C. §§ 1251-1387, establishes a comprehensive program to restore and maintain the chemical, physical, and biological integrity of the waters of the United States. To achieve this goal, the CWA provides for two primary sets of measures for discharges from point sources: technology-based requirements and water quality-based requirements. See generally Arkansas v. Oklahoma, 503 U.S. 91, 101 (1992). EPA promulgates uniform national technology-based regulations, known as "effluent limitations guidelines," for categories and classes of point source discharges. Sections 301 and 304, 33 U.S.C. §§ 1311 and 1314. E.I. du

SEACC v. United States Army Corps of Engineers,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment     2

Pont de Nemours & Co. v. Train, 430 U.S. 112, 126-136 (1977).   Section 301(b)(1)(C), in turn, requires the establishment of limitations as necessary to meet the water quality standards established under CWA section 303(c).  33 U.S.C. §§ 1311(b)(1)(c), 1313(c).[1]

Neither the technology-based controls nor the water-quality based requirements, however, are self-executing under the Act.  See, e.g., EPA v. California ex rel. State Water Resources Control Bd., 426 U.S. 200, 204-205 (1976).  Rather, the permits issued to individual dischargers transform the generally applicable effluent limitations guidelines and water quality-based requirements into enforceable obligations.  See City of Milwaukee v. Illinois, 451 U.S. 304, 311 (1981); International Paper Co. v. Ouellette, 479 U.S. 481, 489 (1987); State Water Resources Control Bd., 426 U.S. at 205; 40 C.F.R. §§ 122.44(a), 122.44(d)(1).  In sum, "[t]he individual point sources fulfill their obligations under the Act by complying with the conditions incorporated by the permit grantors into the permits."  NRDC v. EPA, 537 F.2d 642, 644 (2d Cir. 1976).

Accordingly, Congress provided for the regulation of discharges of pollutants through permit requirements, and the CWA prohibits the discharge of any pollutant from any point source into the waters of the United States, except in compliance with specified provisions of the Act.  33 U.S.C. § 1311(a).[2]  In most cases, this means compliance with a permit issued under one

---

[1] Congress used water quality standards "as a supplementary basis . . . so that numerous point sources, despite individual compliance with effluent limitations, may be further regulated to prevent water quality from falling below acceptable levels."  EPA v. California ex rel. State Water Resources Control Bd., 426 U.S. 200, 205 n.12 (1976).

[2] A point source is "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, [or] container . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).  "Waters of the United States" include, inter alia: waters that "may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide; . . . intrastate lakes, rivers, streams (including intermittent streams), . . . wetlands . . . or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce . . .; [] [a]ll impoundments of waters otherwise defined as waters of the United States under this definition; [] [t]ributaries of waters identified in [the preceding paragraphs . . .; . . . [] [w]etlands adjacent to waters (other than waters that are themselves wetlands) identified in [the preceding paragraphs."  33 C.F.R. §

SEACC v. United States Army Corps of Engineers,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment    3

of the permit programs established by the Act.  The two principal permit programs are the National Pollutant Discharge Elimination System ("NPDES"), administered primarily by EPA under CWA section 402, 33 U.S.C. § 1342, and the section 404 permit program administered primarily by the Corps under CWA section 404, 33 U.S.C. § 1344.

Section 402(a) provides that, "[e]xcept as provided" in section 404, EPA may issue permits for the discharge of any pollutant into navigable waters where specified conditions are met.  33 U.S.C. § 1342(a).  All such NPDES permits must contain both: (1) technology-based controls, or effluent limitations, that reflect the pollution reduction achievable through particular equipment or process changes, without reference to the effect on the receiving water, see E.I. du Pont de Nemours & Co. v. Train, 430 U.S. at 126-36; and (2) where necessary, more stringent limitations representing that level of control necessary to ensure that the receiving waters achieve water quality standards.  See 33 U.S.C. §§ 1311(b), 1313, 1342(a).

Section 402(a)(1)(A) expressly requires that discharges permitted under the NPDES program must meet the applicable requirements under, inter alia, CWA section 306, which directs EPA to publish regulations establishing technology-based national standards of performance for effluent reduction from categories of new sources.  33 U.S.C. §§ 1316(a), (b), 1342(a)(1)(A).[3]  CWA section 306(e) specifies that, after promulgation of a national standard of performance applicable to a new source, "it shall be unlawful . . . to operate such source in violation of any standard of performance applicable to such source."  33 U.S.C. § 1316(e).  For gold mine operations that use a froth-flotation milling process – the process that would be used at the Kensington Mine – EPA issued a new source performance standard in 1982 for the discharge of process wastewater.  That standard provides in relevant part that "there shall be no

---

328.3(a); 40 C.F.R. § 230.3(s); 40 C.F.R. § 122.2.

[3]  "[N]ew source" generally refers to those sources constructed after promulgation of a national standard of performance applicable to the source.  33 U.S.C. § 1316(a)(2); 40 C.F.R. § 122.2.

SEACC v. United States Army Corps of Engineers,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment     4

discharge of process wastewater to navigable waters from mills that use the froth-flotation process . . . for the beneficiation of . . . gold." 40 C.F.R. § 440.104(b)(1).[4]

The CWA section 404 permitting program, in turn, addresses the two pollutants – "dredged or fill material" – that are not addressed in the section 402 NPDES program. 33 U.S.C. § 1344(a). CWA section 404(a) provides that the Corps may issue permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. 1344(a). "Fill material," however, is not defined in the Act.[5]

Under section 404, the Corps is authorized to issue individual or general permits. Individual permits are issued following a case-by-case evaluation of a specific project involving the proposed discharge. 33 C.F.R. 323.2(g). The Corps also may issue general permits on a State, regional, or nationwide basis for certain categories of activities. 33 U.S.C. § 1344(e). In this case, the Corps issued an individual permit.

Unlike section 402, section 404 does not require that discharges covered by section 404 meet the requirements of CWA section 306 or the other CWA sections listed in section 402(a)(1)(A). 33 U.S.C. § 1344(a). Instead, the section 404 permit process is governed primarily by regulations called "404(b)(1) Guidelines" that Congress directed EPA to develop in consultation with the Corps under CWA section 404(b)(1), 33 U.S.C. § 1344(b)(1). See 40 C.F.R. Part 230. The Corps also has developed regulations to implement the section 404 program. 33 C.F.R. Parts 320-330. Both sets of regulations reflect a special concern for the protection of wetlands and other waters of the United States, and both must be satisfied before a permit may be issued by the Corps. 33 C.F.R. §§ 320.4(a) & (b). Under the 404(b)(1)

---

[4] Process wastewater is defined as "any water which, during manufacturing or processing, comes into direct contact with or results from the production or use of any raw material, intermediate product, finished product, byproduct, or waste product." 40 C.F.R. § 122.2.

[5] The term "dredged material" means "material that is excavated or dredged from waters of the United States." 33 C.F.R. § 323.2(c); 40 C.F.R. § 232.2.

SEACC v. United States Army Corps of Engineers,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment    5

Guidelines, the Corps must consider a number of factors, including whether there are practicable alternatives to the proposed discharge. Specifically, the Guidelines require that the Corps deny a permit for the discharge of dredged or fill material if "there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a).[6] A section 404 permit generally cannot be issued for a "discharge of dredged or fill material . . . which will cause or contribute to significant degradation of the waters of the United States." 40 C.F.R. § 230.10(c). Importantly, in making findings of significant degradation, the Corps must place "special emphasis on the persistence and permanence of the effects" of the proposed discharge. Id.

Under 33 C.F.R. § 320.4(a)(1), the Corps also undertakes a "public interest review" of all permit applications, evaluating "the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest." In so doing, the Corps balances "benefits which reasonably may be expected to accrue from the proposal" against the proposal's "reasonably foreseeable detriments." Id. In this evaluation, the Corps considers, among other things, "the public and private need" for the proposed project and "the practicability of using reasonable alternative locations and methods to accomplish the objective" of the proposal. 33 C.F.R. § 320.4(a)(2)(i) & (ii). In issuing a permit, the Corps will include such special conditions that "are necessary to satisfy legal requirements or to otherwise satisfy the public interest requirement." Id. § 325.4(a), (c).

In addition, for section 404 permits, the state issues a certification pursuant to CWA section 401, 33 U.S.C. § 1341. As part of their section 401 certification process, states can

---

[6] Practicable" means "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." Id. § 230.3(q). "Aquatic ecosystem" is defined as "waters of the United States, including wetlands, that serve as habitat for interrelated and interacting communities and populations of plants and animals." Id. § 230.3(c).

SEACC v. United States Army Corps of Engineers,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment    6

impose additional conditions on the permit to provide additional protection to the waters at issue.

PUD No. 1 of Jefferson County v. Washington Dep't of Ecology, 511 U.S. 700, 711-12 (1994).

Here, the state of Alaska reviewed the proposed section 404 permit and issued a Certificate of

Reasonable Assurance, which listed 15 conditions that were incorporated into the section 404

permit.  AR 000028, 001098-1102.[7]

     B.    The "Fill Rule".

While the CWA defines "pollutant" broadly[8], the CWA does not define the term "fill

material.  On May 9, 2002, the Corps and EPA published the joint final fill rule to "clarify the

section 404 regulatory framework" and reconcile the differing definitions by adopting a uniform

definition of fill material.  67 Fed. Reg. 31,129 (May 9, 2002).[9]  The Corps and EPA explained

that they did not see "any indication that Congress intended to exclude discharges for purposes

of waste disposal entirely from coverage under section 404."  Id. at 31,134.  Rather, the Clean

Water Act "establishes the framework for regulating discharges into waters [of the United States]

and . . . the section 404 program is the most appropriate vehicle for regulating overburden and

other mining-related materials."  Id. at 31,135.

