Demian A. Schane
Thomas S. Waldo
EARTHJUSTICE
325 Fourth Street
Juneau, Alaska 99801
Ph: 907-586-2751
Fax: 907-463-5891
Email: dschane@earthjustice.org

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SOUTHEAST ALASKA CONSERVATION COUNCIL, SIERRA CLUB, and LYNN CANAL CONSERVATION,<br><br>        Plaintiffs,<br><br>    v.<br><br>UNITED STATES ARMY CORPS OF ENGINEERS; COLONEL TIMOTHY J. GALLAGHER, in his official capacity as District Engineer; LARRY L. REEDER, in his official capacity as Chief of the Regulatory Branch; DOMINIC IZZO, in his official capacity as Principal Deputy Assistant Secretary of the Army (Civil Works); and UNITED STATES FOREST SERVICE,<br><br>        Defendants,<br><br>    and<br><br>COEUR ALASKA, INC., GOLDBELT, INC., and the STATE OF ALASKA,<br><br>        Intervenor-Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Case No. J05-0012 CV (JKS) |

**PLAINTIFFS' REPLY BRIEF ON COUNT I**

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY ........................................................................1

ARGUMENT ....................................................................................................3

I.    THE CLEAN WATER ACT REQUIRES THAT ALL DISCHARGES COMPLY WITH ANY APPLICABLE EFFLUENT LIMITATIONS AND STANDARDS OF PERFORMANCE. .............................................3

    A.    The plain language of the Clean Water Act disproves the implied exception urged by Defendants. .......................................................3

    B.    The implied exception urged by Defendants contradicts the agencies' longstanding interpretation of the Act. ...........................8

        1.    When the agencies adopted the 2002 fill rule, they reiterated their longstanding interpretation of the Act, requiring that discharges subject to effluent limitations would be governed by section 402. .....................................................................8

        2.    The 2002 fill rule was not intended to change the agency practice of requiring 402 permits for discharges from sources subject to effluent limitations. ...............................................13

        3.    The extra-record evidence presented by Coeur Alaska and the State show that the Corps has never issued a section 404 permit for the discharge of tailings into waters of the United States. ..........................................................................18

    C.    The broad, implied exception urged by Defendants would defeat the purpose of the Clean Water Act. ...............................................21

II.    THE CORPS' SECTION 404 PERMIT IS INCONSISTENT WITH THE REGULATIONS DEFINING "FILL MATERIAL." ...................................24

III.    THE USE OF LOWER SLATE LAKE AS A WASTE DISPOSAL SITE FOR TAILINGS SLURRY OVER THE COURSE OF 10-15 YEARS WILL KILL ALL FISH IN THE LAKE AND PERMANENTLY ALTER THE NATURAL ENVIRONMENT. ......................24

IV.    THE FOREST SERVICE'S ROD AND APPROVAL OF THE PLAN OF OPERATIONS, AND THE CORPS' SECTION 404 PERMIT FOR THE CONSTRUCTION OF A MARINE TERMINAL FACILITY AT CASCADE POINT, ARE ARBITRARY AND NOT IN ACCORDANCE WITH LAW. ...............................................................28

V.    THE COURT SHOULD VACATE THE SECTION 404 PERMITS AND THE FOREST SERVICE'S ROD AND APPROVAL OF THE PLAN OF OPERATIONS, AND GRANT A PERMANENT INJUNCTION. ..............................................................................28

    A.    Vacatur is the appropriate remedy for all decisions challenged in the complaint. .............................................................................28

B.  The Corps' violation of the Clean Water Act is not a mere
     technical violation but goes to the principal purpose of the Act. ...................30

C.  Without an injunction, Plaintiffs will suffer substantial and
     immediate irreparable harm. .........................................................................31

D.  The balance of harms favors Plaintiffs. ........................................................35

CONCLUSION....................................................................................................................37

Plaintiffs submit this reply in support of their Opening Brief on Count I ("Pls. Br.").

Docket No. 41.  This brief responds to four opposition briefs and three *amicus curiae* briefs.  *See*

United States' Opp'n to Pls.' Opening Br., and Mem. in Supp. of Mot. for Summ. J. on Count

One of the First Amended Compl. (Docket No. 80) ("Fed. Opp."); Coeur Alaska, Inc.'s Br. in

Opp'n to Pls.' Mot. for Summ. J. (Docket No. 71) ("Coeur Opp."); Intervenor-Def. Goldbelt's

Mem. in Opp'n to Mot. for Summ. J. (Docket No. 61) ("Goldbelt Opp."); State of Alaska's

Opp'n to Pls.' Opening Br. on Count I (Docket No. 67) ("State Opp."); Br. of *Amicus Curiae*

City and Borough of Juneau (Docket No. 63); Amicus Br. of Southeast Conference in Supp. of

Affirmance (Docket No. 68); and The Berners Bay Consortium's Br. as Amicus Curiae in Opp'n

to Pls.' Mot. for Summ. J. (Docket No. 74).

## INTRODUCTION AND SUMMARY

All Defendants make the same legal argument:  that Congress designed the entire Clean

Water Act permitting structure to hinge on the single question of whether a pollutant meets the

definition of "dredged or fill material," a term that Congress did not define and that was only

incidental to the severe industrial pollution problems to which Congress was responding.  *See*,

*e.g.*, Coeur Opp. at 18.  This argument is inconsistent with the language, structure, and purposes

of the Act, contradicts decades of agency interpretation thereof, and would lead to extreme

results not intended by Congress.  Defendants' entire argument rests on a negative inference

from the language of section 404 to create an implied exception to the direct, plain language of

sections 301(a), 301(e), and 306(e).  This inference cannot withstand scrutiny.

Sections 301(a), 301(e), and 306(e) require that all point source discharges of pollutants

must comply with any applicable effluent limitations or new source performance standards.

There is no exception to this requirement, implied or express, and the U.S. Army Corps of Engineers (Corps) cannot circumvent it by authorizing the proposed discharges as "fill material" under section 404.

To escape this plain language, Defendants note that section 402(a)(1) references sections 301 and 306 while section 404(a) does not. The simple and complete explanation for this difference is that Congress intended that, for any sources subject to effluent limitations or standards of performance adopted by the U.S. Environmental Protection Agency (EPA), discharges of pollutants would be regulated by EPA in section 402 permits. The Corps simply would not issue permits for discharges of pollutants from those sources, so there was no need to reference sections 301 or 306 in section 404(a). There is no need to draw the negative inference upon which Defendants rely or to create an implied exception to the plain language of sections 301 and 306.

Defendants also rely heavily on the plain language of the agencies' 2002 rule defining "fill material." This argument ignores the fact that EPA's 1982 rule setting performance standards for gold mines is equally plain and indisputably applies to the Kensington mine's froth-flotation gold mill. The agencies foresaw this conflict when they adopted the fill definition in 2002 and explained exactly how they would resolve it: the effluent limitations and performance standards govern and the discharge is therefore subject to a 402 permit, consistent with longstanding agency practice and with the plain language of the Clean Water Act. Defendants make no attempt to reconcile their litigation position here with the position the agencies explained in the context of the 2002 rulemaking. There is no way to reconcile them.

ARGUMENT

I.    THE CLEAN WATER ACT REQUIRES THAT ALL DISCHARGES COMPLY WITH
      ANY APPLICABLE EFFLUENT LIMITATIONS AND STANDARDS OF
      PERFORMANCE.

      A.    The plain language of the Clean Water Act disproves the implied exception urged
            by Defendants.

The central provision of the Clean Water Act is section 301(a), 33 U.S.C. § 1311(a).

*Natural Res. Def. Council v. Envtl. Prot. Agency*, 822 F.2d 104, 109 (D.C. Cir. 1987).  It states:

"Except as in compliance with this section <u>and</u> sections 302, 306, 307, 318, 402, <u>and</u> 404 of this

title, the discharge of any pollutant by any person shall be unlawful."  33 U.S.C. § 1311(a)

(emphases added) (original Act sections substituted for U.S.C. sections).  One of the enumerated

provisions, section 301(e), states:  "Effluent limitations established pursuant to this section or

section 302 of this title shall be applied to <u>all</u> point sources of discharge of pollutants in

accordance with the provisions of this chapter."  33 U.S.C. § 1311(e) (emphasis added) (original

Act section substituted for U.S.C. section).  With equally forceful language, section 306(e)

provides:  "After the effective date of standards of performance promulgated under this section,

it shall be unlawful for any owner or operator of any new source to operate such source in

violation of any standard of performance applicable to such source."  33 U.S.C. § 1316(e).[1]

These provisions evince clear congressional intent.  Neither EPA nor the Corps may issue

a permit for a discharge that does not comply with the effluent limitations and standards of

performance promulgated for that source.  EPA promulgated a zero-discharge limitation for all

---

[1] A standard of performance is one kind of effluent limitation.  *See* Pl. Br. at 14.  For simplicity,
Plaintiffs sometimes use the latter term to encompass both.  The zero-discharge standard for
froth-flotation gold mills is a standard of performance, *see* 40 C.F.R. § 440.104(b), and is
therefore covered by both terms.

froth-flotation gold mills in 1982, which Federal Defendants admit applies to the Kensington. *See* Fed. Opp. at 4; Pls. Br. at 18-20.  The section 404 permit issued by the Corps does not comply with this standard and therefore violates sections 301(a), 301(e), and 306(e).

