

**DEPARTMENT OF THE ARMY**
U.S. ARMY ENGINEER DISTRICT, ALASKA
POUCH 898
ANCHORAGE, ALASKA 99506-0898

REPLY TO
ATTENTION OF

NPACO-R-S

To Whom it May Concern:

    Enclosed is the Record of Decision for the Red Dog Mine Project permit action.  The Corps of Engineers processed this action under the following reference numbers:  071-OYD-2-830359, Chukchi Sea 9, and 071-OYD-4-840012, Chukchi Sea 11.  Because this action includes the construction of a transportation system through Cape Krusenstern National Monument, Cominco Alaska must obtain authorization from Congress before the Department of Interior will issue a Right-away permit.  Once Congressional approval is received the Corps of Engineers will issue the required Department of the Army permits pursuant to Section 10 of the River and Harbor Act of 1899 and Section 404 of the Clean Water Act.

    The extensive public involvement in the review of this project has been utilized and was appreciated.  Thank you for your interest.

                                        Sincerely,

                                        *Larry L. Reeder*

                                        Larry L. Reeder
                                        Chief, Regulatory Branch

Enclosure

**Exhibit 43, page 1 of 9**

Record of Decision
Red Dog Mine Project
071-OYD-2-830359, Chukchi Sea 9 and
071-OYD-4-840012, Chukchi Sea 11

In light of the overall public interest, I have decided to issue two Department of the Army (DA) permits under Section 10 of the River and Harbor Act of 1899 (30 Stat 1151; 33 U.S.C. 403) and Section 404 of the Clean Water Act (Public Law 95-217) to Cominco Alaska to perform the following work:

   a)  construct a port facility at Port Lagoon near Kivalina, Alaska;

   b)  construct a 57 mile gravel road from the port facility to the Red Dog Mine;

   c)  construct a 2.1 mile access road from the mill site to the mine; and

   d)  construct a tailing pond dam on the south fork of Red Dog Creek.

This work was identified as alternative 1 in the Final Environmental Impact Statement (FEIS).

1.   This decision is based on information contained in the FEIS, the stated views of Federal and non Federal agencies and the interested public, and current national policy. The possible consequences of all alternatives, including the proposed work, have been evaluated in terms of environmental effects, social well-being, and the public interest. Factors bearing on my decision included conservation, economics, aesthetics, general environmental concerns, historic and cultural values, fish and wildlife values, flood damage prevention, land use, navigation, recreation, subsistence, water supply, water quality, energy needs, safety, national security, and, in general, the needs and welfare of the people.

2.   An Environmental Impact Statement (EIS) was prepared by the Environmental Protection Agency (EPA) and Department of the Interior (DOI) to identfy and analyze the expected impacts associated with the development of the Red Dog Mine, including the effects of constructing a port facility and a road from the coast to the mine site. The Alaska District, U.S. Army Corps of Engineers was a cooperating agency in the preparation of the EIS. The EIS provided information used in the evaluation of the project as required by 404 (b)(1) guidelines (40 CFR part 230), Department of the Army regulations (33 CFR parts 320-330) and Section 1104(g) of the Alaska National Interest Lands Conservation Act (ANILCA, Public Law 96-487).

**Exhibit 43, page 2 of 9**

The EIS identified three feasible alternatives for the development of the Red Dog Mine. All alternatives shared several of the same components. These components included: the location of the mine, mill site, workman housing, tailing pond, and water supply; the type of transportation system (gravel road) and workman housing (campsite); and diesel power generation. Alternative 1, the applicant's proposal, included a southern transportation corridor (Krus Route) which would be routed through Cape Krusenstern National Monument, a port site located at Port Lagoon (VABM 28), and transfer facility consisting of a 400 foot gravel causeway and a ballasted tanker located 4,000 feet offshore in 35 feet of water. Alternative 2 included a northern transportation corridor (Asikpak Route) which would be routed north of Cape Krusenstern National Monument, a port site located at Tugak Lagoon and a transfer facility similiar to Alternative 1. Alternative 3 was the same as Alternative 1 except that the transfer facility would include a 400 foot gravel causeway with a lightering operation instead of the ballasted tanker option. Alternative 1 was identified as the environmentally preferred alternative in the FEIS and was EPA's and DOI's preferred alternative.

