

**Department of the Army**

**Record of Decision**

US Army Corps
of Engineers
Alaska District

Applicant: Coeur Alaska, Incorporated
Application Number: 2-900592
Waterway Number: Lynn Canal 31

I. **Decision**: In light of the overall public interest, I have decided to issue a Department of the Army (DA) permit under Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. 403) and Section 404 of the Clean Water Act (33 U.S.C. 1344). The permit will be issued to Coeur Alaska, Incorporated, hereafter referred to as Coeur, to perform the following work:

Develop the infrastructure to construct, operate, and reclaim the Kensington Gold Mine. The work will include placing fill into approximately 261 acres of jurisdictional wetlands and/or other waters of the United States. The proposed project involves the excavation of approximately 3,911,140 cubic yards of material from jurisdictional wetlands and/or other waters of the United States. There will be a total of 4,704,790 cubic yards of fill material deposited in jurisdictional wetlands and/or waters of the United States. The major surface components are listed below, and have been rounded to the nearest whole number.

   A. Mechanized land clearing, followed by the excavation of wetlands, and the placement of fill to construct the base, containment and drain structures for the Dry Tailings Storage Facility (DTF). The DTF is a permanent disposal and storage site for mill tailings, approximately 113 acres in wetlands.

   B. Mechanized land clearing followed by the excavation of wetlands, to expose the underlying gravels. The sand and gravel deposits will be removed and used as construction material, approximately 55 acres in wetlands.

   C. Mechanized land clearing, followed by the excavation of wetlands, and the placement of fill for building pads for the ore process area, batch plant and personnel camp, approximately 41 acres in wetlands. The diversion of Ophir Creek and Upper Sherman Creek will be constructed around the processing facilities. This component footprint is included within the disturbance for the process facility.

   D. Mechanized land clearing, followed by the excavation of wetlands, and the placement of fill to construct the dissemination area, mine water sedimentation ponds, storm water and sediment detention ponds, a sedimentation facility, topsoil stockpile areas, laydown area, fuel storage, and an explosives magazine, approximately 27 acres in wetlands.

E. Mechanized land clearing followed by the excavation of wetlands, and the placement of fill to construct roads between all the surface facilities and the underground operation, approximately 23 acres in wetlands.

F. Construct a barge landing facility on Lynn Canal. This will involve the excavation of the beach and the placement of concrete planks for a landing ramp. There will be four mooring buoys placed in Lynn Canal for tugs and barges, approximately 2 acres within waters of the United States.

G. All surface disturbance will be reclaimed according to the specifications in Coeur's reclamation plan. The reclamation plan, dated August 1997, sets post-mining objectives and goals for each surface disturbing component within the project area. The reclamation plan stresses concurrent reclamation. Reclamation will include, but is not limited to, the following: removal of all structures, regrade all surface disturbance, apply topsoil to regraded areas, replant disturbed areas, seal all openings to the ore body, and reestablish drainage ways. The material sites, mine water ponds, sedimentation ponds, diversions, and storm water ponds will be left as open waters of the United States. These ponds will be designed and graded to encourage fringe wetland habitat. There will be approximately 15 acres of open water left at the conclusion of the project. Bridges will be used in the access road to cross Sherman Creek, Upper Sherman Creek, and Ivanhoe Creek. Ophir Creek will however, be returned to the original stream channel at the conclusion of the project. The DTF will be left as a self-draining upland to preserve pile stability. The DTF will be concurrently regraded, capped, and seeded to prevent erosion. There will be 107 acres of upland at the DTF. In addition, the area of the process facility will be left as an upland. This area will remain an upland to prevent sloughing of material into upper Sherman Creek. There will be 28 acres reclaimed in this manner. The marine facility will be recontoured, all buildings removed, and the beach regraded to the predisturbance contour.

This work was identified as Alternative D in the Kensington Gold Project; Final Supplemental Environmental Impact Statement (FSEIS) dated August 1997. The United States Forest Service, (USFS) Department of Agriculture, prepared the FSEIS, to identify and analyze alternatives to the Plan of operation submitted to the USFS for the operation of the Kensington Gold Mine. The USFS was the lead Federal agency for the project. The Alaska District, U.S. Army Corps of Engineers was a cooperating agency in the Environmental Impact Statement (EIS) issued on February 1992 and the Supplemental Environmental Impact Statement (SEIS) dated August 1997. The Corps of Engineers hereby adopts the SEIS for the Kensington Gold Project, and those parts of the Kensington Gold Project EIS not changed by the SEIS.

This decision is based upon information contained in the EIS and SEIS, the stated views of Federal and non-Federal agencies, the interested public, and current national policy. The possible consequences of all alternatives, including the proposed alternative, have been evaluated in terms of environmental effects, social well being, and the public interest. Factors bearing on my decision included conservation, economics, aesthetics, general environmental concerns, wetlands, cultural values, fish and wildlife values, flood hazards, flood plain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, mineral needs, considerations of property ownership, and, in general, the needs and welfare of the people.

