**Printed on Recycled Paper**



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION 10**
**ALASKA OPERATIONS OFFICE**
Room 537, Federal Building
222 W. 7ᵗʰ Avenue, #19
Anchorage, Alaska 99513-7588

## FAX COVER SHEET

|  |  | 14 Pages, Including Cover |
| --- | --- | --- |
| **Date:** | August 20, 2004 | Transmission Number _1_ of _1_ |

**To:**         Colonel Timothy Gallagher, District Engineer

**Attention:**  John C. Leeds, III - Project Manager, Kensington Gold Project

**Fax:**        753-5610

**From:**       Marcia Combes, Director
EPA Alaska Operations
Phone (907) 271-5083

**Re:**         EPA Comments on Public Notice of Application for Permit
Reference Numbers: POA-1990-592-M and POA-1997-245-2

August 19, 2204
[ 1 ]  Email from John C. Leeds, III, Juneau Field Office Manager, authorizing postmark
to be treated as COE receipt confirmation - 1 pg

August 20, 2004
[ 2 ]  EPA cover letter signed by Gregory Kellogg, Acting Director for Marcia Combes,
Director, EPA Alaska Operations - 2 pgs

August 20, 2004 - Enclosure 1
[ 3 ]   EPA's Detailed 404 Comments on Kensington Gold Project - 10 pgs

The following documents will be mailed with the original cover letter and Enclosure 1:

April 14, 2004 - Enclosure 2
[ 4 ]  EPA R10 comment letter on DSEIS for Kensington Gold Project
signed by Michelle Pirzadeh, Dir Office of Ecosystems & Communities
- 20 pgs

April 20, 1998 - Enclosure 3
[ 5 ]  3(b) letter signed by Chuck Clarke, Regional Administrator, EPA R10 - 9 pgs



Alaska District

# U.S. ARMY ENGINEER DISTRICT, ALASKA

## JUNEAU REGULATORY BRANCH
## STE 106B, 8800 GLACIER HIGHWAY
## JUNEAU, ALASKA 99801

## FACSIMILE HEADER SHEET

| FROM: JOHN C. LEEDS, III | CEPOA-CO-R-E JUNEAU FIELD OFFICE | OFFICE: 907-790-4490 FAX: 907-790-4499 |
|---|---|---|
| TO: PHIL SANTERRE | OFFICE: OFFICE OF COUNCIL | OFFICE: FAX: 753-2530 |
| RELEASER'S SIGNATURE: | NO. PAGES + COVER 14 | DATE: 26 AUG 2004 |

**SUBJECT:** EPA Letter, dated 20 Aug 2004, pertaining to the Kensington Mine Proposal, plus a bit about the use by Kensington of Goldbelt's proposed marine terminal.

*Missed 2nd page of letter Final Copy →.*



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION 10**
**ALASKA OPERATIONS OFFICE**
Room 537, Federal Building
222 W. 7th Avenue, #19
Anchorage, Alaska 99513-7588

August 20, 2004

Colonel Timothy J. Gallagher
District Engineer
Department of the Army
U.S. Army Engineer District, Alaska
P.O. Box 6898
Elmendorf AFB, Alaska 99506–6898

Subject:     EPA Comments on Public Notice of Application for Permit
             Reference Numbers: POA-1990-592-M and POA-1997-245-2
             Waterway Numbers: Lynn Canal 31 and Berners Bay 4
             Applicant: Coeur Alaska, Inc.
             Location: Kensington Mine and Cascade Point, north of Juneau, Alaska

Attention:   John C. Leeds, III - Project Manager

Dear Colonel Gallagher:

        Thank you for approving our request for an extension of the comment period on the public notices referred to above. The Environmental Protection Agency (EPA) has reviewed the public notices and related documents, pursuant to our authority under Section 404 of the Clean Water Act. The following is a summary of EPA's preliminary findings with respect to the proposed discharges. Please refer to Enclosure 1 for EPA's detailed comments on the proposed projects. We have also enclosed a copy of EPA's comments on the Kensington DSEIS for your information (see Enclosure 2).

        As stated in the Draft Supplemental Environmental Impact Statement (DSEIS), "The purpose of the Proposed Action is to consider certain changes to the 1998 approved Plan of Operations for the Kensington Gold Project regarding access, tailings disposal, and support facilities." The proposed work at Kensington Mine includes the discharge of 5,451,700 cubic yards of fill and dredged material into 95.9 acres of waters of the United States. The proposed work at Cascade Point includes dredging 23,000 cubic yards of material and discharging 29,000 cubic yards of fill material below the High Tide Line.

        The 404(b)(1) Guidelines state, in part, that no discharge of dredged or fill material may be permitted unless it is the least environmentally damaging practicable alternative. Based upon the information provided, EPA believes that there are other practicable alternatives to the proposed discharge that could have less adverse effect on the aquatic ecosystem and we would like to continue to explore the practicability of these alternatives. In 1998, the applicant received

Printed on Recycled Paper

a Section 404 permit for mining activities for the Kensington Gold Project which would locate all of the mine facilities on the east side of Lynn Canal near Sherman Creek and would include disposal of mine tailings in a dry tailings facility. In contrast, the applicant's newly proposed project would locate most of the mine facilities on the northwest side of Berners Bay near Johnson Creek and would include the creation of a tailings disposal facility in Lower Slate Lake (i.e., damming the lake and filling it with 4.5 million tons of tailings), resulting in 95.9 acres of direct impact including the removal of 20 acres of freshwater habitat and associated aquatic life (Lower Slate Lake). EPA has significant concerns with the impacts associated with the new proposal and believes the originally permitted project (evaluated in the DSEIS as Alternative A and, in variation, A1) was, at the time it was permitted, a practicable alternative and would have less adverse impact on the aquatic ecosystem, consistent with the Guidelines.

EPA finds that the impacts associated with the newly proposed project would lead to significant adverse effects to aquatic resources. The direct loss of Lower Slate Lake and indirect impacts to the surrounding aquatic ecosystem, including Berners Bay, may cause or contribute to significant degradation of the waters of the United States. Additionally, we are concerned that, without additional treatment, the proposed discharge may cause or contribute to violations of Alaska water quality standards for turbidity, aluminum, iron and lead. Please note that in response to some of these concerns, which were raised in the NPDES permit application process, the applicant has proposed some changes to the projects (e.g., a pipeline diversion of Upper Slate Lake flows around Lower Slate Lake). The federal and state agencies have begun discussing the outlines of a new alternative that may include these and other changes.

