# Final Environmental Impact Statement
# Pogo Gold Mine Project

Delta, Alaska

National Pollutant Discharge Elimination System (NPDES)
Permit Application No. AK-005334-1



September 2003



Prepared By:



U.S. Environmental Protection Agency
Region 10
Office of Water, NPDES Permits Unit

Cooperating Agencies:



U.S. Army Corps of Engineers



Alaska Department of Natural Resources



With Assistance From:

**Baker**

Engineering & Energy
Michael Baker Jr., Inc.

Volume II (Appendices)

Exhibit 47, page 3 of 5

Pogo Mine Project                                                           Final Environmental Impact Statement

# Appendix E

# Response to Comments on the Draft EIS

A. Public Meeting Comments ................................................................. Page A-1
B. Public Written Comments .................................................................. Page B-1
C. Tribal Written Comments ................................................................... Page C-1
D. Non-Governmental Organization Comments .................................... Page D-1
E. Municipal Government Comments .................................................... Page E-1
F. Legislator Comments ........................................................................ Page F-1
G. Agency Comments ........................................................................... Page G-1
H. Applicant Comments ........................................................................ Page H-1

## Introduction

The purpose of this Appendix E is to present the comments received on the draft Pogo Gold Mine EIS from the public, Tribes, and the agencies, and to respond to those comments.

The Pogo Gold Mine draft EIS presented feasible alternatives to the Applicant's Proposed Project, and described how the environmental impacts would differ between those alternatives. As a result of public, Tribal, and agency comments on the draft EIS, the body of this final EIS contains both changes to the draft EIS text as well as additional information not contained in the draft EIS.

While the draft EIS contained the draft major permits and evaluated the impacts of the different alternatives under consideration by the agencies, this final EIS does not contain the final permits for several reasons, including requirements in law that the final EIS be published before some formal records of decision (ROD) concerning the permits may be finalized. In many cases, therefore, final decisions on comments specific to one or more of the draft permits published in the draft EIS cannot be included in this final EIS because the agencies have not completed their final RODs. All such specific comments, however, have been reviewed by these agencies, and these comments will be fully considered in the agencies' decision-making processes. Thus, many of the comment responses shown later in this appendix merely acknowledge that such comments will be considered by the agency and its final decision will contain a discussion of that particular issue.

When a DEIS comment addressed a particular EIS issue, rather than a draft permit issue, a specific response has been given below. Such responses usually state whether changes have been made as a result of the comment, where those changes have been made, or where in the document information may be found that responds to a comment or question.

The draft EIS comment period formally began with a notice of availability published in the *Federal Register* on March 14 , 2003, and closed 60 days later on May 13, 2003, although



**COMMENT RESPONSE:**

D10-1  The text in Appendix A, Section 1.2, that discusses the screening process for tailings disposal location has been redrafted to describe in further detail the analysis that was conducted to screen the location options to clearly demonstrate there were no reasonable disposal locations that would not impact wetlands.

D10-2  Changes to the dry-stack tailings facility construction plan have occurred since the Applicant's Proposed Project was described in Section 2.3 of the DEIS. The new plan, which details these changes, may be found in the COE 404 Public Notice contained in Appendix B of this FEIS.

In response to comments from the State of Alaska, the Applicant has proposed to augment the project's growth media balance by clearing, grubbing, and stockpiling the organic material from the dry-stack facility footprint. In addition, an erosion control/drainage blanket and under drain system consisting of nonmineralized rock would be placed within the footprint prior to placement of any tailings.

The COE regulates placement of dredge and or fill material into waters of the United States. Mechanized land clearing of wetlands is considered a discharge of fill material into those waters. Land clearing operations involving vegetation removal with mechanized equipment such as front-end loaders, backhoes, or bulldozers with sheer blades, rakes, or discs in wetlands; or windrowing of vegetation, land leveling, or other soil disturbances in wetlands, are considered placement of fill material and are regulated activities under COE jurisdiction. The placement of nonmineralized waste rock into cleared wetlands also would be regulated as placement of fill material into waters of the United States. Appendix B shows the volume of nonmineralized rock fill that would be placed into such waters.

