(Slip Opinion)      OCTOBER TERM, 2005      1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## S. D. WARREN CO. *v.* MAINE BOARD OF ENVIRONMENTAL PROTECTION ET AL.

### CERTIORARI TO THE SUPREME JUDICIAL COURT OF MAINE

No. 04–1527.   Argued February 21, 2006—Decided May 15, 2006

Petitioner company (Warren) asked the Federal Energy Regulatory Commission (FERC) to renew federal licenses for five of the hydroelectric dams it operates on a Maine river to generate power for its paper mill. Each dam impounds water, which is then run through turbines and returned to the riverbed, passing around a section of the river. Under protest, Warren applied for water quality certifications from respondent Maine Board of Environmental Protection pursuant to §401 of the Clean Water Act, which requires state approval of "any activity" "which may result in any discharge into the [Nation's] navigable waters." FERC licensed the dams subject to compliance with those certifications, which require Warren to maintain a minimum stream flow and to allow passage for certain fish and eels. After losing state administrative appeals, Warren filed suit in a state court, which rejected Warren's claim that its dams do not result in a "discharge" under §401. The State Supreme Judicial Court affirmed.

*Held:* Because a dam raises a potential for a discharge, §401 is triggered and state certification is required. Pp. 3–15.

(a) The Clean Water Act does not define "discharge," but provides that the term "when used without qualification includes a discharge of a pollutant, and a discharge of pollutants," 33 U. S. C. §1362(16). But "discharge" is presumably broader, else superfluous, and since it is neither defined nor a term of art, it should be construed "in accordance with its ordinary or natural meaning," *FDIC* v. *Meyer,* 510 U. S. 471, 476. When applied to water, discharge commonly means "flowing or issuing out," Webster's New International Dictionary 742. This Court has consistently intended that meaning in prior water cases, including the only case focused on §401, *PUD No. 1 of Jefferson Cty.* v. *Washington Dept. of Ecology,* 511 U. S. 700, in which no one

questioned that the discharge of water from a dam fell within §401's ambit. The Environmental Protection Agency and FERC have also regularly read "discharge" to cover releases from hydroelectric dams. Pp. 3–6.

  (b) Warren's three arguments for avoiding this common reading are unavailing. The canon *noscitur a sociis*—"a word is known by the company it keeps," *Gustafson* v. *Alloyd Co.,* 513 U. S. 561, 575—does not apply here. Warren claims that since "discharge" is keeping company with "discharge" defined as adding one or more pollutants, see §1362(12), discharge standing alone must also require the addition of something foreign to the water. This argument seems to assume that pairing a broad statutory term with a narrow one shrinks the broad one, but there is no such general usage of language this way. Warren also relies on *South Fla. Water Management Dist.* v. *Miccosukee Tribe,* 541 U. S. 95, but that case is not on point. It addressed §402, not §401, and the two sections are not interchangeable, as they serve different purposes and use different language to reach them. Thus, that something must be added in order to implicate §402 does not explain what suffices for a discharge under §401. Finally, the Clean Water Act's legislative history, if it means anything, goes against Warren's reading of "discharge." Pp. 6–12.

  (c) Warren's arguments against reading "discharge" in its common sense also miss the forest for the trees. Congress passed the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U. S. C. §1251(a), the "national goal" being to achieve "water quality [providing] for the protection and propagation of fish . . . and . . . for recreation," §1251(a)(2). To do this, the Act deals with "pollution" generally, see §1251(b), which it defines as "the man-made or man-induced alteration of the [water's] chemical, physical, biological, and radiological integrity," §1362(19). Because the alteration of water quality as thus defined is a risk inherent in limiting river flow and releasing water through turbines, changes in the river's flow, movement, and circulation fall within a State's legitimate legislative business. State certifications under §401 are essential in the scheme to preserve state authority to address the broad range of pollution. Reading §401 to give "discharge" its common and ordinary meaning preserves the state authority apparently intended. Pp. 12–15.

