A-11 (rev. 5/00)                                                        Page 1 of 2
**USCA DOCKET # (IF KNOWN)**



## UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
## CIVIL APPEALS DOCKETING STATEMENT

PLEASE ATTACH ADDITIONAL PAGES IF NECESSARY.

| TITLE IN FULL: See Attachment #1 | DISTRICT: Alaska | | JUDGE: James K. Singleton |
|---|---|---|---|
| | DISTRICT COURT NUMBER: J05-0012 CV (JKS) | | |
| | DATE NOTICE OF APPEAL FILED: | IS THIS A CROSS-APPEAL? No | |
| | IF THIS MATTER HAS BEEN BEFORE THIS COURT PREVIOUSLY, PLEASE PROVIDE THE DOCKET NUMBER AND CITATION (IF ANY): No | | |

BRIEF DESCRIPTION OF NATURE OF ACTION AND RESULT BELOW: Conservation groups challenged the Army Corps of Engineers issuance of a §404 permit for the Kensington Gold Mine project. The district court denied plaintiffs' motion for summary judgment and granted defendants' cross-motion for summary judgment.

PRINCIPAL ISSUES PROPOSED TO BE RAISED ON APPEAL: See Attachment #2

PLEASE IDENTIFY ANY OTHER LEGAL PROCEEDING THAT MAY HAVE A BEARING ON THIS CASE (INCLUDE PENDING DISTRICT COURT POST-JUDGMENT MOTIONS): NONE

**DOES THIS APPEAL INVOLVE ANY OF THE FOLLOWING:**

☐ Possibility of settlement
☐ Likelihood that intervening precedent will control outcome of appeal
☒ Likelihood of a motion to expedite or to stay the appeal, or other procedural matters (Specify) Emergency Motion for Injunction Pending Appeal
☐ Any other information relevant to the inclusion of this case in the Mediation Program
☐ Possibility parties would stipulate to binding award by Appellate Commissioner in lieu of submission to judges

| **LOWER COURT INFORMATION** | | | Page 2 of 2 |
|---|---|---|---|
| **JURISDICTION** | | **DISTRICT COURT DISPOSITION** | |
| **FEDERAL** | **APPELLATE** | **TYPE OF JUDGMENT/ ORDER APPEALED** | **RELIEF** |
| ☒ Federal Question<br>☐ Diversity<br>☐ Other (Specify): | ☒ Final Decision of District Court<br>☐ Interlocutory Decision Appealable As of Right<br>☐ Interlocutory Order Certified by District Judge (Specify):<br>☐ Other (Specify): | ☐ Default Judgment<br>☐ Dismissal/jurisdiction<br>☐ Dismissal/merits<br>☒ Summary Judgment<br>☐ Judgment/court Decision<br>☐ Judgment/jury Verdict<br>☐ Declaratory Judgment<br>☐ Judgment as a Matter of Law<br>☐ Other (Specify): | ☐ Damages:<br>Sought $<br>Awarded $<br>☒ Injunctions:<br>☐ Preliminary<br>☒ Permanent<br>☐ Granted<br>☒ Denied<br>☐ Attorney Fees:<br>Sought $<br>Awarded $<br>☐ Pending<br>☐ Costs: $ |

## CERTIFICATION OF COUNSEL

**I CERTIFY THAT:**

1. Copies of Order/Judgment Appealed Are Attached.
2. A Current Service List or Representation Statement With Telephone and Fax Numbers Are Attached (See 9th Cir. Rule 3-2).
3. A Copy of This Civil Appeals Docketing Statement Was Served in Compliance with FRAP 25.
4. I Understand That Failure to Comply With These Filing Requirements May Result in Sanctions, Including Dismissal of This Appeal.

| | |
|---|---|
| _Signature_ | 8/7/06<br>_Date_ |

## COUNSEL WHO COMPLETED THIS FORM

NAME: Thomas S. Waldo

FIRM: Earthjustice

ADDRESS: 325 Fourth Street, Juneau, Alaska 99801

E-MAIL: twaldo@earthjustice.org

TELEPHONE: 907-586-2751

FAX: 907-463-5891

**x This Document Should Be Filed in The District Court With The Notice of Appeal x**
**x If Filed Late, it Should Be Filed Directly With the U.S. Court of Appeals x**

## ATTACHMENTS TO CIVIL APPEALS DOCKETING STATEMENT

**Attachment #1 – Title in Full:**
SOUTHEAST ALASKA CONSERVATION COUNCIL, SIERRA CLUB, and LYNN CANAL CONSERVATION,

       Plaintiffs/Appellants,

          v.

