John C. Berghoff, Jr., ILBA# 0181528
Michael P. Rissman, ILBA# 6194350
Mayer, Brown, Rowe & Maw LLP
71 South Wacker Drive
Chicago, IL  60606
Phone: (312) 782-0600/Fax: (312) 701-7711
jberghoff@mayerbrownrowe.com
mrissman@mayerbrownrowe.com

Eric B. Fjelstad, ABA# 9505020
Robert A. Maynard, ABA# 8610093
Perkins Coie LLP
1029 West Third Avenue, Suite 300
Anchorage, AK 99501
Phone: (907) 279-8561/Fax: (907) 276-3108
efjelstad@perkinscoie.com
rmaynard@perkinscoie.com

Attorneys for Defendant-Intervenor Coeur Alaska, Inc.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| SOUTHEAST ALASKA CONSERVATION COUNCIL, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. J05-0012 CV (JKS) |
| UNITED STATES ARMY CORPS OF ENGINEERS, et al., | ) ) ) | |
| Defendants, | ) ) | **COEUR ALASKA, INC.'S OPPOSITION TO PLAINTIFFS'** |
| and | ) ) ) | **MOTION FOR INJUNCTION PENDING APPEAL** |
| COEUR ALASKA, INC., et al., | ) ) | |
| Defendant-Intervenors. | ) ) | |

# TABLE OF CONTENTS

**Page**

OVERVIEW .................................................................................................................1

BACKGROUND ..........................................................................................................4

    The Kensington Project ......................................................................................4

    Status of Activity Around Lower Slate Lake....................................................7

ARGUMENT .................................................................................................................8

I.    Standard For Issuing An Injunction Pending Appeal........................................8

II.    Plaintiffs Have Not Shown a Likelihood of Success
or Raised Serious Questions on the Merits. .....................................................9

    A.    The Tailings Discharge Was Properly Permitted Under
the Section 404 Program. .......................................................10

    B.    Plaintiffs' Proposed Reading of the Statute is Meritless.........................12

    C.    Plaintiffs' Regulatory Argument is Meritless.........................................14

III.    No Irreparable Injury Will Occur During The Appeal. .....................................15

IV.    The Balance of Hardships and the Public Interest Weigh
Heavily Against an Injunction.........................................................................19

CONCLUSION.............................................................................................................22

CERTIFICATE OF SERVICE

EXHIBITS

*SEACC, et al. v. U.S. Army Corps of Engineers, et al.,* J05-0012 CV (JKS)
Coeur Alaska's Opposition to Plaintiffs' Motion for Injunction Pending Appeal

i

# OVERVIEW

Defendant-Intervenor, Coeur Alaska, opposes Plaintiffs' baseless motion for an injunction pending appeal against Kensington Gold Project ("Project") activities.  The result of years of careful planning and review, the award-winning Project represents the best in environmentally sound mineral resource recovery.  Now, after Plaintiffs' legal position has been completely rejected, they belatedly seek a preliminary injunction.[1]  They have shown no reason why such extraordinary relief should be granted.

Plaintiffs' motion does not remotely approach the standards which must be met to justify an injunction pending appeal.  Plaintiffs have virtually no likelihood of success on the merits of this case as highlighted by the decision of this Court, nor have they raised serious questions on the merits.  Further, Plaintiffs have not shown any irreparable harm from denying an injunction.  Granting an injunction, however, would seriously harm not only Coeur Alaska, but also Native Alaskans and other citizens in the communities of Southeast Alaska.  Granting an injunction would also create environmental risks from halting Project construction in mid-course.

With respect to the merits, this Court's decision rejecting Plaintiffs' arguments against the Project Section 404 permit is mandated by the language and structure of the Clean Water Act and the bedrock principle of *Chevron* deference to agency implementation of a statute.  The Corps of Engineers ("Corps") and Environmental Protection Agency ("EPA") joint regulation defining "fill material" and "discharge of fill material" to include mine tailings is entirely

---

[1]    Not only have Plaintiffs filed a motion for injunction pending appeal in this Court, but contrary to the clear admonition of Federal Rule of Appellate Procedure 8(a), Plaintiffs filed an "emergency" motion for injunction pending appeal in the Ninth Circuit Court of Appeals on August 9, 2006.  Coeur Alaska, joined by other defendant parties, has filed a motion to strike Plaintiffs' motion to the Ninth Circuit Court as well as an opposition to Plaintiffs' Ninth Circuit motion, based on this Court's pending consideration of the current motion.

consistent with the Act.  Plaintiffs have not shown any congressional intent that deposit of tailings must be regulated under Section 402 rather than Section 404 of the Act, or other basis under *Chevron* for the Court not to defer to the agencies' implementation of the statute on this issue.  The application by the agencies of Section 404 rather than Section 402 to the Kensington tailings under the clear language of these agency implementing regulations is thus beyond challenge.

Plaintiffs have utterly failed to show any environmental or other injury to their interests from denying their belated request for an injunction.  The entire Project is located in an area of historic mining activity in Southeast Alaska, a place where mines operated from 1897 to 1938, not a pristine wilderness.  The tailings site and other integral components of the Project are the product of many years of rigorous environmental design, analysis, and review by multiple federal, state, and local agencies.  This included the Corps' exhaustive additional public interest analysis of the Section 404 permit after Plaintiffs initially filed their lawsuit, which affirmed that the Lower Slate Lake tailings impoundment is the best environmental alternative for the Project.

Lower Slate Lake is a small, basically pond-sized, and unremarkable feature in the Project area.  It is isolated by natural barriers from fish migration and has only a meager number of resident fish.  It is not visited by or visible to Plaintiffs or other recreationists.  The tailings to be placed at the bottom of the lake are benign crushed rock, and water quality downstream from the tailings impoundment is and will be fully protected under the Section 402 permit that Plaintiffs have not challenged.  The lake area and its ecology will be restored and enhanced at the close of the mine project.

