RECORD OF DECISION                                          POA-1990-592-M



Alaska District

REVISED
DEPARTMENT OF THE ARMY

RECORD OF DECISON
&
PERMIT EVALUATION



**APPLICANT:**        COEUR ALASKA, INCORPORATED and Goldbelt, Incorporated
**APPLICATION NO.:**  POA-1990-592-M and POA-1997-245-N
**WATERWAY:**         Lynn Canal and Berners Bay

This document constitutes the United States (U.S.) Department of the Army, Corps of Engineers' (Corps) Record of Decision (ROD), compliance determination according to the National Environmental Policy Act (NEPA), the U.S. Environmental Protection Agency's (USEPA) Section 404(b)(1) Guidelines[1] (Guidelines), and the public interest review for Coeur Alaska, Incorporated, (hereafter referred to as "Coeur"), proposed Kensington Gold Project.

The U.S. Forest Service (USFS) initiated the NEPA process to identify and analyze alternatives to the amended Mining Plan of Operation submitted to the USFS for the operation of the Kensington Gold Mine. The USFS was the lead Federal agency for the project, and the Corps was a cooperating agency to the Environmental Impact Statement (EIS) published in February 1992, and to the Supplemental EIS (SEIS) dated August 1997. The Corps has been a cooperating agency on and throughout the current Final SEIS (FSEIS) process, which was completed in December 2004, when the USFS published the FSEIS and the USFS' ROD. Alternative D is the USFS's preferred alternative and has been adopted by Coeur.[2] The Corps authorized Alternative D, to two different permittees in separate permits (e.g., to Coeur for the Kensington Gold Project and to Goldbelt, Incorporated (hereafter referred to as "Goldbelt") for the Cascade Point marine facility).

The aforementioned documents[3] included a complete project impact analysis and review of the direct, secondary, cumulative, and reasonably foreseeable impacts of the project as well as pertinent alternatives. These analyses have also resulted in minor changes to the proposed activities.

I have independently reviewed and evaluated the information in the EIS, the DSEIS and the FSEIS, in accordance with 40 CFR 1506.3 and 33 CFR 230.21, and have found them to be accurate assessments, and therefore appropriate for the purposes of the public interest review and alternatives analysis required by 33 CFR 320.4(b)(4) and 40 CFR 230.10. The Corps hereby adopts the FSEIS for the Kensington Gold Project, and those parts of the Kensington Gold Project EIS and SEIS not changed by the FSEIS.

---

[1] 40 CFR 230

[2] The applicant had originally applied for Alternative B (described in Section VI, later in this ROD). Alternative D was not in the Draft of the FSEIS, hereafter referred to as the DSEIS, but originated later as a result of comments received from Federal, State and local agencies, as well as the land manager (USFS), with respect to the DSEIS.

[3] These documents are all available at the USFS, 8465 Old Dairy Road, Juneau, AK 99801. A copy of each was incorporated into the case file.

**000004**

Exhibit D, Page 1

RECORD OF DECISION                                POA-1990-592-M

I. **DECISION**: I have decided, in light of the overall public interest, to issue two Corps permits pursuant to Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. 403), and pursuant to Section 404 of the Clean Water Act (CWA) (33 U.S.C. 1344) (10/404 permit). One permit will be issued to Coeur to authorize the discharge of processed mine tailings into Lower Slate Lake, and the discharge of fill materials into waters of the U.S. to construct a marine dock facility at Slate Creek Cove in accordance with the attached drawings (Attachment E), Alternative D in the FSEIS and this ROD.

The second permit will be issued to Goldbelt for the Cascade Point Docking Facility. See Plans of Goldbelt, attachment A.

The Corps' ROD is based upon information contained in the EIS, DSEIS, the FSEIS and the USFS's ROD, the stated views of Federal, State, local agencies, the interested public, current national policy and applicable laws and regulations. This decision has been made in conformance with the USEPA memorandum, entitled, "Clean Water Act Regulation of Mine Tailings", dated May 17, 2004. The possible consequences of all alternatives, including the USFS's preferred alternative, have been evaluated in terms of environmental effects, social well-being, and the public interest. All factors[4] which may be relevant to my decision were considered, including the cumulative effects thereof. These factors included, but were not limited to conservation, economics, aesthetics, general environmental concerns, wetlands, cultural values, fish and wildlife values, flood hazards, flood plain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, mineral needs, consideration of property ownership, and in general, the needs and welfare of the people.

