IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

| | |
|---|---|
| SOUTHEAST ALASKA CONSERVATION COUNCIL, et al., | )<br>)<br>) |
| Plaintiffs/Appellants, | )<br>) |
| vs. | ) No. 06-35679<br>) |
| UNITED STATES ARMY CORPS OF ENGINEERS, et al., | )<br>)<br>) |
| Defendants/Appellees, | ) **DECLARATION OF**<br>) **ALAN L. WILDER**<br>) |
| and | )<br>) |
| COEUR ALASKA, INC., et al., | )<br>)<br>) |
| Defendant-Intervenor -Appellees. | )<br>)<br>) |

I, Alan L. Wilder, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am Senior Vice President, Project Development for the Coeur d'Alene Mines Corporation. I have overall responsibility for construction of the Kensington Mine Project owned by Coeur Alaska, Inc. ("Coeur Alaska").

2. I have personal knowledge of the factual statements made in this declaration, and they are true and accurate to the best of my knowledge.

[41643-0005/SL062290.011_1.doc]

## Construction Status

3. Kensington project construction activities at the Lower Slate Lake site have been ongoing under our approved plan of operations for the past several months, and most have already been completed. For example, the trees around the lake, which we began clearing in the fall of 2005, have already been cut back to the larger footprint that the lake will occupy at Project completion. The roads are built, shrubs have been cleared, and wetlands removed. An earthen coffer dam (the temporary barrier that excludes water from the dam construction area) and other structures are in place and are already diverting the natural flow of the creek around the lake. The State of Alaska agencies have approved the fully functioning stream diversions necessary to convey storm and runoff flows, and protect the aquatic environment.

4. The construction at the lake site that remains is primarily to complete the earthen impoundment dam. The dam will be built in three stages; Coeur Alaska is currently in the process of constructing Stage I. This includes clearing soil and other materials down to the bedrock, placing compacted native rock fill, and installing a geosynthethic liner. At this point, the wetlands and shallow soils at the dam location have already been excavated or otherwise disturbed. We are close to bedrock and completion of excavation for the dam base area. The Stage I dam will ultimately be built to a height of 38 feet and will have a gradual slope. Kensington Gold Project, Final Supplemental Environmental Impact Statement

(FSEIS) at 2-30 (Ex. B). (Exhibit references are to Coeur Alaska, Inc.'s Opposition to Emergency Motion for Injunction Pending Appeal.) The Stage I dam will also include a spillway to be constructed out of native rock.

5. I understand that the appeal of the District Court decision in this lawsuit may take between one to two years. During the period of the appeal, only Stage I of the dam will be completed. Indeed, the dam is only permitted for Stage I construction. Stages II and III require further Alaska Department of Natural Resources approvals as contemplated in the mine plan and will be completed as mining progresses in future years. Construction of Stage II will not be initiated until at least the third year of active mining, in 2010.

## Lack of Harm From Completing Stage I of the Dam and Other Related Construction

6. The completion of Stage I of the dam and other structures will not further change the current level of Lower Slate Lake or alter the current ecological status at the lake site. In accordance with plans that were filed with and approved by the relevant agencies, Coeur Alaska has already installed pipelines and other facilities to divert natural surface flows around Lower Slate Lake. These structures carry water flowing toward the lake from Slate Creek and elsewhere, carry it around the lake, and discharge it back into Slate Creek below the lake. These initial temporary structures are for the current construction period and are scheduled to be replaced by more capacious and durable structures in the same

footprint, to assure that water quality and minimum flow requirements are maintained throughout the life of the Project. Thus, completion of the Stage I dam and installation of the longer-term diversion structures will simply retain the current flow regime.

7. Completion of the dam will not affect additional wetlands. While there were some wetlands in the area where the stage I dam is now being constructed, they have already been filled, removed or otherwise disturbed as part of the construction of the dam. The Corps of Engineers concluded that the construction of the dam would result in the loss of 3.44 acres of wetlands that were situated at the location of the dam, and the Corps concluded that this loss was not significant. Revised Department of the Army Record of Decision and Permit Evaluation for the Kensington Gold Project (ROD) at 32 (Ex. D). The Corps also noted that completing the Project will create 15 acres of valuable vegetated shallows and emergent wetlands. ROD at 19 (Ex. D).

8. As indicated above, Coeur Alaska must install longer-term diversion pipes to replace the temporary pipes that are currently in place. The temporary structures were not designed to last through the winter freeze and spring melt. Failure of these temporary structures could create serious environmental and safety consequences. The replacement diversion pipes will not additionally affect the site because the temporary structures have already altered the flow of water. Similarly, Coeur needs to complete a low-profile surface runoff diversion ditch along the

western, uphill side of the lake site to augment the diversion capacity of the pipelines, in order to maintain the current lake level and continue diversion of water around the lake site, as precipitation and runoff increase substantially between late fall and spring. Completing this ditch is important to maintain stable water flows at the site and protect downstream water quality. The longer-term diversion pipes and ditch will remain in place for the life of the Project. The pipes will be removed and the ditch filled during site reclamation, when natural flows will be restored.

