David C. Crosby
David C. Crosby, P.C.
5280 Thane Road
Juneau, AK 99801-7717
Telephone: (907) 586-6262
Facsimile: (907) 586-5959
E-mail: crosbylaw@gci.net

Attorney for Intervenor/Defendant
Goldbelt, Inc.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA AT JUNEAU

| | |
|---|---|
| SOUTHEAST ALASKA CONSERVATION COUNCIL, et al., | ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| UNITED STATES ARMY CORPS OF ENGINEERS; et al., | ) ) ) |
| Defendants, and | ) ) |
| COEUR ALASKA, INC., a Delaware Corporation, et al., | ) ) ) |
| Intervenor/Defendant. | ) Case No. J05-0012 CV (JKS) |

INTERVENOR/DEFENDANT GOLDBELT, INC.'S
OPPOSITION TO MOTION FOR INJUNCTION PENDING APPEAL

I.      INTRODUCTION.

Intervenor/Defendant Goldbelt, Inc. ("Goldbelt") is mindful of the burden imposed on this Court reviewing the briefs of multiple parties, and will limit its brief to a description of the devastating impacts that an injunction pending appeal would have on Goldbelt, its shareholders, and other Alaska Natives in northern Southeast Alaska.[1]  In addition to the other requirements for obtaining the extraordinary relief of an injunction pending appeal under the circumstances of this case, the plaintiffs must demonstrate that the equities tip <u>sharply</u> in their favor.  In fact, they tip sharply in the opposite direction.

The Natives of Southeast Alaska, including Goldbelt's shareholders, suffer from unemployment and underemployment rates two-to-three times those of non-Natives and have per capita incomes less than half of their non-Native counterparts.[2]  As related in the attached Declaration of Goldbelt Board Member Randy Wanamaker, the Kensington Mine has been a ray of hope in an otherwise dismal economic picture.  Currently in its construction phase, the

---

[1]    The remaining requirements for issuance of an injunction pending appeal are discussed well and fully in the briefs of the federal defendants and Coeur Alaska, Inc.  Goldbelt adopts those arguments.

[2]    Declaration of Randy Wanamaker ("Wanamaker Decl.") ¶ 20.

Kensington mine already provides meaningful employment to an estimated 75 Alaska Natives.[3]

"No other company," Mr. Wanamaker states, "has ever worked so conscientiously as Coeur Alaska, Inc. ("Coeur") to involve the Natives of northern Southeast Alaska in the planning of its activities, or been so diligent in its efforts to ensure that Alaska Natives are included in the economic benefits to be derived from its operations."[4] The relief requested by the plaintiffs threatens to erase the unprecedented economic gains already made by, and anticipated yet to come to, Alaska Natives as a result of the Kensington Mine Project.

II. AN INJUNCTION PENDING APPEAL WOULD CAUSE IRREPARABLE HARM TO GOLDBELT, ITS TLINGIT SHAREHOLDERS AND OTHER NATIVE COMMUNITIES IN SOUTHEAST ALASKA.

Goldbelt was formed pursuant to Section 14(h)(3) of the Alaska Native Claims Settlement Act, 43 U.S.C. § 1613(h)(3), to receive and administer land and other benefits on behalf of Tlingit Indians residing in or having historical ties to the Juneau area.[5]

---

[3] Wanamaker Decl. ¶ 21.

[4] Wanamaker Decl. ¶ 23.

[5] Wanamaker Decl. ¶ 2.

Included in the settlement lands conveyed to Goldbelt by the United States is Cascade Point across Berners Bay from the Kensington Mine site.[6] Berners Bay lies in the heart of the aboriginal territory of Goldbelt's shareholders, and is still used by the Tlingit for subsistence hunting and fishing.[7] Goldbelt has struggled with profitability. Its economic future depends significantly on its ability to develop its property at Cascade Point.[8] When Coeur Alaska, Inc. ("Coeur") revised its Plan of Operations to access the Kensington Mine from Berners Bay, Goldbelt applied for and obtained permits to construct a marine terminal at Cascade Point to shuttle mine workers from the Juneau road system to the mine site.[9]

