DECLARATION OF RANDY WANAMAKER

RANDY WANAMAKER declares under penalty of perjury as follows:

1. My name is Randy Wanamaker. I reside at 3814 Killewich Drive, Juneau, Alaska, 99801. I am making this declaration based on my personal knowledge of all the facts recited below and in opposition to Appellants' Emergency Motion Under Circuit Rule 27-3 for an injunction pending appeal of the decision of the United States District Court for the District of Alaska dismissing their complaint in <u>Southeast Alaska Conservation Council, et al. v. United States Army Corps of Engineers</u>. This Declaration supplements my attached Declaration of May 3, 2006 (Attachment 1), which was submitted to the District Court as an attachment to the Amicus Curiae brief of the Southeast Conference.

2. I am a Tlingit Indian. I am a shareholder in Intervenor/Appellee Goldbelt, Inc. ("Goldbelt"), the Native Urban Corporation formed pursuant to the Alaska Native Claims Settlement Act ("ANCSA") to receive and administer lands and other benefits on behalf of the Tlingit Indians residing in or having historical ties to the Juneau area, including Berners Bay where the Kensington Mine is located. Because of the critical importance of the Kensington Gold Project to the

economic future of Goldbelt and its shareholders, as discussed in greater detail below, Goldbelt has joined with the federal defendants, Coeur Alaska, Inc. ("Coeur"), and the State of Alaska ("Alaska") as intervenors in opposition to plaintiffs' efforts to kill the Kensington Gold Project.

3. I have been active in the affairs of Goldbelt in general, and specifically in their efforts to develop Goldbelt's lands in the Echo Cove/Cascade Point area, since 1993. From 1993 to 2001, and from 2003 to present I have served as a director of Goldbelt. From 2001 to 2003 I served as Chairman of the Board of Directors of Goldbelt.

4. I am a Certified Professional Geologist and Registered Environmental Assessor. From 1980 to 1990 I served as the Subsurface Resource Manager for Sealaska Corporation supporting and advising Goldbelt in regards to geologic and environmental issues.

5. I have carefully reviewed the attached Declaration of Joe Kahklen dated October 12, 2005 (Attachment 2), and submitted to the District Court in support of Goldbelt's motions for leave to participate in the litigation as an intervenor/defendant and in opposition to plaintiffs' motion for summary judgment. The statements made Chairman Kahklen are true to my own personal knowledge.

6. Since 2001 I have served as an elected member of the Assembly of the City and Borough of Juneau ("CBJ") Assembly. I currently serve as Deputy Mayor of CBJ and am personally acquainted with the overall status of economic activity in the City and Borough. Because CBJ has permitted the Kensington Gold Project, as well as Goldbelt's marine terminal at Cascade Point, and because of the critical importance of the Kensington Gold Project to the economy of Juneau and the surrounding areas, CBJ has participated in the litigation as an amicus curiae urging the court to permit the Kensington Gold Project to go forward.

7. Both Goldbelt and CBJ are members of the Southeast Conference, a non-profit organization working to meet the transportation, energy, social welfare and economic needs of Southeast Alaska. I serve as a director of the Southeast Conference, and in that capacity I am generally familiar with depressed economic conditions throughout Southeast Alaska. Because the Kensington Gold Project is critically important to the future of Southeast Alaska, the Southeast Conference submitted an amicus curiae brief urging the court to reject the plaintiffs' challenge to the Kensington Gold Project.

8. From 1996 to 2003 I served as the coordinator of the Berners Bay Consortium ("BBC"), composed of the Native Urban/Village Corporations of Goldbelt, Kake and Klukwan, and

liaison for BBC with Coeur. BBC was formed in 1996 to provide mine support services, and entered into a Memorandum of Understanding with Coeur dated January 29, 1996, discussed in greater detail below. From 2005 to the present, I have served as the Executive Director of the BBC Human Resource Development Corporation (BBCHRDC), where I am responsible for identifying, recruiting and training Alaska Natives and Alaska residents for employment at the Kensington Mine. The BBCHRDC is a joint venture owned in equal parts by Kake Tribal Corporation, Klukwan, Incorporated, Goldbelt, Incorporated and Coeur Alaska, Incorporated.

9. Because of the critical importance of the Kensington Gold Project to the Native Communities of Juneau, Kake and Klukwan (Haines), BBC also filed an amicus curiae brief urging the Court to reject plaintiffs' claims. I have carefully considered the attached Declaration of Duff W. Mitchell (Attachment 3), and concur, based on my own personal knowledge, with his statements concerning the importance of the Kensington Gold Project to the Native communities of northern Southeast Alaska.

### ISSUANCE OF AN INJUNCTION PENDING APPEAL WOULD HAVE A DEVASTATING IMPACT ON GOLDBELT

10. The site of the Kensington Mine, on Berners Bay some 40 miles north of Juneau, lies in the heart of Tlingit Indian

aboriginal territory. Like my ancestors before them, many Juneau Tlingit continue to fish and hunt for subsistence purposes in the Berners Bay area.

