**Westlaw Attached Printing Summary Report for CROSBY,DAVID 5834265**

| | |
|---|---|
| Date/Time of Request: | Monday, August 21, 2006 16:10:00 Central |
| Client Identifier: | COEUR |
| Database: | DCT |
| Citation Text: | Not Reported in F.Supp. |
| Lines: | 356 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 476414 (S.D.Cal.)
**(Cite as: 1993 WL 476414 (S.D.Cal.))**

**H**
Only the Westlaw citation is currently available.

United States District Court, S.D. California.
COUNTY OF SAN DIEGO, etc., Plaintiff,
v.
Bruce BABBITT, etc., et al., Defendants.
**No. 93-0986-IEG.**

Oct. 15, 1993.

ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
GONZALEZ, District Judge.

*1 The motion for preliminary injunction brought by plaintiff County of San Diego came on regularly for hearing on October 12, 1993, at 10:30 a.m. in Courtroom 11 of the above-entitled court, the Honorable Irma E. Gonzalez presiding. Scott H. Peters, Deputy County Counsel appeared on behalf of the County of San Diego. Lauren N. Soll of the United States Department of Justice appeared on behalf of the following: Bruce Babbitt, Secretary of the United States Department of the Interior; Eddie Frank Brown, Assistant Secretary of the Interior; Woodrow Hopper, Acting Commissioner of Indian Affairs, U.S. Bureau of Indian Affairs; Patrick Hayes, Director, Office of Trust Responsibilities, United States Bureau of Indian Affairs; and Ronald M. Jaeger, United States Bureau of Indian Affairs. David L. Mulliken and William Braniff, of the law firm of Latham & Watkins, and Kevin Gover, of the law firm of Gover, Stetson & Williams, appeared on behalf of the Campo Band of Mission Indians, a sovereign Indian tribal government, and Muht-Hei, Inc., a corporation owned and chartered by the Campo Band of Mission Indians.

The County of San Diego brings this motion for a preliminary injunction to enjoin the defendants from issuing any additional leases or permits, or engaging in any other activities in furtherance of the construction of a proposed non-hazardous waste landfill on the Campo Indian Reservation. The project is supported by the Campo Band of Mission Indians (the "Campo Band") and by the United States Department of the Interior/Bureau of Indian Affairs ("BIA").

Because the federal defendants and the Campo Band defendants raise essentially the same issues in their oppositions, the Court addresses these issues simultaneously.

The County of San Diego claims that the Environmental Impact Statement ("EIS") prepared for the United States Department of the Interior/Bureau of Indian Affairs ("BIA") does not meet the requirements of the National Environmental Protection Act of 1969, 42 U.S.C. § 4321 et seq. ("NEPA"), in that it relies on "faulty science"; it fails to analyze reasonably foreseeable environmental impacts of groundwater contamination from the proposed landfill; it fails to analyze adequately the environmental impacts of transporting waste over long distances; and it avoids the required analysis of alternative sites. The County therefore moves to enjoin further activity towards construction of the landfill pending full adjudication of the issue.

The BIA and the Campo Band, however, contend that the EIS was prepared according to the requirements of NEPA. They point out that it is not the role of this Court to settle a dispute between scientific experts, substituting its own judgment for that of the federal agency. The BIA and the Campo Band further dispute that the EIS inadequately

analyzes the possibility of groundwater contamination, claiming instead that the study thoroughly analyzes the reasonably foreseeable environmental impacts of the proposed plan. The defendants further deny that the EIS fails to analyze the impact of transporting waste or to identify viable alternative sites. The BIA and Campo Band therefore claim that the County has not made the necessary showing for this Court to grant a preliminary injunction.

**\*2** In determining whether or not to grant a preliminary injunction, federal courts generally assess:
  (1) the likelihood of plaintiff's success on the merits;
  (2) the possibility of plaintiff's suffering irreparable injury;
  (3) the extent to which the balance of hardships favors the respective parties; and
  (4) in certain cases, whether the public interest will be advanced by the provision of preliminary relief.

The Ninth Circuit has adopted a two-pronged test. To be successful, the moving party must show either:
  (1) a combination of probable success on the merits and possibility of irreparable injury, or
  (2) that serious questions are raised and the balance of hardships tips in its favor.

*U.S. v. Odessa Union Warehouse Co-Op,* 833 F.2d 172, 174 (9th Cir.1987); *Half Moon Bay Fisherman's Marketing v. Carlucci,* 857 F.2d 505, 507 (9th Cir.1988). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *U.S. v. Odessa Union Warehouse Co-Op,* 833 F.2d at 174. "Thus if the balance of harm tips decidedly toward the plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less decidedly." *Half Moon Bay,* 857 F.2d at 507, citing *Benda v. Grand Lodge of International Association of Machinists,* 584 F.2d 308, 315 (9th Cir.1978), *cert. denied,* 4421 U.S. 937 (1979).

