Demian A. Schane
Thomas S. Waldo
EARTHJUSTICE
325 Fourth Street
Juneau, Alaska 99801
Ph: 907-586-2751
Fax: 907-463-5891
Email: dschane@earthjustice.org

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SOUTHEAST ALASKA CONSERVATION COUNCIL, SIERRA CLUB, and LYNN CANAL CONSERVATION,<br><br>    Plaintiffs,<br><br>    v.<br><br>UNITED STATES ARMY CORPS OF ENGINEERS; COLONEL TIMOTHY J. GALLAGHER, in his official capacity as District Engineer; LARRY L. REEDER, in his official capacity as Chief of the Regulatory Branch; DOMINIC IZZO, in his official capacity as Principal Deputy Assistant Secretary of the Army (Civil Works); and UNITED STATES FOREST SERVICE,<br><br>    Defendants,<br><br>    and<br><br>COEUR ALASKA, INC., GOLDBELT, INC., and the STATE OF ALASKA,<br><br>Intervenor-Defendants. | Case No. J05-0012 CV (JKS) |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION
FOR INJUNCTION PENDING APPEAL**

*SEACC v. U.S. Army Corps of Eng'rs*
J05-0012 CV (JKS)

In this Court's order denying Plaintiffs' motion to expedite consideration of their motion for an injunction pending appeal, the Court directed that "the question that will occupy the parties' attention in their briefing" is whether "reasonable jurists" could differ with this Court's conclusion that Congress intended for a section 404 permit to govern here.  Order of August 10, 2006 at 2 (Docket No. 132).  Plaintiffs submit this reply in light of this direction and the fact that the parties have previously briefed completely the merits of this case.

Coeur Alaska is presently in the process of pumping water out of Lower Slate Lake and has begun construction of a 38-foot high dam at the lake's outfall.  If Plaintiffs ultimately prevail on the merits, this dam will stand above the lake as a permanent eyesore and disruption of the Slate Creek watershed.  Injunctive relief is therefore needed now to prevent irreparable harm.

## ARGUMENT

I.  REASONABLE JURISTS COULD DIFFER WITH THIS COURT'S DECISION AS TO THE APPLICABLITY OF SECTION 402 VERSUS SECTION 404 OF THE CLEAN WATER ACT.

Sections 301(a), 301(e), and 306(e) require all discharges to comply with any applicable effluent limitations or performance standards.  33 U.S.C. §§ 1311(a) & (e), 1316(e).  Of particular importance here is section 306(e)'s mandate that "it shall be unlawful for any owner or operator of any new source to operate such source in violation of any standard of performance applicable to such source."  33 U.S.C. § 1316(e) (emphasis added).  There is no dispute that the Kensington mill is a froth-flotation gold mill and therefore subject to EPA's 1982 standard of performance for those types of mills.  That standard is a zero-discharge standard, prohibiting these mills from discharging any process wastewater into waters of the United States.  *See* 40

C.F.R. § 104.440(b)(1) ("there shall be no discharge of process wastewater to navigable waters from mills that use the froth-flotation process").[1]  Section 306(e) thus precludes the Corps of Engineers (Corps) from issuing a "fill material" permit for the wastewater discharges the Kensington mill.  There is no exception to that requirement, even if the pollutants also satisfy the definition of "fill material."

Until the Corps issued the Kensington mine "fill material permit," it had never issued a section 404 permit for wastewater discharges from a froth-flotation mill.  That is because the agencies do not consider pollutants for which EPA has promulgated effluent limitations or performance standards to constitute "fill material."  This is demonstrated by the agencies' expressed intent at the time of the 2002 rulemaking, their 1986 Memorandum of Agreement, and the Fourth Circuit's decision in *Kentuckians for the Commonwealth v. Rivenburgh*, 317 F.3d 425, 445, 448 (4th Cir. 2003).  *See* Pls.' Opening Br. at 22-24, 32 (Docket No. 41).  Indeed, when EPA and the Corps enacted the 2002 definitions of "fill material" and "discharge of fill material," they expressly discussed the situation here–where pollutants (the mill wastewater discharges in this case) are covered both by EPA's standards and the agencies' new definition of "fill material"—and they explained that EPA would continue to regulate the discharges of those