Accordingly, the jointly issued fill rule defines "fill material" as:

material placed in waters of the United States where the material has the effect of:
(i) Replacing any portion of a water of the United States with dry land; or (ii)

---

[7] "AR" refers to the Administrative Record filed with the Court on April 28, 2006, and the page cites are to the page numbers in the lower right corner of the documents in the AR.

[8] "The term 'pollutant' means "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste."  33 U.S.C. § 1362(6).

[9] Previously, the Corps and EPA had defined "fill material" differently.  The Corps had excluded from its definition "any pollutant discharged into the water primarily to dispose of waste."  33 C.F.R. 323.2(e) (2001).  See 42 Fed. Reg. 37,130 (July 19, 1977).  EPA used an effects-based test, defining "fill material" as "any 'pollutant' which replaces portions of the 'waters of the United States' with dry land or which changes the bottom elevation of a water body for any purpose."  40 C.F.R. 232.2 (2001)

SEACC v. United States Army Corps of Engineers,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment    7

Changing the bottom elevation of any portion of a water of the United States.

67 Fed. Reg. at 31,142.[10]  The Corps and EPA explained that the final rule "generally is intended to maintain our existing approach to regulating pollutants under either section 402 or 404 of the CWA," and that the final rule did not "change any determination we have made regarding discharges that are subject to an effluent limitation guideline and standards, which will continue to be regulated under section 402."  Id. at 31,135.  The Corps and EPA clarified that "EPA has never sought to regulate fill material under effluent guidelines."  Id.

Importantly, the Corps and EPA also revised the definition of "discharge of fill material" in the final fill rule by, among other things, specifically including the "placement of overburden, slurry, or tailings or similar mining-related materials."  Id. (emphasis added).

C.     Regulatory Guidance.

In May, 2004, after consultation with the Corps, EPA issued guidance specifically addressing the application of the fill rule to the Kensington Mine.[11]  May 17, 2004 Memorandum from Diane Regas, James A. Hanlon, Geoffrey H. Grubbs to Randy Smith ("Regas Mem."), AR 006473-77.  The Regas Mem. summarized the results of the agencies' analysis as follows:

> EPA and the Corps agree that the discharge of fill material to construct the dam for a tailings impoundment as well as the discharge of mine tailings into the impoundment is subject to permitting under CWA section 404, which governs the discharge of dredged or fill material.  EPA and the Corps also agree that any discharge of pollutants from the impoundment to a downstream water (such as Slate Creek in the Kensington project) is subject to CWA Section 402, the National Pollutant Discharge Elimination System ("NPDES") program.

_____

[10]  The final rule eliminated from the proposed definition of fill material the exclusion of "discharges covered by proposed or final effluent limitations guidelines and standards under sections 301, 304 or section 306 of the Clean Water Act . . . or discharges covered by an NPDES permit issued under section 402."  67 Fed. Reg. at 31,142.

[11]  While the issue arose in the context of the revised proposal for the Kensington project, the regulatory approach set forth in the guidance is generally applicable to other comparable mining proposals.  Regas Mem. at 1, n.1, AR 006473.

SEACC v. United States Army Corps of Engineers,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment          8

Regas Mem. at 2, AR 006474.

The Regas Mem. explained that this result is clear from the text of the fill rule:

> We believe that the text of the rule makes clear that mine tailings placed into impounded waters of the U.S., as proposed by the Kensington mine project, are regulated under section 404 of the CWA as a discharge of fill material, and that effluent discharged from the impoundment to a downstream water, such as Slate Creek[,] is covered by section 402. Mine tailings placed into the proposed impoundment will have the immediate effect of filling the areas of water into which they are discharged and therefore fall within the scope of section 404.

Regas Mem. at 3, AR 006474. In addition, the agencies' conclusion is confirmed by the rule's preamble, which provided that EPA would continue to regulate under section 402 effluent discharges, such as those from the tailings impoundment to Slate Creek, that might have only an incidental filling effect. As the Regas Mem. explained:

> This result is confirmed by the preamble to the rule which explained the dividing line between section 402 discharges and section 404 discharges by noting that EPA would continue to regulate under section 402 "discharges (such as suspended or settleable solids) [that] can have the associated effect, over time, of raising the bottom elevation of a water due to settling of waterborne pollutants." 67 Fed. Reg. 31135. Here, the effluent discharged from the impoundment into Slate Creek will contain pollutants in the form of suspended and settleable solids, materials that will have, at most, an incidental filling effect. The addition of those pollutants to the Creek from this impoundment associated with an industrial operation would therefore be subject to regulation under section 402.

Regas Mem. at 2-3, 006474-75. The Regas Mem. also clarified that state water quality standards would need to be met for the section 402 discharges to Slate Creek, but would not need to be met for the section 404 discharges to Lower Slate Lake. Id. at 2, 4, AR 006474, 006476.

The Regas Mem. also addressed the issue of whether effluent limits, such as the new source performance standard for process wastewater from froth-flotation mills at gold mines, would apply to the tailings discharges regulated under section 404. Because the tailings discharges would be regulated under section 404, "the regulatory regime applicable to discharges under section 402, including effluent limitations guidelines and standards, such as those

SEACC v. United States Army Corps of Engineers,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment    9

applicable to gold ore mining (see 40 C.F.R. part 440, Subpart J), do not apply to the placement
of tailings into the proposed impoundment.  See 40 C.F.R. § 122.3(b)."  Regas Mem. at 3, AR
006475.

II.    FACTUAL BACKGROUND

    A.    History of the Kensington Mine Proposals.

    The Kensington mine is located northwest of Juneau, Alaska, between Berners Bay to the
east and Lynn Canal to the west, on both private lands and on the Tongass National Forest.  The
United States Forest Service ("Forest Service" or "USFS") has classified the lands surrounding
the Kensington mine as "Modified Landscape (ML) with a minerals overlay."  AR 003624,
003626.  "The ML prescription acknowledges the previous gold mining activities in the area."
AR 003498.  "Goals of the minerals designation include '[t]o encourage the prospecting,
exploration, development, mining, and processing of locatable minerals in areas with the highest
potential for mineral development.'" AR 003624.

    In July, 1992, the Forest Service approved a Plan of Operations ("POO") for the
Kensington Gold Project.  AR 000009.  The POO called for ore processing with on-site
cyanidation, an on-site tailings impoundment, an onsite camp for housing workers, marine
discharge of effluent to Lynn Canal, and various support facilities.  Id.  The mine workings were
located within the Lynn Canal watershed, or west side of the area.  AR 000008, 003357.  The
support facilities for the mine were to be located near Comet Beach on Lynn Canal, which was
to serve as the access point for the mine.  AR 000008.  In connection with this proposal, the
Corps evaluated a CWA section 404 permit application for the creation of a tailings
impoundment, and the disposal of mine tailings behind that dam, but never issued a permit for
that facility.  AR 000009, 003385.

    In May, 1998, the USFS approved a revised POO for the Kensington Gold Project, based
on a modified plan submitted the previous year.  AR 003357.  The modified plan called for

SEACC v. United States Army Corps of Engineers,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment    10

off-site processing of gold concentrate derived from a flotation process so that no cyanide would be used on site for ore processing.  AR 000009.  The plan also called for the discharge of slurried mine tailings through a pipeline into a "dry tailings facility," a tailings facility to be created in wetlands.  Id.  In addition, the slurry would be piped to a dewatering plant before the tailings were placed in the dry tailings facility, and the reclaimed water would be returned to the mill for reuse.  Id.  The mine would produce about 26 million tons of tailings, approximately 25% of which would be backfilled into the mine in a wetted cement mixture, or paste.  AR 000006, 003358.  The proposal also included a camp for on-site housing of the workers.  AR 00009.  Like the 1992 proposal, all of the mine workings, including the dry tailings facility, were to be located near Comet Beach within watersheds draining to Lynn Canal.  AR 000009, 003357.  In January, 1998, the Corps issued a CWA section 404 permit to Coeur Alaska, Inc. ("Coeur Alaska") for the dry tailings facility and support infrastructure under this proposal.  AR 000009, 008738-41.  In May, 1998, EPA issued to Coeur Alaska a CWA section 402 permit for effluent discharges.  However, the mine was not developed under this plan of operations.

After the Corps and EPA issued the 1998 permits, Coeur Alaska obtained control of the Jualin mine site, located to the east, and then submitted a revised proposal to the USFS in November, 2001.  AR 000009.  Under this revision, the marine dock facility, the mill, access road, and tailings storage facility were to be located in the Slate Creek and Johnson Creek drainages within the Berners Bay watershed.  AR 003330, 003357.  The revised proposal modified site access so that the primary access to the mine site would be from the Jualin side via a marine dock facility at Slate Creek Cove off of Berners Bay.  AR 000010.  The revised proposal also eliminated the dry tailings facility in favor of placing the tailings into a tailings impoundment to be created in Lower Slate Lake.  Id.  Under the revised proposal, Coeur Alaska would extract only higher-grade ore and would produce a vastly reduced volume of tailings (7.5 million tons), approximately 40% of which would be backfilled.  AR 000010, 003358.  As with

SEACC v. United States Army Corps of Engineers,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment    11

the prior proposal, the ore would go through a flotation circuit and the concentrate would be shipped offsite for processing.  AR 000010.  Other than some temporary on-site housing during construction, the on-site housing camp was eliminated, and a daily commute by ferry across Berners Bay for the mine workers was proposed.  AR 000010, 003374.