In support of their position, Defendants point to language in sections 402 and 404.  These sections contain the permitting schemes under which EPA and the Corps ensure compliance with section 301(a).  The language on which Defendants rely only reinforces the division between the two permitting programs:  EPA issues permits under section 402 for discharges subject to effluent limitations and standards of performance, 33 U.S.C. § 1342; and the Corps issues permits under section 404 for discharges of fill material pursuant to guidelines developed by EPA and the Corps.  33 U.S.C. § 1344.  These sections do not support the conclusion that the Corps may issue a permit for discharges of fill material that are also subject to effluent limitations or standards of performance governing the source of the discharge.  Sections 301(a), 301(e), and 306(e) prohibit the Corps from authorizing discharges from sources subject to these limits.

Defendants begin with the undisputed proposition that, for a proposed discharge of a pollutant, a person must obtain either a section 402 permit or section 404 permit, but not both. Coeur Opp. at 17 (citing section 402(a)(1) for the proposition that the sections 402 and 404 permit programs are mutually exclusive); Fed. Opp. at 27 (same).[2]  Plaintiffs agree, but this does

---

[2] Federal Defendants also assert that section 402(a)(1) "expressly excepts section 404 permits from the requirement to comply with section 306." Fed. Opp. at 27.  It does no such thing, and Federal Defendants provide no textual analysis to support such an interpretation.  Section 402(a)(1) expressly excepts discharges authorized by permits under section 404 from also getting authorization under section 402.  33 U.S.C. § 1342(a)(1).  It further provides that permits under section 402 must comply with section 306, among other requirements.  *Id.*  The leap from these express provisions to the conclusion that section 306 is inapplicable to discharges of fill is an

(footnote continued…)

not support the contention that the Corps may issue a permit for discharges from a source subject to effluent limitations or standards of performance.

To support their proposition, Defendants rely principally on the fact that section 402 requires that discharges comply with sections 301, 302, 306, 307, 308, and 403, while there is no comparable language in section 404. Coeur Opp. at 23; Fed. Opp. at 27. From this difference, Defendants conclude that if the discharge constitutes "fill material" under section 404, the sections enumerated in section 402 – including sections 301 and 306 – do not apply. *Id*. This negative inference goes too far and cannot withstand scrutiny.

The absence of this language in section 404 does not create an implied exception to sections 301(a), 301(e), or 306(e). Section 301(a), the core operative provision of the entire Clean Water Act, provides that all discharges are unlawful unless they comply "with <u>this section</u> <u>and</u> sections 302, 306, 307, 318, 402, <u>and</u> 404…." 33 U.S.C. § 1311(a) (emphases added) (original Act section numbers substituted for U.S.C. numbers). Had Congress intended to exempt "fill material" from all other strictures of the Clean Water Act, as advocated by Defendants, it would have written section 301(a) to say all discharges are illegal unless they comply with all the other enumerated sections <u>or</u> with section 404. The use of "and" as a connector, twice, in section 301(a) refutes Defendants' interpretation.

Of course, this does not mean that a discharge requires a permit under both section 402 and section 404. Section 402 requires a permit "[e]xcept as provided in sections 318 and 404…." 33 U.S.C. § 1342(a) (original Act sections substituted for U.S.C. sections). If a

_____

(…footnote continued)
overly broad negative inference derived from the lack of such an express statement in section 404. For the reasons discussed in the text, no such inference is warranted.

discharge is properly permitted under section 404, it is <u>expressly</u> exempt from section 402, *id.*, and therefore in compliance with both under section 301(a).  The Act contains no such express exemption from sections 301(e) or 306(e).  To the contrary, section 301(a) expressly requires all discharges to comply with sections 301, 306, 402, <u>and</u> 404.  33 U.S.C. § 1311(a).

The reason section 404 does not mention sections 301 or 306 is that Congress did not intend the Corps to issue 404 permits for sources subject to effluent limitations and standards of performance.  Sections 301(a), 301(e), and 306(e) compel this conclusion.  That is not surprising since enforcing industrial and municipal pollution control requirements is not within the Corps' area of expertise.  Congress envisioned a narrow role for the Corps, focusing on moving earth rather than regulating industrial pollution.  *See* Pls. Br. at 16-17; *infra* pp. 22-23; *see also Res. Invs., Inc. v. United States Army Corps of Eng'rs*, 151 F.3d 1162, 1166 (9th Cir. 1998) (describing section 404 as a continuation of the Corps' historic role under section 10 of the Rivers and Harbors Act of 1899).  The absence of these cross-references in section 404 does not create an implied exception for all discharges that might be considered "fill material" to the express requirements of sections 301 and 306.

The implied exception urged by Defendants goes much too far.  Were it correct, discharges of "fill material" would not even have to comply with section 301(a) of the Act, since section 301 is one of the provisions enumerated in section 402(a)(1) but not 404(a).  However, section 301(a) is "[t]he fundamental premise of the Clean Water Act…."  *Natural Res. Def. Council*, 822 F.2d at 109.  It is the operative provision prohibiting discharges without a permit. 33 U.S.C. § 1311(a).  Thus, under Defendants' negative inference, all discharges of "fill material" would be exempt from the Act's general prohibition against discharges without

permits. No permits would be required for the discharge of fill. This is clearly not what Congress intended and disproves Defendants' reading of sections 402 and 404.

The "permit shield" provision of section 404, on which Federal Defendants but not Coeur Alaska rely, also disproves Defendants' implied exception theory. *See* Fed. Opp. at 27-28. As the government points out, section 404(p) provides that compliance with a fill permit from the Corps is deemed compliance "with sections 301, 307, and 403 of this title." 33 U.S.C. § 1344(p) (original Act sections substituted for U.S.C. sections). Congress must have intended that the discharge of fill material was subject to each of these sections (including section 301), or no permit shield would have been necessary. Thus, section 404(a)'s silence regarding these and other sections of the Act could not have been intended as an implied exception to those sections. Otherwise, the permit shield provision would be entirely superfluous.

Coeur Alaska cites *Defenders of Wildlife v. Browner*, 191 F.3d 1159 (9th Cir. 1999), for the proposition that courts should presume Congress acts intentionally when it includes language in one section of a statute but not another. *See* Coeur Opp. at 23. Though correct, this principle does not resolve the question here. In this case, the lack of a reference to sections 301 and 306 in section 404(a) indicates Congress' intent that section 404 permits not be issued for discharges for which there are effluent limitations promulgated under sections 301 and 306. Unlike the situation in *Defenders*, interpreting section 404 not to apply to discharges covered by effluent limitations does not make section 404 superfluous. *See Defenders*, 191 F.3d at 1165.

B.    <u>The implied exception urged by Defendants contradicts the agencies'
      longstanding interpretation of the Act.</u>

   1.    *When the agencies adopted the 2002 fill rule, they reiterated their
         longstanding interpretation of the Act, requiring that discharges subject to
         effluent limitations would be governed by section 402.*

The conclusion that all point source discharges of pollutants must comply with applicable

effluent limitations and standards of performance is buttressed by over 30 years of administration

of the Clean Water Act.  When EPA and the Corps promulgated their 2002 "fill material"

regulations, they expressly stated:

> As explained previously, under today's rule, <u>we will continue, consistent with our
> long-standing practice, to rely on the existence of effluent limitation guidelines or
> standards or an NPDES permit to inform the determination of how a particular
> discharge is regulated under the Act.</u>  If a specific discharge is regulated under
> Section 402, it would not also be regulated under Section 404, and vice versa.  As
> explained in the proposed rule's preamble (65 FR 21296), many of the discharges
> referred to in Section B.5. of the 1986 MOA are subject to effluent guidelines and
> NPDES permitting, and today's rule would not alter that existing scheme.

Pl. Ex. 28 at 18 (2002 EPA/Corps Response to Comments at 30) (emphasis added).  Section B.5.

of the 1986 MOA explicitly identified certain mining wastes, indistinguishable from the

Kensington tailings, as subject to 402 permits.[3]  *See* 51 Fed. Reg. at 8,872 (1986 MOA, Coeur

Ex. 20 at 4); *see also* Pls. Br. at 22.  The agencies further emphasized that, where a discharge

meeting the new definition of "fill material" was also subject to an effluent limitation, the

discharge would not be treated as fill, but would be subject to a 402 permit: "Nor does today's

---

[3] The State of Alaska argues that the 1986 MOA "was made obsolete by the 2002 rule-
making…."  State Opp. at 7 n.6.  This is plainly incorrect.  The agencies noted in the 2002
rulemaking that the MOA remains in effect and is consistent with the 2002 rulemaking.  *See* 67
Fed. Reg. 31,129, 31,138 (May 9, 2002) (Pl. Ex. 27 at 10) ("the MOA did not expire"); Pl. Ex.
28 at 18 (2002 EPA/Corps Response to Comments at 30) (we "do not agree that today's rule is
inconsistent with or repudiates [paragraph B.5 of the] 1986 MOA provision").

rule change any determination we have made regarding discharges that are subject to an effluent limitation guideline and standards, which will continue to be regulated under section 402 of the CWA." 67 Fed. Reg. at 31,135 (Pl. Ex. 27 at 7).