3.    There are adverse environmental impacts associated with the environmentally preferred alternative. The enviromental impacts that cannot be avoided or mitigated include:

a)  1,336 acres of vegetation in the Red Dog Valley would be disturbed by the construction of the mine area facilities (mine, overburden stockpile, tailing pond, water supply reservior, mill site, work housing and associated roads);

b)  487 acres of wetland habitat would be eliminated from the construction of a gravel road and associated borrow areas, from the mine area through Cape Krusenstern National Monument to the port facility. The majority of the habitat eliminated is moist tundra (sedge-grass tundra, tussock tundra and low shrub tundra);

c)  development at the port site would eliminate 50 acres of wetland habitat (sedge-grass marshland, and tussock tundra);

d)  the destruction of 62.2 acres of benthic habitat from the construction of the 400 foot causeway and ballasted ship;

e)  a total of 16 archeological sites could be impacted by the construction of the transportation corridor and mine facilites and;

f)  the indirect habitat loss of caribou wintering range.

4. In evaluation of this work and consideration of the comments received from coordination of the FEIS and Public Notice, Number 071-OYD-2-830359, Chukchi Sea 9, and 071-OYD-4-840012, Chukchi Sea 11, dated 16 March 1984 the following points are considered pertinent:

2

a)  Federal Agencies:  The Fish and Wildlife Service (USFWS) was the only Federal agency that commented on the DA public notices.  They did not object to the issuance of the DA permits.

b)  State and local agencies:  Water Quality Certification and Coastal Zone Consistency has been received from the State of Alaska for Cominco Alaska's proposed alternative.  The Alaska Department of Environmental Conservation's water quality certification contained two stipulations.

"1.  Adequate culverts are installed and maintained along the access road to assure natural drainage patterns."

"2.  The concentrate transfer facility and the barge dock are designed to remain stable under anticipated scour, wind and ice force to minimize the likelihood of fuel and concentrate spills into the Chukchi Sea during transfer and/or storage."

The State Historic Preservation Officer provided comments to EPA regarding the FEIS.  They agreed with the conclusions and recommendations of the FEIS.

c)  Individual or Organized Groups:  No individuals or organized groups commented on the proposed work through the permit process, although comments were received during the EIS process.  Those comments were evaluated and addressed during the preparation of the FEIS.

5.  In arriving at the decision to issue the DA permits, I have evaluated the project with respect to the following criteria, as required by 1104(g) of ANILCA.

a)  The need for and economic feasibility of the transportation utility system.  Without a transportation system from the mine to a port located on the coast, the Red Dog mineral deposit could not be developed. The FEIS discussed in detail the current economy in the Kotzebue region. Development of the Red Dog Mine, as well as other mines in the region, will provide jobs to an area that has 70 percent unemployment.  This project will help stimulate the economy in the region and will provide an important tax base.

b)  Alternative routes and modes of access.  During the EIS process several modes of access and alternative routes were examined and were eliminated for various reasons.  The FEIS discussed in detail the effects associated with the construction of a gravel road through Cape Krusenstern National Monument (Alternative 1 and 3) and a road located north of the monument (Alternative 2).  A northern route, although more expensive, was found to be economically feasible.  However, the potential adverse impacts to the subsistence resources (caribou, moose, fish, and marine mammals) make Alternative 2 an undesirable alternative.

3

**Exhibit 43, page 4 of 9**

c) The feasibility and impact of including different transportation or utility systems in the same area. Early in the EIS process the State and Federal regulatory and resource agencies indicated that only one transportation corridor and port facility would be authorized in this region. It is the position of the Corps of Engineers' that no additional port facility or transportation corridor will be authorized in this area unless it is clearly demonstrated that the Red Dog Mine transportation corridor and/or port facility is not a practicable or prudent alternative.

d) Short and long term social, economic, and environmental impacts of National, State, or local significance, including impacts on fish and wildlife and their habitat, and on rural traditional life styles. The FEIS has discussed in detail the impacts associated with these issues (Chapter V). I support the conclusions described in the EIS.