In accordance with 40 CFR 1506.3 and 33 CFR 230.21, we have independently reviewed and evaluated the information in the EIS and FSEIS and have found it to be an accurate assessment, and is appropriate for the purposes of our public interest review and alternatives analysis required by

33 CFR 320.4(b)(4) and 40 CFR 230.10, and we hereby adopt the EIS as supplemented by the SEIS.

    A. Project Background: The Kensington Project has undergone numerous public and agency reviews as this project has evolved.

        1. A notice of intent to prepare an EIS was filed in the Federal Register on October 23, 1989. A scoping meeting was held on October 19, 1989, with State, Federal and local agencies. Public scoping meetings were held in Juneau on December 13, 1989 and in Haines on January 9, 1990. A draft-scoping document was mailed to the public in May of 1990 for review and comment. A final scoping document incorporating public comment was sent to the public in August of 1990.

        2. The draft EIS (DEIS) was sent to the public in June 1990 for a ninety-day comment period. The USFS held public hearing in Juneau on July 11, 1990 and Haines on July 18, 1990. A workshop prior to the public hearing was held in each City.

        3. The Corps as a cooperating agency in this EIS process reviewed and contributed to the formulation of the DEIS and the final EIS (FEIS).

        4. During the EIS process the Corps completed a public notice on the project. The public notice was dated April 9, 1992, and the public notice expired on May 8, 1992. The Corps received eight public comments on the project. Of the comments three were from the Federal resource agencies: United States Fish and Wildlife Service (USFWS), Environmental Protection Agency (EPA), and the National Marine Fisheries Service (NMFS). The comments ranged from requesting a public hearing on the proposed project to those requesting the Corps deny the permit application. There were four requests for the Corps to hold a public hearing. The request for a public hearing was denied based on the number of hearings and meetings already held, and that there would not likely be any new information presented.

        5. The EPA Region 10 agreed on September 20, 1992, to complete a Technical Assessment Report (TAR) for the Kensington Gold Mine. The TAR was transmitted to the Corps on November 7, 1994. The TAR examined the projected efficiency of the tailings impoundment with respect to removal of pollutants, the long term risk of contamination of surface and groundwater and the likelihood that the ecological integrity of the area could be restored after mining ceases.

        6. As a result of the new information contained in the TAR the EPA conducted two public workshops. The purpose of the workshops was for EPA to describe the technical basis for the TAR's findings, and to answer any questions regarding information sources, analytical methods and overall conclusions of the TAR. The first workshop was held in Juneau on November 29, 1994, and the second was held in Haines on November 30, 1994.

        7. As a result of the new information contained in the TAR, two public hearings were announced and conducted by the Corps. The purpose of the public hearings was to acquire information or evidence needed to make decisions on the Corps permit application. The first hearing was held in Juneau December 13, 1994, and the second was held in Haines on December 14, 1994. The hearings were

construction of open water and fringe pond wetlands that are in short supply in the immediate area. In addition, other actions proposed to minimize potential adverse effects include the use of Best Management Practices (BMPs). The USFS has incorporated a list of their BMPs into their ROD. The USFS and the CBJ will be actively monitoring the project to ensure the use of BMPs and adherence to the plan. The State of Alaska (ADEC), USFS and CBJ have established monitoring plans to ensure air, surface, and water quality. The EPA has indicated a NPDES permit will be issued for the project and applicable water quality standards can be met. To ensure that impacts to waters of the U.S. are limited to the planned project footprint the following permit condition is recommended:

1. The clearing limit for each mine component shall be clearly identified in the field prior to excavation, clearing and construction. The fill limit boundaries shall be located prior to fill placement. Permanent survey markers shall be placed and monumented so an observer can delineate the clearing and fill limits while walking on the ground at the site.

To ensure compliance with all Coast Guard requirements the following conditions are recommended.

2. Coeur Alaska, Incorporated must install and maintain, at their expense, any safety lights and signals prescribed by the U.S. Coast Guard (USCG) through regulations or otherwise, on the authorized facilities. The USCG can be reached at the following address and telephone number: Commander (oan) 17th Coast Guard District, Post Office Box 25517, Juneau, Alaska 99802-5517, telephone (907) 463-2254.

3. Coeur Alaska, Incorporated shall be responsible to obtain and comply with all appropriate State and Federal Statutes for oil storage and transfer. An oil storage facility shall be subject to the provisions of a plan of operation approved by the USGC and an Oil Spill Contingency Plan approved by the Alaska Department of Environmental Conservation.