EPA continues to have significant concerns regarding the proposed projects under Section 404. We are especially concerned about the adverse effects of the proposed discharge on the Berners Bay ecosystem and adjacent waters of the United States. Berners Bay has unique ecological diversity and productivity and provides outstanding fisheries, shellfish, wildlife and recreation values (see Enclosure 3). EPA will continue to actively participate in discussions on this proposal, pursuant to our authorities under Sections 402 and 404 of the Clean Water Act, Section 309 of the Clean Air Act, and the National Environmental Policy Act.

While we have these concerns, we would very much like to work collaboratively with you and the State to achieve a satisfactory outcome. EPA requests a meeting with the Alaska District to discuss our comments and work towards a timely resolution of these issues. Please let me know when you or your staff are available to meet. If you wish to discuss this letter before we meet, please call me at 907-271-5083, or have your staff call Chris Meade at 907-586-7622.

Sincerely,

Marcia Combes, Director (acting)
Alaska Operations

Enclosures (3)

cc:    Rick Richins, Coeur Alaska, Inc.
        Steve Hohensee, USFS
        Sue Walker, NOAA
        Richard Enriquez, USFWS
        Dan Easton, ADEC

Enclosure 1

## EPA's Detailed Comments on the Kensington Gold Project

Subject:     EPA Comments on Public Notice of Application for Permit
             Reference Number: POA-1990-592-M and POA-1997-245-2
             Waterway Number: Lynn Canal 31 and Berners Bay 4
             Applicant: Coeur Alaska, Inc.
             Location: Kensington Mine and Cascade Point, north of Juneau, Alaska

### Introduction

This document contains the Environmental Protection Agency's (EPA) detailed comments on the Department of the Army's (DA) public notice for the Kensington Gold Project, which was published on June 21, 2004. The legal basis for this review is Section 404 of the Clean Water Act (hereinafter referred to as "404") and the Section 404(b)(1) Guidelines for Specification of Disposal Sites for Dredged or Fill Material set forth at 40 CFR Part 230 (hereinafter referred to as "Guidelines"). EPA has determined that these comments are consistent with EPA's memorandum on Clean Water Act Regulation of Mine Tailings, dated May 17, 2004 (hereinafter referred to as "Mine Tailings Memo").

The Mine Tailings Memo affirms that the placement of the mine tails in the disposal site (i.e., Lower Slate Lake) must comply with the Guidelines. The Guidelines include specific substantive requirements known as restrictions on discharge. These restrictions are set forth at 40 CFR § 230.10, paragraphs (a) through (d). EPA's detailed comments are organized into four sections that correspond to the restrictions on discharge. Section 1 of these comments compares the practicability and ecological impact of various alternatives under consideration (40 CFR § 230.10(a)). Section 2 considers whether the proposed discharge may cause or contribute to violations of any applicable Alaska water quality standards (40 CFR § 230.10(b)(1)). Section 3 analyzes whether the proposed discharge may cause or contribute to significant degradation of the waters of the United States (40 CFR § 230.10(c)). Section 4 examines whether the proposed discharge includes all appropriate and practicable measures to minimize potential harm to the aquatic ecosystem (40 CFR § 230.10(d)).

It is important to note that each of the restrictions on discharge (and thus, each of the sections below) applies independently to the proposed discharge. That is, if the proposed discharge fails to comply with any of the four subsections of 40 CFR 230.10, then DA may not authorize the fill, even if it meets the other three subsections.

### Section 1. Alternatives

The Guidelines state that "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem" (40 CFR § 230.10(a)). The following discussion addresses both the practicability and the aquatic effects of the detailed alternatives in the Kensington DSEIS.

005355

### *Practicable*

The term *practicable* means "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes" (40 CFR § 230.3(q)). Thus, there is a three part test to determine whether an alternative is practicable:

1. *Cost.* The relevant consideration is whether the cost of an alternative is substantially greater than the costs normally associated with the particular type of project, rather than the financial circumstances of the applicant. For comparison, please refer to the cost of other large mine projects in Alaska, such as the Greens Creek and Pogo mines. In both cases, DA and EPA determined that the cost of a DTF is reasonable. EPA believes that all of the detailed alternatives in the Kensington DSEIS may be "capable of being done after taking into consideration cost."

2. *Existing Technology.* The relevant consideration is whether an alternative is technically feasible based on available technology. For comparison, please refer to the technology used at other large mines in Alaska, such as the Greens Creek and Pogo mines. In both cases, DA and EPA determined that a DTF is the best available technology. EPA believes that all of the detailed alternatives in the Kensington DSEIS may be "capable of being done after taking into consideration...existing technology."

3. *Logistics.* In the context of mining in general, and this project in particular, logistics refers to the transportation of personnel, equipment, supplies and minerals. The relevant consideration is whether an alternative provides reasonable access to the project site. EPA believes that all of the detailed alternatives in the Kensington DSEIS may be " capable of being done after taking into consideration...logistics."

As stated above, EPA believes that all of the alternatives considered in detail in the DSEIS may be "capable of being done after taking into consideration cost, existing technology, and logistics." Therefore, we believe that all of the alternatives may be practicable. More specifically, with respect to Alternative A in the DSEIS, our concerns reflect the following facts:

On May 5, 1998, DA issued a 404 permit, identified as POA-1990-0592-2 [Lynn Canal 31], to Coeur Alaska for the development of the Kensington gold mine on the east side of Lynn Canal near Comet Beach and Sherman Creek (hereinafter referred to as the "1998 project" or the "1998 permit"). The 1998 permit was based in part upon DA's factual determinations and findings of compliance with the restrictions on discharge as required under the Guidelines. Among other findings, DA found that the 1998 project is a practicable alternative, and EPA concurred with this finding. The applicant affirmed this finding of practicability by applying for the 1998 permit, and then reaffirmed it by accepting the terms and conditions of the 1998 permit. [1] In the absence of new information to negate the practicability of the 1998 project, EPA believes that it was and still may be a practicable alternative.

### *Less Adverse Impact on the Aquatic Ecosystem*

The Kensington DSEIS includes four alternatives that are studied in detail. While the applicant has applied for a 404 permit for Alternative B, the federal agencies responsible for the development of the DSEIS did not identify a preferred alternative.

Alternative A is the No Action alternative (i.e., the 1998 project) and includes locating all of the mine facilities on the east side of Lynn Canal near Sherman Creek, a mining rate of 4,000 tons of ore per day, 20 million tons of tailings, a DTF, no mine backfill, a marine terminal at Comet beach, employee access by helicopter, and employee housing. Alternative A1 is similar to Alternative A, except that A1 includes a reduced mining rate (2,000 tons of ore per day), reduced tailings production (7.5 million tons), a smaller DTF (4.5 million tons), and 40% mine backfill (3 million tons).