A COE 404 permit may only be issued after the Applicant obtains a Certificate of Reasonable Assurance, or waiver of certification, from ADEC as required by Section 401(a)(I) of the CWA. ADEC must certify that the State's water quality standards would not be violated.

Placement of the erosion control/drainage blanket in the dry-stack facility footprint would convert existing wetlands to uplands. Thus, tailings placed on the erosion control/drainage blanket would be placed in uplands. The COE does not regulate fill placement in uplands, and therefore no CWA Section 404 permit would be required for placement of dry-stack tailings. The tailings, however, would require a solid waste permit from ADEC.

An EPA NPDES permit for discharge of tailings would be neither required nor appropriate. Seepage collected from the dry stack would be directed from the under drain system to the RTP. All effluent discharges from the RTP would pass through the on-site treatment facility, and all water discharged from the treatment facility would be subject to effluent limits and other provisions of a NPDES permit.

D10-3  This issue will be addressed in ADEC's 401 Certification and EPA's response to comments with the final NPDES permit, both of which will be issued after publication of this FEIS.

D10-4  This issue will be addressed in ADEC's 401 Certification and EPA's response to comments with the final NPDES permit, both of which will be issued after publication of this FEIS.

D10-5  The reader is directed to the response to comment D4-13.

D10-6  The text in Section 2.3.8 (Waste Rock Storage) has been redrafted to reflect the comment.

D10-7  The discussion of development rock disposal in Section 4.3.2 has been redrafted to reflect the comment.

D10-8  Presenting an estimated schedule for disposal of mineralized development rock in the tailings dry stack is not considered reasonable at this time because there are many unknown factors that would make it of little practical value. All mineralized development rock brought to the surface and not immediately encapsulated in the dry stack would be stockpiled either on impervious geotextile layers on the valley floor below the existing 1525 Portal of the exploration adit (Figure 2.3-1 a), or temporarily within the dry stack footprint itself (Figure 2.3-1 e).

The only exception might occur below the existing 1525 Portal where the nonmineralized development rock is presently stockpiled. As this rock were used as fill material in the laydown area and for road construction, it would free up the existing engineered polypropylene lined pad and allow placement of additional mineralized development rock on the existing lined pad as temporary storage. If there were more mineralized rock than could fit on the existing lined pad, the excess mineralized rock would be temporarily stored immediately to the north of the existing lined pad and would be moved to the temporary stockpile within the overall footprint of the dry stack in upper Liese Creek within 2 years. It is projected that all mineralized rock would be encapsulated in the dry-stack tailings by year 7 of the project.

D10-9  Thank you for your comment.

D10-10  This issue will be addressed in ADNR's final decision for issuance of the ROW, which will occur after publication of this FEIS.

D10-11  This issue will be addressed in ADNR's final decision for issuance of the ROW, which will occur after publication of this FEIS.

D10-12  This issue will be addressed in ADNR's final decision for issuance of the competitive land lease which will occur after publication of this FEIS.

D10-13  This issue will be addressed in ADNR's final decision for issuance of the ROW, which will occur after publication of this FEIS.

D10-14  This issue will be addressed in ADNR's final decision for issuance of the ROW, which will occur after publication of this FEIS.

D10-15  This issue will be addressed in ADNR's final decision for issuance of the ROW, which will occur after publication of this FEIS.

D10-16  These suggestions will be addressed in ADEC's final decision for issuance of the waste disposal permit which will occur after publication of this FEIS.

D10-17  This issue will be addressed in ADEC's final decision for issuance of the waste disposal permit, which will occur after publication of this FEIS.

D10-18  This issue will be addressed in ADNR'S final Plan of Operations Approval, which will be issued after publication of this FEIS.

D10-19  This issue will be addressed in ADNR'S final Plan of Operations Approval, which will be issued after publication of this FEIS.