2005 ME 27, 868 A. 2d 210, affirmed.

  SOUTER, J., delivered the opinion of the Court, in which ROBERTS, C. J., and STEVENS, KENNEDY, THOMAS, GINSBURG, BREYER, and ALITO, JJ., joined, and in which SCALIA, J., joined as to all but Part III–C.

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

————————

No. 04–1527

————————

## S. D. WARREN COMPANY, PETITIONER *v.* MAINE BOARD OF ENVIRONMENTAL PROTECTION ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME JUDICIAL COURT OF MAINE

[May 15, 2006]

JUSTICE SOUTER delivered the opinion of the Court.*

The issue in this case is whether operating a dam to produce hydroelectricity "may result in any discharge into the navigable waters" of the United States. If so, a federal license under §401 of the Clean Water Act requires state certification that water protection laws will not be violated. We hold that a dam does raise a potential for a discharge, and state approval is needed.

## I

The Presumpscot River runs through southern Maine from Sebago Lake to Casco Bay, and in the course of its 25 miles petitioner, S. D. Warren Company, operates several hydropower dams to generate electricity for its paper mill. Each dam creates a pond, from which water funnels into a "power canal," through turbines, and back to the riverbed, passing around a section of the river just below the impoundment.

It is undisputed that since 1935, Warren has needed a license to operate the dams, currently within the authority

————————

*JUSTICE SCALIA joins all but Part III–C of this opinion.

of the Federal Energy Regulatory Commission (FERC) under the Federal Power Act. 16 U. S. C. §§817(1), 792; see also Public Utility Act of 1935, §210, 49 Stat. 846. FERC grants these licenses for periods up to 50 years, 16 U. S. C. §799, after a review that looks to environmental issues as well as the rising demand for power, §797(e).

Over 30 years ago, Congress enacted a specific provision for licensing an activity that could cause a "discharge" into navigable waters; a license is conditioned on a certification from the State in which the discharge may originate that it will not violate certain water quality standards, including those set by the State's own laws. See Water Quality Improvement Act of 1970, §103, 84 Stat. 108. Today, this requirement can be found in §401 of the Clean Water Act, 86 Stat. 877, codified at 33 U. S. C. §1341: "Any applicant for a Federal license or permit to conduct any activity . . . which may result in any discharge into the navigable water[s] shall provide the licensing or permitting agency a certification from the State in which the discharge originates . . . ." §1341(a)(1).

> "Any certification provided under this section shall set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that any applicant for a Federal license or permit will comply with [§§1311, 1312, 1316, and 1317] and with any other appropriate requirement of State law set forth in such certification, and shall become a condition on any Federal license or permit subject to the provisions of this section."[1] §1341(d).

---

[1] The statutes cross-referenced go to effluent limitations and other limitations, 33 U. S. C. §§1311, 1312, standards of performance, §1316, and toxic effluent standards, §1317. As we have explained before, "state water quality standards adopted pursuant to §303 [of the Clean Water Act, 33 U. S. C. §1313,] are among the 'other limitations' with which a State may ensure compliance through the §401 certification process."

Opinion of the Court

In 1999, Warren sought to renew federal licenses for five of its hydroelectric dams. It applied for water quality certifications from the Maine Department of Environmental Protection (the state agency responsible for what have come to be known as "401 state certifications"), but it filed its application under protest, claiming that its dams do not result in any "discharge into" the river triggering application of §401.

The Maine agency issued certifications that required Warren to maintain a minimum stream flow in the bypassed portions of the river and to allow passage for various migratory fish and eels. When FERC eventually licensed the five dams, it did so subject to the Maine conditions, and Warren continued to deny any need of §401 state certification. After appealing unsuccessfully to Maine's administrative appeals tribunal, the Board of Environmental Protection, Warren filed this suit in the State's Cumberland County Superior Court. That court rejected Warren's argument that its dams do not result in discharges, and the Supreme Judicial Court of Maine affirmed. *S. D. Warren Co.* v. *Board of Environmental Protection,* 2005 ME 27, 868 A. 2d 210. We granted certiorari, 546 U. S. ___ (2005), and now affirm as well.