UNITED STATES ARMY CORPS OF ENGINEERS; COLONEL TIMOTHY J. GALLAGHER, in his official capacity as District Engineer; LARRY L. REEDER, in his official capacity as Chief of the Regulatory Branch; DOMINIC IZZO, in his official capacity as Principal Deputy Assistant Secretary of the Army (Civil Works); and UNITED STATES FOREST SERVICE,

       Defendants/Appellees,

       and

COEUR ALASKA, INC., GOLDBELT, INC., and the STATE OF ALASKA,

       Intervenor-Defendants/Appellees.

**Attachment #2 – Principal Issues Proposed to be Raised on Appeal:**
Whether, under the Clean Water Act, 33 U.S.C. §§ 1311(a) & (e), 1316(e), the Army Corps of Engineers may permit discharges of "fill material" that would violate a standard of performance, 40 C.F.R. § 440.104(b)(1), adopted by the Environmental Protection Agency.

UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | |
|---|---|
| SOUTHEAST ALASKA CONSERVATION COUNCIL; SIERRA CLUB; and LYNN CANAL CONSERVATION, | No. 1:05-cv-00012-JKS |
| Plaintiffs, | **MEMORANDUM DECISION**<br>[Re: Motions at Dockets 41 and 80] |
| v. | |
| UNITED STATES ARMY CORPS OF ENGINEERS; COLONEL TIMOTHY J. GALLAGHER, in his official capacity as District Engineer; LARRY L. REEDER, in his official capacity as Chief of the Regulatory Branch; JOHN C. LEEDS, III, in his capacity as manager of the Juneau Field Office; GLEN E. JUSTIS, in his official capacity as Chief of the East Section; DOMINIC IZZO, in his official capacity as Principal Deputy Assistant Secretary of the Army (Civil Works); and UNITED STATES FOREST SERVICE, | |
| Defendants, | |
| and | |
| COEUR ALASKA, INC.; STATE OF ALASKA; and GOLDBELT, INC., | |
| Defendant-Interveners. | |

I.  PROCEEDINGS

Plaintiffs Southeast Alaska Conservation Council, Sierra Club, and Lynn Canal

Conservation appeal the decision of the U.S. Army Corps of Engineers ("Corps") decision to

grant permits to Coeur Alaska, Inc. and Goldbelt, Inc, under § 404 of the Clean Water Act

("CWA").[1] Plaintiffs seek to vacate the § 404 permits, Record of Decision and plan of operations, and permanently enjoin the Corps and Forest Service from allowing any activities authorized by the vacated permits, ROD, and plan of operations. At Docket No. 41 Plaintiffs have moved for summary judgment. At Docket No. 80 the Federal Defendants have opposed the motion and cross-moved for summary judgment in their favor.[2] At Docket Nos. 61, 67, and 71, respectively, Interveners Goldbelt, Inc., State of Alaska, and Coeur Alaska, Inc. have filed oppositions to Plaintiffs' motion. City and Borough of Juneau and Berners Bay Consortium have filed amici briefs in opposition to Plaintiffs' Motion at Docket Nos. 88 and 92, respectively. At Docket No. 97 Southeast Conference has filed an amicus brief in support of the Plaintiffs' motion. Plaintiffs have replied to the opposition.

At Docket Nos. 83 and 86 Intervener Coeur Alaska and the Federal Defendants have requested oral argument. The Court having reviewed the moving papers, oppositions, and amici briefs has determined that oral argument would not assist the court in deciding the motions. The requests for oral argument are DENIED.

## II. BACKGROUND[3]

The permit granted Coeur Alaska allows it, as the operator of the Kensington Mine, to discharge approximately 210,000 gallons per day of tailings remaining after gold ore is processed using the "froth-flotation process" as "fill material" directly into Lower Slate Lake. The lake will be utilized as a storage facility impounding the tailings.[4]

After the ore is extracted from the ground, it will be processed through crushing, grinding, flotation, thickening and filtration.[5] After the ore is crushed and ground, it is fed to the flotation tanks in slurry form, where air, conditioners and frothing agents will be added to cause the

---

[1] 33 U.S.C. § 1344.