The only activity that Plaintiffs contend is prohibited by their own interpretation of the Clean Water Act—placement of tailings at the bottom of the lake—does not pose a threat of any

irreparable harm during Plaintiffs' appeal. The record establishes that the deposit of this crushed rock material in the lake throughout the operation of the mine will not result in irreparable environmental injury. Moreover, the tailings placement will not even commence until late 2007, and due to the location of tailings placement within the lake, adverse effects on fish or other organisms could not occur before 2009. The dam construction and other activities that Plaintiffs seek to enjoin would not be prohibited under even Plaintiffs' erroneous view of Section 404.

For many months, Plaintiffs have allowed this construction to proceed without requesting an interim injunction. The lake site disturbances about which Plaintiffs complain—tree cutting, road building, wetlands excavation, and diversion of water flows—have already occurred and cannot be considered harm that will occur during an appeal. Dam construction that will occur during Plaintiffs' appeal is limited to the modest first stage of the earthen impoundment dam, and is already underway. The remaining stages of the dam will not be commenced before 2010. The first stage will not alter the lake's current water level or natural flow. It will stabilize a construction site in progress. An injunction that prevents this ongoing construction from being completed according to the approved plan and schedule would not protect the environment, but would instead create environmental as well as site safety risks such as soil erosion and flooding.

Thus, no irreparable injury will occur absent an injunction, and denying the requested injunction will better protect the environment. Further, an injunction would cause severe and irreparable injuries to Coeur Alaska, its employees, its shareholders, and Native and other Alaskans. An injunction has the potential to irrevocably affect the Kensington Project with devastating economic effects and broad adverse public harm to the local and regional communities. Under any calculus, these hardships greatly outweigh any hardships claimed by the Plaintiffs.

This Court has wisely dismissed Plaintiffs' challenge. The Plaintiffs have not raised serious questions on the merits of their legal claim that are likely or even have a reasonable chance to prevail on appeal. They do not demonstrate that their proposed injunction will avert irreparable harm, while the injunction would cause huge harms. This Court should deny Plaintiffs' motion.

## BACKGROUND

The Kensington Project

The Kensington Project is the result of years of study, planning, review, and refinement. It is a model for the responsible use of resources. The Project retrieves the valuable minerals of Southeast Alaska in an environmentally sound manner, while employing more than 300 people and providing much-needed economic stimulus to Alaskan Natives and other residents. The Project recently was chosen by the Bureau of Land Management to receive the prestigious 2006 Hardrock Mineral Community Outreach and Economic Security Award. Russell Decl. ¶ 14 (Ex. A); BLM Award Letter (Ex. C). This important award was presented to the Project for showing "responsible mineral resource development while demonstrating an understanding of sustainable development." *Id.*

The Project (including Lower Slate Lake) is located in an area of historic mining activity in Southeast Alaska, not in a pristine wilderness. FSEIS at 3-101 (Ex. B). This Project is reinvigorating a mining area which operated from 1897 to 1938 and which is specifically designated for mineral development within the national forest. *Id.*; Ex. B at 3-71. The area has been designated for precisely the activity which the Project represents.

More than 900 studies, conducted over a period of many years, have demonstrated the environmental soundness of the Project. The Corps, EPA, State of Alaska, and numerous other

agencies all reviewed and approved Coeur Alaska's plan to reinvigorate the historic Kensington gold mine.[2]   In fact, the Section 404 permit environmental and public interest analysis was completed not once, but twice.  On November 14, 2005, this Court remanded the matter back to the Corps, at the Corps' request, for a supplemental review.  [Docket No. 20]  That exhaustive review was completed with the same conclusion: the Kensington Project plan is the best alternative for the environment and the economy of Southeast Alaska.  ROD at 4-5 (Ex. D).

For the next ten years, the Kensington Project will mine and process gold-containing rock.  The processing will employ a simple, water-based flotation system, without harmful chemicals such as cyanide or mercury.  When complete, the gold-bearing material will be taken off-site for final processing.  Memorandum Decision [Docket No. 117] (hereinafter "Mem. Dec.") at 2-3.  The remaining, water-soaked crushed rock material ("tailings") will be too great in quantity to be shipped any long distances.  To avoid permanently destroying neighboring wetlands with placement of these tailings, Coeur Alaska received approval to deposit a portion of this crushed rock fill at the bottom of nearby Lower Slate Lake.  Ex. D at 5.

Lower Slate Lake sits about two miles back from Berners Bay, and is not visible from the bay.  Ex. B at 4-91.  The lake is small, with a pre-construction surface area of approximately 23 acres.  Mem. Dec. at 4.  The lake has never been used to any significant degree for recreational purposes.  *See infra* at 17 n. 9.  Its waters are isolated by topography; natural barriers block salmon and other migratory fish from reaching the lake.  Ex. B at C-12.  The lake itself has poor fish habitat.  Ex. B at 3-28.  Game fish in the lake amount to only a minor population of small

---

[2]     These agencies included the U. S. Forest Service, Alaska Department of Environmental Conservation, Alaska Department of Natural Resources, and City and Borough of Juneau. Revised Corps Record of Decision ("ROD") at 25 (Ex. D).

dolly varden char.  *Id.*

   The tailings that will be deposited into the lake are not toxic.  As this Court noted, "[t]ests on the tailings show that they will not generate an acid discharge or metals leachate."  Mem. Dec. at 4.  The pH around the discharge pipe "will dissipate very rapidly."  *Id.*  The Alaska Department of Environmental Conservation "looked closely at the characteristics of the tailings" and concluded that "[a] number of marine and freshwater tests show no toxic effects associated with the tailings."  ADEC 12/6/04 Letter to Corps at 1 (Ex. E).  The Corps agreed that the results of these tests were "conclusiv[e]."  Ex. D at 27.  *See also* Ex. A ¶ 8.