Turbidity, total suspended solids (TSS), aluminum, and chromium are the principal components and elements of concern within the tailing storage facility (impoundment). The tailings deposited into the impoundment will have been processed to remove sulfides and the contained gold. The ore will be crushed and ground, with the sulfides and gold mineralization removed by a floatation circuit. This would leave trace concentrations of metals bearing sulfides, metal oxides, metal sulfates, and carbonate salts. Up to 40% of the tailings will be placed back underground in a wetted cement mixture. No cyanide or arsenic will be added to the ore as a reagent to recover gold. In fact, the gold concentrate will be shipped offsite for final recovery. The water in the impoundment will not be directly discharged into any receiving water. The water from the tailings storage facility will be pumped by pipeline to a water treatment facility before discharge to the East Fork of Slate Creek. To ensure water quality standards for the project are met, all water from the impoundment will have to go to and through a water treatment plant during operation. The discharge from the water treatment plant is subject to an NPDES permit. To ensure that the tailings are reclaimed in accordance with approved plans, the USFS and ADNR will hold reclamation bonds on the operation to ensure that all reclamation standards are met. See Section XI, Subpart G.

Attachments to Record of Decision:

A. Plans of Goldbelt

---

[4] These and other factors, which were addressed in the DSEIS and FSEIS, Chapters 3 (Affected Environment) and 4 (Environmental Consequences), which adequately addressed the environmental and public interest factors. No new factors have been identified as a result of this review.

RECORD OF DECISION                                                POA-1990-592-M

B. Kensington Mine Section 404(b)(1) analysis.
C. List of Reference Documents
D. Revised Special Conditions for Coeur permit
E. Revised permit application tables and drawings, Coeur
F. Signed Department of the Army Permit Evaluation and Decision Documents for Goldbelt, Incorporated: (1) POA-1997-245-2 (Cascade Point Dock), and (2) POA-1997-245-M (Road from Echo Cove to Cascade Point),
G. The Section 404(b)(1) Analysis and Public Interest Review for POA-1997-245-N (Cascade Point Dock).

The documents listed in Attachment C were submitted to the Corps by the applicant and by various Federal and State agencies as supporting documents, and specified documents or portions of the listed documents have been incorporated into this ROD by reference.

II. **PROPOSED PROJECT**: The location and description of the proposed work was described in the Corps public notice, dated June 21, 2004. The 45-day comment period, originally commensurate with the comment period of the DSEIS, was later extended at the request of various Federal resource agencies to August 20, 2004.

Coeur's proposal is to mine gold from subsurface mineral deposits located within the Tongass National Forest on Federal and private patented lands, just north of Berners Bay, Alaska.

Coeur proposed[5] in June 2, 2004 in a revised application to place structures, and to discharge an approximate total of 5,451,700 cubic yards (cy) of fill material into an approximate total of 91.7 acres of waters of the U.S., including wetlands, in conjunction with the construction of the following new mine facilities and associated infrastructure:

| Proposed Facilities | Acres of US Waters To Be Impacted | Proposed Fill Volume (cy) |
|---|---|---|
| Process Area | 5.3 | 88,000 |
| Tailing Dam | 1.4 | 145,000 |
| Access Road | 12.0 | 26,000 |
| Laydown Area | 5.0 | 4,800 |
| Waste Rock Disposal | 4.8 | 311,000 |
| Borrow Areas | 4.2 | 0 |
| Mine Tailings | 45.5 | 4,800,000 |
| Tails Placement Facilities | 8.9 | 15,000 |
| Topsoil Stockpile | 1.0 | 33,000 |
| Slate Creek Terminal | 3.6 | 28,900 |
| TOTAL | 91.7 | 5,451,700 |

These activities included the discharge of fill material in waters of the U.S., and the placement of several structures (floats, docks and piles) in navigable waters of the U.S., in conjunction with the construction of a marine dock facility in Slate Creek Cove.