9. The tailings pipeline is in progress along an already cleared corridor, and simply needs to be extended to the lake. This pipeline will also be removed at the close of the Project as part of reclamation.

### Adverse Environmental and Safety Consequences From Stopping Construction

10. Stopping construction at this point would create serious environmental as well as safety risks. The area is currently a construction site in progress. Stopping work at this juncture would leave the site inadequately stabilized. This is a complex, integrated project, with each interdependent component carefully sequenced in light of seasonal, logistical, safety, and other constraints. The construction process cannot be left idling in mid-course. The environmentally sound and safe course is to allow construction to proceed in accordance with the approved plan and schedule.

11. Examples of project construction elements that, if left unfinished, would pose an environmental risk include: (1) the temporary diversion piping that, by definition, is not designed for long-term use. The temporary structures were not designed to last through the winter freeze and spring melt. The natural water channels are no longer present and failure of these temporary structures could create serious environmental and safety consequences; (2) the partially constructed areas with erosion and run-off risks; (3) the temporary earthen coffer dam is not designed to be a long-term retention structure and could be breached by high precipitation or runoff between fall and spring, during which most of the 75 inches of average annual precipitation in the lake area falls. In accordance with the dam safety permit issued by the Alaska Department of Natural Resources, the existing coffer dam is designed to be replaced with the Stage I dam that is already under construction; (4) the current excavation at the dam area that would become unstable if the Stage I dam is not completed. Construction of the dam according to the approved plan and schedule is the necessary and most effective means to stabilize the now disturbed land area and soils lying in the footprint of the impoundment.

12. These environmental concerns are most effectively minimized and resolved by the completion of the Stage I dam, its associated spillway, the western side diversion ditch and replacement of the temporary diversion piping with the planned more sturdy and durable piping. These activities are designed to manage

water levels and flows, stabilize soils, and protect downstream aquatic habitat and water quality.

### Economic Harm From An Injunction

13. I have evaluated the effect on staffing and construction costs caused by the delay that would arise from an injunction of construction activities around the lake. Such an injunction would adversely affect the overall construction schedule and the startup date for gold production. My analysis considered various personnel and resources independently to determine if and how they would be utilized during any delay period. Coeur Alaska would incur large costs during such a delay that it would not otherwise incur. In addition, Coeur Alaska would be forced to make difficult decisions as to scheduling which will inevitably result in layoffs. Thus, the financial impact of delay would not only fall on Coeur Alaska but also on the men and women who would lose their paychecks.

14. With any such delay, Coeur Alaska would incur extensive additional contractor-related costs. These would include the cost of demobilization and remobilization of a great number of personnel and very large equipment. There are also very substantial costs associated with holding and storage and winterization of those materials and equipment that cannot be effectively demobilized. Moreover, there would be costs arising out of maintenance activities that Coeur Alaska would not otherwise incur. One example of this would be efforts to stabilize the already impacted areas with interim sediment controls, silt screens, and additional

diversions and other related activities. Altogether, these contractor-related costs due to an injunction would be very expensive to Coeur Alaska. I believe that in the first two months alone they would exceed $3.6 million. Thereafter the cost per month could be at least $400,000. Remobilization and startup costs after the injunction is lifted would be approximately $3.5 million. Thus, if an injunction led to a delay of 12 months, the excess contractor-related costs would likely be about $10.9 million, and a delay of 18 months would be about $13.5 million.

15. In addition, Coeur Alaska would incur personnel and productivity related costs such as those associated with loss of qualified and experienced managers and operators and availability of equipment due to a shutdown, and then ramping up of construction, re-establishment of contractor offices and infrastructure, and rehabilitation of work areas. These costs are not included in the above direct personnel and equipment demobilization and remobilization costs. For a 12-month delay, the additional personnel and productivity related costs are estimated at $18.1 million; contract extension costs of $82,000; equipment storage and maintenance costs of $135,000; and security and other site maintenance costs of $198,000. If the delay were 18 months, these delay costs would rise to an estimated $24.1 million for personnel and productivity-related costs; $95,000 in contract extension costs; $205,000 in equipment storage and maintenance costs; and $328,000 in site maintenance costs.

16. Delay caused by an injunction will cause Coeur Alaska to lose the value of many equipment warranties. This is because the equipment will not be put into service during the warranty period if start-up is delayed. I estimate that the cost to Coeur Alaska of replacing or repairing equipment that would have been under warranty but for the injunction delay would be $1 million.

17. Thus, taken together, the reasonably foreseeable and quantifiable extra costs are likely to exceed an estimated $30.4 million for a 12-month delay and $39.2 million for an 18-month delay. There will likely be substantial additional losses that are currently difficult to foresee and quantify.

18. Under an extended delay scenario, approximately 50 people associated with the project would remain on the payroll of Coeur Alaska or its contractors. If the project were in full swing, the number of persons on the payroll would be approximately 350 persons. This difference will be felt by families and the community as lost paychecks.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 17, 2006.

*Alan L. Wilder*
Alan L. Wilder