Goldbelt has entered into a long-term agreement to lease the Cascade Point marine terminal to Coeur and to provide mine worker transportation from parking areas close to Juneau to the terminal, and thence across Berners Bay to

---

[6] Ironically, these lands were part of a congressionally approved exchange designed, in part, to mollify plaintiff Sierra Club, which had sued to keep Goldbelt from selecting more valuable timber lands on Admiralty Island. Having chased Goldbelt off of Admiralty, the Sierra Club and SEACC went on to oppose and frustrate every attempt by Goldbelt to put its Cascade Point lands to economic use. Wanamaker Decl. ¶¶ 12, 14.

[7] Wanamaker Decl. ¶ 10.

[8] Wanamaker Decl. ¶ 13.

[9] Wanamaker Decl. ¶ 15.

4

the mine site. Goldbelt plans to complete the dock and commence shuttle operations before the end of this year.[10]

Goldbelt has already expended more than three-quarters of a million dollars in its efforts to permit and construct a dock facility at Cascade Point, including nearly $200,000 in engineering for the proposed marine terminal. Once the terminal is operational, Goldbelt expects to realize over $500,000 in annual profit from operation of the terminal and related transportation services, providing much needed long term employment for 12-15 of Goldbelt's Tlingit shareholders.[11]

Because the marine terminal is tied to the fate of the Kensington Mine,[12] the immediate consequence of an injunction pending appeal will be a delay of indeterminate duration in constructing the terminal and start up of transportation services, resulting in an annual loss of $525,000 in profit, 12-15 shareholder jobs, and additional carrying costs for the approximately $750,000

---

[10] Wanamaker Decl. ¶¶ 16, 17.

[11] Wanamaker Decl. ¶¶ 17, 18.

[12] The permits for the Cascade Point marine terminal restrict its use to mine shuttle operations. Wanamaker Decl. ¶ 15. The plaintiffs have challenged the Clean Water Act § 404 dredge and fill permit issued to Goldbelt by the Corps of Engineers on the ground that if they succeed in stopping the Kensington Gold Project there will be no permitted use for the Cascade Point terminal.

Goldbelt already has invested in the project.[13]  An injunction pending appeal depriving Goldbelt of the ability to put to productive use the lands conveyed to it by Congress for economic development purposes is not in the public interest. *See City of Angoon v. Marsh*, 749 F.2d 1413, 1418 (9th Cir. 1984) (public interest as expressed by Congress in ANCSA weighed against injunction and favored allowing Alaska Native Corporation to continue timber harvest on its lands adjacent to Admiralty Island National Monument).

Goldbelt will not be alone in suffering the impacts of a Kensington Mine Project shut down.  As part of its extraordinary and unprecedented efforts to reach out to Alaska Natives, in 1996 Coeur entered into a Memorandum of Understanding with Goldbelt and the Native Village Corporations for Kake and Haines in which Coeur committed itself to specific Native hire goals and bidding preferences to Native owned or affiliated companies.  Coeur formed a joint venture (60 percent funded by Coeur) with these same Native corporations to train and recruit mine workers.[14]  The results have been impressive.

At the present time an estimated 75 Alaska Natives -- who might otherwise be unemployed or underemployed -- are employed by Coeur, its construction contractors, or one of the five Native owned companies working at

---

[13]   Wanamaker Decl. ¶ 18.

[14]   Wanamaker Decl. ¶ 8, 21.

the mine site.[15]  One of these companies is a Goldbelt subsidiary, employing six shareholders that provides site security, and generates roughly $1 million per year in gross revenues. Still other Alaska Natives are undergoing training in anticipation of being hired at the Kensington Mine.[16]  Goldbelt also leases equipment to Coeur for $2,700 per month.[17]  As Mr. Wanamaker starkly states: "This unprecedented flow of economic benefits to Juneau area Tlingit will come to an abrupt halt if the Court issues the injunction requested by [plaintiffs]."[18]  The public interest in promoting current employment for economically disadvantaged Alaska Natives weighs heavily in favor of denying the injunction. *See*, *e.g., McGregor Printing Corp. v. Kemp*, 811 F.Supp. 10, 14 (D.D.C. 1993), *rev'd on other grounds* 20 F.3d 1188 (D.C.Cir. 1994) (high unemployment among blind workers weighed strongly against granting injunction pending appeal that would have resulted in loss of work for workshops operated by the blind); *County of San Diego v. Babbitt*, 1993 WL 476414 (S.D. Cal. Oct. 15, 1993), slip op. * 5 (preliminary injunction of landfill construction denied, despite allegations of groundwater contamination, where