11.  Although Goldbelt is headquartered in the Juneau area, virtually all of the valuable land on the Juneau road system had already been granted to others by the time ANCSA was enacted in 1971. Consequently, Goldbelt was forced to select its land entitlement in relatively remote areas.

12.  Goldbelt acquired its lands at Cascade Point on Berners Bay in 1983 as part of a Congressionally approved land exchange with the United States – after environmental groups, including Appellant Sierra Club and other plaintiffs in this litigation, sued to stop Goldbelt from exercising its rights under ANCSA to select valuable timber lands on Admiralty Island. Although the exchange was intended to appease the Sierra Club and the environmental community, and to provide Goldbelt with the quiet enjoyment of substitute lands that were then regarded as less environmentally sensitive, the plaintiffs have continued to oppose and frustrate every effort by Goldbelt to develop these lands.

13.  Over the years, Goldbelt has struggled to maintain profitability. Goldbelt's future economic well being hinges, in significant part, on its ability to develop its land at Echo Cove and Cascade Point. These lands are currently zoned

5

by CBJ as "new growth area." Goldbelt has developed a Master Plan for this area with a focus on service to the mining, tourism and fishing industries.

14. In 1998 Appellant SEACC and others succeeded in defeating Goldbelt's application to build a dock at Cascade Point by arguing, in part, that there was no economic need for the dock at that time. SEACC also opposed Goldbelt's application for road access to the Cascade Point area for administrative purposes.

15. When Coeur revised its Plan of Operations to shift mine access to Slate Creek Cove on Berners Bay, Goldbelt renewed its applications to construct a marine terminal at Cascade Point to serve, among other purposes, as a shuttle point for mineworkers residing in Juneau. CBJ and United States Army Corps of Engineers issued permits to construct the facility, but limited its use to mine worker ferry operations.

16. Goldbelt has entered into a long-term agreement with Coeur to lease the Cascade Point marine terminal and other properties and to provide mine worker shuttle services to and from Cascade Point (including land transportation from designated parking areas in Juneau to the Cascade Point terminal). The terms of this agreement will enable Goldbelt to amortize the cost of acquiring transportation equipment and constructing the marine terminal, and in addition to generate

6

employment and significant profits for Goldbelt's shareholders.

17. To date, Goldbelt has invested roughly three-quarters of million dollars in its efforts to permit and construct a dock at Cascade Point. Engineering for the marine terminal (at a cost of nearly $200,000) is virtually complete, and contracts for dock and breakwater construction will be finalized in coming weeks. After years of frustration, Goldbelt is finally prepared to construct the terminal. Goldbelt can complete the dock this construction season and begin ferrying workers to the mine site by the end of the year.

18. Construction of the Cascade Point terminal is linked to continuing construction and operation of the Kensington Mine. If the Kensington project tailings facility construction is enjoined pending resolution of an appeal, the current construction season on the marine terminal also will be will be lost or abbreviated. Completion and commencement of operation of the terminal will be delayed for at least an equivalent period of time. An injunction pending appeal, would cost Goldbelt anticipated profits of $525,000 annually from operation of the terminal and provision of miner transportation services. Twelve-to-fifteen shareholder jobs would be lost. An injunction would also jeopardize the

hundreds of thousands of dollars Goldbelt already has invested in permitting and developing its Berners Bay properties, and cause irreparable harm to Goldbelt's long standing efforts to make economic use of those lands.

19.  In addition to the economic benefits tied to construction and operation of the marine terminal, Goldbelt and its shareholders anticipate that they will share in other economic opportunities and benefits created by the Kensington Mine as described more specifically below, all of which will be lost or deferred indefinitely if the Court enters the injunction requested by the Appellants.

### ISSUANCE OF AN INJUNCTION PENDING APPEAL WOULD HAVE A DEVASTATING IMPACT ON THE NATIVE COMMUNITIES OF SOUTHEAST ALASKA

20.  My own observations, confirmed by a recent University of Alaska study, are that unemployment and underemployment are two-to-three times higher among Natives than the non-Native population.[1]  Per capita income of Alaska Natives is about half that of non-Natives.[2]  Based on my own experience, I believe that these statistics probably understate conditions in Southeast Alaska, especially in rural

---

[1]   G.McDiarmid, et al., "Expanding Job Opportunities for Alaska Natives" (Institute of Social and Economic Research 1998), available on line at www.iser.usa.alaska.edu/publications/client/afnjobs/afnjobs.htm.

[2]   According to the Alaska Federation of Natives in an on line publication at www.nativefederation.org/ance/purpose.php.

areas like Kake, hard hit by recent declines in timber and fishing related jobs. Many of the jobs that are available to area Natives are seasonal, low paying, and do not provide benefits.