In determining the likelihood of the County's success on the merits, the Court must look first to the standard of review in cases involving NEPA. "NEPA is essentially a procedural statute." *Oregon Environmental Council v. Kunzman,* 817 F.2d 484, 492 (9th Cir.1987). As a result, a district court will only set aside agency action if it was undertaken "without observance of the procedure required by law," Administrative Procedure Act, 5 U.S.C. § 706(2)(D) (1982), or was "arbitrary, capricious, an abuse of discretion, or otherwise not according to law." *Oregon Environmental Council v. Kunzman,* 817 F.2d at 492. *See also* APA, 5 U.S.C. § 706(2)(A) (1982).

Under NEPA, "a federal court may only look to insure that the agency in question has 'considered the environmental consequences' of its action." *Save Lake Washington v. Frank,* 641 F.2d 1330, 1334 (9th Cir.1981) (quoting *Strycker's Bay Neighborhood Council v. Karlen,* 444 U.S. 223, 227 (1980)). NEPA does not require an agency to raise environmental concerns over other appropriate considerations. *Id.* The agency, after consideration of the EIS, may still decide that other values outweigh the environmental costs. *Stryckers Bay,* 444 U.S. at 227-228; *Kleppe v. Sierra Club,* 427 U.S. 390, 410 (1976). NEPA itself does not mandate particular results, but simply prescribes the necessary process. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 346 (1989).

**\*3** Accordingly, "[t]he reviewing court may not "flyspeck" an EIS, *Northwest Indian Cemetery Protective Association v. Peterson,* 795 F.2d 688, 695 (9th Cir.1986), or "substitute its judgment for that of the agency concerning the wisdom or prudence of a proposed action." *California v. Block,* 690 F.2d 753, 761 (9th Cir.1982). "Instead, the reviewing court must follow a 'rule of reason' and determine whether the EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Id.* This review requires the district court to make a "pragmatic judgment whether the EIS's form, content and preparation foster both informed decision-making and informed public participation." *Id.* If the agency has taken a "hard look" at a decision's environmental consequences, the decision must not be disturbed. *Kleppe v. Sierra Club,* 427 U.S. at 410, n. 21.

In evaluating the issue of compliance with NEPA, then, this Court must consider whether the procedures required by NEPA were followed, whether the EIS is reasonably thorough, and whether the BIA's action was "arbitrary and capricious."

The County's argument that a preliminary injunction should issue in this case is not convincing. First, it does not appear likely that the County will succeed on the merits, as the BIA's action seems to have adequately considered the EIS, which appears reasonably thorough. Second, the County has failed to show a possibility of irreparable injury. Third, the balance of hardships tips in the Tribe's favor. Finally, the public interest seems best served by permitting the Campo Band to proceed with the project.

The County, in criticizing the BIA's actions and the EIS, claims that the EIS fails to fully consider the environmental consequences of its action. However, the BIA appears to have observed the procedures required by law concerning the environmental consequences of its action. It has issued a lengthy and detailed Environmental Impact Statement, which complies with NEPA's requirements of a fairly detailed analysis of environmental effects and alternatives. [FN1]

The County's greatest concern, the potential for the landfill to contaminate the groundwater, appears to have been a particular concern of the BIA as well, and the measures designed to prevent groundwater contamination are discussed

in full in the EIS. The landfill's containment system, consisting of redundant liners to isolate the waste from the groundwater supply, as described in the EIS, is "well in excess of the federal and California regulatory requirements for Class III [non-hazardous waste] landfills." EIS at S-3. In fact, the Campo Environmental Protection Agency ("CEPA"), which is a federally authorized tribal agency set up to monitor the health, safety and environment of the Campo Indians, has considerably stricter safety requirements than federal regulations require. CEPA's solid waste management regulations require redundant primary and secondary liner systems identical to that required by federal regulations for a Class I hazardous waste landfill. EIS at S-3. The risk of failure of the containment system within 150 years, according to the EIS, is 3 percent, compared with a 30 percent possibility of failure for a landfill which satisfies federal design criteria. Thus the proposed design basis is more than 20 times less likely to fail in 150 years than a landfill designed in accordance with the federal requirements. EIS at S-6. It appears, then, that the experts evaluating the proposed project paid close attention to the possibility of failure and have taken reasonable precautions. Certainly the BIA's action to proceed with the project following this evaluation is not "arbitrary and capricious."