---

[1] In its Decision of August 4, 2006, this Court stated that "Plaintiffs do not specify which standard of performance is violated . . . ."  Order of 08/04/2006 at 9 (Docket No. 117).  It is the standard of performance contained in 40 C.F.R. § 440.104(b)(1) with which section 306(e) requires compliance.  Defendants do not dispute that this standard applies to froth-flotation gold mills, like the one at the Kensington mine.  They simply ignore the problem here, namely, that both the standard of performance and the definition of "fill material" cover the process wastewater discharges from the Kensington mill.  Notwithstanding the agencies' clear statements that, in situations such as these, EPA would continue to apply the standards of performance through the section 402 permitting process, Defendants maintain that standards of performance do not apply to discharges of "fill material."  *See* Coeur Opp. at 12.

pollutants under section 402 of the Act, ensuring compliance with the applicable effluent limitations and standards of performance as required by sections 301(a), 301(e), and 306(e). *See id*. at 24.

Defendants rely on the definition of "discharge of fill material" and statements in the preamble to the 2002 rulemaking concerning the scope of that definition. Fed. Opp. at 8; Coeur Opp. at 14. The definition of "discharge of fill material," however, does not apply here. For a discharge to satisfy this definition, the pollutants must obviously first satisfy the definition of "fill material." As noted above, where there are effluent limitations and standards of performance for a particular pollutant, such as the 1982 standard of performance for process wastewater from froth-flotation gold mills, that pollutant is not "fill material."

The statements in the preamble relating to the agencies' definition of "discharge of fill material" also do help Defendants. *See* Coeur Opp. at 14 ("any mining-related material that has the effect of fill when discharged will be regulated as 'fill material'") (quoting 67 Fed. Reg. 31,129, 31,135 (May 9, 2002)). These statements relate only to the definition of "discharge of fill material" and do not show that the agencies intended to regulate pollutants for which there are effluent limits or standards as "fill material." When the statements are read in context of the entire preamble, it is clear that the agencies intended to exclude from the threshold definition of "fill material" all pollutants governed by effluent limitations and performance standards. *See* Pl. Opening Br. at 39 (Docket No. 41); Pl. Reply Br. at 15 (Docket No. 94). Otherwise, the agencies would have made directly contradictory statements within the preamble, rendering the rulemaking arbitrary.

The Corps' decision to issue the Kensington permit is not entitled to any deference under *Chevron, U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837 (1984). First, *Chevron*

deference does not apply where, as here, the Clean Water Act clearly states that all discharges must comply with applicable performance standards. *Chevron*, 467 U.S. at 842-43 ("the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress").

Second, even if there were ambiguity, *Chevron* does not direct courts to give substantial deference to all agency actions. Agency actions such as the issuance of individual permits for particular projects, like the Kensington mine permit challenged here, "are entitled not to deference, but to a lesser 'respect' based on the persuasiveness of the agency decision." *The Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1067 (9th Cir. 2003) (*en banc*), *amended by* 360 F.3d 1374 (9th Cir. 2004).[2] The Corps' reasoning for its decision to issue the 404 permit to Kensington is unpersuasive because it directly contradicts what the agencies said in the actual rulemaking. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (court will not defer to agency interpretation that contradicts agency's intent at the time it promulgated regulation).

For these reasons, reasonable jurists could conclude that the Clean Water Act and agency regulations preclude the issuance of a section 404 permit for discharges of process wastewater from the Kensington mill.