       B.      <u>Evaluation of Alternatives for the Current Proposal</u>.

The Corps examined two sets of alternatives during its evaluation of the CWA permit application for the Kensington mine project.  The first set, which included Alternatives A and A1 through A3, was based on the alternative that previously was permitted by the Corps in 1998. AR 000011-13.  All of these "A" alternatives included the location of milling and other mine components at the Kensington Mine site adjacent to Lynn Canal.   These alternatives also included a work camp on site for more than 250 workers, with weekly transport of workers by helicopter, and the barging of supplies to and from a pre-existing marine terminal at Comet Beach.  AR 000011.  All of these alternatives involved construction and use of the dry tailings facility in wetlands, and the filling of other wetlands for other mine facilities.  <u>Id.</u> Approximately 25% of the tailings would be put back into the ground as backfill.  <u>Id.</u>  At closure, the dry tailings facility would be capped and revegetated, but the wetlands on which that facility was constructed would be permanently converted to uplands, with total loss of those wetland functions.  AR 000011-12, 000020-21.  The significant difference among the "A" alternatives was the different size of the dry tailings facility as a result of mining higher grades of ore, which would result in progressively smaller volumes of ore processed and tailings generated.  AR 000012.  The Corps determined that the various "A" alternatives would impact from 187 to 268 acres of wetlands, and that the net permanent loss of waters of the United States, after reclamation was completed for wetland areas other than the dry tailings facility, would range from 108 to 164 acres.  AR 000012-13.

The second set of alternatives consisted of Alternatives B, C and D.  Each of these

<u>SEACC v. United States Army Corps of Engineers</u>,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment   12

alternatives involved the location of milling operations and other mine components at the Jualin Mine site location within the Berners Bay watershed, as opposed to the Kensington Mine site adjacent to Lynn Canal. AR 00008, 000010. Each incorporated a high-grade mining technique that would result in smaller volumes of ore processed and mine waste than what was proposed in 1992 and 1997, and involved backfilling of approximately 40% (3 million tons) of the tailings generated. AR 000013-15, 003358. Each of these alternatives included the discharge of slurried tailings to the wet tailings storage facility at Lower Slate Lake, and the construction of a marine terminal at Slate Creek Cove for the daily transport of personnel and the export of ore concentrate for off-site processing. AR 000010, 000013-14. These alternatives involved impacts to waters of the United States in amounts varying slightly, from approximately 97 to 118 acres. AR 000014-15. However, the permanent net loss of filled waters of the United States, after reclamation, was the same for each: 3.44 acres. AR 000014-15.[12]

The destination point for the crew shuttles departing from the mine would be a marine terminal at Cascade Point, for which the Corps issued a separate CWA section 404 permit to Goldbelt, Inc. ("Goldbelt"). AR 000004, 000013. Under that permit, Goldbelt is authorized to fill 1.3 acres of waters of the United States . Thus, including the Cascade Point terminal fill yields a net loss of filled waters of the United States for alternatives B, C and D of 4.74 acres. AR 000014-15.

Alternative B was Coeur's original proposed plan in 2004. It included the recycling of water from Lower Slate Lake back to the mill. AR 000014. Alternative C was similar to Alternative B, except that: (1) it included a diversion channel to divert water around the lake impoundment and back into Slate Creek downstream of the lake; (2) it eliminated a barge ramp

---

[12] Approximately 39 acres of additional wetlands would be converted to other waters of the United States as the lake elevation rose, and approximately 15 acres of emergent wetlands and vegetated shallows would then develop around the rim of the lake. ROD at AR 000013, 000022.

SEACC v. United States Army Corps of Engineers,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment    13

from the Slate Creek Cove marine terminal design; and (3) the recycle circuit that would recycle water from the TSF back to the mill was eliminated. Id.

Alternative D was not listed in the Forest Service's Draft Supplemental Environmental Impact Statement for the project. AR 000015. Instead, it was developed as a result of concerns and issues raised after publication of the DSEIS. Id. Alternative D was similar to Alternative C, but included several changes to respond to concerns raised about water quality in Slate Creek and Lower Slate Lake: (1) it included a stream diversion pipeline to divert waters from Slate Creek around the lake impoundment and back into Slate Creek below the lake; (2) it required that water from Lower Slate Lake be treated at a "reverse osmosis" water treatment plant before the waters were emptied into Slate Creek downstream of the impoundment; and (3) it required the capping of lake bottom sediments after closure of the mine "unless the operator can demonstrate that the tailings would not cause contaminant release after closure." AR 000015. See AR 003769,  003357. Of the second set of alternatives, Alternative D required the most environmental protections.

Ultimately, the Corps concluded that alternative D had the least environmental impact of the alternatives considered and selected that alternative. AR 000010, 000023-24. "The Corps conclude[d] that Alternative D is the least environmentally damaging practicable alternative because the impacts to the aquatic system are less harmful than the impacts of the alternative A variants, which include permanent wetland losses, and it incorporates a water treatment system to ensure water quality is met." AR 000024. In reaching this conclusion, the Corps' evaluation "place[d] special emphasis on the persistence and permanence of the effects." Id. "The permanent loss of wetland functions and values in the Alternative A variants is more damaging and outweighs the temporary losses to the lake and its associated functions and values." Id.

C.     Tailings Disposal and Permitting for the Kensington Mine.

After the ore is extracted from the ground at the Kensington Mine, it would be processed

SEACC v. United States Army Corps of Engineers,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment     14

through crushing, grinding, flotation, thickening and filtration.  AR 003360-61.  <u>See also</u> AR 000021.  After the ore is crushed and ground, it would be fed to the flotation tanks in slurry form, where air, conditioners and frothing agents would be added to cause the gold-bearing minerals to attach to air bubbles at the top of the tank.  AR 003360-61.  The gold-bearing froth would then be skimmed off and further concentrated in additional flotation tanks.  AR 003360-61. Most of the chemicals added to the system would stay in the flotation tanks or be removed with the flotation concentrate rather than being discharged with the tailings.  <u>Id.</u>  Similarly, most of the other metals would be removed from the system along with the gold concentrate rather than being discharged with the tailings.  <u>Id.</u>  <u>See also</u> AR 000005.  Following the final flotation, the ore concentrate would be dewatered and placed in specialized, sealed marine transport containers for shipment to a facility outside Southeast Alaska for further processing.  AR 000005, AR 003360-61.  No cyanide processing would take place at the Kensington Mine or elsewhere in Southeast Alaska.  AR 000005, 000021.

The "tailings" are the solid material left in the bottom of the flotation tanks after the gold-bearing material has been removed.  AR 003362.  Using the "high-grade" mine operations, approximately 40% of the tailings would be backfilled to the mine, leaving approximately 4.5 million tons of tailings to be discharged into the Lower Slate Lake impoundment (compared to 20 million tons of tailings that would have been placed in the dry tailings facility under Alternative A).  AR 000007; AR 003358, 00362, 003367.  The tailings would be transported through a 3.5 mile, double-walled, high-density polyethylene pipeline approximately 6 inches in diameter to the lake impoundment.  AR 003364.  The tailings would be combined with liquid in a slurry so that the tailings can be transported through the gravity-fed pipes.  <u>Id.</u>  The solid component of the slurry (<u>i.e.</u>, the tailings) would comprise approximately 55% of the slurry.

Before the tailings slurry left the mill, a polymer and flocculant would be added to agglomerate the smaller tailings and enhance settling of the tailings once they were deposited

<u>SEACC v. United States Army Corps of Engineers</u>,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment    15

into the lake impoundment.  AR 003364.[13]  The tailings slurry would be discharged from the bottom of the submerged pipe and through perforations in that pipe.  Id.  The underwater tailings pipe would be moved periodically to ensure equal distribution of the tailings.  Id.  The tailings would be placed at a depth that would prevent remobilization of the tailings.  AR 000022.  Upon closure of the mine, the tailings would fill the lake to its current ordinary high water mark, thus reaching a depth of approximately 50 feet.  AR 000013, 003453.  At that time, the lake would have grown to approximately 62 acres from its current size of 23 acres, and will be approximately 33 feet deep over the top of the tailings.  AR 000013.[14]  The discharge of tailings to the lake impoundment would be limited to the pre-specified volume of 4.5 million tons.  See AR 006285, AR 000068.  The tailings would be required to be tested quarterly to ensure that there are no significant deviations from the original tailings analysis that might affect monitoring, closure requirements, water quality or any other permit condition.  AR 000022, 000067-68.

It is anticipated that most aquatic life in the Lower Slate Lake would be lost during mining operations, primarily due to being covered with the discharged material.  AR 000021-22, 003575.  Tests on the tailings have shown that they will not generate an acid discharge or metals leachate.  AR 000030.  While the pH around the discharge pipe would be be toxic to the aquatic environment, this would dissipate very rapidly.  AR 000022.  Reclamation of the 62-acre lake, including capping of the tailings, is required as part of the project.  AR 000013, 000015, 000022-

---

[13]  The added materials are not toxic and would have no effect on water quality other than the benefit of enhancing the settling of the fine material.  AR 003364.

[14]  The increased lake area at closure is expected to consist of approximately 47 acres of deepwater habitat and 15 acres of shallow-water habitat.  AR 000013.  The 15 acres of shallow-water habitat is expected to convert over time to wetlands or vegetated shallows.  Id.

SEACC v. United States Army Corps of Engineers,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment    16

23.[15]  As a result, it is expected that the lake would recover over time, and would provide at least

equivalent aquatic habitat and productivity as it does currently.  AR 000022-23, 003573-76.

This includes habitat for Dolly Varden char and other aquatic organisms.  AR 000022-23,

000069, 003573-76.   Further, the 15 acres of emergent wetlands and vegetated shallows along

the rim of the lake will be much more valuable as aquatic habitat than the permanently filled

wetland for the dry tailings facility under the "A" alternatives.  AR 000022.