This explanation makes clear that the agencies, in determining whether a particular discharge should be regulated under section 402 or section 404, have always relied and would continue to rely on whether there is an applicable effluent limitation or standard of performance. As discussed above, this long held interpretation is required by the plain language of the Clean Water Act. The courts have also recognized and relied upon the agencies' longstanding interpretation. *See*, *e.g.*, *Kentuckians for the Commonwealth v. Rivenburgh*, 317 F.3d 425, 445 (4th Cir. 2003) (recognizing that under "a longstanding and consistent division of authority between the Corps and the EPA with regard to the issuance of permits," the Corps regulated fill discharges "unless the fill amounted to effluent that could be subjected to effluent limitations");[4] *Trustees for Alaska v. Envtl. Prot. Agency*, 749 F.2d 549 (9th Cir. 1984) (placer gold mining discharges regulated under section 402); *see also* Pls. Br. at 32-33.

The position taken in Defendants' briefs is directly contrary to the interpretation the agencies described as their "long-standing practice" when they adopted their new fill rule. *Compare* Pl. Ex. 28 at 18 ("we will continue, consistent with our long-standing practice, to rely

---

[4] The Fourth Circuit in *Kentuckians* upheld the Corps' section 404 permit for the discharge of "overburden." Unlike the discharges at issue here, there are no effluent limitations or performance standards for that type of discharge. *See* Pls. Br. at 32. Coeur Alaska sometimes confuses mine tailings with "waste rock." *See* Coeur Opp. at 1, 5. These terms refer to different materials. Like overburden, waste rock "is the non-ore rock extracted to gain access into the ore zone." Pl. Ex. 48 at 23 (2004 FSEIS at 8-20); *see* Pl. Opening Br. at 32 n.16. Tailings are the waste byproduct of the gold ore beneficiation process. *See* Pl. Ex. 1 at 55 (2004 FSEIS at 8-19). Coeur Alaska does not intend to discharge waste rock into the lake. *See id.* at 17 (2004 FSEIS at 2-19).

on the existence of effluent limitation guidelines or standards or an NPDES permit to inform the determination of how a particular discharge is regulated under the Act") *with* Coeur Opp. at 18 ("The decision of whether a discharge is regulated under the Section 404 program versus the Section 402 program depends exclusively on whether it is a discharge of 'fill material.'"). As described by the agencies at the time of promulgation, it is not enough merely to determine whether the discharge meets the new definition of "fill material." They must also determine whether an effluent limitation applies to the source, and, if it does, it will be subject to a 402 permit. Defendants completely fail to address this inconsistency in their briefs, and it is fatal to their position.

The interpretation asserted at the time the agencies adopted the rule is entitled to the highest level of deference and trumps the subsequent inconsistent positions taken by the agencies. Where an agency interprets a statute through a regulation promulgated through notice-and-comment rulemaking, the interpretation is entitled to substantial deference. *See Chevron, U.S.A. v. Natural Res. Def. Council,* 467 U.S. 837, 843-44 (1984).

Where there is an agency interpretation not connected to formal rulemaking, such as the Regas Memorandum or the issuance of the Kensington permit, the degree of deference is less and depends on a variety of factors the Supreme Court and Ninth Circuit have discussed since *Chevron* was decided. In *United States v. Mead*, 533 U.S. 218 (2001), the Supreme Court concluded that a ruling letter issued by the Customs Service, which was intended to be binding on all Customs personnel and to be relied upon in subsequent transactions, is not entitled to *Chevron* deference. The Court held:

> [A]dministrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that

> authority. Delegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent.

*Id*. at 226-27. Even though *Chevron* deference is inapplicable, an agency interpretation may still be entitled to some respect under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). To determine that level of deference or respect, "courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position." *Mead*, 533 U.S. at 228.

Here, the Regas Memorandum and the Kensington permit are not entitled to respect, because they are inconsistent with language, structure, and purpose of the Clean Water Act and with the agencies' stated intent and long-standing practice at the time they adopted the rule. An agency's clear statement at the time of promulgating a rule is "dispositive" of the agency's intent. *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 715-16 (1985); *see* Pls. Br. at 37-38.

Further, the Regas Memorandum is unprecedented, unprincipled, and illogical. Under its reasoning, where proposed discharges have solids and will fill a lake only gradually, they are subject to regulation under section 402 and could not be discharged at all into waters of the United States. However, where the discharges will fill the lake more quickly, killing all fish in the lake, they are entirely permissible under section 404. In defense of this absurd result, Coeur Alaska argues that "it is entirely appropriate for EPA and the Corps to decide that this is the type of distinction that makes a difference." Coeur Opp. at 33. Coeur, however, points to no basis for making this distinction or even how to draw the line on where the discharges fill the waterbody fast enough to constitute "fill material." There is no basis in the statute, in the regulation, or in the preamble for such a distinction. It appears for the first time in the Regas Memorandum, even

though the agency went through an entire notice-and-comment rulemaking in which it explicitly addressed the dividing line between sections 402 and 404.

Federal Defendants are mistaken in their argument that the section 404 permit itself embodies an interpretation of the Clean Water Act entitled to deference. Agency actions such as the issuance of individual permits for particular projects "are entitled not to deference, but to a lesser 'respect' based on the persuasiveness of the agency decision." *The Wilderness Soc'y v. United States Fish & Wildlife Serv.*, 353 F.3d 1051, 1067 (9th Cir. 2003) (*en banc*) (citing *Mead* and *Skidmore*), *amended by* 360 F.3d 1374 (9th Cir. 2004). *The Wilderness Society* involved a challenge to a permit for a sockeye salmon enhancement project in a designated wilderness area. The Ninth Circuit held that the agency's permit decision was not entitled to deference. The court explained that, under *United States v. Mead*, the issuance of the permit

> involves only an agency's application of law in a particular permitting context, and not an interpretation of a statute that will have the force of law generally for others in similar circumstances. The issuance of a permit by a federal agency cannot in this case be characterized as the exercise of congressionally delegated legislative function.

*The Wilderness Society*, 353 F.3d at 1067. This reasoning applies to the Kensington permit at issue here. The Corps' section 404 permit is simply the "application of law in a particular permitting context" and will not have the force of law for other mines *Id*. Accordingly, it is owed merely respect and only to the extent that the rationale for the decision is persuasive.

Ignoring the controlling authority, Federal Defendants rely on *Kentuckians for the Commonwealth v. Rivenburgh*, 317 F.3d 425, 439 (4th Cir. 2003). *See* Fed. Opp. at 18, 22-23. To the extent the Fourth Circuit held in *Kentuckians* that the permit itself is entitled to *Chevron* deference, it is inconsistent with the U.S. Supreme Court's holding in *Mead* and with the Ninth Circuit's holding in *The Wilderness Society*. This Court should follow the latter cases.

Finally, the agencies' position in this litigation is entitled to little or no deference. Judicial deference "does not extend to 'agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice.'" *Ashoff v. City of Ukiah*, 130 F.3d 409, 411 (9th Cir. 1997) (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988)).

> 2. *The 2002 fill rule was not intended to change the agency practice of requiring 402 permits for discharges from sources subject to effluent limitations.*

Conceding as they must that the agencies' statements at the time they adopted the regulation are highly persuasive as to the agency's intent, Federal Defendants and Coeur Alaska both suggest that the agency's statements of intent are inconsistent with the language of the rule, and that the rule controls. *See* Fed. Opp. at 20 n.19; Coeur Opp. at 27. This argument is based on an assertion that the new "fill material" definition clearly applies to the Kensington discharge, because the discharge will raise the bottom elevation of the water. *See* 33 C.F.R. § 323.2(e)(1)(ii); 40 C.F.R. § 232.2("Fill material")(1)(ii). This ignores the fact, however, that EPA's performance standard for froth-flotation gold mills is equally clear and applies equally to the Kensington discharge. *See* 40 C.F.R. § 440.104(b)(1). The government admits this. *See*, *e.g.*, Fed. Opp. at 4 ("For gold mine operations that use a froth-flotation milling process – the process that would be used at the Kensington Mine – EPA issued a new source performance standard in 1982 for the discharge of process wastewater").[5] Thus the adoption of the new "fill

---

[5] Coeur Alaska makes a passing comment that process wastewater does not include the tailings slurry, *see* Coeur Opp. at 25 n.8, but this is false. The tailings slurry is the waste byproduct of the milling, or gold ore beneficiation, process. It consists of about 55% solids. *See* Fed. Opp. at 15; Pl. Ex. 12 at 19 (Report on Water Quality Modeling at 24). When EPA promulgated the standard of performance for froth-flotation gold mills, it explained that "[m]ill process wastewater is characterized by very high suspended solids levels (often in the percent range

(footnote continued…)

material" rule created a significant ambiguity: there were two incompatible rules that both, on their face, applied to discharges from froth-flotation gold mills.

The preamble to the new rule in the Federal Register acknowledged and directly addressed this ambiguity, explaining that in this situation the discharge would be governed by the effluent limitation, consistent with longstanding practice. *See supra* pp. 8-9. Thus, there is no incompatibility between the rule and its preamble as suggested by Defendants. The preamble was needed to clarify the ambiguity created by adopting overlapping rules.