e) The impacts, if any, on the national security interests of the United States, that may result from approval or denial of the application for a transportation or utility system. No impacts on national security were identified during the EIS or permit processes.

f) Any impacts that would affect the purposes for which the Federal unit or area concerned was established. Cape Krusenstern National Monument was established primarily to protect and interpret evidence of prehistorical and historical native cultures. The proposed transportation through Cape Krusenstern National Monument could disturb or destroy six archeological sites within the monument and seven sites outside the monument.

g) Measures which should be instituted to avoid or minimize negative impacts. These measures are described in paragraph 7.

h) The short-term and long term public values which may be adversely affected by approval of the transportation or utility system versus the short and long term public benefits which may accrue from such approval. I have weighed the detriments against benefits of this project. Both the detriments and benefits have already been discussed in this Record of Decision and the FEIS.

6. The issuance of a permit for the activities described is in compliance with applicable environmental requirements. The development of the EIS was accomplished in accordance with the National Environmental Policy Act of 1969, as amended. Consultation, pursuant to Section 7 of the Endangered Species Act of 1973, as amended, has been conducted and it was determined that the project would not affect the endangered bowhead and gray whales and the threatened peregrine falcon provided the conditions listed in paragraph 7 are incorporated into the permits. Pursuant to Section 401 of the Clean Water Act of 1977, and in accordance with provisions of the Alaska Water Quality Standards, water quality effects

**Exhibit 43, page 5 of 9**

have been evaluated and a Certificate of Reasonable Assurance issued. An ecological evaluation as required by Section 404(b)(1) of the Clean Water Act has been made following the evaluation considerations in 40 CFR 230.4, in conjunction with the evaluation considerations in 49 CFR 230.5. I find that issuance of a permit as described above is in conformance with these guidelines.

Coordination with the Alaska State Historical Preservation Office and the National Park Service was conducted pursuant to the National Historic Preservation Act of 1966, as amended. The proposed plan was found to be consistent with the approved Alaska Coastal Zone Management plan, pursuant to the Coastal Zone Management Act of 1972, as amended.

7.   To avoid or minimize the environment effects associated with the Red Dog Mine project the following special conditions shall be incorporated into the Department of the Army permits.

a)  Permit number 071-0YD-2-830359, Chukchi Sea 9.

(1)   That there shall be no stockpiling nor doublehandling of materials on wetlands adjacent to the project site, without prior approval of the District Engineer.

(2)   That drainage structures shall be installed and maintained that are adequate to prevent impoundment of water or erosion and drainage of adjacent aquatic areas. These structures will be provided at the time of road construction. If surface drainage is not maintained, additional drainage structures or modifications to existing structures shall be accomplished prior to the following spring breakup.

(3)   Except for stream crossings, a minimum distance of 100 feet shall be maintained between the toe of the road and the ordinary high water mark of any adjacent lake, river, or stream.

(4)   That dikes for fuel storage areas shall be designed to hold 110%· of the largest independent container within the dike or, if manifolded tanks are used, the total volume plus 10% of the largest set of manifolded tanks. Dikes for permanent fuel storage areas shall be rendered impermeable.

(5)(a)   To the maximum extent possible the road alignment shall be located at least two miles from any peregrine falcon nest. However, if the road alignment is located within two miles of any peregrine falcon nest site the permittee shall contact the District Engineer for approval prior to construction of that segment of road. Road construction within two miles of any active nest site shall be prohibited from April 15 through August 31.

**Exhibit 43, page 6 of 9**

(5)(b)  That within two miles of active peregrine falcon nest sites all activities having high noise levels, e.g. ballasting, operation of heavy construction equipment, etc., shall be prohibited from April 15 through August 31.

(5)(c)  That within one mile of active peregrine falcon nest sites, aircraft will be required to maintain a minimum altitude of 1,500 feet above nest sites from April 15 through August 31; all ground level activities shall be prohibited from April 15 through August 31; and habitat alterations or the construction of permanent facilities will be prohibited.