4. Coeur Alaska, Incorporated shall provide an annual progress report to the Corps on project status. This report shall summarize the acres disturbed and reclaimed under the Corps' jurisdiction. The disturbance shall reference the twenty project parcels as shown in Table 2.1 of the permit. The report will be due yearly on or before February 15.

5. Failure to comply with permit conditions may be grounds to modify, suspend or revoke the Department of Army permit.

V. **Evaluation of the Discharge of Dredge and Fill Material in Accordance with Section 404 (b) (1) Guidelines (40 CFR 230)**

*SUBPART A - GENERAL*

Dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern.

17

The Guidelines have been developed by the Administrator for the EPA in conjunction with the Secretary of the Army acting through the Chief of Engineers under Section 404(b)(1) of the Clean Water Act (33 U.S.C. 1344). The Guidelines are applicable to the specification of disposal sites for discharges of dredged or fill material into waters of the United States (U.S.).

In evaluating whether a particular discharge site may be specified, the following steps should generally be followed: (a) review the restriction on discharge, the measures to minimize adverse impact, and the required factual determinations; (b) examine practicable alternatives to the proposed discharge; (c) delineate the candidate disposal site; (d) evaluate the various physical and chemical components; (e) identify and evaluate any special or critical characteristics of the candidate disposal site and surrounding areas; (f) review Factual Determinations to determine whether the information is sufficient to provide the required documentation or to perform pre-testing evaluation; (g) evaluate the material to be discharged to determine the possibility of chemical contamination or physical incompatibility; (h) conduct the appropriate tests if there is a reasonable probability of chemical contamination; (i) identify appropriate and practicable changes in the project plan to minimize the impact; and (j) make and document Factual Determinations and Findings of Compliance.

### SUBPART B - COMPLIANCE WITH THE GUIDELINES

The proposed Kensington Gold Mine, file number 2-900592, Lynn Canal 31, will involve the discharge of fill material into special aquatic sites and other waters of the U.S. in order to develop the infrastructure to operate an underground gold mine. A description of the proposed project and alternatives considered is found in the summary, and Chapter one of the FSEIS. There are no practicable alternatives to the proposed discharge (preferred alternative) that would accomplish the project's purpose and need and not result in a discharge into special aquatic sites or have less adverse impact on the aquatic ecosystem. Therefore, the FSEIS preferred alternative is the least damaging practicable alternative. A complete discussion of the alternatives considered is included in the FSEIS chapter two.

As determined in Subparts C through G of this evaluation and as discussed in Chapter four of the FSEIS and in this ROD, the proposed project will not contribute to significant degradation of the waters of the U.S. including adverse effects on human health or welfare, life stages of aquatic life and other wildlife dependent on aquatic ecosystems, aquatic ecosystem diversity, productivity and stability, and recreational, aesthetic, and economic values. The project includes the reclamation of the project site to standards and goals that are acceptable to the Federal land managing agency, the USFS. In addition, the CBJ approved the Large Mine Permit for the project. The discharge of fill material associated with the preferred alternative complies with the requirements of the Guidelines with the inclusion of appropriate and practicable discharge conditions (see Subpart H) to minimize pollution and adverse effects to the affected aquatic ecosystems.

### SUBPART C - POTENTIAL IMPACTS ON PHYSICAL AND CHEMICAL CHARACTERISTICS OF THE AQUATIC ECOSYSTEM

Applicable information about direct, indirect and cumulative environmental impacts of the proposed project and alternatives related to substrate, suspended particulates/turbidity, water, current patterns and water circulation, and normal water fluctuations is contained in Chapter four of the FSEIS. The FSEIS considers all the resource values for the project. The individual affected resources are discussed in detail in Chapter three of the FSEIS. Adverse impacts to these characteristics are expected to be relatively

impacts were fully addressed in the EIS and the FSEIS. This project was issued an air quality emissions permit by the ADEC. This action has been coordinated with ADEC and EPA. Any later indirect emissions are generally not within the Corps continuing program responsibility and cannot be practicably controlled by the Corps.

VIII. **Determination**: I find that the issuance of the DA permit, as described by regulations published in 33 CFR Parts 320 through 330, with the scope of work as described in this document, and in accordance with the drawings attached to the public notice dated September 29, 1997 is based on a thorough analysis and evaluation of the various factors enumerated above. There are no practicable alternatives available to Coeur that will achieve the purposes for which the work is being conducted; the proposed work is deemed to comply with established state and local laws, regulations, and codes; the issuance of this permit is consistent with national policy, statutes, and administrative directives; and on balance, issuance of a DA permit to Coeur for the proposed work is not contrary to the public interest. I have determined that the DA permit will be issued if the State issues a Section 401 Water Quality Certification or waiver and a CZM concurrence, or presumed concurrence.

Prepared and Approved by:   Date: 28 January 1998

Victor O. Ross
Project Manager
South Section
Regulatory Branch