Alternative B, which is the Proposed Action, includes locating most of the mine facilities on the northwest side of Berners Bay near Johnson Creek, a reduced mining rate (2,000 tons of ore per day), reduced tailings production (7.5 million tons), a Tailings Disposal Facility (TDF) in Lower Slate Lake (i.e., damming the lake and filling it with 4.5 million tons of tailings), 40% mine backfill (3 million tons), a tailings pipeline and access road, recycling of process water, no diversion of surface water around Lower Slate Lake, upgrading the existing Jualin Mine road, a marine terminal at Slate Creek Cove (including a landing craft ramp), a marine terminal at Cascade Point, employee access by ferry, and no employee housing. Alternative C is similar to Alternative B, except that C includes diversion of surface water around Lower Slate Lake, no recycling of process water (note that 40 CFR § 440.104(b)(1) requires no discharge of process water, which is generally accomplished by recycling the volume of process water), no landing craft ramp at the Slate Creek Cove marine terminal, and a marine terminal at Echo Cove instead of Cascade Point.

As the above description of the alternatives shows, the alternatives can be characterized according to their similarities and differences. Alternative A1 is a slight variation on the theme of Alternative A, and Alternative C is a variation of Alternative B. Hence, Alternatives A and A1 have more in common with each other than they do with Alternatives B and C, and vice versa. The same pattern holds true when comparing the adverse effects of the alternatives on the aquatic ecosystem.

**Alternative A vs. Alternative A1**

Alternative A1 is essentially a scaled-back version of Alternative A, with the total production volume reduced to match the production volume in the alternative the applicant now prefers (Alternative B), rather than the higher production originally proposed and permitted in 1998. Thus, the effects of Alternatives A and A1 on the aquatic ecosystem are generally the same; the only notable difference is in the direct effects related to the size of the DTF and the borrow sites. Under Alternative A, the DTF impacts 113.4 acres and the borrow sites impact 54.7 acres. Under Alternative A1, the DTF impacts 50 acres and the borrow sites impact 36.6 acres (see Table 2-3 in the DSEIS). The net effect is that Alternative A disturbs 81.5 acres more than Alternative A1.

005357

Note that it is not clear how many of these acres are actually waters of the United States, including wetlands, due to the low resolution of wetlands mapping on the Kensington side of the project area. The DSEIS assumes that all of the acres disturbed under Alternatives A and A1 are wetlands. Refer to page 4-69 of the DSEIS, which states:

"Section 3.12.3 notes that wetlands on the Kensington side of the project area were not mapped with the same level of detail as those on the Jualin side. The result is that 100 percent of the 268 acres of disturbance under Alternative A would occur within wetlands. By comparison, a smaller percentage of the total impacted area under Alternatives B and C are wetlands (60 percent and 65 percent respectively). Due to the differences in mapping, focusing on the extent of impacts within individual wetland types will provide a more realistic comparison across alternatives rather than simply comparing the overall percentage of wetlands impacted by each alternative."

Based on our experience in reviewing numerous projects in Southeast Alaska, wetlands typically cover less than half of the landscape and uplands tend to cover more than half of the landscape. Thus, we believe it is likely that the DSEIS overstates the acreage of jurisdictional wetlands impacted by Alternatives A and A1. Furthermore, the federal agencies have a legal obligation to "Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits" (40 CFR 1502.14(b)). EPA recommends correcting this deficiency by performing a comprehensive jurisdictional determination, consistent with the Wetlands Delineation Manual, for all alternatives before the Final SEIS.

Nonetheless, it is reasonable to conclude that Alternative A1 has less adverse impact on the aquatic ecosystem than Alternative A for two reasons. First, with respect to aquatic habitat quality, the general location of the DTF and borrow sites is the same under both alternatives. Second, in terms of aquatic habitat quantity, the DTF and borrow sites under Alternative A1 are approximately half the size of the DTF and borrow sites under Alternative A. Under these circumstances, it seems clear that Alternative A1 has less adverse effect on the aquatic ecosystem than Alternative A.

**Alternative B vs. Alternative C**

Likewise, the effects of Alternatives B and C on the aquatic ecosystem are mostly similar, with a few exceptions. The main differences between these two alternatives include wetland acres impacted, settling conditions in Lower Slate Lake, effects on fish habitat in Upper Slate Lake, and intertidal impacts in Slate Creek Cove. Some of these differences offset each other, whereas others tend to tip the balance in favor of Alternative C. However, the most significant difference in adverse aquatic effects is that Alternative B impacts herring spawning habitat at Cascade Point. Alternative C is specifically designed to avoid this impact. EPA has commented extensively on this issue in the past (see Enclosure 3). The assessment of herring in the Kensington DSEIS confirms our concerns. Therefore, we conclude that Alternative C has less adverse impact on the aquatic ecosystem than Alternative B.

**Alternatives A and A1 vs. Alternatives B and C**

Next, we compare the effects of Alternatives A and A1 to the effects of Alternatives B and C. The impacts of these two sets of alternatives are substantially different due to the design and location of the various project elements. The most notable differences between these alternatives pertain to wetland impacts, ecological risk of tailings disposal options, and adverse effects on marine mammals and recreation in Berners Bay.

At first glance, Alternatives A/A1 appear to impact more wetlands and lakes than Alternatives B/C. However, as discussed above, the wetlands analysis in the DSEIS is biased due to the lack of accurate and detailed wetlands mapping on the Kensington side of the project area. Therefore, there is insufficient information to make a reasonable judgement about the comparative effects of Alternatives A/A1 and Alternatives B/C on wetlands.

With regard to the ecological risk of the tailings disposal options, the DTF (Alternatives A/A1) minimizes the exposure pathways by lining the dry stack cells, capping the dewatered tailings, treating DTF runoff in a storm water detention and sediment pond, and discharging a very small volume of treated water into a small creek devoid of fish. In contrast, the Lower Slate Lake tailings impoundment (Alternatives B/C) directly exposes the entire lake to the tailings, which have exhibited considerable toxicity (per the failed amphipod bioassay). Alternatives B/C also include a very large NPDES discharge to Slate Creek, which supports anadromous fish and drains to Slate Creek estuary and Berners Bay. Therefore, in terms of the potential ecological pathways for exposure to pollutants, Alternatives B/C pose a higher risk than Alternatives A/A1.