## II

The dispute turns on the meaning of the word "discharge," the key to the state certification requirement under §401.[2] The Act has no definition of the term, but provides that "[t]he term 'discharge' when used without qualification includes a discharge of a pollutant, and a discharge of pollutants."[3] 33 U. S. C. §1362(16). It does

———————

*PUD No. 1 of Jefferson Cty.* v. *Washington Dept. of Ecology,* 511 U. S. 700, 713 (1994).

[2] No one disputes that the Presumpscot River is a navigable water of the United States.

[3] The term "pollutant" is defined in the Act to mean "dredged spoil,

define "discharge of a pollutant" and "discharge of pollutants," as meaning "any addition of any pollutant to navigable waters from any point source." §1362(12). But "discharge" presumably is broader, else superfluous, and since it is neither defined in the statute nor a term of art, we are left to construe it "in accordance with its ordinary or natural meaning." *FDIC* v. *Meyer,* 510 U. S. 471, 476 (1994).

When it applies to water, "discharge" commonly means a "flowing or issuing out," Webster's New International Dictionary 742 (2d ed. 1949); see also *ibid.* ("[t]o emit; to give outlet to; to pour forth; as, the Hudson *discharges* its waters into the bay"), and this ordinary sense has consistently been the meaning intended when this Court has used the term in prior water cases. See, *e.g., Marsh* v. *Oregon Natural Resources Council,* 490 U. S. 360, 364 (1989) (describing a dam's "'multiport' structure, which will permit discharge of water from any of five levels"); *Arizona* v. *California,* 373 U. S. 546, 619, n. 25 (1963) (Harlan, J., dissenting in part) (quoting congressional testimony regarding those who "'take . . . water out of the stream which has been discharged from the reservoir'"); *United States* v. *Arizona,* 295 U. S. 174, 181 (1935) ("Parker Dam will intercept waters discharged at Boulder Dam").

In fact, this understanding of the word "discharge" was accepted by all Members of the Court sitting in our only other case focused on §401 of the Clean Water Act, *PUD No. 1 of Jefferson Cty.* v. *Washington Dept. of Ecology,* 511 U. S. 700 (1994). At issue in *PUD No. 1* was the State of Washington's authority to impose minimum stream flow

_____

solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U. S. C. §1362(6).

rates on a hydroelectric dam, and in posing the question presented, the Court said this:

> "There is no dispute that petitioners were required to obtain a certification from the State pursuant to §401. Petitioners concede that, at a minimum, the project will result in two possible discharges—the release of dredged and fill material during the construction of the project, and the discharge of water at the end of the tailrace after the water has been used to generate electricity." *Id.*, at 711.

The *Pud No. 1* petitioners claimed that a state condition imposing a stream flow requirement on discharges of water from a dam exceeded the State's §401 authority to prevent degradation of water quality, but neither the parties nor the Court questioned that the "discharge of water" from the dam was a discharge within the ambit of §401. *Ibid.* And although the Court's opinion made no mention of the dam as adding anything to the water, the majority's use of the phrase "discharge of water" drew no criticism from the dissent, which specifically noted that "[t]he term 'discharge' is not defined in the [Clean Water Act] but its plain and ordinary meaning suggests 'a flowing or issuing out,' or 'something that is emitted.'" *Id.,* at 725 (opinion of THOMAS, J.) (quoting Webster's Ninth New Collegiate Dictionary 360 (1991)).

In resort to common usage under §401, this Court has not been alone, for the Environmental Protection Agency (EPA) and FERC have each regularly read "discharge" as having its plain meaning and thus covering releases from hydroelectric dams. See, *e.g.,* EPA, Water Quality Standards Handbook §7.6.3, p. 7–10 (2d ed. 1994) ("EPA has identified five Federal permits and/or licenses that authorize activities that may result in a discharge to the waters[, including] licenses required for hydroelectric projects issued under the Federal Power Act"); *FPL Energy Maine*

*Hydro LLC,* 111 FERC ¶61,104, P. 61,505 (2005) (rejecting, in a recent adjudication, the argument that Congress "used the term 'discharge' as nothing more than a shorthand expression for 'discharge of a pollutant or pollutants'").[4]   Warren is, of course, entirely correct in cautioning us that because neither the EPA nor FERC has formally settled the definition, or even set out agency reasoning, these expressions of agency understanding do not command deference from this Court.  See *Gonzales* v. *Oregon,* 546 U. S. ___, ___ (2006) (slip op., at 11) ("*Chevron* deference . . . is not accorded merely because the statute is ambiguous and an administrative official is involved"); *Skidmore* v. *Swift & Co.,* 323 U. S. 134, 140 (1944).  But even so, the administrative usage of "discharge" in this way confirms our understanding of the everyday sense of the term.