[2] For convenience, the named defendants are referred to collectively as "Federal Defendants."

[3] The background and history of this case are well known to the parties and, in the interests of brevity, will not be replicated here except as necessary to an understanding of the Court's decision.

[4] Agency Record ("AR"), Vol. 8, 003328.

[5] AR Vol. 8, 003360–61; *see also* Vol. 1, 000021.

MEMORANDUM DECISION [Motions at Dockets 41 and 80]
*SEACC v. Army, Corps of Engineers*, No. 1:05-cv-00012-JKS   2

gold-bearing minerals to attach to air bubbles at the top of the tank.[6]  The gold-bearing froth is then skimmed off and further concentrated in additional flotation tanks.[7]  Most of the chemicals added to the system will stay in the flotation tanks or be removed with the flotation concentrate, not discharged with the tailings.[8]  Similarly, most of the other metals will be removed from the system along with the gold concentrate, not discharged with the tailings.[9]  Following the final flotation, the ore concentrate is dewatered and placed in specialized, sealed marine transport containers for shipment to a facility outside Southeast Alaska for further processing.[10]  No cyanide processing will take place at the Kensington Mine or elsewhere in Southeast Alaska.[11]

"Tailings" are the solid material left in the bottom of the flotation tanks after the gold-bearing material has been removed.[12]  Using "high-grade" mine operations, approximately 40% of the tailings should be backfilled to the mine, leaving approximately 4.5 million tons of tailings to be discharged into the Lower Slate Lake impoundment.[13]  The tailings will be combined with liquid in a slurry and transported through a 3.5 mile, double-walled, high-density polyethylene pipeline approximately 6 inches in diameter to the lake impoundment.[14]  The solid component of the slurry (*i.e.*, the tailings) will comprise approximately 55% of the slurry.  Before the tailings slurry leave the mill, a polymer and flocculant will be added to agglomerate the smaller tailings and enhance settling of the tailings once they are deposited into the lake impoundment.[15]  The tailings slurry is to be discharged from the bottom of the submerged pipe

---

[6]AR Vol 8, 003360-61.

[7] *Id*.

[8] *Id.*

[9] *Id*.; *see also* AR Vol. 1, 000005.

[10] AR Vol. 1, 000005; Vol. 8, 003360–61.

[11] AR Vol. 1, 000005, 000021.

[12] AR Vol. 8, 003362.

[13] AR Vol 1, 000007; Vol. 8, 003358, 003362, 003367.

[14] AR Vol. 8, 003364.

[15] *Id*.  The added materials are not toxic and are expected to have no effect on water quality other than the benefit of enhancing the settling of the fine material.

and through perforations in that pipe, which will be moved periodically to ensure equal distribution of the tailings.[16/]   The tailings will be placed at a depth that would prevent remobilization of the tailings.[17/]   Upon closure of the mine, the tailings will fill the lake to its current ordinary high water mark, thus reaching a depth of approximately 50 feet.[18/]   At that time, the lake will have grown to approximately 62 acres from its current size of 23 acres, and will be approximately 33 feet deep over the top of the tailings.[19/]   The discharge of tailings to the lake impoundment is limited to the pre-specified volume of 4.5 million tons.[20/]   The tailings must also be tested quarterly to ensure that there are no significant deviations from the original tailings analysis that might affect monitoring, closure requirements, water quality or any other permit condition.[21/]

It is anticipated that most aquatic life in Lower Slate Lake will be lost during mining operations, primarily due to being covered with the discharged material.[22/]   Tests on the tailings show that they will not generate an acid discharge or metals leachate.[23/]   While the pH around the discharge pipe is expected to be toxic to the aquatic environment, it is anticipated this will dissipate very rapidly.[24/]   Reclamation of the 62-acre lake, including capping of the tailings, is required as part of the project.[25/]   As a result, it is expected that the lake would recover over time,

---

[16/] *Id.*

[17/] AR Vol 1, 000022.

[18/] AR Vol 1, 000013; Vol. 8, 003453.