   Placing the tailings on the lake bottom will reshape and enlarge the lake, first by filling a deep, unproductive zone at the center of the lake, and ultimately by increasing the lake's productive zone.  KER 12/23/03 Memo at 3 (Ex. H).  Naturally, burying bottom-dwelling organisms beneath tailings creates uncertainty over whether the lake can "support a fish population during operations."  Ex. B at C-70.  The Corps accounted for this uncertainty by assuming the worst-case scenario—that "most aquatic life in Lower Slate Lake will be lost during mining operations."  *See* Mem. Dec. at 4.[3]

   Nonetheless, the Corps concluded that "after project closure the lake's aquatic ecosystem structure and functions would be restored and expanded."  Ex. I at 5.  This Court concurred, finding that the record established that after restoration the lake "would provide at least equivalent aquatic habitat and productivity as it does currently."  Mem. Dec. at 5.  Coeur's

---

[3]    It is undisputed that the tailings will not affect organisms outside the lake.  *See* Mem. Dec. at 5 n.31 (noting that Plaintiffs do not challenge the issuance of a Section 402 permit requiring discharges from the lake to meet water quality standards).

obligation to reclaim the lake and indeed the entire project area is fully bonded.  *See id.* at 4-5.

Plaintiffs do not challenge these findings.

Status Of Activity Around Lower Slate Lake

      Since the approval of Project permits and filing of this case, Coeur Alaska has proceeded

with the tailings impoundment dam and related construction work at the site according to the

approved plans and schedule.  Wilder Decl. ¶¶ 3-4 (Ex. G).  The trees around the lake have

already been cut back to the footprint that the lake will occupy at Project completion.  *Id.* ¶ 3.

The roads are built, shrubs have been cleared, and wetlands excavated.  *Id.* ¶¶ 3-4.[4]  An earthen

coffer dam to keep the impoundment dam construction area relatively dry and other water

diversion structures are completed and in place.  *Id.*

      The impoundment dam construction is a three-stage project with construction of Stage I

already underway.  Ex. G ¶ 4.  This first stage is comprised only of a gradually sloped 38-foot

high earthen dam.  *Id.*  Stage II and later Stage III construction will not begin before 2010 and

will require further permitting.  *Id.* ¶ 4-5.

      Tailings will not be placed into the lake until late 2007.  For at least two years thereafter,

the tailings will be placed in the lake's deepest reaches, where they will not harm aquatic life.

Ex. A ¶¶ 6-8.

---

[4]     In the very same papers seeking an injunction of tree-cutting, road-building, and water diversion, Plaintiffs themselves advised this Court that "Coeur Alaska completed clearcutting the trees around the lake, constructed a road from the mine site to the lake, and constructed a pipeline which diverts water flow from Slate Creek around the lake."  Decl. of Counsel [Docket No. 120, Ex. 1] ¶ 3.

## ARGUMENT

**I.     Standard For Issuing An Injunction Pending Appeal**

A motion for an injunction pending appeal is decided by the standards similar to those applicable to a preliminary injunction. *Lopez v. Heckler*, 713 F.2d 1432, 1435-36 (9th Cir. 1983). The Ninth Circuit recognizes two separate but related tests for evaluating a request for preliminary injunctive relief. *Earth Island Inst. v. United States Forest Service*, 351 F.3d 1291, 1297 (9th Cir. 2003). Under the "traditional criteria," a plaintiff bears the burden of establishing: (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest. *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1120 (9th Cir. 2005).

Alternatively, a court may issue an injunction if the movant "demonstrates <u>either</u> a combination of probable success on the merits and the possibility of irreparable injury <u>or</u> that serious questions are raised and the balance of hardships tips sharply in his favor." *Earth Island*, 351 F.3d at 1298. The two formulations of this alternative test "represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Save Our Sonoran*, 408 F.3d at 1120. Particularly where the movants have not shown a probability of success on the merits, they must demonstrate a "significant threat of irreparable injury." *Department of Parks and Recreation v. Bazaar Del Mundo, Inc.*, 448 F.3d 1118, 1124-25 (9th Cir. 2006).

## II.    Plaintiffs Have Not Shown a Likelihood of Success or Raised Serious Questions on the Merits.

Under the traditional test, Plaintiffs bear the burden of establishing, among other elements, a strong likelihood of success on the merits.  In light of this Court's decision dismissing Plaintiffs' complaint, Plaintiffs have an extremely low prospect for success on the merits.  Thus, to obtain an injunction, Plaintiffs must satisfy the elements of the Ninth Circuit's alternative test.

Under the alternative test, Plaintiffs also cannot meet their burden.  They cannot show that they have raised "serious questions."  For purposes of injunctive relief, serious questions are "substantial, difficult and doubtful."  *Senate of the State of California v. Mosbacher*, 968 F.2d 974, 977 (9th Cir. 1992).  A movant must show at a minimum a "fair chance of success on the merits," which the Ninth Circuit has equated to "a reasonable showing that [movant] will succeed on the merits."  *National Wildlife Fed'n v. Coston*, 773 F.2d 1513, 1516-17 (9th Cir. 1985).  *See, e.g.*, *Marbled Murrelet v. Babbitt*, 111 F.3d 1447, 1450 (9th Cir. 1997) (district court grant of preliminary injunction reversed and vacated on appeal, due to lack of serious question).