The individual components of the proposed work included the following activities: (1) the construction of building pads for milling facilities, administrative, and support facilities; (2) construction of a tailings dam; (3) construct fill pads associated with the tailings pipeline, access roads,

---

[5] The location and description of the proposed work was described in the Corps public notice, dated June 21, 2004.

3

RECORD OF DECISION                                      POA-1990-592-M

a discharge pipe, and a pump-back sump (located at the toe of the proposed dam); (4) construction of a waste rock disposal site; (5) construction of abutments for the main access road, which would run from Slate Creek Cove to the process area, plus fills associated with the construction of various bridges (abutments, etc.); (6) construction of a staging and laydown area, as well as an infiltration gallery in Johnson Creek; (7) approximately 4,800,000 cy (or 4.5 million tons) of fill material would be discharged into approximately 45.5 acres of waters of the U.S.; (8) material and topsoil stockpiles for use in concurrent and closure reclamation activities; (9) construction of 2-foot high berms encircling settling and storage ponds; and, (10) construction of a marine dock facility in Slate Creek Cove. Galvanized metal piling would be used to anchor various floating components of the dock facility.

Coeur did not include the Cascade Point docking facility in their Department of the Army (DA) permit application. The Cascade Point docking facility application was submitted separately by Goldbelt, Incorporated, and previously evaluated as an independent activity by the Corps in our decision document for that project. This ROD now analyzes Cascade Point as a component of the Kensington Gold Project. Two different permit decisions are being made; one for the Kensington Mine Project, and another for a docking facility at Cascade Point. We re-examined our previous conclusion that the Cascade Point facility was a separate and independent project. Based on a review of all available information including, but not limited to, the FSEIS, Goldbelt's submissions, and the City & Borough of Juneau's Conditional Use permit, we determine that, without the Kensington Mine, the Cascade Point facility would not be constructed in the foreseeable future. Although we recognize that Goldbelt intends the dock to be used for other purposes in the future, such plans are insufficient for us to evaluate it as an independent activity. We therefore conclude that a destination docking facility at Cascade Point is a component of the Kensington Mine project. It is analyzed in the FSEIS, this ROD, and in attachments F (as modified by attachment G) and G (both incorporated into this ROD).

The applicant originally applied for Alternative B, as reflected in the Corps public notice, stating that approximately 5,451,700 cubic yards of fill material would be discharged into 91.7 acres of waters of the U.S., including wetlands. The applicant later adopted the USFS's preferred Alternative D, with the volumes and acreages described in Section VI below, prior to publication of the FSEIS.

III. **PURPOSE AND NEED FOR ACTION**: The basic purpose is to develop a working, profitable gold mine for the Jualin/Kensington ore body. This will be accomplished by extracting the gold ore and reducing it by removal and disposal of non-marketable components, and by transporting the gold concentrate to market. There are several transportation links and construction activities implicit in the overall mining operation.

The overall mine operation project would need the following components: (1) building pads for milling facilities, administrative and support facilities; (2) tailings disposal facilities; (3) fill pads associated with pipelines; (4) a waste rock disposal site; (5) access roads and bridge abutments; (6) staging and laydown areas; (7) an infiltration gallery; (8) material and topsoil stockpiles; (9) two marine dock facilities; and (10) berms to encircle settling and storage ponds.

4

000007

Exhibit D, Page 4

RECORD OF DECISION                                          POA-1990-592-M

Coeur's need is to relocate[6] the major mine components from the Kensington Mine site adjacent to Lynn Canal, to the Jualin Mine site location in the Johnson Creek watershed (approximately two miles to the southeast across a southern ridge extension of Lion's Head Mountain), and at Slate Cove, on the northwest side of Berners Bay. This action would allow Coeur to transport ore from the mine directly[7] to a mill on the Jualin side of the peninsula for processing, from where the processed tailings material slurry would then be piped by gravity feed directly to the alpine lake disposal site (Lower Slate Lake). Coeur needs to establish a marine dock facility in Slate Creek Cove for the transport of mine personnel safely to another destination port and move gold concentrate efficiently and reliably off the mine site.