---

[15]   Wanamaker Decl. ¶ 21.

[16]   Wanamaker Decl. ¶ 23.

[17]   Wanamaker Decl. ¶ 22.

[18]   Wanamaker Dec. ¶ 22.

"[d]elay in the construction of the Project will deprive the Campo Band [of Mission Indians] of much-needed revenue and employment.").[19]

III.  AN INJUNCTION PENDING APPEAL WOULD ALSO CAUSE IRREPARABLE HARM TO OTHER SOUTHEAST ALASKA COMMUNITIES.

Alaska Natives, of course, are not the only ones who will be devastated if the Court grants the relief requested by the plaintiffs. The region is losing population and personal incomes are declining.[20] Rural areas, such as the Native Village of Kake, have been particularly hard hit by recent declines in the timber and fishing industries. Job creation has tended to be in the tourism and retail industries and are often seasonal, typically low paying and without benefits.[21]

Coeur and its construction contractors are currently providing full time, high paying jobs to over 300 people, more than 70 percent of whom are

---

[19]  The rules of the Southern District of California do not prohibit citation of unpublished opinions. A copy of the decision is attached.

[20]  Wanamaker Decl. ¶¶ 24, 25. Mr. Wanamaker is in a unique position to observe these impacts. In addition to his position on the Goldbelt Board of Directors, he serves on the City and Borough of Juneau Assembly and as Deputy Mayor of the City and Borough of Juneau and the Board of the Southeast Conference, a non-profit organization of governmental and private entities working to meet the transportation, energy, social welfare and economic needs of Southeast Alaska. Wanamaker Decl. ¶¶ 6 and 7.

[21]  Wanamaker Decl. ¶ 26.

Alaskans. Once in operation, the mine will employ about 225 people with an annual payroll of $16 million and creation of an additional 500 indirect and induced jobs in the economy.[22] Overwhelmingly, private citizens and area businesses identified the Kensington Mine as one of the most, if not the most, important development for Juneau's economic future. All of these hopes and expectations, of course, will be frustrated for an indefinite period of time if the Court grants the injunction requested by plaintiffs.

If the Kensington Mine Project is enjoined, Juneau will see an immediate rise in unemployment and demand for services coupled with a decline in municipal revenues.[23] Granting an injunction pending appeal that would throw 300 people out of work, suspend numerous active contracts, and defeat the expectations of area governments is clearly not in the public interest.

IV.   AN INJUNCTION, IF ISSUED, SHOULD BE SECURED BY A SUBSTANTIAL BOND TO PROTECT GOLDBELT.

Interlocutory injunctions normally must be secured by a bond. Rule 65(c), for example, provides that

---

[22]   Wanamaker Decl. ¶ 27.

[23]   Wanamaker Decl. ¶ 29.

> No restraining order or preliminary injunction shall issue
> except upon the giving of security by the applicant, in such
> sum as the court deems proper, for the payment of such costs
> and damages as may be incurred or suffered by any party who
> is found to have been wrongfully enjoined or restrained.

Rule 62(c) provides for such security, as does Appellate Rule 8(a)(2)(E).

The requirement is not suspended simply because the applicant claims to be acting in the public interest. The Clean Water Act citizen suit provision, for example, provides that if a temporary restraining order or preliminary injunction is sought, the court may require a bond or equivalent security. 33 U.S.C. § 1365(d). Save Our Sonoran, Inc. v. Flowers, 408 F.3d 1113, 1126 (9th Cir. 2005) (upholding $50,000 bond required of a non-profit citizen suit plaintiff as a condition of issuing a preliminary injunction in Clean Water Act case).