21. Through its Memorandum of Understanding with BBC, Coeur and its contractors are committed to and are achieving meaningful hiring goals for Native employees. For a number of years, for example, Coeur has been assisting in efforts to train Alaska Natives and Alaska residents for full time, high paying jobs in the mining industry. Currently the BBCHRDC – which receives approximately 60% of its funds from Coeur – operates a training program in cooperation with the University of Alaska Southeast, Central Council of Tlingit and Haida Indian Tribes of Alaska, Alaska Department of Labor, Organized Village of Kake, and various local labor organizations. At the present time, Coeur and its contractors are employing more than 300 workers, more than 70 percent of whom are Alaska residents and many of whom are Alaska Natives referred through the training programs supported by Coeur. When the activity of Native owned or affiliated companies is added to direct employment by Coeur and its principal contractors, I estimated that roughly 75 Alaska Natives have found good paying jobs in connection with Kensington Mine construction. These jobs would be lost with serious economic and social repercussions

9

throughout the Native communities of Southeast Alaska if the Court were to grant the injunction requested by Appellants.

22.  In addition to employment of individual Natives, the Coeur/BBC Memorandum of Understanding commits Coeur to bidding preferences to Consortium members and affiliated entities. Goldbelt, through a wholly owned subsidiary, is providing security at the mine site, employing six Native shareholders and generating roughly $1 million per year in gross revenues. Goldbelt also leases trucks to Coeur for $2,700 per month. These trucks would have be sold to pay bank loans if they cannot be used at the Kensington Mine site.  At present, five Alaska Native owned companies or their affiliates have contracts for work at the Kensington Mine.  A partial listing of some of the benefits of this relationship is set forth in paragraph 12 of the attached Declaration of Duff W. Mitchell. This unprecedented flow of economic benefits to Juneau area Tlingit will come to an abrupt halt if the Court issues the injunction requested by the Appellants.

23.  No other company, to my knowledge, has ever worked so conscientiously as Coeur to involve the Natives of northern Southeast Alaska in the planning of its activities, or been so diligent in its efforts to ensure that Alaska Natives are included in the economic benefits to be derived from its operations.  An injunction pending appeal would cause enormous

economic harm to many individual Natives who are employed or in training to be employed at the Kensington and to the Urban/Village Corporations that form BBC, which are benefiting or hope to benefit from mine-related contracts.

### ISSUANCE OF AN INJUNCTION PENDING APPEAL WOULD HAVE A DEVASTATING IMPACT ON THE CITY AND BOROUGH OF JUNEAU AND SURROUNDING COMMUNITIES

24. The Southeast region generally has been hard hit by the loss of timber and fishing related jobs. The population of the region is declining, especially among the economically significant segment between 25 and 35 years of age. The only hope for slowing and reversing this exodus is the creation of new jobs in the private sector that pay a living wage, such as employment constructing and operating the Kensington Mine.

25. Juneau's population has leveled off, its school population (the key determinant of state funding) is declining. Real (inflation adjusted) per capita and personal income have declined by 5% and 3% respectively since 2001.[3]

26. Juneau has suffered from the transfer of high paying government jobs to other areas of the state and a decline in government job creation. The Juneau economy is periodically staggered by efforts to relocate the State Capital, and for

---

[3] This information was provided to the CBJ Assembly and citizens of Juneau by the Juneau Economic Development Council in a July 2006 report, available on line at www.jedc.org/indicators.htm.

11

years has been trying to diversify its economic and employment base to make up for lost government jobs. Job creation in recent years has been primarily in the tourism and retail sectors, which are typically seasonal, low paying, and frequently without benefits. Coeur has a strong commitment to hiring locally. The Kensington would be the second largest private employer in the region, and one of the few new sources of full time employment at a living wage with benefits.

27. The present economic impact of activity at the Kensington Mine is significant, with more than 300 workers, most of them hired locally. Once in operation, the mine is expected to provide approximately 225 high paying jobs with an estimated annual payroll of $16 million. This activity has a significant multiplier effect throughout the community, creating an additional estimated 500 indirect and induced jobs, as described in the socio-economic impact analysis performed as part of the project EIS.

28. In recent years, Juneau has had to hold the line, and in some instances, to decrease its funding for services and community programs. CBJ has already accounted for the anticipated property and sales taxes from the mine in its budget projections.

29. Were the Court to enjoin further mine related activity pending appeal, Juneau would suffer an immediate rise

in local unemployment and a drop in associated economic activity, with an attendant reduction in tax revenues and rise in demand for services.

30.  In a recent survey provided to the CBJ by the Juneau Economic Development Council 76% of Juneau residents identified the Kensington Mine as important or very important to Juneau's economic future (second only to improved ferry service). All Southeast Alaska businesses surveyed responded that the Mine is important or very important to their economic future.[4]

31.  For all the foregoing reasons, an injunction pending appeal of this Court's decision would result in irreparable harm to Goldbelt, its Tlingit Indian shareholders, the community of Juneau, and all of northern Southeast Alaska. The Court should not disrupt the ongoing economic and employment activity generated by the Kensington Mine, especially since the District Court has ruled that plaintiff's claims are without merit.

DATED this 15th day of August, 2006, at Juneau, Alaska.

*Randy Wanamaker*
Randy Wanamaker

WanamakerDecl 8 15 2006.Goldbelt

---

[4]  The survey is available on line at www.jedc.org/indicators.htm.

13