*4 The County has presented a lengthy declaration from Dr. David Huntley, a UCSD professor of Geological Sciences, who disagrees in many areas with the conclusions of the technical experts retained by the BIA. While Dr. Huntley may be an expert in his field, it is not the role of the district court to resolve a battle between scientific experts. "[A] Court is not required to decide whether an EIS is based on the best scientific methodology available ... [or] to resolve disagreements among various scientists as to methodology." *Inland Empire Public Lands Council v. Schultze,* 992 F.2d 977, 981 (9th Cir.1993). *See also Havasupai Tribe v. Robertson,* 943 F.2d 32, 34 (9th Cir.1991).

The County also faults the EIS for failing to indicate the precise mitigating steps which would be taken in the event of failure of the landfill's liner system. However, while NEPA requires that mitigation be discussed in order to guarantee that the agency has taken a "hard look" at the environmental consequences of proposed federal action, "[t]here is a fundamental distinction ... between a requirement that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated, on the one hand, and a substantive requirement that a complete mitigation plan be actually formulated and adopted, on the other." *Robertson v. Methow,* 490 U.S. at 352. "[I]t would be inconsistent with NEPA's reliance on procedural mechanisms--as opposed to substantive, result-based standards--to demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act." *Robertson,* 490 U.S. at 353, citing *Baltimore Gas & Electric Co.,* 462 U.S. 87, 100 (1983).

The EIS does consider the possibility of liner failure and water contamination. Accordingly, the Record of Decision ("ROD") requires the landfill operator to implement an approved groundwater monitoring system. In addition, the EIS identifies six different possible responses to groundwater contamination. These include, among others, elimination of the source of leachate and repair of the liner system, deepening wells and replacement of pumping systems, and replacement of the water supply with water from off-site sources. EIS at 4-25. Thus it would not be "arbitrary and capricious" for the BIA to conclude that mitigation measures and responses to liner failure had been, and would be, adequately analyzed before the project would proceed.

One of the County's additional concerns is whether the project will be monitorable to permit the earliest possible detection of groundwater contamination. As the EIS and ROD point out, the operator of the landfill is required to design, develop, and maintain a groundwater monitoring program that is consistent with federal and tribal regulations. To assure sufficient site monitorability, the landfill has been proposed with a five-tiered overlapping protection and monitoring system that would isolate waste from the environment, provide early detection of any releases from the liner system, and evaluate potential changes in groundwater quality. EIS at 4-21 to 4-25. The ROD is conditioned upon the completion, review and approval of the groundwater monitoring plan. ROD at 10, 12, 17-19, 34, 38; EIS at 1-7, 1-8, 4-21. Thus the EIS and ROD indicate that the agency has seriously examined the question of site monitorability and taken measures to ensure that the project and groundwater will be monitored.

*5 The County claims that the EIS also fails to adequately consider the impact of hauling garbage over potentially long distances to the landfill site. However, the EIS does address the issue of transportation, and analyzes the possibility of transporting garbage both by rail and by truck. By rail, the project would only require one additional round trip per day on a lightly used rail line, causing, according to the EIS, "no significant adverse environmental impacts." EIS at 4-86. The EIS also identifies an alternative hauling method, by truck, and analyzes the effects on traffic volume, access roads, and those roads which will require upgrading. EIS at S-11. These are "significant but mitigable impacts." EIS at S-11, 4-88. Mitigation measures are also addressed. EIS at 4-94. Accordingly, the County's claim that the environmental impact of transporting waste has been insufficiently evaluated is unfounded.

The County further claims that the EIS is defective because it fails to analyze a sufficient range of alternatives, as required by NEPA. However, although the County claims that the experts have considered alternative sites off the reservation, the EIS need only analyze a reasonable range of alternatives. 42 U.S.C. § 4332(2)(C). The range "need not extend beyond those alternatives reasonably related to the purposes of the project." *Trout Unlimited v. Morton,* 509 F.2d 1276, 1286 (cited in *Methow Valley citizens Council v. Regional Forester,* 833 F.2d 810, 816 (9th Cir.1987), *reversed on other grounds, sub nom. Robertson v. Methow Valley Citizens Council,* 490 U.S. 332 (1989).) The standard of review of an agency's compliance with this mandate is the "rule of reason." *Headwaters, Inc. v. Bureau of Land Management,* 914 F.2d 1174, 1180 (9th Cir.1990). This standard requires an agency to "set forth only those

alternatives necessary to permit a reasoned choice." *Id.; see also Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1519-20 (9th Cir.1992).