II.   IRREPARABLE HARM IS OCCURRING NOW.

Coeur Alaska admits that it is currently lowering the water level of Lower Slate Lake and has begun construction of a 38-foot high dam. Coeur Opp. at 7. If Plaintiffs ultimately prevail

---

[2] By contrast, the agencies' interpretation set forth in the Federal Register preamble for the new "fill material" definition, in which the agencies stated that they would continue to require compliance with performance standards in circumstances like this case, is entitled to substantial deference, because it was adopted through notice-and-comment rulemaking. *See Chevron*, 467 U.S. at 843-44.

on the merits, the dam will tower above the lake as a scar in the Tongass National Forest, disrupting the natural water flows of the Slate Creek watershed. These activities are causing substantial and irreparable harm, *i.e.*, "permanent or at least of long duration," to the environment and to Plaintiffs' members. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987). Injunctive relief is therefore needed now.

Defendants ignore the current threat of immediate harm from water lowering and dam construction and contend that an injunction should not issue because the disposal of the tailings-laden wastewater will not occur until next year. Coeur Opp. at 15-16; Fed. Opp. at 9. There is, however, no basis for ignoring the current activities. The alteration of the water level and construction of a dam in the Slate Creek watershed are authorized by, and could not occur without, the section 404 permit challenged here.

Coeur Alaska also argues that there will be no harm from the discharges of wastewater until 2009 when the discharges purportedly begin to kill all benthic organisms and fish in the lake.[3] Coeur Opp. at 15-16. Coeur claims that, prior to that time, its discharges will affect only the deep, unproductive zone of the lake and not the productive, vegetated shallow areas. *Id*. Coeur, however, ignores the immediate harm from its activities. It is currently in the process of

---

[3] Coeur Alaska falsely contends the tailings are not toxic. Coeur Opp. at 15. The record clearly shows that the discharges emanating from the tailings pipeline are toxic and expected to kill all aquatic life in the lake. *See* Pl. Ex. 1 at 27, 28, 60 (Docket No. 41) (discharges will have a pH over 10, significantly higher than natural levels and toxic to aquatic life); Pl. Ex. 39 at 10 (Docket No. 41) ("the pH around the discharge pipe will be toxic to the aquatic environment"). Coeur Alaska's contention depends on some theoretical separation of the suspended solid component of the discharge and ignores the actual nature of the effluent entering the lake. That effluent is a mixture of solid and liquid components. Whether the solid or the liquid component is toxic is irrelevant. They both comprise the discharge and, together, will kill all fish in the lake for the decade, or longer, of mining operations.

lowering the lake's water level, thereby destroying the shallow areas that Coeur admits are important fish habitat. *See* Coeur Ex. A at ¶ 6.[4]

Coeur Alaska also makes a self-serving argument that an injunction would cause more environmental harm due to an inadequate diversion pipe and potential erosion and flooding. Coeur Opp. at 18. However, the injunction requested by Plaintiffs prohibits continued diversion of the stream, so the inadequacy of the pipe is not relevant. Plaintiffs do not intend the injunction to prohibit measures needed to restore stream flows and prevent erosion, such as removing the coffer dam. To avoid any possibility of the problems identified by Coeur, Plaintiffs suggest adding the following sentence to the proposed order they submitted with their motion: "Nothing in this injunction shall prohibit measures needed to restore stream flows, stabilize soils, or prevent erosion."

Defendants argue that Coeur Alaska will incur economic losses and that this project will provide economic benefits to the mine workers, the City and Borough of Juneau, and the larger Southeast region. However, the anticipated economic losses and benefits do not constitute "unusual circumstances" warranting the denial of an injunction or outweigh the substantial and irreparable harm from the proposed operations. *See* Pl. Opening Br. at 42-43,45-46 (Docket No. 41).