       In addition, Mid-Lake East Fork Slate Creek, an upstream tributary of Lower Slate Lake,

would be diverted around the lake impoundment by a pipeline.  AR 00367.  Further, a "reverse

osmosis" water treatment system would be constructed to remove solids and metals from the

lake impoundment water before any of that water is allowed to enter downstream waters.  AR

000015, 003367.  The treated, high quality water would be transported from the treatment plant

to the diversion pipeline, and it would then flow via a spillway to East Fork Slate Creek,

downstream of the lake, eventually joining Slate Creek and entering Berners Bay.  AR 000005,

003367.  The discharges of the treated, high quality water will be subject to a CWA section 402

NPDES permit and will need to meet state water quality standards.  AR 000005.[16]

## STANDARD OF REVIEW

       Under Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837, 842 (1984), courts first determine

"whether Congress has directly spoken to the precise question at issue."  If the statute is silent or

ambiguous on the specific issue, however, courts will apply the second step of Chevron, and

grant deference to the agency's construction of the statute if it is "reasonable and not in conflict

with the expressed intent of Congress."  Leslie Salt Co. v. United States, 896 F.2d 354, 357 (9th

---

[15] A reclamation bond on the operation is being held to ensure that the lake is reclaimed in
accordance with the approved plans.  See AR 000005.

[16]  The State agreed in its CWA section 401 certification that the water discharged from the
tailings disposal facility to East Fork Slate Creek, which was permitted under a CWA section
402 NPDES permit, would meet state water quality standards.  AR 001101.

SEACC v. United States Army Corps of Engineers,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment    17

Cir. 1990) (quoting <u>United States v. Riverside Bayview Homes</u>, 474 U.S. 121, 131 (1985)); <u>see also</u> <u>Chevron U.S.A., Inc. v. NRDC</u>, 467 U.S. at 843-45.  Particular deference is due "where the Agency's decision on the meaning or reach of the Clean Water Act involves reconciling conflicting policies committed to the Agency's care and expertise under the Act."  <u>Rybachek v. EPA</u>, 904 F.2d 1276, 1284 (9th Cir. 1990).

Further, in reviewing the Corps' action under its regulations, the Corps' interpretation of its regulations "is controlling unless plainly erroneous or inconsistent with the regulation." <u>Kentuckians for the Commonwealth, Inc. v. Rivenburgh</u>, 317 F.3d 425, 439 (4th Cir. 2003) (quoting <u>Auer v. Robbins</u>, 519 U.S. 452, 461 (1997) (internal quotation marks omitted)).  Thus, the Corps' interpretation of its own regulation is entitled to deference "amounting to a plain error standard."  <u>Leslie Salt Co.</u>, 896 F.2d at 357; <u>Montana Power Co. v. EPA</u>, 608 F.2d 334, 344 (9th Cir. 1979); <u>see also</u> <u>Udall v. Tallman</u>, 380 U.S. 1, 16 (1965).[17/]

ARGUMENT

I.     REGULATING THE DISCHARGES HERE UNDER CWA SECTION 404 IS
       CONSISTENT WITH THE CWA, APPLICABLE REGULATIONS AND AGENCY
       GUIDANCE.

The Corps properly determined that the slurried tailings to be discharged to the Lower Slate Lake impoundment should be regulated under CWA section 404.  The CWA does not define the term "fill material."  However, the regulations promulgated by the Corps and EPA in the fill rule clearly provide that the slurried tailings at issue here are to be regulated under CWA section 404.  The regulatory guidance in the Regas Mem. also confirms that, under the fill rule, the discharges from the Kensington Mine constitute fill material that should be regulated under section 404.

A.     "Fill Material" Under CWA Section 404(a) is Undefined and Ambiguous.

_____

[17/]  This requirement of "binding deference to agency interpretations of their own regulations" is known as <u>Seminole Rock</u> deference because it was first articulated in <u>Bowles v. Seminole Rock & Sand Co.</u>, 325 U.S. 410 (1945).  <u>Kentuckians for the Commonwealth, Inc.</u>, 317 F.3d at 439.

<u>SEACC v. United States Army Corps of Engineers</u>,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment     18

Congress defined many of key terms in the CWA, including "pollutant," "point source," and "discharge of a pollutant." <u>See</u> 33 U.S.C. § 1362(6), (12), (14). However, it did not define the term "fill material." 33 U.S.C. § 1344(a). Instead, Congress left it to the administering agencies to fill in the gap by defining the term. <u>See</u> <u>Kentuckians</u>, 317 F.3d at 441 ("[b]ecause the Clean Water Act does not define 'fill material,' . . . the statute is silent on the issue . . . and such silence 'normally creates ambiguity.'") (quoting <u>Barnhart v. Walton</u>, 535 U.S. 212 (2002)).[18]

B.     The Permit Decision is Consistent With the Fill Rule.

Plaintiffs' argument that the discharges here should be regulated under section 402 is contrary to the express text of the fill rule. As clarified there, both the Corps and EPA define "fill material" as "material placed in waters of the United States where the material has the effect of: (i) [r]eplacing any portion of a water of the United States with dry land; or (ii) [c]hanging the bottom elevation of any portion of a water of the United States." 67 Fed. Reg. at 31,142. <u>See</u> 33 C.F.R. § 323.2(e)(1); 40 C.F.R. § 232.2. There is no dispute that the tailings would have an immediate and substantial filling effect. Indeed, upon closure of the mine, the tailings would fill the lake bottom to a depth of approximately 50 feet. AR 000013. Thus, the tailings obviously will have the clear effect of "[c]hanging the bottom elevation of" Lower Slate Lake, and these discharges clearly meet the definition of fill material. 33 C.F.R. § 323.2(e)(1); .F.R. § 232.2.

---

[18] Plfs' Brf. largely ignores the fact that "fill material" was left undefined by Congress, and instead focuses on selections from the legislative history of the CWA. The excerpts highlighted by Plaintiffs focus on general statements about water pollution and that dredged spoil should not be treated like other pollutants subject to the section 402 NPDES permit program, but rather handled through a separate permit program. Plfs' Brf. at 12, 16-17. For example, Plfs' Brf. refers to a statement by Senator Ellender that "the disposal of dredged material does not involve the introduction of new pollutants." Plfs' Brf. at 17. Those statements, however, do not address the term "fill material," the nature of its characteristics or its relationship to pollutants addressed by section 402. In addition, it is unclear precisely what Senator Ellender meant as to dredged spoil, in part because dredged spoil may well raise environmental concerns at a new location. It is clear, however, that the legislative history cited by Plaintiffs does not discuss Congress' decision to regulate "fill material" under the section 404 program, and that history does not resolve the ambiguity created by Congress when it chose not to define "fill material."

SEACC v. United States Army Corps of Engineers,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment     19

Further, the discharges of the tailings clearly fit within the regulatory definition of "discharge of fill material."  In the final version of the fill rule, to add even more clarity regarding which permitting program should be used to regulate such mine tailings, the term "discharge of fill material" was revised to include the "placement of overburden, slurry, or tailings or similar mining-related materials."  67 Fed. Reg. at 31,135.  Discharges of tailings obviously are covered in the definition, as is "slurry."  Here, the tailings will be discharged in slurry form so that they can be transported through the pipes to the lake bottom.  AR 000008, 003364.  Thus, there can be no reasonable dispute that the discharges meet the definition of "discharge of fill material."

Plaintiffs argue that the Corps failed to follow the language in the preamble to the final fill rule regarding the regulation of discharges subject to effluent limitation guidelines and standards.  Plfs' Brf. at 24-25, 31.  Plaintiffs' argument is wrong for several reasons.  First and foremost, as discussed above, plaintiffs' argument is contrary to the text of the regulations clarified in the fill rule.[19]

Second, even the preamble language on which Plaintiffs rely so heavily does not support their claims.  The preamble provides that the final rule "generally is intended to maintain [the Corps' and EPA's] existing approach to regulating pollutants under either section 402 or 404 of the CWA," and also clarifies that certain waste disposal, including mining-related materials, should be regulated under CWA section 404.  67 Fed. Reg. at 31,134, 31,135.  The preamble also provided that "EPA has never sought to regulate fill material under effluent guidelines."  Id.  Thus, while the preamble stated that, as a general matter, the existing permitting practices under

---

[19]  As discussed below, the Corps' permit decision is consistent with the preamble.  Nonetheless, it should be borne in mind that the preamble does not alter the terms of the rule itself.  See National Wildlife Fed'n v. EPA, 286 F.3d 554, 569-70 (D.C. Cir. 2002) (court rejects suggestion that a preamble statement can constitute a change in an unchanged regulatory definition).  While the preamble can contribute to the general understanding of the agency action, it cannot change a regulatory provision.  Id. at 569.  Here, the regulatory provisions at issue clearly provide that the discharges of tailings to the lake impoundment are to be regulated under section 404.

SEACC v. United States Army Corps of Engineers,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment     20

sections 402 and 404 would not change, the preamble also provided that, under the effects-based

approach, fill material regulated under section 404 would include certain mining-related waste

materials, such as tailings.  Further, by pointing out that EPA and the Corps had not sought to

regulate fill material under effluent guidelines, the preamble clarified that effluent guidelines like

the new source performance standard upon which plaintiffs rely would not apply to fill material

such as the tailings at issue here.  Thus, the permitting decision is entirely consistent with the fill

rule and the preamble to the fill rule.

       C.     <u>The Permitting Decision is Consistent With Regulatory Guidance</u>.

The Corps' permit is also consistent with EPA's regulatory guidance, which specifically

addressed the application of the fill rule to the Kensington Mine project.  That guidance,

embodied in the Regas Mem., summarized as follows: "EPA and the Corps agree that . . .  the

discharge of the mine tailings into the impoundment is subject to permitting under CWA section

404, which governs the discharge of dredged or fill material."  Regas Mem. at 2, AR 006474.