Nowhere in the entire preamble to the rule or the Response to Comments do the agencies suggest that a discharge from an industrial source subject to an effluent limitation or performance standard promulgated by EPA could nevertheless be permitted as "fill material" by the Corps under section 404. Coeur Alaska and the State both rely on the agencies' statement in the preamble that "[t]he language in today's final rule will clarify that any mining-related material that has the effect of fill when discharged will be regulated as 'fill material.'" 67 Fed. Reg. 31,129, 31,135 (May 9, 2002) (Pl. Ex. 27 at 7). *See* Coeur Opp. at 29; State Opp. at 8. This statement, however, is made in that part of the preamble explaining the meaning of "<u>discharge</u> of fill material." *See* 67 Fed. Reg. at 31,135 (Pl. Ex. 27 at 7) (emphasis added). It is clearly true that if the mining-related material qualifies as "fill material," its placement will constitute the "discharge of fill material" under the new definition. *See* 33 C.F.R. § 323.2(f); 40 C.F.R.

_____

(…footnote continued)
rather than milligrams per liter)…." 47 Fed. Reg. 25,682, 25,685 (June 14, 1982) (Pl. Ex. 18 at 9). EPA reaffirmed this when it issued the Kensington 402 permit, stating that the new source performance standards for froth-flotation gold mills "prohibit the discharge of process water (<u>including</u> mine tailings)." Pl. Ex. 7 at 3 (EPA ROD at 3) (emphasis added). *See* 40 C.F.R. § 401.11(q) (process wastewater defined as "any water which, during manufacturing or processing, comes into direct contact with or results from the production or use of any raw material, intermediate product, finished product, by-product, or waste product").

§ 232.2("Discharge of fill material"). "Fill material" is separately defined. *See* 33 C.F.R.

§ 323.2(e); 40 C.F.R. § 232.2("Fill material"). Thus, the statement relied upon by Defendants,

taken out of context, simply does not address the threshold issue, which is whether the tailings

may be treated as "fill material" in the first place. The discussion in the section of the preamble

addressing "discharge" of fill material does not address the agencies' longstanding practice of

relying on effluent limitations and standards of performance to determine whether section 402 or

404 applies where there is overlap between the fill definition and the effluent limitations. That

discussion occurs in the section preceding the one on which the State and Coeur rely. *See* 67

Fed. Reg. at 31,135 (Pl. Ex. 27 at 7).

Defendants' argument based on the rule's definition of "discharge of fill material," *see*

Fed. Opp. at 20; Coeur Opp. at 19; State Opp. at 7, fails for the same reason. *See* Pls. Br. at 39.

It is inapplicable because discharges from a source subject to an effluent limit would not be

regulated as "fill material" in the first place. Similarly, the agency explanation cited by Coeur

Alaska from the Response to Comments occurs in a discussion of the "discharge of fill material"

provision and does not address the circumstance where an effluent limitation or standard of

performance exists for the source. *See* Coeur Opp. at 30-31; Coeur Ex. 26 at 37-38.

Federal Defendants and Coeur Alaska also rely on the agencies' statement in the

preamble to the 2002 rulemaking that "EPA has never sought to regulate fill material under

effluent guidelines" and EPA's statement in 1982 that it will apply standards of performance

through the section 402 permit program. 67 Fed. Reg. 31,129, 31,135 (May 9, 2002) (Pl. Ex. 27

at 7); 47 Fed. Reg. 54,598, 54,606 (Dec. 3, 1982); *see* Fed. Opp. at 20, 30; Coeur Opp. at 24.

Like their previous arguments, their argument here merely reflects that EPA, not the Corps,

ensures compliance with effluent limitations and standards of performance under section 402 of

the Act.  None of the statements on which Defendants rely address the situation here where there

is an overlap between a regulation imposing a standard of performance and the regulation

defining "fill material."  Defendants ignore all the agencies' statements concerning that situation

and their longstanding practice.[6]

      The State puts significance on the fact that the agencies initially proposed an exception to

the definition of "fill material" for discharges covered by effluent limitations or standards of

performance.  *See* State Opp. at 7-8; 65 Fed. Reg. 21,292, 21,300 (April 20, 2000) (Pl. Ex. 26

at 9).  This fact actually supports Plaintiffs' argument.  At the time they proposed it, the agencies

explained that the exception was consistent with their "current practice" and "consistent with

paragraph B.5 of the 1986 Solid Waste MOA (providing that when discharges are in liquid,

semiliquid, or suspended form or the discharge is of homogeneous solid material, this is a factor

indicating application of section 402)."  65 Fed. Reg. at 21,297 (Pl. Ex. 26 at 6).  When the

agencies removed the exception from the final rule, they explained that they did so out of

concern that the exception "would result in uncertainty … as to whether the reference to effluent

guidelines was meant to refer only to those in existence at the time today's rule was promulgated

---

[6] Coeur Alaska argues that various statements made during the Kensington mine proceedings by Corps officials that the Corps does not regulate tailings were not the "final word."  Coeur Opp. at 31.  However, the Wilcher Memorandum cited by Coeur as the final word, *see id.* at 31-32, does not help Coeur for two reasons.  First, under the analysis in that memorandum, the Corps would not grant permits for discharges of tailings into navigable waters, consistent with the position always taken by Corps officials previously.  *See* Coeur Ex. 28 (Wilcher Memorandum).  Second, EPA and the Corps never issued permits for the Kensington mine under the theory of the Wilcher Memorandum and ultimately decided not to follow that approach.  *See infra* pp. 19-20, n.9; Pl. Ex. 29 at 3 (Regas Memorandum at 3).  The State recognizes that approach as "obsolete."  State Opp. at 7 n.6.

or whether the reference was prospective." 67 Fed. Reg. 31,129, 31,135 (May 9, 2002) (Pl. Ex. 27 at 7). They elaborated:

> In light of the concerns and confusion associated with the proposed provision, we have decided to delete it from the rule. However, although we have removed the language in question from the rule itself, we emphasize that today's rule generally is intended to maintain our existing approach to regulating pollutants under either section 402 or 404 of the CWA.

*Id*. Thus, the discussion surrounding the initial inclusion and subsequent removal of the exception for discharges for which there are effluent limitations lends further support to Plaintiffs' position.

Defendants' assertions that all mining-related discharges that would raise the bottom elevation of water are automatically considered "fill material" would have the effect of a massive implied repeal of numerous effluent limitations and performance standards adopted by EPA. Mining process wastewater, by its very nature, is high in solids and will therefore always have the effect of raising the bottom elevation of water. EPA knew this when it promulgated the performance standards. *See*, *e.g.*, 47 Fed. Reg. 25,682, 25,685 (June 14, 1982) (Pl. Ex. 18 at 9) ("Mill process wastewater is characterized by very high suspended solids levels (often in the percent range rather than milligrams per liter)…."). Presumably, if the agencies had intended such a large-scale repeal of rules carefully adopted by EPA, they would have said so, either in their rule or somewhere in their explanation of it, but they did not. It is simply implausible that the agencies could have silently intended an implied repeal of such significance. "[I]t is a 'cardinal rule . . . that repeals by implication are not favored.'" *County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 262 (1992) (quoting *Posadas v. Nat'l City Bank,* 296 U.S. 497, 503 (1936)). "[A]n agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change…." *Motor Vehicle*

*Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). In this case, not only is there no "reasoned analysis" for the alleged repeal of the effluent limitations, but there is no acknowledgment of it. This is because it did not happen. The agencies stated that they would continue to apply effluent limitations when they adopted the 2002 rule, and the Court should reject Defendants' assertions to the contrary in this case.

> 3. *The extra-record evidence presented by Coeur Alaska and the State show that the Corps has never issued a section 404 permit for the discharge of tailings into waters of the United States.*

Coeur Alaska and the State also introduce evidence outside of the administrative record concerning three mines not at issue here to argue that the Kensington permit is consistent with the Corps' past practice.[7] Their assertions are misleading and false. As far as Plaintiffs are aware, before the Kensington mine, the Corps had never issued a section 404 permit for the discharge of mine tailings directly into waters of the United States. Defendants have apparently canvassed the country in search of a precedent for the Kensington permit, yet failed to find one. This proves Plaintiffs' point.

The Red Dog mine has two section 404 permits which allow it only to: (1) construct a port facility near Kivalina, Alaska; (2) construct a gravel road between the port and the mine;

---

[7] Generally, "judicial review of agency action is limited to a review of the administrative record." *Friends of the Earth v. Hintz*, 800 F.2d 822, 828 (9th Cir. 1986). The party seeking to supplement the record must show that an exception to this general rule applies. *See Sierra Club v. Dombeck*, 161 F. Supp. 2d 1052, 1063 (D. Ariz. 2001). Defendants have made no attempt to show why the record should be supplemented. Nevertheless, because the permits introduced by Defendants illustrate Plaintiffs' point that the Corps has never issued a 404 permit for the discharge of mine tailings as waste, Plaintiffs do not object to these exhibits provided that the Court also considers the additional related exhibits offered by Plaintiffs to provide the complete picture.

(3) construct an access road between the mill and the mine; and (4) construct a dam for the creation of a tailings pond. *See* Pl. Ex. 43 at 2 (Corps' ROD for the Red Dog Mine at 1); *see also* Coeur Ex. 23 at 1 (404 permit authorizing discharges only for construction of dam and road). It does not have a section 404 permit to dispose of its mine tailings as waste into navigable waters.[8] In contrast, the 404 permit for the Kensington mine authorizes the discharge of 3,168,000 cubic yards of "tailings as fill" into the "Tailings Lake." Pl. Ex. 9 at 9 (2005 Corps Permit, Table 1).