(5)(d)  From April 15 through June 1 of each year all peregrine falcon nests will be considered active nest sites. Nest sites determined not to be occupied after June 1 will be considered inactive and the timing restrictions described in the above paragraphs shall not apply for the remainder of that year.

(6)(a)  Vessels and aircraft shall avoid concentrations of groups of whales. Operators shall, at all times, conduct their activities at a maximum distance from such concentrations of whales. Under no circumstances, other than an emergency involving immediate danger or destructon of life or property, will aircraft be operated at an altitude lower than 1,000 feet when within 500 lateral yards of groups of whales. Helicopters shall not hover or circle above such areas or within 500 lateral yards of such areas.

(6)(b)  When weather conditions do not allow a 1,000 foot flying altitude, such as during severe storms or when cloud cover is low, aircraft will be operated below the 1,000 foot altitude as stipulated above. However, when aircraft are operated at altitudes below 1,000 feet because of weather conditions, the operator will avoid known whale concentration areas and will take precautions to avoid flying directly over or within 500 yards of groups of whales.

(7)  When a vessel is operated near a concentrations of whales the operator shall take every precaution to avoid harassment of these animals. Vessels shall reduce speed when within 300 yards of whales and those vessels capable of steering around such groups will do so. Vessels will not be operated in such a way as to separate members of a group of whales from other members of the group.

(8)  Vessel operators shall avoid multiple changes in direction and speed when within 300 yards of whales. In addition, operators will check the waters immediately adjacent to a vessels to ensure that no whales would be injured when the vessel's propellers [or screws] are engaged.

(9)  Small boats shall not be operated at such a speed as to make collisions with whales likely. When weather conditions require, such as when visibility drops, vessels will adjust speed accordingly to avoid the likelihood of injury to whales.

6

**Exhibit 43, page 7 of 9**

(10) That the permittee shall establish and fund, in consultation with the Alaska Department of Fish and Game, a caribou monitoring program which will be designed to determine the extent and alteration of traditional movement patterns due to road activities. The monitoring program shall be submitted to the District Engineer for approval within three months of the issuance of the permit.

(11) That the permittee shall establish and fund, in consultation with Environmental Protection Agency and the Alaska Department of Environmental Conservation, a water quality monitoring program to determine any cumulative effects of small spills on the marine environment. The monitoring program shall be submitted to the District Engineer for approval within three months of the issuance of the permit.

b) Permit number 071-0YD-4-840012

(1) That there shall be no stockpiling nor doublehandling of materials on wetlands adjacent to the project site, without prior approval of the District Engineer.

(2) That drainage structures shall be installed and maintained that are adequate to prevent impoundment of water or erosion and drainage of adjacent aquatic areas. These structures will be provided at the time of road construction. If surface drainage is not maintained, additional drainage structures or modifications to existing structures shall be accomplished prior to the following spring breakup.

(3) Except for stream crossings, a minimum distance of 100' shall be maintained between the two of the road and the ordinary high water mark of any adjacent lake, river, or stream.

(4) That dikes for fuel storage areas shall be designed to hold 110% of the largest independent container within the dike or, if manifolded tanks are used, the total volume plus 10% of the largest set of manifolded tanks. Dikes for permanent fuel storage areas shall be rendered impermeable.

8. I find that issuance of the Department of the Army permits as prescribed by regulations published in 33 CFR, Parts 322 and 323, concerning the proposed action described in this document and in the Red Dog Mine Final Environmental Impact Statement is based upon a thorough analysis and evaluation of the various factors enumerated above; that there are no practicable alternatives available to the applicant that will achieve the purposes for which the work is being conducted; that the proposed work is in accordance with the overall desires of the public; that the proposed work is deemed to comply with established State and local laws, regulations, and codes; that identified significant adverse

**Exhibit 43, page 8 of 9**

environmental effects related to the work as discussed above and in the FEIS have been fully considered; that the issuance of this permit is consonant with national policy, statutes, and administrative directives; and that on balance, the total public interest will best be served by the issuance of the Department of the Army permits to the Cominco Alaska for the proposed work.

Neil E. Saling
Colonel, Corps of Engineers
District Engineer

Date    21 JAN 85

8

**Exhibit 43, page 9 of 9**