The potential impacts of Alternatives B/C on marine mammals are well documented on pages 4-42 through 4-45 of the DSEIS. Humpback whales are listed as an endangered species under the Endangered Species Act, and Steller sea lions are listed as a threatened species (although populations of both species appear to be increasing in Southeast Alaska). As stated on page 4-42, "If the construction of the Slate Creek Cove marine terminal occurred in April-May, a significant impact on Steller sea lions could take place." The applicant can easily mitigate this construction impact by avoiding construction during April and May. However, the DSEIS also states that "The greatest potential for impact on marine mammals would come from boat traffic during the April-May eulachon spawning run." The adverse impact of boat traffic on marine mammals may be unavoidable and irreducible, unless the applicant is willing to temporarily shut down or minimize the number of boat trips during April and May.

The DSEIS also documents the potential impacts that each alternative may have on recreation, including noise, wakes, lights, safety issues, and visual impacts. The most significant adverse effects of Alternatives A/A1 on recreation are the visual impact of the DTF and occasional noise from helicopters. The impacts of Alternatives B/C include increased noise from construction and boat traffic, increased boat wakes, and increased visual impacts within Berners Bay. While some of these impacts are more significant than others, overall, Alternatives A/A1 have less impact on recreation than Alternatives B/C.

The information and analysis presented in the DSEIS support the conclusion that

**005359**

Alternatives A/A1 avoid any significant impact on Berners Bay and Slate Lakes. Conversely, Alternatives B/C will likely result in significant impacts to aquatic resources in Berners Bay and Lower Slate Lake. Therefore, EPA believes that Alternatives A and A1 have less adverse impact on the aquatic ecosystem than Alternatives B and C.

### Conclusion

For the reasons stated above, the relative ranking of the four alternatives (ranked from least impact on the aquatic ecosystem to most impact on the aquatic ecosystem) is as follows: A1, A, C, B. Thus, the proposed projects (Alternative B) may not be the least environmentally damaging practicable alternative, as required by 40 CFR § 230.10(a). Each of the other three alternatives analyzed in the DSEIS may be practicable, and each may have less adverse effects on the aquatic ecosystem.

The relative ranking of the four alternatives above is consistent with EPA's comments on the DSEIS. In those comments, we rated Alternatives A and A1 as "Lack of Objection" and Alternatives B and C as "Environmental Objections." Please refer to Enclosure 2 for a general description of EPA's national rating system and our specific basis for rating the Kensington alternatives.

### Section 2. Water Quality

The Guidelines state that "No discharge of dredged or fill material shall be permitted if it causes or contributes, after consideration of disposal site dilution and dispersion, to violations of any applicable State water quality standard" (40 CFR 230.10(b)(1)). The Mine Tailings Memo affirms that this requirement does not apply within the disposal site (i.e., the Lower Slate Lake tailings impoundment), but that water quality standards must be met in waters outside the impoundment (i.e., East Fork Slate Creek).

EPA's National Pollutant Discharge Elimination System (NPDES) regulations, which implement Section 402 of the Clean Water Act, also include a similar requirement for the discharge of pollutants other than dredged or fill material:

> "No permit may be issued to a new source or a new discharger, if the discharge from its construction or operation will cause or contribute to the violation of water quality standards" (40 CFR § 122.4(i)).

This requirement applies to the discharge from Outfall 002 at the Lower Slate Lake dam into East Fork Slate Creek.

The NPDES Fact Sheet that accompanies the draft NPDES permit for Kensington includes EPA's tentative determination to issue the permit and a description of the proposed permit conditions. In the context of projected discharge chemistry versus effluent limitations for Outfall 002 at the Lower Slate Lake tailings impoundment under the proposed discharge, the Fact Sheet states:

"Evaluation of treatment performance is not necessary because the untreated quality is below the expected permit limits *except for TSS, aluminum, and lead with anticipated iron levels approaching the effluent limits*" (emphasis added).

After the federal agencies published the DSEIS , but before EPA published the draft NPDES permit, EPA determined that the proposed effluent limits for some of the above pollutants could not be met without additional treatment. The applicant then revised the NPDES permit application to include a reverse osmosis (RO) wastewater treatment system and a pipeline diversion of Upper Slate Lake flows around Lower Slate Lake. The pipeline diversion (combined with polymers and other best management practices) should increase settling of Total Suspended Solids (TSS). The RO system should ensure compliance with the permit limits for TSS and the above metals downstream of the disposal site.

Subsequently, we also determined that without additional treatment, the proposed discharge may cause or contribute to violations of Alaska's water quality criterion for turbidity because of the higher TSS levels in the water which are projected. However, the RO system and pipeline diversion should be adequate measures to comply with Alaska's turbidity standard outside of the disposal site.

Based on the information provided in the 404 public notice, it appears that the applicant did not include the RO treatment and pipeline diversion in the 404 permit application. If that is the case, the applicant should correct these omissions in the permit application and DA should include the wastewater treatment system and pipeline diversion as permit conditions to provide a reasonable assurance of compliance with water quality standards for the pollutants of concern. Without this correction, we do not believe the record supports the conclusion that water quality standards will be met, as required by 40 CFR 230.10(b)(1).

EPA recommends that DA closely coordinate its 404 permit decision with EPA and the Alaska Department of Environmental Conservation so that the three agencies can harmonize the separate, but related actions under Sections 401, 402 and 404 of the Clean Water Act. The agencies should complete this water quality coordination step before each agency takes its final action on the Kensington project.

## Section 3. Significant Degradation

The Guidelines state that "no discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States." In relation to findings of significant degradation, the Guidelines emphasize the persistence and permanence of the potential impacts on: physical, chemical and biological characteristics of the aquatic ecosystem; special aquatic sites; and human uses.

EPA is concerned about the permanent loss of the Lower Slate Lake ecosystem and the persistent effects of the tailings on the artificial lake created by the tailings impoundment. The fact that the proposed discharge will completely bury the natural lake with mine tailings is not in dispute. The DSEIS predicts that most aquatic life and all fish, including 500 to 1,000 Dolly Varden, will be unable to survive and reproduce during the tailings disposal operation (ten to

fifteen years). The only question is whether the artificial lake will be able to support a similar ecosystem after closure and reclamation. The answer to that question is uncertain, but the weight of the evidence suggests that restoring and "improving" the lake would take decades, not years.

Due to the demonstrated toxicity of the tailings samples in the bioassay tests, and the limited application of other standard tests on contaminant mobility and pathways, EPA believes that the tailings slurry is a carrier of contaminants (as defined in the Guidelines at 40 CFR 230.3). Therefore, the tailings are unsuitable for use as fill material without further treatment or management (e.g., capping). EPA recommends that DA enlist its considerable in-house expertise in sediment toxicology to review the results of the bioassays and the Ecological Risk Assessment and determine what additional tests should be conducted to develop treatment or management requirements necessary to ensure that the tailings can be made acceptable fill material.