### III

Warren makes three principal arguments for reading the term "discharge" differently from the ordinary way. We find none availing.

### A

The first involves an interpretive canon we think is out of place here.  The canon, *noscitur a sociis,* reminds us

---

[4] Warren relies on a document from the EPA as a counterexample of the EPA's position in this regard.  See Memorandum from Ann R. Klee, EPA General Counsel et al., to Regional Administrators, regarding "Agency Interpretation on Applicability of Section 402 of the Clean Water Act to Water Transfers" (Aug. 5, 2005), available at http://www.epa.gov/ogc/documents/water_transfers.pdf (as visited Apr. 13, 2006, and available in Clerk of Court's case file).  The memorandum does not help Warren, however; it interprets §402 of the Clean Water Act, not §401, and construes the statutory phrase "discharge of a pollutant," which, as explained below, implies a meaning different under the statute from the word "discharge" used alone.  The memorandum, in fact, declares that "[i]t does not address any . . . terms under the statute other than 'addition.'"  *Id.,* at 18.

Opinion of the Court

that "a word is known by the company it keeps," *Gustafson* v. *Alloyd Co.,* 513 U. S. 561, 575 (1995), and is invoked when a string of statutory terms raises the implication that the "words grouped in a list should be given related meaning," *Dole* v. *Steelworkers,* 494 U. S. 26, 36 (1990) (internal quotation marks omitted); see also *Beecham* v. *United States,* 511 U. S. 368, 371 (1994) ("That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well").

Warren claims that the canon applies to §502(16) of the Clean Water Act, which provides that "[t]he term 'discharge' when used without qualification includes a discharge of a pollutant, and a discharge of pollutants." 33 U. S. C. §1362(16). Warren emphasizes that the "include[d]" terms, pollutant discharges, are themselves defined to require an "addition" of pollutants to water. §1362(12). Since "discharge" pure and simple is keeping company with "discharge" defined as adding one or more pollutants, Warren says "discharge" standing alone must require the addition of something foreign to the water into which the discharge flows. And because the release of water from the dams adds nothing to the river that was not there above the dams, Warren concludes that water flowing out of the turbines cannot be a discharge into the river.[5]

_____

[5] We note that the Supreme Judicial Court of Maine accepted the assertion that "[a]n 'addition' is the fundamental characteristic of any discharge." 2005 Me 27, ¶11, 868 A. 2d 210, 215. It then held that Warren's dams add to the Presumpscot River because the water "los[es its] status as waters of the United States" when diverted from its natural course, and becomes an addition to the waters of the United States when redeposited into the river. 868 A. 2d, at 216 (emphasis deleted). We disagree that an addition is fundamental to any discharge, nor can we agree that one can denationalize national waters by exerting private control over them. Cf. *United States* v. *Chandler-Dunbar Water Power Co.,* 229 U. S. 53, 69 (1913) ("[T]hat the running water in a great navigable stream is capable of private ownership is

The problem with Warren's argument is that it purports to extrapolate a common feature from what amounts to a single item (discharge of a pollutant plus the plural variant involving more than one pollutant).  See *Beecham, supra,* at 371.  The argument seems to assume that pairing a broad statutory term with a narrow one shrinks the broad one, but there is no such general usage; giving one example does not convert express inclusion into restrictive equation, and *noscitur a sociis* is no help absent some sort of gathering with a common feature to extrapolate.  It should also go without saying that uncritical use of interpretive rules is especially risky in making sense of a complicated statute like the Clean Water Act, where technical definitions are worked out with great effort in the legislative process.  Cf. H. R. Rep. No. 92–911, p. 125 (1972) ("[I]t is extremely important to an understanding of [§402] to know the definition of the various terms used and a careful reading of the definitions . . . is recommended. Of particular significance [are] the words 'discharge of pollutants'").