[19/] AR Vol. 1, 000013.  The increased lake area at closure is expected to consist of approximately 47 acres of deepwater habitat and 15 acres of shallow-water habitat.  The 15 acres of shallow-water habitat is expected to convert over time to wetlands or vegetated shallows.

[20/] *See* AR Vol 1, 000068, Vol. 13, 006285.

[21/] AR Vol. 1, 000022, 000067–68.

[22/] AR Vol. 1, 000021–22; Vol. 8, 003575.

[23/] AR Vol. 1, 000030.

[24/] AR Vol. 1, 000022.

[25/] AR Vol. 1, 000013, 000015, 000022–23.  A reclamation bond on the operation is being held to ensure that the lake is reclaimed in accordance with the approved plans. *See* AR Vol. 1, 000005.

and would provide at least equivalent aquatic habitat and productivity as it does currently.[26] This includes habitat for Dolly Varden char and other aquatic organisms.[27]

Mid-Lake East Fork Slate Creek, an upstream tributary of Lower Slate Lake, will be diverted around the lake impoundment by a pipeline.[28] Further, a "reverse osmosis" water treatment system will be constructed to remove solids and metals from the lake impoundment water before any of that water is allowed to enter downstream waters.[29] The treated water will be transported from the treatment plant to the diversion pipeline, and then flow via a spillway to East Fork Slate Creek, downstream of the lake, eventually joining Slate Creek and entering Berners Bay.[30] Discharges of the treated water from Lower Slate Lake are subject to a CWA § 402 NPDES permit and must meet state water quality standards.[31]

The overall impact of the project permitted by the Corps and EPA is to convert Lower Slate Lake into a temporary settling pond for the disposal and treatment of the tailings generated by the mining operations at the Kensington Mine. Broadly stated, the project entails; (1) isolating Lower Slate Lake from the rest of the drainage system, (2) using the lake as a tailing storage facility impounding the tailings, and (3) restricting the release of water into the downstream drainage system to that which meets the requirements of § 402. The adverse impact, primarily the destruction of aquatic life, is expected to be limited to Lower Slate Lake. At the termination of the mining operations, restoration of the lake as an aquatic resource is expected to occur.

---

[26] AR Vol. 1, 000022–23; Vol. 8, 003573–76.

[27] AR Vol. 1, 000022-23, 000069; Vol. 8, 003573-76.

[28] AR Vol. 8, 003367.

[29] AR Vol. 1, 000015; Vol. 8, 003367.

[30] *Id*.

[31] AR Vol. 1, 000005. The State agreed in its CWA § 401 certification that the water discharged from the tailings disposal facility (Lower Slate Lake) to East Fork Slate Creek, which was permitted under a CWA § 402 NPDES permit, would meet state water quality standards. AR Vol. 2, 001101. Plaintiffs do not challenge the issuance of this permit.

III.  ISSUES

Plaintiffs contend that the permitting process involved in this case was governed by the more stringent requirements of § 402 of the CWA,[32] not § 404.  At the heart of the controversy are the regulations defining "fill material."  The Environmental Protection Agency ("EPA") and the Corps use the same definition.[33]

> (e)      (1) Except as specified in paragraph (e)(3) of this section, the term fill material means material placed in waters of the United States where the material has the effect of:
>
>> (i) Replacing any portion of a water of the United States with dry land; or
>>
>> (ii) Changing the bottom elevation of any portion of a water of the United States.
>
> (2) Examples of such fill material include, but are not limited to: rock, sand, soil, clay, plastics, construction debris, wood chips, overburden from mining or other excavation activities, and materials used to create any structure or infrastructure in the waters of the United States.
>
> (3) The term fill material does not include trash or garbage.

Also relevant is the definition of "discharge of fill material," defined as:[34]

> (f) The term *discharge of fill material* means the addition of fill material into waters of the United States. The term generally includes, without limitation, the following activities: Placement of fill that is necessary for the construction of any structure or infrastructure in a water of the United States; the building of any structure, infrastructure, or impoundment requiring rock, sand, dirt, or other material for its construction; site-development fills for recreational, industrial, commercial, residential, or other uses; causeways or road fills; dams and dikes; artificial islands; property protection and/or reclamation devices such as riprap, groins, seawalls, breakwaters, and revetments; beach nourishment; levees; fill for structures such as sewage treatment facilities, intake and outfall pipes associated with power plants and subaqueous utility lines; placement of fill material for construction or maintenance of any liner, berm, or other infrastructure associated

---

[32] 33 U.S.C. § 1342.