The issue presented by Plaintiffs' Complaint is whether the Corps' decision to permit the discharge of the Kensington mine tailings as "fill material" under Section 404 of the Clean Water Act ("CWA") is contrary to the CWA or the Corps' regulations.  Far from being "difficult and doubtful," this issue is resolved, as it was by this Court, through straightforward principles of statutory construction and judicial deference.

The CWA flatly contradicts Plaintiffs' position.  Congressional intent is clear: Section 404, not Section 402, governs the permitting of "fill material."  The Kensington tailings indisputably fall within the definition of "fill material" and "discharge of fill material" in the

Corps-EPA joint implementing regulations. The Corps' issuance of the Section 404 permit is fully supported by the statute and the regulations.

Congress did not define "fill material," clearly intending that the agencies would do so by regulation. Courts must defer to an agency's interpretation of its own regulations unless an "alternate reading is compelled by the regulation's plain language." *Alhambra Hosp. v. Thompson*, 259 F.3d 1071, 1074 (9th Cir. 2001). As recognized by this Court, "if the statute is silent or ambiguous with respect to the specific issue," then an agency's permissible construction of the statute is controlling. *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 843 (1984); *Dreiling v. American Express Co.*, __ F.3d __, No. 04-35715, slip op. at 9575 (9th Cir. Aug. 14, 2006) (Ex. P). Here, the agencies' implementation of the CWA and their own regulation is unquestionably permissible.

A.    **The Tailings Discharge Was Properly Permitted Under the Section 404 Program.**

Under the CWA, two mutually exclusive permitting regimes exist to regulate discharges into waters of the United States. The Section 404 program regulates discharges of "dredged or fill material." 33 U.S.C. § 1344(a). Other discharges are regulated under the Section 402 program. 33 U.S.C. § 1342. The CWA expressly provides that discharges covered by Section 404 are not subject to Section 402. *See* 33 U.S.C. § 1342(a)(1) (EPA issues permits under Section 402 "[e]xcept as provided in" Section 404); *Greenfield Mills, Inc. v. Macklin*, 361 F.3d 934, 946 n.14 (7th Cir. 2004).

The two permit programs follow completely separate regulatory regimes. The Corps administers Section 404, assuring environmental protection by applying rigorous review and

guidelines relating to the deposit of fill material promulgated under Section 404(b)(1).[5]  EPA administers Section 402, applying effluent guidelines and standards adopted under Sections 301, 306 and other sections.[6]

The dividing line between these two distinct regimes is the definition of "discharge of dredged or fill material."  The Clean Water Act does not define the terms "fill material" or "discharge of . . . fill material."  Therefore, as this Court held, Congress left to the EPA and Corps the task of defining "fill material"—that is, of deciding what would be regulated by the Corps under the Section 404 program and what would be regulated by EPA under the Section 402 program.  In 2002, the agencies jointly adopted regulations that clearly define these key terms, and that govern Coeur Alaska's permit.  33 C.F.R. § 323.2(e) & (f); 40 C.F.R. § 232.2.

It is undisputed that under the regulation's plain language, the proposed placement of Coeur Alaska's mine tailings "falls within the definition of 'fill material.'"  Mem. Dec. at 9-10. As quoted on page 6 of this Court's decision, the regulation defines "fill material" to include any material that "has the effect of . . . [c]hanging the bottom elevation of any portion of a water of the United States."  33 C.F.R. § 323.2(e)(1)(ii).  The definition of "discharge of fill material"

---

[5]    *See* 40 C.F.R. parts 230-233.  The Section 404(b)(1) Guidelines are "expressly designed to address the entire range of environmental concerns arising from the discharge of dredged or fill material."  67 Fed. Reg. 31,129, 31,133 (May 9, 2002) (citing 40 C.F.R. part 230, subparts C-G).  As this Court noted, there is no dispute that the permit issued to Coeur Alaska satisfies the Section 404(b)(1) Guidelines.  Mem. Dec. at 9 n.44.

[6]    *See* 40 C.F.R. pts. 122-125.  As both the Corps and EPA have recognized, "the principal environmental concern" with the discharge of fill material "is the loss of a portion of the water body itself."  65 Fed. Reg. 21,292, 21,293 (April 20, 2002).   "There are no statutory or regulatory provisions under the section 402 program designed to address" the impacts of filling. *Id*.  They are best evaluated in the Section 404 program, as part of the Corps' consideration of "the entire range of environmental concerns arising from discharges of dredged or fill material." 67 Fed. Reg. at 31,133.  As noted above, the environmental impact of the Kensington tailings comes from burying the lake bottom, not from toxic effects.

includes the "<u>placement of overburden, slurry, or tailings or similar mining-related materials.</u>" *Id.* § 323.2(f) (emphasis added).  Coeur Alaska's discharge of mine tailings, which will change the bottom elevation of Lower Slate Lake, squarely fits within the definition.  Accordingly, the Corps' decision to evaluate the permit application under the Section 404 program was unassailable.  On this basis, this Court properly dismissed Plaintiffs' Complaint.

### B.     Plaintiffs' Proposed Reading of the Statute is Meritless.

Plaintiffs' motion simply references their already-rejected arguments, labels them "serious" and "substantial," and states Plaintiffs' hope that "the Court of Appeals could decide the matter differently."  Plf. Mot. at 4.  As reflected in this Court's decision, these legal arguments do not present substantial legal questions.

Plaintiffs argued that the Kensington tailings discharges should be regulated under Section 402 and therefore that guidelines and standards promulgated under Sections 301 and 306 should apply.  Thus, Plaintiffs' theory goes, the agencies were not free to define the tailings as "fill material."  This Court properly rejected Plaintiffs' argument.  Mem. Dec. at 9.