**IV. SCOPE OF ANALYSIS [33 CFR 325, Appendix B, 7(b)]:** When an applicant proposes to conduct a specific activity (e.g., the actions proposed by Coeur in the Corps' public notice, dated June 21, 2004), requiring authorization from the DA, and it is merely one component of a larger project (e.g., an ongoing mining operation), the District Engineer (DE) shall establish the scope of the ROD and/or permit evaluation assessment to address the impacts of the specific activity requiring Corps authorization and those portions of the entire project over which the DE has sufficient control and responsibility to warrant Federal review. Sufficient control and responsibility is considered to exist for portions of the project beyond the Corps' jurisdiction where the Federal involvement is sufficient to turn an essentially private action into a Federal action. These are situations where the environmental consequences of the larger project are essentially products of the Corps' permit action. (See 33 CFR 325 Appendix B, Paragraph 7.b.)

For this proposal, works initially identified as requiring Corps authorization are limited to the placement of structures, and the discharge of dredged or fill material into waters and navigable waters of the U.S.

However, the DE is considered to have control and responsibility for portions of the project beyond the limits of Corps jurisdiction where the Federal involvement is sufficient to turn an essentially private action into a federal action. These are cases where the environmental consequences are essentially products of the Corps permit action. Typical factors to be considered in determining whether sufficient control and responsibility exists include (1) whether or not the regulated activity is 'merely a link' in a corridor type project; (2) whether adjacent uplands in the immediate vicinity of the regulated activity affected the locations and configuration of the regulated activity; (3) the extent to which the entire project will be within the Corps jurisdiction; and (4) the extent of cumulative Federal control and responsibility.

Combined Federal controls are influenced by the fact that the work would be conducted in part on Federally administered lands (Tongass National Forest-USFS), and in part on State of Alaska administered lands (Alaska Tidelands-marine dock facility); the water leaving the impoundment behind the dam is subject to the (USEPA) regulations (i.e., subject to the USEPA's authorization to discharge under the National Pollutant Discharge Elimination System (NPDES Permit); and other Federal laws (e.g., Endangered Species Act,

---

[6] The locations of certain structures, as yet not constructed, were referenced in the previous Corps authorization. The current proposal would relocate these structures on 'paper' to new locations.

[7] The 'high-grade' ore body that would be mined is located on the eastern side of Lions Head Mountain. Thus, locating the mill on the eastern side would shorten the distance from ore body to portal to mill.

000008

Exhibit D, Page 5

RECORD OF DECISION                                      POA-1990-592-M

Fish and Wildlife Coordination Act, the National Historic Preservation Act, the Marine Mammal Protection Act, the Coastal Zone Management Act, etc.).

There are alternatives available to the applicant, that would allow various activities of the Kensington Gold Project to function without the need for Corps authorization, e.g. use of uplands[8,9]. Additionally, logistics, technological or economic concerns, and/or other Federal or State regulatory findings could affect the practicability of some of the listed alternatives.

The scope of analysis for this action includes not only the impacts, alternatives, and project benefits resulting from the primary proposed actions (two marine docking facilities and a mine tailings disposal site) as identified above, but also the infrastructural items, e.g., the road system, pipelines, and material stockpile sites. Other project-related impacts not within the scope or a product of Corps authorization have been summarized and identified in the direct, secondary and cumulative impact analysis sections of the FSEIS.[10]

V. **BACKGROUND**: In July of 1992, the USFS approved a Plan of Operations (POO) for the Kensington Gold Project. The POO called for underground mining; ore processing with on-site cyanidation; a tailings impoundment; marine discharge of process wastewater; and various support facilities, including the use of liquefied petroleum gas for power generation. Comet Beach was the proposed landing site for all supplies and fuel. A man camp was proposed for the workers. The Corps evaluated a DA permit application for the creation of an impoundment in Sherman Creek Valley, and the disposal of mine tailings behind that dam. The Corps completed a public notice, public meetings, public hearings on this proposal, but never issued a DA permit for that facility.