A fortiori, a bond should be required where the requesting party not only has failed to make the usual showing of likelihood of success on the merits required for a TRO or preliminary injunction, but seeks an injunction pending appeal after losing in the trial court -- when the odds that any restraint will be found wrongful are correspondingly much higher.

An injunction pending appeal, were it to last for one year, would cost Goldbelt an estimated $525,000 in lost profits pursuant to its agreement to provide transportation services to mine workers. Goldbelt would also lose

roughly $1 million in revenues under its existing contract to provided security to the mine site, and $2,700 per month in equipment lease fees. Many Goldbelt shareholders would be thrown out of work.

For the reasons set forth in the briefs of the federal defendants and Coeur, and because the equities tip sharply against the plaintiffs, there is simply no basis for granting the extraordinary remedy of an injunction pending appeal. No bond can compensate for the broader socioeconomic ramifications of an injunction on Goldbelt, its shareholders and other Alaskans from an injunction. In the event that the Court nevertheless does decide to issue an injunction, however, Goldbelt requests that a bond of no less than $1.5 million, in addition to whatever bond the Court might require to secure Coeur and other defendant parties, be required to secure Goldbelt from the losses it will suffer if the

Kensington is wrongfully enjoined. While Goldbelt's shareholders lack the resources to shoulder the losses arising from a wrongfully issued injunction, the plaintiffs can and should.[24]

DATED this 22 day of August, 2006, at Juneau, Alaska.

        Respectfully submitted,

        DAVID C. CROSBY, P.C.

        /s/ David C. Crosby
        David C. Crosby
        5280 Thane Road
        Juneau, AK 99801-7717
        Phone: (907) 586-6262
        Fax: (907) 586-5959
        E-mail: crosbylaw@gci.net
        Alaska Bar No. 7106006

        Attorney for Intervenor/
        Defendant Goldbelt, Inc.

CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2006, a copy of the foregoing document

---

[24] As of December 2004, plaintiff Sierra Club had over $59 million in assets, including $11 million in cash. In 2004 it had gross revenues of over $94 million. After operating expenses of over $89 million, the Sierra Club earned nearly $5 million in net income in 2004. (Sierra Club Fiscal Statement dated December 31, 2004, reproduced in Dun & Bradstreet Comprehensive Report, May 17, 2006, at 14-15.)

was served electronically on:

    Demian A. Schane
    Thomas S. Waldo
    Eric P. Jorgensen
    EARTHJUSTICE
    325 Fourth Street
    Juneau, AK 99801

    Mark A. Nitczynski
    U.S. Department of Justice
    Environmental Defense Section
    1961 Stout Street – 8th Floor
    Denver, CO 80294

    John C. Berghoff, Jr.
    Susan E. Brice
    Michael P. Rissman
    Mayer, Brown, Rowe & Maw LLP
    71 S. Wacker Drive
    Chicago, IL 60606-4637

    Ruth Hamilton Heese
    Assistant Attorney General
    Department of Law
    P.O. Box 110300
    Juneau, AK 99811-0300

    Cameron M. Leonard
    Assistant Attorney General
    Environmental Section
    100 Cushman St., Suite 400
    Fairbanks, AK 99701

    John W. Hartle
    City and Borough of Juneau
    Department of Law
    155 S. Seward Street
    Juneau, AK 99801

Amy Gurton Mead
Robertson, Monagle & Eastaugh P.C.
801 W. 10th Street, Suite 300
Juneau, AK 99801

Stephen F. Sorensen
Simpson, Tillinghast & Sorensen
One Sealaska Plaza, Suite 300
Juneau, AK 99801

/s/  David C. Crosby
David C. Crosby
5280 Thane Road
Juneau, AK 99801-7717
Phone: (907) 586-6262
Fax: (907) 586-5959
E-mail: crosbylaw@gci.net
Alaska Bar No. 7106006

OpposBriefUSDC 8 21 2006.Goldbelt
August 21, 2006