Here, the purpose of the Project is to provide a significant economic development opportunity for the Campo Band. The Secretary of the Interior and the BIA are responsible for promoting, consistent with federal policy, both self-determination and self-sufficiency among Indian Tribes. The BIA is also charged with implementation of the Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 450K, and the Indian Finance Act, 25 U.S.C. § 1451. These Acts are intended to promote the development of Indian self-determination to enable transition from Federal domination of programs and services for Indians to effective participation by the Indian people in the planning, conduct and administration of those programs and services. 25 U.S.C. § 450a(b). The Indian Finance Act was enacted specifically to "help develop and utilize Indian resources, both physical and human, to a point where the Indians will fully exercise responsibility for the utilization and management of their own resources ...". 25 U.S.C. § 1451. Following these acts and their objectives, the federal defendants reasonably limited the range of alternatives to consideration of sites on the Reservation only. EIS at 1- 10 to 1-13, 2-30 to 2-37. Other alternatives for economic development were also considered and rejected. EIS at 2-35 to 2-37. In short, the federal defendants properly considered and analyzed a reasonable range of alternatives which would meet the purpose of the Project, thus complying with the requirements of NEPA.

\*6 It is noteworthy, too, that Secretary of the Interior, Bruce Babbitt, in approving the Campo Solid Waste Management Project, noted that the Department generally does not encourage proposals for large waste facilities on Indian Reservations designed to handle non-Indian waste. He has therefore promulgated strict guidelines for such projects, requiring that tribal members be fully apprised of the risks of the project before granting approval, that a "first-class regulatory system" be implemented and approved by the Tribe, and that the financial terms of the project protect tribal and federal interests. *See* Statement of Secretary Babbitt, attached to ROD. The Secretary's approval clearly indicates that this project meets those requirements.

Regarding the necessary showing of irreparable injury, the County has not shown a real possibility of irreparable damage. The County claims that serious injury will result by denial of its motion because once construction has begun, the bureaucratic wheels will be in motion and unstoppable. Relying on *Sierra Club v. Marsh*, 872 F.2d 499, 500 (1st Cir.1989), the County claims that once the project begins construction, the agency will be less likely to withdraw approval, should later studies indicate greater environmental hazards. The court in *Marsh* found such bureaucratic inertia a factor to be considered in determining the possibility of irreparable injury.

The County has legitimate concerns that a governmental agency will be less likely to halt a project after construction has begun. However, this assumes that serious questions are raised in the EIS, or that the EIS is sufficiently flawed that proceeding with the project would be dangerous. That does not appear to be the case here. Further, as explained earlier, several additional studies are required before construction can even begin. Finally, the concern that the government will be less likely to withdraw approval of the project after its inception is somewhat lessened here, where the Project's proponents bear the financial risks, and public funds will not be used in construction of the Project. Roberts Decl., ¶ 5. *See also State of North Carolina v. City of Virginia Beach*, 951 F.2d 596, 602 (4th Cir.1991) (denying preliminary injunction concerning construction because a private builder accepted financial risk for loss of project construction costs if project not approved.)

In contrast to the speculative nature of the injury claimed by the County, which assumes that the agency will not respond appropriately to further environmental studies, the potential for harm to the Tribe is concrete and immediate. Delay in the construction of the Project will deprive the Campo Band of much-needed revenue and employment. [FN2] As the Tribe also points out, delay of the project may jeopardize negotiations with potential customers of the landfill. Further, the costs of the project could increase substantially. Roberts Decl., ¶ 7. Such factors are commonly considered when deciding whether to grant an injunction halting construction of a project. See *Half Moon Bay*, 857 F.2d at 513-14; *Environmental Defense Fund, Inc. v. Armstrong*, 352 F.Supp. 50, 59 N.D.Cal.1972), *aff'd* 497 F.2d 814 (9th Cir.1973).

\*7 A Preliminary Injunction also does not appear to be in the public interest. As the EIS appears to be reasonably thorough and pursuant to NEPA's requirements, the public interest will not be served by halting construction. Rather, halting construction would harm the public interest in Indian sovereignty and economic security. In addition, there is a public benefit to increasing landfill capacity, as well as providing a competitive alternative to the County's waste management system. If the required further studies indicate that the project poses serious environmental risks, the BIA and the Campo Band may still halt the Project, as the Court assumes they would do if the landfill threatened the tribe's water supply.

Therefore, as the County has failed to show a combination of probable success on the merits and possibility of irreparable injury, or that serious questions are raised and the balance of hardships tips in its favor, plaintiff's motion for a preliminary injunction is DENIED.

IT IS SO ORDERED.

FN1. For "major Federal actions significantly affecting the quality of the human environment," NEPA requires, in part, a statement which explains

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of [the] environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented. 42 U.S.C. § 4332(c).

FN2. The Court has reached this determination following in camera review of the sublease agreement between Muht-Hei, Inc. and Mid-American Waste Systems, Inc., the proposed developer and operator of the landfill.

Not Reported in F.Supp., 1993 WL 476414 (S.D.Cal.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.