---

[4] Defendants argue that, since Coeur Alaska must reclaim the site, the overall impact to the lake and its watershed is temporary. Fed. Opp. at 9; Coeur Opp. at 16. These arguments do not address the immediate harm at issue. Further, they ignore the fact that the lake will be a dead zone for the 10- to 15-year period that the mine is operating, and that even the reclaimed site will be a severe degradation of the natural landscape. Finally, the record does not even support their contention. *See* Pl. Ex. 15 at 11 (Docket No. 41) (whether the lake will recover "is uncertain, but the weight of the evidence suggests that restoring and 'improving' the lake would take decades, not years.").

Moreover, the same benefits will accrue if Coeur Alaska develops the mine with permits for the disposal of mine tailings that do not violate the Clean Water Act. Nothing prohibits Coeur from designing and obtaining permits for a mine that, like other mines, does not discharge its mill wastewater into waters of the United States. Indeed, several years ago, Coeur Alaska spent substantial sums of money to go through the NEPA process and obtain permits for Kensington based on a different design. In 1998, it received permits to build the mine using a dry land waste disposal method, the standard technology in Alaska and, according to EPA, is the environmentally preferable alternative here. Pl. Ex. 16 at 2 (Docket No. 41). Coeur Alaska, however, abandoned that proposal when the price of gold dropped below $400 per ounce. *See id*. At the time of writing this brief, the price of gold was over $620 per ounce. There is therefore good reason to believe that an alternative method for waste disposal is possible.

Even if there were not, an injunction would still be appropriate. In requiring dischargers to adopt control technologies and insisting upon uniform and national standards for new sources, Congress adopted an approach that inherently excludes entities within each industry that are too economically marginal to comply with the standards. The performance standards are absolute prohibitions. *See E.I. du Pont de Nemours & Co. v. Train,* 430 U.S. 112, 138 (1977); *Riverkeeper, Inc. v. EPA*, 358 F.3d 174, 192 and n.19 (2nd Cir. 2004). If the existing standards are somehow inappropriate, EPA always has the authority to amend them.

Coeur Alaska also argues that Plaintiffs are not entitled to relief because they did not previously seek injunctive relief. Coeur Opp. at 17-18. Coeur Alaska, however, ignores the nature of the proceedings before this Court, the timing of events which triggered the need to seek injunctive relief, Plaintiffs' efforts to avoid that need by expediting the case on the merits, and Plaintiffs' prompt action when the need arose.

The need to seek injunctive relief arose because Coeur Alaska has begun diverting water from Slate Creek and construction of a 38-foot high dam at the base of Lower Slate Lake. Plaintiffs commenced this action on September 12, 2005. At that time, the diversion of water around the lake and the construction of the dam were not expected to occur for another 6 to 10 months. Shortly after Plaintiffs filed the Complaint, the City and Borough of Juneau proposed a mediation, to which the parties agreed to participate. *See* Decl. of Counsel at ¶ 10 (Docket No. 14). On October 20, 2005, the parties engaged in mediation proceedings, but those proceedings did not produce a resolution. *Id*.

On November 1, 2005, less than two weeks later, Plaintiffs moved for a shortened briefing schedule and expedited consideration of their principal claim. *See id*. at ¶ 2. This Court entered an order under which Plaintiffs, at their request, would have filed their opening brief on November 10, 2005, and all briefing would have been completed by December 19, 2005. Order of 11/02/2005 at 1-2 (Docket No. 15). This Court also agreed to decide the claim "at the earliest date permitted by its calendar." *Id*. at 2.

Briefing under that schedule never occurred because the Corps moved for a voluntary remand in order to re-analyze its permit decision. *See* Docket No. 16. On November 14, 2005, this Court remanded the permit to the agency and closed the case. Docket No. 20.