EPA expressly based its conclusion on the fill rule:

> We believe that the text of the rule makes clear that mine
> tailings placed into impounded waters of the U.S., as proposed by the
> Kensington mine project, are regulated under section 404 of the CWA as a
> discharge of fill material, and that effluent discharged from the
> impoundment to a downstream water, such as Slate Creek[,] is covered by
> section 402.  <u>Mine tailings placed into the proposed impoundment will
> have the immediate effect of filling the areas of water into which they are
> discharged and therefore fall within the scope of section 404.</u>

Regas Mem. at 2-3, AR 006474-75 (emphasis added).  The determination of EPA and the Corps

is compelled "under both the plain language of the [fill] rule and the Agencies' interpretation of

the regulation in its preamble."  <u>Id.</u> at 3, AR 006475.

At bottom, the issue here is a regulatory question, unresolved by the statute, of which

permitting regime is more appropriate for the discharge of the tailings.  The Corps and EPA

effectively answered the question in the final fill rule when they harmonized the definition of fill

material with the effects-based approach and added the placement of "slurry, or tailings or

similar mining-related materials" to the definition of "discharge of fill material."  EPA, in close coordination with the Corps, further clarified the answer in the Regas Mem., and the Corps acted in accordance with those regulatory determinations here.  Thus, the Corps was correct when it regulated the discharges of slurried tailings under section 404 rather than section 402.  Moreover, the Corps' determination under its regulations clearly was not "plain error."  As a result, plaintiffs' challenge to the determination to permit the tailings discharges under section 404 must fail.

II.     THE FILL RULE IS VALID.

        Plaintiffs argue that the Regas Mem. is not entitled to deference, Plfs' Brf. at 36, and also argue that if the interpretation of the fill rule set forth in the Regas Mem. is correct, then the fill rule is invalid.  Id. at 40.[20]  As discussed below, Plaintiffs arguments are meritless.  The fill rule is entirely consistent with the CWA.  In addition, the Act provides that the new source performance standard on which Plaintiffs rely does not apply to discharges of fill material regulated under section 404, such as the tailings discharges here.

        A.      The Issue Before the Court is the Corps' Interpretation of its Regulations, Not the Guidance Set Forth in the The Regas Mem.

        At the outset, Plaintiffs' attack on the Regas Mem. is misplaced.  The "agency action" challenged in this case is the Corps' issuance of the CWA permit, not the issuance of the Regas Mem.  First Amended Complaint for Declaratory and Injunctive Relief ("First Amended Complaint") [Dkt. No. 28] ¶ 1.  The Corps obviously relied in part on the Regas Mem. in issuing the permit under section 404, see, e.g., AR 000005, but the Corps' action in issuing the permit is

---

[20]  Federal Defendants view Plaintiffs' challenge to the fill rule as an "as applied" challenge rather than a facial challenge.  Plaintiffs' challenge is based on the application of the fill rule to the Kensington Mine.  The fill rule, however, applies nationwide to all projects involving discharges of fill material, regardless of whether they involve mines, tailings or other issues related to Kensington Mine.

SEACC v. United States Army Corps of Engineers,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment    22

what has been challenged here.[21]  Thus, the proper "deference" question in that context is involves the Corps' interpretation of the applicable regulations in issuing the permit.  On that question, the Corps' interpretation of the fill rule is "controlling unless plainly erroneous or inconsistent with the regulation."  <u>Kentuckians</u>, 317 F.3d at 439 (quoting <u>Auer v. Robbins</u>, 519 U.S. 452, 461 (1997).   As discussed above, the Corps' interpretation of the fill rule in regulating the discharges here under section 404 was entirely correct, and clearly did not amount to "plain error."  Accordingly, the Corps determination to regulate the discharges under section 404 should be upheld.

      B.     The Fill Rule is Consistent With the Clean Water Act.

      Plaintiffs also err in arguing that the fill rule is invalid.  The fill rule sets forth a permissible construction of the CWA that is entitled to deference under <u>Chevron</u> step two. Where congressional intent is not clear, the Court must grant deference to an agency construction that is "reasonable" under the second step of the <u>Chevron</u> analysis.  467 U.S. at 844. The Court "need not find that [the interpretation] is the only permissible construction that [the Corps and] EPA might have adopted but only that [the Corps' and] EPA's understanding of this very 'complex statute' is a sufficiently rational one to preclude a court from substituting its judgment for that of [the Corps and] EPA."  <u>Chemical Mfrs. Ass'n v. NRDC</u>, 470 U.S. 116, 125 (1985).   The construction of "fill material" promulgated jointly in the fill rule readily meets that test.[22]

---

[21]  Indeed, a challenge to the Regas Mem. would fail to meet the criteria for judicial review under the APA, which provides for judicial review of "final agency action."  5 U.S.C. § 704. <u>See</u> <u>City of San Diego v. Whitman</u>, 242 F.3d 1097, 1101 (9th Cir. 2001) (<u>quoting</u> <u>Bennett v.Spear</u>, 520 U.S. 154, 177-78 (1997)).

[22]  The deference due is not affected by the fact that the fill rule differs from the prior Corps regulations. Agencies that revise their construction of ambiguous statutory language should still be accorded deference, provided there is a reasoned explanation for the change in interpretation as the agencies provided here.  <u>Rust v. Sullivan</u>, 500 U.S. 173, 186 (1991) ("[a] revised interpretation deserves deference because '[a]n initial agency interpretation is not instantly carved in stone,' and 'the agency, to engage in informed rulemaking, must consider varying

<u>SEACC v. United States Army Corps of Engineers</u>,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment   23

     1.    <u>The Definition of "Fill Material" is Consistent With the Statutory Term</u>.

Most basically, the agencies' construction falls within the most straightforward and obvious reading of the term "fill material" – that is, material that "fills" the pertinent jurisdictional waters.  As the preamble to the proposed rule explains, "regardless of the purpose of a prospective discharge, the definition of 'fill material' should cover material that has the effect of fill."  65 Fed. Reg. at 21,295.

     2.    <u>The Fill Rule is Consistent With the CWA Section 402 and 404 Programs</u>.

The fill rule also is consistent with the statutory scheme and purposes of the section 404 and section 402 programs. As the preamble to the proposed rule explains, "[i]n keeping with the fundamental difference in the nature and effect of the discharge that each program was intended by Congress to address, sections 404 and 402 employ different approaches to regulating the discharges to which they apply." 65 Fed. Reg. at 21,293.  Pollutant discharges are controlled under the section 402 program principally through effluent limitations, which are restrictions on the "quantities, rates, and concentrations of chemical, physical, biological and other constituents

---

interpretations and the wisdom of its policy on a continuing basis.'") (quoting <u>Chevron</u>, 467 U.S. at 863-64); <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 42 (1983) (an agency must be given latitude to adapt rules and policies so long as it provides a "reasoned analysis" for its revised interpretation); <u>Navajo Nation v. Dep't. of Health & Human Services</u>, 285 F.3d 864, 875 n.7 (9th Cir. 2002) (citing <u>Rust v. Sullivan</u>, 500 U.S. at 186).  This is especially true here because the fill rule adopts the substance of EPA's longstanding definition, provides further clarification for the regulated public, and fits the design and purpose of a statute requiring the highly specific expertise of the two agencies charged by Congress with substantively administering a complex regulatory scheme.  <u>Good Samaritan Hospital v. Shalala</u>, 508 U.S. 402, 417-18 (1993); <u>Navajo Nation</u>, 285 F.3d at 875.  Finally, even assuming lesser deference, the uniform agency construction set forth in the fill rule is a highly persuasive and compelling one under the complex statutory scheme, and must be upheld under any standard. <u>See</u> <u>United States v. Mead Corp.</u>, 533 U.S. 218, 235 (2001) (quoting <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 140 (1944), and holding that where Chevron deference is inapplicable, courts will apply so-called <u>Skidmore</u> deference, under which the agency construction is entitled to "respect proportional to its 'power to persuade'").

<u>SEACC v. United States Army Corps of Engineers</u>,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment   24

which are discharged from point sources into navigable waters." Id., citing 33 U.S.C. § 1362(11). See also 33 U.S.C. § 131l(b).

Unlike the section 404 program, which regulates discharges that "fill" jurisdictional waters, the section 402 program generally is not designed to address discharges that convert waters of the United States to dry land. Id. Furthermore, also unlike the section 404 program, the section 402 permitting process "does not require an evaluation of alternatives to a proposed discharge or mitigation for unavoidable impacts." Id. Accordingly, section 402 does not regulate discharges like those at issue here that clearly meet the effects-based test of the fill rule.

The section 404 permitting program differs "in several fundamental respects" from the 402 program. 65 Fed. Reg. at 21,293. As discussed above, section 404 focuses exclusively on two materials, dredged material and fill material. The term "fill material" clearly contemplates material "that fills in a water body and thereby converts it to dry land or changes the bottom elevation." Id. Fill material "differs fundamentally from the types of pollutants covered by section 402 because the principal environmental concern [from the discharge of fill material] is the loss of a portion of the water body itself." Id.