Similarly, the Fort Knox mine does not have a section 404 permit authorizing it to discharge mine tailings into waters of the United States. On its face, the permit authorizes only the discharge of fill for the purpose of construction of a dam and related structures. Coeur Ex. 24 at 1. It states explicitly, in sharp contrast to the Kensington mine permit: "No discharge of waste water to waters of the United States is expected…." *Id.* at 7.[9] Tailings are a component of process wastewater from the froth-flotation milling process. *See* Pls. Br. at 18.

---

[8] Coeur Alaska's Exhibit 23, which purports to be the Red Dog mine's section 404 permit, contains an apparent error. It states that the mining company is authorized to place "mine tailings" in a creek and wetlands to construct a dam. Coeur Ex. 23 at 1. However, the final environmental impact statement for the Red Dog mine states that the tailings pond dam is "an impervious earth-filled structure." Pl. Ex. 45 at 3 (Red Dog Mine FEIS at II-6). Plaintiffs' understanding is that the dam was constructed with earthen material, as stated in the EIS, not with the tailings slurry.

Even if the permit does not contain an error, it authorized the discharge of tailings only for the limited purpose of constructing a dam, not to dispose of waste as with the Kensington mine. This permit was issued at a time when the Corps had a purpose-based definition of "fill material," so the discharge would have been consistent with Corps regulations at that time. *See* Pls. Br. at 20-21. The permit did not authorize the discharge of tailings into navigable waters for any purpose other than to construct the dam. *See* Coeur Ex. 23 at 1.

[9] At that time, the agencies took the view that the impounded stream was no longer a "water of the United States" within the meaning of the Clean Water Act, and that no permit was therefore required to discharge the tailings. *See* State Ex. E at 2 ("Wilcher Memorandum"); Pl. Ex. 45 at 1

(footnote continued…)

For the Smoky Canyon mine, the Corps issued a section 404 permit only "for the construction of a dam, a diversion structure, and a clay cap over a spring area in conjunction with the construction of a tailings impoundment."  Coeur Ex. 25 at 1; *see also* Pl. Ex. 46 at 2 (Corps' Information Paper at 2) (permit "only authorize[d] the discharge of fill material for the containment dam and the diversion structure").  The creek was diverted around that impoundment.  Again, the Corps' permit did not authorize a discharge of tailings into waters of the United States.  Coeur Ex. 25 at 3, 8.

The State also references the Greens Creek and Pogo mines.  State Opp. at 10.  In these two instances, the mining company created a dry tailings facility similar to the one permitted for the Kensington mine in 1998 and analyzed in the 2004 Final Supplemental EIS as Alternatives A and A1.  *See* State Ex. F at 5 (Fogels Decl. at ¶¶ 10-11); Pl. Ex. 47 at 5 (Pogo Mine FEIS, App. E at D-24) (explaining that, to create the dry tailings facility, clean fill and rock materials would be placed in wetlands to construct an "erosion control/drainage blanket," and, thus, "tailings placed on the erosion control/drainage blanket would be placed in uplands").  Neither the Greens Creek nor Pogo mines obtained a 404 permit to discharge mine tailings into waters of the United States.

---

(…footnote continued)
(Corps' letter to EPA re Fort Knox at 1) (explaining that the Corps and EPA agreed to follow "the guidance jointly developed by [their] respective headquarters for the A-J and Kensington Mines for the Fort Knox Mine").  The agencies have subsequently changed their approach and no longer rely on that theory.  *See* Pl. Ex. 29 at 3 (Regas Memorandum at 3).  Although not relevant here, the previous theory was plainly unlawful.  It ignores the fact that the agencies' definition of "waters of the United States" includes "[a]ll impoundments of waters otherwise defined as waters of the United States under this definition."  40 C.F.R. § 122.2 (EPA's regulation); 33 C.F.R. § 328.3(a)(4) (Corps' regulation).  It also contradicts EPA's own legal position that "in-stream treatment ponds and the waters above such ponds are included in the definition of waters of the United States" because they are impoundments.  *W. Va. Coal Ass'n v. Reilly*, 728 F. Supp. 1276, 1289-90 (S.D. W.Va. 1989).

C.     The broad, implied exception urged by Defendants would defeat the purpose of the Clean Water Act.

The purpose of the Clean Water Act and its legislative history also support the conclusion that the Corps cannot issue a section 404 permit for the discharge of pollutants subject to effluent limitations and standards of performance promulgated by EPA.  The Act established a complex regulatory scheme to impose technology-based restrictions on discharges that, over time, become increasingly strict until they force industrial dischargers to operate without adding any pollution to the waters of the United States, *i.e.*, zero discharge of pollution.  Congress enacted this approach to end the practice of using rivers, lakes, and streams "to dispose of man's wastes." S. Rep. No. 92-414, at 7 (1971), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3674 , *and in* 2 Comm. on Public Works, 93rd Cong., A Legislative History of the Water Pollution Control Act Amendments of 1972, at 1425 (1973) (attached as Pl. Ex. 17 at 25).  *See also id.* ("The use of any river, lake, stream or ocean as a waste treatment system is unacceptable").  It codified this goal in section 101.  *See* 33 U.S.C. § 1251(a)(1) ("it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985").

Section 301(a) contains the "fundamental premise of the Clean Water Act," for it makes unlawful all point source discharges of pollutants unless they comply with several enumerated sections, including sections 301, 306, 402, and 404.  *Natural Res. Def. Council v. Envtl. Prot. Agency*, 822 F.2d 104, 109 (D.C. Cir. 1987).  Section 306, "which is designed to assure that new stationary sources of water pollution are designed, built, equipped, and operated to minimize the discharge of pollutants, is among the most significant in the legislation."  S. Rep. No. 92-414, at 57 (1971), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3723-24, *and in* 2 Comm. on Public Works, 93rd Cong., A Legislative History of the Water Pollution Control Act Amendments of 1972, at 1475 (1973) (attached as Pl. Ex. 17 at 29).  Section 306 contains "absolute prohibitions" against

the operation of a source that does not comply with the standards of performance for that source.

*E.I. du Pont de Nemours & Co. v. Train,* 430 U.S. 112, 138 (1977); *accord, Riverkeeper, Inc. v.*

*United States Envtl. Prot. Agency,* 358 F.3d 174, 192 (2nd Cir. 2004).[10]  Congress thus had a

clear purpose in mind:  to eliminate discharges of industrial waste into waters of the United

States by progressively ratcheting down on the amount of pollution a source could discharge.

For gold mines, EPA achieved this explicit congressional objective by adopting a zero-

discharge limit for the precise type of facility to be used at the Kensington mine, finding that it

was feasible for the industry as a whole to avoid any discharges of process wastewater.  40

C.F.R. § 440.104(b)(1); *see* Pls. Br. at 18-20.  Though EPA has never repealed this rule or

renounced its finding, the agencies are now attempting to go backwards, claiming, in effect, an

implied repeal through a new definition of "fill material."  This would be a major retreat from the

congressional objective.

Congress did not intend the section 404 permit program to defeat the statute's purposes in

this fashion.  In enacting the Clean Water Act, Congress was responding primarily to the

problem of industrial and municipal wastes polluting the nation's waters.  The amendment

relating to dredged and fill material was considered a relatively minor issue.  In the words of its

sponsor, the disposal of dredged material "merely moves the material from one location to

another" and "presents no significant problem."  117 Cong. Rec. 38797, 38853 (Nov. 2, 1971)

(remarks of Senator Ellender) (Pl. Ex. 17 at 10); *see* Pls. Br. at 16-17.  Congress did not even

---

[10] Federal Defendants distinguish the facts of *E.I. du Pont de Nemours* from the facts of this case. Fed. Opp. at 30.  Plaintiffs, however, rely on the case simply to demonstrate that Congress understood that there could be no exceptions to section 306.  The Supreme Court obviously did not address the precise issue before this Court.

enact a definition for "fill material."  Yet, under Defendants' interpretation of the Act, the entire

permitting scheme depends on this undefined term, creating an implied exception to explicit

prohibitions going to the very heart of the problem Congress was addressing.  In short, the

Kensington permit makes acceptable the use of a lake as "a waste treatment system," the very

practice Congress was trying to stop.  Congress did not intend for the goal of zero pollution to be

accomplished by reclassifying the pollution as "fill material."

 The history and purposes of the Clean Water Act refute Defendants' assertions that

section 404 is a better tool than section 402 to regulate process wastewater from froth-flotation

gold mills.  *See* Fed. Opp. at 25-26; Coeur Br. at 20-22.  Congress concluded otherwise.

 Defendants' interpretation of the Act also leads to extreme results that go far beyond the

Kensington mine and beyond the mining industry.  Under their interpretation, any industrial or

municipal waste discharge containing solids could be deemed "fill material," because the solids

will inevitably raise the bottom elevation of the water.  This covers a wide range of discharges,

including the effluent from dairy products processing facilities, grain mills processing facilities,

cement manufacturing facilities, leather tanning and finishing facilities, timber products

processing facilities, and froth-flotation gold mill facilities such as the one here, all of which

contain suspended solids.  *See* 40 C.F.R. parts 405, 406, 411, 425, 429, and 440.  In each of these

instances, however, EPA has promulgated effluent limitations and standards of performance to

cover those discharges.  *See id.*  Congress did not intend such a huge loophole in the general

scheme designed to ensure that industrial and municipal sources of pollution would be subject to

effluent limitations and performance standards.