Please refer to Enclosures 2 and 3 for more details about the potential for significantly adverse effects on waters of the United States.

## Section 4. Minimize Harm to the Aquatic Ecosystem

Notwithstanding the concerns expressed above, should the proposal undergo further consideration, EPA believes that the proposed discharge does not include all appropriate and practicable measures to minimize potential harm to the aquatic ecosystem, as required by the Guidelines. The Guidelines state that "no discharge of dredged or fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem. Subpart H identifies such possible steps" (40 CFR § 230.10(d)). Therefore, we recommend that the proposed discharge be modified to include the following measures:

1.     The 404 permit should require a post-closure lake restoration plan including: specific and measurable restoration objectives; specific restoration methods and techniques; a compliance schedule for implementing the plan; and a detailed monitoring and evaluation program to determine whether the specified methods are being implemented on schedule and whether they are effective in achieving the lake restoration objectives.

2.     The 404 permit should require engineered capping of the tailings disposal site in Lower Slate Lake with clean material (see 40 CFR § 230.72(b)). The purpose of capping the tailings is to confine and isolate the toxic material from the aquatic environment, provide a suitable substrate for benthic organisms and to minimize contact between the tailings and the lake water. The tailings cap should be designed to be of sufficient depth or composition to provide an adequate margin of safety. The sediment quality and particle size distribution of the fill material used to cap the tailings should be conducive to the timely attainment of the lake restoration objectives referred to above. The Final SEIS must consider the source and suitability of the cap material, the environmental impact of extracting the material from the source area and placing it in Lower Slate Lake, and the added cost of capping the tailings.

3.    The 404 permit should require diverting water from Upper Slate Lake around the Lower Slate Lake tailings disposal facility during mine operations. The purpose of the diversion is to enhance settling conditions and minimize contact between the high quality waters of Upper Slate Lake and the discharge of pollutants into Lower Slate Lake. This diversion should be done via a pipeline instead of a ditch. The intake should be located upstream of the impounded waters of Lower Slate Lake and the outfall should be located immediately downstream of the Lower Slate Lake dam. The Final SEIS should consider the environmental impact and added cost of the pipeline diversion.

4.    The 404 permit should require an advanced wastewater treatment system, such as RO (or an equivalent technology), to ensure that the proposed discharge complies with applicable Alaska water quality standards, including but not limited to turbidity, aluminum, iron and lead.

5.    The 404 permit should require using nontoxic chemical flocculants to enhance the deposition of suspended particles in the Lower Slate Lake disposal site (see 40 CFR § 230.71(d)). The need for this requirement is supported by the Total Suspended Solids analysis on pages A-63 through A-65 in Volume 2 of the DSEIS.

6.    The 404 permit should require using silt screens or other appropriate methods to confine suspended particles and turbidity to a small area where settling can occur in Lower Slate Lake (see 40 CFR § 230.73(c)). Other methods include: baffles to decrease turbulence and increase retention time; a filter berm between the 404 discharge point and the 402 discharge point; and filter blankets and curtains to filter out suspended solids. The need for this requirement is supported by the Total Suspended Solids analysis on pages A-63 through A-65 in Volume 2 of the DSEIS.

7.    The 404 permit should require designing water releases from Lower Slate Lake dam to accommodate the in-stream flow needs of downstream fish and wildlife (see 40 CFR § 230.77(b)).

8.    The 404 permit should authorize the Echo Cove marine terminal instead of the Cascade Point marine terminal.

9.    The 404 permit should minimize the footprint of the Slate Creek Cove marine terminal by eliminating the landing craft ramp.

10.    The 404 permit should include timing restrictions for the construction of the marine terminals to avoid impacts to fish and marine mammals, especially during the eulachon run in late April and early May.

11.    The 404 permit should include restrictions on timing, ferry speed and ferry routes during the eulachon run in late April and early May.

12.    The 404 permit should include appropriate compensatory mitigation for unavoidable

[1]In the meantime, gold prices, which largely dictate revenues in this type of project, have increased from less than $300 per ounce when the applicant signed the 1998 permit to more than $400 per ounce today.

SENT BY: US EPA    ;                907 271 3424;           SEP-15-04  1:34PM;          PAGE 2

ENCLOSURE 3



## UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
### REGION 10
1200 Sixth Avenue
Seattle, Washington 98101

APR 20 1998

Reply to
Attn. of: AOO/A

Colonel Sheldon L. Jahn,
District Engineer
Department of the Army
U.S. Army Corps of Engineers, Alaska District
P.O. Box 898
Anchorage, Alaska   99506-0898

ATTN: Mr. Ralph Thompson

RE:    Berners Bay 4;     2-970245
       Goldbelt, Incorporated

### CASCADE POINT ACCESS ROAD AND MARINE FACILITY TERMINAL

Dear Colonel Jahn,

This letter regards the referenced permit application submitted by Goldbelt, Incorporated, to discharge fill material into waters of the United States, including wetlands. The applicant proposes to construct the Cascade Point Access Road and a marine facility terminal in Berners Bay, 35 miles north of Juneau, Alaska. On March 24, 1998, the U.S. Environmental Protection Agency (EPA) provided comments to your office regarding this proposed project. At that time, we recommended that the Corps deny the applicant's request for a permit based upon the likelihood that the project may result in substantial and unacceptable impacts to an aquatic resource of national importance. We have enclosed a copy of that letter for your convenience (Enclosure 1).

In general, the U.S. Environmental Protection Agency (EPA) supports the efforts of Alaska Native Corporations to make full economic use of their land holdings allocated pursuant to the Alaska Native Claims Settlement Act (ANCSA). However, EPA has a responsibility to ensure that impacts associated with development projects will not result in a substantial and unacceptable impact to the nation's aquatic resources held in public trust.

Therefore, pursuant to Part IV, Paragraph 3(b) of the August 11, 1992, Clean Water Act Section 404(q) Memorandum of Agreement (MOA) between our agencies, this letter serves as your notification that, in EPA's opinion the discharge from the proposed Cascade Point Access Road and marine facility terminal will have a substantial and unacceptable impact on an aquatic resource of national importance. We have provided detailed site-specific information to support our determination that (1) Berners Bay is an aquatic resource of national importance; (2) the discharge from the proposed project will have substantial and unacceptable impacts (direct, secondary, and cumulative) on an aquatic resource of national importance; and (3) the specific permit, as proposed.

Printed on Recycled Paper

SENT BY: US EPA    ;                    907 271 3424;         SEP-15-04  1:34PM;         PAGE 3

must be denied to protect Berners Bay, an aquatic resource of national importance.