B

Regardless, Warren says the statute should, and even must, be read its way, on the authority of *South Fla. Water Management Dist.* v. *Miccosukee Tribe,* 541 U. S. 95 (2004). But that case is not on point.  *Miccosukee* addressed §402 of the Clean Water Act, not §401, and the two sections are not interchangeable, as they serve different purposes and use different language to reach them.  Section 401 recast pre-existing law and was meant to "continu[e] the authority of the State . . . to act to deny a permit and thereby prevent a Federal license or permit from issuing to a discharge source within such State."  S. Rep. No. 92–414,

─────────

inconceivable").  Thus, though we affirm the Maine judgment, we do so on different reasoning.

Opinion of the Court

p. 69 (1971).  Its terms have a broad reach, requiring state approval any time a federally licensed activity "may" result in a discharge ("discharge" of course being without any qualifiers here), 33 U. S. C. §1341(a)(1), and its object comprehends maintaining state water quality standards, see n. 1, *supra*.

Section 402 has a historical parallel with §401, for the legislative record suggests that it, too, was enacted to consolidate and ease the administration of some predecessor regulatory schemes, see H. R. Rep. No. 92–911, at 124–125.  But it contrasts with §401 in its more specific focus.  It establishes what Congress called the National Pollutant Discharge Elimination System, requiring a permit for the "discharge of any pollutant" into the navigable waters of the United States, 33 U. S. C. §1342(a).  The triggering statutory term here is not the word "discharge" alone, but "discharge of a pollutant," a phrase made narrower by its specific definition requiring an "addition" of a pollutant to the water.  §1362(12).

The question in *Miccosukee* was whether a pump between a canal and an impoundment produced a "discharge of a pollutant" within the meaning of §402, see 541 U. S., at 102–103, and the Court accepted the shared view of the parties that if two identified volumes of water are "simply two parts of the same water body, pumping water from one into the other cannot constitute an 'addition' of pollutants," *id.,* at 109.  *Miccosukee* was thus concerned only with whether an "addition" had been made (phosphorous being the substance in issue) as required by the definition of the phrase "discharge of a pollutant"; it did not matter under §402 whether pumping the water produced a discharge without any addition.  In sum, the understanding that something must be added in order to implicate §402 does not explain what suffices for a discharge under §401.[6]

––––––––

[6]The fact that the parties in *Miccosukee* conceded that the water

C

Warren's third argument for avoiding the common meaning of "discharge" relies on the Act's legislative history, but we think that if the history means anything it actually goes against Warren's position. Warren suggests that the word "includes" in the definition of "discharge" should not be read with any spacious connotation, because the word was simply left on the books inadvertently after a failed attempt to deal specifically with "thermal discharges." As Warren describes it, several Members of Congress recognized that "heat is not as harmful as what most of us view as 'pollutants,' because it dissipates quickly in most bodies of receiving waters," 1 Legislative History of the Water Pollution Control Act Amendments of 1972 (Committee Print compiled for the Senate Committee on Public Works by the Library of Congress), Ser. No. 93–1, p. 273 (1973) (remarks of Cong. Clark), and they pro-

––––––––––

being pumped was polluted does not transform the Court's analysis from one centered on the word "addition" to one centered on the word "discharge." Before *Miccosukee,* one could have argued that transferring polluted water from a canal to a connected impoundment constituted an "addition." *Miccosukee* is at odds with that construction of the statute, but it says nothing about whether the transfer of polluted water from the canal to the impoundment constitutes a "discharge."