[33] 33 C.F.R. § 323.2(e) (Corps); 40 C.F.R. § 232.2 (EPA). [Note: The quoted provision is the Corps' regulation; the definition in the EPA regulations is identical except that the definitions are not set forth in separate subdivisions.]

[34] 33 C.F.R. § 323.2(f) (Corps); 40 C.F.R. § 232.2 (EPA) (emphasis added).

with solid waste landfills; *placement of overburden, slurry, or tailings or similar mining-related materials*; and artificial reefs. The term does not include plowing, cultivating, seeding and harvesting for the production of food, fiber, and forest products (See §323.4 for the definition of these terms). See §323.3(c) concerning the regulation of the placement of pilings in waters of the United States.

Plaintiffs contends that either: (1) in issuing the permit, the Corps misapplied the regulations; or (2) if the regulations were properly applied, the regulations are invalid as contrary to the CWA.[35/]  The real crux of the question before this Court is: Under § 404, may the Corps authorize the use of waters of the United States as a settling pond?  For the reasons stated below, the Court holds that it may.

## IV.  STANDARD OF REVIEW

This Court in reviewing an agency decision may set it aside if the agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[36/]  It is self-evident that an agency decision based upon an invalid regulation or the misapplication of a regulation is "otherwise not in accordance with law."[37/]

In determining the validity of agency regulations, this Court must apply the rule established by the U.S. Supreme Court in *Chevron*.[38/]

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. * * *

----

[35/] The Court notes that Plaintiffs also challenges the granting of the permit on the grounds that it does not meet the requirements of the several sections of the CWA, *e.g.*, §§ 306(e) and 311(e).  This argument must be rejected.  If the permit was properly issued under § 404, those provisions of the CWA are inapplicable.  The applicable standard to be applied are the guidelines promulgated by the EPA based on criteria specified in 33 U.S.C. § 1343(c). *See also* 33 C.F.R. 323.6(a).  If the permit was not properly issued under § 404 it is invalid in any event and the argument of Plaintiffs moot.

[36/] 5 U.S.C. § 706(2)(A).

[37/] *See, e.g.,Regents of the Univ. of California v. Heckler*, 771 F.2d 1182, 1187 (9th Cir. 1985) (invalid regulation), *overruled on other grounds by Good Samaritan Hosp. v. Shalala*, 508 U.S. 402 (1993); *Alaskan Trojan P'ship v. Gutierrez*, 425 F.3d 620, 627–628 (9th Cir. 2005) (agency interpretation of its own regulations)

[38/] *Chevron v. NRDC*, 467 U.S. 837, 842–843 (1984) (footnote omitted)

> \* [I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

The Supreme Court has, however, placed a limitation on the application of *Chevron*.[39/]

> Deference in accordance with *Chevron,* however, is warranted only when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority. Otherwise, the interpretation is entitled to respect only to the extent it has the power to persuade.

When reviewing the interpretation of agency regulations, courts must give substantial deference to an agency's interpretation of its own regulations.[40/]  This Court "must defer to the [Administrator's] interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of the [Administrator's] intent at the time of the regulation's promulgation."[41/]

## V. DISCUSSION

The CWA divides the permitting process into two segments.  In general, permitting for the discharge of effluents is vested in the EPA, the granting of which must meet strict standards.[42/]  Congress has, however, carved out an exception, vesting primary permitting authority in the Corps for the disposal of  "dredged or fill material" into navigable waters at specified disposal sites.[43/]  The standards to be applied for the issuance of these permits is

---

[39/] *Gonzales v. Oregon*, 546 U.S. ___, ___, 126 S.Ct. 904, 914–915 (2006) (citations and internal quotation marks omitted).

[40/] *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512 (1994) (citations omitted).

[41/] *Id.* (internal quotation marks and citation omitted); *see also Auer v. Robbins,* 519 U.S. 452, 461 (1997) (an agency's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulation") (citations and internal quotation marks omitted); *Wards Cove Packing Co. v. NMFS,* 307 F.3d 1214, 1218 (9th Cir. 2002) ("An agency's interpretation of regulations it is charged with administering is entitled to a high degree of deference and will be upheld as long as it is not plainly erroneous or inconsistent with the regulation.") (citations omitted).