Congressional intent is clearly set forth in the language and structure of the CWA.  Sections 301 and 306 contain no language limiting the scope of what may be defined as "fill material."  *See* Mem. Dec. at 9.  As discussed above, the threshold question is to determine which permitting program applies.  As recognized by this Court, for a discharge of fill material Section 404 applies, not the Section 301 and 306 effluent standards that are part of the Section 402 program.  Mem. Dec. at 7 n.35.

The plain language of Sections 402 and 404 determines what standards are applicable.  Section 402 allows EPA to permit a discharge only "upon condition that such discharge will meet . . . all applicable requirements under," among others, Sections 301 and  306.  33 U.S.C. §

1342(a)(1).    Section 404, by contrast, contains no requirement that the Corps consider Section 301 or 306 standards when issuing permits for the discharge of fill material.  *See* 33 U.S.C. § 1344(a).

If Congress had wanted Section 301 and Section 306 standards to apply to permit decisions under Section 404, it would have used the same language in Section 404 that it used in Section 402.  "It is a basic principle of statutory construction that where Congress includes particular language in one section of the statute but omits it in another section of the same Act, . . . Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Hernandez v. Ashcroft*, 345 F.3d 824, 834 (9th Cir. 2003) (internal quotation marks omitted). *See Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1164-65 (9th Cir. 1999) (where subsection of Section 402 dealing with industrial stormwater discharges states that Section 301 guidelines are applicable, and subsection of Section 402 dealing with municipal stormwater discharges does not, Section 301 guidelines do not apply to municipal discharges).[7]

While the language of the statute is dispositive, it is noteworthy that EPA has consistently confirmed that Section 306 standards of performance apply only in the Section 402 program. When EPA adopted the standards of performance for ore mining, it said that they "will be applied to individual ore mines and mills through NPDES permits issued by EPA or approved

---

[7]    Plaintiffs' reliance on Sections 301(e) and 306(e) is misplaced.  Section 301(e) states that certain effluent guidelines shall be applied "in accordance with the provisions" of the Act. Section 306(e) requires compliance with "applicable" standards of performance, but does not state when such standards are applicable.  In accordance with the relevant provision of the Act, namely Section 404, these guidelines and standards are not applicable to fill material.

Plaintiffs' argument based on Section 301(a) is also incorrect.  They contend that *every* section enumerated in Section 301(a) – namely, Sections 301, 302, 306, 307, 318, 402, and 404 – applies to *every* discharge.  This conclusion is incorrect on its face.  For example, Section 402 does not apply to discharges of dredged or fill material, as specified in Section 402.

state agencies, under Section 402 of the Act."  47 Fed. Reg. 54,598, 54,606 (Dec. 3, 1982).
More recently, it reiterated that it "has never sought to regulate fill material under effluent
guidelines [issued under Sections 301 or 306]."  67 Fed. Reg. 31,129, 31,135 (May 9, 2002).

Even if Plaintiffs could convince a court that their contrived reconstruction of the statute
is permissible, they have no reasonable chance of proving that it is the *only* permissible reading
of the statute.  Plaintiffs' own invention cannot trump the agencies' reasonable interpretation of
the statute.  *American Mining Cong. v. EPA*, 965 F.2d 759, 764 (9th Cir. 1992) ("If EPA's
interpretation of the CWA is reasonable, we must defer to the agency's interpretation even if the
agency could also have reached another reasonable interpretation . . . ." (brackets and internal
quotation marks omitted)).    Defendants need not prove that the agencies' interpretation of the
CWA is required, or even the best reading of the statute.  *Smiley v. Citibank (S.D.), N.A.*, 517
U.S. 735, 744-45 (1996).  The only question is whether the Corps' and EPA's interpretation is so
wholly unsupported by reason that it "exceeds the bounds of the permissible."  *Barnhart v.
Walton*, 535 U.S. 212, 218 (2002).  Plaintiffs will not prevail on appeal.

### C.    Plaintiffs' Regulatory Argument is Meritless.

Plaintiffs do not dispute that the mine tailings fall within the plain regulatory definitions
of "fill material" and "discharge of fill material." *See* Mem. Dec. at 9-10.  They base their
regulatory intent argument for a contrary result exclusively on out-of-context snippets from the
rulemaking history.  This argument cannot succeed.  As this Court held, "Plaintiffs overlook or
ignore . . . statements included in the adoption statement that contradict Plaintiffs' position." *Id.*
at 10.  The agencies specifically stated, for example, that under the new rule, "*any mining-
related material that has the effect of fill when discharged will be regulated as 'fill material.'*"
67 Fed. Reg. at 31,135 (quoted in Mem. Dec. at 10 (emphasis by Court)).

This Court was on familiar footing in holding that "[w]hen reviewing the interpretation of agency regulations, courts must give substantial deference to an agency's interpretation of its own regulations." Mem. Dec. at 8 (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)). An agency's interpretation of its regulation "must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Alhambra Hosp.*, 259 F.3d at 1074 (citation omitted). As this Court concluded, the Corps' interpretation is consistent with the plain meaning of the regulation, and cannot be defeated by reference to regulatory history.

## III.    No Irreparable Injury Will Occur During The Appeal.

Plaintiffs' motion devotes only a single conclusory paragraph to alleged harm without an injunction. Plf. Mot. [Docket No. 119] at 4-5. Plaintiffs submit no declarations or other evidence of imminent harm. Instead, Plaintiffs merely present a short list of harms that they assert "could occur." *Id.* at 5. This falls far short of showing the requisite "significant threat of irreparable injury."

In their motion, Plaintiffs seek to stop "further construction" activities around the lake. Docket No. 119, proposed injunction order at 2. Yet, the only specific activity that Plaintiffs contend is contrary to their interpretation of the CWA is placement of tailings in the lake.