In August 1997, the USFS approved a revised POO for the Kensington Gold Project. The modified plan called for off-site processing of a floatation derived gold concentrate; placement of tailings in a dry tailings facility accessed through a pipeline, with 25% of tailings to be paste (wetted cement mixture) backfilled in the underground workings; diesel fuel would be used for power generation; and the tailing slurry would be piped to a dewatering plant and the reclaimed water returned for reuse. Comet Beach was the proposed landing site for supplies and fuel. A camp was proposed for the workers. The Corps of Engineers received a DA permit application for this new facility design. The Corps completed a public notice, public meetings, and public hearings on this proposal. After a thorough evaluation of the project the Corps of Engineers issued a permit for the dry tailings facility and the support infrastructure.

Between the times the 1997 FSEIS evaluated the Kensington Mine Project and the revised Kensington Mine Project proposal in 2001, Coeur gained control of the Jualin Mine site and this changed the land status and gold resource calculations which resulted in a need to modify the Plan of Operation. The previous POO sited all of the mining and milling operations on west side of Lion's Heads Mountain ridge with access and support facilities located at Comet Beach on Lynn Canal. In the 2004 FSEIS, this scenario is represented by all "A" Alternatives. The 2001 revised POO resulted in the siting of the

---

[8] FSEIS, Section 2.2, Overview of Project Alternatives.
[9] ROD, Section VI. Alternatives, below.
[10] See FSEIS, Section 4.21, Cumulative Effects.

RECORD OF DECISION                                       POA-1990-592-M

Site (Dry Tailings Facility). Use of Comet Beach would substantially and unreasonably increase costs and therefore it is impracticable as a docking facility for the Kensington Mine north of Berner's Bay.

Marine Terminal      Construction
  Comet Beach      = $12,202,733.00
  Slate Creek Cove = $ 3,405,996.00

The construction costs for the Comet Beach site included a breakwater, an approach fill and ramp (both below the HTL), and various piles, fenders, anchoring devices, lighting, etc. Although, these items were discussed in the 1997 FSEIS, they are not currently present at Comet Beach.

Comet Beach[40]: Comet Beach is affected by the larger wave action associated with northerly storms; significant exposure occurs from a 0-to-30-mile fetch down Lynn Canal from the north-northwest (302° to 325° from North). Wave exposure is evidenced by the composition of the beach large cobbles, boulders, and wave-deposited debris can be observed in the woods above the high tide line. Site engineering studies performed at Comet Beach indicated that significant armoring would be required for any fill material or structures placed below the high water mark. Comet Beach would be considered a semi-protected to semi-exposed site, based on maximum potential fetch window and wind direction. Point Sherman provides some protection to Comet Beach from waves generated by southeasterly storms.[68]

Traveling to and from Comet Beach, as an alternative to using Slate Creek Cove, to other destinations may result in shorter distances traveled, and correspondingly shorter travel times. However, selection of this site would require construction of a road through wetlands (special aquatic sites) to connect the mine and mill site, at the Jualin Mine site, to Comet Beach, as well as to other facilities not currently proposed. This possibility was further explored by Coeur at the Corps' request:

> "A large breakwater was recommended for Comet Beach, if this route was selected. This would accommodate 8 round trips per 28-day period for marine vessel passenger service from Auke Bay, and fuel and supply shipments from Seattle. The cost of the breakwater was estimated at $12.54 million. This was based on the likelihood of extreme wave heights of 15 to 17 feet being experienced in Lynn Canal over extended winter periods. Marginal reliability was predicted for shuttle ferry transport with 10 foot waves at this location.
>
> A second alternative involving marine access to Kensington by combination of Slate Creek Cove dock and 8.5 miles of new road construction to Comet Beach was also analyzed in the PN&D 1989 study, and dismissed in the 1992 EIS due to environmental and land ownership reasons. The EIS concluded that Lynn Canal access provided significant opportunity for delays during a 60-90 day "winter weather period".[69]

For the reasons stated above, Comet Beach is impracticable for logistical reasons, as well as for cost reasons.