On March 30, 2006, the Corps announced that it had reinstated the original permit without any changes. It amended only its rationale for the decision. On April 4, 2006, less than one week later, Plaintiffs moved to re-open the case and filed an Amended Complaint. Docket Nos. 26 & 27. They also moved for another shortened briefing schedule and expedited consideration of the merits of the case for the stated purpose of avoiding the need, if possible, for preliminary injunction proceedings. *See* Docket No. 29. This Court granted the motion over the

opposition of Coeur Alaska. *See* Docket No. 37. The Court's Order established an expedited briefing schedule under which Plaintiffs filed their opening brief on summary judgment and their request for a permanent injunction on April 7, 2006, only one day after this Court re-opened the case. *See* Docket Nos. 37 & 41. The parties completed the briefing on May 17, 2006, and this Court again agreed to "attempt to render a decision . . . at the earliest date allowed by the Court's calendar." Docket No. 37 at 2.

Plaintiffs had expressly moved for shortened time and expedited consideration of their motion for summary judgment and permanent injunctive relief in order to avoid the need for preliminary injunction proceedings. *See* Decl. of Counsel at ¶ 2 (Docket No. 30). At that time, Plaintiffs made clear that the alteration of the water level of Lower Slate Lake and the construction of the dam would cause irreparable harm and trigger Plaintiffs' need to seek preliminary injunctive relief despite expedited consideration of the merits:

> It is impossible to identify a specific date by which it is critical to have a resolution of this dispute. The dates will depend on weather and on construction decisions by Coeur that are beyond the control of Plaintiffs. While the harm is progressively worse over time, the diversion of spring runoff and construction of the dam are of particular concern to Plaintiffs because of the significant adverse effect they will have on Slate Lake and its surrounding environment. In light of the ongoing harm, and to reduce the likelihood that Plaintiffs will need to seek a preliminary injunction, Plaintiffs request that the Court decide Count I at the earliest date allowed by the Court's calendar.

*Id*. at ¶ 7 (emphasis added). Thus, from the beginning, Plaintiffs made every reasonable effort to move the case to a final decision quickly and, at the same time, protected their interests and preserved their right to seek injunctive relief.

On July 6, 2006, about seven weeks after briefing on the merits had been completed, Plaintiffs learned that Coeur Alaska had begun lowering the water level of the lake and appeared to be preparing to begin construction of the permanent dam. *See* Decl. of Counsel at ¶ 3 (Docket

No. 111). Plaintiffs promptly brought this development to this Court's attention by requesting a status conference on shortened time on July 12, 2006. *See id.* Given that briefing had been completed for nearly two months and this Court had agreed to decide the case at the earliest time permitted by its schedule, seeking a status conference was prudent and appropriate to determine whether it was necessary for Plaintiffs to seek a preliminary injunction in light of the construction and the timing of a final decision from this Court. A motion for preliminary injunction would have been premature when the Court had agreed to expedite its decision for the specific purpose of avoiding those proceedings.

On August 4, 2006, this Court ruled against Plaintiffs on the merits. At that time, Coeur Alaska was continuing to lower the water level of the lake and began, or was close to beginning, construction of the dam. On the same day that this Court issued its final decision, Plaintiffs moved for an injunction pending appeal. *See* Docket No. 119. Plaintiffs moved for expedited consideration of that motion in order to avoid the irreparable harm from these activities. *See* Docket No. 120. This Court denied that motion and, in doing so, "considered whether to grant a temporary injunction akin to a temporary restraining order limited to the time necessary to brief the motion [for an injunction pending appeal] and . . . concluded that no such order should be issued." Order of 08/10/2006 at 1 (Docket No. 132). Five days after Plaintiffs moved this Court for an injunction pending appeal, Plaintiffs filed an emergency motion for an injunction pending appeal in the Ninth Circuit.[5]

---

[5] Coeur Alaska claims that Plaintiffs' motion before the Ninth Circuit violates Rule 8(a) of the Federal Rules of Appellate Procedure. Coeur Opp. at 1 n.1. Coeur Alaska has moved to strike that motion and the briefing of that motion is now before the Ninth Circuit. Plaintiffs have complied fully with Rule 8(a), but it is irrelevant to this Court's decision.