For that reason, the section 404 permitting process "focuses on different considerations than the section 402 permitting program." Id. Those considerations are set forth in the 404(b)(1) Guidelines, which are based on criteria comparable to those contained in CWA section 403(c), 33 U.S.C § 1343(c), entitled "Guidelines for determining degradation of [ocean] waters." In contrast to the section 402 program, the section 403(c) criteria require consideration of, inter alia, "other possible locations and methods of disposal" and "land-based alternatives." 65 Fed. Reg. at 21,293. Also in contrast to the section 402 program, the preamble to fill rule proposal states that "because section 404 was intended by Congress to provide a vehicle for regulating materials whose effects include the physical conversion of waters to non-waters or other physical alterations of aquatic habitat, the section 404(b)(1) Guidelines go beyond [] a water quality based

SEACC v. United States Army Corps of Engineers,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment    25

approach to require numerous additional considerations before a section 404 permit may be issued." Id.  Those considerations include assessing "the effects of the discharge on the aquatic ecosystem as a whole, as well as evaluation of alternatives to the discharge and measures to minimize and compensate for unavoidable adverse effects." Id.  See 40 C.F.R. Part 230.[23]

In short, given the nature of fill material, and the critical substantive differences between the section 404 and section 402 programs, the Corps and EPA reasonably concluded that the section 404 program provides the appropriate basis for determining whether, and under what conditions, the CWA authorizes discharges like those at issue here.  The agencies' uniform construction in the fill rule "makes considerable sense in terms of the statute's basic objectives," and it clearly is a permissible one entitled to deference.  Barnart v. Walton, 535 U.S. 212, 219 (2002).

3.     The Section 306(e) Prohibition Does Not Apply Here.

Plaintiffs argue that the section 404 permit is unlawful because it violates section 306(e) of the Act.  Plfs' Brf. at 28-30.  Plaintiffs contend that the "prohibition" in CWA section 306(e) applies to all discharges from new sources to waters of the United States, whether the discharge is regulated under section 402 or 404.  Id. at 34.

Plaintiffs misread the CWA.  Section 306(e) provides that "it shall be unlawful for any owner or operator of any new source to operate such source in violation of any standard of performance applicable to such source."  33 U.S.C. § 1316(e).  However, the Act makes clear that both the applicability and the enforcement of these standards is limited to section 402 permits, and that the standards do not apply to discharges regulated by section 404 permits.

---

[23]  In addition, as discussed in the following section regarding section 306 new source performance standards, other provisions of the CWA clarify further that Congress envisioned and created very different regulatory regimes under sections 402 and 404.  For example, section 402 begins by excluding from its terms discharges covered by permits issued under section 404: "Except as provided in section[] . . . 404."  Further, the Act provides that discharges covered under section 404 permits need not comply with requirements like the new source performance standards established under CWA section 306.

SEACC v. United States Army Corps of Engineers,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment     26

Section 402(a)(1), which addresses NPDES permits, provides that:

> **Except as provided in section[] . . . 404** . . ., the Administrator [of EPA] may, after opportunity for public hearing, issue a permit for the discharge of any pollutant, or combination of pollutants . . . upon condition that such discharge will meet . . . (A) all applicable requirements under sections 1311, 1312, 1316, 1317, 1318, and 1343 of this title.

33 U.S.C. § 1342(a)(1). (Emphasis added.)[24] Thus, section 402(a)(1) expressly provides that section 402 permits must comply with the requirements of section 306, and also expressly excepts section 404 permits from the requirement to comply with section 306.

Further, unlike section 402, section 404 does not require that discharges permitted under section 404 comply with new source performance standards established under CWA section 306. 33 U.S.C. § 1344(b). Congress excluded that requirement from the 404 permitting regime, and thus the new source performance standards promulgated under section 306 are not applicable to discharges regulated under section 404. Instead, Congress specified that the disposal sites for discharges of dredged or fill material be specified based on the application of the 404(b)(1) Guidelines. Id.[25]

The "Compliance" provisions of sections 402 and 404 further demonstrate that Congress intended that new source performance standards not be applicable to discharges regulated under section 404. Section 402(k), entitled "Compliance with permits," provides that "[c]ompliance with a permit issued pursuant to this section [402] shall be deemed compliance, for purposes of [the enforcement] sections . . . of this title, with sections 1311, 1312, 1316, 1317, and 1343 of this title, except any standard imposed under section 1317 of this title . . ." 33 U.S.C. § 1342(k).

---

[24] Sections 1311, 1312, 1316, 1317, 1318, and 1343 of Title 33 refer to sections 301, 302, 306, 307, 308 and 403 of the CWA.

[25] As mentioned above, the 404(b)(1) Guidelines do not require compliance with new source performance standards, and instead impose very different requirements. See generally 40 C.F.R. Part 230. As directed by Congress in section 404(b)(1), the 404(b)(1) Guidelines are based on criteria comparable to those contained in CWA section 403(c), 33 U.S.C 1343(c), which include, among other things, consideration of "other possible locations and methods of disposal" and "land-based alternatives." 33 U.S.C. § 1343(c)(B), (D), (F).

SEACC v. United States Army Corps of Engineers,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment    27

Thus, this "permit as a shield" provision of section 402 expressly states that a discharger in compliance with a section 402 permit is insulated from an enforcement action alleging that the discharges violate a section 306 new source performance standard.[26]

On the other hand, section 404(p), entitled "Compliance," provides that "[c]ompliance with a permit issued pursuant to this section [404] . . . shall be deemed compliance, for purposes of [the enforcement] sections . . . of this title, with sections 1311, 1317, and 1343 of this title." 33 U.S.C. § 1344(p). This provision does not insulate a discharger in compliance with a section 404 permit from enforcement of a section 306 new source performance standard. This makes sense under the CWA because section 306 new source performance standards do not apply to discharges regulated under section 404 in the first place. Accordingly, there is no need for a "compliance" provision to protect a discharger under a section 404 permit from an enforcement action alleging the violation of a section 306 new source performance standard.

Further, the CWA makes it clear that the new source performance standard under section 306 is enforced by section 402 permits. The technology-based controls in the new source performance standards promulgated under section 306 are not self-executing, see, e.g., California ex rel. State Water Resources Control Bd., 426 U.S. at 204-205, and the permits issued to individual dischargers transform the generally applicable effluent limitations guidelines and water quality-based requirements into enforceable obligations. See City of Milwaukee, 451 U.S. at 311; International Paper Co., 479 U.S. at 489; State Water Resources Control Bd., 426 U.S. at 205; 40 C.F.R. §§ 122.44(a), 122.44(d)(1). "The individual point sources fulfill their obligations under the Act by complying with the conditions incorporated by the permit grantors into the permits." NRDC v. EPA, 537 F.2d at 644. And as discussed above, only section 402 permits are required to ensure compliance with section 306 new source performance standards.

---

[26] This makes sense under the CWA, of course, because the discharger's section 402 permit must require compliance with the new source performance standards, and compliance with the permit is intended to ensure compliance with the new source performance standard.

SEACC v. United States Army Corps of Engineers,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment     28

In sum, Congress provided that discharges covered by permits issued under section 402 must comply with the requirements of section 306, but did not require discharges permitted under section 404 to comply with those requirements. 33 U.S.C. §§ 1342(a)(1)(A), 1344(b). Congress also made it clear that the section 402 permitting program operates separately from the section 404 permitting program. See, e.g., 33 U.S.C. § 1342(a) ("Except as provided in section[] . . . [404]"). The new source performance standards promulgated under section 306 are only enforced through section 402 permits issued to dischargers. Based on the terms of the Act, then, discharges permitted under section 404 need not comply with the new source performance standards of CWA section 306.[27]

Plaintiffs do not address the points discussed above regarding the terms and structure of the CWA, and the application and enforcement of section 306 new source performance standards through section 402 permits. Instead, Plaintiffs attempt to support their incorrect reading of the

---

[27] The application of the fill rule to the tailings discharges here is consistent with the conclusion that the section 306 new source performance standard for process wastewater is not applicable to discharges regulated under section 404. Tailings are discharged with water, often in a slurry, and the water that comes into contact with the tailings meets the definition of "process wastewater." 40 C.F.R. § 122.2. However, the fact that process wastewater is included in the slurried tailings does not alter the fact that those discharges clearly fall within the definitions of "fill material" and "discharge of fill material." Under the fill rule, the proper inquiry is what the effect of the discharges is, not what the components of the discharge are. Here, the tailings still will fill the lake bottom to a depth of 50 feet. AR 000013. The tailings still will clearly have the immediate effect of changing the bottom elevation of the lake. See Regas Mem. at 3, AR 006475 (contrasting the "incidental" filling effect of certain discharges regulated under section 402 with the clear filling effect of discharges of fill material). In addition, the slurried tailings obviously will constitute "slurry" and "tailings" as set forth in the definition of "discharge of fill material." Thus, the fill rule contemplates that process wastewater will be included with discharges of tailings regulated under section 404, but the discharges do not violate the section 306 new source performance standard for process wastewater because section 306 standards are not applicable to discharges regulated under section 404.

EPA guidance came to the same conclusion. The Regas Mem. concluded that, because the tailings discharges at the Kensington mine would fall within the scope of section 404, "the regulatory regime applicable to discharges under section 402, including effluent limitations guidelines and standards, such as those applicable to gold ore mining (see 40 C.F.R. Part 440, Subpart J), do not apply to the placement of tailings into the proposed impoundment." Regas Mem. at 2-3, AR 006474-75.

SEACC v. United States Army Corps of Engineers,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment    29

Act with selected excerpts from caselaw.  Plaintiffs rely heavily on E.I. du Pont de Nemours and Co. v. Train, 430 U.S. 112 ("du Pont"), for their overbroad reading of section 306(e).  Plaintiffs quote du Pont for the proposition that section 306 new source performance standards are "absolute prohibitions."  Plfs' Brf. at 29.  du Pont, however, is completely inapposite.  There, the Supreme Court addressed whether the Court of Appeals was correct to order EPA to create variances from the new source performance standards for the discharges that were subject to those standards.  du Pont, 430 U.S. at 126-27.  On that issue, the Supreme Court agreed with EPA that Congress did not intend that there be such variances from the standards.  du Pont, 430 U.S. at 138.  There was never any suggestion, however, that the new source performance standards applied to, or were to be enforced through, section 404 permits.  On the contrary, the Supreme Court only referenced permits issued under section 402.  du Pont, 430 U.S. at 124. ("The permits granted under [section] 402 . . . incorporate these across-the-board limitations").[28]

Finally, Plaintiffs' arguments are refuted by EPA's explanation of the very standard upon which Plaintiffs rely – the new source performance standard for process wastewater from froth-flotation mills at gold mines.  In proposing that standard, EPA explained that section 402 would be the mechanism for implementing the standard:

> New industrial direct dischargers were required to comply with section 306 new source performance standards (NSPS), based on best available demonstrated technology.  The requirements for direct dischargers were to be incorporated into National Pollutant Discharge Elimination System (NPDES) permits issued under section 402 of the Act.