II.     THE CORPS' SECTION 404 PERMIT IS INCONSISTENT WITH THE
        REGULATIONS DEFINING "FILL MATERIAL."

Because the Clean Water Act prohibits the Corps from issuing 404 permits for discharges

of pollutants regulated by effluent limitations, the Court need not also address whether the permit

is consistent with the agencies' regulations.  *See Envtl. Def. Ctr. v. United States Envtl. Prot.*

*Agency*, 344 F.3d 832, 855 n.32 (9th Cir. 2003) ("every permit must comply with the standards

articulated by the Clean Water Act").  Should the Court disagree with this interpretation of the

statute, however, the Corps' section 404 permit for the Kensington mine is inconsistent with the

agencies' "fill material" regulations.  As discussed above, the agencies made clear in adopting

that regulation that, for discharges from sources for which EPA has promulgated effluent

limitations, the intent of the agencies was that those discharges would be permitted only by EPA

under section 402, not by the Corps under section 404.  *See supra* pp. 8-9.


III.    THE USE OF LOWER SLATE LAKE AS A WASTE DISPOSAL SITE FOR
        TAILINGS SLURRY OVER THE COURSE OF 10-15 YEARS WILL KILL ALL FISH
        IN THE LAKE AND PERMANENTLY ALTER THE NATURAL ENVIRONMENT.

In closing their arguments, Federal Defendants argue that the selected alternative for the

Kensington mine project, Alternative D, is the environmentally preferable one because

Alternatives A and A1, which utilize the dry stack facility approved in 1998, involve the

permanent conversion of wetlands to uplands.  *See* Fed. Opp. at 31-32.  Although this argument

is irrelevant to the merits, which Federal Defendants concede (*id*. at 31), Plaintiffs note that there

is a strong dispute among the federal agencies as to which alternative is environmentally

preferred.  In contrast to Federal Defendants' position, EPA concluded that Alternative A is the

environmentally preferable alternative.  EPA explained:

> Alternative A is the only alternative that will avoid the habitat loss in Lower Slate Lake during mine operations, and the uncertainty in terms of the Lake's long term recovery. It is also the only alternative that avoids the significant impacts to sensitive habitat and resources in Berners Bay that would result from Alternatives B, C and D. . . .

> Alternative A is also EPA's preferred alternative, because in addition to being environmentally preferable, it appears to be a practicable and feasible alternative. The dry tailings facility proposed under Alternative A is a standard industry technology in use at other mines in Alaska.

Pl. Ex. 48 at 8-9 (EPA's FSEIS Comments). EPA elaborated that while Alternative A would affect more acres of wetlands than Alternative D, "EPA believes that forest wetlands [lost under Alternative A] are far more plentiful, and of far less ecological value at this location, than lacustrine and palustrine emergent wetlands [lost under Alternative D], which are rare and ecologically important at this location." *Id*. at 14. EPA reiterated its conclusion when it issued a National Pollutant Discharge Elimination System Permit for the Kensington mine. *See* Pl. Ex. 7 at 7 (EPA Record of Decision at 7) ("for the reasons discussed in our December 1, 2004 letter, EPA continues to believe that Alternative A is environmentally preferable").

On the other hand, the Corps concluded that Alternative D was the least damaging alternative, and the Forest Service concluded that it was a tie between Alternatives A and D. *See* Pl. Ex. 39 at 12 (2006 Revised Record of Decision at 21); Pl. Ex. 2 at 10 (2004 ROD at 9).[11] The EIS did not examine other sites, such as a dry stack facility closer to the mine site, that may

---

[11] Federal Defendants emphasize that Alternatives A and A1 involve the destruction of more acres of wetlands than Alternative D, and wetlands are considered "special aquatic sites." Fed. Opp. at 31-32. While true, it is also important to note that the Corps' obligation is to consider impacts "on the aquatic ecosystem," which is defined as "waters of the United States, including wetlands, that serve as habitat for interrelated and interacting communities and populations of plants and animals." 40 C.F.R. § 230.10(a); *id*. § 230.3(c). This is the distinction EPA made when it found Alternatives A and A1 to be environmentally preferable to Alternative D.

have been preferable to either of these alternatives.  The record is thus mixed on which alternative is the most environmentally sound.  Plaintiffs believe that a properly designed and sited dry stack facility is preferable to polluting a lake.  Without question, under any alternative, the development of a large-scale hard-rock mine such as the proposed Kensington mine will involve substantial environmental degradation.

The Court need not decide which alternative is the best or appropriate.  The issue before the Court is the legality of the Corps' section 404 permit, which dictates only how Coeur Alaska can dispose of its process wastewater (the tailings slurry).  If Plaintiffs prevail, Coeur Alaska can decide how best to construct this mine under a different approach to tailings disposal, and the agencies can analyze that proposal accordingly.

Coeur Alaska also argues that regulating the discharges of tailing slurry under section 402 would weaken the Clean Water Act's protections.  *See* Coeur Opp. at 34-35.  This argument is without merit.  The standard of performance for froth-flotation gold mills is zero discharge. Therefore, that standard would completely protect the lake, its surrounding habitat, and the fish and other aquatic life in the lake.  By contrast, regulating the discharges under section 404 allows the entire, untreated slurry discharges to enter the lake killing all fish and nearly all aquatic life, at least for the 10-15 years that the mine is operating.  Pl. Ex. 1 at 41 (2004 FSEIS at 4-38); Pl. Ex. 39 at 15 (2006 Corps Revised ROD at 27).  If the mining operations expand, all fish in both Lower and Upper Slate Lakes would be killed and the Dolly Varden char population may be permanently lost.  Pl. Ex. 48 at 4 (2004 FSEIS at 4-144).

Coeur Alaska bases its argument on the fact that, if Plaintiffs prevail, they will develop the mine under Alternative A or A1 and "pile the tailings in a wetland area, resulting in the permanent loss of more than 100 acres of wetlands and creating a mountain of tailings."  Coeur

Opp. at 12.  This argument is disingenuous.  In the mid- to late-1990s, Coeur spent millions of

private and federal taxpayer dollars in obtaining the necessary permits and going through the

process under the National Environmental Policy Act (NEPA) to obtain approval for its 1998

plan of operations (Alternative A).  At that time, the Corps concluded that that alternative was

the "least damaging practicable alternative."  Pl. Ex. 49 at 5 (1998 Corps ROD at 18).  Coeur

Alaska's attempt to deride its previously selected alternative is self-serving and not credible.  It

also ignores the possibility that there are other sites suitable for disposal of the tailings.

Coeur Alaska also bases its contention that Plaintiffs' approach would weaken the Clean

Water Act on its belief that, after discharging 210,000 gallons of a toxic slurry into a lake for 10-

15 years, "there will be a more productive Lower Slate Lake, larger and with improved fish

habitat."  Coeur Opp. at 38.  This ignores that for at least 10-15 years, the lake will be a dead

zone.  Further, there is no certainty that it will be possible for the lake to recover.  The only tests

that were done on the toxicity of the mine tailings on freshwater organisms showed that, in one

case, the organisms died and, in the other, they exhibited a reduced rate of emergence from their

eggs.  *See* Pls. Br. at 10-11.  Coeur relies on the State's theory that it may have been milling

reagents in the tailings slurry sample that killed the organisms, which ostensibly will not be a

concern in the lake because those reagents will be diluted by the lake water.  *See* Coeur Opp. at 9

n.3.  Given that there were no other tests done, this theory has never been tested.

Finally, Coeur Alaska also relies on capping the tailings if it cannot prove that the lake

will recover naturally.  However, the record contains no information on how to install a cap over

the bottom of a 62-acre lake and no analysis as to whether it would work.  In short, damming a

lake and dumping tailings into it involves risk, a risk that Congress decided is no longer

acceptable.

IV.  THE FOREST SERVICE'S ROD AND APPROVAL OF THE PLAN OF
     OPERATIONS, AND THE CORPS' SECTION 404 PERMIT FOR THE
     CONSTRUCTION OF A MARINE TERMINAL FACILITY AT CASCADE POINT,
     ARE ARBITRARY AND NOT IN ACCORDANCE WITH LAW.

     The Forest Service's Record of Decision (ROD) and approval of the plan of operations,

and the Corps' section 404 permit for the Cascade Point marine terminal facility, are premised on

the section 404 permit for the Kensington mine.  Since that permit is unlawful, these dependent

decisions are also unlawful.  *See* Pls. Br. at 40-41.  Defendants do not dispute that, on the merits,

the Forest Service's ROD and plan of operations and the Corps' section 404 permit for Cascade

Point are premised on the section 404 permit for the Kensington mine.  They also do not

challenge the conclusion that, if the Kensington mine permit is unlawful, these other permits are

also unlawful.  Rather, they argue that, as a matter of relief, the permits should not be set aside

and the activities enjoined.  Plaintiffs address these contentions in the section on relief below.