### (1) BERNERS BAY AN AQUATIC RESOURCE OF NATIONAL IMPORTANCE

As discussed in our March 24, 1998, letter regarding this proposed project, the Berners Bay ecosystem is a sensitive environmental area of concern, providing a diversity of critical habitat for fish and wildlife, as well as exceptional recreational and social values. The steep mountains and icefields ensure isolation of the area, which maintains its pristine and undeveloped wildland character.

The EPA plans to fulfill the intent of Congress that areas in Berners Bay should be protected for critical fish and wildlife habitat, and social values. The following detailed site-specific information supplements our earlier comments, and provides our rationale for designating Berners Bay as an Aquatic Resource of National Importance:

### Fisheries Resources

The Alaska Department of Fish and Game (ADFG) has catalogued 15 streams/tributaries draining into Berners Bay that are important for the spawning, rearing, or migration of anadromous fish, including pink, coho, sockeye, and chum salmon.[1] Other finfish and shellfish which have important commercial and sportfishing values include steelhead and cutthroat trout, Dolly Varden, Pacific halibut, Pacific herring, eulachon "hooligan" smelt, crab, and shrimp. In particular, Echo Cove maintains up to 100 commercial dungeness crab pots, as well as a number of personal use pots during crabbing season.

In addition, the vegetated (e.g., kelp, fucus, and other macrophytes) rocky coastline of Berners Bay provides critical spawning habitat for the remnant Lynn Canal/Juneau Pacific herring stock. The ADFG has estimated that the population viability of this herring stock has been unstable since the 1970's. A minimum threshold of 10 million pounds is necessary to maintain this population. The traditional migration and spawning range for the Lynn Canal/Juneau Pacific herring stock has been reduced. Now, most spawning activity for this remnant stock is centered near and within Berners Bay.

### Wildlife Resources

Berners Bay provides a feeding ground for a number of marine mammal species. In the Spring, humpback whales, killer whales, harbor porpoises, harbor seals, and Steller sea lions are attracted by the spawning Pacific herring, eulachon smelt, and salmon. In addition, a number of large terrestrial mammals including brown bear[2], black bear[2], Sitka black-tailed deer[2], Alexander Archipelago wolf[2,3], mountain goat[2], and an isolated population of moose[2] are dependent on the aquatic resources of Berners Bay. In particular, the beach fringe and estuary habitats of upper Berners Bay and the Berners, Lace, and Antler Rivers are extremely important for moose during over-wintering and calving

---

[1] Catalogue of waters important for spawning, rearing, or migration of anadromous fishes. Alaska Department of Fish and Game, South central Region Resource Management, Region I.

[2] Currently a "Candidate" species for potential listing as "Threatened" or "Endangered" if substantial information on biological vulnerability and threat(s) become available to warrant protection under the Endangered Species Act (ESA)

2

periods.  Other mammals frequent in the area include martens[3], minks, river otters[3], red squirrels[3], voles, and shrews

Numerous species of migratory, shore and seabirds depend on Berners Bay for resting, feeding, staging, and nesting.  These birds include Common mergansers, Harlequin ducks[4], and Barrows golden eyes.  Seabirds and ducks observed in the area include the common, arctic, and yellow-billed loons, white-winged, surf, and common scoters, grebes, seagulls, murres, and murrelets.  The U.S. Fish and Wildlife Service (USFWS) has identified the location of 25 Bald Eagle[3] nest sites along the old growth forested coastal fringe.

## Legislated Land Use Designation II (LUD II) Management Area

In 1990, Congress identified lands which comprise approximately 46,000 acres within Berners Bay to be managed in perpetuity as a Legislated Land Use Designation II (LUD II) Management Area.[4] Congress selected these LUD II areas for special management because of their critical importance for fish and wildlife habitat and their high value to tourism and recreation.  Legislated LUD II areas are to be managed in a roadless state to retain their wildland character.

## Federally Listed Species

Pursuant to the Endangered Species Act (ESA) of 1973, as amended, the National Marine Fisheries Service (NMFS) has listed the Humpback whale (*Megaptera novaeangliae*) as an "Endangered" species and the Steller sea lion (*Eumetopias jubatus*) as a "Threatened" species.  These species are listed because of the major decline in numbers that had occurred throughout most of their habitat range.  In the Spring, Humpback whales with calves, and Steller sea lions with pups migrate and converge into Berners Bay to feed on Pacific herring and eulachon smelt.  The USFWS has included the Alexander Archipelago wolf, and the Harlequin Duck as "Candidate" species for potential listing as "Threatened" or "Endangered."  Under the ESA, Congress provided a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved.

## Wild Rivers Designation

The Wild and Scenic Rivers Act of 1968, as amended, provides a means for recognizing and protecting the outstanding remarkable scenic, recreation, geologic, fish and wildlife, historic, cultural, ecological, and other values of selected rivers of the United States.  The U.S. Forest Service (USFS) evaluated 112 rivers in the Tongass National Forest for the purpose of determining the potential classification, and suitability of these rivers under the National Wild and Scenic River System.  Four (4) rivers draining the Berners Bay watershed were evaluated for consideration as "Wild Rivers."

---

[3] The US Forest Service has identified Management Indicator Species (MIS) for the Tongass Forest Plan.  MIS are vertebrate or invertebrate species whose response to land management activities can be used to predict the likely response of other species within similar habitat requirements.

[4] Tongass Timber Reform Act (1990).  Berners Bay is one of twelve (12) areas in the Tongass National Forest to be identified for management under Legislated Land Use Designation II (LUD II)  The other LUD II management areas include Yakutat Forelands, Chuck River, Goose Flats, Kadashan, Karta, Lisianski River/Upper Hoonah Sound, Mt. Calder/Mt. Holbrook, Nutkwa, Outside Islands, Trap Bay, and Young Lake.

3

These rivers included the Antler River, Berners River, Gilkey River, and Lace River.[5]  Based on a Suitability Analysis of each river, the Gilkey River was determined "suitable for designation" to the National Wild and Scenic Rivers System as a "Wild River."  The Antler River, Berners River, and Lace River were determined to be "unsuitable for designation."[6]  The USFS' Record of Decision (ROD) indicated that:

> *Designation of the (Antler, Berners, and Lace) as a Wild River could significantly restrict options for location of the corridor (Juneau Access Improvement Project; Alternative 2: East Lynn Canal Highway)  If a decision is made not to construct the road across the (Antler, Berners, and Lace) River, the entire river could be considered in the future for Wild designation, or for Scenic or Recreational designation even if the road is built across the river.*

Although the USFS determined that the Antler, Berners, and Lace Rivers were "unsuitable for designation," evaluation of these rivers could suggest that they deserve recognition and protection for their outstanding and remarkable values in the future.