Likewise, we are not persuaded by Warren's claim that the word "into" somehow changes the meaning of the word "discharge" so as to require an addition. See Reply Brief for Petitioner 1–2 ("However one might read the lone word 'discharge' by itself, the complete statutory phrase 'discharge into the navigable waters' entails the introduction of something into the waters"). The force of this argument escapes us, since one can easily refer to water being poured or discharged out of one place into another without implying that an addition of some hitherto unencountered mixture or quality of water is made. Indeed, the preposition "into" was used without connoting an addition in the *Miccosukee* analogy cited by Warren. See 541 U. S., at 110 ("[I]f one takes a ladle of soup from a pot . . . and pours it back into the pot, one has not 'added' soup or anything else to the pot" (internal quotation marks and brackets omitted)).

Opinion of the Court

posed to regulate thermal discharges less stringently than others. They offered an amendment to exclude thermal discharges from the requirements under §402, but they also wanted to ensure that thermal discharges remained within the scope of §401 and so sought to include them expressly in the general provision covering "discharge." See *id.,* at 1069–1070, 1071. The proposed definition read, "[t]he term 'discharge' when used without qualification includes a discharge of a pollutant, a discharge of pollutants, and a thermal discharge." *Id.,* at 1071.

Of course, Congress omitted the reference to "thermal discharge," and settled on the definition we have today. See Federal Water Pollution Control Act Amendments of 1972, §502(16), 86 Stat. 887. Warren reasons that once Congress abandoned the special treatment for thermal pollutants, it merely struck the words "thermal discharge" from 33 U. S. C. §1362(16) and carelessly left in the word "includes." Thus, Warren argues, there is no reason to assume that describing "discharge" as including certain acts was meant to extend the reach of §401 beyond acts of the kind specifically mentioned;[7] the terminology of §401 simply reflects a failed effort to narrow the scope of §402.

This is what might be called a lawyer's argument. We will assume that Warren is entirely correct about the impetus behind the failed attempt to rework the scope of pollutant discharge under §402. It is simply speculation, though, to say that the word "includes" was left in the description of a "discharge" by mere inattention, and for reasons given in Part IV of this opinion it is implausible speculation at that. But if we confine our view for a moment strictly to the drafting history, the one thing clear is that if Congress had left "thermal discharge" as an in-

---

[7] Warren is hesitant to follow its own logic to completion by simply claiming that §401 covers nothing but what §502(16) mentions, the discharge of a pollutant or pollutants.

cluded subclass of a "discharge" under §502(16), Warren
would have a stronger *noscitur a sociis* argument. For a
thermal discharge adds something, the pollutant heat, see
n. 3, *supra*. Had the list of examples of discharge been
lengthened to include thermal discharges, there would
have been at least a short series with the common feature
of addition. As it stands, however, the only thing the
legislative history cited by Warren demonstrates is the
congressional rejection of language that would have cre-
ated a short series of terms with a common implication of
an addition.

Warren's theory, moreover, has the unintended conse-
quence of underscoring that Congress probably distin-
guished the terms "discharge" and "discharge of pollut-
ants" deliberately, in order to use them in separate places
and to separate ends. Warren hypothesizes that Congress
attempted to tinker with the definition of "discharge"
because it wanted to subject thermal discharges to the
requirements of §401, but not §402. But this assumption
about Congress's motives only confirms the point that
when Congress fine-tunes its statutory definitions, it
tends to do so with a purpose in mind. See *Bates* v. *United
States,* 522 U. S. 23, 29–30 (1997) (if "Congress includes
particular language in one section of a statute but omits it
in another section of the same Act, it is generally presumed
that Congress acts intentionally and purposely in the
disparate inclusion or exclusion" (internal quotation marks
omitted)).

IV

Warren's arguments against reading the word "dis-
charge" in its common sense fail on their own terms. [8]

---

[8] Warren briefly makes another argument for disregarding the plain
meaning of the word "discharge," relying on §511(c)(2) of the Clean
Water Act, 33 U. S. C. §1371(c)(2). This section addresses the intersec-
tion of the Act with another statute, the National Environmental Policy

Opinion of the Court

They also miss the forest for the trees.

Congress passed the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U. S. C. §1251(a); see also *PUD No. 1,* 511 U. S., at 714, the "national goal" being to achieve "water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water." 33 U. S. C. §1251(a)(2). To do this, the Act does not stop at controlling the "addition of pollutants," but deals with "pollution" generally, see §1251(b), which Congress defined to mean "the man-made or man-induced alteration of the chemical, physical, biological, and radiological integrity of water." §1362(19).