[42/] 33 U.S.C. § 1342(a).

[43/] 33 U.S.C. § 1344(a).

determined in accordance with guidelines developed by the EPA in conjunction with the Corps, and are significantly less stringent.[44]

Turning first to the issue of the validity of the regulation. Congress has clearly and unequivocally delegated authority to the EPA to issue regulations necessary to carry out its functions under the CWA.[45] As noted above, one of the functions of the EPA is to develop guidelines, in conjunction with the Corps, for use in guiding the Corps in processing permits under § 404.[46] In the case at bar, it is undisputed that Congress has not defined the term "fill material," thereby leaving its definition to the EPA, which the EPA did using the rule-making process of the Administrative Procedures Act. Accordingly, this Court must give *Chevron*-type deference to the EPA's definition of "fill material" and "discharge of fill material."[47]

Plaintiffs argue that the regulations are invalid because they do not comply with the "expressed intent of Congress." Specifically, that because they do not comply with standards promulgated by the EPA, they are contrary to § 306(e) of the CWA.[48] Plaintiffs' argument on this point is not persuasive. Plaintiffs do not specify which standard of performance is violated by these regulations, which simply define what constitutes fill material within the scope of § 404. This Court cannot say that the definition of fill material contained in the regulations promulgated by the EPA and Corps is not a permissible construction of the statute. the Agency could reasonably conclude that its definition is consistent with the distinction Congress sought to make between § 402 and § 404.

Turning to the interpretation of the regulation and its application in this case. First, the Court notes that it is uncontested that the slurry to be discharged into Lower Slate Lake will

---

[44] 33 U.S.C. §§ 1344(b)(1), 1343(c). The guidelines are promulgated in 33 C.F.R. Part 230. Plaintiffs do not contends that the permit issued to Coeur Alaska does not meet these guidelines.

[45] 33 U.S.C. § 1361(a) ("The Administrator is authorized to prescribe such regulations as are necessary to carry out his functions under this chapter.").

[46] 33 U.S.C. § 1344(b)(1).

[47] *See Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 316 F.3d 916, 921 (9th Cir. 2003).

[48] 33 U.S.C. § 1316(c) ("After the effective date of standards of performance promulgated under this section, it shall be unlawful for any owner or operator of any new source to operate such source in violation of any standard of performance applicable to such source.").

"change the bottom elevation" of the lake.  Thus, it at least facially falls within the definition of
"fill material" contained in the regulations.  Plaintiffs do not dispute this.  Plaintiffs argue that the
inclusion of mine tailings within the definition of "fill material" is contrary to the agencies' intent
at the time the regulations were promulgated.  Plaintiffs' argument is essentially predicated upon
the point that at the time the regulations were amended in 2002, the statement accompanying the
notice of adoption of the final rule made clear that there was no intent to include mine tailings as
"fill material" or "discharge of fill material."[49]  The provisions cited by Plaintiffs taken alone and
in isolation would support a finding of a clear indication by the EPA and Corps that the
interpretation advanced by Plaintiffs is correct.  However, Plaintiffs overlook or ignore other
statements included in the adoption statement that contradict Plaintiffs' position.  Specifically:

> Today's final rule also includes several clarifying changes to the term "discharge
> of fill material." Specifically, the term "infrastructure" has been added in several
> places following the term "structure" to further define the situations where the
> placement of fill material is considered a "discharge of fill material." In addition,
> the phrases "placement of fill material for construction or maintenance of any
> liner, berm, or other infrastructure associated with solid waste landfills" and
> "*placement of overburden, slurry, or tailings or similar mining-related materials*"
> have been added to the definition of "discharge of fill material" *to provide further*
> *clarification of the types of activities regulated under section 404.*[50]

and,

> *The language in today's final rule will clarify that any mining-related material*
> *that has the effect of fill when discharged will be regulated as "fill material."* We
> made this clarification because it was clear from the comments that some were
> reading the examples we identified as an exclusive list. The general intent of this
> rule is to cover materials that have the effect of fill, not simply to focus on any one
> industrial activity. We believe that the additional mining related examples will
> address the confusion reflected in the comments. Finally, as discussed in section
> II.B.1.c of this preamble, we do not agree that the CWA contains a blanket
> prohibition precluding discharges of "waste" materials in to waters of the U.S.
> Instead, the Act establishes the framework for regulating discharges into waters
> and we believe the section 404 program is the most appropriate vehicle for
> regulating overburden and other mining-related materials.[51]

---

[49] Quoting various excerpts from 67 Fed. Reg. 31,129 – 31,143 (May 9, 2002).