Plaintiffs allege that when Coeur Alaska "begin[s]" depositing tailings into the lake, it will kill "all of the aquatic life." Plf. Mot. at 5. In fact, the tailings are not toxic; the alleged harm from placing them in the lake will arise from burying bottom-dwelling organisms, which will not happen before 2009, well after the appeal will be decided. As set forth in the Declaration of Luke Russell: (1) the placement of mine tailings will not begin until late 2007; (2) tailings will first be placed in the deep, unproductive zone at the bottom of the lake, where there are no aquatic organisms to bury; (3) the tailings placement is not expected to reach the

productive areas of the lake until 2009; and (4) the alleged impact to aquatic organisms will not occur until the tailings reach the productive areas.  Ex. A ¶¶ 6-8; *see also* the discussion on page 6, *supra*.[8]

Even if some aquatic populations were affected during the appeal, that impact would not be irreparable.  The record reflects that displaced organisms will quickly recolonize the lake.  Ex. A ¶ 12.  Indeed, the placement of this crushed rock fill material in the lake will create a larger, shallower habitat in the lake, thereby improving its environmental value.  Ex. B at C-70; KER and Earthworks Report at 19 (Ex. F); Ex. H at 2-3.  Complete restoration of the lake habitat and the small population of fish will occur rapidly after closure.  Coeur Alaska Section 404(b)(1) Evaluation at 12-13, 24 (Ex. J).  Where animal communities repopulate, losses of individual animals do "not have a significant impact on the environment."  *Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391, 1402 (9th Cir. 1992); *see Half Moon Bay Fishermans' Marketing Ass'n v. Carlucci*, 857 F.2d 505, 513-14 (9th Cir. 1988) (no irreparable harm from deposit of dredge spoils where, to the extent fish and crab would be destroyed, they would be able to relocate or repopulate).

The only other harm asserted by Plaintiffs is their allegation that construction at the Lower Slate Lake area will "change the natural ecology of the area."  Plf. Mot. at 5.  They do not explain what they mean by their generalized claim of a change in the "natural ecology."  *See* Plf. Mot. at 5.  And while they refer generally to impacts to trees, shrubs, wetlands, and water flows, s*ee id.* at 2, Plaintiffs provide no specific explanation or evidence of harm, irreparable or

---

[8]    In addition, it is undisputed that the tailings discharge will not affect organisms outside the lake.  See Mem. Dec. at 5 n.31 (noting that Plaintiffs do not challenge the issuance of a Section 402 permit under which discharges from the lake must meet state water quality standards).

otherwise. Plaintiffs also do not show how any activity at the lake adversely affects their interests to any tangible degree, and they cannot do so given their lack of use of the lake site.[9] In any event, asserting conclusory statements without any explanation or reasoning is insufficient to establish irreparable harm.

In fact, the remaining construction activities will not harm the environment. Before this Court dismissed their Complaint, Plaintiffs allowed construction to proceed for many months without seeking an injunction. Thus, as Plaintiffs themselves anticipated, Coeur Alaska has completed cutting trees around the lake, built the road to the lake, constructed water diversions around the lake, and begun constructing the earthen Stage I dam. Ex. G ¶¶ 3-4; *see also* Declaration of Plaintiffs' Counsel [Docket 120, Ex. 1] ¶ 3. The environmental or ecological aspects Plaintiffs purportedly want to retain in a status quo have already been altered, and cannot be considered harm that will occur during Plaintiffs' appeal. The remaining construction activities at the lake site—such as completing the stage I earthen dam—will not change the lake level or the current ecology of the lake site. Ex. G ¶¶ 6-7.

Plaintiffs' new-found concern over construction activity in the Lower Slate Lake area rings hollow. A court "may legitimately think it suspicious that the party who asks to preserve the status quo through interim injunctive relief has allowed the status quo to change through unexplained delay." *Kobell v. Suburban Lines, Inc.*, 731 F.2d 1076, 1092 n.27 (3rd Cir. 1984). As the Ninth Circuit has stated, a "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v. Chronicle Publ'g Co., Inc.*, 762

---

[9]     As noted in Coeur Alaska's summary judgment brief, declarations submitted by Plaintiffs showed that only four declarants have ever visited the lake, and then only five times over 70+ years of combined outdoor recreation in the region. Docket No. 71 at 7.

F.2d 1374, 1377 (9th Cir. 1985).    Here, Plaintiffs cannot say they were unaware of the construction at the Project.  Indeed, they noted Coeur Alaska's intent to proceed with the Project in their summary judgment brief filed on April 7, 2006.  Plf. Op. Br. at 41 n.8 [Docket No. 41].

Plaintiffs' lack of urgency was understandable, since there is no irreparable harm from Coeur Alaska's activities at the lake.    As this Court stated, reclamation of the lake and surrounding area is required and bonded; the lake will recover; and it will provide at least equivalent habitat and productivity as it does currently.  Mem. Dec. at 4-5; *see also* Docket No. 71 at 11.  "[U]pon project closure," the Corps concluded, "aesthetic values would be restored." Ex. I at 7.

On the other hand, stopping construction at this point would risk serious environmental and safety consequences.  Ex. G ¶ 10-11.  Coeur Alaska's complex, integrated project cannot be left idling in mid-course.  The already constructed earthworks, diversion piping, and excavation at the site will become vulnerable to overflow, flooding, and erosion from heavy winter rains and spring runoff.  Thus there is a need to complete Stage I of the dam and related work within the next few months.  *Id.* ¶ 12.  The most effective means to avert sediment and other environmental as well as safety risks is to allow the construction to continue to completion according to the approved plans and schedule.   *Id.*  An injunction which would cause environmental and safety risks should not issue.  *See, e.g.*, *Alpine Lakes Protection Society v. Schlapfer*, 518 F.2d 1089, 1090 (9th Cir. 1975); *Greenpeace USA v. Stone*, 748 F. Supp. 749, 768 (D. Haw. 1990).