---

[68] Kensington Gold Project, Corps of Engineers 404(B)(1) Practicability Analysis, prepared by Coeur Alaska, Inc. October 2004. Section 3.1.2. Lower risks of weather delays.
[69] Kensington Gold Project, Corps of Engineers 404(B)(1) Practicability Analysis, prepared by Coeur Alaska, Inc., October 2004. Pages 23-4.

24

000027

RECORD OF DECISION                                           POA-1990-592-M

<u>Commuting Ferry vs. Personnel Camp</u>

A daily commuting ferry as described in Section VI of this ROD eliminates the need for an operational personnel camp. Coeur explained in its October 2004 Practicability Analysis that the annual cost to transport personnel to a camp is $5.296 million, compared to $1.49 million for Berners Bay access. Operating costs for a camp are estimated at more than $3 million annually. Operating a camp also requires substantial on-site fuel transportation and storage. It is our determination that Coeur's economic analysis supports the conclusion that a personnel camp is not practicable for cost reasons.

IX. **FINDINGS**

1. OTHER REQUIRED AUTHORIZATIONS:

   A. The Alaska Department of Environmental Conservation (ADEC) has issued a Certificate of Reasonable Assurance, dated May 6, 2005, with 15 conditions. Conditions on this Certification are listed on Attachment D of the ROD.

   The Certificate also stated, with reference to the proposed disposal of processed mine tailings into an alpine lake, that "The Tailing Disposal Facility (TDF) proposed to be constructed in Slate Creek will be considered a 'disposal site' under federal law and policy (see 40 CFR § 230.3(i)), and is hereby authorized as a 'treatment work' under State law (see AS 46.03.900(33)). Thus, State of Alaska water quality standards will not have to be met within that area. 18 AAC 70.010(c). Water discharged from the TDF shall meet NPDES permit limitations, and the receiving water, East Fork Slate Creek, must meet State water quality standards."

   B. The Alaska Department of Natural Resources, Office of Project Management and Permitting, Alaska Coastal Management Program, has issued a Final Consistency Response (Concurrence), dated April 25, 2005.

   C. The USEPA, Region 10, has issued an Authorization to Discharge under the National Pollutant Discharge Elimination System (NPDES Permit), dated September 1, 2005.

   D. See Attachment G for Cascade Point Docking Facility findings.

2. COMMENTS RECEIVED:

   A. Coeur prepared several document summaries, each addressing comments received from Federal and State Agencies, to the Corps Public Notice, dated June 21, 2004, and to the Public Hearings, which were held by the USEPA in accordance with the USEPA's National Pollutant Discharge Elimination System (NPDES) regulations. The public hearings were held on July 26, 2004, in Juneau, Alaska, and on July 27, 2004, in Haines, Alaska (see case file).

   B. <u>FEDERAL AGENCIES</u>

   **US ENVIRONMENTAL PROTECTION AGENCY [USEPA].**

Comment dated August 20, 2004. Also, see Coeur's Response #18 (Attachment C). USEPA's comment letter, with three attachments, pertained to Goldbelt's proposed marine terminal at Cascade Point[70], and to the proposed changes to the Kensington Mine's Plan of Operations, which includes a marine terminal at Slate Creek Cove and a discharge into Lower Slate Lake. The USEPA's comments respective to Coeur's project centered on the 404(b)(1) Guidelines, and after several pages of instructive discussion relative to 40 CFR 230.10, the USEPA "...rated Alternatives A and A1[71] as 'Lack of Objection' and Alternatives B and C as 'Environmental Objections'." The USEPA concluded the cover letter with a request "...to work collaboratively with you and the State to achieve a satisfactory outcome."

**USEPA ISSUE #1.** "...the wetlands analysis in the DSEIS is biased due to the lack of accurate and detailed wetlands mapping on the Kensington side of the project area. Therefore, there is insufficient information to make a reasonable judgment about the comparative effects of Alternatives A/A1 and Alternatives B/C on wetlands."