Plaintiffs have thus made every effort to resolve this case expeditiously and, at the same time, made clear that the alteration of the natural flow of the Slate Creek and construction of a permanent dam intended to prepare the lake for the disposal of mine tailings would cause them irreparable harm and require immediate injunctive relief. When Plaintiffs learned these activities were ongoing or imminent, they sought appropriate relief immediately.

Plaintiffs' decision to seek a final decision on an expedited schedule rather than a preliminary injunction was reasonable. Under Rule 65(a)(2) of the Federal Rules of Civil Procedure, a district court may consolidate a motion for preliminary injunction with the proceedings to decide the case on the merits. This approach has the advantages of eliminating delay and avoiding presenting the same evidence twice. 11A Charles Alan Wright *et al.*, Federal Practice & Procedure § 2950 at 234 (2d ed. 1995). In cases like the present one, where review is based on an agency's administrative record with no discovery and no trial, this Court has often elected to consolidate preliminary injunction and merits proceedings under Rule 65(a)(2). Here, this Court stated, twice, that it would render a decision at the earliest date possible on the exact issues that would have been presented in a motion for preliminary injunction. Thus, a motion for preliminary injunction would not likely have changed anything, and may even have delayed a final decision. Plaintiffs made a reasonable choice to seek an expedited final decision and should not be penalized for it.

III.    GOLDBELT'S REQUEST FOR A BOND SHOULD BE DENIED.

The Ninth Circuit has repeatedly made clear that it is inappropriate to require a substantial bond from litigants who seek to enforce environmental laws in order to protect the public interest. *See*, *e.g.*, *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325-26 (9th Cir. 1985), *amended on other grounds*, 775 F.2d 998. The Ninth Circuit

most recently reaffirmed this long-standing rule in *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2004), and there is no reason to depart from it here. A bond order that exposes Plaintiffs to potentially significant financial liability destroys the ability of Plaintiffs and other, similar groups to enforce laws created by Congress. As the Ninth Circuit has explained, "special precautions to ensure access to the courts must be taken where Congress has provided for private enforcement of a statute" such as in the Clean Water Act. *Cal. ex rel. Van De Kamp*, 766 F.2d at 1325-26.

  *Save Our Sonoran* does not support Goldbelt's request for a $1,500,000 bond. In that case, the court of appeals affirmed the imposition of a $50,000 bond because the plaintiff had failed "to show that the imposition of anything other than a nominal bond would constitute an undue hardship." *Id*. at 1126. By contrast, here, the attached affidavits show that anything other than a nominal bond would constitute a substantial and undue hardship on Plaintiffs. *See* Exs. 1-3 (attached). It is therefore appropriate to adhere to the "long- standing precedent" of waiving the bond requirement or imposing only a nominal bond. *Save Our Sonoran*, 408 F.3d at 1126.

## CONCLUSION

  For the foregoing reasons, Plaintiffs request that the Court enter an injunction to prevent further irreparable harm from occurring while the appeal is pending.

Respectfully submitted this 23rd day of August, 2006,

   /s/ Demian A. Schane

Demian A. Schane (ABA# 0403007)
Thomas S. Waldo (ABA# 9007047)
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
Ph: 907-586-2751
Fax: 907-463-5891
Email: dschane@earthjustice.org

Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I, Demian Schane, certify that on August 23, 2006, a true and correct copy of PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR INJUNCTION PENDING APPEAL was served electronically to Mark A. Nitczynski, Richard L. Pomeroy, John C. Berghoff, Jr., David C. Crosby, Ruth Hamilton Heese, Cameron M. Leonard, Amy Gurton Mead, Stephen F. Sorensen, and John W. Hartle.  A courtesy copy was also sent via e-mail to Jim Ustasiewski and Aaron Avila.

   /s/ Demian A. Schane
Demian A. Schane