Plfs' Ex. 18 at 4 (emphasis added).  EPA further explained that section 402 "authorized the setting of requirements for direct dischargers on a case-by-case basis," and that Congress

---

[28]  The central issue in du Pont was whether EPA was authorized to create and apply nationwide standards and limits at all, or whether instead all such standards and limits were to be established and applied exclusively through the issuance of individual section 402 permits.  du Pont, 430 U.S. at 124-136.  In its holding, the Supreme Court agreed with EPA that it had the authority under the CWA to "issue regulations setting forth uniform effluent limitations for categories of plants."  Id. at 136.

SEACC v. United States Army Corps of Engineers,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment     30

intended that those control requirements would be "based on" regulations like the new source performance standards.  Id. at 4-5.  Thus, even the caselaw and promulgation history on which Plaintiffs rely demonstrates that the new source performance standard for froth-flotation mills does not apply to discharges of fill material regulated under section 404.

III.    THE "DRY TAILINGS FACILITY" ALTERNATIVE INCLUDED THE
        PERMANENT LOSS OF NUMEROUS ACRES OF WETLANDS.

Plaintiffs seek to contrast the selected alternative, D, with Alternative A.  Plfs' Brf. at 4-5; cf. Plfs' Brf. at 39.  While the Corps' selection among alternatives is not the issue before the Court on Plaintiffs' "Count One" challenge, it should be emphasized that Alternative A would involve discharges of fill material in waters of the United States in connection with the disposal of tailings, and that those discharges would have resulted in the permanent loss of numerous acres of wetlands, which are accorded special protection as "special aquatic sites."

As discussed above, all of the "A" alternatives included, among other things, the creation and use of a dry tailings facility.  AR 000011-13.  The tailings placed in the facility would be "dewatered" through various processes before placement, but because not all of the process wastewater would be removed during the dewatering process, some process wastewater would be included with the tailings placed in the facility.  AR 003362.  The dry tailings facility in all of the "A" alternatives would be constructed in wetlands, and permanently would convert the area to uplands.  AR 000012-13.  The number of wetland acres filled for the dry tailings facility varied among the "A" alternatives from approximately 34 to 113 acres, due to the different proposed sizes of the facility.  AR 000012-13.[29]  The dry tailings facility would be revegetated after mine closure, but the wetland functions there would be totally, permanently

_____

[29]  The Corps concluded that the two smaller proposed dry tailings facilities, which involved filling approximately 34 and 50 acres, simply were not practicable technically because they were "inadequately sized to hold the amount of tailings generated by a high-grade mining process."  AR 000012.

SEACC v. United States Army Corps of Engineers,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment    31

lost.  AR 000011-12, 000020.[30]

Wetlands are waters of the United States that are accorded special protection under the 404(b)(1) Guidelines as "special aquatic sites."  See 40 C.F.R. § 230.41.  The opening section of the 404(b)(1) Guidelines states as follows:

> From a national perspective, the degradation or destruction of special aquatic sites, such as filling operations in wetlands, is considered to be among the most severe environmental impacts covered by these Guidelines.  The guiding principle should be that the degradation or destruction of special sites may represent an irreversible loss of valuable aquatic resources.

40 C.F.R. § 230.1(d).   The "Definitions" portion of the 404(b)(1) Guidelines states further:

> Special aquatic sites . . . are geographic areas, large or small, possessing special ecological characteristics of productivity, habitat, wildlife protection, or other important and easily disrupted ecological values. These areas are generally recognized as significantly influencing or positively contributing to the general overall environmental health or vitality of the entire ecosystem of a region.

40 C.F.R. § 230.3(q-1).  In accordance with the value attributed to special aquatic sites such as wetlands, the 404(b)(1) Guidelines include both a general presumption that "practicable alternatives that do not involve special aquatic sites are presumed to be available" and the presumption that "all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem."  40 C.F.R. § 230.10(3)(a)(3).  Thus, while the section 404 permitting regime allows for the filling of wetlands, the 404(b)(1) Guidelines accord special protection for wetlands, and protect them from filling unless there is a clear demonstration of the need to do so.  Id.

Based in part on the special protection accorded to wetlands, the Corps concluded here that "the impacts to the aquatic ecosystem are less harmful [in Alternative D] than the impacts of the Alternative A variants, which include permanent wetland losses, and [Alternative D]

---

[30]  The conversion of the wetlands to uplands, which would remove the area from CWA jurisdiction, obviously helps explain why the Corps stated that it did "not regulate the placement of tailings" into the dry tailings facility.  AR 008874.  See Plfs' Brf. at 34.

SEACC v. United States Army Corps of Engineers,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment    32

incorporates a water treatment system to ensure water quality." AR 000024. Thus, while the weighing of the environmental impacts of the various alternatives before the Corps is not the issue currently before the Court, it is clear that the "A" alternatives apparently now favored by Plaintiffs would have had significant, irreversible environmental impacts.[31/]

IV.    PLAINTIFFS' REQUESTS FOR RELIEF SHOULD BE DENIED.

Plaintiffs' requests for relief should be denied for a number of reasons. First and foremost, the section 404 permit for the Kensington mine was lawfully issued, and there is no basis on which to grant any of the relief sought by Plaintiffs.

Further, even assuming, <u>arguendo</u>, that the Court were to determine that the Corps acted unlawfully in issuing the permit under section 404, the relief Plaintiffs seek is overbroad. The relief available in administrative agency review cases is akin to injunctive relief and equitable in nature, and it is well-established that injunctive relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiff." <u>Califano v. Yamasaki</u>, 442 U.S. 682, 702 (1979). "An injunction should be carefully addressed to the circumstances of the case," and should not be "broader than necessary to afford full relief" to the particular plaintiff. <u>Virginia Soc'y for Human Life, Inc. v. Federal Election Comm'n</u>, 263 F.3d 379, 393 (4th Cir. 2001). "Injunctive relief . . . must be tailored to remedy the specific harm alleged." <u>Lamb-</u>

---

[31/] It should be noted in this context that Plaintiffs state that other gold mines do not violate the new source performance standard for process wastewater from froth-flotation mills, and imply that the Kensington Mine should do the same. No other mines, of course, are at issue in this permit challenge. In any event, there are numerous ways that mines surrounded by waters of the United States can avoid violating the new source performance standard in connection with their discharges of tailings, including: (1) obtaining a section 404 permit for the tailings discharges, as is the case here; (2) discharging to a dry tailings facility that has converted wetlands to uplands, which removes the discharges to the facility from CWA jurisdiction, as was the case with Alternative A; and (3) discharging to a "waste treatment system," which is excluded from the regulatory definition of "waters of the United States." <u>See</u> Regas Mem. at 3, AR 006475. In each of those situations, the tailings discharges into the impoundment or facility would not be subject to the new source performance standard, but a section 402 permit that incorporates the standard would be required for discharges from the impoundment or facility to waters of the United States. Such discharges of mine tailings have not been previously prohibited.

SEACC v. United States Army Corps of Engineers,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment     33

Weston, Inc. v. McCain Foods, 941 F.2d 970, 974 (9th Cir. 1991).

The request to set aside and remand the Forest Service's ROD and approval of the plan of operations should be denied because the only count in the amended complaint is plead under the CWA. First Amended Complaint at 11. The harm alleged under the CWA necessarily is harm to the waters of the United States, which is the extent of jurisdiction under the CWA. However, the Forest Service's ROD and approval of the plan of operations do not authorize work in waters of the United States. The Corps' section 404 permit does that. Thus, setting aside the Corps' section 404 permit would provide Plaintiffs with full relief and there is no need or basis to set aside the Forest Service's ROD or approval of the plan of operations.

In addition, Plaintiffs' requests for vacatur are premature. Vacating agency action is tantamount to enjoining it, and "an injunction is an equitable remedy." Weinberger v. Romero-Barcelo, 456 U.S. 305, 311 (1982). Thus, this Court has the authority to fashion appropriate equitable remedies in cases seeking review of agency action:

> The jurisdiction to review the orders of [the agency] is vested in a court with equity powers, and while the court must act within the bounds of the statute and without intruding upon the administrative province, it may adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action.

Ford Motor Co. v. Nat'l Labor Relations Bd., 305 U.S. 364, 373 (1939). See also United States v. Oakland Cannabis Buyers' Coop., 532 U.S. 483, 496 (2001) .

A court that finds an agency action unlawful under 5 U.S.C. § 706(2) may remand the matter to the agency for further action. Federal Power Comm'n v. Idaho Power Co., 344 U.S. 17, 20 (1952) ("the function of the reviewing court ends when an error of law is laid bare. At that point the matter once more goes to the [agency] for reconsideration."). As the Supreme Court has stated:

> If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to

SEACC v. United States Army Corps of Engineers,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment          34

> remand to the agency for additional investigation or explanation. The
> reviewing court is not generally empowered to conduct a de novo inquiry
> into the matter being reviewed and to reach its own conclusions based on
> such an inquiry.

Florida Power & Light Co. v. Lorian, 470 U.S. 729, 744 (1985). See also Smith v. United States

Forest Service, 33 F.3d 1072, 1079 (9th Cir. 1994) ("We leave to the agency the decision of how

best to comply with NEPA and its implementing regulations, and hold only that the NEPA

documents before us are insufficient.").