V.   THE COURT SHOULD VACATE THE SECTION 404 PERMITS AND THE FOREST
     SERVICE'S ROD AND APPROVAL OF THE PLAN OF OPERATIONS, AND
     GRANT A PERMANENT INJUNCTION.

     A.    <u>Vacatur is the appropriate remedy for all decisions challenged in the complaint.</u>

     None of the Defendants disputes that the normal remedy under the Administrative

Procedure Act for an unlawful agency action is to "vacate the agency's action and remand to the

agency to act in compliance with its statutory obligations."  *Defenders of Wildlife v. United*

*States Envtl. Prot. Agency*, 420 F.3d 946, 978 (9th Cir. 2005).  Federal Defendants argue only

that it would be "premature" to vacate the section 404 permit for the Kensington mine.  Fed.

Opp. at 34.  They request that the Court remand the agency's decision on the ground that the

Court could "determine that the Corps might easily remedy the deficiency on remand."  *Id*. at 37.

This case, however, does not involve the validity of some analysis or rationale that can be

remedied.  It challenges the validity of the Corps' permit which, if unlawful, cannot be rectified

by additional review.  If Coeur Alaska subsequently chooses an alternative tailings disposal method, the Corps will have to evaluate an entirely new permit proposal.  Accordingly, there is no reason to deny the normal remedy under the Administrative Procedure Act.  Vacatur should be granted.

Federal Defendants also argue that it would be improper to vacate the Forest Service's ROD and approval of the plan of operations because Plaintiffs' claim against the section 404 permit for the mine arises under the Clean Water Act and jurisdiction under the Act extends only to "work in waters of the United States."[12]  Fed. Opp. at 34.  This argument lacks merit.

The Forest Service is a named defendant in this case and the complaint includes a request for vacatur of its decisions.  *See* First Amended Compl. at 16-17.  A key component of the plan of operations is the unlawful section 404 permit authorizing disposal of mine tailings in Lower Slate Lake.  *See* Pl. Ex. 13 at 11 (2006 Plan of Operations at 58).  The Forest Service's ROD and approval of that plan are therefore arbitrary, capricious, and not in accordance with law.  *See* Pls. Br. at 40-41.  The fact that the claim in this case arises under the Clean Water Act does not insulate the plan of operations when the implementation of that plan depends on the validity of a Clean Water Act permit.  If and when Coeur Alaska amends the mining plan to include a legal method for disposing of mine tailings, the Forest Service can issue a new decision.  Until then, it makes no sense to allow the construction of a mine that cannot be operated.

---

[12] Federal Defendants do not argue that, if the section 404 permit for the mine is vacated, the section 404 permit for Cascade Point should not also be vacated.  It thus appears that they concede this point.

B.    <u>The Corps' violation of the Clean Water Act is not a mere technical violation but goes to the principal purpose of the Act.</u>

Relying on *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982), Federal Defendants argue that Plaintiffs are not entitled to injunctive relief.  *See* Fed. Opp. at 36-37.  *Romero-Barcelo* is factually distinguishable, and the Supreme Court's reasoning, if anything, supports an award of injunctive relief.  The case involved the Navy's use of Vieques Island off of Puerto Rico for weapons training.  456 U.S. at 307.  The district court held that the Navy needed to obtain a section 402 permit for its discharges of ordnance and issued an injunction ordering the Navy to do so.  *Id*. at 309.  The district court, however, refused to order the Navy to cease operations in the interim because the Navy had committed only technical violations of the Act, those violations "were not causing any appreciable harm to the environment," and the activities were of national significance, implicating the general welfare of the Nation.  *Id*. at 309-310 (punctuation and citations omitted).

Given the technical nature of the violations, the lack of harm, and national importance of the activities, the Supreme Court upheld the district court's denial of the injunction.  *Id*. at 320.  The Court explained that the "integrity of the Nation's waters, . . . not the permit process, is the purpose of the" Clean Water Act.  *Id*. at 314.  The Supreme Court did not hold that the plaintiffs were entitled to no injunctive relief.  Indeed, they had obtained an injunction ordering the Navy to obtain a permit.

In this case, the Corps' violation goes right to the fundamental purpose of the Act and affects the integrity of the Nation's waters.[13]  It is not a technical violation that can be rectified

---

[13] Coeur Alaska cites to the Mining and Minerals Policy Act of 1970 for the proposition that it is the continuing policy of the federal government to encourage "private enterprise in . . . the

(footnote continued…)

by obtaining a permit.  The standard of performance for froth-flotation gold mills is zero

discharge.  *See* 40 C.F.R. § 440.104(b).  EPA enacted this standard at Congress' direction and in

furtherance of the Act's objective to eliminate the discharge of pollutants from waters of the

United States.  Neither EPA nor the Corps can authorize the proposed discharges into waters of

the United States.  Moreover, unlike naval training, gold mining does not implicate the Nation's

welfare.  Finally, here, there will be "appreciable harm" since the discharges of tailings into the

lake will kill all fish and nearly all aquatic life for at least 10-15 years while the mine is

operating.  Accordingly, under the Supreme Court's reasoning in *Romero-Barcelo*, an injunction

is appropriate.

      C.     <u>Without an injunction, Plaintiffs will suffer substantial and immediate irreparable
harm.</u>

      In cases involving environmental harm, courts normally issue an injunction unless there

are "unusual circumstances."  *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 738

n.18 (9th Cir. 2001) (quoting *Forest Conservation Council v. United States Forest Serv.*, 66 F.3d

1489, 1496 (9th Cir.1995)); *see Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545

(1987).  In this case, there will be substantial environmental harm, *see* Pls. Br. at 43-45, and

---

(…footnote continued)
development of economically sound and stable domestic mining . . . ."  Coeur Opp. at 36
(quoting 30 U.S.C. § 21a).  It is also the federal government's goal "to restore and maintain the
chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  These
goals must be read together.  Nothing in the Mining and Minerals Policy Act of 1970 suggests
that Congress intended to encourage mining activities that are inconsistent with the Clean Water
Act.  Indeed, the Mining and Minerals Policy Act of 1970 also states that it is federal policy to
encourage the "development of methods for the disposal, control, and reclamation of mineral
waste products . . . ."  30 U.S.C. § 21a.

Defendants have failed to show the existence of unusual circumstances warranting the denial of injunctive relief.

Coeur Alaska argues that an injunction should be denied because there will be no environmental harm. Coeur Alaska claims that, at "the end of the day," the lake will be enhanced. Coeur Opp. at 38. However, the "end of the day" is 10-15 years from now, during which time Coeur Alaska will discharge 210,000 gallons of toxic slurry on a daily basis, ultimately depositing 4.5 million tons of solid waste in the lake. The lake will be a dead zone during the entire time that the mine is operating.[14] Pl. Ex. 1 at 29 (2004 FSEIS at 3-25). Moreover, Coeur Alaska's claim that the lake will be fully restored is unsupported by the record, which indicates that there is uncertainty on this issue. *See supra* p. 27; Pls. Br. at 10-11.

There will also be immediate harm. *See* Pls. Br. at 43. In fact, harm is already occurring since Coeur Alaska has clearcut all of the trees around the lake. *See* Pl. Ex. 50 (2006 picture of Lower Slate Lake). Without an injunction, at some point this summer, Coeur Alaska will construct a permanent dam below the lake in order to stop all flow from the lake and prepare the lake to become a waste disposal site.[15]

Coeur Alaska and Goldbelt also contend that there will be no negative impacts on Berners Bay, with Goldbelt focusing, in particular, on impacts associated with the construction

---

[14] Coeur Alaska asserts that the toxic pH level of the discharges will rapidly diminish as the lake water dilutes the effluent from the mill facility. Coeur Opp. at 10 n.4. Whether the fish die from being smothered to death or from the effluent's high pH is irrelevant.

[15] Federal Defendants argue that Plaintiffs are not entitled to relief because they have failed to state specifically when the harms will occur. Fed. Opp. at 38. Federal Defendants cite to no case that placed the burden on Plaintiffs to notify the Court of the defendant's construction schedule. In any event, this argument fails here because harm is already occurring.

and use of the marine terminal facility at Cascade Point.  The administrative record undercuts these contentions.

EPA has designated Berners Bay as an Aquatic Resource of National Importance and noted that its "ecosystem is a sensitive environmental area of concern, providing a diversity of critical habitat for fish and wildlife, as well as exceptional recreational and social values."  Pl. Ex. 51 at 17 (EPA Comments on Corps' Permit).  The Berners Bay area contains important spawning and rearing habitat for four species of salmon, halibut, Pacific herring, eulachon, steel head and cutthroat trout, crab, and shrimp.  *Id*.  It also provides feeding grounds for humpback whales, killer whales, harbor porpoises, harbor seals, and Steller sea lions.  *Id*.

The National Marine Fisheries Service (NMFS) expects that the mine's vessels will cause humpback whales to alter biologically important behavior, "including greater variability in the number of blows per surfacing, increased dive intervals, and changes in swim speed, pod composition, and direction of travel."  Pl. Ex. 52 at 13 (NMFS BiOp at 106).  Further, the proposed 6-10 daily shuttle trips across the bay will go "directly through areas where large aggregations of sea lions have been observed to cooperatively feed."  *Id*. at 10 (NMFS BiOp at 83) (citation omitted).