## Social Values

As indicated in our March 24, 1998, Letter, Berners Bay provides important recreational, tourism, and commercial values.  In addition, this area maintains archeological and cultural significance.  Archeological studies have shown that early inhabitants of Southeast Alaska existed in the area some 10,000 years ago.[7]  Berners Bay was the traditional territory of the Auk Tlingit.  The Auk people considered Berners Bay famous as a source of berries.  The USFS conducted a cultural resources survey along the proposed access road alignment and the proposed Cascade Point development area.[8]  Along the proposed road corridor, 86 culturally modified trees (CMT), with a large number of cut tree stumps, and a small shell midden were found.  All (but one) were hemlocks of the CMTs had the bark stripped.  The Auk Tlingit processed hemlock bark to make a sweet confection.  On Goldbelt, Incorporated lands, 159 CMTs were identified.  The small shell midden recovered during the survey may have been the remains of a temporary campsite used during the processing of hemlock bark confection.  The grove of CMTs and the shell midden have been determined to be eligible for listing on the National Register of Historic Places, pursuant to the National Historic Preservation Act (NHPA) of 1966, as amended.

In 1980, the USFS prepared a plan to examine all resource management opportunities in Management Area C-03 (Echo Cove Management Area), which included the Cowee-Davies Watershed.[7]  In the Echo Cove Management Area, the USFS identified the presence of prehistoric

---

[5] Tongass National Forest Land Management Plan Revision, Final Environmental Impact Statement (1997)  USDA, U.S. Forest Service R10-MB-338f, Appendix E, Volume 2.

[6] Record of Decision (ROD) for the Tongass National Forest Land and Resource Management Plan Revision, Alaska, May 1997. USDA, U.S. Forest Service R10-MB-338a.

[7] Cowee-Davies Management Area Plan 1980  USDA, U.S. Forest Service, Alaska Region  Report Number 121

[8] Cascade Point Access Road, Draft Environmental Impact Statement  USDA, U.S. Forest Service, Tongass National Forest, R10-MB-352.

4

village sites, petroglyphs and other remains.  In addition, old mine structures, machinery, tunnels and shafts, camps, roads, and trails exist as evidence of past use of this area.  One confirmed native village site is listed on the Alaska Heritage Resource Survey.[8]

Furthermore, Berners Bay may contain the sacred burial site(s) of the Auk Tlingit.[9]  According to Ms. Rosa Miller, Tribal Leader of the Auk-Kwan, a medicine man (Shaman) burial site is located in the proposed project area.  Maintaining the physical integrity of the sacred burial site would preserve the deceased Shaman spirit at Lions Head Mountain.

### (2) SUBSTANTIAL AND UNACCEPTABLE IMPACTS

In our opinion, the proposed Cascade Point Access Road and marine facility terminal will result in substantial and unacceptable direct, secondary, and cumulative impacts to an aquatic resource of national importance.  This project represents the first phase of the overall Echo Cove Master Plan Development proposed by the applicant to be implemented in the reasonably foreseeable future[10].  Moreover, this project is related to and would facilitate development of other proposed activities[11] in the Berners Bay area.  To supplement our earlier comments, the EPA would like to provide that additional site-specific information regarding impacts to marine, wildlife, and cultural resources.

### Marine Resources

The proposed Cascade Point Access Road and marine facility terminal will result in substantial and unacceptable impacts to the spawning and rearing habitat for the Lynn Canal/Juneau Pacific herring stock.  In the past 20 years, the Alaska Department of Fish and Game (ADFG) has shown a decline in the abundance of this particular herring stock.  In the 1970's, the herring catch ranged from 60 - 200 thousand pounds.  ADFG estimates that a minimum threshold for this stock to maintain population viability is 10 million pounds.  Since 1982, no commercial harvest of this herring stock has been allowed.  Traditionally, the range of migration and spawning for the Lynn Canal/Juneau Pacific herring stock was from Auke Bay to Point Sherman.  However, in recent years, spawning activity of this remnant stock is centered within or near Berners Bay.  The decline in the Pacific herring stock could be attributed to piecemeal coastal development resulting in the direct loss or fragmentation of critical spawning and rearing habitat.

The decline of the remnant Lynn Canal/Juneau Pacific herring stock may jeopardize the continued existence of species listed as "Endangered" or "Threatened" under the ESA.  In the Spring, Humpback whales and Steller sea lions migrate and converge in Berners Bay to prey on Pacific herring.  One reason for the listing of the Steller Sea lion is due to the changes in the quantity and quality of

---

[9]Personal communication, Ms. Rosa L. Miller, Tribal Leader of the Auk-Kwan.

[10]Echo Cove Master Plan 1996  Prepared for Goldbelt, Inc. by Minch Ritter Voelckers

[11]The March 24, 1998, Letter to Colonel Sheldon L. Jahn, District Engineer, Corps of Engineers, from Rich Albright, Director, Alaska Operations Office, EPA Region 10, identified a number of proposed activities including the Echo Cove Master Plan development, Juneau Access Improvement Project (Alternative 2: East Lynn Canal Highway), the Kensington and Jualin mines, and the Lace River Hydroelectric project

5

available prey which may influence the health and fitness of individual sea lions.[12] The decline of Pacific herring could result in this change in quantity of suitable prey species. Under the ESA, the NMFS has initiated the Section 7 Consultation process to comprehensively evaluate and assess this substantial and unacceptable impact to listed species as a result of the potential loss and fragmentation of herring spawning habitat in Berners Bay.

Wildlife Resources

The proposed project will result in substantial and unacceptable cumulative impacts to wildlife dependent on the aquatic habitat. Based on the Habitat Capability Reduction Models[13] developed for the Tongass National Forest, the USFS estimated that if all of the proposed projects" were implemented, wildlife impacts to four Management Indicator Species (MIS) in Berners Bay may reach the following percentages of habitat capability reduction: Marten 61%; Brown Bears 46%; Black Bears < 14%; and Mountain Goats <7%."

The USFS indicated that these reductions in habitat capability may not be directly related to reductions of animals without exhaustive population studies. However, it is clear that the cumulative habitat capability reductions of brown bear, black bear, and marten have the potential to significantly impact those species in the Berners Bay area.

Cultural Resources

The proposed Cascade Point Access Road will result in substantial and unacceptable impacts to the physical integrity of cultural resources. As indicated above, the proposed road corridor would directly eliminate approximately 86 culturally modified trees and a village/burial site. All of these cultural resources are eligible for listing on the National Register of Historic Places. The cumulative impacts associated with the Echo Cove Master Plan could result in the elimination of over 150 CMTs and other historical and cultural resources of Berners Bay.