_____

Act of 1969 (NEPA), 42 U. S. C. §4321 *et seq.* NEPA "imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions." *Department of Transportation* v. *Public Citizen,* 541 U. S. 752, 756–757 (2004). Section 511(c)(2) makes the point that nothing in NEPA authorizes any federal agency "authorized to license or permit the conduct of any activity which may result in the discharge of a pollutant" to review "any effluent limitation or other requirement established pursuant to this chapter or the adequacy of any certification under [§401] of this title." 33 U. S. C. §1371(c)(2). Warren argues that reading §401 to cover discharges generally would preclude duplicative NEPA review of certifications involving pollutant discharges, but allow such review of those involving nonpollutant discharges.

But Warren overlooks the fact that "discharge of a pollutant" is used in §511(c)(2) in the course of identifying the agency, not the activity to be certified. Whether a §401 certification involves an activity that discharges pollutants or one that simply discharges, FERC (as an agency that may be described, always, as one with "author[ity] to license or permit the conduct of any activity which may result in the discharge of a pollutant," *ibid.*) may not review it. Thus, nothing in §511(c)(2) is disturbed by our holding that hydroelectric dams require §401 state certifications. It is still the case that, when a State has issued a certification covering a discharge that adds no pollutant, no federal agency will be deemed to have authority under NEPA to "review" any limitations or the adequacy of the §401 certification.

The alteration of water quality as thus defined is a risk inherent in limiting river flow and releasing water through turbines. Warren itself admits that its dams "can cause changes in the movement, flow, and circulation of a river . . . caus[ing] a river to absorb less oxygen and to be less passable by boaters and fish." Brief for Petitioner 23. And several *amici* alert us to the chemical modification caused by the dams, with "immediate impact on aquatic organisms, which of course rely on dissolved oxygen in water to breathe." Brief for Trout Unlimited et al. as *Amici Curiae* 13; see also, *e.g.,* Brief for National Wildlife Federation et al. as *Amici Curiae* 6 (explaining that when air and water mix in a turbine, nitrogen dissolves in the water and can be potentially lethal to fish). Then there are the findings of the Maine Department of Environmental Protection that led to this appeal:

> "The record in this case demonstrates that Warren's dams have caused long stretches of the natural river bed to be essentially dry and thus unavailable as habitat for indigenous populations of fish and other aquatic organisms; that the dams have blocked the passage of eels and sea-run fish to their natural spawning and nursery waters; that the dams have eliminated the opportunity for fishing in long stretches of river, and that the dams have prevented recreational access to and use of the river." *In re S. D. Warren Co.,* Maine Board of Environmental Protection (2003), in App. to Pet. for Cert. A–49.

Changes in the river like these fall within a State's legitimate legislative business, and the Clean Water Act provides for a system that respects the States' concerns. See 33 U. S. C. §1251(b) ("It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution"); §1256(a) (federal funds for state efforts to prevent

pollution); see also §1370 (States may impose standards on the discharge of pollutants that are stricter than federal ones).

State certifications under §401 are essential in the scheme to preserve state authority to address the broad range of pollution, as Senator Muskie explained on the floor when what is now §401 was first proposed:

> "No polluter will be able to hide behind a Federal license or permit as an excuse for a violation of water quality standard[s]. No polluter will be able to make major investments in facilities under a Federal license or permit without providing assurance that the facility will comply with water quality standards. No State water pollution control agency will be confronted with a fait accompli by an industry that has built a plant without consideration of water quality requirements." 116 Cong. Rec. 8984 (1970).

These are the very reasons that Congress provided the States with power to enforce "any other appropriate requirement of State law," 33 U. S. C. §1341(d), by imposing conditions on federal licenses for activities that may result in a discharge, *ibid.*

Reading §401 to give "discharge" its common and ordinary meaning preserves the state authority apparently intended. The judgment of the Supreme Judicial Court of Maine is therefore affirmed.

*It is so ordered.*