[50] *Id*., 31,130 (emphasis added).

[51] *Id*., 31,135 (emphasis added)

Contrary to the arguments of Plaintiffs, the interpretation of the regulations in this case is not contrary to the intent of the EPA Administrator at the time she adopted the regulations in question.  While Plaintiffs may offer another plausible interpretation of the regulations in question, that interpretation is not the only reasonable interpretation of the regulation and does not compel this court to strike down the Corps' different interpretation.[52]  Congress has deemed it appropriate to delegate to the Administrator of Environmental Protection Agency and the Secretary of the Army to coordinate their respective jurisdictions under the Clean Water Act. This they have done by duly adopted regulations to which this Court must defer.  The Corps properly issued the permit to Coeur Alaska, Inc. under § 404 of the Clean Water Act.

Plaintiffs also seek to set aside the permit issued to Goldbelt, Inc. to construct a marine terminal facility.  As a basis for this action, Plaintiffs rely on the assumption that Coeur Alaska's § 404 permit will be revoked and, therefore, the need for the marine terminal facility becomes moot.  As the Court has held that the permit to Coeur Alaska was properly issued, there is no basis for granting the relief requested as to Goldbelt, Inc.  The same rationale applies to the ROD issued by the Forest Service.

## VI.  CONCLUSION/ORDER

Based upon the foregoing, Plaintiffs' Motion for Summary Judgment at Docket No. 41 is **DENIED**; and the Cross-Motion for Summary Judgment filed by the Federal Defendants at Docket No. 80 is **GRANTED**.

IT IS HEREBY ORDERED THAT the complaint be, and it hereby is, **DISMISSED**, with prejudice.

The Clerk of the Court to enter judgment accordingly.

Dated at Anchorage, Alaska, this 3rd day of August 2006.

s/ James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
United States District Judge

---

[52] *Akootchook v. United States*, 271 F.3d 1160, 1167 (9th Cir. 2001).

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SOUTHEAST ALASKA CONSERVATION COUNCIL; SIERRA CLUB; and LYNN CANAL CONSERVATION, | Case No. 1:05-CV-00012-JKS |
| Plaintiffs, | |
| vs. | **JUDGMENT<br>IN A CIVIL CASE** |
| UNITED STATES CORPS OF ENGINEERS; COLONEL TIMOTHY J. GALLAGHER in this official capacity as District Engineer; LARRY L. REEDER, in his official capacity as Chief of the Regulatory Branch; JOHN C. LEEDS, III, in his capacity as manager of the Juneau Field Office; GLEN E. JUSTIS, in his official capacity as Chief of the East Section; DOMINIC IZZO, in his official capacity as Principal Deputy Assistant Secretary of the Army (Civil Works); and UNITED STATES FOREST SERVICE, | |
| Defendants, | |
| and | |
| COEUR ALASKA, INC.; STATE OF ALASKA; and GOLDBELT, INC. | |
| Defendant-Interveners. | |

C:\Documents and Settings\danm.AKD-ALASKA\Local Settings\Temp\notes06E812\Judgment.wpd

___  **JURY VERDICT**.  This action came before the Court for a trial by jury.  The

issues have been tried and the jury has rendered its verdict.

  _X_  **DECISION BY COURT**.  This action came to trial or hearing before the Court.

The issues have been tried or heard and a decision has been rendered.

  **IT IS ORDERED AND ADJUDGED** that the complaint on file herein be, and it hereby

is, **DISMISSED**, with prejudice.  Judgment is hereby entered in favor of Defendants.

APPROVED:

  s/ James K. Singleton, Jr.
  _____
  **JAMES K. SINGLETON, JR.**
  United States District Judge

  August 3, 2006                                    IDA ROMACK
  _____        _____
  Date                                               Clerk

                                                     DAN MAUS
                                        _____
                                                   (By) Deputy Clerk

JUDGMENT IN A CIVIL CASE

2