In sum, nothing helpful to the environment will be accomplished by stopping Coeur Alaska from completing the construction during the pendency of an appeal.  Stopping in the midst of construction operations now will not protect the ecology or the water flows at the lake. In fact, the result would be the reverse.

**IV.    The Balance of Hardships and the Public Interest Weigh Heavily Against an Injunction.**

Under the traditional preliminary injunction test, if the movant shows a strong likelihood of success on the merits and irreparable injury, the court then asks whether the balance of hardships tips toward the movant. *Earth Island Inst.*, 351 F.3d at 1297. Under the "alternative test," a movant who does not show a likelihood of success on the merits must show irreparable injury and that the balance of hardships "tips sharply in his favor." *Id.* at 1298. In this case, the balance of hardships tips sharply away from Plaintiffs. Further, an injunction would be against the public interest, not just environmentally but also due to grave adverse socioeconomic impacts to Alaskans.

Coeur Alaska would suffer severe harm from an injunction pending appeal, with repercussions on the viability of the entire Project. At the very least, the company would incur the cost of demobilizing, storing, and remobilizing contractors and their equipment currently in service, excess personnel and equipment costs, and various other quantifiable costs caused by a delay. *See* Ex. G ¶¶ 13-16. Taken together, these costs are likely to exceed $30.4 million for a 12-month delay and $39.2 million for an 18-month delay. *Id.* ¶ 17. They do not include the less quantifiable, but very real and substantial, losses to Coeur Alaska, its shareholders, and employees from delay in receiving any return on the more than $200 million expended on the Project thus far. Sabala Decl. ¶ 3 (Ex. K).

This substantial financial hardship alone more than outweighs the minimal, ephemeral harms alleged by Plaintiffs. Courts must consider the economic repercussions of issuing an injunction. *See, e.g.*, *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987) (loss to oil company of $70 million investment if exploration temporarily enjoined outweighs alleged

injury to fish and wildlife resources); *Half Moon Bay*, 857 F.2d at 513-514 (Corps approval of disposal of dredged spoils in coastal waters from harbor dredging; potential loss of port business and $50 million investment outweighs impact to portion of fishery).  The tangible economic loss that an injunction would cause Coeur Alaska is comparable to the losses in *Amoco Production* and *Half Moon Bay*.

Plaintiffs cite a string of cases for the unremarkable proposition that environmental harms under various circumstances outweigh economic harms.  These cases simply recognize that "[t]o determine whether injunctive relief is appropriate, even in the context of environmental litigation," courts apply "the traditional balance of harms analysis." *National Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 737 (9th Cir. 2001) (citations omitted); *see also Stein v. Barton*, 740 F. Supp. 743, 757 (D. Alaska 1990) (court must "balance the economic hardship that would result" from its decision).  But an injunction remains an extraordinary "equitable remedy that does not issue as of course," regardless of whether the movant alleges environmental harms.  *Amoco Prod.*, 480 U.S. at 542; *see also Lands Council v. Packard*, 391 F. Supp. 2d 869, 871 (D. Idaho 2005) (denying plaintiffs' request for an injunction pending appeal despite allegation of environmental injury); *Tillamook County v. U.S. Army Corps of Engineers*, 288 F.3d 1140, 1143  (9th Cir. 2002).[10]

---

[10]    Because Plaintiffs in the present case have already lost on the merits before this Court, and because the harms they allege are tenuous at best, the cases they cite where injunctive relief was granted are inapt.  *See Babbitt*, 241 F.3d at 738 (granting an injunction after a decision on the merits in plaintiffs' favor); *Idaho Sporting Congress v. Alexander*, 222 F.3d 562, 569 (9th Cir. 2000) (enjoining activity in old-growth forest where recovery would take hundreds of years); *Greenpeace Found. v. Mineta*, 112 F. Supp. 2d 1123, 1136-38 (D. Hawaii 2000) (granting permanent injunction); *Schrader v. Idaho Dep't of Health and Welfare*, 590 F. Supp. 554, 560-61 (D. Idaho 1984), *rev'd on other grounds*, 768 F.2d 1107 (9th Cir. 1985) (enjoining loss of critical government payments to impoverished citizens); *Wyoming Farm Bureau Fed'n v.*

Plaintiffs' motion requests an injunction that would also be contrary to the public interest. In addition to the environmental risks from interrupting construction, the societal harms from an injunction would also be borne by nearly 300 local employees and contractors and their families. If the Project is enjoined, Coeur Alaska will be forced to lay off a great majority of its employees and contractors.  Ex. G ¶ 18.

The abrupt and dramatic loss of nearly 300 family-supporting jobs would come at a particularly bad time for Southeast Alaska, when good jobs are scarce and workers are leaving. The economy of Southeast Alaska has been hit hard as the number of timber, mining, and other natural resource jobs has declined.  Wanamaker Decl. ¶ 24 (attached to Opposition submitted by Defendant-Intervenor Goldbelt, Inc.).  "The population of the region is declining, especially among the economically significant segment between 25 and 35 years of age."  *Id.*  The immediate impact of an injunction would be severe.  *Id.* ¶¶ 24-30.  Native Alaskans would be particularly hard hit.  *Id.* ¶¶ 20-23; Mitchell Decl. ¶¶ 10-11 (Ex. M).

At the same time an injunction would cause immediate unemployment in the region, it would also reduce the tax revenues available for social services.  Wanamaker Decl. ¶ 29.   As stated in declarations filed in this Court by the State of Alaska with their intervention papers, the City and Borough of Juneau will have to wait for the much-needed property and sales tax revenue that will be generated by the Kensington Project.  The effect will be felt state-wide as state tax revenues will also be curtailed.  Hughes Decl. ¶¶ 7-10 (Ex. N).