*CORPS RESPONSE TO USEPA: The wetlands were properly delineated in accordance with the 1987 Manual on both sides of Lion's Heads Mountain and thus there is adequate information to analyze the potential impacts upon wetlands. See the discussion in Section VI (Alternatives Considered) of this ROD.*

**USEPA ISSUE #2.** "With regard to the ecological risk of the tailings disposal options, the DTF [Dry Tailing Facility] (Alternatives A/A1) minimizes the exposure pathways by lining the dry stack cells, capping the dewatered tailings, treating DTF runoff in a storm water detention and sediment pond, and discharging a very small volume of treated water into a small creek devoid of fish. In contrast, the Lower Slate Lake tailings impoundment (Alternatives B/C) directly exposes the entire lake to the tailings, which have exhibited considerable toxicity (per the failed amphipod bioassay)."

*CORPS RESPONSE TO USEPA: Lower Slate Lake is the least environmentally damaging practicable alternative location for the tailings disposal. The tailings will be capped at the cessation of operation unless information is presented to the contrary. See ADEC condition #15. Testing of the tailings and water column of the impoundment will be completed quarterly to insure projected water quality modeling is accurate. See ADEC condition #8. In accordance with 33 U.S.C. 1341(d), all 401 conditions are incorporated into the Department of the Army permit.*
*See Section XI of this ROD, Subpart B, Evaluation and Testing, and Constraints.*

**USEPA ISSUE #3.** "Humpback whales are listed as an endangered species under the Endangered Species Act, and Steller sea lions are listed as a threatened species (although populations of both species appear to be increasing in Southeast Alaska."

---

[70] See Permit Application POA-1997-245-M
[71] Note that Alternative A1 here is the same as Alternative A2 in this ROD.

26

000029

Exhibit D, Page 9

RECORD OF DECISION                                    POA-1990-592-M

*CORPS RESPONSE TO USEPA: See the discussion in Section IX.2.B. ENDANGERED SPECIES ACT (ESA) CONSULTATION PROCESS, in this ROD.*

**USEPA ISSUE #4.** "The DSEIS also documents the potential impacts that each alternative may have on recreation, including noise, wakes, lights, safety issues, and visual impacts."

*CORPS RESPONSE TO USEPA: See the FSEIS, Sections 4.13 (Land Use and Recreation), 4.14 (Visual Resources), 4.15 (Socioeconomics), 4.18 (Noise), and 4.21 (Cumulative Effects).*

**USEPA ISSUE #5.** "After the federal agencies published the DSEIS, but before EPA approved the draft NPDES permit, EPA determined that the proposed effluent limits for some of the above pollutants could not be made without additional treatment. The applicant then revised the NPDES permit application to include a reverse osmosis (RO) wastewater treatment system and a pipeline diversion of Upper Slate Lake flows around Lower Slate Lake."

*CORPS RESPONSE TO USEPA: Coeur has agreed to construct a Reverse Osmosis, or water treatment facility, to aid in the removal of pollutants from water discharged from Lower Slate Lake, as well as construction of a pipeline diversion (of waters around the impoundment and downstream to the dam spillway). These components are part of Alternative D.*

**USEPA ISSUE #6.** "Due to the demonstrated toxicity of the tailings samples in the bioassay tests, and the limited application of other standard test on contaminant mobility and pathways, EPA believes that the tailings slurry is a carrier of contaminants (as defined in the Guidelines at 40 CFR 230.3)." (per the failed amphipod bioassay).