Thus, although vacatur is sometimes necessary to remedy an alleged harm – such as

where the court determines conclusively that the agency lacks authority or a factual basis to

regulate – it is not always necessary and could have adverse consequences. For example, where

a court finds that an agency action has been inadequately explained, but believes the agency may

be able to provide an explanation sufficient to sustain the agency decision, vacatur is not

appropriate. See, e.g., A.L. Pharma, Inc. v. Shalala, 62 F.3d 1484, 1492 (D.C. Cir. 1995); Idaho

Farm Bureau Fed'n v. Babbitt, 58 F.3d 1392, 1405-06 (9th Cir. 1995). An inadequately

explained agency action may be modified quickly on remand, making vacatur unnecessary.

Accordingly, courts have often recognized that they have discretion to remand an agency

decision without vacating it, particularly when the reason for the remand is to give the agency an

opportunity to correct a defect in the explanation for its decision. See, e.g., Checkosky v. SEC,

23 F.3d 452, 466 (D.C. Cir. 1994); Western Oil & Gas Ass'n v. EPA, 633 F.2d 803, 813 (9th Cir.

1980).

Finally, Plaintiffs' request for a permanent injunction should be denied. Plaintiffs request

a permanent injunction "prohibiting Defendants from allowing any activities authorized by the

permits, ROD, and plan of operations, including cutting trees, building roads, clearing shrubs,

excavating wetlands, building dams or other structures, and altering the natural water level of

Lower Slate Lake or the natural flow of East Fork Slate Creek." Plfs' Brf. at 41.

Of course, injunctions under the CWA do not issue as a matter of right in the federal

SEACC v. United States Army Corps of Engineers,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment    35

courts:

> [i]n exercising their sound discretion, courts of equity should pay
> particular regard for the public consequences in employing the
> extraordinary remedy of injunction. * * * The grant of jurisdiction
> to ensure compliance with a statute hardly suggests an absolute
> duty to do so under any and all circumstances, and a federal judge
> sitting as chancellor is not mechanically obligated to grant an
> injunction for every violation of law.

Weinberger v. Romero-Barcelo, 456 U.S. at 312-313 (citations omitted) (declining to issue an

injunction even in the face of a clear statutory violation).  A court must balance the competing

claims of injury and must consider the effect on each party of the granting or withholding of the

requested relief.  Amoco Production Co. v. Village of Gambell, 480 U.S. 531, 542 (1987).

In Romero-Barcelo, the Court reversed the First Circuit's grant of injunctive relief, which

had directed the district court to enjoin all Navy activities until it obtained a CWA permit for

discharging ordnance into the sea.  The Court concluded that the purposes of the Clean Water

Act – to restore and maintain the integrity of the Nation's waters – would not be undermined by

allowing the statutory violation to continue while the Navy applied for a permit because the

ordnance was not polluting the water.  Id. at 314-15.  "The First Circuit had erroneously focused

on the integrity of the permit process rather than on the integrity of the Nation's waters."  Amoco

Production Co. v. Village of Gambell, 480 U.S. at 543.  See also Environmental Defense Center

v. Babbitt, 73 F.3d 867, 872 (9th Cir. 1995).

In so ruling, the Supreme Court in Romero-Barcelo discussed the standard for issuing

injunctive relief under the CWA.  The Court held that a district court should "order relief that

will achieve compliance with the Act," Romero-Barcelo, 456 U.S. at 318, and that in most CWA

cases, a district court will retain its equitable discretion to choose from a wide range of remedies

"to order that relief it considers necessary to secure prompt compliance with the Act." Id. at 320.

Similarly, in National Wildlife Fed'n v. Burlington Northern Railroad, 23 F.3d 1508, 1510 (9th

Cir. 1994), the Ninth Circuit explained that courts "must look at the likelihood of future harm

SEACC v. United States Army Corps of Engineers,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment     36

before deciding whether to grant an injunction." 23 F.3d at 1511. Courts are not "mechanically obligated to grant an injunction for every violation of law." Id. at 1512. "[W]hat we require is a definitive threat of future harm . . ., not mere speculation." Id. at 1512 n.8.

Further, there is not necessarily a presumption of irreparable injury in environmental cases, and courts must balance the equities. Romero-Barcelo, 456 U.S. at 312 (showing of irreparable harm does not mandate injunctive relief); see also Amoco Production Co., 480 U.S. at 542 (where an agency fails to comply with a statutory procedure, courts cannot presume irreparable harm from that violation). Accord Forest Conservation Council v. United States Forest Service, 66 F.3d 1489, 1496 (9th Cir. 1995) ("injunctive relief is an equitable remedy, requiring the court to engage in the traditional balance of harms analysis, even in the context of environmental litigation").

Applying these principles here, the Court should deny Plaintiffs' request for a permanent injunction. Even if the Court determined that the Corps acted unlawfully, the Court could also determine that the Corps might easily remedy the deficiency on remand. In that circumstance, there would be no point in issuing the permanent injunction. In addition, Plaintiffs' request for a permanent injunction is overbroad. Even if the Court determined that the Corps acted substantively in contravention of the CWA, the Court should remand the matter to the Corps, and should not dictate what action the Corps should take on remand. The Supreme Court has long held that a reviewing court, if it disapproves of agency action on review, ought not to order the agency to take specific action on remand. See National Labor Relations Bd v. Food Store Employees Union, 417 U.S. 1, 10 (1974). See also Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 525, 549 (1978); Federal Power Comm'n v. Idaho Power Co., 344 U.S. at 20. Thus, on remand, it is the administrative agency's responsibility to evaluate alternative courses of action and ultimately make a choice. Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21 (1976); James City County v. EPA, 12 F.3d 1330, 1338-39 (4th Cir. 1993). As aptly explained

SEACC v. United States Army Corps of Engineers,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment    37

by the D.C. Circuit:

> We will not, indeed we cannot, dictate to the agency what course it must ultimately take. . . . It may even be that the EPA will choose some other solution altogether.  In any event, that choice is the agency's and not ours.

National Tank Truck Carriers, Inc. v. EPA, 907 F.2d 177, 185 (D.C. Cir. 1990).   Here, the Corps might be able to correct any deficiency identified by the Court on remand, or there may some other analysis or mechanism that justifies the tailings discharges and other activities at issue. The permanent injunction would improperly constrain the agencies' discretion on remand.

Plaintiffs' request for a permanent injunction also should be denied because Plaintiffs have failed to demonstrate the likelihood of substantial and immediate irreparable injury that would warrant that relief.  Plaintiffs discuss alleged harm from actions that Coeur Alaska will take "[i]n order to prepare Lower Slate Lake" for the tailings disposal there, Plfs' Brf. at 43, but do not state when such actions will occur.  In addition, at least some of those activities do not appear to involve potential harm to waters of the United States.  Id.  Plaintiffs also discuss alleged harm to waters of the United States "[o]nce operations begin," Plfs' Brf. At 43, but those operations certainly will not commence immediately.[32]

In addition, there is no question that the Kensington Mine is an economic boon to the Juneau area and Southeast Alaska.  The mining activity will stimulate local cash flow, broaden the local tax base and provide hundreds of local jobs, all in the context of the least environmentally damaging alternative that was before the Corps.  See AR 000010, 000024, 000057.  In turn, issuing the permanent injunction that Plaintiffs seek may effectively shut the

---

[32] It also is not clear that any alleged harm would be "irreparable."  Plaintiffs have stated that if work proceeds at Kensington Mine, Plaintiffs "may seek additional injunctive relief ordering Defendants to restore disturbed areas depending on the nature of the activities that have been completed."  Plfs' Brf. at 41 n.18.  The Federal Defendants presume that Plaintiffs are referring to restoration they may seek from Coeur Alaska, not the Federal Defendants.  In any event, Plaintiffs' statement clearly suggests that restoration – perhaps similar to restoration required upon closure of the mine, see, e.g., AR 000015 –  of any alleged environmental harm is possible. Thus, the alleged harm should not be viewed as "irreparable."

SEACC v. United States Army Corps of Engineers,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment    38

mine down, causing the loss of numerous jobs and the local revenue that comes with them.

Thus, the public interest disfavors the issuance of the permanent injunction.

CONCLUSION

For the reasons stated above, the Court should enter summary judgment in favor of the

Federal Defendants.

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environment and Natural Resources Division
UNITED STATES DEPARTMENT OF JUSTICE


  /s/ Mark A. Nitczynski
MARK A. NITCZYNSKI
Environmental Defense Section
UNITED STATES DEPARTMENT OF JUSTICE
999 18th Street, Ste. 945
Denver, CO   80202
PHONE: (303) 312-7300
FAX: (303) 312-7331

TIMOTHY M. BURGESS
United States Attorney
District of Alaska
RICHARD L. POMEROY
Assistant U.S. Attorney

Attorneys for Defendants United States Army
Corps of Engineers, et al.


CERTIFICATE OF SERVICE

I, Mark A. Nitczynski, certify that on this May 5, 2006, I caused to be filed electronically the
foregoing UNITED STATES' OPPOSITION TO PLAINTIFFS' OPENING BRIEF, AND
MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
ON COUNT ONE OF FIRST AMENDED COMPLAINT with the Clerk of Court using the
CM/ECF system, which sent a Notice of Electronic Filing to the following persons: Demian A.
Schane, Thomas S. Waldo, John C. Berghoff, Jr., David C. Crosby and Ruth Hamilton Heese.

  /s/ Mark A. Nitczynski
MARK A. NITCZYNSKI


SEACC v. United States Army Corps of Engineers,
No. J05-0012 CV (JKS); U.S. Opp. To Plfs' Op. Brf.,
and Mem. in Support of Mot. For Summary Judgment    39