Pacific herring support "the nutritional needs of Steller sea lions, humpback whales, and other species through direct consumption as well as secondary consumption, when the mammals feed on other fish species such as pollock and salmon, which also feed on herring."  *Id*. at 4 (NMFS BiOp at 58).  Contrary to Goldbelt's claim that Cascade Point provides marginal spawning habitat (Goldbelt Opp. at 12), herring have spawned there "in 8 of the past 33 years, or

24% of the time."[16]  *Id*. at 16 (NMFS BiOp at 109) (citation omitted).  In addition, herring

spawned just north of Cascade Point 30% of the time.  *Id*.  "Thus in any given year the estimated

probability that herring will spawn at or near Cascade Point is slightly greater than 50%."  *Id*.

Operations at the marine terminal facilities, Cascade Point in particular, are likely to

cause harm to Pacific herring.  It "is probable that developing herring eggs and larvae near the

Cascade Point marine terminal will be exposed to elevated levels of [polycyclic aromatic

hydrocarbons from discharges of diesel and other fuels].  Chronic poisoning of herring can result

from these regular, low level inputs of hydrocarbons. This exposure may have detrimental affects

[*sic*] to individual herring and the Lynn Canal population as a whole."  *Id*. at 21 (NMFS BiOp at

114) (citation omitted).

Given the likelihood of harm, NMFS recommended that the dock at Cascade Point not be

built:

> Due to potential adverse effects on herring spawning habitat of the Lynn Canal
> Pacific herring population that may in turn negatively impact listed species,
> NMFS maintains its earlier recommendation, proposed during both informal
> section 7 consultation and EFH consultation, to use an alternative dock location to
> Cascade Point, preferably outside Berners Bay, to facilitate transportation of
> crews to the mine.

*Id*. at 23 (NMFS BiOp at 128).  The record thus reflects that the proposed mining operations will

cause substantial and irreparable harm to the environment, *i.e.,* "permanent or at least of long

duration."  *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987).  Plaintiffs'

---

[16] Goldbelt relies on the biological assessment that the Corps and Forest Service prepared and
submitted to NMFS.  *See* Goldbelt Opp. at 12.  NMFS, however, disagreed with the principal
conclusions of that assessment and therefore prepared the biological opinion cited here.  *See* Pl.
Ex. 53 at 1 (NMFS Consultation Letter at 1).

members, who frequently visit the Berners Bay area, including Lower Slate Lake, for the

solitude, recreational, fishing, wildlife viewing, and boating opportunities it offers, will similarly

suffer substantial and irreparable harm.  *See* Pl. Exs. 30-33, 42, 54, & 55 (Member Declarations).

Goldbelt also contends that the record shows only that the proposed operations "could

have impacts, not that they will have impacts."  Goldbelt Opp. at 11.  Not only is this argument

factually untrue, but it also misstates the standard for injunctive relief.  The evidence discussed

above shows that serious impacts are likely to occur.  That is all that the standard for issuing an

injunction requires.  *See Amoco Prod. Co.*, 480 U.S. at 545 (if environmental injury "is

*sufficiently likely*, . . . . the balance of harms will usually favor the issuance of an injunction to

protect the environment") (emphasis added); *G.C. & K.B. Invs., Inc. v. Wilson*, 326 F.3d 1096,

1107 (9th Cir. 2003) ("The requirements for the issuance of a permanent injunction are (1) *the

likelihood* of substantial and immediate irreparable injury, and (2) the inadequacy of remedies at

law") (emphasis added).[17]

  D. The balance of harms favors Plaintiffs.

Federal Defendants, Intervenor-Defendants, and Amici argue that this project will

provide economic benefits to the mine workers, the City and Borough of Juneau, and the larger

Southeast region.  However, the anticipated economic benefits do not constitute "unusual

---

[17] Citing a footnote in Plaintiffs' Opening Brief, Federal Defendants suggest that the harm may not be irreparable because restoration may be possible, including restoration of the lake after it has been filled with 4.5 million tons of mining waste.  Federal Defendants read too much into the footnote.  Plaintiffs stated that, because Coeur Alaska has already commenced operations, they may seek additional relief in the form of restoration.  *See* Pls. Br. at 41 n.18.  They did not mean restoration of the lake at the conclusion of mining.  Rather, they meant they may seek restoration of the clearcutting, road building, and related activities that are occurring right now.

circumstances" warranting the denial of an injunction or outweigh the substantial and irreparable harm from the proposed operations. *See* Pls. Br. at 45-46.

Moreover, these same benefits will accrue whether Coeur Alaska develops the mine based on an illegal or legal permit for the disposal of mine tailings. This case is not about the merits of mining in Alaska or about eliminating the Kensington mine. It is about whether the Corps can authorize discharge of mine slurry from a mill facility directly into a lake in violation of the standard of performance for that very type of facility. If Plaintiffs prevail, the decision would not preclude Coeur Alaska from seeking authorization to develop this mine lawfully. At the time of writing of this brief, the price of gold was around $700 per ounce. In 1998, when Coeur Alaska obtained its permits to develop the mine under Alternative A, the price of gold was much lower, slightly under $400 per ounce. Pl. Ex. 48 at 9 (EPA letter at 2, included in 2004 FSEIS at App. K). There is therefore good reason to believe that an alternative method for waste disposal is possible.

Even if it were not, an injunction would still be appropriate. In forcing pollution control technologies upon industries and insisting upon uniform and national standards of performance for new sources, Congress adopted an approach that inherently excludes those entities within each industry that cannot comply with the standards. If an entity cannot comply, it cannot get a permit for its proposed discharges. The standards of performance are absolute prohibitions and variances cannot be granted. *See E.I. du Pont de Nemours & Co. v. Train,* 430 U.S. 112, 138 (1977); *Riverkeeper, Inc. v. United States Envtl. Prot. Agency*, 358 F.3d 174, 192 and n.19 (2nd Cir. 2004). Consequently, Congress has decided that compliance with the standards of performance is mandatory throughout the United States. If the existing standards are somehow inappropriate, EPA always has the authority to amend them.

Coeur Alaska also argues that injunctive relief should be denied since it has invested $200 million in the Kensington project, and "an investment of $70 million warranted denial of an injunction" in *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531 (1987).  Coeur Opp. at 37.  Coeur Alaska's reliance on *Amoco Production* is misplaced.  In that case, the lower court had expressly found that there would be no harm from the challenged activity.  *See id*. at 544 (the district court "expressly found that exploration activities would not significantly restrict subsistence uses"); *id*. at 545 ("injury to subsistence resources from exploration was not at all probable").  Here, by contrast, there will be substantial environmental harm.  *See* Pls. Br. at 43-45.  Further, Coeur Alaska need not lose its investment if Plaintiffs prevail.  It can still seek a lawful disposal method for its tailings.

<u>CONCLUSION</u>

For the reasons discussed above and in Plaintiffs' Opening Brief, the Court should grant the relief Plaintiffs request.

Respectfully submitted this 17th day of May 2006,

/s/ Demian A. Schane

Demian A. Schane (ABA# 0403007)
Thomas S. Waldo (ABA# 9007047)
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
Ph: 907-586-2751
Fax: 907-463-5891
Email: dschane@earthjustice.org

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I, Demian Schane, certify that on May 17, 2006, a true and correct copy of PLAINTIFFS'
REPLY BRIEF ON COUNT I was served electronically to Mark A. Nitczynski, Richard L.
Pomeroy, John C. Berghoff, Jr., David C. Crosby, Ruth Hamilton Heese, Cameron M. Leonard,
John W. Hartle, Amy Gurton Mead, and Stephen F. Sorensen.  A courtesy copy was also sent via
e-mail to Lawrence L. Hartig and Jim Ustasiewski.

/s/ Demian A. Schane
Demian A. Schane

## TABLE OF EXHIBITS

**Ex. No.**    **Description**

43    1985 Red Dog Mine Project Record of Decision (Corps' ROD for the Red Dog Mine) [excerpt]

44    1984 Red Dog Mine Project Final Environmental Impact Statement (Red Dog Mine FEIS) [excerpt]

45    Letter from John W. Pierce, Corps, to Charles E. Findley, EPA, of 04/06/93 (Corps letter to EPA re Fort Knox)

46    Army Corps of Engineers, Smokey Canyon Phosphate Mine Information Paper, October 17, 1990 (Corps' Information Paper)

47    2003 Pogo Gold Mine Project Final Environmental Impact Statement (Pogo Mine FEIS) [excerpt]

48    2004 Kensington Gold Project Final Supplemental Environmental Impact Statement (2004 FSEIS) [excerpts]

49    Army Corps of Engineers, 1998 Record of Decision for the Kensington Gold Mine (1998 Corps ROD) [excerpt]

50    2006 Picture of Lower Slate Lake

51    EPA's Comments on Proposed Section 404 Permit for Kensington Mine, August 20, 2004 (EPA Comments on Corps' Permit)

52    NMFS, Biological Opinion on Kensington Gold Project, March 2005 (NMFS BiOp) [excerpt]

53    Letter from J. Balsiger, NMFS, to F. Cole, Forest Service, and J. Leeds, Corps, December 3, 2004 (NMFS Consultation Letter)

54    Declaration of Irene Alexakos

55    Declaration of John Hudson