(5)  PERMIT DENIAL

To be clear, the EPA is not opposed to the economic development of land allocated to Native Corporations under ANCSA. However, in this case, we can not support a proposed project which does not comply with the Section 404(b)(1) Guidelines [Guidelines]. As proposed, the Cascade Point Access Road and marine facility terminal will result in substantial and unacceptable impacts to an aquatic resource of national importance. In order to protect the aquatic resource of national importance, we maintain our recommendation that the Corps deny this specific permit request.

---

[12]Recovery Plan for the Steller Sea Lion (*Eumetopias jubatus*).  Prepared by the Steller Sea Lion Recovery Team for the national Marine Fisheries Service, Silver Spring, Maryland, 92 pp.

[13]The Habitat Capability Reduction Model was calculated using three types of impacts: (1) permanent loss of habitat resulting from land alterations; (2) permanent displacement of animals from the vicinity of development areas, and (3) temporary disturbance of animals.  Such factors as hunting, trapping, road kills, human/wildlife encounters, and noise were included in the reduction factors

6

The following represents EPA's findings of non-compliance with the restrictions on discharges as required under the Guidelines:

### Section 230.10 (a) Least Damaging Practicable Alternative

The applicant has not clearly demonstrated that there are no less damaging practicable alternatives to the proposed discharge for the construction of the Cascade Point Access Road and marine facility terminal. In our March 24, 1998, Letter, the EPA recommended that the applicant prepare a comprehensive Alternatives Analysis which considers alternative site locations and road alignments; reconfiguration of the project scope and structural designs, including a pile supported marine facility terminal. This Alternatives Analysis could be used to demonstrate compliance with this section of the Guidelines.

In our February 9, 1998, comments to the USFS regarding the Cascade Point Access Road Draft Environmental Impact Statement (EIS), we indicated that the narrow range of alternatives required under the National Environmental Policy Act (NEPA) warrant further evaluation. Moreover, the range of alternatives identified in the Draft EIS does not provide sufficient detail to respond to the requirements of the Guidelines. As the cooperating agency on the DEIS, your office may determine it necessary to supplement this NEPA document with a more rigorous Alternatives Analysis.

In addition, the supplemental NEPA document should provide a comprehensive evaluation of the direct, secondary, and cumulative impacts of the proposed activity, in relation to other reasonably foreseeable projects" being planned in the Berners Bay area.

Furthermore, pursuant to NEPA, Federal agencies must, whenever feasible, address significant and adverse environmental effects of the proposed actions on native tribes, including social effects. The February 11, 1994, Presidential Executive Order 12898[14], provides that each Federal agency identify and address, as appropriate, disproportionately high and adverse human health and environmental effects on minority populations, such as native Alaskan tribes. In particular, Federal agencies are required to evaluate and address cultural resources and historic sites that may be impacted by the proposed action. The May 24, 1996, Presidential Executive Order 13007[15] further clarifies the Federal requirement to assess impacts of proposed actions on the physical integrity of Indian sacred sites. Tribal rights and concerns should be considered during the development of such actions. Mitigation measures should be identified to avoid and minimize impacts to tribal trust resources.

The Council of Environmental Quality (CEQ), which has oversight of the Federal government's compliance with E.O. 12898 and NEPA, has developed guidance to further assist Federal agencies with their NEPA procedures so that environmental justice concerns are effectively identified and addressed

---

[14]Executive Order 12898 of February 11, 1994. Federal Action to Address Environmental Justice in Minority Populations and Low-Income Populations. Federal Register, Vol. 59, No. 32, February 16, 1994. pp 7629-7633

[15]Executive Order 13007 of May 24, 1996. Indian Sacred Sites.

7

**Exhibit 51, page 22 of 24**

### Section 230.10(b) Species Listed as Endangered or Threatened

Under Section 230.10(b)(3), the proposed discharge may jeopardize the continued existence of species listed as endangered or threatened under the Endangered Species Act of 1973, as amended. The "Endangered" Humpback whale and the "Threatened" Steller sea lion prey on Pacific herring. The decline in the Lynn Canal/Juneau Pacific herring stock could result in a reduction in numbers of both listed species.

### Section 230.10(c) Significant Degradation

The Cascade Point Access Road and marine facility terminal may cause or contribute to significant degradation to spawning habitat critical for the Lynn Canal/Juneau Pacific herring stock. The traditional range of herring spawning was from Auke Bay to Point Sherman. However, in recent years, spawning activity has centered mostly within or near Berners Bay. Loss of critical spawning habitat for the Pacific herring stock from coastal development projects could cause or contribute to the decline of this remnant stock.

### Section 230.10(d) Appropriate and Practicable Steps

To date, the applicant has not taken appropriate and practicable steps to minimize potential adverse impacts of the discharge on the aquatic ecosystem. In our March 24, 1998, Letter, we recommended that the applicant consider the following steps: (1) avoiding sites having unique habitat or other values; (2) selecting sites which are not within a special aquatic site; and (3) minimizing unavoidable impacts. Furthermore, the EPA recommended that the applicant provide mitigation that would be commensurate with the level of unavoidable impacts to the aquatic resource.

Therefore, on the basis of these Guidelines the proposed site for the discharge of dredged or fill material must be specified as failing to comply with the requirements of these Guidelines where there does not exist sufficient information to make a reasonable judgement as to whether the proposed discharge will comply with the these Guidelines (Section 230.12(a)(3)(iv)). In our opinion, the applicant has not provided sufficient information to demonstrate compliance with the requirements of these Guidelines.

In accordance with the MOA, please notify me if your proposed permit decision is contrary to our stated written recommendations. The EPA is willing to meet with your office, and/or the applicant and other Federal and State agencies in order to resolve these issues.

Thank you for your consideration of our concerns. If you have any specific questions, please feel free to contact me at (206) 553-1234, or have your staff contact Mr Mark Jen at (907) 271-3411.

Sincerely,

Chuck Clarke,
Regional Administrator

B

Enclosure

cc:    Ralph Thompson, Corps, Juneau
       Duane Peterson, USFWS, Juneau
       Linda Shaw, NMFS, Juneau
       Jennette de Leeuw, USFS, Juneau
       Jen Garland, ADGC, Juneau
       Dave Sturdevant, ADEC, Juneau
       Terry Rader, ADNR, Juneau
       Clayton Hawkes, ADFG, Douglas
       City and Borough of Juneau, Juneau
       Mr. David Goade, Goldbelt, Incorporated (Applicant)
            9097 Glacier Highway, Suite 200
            Juneau, Alaska  99801