Environmentally sound mining is in the public interest.  Environmental groups' interests "are not the only interests involved in the management of public lands . . . ."  *Lands Council*, 391

---

*Babbitt*, 987 F. Supp. 1349, 1376 (D. Wyo. 1997), *rev'd*, 199 F.3d 1224 (10th Cir. 2000) (staying affirmative injunction pending appeal to protect wolf population).

F. Supp. 2d at 872.   In *Amoco Production*, the Supreme Court upheld the district court's conclusion that "the public interest in this case favored continued oil exploration, given [the Outer Continental Shelf Lands Act's] stated policy . . . ."  480 U.S. at 545.  Congress has also declared "that it is the continuing policy of the Federal Government in the national interest to foster and encourage private enterprise in . . . the development of economically sound and stable domestic mining, minerals, metal and mineral reclamation industries . . . ."  30 U.S.C. § 21a. The Kensington Mine Project is in an area of historic mining which the Forest Service has given a "Minerals" designation to "encourage . . . mining."  Tong. Land Mgmt. Plan at 3-148 (Ex. O).

## CONCLUSION

This Court has determined that Plaintiffs' claim is without merit based on a plain reading of the Clean Water Act and sound principles of judicial deference.  Further, Plaintiffs cannot show any irreparable injury that would be prevented by an injunction.  Indeed, granting the requested injunction would generate its own environmental risks.  Such an injunction would cause massive economic injuries to Coeur Alaska, its workers, and Southeast Alaska citizens and communities, to say nothing of the broader public harms from loss of livelihoods.  Plaintiffs' motion for injunction pending appeal should be denied.

DATED this 22nd day of August, 2006.           Respectfully submitted,

MAYER, BROWN, ROWE & MAW LLP
Attorneys for Defendant-Intervenor
COEUR ALASKA, INC.

/s/ John C. Berghoff, Jr.
John C. Berghoff, Jr.
71 South Wacker Drive
Chicago, IL  60606
Phone: (312) 782-0600/Fax: (312) 701-7711
jberghoff@mayerbrownrowe.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 22nd day of August, 2006 a true and correct copy of the foregoing, along with accompanying documents, was served electronically on Demian A. Schane and Thomas S. Waldo (representing plaintiffs), Mark Nitczynski and Richard L. Pomeroy (representing federal defendants), Ruth Hamilton Heese and Cameron M. Leonard (representing defendant-intervenors), and David C. Crosby (representing defendant-intervenor Goldbelt, Inc.). A courtesy copy was sent via email to Jim Ustasiewski.

<u>/s/ John C. Berghoff, Jr.</u>
John C. Berghoff, Jr.
Mayer, Brown, Rowe & Maw LLP
71 South Wacker Drive
Chicago, IL  60606
Phone: (312) 782-0600
Fax: (312) 701-7711
jberghoff@mayerbrownrowe.com
ILBA# 0181528

# EXHIBIT LIST

No.

A          Declaration of Luke Russell in Support of Coeur Alaska's Opposition to Plaintiffs' Emergency Motion Under Circuit Rule 27-3 (August 17, 2006) ("Russell Decl.")

B          Kensington Gold Project, Final Supplemental Environmental Impact Statement (December 2004) ("FSEIS") [excerpts]

C          Bureau of Land Management 2006 Hardrock Mineral Community Outreach and Economic Security Letter to Coeur Alaska, Inc. (August 3, 2006) ("BLM Award Letter")

D          Revised Department of the Army Record of Decision & Permit Evaluation (March 29, 2006) ("ROD") [excerpts]

E          Alaska Department of Environmental Conservation Letter to United States Army Corps of Engineers (December 6, 2004) ("ADEC 12/6/04 Letter to Corps")

F          Kensington Project Lower Slate Lake Tailings Impoundment: Habitat Creation and Mitigation Plan, prepared by Kline Environmental Research, LLC and Earthworks Technology, Inc. (July 14, 2003) ("KER and Earthworks Report") [excerpts]

G          Declaration of Al Wilder in Support of Coeur Alaska's Opposition to Plaintiffs' Emergency Motion Under Circuit Rule 27-3 (August 17, 2006) ("Wilder Decl.")

H          Kline Environmental Research, LLC Memorandum (December 23, 2003) ("KER 12/23/03 Memo")

I          Corps Section 404(b)(1) Guidelines Evaluation for the Kensington Gold Project [excerpts]

J          Coeur Alaska, Inc.'s Section 404(b)(1) Evaluation (November 17, 2004) ("Section 404(b)(1) Evaluation") [excerpts]

K          Declaration of James A. Sabala in Support of Coeur Alaska, Inc.'s Summary Judgment Response Brief (May 3, 2006) ("Sabala Decl.")

L          Kline Environmental Research, LLC Technical Memorandum (August 17, 2004) ("KER 8/17/04 Memo")

M          Declaration of Duff W. Mitchell in Support of the Berners Bay Consortium's
           Brief as Amicus Curiae in Opposition to Plaintiffs' Motion for Summary
           Judgment (April 27, 2006) ("Mitchell Decl.")

N          Declaration of Richard A. Hughes in Support of State of Alaska's Motion to
           Intervene (April 7, 2006) ("Hughes Decl.") [excerpts]

O          Tongass National Forest Land and Resource Management Plan (1997) ("Tong.
           Land Mgmt. Plan") [excerpts]

P          Dreiling v. American Express Co., __ F.3d __, No. 04-35715, slip op. (9th Cir.
           Aug. 14, 2006)