*CORPS RESPONSE TO USEPA: There is no conclusive test data showing that toxic substances in the tailings caused amphipod mortality. The poor survival of the amphipods in the test cell may be attributed to smothering, the nature of how the material was placed, or the floatation agent(s) used in the bulk sample. See FSEIS App. C and the discussion in Section VII above. Tests upon the tailings have conclusively shown that the tailings will not generate an acid discharge or result in a metals leachate being generated. We agree that all fish and most aquatic life would be lost during operation. (FSEIS 4.9.3). The FSEIS concluded that after closure Lower Slate Lake could be restored to at least equivalent aquatic habitat (see FSEIS 4.9.7). Capping of the impoundment tailings was added as a permit condition by ADEC to isolate any potential contaminants from the water column and to provide habitat for re-colonization in the storage facility. The State of Alaska issued a 401 Certificate of Reasonable Assurance for Alternative D. ADEC also stated that "the available information suggests that the toxicity risks associated with the tailings will be low during and after mining operations."[72] Conditions were incorporated by ADEC to ensure that no potential contaminants would leave the disposal site condition #15. ADEC included a requirement for testing of the material on a quarterly basis condition #8. In addition the Corps agrees to add the following condition to the permit #10. The waters and the discharged processed mine tailing sediments, located in Lower Slate Lake, shall be tested, at lake closure or just prior to cessation of discharges of mine wastes into Lower Slate Lake, in accordance with appropriate testing requirements (at the*

27

RECORD OF DECISION                                    POA-1990-592-M

*time of closure) for the presence of toxic materials and contaminants. The results shall be made available to the United States Army Corps of Engineers, Alaska District, Regulatory Branch, for dissemination to the appropriate State and Federal resource agencies. Also see the Corps response to Issue #2, above.*

The USEPA's primary concerns, as stated, centered on the potential impacts of the current impoundment proposal on the State of Alaska Water Quality Standards.

*CORPS RESPONSE TO THIS ISSUE: The Corps decision was reached in conformance with the permitting framework outlined in the USEPA memorandum, entitled, "Clean Water Act Regulation of Mine Tailings", dated May 17, 2004, and within the regulations found in 33 CFR Part 323, and 40 CFR Part 232, Final Revisions to the Clean Water Act Regulatory Definitions of "Fill Material" and the "Discharge of Fill Material". The Alaska Department of Environmental Conservation's Certificate of Reasonable Assurance (Section 401 Water Quality Certification) stated "The Tailing Disposal Facility (TDF) proposed to be constructed in Slate Creek will be considered a 'disposal site' under federal law and policy (see 40 CFR § 230.3(i)), and is hereby authorized as a 'treatment work' under State law (see AS 46.03.900(33)). Thus, State of Alaska water quality standards will not have to be met within that area. 18 AAC 70.010(c). Water discharged from the TDF shall meet NPDES permit limitations, and the receiving water, East Fork Slate Creek, must meet State water quality standards." For the reasons as set forth in Section VII above, and in the attached Section 404(b)(1) Analysis, Alternative D is the least environmentally damaging practical alternative compared to all alternatives including Alternative A or the variations of Alternative A (i.e., A1, A2 and A3).*

Special Conditions Recommended by the USEPA.

The USEPA recommended 12 special conditions. The substance of the USEPA's recommendations which were necessary to satisfy the public interest criteria, were edited and/or reworded and were incorporated into the Corps permit:

**Suggested Condition 1.** The 404 permit should require a post-closure lake restoration plan including: specific and measurable restoration objectives; specific restoration methods and techniques; a compliance schedule for implementing the plan; and a detailed monitoring and evaluation program to determine whether the specified methods are being implemented on schedule and whether they are effective in achieving the lake restoration objectives.

*CORPS RESPONSE TO USEPA: See response to Condition number 2, below; also, see Section XI, Subpart G, Constraints. This subject is discussed and contained in the Mining Plan of Operations' Reclamation Plan. The Plan has been incorporated into, and is a part of the Final Plan Of Operations for the Kensington Gold Project, dated May 2005, Appendix 4-C, and is enforceable by the USFS. The USFS's Final Plan of Operations has been incorporated as a condition of the Corps permit.*

**Suggested Condition 2.** The 404 permit should require engineered capping of the tailings disposal site in Lower Slate Lake with clean material [see 40 CFR 230.72(b)]. The purpose of capping the tailings is to confine and isolate the toxic material from the aquatic environment, provide a suitable substrate for benthic

28